UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

KRISTINA MIKHAYLOVA,

                Plaintiff,

   -against-

BLOOMINGDALE'S, INC., BLOOMINGDALE'S, INC. d/b/a BLOOMINGDALE'S AND FORTY CARROTS, BLOOMINGDALE'S, LLC, BLOOMINGDALE'S, LLC d/b/a BLOOMINGDALE'S NEW YORK, MACY'S, INC., MACY'S, INC. d/b/a MACY'S OF NEW YORK, UNITED STOREWORKERS RETAIL, WHOLESALE AND DEPARTMENT STORE UNION AFL-CIO LOCAL 3 a/k/a LOCAL 3 UNITED STOREWORKERS RWDSU/UFCW, DENNIS DIAZ, individually, CHRISTOPHER CASTELLANI, individually, RICHARD LAW, individually, and BOBBY BOOKER, individually,

                Defendants.

---

Civil Action No. 1:19-cv-08927-GDB

---

**PLAINTIFF'S COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS AND ADDITIONAL STATEMENT OF FACTS PURSUANT TO RULE 56.1**

      Pursuant to Rule 56.1(a) of the Local Civil Rules of this Court, Plaintiff Kristina Mikhaylova respectfully submits the following Counter-Statement of Undisputed Material Facts ("Counter SUF") in support of her Opposition to Defendants Macy's, Inc., Bloomingdale's LLC (f/k/a Bloomingdale's, Inc.) and Chris Castellani (collectively referred to as "Defendants") motion for summary judgment.

## **INTRODUCTION**

1.  Plaintiff, Kristina Mikhaylova ("Plaintiff"), began working for Bloomingdale's on April 30, 2016 in the Chanel Handbag Department in the Bloomingdale store located at 59th Street as

a commissioned sales associate. Deposition of Kristina Mikhaylova ("Mikhaylova Dep."), pp. 9:21-25; 16:16-21; 17:7-15 (Excerpts from Mikhaylova Dep. are attached as Exhibit A to the accompanying Declaration of Steven Gerber, Esq. ("Gerber Decl.")).

> **Plaintiff's Response: Partially disputed.** Undisputed to the extent that Plaintiff worked for Bloomingdale's in the Chanel Handbag Department at the 59th Street location. Disputed that Plaintiff began on April 30, 2016 as Plaintiff started on May 3, 2016 as seen in the record and request for admissions. Exh. 13, paragraph 2 and 3; Mikh. Decl. paragraph 3-4; Exh 10, bates 754.

2.  Plaintiff's employment was terminated as of June 16, 2017 for various policy violations related to her mailing personal merchandise purchases out of state.  Mikhaylova Dep., pp. 140:12-143:8; Deposition of Richard Law ("Law Dep."), pp. 80:4-23; 86:1-7; 88:4-17; 171:13-23; 150:22-24 (Excerpts from Law Dep. are attached as Exhibit B to the accompanying Gerber Decl.)

> **Plaintiff's Response:** Partially Disputed. Becker testified Plaintiff did not violate any policies. Becker Dep. P. 134:19-135:11.

3.  From the beginning of 2017 until her termination, Denis Diaz was Plaintiff's Direct Supervisor. He reported to Cathy Younis who was the Chanel Brand Director. Younis focused most of her time on the Chanel Ready-to-Wear area but also regularly spent time in the Chanel Handbag area. See accompanying Declaration of Cathy Younis, ("Younis Decl."), ¶¶ 2-3; Mikhaylova Dep., pp. 43:16-19; 45:12-14; 150:19-151:12; Deposition of Cathy Younis ("Younis Dep."), pp. 12:4-13:20; (Excerpts from Younis Dep. are attached as Exhibit C to Gerber Decl.);

Deposition of Denis Diaz ("Diaz Dep."), pp. 7:24; 27:19-24 (Excerpts from Diaz Dep. are attached as Exhibit D to Gerber Decl.)

> **Plaintiff's Response: Partially disputed.** Disputed to the extent that Diaz was Plaintiff's supervisor starting December 2016. Exh. 13, ¶8. Further disputed because Victoria S. was Plaintiff's direct supervisor when she started working for Defendants in 2017 (Plaintiff Dep., pp.44:12-45:8; Mikhay. Decl. ¶6). Undisputed to the rest. extent that Diaz reported to Cathy Younis who was the Chanel Brand Director and that Younis focused most of her time on the Chanel Ready-to-Wear area but also regularly spent time in the Chanel Handbag area.

4. Diaz left Bloomingdale's employ in 2019. Diaz Dep. at pp. 12:6-8; 17:9-14.

> **Plaintiff's Response:** Admitted to the extent that is what Diaz testified to.

5. Richard Law was a Human Resources Manager in the 59th Street Bloomingdale's in 2017. He began working for the Company in June 2016. He resigned from his position in December 2017. Law Dep., pp. 13:4-14:14.

> **Plaintiff's Response:** Admitted and in addition, Law resigned December 17, 2017. Exh. 16 paragraph 4.

**Bloomingdale's Policies**

6. Bloomingdale's (occasionally referred to as the "Company") is an Equal Opportunity Employer and its "EEO & Anti-Harassment Policy," set forth in Bloomingdale's Code of Conduct, strictly prohibits workplace discrimination. This policy is also in the employee handbook. Plaintiff received and signed off on the employee handbook and Code of Conduct. See

accompanying Declaration of Courtney Cox, ("Cox Decl."), ¶¶ 5, 10, 17, and Exhibits A-C; Mikhaylova Dep., pp. 39:16-41:16; 193:6-195:9, 211:7-212:2, Exs. L and Q.

> **Plaintiff's Response:** Admitted to the extent that that is Defendants' policy.

7.      The Company policy requires equal treatment of all employees as to job-related qualifications, abilities and performance, regardless of race, ancestry, color, ethnicity, age, religion, sexual orientation, gender, gender identity, gender expression, national origin, physical or mental disability, genetic information, military and veteran status, marital status, medical condition, or any other category protected by law or unrelated to job performance. Cox Decl., ¶¶ 5, 10, Exhibit A.

> **Plaintiff's Response:** Admitted to the extent that that is Defendants' policy.

8.   Discrimination and harassment are viewed as employee misconduct and will lead to discipline up to and including termination. Cox Decl., ¶ 11.

> **Plaintiff's Response:** Admitted to the extent that that is Defendants' policy.

9.   Any employee who believes they have been subjected to or observed discrimination or harassment must report the situation immediately. Cox Decl., ¶ 12.

> **Plaintiff's Response:** Admitted to the extent that that is Defendants' policy.

10.     Bloomingdale's 59th Street location has four avenues for an employee to complain about any workplace issue: the employee's manager or supervisor; Bloomingdale's human resources department; the Union (59th Street employees are members of the Local 3 RWDSU bargaining unit); or the Compliance Connections hotline (a reporting program accessible via a toll-free telephone line and website). Cox Decl., ¶ 13.

> **Plaintiff's Response:** Admitted to the extent that that is Defendants' policy.

11.     Retaliation in any form against an employee who complains of discrimination or harassment is strictly prohibited and will itself be cause for disciplinary action up to and including termination. Cox Decl., ¶ 14.

**Plaintiff's Response:** Disputed.

12.     Bloomingdale's also has a Reasonable Accommodation Policy to provide reasonable accommodations to those who have requested or need an accommodation for a medical condition or a limitation arising from a disability or a pregnancy-related condition to enable them to perform the essential functions of their job or any other job they are qualified to perform, and to enjoy equal access to the benefits and privileges of employment. Cox Decl., ¶¶ 5-6 , Ex. A.

**Plaintiff's Response:** Disputed. Disputed to the extent the cited document Exhibit A does not say reasonable accommodation for pregnancy-related condition. Also defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

13.     Whether to grant an accommodation is decided by a part of the central human resources organization, the Accommodations, Disability, and Leave Management team. Store Managers – including department managers – cannot decide whether to grant an accommodation. After the central group determines an accommodation is appropriate, they then work with the store (normally the department manager) to decide what form the accommodation will take. Cox Decl., ¶ 7; Law Dep., pp. 28:5-29:5.

**Plaintiff's Response:** Disputed. Younis testified that managers such as Diaz decided which accommodations to give for pregnancy related conditions including breaks, time off the floor, etc. Younis Dep. P. 98:22-99:11. Also defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

14.     Bloomingdale's also has several leaves of absence policies. The only one relevant to this case is the Family and Medical Leave Act policy. This policy provides for either a continuous leave or intermittent leave as designated by health care professional submitting the require certification. Cox Decl., ¶¶ 5, 8, Ex. A.

      **Plaintiff's Response:** Partially disputed. Undisputed to the extent that is what is in Cox declaration. Disputed to the extent this is inadmissible draws a conclusion that the FMLA leave was the only relevant leave of absence policy to this case as it is not supported by evidentiary materials. Also defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

15.     The approval for leaves of absence is given by a central a part of the central human resources organization, the Leave of Absence Team. Once that team approves the leave, they notify the store and the appropriate manager of the type of leave approved and its duration. Cox Decl, ¶ 9; Law Dep., p. 27:10-24.

      **Plaintiff's Response:** Disputed. defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

16.     Bloomingdale's handbook and the Company Code of Conduct have specific policies that require employees to comply with all applicable laws. Employees who violate this or other Company policies are subject to discipline up to and including termination. Cox Decl., ¶ 35, Exs. B-C; Law Dep. 168:13-16.

      **Plaintiff's Response:** Disputed. Defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

17.     Bloomingdale's employee disciplinary process in 2017 was called Responsibility Based Performance ("RBP").   One key part of this RBP process was to explain to the employee the shortcomings the employee had exhibited in her work and have the employee acknowledge his or her short-comings and to own their behavior. In this way the employee would be responsible for their ultimate success or failure to succeed. Cox Decl., ¶ 26.

> **Plaintiff's Response: Disputed** as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produce in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Also defendants produced different handbook that plaintiff signed where this was not included. Exh 10, BLM 22-84.

18.     There were different types of write-ups under the RBP process that proceeded separately from each other. An employee could be placed on the process for attendance issues (being tardy or missing days of work); performance issues (the work was not getting done properly); or for conduct (behavioral issues). Cox Decl., ¶ 27.

> **Plaintiff's Response: Disputed** as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produce in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Undisputed to the extent that that is Defendants' policy. Defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

19.     Plaintiff was on one type of the RBP process during her employment because of her attendance. Cox Decl., ¶ 28.

> **Plaintiff's Response: Disputed** as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produce in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Further disputed because Plaintiff did not

have any disciplinary action in her file at the time of her termination. Exh. 10, BLM 1516 to 1535. Defendants produced different handbook that plaintiff signed where this was not included. Exh 10, BLM 22-84.

20.     The RBP process had three written steps. The first step was a Counseling Summary. During the conversation about the Counseling Summary, the issues with the employee would be discussed along with possible ways to resolve the situation. At the end of the meeting, the employee and her supervisor would sign the document. A human resources executive – who assisted in drafting the write up – would either sign the document during the meeting or would sign later if not present for the meeting. Cox, ¶ 29.

> **Plaintiff's Response: Disputed** as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produce in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Undisputed to the extent that that is Defendants' policy. Defendants produced different handbook that plaintiff signed where this was not included. Exh 10, BLM 22-84.

21.     The second RBP step was a Formal Reminder. This was also written and the employee would be given a chance to put in writing on the document any comments she had on the issues being discussed. The same signatures were captured on this Formal Reminder as on the previous document. Cox Decl., ¶ 30.

> **Plaintiff's Response: Disputed** as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produce in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Undisputed to the extent that that is Defendants' policy. Defendants produced different handbook that plaintiff signed where this was not included. Exh 10, BLM 22-84.

8

22.     The final step in the RBP process was called a Decision Making Leave ("DML"). If a DML was being issued, the same people as were present for the Formal Reminder meeting would meet to discuss the DML write-up and sign the DML document as the meeting concluded. After the DML meeting, the employee was given the next scheduled shift off with pay. This paid shift off was for the employee to think about her issues and decide if she wanted to stay employed by the Company and was able to commit to resolving her issues, or if the employee wanted to resign from employment by the Company. Cox Decl., ¶ 31.

> **Plaintiff's Response: Disputed** as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produce in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Undisputed to the extent that that is Defendants' policy. Defendants produced different handbook that plaintiff signed where this was not included. Exh 10, BLM 22-84.

**Plaintiff's Employment At Bloomingdale's.**

23.     During her employment, Plaintiff received both a formal Counseling and a Formal Reminder for her attendance. The Counseling Summary was dated February 21, 2017 and listed the numerous times that Plaintiff was tardy. The dates of her tardiness that were listed are as follows: January 6, 2017; January 7, 2017; January 8, 2017; January 17, 2017; January 18, 2017; January 28, 2017; and January 31, 2017. Employees are only allowed two lates per month before discipline is administered. Cox Decl., ¶ 32, Ex. I; Mikhaylova Dep., pp. 157:4-159:23, Ex. C.

> **Plaintiff's Response:** Undisputed.

24.     Plaintiff's attendance did not improve over the next few months and she was given a Formal Reminder on April 19, 2017. The dates Plaintiff was tardy related to this write up were: March 9, March 18, and March 22. Cox Decl., ¶ 33, Ex. J.

**Plaintiff's Response:** Undisputed.

25.     On the Formal Reminder, in the section where the employee is allowed to state their comments, Plaintiff referenced the need to check bus and subway schedules to make sure they were running properly and thus, allow her to timely report to work. Specifically, Plaintiff wrote the following on her Formal Reminder:

> I will leave 40 minutes earlier then [sic] what I usually leave.  I will check subway delays earlier on to know if I should take the subway or the bus.

Cox Decl, ¶ 32, Ex. J; Mikhaylova Dep., pp. 159:24-160:25; 164:6-18, Ex. D.

**Plaintiff's Response:** Undisputed.

26.     Plaintiff told her supervisor, Deniz Diaz, about her pregnancy sometime after this meeting. Diaz congratulated Plaintiff and directed her to human resources for any assistance she might need including a leave and/or accommodation. That was the only conversation Diaz had with Plaintiff related to her pregnancy. Diaz Dep., pp. 64:7-65;19; 69:1-13; 110:1-113:10; Mikhaylova Dep., p. 88:1-90:25.

**Plaintiff's Response:** Admitted

27.     Plaintiff never mentioned her morning sickness to Diaz. Diaz Dep., p. 69:6-13.

**Plaintiff's Response:** Disputed,  Plaintiff told Diaz she had morning sickness. Exh 1, Mikhay Dep. P.  88:5-94:8.

28.     Diaz informed Younis that Plaintiff was pregnant, but Plaintiff never told Younis directly that she was pregnant. Younis Decl., ¶ 16; Diaz Dep., pp. 67;9-68:4; Younis Dep., pp. 96:15-98:4.

**Plaintiff's Response:** Partially Disputed. Undisputed she never told her but Plaintiff testified seeing Younis daily on her shift while visibly pregnant. Exh 1 Dep p. 150:24-151:8.

29.     Diaz and Younis let human resources know that Plaintiff was pregnant and would be coming to discuss that issue with them. Diaz Dep., pp. 67:9-68:4.

       **Plaintiff's Response:** Undisputed.

30.     Diaz had no further conversations with anyone about Plaintiff being pregnant. Diaz Dep., p. 73:4-21.

       **Plaintiff's Response:** Undisputed to the extent that that is what Diaz testified to.

31.     After her Formal Warning on April 21, 2017, Plaintiff had 11 more instances of being tardy and one absence (including the two shifts immediately after the April 21 meeting) but she received no further write ups or discipline, and specifically did not escalate to a Decision Making Leave. All of the additional instances of tardiness and the absence occurred before she was formally approved for Intermittent Leave. Cox Decl., ¶ 34 Ex. K; Mikhaylova Dep., p. 100:5-101:25.

       **Plaintiff's Response:** Disputed. Disputed as to the assertion that Plaintiff was approved for intermittent leave because Plaintiff was not approved for intermittent leave. Defendants sent Plaintiff a letter on June 9, 2017 (while she was still on unpaid suspension) asking for more information to be submitted  for her to to her by June 24, 2017. Mendoza Decl. Exh. 10, bates BLM000804-806. Cox was not employed at the time and  did not have any involvement or knowledge in Plaintiff's leave approval. Cox Decl. ¶

32.     Plaintiff gave birth to her child on November 23, 2017. Mikhaylova Dep., 36:19-22.

       **Plaintiff's Response:** Undisputed.

**Leaves of Absence/Reasonable Accommodation**

33.     Plaintiff never told Diaz she needed an accommodation, nor was he aware that she had requested intermittent leave. Diaz Dep., pp. 72:19-21; 106:4-9.

     **Plaintiff's Response: <u>Disputed and</u>**  in that Plaintiff testified she told Diaz that the reason she was coming in late was because of morning sickeness related ot her pregnanc and Diaz told her that she needed to go to HR and once they accommodate her they will remove the formal reminder for tardiness from her file. Exh.1, Mikh dep. P. 92:20-93:4.

34.     Plaintiff never asked Cathy Younis for an accommodation nor did she ever tell Younis that she was not being accommodated by Diaz. Younis Decl., ¶ 17.

     **Plaintiff's Response:** Pasrtially **<u>Disputed</u>**. Disputed because Plaintiff testified she was not allowed to sit down or lean on the counter and Younis told her to stand up and not lean when Plaintiff was not feeling well. Exh 1, Mikhay Dep. P. 99:7-17.

35.     Plaintiff requested intermittent in mid-May but did not submit the required doctor's certification until the company made a second request on June 1, 2017. She then submitted the certification on June 2, 2017. Her intermittent leave was approved on June 9, 2017. Cox Decl., ¶¶ 20-24, Exs. E-H; Mikhaylova Dep., pp. 165:19-169:12, Exs, E-H.

     **Plaintiff's Response: Disputed t**o the extent that Plaintiff testified her doctor provided the certification while Plaintiff was at the doctor's office but could not recall the date that it was sent. Ex 1, Mikhay dep. P. 97:15-98:4**.** Disputed to the extent that Defendants assert Plaintiff requested intermittent leave. Disputed to the assertion that her leave was approved as Defendants letter issued on June 9, 2017 states that in order for plaintiff to receive approval she needed to submit more information by June 24, 2017 or face denial of her leave. Exh. 10, bates 792-794, 797, 804-806. Also defendants documents states as of June 8, 2017 Plaintiff's leave request was cancelled. Exh 10 bates BLM 754.

36.    The medical documentation submitted by Plaintiff for her leave of absence did not request any specific accommodation other than to note that approximately one time per week, Plaintiff might need a couple of hours to deal with her nausea and vomiting and would need time off for medical appointments. There was no other information in the certification related to the need for any other accommodation. Cox Decl., Ex. G; Mikhaylova Dep., pp. 167:18-168:13, Ex. G.

**Plaintiff's Response: Disputed.** Plaintiff testified the paperwork said she needed to be allowed to come in an hour late and accommodate with extra breaks.Exh 1, Mikhay Dep p. 97:5-16. to the extent Plaintiff's medical certification included Plaintiff needed to be seen every 4 weeks until 28 weeks and every 2 weeks until 36 weeks then every week until delivery. Exh. 10 bates BLM 792-794. Further disputed as Plaintiff requested 5 times per 1 week 6 months 2 hours per episode. Exh. 10, BLM 788. Further the medical documentation states Plaintiff had morning sickness, "vomiting and feeling dizzy."Exh. 10 BLM 768.

37.    The medical certification stated that her medical condition requiring intermittent leave - her pregnancy - began on or about March 15, 2017. This is consistent with the medical records produced by the Plaintiff which state that her last menstruation cycle began on February 15, 2017. Cox Decl., Ex. G; Mikhaylova Document Production, bates numbers 2, 21 (documents produced by Mikhaylova in discovery are attached to Gerber Decl. as Ex. E).

**Plaintiff's Response: Partially disputed. Disputed** to the extent that plaintiff's condition requiring intermittent leave was nausea, vomiting, dizziness. Exh. 10 BLM 768; Exh 1, Mikhay Dep p. 93:11-97:5-16. Undisputed to the rest.

38.     Plaintiff alleges she became pregnant sometime in February 2017. Mikhaylova Dep., p. 78:13-15.

   **Plaintiff's Response: Undisputed.**

39.     Younis had numerous employees during her career with Bloomingdale's receive accommodations related to medical or pregnancy issues. Younis Decl., ¶ 16; Younis Dep., 98:22-99:22; 104:21-105:4; 105:22-106:1.

   **Plaintiff's Response:** Undisputed that is what Younis testified.

40.     Plaintiff says the accommodation she wanted was to be able to come in late and not be penalized for it. She also wanted to be able to sit down if she needed to. Mikhaylova Dep., pp. 91:19-94:8.

   **Plaintiff's Response: Partially Disputed for omission of pLaintiffs testimony.**

   Plaintiff testified she wanted to lean on the counter. Exh 1, Mikhay Dep. P. 99:7-17.

41.     She asked for intermittent leave as an accommodation which was granted. Mikhaylova Dep., pp. 94:14-96:13.

   **Plaintiff's Response: Disputed.** Plaintiff did not ask for intermittent leave as an

   accommodation but Plaintiff told HR that she needed an accommodation and Defendants

   gave Plaintiff no other option except to complete the paperwork for intermittent leave. Exh

   1, Mikh dep. P. 90:19-25. Further intermittent leave was not granted as Defendants were

   still asking Plaintiff for medical information on June 9, 2017 for Plaintiff to receive

   approval for intermittent leave. Exh 10, bates BLM 804-806 and Plaintiff's doctor was

   submitting this medical information on June 14, 2017. Exh 10, bates BLM 792-794.

   Plaintiff requested an accommodation to sit down or leave her area if she became sick from

   her pregnancy. Exh. 1, Mikh dep. P. 91:10-92:9.

14

42.     Plaintiff alleges that she was not allowed to sit or lean on the floor which she believes her doctor authorized. She admits breaks were to be taken in the break room. Mikhaylova Dep., pp. 100:24-102:23.

      **Plaintiff's Response:** Undisputed.

### Hostile Work Environment

43.     Plaintiff alleges that she was harassed by an Asset Protection Manager named Bobby Booker. Mikhaylova Dep., pp. 47:9-48:7.

      **Plaintiff's Response: Partially disputed** Undisputed.

44.     Despite seeing Younis on a daily basis, and having numerous contacts with her, Mikhaylova never told Younis that she was being harassed by Booker or anyone else. Younis Decl., ¶ 18; Mikhaylova Dep., p. 48:12-22; 150:19-151:12.

      **Plaintiff's Response: Undisputed.**

45.     While Plaintiff alleges she told Diaz she was uncomfortable with Booker, she does not allege that she told him anything else; Diaz denies that Mikhaylova or anyone else who reported to him ever complained of sex harassment. Mikhaylova Dep., pp. 56:16-57:10; Diaz Dep., pp. 62:1-24; 94:24-95:17; 109:3-14.

      **Plaintiff's Response: Partially disputed** for mischaracterization of plaintiffs testimony. Plaintiff testified to telling Diaz several times she was uncomfortable by Booker and the materials cited for this assertion do not support Plaintiff testified she did not tell Diaz anything else. Ex 1, Mikhay Dep p. 57:3-59:13.

46.     Richard Law stated that he had not received any allegations of harassment from Plaintiff. Law Dep., p. 152:9-19.

      **Plaintiff's Response:**

47.     Plaintiff alleged the issues with Bobby Booker began during the time that Diaz was her supervisor. Mikhaylova Dep., pp. 47:9-48:7.

**Plaintiff's Response: undisputed**

48.     Plaintiff's complaints as to Booker were that he was "looking very deeply" in her eyes and talking to her in a flirtatious manner. She described the flirtatiousness as his body language. The only time he touched her was to allegedly hug her when he first greeted her. He hugged her both from the side and the front. Mikhaylova Dep., 49:24-51:14.

**Plaintiff's Response:Undisputed.**

49.     Plaintiff admits that he never touched her butt or other improper parts of her anatomy but she states that he stared at her butt and chest. Mikhaylova Dep., pp. 5:1-56:9.

**Plaintiff's Response: undisputed.**

50.     Plaintiff never reported this conduct to anyone. Mikhaylova Dep., p. 56: 7-15.

**Plaintiff's Response:** Admitted.

51.     Plaintiff did state that while she did not report the specific conduct, she did tell Denis Diaz that Booker made her uncomfortable. She said nothing else to any member of management. Mikhaylova Dep., pp. 56:16-57:16; 59:5-9.

**Plaintiff's Response: Undisputed.**

52.     Plaintiff never spoke to Human Resources about Booker's alleged conduct. Mikhaylova Dep., p. 58:5-13.

**Plaintiff's Response: undisputed.**

53.     The only comments that Plaintiff could recall is that Booker allegedly asked her out. When she said she was with someone, he said he was married. When she told him she was not interested, he left the department. Plaintiff believes that because Booker allegedly left the

department that he was angry. She had no other facts to support that conclusion. Mikhaylova Dep., pp. 59:10-61:13.

**Plaintiff's Response: Undisputed.**

54.    Mikhaylova alleged that Booker made comments to her of a sexual nature but she could not recall any of them. Mikhaylova Dep., pp. 139:14-140:11.

**Plaintiff's Response: Disputed** mischaracterizarion of testimony cited and omission. Plaintiff testified to not recalling the conversation but previously testified to the comments he made in number 53 above. Further Plaintiff testified Booker said oh your butt looks really good. Exh 1 Mikhay Dep p. 151:25-152:7.

55.    Later, when prompted by the content of the Amended Complaint, Plaintiff recalled that Booker told her her butt looked good and she thanked him. She recalled no other comments. Mikhaylova Dep., pp. 151:21-152:153:14.

**Plaintiff's Response: Undisputed.**

56.    Plaintiff also stated that other AP employees would come over – at Booker's request – to look at her butt. No one told her that Booker told others to do this but she believes that is what happened. Mikhaylova Dep., pp. 154:25-156:18.

**Plaintiff's Response: Disputed,** Mercedes Modesto was a female employee in the asset protection department and told Plaintiff what they were saying about her. Mikhay. Decl. ¶ 31.

57.    Mikhaylova had no further facts related to conduct by Booker. Mikhaylova Dep., pp. 138:23-139:13; 150:13-20; 173:5-13.

**Plaintiff's Response: Partially disputed.** Disputed to the extent that plaintiff said that was all she could recall. Exh 1, Mikhay Dep p. 151:13-154;2 and further disputed this assertion is drawing a conclusion.

58.     Denis Diaz does not recall who Bobby Booker was but never saw any inappropriate conduct by anyone of the type described by Plaintiff. Diaz Dep., pp. 61:24-62:24.

**Plaintiff's Response: Undisputed.**

59.     Booker does not specifically recall Plaintiff but denies making sexual advances or comments to anyone at the 59th Street location. Deposition of Bobby Booker ("Booker Dep."), pp. 68:1-10; 70:14-75:2 (Excerpts from Booker Dep. are attached as Exhibit F to Gerber Decl.).

**Plaintiff's Response: Undisputed.**

60.     Booker noted that there are 2000 employees in the 59th Street Store location and 11 Floors. There was no "hanging out" in the Chanel or any other area unless there was something of importance going on in that area related to Asset Protection. Booker Dep., pp. 32:14-19; 50:2-15.

**Plaintiff's Response: Disputed.** Booker testified to socializing with the employees. Booker Dep. P. 48:8-49:23.

61.     Booker stated that he often hugged people with whom he had a friendly relationship and that included men as well as women. He denies ever making comments about any woman's body parts while with Bloomingdale's. Booker Dep., pp. 47:17-48:12.

**Plaintiff's Response: Undisputed.**

62.     Bloomingdale's conduct regular training on sexual harassment. Booker Dep., pp. 23:17-24:21; 53:6-9; Diaz Dep., p. 94:1-18.

**Plaintiff's Response: Disputed.** Booker testified he could not recall training done every year for sexual harassment but did recall he received separate training reporting

sexual harassment or discrimination from one of the HR managers. Booker Dep., p. 24:9-15. Plaintiff also did not recall discrimination and harassment training during her employment. Mikh. Dep. P. 39:7-11. Younis testified to not receiving training when chanel was "owned" not "leased." Younis dep. P. 14:18-15:12.

**Asset Protection Investigations and Plaintiff's Termination**

63.     In 2017, there was an approximately $1 million fraud in the Chanel Handbag department. Fraudsters were compromising charge cards of legitimate customers and using those cards to purchase items that were sent to another address where the fraudster was located. Becker decl., ¶¶ 5-6; Deposition of Christopher Castellani ("Castellani Dep."), pp. 44:20-45:18; 74:20-75:8 (Excerpts from Castellani Dep. are attached as Exhibit G to Gerber Decl.); Deposition of Fred Becker ("Becker Dep."), p. 57:4-17 (Excerpts from Becker Dep. are attached as Exhibit H to Gerber Decl.).

> **Plaintiff's Response: Undisputed** and further supported with Exh. 10, bates 1554-1555, Exh. 6, Becker Dep., Exh. P-2, BLM 1953-1956, BLM 1982-1987,BLM.

64.     Asset Protection conducted training on red flags for fraud and other improper activities that could cause loss to the company. Mikhaylova Dep., pp. 41:17-43:12.

> **Plaintiff's Response: Undisputed** and supported with Exh. 10, bates 1554-1555.

65.     In February 2017, Asset Protection in the 59th Street Location learned through Macy's Credit and Customer Service ("MCCS") employee, Kim Taylor, that Plaintiff had a high amount of frauds on her "send" orders – orders that were made over the phone and mailed to the customers. Plaintiff had rung $67,000 in fraudulent sales over 5 days. Becker decl., ¶ 7, Ex. A.

> **Plaintiff's Response:** Undisputed.

66. MCCS, a division of Macy's, is located in Ohio. Becker Dep., pp. 38:22-39:1; 127:8-14;

**Plaintiff's Response: Undisputed.**

67. In 2017, Chris Castellani was an Asset Protection Manager at the 59th Street location for Internal Investigations. He supervised a team of 4 to 5 investigators who identified and resolved internal fraud. Castellani Dep., pp. 17:18-21; 22:14-24:4.

**Plaintiff's Response: Undisputed.**

68. In investigating the issue received from MCCS, Chris Castellani spoke to Plaintiff and looked to see if she was following the policy and process for handling "send" or phone orders. Castellani Dep., pp. 44:17-47:1; Becker Decl., ¶¶ 8-9, Ex. A; Mikhaylova Dep., pp. 113:5-122:5.

**Plaintiff's Response: Undisputed.**

69. At that time and presently, established customers have the option of having their contact information and charge card information stored in Bloomingdale's electronic customer book – "b-connected".  Becker Decl., ¶ 10; Mikhaylova Dep., p. 106:17-23.

**Plaintiff's Response: Undisputed.**

70. When a customer in b-connected wants to make a purchase by phone, the associate can pull up all of the necessary information from b-connected. Since the consumer added the information to his/her "b-connected" account, it is a safe way to transact a phone order without fear of fraud. Becker Decl., ¶ 11.

**Plaintiff's Response: Undisputed.**

71. If the customer is not in b-connected, the employee would only be able to make a telephone sale through keying in the credit card information of the person on the phone. This is risky as the credit card is not present for the transaction and there is heightened risk of fraud.

Bloomingdale's developed a process called a memo order that was used to validate the credit card was being properly used in a telephone sale. Becker Decl., ¶ 12.

> **Plaintiff's Response: Undisputed.**

72.     In 2017, the memo order process was manual and the employee had to complete a form that had the customer's name, the address to which the merchandise was being shipped, the merchandise ordered, and the credit card account information. The employee would then take the memo order to the Bloomingdale's cash office, where the personnel there would confirm that the name and address on the credit card account matched what was on the "memo" order. The cash office would put a bar code on the memo order form and remove all credit card account information. The employee would then come back to the cash office to get the form and use the bar code to complete the sales transaction. Becker Decl., ¶ 13, Ex. B; Mikhaylova Dep., pp. 107:9-108:10.

> **Plaintiff's Response: Undisputed.**

73.     This process was only able to catch fraud where the card had not been compromised and the mailing address had not been changed. Becker Decl., Ex. ¶ 14, Ex. B.

> **Plaintiff's Response:Undisputed.**

74.     The memo order process is now systemically conducted on the point-of-sale (POS) register and no longer paper/manual. Becker Decl., ¶ 15.

> **Plaintiff's Response:Undisputed.**

75.     When Castellani interviewed Plaintiff on February 4, 2017 about the fraudulent transactions, she stated that she followed the memo order process and they were authorized. Becker Decl., Ex. A., p. 2139-2140.

> **Plaintiff's Response: Undisputed.**

76.     Castellani was able to confirm that Plaintiff had in fact completed memo orders for the sales in question. As there was no evidence of collusion, Bloomingdale's could not take further action and Plaintiff was returned to work. Plaintiff was not reprimanded in any way. Castellani Dep., pp. 44:17-47:1 ; Becker Decl., ¶ 16; Mikhaylova Dep., pp. 113:5-122:5.

**Plaintiff's Response: Partially disputed.** Disputed to the extent this assertion omits Castellani testified Plaintiff had followed the memo order process. Castellani Dep. P.45:20-46:2. Not disputed to the rest.

77.     As there are ways around the memo order process if a card is compromised, Plaintiff was not cleared of wrong doing but there was no proof at that time to take further action. Becker Dep., pp. 133:24-134:18.

**Plaintiff's Response: Disputed.** Castellani testified Plaintiff had followed the memo order process. Castellani Dep. P.45:20-46:2.

78.     Asset Protection received a second notice about Plaintiff from Central Investigations – located in another section of New York City - on June 1, 2017 that Plaintiff had the highest fraud "sends" in all of Macy's and Bloomingdale's for 2017 at that point. For that period, Plaintiff had over $90,000 in fraud for the transactions she rang. The next closest employee to her had $27,000 in fraud transaction. The third employee had $20,000 in fraudulent transactions. The three of them had over 35% of the fraudulent transactions for the entire company.  Becker Decl., ¶ 17, Ex. C; Castellani Dep., pp. 35:9-37:4; 79:15-82:15; and Ex. 4.

**Plaintiff's Response: Pasrtially disputed,** Undisputed that is what it says. Disputed in that Diaz testified Plaintiff was not one of the highest producers but in the middle to top. Exh Diaz dep. P. 84:1-85:4.

79.     When Castellani received an email on June 1, 2017 from Central Investigations, he was already scheduled to have a second interview with Plaintiff on June 6 due to an investigation that was begun by MCCS because of some red flags they had seen on Plaintiff's credit account. Plaintiff was suspected of violating the employee discount policy and potentially reselling merchandise. Becker Decl., ¶¶ 18-19, Exs. D-E; Castellani Dep., pp. 77:18-78:4; 84:6-23; 104:6-105:7.

> **Plaintiff's Response: Disputed. C**astellani was scheduled to meet with Plaintiff regarding her purchase limits which was overseen internally by Asset Protection not MCCS. Younis Depo. p. 23:17-24:13. Additionally, on April 19, 2017, the same person Abraham Gonzalez in central investifations asset protection not MCCS that sent an email to Castellani asking to meet with Plaintiff for violating the diverter policy of 6 chanel handbags and likely discount abuse. Exh 10, BLM 1884-1905.

80.     The specific concern related to an estimated $65,000 plus of charges that Plaintiff had made to her account. Castellani Dep., pp. 47:16-49:10; 50:20-51:21; Becker Decl., ¶¶ 18-19, Exs. D-E.

> **Plaintiff's Response:Disputed** there were separate investigations regarding Plaintiffs purchases and the transactions she was ringing up. Becker Dep. P. 109:1-115:15.

81.     During the interview on June 6, 2017, Plaintiff admitted that she had made over $65,000 in purchases of Chanel product and mailed the items to friends and relatives to avoid paying New York State taxes. She denied reselling the product or exceeding the product limits. Mailing merchandise to another state to avoid paying sales tax is a violation of company policy.

Becker Decl., ¶¶ 20-22, Exs. F-G; Castellani Dep., pp. 51:23-56:10; 71:13-25; 72:17-73:3; 75:22-76:3; Mikhaylova Dep., pp. 125:17-130:23; 228:21-233:18, Ex. Y.

**Plaintiff's Response:** Disputed. Mischaracterizes Plaintiffs testimony that she said she had the money to pay for her purchases not as to that specific amount. Plaintiff also testified that Castellani did not tell her the specific amount on June 6, 2017. Exh 1 Mikhay Dep p. 239:7-25. Becker testified Plaintiff did not violate any policies. Becker Dep. P. 134: 19-135:11. Plaintiff was shipping gifts to friends and family out of state where they don't have taxes. Exh 1 Mikhay Dep p. 128:18-129:21. Plaintiff paid New York taxes on most if not all of her purchases. Exh 5, Castellani Depo. p. 49:23-50:15; Younis Decl. Exh. D; Exh 12, Mikhaylova 525

82.     There were 28 transaction receipts of Plaintiff's purchases that were part of the investigation. Becker Decl., ¶ 22, Ex. G.

**Plaintiff's Response: Disputed,** Castellani refused to give plaintiff the receipts of transactions that day and only showed her the addresses. Mikhay Decl. ¶43. Further disputed by bECKER's testimony stating the receipts were related to fraud transactions not specific to plaintiff. eXH. Becker dep. P. 83:1-84:21.

83.     Castellani spoke to Richard Law, the human resources manager for the Chanel department, who directed that Plaintiff be suspended. Castellani Dep., pp. 60:12-61:23; Law Dep., pp. 31:6-11; 32:12-15; 77:11-16; Mikhaylova Dep., pp. 131: 8-132:14.

**Plaintiff's Response: Disputed,** Castellani told plaintiff that Law was unavailable therefore she was suspended until Law called her. Mikhay Decl. ¶42; Ex 1 Mikhay Dep p. 131:8-20.

84.     Plaintiff was suspended that day and she was discharged from employment by Richard Law on June 16, 2017. Castellani Dep., p. 60:12-25; Becker Decl., ¶ 20, Ex. F: Law Dep., pp. 36:10-38:17; 46:20-23; 80:17-23; 150:22-24; Mikhaylova Dep., pp. 131: 8-132:14.

**Plaintiff's Response: Undisputed.**

85.     During the time she was suspended, Plaintiff inexplicably sent an email to Law and asked if the fact that she was pregnant was a reason she was suspended. Law contacted her and assured her that her medical condition had nothing to do with her suspension. Law Dep., pp. 118:20-119:24, Ex. G; Mikhaylova Dep., pp. 132:15-136:25.

**Plaintiff's Response: Undisputed**

86.     Law made the decision to discharge Plaintiff. The primary reason for his decision was that Plaintiff exceeded the purchase limits for the merchandise she purchased and he believed based on the amount of money she was spending, the number of purchases she was making, and the fact that she was sending them out of state to someone else that she was a diverter/selling the product for profit which was a violation of the discount policy. Plaintiff also admitted to purposefully evading taxes which was also a terminable offense. Law alone made the termination decision. Law Dep., pp. 46:20-48:17; 69:25-71:15; 80:17-23; 86:1-87:4; 88:1-17; 168:17-169:24; 171:13-23; 173:11-175:10; 177:2-17; 178:12-23.

**Plaintiff's Response: Disputed** and controverted by evidence in the record. Evidence cited does not support each fact and/or conclusion. Law testified the reason for Plaintiffs termination was based primarily on the chanel handbags and possibly the tax evasion. The shoes could have played a part in it but he could not recall. Law Dep. P. 80:1-23. Additionally, Law looked at Plaintiff's performance.  Exh 10, BLM 1516-1523. Becker testified Plaintiff was terminated because she rang transactions and didn't charge state

taxes. Becker Dep. P. 41:5-14. Becker testified Plaintiff did not violate any policies. Becker

Dep. P. 134:19-135:11. Further disputed to the extent Defendants assert Law believed that

Plaintiff was a diverter and/or reselling at the time of her termination. Exh. 22, BLM 901.

Further disputed because Becker testified diversion is not the same as reselling and

avoiding taxes is not diversion. Becker dep. P. 139:1-22.

87.     The termination conversation was in person. The reason Plaintiff says she was

given for her discharge was she purchased too many pairs of shoes and that she had engaged in tax

evasion. Mikhaylova Dep., pp. 140:12-144:23.

**Plaintiff's Response: Partially Disputed.** Law testified he could not recall if it was in

person or over the phone. He also could not recall mentioning shoes but may have

mentioned handbags. Law Dep. P. 150:22-151:14.

88.     Law was not aware that Plaintiff was pregnant until she sent the email on June 8,

2017 referenced above. He also was not aware that she had requested FMLA leave. Law Dep., pp.

43:22-45:4; 118:20-119:10; 169:25-171:12, Ex. G.

**Plaintiff's Response: Disputed. Diaz and Younis told him she was pregnant in April**

2017 when Plaintiff requested an accommodation. Diaz testified to informing Human

Resources when an employee has write ups for lateness. Diaz Depo, P. 32:12-18. Further

disputed as Plaintiff would see Law in the HR office/floor when she submitted her FMLA

paperwork. Mikhay Decl. ¶ 34. Law saw Plaintiff regularly at work and she was visibly

showing she was pregnant. Mikhay Decl. paragraph ¶27.

89.     Neither Becker nor Castellani was not involved in the decision to terminate

Plaintiff's employment. Castellani Dep., pp. 106:17-19; Becker Dep., pp. 21:23-22:6; 41:5-14.

**Plaintiff's Response: Partially disputed,** as Law made the decision based on the information given from Asset protection which includes Castellani and Becker. Ex 10 BLM 1516-1535.

90.     Castellani was not aware that Plaintiff was pregnant or seeking leave while investigating her purchases or during the interview. Castellani Dep., pp. 111:9-112:5.

**Plaintiff's Response: Disputed** Castellani saw Plaintiff regularly at work and she was visibly showing she was pregnant. Mikhay Decl. paragraph ¶27.

91.     Becker did not know that Plaintiff was pregnant nor did that subject come up in any conversations that he had with Chris Castellani. Becker Decl., ¶ 23.

**Plaintiff's Response: Undisputed.**

92.     Asset Protection did not make the decision to discharge Plaintiff from employment with Bloomingdale's. They simply investigated the situation and provided Human Resources with the results of that investigation. Human resources determined the level of discipline or termination. Becker Decl., ¶ 21; Castellani Dep., pp. 106:17-19; Becker Dep., pp. 21:23-22:6; 41:5-14.

**Plaintiff's Response: Undisputed.**

93.     Cathy Younis and Denis Diaz were not involved in the AP investigation or the decision to terminate Plaintiff's employment. While AP let them know that there was an interview, and Law let them know of the termination, neither was asked for a recommendation nor were they told the details of why the termination occurred. Diaz Dep., Younis Decl., ¶ 14, and Ex. E; Younis Dep., pp. 22:9-12; 52:3-10; Diaz Dep., pp. 60:3-7; 76:7-78:24; Castellani Dep., pp. 33:19-23;112:6-113:19; Law Dep., pp. 42:25-43:21.

**Plaintiffs Response: Disputed.** Becker testified Chanel has their own department and processes for tracking bags and resellers. Becker Dep. P. 48:13-23. Becker testified that Cathy Younis and Denis Diaz were part of the Chanel Leadership team during Plaintiff's employment. Becker Dep. P. 48:13-23. Cathy and Denis would have worked with Asset Protection to determine if Plaintiff and other employees were resellers. Becker Dep. P. 48:13-23.

94.    Bloomingdale's discount policy prevents reselling merchandise. Diversion is a form of reselling and constitutes discount abuse. Diaz Dep., pp. 63:13-20; Law Dep., pp. 124:3-125:2; Younis Dep., pp. 37:7-14; 39:5-40:2.

**Plaintiff's Response: Disputed.** Becker testified diversion is not the same as reselling and avoiding taxes is not diversion. Becker dep. P. 139:1-22.

95.    Diversion was a serious issue for Chanel in particular; Plaintiff was aware of the Bloomingdale's diversion policy, and that the Company terminated employees for selling to known diverters. Mikhaylova Dep., pp. 61:14-62:6; 64:5-11; 65:7-22; Gerber Decl., Ex. I, Plaintiff's Responses to Defendants' Requests for Admission, Number 50.

**Plaintiff's Response:** Disputed and the evidence cited does not support this assertion. Becker testified Bloomingdales did not have a diverter policy and each vendor had their own policies. Becker Dep. 59:14-22.  Plaintff testified she did not speak to ayone about diversion being a terminable offense. Mikhay. Dep. P. 64:5-11. In Plaintiff's responses to defendants request for admissions, Plaintiff only admitted that selling to a known diverter was a violation of Bloomingdales policy. Gerber, Decl. Exhibit I, number 50. Younis testified that for the past 11 years no one has been terminated for product diversion. Younis

Depo p. 40:3-9. Further Plaintiff was unaware of the diverter policy during her deposition and Counsel said they were not talking about the same thing. Exh 1, Mikahy dep. P. 65:7-24.

96.     Law also believed that Plaintiff was a diverter based on the number of purchases, the dollar amount and the fact that she mailed merchandise to addresses outside of the state that were not hers. Law Dep., pp. 124:4-125:2; 171:13-19.

**Plaintiff's Response:** Partially disputed. Disputed to the extent that in the materials cited Law says these were all suspicions. Law deP. P. 124:18-125:2.

### Plaintiff's Purchases

97.     According to the Asset Protection investigation, Plaintiff had purchased, over $65,000 in merchandise between October 2016 and April 2017. Because Plaintiff mailed the products out of state, she avoided paying $5,856 in New York state taxes. Becker Decl., ¶ 20, Ex. F.

**Plaintiff's Response: Disputed,** the materials cited do not support the assertion there is no breakdown in numbers just statements. Further pLaintiff was shipping out of state gifts to her family and friends. Exh 1, Mikhay dep p. 128:8-129:22. Defendants did not factor which were gifts. Last Plaintiff's statement from April 2017 shows plaintiff paid taxes on her hnadbags. Exh 12, Mikhyalova 525.

98.     Plaintiff admitted in her handwritten statement that her purchases were for herself or gifts. She stated that she had not received any reimbursement. However, she also admitted that she mailed the merchandise to other states to avoid New York state taxes. In her statement she

says: "I was shipping to various friends and family out of state to avoid New York State tax."
Becker Decl., ¶ 20, Ex. F, page 1894.

> **Plaintiff's Response: Disputed,** Plaintiff testified that she told Castellani about the gifts
> she was sending out of state to her friends addresses where she would not get charged taxes.
> Exh. 1, Mikahy Dep p. 128:18-129:22.

99.     During this case, Plaintiff served a subpoena on MCCS to secure documents related
to Plaintiff's credit account. Those records demonstrate that Plaintiff spent far more than $65,000
in the months from October 2016 and June 2017. Her purchases at Bloomingdale's, which included
all purchases and not just those she mailed out of state, totaled $264,990.44. During this time, she
made payments (including credits she received because of her employee discount) of $261,114.16.
That left a difference of $3,876.28 which was never paid. See accompanying Custodial Affidavit
of Linda Gentry ("Gentry Aff.") and Plaintiff's credit card statements from July 2016 through
February 2018. The account number and Plaintiff's address have been redacted to protect her
privacy.

> **Plaintiff's Response:** Disputed and inadmissible, unsupported by evidence in the record.
> Defendants did not produce an Affidavit from Gentry with their motion.

100.     Plaintiff's final monthly statement totals are misleading. During the month,
Plaintiff made several payments – some in the amount of several thousand dollars and often several
times in one day– so that her end of month statement total did not outwardly reflect the amount of
purchases and payments made during the month. To understand the amounts spent and paid, you
have to review the Activity Detail found in each statement. Gentry Aff. and attachments.

> **Plaintiff's Response:** Disputed and inadmissible, unsupported by evidence in the record.
> Defendants did not produce an Affidavit from Gentry with their motion.

101.    In the months between October 2016 and April 2017, Plaintiff purchased at least 46 handbags from Chanel and 29 pairs of Salon Shoes, among many other items.[1] Gentry Aff. and attachments.

**Plaintiff's Response: Disputed, f**irst this is not supported by any materials in the record. Second, defendants previously stated that Plaintiff had made 26 employee purchases from October 2016 to April 21, 2017. Exh. 10, Bates blm 442.

102.    Plaintiff made a little over $100,000 per year. She alleged that the money she used to make her purchases came from her grandmother and her boyfriend – neither of whom were authorized users of her credit card. Mikhaylova Dep., pp. 80:17-85:25; 208:3-11.

**Plaintiff's Response: Disputed,** micharacterizes plaintiffs tesitimmony.  Plaintiff testified that she was able to afford her spending because she worked, her grandmother was giving her an inheritance, and her boyfriend supported her by paying rent and giving her money to spend. Exh 1, Mikhay Dep. P. 80:17-82:4.

103.    The Chanel Handbag policy that was found in the Bloomingdale's handbook was in effect until the end of 2016. It states that:

> In order to make handbags available to as many of our customers as possible, two handbags are the maximum number that may be sold in a single transaction, without senior management approval….Four (4) bags per month may be purchased and up to 24 bags per year.

> Cox Decl., Ex. A; Younis Decl., ¶ 6, Ex. B; Mikhaylova Dep., pp. 192:22-193:5; 195:13-197:3,Ex. M.

**Plaintiff's Response: Disputed** to the extent that Defendants assert this policy was in effect until the end of 2016. This policy was still in effect during pLaintiff's employment and until

---

[1] While the handbags can be easily counted, some of the references on the credit statements to "Salon shoes" relates to more than one pair of shoes. The number of pairs purchased can be determined by a review of the transaction receipts (Becker Decl., Ex. G) in conjunction with the credit card statements. Gentry Aff. and attachments.

July 17, 2017 when Chanel went leased. **Exh. 10, BLM 1554-1555.** Further disputed because as seen in investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029; Mikhay Decl. paragraph 13-26. Also defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

104.    The Chanel handbag purchase policy that came into effect in early 2017 was more restrictive and limited purchases to one (1) Icon (classic handbag) and one (1) Non-Icon handbag or two (2) Non-Icon handbags per transaction per month. The maximum of 24 handbags per year was the same but the monthly limits were different. Icon handbags had to be purchased in person (not over the phone). Any exceptions had to be authorized by the manager. Younis Decl., ¶ 7, Ex. C; Younis Dep., pp. 17:12-19:22; 30:13-21.

**Plaintiff's Response: Disputed.** The policy was announced around January 31, 2017 but the policy did not go into effect until July 2017. Exhibit 10, bates BLM001552.; Younis testified it did not go into effect until July 2017. Younis depo Further, the policy states four bags per month Exhibit 10, BLM001554-1555. Law testified he was not familiar with this policy and had not seen it before his deposition. Exh. 2, Law Dep. Ex. A, p.51:1-52:16.  Further disputed to the extent this assertion omits employees could buy handbags on sale and those were not included in the purchase limit policy. Exh. 23, bates   MIKHAYLOVA 197-201. Further disputed because as seen in investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029; Also the chanel policy was for employees to use when selling to customers it did not apply to employees. Mikhay Decl. paragraph 13-26. Also defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

105.   At the time of Plaintiff's discharge, the Chanel purchase policy that limited purchases to two per month was the one employees were directed to follow. Younis Decl., ¶ 7, Ex. B.

**Plaintiff's Response: Disputed** and controverted by the cited materials. The bloomingdales policy was still in effect at plainitff's termination and employees were instructed to follow the bloomingdales handbook policy of four bags a month on or before July 10, 2017. Exhibit 10, BLM001554-1555. Further disputed because Defendants submitted to the Department of labor the relevant policy to plaintiff's termination was "all vendors and departments have a purchase limit of 12 units of merchandise by category per customer in a single transaction or within a 90 day period" Exh. 22, BLM 901. Defendants also attach the Bloomingdales policy and not the chanel policy. Exh. 22, BLM 905.Further disputed to the extent this assertion omits the additional handbags that could be purchased on sale that were not included in the purchase limit policy. Exh. 23, bates  MIKHAYLOVA 197-201. Further disputed because as seen in investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029. Also the chanel policy was for employees to use when selling to customers it did not apply to employees. Mikhay Decl. paragraph 13-26. Also defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

106.   Plaintiff was aware that she was limited to purchasing two handbags per month. Mikhaylova. Gerber Decl., Ex. E, bates number Mikhaylova 211; Mikhaylova Dep., pp. 190:10-16.

**Plaintiff's Response: Disputed.** Plaintiff was unaware that the sale handbags were included in the two handbags per month limit as everyone knew there was no limit on sale. Exh. 12, bates Mikhaylova 2; Exhibit 10, BLM001554-1555; Exh. 23, bates MIKHAYLOVA 197-201; Mikhay Decl. paragraph 13-26.. Further disputed because as seen in investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029.

107.    These limits were discussed with employees on a regular basis at morning meetings and in various touch bases with the team. It was a critical policy for the department and Chanel as the vendor. Younis Decl., ¶ 8.

**Plaintiff's Response: Disputed, the other employees besides Plaintiff were unaware of the policy limits.** Exh. 23, bates MIKHAYLOVA 197-201. Further disputed because as seen in investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029.

108.    The limits for other items are in the handbook as well. The handbook states that there is a limit of 12 units of merchandise per customer in a single transaction or within a 90-day period. Younis Decl., ¶ 6, Ex. B; Cox Decl., Ex. A; Becker Decl., ¶ 26, Ex. J.

**Plaintiff's Response: Partially disputed.** Disputed to the extent this assertion omits this policy applies to all verndors and departments except Cosmetics and chanel handbags and "with the exception of purchases in Towels, Tabletop, Table Linens, Hosiery and Gift Registry (where purchases of multiple items is common, and not a reason to suspect the customer is an unauthorized reseller)." Cox Decl., Ex. A, BLM 1051; Exh. 22, BLM905.

Further disputed because as seen in investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029.Not disputed to the rest.

109.    If you violate the purchase limits, you could be terminated. Younis Dep., pp. 22:20,23:23.

> **Plaintiff's Response: Partially disputed for omission of her testimony.** Younis testified that the policies for going over purchase limits was a warning and could be grounds for immediate termination. Younis Depo, P. 23:17-24.

110.    Plaintiff admits that she was sending merchandise for herself as well as gifts to YuYu Lai in New Hampshire to avoid New York State and City sales tax. Mikhaylova Dep., pp. 65:25-67:12; 198:7-199:20.

> **Plaintiff's Response: Partially disputed** to the extent that the evidence cited does not distinguish between New York state and city sales tax.  Mikhaylova Dep., pp. 65:25-67:12; 198:7-199:20.

111.    YuYu Lai would bring the purchases to Plaintiff when Lai came to New York. Plaintiff gave some of the merchandise to Lai. Mikhaylova Dep., p. 68:5-18.

**Plaintiff's Response:** Partially disputed. Undisputed to the extent Plaintiff would get her own purchases from Yu Yu Lai when Yu Yu Lai was in New York. Disputed that Plaintiff "gave" some of the merchandise to Lai. Rather Plaintiff testified she "gifted" some of the products to Yu Yu Lai.  Mikhaylova Dep., p. 68:5-18.

112.    When questioned about employees who said Lai paid them for their purchases mailed to her, Plaintiff initially said that was not correct because her co-workers never told her this. She then stated that she never allowed her co-workers to speak directly to Lai – she picked their products up for them. Plaintiff had no answer as to why these employees would admit to diversion if it were not occurring. Mikhaylova Dep., pp. 69:8-71:2.

> **Plaintiff's Response: Disputed,** this is a mischaracterization of the testimony. **P**laintiff testisfied Yu Yu Lai did not give money to any of her coworkers for the bags they sent Yu YU Lai because they did not tell Plaintiff. Mikh. Dep. p. 69:12-17. Plaintiff did not testify she did not allow her coworkers to speak directly to Lai but that to her knowledge her coworkers did not have any communication with Lai. Plaintiff testified she picked up her coworkers' stuff from Lai. Nowhere in the cited evidence to support this assertion does it say diversion. Exh. 1 Mikh. Dep., pp. 69:8-71:2.

113.    Plaintiff initially said managers also sent bags out of state to avoid tax but then changed her testimony that it was not Diaz but she could not give the names of anyone in management who had in fact done this. Mikhaylova Dep., 71:3-73:22.

> **Plaintiff's Response: Disputed,** this is a mischaracterization of the testimony, controverted, and this assertion impermissibly draws a conclusion. Plaintiff testified she was allowed by management to send bags to New Hampshire to avoid sales tax. Exh. 1, Mikh. Dep., 71:3-73:22. Plaintiff testified that managers Denis and Viktoria approved sending merchandise to a state for herself that did not have taxes for the purpose of avoiding taxes. Exh. 1, Mikh. Dep., 74:7-22.; Exh. 10 BLM 20. When asked which manager approved Plaintiff mailing bags to New Hampshire to avoid sales tax Plaintiff testified Denis Diaz and testified that management was doing it too. Mikhaylova Dep., 71:8-15.

36

Plaintiff also testified that Younis sent her stuff to nEW jERSEY to avoid sales tax. Exh 1

Mikhay Dep p. 76:5-16.

114.    Later she admitted that she could not recall Diaz ever saying anything suggesting

that mailing bags out of state to avoid taxes was acceptable conduct. Mikhaylova Dep., p. 76:1-4.

**Plaintiff's Response: Partially disputed** and mischaracterization of testimony.

**Discount Policy**

115.    The discount policy states that abusing the discount can result in termination.

Discount abuse is defined as letting someone not eligible for the discount use your card or making

a purchase with the discount and being reimbursed in full or part, or buying merchandise with the

intent to resell it. Becker Decl., ¶ 25, Ex. J; Cox Decl, Ex. A; Younis Decl., ¶ 13.

       **Plaintiff's Response: Partially disputed.** Disputed because Cox was not produced

       as the corporate representative to address the discount policies. Exh. Cox Dep. P. 34:8-

       35:9. Second, disputed as to the omission that abusing the discount can result in termination

       of the discount or termination of employment for associates. Exh. 24,bates BLM 919.

       Admitted to the extent assertion repeats what is said in the policy cited.

116.    Plaintiff signed off on the discount policy when she was hired. In addition to the

discount policy being separately signed off by employees, it is also found in the employee

handbook. Cox Decl., ¶¶ 16-19, Exs. A, D; Mikhaylova Dep., pp. 212:13-213:21, Ex. R.

       **Plaintiff's Response: Disputed** the materials do not support the assertion and

       Defendants provided another handbook that plaintiff signed off which does not mention

       the discount policy cited.  Exh 10, BLM 22-84.

117.    Plaintiff alleges she purchased some of the purses at a special sale where they were

60% off of their original price. She alleges there was no limit on how many of these bags that

could be purchased. However, those liquidation sales were infrequent. The discounts for those

sales were 40, 50 or 60% off. Younis Decl., ¶ 10; Younis Dep., pp 72:5-73:13.

>**Plaintiff's Response:** Partially disputed. Not disputed that Plaintiff said there was
>
>no limit, Mikhay. Dep. P. 189:19-192:17.

118.    The discounts for the liquidation sales were what is known as "front of house" as

they were shown on the receipt. Young Decl, ¶ 10, Ex. D.

>**Plaintiff's Response: Undisputed.**

119.    The employee discount that every employee receives on eligible purchases was

known as "back of house" and that discount amount was taken off of the monthly statement. The

statements show the discount as a credit to any amounts purchased. Younis Decl., ¶ 10; Gentry

Aff. and credit statements attached.

>**Plaintiff's Response: Partially disputed** for inadmissible evidence and this
>
>assetion is not supported with materials in the record.

120.    None of the receipts that were part of the AP investigation show that any of the

purses that were purchased were discounted or part of a liquidation sale as they would be if they

were part of such an event. Becker Decl., ¶ 22, Ex. G.

>**Plaintiff's Response: Disputed** bECKER's testimony stating the receipts were
>
>related to fraud transactions not specific to plaintiff. eXH. Becker dep. P. 83:1-84:21.

121.    The salon shoe receipts show discounts but they were not part of the liquidation

sale and there was no exception to the limit of 12 items set forth in the employee handbook.

Becker Decl., Younis Decl., ¶ 11.

**Plaintiff's Response:**   Disputed.   Younis testified she could not rrecall the shoe limit at the time and would have to look at the handbook. She also testified that shoes on sale did not count towards the shoe limit. Younis Dep. P. 64:1-10; p. 75:10-16.

**<u>Miscellaneous</u>**

122.    The transaction receipts that refer to handbags are from the Chanel department if they show the number 54/5. The number 57/76 is the department number for shoes sold in the Chanel department (Salon Shoes). Younis Decl., ¶ 4.

**Plaintiff's Response: Undisputed.**

123.    Bloomingdale's handbook and Code of Conduct requires all employees to comply with state and federal law. Young Decl., ¶ 12; Becker Decl., ¶ 20; Cox Decl., ¶ 35, Exs. A, C; Younis Dep., pp. 33:14-34:1.

**Plaintiff's Response: Undisputed.**

124.    It is a violation of company policy to ship merchandise to states that do not charge sales tax in order to avoid paying New York State sales tax. Managers do not have the authority to authorize a violation of the law. Employees also were not authorized to suggest this type of shipping process to customers. Bloomingdale's has been consistent in its application of this policy. Younis Decl., ¶ 12; Becker Decl., 20; Cox Decl., ¶¶ 36-37, and Ex. L; Younis Dep., pp. 84:9-85:7; 108:12-19; Diaz Dep., p. 83:8-11.

**Plaintiff's Response: Disputed.** Plaintiff testified she told Castellani on June 6, 2017 that Diaz had approved her purchases. Exh 1,  Mikhaylova Dep., 130:5-23, 71:8-15.

125.     There are numerous employees who have been discharged for admitting tax evasion. There is no one who admitted tax evasion who was not discharged. Becker Decl., Ex. H; Cox Decl., ¶ 37, Ex. L.

**Plaintiff's Response: Disputed.** Tyler Rose admitted to shipping to the same state as Plaintiff and he was not terminated by Richard Law.  Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577; Further disputed to the extent the assertion implies employees that admitted tax evasion were discharged for that reason as defendants did not terminate any other employees for tax evasion. Law Dep. P. 126:4-134:14; Diaz Dep., p. 91:17-22; Exh. 10, bates BLM1576-1577; They were suspended and resigned. Further disputed as the evidence cited is controverted by evidence in the record. Employee Exh. 21, BLM 2224-2225, Employee number 72664210 falsified business records to circumvent taxes and made a profit off of it for customers. She was not terminated but only suspended at the conclusion of the investigation. Exh. 21, BLM 2255-2256. Employee number 72043055 stated that she was using her discount to buy chanel at discounted prices for her friends at NYU and using their credit cards to pay her account. . Exh. 21, BLM 2259- 2260. Employee number 72026718 after admitting to avoiding taxes there was further investigation done which revealed employee lied during investigation and was making a profit warranting termination. eXH 21BLM 2229-2230. Employee number 72028976 terminated for return fraud unrelated to taxes. Exh 21, BLM 2224-2225. Employee number 72043089 did not mention taxes he was falsifying time sheets and using his discount for customers. eXH 21 BLM 2187-2188. employee Number 72001188 was using relatives' addresses to save on taxes but the items were going home with him they were not actually shipped. Exh 21 BLM 2199-2200. On September 29, 2016, Employee number 72043192

was getting reimbursed from family and friends for using his discount to buy their purchases. Exh 21 BLM 2209-2210. Employee number 72071094 was investigated because rung up by employee under investigation and the employee ringing her up sent this employees purchase to address to avoid sales tax. Employee number 72071094 was not terminated only suspended and did not return to work which Employee relations then takes as resignation.  Ex 21, BLM 2235-2236; Castellani Dep. P. 105:8-106:15. Employee number 72063603, Angy Lee resigned after she was investigated and cooperating with the FBI for processing 26 fraudulent transactions for various suspects using fraudulent Bloomingdales credit cards to purchase $128,926.23 in chanel handbags. Exh. 21 BLM 2194. Employee number 72063570 Idress Orya was involved in the same fraudulent scheme as angy lee processing fraudulent transations. Nowhere does it mention terminated for tax evasion. Exh 21 bates BLM 2218-2219. Employee number 72607568 was suspended and not terminated but because she did not respond to HR within 48 hours she was terminated. Exh 21, BLM 2213-2214. Employee number 72051456 was making large cash payments from her business in NJ. Exh 21 bates BLM 2265-2266. Employee number 72029423 did not properly ring up a client who asked for item to be shipped. Unclear what date that employee was terminated. Exh. 21 bates BLM 2250-2253. Employee Number 72073466 was reselling merchandise, profiting off her discount, besides sending to NJ addresses to avoid taxes. Ex 21 BLM 2244-2249.

126.    Law also had to decide whether to discharge two other employees – Martha Weh and Tyler Rose who were mailing merchandise to the same New Hampshire address to which the Plaintiff was mailing. Law discharged Weh  and not Rose. His rationale was that Weh had made numerous transactions and had no argument that they were for personal use or a gift. Rose,

however, made only one transaction and did not admit to any wrongdoing but stated he was mailing

the item as a gift. Law did not feel he had enough evidence to discharge Rose. Mikhaylova admits

that Rose only sent to the same address one time. Law Dep., pp. 128:8-142:12; 168:4-12, Exs. H

and I; Mikhaylova Dep., pp. 247:22-249:13.

> **Plaintiff's Response:** Partially disputed. Undisputed to the extent that that is what
>
> Law stated. Disputed in that Rose said he shipped to two different addresses Massachusetts
>
> and New Hampshire. Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577. Further
>
> disputed for mischaracterization of plaintiff's testimony. Plaintiff testified she had no
>
> knowledge as to how many times Rose shipped his items. Exh 1, Mikhaylova Dep. 246:22-
>
> 248:22.

127.   There were numerous other employees who were discharged as part of the

investigation into the $1 million fraud going on in the Chanel department. This investigation

included the involvement of the NYPD. Becker Dep., pp. 39:15-40:10; Becker Decl., ¶ 27, Ex. H.

> **Plaintiff's Response: Disputed.** Becker testified he did not recall any Bloomingdales
>
> employees terminated and/or prosecuted for this fraud scheme. Becker Dep. P.58:4-59:2.
>
> Further disputed because assertion is unsupported by evidence.  Becker's declaration states
>
> other employees were investigated not discharged. Becker Decl., ¶ 27, Ex. H. Nor does ¶
>
> 27 of Becker's declaration mention the $1 million fraud or the NYPD. Becker Decl., ¶ 27,
>
> Ex. H.

128.   At least two additional employees mailed merchandise to the same address as

Plaintiff had. Two of those employees admitted that they had gotten the address from Plaintiff and

one employee admitted that she was reselling to the person at the address and Plaintiff recruited

her. Becker Decl., ¶¶ 24, 27, Ex. H; Castellani Dep., 64:1-65:16; 115:20-117:19; Law Dep., p. 126:4-17; Mikhaylova Dep., p. 204:20-23; 245:18-249:13; 256:7-22.

**Plaintiff's Response: Disputed,** controverted by evidence and inadmissible as hearsay.

129.    The Asset Protection team does not necessarily look for people evading the payment of New York State and City sales tax, but it has come up several times in investigations. Every time an employee has admitted to tax evasion, they have been discharged from employment. See Exhibit H for a summary chart of the Asset Protection investigations where an employee has admitted to evading sales tax. Cox confirms the termination of the employees in her declaration as cited. Becker Decl., ¶ 17; Ex. H; Cox Decl., ¶ 37, Ex. L.

**Plaintiff's Response: Disputed,** Tyler Rose admitted to shipping to the same state as Plaintiff and he was not terminated by Richard Law.  Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577; Further disputed to the extent the assertion implies employees that admitted tax evasion were discharged for that reason as defendants did not terminate any other employees for tax evasion. Law Dep. P. 126:4-134:14; Diaz Dep., p. 91:17-22; Exh. 10, bates BLM1576-1577; They were suspended and resigned. Further disputed as the evidence cited is controverted by evidence in the record. Employee Exh. 21, BLM 2224-2225, Employee number 72664210 falsified business records to circumvent taxes and made a profit off of it for customers. She was not terminated but only suspended at the conclusion of the investigation. Exh. 21, BLM 2255-2256. Employee number 72043055 stated that she was using her discount to buy chanel at discounted prices for her friends at NYU and using their credit cards to pay her account. . Exh. 21, BLM 2259- 2260. Employee number 72026718 after admitting to avoiding taxes there was further

investigation done which revealed employee lied during investigation and was making a profit warranting termination. eXH 21BLM 2229-2230. Employee number 72028976 terminated for return fraud unrelated to taxes. Exh 21, BLM 2224-2225. Employee number 72043089 did not mention taxes he was falsifying time sheets and using his discount for customers. eXH 21 BLM 2187-2188. employee Number 72001188 was using relatives' addresses to save on taxes but the items were going home with him they were not actually shipped. Exh 21 BLM 2199-2200. On September 29, 2016, Employee number 72043192 was getting reimbursed from family and friends for using his discount to buy their purchases. Exh 21 BLM 2209-2210. Employee number 72071094 was investigated because rung up by employee under investigation and the employee ringing her up sent this employees purchase to address to avoid sales tax. Employee number 72071094 was not terminated only suspended and did not return to work which Employee relations then takes as resignation.  Ex 21, BLM 2235-2236; Castellani Dep. P. 105:8-106:15. Employee number 72063603, Angy Lee resigned after she was investigated and cooperating with the FBI for processing 26 fraudulent transactions for various suspects using fraudulent Bloomingdales credit cards to purchase $128,926.23 in chanel handbags. Exh. 21 BLM 2194. Employee number 72063570 Idress Orya was involved in the same fraudulent scheme as angy lee processing fraudulent transations. Nowhere does it mention terminated for tax evasion. Exh 21 bates BLM 2218-2219. Employee number 72607568 was suspended and not terminated but because she did not respond to HR within 48 hours she was terminated. Exh 21, BLM 2213-2214. Employee number 72051456 was making large cash payments from her business in NJ. Exh 21 bates BLM 2265-2266. Employee number 72029423 did not properly ring up a client who asked for item to be shipped. Unclear what

date that employee was terminated. Exh. 21 bates BLM 2250-2253. Employee Number 72073466 was reselling merchandise, profiting off her discount, besides sending to NJ addresses to avoid taxes. Ex 21 BLM 2244-2249.

130.    Plaintiff had not previously spoken to Richard Law or Chris Castellani before the events surrounding her termination. Mikhaylova Dep., pp. 111:16-112:19; 241:4-17.

### PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS

131.    Defendants principal place of business is 7 West 7TH Street, Cincinnati, Ohio 45202.

132.    Plaintiff was employed by Defendants from May 3, 2016 until June 16, 2017. Exh. 13, paragraph 2 and 3; Mikh. Decl. paragraph 3-4; Exh 10, bates 754.

**Defendants' Response:**

133.    Plaintiff was suspended without pay from June 6, 2017 until June 16, 2017.

**Defendants' Response:**

134.    Cathy Younis testified the Chanel Handbag department was "owned" until July 2017 when they went "leased."

**Defendants' Response:**

135.    Plaintiff was told many times by management that the handbags purchased during sales were not to be included in the purchase limit. Exh. 12, bates Mikhaylova 211; Exh 1, **Mikhay. Dep. P. 189:19-192:17.**

**Defendants' Response:**

136.    Plaintiff was and is not a diverter. Mikahy Dep. P. 65:1-22.;Becker dep. P. 139:15-22.

**Defendants' Response:**

137.    Plaintiff told Diaz she had morning sickness. Exh 1, Mikhay Dep. P. 88:5-94:8.

138.    Plaintiff had a pre-pay account. Per the employee handbook, "A prepay account requires an associate to pay the net amount of the purchase (item price less discount, plus tax) before it can be rung on the register") Exh. 10, BLM 1434—if 2016 handbook applied, Cox Decl., Exh D

139.    Younis did not know that Plaintiff was terminated for shipping gifts out of state to avoid taxes. Younis said that she was fired for policy type violations. Younis Dep. P. 54:23-55:22.

140.    Plaintiff also testified that Younis sent her stuff to nEW jERSEY to avoid sales tax. Exh 1 Mikhay Dep p. 76:5-16.

141.    During plaintiff's employment Defendants' policy was that employees could not ring up their own sale but another colleague could ring them up.Younis Depo, P. 37:24-38:15.

142.    During Plaintiff's employment, managers rang up employees. Younis depo p. 45:19-46:3.

143.    Plaintiff did not violate Company policies by shipping her purchases to friends and family out of state. Younis Depo, 107:8-108:6.

144.    Plaintiff paid New York taxes on most if not all of her purchases. Exh 5, Castellani Depo. p. 49:23-50:15;

145.    Around January 31, 2017, Defendants announced the business decision effective July 2017, to change the Chanel businesses in the ready to wear and handbags departments at the Bloomingdales 59th Street location from "owned" to "leased." Exhibit 10, bates BLM001552. The Chanel shoe department at the Bloomingdales 59th Street location was to remain an "owned" business. Exhibit 10, bates BLM001552.

146.     Angy Lee admitted to reselling for a profit but she was not terminated. Exhibit 10, bates BLM001555; Exh. 6, Becker Dep. Exh. P-2.

147.     Defendants failed give plaintiff an accommodation Plaintiff. Exh 1, Mikhay Dep. P. 98:13-101:22-25.

148.     Diaz could not recall who he spoke with at Human Resources about Plaintiff's pregnancy. Exh 4, Diaz deP P. 67:1-68:14.

149.     Plaintiff testified she told Castellani on June 6, 2017 that Diaz had approved her purchases. Exh 1,  Mikhaylova Dep., 130:5-23.

150.     Castellani testified that the discount abuse and potential diverter reselling aspect initiated the investigation against Plaintiff.  Exh 5,  Castellani Dep., 56:1-20.

151.     Plaintiff's Union Local 3 filed a grievance on her behalf around June 20, 2017. The grievance hearing was on July 10, 2017. Ex 10, Mikhyalova 182-191.

**FRAUD**

152.     Becker testified Plaintiff was not terminated nor found to have committed fraud. Becker Dep. P. 39:24-40:10.

153.     Becker testified that no Bloomingdales employees were terminated and/or prosecuted for fraud during the 2017 over $1 million investigation into fraud. Becker Dep. 57:4-59:2. Becker testified that outside individuals were prosecuted for that fraud scheme. Becker Dep. 58:16-59:2.

154.     Becker testified at his deposition that in preparation for his deposition he reviewed documents and information about Plaintiff's case with Defendants. Becker dep. P. 10:18-24.

155.    During the month of June 2017 the chanel handbag department saw an increase in sales from $1,515,495.00 in 2016 to $2,859,648.00. Exh. 10, bates 1554-1555.

156.    After review of all sales in the chanel handbag shop it was identified that approximately $1,100,000.00 of the sales increase on Bloomingdales Prop Credit Cards were made fraudulently. Exh. 10, bates 1554-1555.

157.    The five individuals responsible for $722,000.00 of the fraudulent $1,100,000.00 credit card purchases total between June 1, 2017 to June 29, 2017. Exh. 10, bates 1554-1555.

158.    The five individuals responsible for the fraudulent credit card purchases are Noemi Coste, Angy Lee, Idress Orya, Yueman (Moon) Chen, and Eleanor Dahan. Exh. 10, bates 1554-1555.

159.    Plaintiff admitted that she was aware of coworkers that were terminated for their involvement in a fraud scheme. Exh. 13, ¶45

**ASSET PROTECTION**

160.    Younis testified that Asset Protection oversaw employees' purchase limits. Younis Depo, P. 20:18-24,23:17-24, 37:1-23.

161.    Younis testified it was "extremely difficult" "if not impossible" during Plaintiff's employment to catch an employee exceeding the purchase limits. Younis Depo. p. 25:16-22.

162.    Younis testified that although Asset Protection oversaw purchase limits, employees such as herself had a responsibility to say something if they saw something. Younis Depo. p. 25:5

163.    Defendants terminated Plaintiff because of a suspicion that plaintiff was reselling. Law Dep. P. 88:1-25, 124:16-125:2.

164.     Plaintiff testified that she does not know if the people that started the investigation knew she was pregnant nor if they would have told her that but that she was visibly pregnant. Mikhaylova Depo. P. 136:18-138:14.

165.     Becker testified that firsthand observations by management is part of the investigation process for reselling. Becker Dep. 46:15-23.

166.     Castellani did not tell Plaintiff how her purchases and shipping addresses came to his attention.  Exh 1, Mikhay Dep p. 130:20-23.

167.     Younis testified that the policies for going over purchase limits was a warning and could be grounds for immediate termination. Younis Depo, P. 23:17-24

168.     Determination whether there was a violation of the discount policy was done by asset protection and done on a case-by-case basis. Ex 14 paragraph 5

169.     At that time, Becker testified they were not using a system to track investigations. Exh. 6, Becker Dep. P.86:1-13.

170.     Defendants do not have a list of employees that were investigated for the same reasons as Plaintiff. Exhibit 15 paragraph 5

171.     Asset Protection can and has recommended human resources terminate an employee. Booker Dep. P. 33:16-34:18.

172.     Becker testified Asset Protection's investigations involve internal theft, dishonesty, not necessarily policy type vioaltions. Becker Dep. P. 47:24-48:7.

173.     Becker testified Chanel has their own department and processes for tracking bags and resellers. Becker Dep. P. 48:13-23.

174.     Becker testified that Cathy Younis and Denis Diaz were part of the Chanel Leadership team during Plaintiff's employment. Becker Dep. P. 48:13-23.

175.     Cathy and Denis would have worked with Asset Protection to determine if Plaintiff
and other employees were resellers. Becker Dep. P. 48:13-23.

176.

**Diversion**

177.     Becker testified Bloomingdales did not have a diverter policy and each vendor had
their own policies. Becker Dep. 59:14-22.

178.     Becker testified what diverting meant to him which is similar to reselling, diverting
merchandise to a different, a third party. Similar to reselling, which is buy merchandise and resell
to individuals, diverter would more buy it and then divert it more in bulk. Becker dep. P. 140:1-7.
Diverter buys merchandise and diverts it to a location where you can't buy it. Becker dep. P. 149:1-
22.

179.     Becker testified that a person sending to a third party to avoid paying taxes is not
diversion. Becker dep. P. 139:15-22.

180.     Younis testified that no one was terminated for product diversion. Younis Depo, p.
20:3-9.

181.     Castellani testified that during Plaintiff's employment Diaz and Younis were
concerned about external fraud occurring also known as diverters. Castellani Dep. P. 32:3-18.

182.     Law testified that a diverter is someone purchases merchandise and provides it to
another seller who is not necessarily authorized for that second seller to sell this particular type of
merchandise. Law Dep. P. 124:10-15.

**NO POLICY REGARDING TAXES**

183.    Plaintiff testified that the Company knew she was sending items to tax free states and some of the items were rang by the managers, including Denis Diaz, and that she was doing what everyone else was doing. Mikhaylova Depo. P. 129:3-21; 130:5-12, 131:10-20.

184.    Plaintiff testified that managers Denis and Viktoria approved sending merchandise to a state for herself that did not have taxes for the purpose of avoiding taxes. Exh. 1, Mikh. Dep., 74:7-22. When asked which manager approved Plaintiff mailing bags to New Hampshire to avoid sales tax Plaintiff testified Denis Diaz and testified that management was doing it too. Mikhaylova Dep., 71:8-15.

185.    Plaintiff testified that former manager, Viktoria Somek told plaintiff that everybody mails products out of state to avoid tax. Exh. 1, Mikh. Dep., 74:19-75:6.

186.    Chris Castellani did not tell plaintiff that it was against policy to send items for her personal use out of state for the purpose of avoiding taxes. Exh 1, Mikhaylova Depo. P. 129:22-130:4.

187.    The Company allowed employees to send items to states to avoid paying taxes. Wxh 1, Mikhaylova Depo. P. 129:3-130:12, 131:10-20.

188.    No policy saying cannot ship gifts out of state. Castellani Dep p. 50:16-19.

189.    Since 2014 other employees in the chanel handbag department have informed Defendants that it was common practice and known and approved by the brand manager for chanel that customers and associates ship to states to avoid taxes. eXH 21BLM 2229-2230.

190.    Castellani testified that he could not recall Plaintiff stating that other employees including managers were shipping out of state to avoid taxes. Ex.5, Castellani Dep. P. 66:24-67:14.

191.   During Plaintiff's employment and while Chanel was still "owned" not leased, Defendants' employees were allowed to ship gifts to states that have zero tax if it was a gift being sent. Younis Depo, P. 33:2- 36:6-21, 37:1-18.

192.   During Plaintiff's employment, Defendants did not have any specific policies about purchasing gifts but had very strong language about diversion that whoever is making a purchase and using your employee discount that it is for yourself. Younis Depo, P. 36:6-23, 37:1-18,

193.   Defendants changed their policies after Plaintiff's employment and when chanel went leased instead of owned. Younis Depo, P. 34:2-35:13.

194.   After Plaintiff's termination, Defendants changed their shipping policies where employees cannot ship a purchase unless there is a valid driver's license that says the customer lives in that state. Younis Depo, P. 34:2-35:13.

195.   After Plaintiff's termination, when Younis asked Law what Younis and Diaz should be doing on their end, Law told Younis "my suggestion would be to reinforce to all associates that they are to adhere to all store policies and procedures. If they have a question about a policy or procedure, they should consult with a manger before proceeding." Exh. 10, bates BLM1535.

196.   Plaintiff testified she emailed Law on June 8, 2017 asking if her pregnancy was related to the investigation because she felt that ever since she announced her pregnancy and need for an accommodation, the problems happened because she did not have issues before. She had been buying since December but they started questioning in May or June for purchases that she made in February and she was doing what everyone else was doing. Mikhaylova Depo. P. 132:15-133:33.

**ACCOMMODATIONS FOR FMLA/DISABILITY/PREGNANCY**

197.    Defendants have not given pregnancy related accommodation other thana lactation room. Law Dep. P. 29:3-30:3.

198.    The only accommodations provided to employees for pregnancy related conditions is FMLA leave. Law Dep. P. 155:10-18.

199.    Plaintiff testified she was not allowed to sit down or lean on the counter and younis told her to stand up and not lean. Exh 1, Mikhay Dep. P. 99:7-17. \

200.    Law denied ever receiving a complaint of pregnancy discrimination and/or retaliation. Law Dep. P. 22:25-23:4.

201.    Younis testified that managers such as Diaz decided which accommodations to give for pregnancy related conditions including breaks, time off the floor, etc. Younis Dep. P. 98:22-99:11

202.    Alla Bershadskaya ("Bershadskaya") was employed by Defendants from 2005 until August 31, 2019 as a Sales Associate in the handbag department at Defendants' flagship store, 160 East 60th street New York, NY 10022. Exhibit 9, BLM 1196-1201.

203.    Between June 2019 and August 2019, Defendants had Bershadskaya file for FMLA intermittent leave of absence for future leave to assist her mother with her mother's medical treatment and condition.

204.    Defendants terminated Bershadskaya's employment on August 31, 2019 while her FMLA leave application was still pending. Exhibit 9, BLM 1196-1201

205.    On August 10, 2020 Bershadskaya filed a lawsuit against Defendants for discrimination, unlawful interference,  retaliation, and unlawful termination for seeking future intermittent FMLA leave of absence. Exhibit 9, BLM 1196-1201.

206.    That lawsuit was settled around February 9, 2021 and the case was closed on February 10, 2021. SDNY, Docket Number 20-cv-06271.

207.    Defendants hired Angela Kotsovolos ("Kotsovolos") on February 17, 2004 as the Manager in the Women's Alterations Department for Defendants 59th street flagship store at 1000 Third Ave. New York, NY 10002. Exh. 17, BLM 1383-1388.

208.    Around March 2, 2020, Kotsovolos made a formal complaint of discrimination against co-worker Surazhsky to Human Resources for age and disability discrimination. Defendants failed to respond and/or address Kotsovolos' complaint. Exh. 17, BLM 1383-1388.

209.    Rather, three months after Kotsovolos made her complaint, Defendants terminated Kostovolos due to alleged workforce reduction. However, Defendants Surazhsky did not also fire Surazhsky but rather promoted Surazhsky (with 4 months of experience) to replace Kotsovolos (with 16 years of experience). Exh. 17, BLM 1387.

210.    Former employee Theodora Nikolakopoulos sued Defendants for disability discrimination, interference and retaliation with FMLA during her employment around April 2017. exhibit 18 to be attached BLM001148-001195.

211.    Around April 2017, Nikolakopoulos requested a reasonable accommodation and made a complaint of discrimination to Law. Exh. Law Dep., p. 146:14-150:12; exhibit 18 BLM001148-001195.

212.    On October 4, 2020 former employee Heidi Dakter filed a complaint in the southern district of new York against Defendants for discrimination on the basis of her sex, and pregnancy and unlawful interference with her FMLA leave during her employment with Defendants at the 59th street location around December 2017. Exh. 26, BLM 1202-1211. That case settled after prediscovery. Exh. 26, BLM 1202-1211.

**SEX/GENDER DISCRIMINATION/HOSTILE WORK ENVIRONMENT**

213.    Booker would unwelcomingly visit Plaintiff on a daily basis and touch her arm, hold her elbow and shoulders. Ex. 11, paragraph 6 and 10; Ex 1, Mikhay Dep. P. 49:8-56:23.

214.    Booker made sexually inappropriate comments to Plaintiff many times and Plaintiff's coworkers and managers were witnesses to these comments. Ex. 11, paragraph 7,10; Ex 1, Mikhay Dep. P. 51:11-56:23. Booker asked Plaintiff out, what she was doing later, asked her to a restaurant. Ex 1, Mikhay Dep. P. 51:11-61:6, 139:40-140:6.

215.    When speaking to Plaintiff he would come in very close proximity and stare her straight in the eyes as though he was undressing her, look at Plaintiff's butt and chest all the time, and tell other employees in asset protection to look at Plaintiff's body. Ex. 11, paragraph 8; Ex 1, Mikhay Dep. P. 51:11-56:23, 151:1-156:17.

216.    Booker ignored all of pLaintiff's rejections by coming closer, laugh, and take no for an answer. Ex. 11, paragraph 8; Ex 1, Mikhay Dep. P. 58:1-58:19.

217.    Plaintiff did not report Booker's comments because management and assoicates were witnesses. Mikhaylova Depo. P. 56:11-57:14, 152:15-153:8,

218.    Plaintiff complained to Diaz several times that Booker made her feel uncomfortable.  **Ex 1, Mikhay Dep p. 56:16-59:13.**

219.    Booker had his own office. Booker Dep. P. 28:11-21.

220.    Booker testified to speaking to female employees in the chanel handbag department at 59th street. Exh. 8, bOOKER Dep. P. 69:19-24.

221.    Booker testified that inappropriate comments which is subjective for the most part individuals and the conversation and those in earshot are off limits. Exh. 8, bOOKER Dep. P. 55:5-56:20.

222.     Booker testified that depending on the situation he would report someone complimenting another female's body; and that if he hears two people having a conversation that is not outwardly inappropriate theres no reason to report them because of their relationship. Exh. 8, bOOKER Dep. P. 53:20-56:20.

223.     Booker testified that if youre in their space and they are joking and having a good time and no one steps away or appears they are uncomfortable then they are comfortable with the conversation. Exh. 8, bOOKER Dep. P. 53:20-56:20.

224.     Booker testified there are innocent touches versus inappropriate touches when asked if any physical touch is considered sexual harassment or discrimination according to bloomingdales policies. He testified it was a gray area. Exh. 8, bOOKER Dep. P. 56:20-57:13.

225.     Defendants offered Booker a severance package to leave his position in early 2018.

**PLAINTIFF'S TERMINATION/DISCRIMINATION/RETALIATION**

226.     Plaintiff was the first and only employee defendants terminated for violating the handbag policy by exceeding the purchase limits. Law Dep. P. 151:15-152:8.

227.     Defendants reported to the Department of Labor the reason for Plaintiff's termination was that plaintiff was terminated because Plaintiff "evaded taxes on purchases she made by shipping the items out of state and exceeded purchase limits on merchandise by category. She admitted to avoiding NYS sales tax and acknowledged that she made an excessive amount of purchases. Explanation given was that she wanted to take advantage of the associate discount before department changes occurred." Exh. 22 , BLM 901-911.

228.     However last charge was on April 21, 2017 and she paid taxes but she rang up Tyler Rose who sent to Yu YU lai and they said her last date of violation to DOL was 4/21/2017.Ex 10

BLM 1572 and Plaintiff's statement from April 2017 shows plaintiff paid taxes on her hnadbags. Exh 12, Mikhyalova 525.

229.    The only evidence defendants had to state Yu Yu Lai was a reseller was statements from Plaintiff's coworkers. These statements were received after Plaintiff's termination (June 16, 2017) and before Defendants' decision to the Union grievance committee not to reinstate plaintiff. (November 17, 2017). Castellani Dep. P.117:3-118:7.

230.    Castellani testified that at the time he suspended Plaintiff he did not know if shipping out of state to avoid taxes was illegal. Castellani Dep. 62:13-63:24.

231.    Abraham Gonzalez worked in Central Investigations and partnered with the Asset Protection team to investigate Plaintiff. Castellani dep. P. 80:12-23;109:21-110:3, Exh 10 BLM 1883-1905.

232.    Performance and conduct includes lateness, sales, and productivity. Diaz Dep. 36:21-37:14.

233.    Diaz oversaw and managed the conduct and performance of Defendants' Chanel handbag department employees. Diaz Dep. 36:21-37:14.

234.    Diaz was responsible for checking the employees' sales everyday and who made the most in a month. Exh. Diaz Dep. P. 83:12-25.

235.    Productivity is measured by whatever the total sales were for the month divided by the number of associates and then take into account the number of hours worked and then it would look at where they would fall in their hourly sales. That would determine whether an assocate was falling below the average or above. Diaz Dep. P. 105:11-106:3.

236.     Plaintiff's termination code – 529 Misconduct/Policy Violation – encompasses numerous issues including any policy violations or misconduct Exhibit 14, Rogg. No. 15. defs Resp to Plaintiffs Interrog Req. dated May 12, 2021.

237.     Younis testified pLAINTIFF was not a top producer nor was there an investigation into her sales. Younis depo p. 48:1-9.

238.     Becker testified Plaintiff was terminated because she rang transactions and did not charge state taxes. Becker Dep. P. 41:5-14.

239.     Defendants did not find plaintiff to be reselling. Becker Dep. P. 47:12-15.

240.     Plaintiff never received reimbursement for any of her purchases.**; Mendoza Decl., Exhibit 12,**MIKHAYLOVA_00154.

241.     Plaintiff did not violate company policy by using her discount to purchase gifts for family and friends. Law Dep. P. 125:13-24.

242.     Law testified that nothing was proven Plaintiff was a diverter. Law Dep. P. 125:3-8.

243.     Plaintiff paid New York taxes on most if not all of her purchases. Castellani Depo. p. 49:23-; Younis Decl. Exh. D.

244.     Plaintiff was terminated by asset protection for not following policy and procedure. yoUNIS DEPO p. 48:12-18.

245.     Defendants replaced Plaintiff with a male employee named Zaid. Exh. Diaz Dep. P. 81:16-82:8.

246.     Rose shipped to two of the same addresses as Plaintiff. Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577.

247.    Rose was not terminated nor did he receive any disciplinaty action against him. Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577;

248.    Law nor anyone in HR inquired into Rose's performance. Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577. HR inquired into Plaintiff's personnel file and performance prior to making the decision to terminate Plaintiff's employment. Exh 10, bates BLM 1516-1518.

249.    Rose refused to write and sign a statement even though was pressured into writing a statement several times by Asset Protection and risk facing termination. Exh. 10, bates BLM1576-1577.

**MISC**

250.    Cox was not produced as the corporate representative to address the discount policies. Exh. Cox Dep. P. 34:8-35:9. Cox was produced to discuss discrimination, sexual harassment policies and training. Exh. Cox Dep. P. 34:8-35:9; Exh. 25 topics 1-4.

251.    Defendants state that their email retention policy is only 60 days, and emails for employees who terminate, unless subject to a litigation hold at the time the employment relationship ends, are not preserved beyond the last date of employment. Exh. 16,  **¶4** Defs Resp. to Doc. Demands (1/21/2021)

252.    Absent a litigation hold at the time of Plaintiff's termination, Defendants' emails related to this action were deleted and/or do not exist. Exh. 16,  **¶4** All emails were deleted after 60 days unless saved on separate server. Exh. 10, BLM 16

253.    Since the events leading to the Plaintiff's termination occurred in mid-June 2017, unless the custodian's email was on a hold from a previous matter, no emails would have been saved from mid-June 2017. Exh. 16,  ¶**4**

254.    Since Richard Law resigned effective December 17, 2017, and his account was not subject to a litigation hold at the time he left Bloomingdale's employ, his emails have not been preserved as they were gone before notice of Plaintiff's claims were served in April 2018. Exh. 16,  ¶**4.**


DATED:   September 19, 2023

New York, New York

DEREK SMITH LAW GROUP, PLLC
*Attorneys for Plaintiff*

_____
Melissa Mendoza, Esq.
One Penn Plaza, Suite 4905
New York, NY 10119
(212) 587-0760