UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

KRISTINA MIKHAYLOVA,

    Plaintiff,

-against-

BLOOMINGDALE'S, INC., BLOOMINGDALE'S, INC. d/b/a BLOOMINGDALE'S AND FORTY CARROTS, BLOOMINGDALE'S, LLC, BLOOMINGDALE'S, LLC d/b/a BLOOMINGDALE'S NEW YORK, MACY'S, INC., MACY'S, INC. d/b/a MACY'S OF NEW YORK, UNITED STOREWORKERS RETAIL, WHOLESALE AND DEPARTMENT STORE UNION AFL-CIO LOCAL 3 a/k/a LOCAL 3 UNITED STOREWORKERS RWDSU/UFCW, DENNIS DIAZ, individually, CHRISTOPHER CASTELLANI, individually, RICHARD LAW, individually, and BOBBY BOOKER, individually,

    Defendants.

---

Civil Action No. 1:19-cv-08927-GDB

**DECLARATION OF PLAINTIFF KRISTINA MIKHAYLOVA IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, KRISTINA MIKHAYLOVA, of full age and ability, hereby declare as follows:

1. I am the Plaintiff in this action. I am a female over the age of eighteen (18) years old and reside in the state of New York.

2. This declaration is submitted in opposition to the Defendants' Motion for Summary Judgment and to clarify and discrepancies from my deposition and Defendants declarations submitted with their Motion for Summary Judgment.

3. Around April 30, 2016, Defendant BLOOMINGDALE's Director for the Chanel Handbag Department Cathy Younis ("YOUNIS") interviewed for a Sales Associate position

1

for Defendant BLOOMINGDALES' and Macys' Chanel handbags department at Defendants Bloomingdales' 59th street location with the address: 1000 Third Avenue, New York, New York 10022 (59th street").

4. On May 3, 2016, I started my employment at 59th street and I was terminated on June 16, 2017.

5. Since first week starting at Bloomingdales, I saw the FBI and NYPD investigating Chanel and Dior Counters all the time for fraudulent activity.

6. Between May 3, 2016 and September 2016, Viktoria Margit Somek and Cathy Younis (Younis) were my direct supervisors.

7. Between May 2016 through December 2016, YOUNIS trained me on selling techniques.

8. Around late October 2016, Denis Diaz (Diaz) became my direct supervisor replacing Margit Somek.

9. All managers including Diaz, Margit Somek, and Younis were aware employees were sending merchandise for themselves or customers to states to avoid taxes.

10. When I started working at Bloomingdales I was advised as a selling technique that I can offer to clients to ship to states where they have no taxes. Because of the fact that I work for a department store and our competition such as saks, bergdorfs and Barneys have a very lenient policy about shipping they are allowed to ship to most states as a gift and not pay tax. We always offer to ship to a state that has no Macy's or Bloomingdales to save on tax.

11. During my employment employees were not allowed to ring themselves up. Since I was not allowed to ring up my own purchases, managers including Diaz rang up my merchandise and were aware of my shipping addresses.

2

12. During my entire employment, the Chanel handbag department was owned and not leased.

13. Between late December 2016 and January 2017, I learned that the chanel handbag department was going leased in July 2017.

14. I wouldn't be able to use my Bloomingdales discount once the chanel department was leased therefore I purchased as much as I could before July 2017.

15. During my employment the Chanel handbag department was limited in handbags therefore we were limited on how many items we could sell to a customer. We could only sell one icon and one non icon or two nonicons in a single transaction per month per customer. The monthly limits were four per month excluding those on sale.

16. The purchase limits applied differently for customers and employees. For example employees were not allowed to buy icon bags.

17. During my employment there was always exceptions to the purchase limits we could sell to customers if we received manager approval. For example, if a husband and wife wanted to buy an icon bag each that would be two icons in one transaction. Per the policy that was not allowed but with managers approval we could do it as separate transactions.

18. During my employment the purchase limits for employees for Chanel handbags were 24 maximum per year exclusive of the handbags purchased during the sales events and there were no limit on shoes.

19. We had sales in February, March, April, and June 2017.

20. There were exceptions as well if we purchased three icon handbags in one month then could only buy one icon handbag the following month.

21. There were no purchase limits on handbags purchased on sale.

22. During my employment the purchase limit policies for Chanel and Bloomingdales were inconsistent.

23. There weren't any purchase limits for customers or employees for shoes.

24. During my employment, I was always told by management that customer service was very important therefore if they wanted us to ship to their out of state address instead of them having to come into the store, we were allowed to do that.

25. During my employment I was always told by management that customers could save on taxes by shipping to their homes if they live out of state so if we saw a customer's address was in New Hampshire we would suggest shipping it there to save them on the taxes.

26. I became pregnant around February 14, 2016.

27. Between April 2017 and June 6, 2017, I saw Asset Protection Manager Christopher Castellani, HR Manager Richard Law, and Younis while at work and it was visible that I was pregnant. I was showing more than my other pregnancies.

28. Between October 2016 and February 2017, Asset Protection Manager Bobby Booker made unwelcoming sexual advances towards me.

29. BOOKER made sexual innuendos towards me, commenting on my buttocks and appearances.

30. Around the same time, another employee of the Defendants' loss prevention unit told me "how can you run with that ass." Defendant BOOKER and other employees in the loss prevention unit frequently called me over to ogle at my buttocks.

31. My coworker Mercedes Modesto also worked in Asset Protection and she would hear and tell me the discriminatory comments the Asset Protection team would make about my body.

32. Around April 14, 2017 my Bloomingdales pre-pay credit card was frozen because I put too much money at once.

33. Around April 19, 2017 I had a meeting with Diaz regarding my tardiness. I explained that I was pregnant with a tentative due date of late November 2017 and that I was having really bad morning sickness and nausea due to my pregnancy. Diaz told me he still has to write me up, until I address it to HR and they will make a conclusion of whether or not they want to consider that write up or not.

34. When I went to HR thereafter which is in the second floor of the building I was told I had to file a request for intermittent FMLA leave. I was not given any other option.

35. Richard Law (Law) was the HR manager and his office was in the same office that I submitted my FMLA leave paperwork.

36. Between April 19, 2017 and June 6, 2017, I would tell Diaz when I became nauseas and dizzy while working on the floor but I was never given an accommodation to sit or take additional breaks. Instead Diaz ignored me.

37. I never received a reasonable accommodation.

38. Around May 15, 2017, I informed Defendant BLOOMINGDALE'S of my nausea and fatigue related to my pregnancy. I informed Defendants that on occasion I had to arrive at work late and leave work early because of the extreme nausea and fatigue I was experiencing from my pregnancy.

39. Between Mid-May and June 2, 2017 my Bloomingdales account was no longer frozen and I was allowed to continue making purchases on my card. I made my first purchase on June 2, 2017.

40. On June 6, 2017 I was pulled from work and interviewed for an investigation with Asset Protection manager Castellani regarding my excessive spending and shipping addresses. Castellani began questioning me about my sale item purchases, the volume of purchased items that were shipped and who I was purchasing those items for. I explained that I purchased the same number of items told and done by my coworkers and manager. That I purchased items for myself, mother, sister, and close friends. I said I followed the handbook and did not exceed purchasing the number of items on sale as per the company manual/handbook I received during training.

41. I felt pressured in writing the statement because I could not lose my job during my pregnancy. I asked Christopher what I was supposed to write because I didn't know what I had done wrong, I was doing what everyone else was doing and I was managed to do. During that interview we never went over either the chanel or bloomingdales handbag policies.

42. I was told that HR was unavailable at that time so I was suspended for abusing my discount and to wait to get a call back from HR.

43. Castellani refused to provide me with a print out of the purchased items in question when I asked that day.

44. During those ten days on suspension without pay, I repeatedly called HR to find out what was happening and why I could not return to work. I knew it could be no other reason than because I was pregnant because no one else was getting investigated like me.

45. Some of my coworkers and Defendant BLOOMINGDALES' employees made less than me and were purchasing more items than me and they were not questioned while I was there. Some of my coworkers were even purchasing multiple of the same pieces and never questioned. I am aware of at least five associates that were shipping purchases out of state and

purchasing items at a high volume while I was there and were never investigated or reprimanded for any wrongdoing. Many of my coworkers have done the same as me for years and never questioned, suspended or fired for the same reason as me.

46. Between June 6, 2017 and June 8, 2017, LAW failed to contact me, subjecting me and ignored my repeated phone and email contact attempts.

47. Around June 8, 2017, I emailed LAW for a status of my suspension and if the decision to terminate me was because of my pregnancy.

48. This email prompted a response from LAW on or about June 9, 2017. LAW left me a voicemail saying that I was not suspended due to my pregnancy and that he needed time to conduct an investigation of my purchases.

49. Notably, Law never addressed my complaints of discrimination and retaliation on the basis of my pregnancy and disability.

50. Around June 15, 2017, LAW, finally answered me. LAW scheduled a meeting with me and LOCAL 3 Representative, KATHY HOUSER for June 16, 2017.

51. On June 16, 2017, Defendants unlawfully terminated me. When I attempted to explain that the BLOOMINGDALES's handbook said otherwise, LAW did not want to listen and told me that the decision was made to terminate my employment. Richard Law informed me that I was terminated because I exceeded my purchase limits and when I told him the policy he was stating was inaccurate he said the decision was done and that I admitted to avoiding taxes. He said the policy limit for shoes was 12 and I purchased 15. I told him that I was shipping gifts out of state and to friends and family that live out of state ansd shipping to customers that live out of state just like everyone else. I asked why no one else was getting fired. The union member said she had never seen anything like that before.

52. After the meeting, LOCAL 3's Representative, HOUSER told me that in her experience this was the first time BLOOMINGDALE'S terminated an employee for exceeding the permitted company policy on handbags and shoes, further indicating BLOOMINGDALES's reason for terminating me was merely pretextual.

53. Around the same time, I confirmed with a few of my fellow coworkers that there weren't any limits on the handbag selling policy.

54. Around June 20, 2017, I filed a grievance with Defendant LOCAL 3 against BLOOMINGDALE'S for unlawful termination.

55. Around July 10, 2017, LOCAL 3 held a grievance hearing with Defendants contesting BLOOMINGDALE'S unlawful suspension and termination. During the hearing a representative for BLOOMINGDALE'S could not identify and/or explain BLOOMINGDALE'S decision to terminate me.

56. Around November 17, 2017, LOCAL 3 issued me a letter stating that BLOOMINGDALE'S denied reconsideration of my termination. Notably, this was around the same time as my due date which Defendants were aware of.

57. Defendants subjected me to severe emotional distress late in my pregnancy.

58. On November 23, 2017, I gave birth to my son.

59. Despite Defendants unlawful termination, I was able to obtain subsequent employment with Louis Vuitton Maison from January 2018 to April 2018.

60. I was then employed by Chanel Handbags at Saks 5th Avenue from April 2018 to February 2021.

61. I have been employed with Christian Dior since February of 2021.

8

62. I read and disagree with the Declaration of Cathy Younis filed in support of Defendants' Motion for Summary Judgment dated April 10, 2023. Specifically, Lines 8, 12, and 17.

63. Defendant BLOOMINGDALES had three (3) shifts at the time of my employment. The meetings that I attended occurred during my second or third shift, opposed to the morning and handbag policy limits were not discussed.

64. In Line 12, YOUNIS fails to mention that it was not in violation of the employee handbook to ship handbags and other products when purchased as a gift or ordered by in-store customers. Following the shipment of gifts and in-store customer orders, Defendant BLOOMINGDALES required its employees to process these orders through Defendant BLOOMINGDALES' Asset Protection and Shipping departments. At all times material, none of my shipments were ever questioned or stopped.

65. Regarding Line 17, YOUNIS never offered me any kind of accommodation. Moreover, at no point did YOUNIS or DIAZ advise me of any of my rights as a pregnant woman.

66. I read and disagree with the Declaration of Courtney Cox filed in support of Defendants' Motion for Summary Judgment dated April 11, 2023. Specifically, Lines 25 and 33.

67. Regarding Line 25, my doctor provided Defendant BLOOMINGDALES with a list of my requested accommodations.

68. Regarding Line 33, DIAZ advised me that the formal reminder on April 19, 2017 would be dismissed once Defendant BLOOMINGDALES' Human Resources Department learned of my pregnancy and related morning sickness.

69. I read and disagree with the Declaration of Fred Becker filed in support of Defendants' Motion for Summary Judgment dated April 14, 2023. Specifically, Lines 17, 24, and 27.

70. Regarding Line 17, as Line 16 states, I completed memo orders for the sales in questions and there was no evidence of collusion. Moreover, Defendant CASTELLANI advised me that Defendants' investigation was completed, and no evidence of wrongdoing had been found. Additionally, Defendant BLOOMINGDALES' Asset Protection Department was well aware of customers making large orders and advised me they are allowed so long as the cash office approves them, which they did.

71. Moreover, every phone order I ever completed while working for Defendant BLOOMINGDALES was approved by the cash office.

72. Regarding Line 24, BECKER insinuates I was evading taxes which I was not. I mailed gifts to individuals living in different states, as permitted by Defendant BLOOMINGDALES.

73. Regarding Line 27, at no point did I work with diverters.

Pursuant to 28 U.S.C. §1746(2), I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated:  September 19, 2023
        New York, New York

*Kristina Mikhaylova (Sep 19, 2023 16:52 EDT)*

Kristina Mikhaylova