# EXHIBIT 1

```
 1    UNITED STATES DISTRICT COURT
 2    SOUTHERN DISTRICT OF NEW YORK
 3     - - - - - - - - - - - - - - - - - - -x
 4    KRISTINA MIKHAYLOVA,
 5
                            Plaintiff,
 6
              -against-   Civil Action No.:
 7                         1:19-cv-08927-GDB
 8
      BLOOMINGDALE'S, INC.,
 9    BLOOMINGDALE'S, INC. d/b/a
      BLOOMINGDALE'S AND FORTY
10    CARROTS, BLOOMINGDALE'S, LLC,
      BLOOMINGDALE'S, LLC d/b/a
11    BLOOMINGDALE'S NEW YORK,
      MACY'S, INC., MACY'S, INC. d/b/a
12    MACY'S OF NEW YORK, UNITED
      STOREWORKERS RETAIL,
13    WHOLESALE AND DEPARTMENT
      STORE UNION AFL-CIO LOCAL 3 a/k/a
14    LOCAL 3 UNITED STOREWORKERS
      RWDSU/UFCW, DENNIS DIAZ,
15    Individually, CHRISTOPHER
      CASTELLANI, individually, RICHARD
16    LAW, individually, and BOBBY BOOKER,
      individually
17                         Defendants.
18     - - - - - - - - - - - - - - - - - - -x
19                         Zoom Video Conference
20            DEPOSITION of KRISTINA MIKHAYLOVA
                           March 8, 2022
21                         10:25 a.m.
22
23
24
25
```

                                            Page 1

Kristina Mikhaylova
March 8, 2022

1  DEPOSITION of KRISTINA MIKHAYLOVA, the
2  Plaintiff in the above-entitled action,
3  held vie Zoom Video Conference, taken
4  before Dikila T. Bhutia, a Shorthand
5  Reporter and Notary Public of the State of
6  New York, pursuant to the Federal Rules of
7  Civil Procedure, order and stipulations
8  between Counsel.
9
10          *    *    *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

1  APPEARANCES
2
3  DEREK SMITH LAW GROUP, PLCC
    Attorneys for the Plaintiff
4  1 Pennsylvania Plaza, Suite 4905
    New York, New York 10119
5
    BY:  MELISSA MENDOZA, ESQ.
6
7
    SCHOEMAN UPDIKE KAUFMAN & GERBER
8  Attorneys for the Defendants
    551 Fifth Avenue, 12th Floor
9  New York, NY 10017
10 BY:  STEVEN GERBER, ESQ.
11
12 MACY'S, INC. LAW DEPARTMENT
    Attorneys for the Defendants
13 MACY'S INC.,BLOOMINGDALE'S, LLC AND
    CHRISTOPHER CASTELLANI
14 11477 Olde Cabin Rd., Suite 400
    Creve Coeur, Missouri 63141
15
    BY:  BETTY TIERNEY, ESQ.
16
17
    ALSO PRESENT:  David Tyndall -
18      Paralegal for Macy's
19
20
21
22
23
24
25

Page 4

1      STIPULATIONS
2
3      IT IS HEREBY STIPULATED AND AGREED, by
4  and among counsel for the respective
5  parties hereto, that the filing, sealing
6  and certification of the within deposition
7  shall be and the same are hereby waived;
8      IT IS FURTHER STIPULATED AND AGREED
9  that all objections, except as to form of
10 the question, shall be reserved to the
11 time of the trial;
12     IT IS FURTHER STIPULATED AND AGREED
13 that the within deposition may be signed
14 before any Notary Public with the same
15 force and effect as if signed and sworn to
16 before the Court.
17          *    *    *
18
19
20
21
22
23
24
25

Page 3

1  K R I S T I N A  M I K H A Y L O V A, the
2  Witness herein, having first been duly
3  sworn by the Notary Public, was examined
4  and testified as follows:
5  BY
6  THE COURT REPORTER:
7      Q.   Please state your name for the
8  record.
9      A.   Kristina Mikhaylova.
10     Q.   Please state your address for
11 the record.
12     A.   7330 198 Street, apartment 1,
13 Fresh Meadows, New York 11366.
14 EXAMINATION BY
15 MS. TIERNEY:
16     Q.   Good morning, Ms. Mikhaylova.  I
17 think you were being sworn in by the court
18 reporter.  I missed the rest of that.
19          Are you alone in the home?
20 First of all, where are you having the
21 deposition taken?
22     A.   In my home.
23     Q.   Are you alone?
24     A.   I am alone, my kids are in
25 school.

Page 5

2 (Pages 2 - 5)

K. MIKHAYLOVA

1          K. MIKHAYLOVA
2    Q.   And are there any papers around
3  you?
4    A.   No.  No, I can show you guys.
5    Q.   Thank you.
6    A.   Okay.
7    Q.   Ms. Mikhaylova, my name is Betty
8  Tierney.  I am actually an employee of
9  Macy's and Bloomingdale's.  I am inhouse
10 counsel and I have been admitted to this
11 case specifically by the court.
12 Mr. Gerber is my co-counsel and David
13 Tyndall is one of our paralegals.  We are
14 the team that is defending this case and
15 I will be the one asking you questions
16 today.
17   A.   Okay.
18   Q.   I am not trying to ask tricky
19 questions but as a lawyer, sometimes I
20 think I am smarter than I am and I ask
21 questions that may not make a lot of
22 sense.  So, if I ask you something that
23 doesn't make sense, I would ask that you
24 let me know that.  Can we agree that you
25 will do that?

Page 6

1          K. MIKHAYLOVA
2  that's what the answer is going to be,
3  tell me I can't answer that without
4  talking to counsel.  We can take a break
5  and you can talk to your attorney but just
6  know that that's not something I am trying
7  to get.
8    A.   Okay.  I am allowed to speak --
9  I am allowed to ask my attorney or speak
10 with her?
11   Q.   If you need to take a break and
12 you need to get clarification, you can't
13 talk about the substance of the case
14 during the deposition --
15   A.   Okay.  Got it.
16   Q.   And if you need to take a break,
17 we would ask that you answer any pending
18 question and then you take a break.  Okay?
19   A.   Okay.
20   Q.   With respect to the deposition
21 today, I am entitled to know your best
22 recollection.  I know its been five years
23 since a lot of these events.
24   A.   Yes.
25   Q.   And so I don't want you to guess

Page 8

1          K. MIKHAYLOVA
2    A.   Okay.
3    Q.   And if you answer the question,
4  I will argue to the court that you
5  understood it since you did not tell me
6  that you did not understand it.  Do you
7  understand that as well?
8    A.   Yes, I understand.
9    Q.   Ms. Mikhaylova, have you ever
10 been deposed before?
11   A.   No.
12   Q.   I don't want to know any
13 content of conversation with your
14 attorney, but did you get a chance to meet
15 with your attorney to prepare for this
16 deposition?
17   A.   Yes.  I had a small chance.
18 Yes, we did speak.
19   Q.   If I ask you a question and you
20 think it is trying to get into
21 conversations with your attorney, let me
22 just tell you now, I am not trying to get
23 into anything you said to your attorney.
24 I am not entitled to know that nor am I
25 trying to get that.  So if you think

Page 7

1          K. MIKHAYLOVA
2  or speculate but I do want you to give me,
3  if you have a basis for estimating, I want
4  you to do that because I want to get your
5  best testimony today.
6    A.   Got it.  Will do.
7    Q.   At the end of the deposition,
8  the court reporter who is taking down
9  everything that is being said today, my
10 questions, your answers, any objections by
11 your counsel, she is going to put it into
12 a book and you will have a chance to
13 review it.
14   A.   Okay.
15   Q.   And you understand what you are
16 saying today is under oath?
17   A.   Yes.
18   Q.   With the penalty of perjury?
19   A.   Absolutely.
20   Q.   Very good.
21      Ms. Mikhaylova, my records show
22 you started working for Bloomingdale's
23 somewhere around April 30th of 2016; is
24 that correct?
25   A.   Yes.  That seems about accurate.

Page 9

3 (Pages 6 - 9)

K. MIKHAYLOVA

1
2   Q.   How did you come to work at
3   Bloomingdale's?
4       A.   I saw an ad on Linkedin for a
5   Chanel Handbag Department.  I was at
6   Prada.  At that time my store was closing.
7   They were sending me to another location
8   but I wanted to see my options.  So I sent
9   in my résumé.  I got a call back very
10  quickly from Cathy Younis.  I got an
11  interview.  She really liked me
12  immediately and offered me the job I
13  believe the next day.
14      Q.   Now, can I ask you how old you
15  are currently, Ms. Mikhaylova?
16      A.   I am currently thirty-five years
17  old.
18      Q.   Do you have a degree or a
19  diploma?
20      A.   Yes.
21      Q.   Do you have a college degree?
22      A.   I did not finish college.  I
23  went to Queens College to become a teacher
24  and never finished it.
25      Q.   How much college do you have,

K. MIKHAYLOVA

1
2   Ms. Mikhaylova?
3       A.   Two and a half years.
4       Q.   Did you have any other college
5   education after Queens College?
6       A.   No, I did not.
7       Q.   Have you taken any type of
8   merchandising or any type of course work
9   related to marketing, sales, anything of
10  that nature?
11      A.   No, I did not.
12      Q.   After college what was your
13  first full-time employment?
14      A.   I actually worked for Bebe.  I
15  was eighteen years old.  It was a store on
16  53 Street and Fifth Avenue.
17      Q.   What was your role at Bebe?
18      A.   Sales.
19      Q.   How long were you at Bebe?
20      A.   I was at Bebe for almost two
21  years.
22      Q.   Do you remember who your
23  supervisor was at Bebe?
24      A.   Yes.  Lana Stimlar; L-A-N-A,
25  S-T-I-M-L-A-R.  I have her on my Facebook.

K. MIKHAYLOVA

1
2   I can confirm the spelling of her last
3   name.
4       Q.   After you left Bebe, where did
5   you go if anywhere?
6       A.   I went to a store called Lounge.
7   It was in Soho.  It was a trending up and
8   coming store that sold lot of designer
9   wear for both men and woman.  It was down
10  in Soho.  I believe the address is 305
11  Broadway but I could be mistaken.  It was
12  so many years ago.
13      Q.   Do you know if the Lounge is
14  still around?
15      A.   It is not.  They opened a few
16  other stores after that store closed down
17  but they are not around.
18      Q.   How long did you work at the
19  Lounge?
20      A.   I worked there for about a year
21  and a half.
22      Q.   Why did you leave the Lounge?
23      A.   Well, I left because they -- I
24  wanted to go into sales.  I was doing kind
25  of a supervisor there.  I wanted to just

K. MIKHAYLOVA

1
2   do sales to get commission.  It was taking
3   too long to transition and I got recruited
4   by another company called Blanc De Chine
5   on Fifth Avenue and they offered me a much
6   better salary and commission so I went
7   from Lounge to Blanc De Chine.
8       Q.   How do you spell that if you
9   would?
10      A.   B-L-A-N-C D-E C-H-I-N-E.  It is
11  a luxury brand based out of Hong Kong.
12  They have their own store in the US.
13      Q.   The one you were in was the only
14  store in the US?
15      A.   It was the only store in the US,
16  yes.
17      Q.   What was your role at that
18  location?
19      A.   Sales.
20      Q.   How long were you there?
21      A.   I was there for a little over
22  two years.
23      Q.   Why did you leave that --
24      A.   I left there because I got
25  recruited from a client.  She was a good

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

K. MIKHAYLOVA

1  client.  She was a Saudi princess.  I was
2  doing shopping with her on the side.  I
3  went to the Giorgio Armani store that had
4  just recently opened on Fifth Avenue.  And
5  the -- I was shopping with her and the
6  manager there loved me and offered me a
7  job and put me in their women's
8  Ready-to-Wear Department.  From there I
9  worked in Armani.
10  Q.   How long were you there?
11  A.   I was there for -- I want to
12  guess about almost two years if I'm not
13  mistaken.
14  Q.   Who was your supervisor there?
15  A.   Jamie Moy.  J-A-I-M-E.  M-O-Y is
16  the last name.
17  Q.   And then why did you leave --
18  did you say Armani?
19  A.   Yes.
20  Q.   Why did you leave?
21  A.   I left Armani because I went to
22  -- one of my associates had went to Prada
23  and she had recruited me to go to Prada
24  and Prada offered me a better pay so I

K. MIKHAYLOVA

1  for the job.
2  Q.   Were you looking to leave Prada
3  at that time?
4  A.   I wasn't looking.  My store was
5  closing down.  They wanted me to go to
6  Fifth Avenue and I was okay with that.
7  But I mean, I love Chanel.  I love Chanel
8  as a brand.  It is my favorite brand.  So
9  I definitely, I got very excited.  And I
10  said you know what, let me give it a
11  chance and see what happens and I applied.
12  Q.   And you were there for
13  Bloomingdale's?
14  A.   Yes, correct.
15  Q.   And were you a sales associate
16  in handbag, Chanel Handbag Department?
17  A.   Yes.
18  Q.   Have you found employment since
19  leaving Bloomingdale's?
20  A.   Yes.
21  Q.   What was the first position you
22  took after leaving Bloomingdale's?
23  A.   Louis Vuitton.
24  Q.   What location?

K. MIKHAYLOVA

1  went to Prada.  At that point, at that
2  time Prada was a better brand selling more
3  than Armani so I made that decision to go
4  to Prada.
5  Q.   Who was your supervisor in
6  Prada?
7  A.   Davade, D-A-V-A-D-E.  His last
8  name start with S.  It is a long Italian
9  last name.  I can look at my Facebook.  Do
10  you do need it?
11  Q.   No, that's fine.
12  A.   Okay.
13  Q.   What was your role at Prada?
14  A.   Also sales.
15  Q.   How long were you in Prada?
16  A.   I was there for a little over
17  two years.
18  Q.   And I think you said you left
19  Prada to go to Bloomingdale's?
20  A.   That's correct.  Then I went to
21  Bloomingdale's.
22  Q.   And that's because you saw an
23  advertisement in Linkedin?
24  A.   Yes.  I applied through Linkedin

K. MIKHAYLOVA

1  A.   Fifth Avenue.
2  Q.   Did you make more money working
3  at Louis Vuitton?
4  A.   No, absolutely not.  I made less
5  money.
6  Q.   At Chanel how were you paid
7  commission?
8  A.   I was paid commission verses
9  draw.
10  Q.   What was your -- you were there
11  only a year.  We have your records.
12  A.   I honestly don't remember the
13  draw I was up against.  It was -- I don't
14  remember.
15  Q.   How were you compensated at
16  Louis Vuitton?
17  A.   I was paid 32 an hour, plus 1
18  percent commission.
19  Q.   Was Louis Vuitton handbags as
20  well, was it other items, or what was it?
21  A.   I wasn't in Ready-to-Wear.  I
22  was able to sell handbags but I was in
23  Ready-to-Wear shoes.
24  Q.   Did you stay in Ready-to-Wear

5 (Pages 14 - 17)

K. MIKHAYLOVA
1
2  shoes during your time at Louis Vuitton?
3      A.   Yes.
4      Q.   How long were you with Louis
5  Vuitton?
6      A.   Very short.  I was with them
7  under ninety days.
8      Q.   Why did you leave Louis Vuitton?
9      A.   Because my old friend who put me
10 to Chanel at Saks and I wanted to go back
11 to Chanel so I --
12     Q.   I apologize.  I did not mean to
13 interrupt.
14          Who was your friend that
15 recruited you back to Chanel at Saks?
16     A.   She actually used to work at
17 Bloomingdale's as well.  Her name is
18 Thinny; T-H-I-N-N-Y.  I don't remember her
19 last name.  She said there was an open
20 position.  She worked with me in
21 Bloomingdale's in the Ready-to-Wear
22 department.  She was in Ready-to-Wear and
23 I was in clothing.  I mean, I was in
24 handbag.  Pardon me.  She said listen,
25 there is a position at Saks for Chanel

Page 18

K. MIKHAYLOVA
1
2      Q.   During the six or seven month
3  period of time, eight months give or take,
4  how many places did you apply?
5      A.   I have only applied to two
6  places.  I was -- at that point I was very
7  pregnant.
8      Q.   So two places you applied were
9  Saks and where else?
10     A.   I believe it was Valentino.
11     Q.   Neither place hired you; is that
12 correct?
13     A.   Correct.
14     Q.   And other than those two places
15 during the eight month period of time you
16 did not apply to any other, and you said
17 part of the reason was you were pregnant?
18     A.   Yes, super pregnant.  If
19 somebody is going to see a pregnant woman,
20 it was -- if I wanted a good job to stay
21 there, they weren't going to hire me.  And
22 I didn't want to go from Chanel to
23 something, you know, because -- just
24 because -- I mean, I still tried to apply
25 but I think once they saw I was pregnant,

Page 20

K. MIKHAYLOVA
1
2  handbags, I think it would be great.  I
3  applied for it immediately.  I was super
4  happy to see that because again, I love
5  Chanel and I decided to go to Saks.
6      Q.   Now, how soon after leaving
7  Bloomingdale's did you start working at
8  Louis Vuitton?
9      A.   So I left Bloomingdale's June of
10 2017.  I started working in Louis Vuitton
11 I believe in January or February of 2018.
12     Q.   For that six or seven months you
13 were unemployed, were you looking for
14 work?
15     A.   Yes, I was.
16     Q.   And do you have your résumé and
17 applications, copies of those that you can
18 provide?
19     A.   Most places you don't have an
20 application.  I do -- I actually, I might
21 have an e-mail that I interviewed
22 actually, at Saks at that time.  I believe
23 it was Saks that I sent out my résumé to.
24 I probably will be able to pull that out
25 -- at that time.

Page 19

K. MIKHAYLOVA
1
2  it was a done deal.  I was six months at
3  that time and I was late six months
4  pregnant woman.
5      Q.   When you applied at Saks or
6  Valentino, were you either of those
7  applications in person?
8      A.   No, they were both -- both of
9  them were e-mails I believe.  Valentino
10 might have been in-person actually.  But I
11 know Saks for sure it was through e-mail.
12     Q.   Do you know if anyone at Saks
13 knew you were pregnant at that time?
14     A.   I mean, they didn't know but I
15 was visibly pregnant.  I mean, you know,
16 I'm not a small girl.  You could see I had
17 a belly.
18     Q.   You said you applied through
19 e-mail.  Did you have an in-person
20 interview where someone could see that you
21 were pregnant at Saks?
22     A.   I do not recall if I had an
23 in-person interview.  I know I sent in my
24 résumé.  I was talking to somebody there.
25 I cannot recall if I actually went to an

Page 21

6 (Pages 18 - 21)

K. MIKHAYLOVA

1    K. MIKHAYLOVA
2   interview or I did not.
3      Q.   So you think you might have had
4   an in-person interview at Valentino?
5      A.   Well, Valentino I went in person
6   and I gave them my résumé.
7      Q.   Just to make sure the record is
8   clear and that we are accurate, other than
9   the two applications from the time you
10  left Bloomingdale's until January or
11  February of that year when you started at
12  Louis Vuitton, the only application you
13  put for work were Saks and Louis Vuitton?
14     A.   Yes.
15     Q.   At Louis Vuitton, was it forty
16  hours a week or less?
17     A.   It was forty.
18     Q.   When did you start Chanel at
19  Saks?
20     A.   Immediately after.  So, if I
21  left there in March, I started the next
22  day.  I might have been there April 1st.
23  I don't recall the exact state but it was
24  immediately after.
25     Q.   April 1st of 2018 is your best

Page 22

1    K. MIKHAYLOVA
2      A.   I'm sorry?
3      Q.   How many times?
4      A.   Well, I hit it that year, I hit
5   the next year as well.
6      Q.   You hit --
7      A.   I worked for Saks, just so you
8   know, for Chanel.  It converted into
9   Chanel then.  So, it went leased.  So, the
10  pay structure was already different once
11  it went leased.
12     Q.   You are talking about Saks?
13     A.   Yes.
14     Q.   When you started at Saks it was
15  a similar pay structure to what you had at
16  Bloomingdale's, you got a commission on
17  your Chanel products?
18     A.   Correct.
19     Q.   It was mostly handbags or was it
20  all handbags?
21     A.   It was all handbags pretty much.
22     Q.   At that point in time if you hit
23  a million dollars in sales you get a bonus
24  from Saks?
25     A.   Correct.

Page 24

1    K. MIKHAYLOVA
2   of your recollection of when you went?
3      A.   Yes.
4      Q.   Were you selling the same
5   product that you had been selling at
6   Bloomingdale's?
7      A.   Yes, I was.
8      Q.   Was your compensation similar or
9   more?
10     A.   It was similar.  It was the
11  same, commission verses draw.
12     Q.   Were you eligible for any
13  bonuses or any other type of compensation
14  at Saks?
15     A.   If you hit a million, you do get
16  a bonus.
17     Q.   Do you know if there was
18  anything like that at Bloomingdale's?
19     A.   I do not believe so.
20     Q.   Have you ever hit the million?
21     A.   Yes, in my first six months.
22     Q.   And have you hit the million
23  since then?
24     A.   Yes.
25     Q.   How many times?

Page 23

1    K. MIKHAYLOVA
2      Q.   What was the bonus?  How was
3   that structured?
4      A.   For every million you get --
5   when you hit a million you get 1,200.
6   When you hit 1.1 million you get -- no,
7   I'm sorry.  If you hit a million you get a
8   thousand.  When you hit 1.1 million you
9   get 1,200.  1.3, 1,300.  It was similar
10  along those lines.  Basically, after hit
11  every 100,000 you made, you made I believe
12  a 1,000, 1,100, 1,200, 1,300, and so
13  forth.  Then you get 2,100, 2,200.
14     Q.   I think you said you hit the
15  million in 2019 as well?
16     A.   Correct.  It was already in a
17  Chanel structure where I didn't get that
18  bonus.
19     Q.   Even though you hit at 2019,
20  that was a new structure.  What was the
21  structure under Chanel?
22     A.   It was hourly which is $25 an
23  hour and 3 percent commission.
24     Q.   I'm sorry.  You said $25 an hour
25  plus 3 percent commission?

Page 25

K. MIKHAYLOVA

1      A.   Correct.
2      A.   Correct.
3      Q.   Now, I know there was a similar
4  issue at Bloomingdale's where it went to a
5  licensed department; is that correct?
6      A.   Yes.
7      Q.   Did your pay structure change at
8  Bloomingdale's when that transition
9  occurred?
10     A.   I wasn't there for that
11 transition.
12     Q.   You were there before that
13 occurred?
14     A.   Correct.
15     Q.   Are you still at Saks?
16     A.   I am currently at Dior.
17     Q.   How long did you stay at Saks
18 Chanel?
19     A.   Till December 2020.
20     Q.   Why did you leave that position?
21     A.   Well, it was personal reasons.
22 I went to Neiman Marcus and I was able to
23 sell Chanel through there getting 7
24 percent commission.
25     Q.   Was it solely based on pay?

Page 26

K. MIKHAYLOVA

1      A.   There were some other reasons
2      A.   There were some other reasons
3  but it was more personal for me. I wanted
4  to go to a new environment. Neiman Marcus
5  had just opened in Hudson Yards. The
6  manager at -- that was -- the manager at
7  Saks, he went to Neiman Marcus. He was
8  recruiting me for months to go there and I
9  was like, I think it is a better
10 opportunity. I wanted to go to Neiman
11 Marcus. Unfortunately, Neiman Marcus was
12 short lived because once COVID hit, they
13 announced bankruptcy and they closed down.
14 Sad enough.
15     Q.   When you say personal reasons,
16 was there something other than location?
17     A.   Elaborate on the location part.
18     Q.   You just said --
19     A.   I left for personal reasons. I
20 wasn't too happy there so I wanted to go
21 somewhere else.
22     Q.   I am asking you what it was that
23 you were unhappy about at Chanel Saks?
24     A.   Just personal reasons. It
25 wasn't --

Page 27

K. MIKHAYLOVA

1      Q.   What does that mean?
2      Q.   What does that mean?
3      A.   It was the hours. I was too
4  stressed out there and I -- I couldn't
5  manage my children.
6      Q.   What was it about the position
7  that was stressing you out?
8      A.   Everything, because Chanel has
9  -- because everything had to go through
10 like layer to get stuff approved. Getting
11 a handbag was very hard because it was a
12 huge list. I was battling with twenty
13 other associates. You had to fight for
14 every bag to get. It was stressful.
15     Q.   When you say to get every bag,
16 do you mean to get them to sell or to get
17 the customers to sell?
18     A.   No. I had all the customers to
19 sell. It was hard to get the bags because
20 it was a lot of people you were working
21 against. You were working against a big
22 team.
23     Q.   Neiman Marcus goes to
24 bankruptcy. Where do you go next, if any
25 place?

Page 28

K. MIKHAYLOVA

1      A.   Dior.
2      A.   Dior.
3      Q.   I'm sorry?
4      A.   Dior, Hudson Yards.
5      Q.   You are still at Dior?
6      A.   I am still at Dior.
7      Q.   What is the pay scale or method
8  of payment at Dior?
9      A.   $23 an hour and 3 percent
10 commission.
11     Q.   When you are talking about the
12 stress at Saks, I know that there is some
13 medical records that you began taking
14 antidepressant?
15     A.   Yes.
16     Q.   During the time you were at
17 Saks?
18     A.   Yes, correct.
19     Q.   Was it because of the stress at
20 Saks?
21     A.   Yes. Well, Saks. Then it
22 reminded me about Bloomingdale's. It just
23 brought about the Chanel work ethics. It
24 was very stressful for me. I felt like it
25 was time -- I couldn't handle it.

Page 29

K. MIKHAYLOVA

1
2    Q.    Let me ask again.
3          When you began taking your
4    antidepressant it was in November of 2019;
5    is that correct?
6    A.    I believe so.
7    Q.    You went there because of stress
8    associated with Saks?
9    A.    Not Saks.  Chanel.
10   Q.    I'm sorry, Chanel.  You went to
11   see the doctor because of the stress
12   associated with Chanel?
13   A.    With Chanel and the stress, it
14   reminded me of the stress that I had at
15   Bloomingdale's with getting the handbags.
16   You have to always fight for every handbag
17   because the assortment is very small.  It
18   was just a very stressful environment to
19   be in.
20   Q.    Let me jump back to the time you
21   were at Bloomingdale's and selling Chanel
22   handbags.  Did you have the same issue
23   with getting bags to sell?
24   A.    Absolutely.
25   Q.    That's why there were limits on

Page 30

K. MIKHAYLOVA

1    Handbags Department, correct?
3    A.    Correct.
4    Q.    And you --
5    A.    But --
6    Q.    I know you have your own story,
7    Ms. Mikhaylova, but if we are going to get
8    done in seven hours if you need to answer my
9    questions.  If your counsel is suggesting
10   something else, she can do that.
11   A.    Okay.
12   Q.    At the time you went to get on
13   your antidepressant you had been gone from
14   Bloomingdale's from over two and a half
15   years, correct?
16   A.    Correct.
17   Q.    Are you still on your
18   antidepressant, Lexapro?
19   A.    No, I am not.
20   Q.    How long were you on Lexapro?
21   A.    About two -- about three months
22   months.
23   Q.    And then I know also from your
24   medical records which we will look at
25   shortly that there was a referral, at

Page 32

K. MIKHAYLOVA

1    how many bags you could buy personally
2    because they wanted access for the
3    customers, correct?
4    A.    Correct.  However, at
5    Bloomingdale's, mostly the bags associates
6    were purchasing.  If you look back in the
7    records in Bloomingdale's you will see,
8    not me but other associates, every time
9    there was a release on a bag, it was only
10   purchased by associates and not by
11   customers.
12   Q.    Do you have any documentation
13   that would show that?
14   A.    I don't, but I'm sure you guys
15   can pull it up on your end.
16   Q.    That's just your understanding.
17   You don't have any documents that show
18   that?
19   A.    I can provide documents to show
20   that other associates because I was
21   selling to associates as well.
22   Q.    Right.  And we will get to that
23   because at the time there was a
24   significant fraud going on in the Chanel

Page 31

K. MIKHAYLOVA

1    least a recommendation that you see a
2    psychiatrist or that you had asked about
3    seeing a therapist of some sort; is that
4    correct?
5    A.    Yes.
6    Q.    What was it?  Did you ask or
7    were you recommended?
8    A.    Both.  I asked and I was
9    recommended.
10   Q.    Did you ever see a psychiatrist
11   or mental health therapist?
12   A.    No.  I wanted to but the
13   appointments, we couldn't get one and
14   COVID hit and it became an issue.
15   Q.    Do you have any intent to go see
16   now that COVID is ending to see a mental
17   health professional; psychiatrist,
18   therapist, et cetera?
19   A.    I do.
20   Q.    Are you currently on insurance
21   through Dior that would allow you that
22   access to a mental health provider?
23   A.    Yes.
24   Q.    Have you done anything towards

Page 33

9 (Pages 30 - 33)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1 trying to find a mental health
2 professional?
3     A.   Yes.
4     Q.   What have you done?
5     A.   I have looked.  I have called.
6 I am looking to go -- I have a lot going
7 on now.  Right now I am in an okay stage
8 in my life where I don't feel like I need
9 one at the moment.  I -- when I get there
10 and my anxiety goes up, I will start
11 looking again.
12     Q.   Is there anything that you, and
13 I know you are not a medical provider and
14 I am not asking for a medical opinion, but
15 have you observed anything in particular
16 that causes what you just said your
17 anxiety?  Is there any time that you
18 notice that that happens?
19     A.   When I am stressed out.
20     Q.   Is that work stress, child?
21     A.   Combination.
22     Q.   The general functions of life,
23 working, raising kids, all of that causes
24 stress for you?

K. MIKHAYLOVA

1     A.   Yes.
2     Q.   You believe all of these
3 activities causes significant amount of
4 stress such as you want to see a mental
5 health provider?
6     A.   Absolutely.
7     Q.   But you are not -- strike that.
8         Why did you stop your Lexapro if
9 you were still having stress?
10     A.   I don't want to be on any
11 medication.
12     Q.   Is it fair to say that your
13 medical provider did not recommend you
14 getting off medication?
15     A.   Yes.  He didn't want me to get
16 off of it but I chose to get off of it.
17     Q.   Other than that three month
18 period of time, have you ever been on any
19 type of psychotropic drug or drug for
20 mental health condition?
21     A.   No.
22     Q.   Are you on any other medications
23 for issues or ailments --
24     A.   No.

K. MIKHAYLOVA

1     Q.   -- currently?
2     A.   No.
3     Q.   After you left Bloomingdale's
4 did you see a medical care provider for
5 any type of mental or physical ailment
6 related to what you have attributed to
7 Bloomingdale's conduct?
8     A.   Just my doctor.
9     Q.   When you say your doctor --
10     A.   At that point I didn't have
11 insurance that would -- I believe I had
12 Medicaid but they didn't cover good
13 therapists so I didn't go to see a
14 psychiatrist at that time.
15     Q.   You were on no medication for
16 psychological issues at that time?
17     A.   I was pregnant, no.
18     Q.   When was your child born in
19 2017?
20     A.   November 23, 2017 on
21 Thanksgiving, he day before Black Friday.
22     Q.   Did you have medical insurance
23 to cover for your job?
24     A.   Yes, I did.

K. MIKHAYLOVA

1     Q.   Who was that insurance through?
2     A.   Medicaid.
3     Q.   Did you have insurance through
4 Bloomingdale's?
5     A.   I don't remember.
6     Q.   And I think you said after
7 Bloomingdale's you went to Bebe.  No, I'm
8 sorry.  You went to Louis Vuitton.  You
9 were eventually there for ninety days.
10 Did you have any insurance at the time?
11     A.   I don't believe so.
12     Q.   How about Saks?  Did you have
13 any insurance at Saks?
14     A.   I believe so.
15     Q.   Let me ask it this way.
16         Did you have access to insurance
17 at Saks?
18     A.   Yes.
19     Q.   Do you recall if you signed up
20 for the insurance at Saks?
21     A.   I don't recall.
22     Q.   And then when it became Chanel,
23 did your access to benefits change in any
24 way?

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1
2   A.   Yes, I had insurance at Chanel.
3   Q.   You participated in the
4   insurance plan or program, whatever that
5   required?
6   A.   Yes.
7   Q.   How about at Dior?  Do you
8   currently have medical insurance?
9   A.   I do.
10   Q.   You believe that allows you to
11   have visits to a therapist or psychiatrist
12   as needed?
13   A.   Yes.
14   Q.   When you started at
15   Bloomingdale's, did you go through an
16   orientation period?
17   A.   Yes.
18   Q.   My knowledge which maybe
19   different than your experience is that
20   that's a normal three day orientation
21   period; is that correct?
22   A.   I don't recall.
23   Q.   You are not aware one way or the
24   other?
25   A.   I'm sorry?

Page 38

K. MIKHAYLOVA

1
2   the Code of Conduct?
3   A.   I believe so.
4   Q.   Do you recall having to sign off
5   on the Code of Conduct?
6   A.   It's been so long.  I don't
7   recall.  I mean, I must have.  I think I
8   did, but I'm not a hundred percent sure.
9   Q.   For your orientation were you
10   alerted to the policies and procedures you
11   were required to follow as employee of
12   Bloomingdale's?
13   A.   Correct.
14   Q.   You don't recall if you looked
15   at the handbook and you looked at the
16   policies within the handbook?
17   A.   No, no.  I looked.  You want me
18   to know if I read through the whole
19   handbook and that I don't recall.
20   Q.   You just made a distinction and
21   I am going to follow up on that.  You do
22   recall getting the handbook, you just
23   don't recall reading it?
24   A.   I recall seeing the handbook.  I
25   don't know if they gave me one in my

Page 40

K. MIKHAYLOVA

1
2   Q.   You don't recall one way or the
3   other?
4   A.   No, I don't recall how many days
5   the orientation period was.  I don't know
6   if there was an orientation.
7   Q.   Do you remember learning that
8   Bloomingdale's had a policy against
9   discrimination and harassment during this
10   orientation?
11   A.   I don't recall.
12   Q.   Did you ever know that
13   Bloomingdale's had, I'm sorry, there is
14   our fire siren on in the background.  I
15   apologize for that.
16        Do you recall ever reviewing the
17   Bloomingdale's handbook?
18   A.   Not all of it.  I don't recall.
19   Q.   You were actually given a copy
20   during the orientation, were you not?
21   A.   I do not recall.
22   Q.   You don't recall one way or the
23   other?
24   A.   No.
25   Q.   Do you recall a document called

Page 39

K. MIKHAYLOVA

1
2   possession is what I am saying because I
3   couldn't find one in my house.  I don't
4   remember taking one home.  Do I remember
5   seeing one, correct, but I don't recall
6   them giving me one.
7   Q.   Code of Conduct, do you remember
8   reading the Code of Conduct?
9   A.   No, I do not.
10   Q.   If there is documentation
11   showing you you signed off on the Code of
12   Conduct, would you have been truthful when
13   you signed off saying that you have
14   reviewed?
15   A.   I mean, yeah.  If I reviewed it
16   and if I signed off, that means I read it.
17   Q.   Now, during orientation there is
18   a normally a period where asset protection
19   or loss prevention comes in.  It gives
20   some direction on how to avoid fraud, hose
21   kind of things.  Do you remember sitting
22   through that part of the orientation
23   process?
24   A.   I remember.
25   Q.   I'm sorry?

Page 41

11 (Pages 38 - 41)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1        K. MIKHAYLOVA
2   A.  I remember.
3   Q.  Do you recall anything that lost
4 prevention or asset protection, I am going
5 to call it asset protection because that's
6 what we call it now but I want to make
7 sure you understand what I am talking
8 about.
9      Do you recall anything asset
10 pregnancy said about red flags for fraud?
11  A.  Yes, I did.
12  Q.  What did they say if you recall?
13  A.  They come in quickly to buy a
14 handbag.  They way they dress, to be
15 alert.  What else -- I don't recall.  I
16 can't think of anything else off the top
17 of my head.
18  Q.  Did you understand from asset
19 protection that Chanel handbags was a
20 focus of fraud?
21  A.  Yes, I did.
22  Q.  Who in particular in asset
23 protection do you recall speaking to the
24 group?  Do you remember anybody in
25 particular?

Page 42

1        K. MIKHAYLOVA
2 you were dismissed from Bloomingdale's; is
3 that correct?
4  A.  (No verbal response.)
5  Q.  Yes?
6  A.  Yes.
7  Q.  And I'm sorry, the court
8 reporter cannot take uh-huhs.  She needs
9 verbal answers.  I may not have said that
10 initially so --
11  A.  Correct.
12  Q.  Who was your direct supervisor
13 while you were in Chanel Handbags?
14  A.  When I started Chanel Handbags,
15 it was Victoria.  She was my direct
16 supervisor, she was my manager.
17  Q.  What was Victoria's last name?
18 Do you have any recollection?
19  A.  Something with an S.  I don't
20 remember.
21  Q.  With an S as in Sam; you are not
22 saying F?
23  A.  Like in Sam, correct.
24  Q.  How long was Victoria your
25 manager while you were in Chanel Handbags?

Page 44

1        K. MIKHAYLOVA
2  A.  There were a few people.  One,
3 Chris Castellani.  There was Bobby Booker.
4 When I started, it was someone else.  They
5 go through a lot of people.  I don't
6 remember the name of who -- there was one
7 person that I went to with an incident.
8 His name is -- I want to say David but I
9 could be wrong, by the name of David.
10 There was a few people there.  If you can
11 show me pictures I can identify.  But at
12 this point, I don't remember their names.
13  Q.  Today I am just trying to figure
14 out what you remember.
15  A.  Okay.
16  Q.  When you started, I know you
17 mentioned Cathy Younis; Y-O-U-N-I-S.  Was
18 Cathy your supervisor?
19  A.  I thought she was the director.
20  Q.  When you started in Chanel
21 Handbags -- strike that.
22      When you began at Bloomingdale's
23 you were in Chanel Handbags, correct?
24  A.  Yes, I was.
25  Q.  You remained in handbags until

Page 43

1        K. MIKHAYLOVA
2  A.  I think for three months before
3 she left.
4  Q.  And then who, if anyone, became
5 your manager?
6  A.  So, we didn't have a manager for
7 quite sometime.  After that it was Denis
8 Diaz.
9  Q.  Do you know when Denis Diaz --
10  MS. TIERNEY:  And D-E-N-I-S,
11 D-I-A-Z, only one N.
12  Q.  Do you know when Denis Diaz
13 became your manager?
14  A.  I do not recall.
15  Q.  But you recall it was three --
16  A.  I recall not having a manager,
17 I'm sorry, for a couple of months before
18 he became manager.
19  Q.  You were there from April to
20 June so about fourteen months, right?
21  A.  Correct.
22  Q.  And the first three months were
23 Victoria give or take, and I know that's
24 as estimate?
25  A.  Till September it was Victoria,

Page 45

12 (Pages 42 - 45)

K. MIKHAYLOVA

1      K. MIKHAYLOVA
2  I believe.
3    Q.   Do you recall how long you went
4  without a manager before Denis Diaz came
5  to that department?
6    A.   Several months.  I can't recall
7  the exact timeline without a manager.
8    Q.   Was it after the holidays or did
9  you have a manager in the holiday season?
10    A.   I don't recall honestly.
11    Q.   Did you have any issues during
12  the time, I mean of any kind, people not
13  getting along with people, people
14  bothering you, during the time that
15  Victoria was your manager?
16    A.   No.
17    Q.   During the time that you had no
18  manager, did you have any issues with
19  people treating you improperly, people
20  harassing you, anything that you felt was
21  inappropriately during the time you did
22  not have a manager?
23    A.   In the Chanel boutique?
24    Q.   At any part in Bloomingdale's.
25    A.   Well, it was difficult again to

1      K. MIKHAYLOVA
2  get handbags to sell because of the wait
3  list.  It was going to specific people.
4  It wasn't going to the whole team.  You
5  had to get there at 6:00 in the morning to
6  get a handbag but I had kids and I
7  couldn't show up that early to get a
8  handbags.  In that sense, yes.
9    Q.   Anything else?  I am talking
10  about people acting inappropriately.  The
11  competition for handbags was a work
12  related issue, but people just behaving
13  badly or inappropriately?
14    A.   I had an issue with Bobby
15  Booker.  He was harassing me, but I don't
16  recall the timeframe of when it started.
17    Q.   Do you remember if Denis Diaz
18  was your supervisor at the time the issue
19  with Bobby Booker started?
20    A.   He was.  That I remember.
21    Q.   When I was asking the question
22  were there any issues during the time you
23  didn't have a manager, the Bobby Booker
24  did not arise during the time you did not
25  have a manager, correct?

1      K. MIKHAYLOVA
2    A.   I believe so, to my best of
3  knowledge.
4    Q.   You believe that issue arose
5  when Denis Diaz was your supervisor?
6    A.   Yes.  I know Denis was already
7  present at that time.
8    Q.   Okay.  Do you know who Denis
9  Diaz reported to?
10    A.   I would assume Cathy but again,
11  that's an assumption.
12    Q.   After you were interviewed and
13  hired by Cathy Younis, did you ever have
14  any other contact with Cathy?
15    A.   Yes, numerous amount of times.
16    Q.   Was she headquartered in the
17  store?
18    A.   In the Bloomingdale's location.
19    Q.   Was she there daily, was it
20  weekly?  What kind of contact would you
21  have with Cathy --
22    A.   Daily.  She was there daily.
23    MS. MENDOZA:  It might be best
24  so that the court reporter can take
25  everything down, that you let counsel

1      K. MIKHAYLOVA
2  asking the question first and then
3  respond.
4    THE WITNESS:  Okay.
5    MS. TIERNEY:  If we talk over
6  each other, it gets really confusing
7  so I apologize too.
8    Q.   You believe the situation with
9  Bobby Booker came up during the time that
10  Denis Diaz was your supervisor.  Had Denis
11  been there a long time, was it when Denis
12  came on board?  What do you remember about
13  the timing if anything?
14    A.   As far as the timing, I do not
15  recall.  This is so long ago -- exactly
16  when it started.
17    Q.   How long did it go on?
18    A.   Till the end of my -- till
19  around I want to say till almost the end
20  of my time there.  I believe for a few
21  months for sure.  I don't recall when it
22  ended, but definitely for a few months
23  that I was there.
24    Q.   What was it specifically that
25  Bobby Booker was doing that you found

K. MIKHAYLOVA

1  problematic?
2      A.   Well, he was coming up to me
3  looking very deeply in the eyes making me
4  super uncomfortable, talking to me acting
5  like whatever is going on in Chanel.  He
6  was being flirtatious with me.
7      Q.   Was the flirtatious, was that
8  something he was saying or how did you
9  know he was being flirtatious?
10     A.   Body language, his body hang.
11     Q.   What does that mean?
12     A.   The way he looked me in the
13 eyes, the way he was talking to me, the
14 way he had his hands, combination of
15 everything.
16     Q.   Did he ever put his hands on
17 you?
18     A.   Around my -- around my arms -- I
19 mean, around my shoulders.  I believe so.
20 Like, he would come around and hug me like
21 that (indicating) is what I am trying to
22 say.
23     Q.   Was it a sideway hug or a
24 frontal?

Page 50

K. MIKHAYLOVA

1      A.   Both.
2      Q.   Were you behind the counter,
3  were you on the floor?  Where were you
4  you?
5      A.   It was a combination of both.
6      Q.   Would you push him back?  What
7  would you do?
8      A.   I would push myself away from
9  him.
10     Q.   How many times do you recall
11 Bobby Booker hugging you?
12     A.   Many times.  I do not recall the
13 number of times.
14     Q.   Do you recall any witnesses to
15 him hugging you?
16     A.   Yes.  The the whole Chanel
17 Department including Denis Diaz, including
18 the security they had in front of Chanel.
19     Q.   Can you give me any specific
20 names other than Denis Diaz?
21     A.   Well, the whole Chanel team as
22 well as loss prevention team that stood in
23 the front of the store.
24     Q.   Let me ask it differently.

Page 51

K. MIKHAYLOVA

1      A.   Yeah.
2      Q.   I know you believe everybody saw
3  it.  What I am asking you is can you think
4  of the time when he hugged and you can
5  identify someone who actually observed the
6  conduct?
7      A.   Yes.  The security guard the
8  door, her name was Tanya.  I forgot her
9  last name.  I don't know her last name.
10 Her name was Tanya.
11     Q.   Anyone else that you observed
12 watching while he was hugging you?
13     A.   The girl by the name of -- it
14 was a Polish girl.  I don't recall her
15 name but there was one other girl by the
16 name of Mercedes.  The Polish girl was
17 also, she was part of the loss prevention
18 team at Chanel.  I don't recall her name
19 though.
20     Q.   Anyone else you can think of
21 that would have observed, that you knew
22 and observed seeing him hug you?
23     A.   Besides the -- I can give you
24 names of people in the department that

Page 52

K. MIKHAYLOVA

1  have seen that happen.
2      Q.   Are you aware of them seeing it
3  or you just --
4      A.   They made a comment to me.
5      Q.   Who specifically do you recall
6  making a comment to you about him hugging
7  you?
8      A.   Lisa.
9      Q.   Do you know Lisa's last name?
10     A.   No.  I don't recall.
11     Q.   But she was a Chanel Handbags
12 person?
13     A.   Yes.
14     Q.   Anyone else?
15     A.   Eleanor.
16     Q.   Anyone else?
17     A.   Nel.
18     Q.   How do you spell that?
19     A.   N-E-L.
20     Q.   What was Nel's last name if you
21 know?
22     A.   I don't recall.
23     Q.   Anyone else?
24     A.   Yes.  Hold on.  I don't recall

Page 53

14 (Pages 50 - 53)

K. MIKHAYLOVA

1
2  -- I don't remember her name.
3      Q.   If you remember during the
4  course of the deposition during the day,
5  let me know.  It may come back.
6      A.   Okay.
7      Q.   Or maybe if it is somebody on
8  your list of witnesses, let me know.
9  Other than the hugs and you can't remember
10 how many times but was it like every day,
11 was it once a week?  Do you have any
12 ability to estimate how many times Bobby
13 Booker hugged you?
14     A.   It was for sure, I feel like it
15 was in every shift he was in when he
16 stopped by to see the Chanel team.
17     Q.   Every shift he was working you
18 were also working?
19     A.   Correct.
20     Q.   And I assume there were shifts
21 where you would work and he wouldn't?
22     A.   Yes.
23     Q.   Or he would work and you
24 wouldn't?
25     A.   Yes.

Page 54

K. MIKHAYLOVA

1
2      Q.   Other than the hugs, was there
3  any other contact made by Mr. Booker to
4  your person?
5      A.   Can you elaborate that on,
6  please.
7      Q.   Sure.  Did he grab your butt or
8  other part of your anatomy?
9      A.   No, but he would look at my butt
10 all the time and make me feel very
11 uncomfortable.
12     Q.   You knew that he was looking at
13 your butt because he was standing there
14 staring at you or --
15     A.   Yeah, because other people were
16 like oh, my God.  People make comments
17 about it.
18     Q.   I want to know what you
19 specifically observed.  Did you see him
20 staring at your posterior?
21     A.   Correct.
22     Q.   Other than the hugs did he touch
23 you in any way physically?  Did he put his
24 hands on you?
25     A.   No.

Page 55

K. MIKHAYLOVA

1
2      Q.   And you believe at some point in
3  time based on conversations and your
4  observations, besides your butt any part
5  of the anatomy that he would stare at?
6      A.   My chest.
7      Q.   Did you ever report this conduct
8  to anyone?
9      A.   No.
10     Q.   Why not?
11     A.   Because everybody was there to
12 witness it.  I didn't want to get anyone
13 in trouble.  And I felt like if management
14 sees it and doesn't say anything -- they
15 were right there to see it.
16     Q.   Did you say anything in front of
17 management to suggest you were not
18 friendly with Mr. Booker or that you were
19 not --
20     A.   I mentioned he makes me feel
21 uncomfortable.
22     Q.   To who?
23     A.   Denis Diaz.
24     Q.   What response if any did Denis
25 have?

Page 56

K. MIKHAYLOVA

1
2      A.   I don't recall.
3      Q.   Did you tell anyone else that he
4  made you uncomfortable?
5      A.   The co-workers on my team.
6      Q.   Let me ask it again then a
7  little differently.
8          Did you alert anyone else in the
9  management role other than Denis Diaz?
10     A.   No, not that I recall.
11     Q.   How many times would you tell
12 Denis Diaz that Mr. Booker made you
13 uncomfortable?
14     A.   Several.
15     Q.   Can you put a number on?
16     A.   I can't recall.
17     Q.   Do you recall any response by
18 Denis all those times you allegedly spoke
19 to him about that that he responded?
20     A.   I don't recall specific
21 responses.
22     Q.   Do you know who Mr. Booker's
23 boss was?
24     A.   I thought he was one of the
25 bosses at that time.

Page 57

15 (Pages 54 - 57)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1    Q.   My question is do you know who
2  his boss was?
3
4    A.   No.
5    Q.   Did you have someone at HR at
6  that time that you could have gone to?
7    A.   I believe so.
8    Q.   Did you ever go to HR to
9  complain about Mr. Booker's conduct?
10   A.   No.
11   Q.   Why not?
12   A.   Because I didn't want to get
13 anyone in trouble.
14   Q.   Did you ever tell Mr. Booker to
15 knock it off?
16   A.   Yes.
17   Q.   What was his response, if any,
18 did he have?
19   A.   He laughed about it.
20   Q.   Did you ever see Mr. Booker
21 socially outside the work place?
22   A.   No.
23   Q.   Other than what you have talked
24 about today, is there anything else that
25 Mr. Booker did that you felt was

Page 58

K. MIKHAYLOVA

1    A.   No.  I --
2    Q.   Did he have a response?
3    A.   I --
4    Q.   I am sorry?
5    A.   I told him I am with somebody.
6    Q.   Did he have any response?
7    A.   He said he was with somebody
8  too, that he was married.
9    Q.   Was there anything else said in
10 this conversation?
11   A.   I do not recall.
12   Q.   Any other times that Mr. Booker
13 asked you out or asked you to do things
14 socially?
15   A.   At the moment I don't recall
16 specific instances.  There were several
17 occasions but I don't recall specific
18 incidents.
19   Q.   Did he ever get mad or angry
20 when you told him no?
21   A.   He was upset.  I always told him
22 no.
23   Q.   How do you know he was upset?
24   A.   Because he left the boutique.

Page 60

K. MIKHAYLOVA

1  inappropriate or made you feel
2  uncomfortable?
3    A.   I don't -- I do not recall.
4    Q.   You mentioned to Denis Diaz on
5  several occasions that he made you
6  uncomfortable but you told no one else at
7  management; is that correct?
8    A.   That's correct.
9    Q.   Do you remember any specific
10 comments that Mr. Booker made that made
11 you uncomfortable?
12   A.   He tried to ask me out.  He --
13   Q.   How did he try to ask you out?
14 Did he ask you out or not?
15   A.   He did.  He asked me what am I
16 doing later.  Have I ever been to this
17 place, have I been to that place.
18   Q.   Did he ever say do you want to
19 go to this place with me?
20   A.   Yes.
21   Q.   Where did he ask you to go?
22   A.   I don't recall the exact
23 restaurant but it was a restaurant.
24   Q.   What was your response to that?

Page 59

K. MIKHAYLOVA

1    Q.   So he asked you out and you said
2  no, I can't, I have a boyfriend and he
3  said so do I.  You said no and then he
4  leaves?
5    A.   Correct.
6    Q.   Did you deduce that he was
7  upset?
8    A.   Yes.
9    Q.   Was there anything about the
10 manner in which he left that led you to
11 conclude that he was upset?
12   A.   I mean specific manner, no.
13   Q.   You have worked for a lot of
14 designers, right, Dior, Louis Vuitton, all
15 these guys.  During the time you worked
16 for those specific stores, do you ever
17 recall hearing the word diversion or
18 diverter?
19   A.   Yes.
20   Q.   Is it fair to say that all of
21 those entities that you worked for had
22 policies against diversion?
23   A.   Yes.
24   Q.   It is a brand issue, correct?

Page 61

16 (Pages 58 - 61)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1
2    A.   Yes.  Particularly in Chanel
3  more than anything.
4    Q.   Chanel is very particular about
5  diversion?
6    A.   Yes.
7    Q.   How about when you were at Louis
8  Vuitton?  Did Louis Vuitton have policies?
9    A.   Louis Vuitton did too.
10    Q.   Was it just a limit of how much
11  you can sell, were there other limits
12  other than that?
13    A.   It was limit on certain handbags
14  that we couldn't sell more than.  It was a
15  limit on certain pieces.  We couldn't sell
16  more than one of to a customer.
17    Q.   When you went to Saks Chanel
18  you had the same restrictions I am
19  assuming you had at Bloomingdale's?
20    A.   Correct.
21    Q.   At Dior, do you also have issues
22  at Dior with respect to diversion?
23    A.   Correct.
24    Q.   Is it your understanding that
25  violating a diversion policy at any of

Page 62

K. MIKHAYLOVA

1
2  Chanel directly.  Diversion was a big
3  problem there.  They weren't allowing  us
4  to sell multiple handbags to one person.
5    Q.   Were you aware of the diversion
6  policy when you were at Bloomingdale's?
7    A.   I was aware.
8    Q.   Did you ever speak to anyone
9  about whether or not they considered
10  diversion to be a terminable offence?
11    A.   I never spoke to anyone.
12    Q.   At Louis Vuitton, was diversion
13  considered a terminable offence to your
14  knowledge?
15    A.   I don't recall.
16    Q.   You said that it was a big deal
17  while you were working for Chanel
18  directly.  Was diversion an issue when
19  you were working for Saks not licensed
20  under Chanel?
21    A.   It wasn't an issue.  I mean, I
22  wasn't selling more than two handbags but
23  it was a policy that you weren't allowed
24  to sell more than two handbags to a
25  client.

Page 64

K. MIKHAYLOVA

1
2  these vendors or any of these retailers
3  could result in termination?
4    A.   Well, there is also a fine line
5  because it is under manager's approval as
6  wells.
7    Q.   Let me ask my question again.
8  Do you know whether or not diversion is a
9  terminable offence?  Was diversion a
10  terminable offence to your knowledge?
11    A.   No.  Not a Bloomingdale's.
12    Q.   And why do believe that?
13    A.   Because everybody was selling
14  multiple pieces.  I knew the same
15  customers over and over again.  It wasn't
16  -- it wasn't -- in Bloomingdale's, it
17  wasn't as -- nobody -- I have seen people
18  sell three handbags to one client and it
19  is okay.  Four handbags to a client
20  multiple times.  It wasn't at Chanel
21  though.  In Chanel we are not allowed to
22  do that.
23    Q.   You were selling Chanel at
24  Bloomingdale's?
25    A.   At Saks, when I was working for

Page 63

K. MIKHAYLOVA

1
2    Q.   In Dior, is diversion a
3  terminable offence to your knowledge?
4    A.   Not at Dior.
5    Q.   Now, what is diversion --
6    A.   I haven't experienced it.
7    Q.   Okay.  Let me ask you this.
8  What does diversion mean to you because I
9  am not sure if we are talking the same
10  thing.
11    A.   Selling more than -- customers
12  that buy multiple items of the same piece.
13    Q.   We are not talking about the
14  same thing.  Are you aware of people who
15  sell to resellers --
16    A.   Yes.
17    Q.   -- to be considered diversion?
18    A.   Yes.
19    Q.   In fact, during the time you
20  were at Bloomingdale's sold to resellers,
21  didn't you?
22    A.   No, I did not.
23        MS. MENDOZA:  Objection.  You
24  can answer.
25    Q.   You sent products to Yuyu Lai

Page 65

17 (Pages 62 - 65)

K. MIKHAYLOVA

1 who was a known diverter, is she not?
2
3   A.   No, she is not.
4   Q.   Y-U-Y-U, L-A-I.
5   Q.   Your testimony, ma'am, is she is
6 not a diverter?
7   A.   Correct.
8   Q.   Why would you send product to
9 Yuyu Lai?
10   A.   I'm sorry?
11   Q.   Why would you send product to
12 Yuyu Lai?
13   A.   I sent products to her because
14 she was living in, I believe New
15 Hampshire.  And I was sending her gifts as
16 well as I was sending her my own product.
17   Q.   Why were you sending her your
18 product?
19   A.   Because -- because I am -- from
20 what I learned at Bloomingdale's when you
21 send it there, I wouldn't pay tax.
22   Q.   You, in fact, were sending out
23 of state to avoid tax?
24   A.   On certain pieces for myself and
25 lot of gifts as well.

Page 66

K. MIKHAYLOVA

1 products that you sent her?
2
3   A.   Correct.  She never gave me any
4 money.
5   Q.   How did you get your products
6 back for her?
7   A.   She came to New York quite
8 often.  Some of the products I did gift
9 her.
10   Q.   If your co-workers said they, in
11 fact, were sending to Yuyu Lai to get
12 money for reselling and that you had told
13 them that and given her the information,
14 that would be untrue?
15   A.   Correct.  I never gave them any
16 -- I gave them her information so they can
17 get the product so they won't have to pay
18 tax.
19   Q.   And so when we depose Ms. Lai
20 you think she will support what you just
21 said?
22   A.   Absolutely.
23      MS. TIERNEY:  We have been going
24 for an hour.  Let's take a five minute
25 break.

Page 68

K. MIKHAYLOVA

1   Q.   You were aware that Yuyu Lai
2
3 runs a resell shop in Boston that has
4 significant amount of Chanel products?
5   A.   She does not.
6   Q.   Okay.  Thank you.
7      There has been, some of your
8 colleagues said you had recommended they
9 send products to Yuyu Lai as well?
10   A.   They didn't want to pay tax on
11 their merchandise as well because our
12 discount wasn't that good.
13   Q.   How do you know Yuyu Lai?
14   A.   I knew her for a really long
15 time.  She was a friend of mine.  She
16 would come to New York and I met her in
17 New York.
18   Q.   Where did you meet her in New
19 York?
20   A.   In Queens in a restaurant.  She
21 was wearing a Hermes bag and we started
22 talking.  We have been friends before
23 Bloomingdale's.
24   Q.   So your testimony is that Yuyu
25 Lai never gave you money for any of these

Page 67

K. MIKHAYLOVA

1      MS. MENDOZA:  Sounds good.
2
3 Thank you.
4      (Whereupon, a short recess was
5 taken.)
6      MS. TIERNEY:  Back on the
7 record.
8   Q.   Did Yuyu Lai ever give you
9 anything other than money as far as
10 compensation for the bags you sent her?
11   A.   No.
12   Q.   Do you know if she gave money to
13 any of your co-workers for the bags they
14 sent?
15   A.   No.
16   Q.   You don't know or she didn't?
17   A.   She did not.
18   Q.   How do you know that?
19   A.   Because they didn't tell me.
20   Q.   If I said that she, in fact, had
21 given them money would that be more
22 accurate than your knowledge?
23      MS. MENDOZA:  Objection.
24   A.   They never told me that.
25   Q.   You can answer.

Page 69

18 (Pages 66 - 69)

K. MIKHAYLOVA

1
2    Q.   They would know more than you
3 what they received from Yuyu Lai; is that
4 correct?
5        MS. MENDOZA:  Objection.
6        You can answer.
7    Q.   You can answer.
8    A.   I'm sorry?
9    Q.   Your coworkers would have a
10 better knowledge of what they received
11 from Yuyu Lai than you?
12   A.   Not necessarily.  Actually, no.
13 They didn't speak to her.  I gave them the
14 address and I picked up their stuff.  So
15 that would be a no.
16   Q.   They have never communicated
17 with Yuyu Lai?
18   Q.   Other than mailing bags that
19 they bought from Chanel?
20   A.   No.
21   Q.   No, they didn't mail bags to
22 Yuyu Lai or that's correct other than
23 mailing bags?
24   A.   Other than them sending the
25 bags, they never had any communication

Page 70

K. MIKHAYLOVA

1 with Yuyu Lai.
2    Q.   You admit today that you sent
3 bags to New Hampshire to avoid sales tax;
4 is that correct?
5    A.   I was allowed to do it by
6 management.
7    Q.   Which manager approved you
8 mailing bags to New Hampshire to avoid
9 sales tax?
10   A.   Management was doing it to,
11 Denis Diaz.
12   Q.   If we checked Denis Diaz's file
13 we can see him sending bags to New
14 Hampshire or where did he send them?
15   A.   No, not Denis Diaz.  Other
16 managers who were buying from Chanel that
17 were sending bags to the five states that
18 do not have tax or lower tax rate as a
19 gift.  It was a common practice at
20 Bloomingdale's and everybody was doing it.
21   Q.   I appreciate you think it is a
22 common practice but I need a little more
23 than that, actual facts to support that?
24   A.   That's a fact.  If you look at

Page 71

K. MIKHAYLOVA

1 all the receipts you will see everybody
2 that sends the stuff.  If you open the
3 computer and look at the receipts from
4 2017 to 2018, all the transactions, you
5 will see the amount of people that were
6 sending to the different states.
7    Q.   I appreciate that but it doesn't
8 work that way.  I would like to know who
9 you know in management who approved you
10 sending bags to New Hampshire and
11 Mississippi and other states that did not
12 have tax?
13   A.   Mississippi, you did pay tax.  I
14 was sending it as a gift.
15   Q.   Who did you send to in
16 Mississippi?
17   A.   I don't recall, but Mississippi
18 has tax.
19   Q.   You sent one to Mississippi and
20 you don't remember who you sent a $4,000
21 bag to?
22        MS. MENDOZA:  Objection.
23        You can answer.
24   A.   It was a friend.

Page 72

K. MIKHAYLOVA

1    Q.   You don't remember the friend
2 who you sent a $4,000 gift to?
3    A.   It's been a long time.
4    Q.   Is that friend still in
5 Mississippi if we want to depose him or
6 her?
7    A.   I don't speak to her.  I don't
8 know.  Well -- I don't know.
9    Q.   How soon after you sent the bag
10 that you stopped speaking to the friend in
11 Mississippi?
12   A.   I don't even recall sending a
13 bag to Mississippi.  I was just telling
14 you they pay tax in Mississippi.  I don't
15 recall who I sent it.  I might have had a
16 friend that lived there at that time but I
17 don't recall who it is.
18   Q.   Do you recall ever sending a bag
19 to Mississippi and recovering the bag,
20 getting the bag back?
21   A.   I don't recall.
22   Q.   Do you remember if you had a
23 friend in Mississippi, if it was a man or
24 woman?

Page 73

19 (Pages 70 - 73)

K. MIKHAYLOVA

1    K. MIKHAYLOVA
2    MS. MENDOZA:  Objection.
3    You can answer.
4    A.  I do not recall.
5    Q.  We will look at the receipts
6  later.
7        Did any manager,and I want to
8  make this as clear as I can, ever tell you
9  directly that it was okay to send
10  merchandise to a state for yourself that
11  did not have taxes for the purpose of
12  avoiding taxes?  Did anybody ever approve
13  that and if so, who?
14    A.  It was Denis, Victoria.
15    Q.  I will tell you we have looked
16  for Victoria S at 59 Street and we can't
17  find anybody.  Do you have any better
18  recollection what her name was?
19    A.  Yes.  Let me look.  It is
20  V-I-K-T-O-R-I-A.  Last name is S-O-M-E-K.
21    Q.  V-I-K-T-O-R-I-A?
22    A.  Yes.
23    Q.  Do you know if she is still at
24  Bloomingdale's?
25    A.  No.  She left unless she came

Page 74

1    K. MIKHAYLOVA
2    Q.  Did he ever specifically say
3  anything suggesting that it was okay?
4    A.  I don't recall.
5    Q.  Any other manager other than
6  Viktoria that ever said specifically to
7  you that it was okay to send product out
8  of state for the purpose of avoiding sales
9  tax?
10    A.  Cathy Younis sent all stuff to
11  Jersey to avoid sales tax on her clothes.
12  So I have witnessed it.  If managers can
13  do it, why can't we.
14    Q.  Do you know where Cathy lives?
15    A.  I believe the city.  I don't
16  know where she lives at now.
17    Q.  Did you ever ask Cathy if it was
18  okay to mail products to yourself for the
19  point of avoiding sales tax?
20    A.  I don't recall that.
21    Q.  Did she ever say anything?  Do
22  you ever recall her saying it is okay?
23    A.  I don't recall.
24    Q.  Your only evidence of Cathy's
25  position on this is you saw her ringing

Page 76

1    K. MIKHAYLOVA
2  back.  I'm not sure.
3    Q.  Do you recall her specifically
4  saying it was okay to mail products out of
5  state to avoid tax?
6    A.  She said everybody does it.
7    Q.  Did Denis Diaz specifically tell
8  you that it was okay to mail products for
9  yourself out of state for the purpose of
10  avoiding sales tax?
11    A.  He left it up to me to do.
12  Repeat the question.
13    Q.  Did he ever specifically say it
14  was okay for you to send product for
15  yourself out of state for the purpose of
16  avoiding sales tax?
17    A.  Did he say, no.  But he has rung
18  me up and I gave him the address.
19    Q.  Did he know whether or not it
20  was for you or someone else or did you
21  tell him?
22    A.  He knew it was for me because I
23  was trying it on.
24    Q.  Trying what on, the bag?
25    A.  Yes.

Page 75

1    K. MIKHAYLOVA
2  merchandise for mailing to Jersey?
3    A.  Correct, that she tried on for
4  herself.
5    Q.  You believe she lived in New
6  York City but you don't know where she
7  specifically lives other than your
8  speculation?
9    A.  She lived next to
10  Bloomingdale's.  She told us she lived
11  next to Bloomingdale's.
12    Q.  Anyone else who was in
13  management role that told you that it was
14  okay to mail things out of state to avoid
15  sales tax?
16    A.  Not that I can recall.
17    Q.  Were you aware of an FBI
18  investigation into the fraud going on with
19  the Chanel Department?
20    A.  After I had left Bloomingdale's.
21    Q.  Did you ever learn that some of
22  your co-workers had been indicted for
23  fraud?
24    A.  I did not know that.
25    Q.  Did you know that some sort of

Page 77

20 (Pages 74 - 77)

K. MIKHAYLOVA

1
2 your co-workers had implicated you on the
3 fraud after you left?
4     A.   I don't know how.  I had nothing
5 to do with it.
6     Q.   Question was did you know that
7 any of your colleagues --
8     A.   No, I did not.
9     Q.   I'm sorry?
10    A.   No, I did not.
11    Q.   Thank you.  We will get more
12 into that later.
13         When did you become pregnant in
14 2017 to your knowledge?
15    A.   February 2017.
16    Q.   I have one more question on that
17 topic before we move to another
18 department.
19         Other than the mailings out of
20 state to avoid sales tax that resulted in
21 your termination, had you ever sent out of
22 state to avoid sales tax before that?
23    A.   No, never.  You can check my
24 previous work history.  Nobody does in any
25 other places.  This was allowed here.

K. MIKHAYLOVA

1
2 termination --
3     A.   And I bought a lot of stuff that
4 I paid and took home.
5     Q.   Some of them you took home?
6     A.   Absolutely.
7     Q.   Why would you take some of them
8 home and why would you mail some of them?
9     A.   Because some of them were more
10 expensive pieces and if it was worth me
11 saving on tax -- but if it is pieces that
12 I can only pay -- you know, if it wasn't
13 an expensive item I would take it home
14 with me.  It was different, you know, some
15 were for gifts.  So, it was different
16 reasoning.
17    Q.   Other than your job at
18 Bloomingdale's, did you have any other
19 source of income during 2017, 2018?
20    A.   No.  My grandmother was giving
21 me money.
22    Q.   How much money was your
23 grandmother giving you?
24    A.   Good amount.
25    Q.   How much?

K. MIKHAYLOVA

1
2     Q.   I am talking about your time at
3 Bloomingdale's.
4     A.   Oh.
5     Q.   We have got five e-mails, most f
6 them to Yuyu Lai or other people at the
7 same address in the Mississippi mailing.
8 Other than those five or six, did you ever
9 mail any other products out of state?
10        MS. MENDOZA:  Objection.
11        You can answer.
12    A.   I don't remember.
13    Q.   But it was a common practice,
14 right?
15    A.   Yes.
16    Q.   Is there any reason if you were
17 mailing you would not have mailed it out
18 of state, if it was okay to do it?
19        MS. MENDOZA:  Objection.  You
20    can answer.
21    A.   I don't understand your
22 question.  If you could elaborate on that.
23    Q.   Sure.  There were five or six
24 times you did this and you admittedly did
25 this to avoid tax that resulted in your

K. MIKHAYLOVA

1
2     A.   Different -- different times
3 different amounts.  She always gives me
4 money.  Anywhere from thousands --
5     Q.    She was giving you thousands of
6 dollars?
7     A.   Yes.
8     Q.   And was that because of an
9 inheritance or what was the circumstances
10 your grandmother was giving you money?
11    A.   For inheritance.  She was just
12 giving me money.
13    Q.   Did you declare that in your
14 taxes?
15    A.   I don't recall.  I might have.
16 I don't recall.
17    Q.   What is your grandmother's name?
18    A.   Evelina, E-V-E-L-I-N-A.  Same
19 last name, M-I-K-H-L-O-V-A.
20    Q.   Where does Evelina live?
21    A.   8502.  I'm sorry, that's my
22 mom's address.  141-48, 85th Road,
23 Briarwood, New York 11435.
24    Q.   How many times between 2016 and
25 2017 did your grandmother give you money

21 (Pages 78 - 81)

K. MIKHAYLOVA

1    K. MIKHAYLOVA
2  that was a thousand dollars or more?
3      A.   I don't recall exactly how many.
4      Q.   Do you know how much money your
5  grandmother gave you?
6      A.   No, I don't recall the specific
7  amounts.
8      Q.   Did you deposit the money into
9  your bank account?
10     A.   I don't recall.  Sometimes.
11  Sometimes, yes.  Sometimes -- I don't
12  recall.
13     Q.   What else would you have done
14  with it if you did not put it into the
15  bank account?
16     A.   In my pocket.
17     Q.   What bank do you bank at?  What
18  was your bank?
19     A.   I have several different.  I
20  have Chase.  I have Citi.  At that time I
21  had Sterling National Bank.
22     Q.   I'm sorry.  What was that?
23     A.   Sterling National Bank.
24     Q.   Is there any any reason why you
25  have so many different bank accounts?

Page 82

K. MIKHAYLOVA

1    K. MIKHAYLOVA
2      A.   No.  I always use different bank
3  accounts.
4      Q.   I know that there is at least
5  some evidence that you spent about $65,000
6  on Chanel products for 2016 to 2017?
7      A.   Huh-huh.
8      Q.   I guess the question I have is
9  how would you have paid that kind of money
10  for merchandise?
11     MS. MENDOZA:  Objection.
12       You can answer.
13     A.   I did work.  That's No. 1.  I
14  didn't always buy Chanel bags in the
15  beginning.  It took me a while to start
16  buying Chanel bags.  I started in April.
17  I probably didn't start buying until late
18  that year in December.  I had money in my
19  savings account.  I had money saved.  I
20  always had money.  I always worked.
21     Q.   Your testimony is that based on,
22  for example, the money you earned at
23  Bloomingdale's you were able to spend
24  $65,000 on purchases?
25     A.   Absolutely.  I made a good

Page 83

K. MIKHAYLOVA

1    K. MIKHAYLOVA
2  amount of money working at Bloomingdale's.
3      Q.   I assume you had other expense
4  such as rent, food?
5      A.   I wasn't paying rent.
6      Q.   How were you living without
7  paying rent?
8      A.   My boyfriend.  He was paying the
9  rent and he gave me a lot of the money as
10  well.
11     Q.   Who is your boyfriend?
12     A.   Clayton Fountain; C-L-A-Y-T-O-N,
13  F-O-U-N-T-A-I-N.
14     Q.   What does Clayton do for a
15  living?
16     A.   He is an electrician.
17     Q.   Electrician, did I hear that
18  right?
19     A.   Yes.
20     Q.   How old is Clayton?
21     A.   He is ten years older than me.
22  So I am thirty-five and he is forty-five.
23     Q.   How long has he been an
24  electrician?
25     A.   For the last twelve years.  No,

Page 84

K. MIKHAYLOVA

1    K. MIKHAYLOVA
2  actually more.  Probably over fifteen
3  years now.
4      Q.   For who does he work as an
5  electrician?
6      A.   Right now he works for a
7  contractor.  Their name is -- I don't know
8  the exact name right now.  He works for
9  companies all the time.  I don't know.
10  Empire.  Oh, Empire.
11     Q.   Your testimony is that the
12  65,000 plus that you spent on Chanel
13  handbags and shoes I believe from 2016 to
14  2017 were paid for by a combination of
15  your work money, ,money from your
16  boyfriend and I am assuming money from
17  your grandmother?
18     A.   Yes.
19     Q.   And when you got these gifts of
20  money, some you put into your bank account
21  and some you put it in your pocket in the
22  streets of New York City?
23     MS. MENDOZA:  Objection.
24       You can answer.
25     A.   Correct.

Page 85

22 (Pages 82 - 85)

K. MIKHAYLOVA

1
2    Q.   Now, let's get back to the
3  pregnancy.  You said you believe you
4  became pregnant.  How soon -- strike that.
5        When did you first learn you
6  were pregnant?
7    A.   February 4th of 2017, I believe.
8    Q.   That's when you learned you were
9  pregnant?
10    A.   Yes.  That's when I knew I was
11  pregnant.
12    Q.   How pregnant were you at that
13  point?
14    A.   Couple of weeks.
15    Q.   Did you have any issues with
16  your pregnancy?
17    A.   Yes.
18    Q.   Morning sickness, anything?
19    A.   This is my third child and every
20  pregnancy I have, as soon as I knew my
21  period was missed by a day, I knew I was
22  pregnant because I was sick to my stomach.
23  I couldn't eat nothing.  Everything I ate
24  came right out.  I was super super sick
25  right away.

Page 86

K. MIKHAYLOVA

1
2    Q.   Some of us can identify.
3    A.   Yes, unfortunately.
4    Q.   Okay.  I know that -- strike
5  that.
6        When did you tell anybody at
7  Bloomingdale's that you were pregnant?
8  When was the first time?
9    A.   First time I told a few of my
10  colleagues.  I know Eleanor was one.
11  Martha Way was another person I told I was
12  pregnant.  I told them probably the next
13  day.  When I found out, I remember going
14  to Bloomingdale's and I was super, super
15  pale.  I just didn't look good.  I
16  remember when I came in there was hotdog
17  stand outside and every time I smelled it,
18  I was extremely nauseous and before coming
19  in I would throw up.  And they were like
20  oh, my God, what's wrong with you.
21  Usually I come in, I have makeup.  I am
22  all cheery.  And I was just not myself.
23  So they knew something was wrong with me
24  right away because I didn't look good.  I
25  was super, super pale.  I looked sick.

Page 87

K. MIKHAYLOVA

1
2    Q.   Let me rephrase the question.
3  When was the first time you told someone
4  at management that you were pregnant?
5    A.   I told -- I don't recall the
6  date though.  I know I told Denis first.
7  I don't recall exactly the date.  If it
8  was in the end of February or the
9  beginning of March exactly when I told him
10  I was pregnant.
11    Q.   What response did he have, if
12  any?
13    A.   He told me oh, really.  I said
14  yes.  He said congratulations, you just
15  need to go to HR and make sure you alert
16  them that you are pregnant.
17    Q.   I said but why do I have to go
18  to HR to alert them that I was pregnant
19  because all my other jobs when I had a
20  baby no one sent me to HR to alert them
21  that I was pregnant.  If I am telling a
22  manager, usually that's enough indication
23  to know that I am pregnant.  This is what
24  set me off wrong.  Why do I need to tell
25  HR that I am pregnant.

Page 88

K. MIKHAYLOVA

1
2    Q.   I appreciate your thought
3  process.  However, not relevant to my
4  question.
5        He told you to go to HR.  Did he
6  tell you you need to go to HR to make sure
7  you have time off for the HR?
8    A.   No.  That's not why I had to go
9  to HR.
10    Q.   Why did you have to go to HR?
11    A.   Because they might think I am
12  pregnant.  That what I was under the
13  impression.
14    Q.   You eventually requested a leave
15  of absence for your pregnancy, correct?
16    A.   Correct.
17    Q.   How did that come about?
18    A.   I requested it because I was
19  coming in late and I was extremely,
20  extremely sick.  I was throwing up.  Even
21  with throwing up, I still attempted to go
22  to work every day.  I still tried to work
23  hard and stand but I felt like my job -- I
24  already starting feeling like okay, if
25  they are not aware that I am pregnant, I

Page 89

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1  just need to go to them to let me know
2  that I am pregnant. I just was feeling a
3  push back every time I came in late even
4  though he knew I was pregnant but I felt
5  like it was always why are you late. I am
6  like but I told you, I don't feel good, I
7  had to throw up before going to the floor.
8  I can't come to the floor unless I go to
9  the bathroom first and then come to the
10 floor. I don't know. I felt like I had
11 to go to HR to notify them that I was
12 pregnant.
13    Q.  Did he mention to you that to
14 the extent you needed an accomodation you
15 need to let HR know that so that they can
16 make an accomodation?
17    A.  He didn't mention that to me.
18    Q.  Did you go to HR and tell them
19 that you were pregnant and you were having
20 issues with your morning sickness?
21    A.  Yes. I told them I was having
22 issues and I told them I need an
23 accomodation. That's when they sent me
24 paperwork to go to my doctors.

Page 90

K. MIKHAYLOVA

1    allowed to sit down or allowed to leave.
2    Q.  At what point in time did you
3  have this conversation with HR?
4    A.  Right away. I went there -- I
5  don't recall the date that I went there
6  and I let them know and we started the
7  process with my doctors getting the FLMA
8  leave.
9    Q.  Do you remember the name on the
10 door of the person you spoke to, anything
11 of that nature?
12    A.  No, I don't know that.
13    Q.  Do you have any notes or any
14 other evidence that you had this
15 conversation with HR?
16    A.  With HR?
17    Q.  Yes.
18    A.  No.
19    Q.  When Denis first learned you
20 were pregnant he tells you you need to go
21 to HR?
22    A.  Yes. He had given me a verbal
23 write-up that I was coming in late and I
24 told him but I am pregnant. He said in

Page 92

K. MIKHAYLOVA

1       THE WITNESS: Sorry. I am going
2  to turn offer my phone. Sorry about
3  that. Continue, please.
4    Q.  Who did you speak to in HR?
5    A.  A female, but I don't recall her
6  name.
7    Q.  How did you get to that female
8  to speak to her?
9    A.  I went to -- I believe it is on
10 the second floor. I don't remember what
11 floor HR is on. I went directly to the HR
12 office. I notified them.
13    Q.  You notified them. What does
14 that mean?
15    A.  I told them I was pregnant and I
16 needed accommodation because I wasn't
17 feeling good.
18    Q.  What accomodation did you want?
19    A.  I wanted to be able to come in
20 late if I was allowed to without getting
21 penalized for it. If I needed to sit
22 down, I was able to sit down because in
23 Bloomingdale's, pregnant or not pregnant
24 disability or no disability, you weren't

Page 91

K. MIKHAYLOVA

1  that case you have to go to HR. Once they
2  accommodate you I will remove this from
3  your file.
4    Q.  Now you recall that he did say,
5  in fact, he wanted you to go to HR to get
6  an accomodation?
7       MS. MENDOZA: Objection.
8       You can answer.
9    Q.  You can answer.
10    A.  He told me that -- he didn't
11 tell me for an accomodation. He just told
12 me I need to notify them.
13    Q.  I thought you just said he told
14 you --
15    A.  Just to let them know that I am
16 pregnant. He didn't tell me to go get
17 accommodation. He told me to go to HR to
18 let them know that I am pregnant because
19 as of now, he wrote me up for coming in
20 late while I was pregnant and throwing up.
21    Q.  And I thought you said that he
22 told you if he got the accommodation he
23 would you be able to remove you --
24    A.  Not accommodation. If I had

Page 93

24 (Pages 90 - 93)

Atkinson-Baker, A Veritext Company
(818) 551-7300                         www.veritext.com

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1  notified them. I might have worded it
2  wrong. If I notified them that I was
3  pregnant they would allow me to remove
4  this write-up, that they would remove that
5  write-up. Now, when you say accommodation
6  I think of the leave of absence. That's
7  not what he told me to do.
8      Q.  Let's start with that.
9         Do you know what the word
10  accomodation means?
11     A.  If you want to explain it to me
12  so I can answer.
13     Q.  I am asking you what it means to
14  you?
15     A.  It means to -- it means to give
16  me special, I don't want to say privileges
17  but -- if I have some kind of disability,
18  to let me, due to the disability
19  accommodate it, to let me, you know,
20  whatever makes me comfortable.
21     Q.  You said a minute ago that meant
22  a leave of absence. Were you asking for
23  something other than a leave of absence
24  from Bloomingdale's?

Page 94

K. MIKHAYLOVA

1      A.  From HR?
2      Q.  Yes.
3      A.  Well -- so this is where I am
4  confused. This is during my conversation
5  with Denis Diaz or with HR?
6      Q.  HR.
7      A.  Yes. HR, I had asked them to
8  accommodate me.
9      Q.  You asked them what?
10     A.  I asked them to go on a leave of
11  absence. Well, accommodation. It really
12  wasn't a leave of absence. I was working.
13  It was more of an accomodation.
14     Q.  The person you spoke to, did
15  they ask you what you wanted as far as
16  accommodation?
17     A.  They did not ask me what I
18  wanted.
19     Q.  What did they --
20     A.  They just said we are going to
21  forward paperwork to your doctor. Your
22  doctor fills it out and submit it to
23  Macy's. Then Macy's decides on how they
24  will accommodate you.

Page 95

K. MIKHAYLOVA

1      Q.  Did you, in fact, follow up with
2  that process?
3      A.  Yes, I had it approved.
4      Q.  What was approved?
5      A.  That I was able to come in late
6  and that -- I believe you an hour a day.
7  If I needed to sit, to let me take extra
8  breaks.
9      Q.  That was, in fact, given? That
10  was granted?
11     A.  Correct. It was granted to my
12  doctor, yes, asking them to give it to me.
13     Q.  Who was your doctor?
14     A.  Dr. Kamineni.
15     Q.  Can you spell that?
16     A.  K-A-M-I-N-E-N-I calm.
17     Q.  Do you have a first name?
18     A.  SANTHA; S-A-N-T-H-A.
19     Q.  Was this your ob-gyn or primary
20  care physician?
21     A.  She was my ob-gyn.
22     Q.  It is a she?
23     A.  Yes.
24     Q.  Is there a particular practice

Page 96

K. MIKHAYLOVA

1  group that she is with?
2      A.  At the moment she is in Rego
3  Park. She is part of Northwell Health.
4      Q.  Your recollection is she
5  completed paperwork saying you needed to
6  be allowed to come in hour late?
7      A.  I believe hour late and
8  accommodate with any extra breaks I
9  needed.
10     Q.  Did you ever take into
11  Bloomingdale's or HR a note that are said
12  that?
13     A.  I gave in the paperwork.
14     Q.  You submitted a note from your
15  work?
16     A.  I submitted that paperwork,
17  correct.
18     Q.  To who did you submit that?
19     A.  To Macy's HR. I submitted it
20  and my doctor submitted it, whatever. She
21  had to submit on her behalf.
22     Q.  How do you know your doctor
23  submitted it?
24     A.  Because I was there in the

Page 97

25 (Pages 94 - 97)

K. MIKHAYLOVA

1
2  office when she submitted it.
3      Q.   You saw her hit the button; is
4  that what you mean?
5      A.   I saw her writing it out.
6      Q.   My question is how do you know
7  what she did after she wrote it out?
8      A.   Because Macy's contacted me and
9  let me know that it was submitted and that
10  was the accommodation.
11      Q.   How did Macy's contact you?
12      A.   Vie phone.
13      Q.   Did you get any e-mails from
14  Macy's to let you know this has been
15  received?
16      A.   I don't recall at the moment
17  whether they sent me an e-mail or not.
18      Q.   And you yourself took a copy
19  into HR as well?  Did I understand that
20  correctly?
21      A.   Yes, I had copy of that as well.
22      Q.   Do you still have a copy of
23  that?
24      A.   Somewhere in the house, yes.
25      Q.   You have not produced it in this

Page 98

K. MIKHAYLOVA

1
2      A.   I mean, it was -- I don't recall
3  anything else after they told me I came in
4  late.
5      Q.   Did they ever write you up
6  again.  You actually got one write-up in
7  April?
8      A.   Yes.
9      Q.   After that, was your
10  accommodation paperwork submitted after
11  that?
12      A.   Yes.
13      Q.   You got a write-up.  You go to
14  HR.  You get the accommodation paperwork.
15  Did you ever get another write-up?
16      A.   Not to my knowledge.
17      Q.   Were you late but still not
18  given a write-up?
19      A.   I was late, yes.
20      Q.   But there were no further
21  repercussions on your employment?
22      A.   Well, I don't know.  Not to my
23  knowledge, yeah.
24      Q.   So the only way you weren't
25  accommodated was they asked you not to

Page 100

K. MIKHAYLOVA

1
2  matter?
3      A.   I don't understand that.
4      Q.   Have you given it to your
5  attorney so she can give it to me?
6      A.   I believe I have.
7      Q.   After you got this accommodation
8  or you got this paperwork in, Macy's tells
9  you or Bloomingdale's tells you they got
10  it.  Did think, in fact, accommodate your
11  pregnancy at that time?
12      A.   No.  I still wasn't allowed to
13  sit down.  I still wasn't allowed to lean.
14  I was asked even by Cathy when I did lean
15  that I have to stand up straight and that
16  I couldn't lean.  So, they didn't really
17  accommodate me.
18      Q.   Were you allowed to come in late
19  without issue?
20      A.   They gave me an issue about it.
21      Q.   What issue?
22      A.   That's why they kept asking me
23  why I am coming in late.  I told them I
24  was sick.
25      Q.   Anything else?

Page 99

K. MIKHAYLOVA

1
2  lean or sit if you were standing on the
3  floor?
4      A.   Correct.  And I was always
5  questioned as to why I was late when they
6  knew I was sick and pregnant.
7      Q.   That's the word accommodate --
8      A.   Correct.  They didn't say you
9  can sit upstairs on the tenth floor if I
10  wanted to sit down.  Nothing was easy.
11  There was no water provided to me.  They
12  didn't give me any list of what I could
13  and could not do.  I remember in Prada I
14  was pregnant with my daughter and I told
15  the manager.  They give you a list of
16  things that I am entitled to.  I never
17  received a list, never received anything
18  from them.
19      Q.   That maybe Prada's process.  We
20  are talking about Bloomingdale's process?
21      A.   Correct.
22      Q.   In your recollection doctor said
23  you should be able to come in late and sit
24  and take breaks as needed?
25      A.   Correct.

Page 101

26 (Pages 98 - 101)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1
2    Q.   Did anyone tell you they did not
3    want you breaking on the floor but if you
4    want you can go up to the employee lounge
5    and sit down?
6    A.   I don't remember anyone telling
7    me that.
8    Q.   There is no place to sit on the
9    floor, correct?
10   A.   You can go behind the closet and
11   sit there. You can lean. Actually, there
12   is chairs on the floor so yes, you can sit
13   on the floor.
14   Q.   Did they ask you not to sit on
15   the floor but to go --
16   A.   They didn't tell me.
17   Q.   Normally if you take a break you
18   don't take a break sitting on the floor,
19   you would be off the floor, correct?
20   A.   Yes.
21   Q.   Anything else you asked for as
22   far as accomodation?
23   A.   Not that I recall.
24   Q.   You said people asked you if you
25   came late why are you late and you said

Page 102

K. MIKHAYLOVA

1
2    morning sickness. Other than those kind
3    of questions, did anyone ever mention your
4    pregnancy in a negative way?
5    A.   Not that I'm aware of.
6    Q.   When were you showing? When was
7    it obvious you were pregnant?
8    A.   Already in -- let's say in the
9    beginning of April.
10   Q.   Before the conversations with
11   Chris Castellani, had you ever had any
12   interaction with loss prevention or asset
13   protection?
14   A.   Yes, one time.
15   Q.   When?
16   A.   It was for a phone order that
17   they approved, the cash office approved.
18   I went to Chris, not Chris, a manager and
19   told him this lady keeps calling me for
20   the same thing, different addresses. I
21   don't feel comfortable sending her all
22   this merchandise. They said well, if the
23   cash office approves it then you can go
24   ahead and send it. And, of course, I got
25   questioned for it after why I was sending

Page 103

K. MIKHAYLOVA

1
2    it. And I told Chris, I said well, you
3    guys allowed me to do so. I went to you
4    guys and I said I was uncomfortable doing
5    this because she is placing many orders
6    for to these bags and she has other people
7    calling me and placing orders for these
8    bags and you said as long as it is
9    approved by the cash office and you get a
10   sticker of verification that you can
11   process it, then you can go ahead and do
12   so.
13   Q.   Who was the person you spoke to
14   in loss prevention?
15   A.   I believe it was David. I don't
16   recall his name. It was a guy with
17   moustache. I don't recall his name.
18   Q.   Do you know what his position
19   was in asset protection?
20   A.   He was dealing with external --
21   external theft. I know you guys have
22   internal and external when I was there.
23   And I made sure because I felt
24   uncomfortable because the lady had
25   different -- she was giving out my number.

Page 104

K. MIKHAYLOVA

1
2    She had people calling me but I knew it
3    was the same, sending to different
4    addresses. And cash office kept approving
5    it. Then I was like I said listen, this
6    is it. I am just letting you that is what
7    is happening. And they said as long as
8    this is approved by the cash office, they
9    check the address of the customer. I was
10   shipping it to the same billing, same
11   shipping. But then I felt like something
12   was wrong and then they questioned me
13   about it.
14   Q.   At one point in time, and we
15   will look at the records in a little bit
16   you had the highest fraud transactions in
17   the company?
18   A.   I don't know how --
19        MS. MENDOZA: Objection.
20        You can answer.
21   A.   No, I was not aware of that. It
22   was probably because of this lady that I
23   let them know but I was not aware of that
24   at all.
25   Q.   We will look at the numbers

Page 105

27 (Pages 102 - 105)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1  K. MIKHAYLOVA
2  later.
3    A.   And just so you know, when
4  people came and swiped cards, I called
5  security all the time on that to let them
6  know.  If security is not doing their job
7  and whatever and they are allowing me --
8  you want me to take accountability for
9  doing what they are telling me to do.  I
10  mean, that's just insane.  I called
11  security multiple times every time
12  somebody came in that I felt they were
13  buying too fast or looked suspicious, they
14  would come, they would let me swipe.  And
15  now I am being accused of fraud.  This is
16  insane.
17    Q.   Are you familiar with the
18  re-connective system?
19    A.   Yes.  Somewhat.
20    Q.   State for the record what that
21  that was?
22    A.   It was system where you can
23  outreach to clients.
24    Q.   And clients that were in the
25  reconnected could have sent orders as

Page 106

1  K. MIKHAYLOVA
2  well, correct?
3    A.   I don't remember.  I didn't use
4  reconnect too much.  I think when I was
5  there, reconnect was not like -- I don't
6  recall using reconnect that much at all.
7  I probably didn't even have clients at
8  reconnect if you want to check my history.
9    Q.   Are you familiar with memo order
10  system?
11    A.   Yes, I am.
12    Q.   Explain for the record what that
13  is, please?
14    A.   You take down the client's
15  information.  Billing and shipping must be
16  the same.  You take it upstairs to the
17  cash office on the tenth floor and you
18  wait for them to have, I guess an approval
19  code to get a sticker for you to scan a
20  sticker.  We were never allowed to input
21  any numbers into the system.
22    Q.   They would actually approve and
23  send it back to you?
24    A.   Correct.  I have never used
25  anything without their approval ever,

Page 107

1  K. MIKHAYLOVA
2  never.
3    Q.   If it is a memo order sale you
4  have to send it, you have to mail it?
5    A.   Absolutely.  They have to be
6  mailed to -- shipping and billing is the
7  same.  Unless the person is present and
8  they want it shipped but you don't have do
9  memo for that because they are swiping the
10  card in person.
11    Q.   This lady that you told AP
12  about, was she going through the memo
13  order process or were you going?
14    A.   Absolutely, absolutely.
15    Q.   Was she using different credit
16  cards or --
17    A.   Yes.  I had her friends call me
18  and I knew.  They all sounded the same.
19  It wasn't the same person but it was like
20  oh, she sent me to order this bag from
21  you.  It was going to different address --
22  different people.
23    Q.   She wasn't calling with
24  different credit cards.  She would have
25  people call you with their credit cards --

Page 108

1  K. MIKHAYLOVA
2    A.   She placed an order herself and
3  then she would have other people calling
4  me to place order -- like for them to act
5  like they are new customers and they want
6  to buy this bag and this bag.
7    Q.   And then you would go through
8  the memo process with them?
9    A.   Yes.  And ship it only to
10  billing and shipping the same and get an
11  approval from the cash office upstairs.
12    Q.   What about it was suspicious
13  that made you concerned?
14    A.   Well, because how are all your
15  friends coming to me and asking me to send
16  it.  This is concerning that they are all
17  buying this merchandize.  That's when I
18  went to loss prevention.  I said listen,
19  they are all calling me, this one person
20  got my number.  I mean, they were calling
21  the store as well.  It was just easier
22  access.  I guess she was giving out my
23  number.  They were all I believe going to
24  Texas.  If I'm not mistaken, they were all
25  going to Texas.  So that's another red

Page 109

28 (Pages 106 - 109)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1  flag.  They are all going to different
2  people, different names but -- and I am
3  doing a memo.  He told me are you going to
4  the cash office.  I said of course, I am
5  going to the cash office but just because
6  I am going to the cash office doesn't mean
7  there is nothing fishy about it.  And he
8  said well, as long as you are getting it
9  approved by the cash office, those were
10  his exact words.  He checked a few of the
11  addresses I gave him and he says okay,
12  well, on their record it shows that's
13  their right address.  As long as you are
14  shipping there, you should be fine.
15  Obviously, I wasn't fine.
16     Q.  Do you know how long David had
17  worked for AP or anything about him?
18     A.  His name -- I recall his name
19  being David.  That might have not been his
20  name.  I can definitely identify him.  I
21  remember how he looks like, but I don't
22  know how long he's worked there.
23     Q.  Did you talk to anyone else in
24  AP about this issue?
25

Page 110

K. MIKHAYLOVA

1     A.  It was him and two other people.
2  I specifically went upstairs to their
3  office to bring it to their attention.  I
4  just recall him but there were two other
5  people there when I was talking.  They
6  told me the same thing.  They said are you
7  going to the cash office.  I said of
8  course.  But just because I am going to
9  the cash office and getting it approved
10  doesn't mean that something might not be
11  wrong.  As long as we have that paperwork
12  to back it up that you are doing the right
13  thing, you don't have anything to worry
14  about.  And that's their words to me.
15     Q.  Did you ever have any
16  discussions with Richard Law other than
17  those conversations around your
18  termination?
19     A.  I don't recall.
20     Q.  Did you remember who Richard Law
21  was?
22     A.  I remember he was in HR.
23     Q.  Did you ever deal with a person
24  in HR by the name of Timbite Yonas?
25

Page 111

K. MIKHAYLOVA

1     A.  I don't recall.
2        MS. TIERNEY:  T-I-M-B-I-T-E,
3  Y-O-N-A-S.
4     A.  I don't recall.
5     Q.  I may have asked you this, I
6  apologize.  Have you ever had a
7  conversation with Chris Castellani before
8  he interviewed you the first time?
9     A.  Before the incident with phone
10  order?
11     Q.  Yes.
12     A.  No.
13     Q.  You, in fact, had two interviews
14  with loss prevention, correct?
15     A.  Correct.
16     Q.  Were both of them with Chris
17  Castellani?
18     A.  Yes.
19     Q.  Was the witness Shanine Gray in
20  both instances?
21     A.  I don't recall.  She may have
22  been in the last one.  I don't remember if
23  she was on the first one.
24     Q.  Let's go with the first one.  Do
25

Page 112

K. MIKHAYLOVA

1  you recall conversations with her?
2     A.  Do I recall -- I couldn't hear
3  you.
4     Q.  Do you recall when the first
5  conversation with Chris Castellani
6  occurred?
7     A.  I don't recall the date.  I
8  don't recall the first time when it was.
9     Q.  How did you end up in AP in the
10  office -- strike that.
11        I assume that, first of all, the
12  conversation occurred in the office?
13     A.  Yes.  Somebody came to get me
14  downstairs.  I finished selling and they
15  pulled me upstairs to the site.  They were
16  like oh, we need to ask you a few
17  questions.  That was the first
18  conversation.  I said sure and I went
19  upstairs.
20     Q.  And that was with Chris
21  Castellani and someone else you don't
22  recall?
23     A.  Correct.
24     Q.  What was the conversation?  What

Page 113

29 (Pages 110 - 113)

K. MIKHAYLOVA

1   happened during the conversation?  What do
2   you recall?
3       A.   I recall him telling me do you
4   remember this transaction.  I said very
5   well.  He said this lady was sending stuff
6   and, you know, it is fraudulent.  I said
7   well, you know, I made that aware to you
8   guys that it was fraudulent.  Well, no.
9   Wait.  I said I went to you guys to have
10  it checked and before I had it checked,
11  everything went through the cash office.
12  I said everything on my part I did.  I
13  even made you guys aware that this lady
14  was sending me clients.  That's what I
15  recall having in that conversation.  He
16  asked me do I know her personally.  I said
17  absolutely not.  I met the person.  She
18  called the store and that's how she got my
19  number because I answered the phone.  He
20  asked me am I aware of what I was doing
21  trying to say maybe I had some interaction
22  with the lady.  I said absolutely not, I
23  have no idea who this lady is.  I guess he
24  was thinking I was doing this on purpose.

Page 114

K. MIKHAYLOVA

1   But absolutely not, I would never
2   jeopardize my job for that crap.  Sorry.
3       Q.   Did he talk about other
4   transactions or just one in particular?
5       A.   Well, it was a whole thing of
6   transactions going to Texas so it wasn't
7   the same person.
8       Q.   I want to show you an exhibit.
9       A.   Okay.
10      Q.   I am going to ask to mark
11  Exhibit A Document 2056 to 2079.  This
12  will be a group exhibit.  I will share the
13  screen.
14           (Whereupon, Document 2056 to
15      2079 was marked as Defendant's Exhibit
16      A for identification as of this date.)
17      Q.   Can you see my screen?
18      A.   Yes.
19      Q.   This is a group exhibit.  Do you
20  recognize this?
21      A.   Yes.
22      Q.   Do you recognize that this is a
23  memo order form?
24      A.   Yes.

Page 115

K. MIKHAYLOVA

1       Q.   First page is Margaret Roberts
2   and it is Hickman Street, Dallas, Texas.
3   Do you know if this was the lady that was
4   --
5       A.   I don't recall the name but it
6   is from Texas.  It might have been the
7   lady.
8       Q.   This is a pretty big exhibit.
9   It is something we produced to your
10  counsel last week.  Was this the subject
11  of the first conversation with Chris
12  Castellani?
13      A.   Yes, I believe so.  That was
14  about the lady in Texas, yes.
15      Q.   Let me just kind of go through
16  this.  It may take us a while because it
17  is 124 pages.  Here's the second one.
18  Pamela --
19      A.   Yes.
20      Q.   We can go through the whole
21  thing and if you want to take a look over
22  the break and take a look at it longer?
23      A.   Okay.
24      Q.   This is --

Page 116

K. MIKHAYLOVA

1       A.   It looks like the same person
2   because they are all going to Texas.
3       Q.   This one, this is all different
4   addresses?
5       A.   Yeah, they are different people
6   because she had different people calling
7   me.  Whatever address was on that a memo,
8   I was sending it to that address.
9       Q.   Let me ask you this.  This
10  ticket says suspended.  Does that mean
11  what --
12      A.   It means I was trying to ring it
13  up and maybe her card declined and I had
14  to contact the client to tell her her card
15  was declined.  This really doesn't mean
16  anything.
17      Q.   There was a Ruth Rusch who was
18  also in Dallas?
19      A.   Yes.
20      Q.   This is Ruth Thomas at Sabrina
21  -- Drive?
22      A.   Yes.  That's when I went to
23  them.  They are changing names but they
24  have similar addresses and they are all in

Page 117

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

K. MIKHAYLOVA

1       K. MIKHAYLOVA
2 Texas.
3   Q.  Then you have Ruth Rusch again
4 and Ruth Thomas, same address.  Do you
5 remember any of those names in particular,
6 Ms. Mikhaylova?
7   A.  I don't remember exactly the
8 names.  I didn't have them in my phone.
9 Whatever I put there is that they told me
10 is their address.
11   Q.  Do you remember if Mr.
12 Castellani went through this group of --
13   A.  He wasn't as detailed as you are
14 now and wasn't showing me the receipts but
15 he was showing me all these addresses.
16 This is what I told them, this is why I
17 went to HR and I didn't want an issues
18 with that.
19   Q.  When you said you went to HR --
20   A.  I'm sorry, I'm sorry.  I went to
21 AP.  I'm sorry.  Yeah, there was a lot of
22 transactions.
23   Q.  Here's the Hickman address
24 address but this is Edith Selir.
25   A.  Okay.  I don't even know how

Page 118

1       K. MIKHAYLOVA
2 they were getting approved but they looked
3 like, when I gave the guy the information,
4 he looked and the address was linked to
5 their credit card.  This is not the tenth
6 floor.  Tenth floor, I was just giving the
7 stuff to.  But when I went to loss
8 prevention, I gave them the address and
9 they looked in their system and that
10 person was linked to that credit card with
11 that address.
12   Q.  And employee ID 72061886 is your
13 number, right?
14   A.  Yes.
15   Q.  And that's your Bloomingdale's
16 associate number?
17   A.  Yes.
18   Q.  Here is another Hickman address
19 that is Dorothy --
20   A.  That doesn't look like my
21 handwriting though.  It looks like
22 somebody wrote it out for me.  Doesn't
23 look like my handwriting.  It does look
24 like it is under my number.  That's not my
25 handwriting though.  Weird.  Okay.

Page 119

1       K. MIKHAYLOVA
2   Q.  And is this what would happen?
3 You would send this type of form?
4   A.  Yes.  I would pick the form
5 upstairs myself to the cash office.  They
6 would get an approval and they would put a
7 sticker on it.  The sticker is just
8 basically, if you scan the sticker, you
9 weren't allowed to input any credit card
10 information.
11   Q.  Would it come with these blacked
12 out --
13   A.  From what I remember, it was
14 blacked out with a sticker on.
15   Q.  And the sticker is what you
16 would use to ring the transaction and it
17 would get charged on the proper card?
18   A.  Yes.
19     MS. MENDOZA:  Can you guys give
20 me a moment?
21     MS. TIERNEY:  Sure.  Let's take
22 five minutes.  That's fine.
23     (Whereupon, a short recess was
24 taken from 12:36 p.m. to 12:43 p.m.)
25     MS. TIERNEY:  Back on the

Page 120

1       K. MIKHAYLOVA
2 record.
3     MS. MENDOZA:  I just want to put
4 my objection on the record.  I want to
5 note that plaintiff has not reviewed
6 the documents in the previous exhibit
7 that was shown because we were unable
8 to access the link but she will have
9 an opportunity to look at it during
10 the break.
11   Q.  Ms. Mikhaylova, do these look
12 like at least some of the addresses and
13 things that Mr. Castellani was talking to
14 you about in that first interview?
15   A.  Yes.
16   Q.  You will be looking at those
17 over break and if you want to add
18 anything, we can review then.
19     After you after you tell Mr.
20 Castellani that you had reported this to
21 AP, you had some concerns, what was his
22 response if any?
23   A.  Okay.  We are going to
24 definitely investigate this matter.  I
25 said please do.  That's it.

Page 121

31 (Pages 118 - 121)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1    Q.   Did you first any write-ups, any
2    penalty, any punishments as a result of
3    that conversation?
4    A.   No.
5    Q.   During those conversations did
6    Mr. Castellani inform you that you have
7    the highest fraud transactions that you
8    rang in the company and in the company, I
9    mean in Macy's not just Bloomingdale's?
10   A.   No. I don't know how that is
11   possible. My number isn't high. But no,
12   he did not tell me that.
13   Q.   Do you have any knowledge of the
14   percentage of the rings that were
15   fraudulent? Do your have any knowledge?
16   MS. MENDOZA: Objection.
17        You can answer.
18   A.   No, I have no knowledge.
19   Q.   How long was it in between
20   conversations with Mr. Castellani? I
21   think you said there were two, correct?
22   A.   Correct.
23   Q.   When was the next conversation?
24   How long after the first conversation?

Page 122

K. MIKHAYLOVA

1    amount of fraudulent transactions you had
2    rung?
3    A.   No. Not to my knowledge. It
4    was about all these transactions going to
5    Texas and that's what was the focus on,
6    the Texas transactions.
7    Q.   Do you know how it came to his
8    attention?
9    A.   It was a big amount.
10   Q.   It was a big amount?
11   A.   Yes.
12   Q.   So he did say that?
13   A.   Well, just to the sense, yes.
14   Not general. It was in regard to the
15   sense.
16   Q.   Did he say anything to suggest
17   you have the highest fraudulent sends of
18   anybody in the company?
19   A.   No, he did not.
20   Q.   There were no repercussions; he
21   accepted your version of the events?
22   A.   He never came back to me with
23   it, yes.
24   Q.   You have no first-hand knowledge

Page 124

K. MIKHAYLOVA

1    A.   It was long after before they
2    decided to -- it was before my
3    termination. Two weeks prior to my
4    termination.
5    Q.   Was it like the couple of
6    months, was it a week?
7    A.   Couple of months.
8    Q.   During the time -- strike that.
9         Did Mr. Castellani tell you how
10   it came to his attention about these
11   addresses in the first conversation? Did
12   he tell you how it came up to him?
13   A.   No.
14   Q.   Did he tell you anything about
15   the credit card arm of the company in Ohio
16   that flagged your account or these
17   transactions, anything of that nature?
18   A.   Hold on. How did they flag my
19   account? I don't understand.
20   Q.   I am asking you if he said
21   anything of that nature to you?
22   A.   No, he did.
23   Q.   Did you say that you had been
24   pulled in for interview because of the

Page 123

K. MIKHAYLOVA

1    as to how this came to Chris Castellani's
2    attention?
3    A.   No.
4         MS. MENDOZA: Objection.
5         You can answer.
6    Q.   Do you know if Denis Diaz had
7    anything to do with this?
8    A.   No, I have no idea.
9    Q.   Do you know if Cathy Younis had
10   anything to do with this?
11   A.   I wouldn't know that.
12   Q.   Did Mr. Castellani mention
13   either of them in his conversation with
14   you?
15   A.   No, not to my knowledge.
16   Q.   Couple of months you had a
17   second conversation. Tell me how that
18   came about?
19   A.   I just finished ringing up a
20   sale and I remember Justin, he pulled me
21   from the floor quietly. And he said just
22   come with me for a second. That was how
23   he approached me.
24   Q.   I'm sorry, who was it that

Page 125

32 (Pages 122 - 125)

K. MIKHAYLOVA

1  K. MIKHAYLOVA
2  called you?
3      A.   Justin.  He was part of loss
4  prevention.
5      Q.   Is Justin the person you spoke
6  to perhaps in the past --
7      A.   No, no.
8      Q.   That was the name I did not hear
9  you mention before.
10     A.   I just remember his name being
11  Justin.  I remember this guy.  He pulled
12  me to the side very quietly.  First time
13  when I was pulled, the whole team saw it.
14  This time it was very quietly.  He said we
15  just want to ask you some things.  I said
16  okay, sure.  So I went ahead.  Then he
17  took me to upstairs to his office.  Then
18  here comes out Chris and the other young
19  lady, I don't remember her name.  They are
20  like sit down.  So I sit down.  If I had
21  known -- I should have been able to take
22  a union rep.  They didn't ask me if I
23  wanted a union rep.  I didn't even have
24  time to decide.  They just told me to sit
25  down, I have something to show you.  I

Page 126

1  K. MIKHAYLOVA
2  sending things.  I said no, because -- I
3  was sending things -- the things he was
4  showing me, I was sending it to my
5  clients.  He was like so you were sending
6  it to them and not paying taxes.  I said
7  well, they live in states that don't pay
8  taxes.  So, yeah.  So, he forced me to say
9  it.  But yes, I did have that conversation
10  with him in regards to me sending things
11  and not paying tax, correct.
12     Q.   I think you testified earlier
13  that you, in fact, sent some of these
14  items to avoid paying taxes.  Did I
15  misunderstand that?
16     A.   No, you did not.
17     Q.   You said he forced you to --
18     A.   We were talking about
19  transactions that I was sending to my
20  clients, gifts.  So he was telling me so
21  you weren't paying taxes on them.  I said
22  correct.  He said okay, so you sent them
23  to avoid paying taxes.  I said well,
24  things that were sent to me.  But things
25  sent to them were gifts and we were

Page 128

1  K. MIKHAYLOVA
2  said okay.  That's when they started
3  questioning me about the transaction.  I
4  mean about my buys.
5      Q.   This was your personal
6  purchases?
7      A.   Correct.  Nothing to do with
8  fraudulent activity.
9      Q.   Do you recall the part of the
10  conversation centered around the fact that
11  you were sending things to out of state
12  and they were like five or six different
13  addresses?
14     A.   I remember something like that,
15  yes.
16     Q.   During the course of this
17  conversation you admitted to Chris
18  Castellani that you were sending things
19  out of state to avoid taxes, correct?
20     A.   Well, he forced me to say that.
21  That's number one.  Number two is --
22     Q.   How did he force you to say
23  that?
24     A.   He said, he said you were -- so
25  you were -- he was like so you were

Page 127

1  K. MIKHAYLOVA
2  allowed to do that.
3      Q.   Your testimony is you told Chris
4  Castellani that you had been authorized to
5  do that?
6      A.   Correct.  I told him that too.
7  I told him I was allowed to do so.  Some
8  of the transactions were rang by them.
9  Nobody stopped me from sending to those
10  states.  And also, I know you don't want
11  to hear this but when I worked at Saks, if
12  you sent to a tax free state they are
13  automatically going to contact AP.  Why is
14  Bloomingdale's not having a system to not
15  allow you to do that.  That means they are
16  allowing you to send to tax free states
17  because everybody was sending to tax free
18  states, employees, customers, everybody.
19  I was just doing what everybody was
20  allowed to do.  I know you don't want to
21  hear this but --
22     Q.   I don't think it is relevant.
23  The issue is did Chris Castellani tell you
24  that it was against policy to send items
25  for your personal use out of state for the

Page 129

33 (Pages 126 - 129)

K. MIKHAYLOVA

1  purpose of avoiding taxes?
2     A.   I don't recall him indicating
3  that.
4     Q.   Did you give him the names of
5  any managers that he could talk to who had
6  approved --
7     A.   I absolutely did.
8     Q.   Who did you tell?
9     A.   I told him it was Denis Diaz.
10  Under Viktoria I wasn't even shipping and
11  buying anything.
12     Q.   You said Denis never told you
13  that but he rang for you out of the state;
14  is that correct?
15     A.   Yes.
16     Q.   Other than Denis Diaz, did you
17  give him any other names?
18     A.   No.
19     Q.   Did Chris Castellani tell you
20  during this meeting how this came to his
21  attention?
22     A.   No, he did not.
23     Q.   Do you know if Denis Diaz had
24  anything to do with bringing this to

Page 130

K. MIKHAYLOVA

1     A.   I believe so.  It is either 5th
2  or 6th.
3     Q.   When do you next hear from HR or
4  anyone in management?
5     A.   I was contacting them almost
6  every day after the incident happened.
7  They kept telling me oh, no, we don't have
8  an answer for you.  We don't have an
9  answer for you.  Finally, I left numerous
10  messages to Mr. Law and he returned my
11  call.  He said okay, we can meet at such
12  and such date to discuss the further
13  steps.
14     Q.   At one point you sent an e-mail
15  to Mr. Law asking asking if your pregnancy
16  had something to do with this situation?
17     A.   Correct.
18     Q.   Why?
19     A.   Because I felt like ever since I
20  announced that I am pregnant and I need
21  accommodation, this is when all the
22  problems happened because I never had no
23  issues before.  I have been buying since
24  what -- December.  They have only started

Page 132

K. MIKHAYLOVA

1  Castellani?
2     A.   I would have no idea on that.
3     Q.   Fair enough.  How about Cathy
4  Younis, do you know if she had anything to
5  do with --
6     A.   I would have no idea.
7     Q.   How did the meeting with Mr.
8  Castellani the second time end?
9     A.   He said okay.  He said I will be
10  suspended for the rest of the day, that HR
11  will contact me tomorrow.  Once the
12  investigation is done we will follow up
13  with the next steps.  I asked him am I
14  getting fired for this.  I said you are
15  firing me for something that I was allowed
16  to do.  He said well, no, I am not telling
17  you that.  I am just telling you these are
18  the next steps and they will contact you
19  and let you know what is next.
20     Q.   I assume you go home and you
21  leave the store?
22     A.   Correct.
23     Q.   I think this was June 6th of
24  2017; is that correct?

Page 131

K. MIKHAYLOVA

1  questioning me about this -- in May or
2  June they fired me for purchases that I
3  made in February.  So why is it right
4  after I tell you I am pregnant and I need
5  accommodation, you all of a sudden open an
6  investigation about me.  I wasn't stealing
7  products.  I was doing what I was allowed
8  to do and what everybody else in the
9  boutique was doing.  Everybody else was
10  allowed.  I personally never seen anyone
11  fired.  Staff people were buying 100,000
12  worth of merchandize, nobody was even
13  questioning them but they see a pregnant
14  woman buying and now you want to know
15  where my money is coming from.  I'm sorry,
16  that's not okay.
17     Q.   Do you know if Chris Castellani
18  knew you had asked for accomodation?
19     A.   I wouldn't know that.  I
20  wouldn't know.
21     Q.   Do you know if Chris Castellani
22  knew you had asked for a leave of absence?
23     A.   I wouldn't know that.
24     Q.   Do you know if you had any

Page 133

34 (Pages 130 - 133)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1    K. MIKHAYLOVA
2  conversation with Cathy Younis or Denis
3  Diaz about your request for accomodation
4  or need for leave of absence?
5      A.   I wouldn't know that.
6      Q.   You have no knowledge, right?
7      A.   I have no knowledge.
8      Q.   Other than the timing, I am
9  pregnant now and all of a sudden I am
10  having an AP conversation, that's your
11  evidence that this is related to
12  pregnancy --
13     A.   It wasn't all the AP.  They
14  canceled my -- they stopped me from using
15  my card.  Why did it take you  two months
16  to do this investigation.  Why didn't you
17  come to me -- it was definitely over six
18  weeks.  Why didn't you come to me and ask
19  me.  Why did you do all that.  Why did you
20  have to start as soon as I told you guys I
21  need accomodation.  I never had no issues
22  before besides that issues with the phone
23  with the lady to Texas which they came to
24  me after, which I told them I had gotten
25  approved as well as I went to AP to bring

Page 134

1    K. MIKHAYLOVA
2  it to their attention.  And even customers
3  that were coming to Bloomingdale's that I
4  thought were suspicious, I called AP to
5  come down but according to them, they
6  said unless they are using a
7  Bloomingdale's card they cannot arrest the
8  people whether or not I think they are
9  fraud.  But there is no way of stopping
10  them.  But now I am to blame for that --
11  and this is offensive to me.
12     Q.   You said something there about
13  stop using your card.  What does that
14  mean?
15     A.   So, when I saw a client that
16  came in that I thought was suspicious or
17  using a fraudulent credit card, I would
18  immediately call loss prevention for them
19  to come down.  So they would come down and
20  they would do nothing about it so I would
21  ring the sale.  I mean, they -- stop doing
22  what they are allowing me to do, telling
23  me to do because I can't just use the fact
24  that I think they are suspicious and I
25  can't ring.  So they explained to me that

Page 135

1    K. MIKHAYLOVA
2  unless it is a Bloomingdale's card that
3  they are using, even though I could think
4  they are fraud or they know they are
5  fraud, they cannot stop the client from
6  buying.
7      Q.   Other than the termination and
8  the two conversations with asset
9  protection, was there anything, and I know
10  you were eventually terminated because of
11  that, was there anything else that
12  happened in Bloomingdale's that you think
13  was discriminatory?
14     A.   No, I don't remember.
15     Q.   You don't know how either
16  investigation started, right?
17     A.   No.
18     Q.   Do you know if the people who
19  started the investigation knew if you were
20  pregnant?
21     A.   I mean, would they have told me
22  that, no.  I mean, I wouldn't know.  I
23  looked pregnant so I knew I was pregnant.
24  I don't know what they knew.  I don't know
25  what knowledge they had.

Page 136

1    K. MIKHAYLOVA
2      Q.   If the investigation started
3  outside of the New York area because of
4  reports and other things and the people
5  had never met you, then it would not be
6  related to your pregnancy.  Would you
7  agree with that?
8          MS. MENDOZA:  Objection.
9          You can answer.
10     Q.   You can answer.
11     A.   I don't understand that
12  question.
13     Q.   Sure.  If the person who started
14  the investigation did so just based on
15  numbers, reports, how much money you
16  returned on your card, et cetera, how much
17  loss your transactions were causing and
18  they never met you --
19     A.   How much loss?  What do you
20  mean?
21     Q.   The fraudulent sends you were
22  ringing.
23     A.   But I was told to ring them and
24  I was told --
25     Q.   You really need to listen to my

Page 137

35 (Pages 134 - 137)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1 question. I know you have arguments and
2 not to be disrespectful but I don't care.
3 Answer my question. Okay.
4
5 If people starting the
6 investigation had never met you, would you
7 agree then that these investigations could
8 not be related to your pregnancy?
9 MS. MENDOZA: Objection.
10 You can answer.
11 A. I can't agree or disagree
12 because I don't know what they were told.
13 Q. Fair enough. I can prove that
14 myself.
15 MS. TIERNEY: Why don't we take
16 a lunch break?
17 MS. MENDOZA: Sure. We can do
18 thirty minutes.
19 (Whereupon, a short recess was
20 taken from 1:00 p.m. to 1:33 p.m.)
21 MS. TIERNEY: Back on the
22 record.
23 Q. I know we talked about Bobby
24 Booker. Is there anything else Mr. Booker
25 did that you felt was inappropriate that

Page 138

K. MIKHAYLOVA

1 you haven't told me about already?
2 A. Not that I recall at the moment.
3 Q. Do you have any notes or
4 anything that would refresh you as to the
5 conduct of Mr. Booker?
6 A. No.
7 Q. How about anyone else at
8 Bloomingdale's? Did anyone else do
9 anything that you felt was inappropriate
10 and was sexually harassing or made you
11 feel uncomfortable other than Mr. Booker?
12 A. Not that I recall.
13 Q. Were there any other comments
14 made by Mr. Booker that we haven't talked
15 about today that you felt was sexual in
16 nature or inappropriate?
17 A. We had a conversation once in
18 regard to like -- it was like he started
19 -- I just -- I honestly cannot recall the
20 whole conversation. It was -- he was
21 asking me about something in regard to --
22 something sexual. I said listen, I don't
23 feel comfortable even talking about. But
24 I don't remember the terms of exactly what
25

Page 139

K. MIKHAYLOVA

1 the conversation was about directly.
2 Because A, it's been too long. B, all I
3 remember is I was trying to push him away
4 and say listen, I don't even want to get
5 in with that.
6 Q. Anything else with regard to
7 making any inappropriate comments of a
8 sexual nature about your body, anything
9 like that?
10 A. Not that I recall.
11 Q. How did you find out you were
12 being terminated?
13 A. Well, I believe on June 6th --
14 no -- two weeks later Richard Law, he got
15 me into his office. He called me and
16 probably was the one that told me.
17 Q. It was an in-person
18 conversation?
19 A. It was in-person and I had a
20 union rep with me as well. Mr. -- who was
21 the union rep.
22 THE WITNESS: Melissa, do you
23 ever the union help's name? I don't
24 remember right now.
25

Page 140

K. MIKHAYLOVA

1 Q. Was it Kathy Houser?
2 A. Yes.
3 Q. Was Kathy someone you had used
4 before?
5 A. No, I have never used union rep
6 before.
7 Q. How long did this conversation
8 with Richard Law take?
9 A. About ten minutes if I recall
10 correctly.
11 Q. I'm sorry, ten minutes --
12 A. Ten minutes I would say, give or
13 take.
14 Q. What do you remember being said
15 in this conversation?
16 A. He said that they made a
17 decision to terminate me because I was --
18 well, A, he said I bought too many shoes.
19 I asked him, I said where does it say I
20 couldn't buy it. He said -- he wouldn't
21 show me no paperwork stating that -- and I
22 have actually sent messages to Melissa.
23 At that time, Norman, who was the manager
24 of the shoe department, I asked him, I
25

Page 141

36 (Pages 138 - 141)

K. MIKHAYLOVA
1
2  said was there a limit as to how many
3  shoes you can buy.  He said not to my
4  knowledge, we didn't have a limit.
5       So he mentioned to me I bought
6  too many shoes.  I said wait, but I wasn't
7  aware of that.  I wasn't aware like again
8  there was no limit as to how many shoes I
9  could buy.  He just said that was the
10  decision they made and I am just telling
11  you.  I said okay, that doesn't make
12  sense.  Management is allowing me to send
13  and buy but now all of a sudden you are
14  firing me for it for something that wasn't
15  allowed.  I don't understand.  He said
16  well, unfortunately that's the decision
17  they made.  Even Cathy was surprised they
18  were terminating me for that.  She herself
19  said I have never seen this before.  I
20  said neither have I.  She tried to calm me
21  down because I was pregnant and extremely
22  in shock and disbelief.  She said we can
23  argue it.  I guess -- what is it called --
24  I guess the union can, they go into a
25  meeting and they can, I guess reverse that

Page 142

K. MIKHAYLOVA
1
2  decision or something.  She said I can
3  apply for it.  That was it.
4    Q.   Did he mention anything about
5  the tax evasion issue during this
6  conversation?
7    A.   Yes.  He mentioned that issue as
8  well.
9    Q.   That that was a basis for
10  termination?
11        MS. MENDOZA:  Objection.
12        You can answer.
13    A.   So, he didn't -- I asked him, I
14  said what is the basis for termination.  I
15  asked him for a letter.  Can you give me a
16  letter stating what I was terminated for
17  exactly.  He said we can't provide that
18  letter.
19    Q.   Did he mention -- withdrawn.
20        Question relates to the
21  termination --
22    A.   I asked him what exactly terms
23  they terminated me on and he wouldn't
24  answer the question.
25    Q.   How did the tax evasion issue

Page 143

K. MIKHAYLOVA
1
2  come up in the conversation?
3    A.   First, he said I was buying too
4  many shoes and handbags.  Then he said
5  also, you were avoiding tax.  I said well,
6  which one is it.  I don't understand.  I
7  was allowed to buy all these products.  He
8  said well, I am just telling you based on
9  what they decided that you were shipping
10  to save on tax.  Yeah, that's what he told
11  me.
12    Q.   Anything else that Richard Law
13  said in this conversation?
14    A.   I don't recall.  I recall me
15  asking him for paperwork why I was
16  terminated and he didn't give that to me.
17    Q.   Did he say it was not policy to
18  do that?
19    A.   No, he did not.
20    Q.   Anything that you or Cathy said
21  in this meeting that we haven't talked
22  about?
23    A.   No.
24    Q.   Did you have any issue with
25  entering Bergdorf Goodman?

Page 144

K. MIKHAYLOVA
1
2    A.   I did.  So, a really good friend
3  of my mine who was a stylist at Bergdorf
4  Goodman recommended me to work at Chanel
5  Handbags Department.  Back when I was
6  looking for a job, this was after -- I
7  already got a job at Louis Vuitton but I
8  wasn't happy there.  I saw an opening at
9  Bergdorf Goodman and she sent a letter for
10  me to recommend me.  So I got a call back
11  from -- who was in HR --
12        THE WITNESS:  Melissa, do you
13     remember the name?
14    A.   Heidi, Heidi.  Heidi Ruscono, I
15  believe was her name.  I got an e-mail
16  from her.  Heidi really liked me.  She
17  took me to Luis C. who was the director of
18  handbag and he really liked me.  Then it
19  was Diana and Diana came from
20  Bloomingdale's.  Diana is  friends with
21  all the -- from Bloomingdale's.  And I
22  know for a fact, I mean, I don't have any
23  proof but I know they told her not to hire
24  me because I was terminated from
25  Bloomingdale's.  I know  that because the

Page 145

37 (Pages 142 - 145)

K. MIKHAYLOVA
1     K. MIKHAYLOVA
2  person they hired after me does not have a
3  good book and got the job.  Meanwhile, I
4  speak many languages, I I have knowledge
5  in Chanel and every single person liked me
6  except Diana and she was the final
7  decision.  Do I have written evidence, no
8  but --
9     Q.   Wait a minute.  You are going on
10  and on.
11        Tell me who Diana was again?
12    A.   She was the store -- she was the
13  manager at Chanel at Bergdorf Goodman.
14  Previous to Bergdorf, she was the manager
15  at Bloomingdale's and she was very good
16  friends with the union rep, Eric.  Eric
17  would always come into work, he was one of
18  those blabbermouths.  Oh, I told Diana
19  this.  He would tell on himself all the
20  time when he came to work as to what --
21  him and Diana were best friends.
22        As soon as I met with her, I
23  knew my interview process stopped and they
24  didn't hire me because she went to him and
25  he said to her not to hire me.

Page 146

1     K. MIKHAYLOVA
2    Q.   And that's your speculation, you
3  have no evidence that that happened?
4    A.   No, but --
5    Q.   Do you have any evidence that
6  that happened?
7    A.   I have no evidence but I have
8  seen it happen with somebody else.
9    Q.   So you were guessing that's what
10  happened and there is no evidence?
11    A.   Yes, correct.
12    Q.   Did anyone at Bloomingdale's
13  ever make a comment about your buttocks or
14  other parts of your anatomy?
15    A.   In a sexual way, no.  They have
16  commented and said I look nice in my
17  pants, my butt looks nice.  It came from
18  females.  It wasn't anything that was
19  uncomfortable.
20    Q.   I am going to share my screen
21  and show you the Exhibit B, the complaint
22  in this case.
23        (Whereupon, complaint was marked
24    as Defendant's Exhibit B for
25    identification as of this date.)

Page 147

1     K. MIKHAYLOVA
2    Q.   Can you see my screen?
3    A.   Yes.
4    Q.   I will go to the very top.  I
5  will tell you that this is the amended
6  complaint that your counsel has filed on
7  your behalf this matter.  There is a
8  reference that Chris Castellani had
9  supervisory authority over in paragraph
10  23.  In what way did Castellani have
11  supervisory on you?
12    A.   Can you elaborate on that?
13    Q.   I am just looking at what the
14  complaint says.  Was he your supervisor,
15  Chris Castellani?
16    A.   To a degree, yes, because he was
17  a supervisor for the loss prevention.
18    Q.   Were you in loss prevention at
19  the time?
20    A.   I don't understand.
21    Q.   You said he was a supervisor in
22  loss prevention.  You weren't in loss
23  prevention, were you?
24    A.   Me, no.  I was not in loss
25  prevention.

Page 148

1     K. MIKHAYLOVA
2    Q.   Did you ever consider Chris
3  Castellani to be your supervisor?
4        MS. MENDOZA:  Objection.
5        You can answer.
6    Q.   You can answer.
7    A.   Yes, I did.
8    Q.   In what regard?
9    A.   In regards to he still work at
10  Bloomingdale's and he was the supervisor
11  for loss prevention.
12    Q.   You believe Bobby Booker to be
13  the asset protection manager; was that
14  your understanding?
15    A.   Yes.
16    Q.   Are you aware of when Bobby
17  Booker left the company?
18    A.   What was the question?
19    Q.   Do you know when Bobby Booker
20  left the store?
21    A.   No.
22    Q.   Your complaint says Cathy Younis
23  was the director for the Chanel Handbags
24  Department.  You testified to that earlier
25  that that was your understanding?

Page 149

38 (Pages 146 - 149)

K. MIKHAYLOVA

1
2    A.    Yes.
3    Q.    And then we also talked about,
4  you said Cathy Younis interviewed and
5  hired you for the Chanel Handbags
6  Department on or about April 30th of 2016;
7  is that correct?
8    A.    I believe so .
9    Q.    Then in paragraph 36 it says
10 that between May of 2016 and January of
11 2017 Cathy Younis trained you on selling
12 techniques.  Did Cathy Younis work with
13 you as far as selling in that period of
14 time?
15   A.    (No verbal response.)
16   Q.    I'm sorry.  Did you answer that
17 question, Ms. Mikhaylova?
18   A.    Yes.  I said yes.
19   Q.    Just so we are clear.  During
20 the time you never told her that you were
21 having uncomfortable, that Bobby Booker
22 was making you uncomfortable?  You only
23 told Denis Diaz, right?
24   A.    Yes.  Cathy Younis wasn't -- she
25 was mostly all the time in Ready-to-Wear.

K. MIKHAYLOVA

1  She wasn't someone that I went to -- it
2  was Denis that was dealing with the
3  handbags department.  So, Cathy was not
4  someone that I -- I mean, I saw her when
5  she was on her shift.  I saw her probably
6  daily but she wasn't someone that was
7  standing in that department.
8    Q.    You testified earlier that you
9  saw her every day, right?
10   A.    I saw her every date but for
11 short period of time.
12   Q.    Paragraph 38 you said Mr. Booker
13 made sexual innuendos.  Have we talked
14 about all the conduct that you felt was
15 sexual innuendo by Booker?
16   A.    I thought we spoke about it.
17   Q.    Is there anything new that we
18 haven't talked about it?
19   A.    No.
20   Q.    Then it says commenting on your
21 buttocks and appearance.  I don't remember
22 you saying that he commented on your
23 buttocks, but maybe I am wrong.
24   A.    He was looking at my butt and

K. MIKHAYLOVA

1  saying oh, your butt looks really good,
2  and I said thanks.
3    Q.    Other than saying your butt
4  looks really good did he make any other
5  comments to you?
6    A.    No.  I honestly cannot recall.
7  It is just now that I said -- and I
8  remember him mentioning that and looking
9  at my butt which I mentioned to you
10 previously.
11   Q.    You did mention looking.  You do
12 remember that comment now?
13   A.    Yes.
14   Q.    Did you ever tell anyone that he
15 made that comment?
16   A.    No, because everyone was around.
17 I didn't --
18   Q.    Who was around to witness that
19 comment being made?
20   A.    Management associates.
21   Q.    Can you be a little more
22 specific?
23   A.    I had an associate come up to me
24 and say are you sure you are okay with him

K. MIKHAYLOVA

1  talking.  She was like I feel like every
2  time he comes here he makes you
3  uncomfortable.  I said yeah, but I just
4  tell him to go away.  I kind of stop the
5  conversation.  But I have had numerous
6  associates mention to me that the way he
7  looks at me is inappropriate.
8    Q.    I need you to answer my question
9  specifically when he made the comment to
10 you your butt looks like good or whatever
11 dit was, who was around to see that
12 comment being made?
13   A.    I don't remember exactly.
14   Q.    You don't remember exactly.
15 That's the only time he made that comment;
16 is that correct?
17   A.    I don't remember how many times
18 he made it.
19   Q.    I know you testified that he
20 hugged you either by the side or the front
21 but this says he touched your arm when he
22 spoke to you?
23   A.    Yeah.  Like when he spoke to me
24 he would hold me by the elbow like that

K. MIKHAYLOVA
1          K. MIKHAYLOVA
2   (indicating).
3      Q.   Did he hug you and hold you by
4   the elbow or does this refresh that he
5   only held your elbow?
6      A.   Like when he came in, he would
7   give me a hug.  He would hold on by the
8   elbow like that (indicating).
9      Q.   Would he only hug when he first
10   came in for the day or would it be more
11   than that?
12      A.   Yes.  I don't remember exactly
13   how many times.
14      Q.   Let's talk about paragraph 43.
15   This says another employee of defendant
16   loss prevention unit told plaintiff how
17   can you run with that ass.  Do you
18   remember that comment?
19      A.   Yes.  I was trying to think who
20   said it though.  I don't remember who.  I
21   definitely remember that comment but I
22   don't remember who said that.  I believe
23   it was -- I believe it was another guard
24   but I don't remember the name.
25      Q.   This says defendant Booker and

Page 154

K. MIKHAYLOVA
1          K. MIKHAYLOVA
2   other employees of loss prevention unit
3   frequently called plaintiff to ogle at or
4   a buttocks.
5      A.   Yes.
6      Q.   Okay.  Tell me about that.
7      A.   He would call his -- the people
8   that were in loss prevention to come take
9   a look at me.
10      Q.   How do you know that he did
11   that?
12      A.   They would come over and see.
13   Do I know what he is saying, no.  But you
14   can read their lips.  You can read what
15   they are saying, come over here and take a
16   look.
17      Q.   Are you speculating that that
18   happened or do you have any facts to prove
19   that it did happen?
20      A.   It happened.  I mean, do I have
21   a person saying hey, can you come and say
22   that this definitely happened, no.  But
23   did it happen, absolutely.
24      Q.   So people come over and look at
25   your butt and you assume that they were

Page 155

K. MIKHAYLOVA
1          K. MIKHAYLOVA
2   sent by Booker?
3          MS. MENDOZA:  Objection.
4          You can answer.
5      A.   Not everyone, but if it is a
6   male from his team, then yes.
7      Q.   You believe that because they
8   were on his team and they were male and
9   you believe they were looking at your
10   posterior, that somehow Mr. Booker
11   encouraged that?
12      A.   Yes.
13      Q.   Even though the person never
14   told you that and Mr. Booker never said
15   that; is that correct?
16      A.   (No verbal response.)
17      Q.   Yes?
18      A.   That's correct.
19      Q.   This says that Yeseer (ph)
20   became your supervisor some January 2017;
21   is that correct?
22      A.   I believe so.  I don't have the
23   correct -- at the moment I don't remember.
24      Q.   I will show you two additional
25   documents.  Can you see my screen, Ms.

Page 156

K. MIKHAYLOVA
1          K. MIKHAYLOVA
2   Mikhaylova?
3      A.   Yes.
4      Q.   Exhibit C is, and for the record
5   it is Bates 348 to 350.
6          (Whereupon, Bates 348 to 350 was
7      marked as Defendant's Exhibit C for
8      identification as of this date.)
9      Q.   This is a counseling summary
10   form.  Do you recall Denis Diaz giving you
11   counseling --
12      A.   Yes.
13      Q.   -- in February 2021 for your
14   tardiness?
15      A.   I don't remember the date but I
16   know he gave me counseling.
17      Q.   Is that, in fact, your signature
18   at the bottom of page 348?
19      A.   That's the date.
20      Q.   Is that your signature?
21      A.   Yes.
22      Q.   Did you sign that document on or
23   about 2/21/2017?
24      A.   Yes.
25      Q.   Looks like Denis Diaz was also

Page 157

40 (Pages 154 - 157)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1   there and he signed it on the same.  Did
2   he sign in front of you?
3       A.   I don't remember that.
4       Q.   Tinbite Yonas, do you know who
5   the HR person was who signed the
6   counseling form?
7       A.   No.
8       Q.   Did you understand that you were
9   being counseled based on your tardiness?
10      A.   Yes.
11      Q.   There are at least seven
12   instances of you being tardy at that point
13   in time, right?
14      A.   Yes.
15      Q.   Did you give any excuse for your
16   tardiness at that point in time?
17      A.   Yes.  I told them that I was
18   experiencing morning sickness really bad
19   and that's why I have been coming in late.
20      Q.   The box for associate comment,
21   you didn't write anything there?
22      A.   Hold on.  I don't recall the
23   time period.  How many of these did I get?
24   This was the one that I signed.  Yes.  I

*(Line numbers above: 1–25; page indicator:)* Page 158

K. MIKHAYLOVA

1   marked as Defendant's Exhibit D for
2   identification as of this date.)
3       Q.   I am going to show you Exhibit
4   D which is Bates 343 through 346.  That is
5   formal reminder related to your
6   attendance.
7       A.   Yes.  I can tell by the dates.
8   Okay.  So that --
9       Q.   Is that your signature on
10   April 19, 2017?
11      A.   Yes.
12      Q.   It is your signature?
13      A.   Yes.
14      Q.   Do you know who the HR person
15   who signed it was?
16      A.   There was no HR person with me
17   that signed it.  I didn't have that
18   person, but I guess whoever signed after.
19   It was just me and Denis.  Okay.  So now
20   it is a little more clear.  It didn't add
21   up.
22      Q.   Is this, in fact, the associate
23   comment that you worked with Denis?
24      A.   Yes.

Page 160

K. MIKHAYLOVA

1   told him -- now I remember.  Hold on.  I
2   told him that I was pregnant and that
3   there is going to be times that I am going
4   to come in late.  I said I wasn't feeling
5   good at that time.  And I said and we
6   worked out -- and we wrote out an action
7   plan as to what I am going to do to come
8   in on time.  If I'm not mistaken, that's
9   what we did there.
10      Q.   What was the action plan?
11      A.   To get up early, to set my clock
12   back so that I can come back earlier.  And
13   I told him that I would, you know, do my
14   best.  Even with me not being sick now --
15   at that point I was very sick.  During
16   those times -- I told him now I am sick, I
17   just want to let you know tat going
18   forward if I am late, I am sick.
19      Q.   Are you sure that happened with
20   this one and not the subsequent write-up?
21      A.   No, I'm not.  That's why
22   confused.
23      Q.   Let me go to Exhibit D.
24           (Whereupon, Bates 343 to 346 was

Page 159

K. MIKHAYLOVA

1       Q.   This doesn't say anything about
2   you being pregnant or issues with your
3   pregnancy, right?
4       A.   Yeah, I didn't write that in.
5   This was about our -- this was how I would
6   get to work on time.  I didn't write that
7   I was pregnant but I know he knew at that
8   point that I was pregnant.  That's the one
9   he told me about that he would take out,
10   the write-up, this one in particular.
11      Q.   Your morning sickness, if you
12   got up early did it give you time to eat
13   something and you felt better or did it
14   last --
15      A.   No.  Unfortunately, it was
16   called morning sickness but I was sick all
17   day.  I was on medication.  I was on
18   Zofran which wasn't even helping me.  I
19   was still throwing up and I was still --
20   like it just stopped me from throwing up
21   more.  I was throwing up less with Zofran
22   but I was still vomiting and nauseous all
23   the time.
24      Q.   At this point in time you had

Page 161

41 (Pages 158 - 161)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1  not requested an accomodation and Denis
2  Diaz told you that if you got an
3  accommodation and approved by HR that they
4  would take out this write-up?
5      A.  So again, we didn't talk about
6  accomodation with him.  We talked about
7  that I need to go to HR and tell them I am
8  pregnant.  We didn't speak about
9  accomodation.  Accommodation, I did later.
10  He just said I need to go to HR and tell
11  them I am pregnant.  That's what I did
12  after.
13      Q.  Did he say that in response to
14  you saying I can't get to work on time
15  because I am pregnant?
16      A.  It wasn't because I was pregnant
17  that I couldn't get to work on time.  It
18  was because I was sick.  I told him that I
19  was very sick.
20      Q.  And in response to that he told
21  you to go to HR and tell them you were
22  pregnant?
23      A.  Correct.
24      Q.  And did you not say that at some

Page 162

K. MIKHAYLOVA

1  point in time Denis Diaz said that
2  depending on what HR says that this
3  write-up would go away?
4      A.  Well, that's what he said.  Once
5  I get that handed over to HR, they will
6  take away this whether it was a write-up,
7  or warning, whatever that is, it would be
8  removed from my file.
9      Q.  And you believe this wasn't
10  given to you somewhere around April 19,
11  2017?
12      A.  Yes.
13      Q.  Going back to Exhibit B, the
14  amended complaint.  This says you got the
15  write-up around August 6 which we just saw
16  the date of that.  You informed him that
17  you were pregnant.  This suggests that you
18  did not tell them you were pregnant in
19  February.  Does that help refresh your
20  recollection that you did not tell Denis
21  Diaz you were pregnant?
22      A.  I only got pregnant around
23  February 4th.  To my knowledge, that's
24  when I found out I was pregnant.  I was

Page 163

K. MIKHAYLOVA

1  showing -- but that's when I told Denis I
2  was -- I don't know if he knew I was
3  pregnant before then but that's when I
4  believe I told him if I'm not mistaken.
5      Q.  What you just said, I am totally
6  confused.  Did you mean you told him in
7  April or February.  This says you told him
8  immediately after --
9      A.  Yes, which was when I signed
10  that paperwork that I was late.
11      Q.  And that was April or February?
12      A.  That was the April one.
13      Q.  Denis Diaz did not know you were
14  pregnant in February?
15      A.  Correct.
16      Q.  Or you did not tell him?
17      A.  To my knowledge, he didn't.
18      Q.  Then it says on May 15th you
19  informed Bloomingdale's of your nausea
20  related to pregnancy --
21      A.  Okay.  So I --
22      Q.  Let me finish the question
23  first, Ms. Mikhaylova.
24          Is that when you went to HR to

Page 164

K. MIKHAYLOVA

1  talk to them about your nausea and your
2  need for intermittent leave?
3      A.  I don't know that's the first
4  day or is it the day I went to submit my
5  documents, I don't remember.  I might have
6  went to them before and told them or I
7  might have submitted that day.  So, I'm
8  not sure about the date.
9      Q.  This says on May 15th you
10  submitted a request for leave?
11          MS. MENDOZA:  Objection.
12          You can answer.
13      A.  Yes.
14      Q.  Is that, in fact, when you
15  submitted your request?
16      A.  Yes, probably.  That's when I
17  submitted the paperwork probably.
18          (Whereupon, Bates 301 was marked
19      as Defendant's Exhibit E for
20      identification as of this date.)
21      Q.  This says that your leave was
22  approved.  Let me show you a couple more
23  documents.  For Exhibit E, we are going to
24  have a document letter Bates 301.

Page 165

42 (Pages 162 - 165)

K. MIKHAYLOVA

1
2       Ms. Mikhaylova, do you recall
3   receiving this letter from the leave of
4   absence department on or about May 16,
5   2017 at your home address?
6       A.   Yes.
7       Q.   I'm sorry.  Yes?
8       A.   Yes.
9       Q.   And this says that you had asked
10  for a leave.  I believe it was
11  intermittent leave from May to August and
12  it says you have to provide a healthcare
13  form.  This is just the initial stages of
14  your leave request; is that correct?
15      A.   Correct.
16      Q.   This letter is dated May 16th.
17  Let's look at Exhibit F which is a letter
18  Bates Bloomingdale's 311.
19          (Whereupon, Bates 311 was marked
20      as Defendant's Exhibit F for
21      identification as of this date.)
22      Q.   Ms. Mikhaylova, did you in fact
23  receive this letter on or about June 1,
24  2017 at your home address.
25      A.   Yes.

Page 166

K. MIKHAYLOVA

1
2       A.   Yes.
3       Q.   Was that a yes?
4       A.   Yes, that's right.
5       Q.   At the very bottom of the Page 2
6   there is a notice of your rights.  Did
7   you, in fact, sign this document on
8   June 2, 2017?
9       A.   Yes.
10      Q.   And that's part of the
11  information you sent to Bloomingdale's or
12  Macy's on June 2nd, right?
13      A.   Yes.
14      Q.   Let's look at one more document
15  related to your leave, Exhibit H, Bates
16  335.
17          (Whereupon, Bates 335 was marked
18      as Defendant's Exhibit H for
19      identification as of this date.)
20      Q.   Ms. Mikhaylova, did you in fact
21  receive this letter on or about June 9,
22  2017 at your home address related to your
23  intermittent leave?
24      A.   I believe so.  It's been so
25  long.  I believe so.  It's been so long.

Page 168

K. MIKHAYLOVA

1
2       Q.   This letter says that in
3   response to Exhibit E, the letter of
4   May 16th, they had asked for information
5   to support your leave and you hadn't sent
6   it in yet and the company still needed to
7   get your healthcare providers's form,
8   correct?
9       A.   Yes.
10      Q.   As of June 1st you had still not
11  submitted your doctor's --
12      A.   I was under the impression that
13  my leave already got approved in June.
14  The timing here, I don't want to answer
15  incorrect.  I don't remember the time.  I
16  was under the impression that my leave was
17  already approved.
18      Q.   Let's look at Exhibit G.
19          (Whereupon, Bates 315 to 318 was
20      marked as Defendant's Exhibit G for
21      identification as of this date.)
22      Q.   It is going to be Bates 315 to
23  318.  Is this the fax that you submitted
24  on June 2, 2017 to the leave of absence
25  department at Macy's, Bloomingdale's?

Page 167

K. MIKHAYLOVA

1
2   I don't remember the dates.
3       Q.   This says the doctor's
4   certificate was dated June 1, correct?
5       A.   Yes.
6       Q.   And based on that you qualified
7   for intermittent leave of absence,
8   correct?
9       A.   Yes.
10      Q.   So your leave of absence was
11  approved on June 9, 2017?
12      A.   Yes.
13      Q.   This document says, your amended
14  complaint says on June 1st you submitted
15  the documentation and your leave of
16  absence was approved.  So that's all
17  accurate, right?
18      A.   Yes.
19          MS. MENDOZA:  Objection.
20      You can answer.
21      Q.   Did you say yes, Ms. Mikhaylova?
22      A.   Yes.  I said yes.
23      Q.   In the next part of this
24  document, the amended complaint talks
25  about, and that's Exhibit B.  It talks

Page 169

43 (Pages 166 - 169)

K. MIKHAYLOVA

1    K. MIKHAYLOVA
2    about you being called into the loss
3    prevention office on June 6th.  That, in
4    fact, was the conversation that led to
5    your termination; is that correct?
6      A.   (No verbal response.)
7      Q.   Ms. Mikhaylova?
8      A.   Yes, yes.
9      Q.   It says at the bottom of Page 9
10   of Exhibit B paragraph 57, plaintiff is
11   aware of at least five associates that
12   were shipping purchases out of state and
13   purchasing items at a high volume and were
14   never investigated or reprimanded.  Can
15   you tell me who those five employees are?
16     A.   I believe I gave the names to
17   Melissa before.
18     Q.   Do you recall those names as you
19   sit here today?
20     A.   Some of the names were Asian so
21   I don't remember the correct spelling of
22   the names.  I did at that time.  I don't
23   have the names in front of me.
24     Q.   Do you have anything where these
25   names are written down?

Page 170

1    K. MIKHAYLOVA
2      A.   I can provide it to you at a
3    later date.
4          *MS. TIERNEY:  Counsel, we would
5      ask that we be provided with those
6      names.
7      Q.   At the time this conversation
8    had occurred your leave of absence had hot
9    been approved, right?  You got the letter
10   on June 9th?
11     A.   Yes.
12     Q.   Did the union ever grieve your
13   termination?
14     A.   I believe they did.
15     Q.   Do you know what the results
16   were of that grievance?
17     A.   No, because they were very hard
18   to --
19     Q.   Say that again?
20     A.   Get a hold of.  Sean was very
21   hard to get a hold of.  He kept telling me
22   it takes time, it takes time.  I figured
23   it wasn't going nowhere so I left it
24   alone.
25          (Whereupon, Rule 26A disclosure

Page 171

1    K. MIKHAYLOVA
2      was marked as Defendant's Exhibit I
3      for identification as of this date.)
4      Q.   I am going to pull another
5    document.  I am going to mark as Exhibit I
6    your initial Rule 26A disclosure.
7          Ms. Mikhaylova, the first thing
8    in the disclosure is list of people with
9    knowledge disclosure about the case likely
10   to have discoverable information about
11   your case.  Kristina Mikhaylova, of
12   course, is yourself.  With respect to
13   Denis Diaz, have we talked about to the
14   best of my knowledge all the interaction
15   you had with Denis Diaz to support your
16   case?
17         MS. MENDOZA:  Objection.
18         You can answer.
19     A.   Yes.
20     Q.   Other than the e-mails with
21   Richard Law and the term conversation, did
22   you have any other interaction with
23   Richard Law during your employment with
24   Bloomingdale's?
25     A.   I don't remember.

Page 172

1    K. MIKHAYLOVA
2      Q.   I'm sorry, I missed that.
3      A.   Not that I can remember at the
4    moment.
5      Q.   And I know we have talked by
6    little bit about Bobby Booker and the
7    allegation of conduct that you believe was
8    inappropriate and of a sexual nature.  Is
9    there anything else that you can recall
10   that Mr. Booker did that you felt was
11   inappropriate or sexual harassing that we
12   have not already discussed?
13     A.   Not that I recall.
14     Q.   Other than having two
15   conversations with you about various asset
16   protection issues, is there anything else
17   that Chris Castellani has knowledge of to
18   your estimation about your case?
19     A.   I can't think of anything at the
20   moment.
21     Q.   I know you said Kathy Houser was
22   with you during the termination
23   conversation.  Does she have any other
24   connection to your case other than that?
25     A.   Not that I recall.

Page 173

K. MIKHAYLOVA

1    Q.   Kathy before she came to you
2    before the Richard Law conversation?
3    A.   I have never worked with her but
4    I have seen her.  She worked with fine
5    jewelry at Bloomingdale's.
6    Q.   Who is Costello Dash?
7         THE WITNESS:  Melissa?
8         MS. TIERNEY:  I'm sorry, she
9    can't testify.
10   Q.   Do you remember who that is?
11   A.   I don't remember.  Is that Chris
12   Castellani -- no.  I don't remember.  I
13   can't --
14   Q.   Was this a co-worker or somebody
15   you had spoken to about your case?
16   A.   I don't remember.  I don't
17   remember.
18   Q.   Mr. Dash, do you know if he was
19   a union guy?
20   A.   Yes.  He was dealing with my
21   grievance, yes.
22   Q.   Do you recall any conversation
23   with Mr. Dash?
24   A.   I don't recall.  I don't

K. MIKHAYLOVA

1    interviewed with at Bergdorf Goodman?
2    A.   Yes.
3    Q.   I think you talked about Heidi
4    Ruscone who was someone you interviewed
5    with; is that correct?
6    A.   Yes.  She was part the interview
7    process.  So was Susan Cohen.
8    Q.   At Bergdorf Goodman?
9    A.   Correct.  And so was Lucy
10   Greystone.
11   Q.   Did any of them mention to you
12   anything about what had happened at
13   Bloomingdale's?
14   A.   Not to my knowledge.
15   Q.   Who is Eleanor Dahan; D-A-H-A-N?
16   A.   She was the one that -- she
17   provided the policies and procedures, the
18   Bloomingdale's policies and procedures
19   which stated the under management
20   discretion.  She was one of the other
21   people that also made the purchases.  Same
22   thing with Nehemiah.  Same thing with
23   Henry.  Same thing with -- Shixi Zhang  --
24   these are the names.

K. MIKHAYLOVA

1    remember.
2    Q.   Sean Kavanagh, union?
3    A.   Yes.
4    Q.   Any conversation or any  factual
5    knowledge you have of Mr. Kavanagh's
6    connection to your case?
7    A.   I don't remember.
8    Q.   Eric Guiterrez, I think we
9    talked about with respect to the Bergdorf
10   Goodman issue?
11   A.   Yes.
12   Q.   You have not talked to him about
13   that issue?
14   A.   No.
15   Q.   No?
16   A.   Not that I recall.  I don't
17   recall.  I don't remember.
18   Q.   When you interviewed with Diana,
19   did she say anything to you that she knew
20   what happened to you at Bloomingdale's or
21   was aware of your situation with
22   Bloomingdale's or anything of that nature?
23   A.   Not that I'm aware of.
24   Q.   Diana was the person you

K. MIKHAYLOVA

1    Q.   Those are the names I was asking
2    about earlier.  Okay.  Let's go back and
3    do it one at a time.  What you are saying
4    about Eleanor and policy and practice?
5    A.   She also bought stuff and
6    shipped it to er -- to other addresses.
7    That's what I mean.
8    Q.   For personal use?
9    A.   Correct.
10   Q.   How do you that?
11   A.   Because she told me.
12   Q.   Other than her telling you, do
13   you have any other knowledge?
14   A.   No.  I have seen them being
15   shipped out.
16   Q.   Did you see the addresses?
17   A.   Yes, I did.
18   Q.   Do you know where they were
19   going?
20   A.   They were going to Las Vegas.
21   They were going to other states.
22   Q.   Do you know if she was mailing
23   gifts or was it for her personal use?
24   A.   Both.

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1
2  Q.   How do you know that?
3  A.   Because I was -- she told me.
4  Q.   Other than her telling you, do
5  you have any other knowledge of that?
6  A.   (No verbal response.)
7  Q.   Ma'am --
8  A.   Nehemiah --
9  Q.   I have a pending question.
10 Other than her telling you that the things
11 she was sending were for gifts and some
12 for personal use, do you have any
13 knowledge other than that?
14 A.   No.
15 Q.   Nehemiah?
16 A.   Same thing.  He would mail
17 things out.
18 Q.   When was he mailing things out?
19 A.   I don't recall the address.  I
20 don't know the exact address for other
21 people.  I just know they were going to
22 tax free states.
23 Q.   Did they tell you that or did
24 you just see --
25 A.   I worked for Bloomingdale's.  I

Page 178

K. MIKHAYLOVA

1
2  A.   I gave the spelling to the best
3  of my knowledge.  I believe those were all
4  their names.
5  Q.   She is the same thing, just so
6  make sure.  She knew she was mailing to
7  tax free states?
8  A.   Yes.
9  Q.   And she was doing it numerous
10 times?
11 A.   Yes.
12 Q.   Do you know Shixi Zhang was
13 sending things?
14 A.   I don't remember if it was in
15 New Hampshire or Delaware.  I don't
16 recall.
17 Q.   F-E-I-Y-A, C-A-I, same thing for
18 her?
19 A.   Yes.
20 Q.   I assume the gender is she?
21 A.   Yes.
22 Q.   If I am wrong, please correct
23 me.
24 A.   Okay.
25 Q.   Next one is Y-A-X-U-A-N,

Page 180

K. MIKHAYLOVA

1
2  was able to see receipts.
3  Q.   Did you know what the person was
4  sending it for?  Was it for a wedding
5  gift, was it for some other gift to a
6  family member?  Do you have any
7  independent knowledge --
8  A.   There were numerous gifts so I
9  can't give you anyone that was doing it
10 several times.  It was numerous times.
11 Q.   Your knowledge is they were
12 doing it numerous times and they were
13 going to tax free states; is that correct?
14 A.   Yes.
15 Q.   Do you know anything else about
16 what Nehemiah was doing?
17 A.   No.
18 Q.   How about Derkovorkia (ph)?
19 A.   Same thing.
20 Q.   Once again, you know they were
21 going to a tax free state and there were
22 many purchases and that's all you know?
23 A.   Yes.
24 Q.   Shixi Zhang; S-H-I-X-I,
25 Z-H-A-N-G?

Page 179

K. MIKHAYLOVA

1
2  Z-H-A-N-G.  Is that the same thing?
3  A.   Yes, same thing.
4  Q.   Julia Truong; T-R-U-O-N-G?
5  A.   Yes.
6  Q.   Same thing?
7  A.   Yes.
8  Q.   Do you have any more details
9  other than these folks numerous packages
10 to what you believe were tax free states?
11 A.   Those were just the few names
12 that I have seen on a regular basis that
13 were doing it but it was managers, it was
14 associates that were sending it.  Again,
15 it was a common practice at
16 Bloomingdale's.  I have seen it all the
17 time.  Those are just the few names that I
18 have seen numerous times doing it.
19 Q.   Are any of the people that we
20 just wen through starting with Eleanor to
21 Julie Truong manage employees?
22 A.   That information, I don't know.
23 Some of them are not from Chanel.
24 Q.   Where are they from?
25 A.   They are from Bloomingdale's.  I

Page 181

K. MIKHAYLOVA

1
2 don't know what their title is in other
3 departments.
4    Q.   Where did Eleanor work then?
5    A.   Eleanor and Nehemiah were in
6 Chanel employees.  The rest of them, I
7 don't know.
8    Q.   Where did you get Henry's name?
9    A.   What do you mean?  I worked for
10 Chanel.  I knew when we were ringing up, I
11 knew who these people are.  I saw him all
12 the time.
13    Q.   How did you not know where he
14 worked?
15    A.   Oh, what department?  I don't
16 know what department.  I know he worked in
17 Bloomingdale's.  I just don't know what
18 department.  I don't know a lot f
19 departments that they worked for.  I know
20 Julie worked for Miu Miu.  I don't recall.
21 Some of them were stock, some of them were
22 cosmetic people.  I don't remember.  I
23 think Henry was -- I'm not a hundred
24 percent sure what department they worked
25 for.

Page 182

K. MIKHAYLOVA

1
2    Q.   How would you see their
3 packages?
4    A.   Because they would come to the
5 store and their items were rung up.  It is
6 not like you can ring them up in
7 cosmetics.  You have to come in Chanel to
8 be rung up.
9    Q.   So they were buying Chanel
10 products that were mailed?
11    A.   I don't know about other stuff.
12 I just know about Chanel products.
13    Q.   Okay.  Do you know if any of
14 those people were implicated in any way in
15 the fraud that was going on at the Chanel
16 Department?
17    A.   I have no idea.  That was after
18 me.
19    Q.   Now, the next one talks about
20 your damages.  It says emotional distress
21 and physical injury $3 million.  Do you
22 have any physical injuries as a result of
23 this case?
24    A.   Physically, no.  My emotional, I
25 have a lot.  I have been to this day

Page 183

K. MIKHAYLOVA

1
2 really messed up over that case.  It
3 traumatized me.  I think anyone that
4 leaves Bloomingdale's is traumatized.
5 Being there, being fired while I was
6 pregnant, that's going to last me a
7 lifetime unfortunately.
8    Q.   How do you evaluate at
9 $3 million?
10       MS. MENDOZA:  Objection.
11       You can answer.
12    A.   I would have to get back to you
13 on that.
14    Q.   I am going to talk about lost
15 wages.  You actually got a job within
16 eight months of leaving Bloomingdale's,
17 right -- strike that.
18       How long of a maternity leave
19 did you take with your little one after
20 the birth of November 2017?
21    A.   Well, I had no money so I had to
22 go to work right way.
23    Q.   When you say right away, January
24 or February of 2018, right?
25    A.   Yes.  I went back in January.

Page 184

K. MIKHAYLOVA

1
2    Q.   2018 you went back to work?
3    A.   Yes.  He was only like four
4 weeks old.
5    Q.   And that was Louis Vuitton?
6    A.   Yes.
7    Q.   Even though you had worked
8 almost consistently since your discharge
9 you were still asking for ten years of
10 wages from Bloomingdale's; is that
11 correct?
12    A.   Yes, correct.
13    Q.   And the, of course, you are
14 asking for attorney fees.  Do have, in
15 fact, have an agreement with your counsel
16 for counsel fees?  I don't want details.
17 I just want to know that.
18    A.   Yes.
19    Q.   We are going to mark as Exhibit
20 J your interrogatory responses.
21       (Whereupon, interrogatory
22       responses was marked as Defendant's
23       Exhibit J for identification as of
24       this date.)
25    Q.   Once again, this is a list of

Page 185

47 (Pages 182 - 185)

K. MIKHAYLOVA

1       K. MIKHAYLOVA
2 people that you believe have knowledge of
3 your case. Houser, Law. You list Yuyu
4 Lai. And you know Yuyu Lai from New York,
5 you met her there. Where did you meet
6 Yuyu Lai?
7    A. It was at a dim sum place in
8 Flushing. That's where I met her. It was
9 in Flushing, Queens.
10    Q. What does Yuyu Lai do for a
11 living?
12    A. At the moment she takes care of
13 her daughter. Actually, Yuyu Lai comes
14 from a super wealthy family. She doesn't
15 do anything for a living at the moment. I
16 don't think she even did anything for a
17 living at that time. Yuyu Lai used to own
18 a cell phone store in Boston. No, not
19 Boston. She had a cell phone business
20 that her parents gave her. She no longer
21 lives here. She is in Taiwan and she a
22 stay-at-home mom.
23    Q. You understand she owned a cell
24 phone store in Boston?
25    A. Yes.

Page 186

1       K. MIKHAYLOVA
2    Q. Where did she live physically?
3    A. She used to live there. She no
4 longer lives there.
5    Q. So why were you mailing stuff to
6 her in New Hampshire?
7      MS. MENDOZA: Objection.
8      You can answer.
9    A. She lived in New Hampshire.
10 Sorry, not Boston. I dont know where I am
11 getting that from. She lived in New
12 Hampshire, not in Boston.
13    Q. What part of New Hampshire?
14    A. I want to say Bedford but I
15 might be incorrect. I don't remember. I
16 don't remember -- I don't know why I got
17 Boston. I don't remember where she lived
18 in New Hampshire.
19    Q. Have you been been to her house
20 in New Hampshire?
21    A. I have met her in New Hampshire.
22 I don't know where she lived though. I
23 have no idea where in New Hampshire.
24    Q. Then you say Chris's secretary.
25 I assume that's Castellani's secretary?

Page 187

1       K. MIKHAYLOVA
2    A. Yes, probably.
3    Q. What is her connection?
4    A. She was the one that took down
5 the information if I'm not mistaken when I
6 was written up. I don't remember her
7 name. That's why I wrote his secretary.
8 The young lady that was there when I was
9 getting questioned, that one.
10    Q. The witness to the interview?
11    A. Huh-huh. You mentioned her name
12 today but I don't remember.
13    Q. Shanine Gray?
14    A. Is that the one that signed off
15 when I was sitting there? If that's the
16 one, then that's the one.
17    Q. What is Angy Lee? I think it is
18 A-N-G-Y, actually. Is that a male or
19 female?
20    A. That's a female.
21    Q. What is her connection to your
22 case?
23    A. So, she was the one that shipped
24 stuff to -- and same thing with Edress, to
25 Yuyu Lai that she said she was shipping --

Page 188

1       K. MIKHAYLOVA
2 well, Edress, he bought a bag for his mom
3 and he shipped one time. Angy was
4 shipping her stuff to her so that she
5 wouldn't have to pay tax.
6    Q. Now Exhibit K is your response
7 to request for admission.
8      (Whereupon, response to request
9    for admission was marked as
10    Defendant's Exhibit K for
11    identification as of this date.)
12    Q. Do you recall completing the
13 response to this document?
14    A. Yes.
15    Q. And you understand that the
16 facts that are stated here if you say
17 admitted are considered admissions?
18    A. Yes.
19    Q. Were you aware that there were,
20 in fact, limits as to the amount of
21 handbags that could be purchased?
22      MS. MENDOZA: Objection.
23      You can answer.
24    A. Yes. There were limits, but it
25 was under -- when we had sale we had no

Page 189

48 (Pages 186 - 189)

K. MIKHAYLOVA

1        K. MIKHAYLOVA
2    limits.  We were told we didn't have any
3    limits during sale.  So it was under
4    management.  In our document it says, in
5    the book it did says under manager's
6    discretion.  So there were certain times
7    when there were no limits.  There were
8    only limit on handbags.  On sale, we
9    didn't have a limit on it.
10       Q.   What was the limit, the normal
11   limit?
12       A.   12 handbags a year.
13       Q.   Maximum two per month?
14       A.   Correct, unless if you buy three
15   in one month then you can only buy one the
16   next month.
17       Q.   Was it a specific sale --
18       A.   It was --
19       Q.   What constituted a sale?  You
20   said when there was a sale the rule was
21   different.  What does that mean, what kind
22   of sale?
23       A.   It was all merchandise, lot of
24   it was unsellable condition.  It was
25   slightly damaged or like materials that

Page 190

1        K. MIKHAYLOVA
2    didn't sell.  So they were would put it on
3    40, 50, 70 percent off.  Some of it was
4    like -- there was a lot of bags but it was
5    just stuff that were super old and damaged
6    merchandize that they would mark off to
7    like 60 off, 70 off.  Some of them was
8    just double.  Some of it was like
9    discounted at like 70 off, sometimes 60.
10   It depended on the thing.
11       Q.   You recall something that said
12   manager's discretion.  Does that mean you
13   had to get approval to buy more of them?
14       A.   There were no limits as to how
15   much you can buy per management.
16       Q.   Did you ever ask your manager
17   Denis Diaz when you were sending stuff out
18   if it was okay to buy more than the
19   number?
20       A.   I asked Cathy Younis one time
21   because I was buying a few pieces and she
22   said yes.
23       Q.   What were you buying
24   specifically?
25       A.   I was buying two totes and

Page 191

1        K. MIKHAYLOVA
2    trendy CC.  It was like a big bag.
3        Q.   You had three bags?
4        A.   Yes.  She said if you are able
5    to get your hands on it, you should get
6    it.  It was good bags.  I mean, they were
7    great pieces.  They had scratches on them
8    but I didn't care.  They were trying to
9    get rid of that merchandise.  I asked
10   several times if sale was included in your
11   limit just to clarify and I was told sale
12   was not included in our limits per
13   management.
14       Q.   Who did that; your co-workers or
15   managers?
16       A.   Co-workers too, but Cathy and
17   Denis Diaz.
18       THE WITNESS:  Give me one
19   second.  Hold on one second.
20       MS. TIERNEY:  Okay.  Back to
21   Exhibit K the admission.
22       Q.   This talks about the handbags
23   policy and it says it can be exceeded with
24   the manager's approval?
25       A.   Yes.

Page 192

1        K. MIKHAYLOVA
2        Q.   If you were exceeding the number
3    of bags allowed on the policy, you had to
4    get permission from a manager?
5        A.   Yes.
6        Q.   This also talks about document
7    produced by Bloomingdale's Bates 298.
8        (Whereupon, Bloomingdale's Bates
9        298 was marked as Defendant's Exhibit
10       L for identification as of this date.)
11       Q.   The admission is that is, in
12   fact, your signature on the document.
13   Here is the document.  Is that, in fact,
14   your signature, ma'am?
15       A.   Yes, it is.
16       Q.   Did you sign that document on or
17   about May 3 of 2016?
18       A.   Yes.
19       Q.   We talked earlier about the
20   handbook and this document says I
21   acknowledge that I have received a copy of
22   the Bloomingdale's associate handbook and
23   I understand I am responsible for reading
24   the contents of the handbook and comply
25   with all company policies and procedures

Page 193

K. MIKHAYLOVA

1 and rules. Does that refresh as to
2 whether or not you received a copy of the
3 employees handbook?
4     MS. MENDOZA:  Objection.
5     You can answer.
6     A.   I don't remember receiving it.
7 I remember seeing it.
8     Q.   Would you have signed something
9 saying you didn't --
10     A.   I did sign it because I was told
11 to sign it so I definitely -- I know I
12 signed it because I had to sign it but I
13 didn't receive it.  I just don't remember
14 me taking one home physically as to
15 that's the policies and procedures.
16     Q.   You could have, you just don't
17 remember?
18     A.   You are right, I could have.
19     Q.   Are you in the habit of signing
20 things that are untrue?
21     MS. MENDOZA:  Objection.
22     You can answer.
23     A.   No, not at all.  It is just --
24 with this, it was a work thing.  If they

Page 194

K. MIKHAYLOVA

1 need, I would just sign it because they
2 asked me to sign it.  I probably skimmed
3 through it.
4     Q.   Just because somebody asked you
5 at work to sign something that is
6 inaccurate and untrue, would you still
7 sign it?
8     A.   No.
9     Q.   You deny No. 13.  That is Bates
10 379.  Exhibit M is going to be Bates 379
11 to 380.
12     (Whereupon, Bates 379 to 380 was
13     marked as Defendant's Exhibit M for
14     identification as of this date.)
15     Q.   Standard of conduct.  This is
16 from this handbook that you signed
17 the document saying you received.  Do you
18 recall seeing this set of rules?
19     A.   I recall that.  I think I recall
20 but I don't remember when, where, but I
21 recall seeing that.
22     Q.   There is a section about Chanel
23 handbags particularly on the next page.
24 You cannot split transactions to satisfy

Page 195

K. MIKHAYLOVA

1 the requirement.  Two handbags per
2 transaction.  So even customers can only
3 buy two handbags at a time?
4     A.   That was the rule.
5     Q.   And the same for employees as
6 well?
7     A.   Yes.
8     Q.   Four handbags per months so 24 a
9 year?
10     A.   Yes.
11     Q.   Is that correct or is that not
12 accurate?
13     A.   That must be correct.
14     Q.   This transaction history is
15 tracked to ensure adherence?
16     A.   Yes.
17     Q.   Did you understand that the
18 company took that particular policy
19 seriously with respect to following the
20 guidelines?
21     A.   To cover my track I asked them
22 if it was okay.  I didn't want to get into
23 trouble for that.
24     Q.   But you agree this was something

Page 196

K. MIKHAYLOVA

1 you were agreed to follow as an employee?
2     A.   Yes.
3     Q.   Do you know why it is denied on
4 the admissions?
5     A.   No.
6     Q.   Your testimony today is that
7 that is, in fact, something you were
8 required to follow?
9     A.   It is denied because it was
10 under manager's discretion.  So, because
11 there is like a gray line, gray area with
12 this.  Because if this was approved by the
13 manager to buy, then I was allowed to buy.
14     Q.   This document does not say that
15 there is an exception; does it?
16     A.   This document doesn't, but there
17 was another document that does say that.
18 Hold on.  There was definitely another
19 document that said it was under manager's
20 discretion.  There were several different
21 documents on this.
22     Q.   This one says that if the
23 customer really wants to buy more than the
24 limit and there was a reason and not a

Page 197

50 (Pages 194 - 197)

K. MIKHAYLOVA

1 diverter, wedding party for example, that
2 the general manager or the senior
3 executive for that department could
4 approve that exception, right?
5    A.   Correct.
6    Q.   These are the documents, the
7 reminder documents.  I am going to belabor
8 this a little bit more.  During the
9 interview you admitted to mailing handbags
10 to out-of-state relatives to avoid sales
11 tax.  And this response says Mr.
12 Castellani demanded you say that.  My
13 understanding of your testimony and I
14 guess what I am confused about is while he
15 asked that question you, in fact, were
16 mailing stuff for your personal use to
17 avoid sales tax?
18    A.   Some stuff, yes.  He was
19 demanding that I say that during my
20 conversation with him.
21    Q.   But it was, in fact, true?
22    A.   Yes.
23    Q.   Whether he was demanding it or
24 not does not change the fact that it was a

K. MIKHAYLOVA

1 true statement; is that correct?
2    A.   Yes.
3    Q.   It does not change it; is that
4 right?  I asked in the negative.
5    A.   Yes.
6    Q.   The fact that he asked doesn't
7 change the fact that it was true; is that
8 correct?
9    A.   Yes.
10    Q.   We will get to your witness
11 statement.  Do you know if avoiding sales
12 tax is a violation of Bloomingdale's
13 policy?
14    A.   No, I did not know that.
15    Q.   Do you know if that's a
16 violation of the law?
17    A.   No, I did not know that.  That
18 was the first time I did that when I
19 worked there.  I never did it before.
20    Q.   Who is Chumo Mikhaylova?
21    A.   Family member.
22    Q.   Who in the family?
23    A.   My uncle.
24    Q.   Chumo is a male name?

K. MIKHAYLOVA

1    A.   Yes.
2    Q.   What does your uncle Chumo live?
3    A.   At that time I don't know where
4 he lived.  Now he lives in -- I think New
5 Jersey.  I sent a give for his wife.
6    Q.   To the same address as Yuyu Lai?
7    A.   I don't remember the address.
8    Q.   How about Sophia Mikhaylova?
9 Who is Sophia?
10    A.   My cousin.
11    Q.   Where did she live at this time?
12    A.   I don't remember.  I think she
13 was going to school -- I think she was
14 going to school in New Hampshire.
15    Q.   Do you know where she was going
16 to school in New Hampshire?
17    A.   No.
18    Q.   Do you know what is located at
19 373 South Willow Street in Manchester, New
20 Hampshire?
21    A.   No.
22    Q.   Do you know if it is actually
23 some type of -- strike that.
24        Where did you get that address

K. MIKHAYLOVA

1 373 South Willow Street in Manchester,
2 New Hampshire?
3    A.   From Yuyu Lai.  She told me
4 someone will be there to sign.  If you
5 don't sign for the package, it will come
6 back to the store.
7    Q.   Chumo Mikhaylova, 373 South
8 Willow Street in Manchester, New
9 Hampshire.  Polagrains Pan America, what
10 is Polagrains Pan America?
11    A.   I don't remember.
12    Q.   Is that something that Yuyu Lai
13 was attached to?
14    A.   I don't remember.  I can't
15 recall.
16    Q.   And then next one is 373 South
17 Willow Street.  Now you have got D11 Unit
18 204.  Do you know what that refers to?  Is
19 that like a box or what is that?
20    A.   I don't remember.  I don't
21 remember.
22    Q.   Next one is 373 South Willow
23 Street, Unit 320.  Do you remember what
24 that was?

K. MIKHAYLOVA

1
2    A.   I think you mentioned that.  I
3  don't remember.
4    Q.   Once again, next one is
5  Polagrains Pan America.  You don't
6  remember that either?
7    A.   No.
8    Q.   We have Yuyu Lai.  373 South
9  Willow Street, Unit 204.  Was this a
10  standard mailing address for Yuyu Lai to
11  your knowledge?
12    A.   I don't remember.
13    Q.   Then there is another address
14  373 South Willow Street PMB330 Manchester.
15  Do you know what the number 330 is?
16    A.   I don't remember.
17    Q.   Then there is another one to
18  Polagrains Pan America at the same address
19  PMB330.  Do you recall why you were
20  sending it to Polagrains Pan America?
21    A.   No.
22    Q.   Then you sent one to yourself at
23  that address --
24    A.   I don't know why.  These people
25  were ringing me up.  I don't know why they

K. MIKHAYLOVA

1
2  put.  I wasn't the one.  Somebody might
3  have just typed it in that they are just
4  sending it to me, whoever rung it up.  I
5  don't know why they would put my name.  I
6  don't ring myself up.  Somebody rung it up
7  and they might have rung me up and put
8  that name on there which is my name.  I
9  don't remember why my name.
10    Q.   If you are buying something and
11  somebody else is ringing you up, wouldn't
12  they get the send address from you?
13    A.   I don't know why they would put
14  my name.  I don't remember.  I don't
15  recall.
16    Q.   And then one is to Christina
17  Polygreen Pam?  You don't remember?
18    A.   I have a cousin named Christina
19  with a C, but I don't remember.  I don't
20  remember.
21    Q.   There is one at 4605 Woodfield
22  Street, Vancleave, Mississippi.
23      MS. TIERNEY:  Did we lose her?
24  Ms. Mikhaylova?  I think we lost her.
25      (Whereupon, a short recess was

K. MIKHAYLOVA

1
2  taken from 2:46 p.m. to 2:54 p.m.)
3      MS. TIERNEY:  Back on the
4  record.
5    Q.   There was also a bag sent to
6  4605 Woodfield Street, Vancleave,
7  Mississippi and I think you testified
8  earlier --
9    A.   Yeah, I don't recall.
10    Q.   But you sent some bags to that
11  address, correct?
12    A.   I don't recall.
13    Q.   Let me go through a few more of
14  these but I think you got the point.  Is
15  it true, Ms. Mikhaylova, that you deny
16  selling these bags or sending these bags
17  to Willow Street and Mississippi to give
18  or sell to a diverter?
19    A.   Correct.
20    Q.   You admit though that you have
21  co-workers who also mailed purchases to
22  the Willow Street address?
23    A.   So save on tax, yes.
24    Q.   Were you aware that you had rung
25  90,000 worth of fraudulent sales in

K. MIKHAYLOVA

1
2  January February of 2017?
3    A.   No.  I wasn't aware but those --
4  I don't know how much those sales
5  accumulate to that we were talking about
6  early today.
7    Q.   That sounds like a lot to me.
8  Does that sound like a lot to me?
9    A.   Yeah.  I mean, Chanel handbag is
10  6, 7,000.  So it is easy to get to that
11  amount.
12    Q.   Did you also ring purchases for
13  co-workers who were buying bags and
14  sending to the Willow Street address,
15  right?
16    A.   Yes.
17    Q.   And were you aware some of the
18  cards you used to make purchases were
19  compromises cards or part of a fraud
20  scheme?
21    A.   No, I was not aware.
22    Q.   Did you recruit your co-workers
23  to participate in a diversion scheme to
24  assist Yuyu Lai in getting Chanel bags?
25    A.   No.

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1  Q.   I think you told me you didn't
2  think diversion was not a terminable
3  offence at Bloomingdale's but the last two
4  admissions, that confuses me.  No. 50 says
5  admit selling to a known diverter is a
6  violation of Bloomingdale's policy and you
7  admit that.  51 says admit that
8  Bloomingdale's policy is to terminate
9  employees who sell to a known diverter and
10 you admit is that as well.  So you admit
11 that Bloomingdale's had a policy against
12 selling to a diverter and you could be
13 terminated for violating that policy,
14 right?
15      MS. MENDOZA: Objection.  You
16 can answer.
17      A.   I don't recall that.
18      THE WITNESS:  I just need one
19 second.  Okay.
20      (Whereupon, Bates 297 was marked
21 as Defendant's Exhibit N for
22 identification as of this date.)
23      Q.   We are going to have another
24 exhibit and I am hoping you can see it.

*Page 206*

K. MIKHAYLOVA

1  Exhibit M is what I have.  This is Bates
2  297.  Is that, in fact, your signature,
3  Ms. Mikhaylova?
4      A.   I can't see my screen.
5      Q.   Sorry.  You are right.  Do you
6  see the screen now?
7      A.   Yes.
8      Q.   Is that, in fact, your
9  signature?
10     A.   Yes.
11     Q.   It is signed on or about May 3rd
12 of 2016?
13     A.   Yes.
14     Q.   And it is that you will
15 basically comply with Bloomingdale's time
16 and attendance policies?
17     A.   Yes.
18     Q.   And that's what this document
19 is; is that correct?
20     A.   Yes.
21     Q.   Ms. Mikhaylova, do you know how
22 much money you made at Bloomingdale's
23 during the time you worked there, what it
24 averaged out to annually?

*Page 207*

K. MIKHAYLOVA

1      A.   I don't recall the exact amount.
2      Q.   Do you have a ballpark?
3      A.   For the whole year?
4      Q.   Yes.
5      A.   Above a hundred.
6      Q.   Other than your W-2s and your
7  paychecks, is there anything else that you
8  would be relying on to figure out what
9  your annual rate was at Bloomingdale's?
10     A.   No.
11     Q.   I have a new exhibit.  This is
12 Exhibit O.
13     (Whereupon, Bates 821 to 823 was
14 marked as Defendant's Exhibit O for
15 identification as of this date.)
16     Q.   This Bates 821 to 823.  This is
17 a case that you submitted to ask HR.  This
18 says associate inquired about who to speak
19 to with regard to an in-store conflict.
20 This looks like somewhere around
21 June 2017.  That was expected resolution.
22 Did you call to ask HR when you found out
23 you were being terminated or did you call
24 before then?

*Page 208*

K. MIKHAYLOVA

1      A.   I don't recall.  I'm sorry.
2      Q.   You don't recall calling anybody
3  other than sending e-mails to Richard Law?
4      A.   I might have called HR but I
5  can't remember specifically what I did.
6      Q.   Fair enough.
7      (Whereupon, Bates 1021 to 1086
8  was marked as Defendant's Exhibit P
9  for identification as of this date.)
10     Q.   Exhibit P is the Bloomingdale's
11 handbook.  It is Bates 1021 to 1086.  I am
12 going to go through the first couple of
13 pages to see if this refreshes as to
14 whether or not you were given a copy.  I
15 know you said you signed something saying
16 you were given a copy but you also said
17 you don't recall.  If you need me to go
18 slower or faster, whatever you prefer this
19 is but just to give you a little bit --
20     A.   I might have gotten that one
21 when I first started during orientation.
22 I can't be a hundred percent.  I am
23 assuming that's when I got it.
24     Q.   I am going to show you a picture

*Page 209*

53 (Pages 206 - 209)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1 of someone. Do you recognize that person?
2    A.   That picture is kind of blurry
3 on my phone. I can't tell who that is.
4 No, I have no idea who that is.
5    Q.   That's not Yuyu Lai?
6    A.   No. That's definitely not Yuyu
7 Lai that I know. That I know.
8    Q.   This came from an announcement
9 February 2017 opening of her store, X
10 Closet which sold as you can see from the
11 picture, it shows you purses?
12    A.   That's not the Yuyu that I know.
13 I have no idea who that is.
14    Q.   You were not aware that she
15 owned a boutique called X Closet?
16    A.   No. I know she had a cell phone
17 business.
18    Q.   How old is Yuyu Lai to your best
19 estimate?
20    A.   She was around the same age as
21 me.
22    Q.   So about thirty-five?
23    A.   Huh-huh. She maybe a little
24 younger. I'm not sure.

Page 210

K. MIKHAYLOVA

1    Q.   I am assuming she is of Asian
2 ancestry?
3    A.   Yes.
4    Q.   Exhibit Q. 1087, 1088 is the
5 Bates number.
6        (Whereupon, Bates 1087, 1088
7    was marked as Defendant's Exhibit Q
8    for identification as of this date.)
9    Q.   When you started working at
10 Bloomingdale's, do you recall doing some
11 online sign off on policies and
12 procedures?
13    A.   I don't recall. I'm not sure.
14 I don't remember.
15    Q.   I will tell you this is an
16 internal document.
17    A.   Is it the one that we did like
18 the shooting and stuff like that -- yeah.
19    Q.   This one is from April 19, 2016?
20    A.   Yes, I remember.
21    Q.   You signed off on the associate
22 handbook?
23    A.   Yes.
24    Q.   And the code of conduct?

Page 211

K. MIKHAYLOVA

1    A.   Yes.
2    Q.   All right. I just want to make
3 sure you remember that.
4        Were you aware the discount
5 policy that the company had?
6    A.   I mean, we spoke about it. Yes,
7 I was aware of Chanel. I wasn't aware of
8 other brands.
9    Q.   Did you have a discount card?
10 Did you get a Bloomingdale's discount?
11    A.   Yes, I did.
12        (Whereupon, Bates 1098 to 1110
13    was marked as Defendant's Exhibit R
14    for identification as of this date.)
15    Q.   Normally you would sign off on
16 the discount policy as part of your new
17 hire documentation. Exhibit R is Bates
18 numbers 1098 to 1110. Do you recall
19 signing off on the discount policy in
20 April 2016?
21    A.   I might have, yes. I probably.
22    Q.   Several things that are listed
23 as a violation of the discount policy.
24 Discount talks about when it is

Page 212

K. MIKHAYLOVA

1 appropriate and it can only be for your
2 personal use or gift. And you knew that,
3 correct?
4    A.   Yes, I did know that.
5    Q.   You pay with the credit card and
6 you get the discount?
7    A.   Correct.
8    Q.   Then it talks about associate
9 discount abuse is a serious offence.
10 Allowing somebody ineligible to receive a
11 discount by loaning the card, making a
12 purchase with your discount, when
13 purchasing with intent to resell. So
14 resell to a diverter would be a violation
15 of discount policy, right?
16    A.   Yes.
17    Q.   To your knowledge, once again,
18 going back to the admission, that is
19 terminable offence?
20    A.   Yes.
21    Q.   I think these are documents you
22 produced, Ms. Mikhaylova. Do you know
23 what this is? I will state for the record
24 this is Exhibit S and it is Mikhaylova 171

Page 213

54 (Pages 210 - 213)

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1  to 175.
2      (Whereupon, Mikhaylova 171 to
3  175 was marked as Defendant's Exhibit
4  S for identification as of this date.)
5      A.   Are these my purchases?
6      Q.   Yes.  So is there anything on
7  this that suggests that this is somehow a
8  discount or --
9      A.   No.  The discount comes out back
10  of house at Bloomingdale's.
11      Q.   There would be nothing on the
12  receipt that would say this is one of the
13  ones that I can buy more of because it is
14  a discount purchase?
15      A.   Yes, correct.
16      Q.   Do you know who rang this?  Who
17  this number is, 72061239?
18      A.   No.
19      Q.   This was one that was actually
20  sent to your home address, right?
21      A.   Yes.
22      Q.   Is this your phone number
23  646-270-0228?
24      A.   Yes.  It is my address.

Page 214

K. MIKHAYLOVA

1      Q.   So sender's phone number and
2  receiver's phone number are both the same
3  and this is your home address?
4      A.   Yes.
5      Q.   Do you normally put sender's
6  phone number and receiver's phone number
7  as usually the same?
8      A.   I don't recall.  I don't
9  remember.
10      Q.   Why would you send it to your
11  home address if you could just take it
12  home from work?
13      A.   Maybe I didn't want to carry it
14  home.  I am just assuming.  I don't
15  remember what I did.
16      Q.   Did you drive back and forth to
17  work or public transportation?
18      A.   I took the subway.
19      Q.   And then there was another one.
20  This one went to Boynton Street in
21  Manchester, New Hampshire.  Who lives
22  there?
23      A.   I think that's my friend that
24  lives there.  I don't recall exactly.

Page 215

K. MIKHAYLOVA

1      Q.   Who is that?  I am sorry, I
2  didn't understand.
3      A.   It might have been a friend.  I
4  don't recall who exactly who it was.
5      Q.   Just for the record and so we
6  know, you do not believe this to be the
7  address of a diverter?
8      A.   No.  No.
9      Q.   Sender is Martha, Chanel
10  Handbags.  I assume that's Martha Way?
11      A.   Yes.
12      Q.   Another one.  This is your
13  purchase going to Yuyu Lai at Unit 204?
14      A.   Yes.
15      Q.   Once again friend, not a
16  diverter?
17      A.   Correct.
18      Q.   And that one said Kristina pick
19  up.  Another one to Yuyu Lai.  These were
20  produced by you.  Was there any reason why
21  you maintained these specific receipts?
22      A.   I don't remember as to why I
23  did.
24      Q.   Exhibit T is Mikhaylova 176.

Page 216

K. MIKHAYLOVA

1      (Whereupon, Mikhaylova 176 was
2  marked as Defendant's Exhibit T for
3  identification as of this date.)
4      Q.   I would ask you what this is,
5  Ms. Mikhaylova.
6      A.   I can't say.  It is a little
7  small.  This is the Neiman Marcus -- was
8  that for the position in Chanel?
9      Q.   I will tell you what it says.
10  It says it is from, it is dated April 30,
11  2018 from Neiman Marcus Group Human
12  Resource?
13      A.   Yeah, that's from Bergdorf
14  Goodman.  That's probably for the position
15  at Chanel.
16      Q.   This is the Bergdorf Goodman?
17      A.   Yes, because it is owned under
18  Neiman Marcus.
19      Q.   It says there were many
20  candidates, that you are not going to be
21  selected for the position?
22      A.   Yes.
23      Q.   Is there any other significance
24  to that particular letter?

Page 217

55 (Pages 214 - 217)

K. MIKHAYLOVA

1
2  A.  No.
3  Q.  While you have a theory about
4  how things happened, you have no
5  first-hand knowledge?
6  A.  Yes.  In this particular -- I
7  can have other people testify though that
8  they know that Eric had made comments to
9  Diana.
10  Q.  Did anybody hear him say that he
11  made comments to Diana about you?
12  A.  Yes.
13  Q.  Who heard that?
14  A.  Martha Way.
15  Q.  What did he say?
16  A.  He was saying that I -- not to
17  hire me.  He was giving her the
18  explanation as to why I got fired at
19  Bloomingdale's which he is not supposed to
20  be doing in the first place.
21  Q.  He is a union rep or union
22  person; is that correct?
23  A.  Yes, correct.
24  Q.  Other than Martha, has anybody
25  told you that Eric was saying anything

Page 218

K. MIKHAYLOVA

1
2  about you?
3  A.  No.
4  Q.  Or that he said anything to
5  Diana?
6  A.  No.
7  Q.  This is going to be U.  It is
8  Mikhaylova 187.
9  (Whereupon, Mikhaylova 187 was
10  marked as Defendant's Exhibit U for
11  identification as of this date.)
12  Q.  I just want to know what this
13  is, Ms. Mikhaylova?
14  A.  I don't know.
15  Q.  It looks like a notebook or
16  something?
17  A.  That doesn't look like my
18  handwriting.
19  Q.  Do you know where this came
20  from?  It was produced by you.
21  A.  I don't remember.  I'm sorry.
22  Q.  It says term for discount abuse.
23  Shipping merchandise to New Hampshire.
24  She said her manager too --
25  A.  I don't even know what that

Page 219

K. MIKHAYLOVA

1
2  says.
3  Q.  I don't either.
4  A.  That's not my handwriting
5  though.  I don't know if it was produced
6  by me.
7  Q.  Did you get any documents from
8  the union as part of the grievance?
9  A.  Maybe that's them writing it.  I
10  don't remember.  I don't know what that
11  is.  And the date is 4/27/16.  That's kind
12  of weird.  I don't remember.
13  Q.  I wonder if it should be 17.
14  But you don't remember where that came
15  from?
16  A.  No.
17  Q.  It was produced by your
18  attorney.
19  A.  I have to go back.  I don't
20  remember exactly.
21  Q.  This is going to be Exhibit V.
22  Mikhaylova 195 to 196.
23  (Whereupon, Mikhaylova 195 to
24  196 was marked as Defendant's Exhibit
25  V for identification as of this date.)

Page 220

K. MIKHAYLOVA

1
2  Q.  This appears to be a copy of one
3  of your more recent résumé; is that
4  correct?
5  A.  Yes.
6  Q.  Reason I say that is it has the
7  Chanel Handbags, Bloomingdale's.  Then it
8  goes onto Louis Vuitton and then to Saks
9  Chanel.  I guess my main question is what
10  did you tell about the reason you left
11  Bloomingdale's?
12  A.  I don't remember even asked,
13  being asked why I left Bloomingdale's.  I
14  don't remember that question being asked
15  as to why I left Bloomingdale's.  When I
16  got hired, I don't think they were worried
17  about my previous employment.
18  Q.  That's all I have on that.
19  I know you were talking about
20  text messages.  Exhibit W is going to be
21  Mikhaylova 197 to 201.
22  (Whereupon, Mikhaylova 197 to
23  201 was marked as Defendant's Exhibit
24  W for identification as of this date.)
25  Q.  Are these some of the text

Page 221

56 (Pages 218 - 221)

K. MIKHAYLOVA

1      K. MIKHAYLOVA
2  messages you had with your co-workers?
3    A.  Yes.
4    Q.  Who is Sanela?
5    A.  Sanela is an employee at
6  Bloomingdale's, Chanel Handbags.
7    Q.  What is her role?
8    A.  She is a salesperson.
9    Q.  She is an associate, not a
10  manager?
11    A.  Correct.
12    Q.  Then you say the ones that were
13  on additional, what does that mean?
14    A.  That means anything like other
15  than the additional discount.  The ones
16  that were on additional meant the ones I
17  was telling you about that were 60 or 70
18  percent off.
19    Q.  Did you send this text after you
20  were let go?  She said is everything okay.
21  You said yeah, I am just asking, my
22  co-worker is asking.  Were you gathering
23  information for your case?
24    A.  I don't remember when the
25  timeline is when I sent that.

Page 222

1      K. MIKHAYLOVA
2    Q.  It looks like June 20th.  So you
3  were already let go at that particular
4  time.
5    A.  Was that June 20th that I sent
6  the messages over, or was that that I
7  copied the messages, or was that -- I
8  don't know if that was from before that I
9  was gathering the information.  That could
10  have been a message from before but I
11  don't remember.
12    Q.  You don't remember?
13    A.  Yes.
14    Q.  Okay.  Amapara?
15    A.  Ampara.
16    Q.  Who is that?
17    A.  She is the salesperson at Chanel
18  Handbags.
19    Q.  At Bloomingdale's?
20    A.  Yes.
21    Q.  She is an associate as well?
22    A.  Correct, salesperson.
23    Q.  You ask hey, Kemi.  Who is Kemi?
24    A.  She is salesperson at Chanel
25  Handbags.

Page 223

1      K. MIKHAYLOVA
2    Q.  Once again this is an employee
3  or associate, not a manager?
4    A.  Correct.
5    Q.  She says the ones that are on
6  additional.  She says no limit on the 60
7  20 20.  What does that mean?
8    A.  That's additional discount I was
9  telling you about.  That's what she is
10  referring to.
11    Q.  What are the numbers there?  Do
12  you have any knowledge?
13    A.  60 percent off, then another
14  20 percent off, and then another
15  20 percent off.
16    Q.  Mercedes Modesto, I think is
17  also another sales associate.
18    A.  No.  She is part of security.
19    Q.  But she is on 59 Street?
20    A.  Correct, Bloomingdale's.
21    Q.  Do you have any other text
22  messages related to this issue?
23    A.  Not at the moment.  Not to my
24  knowledge unless I have submitted them in.
25    Q.  Let's move on to Exhibit X.

Page 224

1      K. MIKHAYLOVA
2    (Whereupon, Mikhaylova 213 to
3    216 was marked as Defendant's Exhibit
4    X for identification as of this date.)
5    Q.  This is Mikhaylova 213 to 216.
6  I think some of these we have already
7  talked about, Ms. Mikhaylova.
8    A.  Yes.
9    Q.  It looks like you went to see
10  your physician on November 21st of 2019?
11    A.  Yes.
12    Q.  Your chief complaint was
13  anxiety?
14    A.  Yes.
15    Q.  Do you recall that going to
16  Briarwood Medical?
17    A.  Yes.
18    Q.  This was two and a half years
19  after you left Bloomingdale's, give or
20  take?
21    A.  Yes.
22    Q.  This talks about the history of
23  present illness.  Patient believes she
24  needs time off work to help manage
25  symptoms.  Did you, in fact, take time off

Page 225

57 (Pages 222 - 225)

K. MIKHAYLOVA

1 K. MIKHAYLOVA
2 in November of 2019 to manage symptoms?
3   A.   I did.  I think I took two or
4 three weeks off.
5   Q.   Did you go through the leave of
6 absence process at Saks or Chanel?
7   A.   Yes.  I believe I did.
8   Q.   And then you went back to work
9 after?
10   A.   Yes.
11   Q.   It says they are relatively
12 pervasive symptoms that come and go.
13 Present for, there is nothing.  You have
14 difficulty with sleep, nervousness, and
15 occasional panic attacks, heart rate rapid
16 and palpitations, sleep disturbance.  Then
17 it says stress stable.  Support from
18 spouse.  Panic attacks.  None.  I don't
19 understand any of that.  Okay.
20       Do you recall what your symptoms
21 were.  Were those your symptoms difficulty
22 sleeping, excessive sweating, nervousness
23 --
24   A.   Yes.
25   Q.   That was what you were having in

Page 226

1 K. MIKHAYLOVA
2 Lexapro at that point in time?
3   A.   Yes.
4   Q.   Your diagnosis was headaches and
5 anxiety disorder?
6   A.   Yes.
7   Q.   Do you, in fact, have migraines?
8 Have you been referred to a neurologist?
9       MS. MENDOZA:  Objection.  You
10 can answer.
11   A.   No.  Not at the moment.
12       MS. TIERNEY:  Why don't we take
13 a short break?  Let me go through the
14 documents I have left.  Maybe five
15 minutes or so.
16       MS. MENDOZA:  Okay.
17       (Whereupon, a short recess was
18 taken.)
19       MS. TIERNEY:  Back on the
20 record.
21       (Whereupon, Document 1894 to
22 1600 Bloomingdale's was marked as
23 Defendant's Exhibit Y for
24 identification as of this date.)
25   Q.   I am going to show you Exhibit Y

Page 228

1 K. MIKHAYLOVA
2 2019?
3   A.   Yes.
4   Q.   Did the two to three weeks off
5 with the medication give you the relief
6 you needed?
7   A.   No.
8   Q.   But you were back to work
9 anyway?
10   A.   I had no choice.
11   Q.   At that time you were not taking
12 any medications?
13   A.   Correct.
14   Q.   You were diagnosed with anxiety
15 disorder unspecified.  He referred you to
16 a psych and you had Lexapro 5 milligrams
17 which you said earlier that you took for
18 three months and then you quit on your
19 own?
20   A.   Yes.
21   Q.   Then it looks like you went back
22 a week later, six days later, something
23 like that?
24   A.   Yes.
25   Q.   You were still taking your

Page 227

1 K. MIKHAYLOVA
2 which is 1894 to 1600 Bloomingdale's.
3       MS. TIERNEY:  Are you on your
4 phone now or your computer?
5       THE WITNESS:  It didn't work.  I
6 didn't want to keep you guys waiting.
7   Q.   This is what appears to be your
8 statement written on June 6, 2017 at
9 1:40 p.m.  Do you recognize this document,
10 Ms. Mikhaylova?
11   A.   Yes.
12   Q.   I think that's your signature at
13 the end and you wrote the date June 6,
14 2017; is that correct?
15   A.   Yes, correct.
16   Q.   If you read you there, through
17 the statement it talks about Chris and
18 Shanine.
19   A.   Yes.
20   Q.   You said something about in
21 February we found out we will be going
22 lease and the discount will not be as
23 good?
24   A.   Yes.
25   Q.   How was the discount you receive

Page 229

58 (Pages 226 - 229)

K. MIKHAYLOVA

1 impacted by the --
2    A.   Once it was leased, the
3 department, you were no longer allowed to
4 buy any bags on discount.  That's when I
5 started to by my bags because they are no
6 longer -- the discount was no longer going
7 to be valid for any employees.
8    Q.   I know you previously said you
9 used your own money and money from your
10 grandmother, et cetera, to buy the bags.
11 How did your grandmother convey the money
12 to you that you said she gave?  Was it
13 check, did you deposit?
14    A.   She gave me --
15       MS. MENDOZA:  Objection.
16       You can answer.
17    A.   She gave me cash whenever I
18 asked her, whenever she wanted to give me.
19    Q.   I think you testified that at
20 times it would be 10 or $15,000 in cash?
21    A.   I didn't say the amount.  I'm
22 not sure the amount.  I don't want to
23 quote an exact amount.  I don't know.  I
24 don't remember.

Page 230

K. MIKHAYLOVA

1    Q.   Do you have any documentation
2 that will tell you how much money your
3 grandmother gave you?
4    A.   No.
5    Q.   Did you ever put the money in
6 the bank?
7    A.   I don't recall.  I might have
8 but I can't be -- I can't give you a
9 definitive answer.
10    Q.   You said the purchases were all
11 for yourself for gifts.  You said I was
12 shipping to various friends and family out
13 of state to avoid New York State taxes.
14 You were shipping a lot of items so you
15 sent to different people not to
16 inconvenience anybody.
17    A.   Sure.
18    Q.   Then you say that you now know
19 it is problem to ship things out of state
20 to avoid taxes.  I am assuming that is
21 what Chris Castellani said or Shanine?
22    A.   That's something I said because
23 I didn't know that it was a problem.
24    Q.   I mean I assume they said

Page 231

K. MIKHAYLOVA

1 something to you saying that it was, in
2 fact, a problem?
3    A.   Yes.
4    Q.   Then you say I will no longer do
5 this?
6    A.   Yes.
7    Q.   And then this is a true
8 statement, I was not forced to write it.
9 Is there anything in your statement that
10 is inaccurate?
11    A.   No.  Besides that it was a true
12 statement and they asked me a statement.
13    Q.   How is that inaccurate?
14    A.   They forced me to write it.
15    Q.   How did they force you to write?
16    A.   They told me I have to write it,
17 that I have to make a statement.
18    Q.   How did that force you to write
19 it if you did not want to?
20    A.   I didn't want to write.  They
21 told me I have to write a statement.
22    Q.   I mean there was no physical --
23    A.   Union rep offered to me that I
24 was entitled to have these kind of things.

Page 232

K. MIKHAYLOVA

1 It was never brought up.  It was never
2 offered.
3    Q.   But the actual content of the
4 document is true?
5    A.   Yes.
6    Q.   Is that your signature on Bates
7 1895?
8    A.   Yes.
9    Q.   And Shanine Gray signed as the
10 witness?
11    A.   Correct.
12    Q.   Did Chris say anything or
13 Shanine during the course of this
14 conversation that you were investigating
15 your conduct as an employee discount
16 abuse?
17    A.   I don't remember.
18    Q.   Couple of times today we have
19 been talking about, this is going to be
20 Exhibit Z, 1456.
21       (Whereupon, Bates 1456 was
22       marked as Defendant's Exhibit Z for
23       identification as of this date.)
24    Q.   At some point the director of

Page 233

59 (Pages 230 - 233)

Kristina Mikhaylova

March 8, 2022

K. MIKHAYLOVA

1   fraud, Eric Rainsberg, sent an e-mail and
2   he is talking about associates 72061886.
3   That would be you, correct?
4        MS. MENDOZA:  Objection.
5        You can answer.
6     A.  I'm not sure if that's my
7   number.  I don't know who that i.
8     Q.  Then he puts in parenthesis
9   Kristina Mikhaylova Chanel Handbags?
10    A.  That's me.
11    Q.  Is a runaway top loss associate
12  with $90,000 in loss in January February
13  alone.  I think you said you are not
14  aware of that number but how much --
15    A.  I wasn't aware of the number but
16  I knew it was a big amount and when Chris
17  Castellani got me in the office, we
18  discussed that.
19    Q.  Did you have any understanding
20  or reason as to why you would have such a
21  high fraud send number?
22    A.  We already discussed.  It was in
23  regards to that send Texas.  That was the
24  number that I brought to their attention

K. MIKHAYLOVA

1   before they even questioned me.  And told
2   me to continue to do so.  So I continued
3   to do so.  I followed the company's
4   protocol to shipping and billing that was
5   the same and I was allowed to do so.  So,
6   that was the same thing.
7     Q.  Do you know you sent to Texas
8   total of $90,000.  Do you know?
9        MS. MENDOZA:  Objection.  You
10  can answer.
11    A.  I don't know.
12       MS. MENDOZA:  Just to be clear
13  on that exhibit, I think it said 90
14  million.
15       MS. MENDOZA:  Thank you.
16       MS. TIERNEY:  That's 90k.  That
17  is the appropriate for thousand in
18  this context.
19       MS. MENDOZA:  Thank you.
20    Q.  I am going to mark this as AA.
21       (Whereupon, Bates 1462 and 1463
22  was marked as Defendant's Exhibit AA
23  for identification as of this date.)
24    Q.  This is 1462 and 1463.  This

K. MIKHAYLOVA

1   talks about, once again, this is an
2   internal e-mail with loss prevention
3   talking about the fraud store sends.  And
4   there were three employees that totaled
5   the most, 35 percent of the whole store.
6   Yours was 90,000 and the closest to you is
7   27,000.  Once again, I know you had the
8   issue in Texas but other than that, do you
9   have any reason to explain why your fraud
10  send would be so high other than what --
11    A.  No --
12       MS. MENDOZA:  Objection.  You
13  can answer.
14    A.  Sorry.  Every cent I had, I
15  followed the store's protocol and I did
16  what they allowed me to do.  I did not do
17  anything that was inputting cards or not
18  getting anything verified.  Whatever they
19  said is fraud and they are saying it is,
20  it is what it is but it was all under
21  things that I got approved for.  I do not
22  know these people.  These were things they
23  were calling the store and asking for
24  order.  I was fulfilling the orders and

K. MIKHAYLOVA

1   they were allowing me to do so.  If I was
2   not allowed to send, then I would not and
3   I did not send any orders that I was not
4   allowed to send.
5     Q.  Exhibit AA 1462.  It talks about
6   associate 72061886 which is your number is
7   the highest fraud store send associate in
8   all of Macy's, Inc. for 2017.  Did Chris
9   Castellani tell you that?
10    A.  No, he did not.  All these sends
11  were the sends to Texas that I made them
12  aware of.  He just discussed with me in
13  regard to this and said that he would
14  finish the investigation.  I said okay.
15  And at that point, I don't recall who I
16  spoke to him.  But when I spoke to him at
17  that point, I made aware them of that
18  situation and they were actually there.
19  He asked them and they said I did.  And I
20  remember clearly and they said I did come
21  up to them in regard to that.
22    Q.  You do understand why they would
23  want to talk to you if your frauds were
24  that high?

Atkinson-Baker, A Veritext Company
(818) 551-7300                          www.veritext.com

K. MIKHAYLOVA

1       A.   Yes.  Absolutely.
2       Q.   Exhibit BB is going to be 1507
3  exhibit.
4
5          (Whereupon, Bates 1507 was
6    marked as Defendant's Exhibit BB for
7    identification as of this date.)
8       Q.   Chris Castellani is talking to
9  HR to Tinbite Yonas.  They were going to
10  speak to you that afternoon on discount
11  abuse, this was June 6, and potential
12  diverter activity.  Then he talked about
13  the previous conversation with you.
14  During the interview and followup it
15  appears she, you, followed policy and
16  procedure around the memo order process.
17  That was your understanding as well?
18      A.   I always followed the procedure
19  other than memo and order process, always.
20  I always called security if I thought
21  something did not sound right, I always
22  went through them.  And they are aware of
23  that.
24      Q.   CC is going to be 1510.
25          (Whereupon, Bates 1522 to 1523

Page 238

K. MIKHAYLOVA

1  was marked as Defendant's Exhibit CC
2    for identification as of this date.)
3       Q.   This is just a copy of your
4  statement so I am going to withdraw that.
5       A.   Okay.
6       Q.   CC will be 1522 to 1523.  These
7  are internal e-mails that were going back
8  and forth to Richard Law from Chris
9  Castellani.  He said you shipped 26
10  purchases to six different addresses, five
11  in New Hampshire and one in Mississippi.
12  That cost a total tax evasion of almost
13  $6,000.  Did he convey that to you in the
14  course of your interview what the amount
15  was?
16      A.   No.
17      Q.   Did you realize that in those
18  six addresses you sent 26 transactions
19  some were multiple items which is what
20  Castellani says to Richard Law?
21      A.   I'm sorry.  What was the
22  question?  Did I --
23      Q.   That there were 26 packages.
24      A.   I didn't know the numbers.  We

Page 239

K. MIKHAYLOVA

1  didn't discuss the numbers.
2       Q.   Does that sound right or does
3  that sound high to you?  What he says is,
4  question about the transaction.  Wait a
5  minute.  He said 26 total transactions
6  some containing multiple items from
7  10/7/16 to 4/21/17 to those six addresses?
8       A.   That might be correct.
9       Q.   You have no basis to challenge
10  that; is that correct?
11      A.   I mean, if that's what he says
12  -- I mean, I can't confirm it is exactly
13  26 but it sounds about right.
14          (Whereupon, Bates 1531 was
15    marked as Defendant's Exhibit DD for
16    identification as of this date.)
17      Q.   This which is Exhibit DD is
18  1531.  This appears to be the e-mail that
19  you sent to Richard Law on June 8th; is
20  that correct?
21      A.   Yes.
22      Q.   And then at the very end, I
23  would like to know how long my suspension
24  is because I am pregnant.  Did anyone tell

Page 240

K. MIKHAYLOVA

1  you to put that in your e-mail?
2       A.   No.
3       Q.   Had you spoken to Richard Law
4  before the conversation where you were
5  suspended and told to contact him before
6  returning to work?
7       A.   No.
8       Q.   Had you ever met Richard Law?
9       A.   Yes.
10      Q.   When?
11      A.   During my employment there.
12  During my employment at Bloomingdale's.
13      Q.   On the floor or --
14      A.   I have seen him around.  I don't
15  recall having any conversations with him
16  prior to this whole situation.
17      Q.   Do you know if he saw you in the
18  months leading up to the termination?
19      A.   Yes.  I have seen him a few
20  times.  I mean, he walks around.  I just
21  don't -- like, I didn't have a need to
22  have a conversation with Richard.
23      Q.   He says in this e-mail to
24  Tinbite and Chris, I spoke to Kristina and

Page 241

61 (Pages 238 - 241)

K. MIKHAYLOVA

1 informed her that she is still on
2 informed her that she is still on
3 suspension until further notice and that
4 the investigation is not related to her
5 medical condition. Did he, in fact, reach
6 out to you and convey that conversation?
7   A.   No.
8   Q.   Do you remember if he sent you
9 an e-mail or anything like that?
10   A.   I don't remember if he did or he
11 did not. He called me after that e-mail
12 and told me -- he called me but I don't
13 remember the content of our conversation.
14 He might have said the investigation is
15 still pending and we will get back to you
16 as soon as we know something.
17   Q.   I think we talked earlier about
18 someone by the name of Angy Lee.
19   A.   Yes.
20   Q.   1536 to 1543 is going to be
21 Exhibit EE.
22      (Whereupon, 1536 to 1543 was
23   marked as Defendant's Exhibit EE for
24   identification as of this date.)
25   Q.   Did you have much to do with

Page 242

K. MIKHAYLOVA

1 Angy Lee during your time in Chanel?
2   A.   She was my co-worker.
3   Q.   Did you know her very well? Did
4 you socialize with her?
5   A.   I have socialized with her.
6 Maybe not very well but I did socialize.
7   Q.   This is the investigation
8 related to Ms. Lee. I think she is a
9 woman, right?
10   A.   Yes.
11   Q.   She was sending her handbags to
12 two addresses. One was Yuyu Lai at 373
13 South Willow and that is a UPS store and
14 it was also the address used by you. She
15 was also sending to an address Boynton.
16 That was the address we looked at
17 previously?
18   A.   Yes.
19   Q.   You couldn't remember who you
20 were sending to at that address?
21   A.   Correct. That was a friend of
22 mine, but I don't remember who was staying
23 there at that time.
24   Q.   You had Angy Lee send her

Page 243

K. MIKHAYLOVA

1 purchases to both to Yuyu Lai and the
2 person at Boynton?
3   A.   Yes.
4   Q.   Was Crystal Lee the person who
5 lived at Boynton?
6   A.   Could be, but I don't recall if
7 that was her address for sure or not.
8   Q.   Do you know anybody by the name
9 of Crystal Lee?
10   A.   I do know. I'm not sure if that
11 was her address at the time is what I am
12 saying. I know a lot of people in New
13 Hampshire and Delaware.
14      (Whereupon, Bates 1551 to 1557
15   was marked as Defendant's Exhibit FF
16   for identification as of this date.)
17   Q.   Exhibit FF is going to be 1551
18 to 1557. Another member of the AP team,
19 they are talking about Yuyu Lai and her
20 South Willow Manchester address. It says
21 she owns an X Closet Boston boutique in
22 Boston which you said you were not aware
23 of, right?
24   A.   Yes.

Page 244

K. MIKHAYLOVA

1   Q.   Polagrains Pan America is also
2 part of the reference which is the address
3 you were using to her at 373 South Willow,
4 right?
5   A.   Yes.
6   Q.   Then they talk about the various
7 addresses people are using where they were
8 sending stuff to the South Willow address.
9      This is the reference I think to
10 the licensing or the change in ownership
11 of the Chanel Department, the handbags
12 department. Do you recall when the
13 licensing was going to take over?
14   A.   They didn't have a definite date
15 when I was there but it was not there
16 during my employment.
17   Q.   Now, something that really
18 doesn't make sense in the context of your
19 testimony is in Exhibit 1557, summary of
20 the fraud and the theft. It says Angy Lee
21 was interviewed and she admitted to
22 selling Chanel handbags on a personal
23 Bloomingdale's account to resellers. She
24 implicated former Chanel handbag employee,

Page 245

62 (Pages 242 - 245)

K. MIKHAYLOVA

1       K. MIKHAYLOVA
2  Kristina Mikhalova, as a conduit to Yuyu
3  Lai, the owner of a high-end boutique in
4  Boston.
5       A.   I never spoken to Angy Lee about
6  -- I don't even know what she is talking
7  about.  If she testifies -- if you even
8  get her, she has no idea who Yuyu Lai is.
9  That's No. 1.  No. 2 is I sent her items
10 there so she could avoid tax.  Whatever
11 Angy did, unless she got her number some
12 other way, I don't recall her speaking to
13 Yuyu Lai or having any conversation with
14 Yuyu except for me giving her her personal
15 bag.  So, I don't know what Angy wrote and
16 her statement is not true.  Angy Lee only
17 bought like three to four bags that she
18 sent to her house.
19      (Whereupon, Bates 1571 was
20      marked as Defendant's Exhibit GG for
21      identification as of this date.)
22      Q.   Looking at Exhibit GG which is
23 going to be 1571.  This is part of the
24 investigation in the Angy Lee and they are
25 talking about a video on June 3rd.  They

Page 246

1       K. MIKHAYLOVA
2  saw Lee ringing an associate when she
3  conducted a transaction for Kristina
4  Mikhaylova.  During the transaction it was
5  for $4,700.  Mikhaylova wrote something on
6  a piece of paper and then handed the paper
7  to Lee.  Lee took a picture of the paper
8  with her cellphone and expected a sale
9  send for the handbag.  The merchandise was
10 sent to Yuyu Lai.
11      A.   Huh-huh.
12      Q.   And then it says Yuyu Lai is the
13 owner of a high-end boutique called X
14 Closet that sells Chanel handbags and
15 shoes which is not an authorized Chanel
16 handbags dealer.  Do you recall any
17 episode that where you were writing
18 account number?
19      A.   I don't remember this, me
20 writing anything to her.  I just don't
21 remember.
22      Q.   Do you know who Tyler Rose is?
23      A.   He is an associate at Chanel.
24      Q.   Did he ever send to any of your
25 buddies?

Page 247

1       K. MIKHAYLOVA
2       A.   I don't think so.  I don't
3  remember.
4       Q.   We are going to have HH which is
5  1576.
6       (Whereupon, Bates 1576 was
7       marked as Defendant's Exhibit HH for
8       identification as of this date.)
9       Q.   I will represent this is part of
10 the investigation into Tyler Rose.  It
11 looks like according to the investigation
12 he shipped his personal Chanel handbag to
13 New Hampshire where shipping fee was
14 waived.  He shipped to Yuyu Lai at 373
15 South Willow Street at New Hampshire which
16 is the same one that you used.
17      A.   Did he use it like one time --
18 maybe he used it one time but it was his
19 item.  I don't remember giving him the
20 address.  I mean if I did, I might have
21 gave it to him.  It was definitely an item
22 for him.
23      Q.   How about Martha Way?  Did you
24 give it to her too?
25      A.   Yes, I did.

Page 248

1       K. MIKHAYLOVA
2       Q.   On this counter to avoid taxes
3  at least --
4       A.   She bought it for yourself.  She
5  didn't want to pay tax.  That was the only
6  people I knew at that time.  Whoever was
7  available, I gave her the address.
8       Q.   You gave Angy Lee, Martha Way,
9  and Tyler Rose --
10      A.   They have only shipped it a few
11 times.  I know Angy shipped couple of
12 times.  Tyler, I don't recall.  If he did,
13 it might have been one time.
14      MS. TIERNEY:  Kristina, let
15      counsel ask the question.
16      THE WITNESS:  Okay.
17      Q.   All those people who were
18 sending to Yuyu Lai avoiding taxes, would
19 you now have learned at least through your
20 own interview that this is an
21 inappropriate policy at Bloomingdale's --
22      A.   Correct.  I did not know that
23 was something illegal at that time.  Like
24 I said, we weren't the only ones.
25 Everybody was shipping.  It was a known

Page 249

63 (Pages 246 - 249)

K. MIKHAYLOVA

1        K. MIKHAYLOVA
2  habit to have in Bloomingdale's.
3    Q.  And your testimony is Yuyu Lai
4  just accepted all these packages --
5    A.  Yes.
6    Q.  This is going to be 1579 to
7  1580, II.
8       (Whereupon, Bates 1579 to 1580
9    was marked as Defendant's Exhibit II
10   for identification as of this date.)
11    Q.  I know you said you didn't think
12  Yuyu Lai had a clothing store.  And this
13  is --
14    A.  But I really don't know if we
15  are talking about same Yuyu.  There is a
16  lot of Yuyu Lais.  This is my whole thing.
17  You are linking me with that girl with X
18  Closet.  Did you even see my merchandise
19  in her store?  I don't know who this
20  person is with this -- this is probably --
21  I have Boston in my head because you guys
22  mentioned it to me.  I don't know who Yuyu
23  Lai is and that girl you sent me the
24  picture of is not the same Yuyu Lai that I
25  know.
                  Page 250

1        K. MIKHAYLOVA
2    Q.  Ma'am, don't go into tirades.
3  We need to get this done.
4       Exhibit JJ is Bates No. 1589.
5      (Whereupon, Bates 1589 was
6    marked as Defendant's Exhibit JJ for
7    identification as of this date.)
8    Q.  This is a list of sends.  You
9  can tell how many were sent to Yuyu Lai.
10  There are some that are not you and then
11  there is Angy Lee, Rose, Way.  Do you have
12  any reason to doubt that all of these
13  transactions were sent to Yuyu Lai?  Do
14  you have any reason to doubt that
15  information?
16    A.  I don't believe so.
17    Q.  Even if your Yuyu Lai is not the
18  same one that has the Boston boutique, do
19  you have any reason to doubt that loss
20  prevention were the same --
21    A.  I had no idea that there is even
22  a Yuyu Lai at Boston.
23    Q.  Do you have any reason to doubt
24  that at least loss prevention asset
25  protection believe that they were related,
                  Page 252

1        K. MIKHAYLOVA
2    Q.  At least to your knowledge it is
3  not the same place?
4    A.  No, it is not.  It is not.  You
5  guys assuming it is but it is not.
6    Q.  But your colleague, Angy Lee,
7  has admitted to selling to Yuyu?
8    A.  But how can Angy Lee admit it
9  when she has never even had a conversation
10  with Yuyu.  She doesn't even know who Yuyu
11  is.  Why don't you ask her has she ever
12  had a conversation with Yuyu Lai and see
13  what she says?  She never had a
14  conversation with her.  Search her phone
15  records.  She never had -- she is my
16  friend that I was doing a favor for Angy
17  Lee so how does Angy know who this woman.
18  She doesn't.
19      And Angy got -- from what I
20  known Angy got in trouble for something
21  else and you guys threw this,
22  Bloomingdale's threw this into the mix.
23  This has nothing to do with -- Angy has
24  never had a conversation with Yuyu Lai
25  ever.  I was doing a favor.
                  Page 251

1        K. MIKHAYLOVA
2  any facts to dispute that?
3    A.  I don't have any facts.  I don't
4  understand the question to be honest.  I
5  don't --
6    Q.  Let me try again.
7    A.  Yes.
8    Q.  Is there any reason, even if you
9  are right and let's say there are two Yuyu
10  Lais that are not related, and I don't buy
11  that for a second just for the record.
12  Let's assume that they are different.  Do
13  you have any facts to believe that loss
14  prevention did not truly believe that they
15  were related?
16      MS. MENDOZA:  Objection.
17      You can answer.
18    A.  I can't answer that because I
19  have no idea what they believe.
20    Q.  And that's my point.  You have
21  no idea whether they did or did not
22  believe it, correct?
23    A.  Yeah, I have no idea.
24    Q.  I will take that.
25      Did you have a lot of contact
                  Page 253

Kristina Mikhaylova
March 8, 2022

K. MIKHAYLOVA

1    with Idress?
2    Q.   With who?
3    A.   With who?
4    Q.   Idress; I-D-R-E-S-S, O-R-Y-A.
5    A.   Yes, he was a co-worker.
6    Q.   Was he someone that you spoke
7    to lot on the phone, was he a social
8    friend, what was your relationship with
9    Idress?
10   A.   He was a friend.  Not someone
11   that I spoke to a lot, but someone I knew
12   at work.
13   Q.   Did he ever send to Yuyu Lai?
14   A.   I believe Idress did.
15       MS. TIERNEY:  I think I am
16   almost done.  Let's take a five minute
17   break.  Let me chat with Steve if
18   that's okay with you.
19       MS. MENDOZA:  Yes.
20       (Whereupon, a short recess was
21   taken.)
22       MS. TIERNEY:  Back on the
23   record.
24   Q.   I know we talked about the issue
25   with the sales tax.  You sent us

Page 254

K. MIKHAYLOVA

1       MS. MENDOZA:  Objection.  You
2    can answer.
3    A.   Me and everybody that else that
4    purchased at Bloomingdale's, yes, clients
5    and co-workers.
6    Q.   But right now we are talking
7    about you, correct?
8    A.   Correct.
9    Q.   To the extent that your friends
10   or co-workers actually knew anything about
11   Yuyu Lai or knew there was an opportunity
12   that they can send items and avoid taxes,
13   the only way they knew that was
14   because you told them about that and gave
15   them the information, right?
16   A.   That was their decision whether
17   or not to send.
18   Q.   The reason they were able to do
19   is because you gave them the information,
20   correct?
21   A.   Yes.
22       MS. TIERNEY:  I think that's
23   everything I have.
24       MS. MENDOZA:  I don't have any

Page 256

K. MIKHAYLOVA

1    information to these products to avoid
2    sales tax but you understand that if you
3    purchased these items at the store and
4    taken them home, there would have been
5    sales tax to the State of New York,
6    federal tax, right?  Do you understand
7    that?
8    A.   Yes.
9    Q.   And you understand that any time
10   you make a purchase like that, the
11   government is entitled to its share and by
12   doing this you have actually cheated the
13   state and the fed out of moneys that are
14   actually due to them.  Do you understand
15   that?
16       MS. MENDOZA:  Objection.
17       You can answer.
18   Q.   I meant the city and state.  You
19   understand that the city and state are
20   entitled to moneys from the purchases that
21   you made and that by you sending these
22   transactions out of state, you have denied
23   the city and the state moneys that they
24   would be otherwise be entitled, right?

Page 255

K. MIKHAYLOVA

1    questions.
2       MS. TIERNEY:  Ms. Mikhaylova,
3    thank you for your time today.  I
4    appreciate your patience and
5    cooperation.
6       MS. MENDOZA:  Sorry about the
7    technical difficulties.  Thank you.
8       MS. MENDOZA:  Thank you.
9
10      [TIME NOTED:  4:22 p.m.]
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 257

65 (Pages 254 - 257)

            I N D E X

WITNESS      EXAMINATION BY    PAGE

KRISTINA MIKHAYLOVA MS. TIERNEY   5

    E X H I B I T S

DEFENDANT'S  DESCRIPTION    PAGE

Exhibit A  Document 2056 to 2079  115

Exhibit B  Compliant       147

Exhibit C  Bates 348 to 350    157

Exhibit D  Bates 343 to 346    160

Exhibit E  Bates 301       165

Exhibit F  Bates 311       166

Exhibit G  Bates 315 to 318    167

Exhibit H  Bates 335       168

Exhibit I  Rule 26A disclosure  172

Exhibit J  interrogatory responses 185

Exhibit K  response to request for 189
           admission
Exhibit L  Bates 298       193
Exhibit M  Bates 379 to 380    195
Exhibit N  Bates 297       206
Exhibit O  Bates 821 to 823    208
Exhibit P  Bates 1021 to 1086   209
Exhibit Q  Bates 1087, 1088    211
INDEX CONTINUED

Page 258

            I N D E X

DEFENDANT'S DESCRIPTION     PAGE

Exhibit R  Bates 1098 to 1110  212

Exhibit S  Mikhaylova 171 to 175  214

Exhibit T  Mikhaylova 176    217

Exhibit U  Mikhaylova 187    219

Exhibit V  Mikhaylova 195 to 196 220

Exhibit W  Mikhaylova 197 to 201 221

Exhibit X  Mikhaylova 213 to 216 225

Exhibit Y  Document 1894 to 1600 228

Exhibit Z  Bates 1456      233

Exhibit AA  Bates 1462 and 1463  235

Exhibit BB  Bates 1507     238

Exhibit CC  Bates 1522 to 1523  239

Exhibit DD  Bates 1531     240

Exhibit EE  Bates 1536 to 1543  242

Exhibit FF  Bates 1551 to 1557  244

Exhibit GG  Bates 1571     246

Exhibit HH  Bates 1576     248

Exhibit II  Bates 1579 to 1580  250

Attorney has retained all exhibits.

     REQUESTS
     PAGE  LINE
     171   4

Page 259

CERTIFICATION

I, DIKILA T. BHUTIA, a Notary Public for
and within the State of New York, do
hereby certify:
That the witness whose testimony as
herein set forth, was duly sworn by me;
and that the within transcript is a true
record of the testimony given by said
witness.
I further certify that I am not related
to any of the parties to this action by
blood or marriage, and that I am in no way
interested in the outcome of this matter.
I                    I have hereunto set
n                    arch, 2022.

DIKILA T. BHUTIA

          *   *   *

Page 260

MELISSA MENDOZA, ESQ.

melissa@dereksmithlaw.com

            March 17, 2022

RE: Mikhaylova, Kristina vs. Bloomingdale's Inc

March 8, 2022, Kristina Mikhaylova, 5084339

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

   to schedule a time to review the original transcript at

   a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

   Transcript - The witness should review the transcript and

   make any necessary corrections on the errata pages included

   below, noting the page and line number of the corrections.

   The witness should then sign and date the errata and penalty

   of perjury pages and return the completed pages to all

   appearing counsel within the period of time determined at

   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

   Counsel - Original transcript to be released for signature

   as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

   time of the deposition.

Page 261

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

1  _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2  Transcript - The witness should review the transcript and
3  make any necessary corrections on the errata pages included
4  below, notating the page and line number of the corrections.
5  The witness should then sign and date the errata and penalty
6  of perjury pages and return the completed pages to all
7  appearing counsel within the period of time determined at
8  the deposition or provided by the Federal Rules.
9  __ Federal R&S Not Requested - Reading & Signature was not
10  requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 262

1  Mikhaylova, Kristina v. Bloomingdale's Inc
2  Kristina Mikhaylova (#5084339)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Kristina Mikhaylova, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Kristina Mikhaylova                Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

Page 264

1  Mikhaylova, Kristina vs. Bloomingdale's Inc
2  Kristina Mikhaylova, 5084339
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Kristina Mikhaylova                Date
25

Page 263

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

[& - 2025.520]

**&**

**&** 4:7 261:23 262:9

**0**

**08927** 1:7

**1**

**1** 4:4 5:12 17:18 83:13 166:23 169:4 246:9 262:1
**1,000** 25:12
**1,100** 25:12
**1,200** 25:5,9,12
**1,300** 25:9,12
**1.1** 25:6,8
**1.3** 25:9
**10** 230:21
**10/7/16** 240:8
**100,000** 25:11 133:12
**10017** 4:9
**10119** 4:4
**1021** 209:8,12 258:23
**1086** 209:8,12 258:23
**1087** 211:5,7 258:24
**1088** 211:5,7 258:24
**1098** 212:13,19 259:3
**10:25** 1:21
**1110** 212:13,19 259:3
**11366** 5:13
**11435** 81:23
**11477** 4:14
**115** 258:7
**12** 190:12

**124** 116:18
**12:36** 120:24
**12:43** 120:24
**12th** 4:8
**13** 195:10
**14086** 260:18
**141-48** 81:22
**1456** 233:21,22 259:11
**1462** 235:22,25 237:6 259:12
**1463** 235:22,25 259:12
**147** 258:8
**15,000** 230:21
**1507** 238:3,5 259:13
**1510** 238:24
**1522** 238:25 239:7 259:14
**1523** 238:25 239:7 259:14
**1531** 240:15,19 259:15
**1536** 242:20,22 259:16
**1543** 242:20,22 259:16
**1551** 244:15,18 259:17
**1557** 244:15,19 245:20 259:17
**157** 258:9
**1571** 246:19,23 259:18
**1576** 248:5,6 259:19
**1579** 250:6,8 259:20
**1580** 250:7,8 259:20

**1589** 252:4,5
**15th** 164:19 165:10
**16** 166:4
**160** 258:10
**1600** 228:22 229:2 259:10
**165** 258:11
**166** 258:12
**167** 258:13
**168** 258:14
**16th** 166:16 167:4
**17** 220:13 261:3
**171** 213:25 214:3 259:4,25
**172** 258:15
**175** 214:2,4 259:4
**176** 216:25 217:2 259:5
**17th** 260:16
**185** 258:16
**187** 219:8,9 259:6
**189** 258:17
**1894** 228:21 229:2 259:10
**1895** 233:8
**19** 160:11 163:11 211:20
**193** 258:19
**195** 220:22,23 258:20 259:7
**196** 220:22,24 259:7
**197** 221:21,22 259:8
**198** 5:12
**1:00** 138:20
**1:19** 1:7
**1:33** 138:20
**1:40** 229:9

**1st** 22:22,25 167:10 169:14

**2**

**2** 167:24 168:5,8 246:9
**2,100** 25:13
**2,200** 25:13
**2/21/2017** 157:23
**20** 224:7,7,14,15 264:15
**201** 221:21,23 259:8
**2016** 9:23 81:24 83:6 85:13 150:6 150:10 193:17 207:13 211:20 212:21
**2017** 19:10 36:20 36:21 72:5 78:14 78:15 80:19 81:25 83:6 85:14 86:7 131:25 150:11 156:20 160:11 163:12 166:5,24 167:24 168:8,22 169:11 184:20 205:2 208:22 210:10 229:8,14 237:9
**2018** 19:11 22:25 72:5 80:19 184:24 185:2 217:12
**2019** 25:15,19 30:4 225:10 226:2 227:2
**2020** 26:19
**2021** 157:13
**2022** 1:20 260:16 261:3,5
**2025.520** 261:9,12

Page 1

**[204 - able]**

**204** 201:19 202:9
258:21 198: $216:14$ 216:14
**2056** 115:12,15
258:7
**206** 258:21
**2079** 115:12,16
258:7
**208** 258:22
**209** 258:23
**20th** 223:2,5
**211** 258:24
**212** 259:3
**213** 225:2,5 259:9
**214** 259:4
**216** 225:3,5 259:9
**217** 259:5
**219** 259:6
**21st** 225:10
**220** 259:7
**221** 259:8
**225** 259:9
**228** 259:10
**23** 29:9 36:21
148:10
**233** 259:11
**235** 259:12
**238** 259:13
**239** 259:14
**24** 196:9
**240** 259:15
**242** 259:16
**244** 259:17
**246** 259:18
**248** 259:19
**25** 25:22,24
**250** 259:20
**26** 239:10,19,24
240:6,14
**26a** 171:25 172:6
258:15

**27,000** 236:8
**297** 206:21 207:3
258:21
**298** 193:7,9 258:19
**2:46** 204:2
**2:54** 204:2
**2nd** 168:12
**2s** 208:7

**3**

**3** 1:13,14 25:23,25
29:9 183:21 184:9
193:17
**30** 217:11 262:1
**301** 165:19,25
258:11
**305** 12:10
**30th** 9:23 150:6
**311** 166:18,19
258:12
**315** 167:19,22
258:13
**318** 167:19,23
258:13
**32** 17:18
**320** 201:24
**330** 202:15
**335** 168:16,17
258:14
**343** 159:25 160:5
258:10
**346** 159:25 160:5
258:10
**348** 157:5,6,18
258:9
**35** 236:6
**350** 157:5,6 258:9
**36** 150:9
**373** 200:20 201:2,8
201:17,23 202:8
202:14 243:13
245:4 248:14

**379** 195:11,11,13
258:20
**38** 151:13
**380** 195:12,13
258:20
**3rd** 207:12 246:25

**4**

**4** 259:25
**4,000** 72:21 73:3
**4,700** 247:5
**4/21/17** 240:8
**4/27/16** 220:11
**40** 191:3
**400** 4:14
**43** 154:14
**4605** 203:21 204:6
**4905** 4:4
**4:22** 257:11
**4th** 86:7 163:24

**5**

**5** 227:16 258:3
**50** 191:3 206:5
**5084339** 261:5
263:2 264:2
**51** 206:8
**53** 11:16
**551** 4:8
**57** 170:10
**59** 74:16 224:19
**5th** 132:2

**6**

**6** 163:16 205:10
229:8,13 238:11
**6,000** 239:14
**60** 191:7,9 222:17
224:6,13
**63141** 4:14
**646-270-0228**
214:24

**65,000** 83:5,24
85:12
**6:00** 47:5
**6th** 131:24 132:3
140:14 170:3

**7**

**7** 26:23
**7,000** 205:10
**70** 191:3,7,9
222:17
**72061239** 214:18
**72061886** 119:12
234:3 237:7
**7330** 5:12

**8**

**8** 1:20 261:5
**821** 208:14,17
258:22
**823** 208:14,17
258:22
**8502** 81:21
**85th** 81:22
**8th** 240:20

**9**

**9** 168:21 169:11
170:9
**90** 235:14
**90,000** 204:25
234:13 235:9
236:7
**90k** 235:17
**9th** 171:10

**a**

**a.m.** 1:21
**aa** 235:21,23 237:6
259:12
**ability** 54:12
**able** 17:23 19:24
26:22 83:23 91:20

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[able - amount]**

91:23 93:24 96:6
101:23 126:21
179:2 192:4
256:19
**absence** 89:15
94:7,23,24 95:12
95:13 133:23
134:4 166:4
167:24 169:7,10
169:16 171:8
226:6
**absolutely** 9:19
17:5 30:24 35:7
68:22 80:6 83:25
108:5,14,14
114:18,23 115:2
130:8 155:23
238:2
**abuse** 213:10
219:22 233:17
238:11
**accepted** 124:22
250:4
**access** 31:3 33:23
37:17,24 109:22
121:8
**accommodate**
93:3 94:20 95:9
95:25 97:9 99:10
99:17 101:7
**accommodated**
100:25
**accommodation**
91:17 93:18,23,25
94:6 95:12,17
98:10 99:7 100:10
100:14 132:22
133:6 162:4,10
**accomodation**
90:15,17,24 91:19
93:7,12 94:11

95:14 102:22
133:19 134:3,21
162:2,7,10
**account** 82:9,15
83:19 85:20
123:17,20 245:24
247:18
**accountability**
106:8
**accounts** 82:25
83:3
**accumulate** 205:5
**accurate** 9:25 22:8
69:22 169:17
196:13
**accused** 106:15
**acknowledge**
193:21
**acknowledgement**
264:3
**act** 109:4
**acting** 47:10 50:5
**action** 1:6 2:2
159:7,11 260:12
**activities** 35:4
**activity** 127:8
238:12
**actual** 71:24 233:4
**ad** 10:4
**add** 121:17 160:21
**additional** 156:24
222:13,15,16
224:6,8
**additions** 264:6
**address** 5:10
12:10 70:14 75:18
79:7 81:22 105:9
108:21 110:14
117:8,9 118:4,10
118:23,24 119:4,8
119:11,18 166:5

166:24 168:22
178:19,20 200:7,8
200:25 202:10,13
202:18,23 203:12
204:11,22 205:14
214:21,25 215:4
215:12 216:8
243:15,16,17,21
244:8,12,21 245:3
245:9 248:20
249:7
**addresses** 103:20
105:4 110:12
117:5,25 118:15
121:12 123:12
127:13 177:7,17
239:11,19 240:8
243:13 245:8
**adherence** 196:16
**admission** 189:7,9
192:21 193:11
213:19 258:18
**admissions** 189:17
197:5 206:5
**admit** 71:3 204:20
206:6,8,8,11,11
251:8
**admitted** 6:10
127:17 189:17
198:10 245:22
251:7
**admittedly** 79:24
**advertisement**
15:24
**afl** 1:13
**afternoon** 238:10
**age** 210:21
**ago** 12:12 49:15
94:22
**agree** 6:24 137:7
138:7,11 196:25

**agreed** 3:3,8,12
197:2
**agreement** 185:15
**ahead** 103:24
104:11 126:16
**ailment** 36:6
**ailments** 35:24
**alert** 42:15 57:8
88:15,18,20
**alerted** 40:10
**allegation** 173:7
**allegedly** 57:18
**allow** 33:22 94:4
129:15
**allowed** 8:8,9
63:21 64:23 71:6
78:25 91:21 92:2
92:2 97:7 99:12
99:13,18 104:3
107:20 120:9
129:2,7,20 131:16
133:8,11 142:15
144:7 193:3
197:14 230:4
235:6 236:17
237:3,5
**allowing** 64:3
106:7 129:16
135:22 142:12
213:11 237:2
**allows** 38:10
**amapara** 223:14
**amended** 148:5
163:15 169:13,24
**america** 201:10,11
202:5,18,20 245:2
**amount** 35:4
48:15 67:4 72:6
80:24 84:2 124:2
124:10,11 189:20
205:11 208:2

[amount - associate]

230:22,23,24
234:17 239:15
**amounts** 81:3 82:7
**ampara** 223:15
**anatomy** 55:8 56:5
147:14
**ancestry** 211:3
**angry** 60:20
**angy** 188:17 189:3
242:18 243:2,25
245:21 246:5,11
246:15,16,24
249:8,11 251:6,8
251:16,17,19,20
251:23 252:11
**announced** 27:13
132:21
**announcement**
210:9
**annual** 208:10
**annually** 207:25
**answer** 7:3 8:2,3
8:17 32:8 65:24
69:25 70:6,7
72:24 74:3 79:11
79:20 83:12 85:24
93:9,10 94:13
105:20 122:18
125:6 132:9,10
137:9,10 138:4,10
143:12,24 149:5,6
150:16 153:9
156:4 165:13
167:14 169:20
172:18 184:11
187:8 189:23
194:6,23 206:17
228:10 230:17
231:10 234:6
235:11 236:14
253:17,18 255:18

256:3
**answered** 114:20
**answers** 9:10 44:9
**antidepressant**
29:14 30:4 32:13
32:18
**anxiety** 34:11,18
225:13 227:14
228:5
**anybody** 42:24
74:12,17 87:6
124:19 209:3
218:10,24 231:17
244:9
**anyway** 227:9
**ap** 108:11 110:18
110:25 113:10
118:21 121:21
129:13 134:10,13
134:25 135:4
244:19
**apartment** 5:12
**apologize** 18:12
39:15 49:7 112:7
**appearance**
151:22
**appearing** 261:18
262:7
**appears** 221:2
229:7 238:15
240:19
**appended** 264:7
**application** 19:20
22:12
**applications** 19:17
21:7 22:9
**applied** 15:25
16:12 19:3 20:5,8
21:5,18
**apply** 20:4,16,24
143:3

**appointments**
33:14
**appreciate** 71:22
72:8 89:2 257:5
**approached**
125:24
**appropriate** 213:2
235:18
**approval** 63:5
107:18,25 109:11
120:6 191:13
192:24
**approve** 74:12
107:22 198:5
**approved** 28:10
71:8 72:10 96:4,5
103:17,17 104:9
105:8 110:10
111:10 119:2
130:7 134:25
162:4 165:23
167:13,17 169:11
169:16 171:9
197:13 236:22
**approves** 103:23
**approving** 105:4
**april** 9:23 22:22
22:25 45:19 83:16
100:7 103:9 150:6
160:11 163:11
164:8,12,13
211:20 212:21
217:11
**area** 137:3 197:12
**argue** 7:4 142:23
**arguments** 138:2
**arm** 123:16
153:22
**armani** 14:4,10,19
14:22 15:4

**arms** 50:19
**arose** 48:4
**arrest** 135:7
**asian** 170:20 211:2
**asked** 33:3,9 59:16
60:14,14 61:2
95:8,10,11 99:14
100:25 102:21,24
112:6 114:17,21
131:14 133:19,23
141:20,25 143:13
143:15,22 166:9
167:4 191:20
192:9 195:3,5
196:22 198:16
199:5,7 221:12,13
221:14 230:19
232:13 237:20
**asking** 6:15 27:22
34:15 47:21 49:2
52:4 94:14,23
96:13 99:22
109:15 123:21
132:16,16 139:22
144:15 177:2
185:9,14 222:21
222:22 236:24
**ass** 154:17
**asset** 41:18 42:4,5
42:9,18,22 103:12
104:19 136:8
149:13 173:15
252:24
**assist** 205:24
**associate** 16:16
119:16 152:24
158:21 160:23
193:22 208:19
211:22 213:9
222:9 223:21
224:3,17 234:12

[associate - behaving]

237:7,8 247:2,23
**associated** 30:8,12
**associates** 14:23
28:13 31:6,9,11,21
31:22 152:21
153:7 170:11
181:14 234:3
**assortment** 30:17
**assume** 48:10
54:20 84:3 113:12
131:21 155:25
180:20 187:25
216:11 231:25
253:12
**assuming** 62:19
85:16 209:24
211:2 215:15
231:21 251:5
**assumption** 48:11
**ate** 86:23
**attached** 201:14
**attacks** 226:15,18
**attempted** 89:21
**attendance** 160:7
207:17
**attention** 111:4
123:11 124:9
125:3 130:22
135:2 234:25
**attorney** 7:14,15
7:21,23 8:5,9 99:5
185:14 220:18
259:22
**attorneys** 4:3,8,12
**attributed** 36:7
**august** 163:16
166:11
**authority** 148:9
**authorized** 129:4
247:15

**automatically**
129:13
**available** 249:7
**avenue** 4:8 11:16
13:5 14:5 16:7
17:2
**averaged** 207:25
**avoid** 41:20 66:23
71:4,9 75:5 76:11
77:14 78:20,22
79:25 127:19
128:14,23 198:11
198:18 231:14,21
246:10 249:2
255:2 256:13
**avoiding** 74:12
75:10,16 76:8,19
130:2 144:5
199:12 249:18
**aware** 38:23 53:3
64:5,7 65:14 67:2
77:17 89:25 103:5
105:21,23 114:8
114:14,21 142:7,7
149:16 170:11
175:22,24 189:19
204:24 205:3,17
205:21 210:15
212:5,8,8 234:15
234:16 237:13,18
238:22 244:23

**b**

**b** 1:9,10,11 13:10
112:3 140:3
147:21,24 163:14
169:25 170:10
258:5,8 262:1
**baby** 88:20
**back** 10:9 18:10
18:15 30:20 31:7
51:7 54:5 68:6

69:6 73:21 75:2
86:2 90:4 107:23
111:13 120:25
124:23 138:21
145:5,10 159:13
159:13 163:14
177:3 184:12,25
185:2 192:20
201:7 204:3
213:19 214:10
215:17 220:19
226:8 227:8,21
228:19 239:8
242:15 254:22
**background** 39:14
**bad** 158:19
**badly** 47:13
**bag** 28:14,15
31:10 67:21 72:22
73:10,14,19,20,21
75:24 108:20
109:6,6 189:2
192:2 204:5
246:15
**bags** 28:19 30:23
31:2,6 69:10,13
70:18,21,23,25
71:4,9,14,18 72:11
83:14,16 104:6,8
191:4 192:3,6
193:3 204:10,16
204:16 205:13,24
230:5,6,11 246:17
**ballpark** 208:3
**bank** 82:9,15,17
82:17,18,21,23,25
83:2 85:20 231:7
**bankruptcy** 27:13
28:24
**based** 13:11 26:25
56:3 83:21 137:14

144:8 158:10
169:6
**basically** 25:10
120:8 207:16
**basis** 9:3 143:9,14
181:12 240:10
**bates** 157:5,6
159:25 160:5
165:19,25 166:18
166:19 167:19,22
168:15,17 193:7,8
195:10,11,13
206:21 207:2
208:14,17 209:8
209:12 211:6,7
212:13,18 233:7
233:22 235:22
238:5,25 240:15
244:15 246:19
248:6 250:8 252:4
252:5 258:9,10,11
258:12,13,14,19
258:20,21,22,23
258:24 259:3,11
259:12,13,14,15
259:16,17,18,19
259:20
**bathroom** 90:10
**battling** 28:12
**bb** 238:3,6 259:13
**bebe** 11:14,17,19
11:20,23 12:4
37:8
**bedford** 187:14
**began** 29:13 30:3
43:22
**beginning** 83:15
88:9 103:9
**behalf** 97:22 148:7
**behaving** 47:12

Page 5

**[belabor - boynton]**

**belabor** 198:8
**believe** 10:13
  12:10 19:11,22
  20:10 21:9 23:19
  25:11 30:6 35:3
  36:12 37:12,15
  38:10 40:3 46:2
  48:2,4 49:8,20
  50:20 52:3 56:2
  58:7 63:12 66:14
  76:15 77:5 85:13
  86:3,7 91:10 96:7
  97:8 99:6 104:15
  109:23 116:14
  132:2 140:14
  145:15 149:12
  150:8 154:22,23
  156:7,9,22 163:10
  164:5 166:10
  168:24,25 170:16
  171:14 173:7
  180:3 181:10
  186:2 216:7 226:7
  252:16,25 253:13
  253:14,19,22
  254:14
**believes** 225:23
**belly** 21:17
**benefits** 37:24
**bergdorf** 144:25
  145:3,9 146:13,14
  175:10 176:2,9
  217:14,17
**best** 8:21 9:5 22:25
  48:2,23 146:21
  159:15 172:14
  180:2 210:19
**better** 13:6 14:25
  15:3 27:9 70:10
  74:17 161:14

**betty** 4:15 6:7
**bhutia** 2:4 260:3
  260:19
**big** 28:21 64:2,16
  116:9 124:10,11
  192:2 234:17
**billing** 105:10
  107:15 108:6
  109:10 235:5
**birth** 184:20
**bit** 105:15 173:6
  198:9 209:20
**blabbermouths**
  146:18
**black** 36:22
**blacked** 120:11,14
**blame** 135:10
**blanc** 13:4,7
**blood** 260:13
**bloomingdale's**
  6:9 9:22 10:3
  15:20,22 16:14,20
  16:23 18:17,21
  19:7,9 22:10 23:6
  23:18 24:16 26:4
  26:8 29:22 30:15
  30:21 31:6,8
  32:14 36:4,8 37:5
  37:8 38:15 39:8
  39:13,17 40:12
  43:22 44:2 46:24
  48:18 62:19 63:11
  63:16,24 64:6
  65:20 66:20 67:23
  71:21 74:24 77:10
  77:11,20 79:3
  80:18 83:23 84:2
  87:7,14 91:24
  94:25 97:12 99:9
  101:20 119:15
  122:10 129:14

  135:3,7 136:2,12
  139:9 145:20,21
  145:25 146:15
  147:12 149:10
  164:20 166:18
  167:25 168:11
  172:24 174:6
  175:21,23 176:14
  176:19 178:25
  181:16,25 182:17
  184:4,16 185:10
  193:7,8,22 199:13
  206:4,7,9,12
  207:16,23 208:10
  209:11 211:11
  212:11 214:11
  218:19 221:7,11
  221:13,15 222:6
  223:19 224:20
  225:19 228:22
  229:2 241:13
  245:24 249:21
  250:2 251:22
  256:5 261:4 263:1
  264:1
**bloomingdale's**
  1:8,9,9,10,10,11
  4:13
**blurry** 210:3
**board** 49:12
**bobby** 1:16 43:3
  47:14,19,23 49:9
  49:25 51:12 54:13
  138:23 149:12,16
  149:19 150:21
  173:6
**body** 50:11,11
  140:9
**bonus** 23:16 24:23
  25:2,18

**bonuses** 23:13
**book** 9:12 146:3
  190:5
**booker** 1:16 43:3
  47:15,19,23 49:9
  49:25 51:12 54:13
  55:3 56:18 57:12
  58:14,20,25 59:11
  60:13 138:24,24
  139:6,12,15
  149:12,17,19
  150:21 151:13,16
  156:14 173:6,10
**booker's** 57:22
  58:9
**born** 36:19
**boss** 57:23 58:3
**bosses** 57:25
**boston** 67:3
  186:18,19,24
  187:10,12,17
  244:22,23 246:4
  250:21 252:18,22
**bothering** 46:14
**bottom** 157:18
  168:5 170:9
**bought** 70:19 80:3
  141:19 142:5
  177:6 189:2
  246:17 249:4
**boutique** 46:23
  60:25 133:10
  210:16 244:22
  246:3 247:13
  252:18
**box** 158:21 201:20
**boyfriend** 61:3
  84:8,11 85:16
**boynton** 215:21
  243:16 244:3,6

**[brand - chanel]**

**brand** 13:11 15:3
16:9,9 61:25
**brands** 212:9
**break** 8:4,11,16,18
68:25 102:17,18
116:23 121:10,17
138:16 228:13
254:17
**breaking** 102:3
**breaks** 96:9 97:9
101:24
**briarwood** 81:23
225:16
**bring** 111:4
134:25
**bringing** 130:25
**broadway** 12:11
**brought** 29:23
233:2 234:25
**buddies** 247:25
**business** 186:19
210:18
**butt** 55:7,9,13
56:4 147:17
151:25 152:2,4,10
153:11 155:25
**buttocks** 147:13
151:22,24 155:4
**button** 98:3
**buy** 31:2 42:13
65:12 83:14 109:6
141:21 142:3,9,13
144:7 190:14,15
191:13,15,18
196:4 197:14,14
197:24 214:14
230:5,11 253:10
**buying** 71:17
83:16,17 106:13
109:17 130:12
132:24 133:12,15

136:6 144:3 183:9
191:21,23,25
203:10 205:13
**buys** 127:4

**c**

**c** 4:1 13:10,10
84:12 145:17
157:4,7 180:17
203:19 258:9
**ca** 261:9,12,20
**cabin** 4:14
**call** 10:9 42:5,6
108:17,25 132:12
135:18 145:10
155:7 208:23,24
**called** 12:6 13:4
34:6 39:25 106:4
106:10 114:19
126:2 135:4
140:16 142:23
155:3 161:17
170:2 209:5
210:16 238:20
242:11,12 247:13
**calling** 103:19
104:7 105:2
108:23 109:3,19
109:20 117:7
209:3 236:24
**calm** 96:17 142:20
**canceled** 134:14
**candidates** 217:21
**card** 108:10
117:14,15 119:5
119:10 120:9,17
123:16 134:15
135:7,13,17 136:2
137:16 212:10
213:6,12
**cards** 106:4
108:16,24,25

205:18,19 236:18
**care** 36:5 96:21
138:3 186:12
192:8
**carrots** 1:10
**carry** 215:14
**case** 6:11,14 8:13
93:2 147:22 172:9
172:11,16 173:18
173:24 174:16
175:7 183:23
184:2 186:3
188:22 208:18
222:23
**cash** 103:17,23
104:9 105:4,8
107:17 109:11
110:5,6,7,10 111:8
111:10 114:12
120:5 230:18,21
**castellani** 1:15
4:13 43:3 103:11
112:8,18 113:6,22
116:13 118:12
121:13,20 122:7
122:21 123:10
125:13 127:18
129:4,23 130:20
131:2,9 133:18,22
148:8,10,15 149:3
173:17 174:13
198:13 231:22
234:18 237:10
238:8 239:10,21
**castellani's** 125:2
187:25
**cathy** 10:10 43:17
43:18 48:10,13,14
48:21 76:10,14,17
99:14 125:10
131:4 134:2

142:17 144:20
149:22 150:4,11
150:12,24 151:4
191:20 192:16
**cathy's** 76:24
**causes** 34:17,24
35:4
**causing** 137:17
**cc** 192:2 238:24
239:2,7 259:14
**ccp** 261:9,12
**cell** 186:18,19,23
210:17
**cellphone** 247:8
**cent** 236:15
**centered** 127:10
**certain** 62:13,15
66:24 190:6
**certificate** 169:4
**certification** 3:6
260:1
**certify** 260:5,11
**cetera** 33:19
137:16 230:11
**chairs** 102:12
**challenge** 240:10
**chance** 7:14,17
9:12 16:12
**chanel** 10:5 16:8,8
16:17 17:7 18:10
18:11,15,25 19:5
20:22 22:18 24:8
24:9,17 25:17,21
26:18,23 27:23
28:8 29:23 30:9
30:10,12,13,21
31:25 37:23 38:2
42:19 43:20,23
44:13,14,25 46:23
50:6 51:17,19,22
52:19 53:12 54:16

Kristina McCarthy Vega
March 8, 2022

[chanel - company]

62:2,4,17 63:20,21
63:23 64:2,17,20
67:4 70:19 71:17
77:19 83:6,14,16
85:12 145:4 146:5
146:13 149:23
150:5 181:23
182:6,10 183:7,9
183:12,15 195:23
205:9,24 212:8
216:10 217:9,16
221:7,9 222:6
223:17,24 226:6
234:10 243:2
245:12,23,25
247:14,15,23
248:12
**change** 26:7 37:24
198:25 199:4,8
245:11 263:4,7,10
263:13,16,19
**changes** 264:6
**changing** 117:24
**charged** 120:17
**chase** 82:20
**chat** 254:17
**cheated** 255:13
**check** 78:23 105:9
107:8 230:14
**checked** 71:13
110:11 114:11,11
**cheery** 87:22
**chest** 56:6
**chief** 225:12
**child** 34:21 36:19
86:19
**children** 28:5
**chine** 13:4,7
**choice** 227:10
**chose** 35:17

**chris** 43:3 103:11
103:18,18 104:2
112:8,17 113:6,21
116:12 125:2
126:18 127:17
129:3,23 130:20
133:18,22 148:8
148:15 149:2
173:17 174:12
229:17 231:22
233:13 234:17
237:9 238:8 239:9
241:25
**chris's** 187:24
**christina** 203:16
203:18
**christopher** 1:15
4:13
**chumo** 199:21,25
200:3 201:8
**cio** 1:13
**circumstances**
81:9
**citi** 82:20
**city** 76:15 77:6
85:22 255:19,20
255:24
**civil** 1:6 2:7
261:19,20
**clarification** 8:12
**clarify** 192:11
**clayton** 84:12,14
84:20
**clear** 22:8 74:8
150:19 160:21
235:13
**clearly** 237:21
**client** 13:25 14:2
63:18,19 64:25
117:15 135:15
136:5

**client's** 107:14
**clients** 106:23,24
107:7 114:15
128:5,20 256:5
**clock** 159:12
**closed** 12:16 27:13
**closest** 236:7
**closet** 102:10
210:11,16 244:22
247:14 250:18
**closing** 10:6 16:6
**clothes** 76:11
**clothing** 18:23
250:12
**code** 40:2,5 41:7,8
41:11 107:19
211:25 261:9,12
261:19,20
**coeur** 4:14
**cohen** 176:8
**colleague** 251:6
**colleagues** 67:8
78:7 87:10
**college** 10:21,22
10:23,25 11:4,5,12
**combination**
34:22 50:15 51:6
85:14
**come** 10:2 42:13
50:21 54:5 67:16
87:21 89:17 90:9
90:10 91:20 96:6
97:7 99:18 101:23
106:14 120:11
125:23 134:17,18
135:5,19,19 144:2
146:17 152:24
155:8,12,15,21,24
159:5,8,13 183:4,7
201:6 226:12
237:21

**comes** 41:19
126:18 153:3
186:13 214:10
**comfortable** 94:21
103:21 139:24
**coming** 12:8 50:3
87:18 89:19 92:24
93:20 99:23
109:15 133:16
135:3 158:20
**comment** 53:5,7
147:13 152:13,16
152:20 153:10,13
153:16 154:18,21
158:21 160:24
**commented**
147:16 151:23
**commenting**
151:21
**comments** 55:16
59:11 139:14
140:8 152:6 218:8
218:11
**commission** 13:2,6
17:8,9,19 23:11
24:16 25:23,25
26:24 29:10
**common** 71:20,23
79:13 181:15
**communicated**
70:16
**communication**
70:25
**companies** 85:9
**company** 13:4
105:17 122:9,9
123:16 124:19
149:17 167:6
193:25 196:19
212:6

Page 8

[company's - counsel]

company's 235:4
compensated
17:16
compensation
23:8,13 69:10
competition 47:11
complain 58:9
complaint 147:21
147:23 148:6,14
149:22 163:15
169:14,24 225:12
complete 264:8
completed 97:6
261:7,17 262:6
completing 189:12
completion 262:10
compliant 258:8
comply 193:24
207:16
compromises
205:19
computer 72:4
229:4
concerned 109:13
concerning 109:16
concerns 121:21
conclude 61:12
condition 35:21
190:24 242:5
conduct 36:8 40:2
40:5 41:7,8,12
52:7 56:7 58:9
139:6 151:15
173:7 195:16
211:25 233:16
conducted 247:3
conduit 246:2
conference 1:19
2:3
confirm 12:2
240:13

conflict 208:20
confused 95:5
159:23 164:7
198:15
confuses 206:5
confusing 49:6
congratulations
88:14
connection 173:24
175:7 188:3,21
connective 106:18
consider 149:2
considered 64:9
64:13 65:17
189:17
consistently 185:8
constituted 190:19
contact 48:14,20
55:3 98:11 117:15
129:13 131:12,19
241:6 253:25
261:9
contacted 98:8
contacting 132:6
containing 240:7
content 7:13 233:4
242:13
contents 193:24
context 235:19
245:19
continue 91:4
235:3
continued 235:3
258:25
contractor 85:7
conversation 7:13
60:11 92:4,16
95:5 112:8 113:6
113:13,19,25
114:2,16 116:12
122:4,24,25

123:12 125:14,18
127:10,17 128:9
134:2,10 139:18
139:21 140:2,19
141:8,16 143:6
144:2,13 153:6
170:4 171:7
172:21 173:23
174:3,21 175:5
198:21 233:15
238:13 241:5,23
242:6,13 246:13
251:9,12,14,24
conversations
7:21 56:3 103:10
111:18 113:2
122:6,21 136:8
173:15 241:16
converted 24:8
convey 230:12
239:14 242:6
cooperation 257:6
copied 223:7
copies 19:17
copy 39:19 98:18
98:21,22 193:21
194:3 209:15,17
221:2 239:4
correct 9:24 15:21
16:15 20:12,13
24:18,25 25:16
26:2,5,14 29:18
30:5 31:4,5 32:2,3
32:15,16 33:5
38:21 40:13 41:5
43:23 44:3,11,23
45:21 47:25 54:19
55:21 59:8,9 61:6
61:25 62:20,23
66:7 68:3,15 70:4
70:22 71:5 77:3

85:25 89:15,16
96:12 97:18 101:4
101:8,21,25 102:9
102:19 107:2,24
112:15,16 113:24
122:22,23 127:7
127:19 128:11,22
129:6 130:15
131:23,25 132:18
147:11 150:7
153:17 156:15,18
156:21,23 162:24
164:16 166:14,15
167:8 169:4,8
170:5,21 176:6,10
177:10 179:13
180:22 185:11,12
190:14 196:12,14
198:6 199:2,9
204:11,19 207:20
213:4,8 214:16
216:18 218:22,23
221:4 222:11
223:22 224:4,20
227:13 229:14,15
233:12 234:4
240:9,11,21
243:22 249:22
253:22 256:8,9,21
264:8
corrections 261:14
261:15 262:3,4
264:6
correctly 98:20
141:11
cosmetic 182:22
cosmetics 183:7
cost 239:13
costello 174:7
counsel 2:8 3:4
6:10,12 8:4 9:11

[counsel - definitely]

32:9 48:25 116:11
148:6 171:4
185:15,16 249:15
261:18,21 262:7
**counseled**  158:10
**counseling**  157:9
157:11,16 158:7
**counter**  51:3
249:2
**couple**  45:17
86:14 123:6,8
125:17 165:23
209:13 233:19
249:11
**course**  11:8 54:4
103:24 110:5
111:9 127:16
172:12 185:13
233:14 239:15
**court**  1:1 3:16 5:6
5:17 6:11 7:4 9:8
44:7 48:24
**cousin**  200:11
203:18
**cover**  36:13,24
196:22
**covid**  27:12 33:15
33:17
**coworkers**  70:9
**crap**  115:3
**credit**  108:15,24
108:25 119:5,10
120:9 123:16
135:17 213:6
**creve**  4:14
**crystal**  244:5,10
**currently**  10:15,16
26:16 33:21 36:2
38:8
**customer**  62:16
105:9 197:24

**customers**  28:17
28:18 31:4,12
63:15 65:11 109:5
129:18 135:2
196:3
**cv**  1:7

# d

**d**  1:9,10,11 13:10
15:8,8 45:10,11
159:24 160:2,5
176:16 254:4
258:1,10 259:1
**d11**  201:18
**dahan**  176:16
**daily**  48:19,22,22
151:7
**dallas**  116:3
117:19
**damaged**  190:25
191:5
**damages**  183:20
**dash**  174:7,19,24
**date**  88:6,7 92:6
113:8 115:17
132:13 147:25
151:11 157:8,15
157:19 160:3
163:17 165:9,21
166:21 167:21
168:19 171:3
172:3 185:24
189:11 193:10
195:15 206:23
208:16 209:10
211:9 212:15
214:5 217:4
219:11 220:11,25
221:24 225:4
228:24 229:13
233:24 235:24
238:7 239:3

240:17 242:24
244:17 245:15
246:21 248:8
250:10 252:7
261:16 262:5
263:24 264:12
**dated**  166:16
169:4 217:11
**dates**  160:8 169:2
**daughter**  101:14
186:13
**davade**  15:8
**david**  4:17 6:12
43:8,9 104:15
110:17,20
**day**  10:13 22:22
36:22 38:20 54:4
54:10 86:21 87:13
89:22 96:7 131:11
132:7 151:10
154:10 161:18
165:5,5,8 183:25
260:16 264:15
**days**  18:7 37:10
39:4 227:22
**dd**  240:16,18
259:15
**de**  13:4,7
**deal**  21:2 64:16
111:24
**dealer**  247:16
**dealing**  104:20
151:3 174:21
**december**  26:19
83:18 132:25
**decide**  126:24
**decided**  19:5
123:3 144:9
**decides**  95:24
**decision**  15:4
141:18 142:10,16

143:2 146:7
256:17
**declare**  81:13
264:4
**declined**  117:14
117:16
**deduce**  61:7
**deemed**  264:6
**deeply**  50:4
**defendant**  154:15
154:25
**defendant's**
115:16 147:24
157:7 160:2
165:20 166:20
167:20 168:18
172:2 185:22
189:10 193:9
195:14 206:22
208:15 209:9
211:8 212:14
214:4 217:3
219:10 220:24
221:23 225:3
228:23 233:23
235:23 238:6
239:2 240:16
242:23 244:16
246:20 248:7
250:9 252:6 258:6
259:2
**defendants**  1:17
4:8,12
**defending**  6:14
**definite**  245:15
**definitely**  16:10
49:22 110:21
121:24 134:17
154:21 155:22
194:12 197:19
210:7 248:21

[definitive - disturbance]

definitive 231:10
degree 10:18,21
  148:16
delaware 180:15
  244:14
demanded 198:13
demanding 198:20
  198:24
denied 197:4,10
  255:23
denis 45:7,9,12
  46:4 47:17 48:5,6
  48:8 49:10,10,11
  51:18,21 56:23,24
  57:9,12,18 59:5
  71:12,13,16 74:14
  75:7 88:6 92:20
  95:6 125:7 130:10
  130:13,17,24
  134:2 150:23
  151:3 157:10,25
  160:20,24 162:2
  163:2,21 164:2,14
  172:13,15 191:17
  192:17
dennis 1:14
deny 195:10
  204:15
department 1:13
  4:12 10:5 14:9
  16:17 18:22 26:5
  32:2 46:5 51:18
  52:25 77:19 78:18
  141:25 145:5
  149:24 150:6
  151:4,8 166:4
  167:25 182:15,16
  182:18,24 183:16
  198:4 230:4
  245:12,13

departments
  182:3,19
depended 191:10
depending 163:3
deponent 264:3
depose 68:19 73:6
deposed 7:10
deposit 82:8
  230:14
deposition 1:20
  2:1 3:6,13 5:21
  7:16 8:14,20 9:7
  54:4 261:19,22,24
  262:8,10
derek 4:3
dereksmithlaw.c...
  261:2
derkovorkia
  179:18
description 258:6
  259:2
designer 12:8
designers 61:15
detailed 118:13
details 181:8
  185:16
determined
  261:18,22 262:7
diagnosed 227:14
diagnosis 228:4
diana 145:19,19
  145:20 146:6,11
  146:18,21 175:19
  175:25 218:9,11
  219:5
diaz 1:14 45:8,9
  45:12 46:4 47:17
  48:5,9 49:10
  51:18,21 56:23
  57:9,12 59:5
  71:12,16 75:7

95:6 125:7 130:10
  130:17,24 134:3
  150:23 157:10,25
  162:3 163:2,22
  164:14 172:13,15
  191:17 192:17
diaz's 71:13
different 24:10
  38:19 72:7 80:14
  80:15 81:2,2,3
  82:19,25 83:2
  103:20 104:25
  105:3 108:15,21
  108:22,24 110:2,3
  117:4,6,7 127:12
  190:21 197:21
  231:16 239:11
  253:12
differently 51:25
  57:7
difficult 46:25
difficulties 257:8
difficulty 226:14
  226:21
dikila 2:4 260:3,19
dim 186:7
dior 26:16 29:2,4
  29:5,6,8 33:22
  38:7 61:15 62:21
  62:22 65:2,4
diploma 10:19
direct 44:12,15
direction 41:20
directly 64:2,18
  74:9 91:12 140:2
director 43:19
  145:17 149:23
  233:25
disability 91:25,25
  94:18,19

disagree 138:11
disbelief 142:22
discharge 185:8
disclosure 171:25
  172:6,8,9 258:15
discount 67:12
  212:5,10,11,17,20
  212:24,25 213:7
  213:10,12,13,16
  214:9,10,15
  219:22 222:15
  224:8 229:22,25
  230:5,7 233:16
  238:10
discounted 191:9
discoverable
  172:10
discretion 176:21
  190:6 191:12
  197:11,21
discrimination
  39:9
discriminatory
  136:13
discuss 132:13
  240:2
discussed 173:12
  234:19,23 237:13
discussions 111:17
dismissed 44:2
disorder 227:15
  228:5
dispute 253:2
disrespectful
  138:3
distinction 40:20
distress 183:20
district 1:1,2
disturbance
  226:16

Atkinson-Baker, A Veritext Company
(818) 551-7300                                    www.veritext.com

**[dit - estimating]**

dit 153:12
diversion 61:18,23
  62:5,22,25 63:8,9
  64:2,5,10,12,18
  65:2,5,8,17 205:23
  206:3
diverter 61:19
  66:2,6 198:2
  204:18 206:6,10
  206:13 213:15
  216:8,17 238:12
doctor 30:11 36:9
  36:10 95:22,23
  96:13,14 97:21,23
  101:22
doctor's 167:11
  169:3
doctors 90:25 92:8
document 39:25
  115:12,15 157:22
  165:25 168:7,14
  169:13,24 172:5
  189:13 190:4
  193:6,12,13,16,20
  195:18 197:15,17
  197:18,20 207:19
  211:17 228:21
  229:9 233:5 258:7
  259:10
documentation
  31:13 41:10
  169:15 212:18
  231:2
documents 31:18
  31:20 121:6
  156:25 165:6,24
  197:22 198:7,8
  213:22 220:7
  228:14
doing 12:24 14:3
  49:25 59:17 71:11

71:21 104:4 106:6
  106:9 110:4
  111:13 114:21,25
  129:19 133:8,10
  135:21 179:9,12
  179:16 180:9
  181:13,18 211:11
  218:20 251:16,25
  255:13
dollars 24:23 81:6
  82:2
door 52:9 92:11
dorothy 119:19
double 191:8
doubt 252:12,14
  252:19,23
downstairs 113:15
dr 96:15
draw 17:10,14
  23:11
dress 42:14
drive 117:22
  215:17
drug 35:20,20
due 94:19 255:15
duly 5:2 260:7

**e**

e 4:1,1 13:10,10
  14:16 15:8 19:21
  21:9,11,19 45:10
  53:20 74:20 79:5
  81:18,18 96:17
  98:13,17 112:3
  132:15 145:15
  165:20,24 167:3
  172:20 180:17
  209:4 234:2 236:3
  239:8 240:19
  241:2,24 242:9,11
  254:4 258:1,5,11
  259:1 261:9,12

262:1 263:3,3,3
earlier 128:12
  149:24 151:9
  159:13 177:3
  193:19 204:8
  227:17 242:17
early 47:7 159:12
  161:13 205:6
earned 83:22
easier 109:21
easy 101:10
  205:10
eat 86:23 161:13
edith 118:24
edress 188:24
  189:2
education 11:5
ee 242:21,23
  259:16
effect 3:15
eight 20:3,15
  184:16
eighteen 11:15
either 21:6 125:14
  132:2 136:15
  153:21 202:6
  220:3
elaborate 27:17
  55:5 79:22 148:12
elbow 153:25
  154:4,5,8
eleanor 53:16
  87:10 176:16
  177:5 181:20
  182:4,5
electrician 84:16
  84:17,24 85:5
eligible 23:12
emotional 183:20
  183:24

empire 85:10,10
employee 6:8
  40:11 102:4
  119:12 154:15
  197:2 222:5 224:2
  233:16 245:25
employees 129:18
  155:2 170:15
  181:21 182:6
  194:4 196:6
  206:10 230:8
  236:5
employment 11:13
  16:19 100:21
  172:23 221:17
  241:12,13 245:17
encouraged
  156:11
ended 49:22
ensure 196:16
entering 144:25
entities 61:22
entitled 2:2 7:24
  8:21 101:16
  232:25 255:12,21
  255:25
environment 27:4
  30:18
episode 247:17
er 177:7
eric 146:16,16
  175:9 218:8,25
  234:2
errata 261:14,16
  262:3,5
esq 4:5,10,15
  261:1
estimate 45:24
  54:12 210:20
estimating 9:3

**[estimation - feeling]**

| | | | |
|---|---|---|---|
| **estimation** 173:18 | **excited** 16:10 | **exhibits** 259:22 | 199:7,8 207:3,9 |
| **et** 33:19 137:16 | **excuse** 158:16 | **expected** 208:22 | 225:25 228:7 |
| 230:11 | **executive** 198:4 | 247:8 | 232:3 242:5 |
| **ethics** 29:23 | **exhibit** 115:9,12 | **expense** 84:3 | **facts** 71:24 155:18 |
| **evaluate** 184:8 | 115:13,16,20 | **expensive** 80:10 | 189:16 253:2,3,13 |
| **evasion** 143:5,25 | 116:9 121:6 | 80:13 | **factual** 175:5 |
| 239:13 | 147:21,24 157:4,7 | **experience** 38:19 | **fair** 35:13 61:21 |
| **evelina** 81:18,20 | 159:24 160:2,4 | **experienced** 65:6 | 131:4 138:13 |
| **events** 8:23 124:22 | 163:14 165:20,24 | **experiencing** | 209:7 |
| **eventually** 37:10 | 166:17,20 167:3 | 158:19 | **familiar** 106:17 |
| 89:14 136:10 | 167:18,20 168:15 | **explain** 94:12 | 107:9 |
| **everybody** 52:3 | 168:18 169:25 | 107:12 236:10 | **family** 179:6 |
| 56:11 63:13 71:21 | 170:10 172:2,5 | **explained** 135:25 | 186:14 199:22,23 |
| 72:2 75:6 129:17 | 185:19,23 189:6 | **explanation** | 231:13 |
| 129:18,19 133:9 | 189:10 192:21 | 218:18 | **far** 49:14 69:9 |
| 133:10 249:25 | 193:9 195:11,14 | **extent** 90:15 | 95:16 102:22 |
| 256:4 | 206:22,25 207:2 | 256:10 | 150:13 |
| **evidence** 76:24 | 208:12,13,15 | **external** 104:20,21 | **fast** 106:13 |
| 83:5 92:15 134:11 | 209:9,11 211:5,8 | 104:22 | **faster** 209:19 |
| 146:7 147:3,5,7,10 | 212:14,18 213:25 | **extra** 96:8 97:9 | **favor** 251:16,25 |
| **exact** 22:23 46:7 | 214:4 216:25 | **extremely** 87:18 | **favorite** 16:9 |
| 59:23 85:8 110:11 | 217:3 219:10 | 89:19,20 142:21 | **fax** 167:23 |
| 178:20 208:2 | 220:21,24 221:20 | **eyes** 50:4,14 | **fbi** 77:17 |
| 230:24 | 221:23 224:25 | | **february** 19:11 |
| **exactly** 49:15 82:3 | 225:3 228:23,25 | **f** | 22:11 78:15 86:7 |
| 88:7,9 118:7 | 233:21,23 235:14 | **f** 44:22 79:5 84:13 | 88:8 133:4 157:13 |
| 139:25 143:17,22 | 235:23 237:6 | 166:17,20 180:17 | 163:20,24 164:8 |
| 153:14,15 154:12 | 238:3,4,6 239:2 | 182:18 258:12 | 164:12,15 184:24 |
| 215:25 216:5 | 240:16,18 242:21 | **facebook** 11:25 | 205:2 210:10 |
| 220:20 240:13 | 242:23 244:16,18 | 15:10 | 229:21 234:13 |
| **examination** 5:14 | 245:20 246:20,22 | **fact** 65:19 66:22 | **fed** 255:14 |
| 258:2 | 248:7 250:9 252:4 | 68:11 69:20 71:25 | **federal** 2:6 255:7 |
| **examined** 5:3 | 252:6 258:7,8,9,10 | 93:6 96:2,10 | 262:1,8,9 |
| **example** 83:22 | 258:11,12,13,14 | 99:10 112:14 | **fee** 248:13 |
| 198:2 | 258:15,16,17,19 | 127:10 128:13 | **feel** 34:9 54:14 |
| **exceeded** 192:23 | 258:20,21,22,23 | 135:23 145:22 | 55:10 56:20 59:2 |
| **exceeding** 193:2 | 258:24 259:3,4,5,6 | 157:17 160:23 | 90:7 103:21 |
| **exception** 197:16 | 259:7,8,9,10,11,12 | 165:15 166:22 | 139:12,24 153:2 |
| 198:5 | 259:13,14,15,16 | 168:7,20 170:4 | **feeling** 89:24 90:3 |
| **excessive** 226:22 | 259:17,18,19,20 | 185:15 189:20 | 91:18 159:5 |
| | | 193:12,13 197:8 | |
| | | 198:16,22,25 | |

Atkinson-Baker, A Veritext Company
(818) 551-7300                                   www.veritext.com

**[fees - g]**

| | | | |
|---|---|---|---|
| **fees** 185:14,16 | **firing** 131:16 | **follow** 40:11,21 | 236:20 237:8 |
| **felt** 29:24 46:20 | 142:14 | 96:2 131:13 197:2 | 245:21 |
| 56:13 58:25 89:23 | **first** 5:2,20 11:13 | 197:9 | **frauds** 237:24 |
| 90:5,11 104:23 | 16:22 23:21 45:22 | **followed** 235:4 | **fraudulent** 114:7 |
| 105:11 106:12 | 49:2 86:5 87:8,9 | 236:16 238:15,18 | 114:9 122:16 |
| 132:20 138:25 | 88:3,6 90:10 | **following** 196:20 | 124:2,18 127:8 |
| 139:10,16 151:15 | 92:20 96:18 112:9 | **follows** 5:4 261:8 | 135:17 137:21 |
| 161:14 173:10 | 112:24,25 113:5,9 | **followup** 238:14 | 204:25 |
| **female** 91:6,8 | 113:12,18 116:2 | **food** 84:4 | **frcp** 262:1 |
| 188:19,20 | 116:12 121:14 | **force** 3:15 127:22 | **free** 129:12,16,17 |
| **females** 147:18 | 122:2,25 123:12 | 232:16,19 | 178:22 179:13,21 |
| **ff** 244:16,18 | 124:25 126:12 | **forced** 127:20 | 180:7 181:10 |
| 259:17 | 144:3 154:9 | 128:8,17 232:9,15 | **frequently** 155:3 |
| **fifteen** 85:2 | 164:24 165:4 | **foregoing** 264:5 | **fresh** 5:13 |
| **fifth** 4:8 11:16 | 172:7 199:19 | **forgot** 52:9 | **friday** 36:22 |
| 13:5 14:5 16:7 | 209:13,22 218:5 | **form** 3:9 115:24 | **friend** 18:9,14 |
| 17:2 | 218:20 | 120:3,4 157:10 | 67:15 72:25 73:2 |
| **fight** 28:13 30:16 | **fishy** 110:8 | 158:7 166:13 | 73:5,11,17,24 |
| **figure** 43:13 208:9 | **five** 8:22 10:16 | 167:7 | 145:2 215:24 |
| **figured** 171:22 | 68:24 71:18 79:5 | **formal** 160:6 | 216:4,16 243:22 |
| **file** 71:13 93:4 | 79:8,23 84:22,22 | **former** 245:25 | 251:16 254:8,10 |
| 163:9 | 120:22 127:12 | **forth** 25:13 215:17 | **friendly** 56:18 |
| **filed** 148:6 | 170:11,15 210:23 | 239:9 260:7 | **friends** 67:22 |
| **filing** 3:5 | 228:14 239:11 | **forty** 1:9 22:15,17 | 108:17 109:15 |
| **fills** 95:23 | 254:16 | 84:22 | 145:20 146:16,21 |
| **final** 146:6 | **flag** 110:2 123:19 | **forward** 95:22 | 231:13 256:10 |
| **finally** 132:10 | **flagged** 123:17 | 159:19 | **front** 51:19,24 |
| **find** 34:2 41:3 | **flags** 42:10 | **found** 16:19 49:25 | 56:16 153:21 |
| 74:17 140:12 | **flirtatious** 50:7,8 | 87:13 163:25 | 158:3 170:23 |
| **fine** 15:12 63:4 | 50:10 | 208:23 229:21 | **frontal** 50:25 |
| 110:15,16 120:22 | **flma** 92:8 | **fountain** 84:12 | **fulfilling** 236:25 |
| 174:5 | **floor** 4:8 51:4 90:8 | **four** 63:19 185:3 | **full** 11:13 |
| **finish** 10:22 | 90:9,11 91:11,12 | 196:9 246:17 | **functions** 34:23 |
| 164:23 237:15 | 101:3,9 102:3,9,12 | **fourteen** 45:20 | **further** 3:8,12 |
| **finished** 10:24 | 102:13,15,18,19 | **fraud** 31:25 41:20 | 100:20 132:13 |
| 113:15 125:20 | 107:17 119:6,6 | 42:10,20 77:18,23 | 242:3 260:11 |
| **fire** 39:14 | 125:22 241:14 | 78:3 105:16 | |
| **fired** 131:15 133:3 | **flushing** 186:8,9 | 106:15 122:8 | **g** |
| 133:12 184:5 | **focus** 42:20 124:6 | 135:9 136:4,5 | **g** 167:18,20 179:25 |
| 218:18 | **folks** 181:9 | 183:15 205:19 | 181:2,4 188:18 |
| | | 234:2,22 236:4,10 | 258:13 |

[gathering - guys]

gathering 222:22
223:9
gdb 1:7
gender 180:20
general 34:23
124:15 198:3
gerber 4:7,10 6:12
getting 26:23
28:10 30:15,23
35:15 40:22 46:13
73:21 91:21 92:8
110:9 111:10
119:2 131:15
187:11 188:9
205:24 236:19
gg 246:20,22
259:18
gift 68:8 71:20
72:15 73:3 179:5
179:5 213:3
gifts 66:15,25
80:15 85:19
128:20,25 177:24
178:11 179:8
231:12
giorgio 14:4
girl 21:16 52:14,15
52:16,17 250:17
250:23
give 9:2 16:11 20:3
45:23 51:20 52:24
69:8 81:25 94:16
96:13 99:5 101:12
101:15 120:19
130:5,18 141:13
143:15 144:16
154:7 158:16
161:13 179:9
192:18 200:6
204:17 209:20
225:19 227:5

230:19 231:9
248:24
given 39:19 68:13
69:21 92:23 96:10
99:4 100:18
163:11 209:15,17
260:9 264:9
gives 41:19 81:3
giving 41:6 80:20
80:23 81:5,10,12
104:25 109:22
119:6 157:10
218:17 246:14
248:19
go 12:5,24 14:24
15:4,20 16:6
18:10 19:5 20:22
27:4,8,10,20 28:9
28:24 33:16 34:7
36:14 38:15 43:5
49:17 58:8 59:20
59:22 88:15,17
89:5,6,8,10,21
90:2,9,12,19,25
92:21 93:2,6,17,18
95:11 100:13
102:4,10,15
103:23 104:11
109:7 112:25
116:16,21 131:21
142:24 148:4
153:5 159:24
162:8,11,22 163:4
177:3 184:22
204:13 209:13,18
220:19 222:20
223:3 226:5,12
228:13 252:2
god 55:16 87:20
goes 28:23 34:11
221:8

going 8:2 9:11
20:19,21 31:25
32:7 34:7 40:21
42:4 47:3,4 50:6
68:23 77:18 87:13
90:8 91:2 95:21
108:12,13,21
109:23,25 110:2,4
110:6,7 111:8,9
115:7,11 117:3
121:23 124:5
129:13 146:9
147:20 159:4,4,8
159:18 160:4
163:14 165:24
167:22 171:23
172:4,5 177:20,21
177:22 178:21
179:13,21 183:15
184:6,14 185:19
195:11 198:8
200:14,15,16
206:24 209:13,25
213:19 216:14
217:21 219:7
220:21 221:20
225:15 228:25
229:21 230:7
233:20 235:21
238:3,9,24 239:5,8
242:20 244:18
245:14 246:23
248:4 250:6
good 5:16 9:20
13:25 20:20 36:13
67:12 69:2 80:24
83:25 87:15,24
90:7 91:18 145:2
146:3,15 152:2,5
153:11 159:6
192:6 229:23

goodman 144:25
145:4,9 146:13
175:11 176:2,9
217:15,17
gotten 134:24
209:21
government
255:12
grab 55:7
grandmother
80:20,23 81:10,25
82:5 85:17 230:11
230:12 231:4
grandmother's
81:17
granted 96:11,12
gray 112:20
188:13 197:12,12
233:10
great 19:2 192:7
greystone 176:11
grievance 171:16
174:22 220:8
grieve 171:12
group 4:3 42:24
97:2 115:13,20
118:12 217:12
guard 52:8 154:23
guess 8:25 14:13
83:8 107:18
109:22 114:24
142:23,24,25
160:19 198:15
221:9
guessing 147:9
guidelines 196:21
guiterrez 175:9
guy 104:16 119:3
126:11 174:20
guys 6:4 31:15
61:16 104:3,4,21

Atkinson-Baker, A Veritext Company
(818) 551-7300                                    www.veritext.com

**[guys - hours]**

114:9,10,14
120:19 134:20
229:6 250:21
251:5,21
**gyn** 96:20,22

**h**

**h** 5:1 13:10 18:18
81:19 96:19
168:15,18 176:16
179:24,25 181:2
258:5,14 263:3
**habit** 194:20 250:2
**half** 11:3 12:21
32:14 225:18
**hampshire** 66:15
71:4,9,15 72:11
180:15 187:6,9,12
187:13,18,20,21
187:23 200:15,17
200:21 201:3,10
215:22 219:23
239:12 244:14
248:13,15
**hand** 124:25 218:5
260:16
**handbag** 10:5
16:17,17 18:24
28:11 30:16 42:14
47:6 145:18 205:9
245:25 247:9
248:12
**handbags** 17:20
17:23 19:2 24:19
24:20,21 30:15,22
32:2 42:19 43:21
43:23,25 44:13,14
44:25 47:2,8,11
53:12 62:13 63:18
63:19 64:4,22,24
85:13 144:4 145:5
149:23 150:5

151:4 189:21
190:8,12 192:22
195:24 196:2,4,9
198:10 216:11
221:7 222:6
223:18,25 234:10
243:12 245:12,23
247:14,16
**handbook** 39:17
40:15,16,19,22,24
193:20,22,24
194:4 195:17
209:12 211:23
**handed** 163:6
247:6
**handle** 29:25
**handled** 261:8
**hands** 50:15,17
55:24 192:5
**handwriting**
119:21,23,25
219:18 220:4
**hang** 50:11
**happen** 53:2 120:2
147:8 155:19,23
**happened** 114:2
132:7,23 136:12
147:3,6,10 155:18
155:20,22 159:20
175:21 176:13
218:4
**happening** 105:7
**happens** 16:12
34:19
**happy** 19:4 27:20
145:8
**harassing** 46:20
47:15 139:11
173:11
**harassment** 39:9

**hard** 28:11,19
89:23 171:17,21
**head** 42:17 250:21
**headaches** 228:4
**headquartered**
48:16
**health** 33:12,18,23
34:2 35:6,21 97:4
**healthcare** 166:12
167:7
**hear** 84:17 113:3
126:8 129:11,21
132:4 218:10
**heard** 218:13
**hearing** 61:18
**heart** 226:15
**heidi** 145:14,14,14
145:16 176:4
**held** 2:3 154:5
**help** 163:20
225:24
**help's** 140:24
**helping** 161:19
**henry** 176:24
182:23
**henry's** 182:8
**hereto** 3:5 264:7
**hereunto** 260:15
**hermes** 67:21
**hey** 155:21 223:23
**hh** 248:4,7 259:19
**hickman** 116:3
118:23 119:18
**high** 122:12
170:13 234:22
236:11 237:25
240:4 246:3
247:13
**highest** 105:16
122:8 124:18
237:8

**hire** 20:21 145:23
146:24,25 212:18
218:17
**hired** 20:11 48:13
146:2 150:5
221:16
**history** 78:24
107:8 196:15
225:22
**hit** 23:15,20,22
24:4,4,6,22 25:5,6
25:7,8,14,19 27:12
33:15 98:3
**hold** 53:25 123:19
153:25 154:3,7
158:23 159:2
171:20,21 192:19
197:19
**holiday** 46:9
**holidays** 46:8
**home** 5:19,22 41:4
80:4,5,8,13 131:21
166:5,24 168:22
186:22 194:15
214:21 215:4,12
215:13,15 255:5
**honest** 253:4
**honestly** 17:13
46:10 139:20
152:7
**hong** 13:11
**hoping** 206:25
**hose** 41:20
**hot** 171:8
**hotdog** 87:16
**hour** 17:18 25:23
25:24 29:9 68:24
96:7 97:7,8
**hourly** 25:22
**hours** 22:16 28:3
32:8

[house - interviewed]

| | | | |
|---|---|---|---|
| **house** 41:3 98:24 187:19 214:11 246:18 | 246:8 252:21 253:19,21,23 **identification** 115:17 147:25 | 153:8 173:8,11 249:21 **inappropriately** 46:21 47:10,13 | **initially** 44:10 **injuries** 183:22 **injury** 183:21 **innuendo** 151:16 |
| **houser** 141:2 173:21 186:3 | 157:8 160:3 165:21 166:21 | **incident** 43:7 112:10 132:7 | **innuendos** 151:14 **input** 107:20 |
| **hr** 58:5,8 88:15,18 88:20,25 89:5,6,7 89:9,10 90:12,16 90:19 91:5,12,12 92:4,16,17,22 93:2 93:6,18 95:2,6,7,8 97:12,20 98:19 100:14 111:23,25 118:17,19 131:11 132:4 145:11 158:6 160:15,17 162:4,8,11,22 163:3,6 164:25 208:18,23 209:5 238:9 | 167:21 168:19 172:3 185:23 189:11 193:10 195:15 206:23 208:16 209:10 211:9 212:15 214:5 217:4 219:11 220:25 221:24 225:4 228:24 233:24 235:24 238:7 239:3 240:17 242:24 244:17 246:21 248:8 250:10 252:7 | **incidents** 60:19 **included** 192:10 192:12 261:14 262:3 **including** 51:18,18 **income** 80:19 **inconvenience** 231:17 **incorrect** 167:15 187:15 **independent** 179:7 **index** 258:25 **indicating** 50:22 130:3 154:2,8 **indication** 88:22 **indicted** 77:22 | 120:9 **inputting** 236:18 **inquired** 208:19 **insane** 106:10,16 **instances** 60:17 112:21 158:13 **insurance** 33:21 36:12,23 37:2,4,11 37:14,17,21 38:2,4 38:8 **intent** 33:16 213:14 **interaction** 103:12 114:22 172:14,22 **interested** 260:14 **intermittent** 165:3 166:11 168:23 169:7 |
| **hudson** 27:5 29:4 **hug** 50:21,24 52:23 154:3,7,9 **huge** 28:12 | **identify** 43:11 52:6 87:2 110:21 **idress** 254:2,4,9,14 **ii** 250:7,9 259:20 | **individually** 1:15 1:15,16,16 **ineligible** 213:11 **inform** 122:7 | **internal** 104:22 211:17 236:3 239:8 |
| **hugged** 52:5 54:13 153:21 | **illegal** 249:23 **illness** 225:23 **immediately** 10:12 | **information** 68:13 68:16 107:15 119:3 120:10 | **interrogatory** 185:20,21 258:16 **interrupt** 18:13 |
| **hugging** 51:12,16 52:13 53:7 **hugs** 54:9 55:2,22 **huh** 83:7,7 188:11 188:11 210:24,24 247:11,11 | 19:3 22:20,24 135:18 164:9 **impacted** 230:2 **implicated** 78:2 183:14 245:25 **impression** 89:13 | 167:4 168:11 172:10 181:22 188:5 222:23 223:9 252:15 255:2 256:16,20 **informed** 163:17 | **interview** 10:11 21:20,23 22:2,4 121:14 123:25 146:23 176:7 188:10 198:10 238:14 239:15 |
| **huhs** 44:8 **human** 217:12 **hundred** 40:8 182:23 208:6 209:23 | 167:12,16 **improperly** 46:19 **inaccurate** 195:7 232:11,14 **inappropriate** | 164:20 242:2 **inheritance** 81:9 81:11 **inhouse** 6:9 **initial** 166:13 | 249:20 **interviewed** 19:21 48:12 112:9 150:4 175:19 176:2,5 |
| **i** | 59:2 138:25 139:10,17 140:8 | 172:6 | 245:22 |
| **idea** 114:24 125:9 131:3,7 183:17 187:23 210:5,14 | | | |

interviews   112:14
investigate   121:24
investigated
   170:14
investigating
   233:15
investigation
   77:18 131:13
   133:7 134:16
   136:16,19 137:2
   137:14 138:6
   237:15 242:4,14
   243:8 246:24
   248:10,11
investigations
   138:7
issue   26:4 30:22
   33:15 47:12,14,18
   48:4 61:25 64:18
   64:21 99:19,20,21
   110:25 129:23
   143:5,7,25 144:24
   175:11,14 224:22
   236:9 254:24
issues   35:24 36:17
   46:11,18 47:22
   62:21 86:15 90:21
   90:23 118:17
   132:24 134:21,22
   161:3 173:16
italian   15:9
item   80:13 248:19
   248:21
items   17:21 65:12
   128:14 129:24
   170:13 183:5
   231:15 239:20
   240:7 246:9 255:4
   256:13

**j**

j   14:16 185:20,23
   258:16
jamie   14:16
january   19:11
   22:10 150:10
   156:20 184:23,25
   205:2 234:13
jeopardize   115:3
jersey   76:11 77:2
   200:6
jewelry   174:6
jj   252:4,6
job   10:12 14:8
   16:2 20:20 36:24
   80:17 89:23 106:6
   115:3 145:6,7
   146:3 184:15
jobs   88:19
julia   181:4
julie   181:21
   182:20
jump   30:20
june   19:9 45:20
   131:24 133:3
   140:14 166:23
   167:10,13,24
   168:8,12,21 169:4
   169:11,14 170:3
   171:10 208:22
   223:2,5 229:8,13
   238:11 240:20
   246:25
justin   125:21
   126:3,5,11

**k**

k   1:13 5:1,1 6:1
   7:1 8:1 9:1 10:1
   11:1 12:1 13:1
   14:1 15:1 16:1

17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1,20,20,21 75:1
76:1 77:1 78:1
79:1 80:1 81:1,19
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1,17
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1

139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
189:6,10 190:1
191:1 192:1,21
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1

Atkinson-Baker, A Veritext Company
(818) 551-7300                              www.veritext.com

**[k - lai]**

| | | | |
|---|---|---|---|
| 258:17 | 40:18,25 43:16 | 182:17,18,19 | 213:18 218:5 |
| **kamineni** 96:15 | 45:9,12,23 48:6,8 | 183:11,12,13 | 224:12,24 251:2 |
| **kathy** 141:2,4 | 50:10 52:3,10 | 185:17 186:4 | **known** 66:2 |
| 173:21 174:2 | 53:10,22 54:5,8 | 187:10,16,22 | 126:21 206:6,10 |
| **kaufman** 4:7 | 55:18 57:22 58:2 | 194:12 197:4 | 249:25 251:20 |
| **kavanagh** 175:3 | 60:24 63:8 67:13 | 199:12,15,16,18 | **kong** 13:11 |
| **kavanagh's** 175:6 | 69:12,16,18 70:2 | 200:4,16,19,23 | **kristina** 1:4,20 2:1 |
| **keep** 229:6 | 72:9,10 73:9,9 | 201:19 202:15,24 | 5:9 172:11 216:19 |
| **keeps** 103:19 | 74:23 75:19 76:14 | 202:25 203:5,13 | 234:10 241:25 |
| **kemi** 223:23,23 | 76:16 77:6,24,25 | 205:4 207:22 | 246:2 247:3 |
| **kept** 99:22 105:4 | 78:4,6 80:12,14 | 209:16 210:8,8,13 | 249:14 258:3 |
| 132:8 171:21 | 82:4 83:4 85:7,9 | 210:17 213:5,23 | 261:4,5 263:1,2,24 |
| **kids** 5:24 34:24 | 87:4,10 88:6,23 | 214:17 216:7 | 264:1,2,4,12 |
| 47:6 | 90:2,11,16 92:7,13 | 218:8 219:12,14 | **l** |
| **kind** 12:24 41:21 | 93:16,19 94:10,20 | 219:19,25 220:5 | |
| 46:12 48:20 83:9 | 97:23 98:6,9,14 | 220:10 221:19 | **l** 5:1 11:24,25 |
| 94:18 103:2 | 100:22 104:18,21 | 223:8 230:9,24 | 13:10 53:20 66:4 |
| 116:16 153:5 | 105:18,23 106:3,6 | 231:19,24 234:8 | 81:18,19 84:12 |
| 190:21 210:3 | 110:17,23 114:7,8 | 235:8,9,12 236:8 | 193:10 258:19 |
| 220:11 232:25 | 114:17 116:4 | 236:23 239:25 | **lady** 103:19 |
| **knew** 21:13 52:22 | 118:25 122:11 | 240:24 241:18 | 104:24 105:22 |
| 55:12 63:14 67:14 | 124:8 125:7,10,12 | 242:16 243:4 | 108:11 114:6,14 |
| 75:22 86:10,20,21 | 129:10,20 130:24 | 244:9,11,13 246:6 | 114:23,24 116:4,8 |
| 87:23 90:5 101:6 | 131:5,20 133:15 | 246:15 247:22 | 116:15 126:19 |
| 105:2 108:18 | 133:18,20,21,22 | 249:11,22 250:11 | 134:23 188:8 |
| 133:19,23 136:19 | 133:24,25 134:5 | 250:14,19,22,25 | **lai** 65:25 66:9,12 |
| 136:23,24 146:23 | 136:4,9,15,18,22 | 251:10,17 254:24 | 67:2,9,13,25 68:11 |
| 161:8 164:3 | 136:24,24 138:2 | **knowledge** 38:18 | 68:19 69:8 70:3 |
| 175:20 180:6 | 138:12,23 145:22 | 48:3 63:10 64:14 | 70:11,17,22 71:2 |
| 182:10,11 213:3 | 145:23,25 149:19 | 65:3 69:22 70:10 | 79:6 186:4,4,6,10 |
| 234:17 249:6 | 153:20 155:10,13 | 78:14 100:16,23 | 186:13,17 188:25 |
| 254:11 256:11,12 | 157:16 158:5 | 122:14,16,19 | 200:7 201:4,13 |
| 256:14 | 159:14,18 160:15 | 124:4,25 125:16 | 202:8,10 205:24 |
| **knock** 58:15 | 161:8 164:3,14 | 134:6,7 136:25 | 210:6,8,19 216:14 |
| **know** 6:24 7:12,24 | 165:4 171:15 | 142:4 146:4 | 216:20 243:13 |
| 8:6,21,22 12:13 | 173:5,21 174:19 | 163:24 164:18 | 244:2,20 246:3,8 |
| 16:11 20:23 21:11 | 177:19,23 178:2 | 172:9,14 173:17 | 246:13 247:10,12 |
| 21:12,14,15,23 | 178:20,21 179:3 | 175:6 176:15 | 248:14 249:18 |
| 23:17 24:8 26:3 | 179:15,20,22 | 177:14 178:5,13 | 250:3,12,23,24 |
| 29:12 32:6,23 | 180:12 181:22 | 179:7,11 180:3 | 251:12,24 252:9 |
| 34:14 39:5,12 | 182:2,7,13,16,16 | 186:2 202:11 | 252:13,17,22 |
| | | | 254:13 256:12 |

**[lais - look]**

lais 250:16 253:10
lana 11:24
language 50:11
languages 146:4
las 177:21
late 21:3 83:17
  89:19 90:4,6
  91:21 92:24 93:21
  96:6 97:7,8 99:18
  99:23 100:4,17,19
  101:5,23 102:25
  102:25 158:20
  159:5,19 164:11
laughed 58:19
law 1:16 4:3,12
  111:17,21 132:11
  132:16 140:15
  141:9 144:12
  172:21,23 174:3
  186:3 199:17
  209:4 239:9,21
  240:20 241:4,9
lawyer 6:19
layer 28:10
leading 241:19
lean 99:13,14,16
  101:2 102:11
learn 77:21 86:5
learned 66:20 86:8
  92:20 249:19
learning 39:7
lease 229:22
leased 24:9,11
  230:3
leave 12:22 13:23
  14:18,21 16:3
  18:8 26:20 89:14
  92:2,9 94:7,23,24
  95:11,13 131:22
  133:23 134:4
  165:3,11,22 166:3

166:10,11,14
  167:5,13,16,24
  168:15,23 169:7
  169:10,15 171:8
  184:18 226:5
leaves 61:5 184:4
leaving 16:20,23
  19:6 184:16
led 61:11 170:4
lee 188:17 242:18
  243:2,9,25 244:5
  244:10 245:21
  246:5,16,24 247:2
  247:7,7 249:8
  251:6,8,17 252:11
left 12:4,23 13:24
  14:22 15:19 19:9
  22:10,21 27:19
  36:4 45:3 60:25
  61:11 74:25 75:11
  77:20 78:3 132:10
  149:17,20 171:23
  221:10,13,15
  225:19 228:14
legal 261:7
letter 143:15,16,18
  145:9 165:25
  166:3,16,17,23
  167:2,3 168:21
  171:9 217:25
letting 105:6
lexapro 32:18,20
  35:9 227:16 228:2
licensed 26:5
  64:19
licensing 245:11
  245:14
life 34:9,23
lifetime 184:7
liked 10:11 145:16
  145:18 146:5

limit 62:10,13,15
  142:2,4,8 190:8,9
  190:10,11 192:11
  197:25 224:6
limits 30:25 62:11
  189:20,24 190:2,3
  190:7 191:14
  192:12
line 63:4 197:12
  259:24 261:15
  262:4 263:4,7,10
  263:13,16,19
lines 25:10
link 121:8
linked 119:4,10
linkedin 10:4
  15:24,25
linking 250:17
lips 155:14
lisa 53:9
lisa's 53:10
list 28:12 47:3
  54:8 101:12,15,17
  172:8 185:25
  186:3 252:8
listed 212:23
listen 18:24 105:5
  109:18 137:25
  139:23 140:5
little 13:21 15:17
  57:7 71:23 105:15
  152:22 160:21
  173:6 184:19
  198:9 209:20
  210:24 217:7
live 81:20 128:7
  187:2,3 200:3,12
lived 27:12 73:17
  77:5,9,10 187:9,11
  187:17,22 200:5
  244:6

lives 76:14,16 77:7
  186:21 187:4
  200:5 215:22,25
living 66:14 84:6
  84:15 186:11,15
  186:17
llc 1:10,10 4:13
loaning 213:12
local 1:13,14
located 200:19
location 10:7
  13:18 16:25 27:16
  27:17 48:18
locked 261:12
  262:1
long 11:19 12:18
  13:3,20 14:11
  15:9,16 18:4
  26:17 32:20 40:6
  44:24 46:3 49:11
  49:15,17 67:14
  73:4 84:23 104:8
  105:7 110:9,14,17
  110:23 111:12
  122:20,25 123:2
  140:3 141:8
  168:25,25 184:18
  240:24
longer 116:23
  186:20 187:4
  230:4,7,7 232:5
look 15:10 31:7
  32:24 55:9 71:25
  72:4 74:5,19
  87:15,24 105:15
  105:25 116:22,23
  119:20,23,23
  121:9,11 147:16
  155:9,16,24
  166:17 167:18
  168:14 219:17

Page 20

[looked - marked]

**looked** 34:6 40:14
40:15,17 50:13
74:15 87:25
106:13 119:2,4,9
136:23 243:17
**looking** 16:3,5
19:13 34:7,12
50:4 55:12 121:16
145:6 148:13
151:25 152:9,12
156:9 246:22
**looks** 110:22 117:2
119:21 147:17
152:2,5 153:8,11
157:25 208:21
219:15 223:2
225:9 227:21
248:11
**lose** 203:23
**loss** 41:19 51:23
52:18 103:12
104:14 109:18
112:15 119:7
126:3 135:18
137:17,19 148:17
148:18,22,22,24
149:11 154:16
155:2,8 170:2
234:12,13 236:3
252:19,24 253:13
**lost** 42:3 184:14
203:24
**lot** 6:21 8:23 12:8
28:20 34:7 43:5
61:14 66:25 80:3
84:9 118:21
182:18 183:25
190:23 191:4
205:7,8 231:15
244:13 250:16
253:25 254:7,11

**louis** 16:24 17:4,17
17:20 18:2,4,8
19:8,10 22:12,13
22:15 37:9 61:15
62:7,8,9 64:12
145:7 185:5 221:8
**lounge** 12:6,13,19
12:22 13:7 102:4
**love** 16:8,8 19:4
**loved** 14:7
**lower** 71:19
**lucy** 176:10
**luis** 145:17
**lunch** 138:16
**luxury** 13:11

**m**

**m** 5:1 11:25 14:16
14:16 74:20 81:19
96:17 112:3
195:11,14 207:2
258:20
**ma'am** 66:5 178:7
193:14 252:2
**macy's** 4:13,18 6:9
95:24,24 97:20
98:8,11,14 99:8
122:10 167:25
168:12 237:9
**macy's** 1:11,11,12
4:12
**mad** 60:20
**mail** 19:21 21:11
21:19 70:21 75:4
75:8 76:18 77:14
79:9 80:8 98:17
108:4 132:15
145:15 178:16
234:2 236:3
240:19 241:2,24
242:9,11

**mailed** 79:17
108:6 183:10
204:21
**mailing** 70:18,23
71:9 77:2 79:7,17
177:23 178:18
180:6 187:5
198:10,17 202:10
**mailings** 78:19
**mails** 21:9 79:5
98:13 172:20
209:4 239:8
**main** 221:9
**maintained**
216:22
**makeup** 87:21
**making** 50:4 53:7
140:8 150:22
213:12
**male** 156:6,8
188:18 199:25
**man** 73:24
**manage** 28:5
181:21 225:24
226:2
**management**
56:13,17 57:9
59:8 71:7,11
72:10 77:13 88:4
132:5 142:12
152:21 176:20
190:4 191:15
192:13
**manager** 14:7
27:6,6 44:16,25
45:5,6,13,16,18
46:4,7,9,15,18,22
47:23,25 71:8
74:7 76:5 88:22
101:15 103:18
141:24 146:13,14

149:13 191:16
193:4 197:14
198:3 219:24
222:10 224:3
**manager's** 63:5
190:5 191:12
192:24 197:11,20
**managers** 71:17
76:12 130:6
181:13 192:15
**manchester**
200:20 201:2,9
202:14 215:22
244:21
**manner** 61:11,13
**march** 1:20 22:21
88:9 260:16 261:3
261:5
**marcus** 26:22 27:4
27:7,11,11 28:23
217:8,12,19
**margaret** 116:2
**mark** 115:11
172:5 185:19
191:6 235:21
**marked** 115:16
147:23 157:7
160:2 165:19
166:19 167:20
168:17 172:2
185:22 189:9
193:9 195:14
206:21 208:15
209:9 211:8
212:14 214:4
217:3 219:10
220:24 221:23
225:3 228:22
233:23 235:23
238:6 239:2
240:16 242:23

[marked - mikhaylova]

244:16 246:20
248:7 250:9 252:6
**marketing** 11:9
**marriage** 260:13
**married** 60:9
**martha** 87:11
216:10,11 218:14
218:24 248:23
249:8
**materials** 190:25
**maternity** 184:18
**matter** 99:2
121:24 148:7
260:14
**maximum** 190:13
**meadows** 5:13
**mean** 16:8 18:12
18:23 20:24 21:14
21:15 28:2,16
40:7 41:15 46:12
50:12,20 61:13
64:21 65:8 91:15
98:4 100:2 106:10
109:20 110:7
111:11 117:11,16
122:10 127:4
135:14,21 136:21
136:22 137:20
145:22 151:5
155:20 164:7
177:8 182:9
190:21 191:12
192:6 205:9 212:7
222:13 224:7
231:25 232:23
240:12,13 241:21
248:20
**means** 41:16 94:11
94:14,16,16
117:13 129:15
222:14

**meant** 94:22
222:16 255:19
**medicaid** 36:13
37:3
**medical** 29:13
32:24 34:14,15
35:14 36:5,23
38:8 225:16 242:5
**medication** 35:12
35:15 36:16
161:18 227:5
**medications** 35:23
227:12
**meet** 7:14 67:18
132:12 186:5
**meeting** 130:21
131:8 142:25
144:21
**melissa** 4:5 140:23
141:23 145:12
170:17 174:8
261:1,2
**member** 179:6
199:22 244:19
**memo** 107:9 108:3
108:9,12 109:8
110:4 115:24
117:8 238:16,19
**men** 12:9
**mendoza** 4:5
48:23 65:23 69:2
69:23 70:5 72:23
74:2 79:10,19
83:11 85:23 93:8
105:19 120:19
121:3 122:17
125:5 137:8 138:9
138:17 143:11
149:4 156:3
165:12 169:19
172:17 184:10

187:7 189:22
194:5,22 206:16
228:9,16 230:16
234:5 235:10,13
235:16,20 236:13
253:16 254:19
255:17 256:2,25
257:7,9 261:1
**mental** 33:12,17
33:23 34:2 35:5
35:21 36:6
**mention** 90:14,18
103:3 125:13
126:9 143:4,19
152:12 153:7
176:12
**mentioned** 43:17
56:20 59:5 142:5
143:7 152:10
188:11 202:2
250:22
**mentioning** 152:9
**mercedes** 52:17
224:16
**merchandise**
67:11 74:10 77:2
83:10 103:22
190:23 192:9
219:23 247:9
250:18
**merchandising**
11:8
**merchandize**
109:17 133:13
191:6
**message** 223:10
**messages** 132:11
141:23 221:20
222:2 223:6,7
224:22

**messed** 184:2
**met** 67:16 114:18
137:5,18 138:6
146:22 186:5,8
187:21 241:9
**method** 29:7
**migraines** 228:7
**mikhalova** 246:2
**mikhaylova** 1:4,20
2:1 5:9,16 6:1,7
7:1,9 8:1 9:1,21
10:1,15 11:1,2
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1,7
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1

Page 22

[mikhaylova - name]

| | | | |
|---|---|---|---|
| 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1,6 119:1 120:1 121:1 121:11 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,17 151:1 152:1 153:1 154:1 155:1 156:1 157:1 157:2 158:1 159:1 160:1 161:1 162:1 163:1 164:1,24 165:1 166:1,2,22 167:1 168:1,20 169:1,21 170:1,7 171:1 172:1,7,11 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 199:21 200:1,9 201:1,8 202:1 203:1,24 204:1,15 205:1 206:1 207:1 | 207:4,22 208:1 209:1 210:1 211:1 212:1 213:1,23,25 214:1,3 215:1 216:1,25 217:1,2,6 218:1 219:1,8,9,13 220:1,22,23 221:1 221:21,22 222:1 223:1 224:1 225:1 225:2,5,7 226:1 227:1 228:1 229:1 229:10 230:1 231:1 232:1 233:1 234:1,10 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 247:4,5 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 257:3 258:3 259:4 259:5,6,7,8,9 261:4,5 263:1,2,24 264:1,2,4,12 **milligrams** 227:16 **million** 23:15,20 23:22 24:23 25:4 25:5,6,7,8,15 183:21 184:9 235:15 **mine** 67:15 145:3 243:23 **minute** 68:24 94:22 146:9 240:6 254:16 **minutes** 120:22 138:18 141:10,12 141:13 228:15 | **missed** 5:18 86:21 173:2 **mississippi** 72:12 72:14,17,18,20 73:6,12,14,15,20 73:24 79:7 203:22 204:7,17 239:12 **missouri** 4:14 **mistaken** 12:11 14:14 109:24 159:9 164:5 188:5 **misunderstand** 128:15 **miu** 182:20,20 **mix** 251:22 **modesto** 224:16 **mom** 186:22 189:2 **mom's** 81:22 **moment** 34:10 60:16 97:3 98:16 120:20 139:3 156:23 173:4,20 186:12,15 224:23 228:11 **money** 17:3,6 67:25 68:4,12 69:9,12,21 80:21 80:22 81:4,10,12 81:25 82:4,8 83:9 83:18,19,20,22 84:2,9 85:15,15,16 85:20 133:16 137:15 184:21 207:23 230:10,10 230:12 231:3,6 **moneys** 255:14,21 255:24 **month** 20:2,15 35:18 190:13,15 190:16 | **months** 19:12 20:3 21:2,3 23:21 27:8 32:21,22 45:2,17 45:20,22 46:6 49:21,22 123:7,8 125:17 134:15 184:16 196:9 227:18 241:19 **morning** 5:16 47:5 86:18 90:21 103:2 158:19 161:12,17 **moustache** 104:17 **move** 78:17 224:25 **moy** 14:16 **multiple** 63:14,20 64:4 65:12 106:11 239:20 240:7 |
| | | | **n** |
| | | | **n** 4:1 5:1 11:24 13:10,10 18:18,18 43:17 45:10,11 53:20 81:18 84:12 84:13,13 96:17,17 96:19 112:4 176:16 179:25 180:25 181:2,4 188:18 206:22 258:1,21 259:1 **name** 5:7 6:7 12:3 14:17 15:9,10 18:17,19 43:6,8,9 44:17 52:9,10,10 52:11,14,16,17,19 53:10,21 54:2 74:18,20 81:17,19 85:7,8 91:7 92:10 96:18 104:16,17 110:19,19,21 111:25 116:6 126:8,10,19 |

[name - objection]

140:24 145:13,15
154:24 182:8
188:7,11 199:25
203:5,8,8,9,14
242:18 244:9
**named** 203:18
**names** 43:12 51:21
52:25 110:3
117:24 118:5,8
130:5,18 170:16
170:18,20,22,23
170:25 171:6
176:25 177:2
180:4 181:11,17
**national** 82:21,23
**nature** 11:10
92:12 123:18,22
139:17 140:9
173:8 175:23
**nausea** 164:20
165:2
**nauseous** 87:18
161:23
**necessarily** 70:12
**necessary** 261:14
262:3 264:6
**need** 8:11,12,16
15:11 32:8 34:9
71:23 88:15,24
89:6 90:2,16,23
92:21 93:13
113:17 132:21
133:5 134:4,21
137:25 153:9
162:8,11 165:3
195:2 206:19
209:18 241:22
252:3
**needed** 38:12
90:15 91:17,22
96:8 97:6,10

101:24 167:6
227:6
**needs** 44:8 225:24
**negative** 103:4
199:5
**nehemiah** 176:23
178:8,15 179:16
182:5
**neiman** 26:22 27:4
27:7,10,11 28:23
217:8,12,19
**neither** 20:11
142:20
**nel** 53:18
**nel's** 53:21
**nervousness**
226:14,22
**neurologist** 228:8
**never** 10:24 64:11
67:25 68:3,15
69:24 70:16,25
78:23 101:16,17
107:20,24 108:2
115:2 124:23
130:13 132:23
133:11 134:21
137:5,18 138:6
141:6 142:19
150:20 156:13,14
170:14 174:4
199:20 233:2,2
246:5 251:9,13,15
251:24
**new** 1:2,11,12 2:6
4:4,4,9 5:13 25:20
27:4 66:14 67:16
67:17,18 68:7
71:4,9,14 72:11
77:5 81:23 85:22
109:5 137:3
151:18 180:15

186:4 187:6,9,11
187:13,18,20,21
187:23 200:5,15
200:17,20 201:3,9
208:12 212:17
215:22 219:23
231:14 239:12
244:13 248:13,15
255:6 260:4
**nice** 147:16,17
**ninety** 18:7 37:10
**normal** 38:20
190:10
**normally** 41:18
102:17 212:16
215:6
**norman** 141:24
**northwell** 97:4
**notary** 2:5 3:14
5:3 260:3 264:13
264:19
**notating** 261:15
262:4
**note** 97:12,15
121:5
**notebook** 219:15
**noted** 257:11
264:7
**notes** 92:14 139:4
**notice** 34:19 168:6
242:3
**notified** 91:13,14
94:2,3
**notify** 90:12 93:13
**november** 30:4
36:21 184:20
225:10 226:2
**number** 51:14
57:15 104:25
109:20,23 114:20
119:13,16,24

122:12 127:21,21
191:19 193:2
202:15 211:6
214:18,23 215:2,3
215:7,7 234:8,15
234:16,22,25
237:7 246:11
247:18 261:15
262:4
**numbers** 105:25
107:21 137:15
212:19 224:11
239:25 240:2
**numerous** 48:15
132:10 153:6
179:8,10,12 180:9
181:9,18
**ny** 4:9

| o |
|---|

**o** 5:1 14:16 43:17
74:20,20,21 81:19
84:12,13 112:4
181:4 208:13,15
254:4 258:22
**oath** 9:16
**ob** 96:20,22
**objection** 65:23
69:23 70:5 72:23
74:2 79:10,19
83:11 85:23 93:8
105:19 121:4
122:17 125:5
137:8 138:9
143:11 149:4
156:3 165:12
169:19 172:17
184:10 187:7
189:22 194:5,22
206:16 228:9
230:16 234:5
235:10 236:13

[objection - parents]

253:16 255:17
256:2
**objections** 3:9
9:10
**observations** 56:4
**observed** 34:16
52:6,12,22,23
55:19
**obvious** 103:7
**obviously** 110:16
**occasional** 226:15
**occasions** 59:6
60:18
**occurred** 26:9,13
113:7,13 171:8
**offence** 63:9,10
64:10,13 65:3
206:4 213:10,20
**offensive** 135:11
**offer** 91:3
**offered** 10:12 13:5
14:7,25 232:24
233:3
**office** 91:13 98:2
103:17,23 104:9
105:4,8 107:17
109:11 110:5,6,7
110:10 111:4,8,10
113:11,13 114:12
120:5 126:17
140:16 170:3
234:18 261:11
**ogle** 155:3
**oh** 55:16 79:4
85:10 87:20 88:13
108:20 113:17
132:8 146:18
152:2 182:15
**ohio** 123:16
**okay** 6:6,17 7:2
8:8,15,18,19 9:14

15:13 16:7 32:11
34:8 43:15 48:8
49:4 54:6 63:19
65:7 67:6 74:9
75:4,8,14 76:3,7
76:18,22 77:14
79:18 87:4 89:24
110:12 115:10
116:24 118:25
119:25 121:23
126:16 127:2
128:22 131:10
132:12 133:17
138:4 142:11
152:25 155:6
160:9,20 164:22
177:3 180:24
183:13 191:18
192:20 196:23
206:20 222:20
223:14 226:19
228:16 237:15
239:6 249:16
254:18
**old** 10:14,17 11:15
18:9 84:20 185:4
191:5 210:19
**olde** 4:14
**older** 84:21
**once** 20:25 24:10
27:12 54:11 93:2
131:12 139:18
163:5 179:20
185:25 202:4
213:18 216:16
224:2 230:3 236:2
236:8
**ones** 214:14
222:12,15,16
224:5 249:24

**online** 211:12
**open** 18:19 72:3
133:6
**opened** 12:15 14:5
27:5
**opening** 145:8
210:10
**opinion** 34:15
**opportunity** 27:10
121:9 256:12
**options** 10:8
**order** 2:7 103:16
107:9 108:3,13,20
109:2,4 112:11
115:24 236:25
238:16,19
**orders** 104:5,7
106:25 236:25
237:4
**orientation** 38:16
38:20 39:5,6,10,20
40:9 41:17,22
209:22
**original** 261:10,21
**outcome** 260:14
**outreach** 106:23
**outside** 58:21
87:17 137:3
**owned** 186:23
210:16 217:18
**owner** 246:3
247:13
**ownership** 245:11
**owns** 244:22

**p**

**p** 4:1,1 209:9,11
258:23
**p.m.** 120:24,24
138:20,20 204:2,2
229:9 257:11

**package** 201:6
**packages** 181:9
183:3 239:24
250:4
**page** 116:2 157:18
168:5 170:9
195:24 258:2,6
259:2,24 261:15
262:4 263:4,7,10
263:13,16,19
**pages** 116:18
209:14 261:14,17
261:17 262:3,6,6
**paid** 17:7,9,18
80:4 83:9 85:14
**pale** 87:15,25
**palpitations**
226:16
**pam** 203:17
**pamela** 116:19
**pan** 201:10,11
202:5,18,20 245:2
**panic** 226:15,18
**pants** 147:17
**paper** 247:6,6,7
**papers** 6:2
**paperwork** 90:25
95:22 97:6,14,17
99:8 100:10,14
111:12 141:22
144:15 164:11
165:18
**paragraph** 148:9
150:9 151:13
154:14 170:10
**paralegal** 4:18
**paralegals** 6:13
**pardon** 18:24
**parenthesis** 234:9
**parents** 186:20

Kristina McGhay-Taylor

March 8, 2022

[park - point]

park 97:4
part 20:17 27:17
  41:22 46:24 52:18
  55:8 56:4 97:4
  114:13 126:3
  127:9 168:10
  169:23 176:7
  187:13 205:19
  212:17 220:8
  224:18 245:3
  246:23 248:9
participate 205:23
participated 38:3
particular 34:16
  42:22,25 62:4
  96:25 115:5 118:5
  161:11 196:19
  217:25 218:6
  223:3
particularly 62:2
  195:24
parties 3:5 260:12
parts 147:14
party 198:2
patience 257:5
patient 225:23
pay 14:25 24:10
  24:15 26:7,25
  29:7 66:21 67:10
  68:17 72:14 73:15
  80:12 128:7 189:5
  213:6 249:5
paychecks 208:8
paying 84:5,7,8
  128:6,11,14,21,23
payment 29:8
pdf 261:12 262:1
penalized 91:22
penalty 9:18 122:3
  261:16 262:5

pending 8:17
  178:9 242:15
pennsylvania 4:4
people 28:20 43:2
  43:5,10 46:12,13
  46:13,19,19 47:3
  47:10,12 52:25
  55:15,16 63:17
  65:14 72:6 79:6
  102:24 104:6
  105:2 106:4
  108:22,25 109:3
  110:3 111:2,6
  117:6,7 133:12
  135:8 136:18
  137:4 138:5 155:7
  155:24 172:8
  176:22 178:21
  181:19 182:11,22
  183:14 186:2
  202:24 218:7
  231:16 236:23
  244:13 245:8
  249:6,17
percent 17:19
  25:23,25 26:24
  29:9 40:8 182:24
  191:3 209:23
  222:18 224:13,14
  224:15 236:6
percentage 122:15
period 20:3,15
  35:19 38:16,21
  39:5 41:18 86:21
  150:13 151:12
  158:24 261:18
  262:7
perjury 9:18
  261:17 262:6
permission 193:4

person 21:7,10,19
  21:23 22:4,5 43:7
  53:13 55:4 64:4
  87:11 92:11 95:15
  104:13 108:7,10
  108:19 109:19
  111:24 114:18
  115:8 117:2
  119:10 126:5
  137:13 140:18,20
  146:2,5 155:21
  156:13 158:6
  160:15,17,19
  175:25 179:3
  210:2 218:22
  244:3,5 250:20
personal 26:21
  27:3,15,19,24
  127:5 129:25
  177:9,24 178:12
  198:17 213:3
  245:23 246:14
  248:12
personally 31:2
  114:17 133:11
pervasive 226:12
ph 156:19 179:18
phone 91:3 98:12
  103:16 112:10
  114:20 118:8
  134:22 186:18,19
  186:24 210:4,17
  214:23 215:2,3,7,7
  229:4 251:14
  254:7
physical 36:6
  183:21,22 232:23
physically 55:23
  183:24 187:2
  194:15

physician 96:21
  225:10
pick 120:4 216:19
picked 70:14
picture 209:25
  210:3,12 247:7
  250:24
pictures 43:11
piece 65:12 247:6
pieces 62:15 63:14
  66:24 80:10,11
  191:21 192:7
place 20:11 28:25
  58:21 59:18,18,20
  102:8 109:4 186:7
  218:20 251:3
placed 109:2
places 19:19 20:4
  20:6,8,14 78:25
placing 104:5,7
plaintiff 1:5 2:2
  4:3 121:5 154:16
  155:3 170:10
plan 38:4 159:8,11
plaza 4:4
plcc 4:3
please 5:7,10 55:6
  91:4 107:13
  121:25 180:22
plus 17:18 25:25
  85:12
pmb330 202:14,19
pocket 82:16
  85:21
point 15:2 20:6
  24:22 36:11 43:12
  56:2 76:19 86:13
  92:3 105:14
  132:15 158:13,17
  159:16 161:9,25
  163:2 204:14

[point - pulled]

228:2 233:25
237:16,18 253:20
**polagrains** 201:10
201:11 202:5,18
202:20 245:2
**policies** 40:10,16
61:23 62:8 176:18
176:19 193:25
194:16 207:17
211:12
**policy** 39:8 62:25
64:6,23 129:24
144:17 177:5
192:23 193:3
196:19 199:14
206:7,9,12,14
212:6,17,20,24
213:16 238:15
249:21
**polish** 52:15,17
**polygreen** 203:17
**position** 16:22
18:20,25 26:20
28:6 76:25 104:18
217:9,15,22
**possession** 41:2
**possible** 122:12
**posterior** 55:20
156:10
**potential** 238:11
**practice** 71:20,23
79:13 96:25 177:5
181:15
**prada** 10:6 14:23
14:24,25 15:2,3,5
15:7,14,16,20 16:3
101:13
**prada's** 101:19
**prefer** 209:19
**pregnancy** 42:10
86:3,16,20 89:15

99:11 103:4
132:16 134:12
137:6 138:8 161:4
164:21
**pregnant** 20:7,17
20:18,19,25 21:4
21:13,15,21 36:18
78:13 86:4,6,9,11
86:12,22 87:7,12
88:4,10,16,18,21
88:23,25 89:12,25
90:3,5,13,20 91:16
91:24,24 92:21,25
93:17,19,21 94:4
101:6,14 103:7
132:21 133:5,14
134:9 136:20,23
136:23 142:21
159:3 161:3,8,9
162:9,12,16,17,23
163:18,19,22,23
163:25 164:4,15
184:6 240:25
**prepare** 7:15
**present** 4:17 48:7
108:7 225:23
226:13
**pretty** 24:21 116:9
**prevention** 41:19
42:4 51:23 52:18
103:12 104:14
109:18 112:15
119:8 126:4
135:18 148:17,18
148:22,23,25
149:11 154:16
155:2,8 170:3
236:3 252:20,24
253:14
**previous** 78:24
121:6 146:14

221:17 238:13
**previously** 152:11
230:9 243:18
**primary** 96:20
**princess** 14:2
**prior** 123:4 241:17
**privileges** 94:17
**probably** 19:24
83:17 85:2 87:12
105:22 107:7
140:17 151:6
165:17,18 188:2
195:3 212:22
217:15 250:20
**problem** 64:3
231:20,24 232:3
**problematic** 50:2
**problems** 132:23
**procedure** 2:7
238:16,18 261:19
261:20
**procedures** 40:10
176:18,19 193:25
194:16 211:13
**process** 41:23 89:3
92:8 96:3 101:19
101:20 104:11
108:13 109:8
146:23 176:8
226:6 238:16,19
**produced** 98:25
116:10 193:7
213:23 216:21
219:20 220:5,17
**product** 23:5 66:8
66:11,16,18 68:17
75:14 76:7
**products** 24:17
65:25 66:13 67:4
67:9 68:2,5,8 75:4
75:8 76:18 79:9

83:6 133:8 144:7
183:10,12 255:2
**professional** 33:18
34:3
**program** 38:4
**proof** 145:23
**proper** 120:17
**protection** 41:18
42:4,5,19,23
103:13 104:19
136:9 149:13
173:16 252:25
**protocol** 235:5
236:16
**prove** 138:13
155:18
**provide** 19:18
31:20 143:17
166:12 171:2
**provided** 101:11
171:5 176:18
261:19 262:8
**provider** 33:23
34:14 35:6,14
36:5
**providers's** 167:7
**psych** 227:16
**psychiatrist** 33:3
33:11,18 36:15
38:11
**psychological**
36:17
**psychotropic**
35:20
**public** 2:5 3:14 5:3
215:18 260:3
264:19
**pull** 19:24 31:16
172:4
**pulled** 113:16
123:25 125:21

[pulled - receipts]

126:11,13
**punishments**
122:3
**purchase** 213:13
214:15 216:14
255:11
**purchased** 31:11
189:21 255:4
256:5
**purchases** 83:24
127:6 133:3
170:12 176:22
179:22 204:21
205:12,18 214:6
231:11 239:11
244:2 255:21
**purchasing** 31:7
170:13 213:14
**purpose** 74:11
75:9,15 76:8
114:25 130:2
**purses** 210:12
**pursuant** 2:6
**push** 51:7,9 90:4
140:4
**put** 9:11 14:8 18:9
22:13 50:17 55:23
57:15 82:14 85:20
85:21 118:9 120:6
121:3 191:2 203:2
203:5,7,13 215:6
231:6 241:2
**puts** 234:9

**q**

**qualified** 169:6
**queens** 10:23 11:5
67:20 186:9
**question** 3:10 7:3
7:19 8:18 47:21
49:2 58:2 63:7
75:12 78:6,16

79:22 83:8 88:2
89:4 98:6 137:12
138:2,4 143:20,24
149:18 150:17
153:9 164:23
178:9 198:16
221:9,14 239:23
240:5 249:15
253:4
**questioned** 101:5
103:25 105:12
188:9 235:2
**questioning** 127:3
133:2,14
**questions** 6:15,19
6:21 9:10 32:9
103:3 113:18
257:2
**quickly** 10:10
42:13
**quietly** 125:22
126:12,14
**quit** 227:18
**quite** 45:7 68:7
**quote** 230:24

**r**

**r** 4:1 5:1 11:25
74:20,21 181:4
212:14,18 254:4,4
259:3 263:3,3
**r&s** 262:1,9
**rainsberg** 234:2
**raising** 34:24
**rang** 122:9 129:8
130:14 214:17
**rapid** 226:15
**rate** 71:19 208:10
226:15
**rd** 4:14
**reach** 242:5

**read** 40:18 41:16
155:14,14 229:16
264:5
**reading** 40:23
41:8 193:23
261:23 262:9
**ready** 14:9 17:22
17:24,25 18:21,22
150:25
**realize** 239:18
**really** 10:11 49:6
67:14 88:13 95:12
99:16 117:16
137:25 145:2,16
145:18 152:2,5
158:19 184:2
197:24 245:18
250:14
**reason** 20:17
79:16 82:24
197:25 216:21
221:6,10 234:21
236:10 252:12,14
252:19,23 253:8
256:19 263:6,9,12
263:15,18,21
**reasoning** 80:16
**reasons** 26:21 27:2
27:15,19,24
**recall** 21:22,25
22:23 37:20,22
38:22 39:2,4,11,16
39:18,21,22,25
40:4,7,14,19,22,23
40:24 41:5 42:3,9
42:12,15,23 45:14
45:15,16 46:3,6,10
47:16 49:15,21
51:11,13,15 52:15
52:19 53:6,11,23
53:25 57:2,10,16

57:17,20 59:4,23
60:12,16,18 61:18
64:15 72:18 73:13
73:16,18,19,22
74:4 75:3 76:4,20
76:22,23 77:16
81:15,16 82:3,6,10
82:12 88:5,7 91:6
92:6 93:5 98:16
100:2 102:23
104:16,17 107:6
110:19 111:5,20
112:2,5,22 113:2,3
113:5,8,9,23 114:3
114:4,16 116:6
127:9 130:3 139:3
139:13,20 140:11
141:10 144:14,14
152:7 157:10
158:23 166:2
170:18 173:9,13
173:25 174:23,25
175:17,18 178:19
180:16 182:20
189:12 191:11
195:19,20,20,22
201:16 202:19
203:15 204:9,12
206:18 208:2
209:2,3,18 211:11
211:14 212:19
215:9,25 216:5
225:15 226:20
231:8 237:16
241:16 244:7
245:13 246:12
247:16 249:12
**receipt** 214:13
**receipts** 72:2,4
74:5 118:14 179:2
216:22

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**receive** 166:23
168:21 194:14
213:11 229:25
**received** 70:3,10
98:15 101:17,17
193:21 194:3
195:18
**receiver's** 215:3,7
**receiving** 166:3
194:7
**recess** 69:4 120:23
138:19 203:25
228:17 254:20
**recognize** 115:21
115:23 210:2
229:9
**recollection** 8:22
23:2 44:18 74:18
97:5 101:22
163:21
**recommend** 35:14
145:10
**recommendation**
33:2
**recommended**
33:8,10 67:8
145:4
**reconnect** 107:4,5
107:6,8
**reconnected**
106:25
**record** 5:8,11 22:7
69:7 106:20
107:12 110:13
121:2,4 138:22
157:4 204:4
213:24 216:6
228:20 253:11
254:23 260:9
**records** 9:21 17:12
29:13 31:8 32:24

105:15 251:15
**recovering** 73:20
**recruit** 205:22
**recruited** 13:3,25
14:24 18:15
**recruiting** 27:8
**red** 42:10 109:25
**reference** 148:8
245:3,10
**referenced** 261:6
**referral** 32:25
**referred** 227:15
228:8
**referring** 224:10
**refers** 201:19
**refresh** 139:5
154:4 163:20
194:2
**refreshes** 209:14
**regard** 124:15
139:19,22 140:7
149:8 208:20
237:14,22
**regards** 128:10
149:9 234:24
**rego** 97:3
**regular** 181:12
**related** 11:9 36:7
47:12 134:11
137:6 138:8 160:6
164:21 168:15,22
224:22 242:4
243:9 252:25
253:10,15 260:11
**relates** 143:20
**relationship** 254:8
**relatively** 226:11
**relatives** 198:11
**release** 31:10
**released** 261:21

**relevant** 89:3
129:22
**relief** 227:5
**relying** 208:9
**remained** 43:25
**remember** 11:22
17:13,15 18:18
37:6 39:7 41:4,4,7
41:21,24 42:2,24
43:6,12,14 44:20
47:17,20 49:12
54:2,3,9 59:10
72:21 73:2,23
79:12 87:13,16
91:11 92:10
101:13 102:6
107:3 110:22
111:21,23 112:23
114:5 118:5,7,11
120:13 125:21
126:10,11,19
127:14 136:14
139:25 140:4,25
141:15 145:13
151:22 152:9,13
153:14,15,18
154:12,18,20,21
154:22,24 156:23
157:15 158:4
159:2 165:6
167:15 169:2
170:21 172:25
173:3 174:11,12
174:13,17,18
175:2,8,18 180:14
182:22 187:15,16
187:17 188:6,12
194:7,8,14,18
195:21 200:8,13
201:12,15,21,22
201:24 202:3,6,12

202:16 203:9,14
203:17,19,20
209:6 211:15,21
212:4 215:10,16
216:23 219:21
220:10,12,14,20
221:12,14 222:24
223:11,12 230:25
233:18 237:21
242:8,10,13
243:20,23 247:19
247:21 248:3,19
**reminded** 29:22
30:14
**reminder** 160:6
198:8
**remove** 93:3,24
94:4,5
**removed** 163:9
**rent** 84:4,5,7,9
**rep** 126:22,23
140:21,22 141:6
146:16 218:21
232:24
**repeat** 75:12
**repercussions**
100:21 124:21
**rephrase** 88:2
**report** 56:7
**reported** 48:9
121:20
**reporter** 2:5 5:6
5:18 9:8 44:8
48:24
**reports** 137:4,15
**represent** 248:9
**reprimanded**
170:14
**request** 134:3
165:11,16 166:14
189:7,8 258:17

[requested - sales]

requested 89:14 89:18 162:2 262:1 262:9,10
requests 259:23
required 38:5 40:11 197:9 264:13
requirement 196:2
resell 67:3 213:14 213:15
resellers 65:15,20 245:24
reselling 68:12
reserved 3:10
resolution 208:22
resource 217:13
respect 8:20 62:22 172:12 175:10 196:20
respective 3:4
respond 49:3
responded 57:19
response 44:4 56:24 57:17 58:17 59:25 60:3,7 88:11 121:22 150:15 156:16 162:14,21 167:3 170:6 178:6 189:6 189:8,13 198:12 258:17
responses 57:21 185:20,22 258:16
responsible 193:23
rest 5:18 131:11 182:6
restaurant 59:24 59:24 67:20

restrictions 62:18
result 63:3 122:3 183:22
resulted 78:20 79:25
results 171:15
retail 1:12
retailers 63:2
retained 259:22
return 261:17 262:6
returned 132:11 137:16
returning 241:7
reverse 142:25
review 9:13 121:18 261:8,10 261:13 262:2
reviewed 41:14,15 121:5
reviewing 39:16
richard 1:15 111:17,21 140:15 141:9 144:12 172:21,23 174:3 209:4 239:9,21 240:20 241:4,9,23
rid 192:9
right 31:23 34:8 45:20 56:15 61:15 79:14 84:18 85:6 85:8 86:24,25 87:24 92:5 110:14 111:13 119:13 133:4 134:6 136:16 140:25 150:23 151:10 158:14 161:4 168:4,12 169:17 171:9 184:17,22 184:23,24 194:19

198:5 199:5 205:15 206:15 207:6 212:3 213:16 214:21 238:21 240:3,14 243:10 244:24 245:5 253:9 255:7 255:25 256:7,16
rights 168:6
ring 117:13 120:16 135:21,25 137:23 183:6 203:6 205:12
ringing 76:25 125:20 137:22 182:10 202:25 203:11 247:2
rings 122:15
road 81:22
roberts 116:2
role 11:17 13:17 15:14 57:9 77:13 222:7
rose 247:22 248:10 249:9 252:11
rule 171:25 172:6 190:20 196:5 258:15
rules 2:6 194:2 195:19 262:8
run 154:17
runaway 234:12
rung 75:17 124:3 183:5,8 203:4,6,7 204:24
runs 67:3
rusch 117:18 118:3
ruscone 176:5

ruscono 145:14
ruth 117:18,21 118:3,4
rwdsu 1:14
résumé 10:9 19:16 19:23 21:24 22:6 221:3

**s**

s 4:1 5:1 11:25 15:9 43:17 44:19 44:21 45:10 74:16 74:20 96:19 112:4 179:24 213:25 214:5 254:4,4 258:5 259:4 263:3
sabrina 117:21
sad 27:14
saks 18:10,15,25 19:5,22,23 20:9 21:5,11,12,21 22:13,19 23:14 24:7,12,14,24 26:15,17 27:7,23 29:12,17,20,21 30:8,9 37:13,14,18 37:21 62:17 63:25 64:19 129:11 221:8 226:6
salary 13:6
sale 108:3 125:21 135:21 189:25 190:3,8,17,19,20 190:22 191:10 192:10,11 247:8
sales 11:9,18 12:24 13:2,19 15:15 16:16 24:23 71:4 71:10 75:10,16 76:8,11,19 77:15 78:20,22 198:11 198:18 199:12

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[sales - sent]**

| | | | |
|---|---|---|---|
| 204:25 205:4 | 183:20 190:4,5 | 55:19 56:15 58:20 | 142:12 203:12 |
| 224:17 254:25 | 192:23 193:20 | 71:14 72:2,6 | 215:11 222:19 |
| 255:3,6 | 197:23 198:12 | 115:18 133:14 | 234:22,24 236:11 |
| **salesperson** 222:8 | 206:5,8 208:19 | 148:2 153:12 | 237:3,4,5,8 243:25 |
| 223:17,22,24 | 217:10,11,20 | 155:12 156:25 | 247:9,24 254:13 |
| **sam** 44:21,23 | 219:22 220:2 | 177:17 178:24 | 256:13,18 |
| **sanela** 222:4,5 | 224:5,6 226:11,17 | 179:2 183:2 | **sender** 216:10 |
| **santha** 96:19 | 239:21 240:4,12 | 206:25 207:5,7 | **sender's** 215:2,6 |
| **satisfy** 195:25 | 241:24 244:21 | 209:14 210:11 | **sending** 10:7 |
| **saudi** 14:2 | 245:21 247:12 | 225:9 250:18 | 66:15,16,17,22 |
| **save** 144:10 | 251:13 | 251:12 | 68:11 70:24 71:14 |
| 204:23 | **scale** 29:7 | **seeing** 33:4 40:24 | 71:18 72:7,11,15 |
| **saved** 83:19 | **scan** 107:19 120:8 | 41:5 52:23 53:3 | 73:13,19 103:21 |
| **saving** 80:11 | **schedule** 261:10 | 194:8 195:19,22 | 103:25 105:3 |
| **savings** 83:19 | **scheme** 205:20,23 | **seen** 53:2 63:17 | 114:6,15 117:9 |
| **saw** 10:4 15:23 | **schoeman** 4:7 | 133:11 142:19 | 127:11,18 128:2,3 |
| 20:25 52:3 76:25 | **school** 5:25 200:14 | 147:8 174:5 | 128:4,5,10,19 |
| 98:3,5 126:13 | 200:15,17 | 177:15 181:12,16 | 129:9,17 178:11 |
| 135:15 145:8 | **scratches** 192:7 | 181:18 241:15,20 | 179:4 180:13 |
| 151:5,6,10,11 | **screen** 115:14,18 | **sees** 56:14 | 181:14 191:17 |
| 163:16 182:11 | 147:20 148:2 | **selected** 217:22 | 202:20 203:4 |
| 241:18 247:2 | 156:25 207:5,7 | **selir** 118:24 | 204:16 205:14 |
| **saying** 9:16 41:2 | **sealing** 3:5 | **sell** 17:23 26:23 | 209:4 243:12,16 |
| 41:13 44:22 50:9 | **sean** 171:20 175:3 | 28:16,17,19 30:23 | 243:21 245:9 |
| 75:4 76:22 97:6 | **search** 251:14 | 47:2 62:11,14,15 | 249:18 255:22 |
| 151:23 152:2,4 | **season** 46:9 | 63:18 64:4,24 | **sends** 72:3 124:18 |
| 155:13,15,21 | **second** 91:11 | 65:15 191:2 | 137:21 236:4 |
| 162:15 177:4 | 116:18 125:18,23 | 204:18 206:10 | 237:11,12 252:8 |
| 194:10 195:18 | 131:9 192:19,19 | **selling** 15:3 23:4,5 | **senior** 198:3 |
| 209:16 218:16,25 | 206:20 253:11 | 30:21 31:22 63:13 | **sense** 6:22,23 47:8 |
| 232:2 236:20 | **secretary** 187:24 | 63:23 64:22 65:11 | 124:14,16 142:12 |
| 244:13 | 187:25 188:7 | 113:15 150:11,13 | 245:19 |
| **says** 110:12 | **section** 195:23 | 204:16 206:6,13 | **sent** 10:8 19:23 |
| 117:11 148:14 | **security** 51:19 | 245:23 251:7 | 21:23 65:25 66:13 |
| 149:22 150:9 | 52:8 106:5,6,11 | **sells** 247:14 | 68:2 69:10,14 |
| 151:21 153:22 | 224:18 238:20 | **send** 66:8,11,21 | 71:3 72:20,21 |
| 154:15,25 156:19 | **see** 10:8 16:12 | 67:9 71:15 72:16 | 73:3,10,16 76:10 |
| 163:3,15 164:8,19 | 19:4 20:19 21:16 | 74:9 75:14 76:7 | 78:21 88:20 90:24 |
| 165:10,22 166:9 | 21:20 30:11 31:8 | 103:24 107:23 | 98:17 106:25 |
| 166:12 167:2 | 33:2,11,16,17 35:5 | 108:4 109:15 | 108:20 128:13,22 |
| 169:3,13,14 170:9 | 36:5,14 54:16 | 120:3 129:16,24 | 128:24,25 129:12 |

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

[sent - somebody]

132:15 141:23
145:9 156:2 167:5
168:11 200:6
202:22 204:5,10
214:21 222:25
223:5 231:16
234:2 235:8
239:19 240:20
242:8 246:9,18
247:10 250:23
252:9,13 254:25
**september** 45:25
**serious** 213:10
**seriously** 196:20
**set** 88:24 159:12
195:19 260:7,15
**seven** 19:12 20:2
32:8 158:12
**sexual** 139:16,23
140:9 147:15
151:14,16 173:8
173:11
**sexually** 139:11
**shanine** 112:20
188:13 229:18
231:22 233:10,14
**share** 115:13
147:20 255:12
**shift** 54:15,17
151:6
**shifts** 54:20
**ship** 109:9 231:20
**shipped** 108:8
177:7,16 188:23
189:3 239:10
248:12,14 249:10
249:11
**shipping** 105:10
105:11 107:15
108:6 109:10
110:15 130:11

144:9 170:12
188:25 189:4
219:23 231:13,15
235:5 248:13
249:25
**shixi** 176:24
179:24 180:12
**shock** 142:22
**shoe** 141:25
**shoes** 17:24 18:2
85:13 141:19
142:3,6,8 144:4
247:15
**shooting** 211:19
**shop** 67:3
**shopping** 14:3,6
**short** 18:24 27:12
69:4 120:23
138:19 151:12
203:25 228:13,17
254:20
**shorthand** 2:4
**shortly** 32:25
**shoulders** 50:20
**show** 6:4 9:21
31:14,18,20 43:11
47:7 115:9 126:25
141:22 147:21
156:24 160:4
165:23 209:25
228:25
**showing** 41:11
103:6 118:14,15
128:4 164:2
**shown** 121:7
**shows** 110:13
210:12
**sick** 86:22,24
87:25 89:20 99:24
101:6 159:15,16
159:17,19 161:17

162:19,20
**sickness** 86:18
90:21 103:2
158:19 161:12,17
**side** 14:3 126:12
153:21
**sideway** 50:24
**sign** 40:4 157:22
158:3 168:7
193:16 194:11,12
194:13 195:2,3,6,8
201:5,6 211:12
212:16 261:16
262:5
**signature** 157:17
157:20 160:10,13
193:12,14 207:3
207:10 229:12
233:7 260:18
261:21,23,23
262:9
**signed** 3:13,15
37:20 41:11,13,16
158:2,6,25 160:16
160:18,19 164:10
188:14 194:9,13
195:17 207:12
209:16 211:22
233:10
**significance**
217:24
**significant** 31:25
35:4 67:4
**signing** 194:20
212:20
**similar** 23:8,10
24:15 25:9 26:3
117:25
**single** 146:5
**siren** 39:14

**sit** 91:22,23 92:2
96:8 99:13 101:2
101:9,10,23 102:5
102:8,11,12,14
126:20,20,24
170:19
**site** 113:16
**sitting** 41:21
102:18 188:15
**situation** 49:8
132:17 175:22
237:19 241:17
**six** 19:12 20:2 21:2
21:3 23:21 79:8
79:23 127:12
134:17 227:22
239:11,19 240:8
**skimmed** 195:3
**sleep** 226:14,16
**sleeping** 226:22
**slightly** 190:25
**slower** 209:19
**small** 7:17 21:16
30:17 217:8
**smarter** 6:20
**smelled** 87:17
**smith** 4:3
**social** 254:7
**socialize** 243:5,7
**socialized** 243:6
**socially** 58:21
60:15
**soho** 12:7,10
**sold** 12:8 65:20
210:11
**solely** 26:25
**solutions** 261:7
**somebody** 20:19
21:24 54:7 60:6,8
106:12 113:14
119:22 147:8

Atkinson-Baker, A Veritext Company
(818) 551-7300                                      www.veritext.com

[somebody - store]

| | | | |
|---|---|---|---|
| 174:15 195:5 203:2,6,11 213:11 | **speaking** 42:23 73:11 246:12 | **standard** 195:16 202:10 | **states** 1:1 71:18 72:7,12 128:7 |
| **somewhat** 106:19 | **special** 94:17 | **standing** 55:13 101:2 151:8 | 129:10,16,18 177:22 178:22 |
| **soon** 19:6 73:10 86:4,20 134:20 146:22 242:16 | **specific** 47:3 51:20 57:20 59:10 60:17 60:18 61:13,17 82:6 152:23 190:17 216:22 | **stare** 56:5 | 179:13 180:7 181:10 |
| **sophia** 200:9,10 | | **staring** 55:14,20 | **stating** 141:22 143:16 |
| **sorry** 24:2 25:7,24 29:3 30:10 37:9 38:25 39:13 41:25 44:7 45:17 60:5 66:10 70:8 78:9 81:21 82:22 91:2 91:3 115:3 118:20 118:20,21 125:25 133:16 141:12 150:16 166:7 173:2 174:9 187:10 207:6 209:2 216:2 219:21 236:15 239:22 257:7 | | **start** 15:9 19:7 22:18 34:11 83:15 83:17 94:9 134:20 | **stay** 17:25 20:20 26:17 186:22 |
| | **specifically** 6:11 49:24 53:6 55:19 75:3,7,13 76:2,6 77:7 111:3 153:10 191:24 209:6 | **started** 9:22 19:10 22:11,21 24:14 38:14 43:4,16,20 44:14 47:16,19 49:16 67:21 83:16 92:7 127:2 132:25 136:16,19 137:2 137:13 139:19 209:22 211:10 230:6 | **staying** 243:23 |
| | | | **stealing** 133:7 |
| | **speculate** 9:2 | | **steps** 131:14,19 132:14 |
| | **speculating** 155:17 | | **sterling** 82:21,23 |
| | **speculation** 77:8 147:2 | | **steve** 254:17 |
| | | | **steven** 4:10 |
| | **spell** 13:8 53:19 96:16 | **starting** 89:24 138:5 181:20 | **sticker** 104:10 107:19,20 120:7,7 120:8,14,15 |
| **sort** 33:4 77:25 | **spelling** 12:2 170:21 180:2 | **state** 2:5 5:7,10 22:23 66:23 74:10 75:5,9,15 76:8 77:14 78:20,22 79:9,18 106:20 127:11,19 129:12 129:25 130:14 170:12 179:21 198:11 213:24 231:14,14,20 255:6,14,19,20,23 255:24 260:4 261:9,12 | **stimlar** 11:24 |
| **sound** 205:8 | **spend** 83:23 | | **stipulated** 3:3,8,12 |
| **sounded** 108:18 238:21 240:3,4 | **spent** 83:5 85:12 | | **stipulation** 261:20 |
| | **split** 195:25 | | **stipulations** 2:7 3:1 |
| **sounds** 69:2 205:7 240:14 | **spoke** 57:18 64:11 92:11 95:15 104:13 126:5 151:17 153:23,24 212:7 237:17,17 241:25 254:6,11 | | **stock** 182:21 |
| | | | **stomach** 86:22 |
| **source** 80:19 | | | **stood** 51:23 |
| **south** 200:20 201:2,8,17,23 202:8,14 243:14 244:21 245:4,9 248:15 | | | **stop** 35:9 135:13 135:21 136:5 153:5 |
| | **spoken** 174:16 241:4 246:5 | **stated** 176:20 189:16 | **stopped** 54:16 73:11 129:9 134:14 146:23 161:21 |
| | **spouse** 226:18 | **statement** 199:2 199:12 229:8,17 232:9,10,13,13,18 232:22 239:5 246:16 | |
| **southern** 1:2 | **stable** 226:17 | | **stopping** 135:9 |
| **speak** 7:18 8:8,9 64:8 70:13 73:8 91:5,9 146:4 162:9 208:19 238:10 | **staff** 133:12 | | **store** 1:13 10:6 11:15 12:6,8,16 13:12,14,15 14:4 16:5 48:17 51:24 109:21 114:19 |
| | **stage** 34:8 | | |
| | **stages** 166:13 | | |
| | **stand** 87:17 89:23 99:15 | | |

Atkinson-Baker, A Veritext Company
(818) 551-7300                         www.veritext.com

**[store - talked]**

131:22 146:12
149:20 183:5
186:18,24 201:7
208:20 210:10
236:4,6,24 237:8
243:14 250:12,19
255:4
**store's** 236:16
**stores** 12:16 61:17
**storeworkers** 1:12
1:14
**story** 32:6
**straight** 99:15
**street** 5:12 11:16
74:16 116:3
200:20 201:2,9,18
201:24 202:9,14
203:22 204:6,17
204:22 205:14
215:21 224:19
248:15
**streets** 85:22
**stress** 29:12,19
30:7,11,13,14
34:21,25 35:5,10
226:17
**stressed** 28:4
34:20
**stressful** 28:14
29:24 30:18
**stressing** 28:7
**strike** 35:8 43:21
86:4 87:4 113:11
123:9 184:17
200:24
**structure** 24:10,15
25:17,20,21 26:7
**structured** 25:3
**stuff** 28:10 70:14
72:3 76:10 80:3
114:6 119:7 177:6

183:11 187:5
188:24 189:4
191:5,17 198:17
198:19 211:19
245:9
**stylist** 145:3
**subject** 116:11
**submit** 95:23
97:19,22 165:5
**submitted** 97:15
97:17,20,21,24
98:2,9 100:10
165:8,11,16,18
167:11,23 169:14
208:18 224:24
**subscribed** 264:14
**subsequent** 159:21
**substance** 8:13
**subway** 215:19
**sudden** 133:6
134:9 142:13
**suggest** 56:17
124:17
**suggesting** 32:9
76:3
**suggests** 163:18
214:8
**suite** 4:4,14
**sum** 186:7
**summary** 157:9
245:20
**super** 19:3 20:18
50:5 86:24,24
87:14,14,25,25
186:14 191:5
**supervisor** 11:23
12:25 14:15 15:6
43:18 44:12,16
47:18 48:5 49:10
148:14,17,21
149:3,10 156:20

**supervisory** 148:9
148:11
**support** 68:20
71:24 167:5
172:15 226:17
**supposed** 218:19
**sure** 21:11 22:7
31:15 40:8 42:7
49:21 54:14 55:7
65:9 75:2 79:23
88:15 89:6 104:23
113:19 120:21
126:16 137:13
138:17 152:25
159:20 165:9
180:6 182:24
210:25 211:14
212:4 230:23
231:18 234:7
244:8,11
**surprised** 142:17
**susan** 176:8
**suspended** 117:11
131:11 241:6
**suspension** 240:24
242:3
**suspicious** 106:13
109:12 135:16,24
**suspiciouss** 135:4
**sweating** 226:22
**swipe** 106:14
**swiped** 106:4
**swiping** 108:9
**sworn** 3:15 5:3,17
260:7 264:14
**symptoms** 225:25
226:2,12,20,21
**system** 106:18,22
107:10,21 119:9
129:14

| t |
| --- |

**t** 2:4 5:1 11:25
18:18 74:20,21
84:12,13 96:19
112:3,3 181:4
216:25 217:3
258:5 259:5 260:3
260:19 263:3,3
**taiwan** 186:21
**take** 8:4,11,16,18
20:3 44:8 45:23
48:24 68:24 80:7
80:13 96:8 97:11
101:24 102:17,18
106:8 107:14,16
116:17,22,23
120:21 126:21
134:15 138:15
141:9,14 155:8,15
161:10 162:5
163:7 184:19
215:12 225:20,25
228:12 245:14
253:24 254:16
**taken** 2:3 5:21
11:7 69:5 120:24
138:20 204:2
228:18 254:21
255:5
**takes** 171:22,22
186:12
**talk** 8:5,13 49:5
110:24 115:4
130:6 154:14
162:6 165:2
184:14 237:24
245:7
**talked** 58:23
138:23 139:15
144:21 150:3
151:14,19 162:7

Atkinson-Baker, A Veritext Company
(818) 551-7300
www.veritext.com

[talked - things]

172:13 173:5
175:10,13 176:4
193:19 225:7
238:12 242:17
254:24
**talking**   8:4 21:24
24:12 29:11 42:7
47:9 50:5,14 65:9
65:13 67:22 79:2
101:20 111:6
121:13 128:18
139:24 153:2
205:5 221:19
233:20 234:3
236:4 238:8
244:20 246:6,25
250:15 256:7
**talks**   169:24,25
183:19 192:22
193:6 212:25
213:9 225:22
229:17 236:2
237:6
**tanya**   52:9,11
**tardiness**   157:14
158:10,17
**tardy**   158:13
**tat**   159:18
**tax**   66:21,23 67:10
68:18 71:4,10,19
71:19 72:13,14,19
73:15 75:5,10,16
76:9,11,19 77:15
78:20,22 79:25
80:11 128:11
129:12,16,17
143:5,25 144:5,10
178:22 179:13,21
180:7 181:10
189:5 198:12,18
199:13 204:23

239:13 246:10
249:5 254:25
255:3,6,7
**taxes**   74:11,12
81:14 127:19
128:6,8,14,21,23
130:2 231:14,21
249:2,18 256:13
**teacher**   10:23
**team**   6:14 28:22
47:4 51:22,23
52:19 54:16 57:5
126:13 156:6,8
244:19
**technical**   257:8
**techniques**   150:12
**tell**   7:5,22 8:3 57:3
57:11 58:14 69:19
74:8,15 75:7,21
87:6 88:24 89:6
90:19 93:12,17
102:2,16 117:15
121:19 122:13
123:10,13,15
125:18 129:23
130:9,20 133:5
146:11,19 148:5
152:15 153:5
155:6 160:8 162:8
162:11,22 163:19
163:21 164:17
170:15 178:23
210:4 211:16
217:10 221:10
231:3 237:10
240:25 252:9
**telling**   73:14 88:21
102:6 106:9 114:4
128:20 131:17,18
132:8 135:22
142:10 144:8

171:21 177:13
178:4,10 222:17
224:9
**tells**   92:21 99:8,9
**ten**   84:21 141:10
141:12,13 185:9
**tenth**   101:9 107:17
119:5,6
**term**   172:21
219:22
**terminable**   63:9
63:10 64:10,13
65:3 206:3 213:20
**terminate**   141:18
206:9
**terminated**   136:10
140:13 143:16,23
144:16 145:24
206:14 208:24
**terminating**
142:18
**termination**   63:3
78:21 80:2 111:19
123:4,5 136:7
143:10,14,21
170:5 171:13
173:22 241:19
**terms**   139:25
143:22
**testified**   5:4
128:12 149:24
151:9 153:20
204:7 230:20
**testifies**   246:7
**testify**   174:10
218:7
**testimony**   9:5 66:5
67:24 83:21 85:11
129:3 197:7
198:14 245:20
250:3 260:6,9

264:8
**texas**   109:24,25
115:7 116:3,7,15
117:3 118:2 124:6
124:7 134:23
234:24 235:8
236:9 237:12
**text**   221:20,25
222:19 224:21
**thank**   6:5 67:6
69:3 78:11 235:16
235:20 257:4,8,9
**thanks**   152:3
**thanksgiving**
36:22
**theft**   104:21
245:21
**theory**   218:3
**therapist**   33:4,12
33:19 38:11
**therapists**   36:14
**thing**   65:10,14
103:20 111:7,14
115:6 116:22
172:7 176:23,23
176:24 178:16
179:19 180:5,17
181:2,3,6 188:24
194:25 235:7
250:16
**things**   41:21 60:14
77:14 101:16
121:13 126:15
127:11,18 128:2,3
128:3,10,24,24
137:4 178:10,17
178:18 180:13
194:21 212:23
218:4 231:20
232:25 236:22,23

Page 35

[think - told]

**think** 5:17 6:20
7:20,25 15:19
19:2 20:25 22:3
25:14 27:9 37:7
40:7 42:16 45:2
52:4,21 68:20
71:22 89:11 94:7
99:10 107:4
122:22 128:12
129:22 131:24
135:8,24 136:3,12
154:19 173:19
175:9 176:4
182:23 184:3
186:16 188:17
195:20 200:5,13
200:14 202:2
203:24 204:7,14
206:2,3 213:22
215:24 221:16
224:16 225:6
226:3 229:12
230:20 234:14
235:14 242:17
243:9 245:10
248:2 250:11
254:15 256:23
**thinking** 114:25
**thinny** 18:18
**third** 86:19
**thirty** 10:16 84:22
138:18 210:23
**thomas** 117:21
118:4
**thought** 43:19
57:24 89:2 93:14
93:22 135:4,16
151:17 238:20
**thousand** 25:8
82:2 235:18

**thousands** 81:4,5
**three** 32:21 35:18
38:20 45:2,15,22
63:18 190:14
192:3 226:4 227:4
227:18 236:5
246:17
**threw** 251:21,22
**throw** 87:19 90:8
**throwing** 89:20,21
93:21 161:20,21
161:22
**ticket** 117:11
**tierney** 4:15 5:15
6:8 45:10 49:5
68:23 69:6 112:3
120:21,25 138:15
138:21 171:4
174:9 192:20
203:23 204:3
228:12,19 229:3
235:17 249:14
254:15,22 256:23
257:3 258:3
**till** 26:19 45:25
49:18,18,19
**timbite** 111:25
**time** 3:11 10:6
11:13 15:3 16:4
18:2 19:22,25
20:3,15 21:3,13
22:9 24:22 29:16
29:25 30:20 31:9
31:24 32:12 34:18
35:19 36:15,17
37:11 46:12,14,17
46:21 47:18,22,24
48:7 49:9,11,20
52:5 55:10 56:3
57:25 58:6 61:16
65:19 67:15 73:4

73:17 79:2 82:20
85:9 87:8,9,17
88:3 89:7 90:4
92:3 99:11 103:14
105:14 106:5,11
112:9 113:9 123:9
126:12,14,24
131:9 141:24
146:20 148:19
150:14,20,25
151:12 153:3,16
158:14,17,24
159:6,9 161:7,13
161:24,25 162:15
162:18 163:2
167:15 170:22
171:7,22,22 177:4
181:17 182:12
186:17 189:3
191:20 196:4
199:19 200:4,12
207:16,24 223:4
225:24,25 227:11
228:2 243:2,24
244:12 248:17,18
249:6,13,23
255:10 257:4,11
261:10,18,24
262:7
**timeframe** 47:16
**timeline** 46:7
222:25
**times** 23:25 24:3
48:15 51:11,13,14
54:10,12 57:11,18
60:13 63:20 79:24
81:2,24 106:11
153:18 154:13
159:4,17 179:10
179:10,12 180:10
181:18 190:6

192:10 230:21
233:19 241:21
249:11,12
**timing** 49:13,14
134:8 167:14
**tinbite** 158:5
238:9 241:25
**tirades** 252:2
**title** 182:2
**today** 6:16 8:21
9:5,9,16 43:13
58:24 71:3 139:16
170:19 188:12
197:7 205:6
233:19 257:4
**told** 59:7 60:6,21
60:22 68:12 69:24
77:10,13 87:9,11
87:12 88:3,5,6,9
88:13 89:5 90:7
90:22,23 91:16
92:25 93:11,12,14
93:18,23 94:8
99:23 100:3
101:14 103:19
104:2 108:11
110:4 111:7 118:9
118:16 126:24
129:3,6,7 130:10
130:13 134:20,24
136:21 137:23,24
138:12 139:2
140:17 144:10
145:23 146:18
150:20,23 154:16
156:14 158:18
159:2,3,14,17
161:10 162:3,19
162:21 164:2,5,7,8
165:7 177:12
178:3 190:2

Atkinson-Baker, A Veritext Company
(818) 551-7300                                    www.veritext.com

[told - v]

192:11 194:11
201:4 206:2
218:25 232:17,22
235:2 241:6
242:12 256:15
**tomorrow** 131:12
**top** 42:16 148:4
234:12
**topic** 78:17
**total** 235:9 239:13
240:6
**totaled** 236:5
**totally** 164:6
**totes** 191:25
**touch** 55:22
**touched** 153:22
**track** 196:22
**tracked** 196:16
**trained** 150:11
**transaction** 114:5
120:16 127:3
196:3,15 240:5
247:3,4
**transactions** 72:5
105:16 115:5,7
118:22 122:8
123:18 124:2,5,7
128:19 129:8
137:17 195:25
239:19 240:6
252:13 255:23
**transcript** 260:8
261:6,8,10,13,13
261:21 262:2,2
264:5,8
**transition** 13:3
26:8,11
**transportation**
215:18
**traumatized** 184:3
184:4

**treating** 46:19
**trending** 12:7
**trendy** 192:2
**trial** 3:11
**tricky** 6:18
**tried** 20:24 59:13
77:3 89:22 142:20
**trouble** 56:13
58:13 196:24
251:20
**true** 198:22 199:2
199:8 204:15
232:8,12 233:5
246:16 260:8
264:8
**truly** 253:14
**truong** 181:4,21
**truthful** 41:12
**try** 59:14 253:6
**trying** 6:18 7:20
7:22,25 8:6 34:2
43:13 50:22 75:23
75:24 114:22
117:13 140:4
154:19 192:8
**turn** 91:3
**twelve** 84:25
**twenty** 28:12
**two** 11:3,20 13:22
14:13 15:18 20:5
20:8,14 22:9
32:14,21 64:22,24
96:7 111:2,5
112:14 122:22
123:4 127:21
134:15 136:8
140:15 156:24
173:14 190:13
191:25 196:2,4
206:4 225:18
226:3 227:4

243:13 253:9
**tyler** 247:22
248:10 249:9,12
**tyndall** 4:17 6:13
**type** 11:7,8 23:13
35:20 36:6 120:3
200:24
**typed** 203:3

**u**

**u** 43:17 66:4,4
84:13 180:25
181:4 219:7,10
259:6
**ufcw** 1:14
**uh** 44:8
**unable** 121:7
**uncle** 199:24
200:3
**uncomfortable**
50:5 55:11 56:21
57:4,13 59:3,7,12
104:4,24 139:12
147:19 150:21,22
153:4
**understand** 7:6,7
7:8 9:15 42:7,18
79:21 98:19 99:3
123:20 137:11
142:15 144:6
148:20 158:9
186:23 189:15
193:23 196:18
216:3 226:19
237:23 253:4
255:3,7,10,15,20
**understanding**
31:17 62:24
149:14,25 198:14
234:20 238:17
**understood** 7:5

**unemployed** 19:13
**unfortunately**
27:11 87:3 142:16
161:16 184:7
**unhappy** 27:23
**union** 1:13 126:22
126:23 140:21,22
140:24 141:6
142:24 146:16
171:12 174:20
175:3 218:21,21
220:8 232:24
**unit** 154:16 155:2
201:18,24 202:9
216:14
**united** 1:1,12,14
**unsellable** 190:24
**unspecified**
227:15
**untrue** 68:14
194:21 195:7
**updike** 4:7
**ups** 122:2 243:14
**upset** 60:22,24
61:8,12
**upstairs** 101:9
107:16 109:11
111:3 113:16,20
120:5 126:17
**use** 83:2 107:3
120:16 129:25
135:23 177:9,24
178:12 198:17
213:3 248:17
**usually** 87:21
88:22 215:8

**v**

**v** 5:1 15:8 74:20
74:21 81:18,19
220:21,25 259:7
264:1

Page 37

[valentino - witnesses]

valentino 20:10
21:6,9 22:4,5
valid 230:8
vancleave 203:22
204:6
various 173:15
231:13 245:7
vegas 177:21
vendors 63:2
verbal 44:4,9
92:23 150:15
156:16 170:6
178:6
verification
104:10
verified 236:19
veritext 261:7,9
261:11
verses 17:9 23:11
version 124:22
victoria 44:15,24
45:23,25 46:15
74:14,16
victoria's 44:17
video 1:19 2:3
246:25
vie 2:3 98:12
viktoria 76:6
130:11
violating 62:25
206:14
violation 199:13
199:17 206:7
212:24 213:15
visibly 21:15
visits 38:11
volume 170:13
vomiting 161:23
vs 261:4 263:1
vuitton 16:24 17:4
17:17,20 18:2,5,8

19:8,10 22:12,13
22:15 37:9 61:15
62:8,8,9 64:12
145:7 185:5 221:8

w

w 208:7 221:20,24
259:8
wages 184:15
185:10
wait 47:2 107:18
114:10 142:6
146:9 240:5
waiting 229:6
waived 3:7 248:14
261:23,23
waiving 261:20
walks 241:21
want 7:12 8:25 9:2
9:3,4 14:12 20:22
35:5,11,16 40:17
42:6 43:8 49:19
55:18 56:12 58:12
59:19 67:10 73:6
74:7 91:19 94:12
94:17 102:3,4
106:8 107:8 108:8
109:5 115:9
116:22 118:17
121:3,4,17 126:15
129:10,20 133:15
140:5 159:18
167:14 185:16,17
187:14 196:23
212:3 215:14
219:12 229:6
230:23 232:20,21
237:24 249:5
wanted 10:8 12:24
12:25 16:6 18:10
20:20 27:3,10,20
31:3 33:13 91:20

93:6 95:16,19
101:10 126:23
230:19
wants 197:24
warning 163:8
watching 52:13
water 101:11
way 37:16,25
38:23 39:2,22
42:14 50:13,14,15
55:23 72:9 87:11
100:24 103:4
135:9 147:15
148:10 153:7
183:14 184:22
216:11 218:14
246:12 248:23
249:8 252:11
256:14 260:13
wealthy 186:14
wear 12:9 14:9
17:22,24,25 18:21
18:22 150:25
wearing 67:21
wedding 179:4
198:2
week 22:16 54:11
116:11 123:7
227:22
weekly 48:20
weeks 86:14 123:4
134:18 140:15
185:4 226:4 227:4
weird 119:25
220:12
wells 63:6
wen 181:20
went 10:23 12:6
13:6 14:4,22,23
15:2,21 21:25
22:5 23:2 24:9,11

26:4,22 27:7 30:7
30:10 32:12 37:8
37:9 43:7 46:3
62:17 91:10,12
92:5,6 103:18
104:3 109:18
111:3 113:19
114:10,12 117:23
118:12,17,19,20
119:7 126:16
134:25 146:24
151:2 164:25
165:5,7 184:25
185:2 215:21
225:9 226:8
227:21 238:22
whereof 260:15
wholesale 1:13
wife 200:6
willow 200:20
201:2,9,18,23
202:9,14 204:17
204:22 205:14
243:14 244:21
245:4,9 248:15
withdraw 239:5
withdrawn 143:19
witness 5:2 49:4
56:12 91:2 112:20
140:23 145:12
152:19 174:8
188:10 192:18
199:11 206:19
229:5 233:11
249:16 258:2
260:6,10,15
261:13,16 262:2,5
witnessed 76:12
witnesses 51:15
54:8

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[woman - zoom]**

**woman** 12:9 20:19
21:4 73:25 133:15
243:10 251:17
**women's** 14:8
**wonder** 220:13
**woodfield** 203:21
204:6
**word** 61:18 94:10
101:7
**worded** 94:2
**words** 110:11
111:15
**work** 10:2 11:8
12:18 18:16 19:14
22:13 29:23 34:21
47:11 54:21,23
58:21 72:9 78:24
83:13 85:4,15
89:22,22 97:16
145:4 146:17,20
149:9 150:12
161:7 162:15,18
182:4 184:22
185:2 194:25
195:6 215:13,18
225:24 226:8
227:8 229:5 241:7
254:12
**worked** 11:14
12:20 14:10 18:20
24:7 61:14,16,22
83:20 110:18,23
129:11 159:7
160:24 174:4,5
178:25 182:9,14
182:16,19,20,24
185:7 199:20
207:24
**worker** 174:15
222:22 243:3
254:5

**workers** 57:5
68:10 69:13 77:22
78:2 192:14,16
204:21 205:13,22
222:2 256:6,11
**working** 9:22 17:3
19:7,10 28:20,21
34:24 54:17,18
63:25 64:17,19
84:2 95:13 211:10
**works** 85:6,8
**worried** 221:16
**worry** 111:14
**worth** 80:10
133:13 204:25
**write** 92:24 94:5,6
100:5,6,13,15,18
122:2 158:22
159:21 161:5,7,11
162:5 163:4,7,16
232:9,15,16,17,19
232:21,22
**writing** 98:5 220:9
247:17,20
**written** 146:7
170:25 188:6
229:8
**wrong** 43:9 87:20
87:23 88:24 94:3
105:12 111:12
151:24 180:22
**wrote** 93:20 98:7
119:22 159:7
188:7 229:13
246:15 247:5

**x**

**x** 1:3,18 179:24
180:25 210:10,16
224:25 225:4
244:22 247:13
250:17 258:1,5

259:1,9 262:1

**y**

**y** 5:1 14:16 18:18
43:17 66:4,4
84:12 112:4
180:17,25 188:18
228:23,25 254:4
259:10
**yards** 27:5 29:4
**yeah** 41:15 52:2
55:15 100:23
117:6 118:21
128:8 144:10
153:4,24 161:5
204:9 205:9
211:19 217:14
222:21 253:23
**year** 12:20 17:12
22:11 24:4,5
83:18 190:12
196:10 208:4
**years** 8:22 10:16
11:3,15,21 12:12
13:22 14:13 15:18
32:15 84:21,25
85:3 185:9 225:18
**yeseer** 156:19
**yonas** 111:25
158:5 238:9
**york** 1:2,11,12 2:6
4:4,4,9 5:13 67:16
67:17,19 68:7
77:6 81:23 85:22
137:3 186:4
231:14 255:6
260:4
**young** 126:18
188:8
**younger** 210:25
**younis** 10:10
43:17 48:13 76:10

125:10 131:5
134:2 149:22
150:4,11,12,24
191:20
**yuyu** 65:25 66:9
66:12 67:2,9,13,24
68:11 69:8 70:3
70:11,17,22 71:2
79:6 186:3,4,6,10
186:13,17 188:25
200:7 201:4,13
202:8,10 205:24
210:6,7,13,19
216:14,20 243:13
244:2,20 246:2,8
246:13,14 247:10
247:12 248:14
249:18 250:3,12
250:15,16,22,24
251:7,10,10,12,24
252:9,13,17,22
253:9 254:13
256:12

**z**

**z** 45:11 179:25
181:2 233:21,23
259:11
**zhang** 176:24
179:24 180:12
**zofran** 161:19,22
**zoom** 1:19 2:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.