# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3                     -  -  -
   KRISTINA MIKHAYLOVA,              :
 4                                   :
            Plaintiff,              :
 5                                 :Case No. 19-8927
               vs.                 :
 6                                 :
   BLOOMINGDALE'S INC., et al.,    :
 7                                 :
            Defendant(s).          :
 8
                       -  -  -
 9          REMOTE videoconference deposition of

10   RICHARD LAW, held via videoconference on Monday,

11   December 5, 2022, beginning at approximately

12   10:14 a.m., before Robin A. Vance, CCR, RPR, and

13   Notary Public for the States of New Jersey,

14   Delaware and Pennsylvania.

15

16                     -  -  -

17

18

19

20

21

22

23

24

25
```

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 3 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

```
1    A P P E A R A N C E S:

2    (PARTICIPANTS WERE PRESENT VIA REMOTE VIDEOCONFERENCE)

3    DEREK SMITH LAW GROUP, PLLC
     BY:  MELISSA MENDOZA, ESQUIRE
4    One Penn Plaza
     Suite 4905
5    New York, NY 10119
     212-587-0760
6    Melissa@dereksmithlaw.com
     -- Representing the Plaintiff
7

8    PRO HOC - IN-HOUSE COUNSEL FOR MACY'S
     BY:  BETTY TIERNEY, ESQUIRE
9    11477 Olde Cabin Road
     Suite 400
10   St. Louis, MO 63141
     Betty.tierney@macys.com
11   -- Representing the Defendants

12

13   BARTON GILMAN, LLP
     BY:  STEVEN GERBER, ESQUIRE
14   165 Passaic Avenue
     Suite 107
15   Fairfield, NJ 07004
     973-256-9000
16   Sgerber@bglaw.com
     -- Co-counsel representing the Defendants

17

18   Also Present:  David Tyndall, Paralegal to
                     Betty Tierney

19                   Trinity Harris - Video Tech

20

21

22

23

24

25
```

```
 1                 I N D E X

 2
     WITNESS                              PAGE
 3
     RICHARD LAW
 4
          BY MS. MENDOZA              5, 173
 5
          BY MS. TIERNEY          167, 177
 6
                           -   -   -
 7
                       EXHIBITS
 8
     No.              DESCRIPTION            PAGE
 9
     Exhibit-A        Chanel Handbag Policy    51
10
     Exhibit-B        Text messages           56
11
     Exhibit-C        Transcript excerpt from  66
12                    deposition of Cathy Younis

13   Exhibit-D        Grievance               74

14   Exhibit-E        Standards of Conduct    89

15   Exhibit-F        Various Documents      101

16   Exhibit-G        E-mail chain           117

17   Exhibit-H        Investigative Summaries 127

18   Exhibit-I        E-mail dated 11/3/2017  139

19   Exhibit-J        Case details           143

20   Exhibit-K        Complaint              146

21   Exhibit-L        Grievance form         156

22   Exhibit-M        E-mail retention policy 159

23

24   REQUEST FOR PRODUCTION:

25   By Ms. Mendoza:  Page 79, 122
```

Case 1:19-cv-08927-GBD-SLC    Document 128-2    Filed 09/20/23    Page 5 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 4

1     (It is agreed by and between
2  counsel that certification and sealing are
3  hereby waived; all objections, except as
4  to the form of the questions, are reserved
5  until the time of trial.)
6     COURT REPORTER:  The attorneys
7  participating in this proceeding
8  acknowledge that I am not physically
9  present with the witness and that I will
10 be reporting this proceeding remotely.
11 They further acknowledge that, in lieu of
12 an oath administered in person, the
13 witness will verbally declare that his
14 testimony in this matter is under penalty
15 of perjury.  The parties and their counsel
16 consent to this arrangement and waive any
17 objections at this time.
18     Counsel also acknowledges and
19 agrees that the official transcript is
20 solely the one transcribed by the court
21 reporter.
22     Counsel, please indicate your
23 agreement by stating your name and your
24 agreement on the record beginning with
25 Plaintiff's counsel.

Page 5

1     - - -
2     MS. MENDOZA:  Melissa Mendoza from
3  Derek Smith Law Group and I agree.
4     MS. TIERNEY:  Betty Tierney.  I am
5  pro hoc and I represent the defendants in
6  this matter and I agree.
7     MR. GERBER:  Steve Gerber and I
8  also agree.
9     - - -
10    RICHARD LAW, having been duly
11 sworn, was examined and testified as
12 follows:
13    - - -
14    EXAMINATION
15    - - -
16 BY MS. MENDOZA:
17    Q.    Good morning, Mr. Law.
18    A.    Good morning.
19    Q.    As we've already been introduced, I am
20 the attorney for the Plaintiff in this case,
21 Kristina Mikhaylova.  And you know Kristina
22 Mikhaylova, correct?
23    A.    I only know her by name.  I do not
24 recall meeting her in person.
25    Q.    Oh, okay.  And where -- how do you

Page 6

1  know her by name?
2     A.    I know her by name because we both
3  worked together at Bloomingdale's several years
4  ago.  I think it was 2016, 2017.
5     Q.    Okay.  And for purposes of today's
6  deposition, I will be asking questions regarding
7  Kristina Mikhaylova's employment at
8  Bloomingdale's during that time period, 2016 to
9  2017.  Unless I state otherwise, I will be
10 referring to that time period.  Okay?
11    A.    Okay.
12    Q.    All right.
13    MS. TIERNEY:  Now, Melissa, just to
14 save me from making objections because
15 this has come up in other depositions, any
16 questions you ask, just for clarity, are
17 '16, '17, correct?
18    MS. MENDOZA:  Correct.
19    MS. TIERNEY:  Okay.
20    MS. MENDOZA:  Correct.
21    MS. TIERNEY:  So I'm not going to
22 object and I assume that I can preserve
23 any objections other than -- I mean, I'm
24 not going to object based on time like I
25 have in other cases.

Page 7

1     MS. MENDOZA:  Okay.
2     MS. TIERNEY:  I just want to be
3  clear that that's what we're talking
4  about.
5     MS. MENDOZA:  Okay.
6  BY MS. MENDOZA:
7     Q.    And have you ever had your deposition
8  taken before?
9     A.    I had to give testimony in a grand
10 jury for a criminal matter.
11    Q.    Okay.  And -- well, I'm just going go
12 over a few round rules before I get started with
13 my other questions.  And just want -- just to let
14 you know that this is -- well, you are aware that
15 you're under oath, correct?
16    A.    Yes.
17    Q.    And so even though this is an informal
18 setting, it is as if we were in front of a judge
19 or a jury.  You understand that, correct?
20    A.    Yes.
21    Q.    Okay.  And since the court reporter is
22 taking down everything that we say, it is
23 important that you respond with verbal responses,
24 not nodding of the head or anything like that, so
25 that she can take down your responses.

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 8

Understood?

A.   Yes.

Q.   And also, I ask that you just wait until I'm done asking the question before you respond so that we're not speaking over one another, and I will try and do the same.  Okay?

A.   Yes.

Q.   All right.  And please, if you do not understand any of my questions, I'm more than happy to rephrase it.  Just ask me and I will continue rephrasing it.  Okay?

A.   Yes.

Q.   And are you aware of any reason that might impair or prevent you from truthfully answering my questions today?

A.   No.

Q.   Okay.  Do you suffer from any condition, either mental or physical, that might impair your ability to truthfully answer my questions today?

A.   No.

Q.   Okay.  And have you taken any prescription medication or otherwise in the last 24 hours?

A.   No.

Page 9

Q.   Were you supposed to take any prescription medication or otherwise in the last 24 hours and you did not?

A.   Yes.

Q.   Okay.  And will that affect your ability to respond to my questions today?

A.   I do not believe so.

Q.   Okay.  And are you being represented today?

A.   Yes.

Q.   Okay.  And by whom?

A.   Betty Tierney and Steve Gerber.

Q.   Okay.  And if you need to take a break at all, I'm more than happy with that, just let me know.  And I just ask that you please answer the last question that was asked and then you can take a break.  Okay?

A.   Yes.

Q.   All right.  And so, how did you prepare for today's deposition?  But don't tell me any conversations that you had with your attorney.

A.   I reviewed documents and spoke with my attorney.

Q.   Okay.  What documents did you review?

Page 10

A.   Off the top of my head, there were various documents.  There was an employee handbook, discount policy, EEO policy.  Several different AP investigation documents.  Some transaction receipts.  And I think there might have been one or two more off the top of my head I can't recall.

Q.   Okay.  And when did you review these documents?

A.   Within the past few days.

Q.   Okay.  And when was the last time you saw those documents, if you hadn't seen them before?

A.   Probably last night.

Q.   But before you saw them?

A.   Oh, before, I apologize.  It was probably when I was still employed at Bloomingdale's back in 2016, 2017.

Q.   Okay.  All right.  Did you read any transcripts, deposition transcripts, that have been taken in this case already?

A.   I have not read any transcripts.

Q.   Okay.  Did you speak with anyone else besides your lawyer, your lawyers, regarding today's deposition?

Page 11

A.   No.

Q.   Okay.  And have you ever been a plaintiff in a case?

A.   No.

Q.   Have you ever been a defendant?

A.   No.

Q.   Have you ever been convicted or pled guilty to any crime other than a minor traffic violation?

A.   No.

Q.   And do you go by any other names besides Richard?

A.   I typically go by Richard.

Q.   Do you go by any other names?

A.   Sometimes Rich, but generally not any other name.

Q.   Okay.  Do you have any other last name?

A.   No.

Q.   Okay.  And where do you live?

A.   In New York, on Long Island.

Q.   Did you attend high school?

A.   Yes.

Q.   Okay.  Where did you attend high school?

Deposition of Richard Law                                Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 12

1    A.    Deer Park High School.
2    Q.    Is that in New York?
3    A.    Yes, it is.
4    Q.    And did you attend college?
5    A.    Yes.
6    Q.    Did you graduate?
7    A.    Yes.
8    Q.    And did you -- what degrees did you
9  get?
10   A.    So I have a few different degrees.  I
11 have a bachelor's degree and I have two different
12 master's degrees.
13   Q.    Okay.  And what are those degrees in?
14   A.    The bachelor's degree is in economics.
15 One master's degree is in business administration
16 and the other master's degree is in human
17 resources management.
18   Q.    Okay.  And besides your masters, did
19 you take any other educational courses?
20   A.    I took a certificate program in
21 project management.
22   Q.    Okay.  And where was that?
23   A.    Stony Brook university.
24   Q.    Okay.  And who is your current
25 employer?

Page 13

1    A.    I do not have a current employer.
2    Q.    Are you retired?
3    A.    No.
4    Q.    And who was your last employer?
5    A.    Bloomingdale's.
6    Q.    And when was your last date of
7  employment?
8    A.    It was the very end of 2017 in
9  December.
10   Q.    Were you terminated?
11   A.    No, I left voluntarily.
12   Q.    Why did you leave?
13   A.    Personal matters.
14   Q.    Personal as in family?
15   A.    Yes.
16   Q.    Okay.  And when did you start working
17 at Bloomingdale's?
18   A.    I believe it was June of 2016.
19   Q.    Did you receive any disciplinary
20 action while you were at Bloomingdale's?
21   A.    No.
22   Q.    Did you receive a review?
23   A.    Not that I recall.
24   Q.    Who was your supervisor?
25   A.    Initially, Michelle Ronquillo and then

Page 14

1  Tinbite Yonas.
2    Q.    Okay.  And what was your position at
3  Bloomingdale's?
4    A.    Human resources manager.
5    Q.    Is that what you interviewed for?
6    A.    No, I initially interviewed for a
7  lower level position and then was asked about my
8  interest in this particular role.
9    Q.    Okay.  And so did you start with
10 that -- the HR manager position?
11   A.    Yes.
12   Q.    Okay.  And was that your ending
13 position as well?
14   A.    Yes.
15   Q.    Where did you work before
16 Bloomingdale's?
17   A.    All the places I've worked or
18 immediately preceding?
19   Q.    Immediately preceding and then we'll
20 work backwards.
21   A.    So that might have been Macy's.
22   Q.    Okay.  And when did you start working
23 for Macy's?
24   A.    I want to say in 2009, probably
25 Octoberish.

Page 15

1    Q.    Okay.  And then why did you leave
2  Macy's?
3    A.    To attend full time graduate school.
4    Q.    And when did you leave Macy's?
5    A.    I want to say January of 2011.
6    Q.    So between 2011 and 2016 you did not
7  work?
8    A.    I may have had some quote-unquote
9  contract type jobs, I don't recall specifically,
10 but it was not that I recall with a -- like, a
11 named organization.
12   Q.    Okay.  And what was your position at
13 Macy's?
14   A.    The official title was administrative
15 support team associate.
16   Q.    Okay.  And what department did that
17 fall under?
18   A.    That fell under, I guess it was either
19 human resources or office management.
20   Q.    Okay.  And did you receive any
21 disciplinary action while you were at Macy's?
22   A.    No, I did not.
23   Q.    Okay.  And where did you work before
24 Macy's?
25   A.    So before Macy's, I think it might

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 16

1  have been OfficeMax.
2      Q.   Okay.  Do you recall the years that
3  you started and ended?
4      A.   I want to say 2002, 2003.
5      Q.   Okay.  So between 2003 and 2011, where
6  did you work?
7          MS. TIERNEY:  Objection.  I think
8      you meant 2009, didn't you, Melissa?
9          MS. MENDOZA:  My apologies, 2009.
10         THE WITNESS:  Off the top of my
11     head, I don't believe I did work.
12 BY MS. MENDOZA:
13     Q.   Okay.  And at OfficeMax, what was your
14 position?
15     A.   I was a product manager.
16     Q.   Okay.  So going back to Bloomingdale's
17 now, if you can explain a little bit about the
18 position, the HR manager position, what your
19 duties and responsibilities were?
20     A.   Sure.  So, I was part of a team of
21 human resources executives and staff in the 59th
22 Street location.  My role consisted primarily of
23 what I'm going to call the day-to-day
24 administrational operational aspect of HR as well
25 as employee relations.

Page 17

1      Q.   Okay.  And what type of training did
2  you take for that position?
3      A.   So, training for that position
4  probably would have been my master's degree as
5  well as, I guess, day-to-day training and some
6  computer-based training when I first started.
7      Q.   Okay.  And you're saying
8  computer-based because was -- were the company's
9  employees files on software?
10         MS. TIERNEY:  Object to the form.
11     You may answer.
12         THE WITNESS:  Um, so if I
13     understand your question correctly, how
14     was I trained?  And that would have been
15     through programs via computer
16     applications.
17 BY MS. MENDOZA:
18     Q.   Okay.  But was it for Bloomingdale's
19 specific, what was it -- withdrawn.
20         What was it for?
21     A.   So this training encompassed a bunch
22 of, from what I recall, things such as how to
23 conduct investigations.  There were a few others.
24 I don't recall specifically.
25     Q.   Okay.  Did you handle complaints of

Page 18

1  discrimination?
2      A.   Can you clarify what you mean by
3  "discrimination"?
4      Q.   Does -- okay.  Does Bloomingdale's
5  have a discrimination policy?
6      A.   I believe they do, yes.
7      Q.   Okay.  And do you recall what that
8  policy is?
9      A.   Broadly speaking, I think it involves
10 some form of zero tolerance for, like, verbal
11 comments based on things such as religion, sexual
12 orientation, marital status, and other protected
13 classes.
14     Q.   Okay.  And so if someone has a
15 complaint of discrimination, who are they
16 supposed to report it to?
17     A.   There were several different avenues
18 that they could report it to.  Not in any
19 particular order, they could report it to their
20 supervisor or manager; they could report it to
21 human resources; or I believe there were two or
22 three different 800 numbers they could report it
23 to.
24     Q.   Okay.  And did you conduct those
25 investigations?

Page 19

1      A.   Depending upon the type of
2  investigation and whether it fell within my
3  purview, yes.
4      Q.   Okay.  And what was that
5  investigation?
6          MS. TIERNEY:  Objection to the
7      form.  You can answer.
8          THE WITNESS:  Can you clarify what
9      you mean by that?
10 BY MS. MENDOZA:
11     Q.   What did that investigation entail?
12 What did those investigations entail?
13     A.   Those investigations could have
14 entailed anything from, as I tried to explain
15 earlier, discrimination, harassment, and
16 basically things along that nature.
17     Q.   Okay.  Did you get witness testimony?
18     A.   Yes.
19     Q.   Okay.  And how did you make a
20 decision, determination if there was
21 discrimination?
22     A.   Based upon testimony from the
23 complainant, the accused, and witnesses, putting
24 facts together, seeing if they made sense, and
25 making determination from there.

Page 20

Q.    Okay.  And did you look at any cameras, any videos?

A.    Depending upon the situations, yes, there might have been video footage, there might have been other documentation such as transactions.

Q.    Okay.  And did you document these investigations?

A.    I believe I did.

Q.    And where did you store these documents?

A.    Probably would have been in a folder in my office.

Q.    Okay.  And did you have to give a report to anyone?

A.    So, sometimes I believe I gave a verbal report to my supervisor and other times it might have been a quick write-up.

Q.    Okay.  And were there any findings of discrimination that you found?

        MS. TIERNEY:  Object to the form. You can answer.

        THE WITNESS:  Not that I recall specifically.

BY MS. MENDOZA:

Page 21

Q.    In general?

        MS. TIERNEY:  Objection to the form.  You can answer.

        THE WITNESS:  I do not believe so.

BY MS. MENDOZA:

Q.    Okay.  Were there any complaints of discrimination?

A.    Yes.

Q.    Okay.  How many?

A.    I do not know the number off the top of my head, but there were several.

Q.    And what were they for?

A.    Are --

        MS. TIERNEY:  Object to the form. You can answer.

        MS. MENDOZA:  I'll be more specific.

BY MS. MENDOZA:

Q.    What were they based on; for example, sex, gender?

A.    So I'm going to use the term, quote-unquote hostile work environment where comments were made to an individual and this individual alleged a hostile-type work environment.

Page 22

Q.    Okay.  And what was the outcome of that?

A.    The outcome -- the outcome of that was that after the various testimony from the witnesses and all parties involved, that there was no discrimination or hostile work environment.

Q.    Okay.  And was anything done for the complainant?

        MS. TIERNEY:  Object to the form. You can answer.

        THE WITNESS:  I believe the complainant was spoken to that an investigation had been conducted, but we were not able to substantiate his claim.

BY MS. MENDOZA:

Q.    Were any of Bloomingdale's policies changed after that investigation?

A.    During the time that I was there, I do not believe so.

Q.    Okay.  Was there another complaint of discrimination or hostile work environment?

A.    There may have been, but I don't recall specifically.

Q.    Okay.  And were there any complaints

Page 23

of pregnancy discrimination?

A.    Not that I was aware of.

Q.    Okay.  And what about retaliation?

A.    Not that I was aware of.

Q.    And failure to accommodate?

A.    Not that I was aware of.

Q.    Okay.  Were there any lawsuits for discrimination made against Bloomingdale's while you were there?

A.    Not that I was aware of.

Q.    Okay.  And what about the same question, but for retaliation?

A.    Again, not that I was aware of.

Q.    Okay.  And same question for failure to accommodate?

A.    Again, not that I was aware of.

Q.    Okay.  Were you in charge of training employees about -- withdrawn.

        Were you in charge of enforcing the discrimination retaliation policies at Bloomingdale's?

        MS. TIERNEY:  I'm going to object to the form.  You can answer.

        THE WITNESS:  So, if I understand your question, was I the one that would

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 10 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 24

1  say, you know, no, you shouldn't be doing
2  this? Then my answer would be, I could
3  have been one of several individuals.
4  BY MS. MENDOZA:
5  Q.   Okay. What department did that fall
6  under?
7  A.   That probably would have fallen under
8  human resources.
9  Q.   Okay. Did you supervise anyone?
10  A.   I did not.
11  Q.   So who were the other people that
12  enforced the discrimination policies?
13  A.   It could have been one of several
14  different individuals. It could have been, not
15  in any particular order, Michelle Ronquillo,
16  Tinbite Yonas, Susan Wright, Steven Valecca (ph),
17  Raul Argaden (ph). And off the top of my head, I
18  think that might have been it.
19  Q.   Okay.
20  A.   And myself.
21  Q.   Right. And so -- and they are all HR?
22  A.   Yes, they were all HR executives like
23  myself.
24  Q.   Okay. And when you're saying HR,
25  you're just speaking for 59th Street?

Page 25

1  A.   That is correct.
2  Q.   Okay. Did you report to corporate?
3  A.   No. I reported to the senior
4  executive of HR at the 59th Street location.
5  Q.   Okay.
6  A.   And then -- I initially reported to
7  her and then I wound up reporting to Tinbite
8  Yonas.
9  Q.   And what was her position or title?
10  A.   Which one?
11  Q.   Position first?
12  A.   No, which person?
13  Q.   Tinbite Yonas.
14  A.   Her title was human resources
15  director.
16  Q.   So what was the difference between
17  your position as manager versus hers as director?
18  A.   I believe the difference was that I
19  focused more on day-to-day aspects and she
20  focused more on the talent management side of
21  things.
22  Q.   Okay. By talent management, are you
23  talking about recruiting?
24  A.   Not recruiting specifically, but more
25  so like succession planning for staff.

Page 26

1  Q.   Okay. And when you -- can you
2  elaborate by what you mean by day-to-day
3  operations?
4  A.   So day-to-day operations could be
5  things such as an employee having a question
6  about things like taking time off or -- or
7  questions about policies and things along those
8  nature.
9  Q.   Okay. So they would come to you and
10  you would answer them about those questions?
11  A.   Yes.
12  Q.   Okay. Did you change any policies
13  while you were there?
14  A.   I did not have the authority to change
15  any policies.
16  Q.   Did you recommend any changes to
17  policies?
18  A.   Not that I recall.
19  Q.   Okay. And were any changes made, not
20  by you, but by HR while you were there?
21  MS. TIERNEY: Object to the form.
22  You can answer.
23  THE WITNESS: Not that I recall.
24  BY MS. MENDOZA:
25  Q.   Okay. Did the 59th Street -- 59th

Page 27

1  Street -- withdrawn.
2  Did HR have an FMLA department?
3  A.   I'm sorry, could you repeat that?
4  Q.   Did HR have an FMLA department?
5  A.   Are you referring to 59th Street
6  specifically?
7  Q.   Yes.
8  A.   No, I wouldn't say that there was a
9  specific FMLA department.
10  Q.   Okay. Did you handle FMLA leave
11  requests?
12  A.   So I facilitated interaction between
13  the Centers of Expertise for FMLA requests and
14  the 59th Street location, but I did not have
15  approval authority.
16  Q.   Okay. So who did have approval
17  authority?
18  A.   That would have been somewhere in the
19  Centers of Expertise.
20  Q.   And is that not at 59th Street?
21  A.   That is correct, it's not at 59th
22  Street.
23  Q.   Is it corporate?
24  A.   I would say it's probably corporate.
25  Q.   Okay. And when you say -- so then did

Page 28

1 you submit requests to the Centers of Expertise?

2 A.   Sometimes if the employee came to me,
3 yes.  I, you know, prefer that they did it
4 directly, but sometimes they came to me.

5 Q.   Okay.  And if anyone wanted a medical
6 accommodation, would they come to you?

7 A.   If the medical accommodation was
8 approved through corporate, then yes.

9 Q.   So is the employee first supposed to
10 make the accommodation request to corporate?

11 A.   I would say yes.

12 Q.   Okay.  So let's say if an employee
13 needs an accommodation, a medical accommodation,
14 what are they supposed to do?

15 A.   From my recollection, they needed to
16 provide medical documentation from their medical
17 provider to corporate for corporate to review
18 before any accommodation would be made.

19 Q.   Okay.  And -- and so then they would
20 make a determination whether or not to grant that
21 accommodation, correct?

22 A.   They would make the determination on
23 approving the overall request, but it also, I
24 think, depended upon the nature of the request in
25 terms of whether or not that was something that

Page 29

1 we could actually request in the store --
2 accommodate in the store.

3 Q.   Okay.  And did you give any
4 accommodations?

5 A.   I believe I did.

6 Q.   Okay.  And what were those?

7 MS. TIERNEY:  Note my objection to
8 form.  You can answer, Richard.

9 THE WITNESS:  I don't recall the
10 accommodations specifically, but I do
11 recall that accommodations were made for
12 different individuals.  Okay, so I do
13 recall one accommodation could have been
14 for an individual who could only lift a
15 certain amount of weight at any given
16 time.  And in discussions with that
17 individual, we came to the agreement that
18 the associate would self monitor the
19 amount of weight they would lift at any
20 one time and still be able to perform
21 their functions satisfactorily.

22 BY MS. MENDOZA:

23 Q.   Okay.  And were there any
24 accommodations given for pregnancy related
25 conditions?

Page 30

1 A.   Other than having what I'm going to
2 call a -- a lactation room, I do not recall
3 specific pregnancy accommodations.

4 Q.   Okay.  And how did you come to the
5 conclusion as to what accommodations could be
6 given in the store?

7 A.   So that was in consultation with the
8 department they worked in and the -- whatever
9 those restrictions for the accommodation were,
10 and whether or not that severely restricted their
11 capabilities to perform the essential functions
12 of the job.

13 Q.   Okay.  So were the managers involved?

14 A.   I would say yes.

15 Q.   Okay.  All right.  And so do you
16 recall the Asset Protection department at the
17 59th Street location?

18 A.   So, yes, I recall that there was an
19 Asset Protection department in the store.

20 Q.   Okay.  And did you work with Asset
21 Protection?

22 MS. TIERNEY:  Objection to form.
23 You can answer.

24 THE WITNESS:  Yes, I did partner
25 with the Asset Protection team.

Page 31

1 BY MS. MENDOZA:

2 Q.   Okay.  And how did you work together?

3 A.   So, typically, if there was a
4 situation that might need human resources
5 involvement, I was contacted by Asset Protection.

6 Q.   Okay.  What types of situations would
7 involve HR?

8 A.   If they needed to potentially suspend
9 somebody or if there were incidents of things
10 such as fraud or theft, human resources might be
11 contacted.

12 Q.   Okay.  Was any of that documented?

13 MS. TIERNEY:  Object to the form.
14 You can answer.

15 THE WITNESS:  Can you be a little
16 bit more specific on that?

17 BY MS. MENDOZA:

18 Q.   Yeah, so was your -- how you worked
19 together, whether it was for fraud, theft,
20 whatnot, was that all documented?

21 A.   It was documented in the sense of the
22 Asset Protection investigation paperwork.

23 Q.   Okay.  But did you have meetings or
24 verbal conversations, e-mails?

25 A.   Yeah, so there could have been any of

Deposition of Richard Law                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 32

1 those.
2   Q.   Okay.  And who did you work with in
3 Asset Protection?
4   A.   So I would have worked with a couple
5 of different individuals.  Names that I recall
6 could have been Fred Becker, could have been
7 Chris Castellani, could have been David Ray.
8 There might be a few other individuals whose
9 names I don't remember.
10   Q.   Okay.  Did anyone have to -- or did --
11 withdrawn.
12       Did Asset Protection have to report
13 to you their findings from their investigations?
14   A.   So, if it involved HR potential
15 interaction, then yes.
16   Q.   Okay.  Okay.  And how did your
17 department maintain employees' files?
18       MS. TIERNEY:  Object to the form.
19    You can answer.
20       THE WITNESS:  I can't speak for the
21    rest of the department.  I usually kept
22    files in, you know, folders.  Or there
23    might have been online folders.
24 BY MS. MENDOZA:
25   Q.   Okay.  So when you say folders, are

Page 33

1 you saying physical -- you used to keep physical
2 folders?
3   A.   It could have been, yes.
4   Q.   Okay.  And did you use any software
5 application?
6   A.   So it could have been Microsoft Word,
7 off the top of my head.  I don't recall other
8 specific applications.
9   Q.   Okay.  So was there, like, any
10 software program that stored all of -- or each
11 employee's information including their hire date,
12 end date, disciplinary action taken against them,
13 or any investigations being done?
14       MS. TIERNEY:  Objection to form.
15    You can answer, Richard.
16       THE WITNESS:  So, yes, I believe
17    that there were various applications that
18    might have housed those types of
19    information.
20 BY MS. MENDOZA:
21   Q.   Okay.  But do you recall if you had to
22 input information into a software program for the
23 employees that you were overseeing?
24   A.   Can you elaborate on what you mean by
25 "oversee"?

Page 34

1   Q.   So all -- you were supervising -- or
2 you were overseeing essentially all of the 59th
3 Street employees, correct, as HR?
4   A.   To a certain degree, yes.
5   Q.   Okay.  So then for all of those
6 employees, did you have to input information into
7 some type of software for them?
8   A.   Generally speaking, no, unless there
9 was some sort of action that I was a part of.
10 Sometimes I would enter that information myself
11 and other times it might be somebody else.
12   Q.   And do you recall what that
13 application or software was?
14   A.   Off the top of my head, it could have
15 been PeopleSoft.
16   Q.   Okay.  Did you conduct annual reviews?
17   A.   No, I did not.
18   Q.   Okay.  Who conducted those?
19   A.   My -- well, I believe it may have been
20 either the employee's direct supervisor
21 partnering with some of my HR colleagues.
22   Q.   Okay.  And so did you keep track of
23 employees' disciplinary files?
24   A.   I did not personally keep track of
25 employees' disciplinary files.

Page 35

1   Q.   Okay.  Who did?
2   A.   It could have been a couple of
3 different individuals.  It could have been -- the
4 information could have been input by some of the
5 staff members in HR.  It could have been tracked
6 by his or her or their immediate supervisor.
7   Q.   Okay.  And where -- where is that all
8 stored?
9   A.   I do not recall where it was all
10 stored.  It could have been in some sort of
11 central repository application.
12   Q.   Okay.  And -- okay.  So then you
13 didn't conduct the performance reviews you said,
14 correct?
15   A.   That's correct.
16   Q.   Okay.  And who in HR did?
17       MS. TIERNEY:  Objection, asked and
18    answered.  You can respond.
19       THE WITNESS:  Again, I think it
20    might have been the human resources
21    directors.
22 BY MS. MENDOZA:
23   Q.   Okay.  And do -- do you know -- it's
24 fine if you don't, but do you know what the
25 performance reviews are based on?

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 13 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 36

A.   Specifically, no.

Q.   Okay.  And were you involved in any of that or no?

MS. TIERNEY:  Object to the form.  You can answer.

THE WITNESS:  So if you're asking me if I was involved in any way with the performance reviews, the answer is no.

BY MS. MENDOZA:

Q.   Okay.  Did you fire anyone?

A.   Yes.

Q.   Okay.  Did you hire anyone?

A.   Yes.

Q.   Okay.  And how many people did you fire?

A.   I do not know the number off the top of my head.

Q.   Okay.  And how did you have authority to fire any of the employees?

MS. TIERNEY:  Objection to form.  You can answer, Richard.

THE WITNESS:  So essentially, as one of the human resources executives on 59th Street, I had the decisionmaking authority to do that typically after

Page 37

policy and procedure violations.

BY MS. MENDOZA:

Q.   So are you saying for only in situations where there was policy and procedure violations, that's when you would make the decisions -- you were responsible for making the decisions to terminate?

A.   So, if I understand your question, if there was policy and procedure violations, did I have authority to terminate an employee?  Then the answer would be yes.

Q.   Okay.  And so, if it was something other than policy or procedure violations, would somebody else have authority to make a decision whether or not to terminate?

A.   So, broadly speaking, decisions to terminate could have been done by any of the HR executives at the 59th Street location.

Q.   Okay.  Did you have to consult with anyone before making the decision whether or not to fire someone?

A.   Typically, I do not recall the requirement to consult with anyone.

Q.   Okay.  Did anyone look over afterwards any of your decisions?

Page 38

MS. TIERNEY:  Object to the form.  You can answer.

THE WITNESS:  If there was a situation where I perhaps needed some guidance, then I would reach out to my supervisor or the head of the department seeking such advice.

BY MS. MENDOZA:

Q.   Okay.  And were you ever reprimanded or consulted about any of your decisions?

A.   Not that I recall.

Q.   Okay.  And how did you make the decision to fire someone?

MS. TIERNEY:  Objection to form.  You may answer, Richard.

THE WITNESS:  I reviewed the information that was presented before me.

BY MS. MENDOZA:

Q.   Okay.  And so what I'm trying to get at is the process of how it came to you.  So would it come from managers, would it come from the Asset Protection and then it comes to you?

A.   Are we referring to firing people?

Q.   Yes, just as to firing.

A.   So the -- it could have come to my

Page 39

attention the -- in regards to firing individuals, could have come from the associates' supervisors or Asset Protection.

Q.   Okay.  And then was there any -- were there any policies as to a written warning, a suspension, and then ultimately termination?

A.   There was what I'm going to call a responsibility based performance policy at Bloomingdale's 59th Street where the disciplinary actions could have been, but did not necessarily require progressive steps.

Q.   Okay.  And so did you make any determinations to give the progressive steps instead of termination?

MS. TIERNEY:  Object to the form.  You can answer.

THE WITNESS:  Can you repeat that question, please?

BY MS. MENDOZA:

Q.   Yes.  Did you make any decisions to forgo termination and instead give progressive steps?

MS. TIERNEY:  Same objection.

THE WITNESS:  I don't recall specifically.  I may have.

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 14 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 40

BY MS. MENDOZA:

Q.    Okay.  I guess my question is that did you, in your time there, did you give any -- make any decisions to give a progressive step instead of termination?

        MS. TIERNEY:  Object to the form. You can answer.

        THE WITNESS:  Again, I don't recall specifically.  I may have.

BY MS. MENDOZA:

Q.    Okay.  And did you consult with the union during your time there?

A.    In what regards?

Q.    In your position as HR manager, did you have to consult with the union?

A.    If you mean consult in terms of interaction with the union, then yes.

Q.    Okay.  And what types of interactions did you have?

A.    It could have been anywhere from having a union rep sit in on situations with an employee, mostly from the employee's request, or it could have been conversations or meetings with different individuals from the union leadership.

Q.    Okay.  And did you handle grievances?

Page 41

A.    I did not handle grievances.

Q.    Who did?

A.    That probably would have been Michelle Ronquillo.

Q.    Were managers allowed to make accommodation -- withdrawn.

        Were managers allowed to grant accommodation requests?

A.    To my knowledge, no.

Q.    Okay.  All right.  And do you know who -- did you work with Cathy Younis?

A.    I know Cathy because we worked at Bloomingdale's during my tenure there, but in terms of, you know, having significant interactions with her, the answer would be no.

Q.    Okay.  And -- I'll be a little bit more specific now.  I'm going into Kristina's employment.

        MS. TIERNEY:  If we're changing, could we take a short restroom break, Melissa?  If you don't mind, maybe five minutes?

        MS. MENDOZA:  That's fine.  Back on at 11:11.

        MS. TIERNEY:  Sounds good.  Thank

Page 42

you.

        (Brief recess.)

BY MS. MENDOZA:

Q.    All right.  Now I'm going to ask you some questions about Kristina's employment, Kristina Mikhaylova.  And did you interview Kristina Mikhaylova?

        MS. TIERNEY:  Object to form.  At what point?

        MS. MENDOZA:  At the time of hire.

        THE WITNESS:  No, I did not.

BY MS. MENDOZA:

Q.    Okay.  And what department did Kristina work in?

A.    To my knowledge, she worked in Chanel Handbags.

Q.    Okay.  And was Cathy Younis the director there at the time in that department?

A.    I believe she was.

Q.    Okay.  And do you recall if Dennis Diaz was Kristina's manager?

A.    I believe he was.

Q.    And the Chanel Handbag department -- withdrawn.

        So, did you have any conversations

Page 43

with Cathy Younis about Kristina Mikhaylova?

A.    Is there a timeframe you're referring to?

Q.    No.  We're still talking about that timeframe; 2016, 2017.

A.    I do not recall any direct conversations with Cathy regarding Kristina.

Q.    When you say "direct," do you mean verbal?

A.    That's correct.

Q.    Okay.  Do you recall any correspondence, e-mail correspondence?

A.    I recall an e-mail from Cathy regarding the Chanel department and any advice on -- basically, how they should proceed, given Kristina's situation.  And I believe my response was something like, just make sure they follow all the policies and procedures.

Q.    Okay.  And did you have any conversations about Kristina with Dennis Diaz?

A.    No.

Q.    Did you know that Kristina was pregnant?

A.    Up until she sent me an e-mail after she had been placed on suspension, I did not know

Page 44

1  she was pregnant.
2      Q.    Okay.  And what did you do when she
3  told you she was pregnant?
4          MS. TIERNEY:  Object to the form.
5      You may answer.
6          THE WITNESS:  I don't recall doing
7      anything specifically.
8  BY MS. MENDOZA:
9      Q.    Okay.  And do you know if she was on
10 FMLA leave, intermittent FMLA leave?
11     A.    To my knowledge, I don't recall being
12 notified that she was on intermittent FMLA.
13     Q.    Were you supposed to have been
14 notified?
15     A.    Possibly, yes.  Probably.
16     Q.    Why?
17     A.    Just as a matter of procedure from
18 corporate, so that we knew if an employee was out
19 and how to -- I'm going to call it how to respond
20 to that, if they needed to take time off.
21     Q.    Okay.  So who should have told you?
22     A.    That type of notification typically
23 comes from corporate.
24     Q.    Okay.  So you're saying corporate
25 should have told you that she was on FMLA leave;

Page 45

1  is that correct?
2          MS. TIERNEY:  Object to form.  You
3      may answer.
4          THE WITNESS:  Yes.
5  BY MS. MENDOZA:
6      Q.    Okay.  And do you know if she had
7  requested a medical accommodation?
8      A.    I do not believe I was informed she
9  was requesting a medical accommodation.
10     Q.    Okay.  So when did you learn that she
11 was on FMLA leave?
12         MS. TIERNEY:  Object to the form.
13     You may answer.
14         THE WITNESS:  I don't recall
15     specifically when I might have been
16     informed that she was on FMLA.
17 BY MS. MENDOZA:
18     Q.    Was it after her termination?
19         MS. TIERNEY:  Object to the form.
20     You can answer.
21         THE WITNESS:  It's possible, but I
22     don't recall specifically.
23 BY MS. MENDOZA:
24     Q.    Okay.  Did you speak with Christopher
25 Castellani about Kristina?

Page 46

1      A.    So, yes, we had some conversations
2  regarding the situation with Kristina.
3      Q.    Okay.  And so was it -- that was
4  regarding the investigation, correct?
5      A.    That's correct.
6      Q.    Okay.  Did you take any disciplinary
7  action against Cathy Younis?
8          MS. TIERNEY:  Object to the form.
9      You can answer.
10         THE WITNESS:  No.
11 BY MS. MENDOZA:
12     Q.    And what about Dennis Diaz?
13         MS. TIERNEY:  Same objection.
14         THE WITNESS:  No.
15 BY MS. MENDOZA:
16     Q.    Okay.  Are you aware of any
17 disciplinary action that was taken against either
18 one of them?
19     A.    To my knowledge, no.
20     Q.    Okay.  And why was Kristina
21 terminated?
22     A.    From what I recall, she was terminated
23 due to violating Bloomingdale's discount policy.
24     Q.    Okay.  And can you be more specific?
25     A.    From what I recall, she purchased a

Page 47

1  significant number of items, exceeding the limit
2  that she was allowed given the given timeframe.
3  And -- yeah.
4      Q.    Okay.  So how did you determine that
5  she exceeded the purchase limit?
6      A.    Through reviewing the discount policy
7  and the employee handbook, as well as numerous
8  transactions provided to me by the AP team.
9      Q.    Okay.  And did the Chanel department
10 have a separate policy than Bloomingdale's
11 policy?
12         MS. TIERNEY:  Object to the form.
13     You can answer.
14         THE WITNESS:  If I understand your
15     question, was there a section where there
16     were limits placed on the number of Chanel
17     purchases, then the answer would be yes.
18 BY MS. MENDOZA:
19     Q.    Right.  So my question is if you were
20 looking at the purchase limits for Chanel or is
21 it -- was it for Bloomingdale's purchase limits?
22         MS. TIERNEY:  Objection.  You can
23     answer.  Sorry, Richard.
24         THE WITNESS:  My apologies, Betty.
25         MS. TIERNEY:  No, no, no, you're

Page 48

1 fine.
2         THE WITNESS:  So, from what I
3 recall, yes, there are purchase limits
4 within the Bloomingdale's employee
5 handbook and there is a separate section
6 for Chanel purchases.
7 BY MS. MENDOZA:
8     Q.    Okay.  And what's the difference
9 between the two policies?
10     A.    The Chanel policy, from what I recall,
11 was -- I'm going to use the term "stricter" in
12 the sense that the quantity of items an associate
13 was allowed to purchase was smaller than other
14 items within a given timeframe.
15     Q.    Okay.  And did you consult with Cathy
16 Younis about Kristina's purchases?
17     A.    No.
18     Q.    Okay.  And did the Chanel department
19 have sales often?
20         MS. TIERNEY:  Object to the form.
21     You may answer.
22         THE WITNESS:  Can you elaborate on
23     what you mean by often?
24 BY MS. MENDOZA:
25     Q.    I'll ask it differently.  So were

Page 49

1 there any times that the purchase -- that there
2 could be purchases on the handbags that did not
3 count towards the purchase limits?
4         MS. TIERNEY:  Object to the form.
5         THE WITNESS:  So if you're asking
6     were the purchase limits waived at any
7     point in time for Chanel handbags, my
8     answer would be, to my knowledge, no.
9 BY MS. MENDOZA:
10     Q.    Okay.  Not waived, but it's -- that it
11 wasn't -- if I, for example, purchased a bag
12 during a liquidation sale and -- would that
13 purchase be counted towards that purchase limit?
14         MS. TIERNEY:  Object to the form.
15     You may answer.
16         THE WITNESS:  To my knowledge, all
17     Chanel handbags purchased counted towards
18     the limit.
19 BY MS. MENDOZA:
20     Q.    Okay.  And who told you that?
21     A.    That was my interpretation from the
22 employee handbook.
23     Q.    Okay.  And did Kristina tell you that
24 there wasn't any limits -- there weren't any
25 limits put on some of the bags?

Page 50

1     A.    I do not recall her ever telling me
2 that.
3     Q.    Okay.  Just give me a moment while I
4 upload some exhibits.
5         MS. TIERNEY:  Trinity, I know you
6     were sending me the link for exhibits.  I
7     never got it.  I think Richard got it.  I
8     don't know if Steve got it.
9         MR. GERBER:  I think I did,
10     although I'm having trouble opening it.
11         MS. TIERNEY:  Yeah.  Trinity, I did
12     not.  So I don't know if we have my e-mail
13     address wrong.
14         (Discussion held off the Record.)
15         MS. MENDOZA:  All right.  If we can
16     pull up the handbag policy.
17         (Discussion held off the Record.)
18         (Document being shown.)
19         MS. MENDOZA:  Okay.  Do you want me
20     to wait until everybody has it or do you
21     want me to go ahead?
22         MS. TIERNEY:  Go ahead, we can see
23     it.
24         MR. GERBER:  I can see it.
25 BY MS. MENDOZA:

Page 51

1     Q.    Okay.  So if you can take a moment to
2 look at this, please, Richard, this document in
3 front of you?
4     A.    Uh-huh.
5     Q.    And let me know when you're done.
6     A.    (Reviewing document).
7         MR. GERBER:  Are you numbering this
8     or lettering this exhibit, Melissa.
9         MS. MENDOZA:  Yes.  We'll do --
10     we'll start with -- I don't recall if you
11     did one -- letters or not, but we can do
12     one.
13         MS. TIERNEY:  However you want to
14     do it is fine.  We don't care.
15         MS. MENDOZA:  All right.
16     Exhibit-1.  Actually, we'll do letters
17     because we've been doing letters, so
18     Exhibit-A.
19         (Whereupon Exhibit-A was marked for
20     identification.)
21         THE WITNESS:  Okay.  I think I'm
22     ready.
23 BY MS. MENDOZA:
24     Q.    Okay.  So it says at the top there,
25 Handbag Policy.  Do you see that?

Page 52

A.    Uh-huh.

Q.    Okay.  And this is the Chanel department, right?  Below, you see there?

A.    Uh-huh.

Q.    Was this the Chanel Handbag policy while you were employed there?

A.    I am not familiar with this document, no.

Q.    Okay.  So do you recall this policy at all, whether -- regardless of the document, but anything in the document?

A.    I seem to recall that there was a maximum number of handbags allowed to be purchased per year, yes.  The rest of this is -- I can't say that I've seen the rest of this.

Q.    Okay.  So -- so when you stated before -- withdrawn.

When you were referring to -- or when you had to look at the handbag policy for Chanel, where did you -- what policy were you referring to?

A.    I was referring -- excuse me -- I was referring to the policy in the Bloomingdale's employee handbook.

Q.    My apologies; did you say the Chanel

Page 53

Handbag policy in the Bloomingdale's handbook?

A.    The Chanel policy in the Bloomingdale's handbook.

Q.    Okay.  And at what point did that change?  Did that change at all?

A.    I am not aware of that policy being changed.

Q.    Okay.  And you said that you did not handle Kristina's grievance; is that correct?

A.    That's correct.

Q.    So -- and is this, what's in this policy here, does that contradict what you -- the policy that's in the -- the Chanel policy that's in the employee handbook?

A.    From my recollection, the policy is different.

Q.    Okay.  How so?

A.    There are -- there's other information in here that I do not recall seeing.

Q.    Okay.  And what is that information?

A.    So from my recollection, for instance, the first hash, one icon and one non-icon, et cetera, I do not recall seeing that in the Bloomingdale's version of the policy.

Q.    Okay.  But is the 24 handbags per

Page 54

year, max of 12, is that consistent with the policy that you referred to?

A.    The 24 per year sounds about right.  However, there were monthly limits as to how many could be purchased.

Q.    And you're saying the monthly limit came from Bloomingdale's?

A.    From the Bloomingdale's policy, yes.  The Bloomingdale's handbook.  Sorry.

Q.    Okay.  Okay.

MS. MENDOZA:  We can get off this screen now.  Thank you.

MS. TIERNEY:  Melissa, is there a Bates for Exhibit-A?  I think you produced it.

MS. MENDOZA:  We did, it's just -- it wasn't as clear as this one.  I think we did, though.  I have to go back and look.  I think we gave you one that might have been a little bit more blurry.

MS. TIERNEY:  All right.  But this is the same one, it just isn't Bated, right?  Is that --

MS. MENDOZA:  Right.

MS. TIERNEY:  -- your

Page 55

representation?

MS. MENDOZA:  Yes, yes.

BY MS. MENDOZA:

Q.    Was anyone else -- did you terminate anyone else for exceeding the purchase limits?

A.    I believe I may have.

Q.    Who?

A.    It might have been Martha Weh.  I don't recall specifically, but it might have been.

Q.    Okay.  And... we'll go back to her later.

But when you were employed at Bloomingdale's, did the Chanel department go leased?

A.    I seem to recall that there was some sort of transition from what I'm going to call a Bloomingdale's owned department to going leased.

Q.    Okay.  Do you recall if that was in February?

A.    I do not recall the timeframe.

Q.    Okay.  Do you recall if that changed -- if that made any change to the handbag policy limits?

A.    I do not believe I was aware of any

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 18 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 56

changes to the handbag policy.

Q.    Okay.

MS. MENDOZA:  If you refresh your page now, there should be another exhibit. But let's pull up the discount employees document, please, and make this Exhibit-B.

(Whereupon Exhibit-B was marked for identification.)

(Document being shown.)

BY MS. MENDOZA:

Q.    Okay.  You can take a moment to review the document in front of you.  And if you want control over the document, just let us know. There's five pages.  And let me know when you're done.

A.    So I'm not sure if I have the right document in front of me.  I have what appears to be some sort of text communication between individuals.

Q.    Yes, that's right.

A.    Okay. (Reviewing document).  Can you give me control of the document so I can look at it?

VIDEOGRAPHER:  You have control now.

Page 57

THE WITNESS:  Thank you.

(Reviewing document).  Okay.

BY MS. MENDOZA:

Q.    Okay.  So this document, Plaintiff's Exhibit-B, it's text messages, if you go to page 1, between Kristina Mikhaylova and her former coworkers.  And it's Bates stamped, the first page, if you look at the first page, the bottom of it says Mikhaylova 00197.  Do you see that there?

A.    Yes.

Q.    Okay.  And it says at the top right: Hey Sanela, I have you my Sunday.

This is from Kristina.

I have a question was there a limit to how many handbags we can purchase during sale? The ones that were on addition.

Do you know who Sanela was?

A.    No, I do not.

Q.    Okay.  And her response is:  Hi Kristina, thank you very much.  No I don't think they said anything.

And she states:  I just remember Cathy telling us we had no limits on any of the additional items on sale so I wanted to confirm.

Page 58

All right.  And then go to the next page.  I'm going to have to turn it.  It's Bates stamped Mikhaylova 00199.  You can rotate the page, if you like.

But at the top there is an exchange -- a text message exchange between Kristina and Amapara.  Do you know who Amapara was?

A.    No, I do not.

Q.    And her first message is:  Hey Amapara how are you?  I miss you guys.  I have a question was there a limit to how many handbags we can purchase during sale?  The ones that were on additional.

And you see that there, correct?

A.    I do see that, yes.

Q.    Okay.  And her response is:  Miss you too.  No there is no limit.

You see that, right?

A.    I do see that.

Q.    And then on the next page, Mikhaylova -- Bates stamp Mikhaylova 00200, it says -- it's a message from Kristina.  It says: Hey Kemi sorry to bother you.  I know you're on vacation.  I just have a question, was there a

Page 59

limit to how many handbags we can purchase during sale?  The ones that were on addition.

And her response is:  No limit on the 60/20/20.  Hey girl.  No bother just waiting on my Uber to take me away, laugh out loud.  Is everything ok?

Do you see that there?

A.    I do see that.

Q.    Okay.  And so my question for you is, do you recall if there was a difference between any sales versus the 60/20/20 sale?

MS. TIERNEY:  Object to the form. You may answer.

THE WITNESS:  So if you're asking me was there a change in policy in terms of the number of items an associate could purchase for this particular sale, I was not aware of any changes.

BY MS. MENDOZA:

Q.    Not changes, but was there a policy -- withdrawn.

Was part of the policy that the 60/20/20 purchases would not apply to the handbag limit?

MS. TIERNEY:  Object to the form.

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 19 of 83

Deposition of Richard Law                                      Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 60

1    You may answer.
2         THE WITNESS:  I was not aware of
3    any changes in terms of the limit for the
4    number of handbags, regardless of whether
5    it was the policy in the employee handbook
6    or this.
7    BY MS. MENDOZA:
8    Q.   Okay.  Okay.  But are you aware -- but
9    how did you know -- withdrawn.
10        How was the Chanel Handbag policy
11   updated in the Bloomingdale's employee handbook?
12        MS. TIERNEY:  Object to the form.
13        THE WITNESS:  To my knowledge,
14   there was no update to the Chanel policy
15   in the Bloomingdale's handbook.
16   BY MS. MENDOZA:
17   Q.   Okay.  Well, let me rephrase it.
18        Who created or who put in that
19   policy?
20        MS. TIERNEY:  Object to the form.
21   You may answer.
22        THE WITNESS:  From what I recall of
23   seeing from the first exhibit you showed
24   us, to me that appears to be a Chanel
25   specific policy, not necessarily a

Page 61

1    Bloomingdale's policy, based solely upon
2    the branding on that particular page.
3    BY MS. MENDOZA:
4    Q.   Right.  But does that --
5         MS. MENDOZA:  We can get off that
6    screen.
7    BY MS. MENDOZA:
8    Q.   But does that make a difference --
9    would that have made -- withdrawn.
10        Would that have made a difference
11   in your decision to terminate Kristina?
12   A.   I can't say for sure because this was
13   the first time I've seen that particular
14   document.
15   Q.   Okay.  I'm referring to any specific
16   Chanel Handbag policy, not specifically that
17   document.
18        MS. TIERNEY:  Object to the form.
19   You may answer.
20        THE WITNESS:  Can you repeat that
21   question, please?
22   BY MS. MENDOZA:
23   Q.   If you were aware -- well, withdrawn.
24   I will --
25        MS. MENDOZA:  Let's introduce

Page 62

1    Younis depo regarding liquidation.
2         MS. TIERNEY:  You're going to
3    introduce her deposition?  We're going to
4    object --
5         MS. MENDOZA:  Transcript, her
6    transcript.
7         MS. TIERNEY:  We're going to object
8    to having him answer anything about Cathy
9    Eunice's transcript.  That is not
10   appropriate.  You can ask him, but he's
11   not going to read her transcript and
12   interpret what Cathy meant or said.
13   That's just not happening.  I've never
14   even heard of that in 30 years, Melissa.
15        MS. MENDOZA:  Well, I'm glad I did
16   something different, new.  But --
17        MS. TIERNEY:  Inappropriate would
18   be my word, but okay.
19        MS. MENDOZA:  I'm sorry?
20        MS. TIERNEY:  Inappropriate would
21   be my word, but okay.
22        MS. MENDOZA:  No, I've actually
23   seen it before, so that's why it's
24   interesting.  Actually, it's been done by
25   defense counsel.  So it's -- because I'm

Page 63

1    not asking him to interpret, I'm trying
2    to -- he didn't understand what I meant
3    before --
4         Don't show it yet.  Don't show it,
5    because if she's objecting to it.
6         And I -- I'm showing it for
7    purposes of explaining to him the
8    liquidation sale.
9         MS. TIERNEY:  He just told you he
10   was not aware of any differences in the
11   policies.  He knew what was in the
12   handbook and that's the basis for his
13   decision.  The fact that Cathy Younis said
14   there was a once-a-year sale that had
15   specific discounts, does not lend itself
16   to his decision because there's no
17   evidence of when that sale was in 2017, or
18   that that was even any of the purchases
19   that your clients made.  So I'm not sure
20   what the purpose is --
21        MS. MENDOZA:  No, she was talking
22   about the change in limits, which is what
23   I asked before --
24        MS. TIERNEY:  -- had a liquidation
25   sale once a year.  She said it happened

Page 64

once a year, not every month like your
client is representing.  That's what --
     MS. MENDOZA:  Well, no, that's not
what I'm -- I'm telling you what the
purpose of the transcript is and what I
was going to ask him.  Right?  So, and I'm
telling you it's that it's for the
purposes of my previous question as to if
there was any point where any purchases
did not apply to the limit.  And he stated
before he did not know, and so that's why
I was introducing what was said.
     MS. TIERNEY:  The liquidation sale
was Chanel specific.  There's no evidence
that Richard had any knowledge of that.  I
think he's already testified to that.
     MS. MENDOZA:  And that's all I
wanted him, in knowing if I was more clear
from what she had testified --
     MS. TIERNEY:  I will let you go
with him knowing, as long as you're
specific.  Because I don't want it to be
used to misrepresent to him what Cathy
said, because Cathy was very specific.
     MS. MENDOZA:  And that's why I'm

Page 65

showing the transcript.  Instead of me
repeating -- just saying my
interpretation, I thought that it would
have been best to use her transcript so
that it's not my words, it's hers.
     MS. TIERNEY:  I just don't know how
that's going to help him, seeing what
Cathy said happened, when he was not in
the department and was not aware of the
day-to-day interactions with the team.  I
mean, I let him testify about text
messages he's never seen before that
were -- that your client actually sent
after she was terminated.  So, you can --
     MS. MENDOZA:  This is just to
refresh his recollection.  If he doesn't
know, then that's different.
     MS. TIERNEY:  He hasn't testified
that he had a recollection to be
refreshed.  That's the problem with that
argument.  He said he didn't know.  He
didn't say, I knew and forgot.  He said, I
did not know of any other changes.
     MS. MENDOZA:  Right.  If he doesn't
know, then perhaps this could refresh his

Page 66

recollection and then now he may recall,
yes, there was a difference.
     MS. TIERNEY:  Well, my experience
with refreshing recollection is there has
to be something by the witness saying that
they had a recollection and they no longer
recall it and something will refresh them.
I don't think that's what he testified to.
     MS. MENDOZA:  Right.  I just want
to know --
     MS. TIERNEY:  I'll let you do it,
but I'm going to reserve my right to make
more objections because I do think this is
very unusual and I do think it's
inappropriate.  Let's move forward because
I don't want to have to bring him back.
     MS. MENDOZA:  Make the objection.
     MS. TIERNEY:  I'll make my
objections as we go along.  I'm not going
to -- I don't want to bring him back for
this.
     MS. MENDOZA:  Okay.  Okay.  So now
if we can introduce the document, please?
     (Whereupon Exhibit-C was marked for
identification.)

Page 67

     (Document being shown.)
     MS. TIERNEY:  What page are we
looking at?
     MS. MENDOZA:  We are at 64 -- I'm
sorry, 67.
BY MS. MENDOZA:
     Q.   All right.  So in front of you,
Plaintiff's Exhibit-C is an excerpt from the
deposition of Cathy Younis and it's pages 67 to
73.
          And so, in referring to what we
just talked about, the 60/20/20 that I just asked
you about the limits, if there was any changes to
the limits, right, so --
     MS. TIERNEY:  Counsel, I'm going to
ask one -- when he reads this, she talks
about a chain.  Was that Exhibit-B that
she is referring to?  I do not recall.
     MS. MENDOZA:  Yes, that's the same,
the text messages.
     MS. TIERNEY:  Okay.  Just so
Richard understands the context of the
question, Cathy is responding to that
e-mail text chain -- or that text string
that you looked at, Richard.

Page 68

THE WITNESS:  Okay.

MS. MENDOZA:  Exhibit-B.  So now, counsel, do you want him to look through the document first and then I'll ask --

MS. TIERNEY:  Is it just the one page?

MS. MENDOZA:  No.  We're going to go into the second page.

MS. TIERNEY:  Okay.  Let me read it really quickly.  I think the first page is fine.  (Reviewing document).

And I guess this is -- my -- my position is going to be as long as you let him read all seven pages -- and I think they're consecutive pages, there's no gaps.  71, 72, 70, 69.  I want him to read all seven pages before he answers any questions.

MS. MENDOZA:  Okay.

THE WITNESS:  (Reviewing document).

BY MS. MENDOZA:

Q.   Okay.  If you go to the first page?

A.   Okay.

Q.   All right.  It's page 67, right at the bottom and --

Page 69

A.   Yes.

Q.   Okay.  And so as I showed you Exhibit-B, the same was shown to Cathy Younis.  And she states here -- the question is:  So before I was asking you was there any difference in the policy when there was a sale going on.  So my question is, again, same as here, is there any -- was there a limit?  A change in the limits -- handbag limits when there was a sale?

Her response, answer:  So this, what they are referring to in this chain was not a sale.  These were one-off bags that were old age that we created as special employee events for.  So this was only available to employees.  And we would pull the bags to a special designation because these were bags that, basically, we were going to sell back to Chanel at pennies apiece so to speak.  So when you said before limits, I just thought you meant normal limits.  But this specific what they are talking about here is what we would have, these one off, like, maybe once a year kind of big Chanel sales.

Do you see that there?

A.   I do.

Q.   Okay.  So my question is, did

Page 70

Bloomingdale's have, or Chanel department specifically have a big sale, and in which those purchases did not apply to the handbag limit?

MS. TIERNEY:  And I'm going to object to the form.

You can -- I'm sorry, Richard, you can answer.

THE WITNESS:  So my recollection is that there may have been a big sale, maybe once a year on, you know, these types of expensive luxury items.  I think you asked about limits; is that correct?

BY MS. MENDOZA:

Q.   Yes.

A.   So to my knowledge, I was never advised or told of any change in the limits for the bags to be sold from Chanel.

Q.   Okay.  So my question is, that if -- when you were looking at her purchases that exceeded the amount, did you look to see which were made during that sale?

MS. TIERNEY:  Object to the form.  You can answer.

THE WITNESS:  Specifically, no.  What I recall from looking at her

Page 71

transactions is that she had numerous transactions within -- with numerous items, on several different occasions that did not necessarily fall within a one-day or perhaps even two-day period.

BY MS. MENDOZA:

Q.   Okay.  Okay.  But you didn't know about this policy or that there -- these did not apply to the handbag total limit that couldn't be exceeded, correct?

A.   I did --

MS. TIERNEY:  Objection.  You may answer, Richard.

THE WITNESS:  I did not know of any exceptions to the limit policy.

BY MS. MENDOZA:

Q.   Okay.  And did Kristina tell you that there was no limit?

A.   She may have.  I don't recall specifically.

Q.   Okay.  Do you know if anyone looked into whether that was true that there was no limit?

A.   I cannot speak for anybody else, but I did not.

Page 72

Q.   Okay.  And what I mean is that in the HR department was there any conversation as to inquiring as to the discrepancy between the handbag limits for Chanel and Bloomingdale's handbook?

MS. TIERNEY:  I'm going to object to the form.  You can answer, Richard.

THE WITNESS:  I do not recall any conversations whatsoever regarding a change in limits.

BY MS. MENDOZA:

Q.   Okay.  And not -- and just to be specific, I just want to be clear that you understand my question, that it's not a change in the limits but that there is a discrepancy; that whether there was a discrepancy between the handbag limits that are in the employee handbook versus what the Chanel department was doing.  Did anyone look into that discrepancy?

MS. TIERNEY:  Objection to the form.  You may answer.

THE WITNESS:  So, again, I was not aware of any changes to the limits for the amount of items that could be purchased.

BY MS. MENDOZA:

Page 73

Q.   Okay.  Okay.  So you see -- so -- my first question to you is, are you aware of any liquidation handbags?

MS. TIERNEY:  Object to the form.  You can answer.

THE WITNESS:  There may have been an event where they were trying to liquidate handbags, but because this is not a product that I'm personally interested in, I did not necessarily pay attention to it.

BY MS. MENDOZA:

Q.   Okay.  And so how did that liquidation sale factor into the handbag limits in the Bloomingdale's handbook?

MS. TIERNEY:  Object to the form.  You may answer, Richard.

THE WITNESS:  So, again, I was not aware of any changes to the limits and that, regardless of whether this was a liquidation sale or something else, that the purchases here would not count towards those limits.

BY MS. MENDOZA:

Q.   Okay.  All right.  That's everything

Page 74

we can get off the document.

And then my last question is, did you have any -- you may have already answered this, but did you have any conversations with Cathy Younis, either during Kristina's employment or after she was terminated, about the handbag limits?

MS. TIERNEY:  Object to the form.  You may answer.

THE WITNESS:  I do not recall having any conversations with Cathy regarding handbag limits.

BY MS. MENDOZA:

Q.   Okay.  And same question but with Dennis Diaz?

A.   Same answer.

Q.   Okay.

MS. MENDOZA:  Okay, if we can pull up Mikhaylova 158 and 159.  Bates stamped 158 and 59.  Plaintiff's Exhibit-D.

(Whereupon Exhibit-D was marked for identification.)

(Document being shown.)

BY MS. MENDOZA:

Q.   And if you can take a moment to look

Page 75

at the document, and when you're done let me know.

MS. TIERNEY:  Just one second.  Steve, I don't know if you're getting it but I refreshed and it's not showing up.

MR. GERBER:  Betty, I had to do it three times before it refreshed.

MS. TIERNEY:  Here it is.  I got it.  Yes.  Thank you, Steve.  Sorry.  I've got it.

THE WITNESS:  (Reviewing document).  Okay.  I think I'm ready.

BY MS. MENDOZA:

Q.   Okay.  So the first page is Bates stamped Mikhaylova 00158, Plaintiff's Exhibit-D in front of you.  The first page there, you see -- have you ever seen this document before?

A.   I do not recall ever seeing this document.

Q.   Okay.  So if you look at the top of the page, scroll to the top of the page, it's a grievance, right, from e-mail from Kristina Mikhaylova dated June 20, 2017.  You see that there, right?

A.   Yes.

Page 76

Q.   Okay.  And it's addressed to Shawn.
It's Shawn Kavanagh.  Do you know who Shawn
Kavanagh was, or is?
A.   Yes.
Q.   Okay.  And who was he?
A.   He was one of the officers of the
union.  I don't remember his exact title.
Q.   Okay.  And did you talk to him about
Kristina's purchases?
A.   I don't recall having a conversation
with him about them.
Q.   Okay.  Do you recall having a
conversation with him about her termination?
A.   No, I don't believe I recall a
conversation regarding her termination.
Q.   Okay.  And then looking at this it
says:  Dear Shawn -- right -- it says, I'm
writing to file a grievance with Bloomingdale's
59th Street.  And it says:  On June 16, 2017 at
around 11:30 a.m. I had a meeting with Richard
Law from HR.  He advised me that Bloomingdale's
decided to terminate me because in accordance to
them I was abusing the discount and shipping
merchandise to a state with no Macy's or
Bloomingdale's to save on tax.  I am submitting

Page 77

this letter as a grievance because I do not agree
with the decision regarding my termination.
        Do you see that there?
A.   I do.
Q.   Do you recall that conversation with
Kristina?
A.   I do not recall the specific
conversation with Kristina but, you know, I may
have had a conversation with her regarding her
termination but I don't recall specifically.
Q.   Okay.  So prior to her termination,
was she suspended?
A.   Yes.
Q.   Okay.  And -- and she was suspended
after she met with Asset Protection, correct?
A.   I believe so, yes.
Q.   Okay.  And what did you do as part of
your job duties between her suspension and then
the decision to terminate her?
        MS. TIERNEY:  Object to the form.
You may answer.
        THE WITNESS:  So, from what I
recall, I reviewed the information that
Asset Protection had sent over to me, as
well as asked some follow-up questions to

Page 78

Asset Protection.
BY MS. MENDOZA:
Q.   Okay.  And did you meet -- before the
June 16th date, did you meet with or have any
conversations with Kristina?
A.   I do not recall having any
conversations with Kristina, you know, during the
interim.
Q.   Okay.  And then if you go down, it
says -- in the second paragraph we're going to go
to -- there.  She states that I was told that I
was in the -- one, two, three, four, five, six,
seven -- seventh sentence down, seven lines down
in the second paragraph.
        In there it says:  But again I was
told that I was allowed to purchase all those
handbags and now I am being terminated for
something I was allowed to do.  You can ask my
whole team and they will tell you that additional
sale had no limit.  I feel as though I'm -- as
though being completely singled out because so
many coworkers were purchasing many handbags
during those sales and they were all allowed.
        Do you see that there?
A.   I do.

Page 79

Q.   Did Kristina tell you that?
A.   I do not recall whether or not she
might have mentioned that to me.
Q.   Okay.  Did anyone tell you that?
A.   I do not recall anyone telling me
that, no.
Q.   Okay.  Did you take any notes during
your meeting with Kristina?
A.   I may have.  I can't recall
specifically.
Q.   Okay.  And do you know where those
notes are, if they exist?
A.   If they exist, they would probably be
with the rest of the documentation.
Q.   Which is where?
A.   It would have been in my office.
Q.   Okay.  Is it on a -- in a computer or
is it a physical document?
A.   It may have been a physical document,
but I can't be certain whether or not it was
physical or computer.
Q.   Okay.
        MS. MENDOZA:  And we'll request
those documents. ****REQUEST
        MS. TIERNEY:  And I've told you

Page 80

1 before, we produced everything we have.
2      MS. MENDOZA:  Okay.
3 BY MS. MENDOZA:
4    Q.    And it says there, continuing on:  I
5 feel as though I am being completely singled out
6 because so many coworkers were purchasing many
7 handbags during those sales and they were all
8 allowed.  Many times managers were there during
9 these sales and they saw what was happening and
10 they allowed it.  Same thing goes for the salon
11 shoes.  I was told by Richard Law that I went
12 over my limit on shoes.
13      Did you tell Kristina that she went
14 over her limit on the shoes?
15    A.    I do not specifically recall telling
16 her that.
17    Q.    Okay.  Was that a reason for the
18 termination?
19    A.    The reason for her termination was
20 based primarily upon the Chanel handbags and
21 possibly the tax evasion.  The shoes could have
22 played a part in it, but I don't recall
23 specifically.
24    Q.    Okay.  Do you recall what the shoe
25 limit was?

Page 81

1    A.    Not off the top of my head, no.
2    Q.    Did you terminate anyone else for
3 going over the shoe limit?
4    A.    I do not believe anyone else was
5 presented to me in reference to going over a shoe
6 limit.
7    Q.    How did Bloomingdale's keep track of
8 who was going over the limits?
9      MS. TIERNEY:  Object to the form.
10 You may answer.
11      THE WITNESS:  I can't say
12 specifically.  My sense is that it might
13 have been through Macy's/Bloomingdale's
14 credit services.
15 BY MS. MENDOZA:
16    Q.    Okay.  And in your department, were
17 you responsible for ensuring that people did not
18 exceed any of the limits?
19      MS. TIERNEY:  Object to the form.
20 You can answer, Mr. Law.
21      THE WITNESS:  It was -- it was not
22 my job to track which associates purchased
23 what items.
24 BY MS. MENDOZA:
25    Q.    Okay.  Okay.  So going back, it says

Page 82

1 in the document, it says:  I was never even aware
2 that there were any limitations on shoes.  I
3 asked the shoe manager many times as well as so
4 many of the sales associates in the shoe salon if
5 there was a limit and everyone said no limit.
6      You see that there?
7    A.    Yes, yes.
8    Q.    Did she tell you that?
9    A.    I do not recall her mentioning that to
10 me.
11    Q.    Okay.  And then it states:  As far as
12 me shipping the merchandise I was advised by
13 Victoria when I first started that we are allowed
14 to offer customers as well as coworkers to ship
15 to a state that will -- to a state with no
16 Bloomingdale's or Macy's to save on tax.
17      And did she tell you that?
18    A.    I do not recall her telling me that.
19    Q.    Okay.  And do you know who Victoria is
20 or was?
21    A.    That name does not ring a bell at the
22 moment, no.
23    Q.    Okay.  And then it says:  We do it
24 constantly in our department to both customers
25 and coworkers and it has -- and go to the next

Page 83

1 page -- it has not been a problem.  Managers are
2 all aware that we do this and never gave anyone
3 any problems.
4      You see that there?
5    A.    I do see that.
6    Q.    Did she tell you that?
7    A.    I do not recall her telling me that.
8    Q.    Okay.  Then I would also like to state
9 that -- she says:  I would also like to state
10 that prior to me meeting with Richard at HR I was
11 suspended for 10 days and I was never aware that
12 I was being suspended.  All I was told by Chris
13 from loss prevention is that I was suspended for
14 that day which was the day that they pulled me
15 from the floor.
16      Did you talk to Kristina --
17 withdrawn.
18      You stated that you didn't talk to
19 Kristina between the time she was suspended and
20 this date, correct?
21    A.    Yes.  I do not recall having any
22 communication -- having a conversation with her
23 between those days.
24    Q.    Okay.
25      MS. MENDOZA:  And we can go off the

Page 84

1 screen.
2 BY MS. MENDOZA:
3    Q.    What do you recall Christopher telling
4 you about their findings in their investigation?
5    A.    Are you referring to Chris Castellani?
6    Q.    Yes.
7    A.    I seem to recall that Chris told me
8 there was an investigation about possible
9 discount abuse and tax evasion.  I don't really
10 remember any more specifics than that.
11    Q.    Okay.  And so then when he told you
12 that, then what did you do while Kristina was
13 suspended?
14         MS. TIERNEY:  Object to the form.
15    You may answer, Mr. Law.
16         THE WITNESS:  I think we addressed
17    that earlier, but I seem to recall
18    reviewing the documents that Chris had
19    sent to me as well as the employee
20    handbook.
21 BY MS. MENDOZA:
22    Q.    Right.  We didn't talk about the tax
23 issue, though, before.  We were just talking
24 about the limits.  And so I just wanted to know
25 now, as far as the taxes, what did you -- what

Page 85

1 documents did you look at?
2    A.    In regard to the taxes?
3    Q.    Yes.
4    A.    I believe it may have been the
5 transaction receipts.
6    Q.    Okay.  And do you recall if Kristina
7 was investigated several times?
8    A.    Unless it was brought to my attention,
9 then no, I wouldn't -- I would not have been
10 aware of that.
11    Q.    Okay.  So what -- what was the basis
12 for her termination regarding the taxes?
13         MS. TIERNEY:  I'm going to object
14    to the form.  You can answer, Mr. Law.
15         THE WITNESS:  So I seem to recall
16    that there might have been something in
17    the handbook or the credit card policy
18    about evading taxes.  I can't recall
19    specifically.
20 BY MS. MENDOZA:
21    Q.    So you're saying that you can't recall
22 what she did that was evading taxes?
23         MS. TIERNEY:  Object to the form.
24    You may answer.
25 BY MS. MENDOZA:

Page 86

1    Q.    I'm trying to understand your answer,
2 that's all.  So you can rephrase it or restate it
3 if you'd like.
4    A.    So from what I recall, she shipped her
5 purchases out of state to evade the taxes for New
6 York State, which I believe is a violation of the
7 policies.
8    Q.    Okay.  And you're saying that there's
9 a policy in the handbook about that?
10    A.    I don't recall specifically.  There
11 may have been.  But getting back to the premise
12 of the question, a large part of my decision was
13 based upon the discount abuse and going over the
14 purchase limits.  And as I might have stated
15 previously, the tax portion evasion may have
16 played a part in it but I don't recall
17 specifically.
18    Q.    Okay.  So what proof did you have to
19 substantiate these allegations against Kristina?
20         MS. TIERNEY:  I'm going to object
21    to the form.  You may answer.
22         THE WITNESS:  Can you elaborate
23    when you say allegations?
24 BY MS. MENDOZA:
25    Q.    That she was shipping to states to

Page 87

1 avoid or evade taxes.
2    A.    By the transaction receipts.  The
3 transaction receipts clearly state where the
4 product was shipped.
5    Q.    Okay.  And in the receipts, are
6 they -- is that the same -- withdrawn.
7         In the receipts -- we can pull up
8 one.  In the receipts, if it says sender, right,
9 is that if she's ringing up someone or is that
10 that she is the sender?
11    A.    Because I'm not necessarily a sales
12 associates or sales manager, I can't answer that
13 specifically.
14    Q.    Okay.  So when you looked at the
15 receipts, though, what were you looking at?
16    A.    I believe I may have been looking at
17 sender -- no.  Shipped to, I think it was shipped
18 to.
19    Q.    Okay.  So if it's shipped to -- and
20 it's her name but at a different address, that's
21 what you were looking at?
22    A.    That sounds about right.
23    Q.    Okay.  Did she say that she was
24 sending purchases to family and friends?
25    A.    I believe she may have said that, yes.

Page 88

Q.   Is that a violation of the policies?

A.   Broadly speaking, I don't believe so.

Q.   Okay.  And what about specifically?

A.   Specifically, again, getting back to the discount policy and the number of items purchased, then possibly, yes.

Q.   Okay.  So -- so did you suspect that Kristina was not sending it to family and friends?

A.   There was some suspicion, yes.

Q.   Why did you suspect that?

A.   There were some different names on the recipients as well as different addresses and different locations, as well as the -- what I'm going to call the volume of purchases.  The number of transactions as well as the number of items.  And the cost of the items.

Q.   Okay.

MS. TIERNEY:  When we get to a point, can we take another restroom break?  We've been going about another hour and a half.

MS. MENDOZA:  Yeah.  I don't know when you want to take a lunch break, I know you're an hour behind, so...

Page 89

MS. TIERNEY:  Yeah, I'm more worried about Richard.  Don't worry about me.  I do want him to take a lunch break.  I don't know if you know how long you're going to go, so if we're going to go -- what is it, 12:30 there.  I don't know when you normally eat lunch, Richard.  Can we go off the record?

(Discussion held off the Record.)

(Lunch recess.)

MS. MENDOZA:  This will be marked as Plaintiff's Exhibit-E.

(Whereupon Exhibit-E was marked for identification.)

(Document being shown.)

THE WITNESS:  Is that BLM, dot-dot-dot, 379?

MS. TIERNEY:  That is correct.

THE WITNESS:  Okay.

BY MS. MENDOZA:

Q.   Okay.  If you would just take a moment and look at this document.  I don't know if you want to look through it all.  It's up to you and your counsel if you want to look through it all or just the pages I'm going to be referring to.

Page 90

MS. TIERNEY:  Is this just a selection of documents from the production?  I mean, they don't seem to be -- I mean, it's not like one file or anything.  Is it or is it?

MS. MENDOZA:  No.

MS. TIERNEY:  Okay.  So what I think we should do, Richard, I really don't want you to read 78 pages as we sit here.

I mean, are you just going to ask him about the first page initially, Melissa?

MS. MENDOZA:  Yes.

MS. TIERNEY:  So let's just read the first page and we'll just review each page as you ask questions about it, if that makes sense.  And hopefully that will make us move along a little quicker.

MR. GERBER:  Just one second.  I still do not have that document.  I keep on refreshing.

MS. TIERNEY:  Oh, shoot, okay.

MR. GERBER:  I'm looking.  Now it's showing up.

Page 91

MS. TIERNEY:  Okay, good.  And it's a big one.  That may be part of it.

MR. GERBER:  Yep.  Thank you.

MS. TIERNEY:  Okay.  I think we're ready, Melissa, whenever you are.

Oh, I think you're still looking at it, Richard.  Sorry.

THE WITNESS:  That's okay.  Just give me a few moments, please.

(Reviewing document).  Okay, I think I'm ready after glancing at the first page.

BY MS. MENDOZA:

Q.   Okay.  The first and second page.

A.   Oh, okay.

Q.   379 to 380.

MS. TIERNEY:  And, Melissa, just so we're clear, is Exhibit-E just those two pages or are you counting all 78 pages as Exhibit-E?

MS. MENDOZA:  I'll count all 78 pages.

MS. TIERNEY:  Okay.

THE WITNESS:  (Reviewing document).  Okay.

Page 92

BY MS. MENDOZA:

Q.   Okay.  So, before as we were talking, you were referring to the handbag policy that's in the employee handbook.  Was this -- and this that I'm referring to is document Plaintiff's Exhibit-E, and it's Bates stamped at the bottom, BLM, if you go down, 379 to 380.  000380.

Is that the policy that you were referring to that you made the decision to terminate Kristina?

A.   Yes, that is the policy.

Q.   Okay.  And so the policy is there in the Chanel Handbags, is it -- and I want to be clear.  Is it the Chanel Handbags policy or was it -- at the top it says -- I would assume not, but it says general merchandise, all vendors and departments except cosmetics and Chanel Handbags.

A.   So I believe I was referring to the Chanel Handbags section when I made the determination to terminate.

Q.   Okay.  All right.  So the Chanel Handbags.  So in order to make handbags available to as many of our customers as possible, two handbags are the maximum number that may be sold in a single transaction -- I'm reading from the

Page 93

document there -- without senior management approval.  Stores cannot split transactions or tender types to satisfy the requirements of two handbags per transaction.  Four bags per month may be purchased and up to 24 bags per year.  Both customer and associate transaction history is tracked centrally to ensure adherence to the above guidelines.

You see that, right?

A.   Yes.

Q.   Okay.  And so, it says there without senior management approval as to the -- in the first sentence, the two handbags are the maximum number.  Is -- did you factor that into your decision as to whether or not Kristina exceeded the limit?

MS. TIERNEY:  I'm going to object to the form.  You may answer.

THE WITNESS:  There was nothing to indicate within the information provided to me that she had gotten any form of senior management approval.

BY MS. MENDOZA:

Q.   How would you know that?

A.   Um, I wouldn't necessarily know that.

Page 94

But again, based upon the information provided to me, nothing seemed to indicate senior management approval nor do I recall, other than what she says about the -- the quote-unquote liquidation sale, her mentioning anything about senior management approval.

Q.   Okay.  So, but you're saying that that would -- but my question is, would -- where would it show up in the information that was given to you that if she had senior management approval?

A.   I'm not sure if it would necessarily show up.

Q.   Okay.  Did you ask if she received senior management approval?

A.   I do not recall asking her that.

Q.   Okay.  And then now we'll look at 381.  381.  And if you -- if you'd like to look at all of it because this is part of the -- what was submitted to the Unemployment Department of Labor for unemployment benefits, so I'll be asking questions about that.  So if you want to review all of that portion, you can.

MS. TIERNEY:  What portion are you going to be asking him questions about,

Page 95

counsel?

MS. MENDOZA:  About the --
(Simultaneous speaking.)
MS. MENDOZA:  -- page 420.
MS. TIERNEY:  So you're going to be asking him questions all the way down to 420?
MS. MENDOZA:  Yes.
MS. TIERNEY:  Richard, I want you to take your time.  You don't have to read it word for word but if you haven't reviewed something and counsel asks you a question about it and you need to review it in more detail, then we will take that time to do so.  So refresh yourself with -- you know, see if you recognize any of these docs now through Bates number 420, just to get a comfort level, and then we can read it specifically when questions are asked.
THE WITNESS:  Okay.  So I'm just going to scroll through to see if I recognize any of these documents; is that correct?
MS. TIERNEY:  That is correct.

Page 96

1   THE WITNESS:  Okay.  (Reviewing
2   document).
3   MS. TIERNEY:  Yeah, a couple of
4   these I can't read.  I don't know if you
5   can read them, Richard.
6   THE WITNESS:  No, the one I just
7   passed was difficult to read.
8   (Reviewing document).
9   MS. TIERNEY:  I think she just
10  wanted you to go to 420, Richard.  I think
11  you're past.
12  THE WITNESS:  Oh, did I pass it?  I
13  apologize.
14  MS. TIERNEY:  No, no.  No worries.
15  THE WITNESS:  Okay.
16  BY MS. MENDOZA:
17  Q.   Okay.  So if you look at 420,
18  Plaintiff's Exhibit-E, page 420 -- I mean, my
19  apologies, so BLM 000420, Bates stamp 000420 at
20  the bottom right-hand corner?
21  A.   Uh-huh.
22  Q.   Okay.  And you might need to zoom in
23  the page there.
24  A.   Okay.  Let me just get to the top.
25  Okay.

Page 97

1   Q.   The question is, what is your
2   company -- at the top there it says Equifax, TALX
3   UCM Services and it's dated June 30, 2017.  Have
4   you seen this document before?
5   A.   I have not.
6   Q.   Okay.  Did you submit the information
7   regarding Kristina's termination to the
8   Department of Labor?
9   A.   I do not recall submitting it to the
10  Department of Labor, no.
11  Q.   Okay.  So, if you go down to, it says
12  regarding the fax number and then regarding
13  Kristina Mikhaylova, employee ID 72061886.  And
14  then it says Dear State Representative, right?
15  You see that there?
16  A.   Uh-huh.
17  Q.   Okay.  So then it says -- if you go
18  all the way down to, What is your company policy
19  relating to this situation?
20  A.   Okay.
21  MS. TIERNEY:  And, Richard, if you
22  haven't read the whole page, I would want
23  to you read the whole page before you
24  answer any questions.
25  THE WITNESS:  I have not read the

Page 98

1   whole page.
2   MS. MENDOZA:  Okay, so then read
3   the page.
4   THE WITNESS:  (Reviewing document).
5   Okay.
6   BY MS. MENDOZA:
7   Q.   Okay.  So it says, What is your
8   company policy relating to this situation?
9   A.   Uh-huh.
10  Q.   See there it says -- and the response
11  is:  All vendors and departments have a purchase
12  limit of 12 units of merchandise by category per
13  customer in a single transaction or within a
14  90-day period.  And:  Be truthful, honest at all
15  times on all document, records or statements.
16  Do you see that?
17  A.   I do.
18  Q.   Okay.  So that's not the correct
19  policy that we were talking about before, though,
20  correct?
21  A.   In my opinion, no.
22  Q.   Okay.  But it's not what was on page
23  BLM 000380, correct?
24  A.   If you're referring to the Chanel
25  policy, then it is not the same policy.

Page 99

1   Q.   Okay.  All right.  And if you had
2   known about the handbag limits for the
3   liquidation sales, would it have made a
4   difference in your decision to terminate
5   Kristina?
6   MS. TIERNEY:  I'm going to object
7   to the form.  You may answer.
8   THE WITNESS:  It may have.  I can't
9   say specifically whether or not it would
10  have.
11  BY MS. MENDOZA:
12  Q.   Okay.  Okay.  And let's go to --
13  MS. MENDOZA:  We can get off this
14  screen now.  Thank you.
15  BY MS. MENDOZA:
16  Q.   Did you review Kristina's video
17  interview with Christopher Castellani during the
18  investigation period?
19  A.   So from what I recall, there was a
20  written statement from Kristina and an AP
21  interview summary, and those are the pieces of --
22  I did inter -- I did review those pieces of
23  information.
24  Q.   Okay.  But not the video, correct?
25  A.   I do not recall specifically whether

Page 100

1  or not there was a video, but I don't recall
2  reviewing any video.
3     Q.   Okay.  Who else was -- did you work
4  with -- did you work with anyone else on making
5  the decision to terminate Kristina?
6     A.   I may have consulted with either
7  Tinbite Yonas or Michelle Ronquillo.
8     Q.   And do you recall any of those
9  conversations?
10    A.   I do not.
11    Q.   Okay.
12         MS. MENDOZA:  And if we can open
13     BLM 1486 to 1515, please.
14         THE WITNESS:  I'm sorry, what
15     numbers?
16         MS. MENDOZA:  1486 to 1515.
17         THE WITNESS:  Okay.
18         MR. GERBER:  I'm not seeing those
19     yet.
20         MS. TIERNEY:  Yeah, they just
21     popped up for me, Steve, so you may need
22     another refresh.
23         MR. GERBER:  Okay.
24         THE WITNESS:  Bear with me while I
25     refresh.

Page 101

1         MS. TIERNEY:  Counsel, is this
2     Exhibit-F?
3         MS. MENDOZA:  Yes.
4         (Whereupon Exhibit-F was marked for
5     identification.)
6         (Document being shown.)
7  BY MS. MENDOZA:
8     Q.   All right.  So if you look at 1513, I
9  don't know again if you want to go through it
10 all, but it's not consecutive.  This is kind of
11 separated.  It's a few different things in here.
12        MS. TIERNEY:  Richard, I just ask
13     that you go through each -- you review
14     each page as you're asked questions.  That
15     way we can save some time.
16 BY MS. MENDOZA:
17    Q.   So if you want to go to 1513?
18    A.   Okay, let me see if I can find it.
19 Just bear with me.  Okay.
20    Q.   Okay.
21    A.   Let me read the... (Reviewing
22 document).  Okay.
23    Q.   Okay.  So looking at 1514, it says the
24 document -- this is Plaintiff's Exhibit-F,
25 Bates-stamped BLM 0001514 right there at the

Page 102

1  bottom.
2     A.   Uh-huh.
3     Q.   And it says at the top it's from
4  Tinbite Yonas and subject Kristina Mikhaylova
5  interview, to Barbara Hoelz, CC Chris and Richard
6  Law, yourself, correct?
7     A.   Yes.
8     Q.   And it's dated June 7, 2017, right?
9     A.   Yes.
10    Q.   Okay.  And do you recall seeing this
11 e-mail?
12    A.   Yes.
13    Q.   And who is Barbara Hoelz?
14    A.   Barbara Hoelz was another HR
15 executive.  I don't recall what her title was.
16 And I believe she was filling out on an interim
17 basis.
18    Q.   Okay.  And do you know what her
19 involvement was in --
20    A.   Um -- sorry.
21    Q.   In Kristina's employment?
22    A.   I do not know of what her involvement
23 might have been.
24    Q.   Okay.  So, did you correspond with her
25 about Kristina's suspension or termination?

Page 103

1     A.   I think there might have been an
2  e-mail just on an update as to where the
3  investigation was at that point in time.
4     Q.   Okay, right.  But why would she be
5  concerned as to what the -- what's the update?
6         MS. TIERNEY:  Object to the form.
7     You may answer.
8         THE WITNESS:  So from what I
9     recall, the HR department was short one HR
10     director at that time and Barbara was
11     filling in.  And this might have been
12     basically here's what's going on, FYI.
13 BY MS. MENDOZA:
14    Q.   Okay.  All right.  So let's look at
15 the document, so 1514, where Tinbite -- my
16 apologies.  It says -- on June 7, 2017 at 10:19
17 a.m. Barbara Hoelz wrote:  Any update on this and
18 was any disciplinary action taken with associate
19 previously?  What is her current performance
20 rating and tenure in job?  Thanks, b.
21         Right, you see that?
22    A.   Uh-huh.
23    Q.   And then the response from Tinbite is:
24 Hi, Richard is handling investigation.
25         Right, you see that?

Page 104

1  A.   Yes.
2  Q.   Okay.  So my question is, why was she
3 concerned as to whether any disciplinary action
4 was taken?
5       MS. TIERNEY:  Object to the form.
6  You may answer it.
7       THE WITNESS:  I do not know.
8 BY MS. MENDOZA:
9  Q.   Did you talk to her about Kristina's
10 disciplinary actions?
11  A.   The only correspondence I recall with
12 Barbara in this instance was to say something to
13 the effect of I was not able to locate any
14 disciplinary paperwork within the imaging system.
15  Q.   Okay.  And what is current performance
16 rating; what does performance rating mean?
17  A.   I don't know.  That was not part of my
18 job.
19  Q.   Okay.  So you don't know what it means
20 at all?
21  A.   I would assume that it means was she a
22 satisfactory employee, unsatisfactory, stellar,
23 something along those lines.  But I cannot speak
24 specifically to that.
25  Q.   Okay.  And did you factor or consider

Page 105

1 Kristina's performance in your decision to
2 terminate her?
3  A.   I did not.
4  Q.   Okay.  Did anyone else?
5  A.   To my knowledge, no.
6  Q.   Okay.  Did you e-mail back Barbara
7 about Kristina's performance?
8  A.   I believe I did send an e-mail back
9 saying something to the effect of, yes, I'm
10 handling the investigation, I was not able to
11 find any disciplinary paperwork in the imaging
12 system, and that she might want to consult with
13 Tinbite regarding her performance.
14  Q.   Okay.  And so as to Tinbite then, then
15 she was responsible for handling employees'
16 performances?
17  A.   In this case --
18       MS. TIERNEY:  Objection.  You can
19  answer.
20       THE WITNESS:  In this instance I
21  believe she would have been, yes.
22 BY MS. MENDOZA:
23  Q.   Okay.  Why do you say in this
24 instance?
25  A.   Because there was a delineation

Page 106

1 between the responsibilities I handled and the
2 rest of the HR directors handled.
3  Q.   Okay.  And so... why was Barbara
4 Hoelz -- withdrawn.
5       Were you all, HR, involved in every
6  employee's investigation?
7       MS. TIERNEY:  Object to the form.
8  You can answer.
9       THE WITNESS:  No.
10 BY MS. MENDOZA:
11  Q.   Okay.  So why was Barbara, Tinbite,
12 and yourself all CC'd on this e-mail with
13 Christopher Castellani?
14       MS. TIERNEY:  Object to the form.
15  You may answer.
16       THE WITNESS:  So, I'm not sure
17  specifically why Chris might have included
18  Tinbite and Barbara other than perhaps
19  keeping them in on the loop as to regards
20  to the investigation.
21 BY MS. MENDOZA:
22  Q.   Okay.  And so, but that's not normal;
23 that's not what's supposed to be done, correct?
24       MS. TIERNEY:  Object to the form.
25  You may answer.

Page 107

1       THE WITNESS:  From my recollection,
2  typically AP and I would partner together
3  and then if additional guidance was
4  needed, one of the other HR executives
5  might be brought in for guidance.
6 BY MS. MENDOZA:
7  Q.   Okay.  And did you seek guidance from
8 Barbara or Tinbite?
9  A.   I believe Tinbite and I might have had
10 a conversation regarding this.
11  Q.   And what was that conversation?
12  A.   I think it was in regards to the
13 allegation of her being pregnant.
14  Q.   Okay.
15  A.   And whether or not I knew anything
16 about it prior.
17  Q.   Okay.  And so Barbara -- withdrawn.
18       And so again, why was Barbara
19 asking about Kristina's disciplinary action?
20       MS. TIERNEY:  Object to the form.
21  You may answer.
22       THE WITNESS:  I do not know
23  specifically why she was asking me about
24  that.
25 BY MS. MENDOZA:

Deposition of Richard Law                                              Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 108

Q.    Does -- right.  And typically whoever, whether it's her position or the position she was in the interim for, is that position usually involved in the investigations with AP and asks about disciplinary action?

MS. TIERNEY:  Object to the form. You can answer.

THE WITNESS:  I don't know if there -- I wouldn't say that they're necessarily typically involved in that; again, unless there were questions I might have had on their end or, if they were being kept in the loop, they had questions.

BY MS. MENDOZA:

Q.    I guess my question is, is this unusual?  Was this an unusual e-mail?

A.    In my opinion, no, it was not necessarily unusual.

Q.    Okay.  And would it have made a difference what -- whether Kristina had a good performance or disciplinary action or not?

A.    It would not have made a difference.

Q.    Okay.  But you don't know why she was asking?

Page 109

A.    That is correct, I do not know why.

Q.    Okay.  Okay.  And then if we look at 1513.  And just looking at -- since it's from Tinbite to you, then below that it's from Chris to Tinbite, CC David Rey, Sarah Shaw, Lily Flast. You see that there?

A.    I do.

Q.    Okay.  Who is David Rey?

A.    David Rey, I believe was another Asset Protection manager.

Q.    Okay.  And Sarah Shaw, who is she?

A.    Sarah Shaw was the vice president/ general manager of the group that Chanel ultimately reported in to.

Q.    Okay.  So was she above Cathy Younis?

A.    I believe so, yes.

Q.    Okay.  And who's Lily Flast?

A.    Lily Flast, I don't recall her specific title but she was something like a group manager, which I think at the time she may have been in charge of all handbags.

Q.    Okay.  All right.  So in this, it's addressed to Tinbite:  We'll be speaking -- from Christopher Castellani -- we will be speaking to Chanel Handbags associate Kristina Mikhaylova,

Page 110

72061886, this afternoon based on investigation indicating discount abuse --

COURT REPORTER:  Counsel, I need you to slow down.

BY MS. MENDOZA:

Q.    This afternoon based on investigation indicating discount abuse and potential diverter reseller activity.

Why was this e-mail not sent to you first?

MS. TIERNEY:  Object to the form. You may answer.

THE WITNESS:  I do not know why.

BY MS. MENDOZA:

Q.    Sorry, withdraw it.

Why did Christopher not address it to you and instead to Tinbite?

MS. TIERNEY:  Object to the form. You may answer.

THE WITNESS:  I do not know why.

BY MS. MENDOZA:

Q.    Okay.  And next question is, typically when -- before Asset Protection goes to you, do they first go to Tinbite?

MS. TIERNEY:  Object to the form.

Page 111

You can answer.

THE WITNESS:  I think it depends upon which HR director the associate fell under.

BY MS. MENDOZA:

Q.    Okay.  And did she fall under Tinbite?

A.    At that point in time, I believe she did.

Q.    Okay.  So then why did Christopher then partner with you to suspend Kristina?

MS. TIERNEY:  I'm going to object to the form.  You can answer.

THE WITNESS:  My only explanation for why he might have partnered with me is because I was the one who does the investigations.

BY MS. MENDOZA:

Q.    Okay.  Going back to the document, it says:  Ms. Mikhaylova was spoken to previously, 2/4/2017, for her high level of fraudulent credit card transactions.  During that interview and follow-up it appears she followed P&P around the MEMO order process.

Do you see that there?

A.    I do.

Deposition of Richard Law                          Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 112

1    Q.    Okay.  And if we go up to BLM 0001510
2  and BLM 0001511, you see that?  Let me know when
3  you're there.
4    A.    Yes.
5    Q.    Okay.  And so you see that that's a
6  statement from Kristina, right, on 1510, BLM
7  1510?
8    A.    Yes.
9    Q.    Okay.  And is that the statement that
10 you looked at?
11        MS. TIERNEY:  Richard, take a look
12     at it and read through it and make sure
13     and refresh yourself, please.
14        THE WITNESS:  (Reviewing document).
15     Okay.  This appears to be the statement
16     that I had seen, yes.
17 BY MS. MENDOZA:
18    Q.    Okay.  And then on the next page,
19 1511, that's the Bloomingdale's Consent to
20 Interview and it says:  I understand that this
21 meeting with a representative of Bloomingdale's
22 Asset Protection will be recorded in both a video
23 and audio format.  It is fully understood that
24 this recording is taking place and that I give my
25 informed consent to record this meeting.

Page 113

1        Do you see that there?
2    A.    I do.
3    Q.    And it's signed by Kristina and it's
4  dated 6/16/17.  You see that, right?
5    A.    Yes.
6    Q.    But you don't recall seeing an audio
7  or video, correct?
8    A.    That is correct.
9    Q.    Okay.  And in these types of
10 investigations, do you typically review those
11 videos or recordings?
12    A.    I would say probably, yes.
13    Q.    Okay.  And why didn't you do it for
14 her?
15    A.    I do not recall receiving a video or
16 audio from the interview.
17    Q.    Do you recall asking for it?
18    A.    I do not recall whether or not I asked
19 for it.
20    Q.    All right.  And do you -- what is the
21 difference -- do you know the difference between
22 credit card fraud versus -- withdrawn.
23        Let's go to document 1494.
24    A.    Okay.
25    Q.    It's on the same exhibit.  All right,

Page 114

1  you're there?
2    A.    I'm on the page.  I haven't read it
3  yet.
4    Q.    Okay.
5    A.    (Reviewing document).  Okay.
6    Q.    Okay.  So it says there it's an e-mail
7  from Abraham Gonzalez.  Do you know who that is?
8    A.    I do not.
9    Q.    Okay.  And it's sent Thursday, June 1,
10 2017 and it's to Christopher Castellani and Fred
11 Becker.  You see that there?
12    A.    I see that.
13    Q.    Okay.  And it says third party -- in
14 the subject, third party store send top
15 associates.  Do you see that?
16    A.    Yes.
17    Q.    Okay.  And then it says:  Chris, Fred,
18 I've attached a spreadsheet with information
19 pertaining to three individuals at 59th Street
20 that contribute to 35 percent of all fraud store
21 sends.
22        Do you see that?
23    A.    Yes.
24    Q.    Do you know what fraud store sends
25 are?

Page 115

1    A.    Not particularly, no.
2    Q.    Okay.  And it says -- if you look
3  at -- it says:  I took a look at 72061886.  Our
4  associate looks completely unrelated to the
5  customers.  You can tell it's fraud because the
6  addresses and phone numbers come back to
7  different folks, as do the card numbers.
8        You see that there, right?
9    A.    I do.
10    Q.    Okay.  And so if you go down to 1496.
11 And so you see it says the name, it says Margaret
12 Roberts, right?
13    A.    Yes.
14    Q.    Okay.  And so this is -- well,
15 actually, have you seen this document before?
16    A.    I have not.
17    Q.    Okay.  Have you ever seen a Memo Order
18 before?
19    A.    I may have seen a blank memo form
20 during training, but I don't recall seeing it
21 after that.
22    Q.    Okay.  So then if we go to 1497 now,
23 BLM 1497, 1498.  Okay.  It says send to
24 name/address, right?
25    A.    Yes.

Page 116

Q.   Okay.  And then this is a receipt, transaction receipt.  And then it says -- it's an address, Margaret Roberts.  And then sender, it says Kristina Chanel, right?

A.   Yes.

Q.   Okay.  And so like we were talking, I asked you before, when you were reviewing the receipts for Kristina's purchases, though, you said that it would have said shipped to?

A.   That sounds about right.

Q.   Okay.  And therefore, credit card fraud transactions is not the same as discount abuse, is it?

MS. TIERNEY:  Object to the form.  You may answer.

THE WITNESS:  I don't think I really have the expertise to answer that.

BY MS. MENDOZA:

Q.   When you were -- did you ever terminate anybody for credit card fraud?

A.   Not that I recall.

Q.   Okay.  So, were any employees ever -- withdrawn.

MS. MENDOZA:  And we can now get off this screen.  Thank you.

Page 117

This will be Plaintiff's Exhibit-G and it's BLM 1531 to 32.

(Whereupon Exhibit-G was marked for identification.)

(Document being shown.)

BY MS. MENDOZA:

Q.   Take a moment to look at the document and then let me know when you're done.

A.   I don't see anything that specifically says G.  I have a BLM 001486 dash 1515.

Q.   No, it's 1531, BLM 1531 to 32.

A.   I don't think I have that yet.

MS. TIERNEY:  No, I don't either.

MS. MENDOZA:  Okay.

(Discussion held off the Record.)

THE WITNESS:  Okay.

BY MS. MENDOZA:

Q.   Okay.  So Plaintiff's Exhibit-G. 1531, 1532.  If you look at BLM 001531, and the e-mail is from you, sent Thursday, June 8, 2017 to Tinbite Yonas, Chris Castellani, Barbara Hoelz.  Subject is, forward, Kristina Mikhaylova/ Chanel Handbags and -- do you see that?

A.   I do.

Q.   Okay.  Do you recall this e-mail?

Page 118

A.   I do now.

Q.   Okay.  And it's sent from -- the forwarded message is from Kristina to you.  And it says:  Hi Richard, This is Kristina Mikhaylova from the Chanel Handbag department.  I am reaching out to you because I need to know the status of my suspension.  And then she states:  Chris stated that it will be reviewed tomorrow which would be Wednesday morning by Richard and I would be contacted prior to my 12 p.m. shift.  He told me not to come into work unless I hear from you.  Today is Thursday June 8th after 6 p.m. and I have still yet to hear from you or anyone from HR.  I would like to know how long is my suspension for and is my suspension because I am pregnant?  If you have any further questions please contact me.  And all the best, Kristina.

You see that, right?

A.   I do.

Q.   And would you consider that a complaint of pregnancy discrimination?

A.   Well, as I might have stated previously, this is the first that I believe that I was made aware that she was saying she was pregnant.

Page 119

Q.   Okay.  And would you consider that a complaint of pregnancy discrimination?

A.   No.

Q.   Okay.  And would you consider that a complaint of pregnancy retaliation?

A.   No.

Q.   Okay.  And why not?

A.   To my knowledge, up until this e-mail I was not aware of anyone knowing that she was pregnant.

Q.   Okay.  And so now that you had this information, do you recall what you did afterward?

A.   Well, based upon the e-mail in front of me here, it appears I spoke to Kristina and informed her that her suspension was not associated with her being pregnant whatsoever.

Q.   Okay, right.  So referring back to the document, you're referring to your e-mail to Tinbite, Chris Castellani, Barbara Hoelz, stating:  FYI only, I spoke to Kristina and informed her that she is still on suspension until further notice and that the investigation is not related to her medical condition.

Right?

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 34 of 83

Deposition of Richard Law                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 120

1    A.    Yes.
2    Q.    And what was her medical condition?
3    A.    Well, she's stating that she was
4  pregnant.
5    Q.    Okay.  And did you do any
6  investigation into whether anybody else knew
7  whether she was pregnant?
8    A.    I do not recall whether or not I
9  reached out to anybody in terms of her stated
10  pregnancy.
11    Q.    Okay.  So did you -- were you supposed
12  to do an investigation based on her complaint in
13  her e-mail if that was because of her pregnancy?
14        MS. TIERNEY:  Object to the form.
15        THE WITNESS:  It's possible.  I
16      don't recall whether or not an
17      investigation was done.
18  BY MS. MENDOZA:
19    Q.    Okay.  Okay.  So if -- if any
20  employee -- as per the company's policies, if an
21  employee comes to you and says that I think this
22  is happening because of my pregnancy, is that a
23  complaint of discrimination or retaliation?
24        MS. TIERNEY:  Object to the form.
25      You may answer.

Page 121

1        THE WITNESS:  I suppose it could
2      be.
3  BY MS. MENDOZA:
4    Q.    And then would -- under the policy,
5  would an investigation be conducted?
6    A.    I would say probably.
7    Q.    Okay.  And that didn't happen here,
8  right?
9    A.    I do not recall --
10        MS. TIERNEY:  Objection.  Go ahead,
11      you can answer.
12        THE WITNESS:  I do not recall
13      whether or not I conducted an
14      investigation.
15  BY MS. MENDOZA:
16    Q.    Is there any documents that can
17  refresh your memory?
18    A.    I do not recall.
19    Q.    Would it be stored anywhere, if an
20  investigation was done?
21    A.    If an investigation was done, I would
22  suppose that there might be some sort of
23  documentation, either physically or digitally.
24    Q.    Okay.
25        MS. MENDOZA:  And we'll obviously

Page 122

1  request those records. ****REQUEST
2        MS. TIERNEY:  Counsel, I've given
3      you what we've got.  I don't know how many
4      times I get to say that, but there you
5      have it.
6  BY MS. MENDOZA:
7    Q.    And would that have fallen under your
8  responsibilities still or does that go on to some
9  other HR executive?
10    A.    In terms of investigating her
11  pregnancy?
12    Q.    Those complaints, yes.
13    A.    It probably fell under mine.
14    Q.    Okay.  And then looking back at the
15  document, you write:  Separately, I also informed
16  Cathy Younis and Dennis Diaz that Kristina is
17  still on suspension until further notice.
18        Do you recall that conversation
19  that you had with them?
20    A.    I don't recall specifically whether it
21  was a conversation or a quick e-mail.
22    Q.    Okay.  Do you know who replaced
23  Kristina?
24    A.    Are you referring to her in her
25  position as a selling associate?

Page 123

1    Q.    Yes.
2    A.    No, I do not.
3    Q.    Okay.
4        MS. MENDOZA:  And you can get off
5      this screen now.  Thank you.
6  BY MS. MENDOZA:
7    Q.    And did you look into -- withdrawn.
8        As part of your investigation while
9  Kristina was suspended, did you look at the
10  addresses that Kristina sent -- was making
11  purchases sent to?
12    A.    I do recall looking at the addresses,
13  yes.
14    Q.    Okay.  Were any other employees also
15  sending to the same addresses?
16    A.    From what I recall, there may have
17  been, but I can't say specifically.
18    Q.    Okay.  And after Kristina was
19  terminated, did Asset Protection continue
20  investigating Kristina?
21        MS. TIERNEY:  Objection --
22        THE WITNESS:  Um -- go ahead,
23      Betty.
24        MS. TIERNEY:  Just object to the
25      form.  You can answer.

Deposition of Richard Law

Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 124

THE WITNESS: I would not know.

BY MS. MENDOZA:

Q. Okay. And was Kristina a diverter?

MS. TIERNEY: Object to the form. You can answer.

THE WITNESS: Based upon the information provided to me, I believe she was a diverter.

BY MS. MENDOZA:

Q. And what is a diverter?

A. Broadly speaking, a diverter is someone who purchases merchandise and provides it to another seller who is not necessarily authorized, for that second seller to sell this particular type of merchandise.

Q. Okay. And what proof did you have for that?

A. The, I'm going to call it the volume and frequency of purchases. The shipping to different addresses out of state. I think there might have been some comment from Asset Protection that one of the addresses being shipped to was a known diverter. I don't recall that specifically.

Q. Okay. So did you -- but these were

Page 125

all suspicions, correct?

A. Correct.

Q. Okay. So nothing was actually proven, correct?

MS. TIERNEY: Object to the form. You can answer, Mr. Law.

THE WITNESS: From a diverter point of view, no.

BY MS. MENDOZA:

Q. Can someone be considered a diverter if they are -- withdrawn.

Is it illegal -- withdrawn.

Was it a violation of the company's policy for Kristina to have purchased something for her family, friends who live in a state that doesn't have tax, and instead of just taking it home, she instead just had it shipped directly to them so that she didn't have to pay the New York sales tax; was there anything wrong with that?

MS. TIERNEY: I'm going to object to the form. Subject to that, you may answer.

THE WITNESS: Broadly speaking, no, I don't think that's a violation.

BY MS. MENDOZA:

Page 126

Q. Okay. And how many other employees did you investigate that had the same frequency -- withdrawn.

How many other employees were you aware of that were sending to the same addresses as Kristina?

A. From my recollection, I believe there may have been two, possibly three.

Q. Okay. And were all of those people fired?

A. From what I recall, no.

Q. And why not?

A. There was one instance where one person was fired and one instance where the person was not fired because I did not feel there was enough supporting evidence to deem a termination.

Q. Okay. And are you talking about Tyler Rose?

A. Yes.

Q. And did he work in the Chanel Handbag department?

A. I don't recall specifically what department he worked in, but he may have.

Q. Okay. So...

Page 127

MS. MENDOZA: Sorry, the document didn't upload, so I'm going to wait for it to upload. But in the meantime we can look at 1576. Yeah, we can open up 1576. It will be 1576 to 1605. It's a little blurry.

MS. TIERNEY: This is H?

MS. MENDOZA: Yes, Plaintiff's Exhibit-H.

(Whereupon Exhibit-H was marked for identification.)

(Document being shown.)

MS. MENDOZA:

THE WITNESS: You said 1576 to 1605?

BY MS. MENDOZA:

Q. Yes.

A. Okay. Got it.

(Discussion held off the Record.)

MS. TIERNEY: Take your time, Richard, and please read through the whole thing.

THE WITNESS: Okay. (Reviewing document).

MS. TIERNEY: Counsel, while he's

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 36 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 128

1 reviewing this can we take a short
2 restroom break?
3        MS. MENDOZA:  Sure.  We'll do five
4 minutes, 2:20.
5        (Discussion held off the Record.)
6        (Brief recess.)
7 BY MS. MENDOZA:
8    Q.    So, Tyler Rose -- this is Plaintiff's
9 Exhibit-H.  And looking at Bates stamp BLM 001576
10 in the bottom right corner on the first page
11 there.  This is an investigate summary for Tyler
12 Rose.  Have you seen this document before?
13    A.    Yes, I have.
14    Q.    When did you see this document?
15    A.    It was probably during my time at
16 Bloomingdale's.
17    Q.    Okay.  And during your time at
18 Bloomingdale's, was it during an investigation
19 for Tyler Rose?
20    A.    Yes.
21    Q.    Okay.  And what was the investigation
22 for?
23    A.    The investigation, from what I recall,
24 was a result of allegations of selling to other
25 individuals who should be receiving the product.

Page 129

1    Q.    Okay.  And Tyler sent to the same
2 address as Kristina, it's alleged, correct?
3    A.    I believe so, yes.
4    Q.    Okay.  And in this document, if you
5 look down it says:  Violations, discount abuse,
6 tax evasion, reselling.  Rose shipped his
7 personal Chanel Handbag purchase -- a purchase
8 address in New Hampshire where the shipping fee
9 is waived.  On 4/21/2017 purchases were made and
10 shipped to Yu Yu Lai.
11        And there's an address there,
12 right, you see that there?
13    A.    I do.
14    Q.    Okay.  And so what was the -- what was
15 your determination or findings?
16    A.    So my determination was that it was
17 one instance where he sent it to this address.  I
18 didn't think that was strong enough to proceed
19 further with any disciplinary actions.  He
20 mentioned that it was a gift for someone.  And he
21 didn't make any other mention in terms of what
22 might be perceived as a violation of policy.
23    Q.    Okay.  But is that -- was the person
24 that he sent it to the known reseller?
25    A.    It might have been.  I don't recall

Page 130

1 specifically.
2    Q.    So if he sent it to a potential -- or
3 what may have been considered a known reseller,
4 wouldn't that have been a violation of policy?
5    A.    I would say potentially, yes.
6 Although it was one instance, not multiple
7 instances like some of the other individuals.
8    Q.    Okay.  So the difference between
9 him -- what was the difference between him and
10 Kristina?
11    A.    The difference between him and
12 Kristina in my mind was that Kristina had
13 numerous transactions with numerous items sent to
14 numerous locations out of state, whereas Tyler,
15 in my opinion, was just one instance and it
16 wasn't clear to me that there was sufficient
17 information to support terminating him.
18    Q.    Okay.  Except his statement, correct?
19        MS. TIERNEY:  Object to the form.
20    You may answer.
21        THE WITNESS:  Yes.
22 BY MS. MENDOZA:
23    Q.    Okay.  And if we go to the next
24 document, 1577.  So it says the purchase that he
25 made was sent to -- was being sent to an address

Page 131

1 in Boston Massachusetts, right?
2    A.    Yes.
3    Q.    And the address that he sent to that
4 was the same as Kristina was in Manchester, New
5 Hampshire, correct?
6    A.    I don't recall specifically, but it
7 may have been.
8    Q.    If you look at 1576.
9    A.    Bear with me.  (Reviewing document).
10 Okay.
11    Q.    Do you see where it says under
12 the discount -- violations, discount abuse:  Rose
13 shipped his personal Chanel Handbag purchase to
14 an address in New Hampshire.  Right, then --
15 okay.  And then it says:  This address is for a
16 UPS shipping store.  It is also the same address
17 used by Mikhaylova who was terminated on 6/6/17
18 for what she claimed to be tax evasion.
19        Do you see that?
20    A.    I do.
21    Q.    Okay.  And do you know why it says,
22 for what she claimed to be tax evasion?
23    A.    No.
24    Q.    Okay.  And so they did not send -- and
25 then it says -- sorry.  And then if you go down

Page 132

to that same page, Findings and Recommendations, UPS Shipping Location, the merchandise was sent to Yu Yu Lai, Manchester, New Hampshire. Yu Yu Lai is the owner of a high-end boutique called X-Closet in Boston, Massachusetts.

Do you see that?

A.   I do.

Q.   Okay. And then to 1577. So then my question is that Tyler admitted to sending it to Boston, Massachusetts, correct?

A.   Yes.

Q.   Okay. So it's not the same address that he was sending to as Kristina, right? The New Hampshire address?

A.   Well, Boston is not in New Hampshire, so then, no.

Q.   So he was sending it directly to the known -- this potential boutique X-Closet in Boston, Massachusetts, right?

MS. TIERNEY:  Object to the form. You may answer, I'm sorry.

THE WITNESS:  It would appear that way.

BY MS. MENDOZA:

Q.   Okay. And then if you go for --

Page 133

sorry, 1578. 4/21 -- it's the transaction detail, 4/21/17. Was that the receipt for Tyler's transaction?

MS. TIERNEY:  Object to the form. You may answer.

THE WITNESS:  I can't say specifically.

BY MS. MENDOZA:

Q.   Okay. Do you recall looking at the actual receipt for him?

A.   I may have. I don't recall specifically.

Q.   Okay. And did you look at Tyler's performance?

A.   I did not.

Q.   Okay. You did not. Or any disciplinary action taken against him?

A.   No, I don't recall looking at any of that.

Q.   Did anyone else?

A.   I do not know.

Q.   Okay. Well, were there -- do you know if anyone asked you or discussed his performance at that time?

A.   I do not recall anybody asking me

Page 134

about his performance.

Q.   Okay. And Tyler Rose was not fired, right?

A.   That is correct.

Q.   And was he suspended -- my apologies -- did he receive any written warning?

A.   In what regard?

Q.   Did he receive any write-up for anything, any disciplinary action?

A.   Based upon this transaction or something else?

Q.   Based on this investigation, the outcome of this investigation?

A.   To my recollection, no, he did not.

Q.   Okay. And so Martha Weh, BLM 001584, this is the Martha Weh that you mentioned earlier, right?

A.   I believe so, yes.

Q.   Okay. And Martha Weh was terminated, correct?

A.   I believe so.

Q.   And why was she terminated?

A.   From what I recall, for violation of the discount policy.

Q.   And what specifically did she violate?

Page 135

A.   Shipping out of state to -- purchasing items, shipping out of state to -- sorry. Purchasing items in quantities that may have exceeded the discount policy and shipping them out of state.

Q.   Okay. So she sent to -- it says on 1/25/2017 -- I'm looking at 1584 under Violations: Weh shipped her personal Chanel Handbag to two addresses in New Hampshire where the shipping fee is waived. On 1/25/17 and 2/15/17 purchases were made and shipped to Yu Yu Lai in New Hampshire.

Right, that's what it says?

A.   Yes.

Q.   Okay. And so those were the two -- that was the same address -- it says it's also the same address used by Mikhaylova who was terminated on 6/17[sic].

You see that there, right?

A.   Yes.

Q.   Okay. And so you're saying the difference between her and Tyler is that she had multiple shipping?

A.   Yes.

Q.   Okay. But many employees are allowed

Page 136

1  to ship purchases out of state, correct?
2         MS. TIERNEY:  Object to the form.
3    You may answer.
4         THE WITNESS:  I believe so, yes.
5  BY MS. MENDOZA:
6    Q.    Okay.  So what was the -- what was the
7  violation that she was doing?
8    A.    So I believe the violation was
9  shipping to the known reseller.
10   Q.    Okay.  And then if you look at 1589,
11 you see that there's a list of -- it says
12 location, N, pickup date, receiver, N, receiver,
13 company name.  Reference 1, name, hire date.  Do
14 you see that there?
15   A.    Yes.
16   Q.    And have you seen this document
17 before?
18   A.    I do not recall seeing this document.
19   Q.    Okay.  Do you need to look at the
20 document first?  And then I can ask you questions
21 on it.
22   A.    (Reviewing document).  Okay.
23   Q.    So --
24         MR. GERBER:  Counsel, I'm sorry,
25    what is the Bates number, the vision --

Page 137

1    the view that Richard is looking at.  BLM
2    what?
3         MS. MENDOZA:  1589.
4         MR. GERBER:  Thank you.
5  BY MS. MENDOZA:
6    Q.    Okay.  So you don't recall seeing this
7  document before?
8    A.    Not that I recall, no.
9    Q.    Okay.  And do you recall seeing any of
10 documents 1590, 1591?
11   A.    No, I do not recall seeing that
12 document, or those document numbers.
13   Q.    And these are pertaining to
14 that person Yu Yu, correct?
15   A.    It appears that way, yes.
16   Q.    And that X-Closet boutique, right,
17 that's what it says there?
18   A.    Um, yes.
19   Q.    Okay.  And looking at 1594 it says
20 send purchase 10/23/2016, the transaction, and
21 there's no one's name, right?
22   A.    Correct.
23   Q.    Okay.  And then on the next one, BLM
24 001595, it says presale 1/25/17 and then the
25 selling associate.  And that's Kristina's

Page 138

1  numbers, right?
2    A.    I do not know Kristina's number off
3  the top of my head.
4    Q.    Okay.  It says 72061886.  And it says
5  send on 1/26/17 and it says regular
6  Bloomingdale's Martha Weh, right?
7    A.    Yes.
8    Q.    Send to name/address, Yu Yu Lai.  You
9  see that?
10   A.    Yes.
11   Q.    Okay.  So that's Martha Weh --
12 withdrawn.
13         Am I reading this right that it's
14 Martha Weh making a purchase to send to Yu Yu
15 Lai?
16   A.    I'm not well versed in transaction
17 details.
18   Q.    Right.  I'm asking when you were
19 reviewing the receipts, the transactions, if
20 that's what you were looking at to confirm that
21 the person was sending it to that address?
22   A.    That's probably what I was looking at,
23 yes.
24   Q.    Okay.
25         MS. MENDOZA:  And we can get off

Page 139

1    that screen now, thank you.
2         So if we look at Bates stamp 17 --
3    sorry, what is BLM 1709.  It's document
4    1709, Tyler Rose.
5         THE WITNESS:  Is that a new exhibit
6    or the same exhibit?
7         MS. MENDOZA:  It would be a new
8    exhibit.  My apologies.  Exhibit-I.
9         (Whereupon Exhibit-I was marked for
10   identification.)
11        (Document being shown.)
12        MS. MENDOZA:  It just takes a
13   moment to load the document.
14        THE WITNESS:  I haven't received it
15   yet.
16        MS. TIERNEY:  Nor have I.
17        THE WITNESS:  There it is.
18   (Reviewing document).  Okay.
19 BY MS. MENDOZA:
20   Q.    Okay.  You looked at the document?
21   A.    I did.
22   Q.    Okay.  And so this is an e-mail from
23 you, subject is regarding pending suspensions, to
24 Michelle Ronquillo, Susan Wright, Tinbite Yonas,
25 right?

Page 140

1  A.   Yes.
2  Q.   And the date is November 3, 2017?
3  A.   Yes.
4  Q.   And it says:  I spoke with Dan Niski
5  and one of the two investigators, Ulanda Fulford,
6  regarding the Chanel associates on suspension.
7       And Dan, who's Dan?
8  A.   I don't recall his exact title.  I
9  believe he might be part of corporate AP.
10 Q.   Okay.  And Ulanda or Ulanda Fulford,
11 who is she?
12 A.   I think she was also part of corporate
13 AP.
14 Q.   Okay.  And I don't know if we already
15 mentioned it, but who is Susan Wright?
16 A.   Susan Wright was a fellow HR director.
17 Q.   Okay.  Was she there at the time of
18 Kristina Mikhaylova?
19 A.   I do not recall specifically.
20 Q.   Okay.  So it says:  Tyler Rose.  One
21 transaction, he mentioned it was a gift for
22 someone, he made a payment to his card prior to
23 using his card to make the purchase.  After
24 further discussion --
25 A.   I'm sorry.  Let me put you on hold

Page 141

1  just for one second.  Okay?
2       (Brief recess.)
3       THE WITNESS:  I apologize, someone
4  was knocking at my door.
5  BY MS. MENDOZA:
6  Q.   No worries.  Okay.  So back at the
7  document 1709, Plaintiff's Exhibit-I.  Tyler
8  Rose, you said that there -- after further
9  discussion, I was not confident there was a clear
10 policy violation and determination would be
11 warranted.  Dan and the investigator seemed to
12 agree.
13      Do you see that?
14 A.   I do.
15 Q.   Okay.  And then for Martha Weh,
16 several transactions not mention -- no mention
17 during the interview (unintelligible) --
18      COURT REPORTER:  Counsel, I'm
19 sorry, can you slow down?
20      MS. MENDOZA:  Yes.
21 BY MS. MENDOZA:
22 Q.   No mention during the interview the
23 items were gifts for someone sent to individuals
24 other than herself, to the same out-of-state
25 address.  And she made payments to her card prior

Page 142

1  to making the purchases.
2       Okay.  And so here you also state
3  at the bottom:  On a related note, per Fred
4  Becker, most of the transactions in question were
5  rung by Kristina Mikhaylova.
6       Right, that's what it says there?
7  A.   Yes.
8  Q.   Okay.  And did it make a difference if
9  Martha said it was a gift, if she was sending
10 gifts?
11 A.   I don't recall specifically, but I'm
12 not sure that it would have.
13 Q.   Okay.  All right.
14      MS. MENDOZA:  And we can get off
15 the screen now.  Thank you.
16 BY MS. MENDOZA:
17 Q.   Do you know who Eleanor Dahan is or
18 who she was?
19 A.   No, I don't believe so.
20 Q.   Okay.
21      MS. MENDOZA:  We can open BLM
22 01995, please.  Oh, BLM Bates Dahan.
23      THE WITNESS:  Again, is that a new
24 exhibit?
25      MS. MENDOZA:  Yes.

Page 143

1       THE WITNESS:  Okay.
2       MS. MENDOZA:  It's J.
3       (Whereupon Exhibit-J was marked for
4  identification.)
5       (Document being shown.)
6  BY MS. MENDOZA:
7  Q.   All right.  So take a moment to look
8  at the document and let me know when you're done.
9  A.   (Reviewing document.)
10      (Discussion held off the Record.)
11 BY MS. MENDOZA:
12 Q.   Okay.  So after looking at the
13 document from -- this is BLM 001994 to 1999.
14 Regarding Eleanor Dahan, do you recall who that
15 person is?
16 A.   I do not recall who that person is.
17 Q.   Okay.  And it says, if you look at BLM
18 0001996, if you look at it it says -- my
19 apologies, it's 1995.  Termination date.  Under
20 employment information?
21 A.   Uh-huh.
22 Q.   9/30/2017.  You see that, right?
23 A.   I do.
24 Q.   Okay.  And was somebody else
25 responsible for making decisions as to

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 40 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 144

1  terminations at that time?
2      A.    I do not know.  I do not recall this
3  person's name or terming this person.  So if she
4  was termed or when she was termed, I don't recall
5  who might have done it.
6      Q.    Okay.  But who else was in charge of
7  doing those terminations?
8      A.    It could have been possibly any of the
9  senior HR executives.
10     Q.    Okay.  And if you look at BLM 0001997,
11 at the top there it says credit fraud and then
12 discount abuse.  Send Chanel bags purchased on
13 account to 215 South Broadway, Salem, New
14 Hampshire.  Has several clients that use this
15 address.  Betty, former employee, Zhang, and
16 Chang.
17            Do you see that there?
18     A.    I do.
19     Q.    And Nevada and California.
20            And then if we keep going to BLM
21 00199.  It says that --
22     A.    I'm sorry, what was that number?
23     Q.    BLM 00199?
24     A.    Is that towards the top, because I
25 don't currently see a 19 --

Page 145

1      Q.    The last page.
2      A.    Oh, 1999.  I apologize.
3      Q.    So it says at the very bottom there:
4  Dahan is directly linked to the main suspect in
5  an FBI investigation.
6            Were you aware of any FBI
7  investigation that was going on at the time?
8      A.    I was told after the fact that there
9  was an FBI investigation, but I was not involved
10 with it.
11     Q.    Okay.  And it says there that Dahan
12 wrote a letter to HR expressing her concerns --
13 in the second paragraph -- expressing her
14 concerns that she was under investigation by the
15 Asset Protection department.
16            Did you see a letter from her or
17 were you aware of the letter?
18     A.    I do not recall seeing a letter from
19 her.
20     Q.    Okay.  And then she subsequently went
21 on MLOA.  Do you know what MLOA is?
22     A.    I believe it stands for medical leave
23 of absence.
24     Q.    Okay.  And was expected to return on
25 10/18/2017.  Dahan resigned before the end of her

Page 146

1  MLOA 9/30/2017.  And days after Asset Protection
2  spoke with three other Chanel Handbag employees,
3  Orya, Lee, and Costa.
4            Do you see that?
5      A.    I do.
6      Q.    Okay.  And do you know who those
7  employees are?
8      A.    Specifically, no.
9      Q.    Okay.  All right.
10            MS. MENDOZA:  We can get off that
11      screen now.  Thank you.  And if we can
12      look at BLM 001148, this is Bates stamp --
13      I mean Plaintiff's Exhibit-K.
14            (Whereupon Exhibit-K was marked for
15      identification.)
16            VIDEOGRAPHER:  1148 through 1195,
17      right, counsel?
18            MS. MENDOZA:  Correct.
19            (Document being shown.)
20 BY MS. MENDOZA:
21     Q.    You can take a moment and look through
22 the document.
23     A.    I haven't received it yet.
24            Just to clarify, should I read
25 through the whole document.

Page 147

1            MS. TIERNEY:  Why don't we wait and
2      let her ask you some questions, because
3      there's very limited references to you in
4      this document, I believe.
5            MS. MENDOZA:  Right.  I'm just
6      going to have a question about one
7      paragraph on here.
8            MS. TIERNEY:  Well then let's read
9      that paragraph.
10            MS. MENDOZA:  Okay.
11 BY MS. MENDOZA:
12     Q.    So first, have you seen this document
13 before?  It's a complaint.
14     A.    I do not recall seeing this document.
15     Q.    Okay.  And it's dated at the top, it's
16 filed 2/26/20 and the Plaintiff is Theodora
17 Nikola -- Nikolakopulo --
18            MS. TIERNEY:  Nikolakopoulos.
19            MS. MENDOZA:  Yes.
20 BY MS. MENDOZA:
21     Q.    Have you -- do you recall that person?
22     A.    The name sounds vaguely familiar, but
23 I don't remember much about her.
24     Q.    Okay.  Did she work at Bloomingdale's?
25     A.    I believe she did.

Page 148

Q.   Okay.  And then in what department?

A.   I don't recall specifically.  It could have been the alterations department.

Q.   Okay.  And if you go to paragraph -- well, we'll go to Bates stamp BLM 1160 -- yeah, it's 1160.  Paragraph 71, it says there:  Since, in or around April 2017, Mr. Law called Plaintiff into his office on at least three occasions and told Plaintiff that she should leave her job with the Corporate Defendants.

Do you recall that conversation?

A.   I do not recall ever having that conversation.

Q.   Okay.  And do you recall her asking for medical accommodations?

A.   I believe she did ask for medical accommodations, but I don't remember whether or not we were able to accommodate them.

Q.   Okay.  And did she complain about discrimination?

A.   Not that I specifically recall.

Q.   Then BLM 001161, paragraph 83, again:  On or about May 15, 2017, Plaintiff again complained to Mr. Law about the continued discriminatory and retaliatory treatment she was

Page 149

being subjected by Kotsovolos?

Do you recall having that conversation?

MS. TIERNEY:  I'm going to object to the form.

THE WITNESS:  I may have, but I don't recall specifically.

BY MS. MENDOZA:

Q.   Do you recall her complaining about discriminatory or retaliatory treatment?

MS. TIERNEY:  Object to the form.  You may answer.

THE WITNESS:  Possibly.  Again, I don't recall specifically.

BY MS. MENDOZA:

Q.   Okay.  Was any investigation done?

A.   I believe -- if an investigation was done, I believe I spoke with her manager.  But again, I don't -- I don't recall whether or not what she was complaining about was in regard to being able to accommodate her request for accommodations.

Q.   Okay.

MS. TIERNEY:  And just another objection.  This case at least has been

Page 150

resolved in the federal court and it's been dismissed on summary judgment, so I don't see the relevance of this.  I'm not going to stop it because, again, if I don't want to bring him back, but I really don't understand what the point of this is.

MS. MENDOZA:  Okay.

BY MS. MENDOZA:

Q.   And so --

MS. MENDOZA:  We can get off this screen now.  Thank you.

BY MS. MENDOZA:

Q.   Going back to your conversation with Kristina Mikhaylova on -- if you recall earlier, I showed you a Bates stamp, a document that you had a conversation with Kristina around June 16, 2017.  Do you recall that?

A.   I don't recall specifics of a conversation, but it's possible we had a conversation.

Q.   Was she terminated on June 16, 2017, do you recall?

A.   That sounds about the right timeframe.

Q.   Okay.  And was her union rep present?

Page 151

A.   I don't recall.  I don't recall whether the conversation was in person or over the phone.

Q.   Okay.  And did you give Kristina a printout of the merchandise that she purchased improperly?

A.   Not that I recall, no.

Q.   Did she ask for one?

A.   Not that I recall.

Q.   Okay.  And did you state that Kristina purchased 15 pairs of shoes and she was only allowed to purchase 12?

A.   I don't recall specifically mentioning shoes.  I may have mentioned the handbags.

Q.   Okay.  And was this the -- the first time that any employee was terminated for violating the handbag policy?

A.   With me, to my knowledge, yes.

Q.   Okay.  And did you terminate anyone else after her?

A.   I believe I may have been involved in the Martha Weh termination, but I don't recall specifically.

Q.   Okay.  So, but with Martha Weh are you saying that she exceeded the handbag policy

Deposition of Richard Law                                        Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 152

limit?

A.    Not necessarily exceed the handbag policy limit, but was sending to the diverter.

Q.    Okay.  But my question is, has any other employee -- did you terminate any other employee for exceeding the handbag policy limit?

A.    Other than possibly those two, not that I recall.

Q.    Okay.  And do you know who Bobby Booker is or was?

A.    I do.

Q.    And who was he?

A.    I believe he was another Asset Protection manager at the 59th Street location.

Q.    Okay.  And did -- did Kristina make a complaint of sexual harassment against him?

A.    I was not aware of any complaints from Kristina about sexual harassment allegations against him.

Q.    Okay.  And did anyone else make any complaints against Bobby Booker for sexual harassment?

A.    Not to my knowledge.

Q.    And what about discrimination?

A.    Not to my knowledge.

Page 153

Q.    And retaliation?

A.    Not to my knowledge.

Q.    And did he have any disciplinary action taken against him?

A.    I would not necessarily know that.

Q.    Okay.  Do you know if he was fired?

A.    I do not know what happened to him.

Q.    Okay.  And did you work with him?

A.    I worked with him in the sense that we were at Bloomingdale's at the same time, but I don't recall a lot of specific interactions with him.

Q.    Okay.  So what was your relationship with Bobby Booker?

A.    I would say that there was no real relationship other than coworkers.  He happened to work Asset Protection and I happened to work in human resources.

Q.    Okay.  Did you do any investigations together?

A.    Not that I recall.

Q.    Okay.  And I'm just going to take a quick look, but I think I'm done.

(Brief recess.)

BY MS. MENDOZA:

Page 154

Q.    Did Bobby Booker ever make any complaints against Kristina Mikhaylova?

A.    Not to me, not that I'm aware of.

Q.    Okay.  Did anyone make any complaints against Kristina?

A.    Not that I'm aware of.

Q.    Okay.  And what were the company's policies regarding pregnancy related medical conditions, accommodations for pregnancy related medical conditions?

MS. TIERNEY:  Object to the form. You can answer.

THE WITNESS:  My recollection is that if the request was approved by the corporate office, then we would do our best to honor them.

BY MS. MENDOZA:

Q.    Okay.  But -- withdrawn.

And in the store, which -- do you recall which accommodations were given?

MS. TIERNEY:  Object to the form. You can answer.

THE WITNESS:  So throughout my time there, there were various accommodations given.  Some could have been, as I might

Page 155

have described earlier, a weight limit restriction.  That seemed to me to be probably the most frequent.  There were probably some others that I don't recall off the top of my head.

BY MS. MENDOZA:

Q.    Okay.  But is that for just medical accommodation or is that pregnancy related?

A.    Medical in general.

Q.    Okay.  And so my question is specifically pregnancy related; what medical accommodations -- what accommodations were given for pregnancy related conditions?

MS. TIERNEY:  Objection to the form.  You may answer.

THE WITNESS:  I don't recall any specifically other than the intermittent leave.

BY MS. MENDOZA:

Q.    Okay.  And after Kristina was terminated -- withdrawn.

If we look at -- you may not have it yet, it's document 182, Mikhaylova 182, Bates stamp Mikhaylova 182.

MS. MENDOZA:  And this will be

Page 156

1   Exhibit-L.
2          (Whereupon Exhibit-L was marked for
3   identification.)
4          (Document being shown.)
5   BY MS. MENDOZA:
6   Q.    Just take a moment to look at the
7   document and let me know when you're done.
8   A.    I haven't received it yet.
9          MS. TIERNEY:  It just came across
10   for me, Richard, so it may be on its way.
11          THE WITNESS:  Oh, okay.  (Reviewing
12   document).  Okay.
13   BY MS. MENDOZA:
14   Q.    Okay.  Have you seen this document
15   before?
16   A.    I have not.
17   Q.    Okay.  At the top there it says:
18   Filed 2/13/20.  Union rep Kavanagh.  And the date
19   is 6/16/17.  Name, Kristina Mikhaylova.
20          You see that, right?
21   A.    Yes.
22   Q.    Okay.  And grievance, VOP.  Term - in
23   handbook it said two handbags according Richard
24   Law.
25          See that?

Page 157

1   A.    I do.
2   Q.    So, is that true?
3          MS. TIERNEY:  Object to the form.
4   You may answer.
5          THE WITNESS:  Is what true?
6   BY MS. MENDOZA:
7   Q.    That you said two handbags to -- that
8   she was terminated for that?
9   A.    I don't recall specifically saying two
10   handbags.
11   Q.    It says she purchased -- she purchased
12   more than two?
13   A.    I may have said, yes, she purchased
14   more than two in a given transaction.
15   Q.    Okay.  And then it says:  She said
16   that according to Cathy Younis, Law said she
17   purchased more than the allowed number of shoes.
18   She bought 15 shoes.
19          Do you remember saying that?
20   A.    I don't recall saying the 15 shoes.
21   Q.    Okay.  All right.  And during --
22          MS. MENDOZA:  We can get off that
23   screen.
24   BY MS. MENDOZA:
25   Q.    During Kristina's suspension, did

Page 158

1   Kristina talk to you over the phone?
2   A.    I don't recall specifically.  We may
3   have had a conversation on the phone.
4   Q.    Okay.  And did you tell her that you
5   needed time to investigate?
6   A.    It's possible I may have said that.
7   Again, I don't remember specifically.
8   Q.    Okay.  Do you recall if she complained
9   about the suspension being in retaliation to her
10   pregnancy?
11   A.    I do not recall her saying that on a
12   conversation we may have had.
13   Q.    Okay.  Did she bring up her pregnancy
14   to you on the phone?
15   A.    Not that I recall.
16   Q.    Okay.  And did anyone come talk to you
17   during the grievance process?  Did they discuss
18   with you your decision and why you reached that
19   decision to terminate her?
20   A.    I do not believe so.
21   Q.    Okay.  How are -- withdrawn.
22          You stated before that somebody
23   else handled the grievance procedure; is that
24   correct?
25   A.    That's correct.

Page 159

1   Q.    Okay.  And you don't recall who
2   handled it for Kristina?
3   A.    I don't think that's what I said.  I
4   think I might have said that Michelle Ronquillo
5   handle the grievances.
6   Q.    Okay.  And does Bloomingdale's have an
7   e-mail retention policy?
8          MS. TIERNEY:  Object to the form.
9   You may answer.
10          THE WITNESS:  It's possible, but if
11   they did, I do not know what that policy
12   is.
13   BY MS. MENDOZA:
14   Q.    Okay.  Did you -- I'll just pull it
15   up.  BLM 2036 to 2039.
16          (Whereupon Exhibit-M was marked for
17   identification.)
18          (Document being shown.)
19   BY MS. MENDOZA:
20   Q.    Take a moment to look at the document
21   and let me know when you're done.
22   A.    (Reviewing document).
23   Q.    I mean, it's up to you if you want to
24   look through the whole document, but this is
25   mainly to refresh your recollection if you recall

Page 160

1 the policy.
2        MS. TIERNEY:  Read it as much as
3    you need to, Richard, to familiarize
4    yourself with the topic.
5        THE WITNESS:  Okay. (Reviewing
6    document).  Okay.
7 BY MS. MENDOZA:
8    Q.   Okay.  So do you recall now what the
9 policy was?
10        MS. TIERNEY:  You mean other than
11    reading it?
12        THE WITNESS:  I'm sorry?
13        MS. TIERNEY:  I mean, I guess my
14    objection is, are you asking him does he
15    know what that document says or are you
16    asking him if this refreshed him as to
17    whether or not he knew what the policy was
18    before he read this document?  What's the
19    question?
20 BY MS. MENDOZA:
21    Q.   Is that your question, Mr. Law?
22    A.   Yes.  I'm not quite sure I'm
23 understanding what you're asking me.
24    Q.   Okay.  If you'd like me to rephrase
25 it, I'm happy to rephrase it for you.

Page 161

1        So the -- my question is, did
2 Bloomingdale's have an e-mail retention policy?
3        MS. TIERNEY:  Objection.  You may
4    answer.
5        THE WITNESS:  It would appear that,
6    yes, they did have an e-mail retention
7    policy.
8 BY MS. MENDOZA:
9    Q.   And do you recall if you saved any of
10 your documents in a separate folder?
11    A.   So based upon this e-mail retention
12 policy, which appears to be quite old, this was
13 on a different e-mail system than what I was
14 using at the time in Bloomingdale's.
15    Q.   Okay.  And what system were you using?
16    A.   I believe we were using Microsoft
17 Outlook.
18    Q.   Okay.  And what difference would that
19 have made?
20        MS. TIERNEY:  Object to the form.
21    If you know, you may answer.
22        THE WITNESS:  I'm not sure if that
23    necessarily would have made a difference.
24 BY MS. MENDOZA:
25    Q.   Okay.  But how is it any different

Page 162

1 than that old policy?
2        MS. TIERNEY:  Object to the form.
3    You may answer.
4        THE WITNESS:  I'm not quite
5    understanding what you're trying to ask.
6 BY MS. MENDOZA:
7    Q.   Okay.  So in Microsoft Outlook that
8 you used, right, did it have any -- did it have a
9 60-day purge?
10    A.   I do not recall whether or not
11 specifically there was a 60-day purge.
12    Q.   Did you receive any information
13 regarding an e-mail retention policy with respect
14 to Microsoft Outlook?
15    A.   With respect to an e-mail retention
16 policy, it's possible I may have received
17 something, but I don't recall specifically.
18    Q.   Okay.  And if -- so -- do you know if
19 any of your e-mails were retained past a certain
20 amount of time with Outlook?
21    A.   No, I do not know that information.
22        MS. TIERNEY:  Object to the form.
23    You can answer.  Okay.
24 BY MS. MENDOZA:
25    Q.   Were you told to save it in a

Page 163

1 separate -- any documents that needed to be
2 retained for a long period of time, to keep it in
3 a separate folder?
4        MS. TIERNEY:  Object to the form.
5    You can answer.
6        THE WITNESS:  It's possible I may
7    have been told that, but I don't recall
8    specifically.
9 BY MS. MENDOZA:
10    Q.   Okay.  And do you recall saving any
11 documents in a separate folder?
12    A.   No, I do not.
13    Q.   Did you archive documents?
14    A.   Not that I recall.
15    Q.   Okay.  So you didn't archive e-mails;
16 is that correct?
17    A.   Not that I recall, that is correct.
18    Q.   Okay.  Does it -- did it automatically
19 archive documents?
20        MS. TIERNEY:  Object to the form.
21    You can answer.
22        THE WITNESS:  It may have.  I don't
23    recall.
24 BY MS. MENDOZA:
25    Q.   Okay.

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 45 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 164

1        MS. TIERNEY:  And I'd admonish the
2    witness not to guess or speculate.
3    BY MS. MENDOZA:
4        Q.    All right.  Did you recommend that an
5    investigation be done for any other employees
6    that were sending to the same address as
7    Kristina?
8        A.    Not that I recall.
9        Q.    And why not?
10       A.    I would not necessarily know who was
11   sending to various places unless it was brought
12   to my attention.
13       Q.    Okay.  And did you investigate anyone
14   else that was exceeding the handbag limit?
15       MS. TIERNEY:  Object to the form.
16   Asked and answered a couple times.
17       MS. MENDOZA:  I'll rephrase it.
18   BY MS. MENDOZA:
19       Q.    I'm asking if -- did you -- after
20   Kristina stated in her statement that you
21   reviewed, and in her grievance in which she
22   complained, she stated that other people were
23   doing the same thing.  So my question is, if
24   after you learned that information, did you ask
25   for an investigation to be done for anyone else

Page 165

1    that could have been exceeding the handbag policy
2    or shoe limit?
3        A.    Other than the three individuals I
4    think that we've discussed here, I do not recall
5    hearing of anyone else in terms of the handbag
6    policy violation.
7        Q.    Okay.  It's not that you heard of, but
8    did you start an invest -- did you ask maybe to
9    do an investigation for it?
10       A.    So --
11       MS. TIERNEY:  Objection.  You can
12   answer.
13       THE WITNESS:  No.
14   BY MS. MENDOZA:
15       Q.    Okay.  And did you ever ask Asset
16   Protection to do an investigation of any
17   employees?
18       A.    I personally do not recall asking
19   Asset Protection to investigate anyone.
20       Q.    Okay.  Did you do your own
21   investigation on any employees?
22       MS. TIERNEY:  Objection --
23       THE WITNESS:  In what --
24       MS. TIERNEY:  Go ahead.  I'm sorry,
25   Richard.

Page 166

1        THE WITNESS:  In what regard?
2    BY MS. MENDOZA:
3        Q.    In any regard.  In your -- as HR?
4        A.    So, I do not recall asking AP to
5    conduct any investigations on my behalf.
6        Q.    Okay.  Not for your behalf
7    necessarily, but as for any violation of
8    policies?
9        A.    There may have been instances where I
10   asked AP for additional information, but only
11   after they brought a situation to my attention.
12       Q.    Okay.  And do you recall what those
13   instances were?
14       A.    There might have been an instance of
15   alleged theft, so I asked if there was video.
16       Q.    Okay.  And when was that?
17       A.    I do not recall the specific date.
18       Q.    Was it before or after Kristina's
19   termination?
20       A.    It would probably have been before.
21   It's possible it could have been after as well.
22       Q.    Okay.  And did you understand all the
23   questions that I asked you today?
24       A.    I believe I did.
25       Q.    And do you want to change any of your

Page 167

1    answers today?
2        A.    No, I don't believe so.
3        Q.    Okay.  I'll reserve the right to ask
4    any questions in response.
5        MS. MENDOZA:  And we can get off
6    this screen, sorry.  Thank you.
7               - - -
8          EXAMINATION
9               - - -
10   BY MS. TIERNEY:
11       Q.    And, Mr. Law, I will try to be quick.
12   I know it's been a long day.
13       There were -- there was some
14   talk -- or questions by counsel early on in the
15   day related to this alleged liquidation sale.  Do
16   you know as you sit here today whether or not
17   there was in fact a liquidation sale of Chanel
18   product in 2017?
19       A.    So that's not something that I'm
20   necessarily interested in, so I can't say
21   specifically whether or not there was a
22   liquidation sale.
23       Q.    Okay.  Now, I know we also talked
24   about Tyler Rose and there was some -- I think
25   there was -- in that exhibit there was reference

Page 168

1 to him sending product to the same address that
2 Mikhaylova had sent to in New Hampshire.  And
3 then on the summary there was a reference to him
4 sending product to Boston.  Other than that
5 write-up, do you have any knowledge as to where
6 Tyler Rose was sending product?
7     A.    No, I do not.
8     Q.    And was it your understanding that he
9 only sent product to one address?
10     A.    That is correct.
11     Q.    Or one time?  Okay.
12     A.    Yes.
13     Q.    Would you agree with me, Mr. Law, that
14 Bloomingdale's anticipates that its employees
15 will actually adhere to the law?
16     A.    That would be my understanding, yes.
17     Q.    So, and you understand that Ms.
18 Mikhaylova actually admitted to tax evasion when
19 she was interviewed; is that correct?
20          MS. MENDOZA:  Objection.
21 BY MS. TIERNEY:
22     Q.    You can answer.
23     A.    Yes.
24     Q.    Okay.  And would that be a violation
25 of policy?

Page 169

1     A.    It probably would be, yes.
2     Q.    Okay.  And let me show you -- I'm
3 going to share my screen.  This is Exhibit-E.
4 And I hope I do this right.
5          (Document being shown.)
6 BY MS. TIERNEY:
7     Q.    Okay.  Can you see my screen, Mr. Law?
8     A.    Yes.
9     Q.    Okay.  And if you look down at the
10 very bottom, the last -- would you read into the
11 record the very last sentence of this page?
12     A.    Any action taken by the company will
13 be in compliance with applicable law.
14     Q.    Does that suggest to you whether or
15 not employees are expected to abide by the tax
16 laws?
17     A.    Yes.
18     Q.    Okay.  Are you aware of anybody who
19 has admitted to tax fraud -- excuse me, tax
20 evasion who has not been terminated?
21          MS. MENDOZA:  Objection.
22 BY MS. TIERNEY:
23     Q.    You can answer.
24     A.    Not that I'm aware of.
25     Q.    Now, I know that there was also a

Page 170

1 question about the e-mail you got from Ms.
2 Mikhaylova where she asked if her suspension was
3 related to her pregnancy.  Do you recall that
4 line of questions?
5     A.    I do.
6     Q.    And I believe you were asked whether
7 or not you felt that was a complaint of
8 discrimination and/or a complaint of retaliation
9 and you said no; is that right?
10     A.    Correct.
11     Q.    And then there was a line of
12 questioning about whether or not you had
13 initiated some type of investigation.  Do you
14 normally investigate if there's no complaint?
15     A.    No.
16     Q.    Okay.  And does that refresh you as to
17 whether or why you would not have investigated
18 her question as to whether or not she was put on
19 suspension because of her pregnancy?
20          MS. MENDOZA:  Objection.
21 BY MS. TIERNEY:
22     Q.    You can answer it.
23     A.    Can you rephrase the question, please?
24     Q.    Sure.  Let me ask it again.
25          If there's no complaint, there's no

Page 171

1 investigation, correct?
2     A.    Correct.
3     Q.    So if you did not investigate her
4 pregnancy, was it because there was no complaint?
5          MS. MENDOZA:  Objection.
6 BY MS. TIERNEY:
7     Q.    You can answer it.
8     A.    I did not feel that there was a
9 complaint, no.
10     Q.    So there was nothing to investigate,
11 correct?
12     A.    Correct.
13     Q.    Okay.  And you did in fact believe
14 that Ms. Mikhaylova was a diverter?
15     A.    In my mind, yes.
16     Q.    And she also admittedly was a tax
17 evader; is that correct?
18          MS. MENDOZA:  Objection.
19          THE WITNESS:  Yes.
20 BY MS. TIERNEY:
21     Q.    Are both of those sufficient reasons
22 for her termination?
23     A.    Yes.
24          MS. MENDOZA:  Objection.
25 BY MS. TIERNEY:

Page 172

1  Q.   Okay.  And have you had any
2  involvement in the Theodora Nikolakopoulos case?
3  A.   No.
4  Q.   And do you have any involvement while
5  you were at Bloomingdale's in setting or adhering
6  to the e-mail retention policy?
7  A.   I'm sorry, say that again, please.
8  Q.   While you were at Bloomingdale's did
9  you have any responsibility in either setting the
10  e-mail policy or adhering to it?  The e-mail
11  retention policy, excuse me.
12  A.   So I was not involved with setting the
13  policy.
14  Q.   Okay.  And did you have any duties
15  with respect to ensuring adherence to the e-mail
16  retention policy?
17  A.   If I thought that there was an e-mail
18  that needed to be retained, I probably would have
19  put it in, you know, that separate folder that
20  they talk about.
21  Q.   Okay.  Are you familiar with the
22  Business Critical folder?
23  A.   I've heard of it, but I can't say that
24  I'm completely familiar with it.
25  Q.   Did you ever have a Business Critical

Page 173

1  folder?
2  A.   Personally, not that I recall.
3  Q.   Okay.  Fair enough.  And I think
4  that's all I have.
5  MS. MENDOZA:  Okay.  Just two
6  questions.
7  - - -
8  EXAMINATION
9  - - -
10  BY MS. MENDOZA:
11  Q.   You stated -- withdrawn.  How did
12  Kristina admit to tax evasion?
13  A.   From my recollection, she admitted it
14  during the AP investigation.
15  Q.   How?
16  MS. TIERNEY:  I'm going to object
17  to the form.  You can answer it if you
18  understand it.
19  THE WITNESS:  So if I understand
20  the question, it is how did Kristina admit
21  to it, to the tax evasion?
22  BY MS. MENDOZA:
23  Q.   During the AP investigation?
24  A.   I do not know specifically because I
25  was not in the room, but I believe it was in the

Page 174

1  AP investigation notes as well as her written
2  statement.
3  Q.   Okay.  So in -- so you're stating that
4  AP investigation notes said that she admitted to
5  tax evasion?
6  A.   Yes, as well as her own written
7  personal statement.
8  Q.   Okay.  And in her written personal
9  statement she said that she committed tax
10  evasion?
11  A.   I don't remember the exact words.  It
12  was something like shipping it out of state to
13  avoid taxes.
14  Q.   Okay.  But shipping out of state to --
15  instead of paying taxes today, to take home, and
16  instead just shipping it to the person, recipient
17  that isn't out of state -- in a place that
18  doesn't have to pay tax, is that tax evasion?
19  MS. TIERNEY:  I'm going to object
20  to the argumentative nature of the
21  question.  You can answer it one more
22  time.
23  MS. MENDOZA:  I apologize if it's
24  argumentative in any way.  I'm just -- I'm
25  trying to clarify the difference.

Page 175

1  THE WITNESS:  So in my mind --
2  MS. TIERNEY:  I also object to the
3  extent that it calls for a legal
4  conclusion.  You may state what your
5  understanding is, Mr. Law.
6  THE WITNESS:  So in my mind, the
7  fact that she said she purchased some of
8  these items for personal use but shipped
9  them out of state to avoid taxes, that to
10  me is tax evasion.
11  BY MS. MENDOZA:
12  Q.   Okay.  So I will pull up her
13  statement, just for clarification purposes.
14  MS. MENDOZA:  If we can pull up
15  Exhibit-K -- or, no, Exhibit-F.  I think
16  it's Exhibit-F, please.
17  (Document being shown.)
18  MS. MENDOZA:  And if you can turn
19  to exhibit -- I'm sorry, page BLM, Bates
20  stamp BLM 001510, please.
21  (Document being shown.)
22  BY MS. MENDOZA:
23  Q.   Let me know when you're ready for me
24  to ask you a question.
25  MS. TIERNEY:  Mr. Law, just read

Page 176

1   the whole statement if you would.
2        THE WITNESS:  Okay.  One moment,
3   please.  (Reviewing document).  Okay.
4   BY MS. MENDOZA:
5        Q.   So where in that document did you find
6   that Kristina admitted to tax evasion?
7        A.   Let me find it.  Sorry, I need to
8   scroll back down the document.  So she didn't
9   outright admit to -- to tax evasion, but what she
10  wrote is that:  I now understand that it is a
11  problem to ship things out of state to avoid
12  taxes.
13       Q.   Okay.  And is that what you
14  interpreted to mean that she was committing tax
15  evasion?
16       A.   Yes.
17       Q.   Okay.  Okay.  But employees are
18  allowed to ship to different addresses, correct?
19       MS. TIERNEY:  Object to the form.
20   You can answer.
21       THE WITNESS:  In general, yes.
22  BY MS. MENDOZA:
23       Q.   Okay.  And --
24       MS. MENDOZA:  Thank you, we can get
25   off this screen.

Page 177

1   BY MS. MENDOZA:
2        Q.   And you stated that she -- you
3   believed her to be a diverter, that Kristina was
4   a diverter; is that correct?
5        A.   Yes.
6        Q.   Okay.  And why didn't you write in any
7   of the termination forms or to the Department of
8   Labor that she was a diverter?
9        MS. TIERNEY:  Object to the form.
10   You can answer.
11       THE WITNESS:  I was trying to use
12   the policies and procedures language.
13  BY MS. MENDOZA:
14       Q.   And isn't there a policy for a
15  diverter?
16       A.   There may be.  I don't recall
17  specifically where it might be in the handbook.
18       Q.   Okay.  All right.  No further
19  questions.  Thank you.
20       MS. TIERNEY:  Well, I'm going to
21   have a couple more.
22            - - -
23            EXAMINATION
24            - - -
25  BY MS. TIERNEY:

Page 178

1        Q.   I want to go back to that document you
2   were just looking at.  And I know you pointed out
3   a specific line, but doesn't Ms. Mikhaylova
4   also --
5        MS. TIERNEY:  Oh, Trinity, did you
6    put that up?  Thank you.
7        (Document being shown.)
8   BY MS. TIERNEY:
9        Q.   Do you see the statement, Mr. Law?
10       A.   I have her statement in front of me,
11  yes.
12       Q.   Do you see on the one, two, three,
13  four, five, six, seven, eight, nine, ten, eleven,
14  twelve, thirteenth line:  I was shipping to
15  various friends and family out of state to avoid
16  New York State tax?
17       A.   Yes, I do see that.
18       Q.   Okay.  And was that also part of your
19  decisionmaking process?
20       MS. MENDOZA:  Objection.
21  BY MS. TIERNEY:
22       Q.   You can answer.
23       A.   Yes.
24       Q.   Okay.  That's all I have.
25       MS. MENDOZA:  Thank you.

Page 179

1        MS. TIERNEY:  We will read and sign
2    and we do want a copy.
3            - - -
4        (Witness excused.)
5        (Deposition concluded at
6   approximately 3:58 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              C E R T I F I C A T I O N

2

3              I hereby certify that the
   proceedings, evidence, and objections noted
4  herein are contained fully and accurately in the
   stenographic notes taken by me upon the foregoing
5  matter, and that this is a correct transcript of
   the same.

6

7

   I do further certify that I am neither a
8  relative nor employee, nor attorney, nor counsel
   to any parties involved, that I am neither
9  related to nor employed by any such attorney or
   counsel, and that I am not financially interested
10 in the action.

11

12

13

14 _____
   Robin A. Vance, CCR, RPR
15 CCR-NJ License No. XI 02131
   RPR - NCRA No. 817327
16 Notary Public of New Jersey
   Commission Expires 1/8/24

17

18

19

20

              (The foregoing certification of this
21 transcript does not apply to any reproduction of
   the same by any means, unless under the direct
22 control and/or supervision of the certifying
   reporter.)

23

24

25

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 50 of 83

Deposition of Richard Law                              Kristina Mikhaylova v. Bloomingdale's Inc., et al.

```
 1            INSTRUCTIONS TO WITNESS

 2                    -   -   -

 3            Read your deposition over

 4     carefully.  It is your right to read your

 5     deposition and make changes in form or substance.

 6     You should assign a reason in the appropriate

 7     column on the ERRATA SHEET for any change made.

 8                 After making any change in form or

 9     substance, which have been noted on the following

10     ERRATA SHEET, along with the reason for the

11     change, sign your name on the ERRATA SHEET and

12     date it.

13                 Then sign your deposition at the

14     end of your testimony in the space provided.  You

15     are signing it subject to the changes you have

16     made in the ERRATA SHEET, which will be attached

17     to the deposition before filing.

18            You must sign in the space provided.  The

19     witness need not be a Notary Public.  Any

20     competent adult may witness your signature.

21            Return the original ERRATA SHEET to your

22     counsel.  The Court rules require filing within

23     30 days after you receive the deposition.

24

25
```

1                    SIGNATURE PAGE

2                          OF

3                    RICHARD LAW

4            I hereby acknowledge that I have read

5    the foregoing deposition dated Monday, December

6    5, 2022, and that the same is a true and correct

7    transcription of the answers given by me to the

8    questions propounded, to the best of my

9    recollection, knowledge and belief, except for

10   the changes, if any, noted on the attached ERRATA

11   SHEET.

12

13   SIGNATURE

14   _____          _____

15   RICHARD LAW                               DATE

16

17

18   _____          _____

19   WITNESSED BY:                             DATE

20

21   ADDRESS

22   _____

23   _____

24

25

1                          ERRATA SHEET

2    PAGE              LINE                   CORRECTION

3    _____             _____      _____

4    _____             _____      _____

5    _____             _____      _____

6    _____             _____      _____

7    _____             _____      _____

8    _____             _____      _____

9    _____             _____      _____

10   _____             _____      _____

11   _____             _____      _____

12   _____             _____      _____

13   _____             _____      _____

14   _____             _____      _____

15   _____             _____      _____

16   _____             _____      _____

17   _____             _____      _____

18   _____             _____      _____

19   _____             _____      _____

20   _____             _____      _____

21   _____             _____      _____

22   _____             _____      _____

23   _____             _____      _____

24   _____             _____      _____

25   _____             _____      _____

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 53 of 83

Deposition of Richard Law                                                Kristina Mikhaylova v. Bloomingdale's Inc., et al.

## WORD INDEX

**< 0 >**
**0001510**  112:*1*
**0001511**  112:*2*
**0001514**  101:*25*
**0001996**  143:*18*
**0001997**  144:*10*
**000380**  92:*7*  98:*23*
**000420**  96:*19*
**001148**  146:*12*
**001161**  148:*22*
**001486**  117:*10*
**001510**  175:*20*
**001531**  117:*19*
**001576**  128:*9*
**00158**  75:*15*
**001584**  134:*15*
**001595**  137:*24*
**00197**  57:*9*
**00199**  58:*3*  144:*21, 23*
**001994**  143:*13*
**00200**  58:*22*
**01995**  142:*22*
**02131**  180:*15*
**07004**  2:*14*

**< 1 >**
**1**  57:*6*  114:*9*  136:*13*
**1/25/17**  135:*10* 137:*24*
**1/25/2017**  135:*7*
**1/26/17**  138:*5*
**1/8/24**  180:*16*
**10**  83:*11*
**10/18/2017**  145:*25*
**10/23/2016**  137:*20*
**10:14**  1:*12*
**10:19**  103:*16*
**101**  3:*15*
**10119**  2:*5*
**107**  2:*14*
**11/3/2017**  3:*18*
**11:11**  41:*24*
**11:30**  76:*20*
**11477**  2:*9*
**1148**  146:*16*
**1160**  148:*5, 6*

**117**  3:*16*
**1195**  146:*16*
**12**  54:*1*  98:*12* 118:*10*  151:*12*
**12:30**  89:*6*
**122**  3:*25*
**127**  3:*17*
**139**  3:*18*
**143**  3:*19*
**146**  3:*20*
**1486**  100:*13, 16*
**1494**  113:*23*
**1496**  115:*10*
**1497**  115:*22, 23*
**1498**  115:*23*
**15**  148:*23*  151:*11* 157:*18, 20*
**1510**  112:*6, 7*
**1511**  112:*19*
**1513**  101:*8, 17*  109:*3*
**1514**  101:*23*  103:*15*
**1515**  100:*13, 16* 117:*10*
**1531**  117:*2, 11, 19*
**1532**  117:*19*
**156**  3:*21*
**1576**  127:*4, 5, 14* 131:*8*
**1577**  130:*24*  132:*8*
**1578**  133:*1*
**158**  74:*19, 20*
**1584**  135:*7*
**1589**  136:*10*  137:*3*
**159**  3:*22*  74:*19*
**1590**  137:*10*
**1591**  137:*10*
**1594**  137:*19*
**16**  6:*17*  76:*19* 150:*17, 22*
**1605**  127:*5, 15*
**165**  2:*13*
**167**  3:*1*
**16th**  78:*4*
**17**  6:*17*  139:*2*
**1709**  139:*3, 4*  141:*7*
**173**  3:*1*
**177**  3:*1*
**182**  155:*23, 24*
**19**  144:*25*

**19-8927**  1:*5*
**1995**  143:*19*
**1999**  143:*13*  145:*2*

**< 2 >**
**2/13/20**  156:*18*
**2/15/17**  135:*11*
**2/26/20**  147:*16*
**2/4/2017**  111:*20*
**2:20**  128:*4*
**20**  75:*23*
**2002**  16:*4*
**2003**  16:*4, 5*
**2009**  14:*24*  16:*8, 9*
**2011**  15:*5, 6*  16:*5*
**2016**  6:*4, 8*  10:*18* 13:*18*  15:*6*  43:*5*
**2017**  6:*4, 9*  10:*18* 13:*8*  43:*5*  63:*17* 75:*23*  76:*19*  97:*3* 102:*8*  103:*16*  114:*10* 117:*20*  140:*2*  148:*7, 23*  150:*18, 22*  167:*18*
**2022**  1:*11*  182:*6*
**2036**  159:*15*
**2039**  159:*15*
**212-587-0760**  2:*5*
**215**  144:*13*
**24**  8:*24*  9:*3*  53:*25* 54:*3*  93:*5*

**< 3 >**
**3**  140:*2*
**3:58**  179:*6*
**30**  62:*14*  97:*3* 181:*23*
**32**  117:*2, 11*
**35**  114:*20*
**379**  89:*17*  91:*16* 92:*7*
**380**  91:*16*  92:*7*
**381**  94:*17, 18*

**< 4 >**
**4/21**  133:*1*
**4/21/17**  133:*2*
**4/21/2017**  129:*9*
**400**  2:*9*
**420**  95:*4, 7, 18*  96:*10,*

17, 18
**4905**  2:*4*

**< 5 >**
**5**  1:*11*  3:*1*  182:*6*
**51**  3:*1*
**56**  3:*1*
**59**  74:*20*
**59th**  16:*21*  24:*25* 25:*4*  26:*25*  27:*5, 14, 20, 21*  30:*17*  34:*2* 36:*24*  37:*18*  39:*9* 76:*19*  114:*19*  152:*14*

**< 6 >**
**6**  118:*12*
**6/16/17**  113:*4*  156:*19*
**6/17[sic**  135:*18*
**6/6/17**  131:*17*
**60/20/20**  59:*4, 11, 23* 67:*12*
**60-day**  162:*9, 11*
**63141**  2:*10*
**64**  67:*4*
**66**  3:*1*
**67**  67:*5, 9*  68:*24*
**69**  68:*16*

**< 7 >**
**7**  102:*8*  103:*16*
**70**  68:*16*
**71**  68:*16*  148:*6*
**72**  68:*16*
**72061886**  97:*13* 110:*1*  115:*3*  138:*4*
**73**  67:*10*
**74**  3:*13*
**78**  90:*9*  91:*19, 21*
**79**  3:*25*

**< 8 >**
**8**  117:*20*
**800**  18:*22*
**817327**  180:*15*
**83**  148:*22*
**89**  3:*14*
**8th**  118:*12*

**< 9 >**

**9/30/2017** 143:*22*
146:*1*
**90-day** 98:*14*
**973-256-9000** 2:*15*

**< A >**
**a.m** 1:*12* 76:*20*
103:*17*
**abide** 169:*15*
**ability** 8:*19* 9:*6*
**able** 22:*15* 29:*20*
104:*13* 105:*10*
148:*18* 149:*21*
**Abraham** 114:*7*
**absence** 145:*23*
**abuse** 84:*9* 86:*13*
110:2, *7* 116:*13*
129:*5* 131:*12* 144:*12*
**abusing** 76:*23*
**accommodate** 23:*5*,
*15* 29:*2* 148:*18*
149:*21*
**accommodation** 28:*6*,
*7, 10, 13, 18, 21* 29:*13*
30:*9* 41:*6, 8* 45:*7, 9*
155:*8*
**accommodations**
29:*4, 10, 11, 24* 30:*3*,
*5* 148:*15, 17* 149:*22*
154:*9, 20, 24* 155:*12*
**account** 144:*13*
**accurately** 180:*4*
**accused** 19:*23*
**acknowledge** 4:*8, 11*
182:*4*
**acknowledges** 4:*18*
**action** 13:*20* 15:*21*
33:*12* 34:*9* 46:*7, 17*
103:*18* 104:*3* 107:*19*
108:*5, 22* 133:*17*
134:*9* 153:*4* 169:*12*
180:*10*
**actions** 39:*10* 104:*10*
129:*19*
**activity** 110:*8*
**actual** 133:*10*
**addition** 59:*2*
**additional** 57:*17, 25*
58:*14* 78:*19* 107:*3*
166:*10*

**address** 50:*13* 87:*20*
110:*16* 116:*3* 129:2,
*8, 11, 17* 130:*25*
131:*3, 14, 15, 16*
132:*12, 14* 135:*16, 17*
138:*21* 141:*25*
144:*15* 164:*6* 168:*1*,
*9* 182:*21*
**addressed** 76:*1*
84:*16* 109:*23*
**addresses** 88:*13*
115:*6* 123:*10, 12, 15*
124:*20, 22* 126:*5*
135:*9* 176:*18*
**adhere** 168:*15*
**adherence** 93:*7*
172:*15*
**adhering** 172:*5, 10*
**administered** 4:*12*
**administration** 12:*15*
**administrational**
16:*24*
**administrative** 15:*14*
**admit** 173:*12, 20*
176:*9*
**admitted** 132:*9*
168:*18* 169:*19*
173:*13* 174:*4* 176:*6*
**admittedly** 171:*16*
**admonish** 164:*1*
**adult** 181:*20*
**advice** 38:*7* 43:*14*
**advised** 70:*16* 76:*21*
82:*12*
**affect** 9:*5*
**afternoon** 110:*1, 6*
**afterward** 119:*13*
**age** 69:*13*
**ago** 6:*4*
**agree** 5:*3, 6, 8* 77:*1*
141:*12* 168:*13*
**agreed** 4:*1*
**agreement** 4:*23, 24*
29:*17*
**agrees** 4:*19*
**ahead** 50:*21, 22*
121:*10* 123:*22*
165:*24*
**al** 1:*6*
**allegation** 107:*13*

**allegations** 86:*19, 23*
128:*24* 152:*18*
**alleged** 21:*24* 129:*2*
166:*15* 167:*15*
**allowed** 41:5, *7* 47:*2*
48:*13* 52:*13* 78:*16*,
*18, 23* 80:*8, 10* 82:*13*
135:*25* 151:*12*
157:*17* 176:*18*
**alterations** 148:*3*
**Amapara** 58:*7, 10*
**amount** 29:*15, 19*
70:*20* 72:*24* 162:*20*
**and/or** 170:*8* 180:*22*
**annual** 34:*16*
**answer** 8:*19* 9:*15*
17:*11* 19:*7* 20:*22*
21:*3, 15* 22:*11* 23:*23*
24:*2* 26:*10, 22* 29:*8*
30:*23* 31:*14* 32:*19*
33:*15* 36:*5, 8, 21*
37:*11* 38:*2, 15* 39:*16*
40:*7* 41:*15* 44:*5*
45:*3, 13, 20* 46:*9*
47:*13, 17, 23* 48:*21*
49:*8, 15* 59:*13* 60:*1*,
*21* 61:*19* 62:*8* 69:*10*
70:*7, 23* 71:*13* 72:*7*,
*21* 73:*5, 17* 74:*9, 16*
77:*21* 81:*10, 20*
84:*15* 85:*14, 24* 86:*1*,
*21* 87:*12* 93:*18*
97:*24* 99:*7* 103:*7*
104:*6* 105:*19* 106:*8*,
*15, 25* 107:*21* 108:*7*
110:*12, 19* 111:*1, 12*
116:*15, 17* 120:*25*
121:*11* 123:*25* 124:*5*
125:*6, 22* 130:*20*
132:*21* 133:*5* 136:*3*
149:*12* 154:*12, 22*
155:*15* 157:*4* 159:*9*
161:*4, 21* 162:*3, 23*
163:*5, 21* 165:*12*
168:*22* 169:*23*
170:*22* 171:*7* 173:*17*
174:*21* 176:*20*
177:*10* 178:*22*
**answered** 35:*18* 74:*3*

164:*16*
**answering** 8:*15*
**answers** 68:*17* 167:*1*
182:*7*
**anticipates** 168:*14*
**anybody** 71:*24*
116:*20* 120:6, *9*
133:*25* 169:*18*
**AP** 10:*4* 47:*8* 99:*20*
107:*2* 108:*4* 140:*9*,
*13* 166:*4, 10* 173:*14*,
*23* 174:*1, 4*
**apiece** 69:*18*
**apologies** 16:*9* 47:*24*
52:*25* 96:*19* 103:*16*
134:*6* 139:*8* 143:*19*
**apologize** 10:*16*
96:*13* 141:*3* 145:*2*
174:*23*
**appear** 132:*22* 161:*5*
**appears** 56:*17* 60:*24*
111:*22* 112:*15*
119:*15* 137:*15*
161:*12*
**applicable** 169:*13*
**application** 33:*5*
34:*13* 35:*11*
**applications** 17:*16*
33:*8, 17*
**apply** 59:*23* 64:*10*
70:*3* 71:*9* 180:*21*
**appropriate** 62:*10*
181:*6*
**approval** 27:*15, 16*
93:*2, 12, 22* 94:*3, 6*,
*11, 15*
**approved** 28:*8*
154:*14*
**approving** 28:*23*
**approximately** 1:*11*
179:*6*
**April** 148:*7*
**archive** 163:*13, 15, 19*
**Argaden** 24:*17*
**argument** 65:*21*
**argumentative**
174:*20, 24*
**arrangement** 4:*16*
**asked** 9:*16* 14:*7*
35:*17* 63:*23* 67:*12*

70:11  77:25  82:3
95:20  101:14  113:18
116:7  133:23  164:16
166:10, 15, 23  170:2,
6
**asking**  6:6  8:4  36:6
49:5  59:14  63:1
69:5  94:16, 21, 25
95:6  107:19, 23
108:25  113:17
133:25  138:18
148:14  160:14, 16, 23
164:19  165:18  166:4
**asks**  95:12  108:4
**aspect**  16:24
**aspects**  25:19
**Asset**  30:16, 19, 20,
25  31:5, 22  32:3, 12
38:22  39:3  77:15, 24
78:1  109:9  110:23
112:22  123:19
124:21  145:15  146:1
152:13  153:17
165:15, 19
**assign**  181:6
**associate**  15:15
29:18  48:12  59:16
93:6  103:18  109:25
111:3  115:4  122:25
137:25
**associated**  119:17
**associates**  39:2
81:22  82:4  87:12
114:15  140:6
**assume**  6:22  92:15
104:21
**attached**  114:18
181:16  182:10
**attend**  11:22, 24
12:4  15:3
**attention**  39:1  73:11
85:8  164:12  166:11
**attorney**  5:20  9:22,
24  180:8, 9
**attorneys**  4:6
**audio**  112:23  113:6,
16
**authority**  26:14
27:15, 17  36:18, 25

37:10, 14
**authorized**  124:14
**automatically**  163:18
**available**  69:14  92:22
**Avenue**  2:13
**avenues**  18:17
**avoid**  87:1  174:13
175:9  176:11  178:15
**aware**  7:14  8:13
23:2, 4, 6, 10, 13, 16
46:16  53:6  55:25
59:18  60:2, 8  61:23
63:10  65:9  72:23
73:2, 19  82:1  83:2,
11  85:10  118:24
119:9  126:5  145:6,
17  152:17  154:3, 6
169:18, 24

**< B >**
**bachelor's**  12:11, 14
**back**  10:18  16:16
41:23  54:18  55:11
66:16, 20  69:17
81:25  86:11  88:4
105:6, 8  111:18
115:6  119:18  122:14
141:6  150:5, 14
176:8  178:1
**backwards**  14:20
**bag**  49:11
**bags**  49:25  69:12, 15,
16  70:17  93:4, 5
144:12
**Barbara**  102:5, 13, 14
103:10, 17  104:12
105:6  106:3, 11, 18
107:8, 17, 18  117:21
119:20
**BARTON**  2:11
**based**  6:24  18:11
19:22  21:19  35:25
39:8  61:1  80:20
86:13  94:1  110:1, 6
119:14  120:12  124:6
134:10, 12  161:11
**basically**  19:16
43:15  69:17  103:12
**basis**  63:12  85:11

102:17
**Bated**  54:22
**Bates**  54:14  57:7
58:2, 22  74:19  75:14
92:6  95:17  96:19
128:9  136:25  139:2
142:22  146:12  148:5
150:16  155:23
175:19
**Bates-stamped**  101:25
**Bear**  100:24  101:19
131:9
**Becker**  32:6  114:11
142:4
**beginning**  1:11  4:24
**behalf**  166:5, 6
**belief**  182:9
**believe**  9:7  13:18
16:11  18:6, 21  20:9,
16  21:4  22:12, 20
25:18  29:5  33:16
34:19  42:19, 22
43:16  45:8  55:6, 25
76:14  77:16  81:4
85:4  86:6  87:16, 25
88:2  92:18  102:16
105:8, 21  107:9
109:9, 16  111:7
118:23  124:7  126:7
129:3  134:18, 21
136:4, 8  140:9
142:19  145:22  147:4,
25  148:16  149:17, 18
151:21  152:13
158:20  161:16
166:24  167:2  170:6
171:13  173:25
**believed**  177:3
**bell**  82:21
**benefits**  94:21
**best**  65:4  118:17
154:16  182:8
**BETTY**  2:8, 18  5:4
9:12  47:24  75:6
123:23  144:15
**Betty.tierney@macys.c
om**  2:10
**big**  69:22  70:2, 9
91:2

**bit**  16:17  31:16
41:16  54:20
**blank**  115:19
**BLM**  89:16  92:7
96:19  98:23  100:13
101:25  112:1, 2, 6
115:23  117:2, 10, 11,
19  128:9  134:15
137:1, 23  139:3
142:21, 22  143:13, 17
144:10, 20, 23  146:12
148:5, 22  159:15
175:19, 20
**BLOOMINGDALE'S**
1:6  6:3, 8  10:18
13:5, 17, 20  14:3, 16
16:16  17:18  18:4
22:17  23:8, 21  39:9
41:13  46:23  47:10,
21  48:4  52:23  53:1,
3, 24  54:7, 8, 9  55:14,
18  60:11, 15  61:1
70:1  72:4  73:15
76:18, 21, 25  81:7
82:16  112:19, 21
128:16, 18  138:6
147:24  153:10  159:6
161:2, 14  168:14
172:5, 8
**blurry**  54:20  127:6
**Bobby**  152:9, 21
153:14  154:1
**Booker**  152:10, 21
153:14  154:1
**Boston**  131:1  132:5,
10, 15, 19  168:4
**bother**  58:24  59:4
**bottom**  57:8  68:25
92:6  96:20  102:1
128:10  142:3  145:3
169:10
**bought**  157:18
**boutique**  132:4, 18
137:16
**branding**  61:2
**break**  9:13, 17  41:20
88:20, 24  89:3  128:2
**Brief**  42:2  128:6
141:2  153:24

**bring** 66:*16, 20*
150:*5*  158:*13*
**Broadly** 18:*9*  37:*16*
88:2  124:*11*  125:*23*
**Broadway** 144:*13*
**Brook** 12:*23*
**brought** 85:8  107:*5*
164:*11*  166:*11*
**bunch** 17:*21*
**business** 12:*15*
172:22, 25

**< C >**
**Cabin** 2:*9*
**California** 144:*19*
**call** 16:*23*  30:2  39:7
44:*19*  55:*17*  88:*15*
124:*18*
**called** 132:*4*  148:7
**calls** 175:*3*
**cameras** 20:2
**capabilities** 30:*11*
**card** 85:*17*  111:*21*
113:22  115:7  116:*11,
20*  140:22, 23  141:*25*
**care** 51:*14*
**carefully** 181:*4*
**Case** 1:*5*  3:*19*  5:*20*
10:*21*  11:*3*  105:*17*
149:*25*  172:2
**cases** 6:*25*
**Castellani** 32:7
45:*25*  84:*5*  99:*17*
106:*13*  109:*24*
114:*10*  117:*21*
119:*20*
**category** 98:*12*
**Cathy** 3:*12*  41:*11,
12*  42:*17*  43:*1, 7, 13*
46:7  48:*15*  57:*24*
62:*8, 12*  63:*13*  64:*23,
24*  65:8  67:*9, 23*
69:*3*  74:*5, 11*  109:*15*
122:*16*  157:*16*
**CC** 102:*5*  109:*5*
**CC'd** 106:*12*
**CCR** 1:*12*  180:*14*
**CCR-NJ** 180:*15*
**Centers** 27:*13, 19*

28:*1*
**central** 35:*11*
**centrally** 93:7
**certain** 29:*15*  34:*4*
79:*20*  162:*19*
**certificate** 12:*20*
**certification** 4:2
180:*16*
**certify** 180:*3, 5*
**certifying** 180:*22*
**cetera** 53:*23*
**chain** 3:*16*  67:*17, 24*
69:*11*
**Chanel** 3:*1*  42:*15, 23*
43:*14*  47:*9, 16, 20*
48:*6, 10, 18*  49:*7, 17*
52:2, *5, 20, 25*  53:2,
*13*  55:*14*  60:*10, 14,
24*  61:*16*  64:*14*
69:*17, 22*  70:*1, 17*
72:*4, 18*  80:*20*  92:*13,
14, 17, 19, 21*  98:*24*
109:*13, 25*  116:*4*
117:*23*  118:*5*  126:*21*
129:7  131:*13*  135:8
140:6  144:*12*  146:2
167:*17*
**Chang** 144:*16*
**change** 26:*12, 14*
53:*5*  55:*23*  59:*15*
63:22  69:8  70:*16*
72:*10, 14*  166:*25*
181:7, *8, 11*
**changed** 22:*18*  53:7
55:*23*
**changes** 26:*16, 19*
56:*1*  59:*18, 20*  60:*3*
65:*23*  67:*13*  72:*23*
73:*19*  181:*5, 15*
182:*10*
**changing** 41:*19*
**charge** 23:*17, 19*
109:*21*  144:6
**Chris** 32:7  83:*12*
84:*5, 7, 18*  102:*5*
106:*17*  109:*4*  114:*17*
117:*21*  118:8  119:*20*
**Christopher** 45:*24*
84:*3*  99:*17*  106:*13*

109:*24*  110:*16*  111:9
114:*10*
**claim** 22:*15*
**claimed** 131:*18, 22*
**clarification** 175:*13*
**clarify** 18:2  19:8
146:*24*  174:*25*
**clarity** 6:*16*
**classes** 18:*13*
**clear** 7:*3*  54:*17*
64:*18*  72:*13*  91:*18*
92:*14*  130:*16*  141:9
**clearly** 87:*3*
**client** 64:2  65:*13*
**clients** 63:*19*  144:*14*
**Co-counsel** 2:*16*
**colleagues** 34:*21*
**college** 12:*4*
**column** 181:7
**come** 6:*15*  26:9
28:6  30:*4*  38:*21, 25*
39:2  115:6  118:*11*
158:*16*
**comes** 38:22  44:*23*
120:*21*
**comfort** 95:*18*
**comment** 124:*21*
**comments** 18:*11*
21:*23*
**Commission** 180:*16*
**committed** 174:9
**committing** 176:*14*
**communication** 56:*18*
83:22
**company** 97:2, *18*
98:8  136:*13*  169:*12*
**company's** 17:8
120:*20*  125:*13*  154:7
**competent** 181:*20*
**complain** 148:*19*
**complainant** 19:*23*
22:*9, 13*
**complained** 148:*24*
158:8  164:22
**complaining** 149:9, *20*
**Complaint** 3:*20*
18:*15*  22:*21*  118:*21*
119:*2, 5*  120:*12, 23*
147:*13*  152:*16*  170:7,
*8, 14, 25*  171:*4, 9*

**complaints** 17:*25*
21:6  22:*25*  122:*12*
152:*17, 21*  154:2, *4*
**completely** 78:*21*
80:*5*  115:*4*  172:*24*
**compliance** 169:*13*
**computer** 17:*15*
79:*17, 21*
**computer-based** 17:*6,
8*
**concerned** 103:*5*
104:*3*
**concerns** 145:*12, 14*
**concluded** 179:*5*
**conclusion** 30:*5*
175:*4*
**condition** 8:*18*
119:*24*  120:2
**conditions** 29:*25*
154:*9, 10*  155:*13*
**Conduct** 3:*14*  17:*23*
18:*24*  34:*16*  35:*13*
166:*5*
**conducted** 22:*14*
34:*18*  121:*5, 13*
**confident** 141:9
**confirm** 57:*25*
138:*20*
**consecutive** 68:*15*
101:*10*
**consent** 4:*16*  112:*19,
25*
**consider** 104:*25*
118:*20*  119:*1, 4*
**considered** 125:*10*
130:*3*
**consisted** 16:22
**consistent** 54:*1*
**constantly** 82:*24*
**consult** 37:*19, 23*
40:*11, 15, 16*  48:*15*
105:*12*
**consultation** 30:7
**consulted** 38:*10*
100:*6*
**contact** 118:*17*
**contacted** 31:*5, 11*
118:*10*
**contained** 180:*4*

Deposition of Richard Law

Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**context** 67:22
**continue** 8:*11* 123:*19*
**continued** 148:*24*
**continuing** 80:4
**contract** 15:9
**contradict** 53:12
**contribute** 114:*20*
**control** 56:*13, 22, 24*
180:22
**conversation** 72:2
76:*10, 13, 15* 77:5, 8,
9 83:22 107:*10, 11*
122:*18, 21* 148:*11, 13*
149:*3* 150:*14, 17, 20,*
*21* 151:22 158:*3, 12*
**conversations** 9:*21*
31:24 40:23 42:25
43:*7, 20* 46:*1* 72:9
74:4, *11* 78:5, 7
100:9
**convicted** 11:7
**copy** 179:2
**corner** 96:20 128:10
**corporate** 25:2
27:23, 24 28:8, *10, 17*
44:*18, 23, 24* 140:9,
*12* 148:*10* 154:*15*
**correct** 5:22 6:*17, 18,*
*20* 7:*15, 19* 25:1
27:21 28:21 34:*3*
35:*14, 15* 43:*10* 45:*1*
46:4, 5 53:9, *10*
58:15 70:*12* 71:*10*
77:15 83:20 89:*18*
95:24, 25 98:*18, 20,*
*23* 99:24 102:6
106:*23* 109:*1* 113:7,
8 125:*1, 2, 4* 129:2
130:*18* 131:5 132:*10*
134:4, *20* 136:*1*
137:*14, 22* 146:*18*
158:24, 25 163:*16, 17*
168:*10, 19* 170:*10*
171:*1, 2, 11, 12, 17*
176:*18* 177:*4* 180:5
182:6
**CORRECTION**
183:2
**correctly** 17:*13*
**correspond** 102:*24*

**correspondence**
43:*12* 104:*11*
**cosmetics** 92:*17*
**cost** 88:*17*
**Costa** 146:*3*
**COUNSEL** 2:8 4:2,
*15, 18, 22, 25* 62:25
67:*15* 68:*3* 89:24
95:*1, 12* 101:*1* 110:*3*
122:*2* 127:25 136:24
141:*18* 146:*17*
167:*14* 180:8, 9
181:22
**count** 49:*3* 73:22
91:*21*
**counted** 49:*13, 17*
**counting** 91:*19*
**couple** 32:4 35:2
96:*3* 164:*16* 177:*21*
**courses** 12:*19*
**COURT** 1:*1* 4:*6, 20*
7:*21* 110:*3* 141:*18*
150:*1* 181:22
**coworkers** 57:7
78:22 80:6 82:*14, 25*
153:*16*
**created** 60:*18* 69:*13*
**credit** 81:*14* 85:*17*
111:*20* 113:22
116:*11, 20* 144:*11*
**crime** 11:8
**criminal** 7:*10*
**Critical** 172:22, *25*
**current** 12:*24* 13:*1*
103:*19* 104:*15*
**currently** 144:*25*
**customer** 93:6 98:*13*
**customers** 82:*14, 24*
92:*23* 115:5

**< D >**
**Dahan** 142:*17, 22*
143:*14* 145:4, *11, 25*
**Dan** 140:4, 7 141:*11*
**dash** 117:*10*
**date** 13:6 33:*11, 12*
78:*4* 83:20 136:*12,*
*13* 140:2 143:*19*
156:*18* 166:*17*
181:*12* 182:*15, 19*

**dated** 3:*18* 75:23
97:*3* 102:8 113:4
147:*15* 182:5
**David** 2:*16* 32:7
109:5, 8, 9
**day** 83:*14* 167:*12, 15*
**days** 10:*10* 83:*11, 23*
146:*1* 181:23
**day-to-day** 16:*23*
17:5 25:*19* 26:2, *4*
65:*10*
**Dear** 76:*17* 97:*14*
**December** 1:*11* 13:9
182:5
**decided** 76:22
**decision** 19:20 37:*14,*
*20* 38:*13* 61:*11*
63:*13, 16* 77:2, *19*
86:*12* 92:9 93:*15*
99:4 100:5 105:*1*
158:*18, 19*
**decisionmaking**
36:24 178:*19*
**decisions** 37:6, 7, *16,*
*25* 38:*10* 39:20 40:4
143:25
**declare** 4:*13*
**deem** 126:*16*
**Deer** 12:*1*
**defendant** 11:5
**Defendant(s** 1:7
**Defendants** 2:*11, 16*
5:5 148:*10*
**defense** 62:25
**degree** 12:*11, 14, 15,*
*16* 17:4 34:4
**degrees** 12:8, *10, 12,*
*13*
**Delaware** 1:*14*
**delineation** 105:*25*
**Dennis** 42:20 43:20
46:*12* 74:*15* 122:*16*
**department** 15:*16*
24:5 27:2, 4, 9 30:8,
*16, 19* 32:*17, 21* 38:6
42:*13, 18, 23* 43:*14*
47:9 48:*18* 52:*3*
55:*14, 18* 65:9 70:*1*
72:2, *18* 81:*16* 82:24
94:20 97:8, *10* 103:9

118:5 126:22, *24*
145:*15* 148:*1, 3*
177:7
**departments** 92:*17*
98:*11*
**depended** 28:24
**Depending** 19:*1* 20:*3*
**depends** 111:2
**depo** 62:*1*
**deposition** 1:9 3:*12*
6:6 7:7 9:20 10:*20,*
*25* 62:*3* 67:9 179:5
181:*3, 5, 13, 17, 23*
182:5
**depositions** 6:*15*
**DEREK** 2:*3* 5:*3*
**described** 155:*1*
**DESCRIPTION** 3:*1*
**designation** 69:*16*
**detail** 95:*14* 133:2
**details** 3:*19* 138:*17*
**determination** 19:20,
*25* 28:20, 22 92:20
129:*15, 16* 141:*10*
**determinations** 39:*13*
**determine** 47:4
**Diaz** 42:*21* 43:20
46:*12* 74:*15* 122:*16*
**difference** 25:*16, 18*
48:8 59:*10* 61:8, *10*
66:2 69:5 99:4
108:*21, 23* 113:*21*
130:8, 9, *11* 135:22
142:8 161:*18, 23*
174:25
**differences** 63:*10*
**different** 10:*4* 12:*10,*
*11* 18:*17, 22* 24:*14*
29:*12* 32:5 35:*3*
40:24 53:*16* 62:*16*
65:*17* 71:*3* 87:20
88:*12, 13, 14* 101:*11*
115:7 124:20 161:*13,*
*25* 176:*18*
**differently** 48:*25*
**difficult** 96:7
**digitally** 121:*23*
**direct** 34:20 43:6, 8
180:*21*

**directly** 28:*4* 125:*17*
132:*17* 145:*4*
**director** 25:*15, 17*
42:*18* 103:*10* 111:*3*
140:*16*
**directors** 35:*21* 106:*2*
**disciplinary** 13:*19*
15:*21* 33:*12* 34:*23,*
*25* 39:*9* 46:*6, 17*
103:*18* 104:*3, 10, 14*
105:*11* 107:*19* 108:*5,*
*22* 129:*19* 133:*17*
134:*9* 153:*3*
**discount** 10:*3* 46:*23*
47:*6* 56:*5* 76:*23*
84:*9* 86:*13* 88:*5*
110:2, 7 116:*12*
129:*5* 131:*12* 134:*24*
135:*4* 144:*12*
**discounts** 63:*15*
**discrepancy** 72:*3, 15,*
*16, 19*
**discrimination** 18:*1,*
*3, 5, 15* 19:*15, 21*
20:*20* 21:*7* 22:*6, 22*
23:*1, 8, 20* 24:*12*
118:*21* 119:*2* 120:*23*
148:*20* 152:*24* 170:*8*
**discriminatory**
148:*25* 149:*10*
**discuss** 158:*17*
**discussed** 133:*23*
165:*4*
**Discussion** 50:*14, 17*
89:*9* 117:*15* 127:*19*
128:*5* 140:*24* 141:*9*
143:*10*
**discussions** 29:*16*
**dismissed** 150:*2*
**DISTRICT** 1:*1, 2*
**diverter** 110:*7* 124:*3,*
*8, 10, 11, 23* 125:*7, 10*
152:*3* 171:*14* 177:*3,*
*4, 8, 15*
**docs** 95:*17*
**document** 20:*7*
50:*18* 51:2, *6* 52:*7,*
*10, 11* 56:*6, 9, 12, 13,*
*17, 21, 22* 57:*2, 4*
61:*14, 17* 66:*23* 67:*1*

68:*4, 11, 20* 74:*1, 23*
75:*1, 11, 17, 19* 79:*18,*
*19* 82:*1* 89:*15, 22*
90:*21* 91:*10, 24* 92:*5*
93:*1* 96:*2, 8* 97:*4*
98:*4, 15* 101:*6, 22, 24*
103:*15* 111:*18*
112:*14* 113:*23* 114:*5*
115:*15* 117:*5, 7*
119:*19* 122:*15* 127:*1,*
*12, 24* 128:*12, 14*
129:*4* 130:*24* 131:*9*
136:*16, 18, 20, 22*
137:*7, 12* 139:*3, 11,*
*13, 18, 20* 141:*7*
143:*5, 8, 9, 13* 146:*19,*
*22, 25* 147:*4, 12, 14*
150:*16* 155:*23* 156:*4,*
*7, 12, 14* 159:*18, 20,*
*22, 24* 160:*6, 15, 18*
169:*5* 175:*17, 21*
176:*3, 5, 8* 178:*1, 7*
**documentation** 20:*5*
28:*16* 79:*14* 121:*23*
**documented** 31:*12,*
*20, 21*
**Documents** 3:*15*
9:*23, 25* 10:*2, 4, 9, 12*
20:*11* 79:*24* 84:*18*
85:*1* 90:*2* 95:*23*
121:*16* 137:*10*
161:*10* 163:*1, 11, 13,*
*19*
**doing** 24:*1* 44:*6*
51:*17* 72:*18* 136:*7*
144:*7* 164:*23*
**door** 141:*4*
**dot-dot-dot** 89:*17*
**due** 46:*23*
**duly** 5:*10*
**duties** 16:*19* 77:*18*
172:*14*

< E >
**earlier** 19:*15* 84:*17*
134:*17* 150:*15* 155:*1*
**early** 167:*14*
**eat** 89:*7*
**economics** 12:*14*

**educational** 12:*19*
**EEO** 10:*3*
**effect** 104:*13* 105:*9*
**eight** 178:*13*
**either** 8:*18* 15:*18*
34:*20* 46:*17* 74:*5*
100:*6* 117:*13* 121:*23*
172:*9*
**elaborate** 26:2 33:*24*
48:*22* 86:*22*
**Eleanor** 142:*17*
143:*14*
**eleven** 178:*13*
**E-mail** 3:*16, 18, 22*
43:*12, 13, 24* 50:*12*
67:*24* 75:*22* 102:*11*
103:2 105:*6, 8*
106:*12* 108:*17* 110:*9*
114:*6* 117:*20, 25*
119:*8, 14, 19* 120:*13*
122:*21* 139:*22* 159:*7*
161:*2, 6, 11, 13*
162:*13, 15* 170:*1*
172:*6, 10, 15, 17*
**e-mails** 31:*24* 162:*19*
163:*15*
**employed** 10:*17*
52:*6* 55:*13* 180:*9*
**employee** 10:2 16:*25*
26:*5* 28:*2, 9, 12*
37:*10* 40:*22* 44:*18*
47:*7* 48:*4* 49:*22*
52:*24* 53:*14* 60:*5, 11*
69:*13* 72:*17* 84:*19*
92:*4* 97:*13* 104:*22*
120:*20, 21* 144:*15*
151:*16* 152:*5, 6*
180:*8*
**employees** 17:*9*
23:*18* 32:*17* 33:*23*
34:*3, 6, 23, 25* 36:*19*
56:*5* 69:*14* 105:*15*
116:*22* 123:*14* 126:*1,*
*4* 135:*25* 146:*2, 7*
164:*5* 165:*17, 21*
168:*14* 169:*15*
176:*17*
**employee's** 33:*11*
34:*20* 40:*22* 106:*6*

**employer** 12:*25* 13:*1,*
*4*
**employment** 6:*7*
13:*7* 41:*18* 42:*5*
74:*5* 102:*21* 143:*20*
**encompassed** 17:*21*
**ended** 16:*3*
**enforced** 24:*12*
**enforcing** 23:*19*
**ensure** 93:*7*
**ensuring** 81:*17*
172:*15*
**entail** 19:*11, 12*
**entailed** 19:*14*
**enter** 34:*10*
**environment** 21:22,
*25* 22:*7, 22*
**Equifax** 97:2
**ERRATA** 181:*7, 10,*
*11, 16, 21* 182:*10*
183:*1*
**ESQUIRE** 2:*3, 8, 13*
**essential** 30:*11*
**essentially** 34:2
36:22
**et** 1:*6* 53:22
**Eunice's** 62:*9*
**evade** 86:*5* 87:*1*
**evader** 171:*17*
**evading** 85:*18, 22*
**evasion** 80:*21* 84:*9*
86:*15* 129:*6* 131:*18,*
*22* 168:*18* 169:*20*
173:*12, 21* 174:*5, 10,*
*18* 175:*10* 176:*6, 9,*
*15*
**event** 73:*7*
**events** 69:*13*
**everybody** 50:*20*
**evidence** 63:*17*
64:*14* 126:*16* 180:*3*
**exact** 76:*7* 140:*8*
174:*11*
**EXAMINATION**
5:*14* 167:*8* 173:*8*
177:*23*
**examined** 5:*11*
**example** 21:*19* 49:*11*
**exceed** 81:*18* 152:2

Deposition of Richard Law                                   Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**exceeded** 47:*5* 70:*20* 71:*10* 93:*15* 135:*4* 151:*25*

**exceeding** 47:*1* 55:*5* 152:*6* 164:*14* 165:*1*

**exceptions** 71:*15*

**excerpt** 3:*1* 67:*8*

**exchange** 58:*6*

**excuse** 52:*22* 169:*19* 172:*11*

**excused** 179:*4*

**executive** 25:*4* 102:*15* 122:*9*

**executives** 16:*21* 24:*22* 36:*23* 37:*18* 107:*4* 144:*9*

**exhibit** 51:*8* 56:*4* 60:*23* 113:*25* 139:*5, 6, 8* 142:*24* 167:*25* 175:*19*

**Exhibit-1** 51:*16*

**Exhibit-A** 3:*1* 51:*18, 19* 54:*14*

**Exhibit-B** 3:*1* 56:*6, 7* 57:*5* 67:*17* 68:*2* 69:*3*

**Exhibit-C** 3:*1* 66:*24* 67:*8*

**Exhibit-D** 3:*13* 74:*20, 21* 75:*15*

**Exhibit-E** 3:*14* 89:*12, 13* 91:*18, 20* 92:*6* 96:*18* 169:*3*

**Exhibit-F** 3:*15* 101:*2, 4, 24* 175:*15, 16*

**Exhibit-G** 3:*16* 117:*1, 3, 18*

**Exhibit-H** 3:*17* 127:*9, 10* 128:*9*

**Exhibit-I** 3:*18* 139:*8, 9* 141:*7*

**Exhibit-J** 3:*19* 143:*3*

**Exhibit-K** 3:*20* 146:*13, 14* 175:*15*

**Exhibit-L** 3:*21* 156:*1, 2*

**Exhibit-M** 3:*22* 159:*16*

**EXHIBITS** 3:*1* 50:*4, 6*

**exist** 79:*12, 13*

**expected** 145:*24* 169:*15*

**expensive** 70:*11*

**experience** 66:*3*

**Expertise** 27:*13, 19* 28:*1* 116:*17*

**Expires** 180:*16*

**explain** 16:*17* 19:*14*

**explaining** 63:*7*

**explanation** 111:*13*

**expressing** 145:*12, 13*

**extent** 175:*3*

**< F >**

**facilitated** 27:*12*

**fact** 63:*13* 145:*8* 167:*17* 171:*13* 175:*7*

**factor** 73:*14* 93:*14* 104:*25*

**facts** 19:*24*

**failure** 23:*5, 14*

**Fair** 173:*3*

**Fairfield** 2:*14*

**fall** 15:*17* 24:*5* 71:*4* 111:*6*

**fallen** 24:*7* 122:*7*

**familiar** 52:*7* 147:*22* 172:*21, 24*

**familiarize** 160:*3*

**family** 13:*14* 87:*24* 88:*8* 125:*15* 178:*15*

**far** 82:*11* 84:*25*

**fax** 97:*12*

**FBI** 145:*5, 6, 9*

**February** 55:*20*

**federal** 150:*1*

**fee** 129:*8* 135:*10*

**feel** 78:*20* 80:*5* 126:*15* 171:*8*

**fell** 15:*18* 19:*2* 111:*3* 122:*13*

**fellow** 140:*16*

**felt** 170:*7*

**file** 76:*18* 90:*4*

**filed** 147:*16* 156:*18*

**files** 17:*9* 32:*17, 22*

**34**:*23, 25*

**filing** 181:*17, 22*

**filling** 102:*16* 103:*11*

**financially** 180:*9*

**find** 101:*18* 105:*11* 176:*5, 7*

**findings** 20:*19* 32:*13* 84:*4* 129:*15* 132:*1*

**fine** 35:*24* 41:*23* 48:*1* 51:*14* 68:*11*

**fire** 36:*10, 15, 19* 37:*21* 38:*13*

**fired** 126:*10, 14, 15* 134:*2* 153:*6*

**firing** 38:*23, 24* 39:*1*

**first** 17:*6* 25:*11* 28:*9* 53:*22* 57:*7, 8* 58:*10* 60:*23* 61:*13* 68:*4, 10, 22* 73:*2* 75:*14, 16* 82:*13* 90:*12, 16* 91:*12, 14* 93:*13* 110:*10, 24* 118:*23* 128:*10* 136:*20* 147:*12* 151:*15*

**five** 41:*21* 56:*14* 78:*12* 128:*3* 178:*13*

**Flast** 109:*5, 17, 18*

**floor** 83:*15*

**FMLA** 27:*2, 4, 9, 10, 13* 44:*10, 12, 25* 45:*11, 16*

**focused** 25:*19, 20*

**folder** 20:*12* 161:*10* 163:*3, 11* 172:*19, 22* 173:*1*

**folders** 32:*22, 23, 25* 33:*2*

**folks** 115:*7*

**follow** 43:*17*

**followed** 111:*22*

**following** 181:*9*

**follows** 5:*12*

**follow-up** 77:*25* 111:*22*

**footage** 20:*4*

**foregoing** 180:*4, 16* 182:*5*

**forgo** 39:*21*

**forgot** 65:*22*

**form** 3:*21* 4:*4* 17:*10* 18:*10* 19:*7* 20:*21* 21:*3, 14* 22:*10* 23:*23* 26:*21* 29:*8* 30:*22* 31:*13* 32:*18* 33:*14* 36:*4, 20* 38:*1, 14* 39:*15* 40:*6* 42:*8* 44:*4* 45:*2, 12, 19* 46:*8* 47:*12* 48:*20* 49:*4, 14* 59:*12, 25* 60:*12, 20* 61:*18* 70:*5, 22* 72:*7, 21* 73:*4, 16* 74:*8* 77:*20* 81:*9, 19* 84:*14* 85:*14, 23* 86:*21* 93:*18, 21* 99:*7* 103:*6* 104:*5* 106:*7, 14, 24* 107:*20* 108:*6* 110:*11, 18, 25* 111:*12* 115:*19* 116:*14* 120:*14, 24* 123:*25* 124:*4* 125:*5, 21* 130:*19* 132:*20* 133:*4* 136:*2* 149:*5, 11* 154:*11, 21* 155:*15* 157:*3* 159:*8* 161:*20* 162:*2, 22* 163:*4, 20* 164:*15* 173:*17* 176:*19* 177:*9* 181:*5, 8*

**format** 112:*23*

**former** 57:*6* 144:*15*

**forms** 177:*7*

**forward** 66:*15* 117:*22*

**forwarded** 118:*3*

**found** 20:*20*

**four** 78:*12* 93:*4* 178:*13*

**fraud** 31:*10, 19* 113:*22* 114:*20, 24* 115:*5* 116:*12, 20* 144:*11* 169:*19*

**fraudulent** 111:*20*

**Fred** 32:*6* 114:*10, 17* 142:*3*

**frequency** 124:*19* 126:*3*

**frequent** 155:*3*

**friends** 87:*24* 88:*9* 125:*15* 178:*15*

Case 1:19-cv-08927-GBD-SLC    Document 128-2    Filed 09/20/23    Page 60 of 83

Deposition of Richard Law                                Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**front** 7:*18* 51:*3*
56:*12, 17* 67:*7* 75:*16*
119:*14* 178:*10*
**Fulford** 140:*5, 10*
**full** 15:*3*
**fully** 112:*23* 180:*4*
**functions** 29:*21*
30:*11*
**further** 4:*11* 118:*16*
119:*23* 122:*17*
129:*19* 140:*24* 141:*8*
177:*18* 180:*5*
**FYI** 103:*12* 119:*21*

**< G >**
**gaps** 68:*16*
**gender** 21:*20*
**general** 21:*1* 92:*16*
109:*13* 155:*9* 176:*21*
**generally** 11:*15* 34:*8*
**GERBER** 2:*13* 5:*7*
9:*12* 50:*9, 24* 51:*7*
75:*6* 90:*20, 24* 91:*3*
100:*18, 23* 136:*24*
137:*4*
**getting** 75:*4* 86:*11*
88:*4*
**gift** 129:*20* 140:*21*
142:*9*
**gifts** 141:*23* 142:*10*
**GILMAN** 2:*11*
**girl** 59:*4*
**give** 7:*9* 20:*14* 29:*3*
39:*13, 21* 40:*3, 4*
50:*3* 56:*22* 91:*9*
112:*24* 151:*4*
**given** 29:*15, 24* 30:*6*
43:*15* 47:*2* 48:*14*
94:*10* 122:*2* 154:*20,
25* 155:*12* 157:*14*
182:*7*
**glad** 62:*15*
**glancing** 91:*11*
**go** 7:*11* 11:*11, 13, 14*
50:*21, 22* 54:*18*
55:*11, 14* 57:*5* 58:*1*
64:*20* 66:*19* 68:*8, 22*
78:*9, 10* 82:*25* 83:*25*
89:*5, 8* 92:*7* 96:*10*
97:*11, 17* 99:*12*

101:*9, 13, 17* 110:*24*
112:*1* 113:*23* 115:*10,
22* 121:*10* 122:*8*
123:*22* 130:*23*
131:*25* 132:*25* 148:*4,
5* 165:*24* 178:*1*
**goes** 80:*10* 110:*23*
**going** 6:*21, 24* 7:*11*
16:*16, 23* 21:*21*
23:*22* 30:*1* 39:*7*
41:*17* 42:*4* 44:*19*
48:*11* 55:*17, 18* 58:*2*
62:*2, 3, 7, 11* 64:*6*
65:*7* 66:*12, 19* 67:*15*
68:*7, 13* 69:*6, 17*
70:*4* 72:*6* 78:*10*
81:*3, 5, 8, 25* 85:*13*
86:*13, 20* 88:*15, 21*
89:*5, 25* 90:*11* 93:*17*
94:*25* 95:*5, 22* 99:*6*
103:*12* 111:*11, 18*
124:*18* 125:*20* 127:*2*
144:*20* 145:*7* 147:*6*
149:*4* 150:*4, 14*
153:*22* 169:*3* 173:*16*
174:*19* 177:*20*
**Gonzalez** 114:*7*
**Good** 5:*17, 18* 41:*25*
91:*1* 108:*21*
**gotten** 93:*21*
**graduate** 12:*6* 15:*3*
**grand** 7:*9*
**grant** 28:*20* 41:*7*
**Grievance** 3:*13, 21*
53:*9* 75:*22* 76:*18*
77:*1* 156:*22* 158:*17,
23* 164:*21*
**grievances** 40:*25*
41:*1* 159:*5*
**GROUP** 2:*3* 5:*3*
109:*13, 19*
**guess** 15:*18* 17:*5*
40:*2* 68:*12* 108:*16*
160:*13* 164:*2*
**guidance** 38:*5* 107:*3,
5, 7*
**guidelines** 93:*8*
**guilty** 11:*8*
**guys** 58:*11*

**< H >**
**half** 88:*22*
**Hampshire** 129:*8*
131:*5, 14* 132:*3, 14,
15* 135:*9, 12* 144:*14*
168:*2*
**Handbag** 3:*1* 42:*23*
50:*16* 51:*25* 52:*5, 19*
53:*1* 55:*23* 56:*1*
59:*23* 60:*10* 61:*16*
69:*9* 70:*3* 71:*9* 72:*4,
17* 73:*14* 74:*6, 12*
92:*3* 99:*2* 118:*5*
126:*21* 129:*7* 131:*13*
135:*9* 146:*2* 151:*17,
25* 152:*2, 6* 164:*14*
165:*1, 5*
**Handbags** 42:*16*
49:*2, 7, 17* 52:*13*
53:*25* 57:*16* 58:*12*
59:*1* 60:*4* 73:*3, 8*
78:*17, 22* 80:*7, 20*
92:*13, 14, 17, 19, 22,
24* 93:*4, 13* 109:*21,
25* 117:*23* 151:*14*
156:*23* 157:*7, 10*
**handbook** 10:*3* 47:*7*
48:*5* 49:*22* 52:*24*
53:*1, 3, 14* 54:*9* 60:*5,
11, 15* 63:*12* 72:*15, 17*
73:*15* 84:*20* 85:*17*
86:*9* 92:*4* 156:*23*
177:*17*
**handle** 17:*25* 27:*10*
40:*25* 41:*1* 53:*9*
159:*5*
**handled** 106:*1, 2*
158:*23* 159:*2*
**handling** 103:*24*
105:*10, 15*
**happen** 121:*7*
**happened** 63:*25*
65:*8* 153:*7, 16, 17*
**happening** 62:*13*
80:*9* 120:*22*
**happy** 8:*10* 9:*14*
160:*25*
**harassment** 19:*15*

152:*16, 18, 22*
**Harris** 2:*19*
**hash** 53:*22*
**head** 7:*24* 10:*1, 6*
16:*11* 21:*11* 24:*17*
33:*7* 34:*14* 36:*17*
38:*6* 81:*1* 138:*3*
155:*5*
**hear** 118:*11, 13*
**heard** 62:*14* 165:*7*
172:*23*
**hearing** 165:*5*
**held** 1:*10* 50:*14, 17*
89:*9* 117:*15* 127:*19*
128:*5* 143:*10*
**help** 65:*7*
**Hey** 57:*13* 58:*10, 24*
59:*4*
**Hi** 57:*20* 103:*24*
118:*4*
**high** 11:*22, 24* 12:*1*
111:*20*
**high-end** 132:*4*
**hire** 33:*11* 36:*12*
42:*10* 136:*13*
**history** 93:*6*
**HOC** 2:*8* 5:*5*
**Hoelz** 102:*5, 13, 14*
103:*17* 106:*4* 117:*22*
119:*20*
**hold** 140:*25*
**home** 125:*17* 174:*15*
**honest** 98:*14*
**honor** 154:*16*
**hope** 169:*4*
**hopefully** 90:*18*
**hostile** 21:*22* 22:*6, 22*
**hostile-type** 21:*24*
**hour** 88:*21, 25*
**hours** 8:*24* 9:*3*
**housed** 33:*18*
**HR** 14:*10* 16:*18, 24*
24:*21, 22, 24* 25:*4*
26:*20* 27:*2, 4* 31:*7*
32:*14* 34:*3, 21* 35:*5,
16* 37:*17* 40:*14* 72:*2*
76:*21* 83:*10* 102:*14*
103:*9* 106:*2, 5* 107:*4*
111:*3* 118:*14* 122:*9*

140:*16* 144:*9* 145:*12* 166:*3*

**human** 12:*16* 14:*4* 15:*19* 16:*21* 18:*21* 24:*8* 25:*14* 31:*4, 10* 35:*20* 36:*23* 153:*18*

**< I >**
**icon** 53:*22*
**ID** 97:*13*
**identification** 51:*20* 56:*8* 66:*25* 74:*22* 89:*14* 101:*5* 117:*4* 127:*11* 139:*10* 143:*4* 146:*15* 156:*3* 159:*17*
**illegal** 125:*12*
**imaging** 104:*14* 105:*11*
**immediate** 35:*6*
**immediately** 14:*18, 19*
**impair** 8:*14, 19*
**important** 7:*23*
**improperly** 151:*6*
**Inappropriate** 62:*17, 20* 66:*15*
**incidents** 31:*9*
**included** 106:*17*
**including** 33:*11*
**indicate** 4:*22* 93:*20* 94:*2*
**indicating** 110:*2, 7*
**individual** 21:*23, 24* 29:*14, 17*
**individuals** 24:*3, 14* 29:*12* 32:*5, 8* 35:*3* 39:*2* 40:*24* 56:*19* 114:*19* 128:*25* 130:*7* 141:*23* 165:*3*
**informal** 7:*17*
**information** 33:*11, 19, 22* 34:*6, 10* 35:*4* 38:*17* 53:*18, 20* 77:*23* 93:*20* 94:*1, 9* 97:*6* 99:*23* 114:*18* 119:*12* 124:*7* 130:*17* 143:*20* 162:*12, 21* 164:*24* 166:*10*
**informed** 45:*8, 16* 112:*25* 119:*16, 22*

122:*15*
**IN-HOUSE** 2:*8*
**Initially** 13:*25* 14:*6* 25:*6* 90:*12*
**initiated** 170:*13*
**input** 33:*22* 34:*6* 35:*4*
**inquiring** 72:*3*
**instance** 53:*21* 104:*12* 105:*20, 24* 126:*13, 14* 129:*17* 130:*6, 15* 166:*14*
**instances** 130:*7* 166:*9, 13*
**INSTRUCTIONS** 181:*1*
**inter** 99:*22*
**interaction** 27:*12* 32:*15* 40:*17*
**interactions** 40:*18* 41:*15* 65:*10* 153:*11*
**interest** 14:*8*
**interested** 73:*10* 167:*20* 180:*9*
**interesting** 62:*24*
**interim** 78:*8* 102:*16* 108:*3*
**intermittent** 44:*10, 12* 155:*17*
**interpret** 62:*12* 63:*1*
**interpretation** 49:*21* 65:*3*
**interpreted** 176:*14*
**interview** 42:*6* 99:*17, 21* 102:*5* 111:*21* 112:*20* 113:*16* 141:*17, 22*
**interviewed** 14:*5, 6* 168:*19*
**introduce** 61:*25* 62:*3* 66:*23*
**introduced** 5:*19*
**introducing** 64:*12*
**invest** 165:*8*
**investigate** 126:*2* 128:*11* 158:*5* 164:*13* 165:*19* 170:*14* 171:*3, 10*
**investigated** 85:*7* 170:*17*

**investigating** 122:*10* 123:*20*
**investigation** 10:*4* 19:*2, 5, 11* 22:*14, 18* 31:*22* 46:*4* 84:*4, 8* 99:*18* 103:*3, 24* 105:*10* 106:*6, 20* 110:*1, 6* 119:*23* 120:*6, 12, 17* 121:*5, 14, 20, 21* 123:*8* 128:*18, 21, 23* 134:*12, 13* 145:*5, 7, 9, 14* 149:*16, 17* 164:*5, 25* 165:*9, 16, 21* 170:*13* 171:*1* 173:*14, 23* 174:*1, 4*
**investigations** 17:*23* 18:*25* 19:*12, 13* 20:*8* 32:*13* 33:*13* 108:*4* 111:*16* 113:*10* 153:*19* 166:*5*
**Investigative** 3:*17*
**investigator** 141:*11*
**investigators** 140:*5*
**involve** 31:*7*
**involved** 22:*5* 30:*13* 32:*14* 36:*2, 7* 106:*5* 108:*4, 10* 145:*9* 151:*21* 172:*12* 180:*8*
**involvement** 31:*5* 102:*19, 22* 172:*2, 4*
**involves** 18:*9*
**Island** 11:*21*
**issue** 84:*23*
**items** 47:*1* 48:*12, 14* 57:*25* 59:*16* 70:*11* 71:*3* 72:*24* 81:*23* 88:*5, 17* 130:*13* 135:*2, 3* 141:*23* 175:*8*
**its** 156:*10* 168:*14*

**< J >**
**January** 15:*5*
**Jersey** 1:*13* 180:*16*
**job** 30:*12* 77:*18* 81:*22* 103:*20* 104:*18* 148:*9*
**jobs** 15:*9*

**judge** 7:*18*
**judgment** 150:*2*
**June** 13:*18* 75:*23* 76:*19* 78:*4* 97:*3* 102:*8* 103:*16* 114:*9* 117:*20* 118:*12* 150:*17, 22*
**jury** 7:*10, 19*

**< K >**
**Kavanagh** 76:*2, 3* 156:*18*
**keep** 33:*1* 34:*22, 24* 81:*7* 90:*21* 144:*20* 163:*2*
**keeping** 106:*19*
**Kemi** 58:*24*
**kept** 32:*21* 108:*13*
**kind** 69:*22* 101:*10*
**knew** 44:*18* 63:*11* 65:*22* 107:*15* 120:*6* 160:*17*
**knocking** 141:*4*
**know** 5:*21, 23* 6:*1, 2* 7:*14* 9:*15* 21:*10* 24:*1* 28:*3* 32:*22* 35:*23, 24* 36:*16* 41:*10, 12, 14* 43:*22, 25* 44:*9* 45:*6* 50:*5, 8, 12* 51:*5* 56:*13, 14* 57:*18* 58:*7, 24* 60:*9* 64:*11* 65:*6, 17, 21, 23, 25* 66:*10* 70:*10* 71:*7, 14, 21* 75:*2, 4* 76:*2* 77:*8* 78:*7* 79:*11* 82:*19* 84:*24* 88:*23, 25* 89:*4, 6, 22* 93:*24, 25* 95:*16* 96:*4* 101:*9* 102:*18, 22* 104:*7, 17, 19* 107:*22* 108:*8, 24* 109:*1* 110:*13, 20* 112:*2* 113:*21* 114:*7, 24* 117:*8* 118:*6, 14* 122:*3, 22* 124:*1* 131:*21* 133:*21, 22* 138:*2* 140:*14* 142:*17* 143:*8* 144:*2* 145:*21* 146:*6* 152:*9* 153:*5, 6, 7* 156:*7* 159:*11, 21* 160:*15* 161:*21*

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 62 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

162:*18*, 21  164:*10*
167:*12*, 16, 23  169:*25*
172:*19*  173:*24*
175:*23*  178:2
**knowing**  64:*18*, 21
119:9
**knowledge**  41:9
42:*15*  44:*11*  46:*19*
49:8, *16*  60:*13*  64:*15*
70:*15*  105:5  119:8
151:*18*  152:*23*, 25
153:2  168:5  182:9
**known**  99:2  124:*23*
129:*24*  130:*3*  132:*18*
136:9
**Kotsovolos**  149:*1*
**KRISTINA**  1:*3*  5:*21*
6:7  42:6, 7, *14*  43:*1*,
7, *20*, 22  45:25  46:2,
20  49:*23*  57:6, *14*, 21
58:7, *23*  61:*11*  71:*17*
75:22  77:6, 8  78:5, 7
79:*1*, 8  80:*13*  83:*16*,
19  84:*12*  85:6  86:*19*
88:8  92:*10*  93:*15*
97:*13*  99:5, 20  100:5
102:4  108:*21*  109:*25*
111:*10*  112:6  113:*3*
116:4  117:22  118:*3*,
4, *17*  119:*15*, 21
122:*16*, 23  123:9, *10*,
18, 20  124:*3*  125:*14*
126:6  129:2  130:*10*,
12  131:*4*  132:*13*
140:*18*  142:5  150:*15*,
17  151:4, *10*  152:*15*,
18  154:2, 5  155:*20*
156:*19*  158:*1*  159:2
164:7, 20  173:*12*, 20
176:6  177:*3*
**Kristina's**  41:*17*
42:5, *21*  43:*16*  48:*16*
53:9  74:5  76:9  97:7
99:*16*  102:*21*, 25
104:9  105:*1*, 7
107:*19*  116:8  137:25
138:2  157:*25*  166:*18*


**< L >**

**Labor**  94:*20*  97:8,
10  177:8
**lactation**  30:2
**Lai**  129:*10*  132:*3*, 4
135:*12*  138:8, *15*
**language**  177:*12*
**large**  86:*12*
**laugh**  59:5
**LAW**  1:*10*  2:3  3:*1*
5:*3*, *10*, 17  76:*21*
80:*11*  81:20  84:*15*
85:*14*  102:6  125:6
148:7, *24*  156:*24*
157:*16*  160:*21*
167:*11*  168:*13*, 15
169:7, *13*  175:5, *25*
178:9  182:*3*, 15
**laws**  169:*16*
**lawsuits**  23:7
**lawyer**  10:*24*
**lawyers**  10:*24*
**leadership**  40:*24*
**learn**  45:*10*
**learned**  164:*24*
**leased**  55:*15*, 18
**leave**  13:*12*  15:*1*, 4
27:*10*  44:*10*, 25
45:*11*  145:22  148:9
155:*18*
**Lee**  146:*3*
**left**  13:*11*
**legal**  175:*3*
**lend**  63:*15*
**letter**  77:*1*  145:*12*,
16, 17, 18
**lettering**  51:8
**letters**  51:*11*, 16, 17
**level**  14:7  95:*18*
111:*20*
**License**  180:*15*
**lieu**  4:*11*
**lift**  29:*14*, 19
**Lily**  109:5, *17*, 18
**limit**  47:*1*, 5  49:*13*,
18  54:6  57:*15*  58:*12*,
18  59:*1*, 3, 24  60:*3*
64:*10*  69:8  70:*3*
71:9, *15*, 18, 23  78:*20*
80:*12*, 14, 25  81:*3*, 6
82:5  93:*16*  98:*12*

152:*1*, 3, 6  155:*1*
164:*14*  165:2
**limitations**  82:2
**limited**  147:*3*
**limits**  47:*16*, 20, 21
48:*3*  49:*3*, 6, 24, 25
54:4  55:5, *24*  57:*24*
63:22  67:*13*, 14  69:9,
19, 20  70:*12*, 16  72:4,
*10*, 15, 17, 23  73:*14*,
19, 23  74:7, *12*  81:8,
18  84:*24*  86:*14*  99:2
**line**  170:*4*, *11*  178:*3*,
14  183:2
**lines**  78:*13*  104:*23*
**link**  50:6
**linked**  145:4
**liquidate**  73:8
**liquidation**  49:*12*
62:*1*  63:8, *24*  64:*13*
73:*3*, 13, 21  94:4
99:*3*  167:*15*, 17, 22
**list**  136:*11*
**little**  16:*17*  31:*15*
41:*16*  54:20  90:*19*
127:5
**live**  11:*20*  125:*15*
**LLP**  2:*11*
**load**  139:*13*
**locate**  104:*13*
**location**  16:22  25:4
27:*14*  30:*17*  37:*18*
132:2  136:*12*  152:*14*
**locations**  88:*14*
130:*14*
**Long**  11:*21*  64:*21*
68:*13*  89:4  118:*14*
163:2  167:*12*
**longer**  66:6
**look**  20:*1*  37:*24*
51:2  52:*19*  54:*19*
56:22  57:8  68:*3*
70:20  72:19  74:25
75:20  85:*1*  89:22, 23,
24  94:*17*, 18  96:*17*
101:8  103:*14*  109:2
112:*11*  115:2, *3*
117:7, *19*  123:7, 9
127:*4*  129:5  131:8
133:*13*  136:*10*, 19

139:2  143:7, *17*, 18
144:*10*  146:*12*, 21
153:*23*  155:22  156:6
159:*20*, 24  169:9
**looked**  67:25  71:*21*
87:*14*  112:*10*  139:*20*
**looking**  47:*20*  67:*3*
70:*19*, 25  76:*16*
87:*15*, 16, 21  90:*24*
91:6  101:*23*  109:*3*
122:*14*  123:*12*  128:9
133:9, *18*  135:7
137:*1*, *19*  138:*20*, 22
143:*12*  178:2
**looks**  115:*4*
**loop**  106:*19*  108:*13*
**loss**  83:*13*
**lot**  153:*11*
**loud**  59:5
**Louis**  2:*10*
**lower**  14:7
**lunch**  88:*24*  89:*3*, 7,
10
**luxury**  70:*11*


**< M >**

**MACY'S**  2:*8*  14:*21*,
23  15:2, 4, *13*, 21, *24*,
25  76:24  82:*16*

**Macy's/Bloomingdale's**
81:*13*
**main**  145:*4*
**maintain**  32:*17*
**making**  6:*14*  19:25
37:6, *20*  100:*4*
123:*10*  138:*14*  142:*1*
143:25  181:8
**management**  12:*17*,
21  15:*19*  25:20, 22
93:*1*, 12, 22  94:2, 6,
*10*, 15
**manager**  14:4, *10*
16:*15*, 18  18:20
25:*17*  40:*14*  42:*21*
82:*3*  87:*12*  109:*10*,
13, 20  149:*18*  152:*14*
**managers**  30:*13*
38:*21*  41:5, 7  80:8
83:*1*

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 63 of 83

Deposition of Richard Law                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**Manchester** 131:*4* 132:*3*

**Margaret** 115:*11* 116:*3*

**marital** 18:*12*

**marked** 51:*19* 56:*7* 66:*24* 74:*21* 89:*11, 13* 101:*4* 117:*3* 127:*10* 139:*9* 143:*3* 146:*14* 156:*2* 159:*16*

**Martha** 55:*8* 134:*15, 16, 19* 138:*6, 11, 14* 141:*15* 142:*9* 151:*22, 24*

**Massachusetts** 131:*1* 132:*5, 10, 19*

**masters** 12:*18*

**master's** 12:*12, 15, 16* 17:*4*

**matter** 4:*14* 5:*6* 7:*10* 44:*17* 180:*5*

**matters** 13:*13*

**max** 54:*1*

**maximum** 52:*13* 92:*24* 93:*13*

**mean** 6:*23* 18:*2* 19:*9* 26:*2* 33:*24* 40:*16* 43:*8* 48:*23* 65:*11* 72:*1* 90:*3, 4, 11* 96:*18* 104:*16* 146:*13* 159:*23* 160:*10, 13* 176:*14*

**means** 104:*19, 21* 180:*21*

**meant** 16:*8* 62:*12* 63:*2* 69:*19*

**medical** 28:*5, 7, 13, 16* 45:*7, 9* 119:*24* 120:*2* 145:*22* 148:*15, 16* 154:*8, 10* 155:*7, 9, 11*

**medication** 8:*23* 9:*2*

**meet** 78:*3, 4*

**meeting** 5:*24* 76:*20* 79:*8* 83:*10* 112:*21, 25*

**meetings** 31:*23* 40:*23*

**MELISSA** 2:*3* 5:*2* 6:*13* 16:*8* 41:*21*

51:*8* 54:*13* 62:*14* 90:*13* 91:*5, 17*

**Melissa@dereksmithlaw.com** 2:*6*

**members** 35:*5*

**MEMO** 111:*23* 115:*17, 19*

**memory** 121:*17*

**MENDOZA** 2:*3* 3:*1, 25* 5:*2, 16* 6:*18, 20* 7:*1, 5, 6* 16:*9, 12* 17:*17* 19:*10* 20:*25* 21:*5, 16, 18* 22:*16* 24:*4* 26:*24* 29:*22* 31:*1, 17* 32:*24* 33:*20* 35:*22* 36:*9* 37:*2* 38:*8, 18* 39:*19* 40:*1, 10* 41:*23* 42:*3, 10, 12* 44:*8* 45:*5, 17, 23* 46:*11, 15* 47:*18* 48:*7, 24* 49:*9, 19* 50:*15, 19, 25* 51:*9, 15, 23* 54:*11, 16, 24* 55:*2, 3* 56:*3, 10* 57:*3* 59:*19* 60:*7, 16* 61:*3, 5, 7, 22, 25* 62:*5, 15, 19, 22* 63:*21* 64:*3, 17, 25* 65:*15, 24* 66:*9, 17, 22* 67:*4, 6, 19* 68:*2, 7, 19, 21* 70:*13* 71:*6, 16* 72:*11, 25* 73:*12, 24* 74:*13, 18, 24* 75:*13* 78:*2* 79:*23* 80:*2, 3* 81:*15, 24* 83:*25* 84:*2, 21* 85:*20, 25* 86:*24* 88:*23* 89:*11, 20* 90:*6, 14* 91:*13, 21* 92:*1* 93:*23* 95:*2, 4, 8* 96:*16* 98:*2, 6* 99:*11, 13, 15* 100:*12, 16* 101:*3, 7, 16* 103:*13* 104:*8* 105:*22* 106:*10, 21* 107:*6, 25* 108:*15* 110:*5, 14, 21* 111:*5, 17* 112:*17* 116:*18, 24* 117:*6, 14, 17* 120:*18* 121:*3, 15, 25* 122:*6* 123:*4, 6* 124:*2, 9* 125:*9, 25* 127:*1, 8, 13, 16* 128:*3, 7* 130:*22*

132:*24* 133:*8* 136:*5* 137:*3, 5* 138:*25* 139:*7, 12, 19* 141:*5, 20, 21* 142:*14, 16, 21, 25* 143:*2, 6, 11* 146:*10, 18, 20* 147:*5, 10, 11, 19, 20* 149:*8, 15* 150:*8, 9, 11, 13* 153:*25* 154:*17* 155:*6, 19, 25* 156:*5, 13* 157:*6, 22, 24* 159:*13, 19* 160:*7, 20* 161:*8, 24* 162:*6, 24* 163:*9, 24* 164:*3, 17, 18* 165:*14* 166:*2* 167:*5* 168:*20* 169:*21* 170:*20* 171:*5, 18, 24* 173:*5, 10, 22* 174:*23* 175:*11, 14, 18, 22* 176:*4, 22, 24* 177:*1, 13* 178:*20, 25*

**mental** 8:*18*

**mention** 129:*21* 141:*16, 22*

**mentioned** 79:*3* 129:*20* 134:*16* 140:*15, 21* 151:*14*

**mentioning** 82:*9* 94:*5* 151:*13*

**merchandise** 76:*24* 82:*12* 92:*16* 98:*12* 124:*12, 15* 132:*2* 151:*5*

**message** 58:*6, 10, 23* 118:*3*

**messages** 3:*1* 57:*5* 65:*12* 67:*20*

**met** 77:*15*

**Michelle** 13:*25* 24:*15* 41:*3* 100:*7* 139:*24* 159:*4*

**Microsoft** 33:*6* 161:*16* 162:*7, 14*

**MIKHAYLOVA** 1:*3* 5:*21, 22* 42:*6, 7* 43:*1* 57:*6, 9* 58:*3, 22* 74:*19* 75:*15, 23* 97:*13* 102:*4* 109:*25* 111:*19* 117:*22* 118:*4* 131:*17* 135:*17*

**140:*18* 142:*5* 150:*15* 154:*2* 155:*23, 24* 156:*19* 168:*2, 18* 170:*2* 171:*14* 178:*3*

**Mikhaylova's** 6:*7*

**mind** 41:*21* 130:*12* 171:*15* 175:*1, 6*

**mine** 122:*13*

**minor** 11:*8*

**minutes** 41:*22* 128:*4*

**misrepresent** 64:*23*

**MLOA** 145:*21* 146:*1*

**MO** 2:*10*

**moment** 50:*3* 51:*1* 56:*11* 74:*25* 82:*22* 89:*21* 117:*7* 139:*13* 143:*7* 146:*21* 156:*6* 159:*20* 176:*2*

**moments** 91:*9*

**Monday** 1:*10* 182:*5*

**monitor** 29:*18*

**month** 64:*1* 93:*4*

**monthly** 54:*4, 6*

**morning** 5:*17, 18* 118:*9*

**move** 66:*15* 90:*19*

**multiple** 130:*6* 135:*23*

**< N >**

**name** 4:*23* 5:*23* 6:*1, 2* 11:*16, 18* 82:*21* 87:*20* 115:*11* 136:*13* 137:*21* 144:*3* 147:*22* 156:*19* 181:*11*

**name/address** 115:*24* 138:*8*

**named** 15:*11*

**names** 11:*11, 14* 32:*5, 9* 88:*12*

**nature** 19:*16* 26:*8* 28:*24* 174:*20*

**NCRA** 180:*15*

**necessarily** 39:*10* 60:*25* 71:*4* 73:*10* 87:*11* 93:*25* 94:*12* 108:*10, 19* 124:*13* 152:*2* 153:*5* 161:*23* 164:*10* 166:*7* 167:*20*

**need** 9:*13* 31:*4*
95:*13* 96:22 100:*21*
110:*3* 118:*6* 136:*19*
160:*3* 176:7 181:*19*
**needed** 28:*15* 31:8
38:*4* 44:20 107:*4*
158:*5* 163:*1* 172:*18*
**needs** 28:*13*
**neither** 180:*5, 8*
**Nevada** 144:*19*
**never** 50:7 62:*13*
65:*12* 70:*15* 82:*1*
83:2, *11*
**NEW** 1:*2, 13* 2:*5*
11:*21* 12:2 62:*16*
86:*5* 125:*18* 129:8
131:*4, 14* 132:*3, 14,*
*15* 135:*9, 12* 139:*5, 7*
142:*23* 144:*13* 168:2
178:*16* 180:*16*
**night** 10:*14*
**Nikola** 147:*17*
**Nikolakopoulos**
147:*18* 172:2
**Nikolakopulo** 147:*17*
**nine** 178:*13*
**Niski** 140:*4*
**NJ** 2:*5*
**nodding** 7:*24*
**non-icon** 53:22
**normal** 69:*19* 106:22
**normally** 89:7
170:*14*
**Notary** 1:*13* 180:*16*
181:*19*
**Note** 29:7 142:*3*
**noted** 180:*3* 181:9
182:*10*
**notes** 79:7, *12* 174:*1,*
*4* 180:*4*
**notice** 119:*23* 122:17
**notification** 44:22
**notified** 44:*12, 14*
**November** 140:2
**number** 21:*10* 36:16
47:*1, 16* 52:*13* 59:16
60:*4* 88:*5, 16* 92:24
93:*14* 95:*17* 97:*12*
136:25 138:2 144:22

**157**:*17*
**numbering** 51:7
**numbers** 18:22
100:*15* 115:*6, 7*
137:*12* 138:*1*
**numerous** 47:7 71:*1,*
*2* 130:*13, 14*
**NY** 2:*5*

**< O >**
**oath** 4:*12* 7:*15*
**object** 6:22, *24* 17:*10*
20:*21* 21:*14* 22:*10*
23:22 26:*21* 31:*13*
32:*18* 36:*4* 38:*1*
39:*15* 40:*6* 42:8
44:*4* 45:*2, 12, 19*
46:*8* 47:*12* 48:20
49:*4, 14* 59:*12, 25*
60:*12, 20* 61:*18* 62:*4,*
*7* 70:*5, 22* 72:6 73:*4,*
*16* 74:*8* 77:20 81:*9,*
*19* 84:*14* 85:*13, 23*
86:20 93:*17* 99:6
103:6 104:5 106:*7,*
*14, 24* 107:20 108:6
110:*11, 18, 25* 111:*11*
116:*14* 120:*14, 24*
123:*24* 124:*4* 125:*5,*
*20* 130:*19* 132:20
133:*4* 136:2 149:*4,*
*11* 154:*11, 21* 157:*3*
159:8 161:*20* 162:*2,*
22 163:*4, 20* 164:*15*
173:*16* 174:*19* 175:*2*
176:*19* 177:*9*
**objecting** 63:*5*
**Objection** 16:7 19:*6*
21:*2* 29:7 30:22
33:*14* 35:*17* 36:20
38:*14* 39:23 46:*13*
47:22 66:*17* 71:*12*
72:20 105:*18* 121:*10*
123:*21* 149:*25*
155:*14* 160:*14* 161:*3*
165:*11, 22* 168:20
169:*21* 170:20 171:*5,*
*18, 24* 178:20

**objections** 4:3, *17*
6:*14, 23* 66:*13, 19*
180:*3*
**obviously** 121:*25*
**occasions** 71:*3* 148:8
**Octoberish** 14:*25*
**offer** 82:*14*
**office** 15:*19* 20:*13*
79:*16* 148:8 154:*15*
**OfficeMax** 16:*1, 13*
**officers** 76:6
**official** 4:*19* 15:*14*
**Oh** 5:*25* 10:*16*
90:*23* 91:6, *15* 96:*12*
142:22 145:2 156:*11*
178:*5*
**ok** 59:6
**okay** 5:*25* 6:*5, 10, 11,*
*19* 7:*1, 5, 11, 21* 8:*6,*
*11, 17, 22* 9:*5, 8, 11,*
*13, 17, 25* 10:*8, 11, 19,*
*23* 11:*2, 17, 20, 24*
12:*13, 18, 22, 24*
13:*16* 14:*2, 9, 12, 22*
15:*1, 12, 16, 20, 23*
16:*2, 5, 13, 16* 17:*1, 7,*
*18, 25* 18:*4, 7, 14, 24*
19:*4, 17, 19* 20:*1, 7,*
*14, 19* 21:6, *9* 22:*1, 8,*
*21, 25* 23:*3, 7, 11, 14,*
*17* 24:*5, 9, 19, 24*
25:*2, 5, 22* 26:*1, 9, 12,*
*19, 25* 27:*10, 16, 25*
28:*5, 12, 19* 29:*3, 6,*
*12, 23* 30:*4, 13, 15, 20*
31:*2, 6, 12, 23* 32:*2,*
*10, 16, 25* 33:*4, 9, 21*
34:*5, 16, 18, 22* 35:*1,*
*7, 12, 16, 23* 36:*12, 19,*
*12, 14, 18* 37:*12, 19,*
*24* 38:*9, 12, 19* 39:*4,*
*12* 40:*2, 11, 18, 25*
41:*10, 16* 42:*13, 17,*
*20* 43:*11, 19* 44:*2, 9,*
*21, 24* 45:*6, 10, 24*
46:*3, 6, 16, 20, 24*
47:*4, 9* 48:*8, 15, 18*
49:*10, 20, 23* 50:*3, 19*
51:*1, 21, 24* 52:*5, 9,*
*16* 53:*4, 8, 17, 20, 25*

54:*10* 55:*11, 19, 22*
56:*2, 11, 21* 57:*2, 4,*
*12, 20* 58:*17* 59:9
60:*8, 17* 61:*15* 62:*18,*
*21* 66:22 67:*21* 68:*1,*
*9, 19, 22, 23* 69:*2, 25*
70:*18* 71:*7, 17, 21*
72:*1, 12* 73:*1, 13, 25*
74:*14, 17, 18* 75:*12,*
*14, 20* 76:*1, 5, 8, 12,*
*16* 77:*11, 14, 17* 78:*3,*
*9* 79:*4, 7, 11, 17, 22*
80:*2, 17, 24* 81:*16, 25*
82:*11, 19, 23* 83:*8, 24*
84:*11* 85:*6, 11* 86:*8,*
*18* 87:*5, 14, 19, 23*
88:*3, 7, 18* 89:*19, 21*
90:*7, 23* 91:*1, 4, 8, 10,*
*14, 15, 23, 25* 92:*2, 12,*
*21* 93:*11* 94:*7, 14, 17*
95:*21* 96:*1, 15, 17, 22,*
*24, 25* 97:*6, 11, 17, 20*
98:*2, 5, 7, 18, 22* 99:*1,*
*12, 24* 100:*3, 11, 17,*
*23* 101:*18, 19, 20, 22,*
*23* 102:*10, 18, 24*
103:*4, 14* 104:*2, 15,*
*19, 25* 105:*4, 6, 14, 23*
106:*3, 11, 22* 107:*7,*
*14, 17* 108:20, *24*
109:*2, 8, 11, 15, 17, 22*
110:22 111:*6, 9, 18*
112:*1, 5, 9, 15, 18*
113:*9, 13, 17, 24*
114:*4, 5, 6, 9, 13, 17*
115:*2, 10, 14, 17, 22,*
*23* 116:*1, 6, 11, 22*
117:*14, 16, 18, 25*
118:*2* 119:*1, 4, 7, 11,*
*18* 120:*5, 11, 19*
121:*7, 24* 122:*14, 22*
123:*3, 14, 18* 124:*3,*
*16, 25* 125:*3* 126:*1, 9,*
*18, 25* 127:*18, 23*
128:*17, 21* 129:*1, 4,*
*14, 23* 130:*8, 18, 23*
131:*10, 15, 21, 24*
132:*8, 12, 25* 133:*9,*
*13, 16, 22* 134:*2, 15,*
*19* 135:*6, 15, 21, 25*

136:6, *10, 19, 22*
137:6, *9, 13, 19, 23*
138:*4, 11, 24* 139:*18,*
*20, 22* 140:*10, 14, 17,*
*20* 141:*1, 6, 15* 142:*2,*
*8, 13, 20* 143:*1, 12, 17,*
*24* 144:6, *10* 145:*11,*
*20, 24* 146:6, *9*
147:*10, 15, 24* 148:*1,*
*4, 14, 19* 149:*16, 23*
150:*8, 25* 151:*4, 10,*
*15, 19, 24* 152:*4, 9, 15,*
*20* 153:6, *8, 13, 19, 22*
154:*4, 7, 18* 155:*7, 10,*
*20* 156:*11, 12, 14, 17,*
*22* 157:*15, 21* 158:*4,*
*8, 13, 16, 21* 159:*1, 6,*
*14* 160:*5, 6, 8, 24*
161:*15, 18, 25* 162:*7,*
*18, 23* 163:*10, 15, 18,*
*25* 164:*13* 165:*7, 15,*
*20* 166:6, *12, 16, 22*
167:*3, 23* 168:*11, 24*
169:*2, 7, 9, 18* 170:*16*
171:*13* 172:*1, 14, 21*
173:*3, 5* 174:*3, 8, 14*
175:*12* 176:*2, 3, 13,*
*17, 23* 177:*6, 18*
178:*18, 24*
**old** 69:*12* 161:*12*
162:*1*
**Olde** 2:*9*
**once** 63:*25* 64:*1*
69:*22* 70:*10*
**once-a-year** 63:*14*
**one-day** 71:*4*
**one-off** 69:*12*
**ones** 57:*17* 58:*13*
59:*2*
**one's** 137:*21*
**online** 32:*23*
**open** 100:*12* 127:*4*
142:*21*
**opening** 50:*10*
**operational** 16:*24*
**operations** 26:*3, 4*
**opinion** 98:*21*
108:*18* 130:*15*
**order** 18:*19* 24:*15*

92:*22* 111:*23* 115:*17*
**organization** 15:*11*
**orientation** 18:*12*
**original** 181:*21*
**Orya** 146:*3*
**outcome** 22:*1, 3*
134:*13*
**Outlook** 161:*17*
162:*7, 14, 20*
**out-of-state** 141:*24*
**outright** 176:*9*
**overall** 28:*23*
**oversee** 33:*25*
**overseeing** 33:*23*
34:*2*
**owned** 55:*18*
**owner** 132:*4*

**< P >**
**P&P** 111:*22*
**p.m** 118:*10, 12* 179:*6*
**PAGE** 3:*1, 25* 56:*4*
57:*5, 8* 58:*2, 4, 21*
61:*2* 67:*2* 68:*6, 8, 10,*
*22, 24* 75:*14, 16, 21*
83:*1* 90:*12, 16, 17*
91:*12, 14* 95:*4* 96:*18,*
*23* 97:*22, 23* 98:*1, 3,*
*22* 101:*14* 112:*18*
114:*2* 128:*10* 132:*1*
145:*1* 169:*11* 175:*19*
182:*1* 183:*2*
**pages** 56:*14* 67:*9*
68:*14, 15, 17* 89:*25*
90:*9* 91:*19, 22*
**pairs** 151:*11*
**paperwork** 31:*22*
104:*14* 105:*11*
**paragraph** 78:*10, 14*
145:*13* 147:*7, 9*
148:*4, 6, 22*
**Paralegal** 2:*16*
**Park** 12:*1*
**part** 16:*20* 34:*9*
59:*22* 77:*17* 80:*22*
86:*12, 16* 91:*2* 94:*19*
104:*17* 123:*8* 140:*9,*
*12* 178:*18*
**PARTICIPANTS** 2:*2*
**participating** 4:*7*

**particular** 14:*8*
18:*19* 24:*15* 59:*17*
61:*2, 13* 124:*15*
**particularly** 115:*1*
**parties** 4:*15* 22:*5*
180:*8*
**partner** 30:*24* 107:*2*
111:*10*
**partnered** 111:*14*
**partnering** 34:*21*
**party** 114:*13, 14*
**pass** 96:*12*
**Passaic** 2:*13*
**passed** 96:*7*
**pay** 73:*10* 125:*18*
174:*18*
**paying** 174:*15*
**payment** 140:*22*
**payments** 141:*25*
**penalty** 4:*14*
**pending** 139:*23*
**Penn** 2:*4*
**pennies** 69:*18*
**Pennsylvania** 1:*14*
**people** 24:*11* 36:*14*
38:*23* 81:*17* 126:*9*
164:*22*
**PeopleSoft** 34:*15*
**perceived** 129:*22*
**percent** 114:*20*
**perform** 29:*20* 30:*11*
**performance** 35:*13,*
*25* 36:*8* 39:*8* 103:*19*
104:*15, 16* 105:*1, 7,*
*13* 108:*22* 133:*14, 23*
134:*1*
**performances** 105:*16*
**period** 6:*8, 10* 71:*5*
98:*14* 99:*18* 163:*2*
**perjury** 4:*15*
**person** 4:*12* 5:*24*
25:*12* 126:*14, 15*
129:*23* 137:*14*
138:*21* 143:*15, 16*
144:*3* 147:*21* 151:*2*
174:*16*
**Personal** 13:*13, 14*
129:*7* 131:*13* 135:*8*
174:*7, 8* 175:*8*

**personally** 34:*24*
73:*9* 165:*18* 173:*2*
**person's** 144:*3*
**pertaining** 114:*19*
137:*13*
**ph** 24:*16, 17*
**phone** 115:*6* 151:*3*
158:*1, 3, 14*
**physical** 8:*18* 33:*1*
79:*18, 19, 21*
**physically** 4:*8* 121:*23*
**pickup** 136:*12*
**pieces** 99:*21, 22*
**place** 112:*24* 174:*17*
**placed** 43:*25* 47:*16*
**places** 14:*17* 164:*11*
**Plaintiff** 1:*4* 2:*6*
5:*20* 11:*3* 147:*16*
148:*7, 9, 23*
**Plaintiff's** 4:*25* 57:*4*
67:*8* 74:*20* 75:*15*
89:*12* 92:*5* 96:*18*
101:*24* 117:*1, 18*
127:*8* 128:*8* 141:*7*
146:*13*
**planning** 25:*25*
**played** 80:*22* 86:*16*
**Plaza** 2:*4*
**please** 4:*22* 8:*8*
9:*15* 39:*18* 51:*2*
56:*6* 61:*21* 66:*23*
91:*9* 100:*13* 112:*13*
118:*17* 127:*21*
142:*22* 170:*23* 172:*7*
175:*16, 20* 176:*3*
**pled** 11:*7*
**PLLC** 2:*3*
**point** 42:*9* 49:*7*
53:*4* 64:*9* 88:*20*
103:*3* 111:*7* 125:*7*
150:*6*
**pointed** 178:*2*
**policies** 22:*17* 23:*20*
24:*12* 26:*7, 12, 15, 17*
39:*5* 43:*18* 48:*9*
63:*11* 86:*7* 88:*1*
120:*20* 154:*8* 166:*8*
177:*12*
**Policy** 3:*1, 22* 10:*3*
18:*5, 8* 37:*1, 4, 9, 13*

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 66 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

39:8  46:23  47:6, 10,
11  48:10  50:16
51:25  52:5, 9, 19, 20,
23  53:1, 2, 6, 12, 13,
15, 24  54:2, 8  55:24
56:1  59:15, 20, 22
60:5, 10, 14, 19, 25
61:1, 16  69:6  71:8,
15  85:17  86:9  88:5
92:3, 8, 11, 12, 14
97:18  98:8, 19, 25
121:4  125:14  129:22
130:4  134:24  135:4
141:10  151:17, 25
152:3, 6  159:7, 11
160:1, 9, 17  161:2, 7,
12  162:1, 13, 16
165:1, 6  168:25
172:6, 10, 11, 13, 16
177:14
**popped** 100:21
**portion** 86:15  94:23,
24
**position** 14:2, 7, 10,
13  15:12  16:14, 18
17:2, 3  25:9, 11, 17
40:14  68:13  108:2, 3
122:25
**possible** 45:21  84:8
92:23  120:15  150:20
158:6  159:10  162:16
163:6  166:21
**Possibly** 44:15  80:21
88:6  126:8  144:8
149:13  152:7
**potential** 32:14
110:7  130:2  132:18
**potentially** 31:8
130:5
**preceding** 14:18, 19
**prefer** 28:3
**pregnancy** 23:1
29:24  30:3  118:21
119:2, 5  120:10, 13,
22  122:11  154:8, 9
155:8, 11, 13  158:10,
13  170:3, 19  171:4
**pregnant** 43:23  44:1,
3  107:13  118:16, 25

119:10, 17  120:4, 7
**premise** 86:11
**prepare** 9:20
**presale** 137:24
**prescription** 8:23  9:2
**PRESENT** 2:2, 16
4:9  150:25
**presented** 38:17  81:5
**preserve** 6:22
**president** 109:12
**prevent** 8:14
**prevention** 83:13
**previous** 64:8
**previously** 86:15
103:19  111:19
118:23
**primarily** 16:22
80:20
**printout** 151:5
**prior** 77:11  83:10
107:16  118:10
140:22  141:25
**PRO** 2:8  5:5
**Probably** 10:14, 17
14:24  17:4  20:12
24:7  27:24  41:3
44:15  79:13  113:12
121:6  122:13  128:15
138:22  155:3, 4
166:20  169:1  172:18
**problem** 65:20  83:1
176:11
**problems** 83:3
**procedure** 37:1, 4, 9,
13  44:17  158:23
**procedures** 43:18
177:12
**proceed** 43:15
129:18
**proceeding** 4:7, 10
**proceedings** 180:3
**process** 38:20
111:23  158:17
178:19
**produced** 54:14  80:1
**product** 16:15  73:9
87:4  128:25  167:18
168:1, 4, 6, 9
**PRODUCTION** 3:24
90:3

**program** 12:20
33:10, 22
**programs** 17:15
**progressive** 39:11, 13,
21  40:4
**project** 12:21
**proof** 86:18  124:16
**propounded** 182:8
**protected** 18:12
**Protection** 30:16, 19,
21, 25  31:5, 22  32:3,
12  38:22  39:3  77:15,
24  78:1  109:10
110:23  112:22
123:19  124:22
145:15  146:1  152:14
153:17  165:16, 19
**proven** 125:3
**provide** 28:16
**provided** 47:8  93:20
94:1  124:7  181:14,
18
**provider** 28:17
**provides** 124:12
**Public** 1:13  180:16
181:19
**pull** 50:16  56:5
69:15  74:18  87:7
159:14  175:12, 14
**pulled** 83:14
**purchase** 47:5, 20, 21
48:3, 13  49:1, 3, 6, 13
55:5  57:16  58:13
59:1, 17  78:16  86:14
98:11  129:7  130:24
131:13  137:20
138:14  140:23
151:12
**purchased** 46:25
49:11, 17  52:14  54:5
72:24  81:22  88:6
93:5  125:14  144:12
151:5, 11  157:11, 13,
17  175:7
**purchases** 47:17
48:6, 16  49:2  59:23
63:18  64:9  70:3, 19
73:22  76:9  86:5
87:24  88:15  116:8
123:11  124:12, 19

129:9  135:11  136:1
142:1
**purchasing** 78:22
80:6  135:1, 3
**purge** 162:9, 11
**purpose** 63:20  64:5
**purposes** 6:5  63:7
64:8  175:13
**purview** 19:3
**put** 49:25  60:18
140:25  170:18
172:19  178:6
**putting** 19:23

**< Q >**
**quantities** 135:3
**quantity** 48:12
**question** 8:4  9:16
17:13  23:12, 14, 25
26:5  37:8  39:18
40:2  47:15, 19  57:15
58:11, 25  59:9  61:21
64:8  67:23  69:4, 7,
25  70:18  72:14  73:2
74:2, 14  86:12  94:8
95:13  97:1  104:2
108:16  110:22  132:9
142:4  147:6  152:4
155:10  160:19, 21
161:1  164:23  170:1,
18, 23  173:20  174:21
175:24
**questioning** 170:12
**questions** 4:4  6:6, 16
7:13  8:9, 15, 20  9:6
26:7, 10  42:5  68:18
77:25  90:17  94:22,
25  95:6, 19  97:24
101:14  108:11, 14
118:16  136:20  147:2
166:23  167:4, 14
170:4  173:6  177:19
182:8
**quick** 20:18  122:21
153:23  167:11
**quicker** 90:19
**quickly** 68:10
**quite** 160:22  161:12
162:4

Deposition of Richard Law                     Kristina Mikhaylova v. Bloomingdale's Inc., et al.

quote-unquote 15:8
21:22  94:4

< R >
rating 103:20  104:16
Raul 24:17
Ray 32:7
reach 38:5
reached 120:9
158:18
reaching 118:6
read 10:19, 22  62:11
68:9, 14, 16  90:9, 15
95:10, 19  96:4, 5, 7
97:22, 23, 25  98:2
101:21  112:12  114:2
127:21  146:24  147:8
160:2, 18  169:10
175:25  179:1  181:3,
4  182:4
reading 92:25
138:13  160:11
reads 67:16
ready 51:22  75:12
91:5, 11  175:23
real 153:15
really 68:10  84:9
90:8  116:17  150:5
reason 8:13  80:17,
19  181:6, 10
reasons 171:21
recall 5:24  10:7
13:23  15:9, 10  16:2
17:22, 24  18:7  20:23
22:24  26:18, 23  29:9,
11, 13  30:2, 16, 18
32:5  33:7, 21  34:12
35:9  37:22  38:11
39:24  40:8  42:20
43:6, 11, 13  44:6, 11
45:14, 22  46:22, 25
48:3, 10  50:1  51:10
52:9, 12  53:19, 23
55:9, 16, 19, 21, 22
59:10  60:22  66:1, 7
67:18  70:25  71:19
72:8  74:10  75:18
76:10, 12, 14  77:5, 7,
10, 23  78:6  79:2, 5, 9
80:15, 22, 24  82:9, 18

83:7, 21  84:3, 7, 17
85:6, 15, 18, 21  86:4,
10, 16  94:3, 16  97:9
99:19, 25  100:1, 8
102:10, 15  103:9
104:11  109:18  113:6,
15, 17, 18  115:20
116:21  117:25
119:12  120:8, 16
121:9, 12, 18  122:18,
20  123:12, 16  124:23
126:11, 23  128:23
129:25  131:6  133:9,
11, 18, 25  134:23
136:18  137:6, 8, 9, 11
140:8, 19  142:11
143:14, 16  144:2, 4
145:18  147:14, 21
148:2, 11, 12, 14, 21
149:2, 7, 9, 14, 19
150:15, 18, 19, 23
151:1, 7, 9, 13, 22
152:8  153:11, 21
154:20  155:4, 16
157:9, 20  158:2, 8, 11,
15  159:1, 25  160:8
161:9  162:10, 17
163:7, 10, 14, 17, 23
164:8  165:4, 18
166:4, 12, 17  170:3
173:2  177:16
receipt 116:1, 2
133:2, 10
receipts 10:5  85:5
87:2, 3, 5, 7, 8, 15
116:8  138:19
receive 13:19, 22
15:20  134:6, 8
162:12  181:23
received 94:14
139:14  146:23  156:8
162:16
receiver 136:12
receiving 113:15
128:25
recess 42:2  89:10
128:6  141:2  153:24
recipient 174:16
recipients 88:13
recognize 95:16, 23

recollection 28:15
53:15, 21  65:16, 19
66:1, 4, 6  70:8  107:1
126:7  134:14  154:13
159:25  173:13  182:9
recommend 26:16
164:4
Recommendations
132:1
record 4:24  50:14,
17  89:8, 9  112:25
117:15  127:19  128:5
143:10  169:11
recorded 112:22
recording 112:24
recordings 113:11
records 98:15  122:1
recruiting 25:23, 24
reference 81:5
136:13  167:25  168:3
references 147:3
referred 54:2
referring 6:10  27:5
38:23  43:2  52:18, 21,
22, 23  61:15  67:11,
18  69:11  84:5  89:25
92:3, 5, 9, 18  98:24
119:18, 19  122:24
refresh 56:3  65:16,
25  66:7  95:15
100:22, 25  112:13
121:17  159:25
170:16
refreshed 65:20  75:5,
7  160:16
refreshing 66:4
90:22
regard 85:2  134:7
149:20  166:1, 3
regarding 6:6  10:24
43:7, 14  46:2, 4  62:1
72:9  74:12  76:15
77:2, 9  85:12  97:7,
12  105:13  107:10
139:23  140:6  143:14
154:8  162:13
regardless 52:10
60:4  73:20
regards 39:1  40:13

106:19  107:12
regular 138:5
related 29:24  119:24
142:3  154:8, 9  155:8,
11, 13  167:15  170:3
180:9
relating 97:19  98:8
relations 16:25
relationship 153:13,
16
relative 180:8
relevance 150:3
religion 18:11
remember 32:9
57:23  76:7  84:10
147:23  148:17
157:19  158:7  174:11
REMOTE 1:9  2:2
remotely 4:10
rep 40:21  150:25
156:18
repeat 27:3  39:17
61:20
repeating 65:2
rephrase 8:10  60:17
86:2  160:24, 25
164:17  170:23
rephrasing 8:11
replaced 122:22
report 18:16, 18, 19,
20, 22  20:15, 17  25:2
32:12
reported 25:3, 6
109:14
REPORTER 4:6, 21
7:21  110:3  141:18
180:22
reporting 4:10  25:7
repository 35:11
represent 5:5
representation 55:1
Representative 97:14
112:21
represented 9:8
Representing 2:6, 11,
16  64:2
reprimanded 38:9
reproduction 180:21
REQUEST 3:24
28:10, 23, 24  29:1

40:22  79:23, 24
122:1  149:21  154:14
**requested**  45:7
**requesting**  45:9
**requests**  27:11, 13
28:1  41:8
**require**  39:11  181:22
**requirement**  37:23
**requirements**  93:3
**reseller**  110:8
129:24  130:3  136:9
**reselling**  129:6
**reserve**  66:12  167:3
**reserved**  4:4
**resigned**  145:25
**resolved**  150:1
**resources**  12:17  14:4
15:19  16:21  18:21
24:8  25:14  31:4, 10
35:20  36:23  153:18
**respect**  162:13, 15
172:15
**respond**  7:23  8:5
9:6  35:18  44:19
**responding**  67:23
**response**  43:16
57:20  58:17  59:3
69:10  98:10  103:23
167:4
**responses**  7:23, 25
**responsibilities**  16:19
106:1  122:8
**responsibility**  39:8
172:9
**responsible**  37:6
81:17  105:15  143:25
**rest**  32:21  52:14, 15
79:14  106:2
**restate**  86:2
**restricted**  30:10
**restriction**  155:2
**restrictions**  30:9
**restroom**  41:20
88:20  128:2
**result**  128:24
**retained**  162:19
163:2  172:18
**retaliation**  23:3, 12,
20  119:5  120:23
153:1  158:9  170:8

**retaliatory**  148:25
149:10
**retention**  3:22  159:7
161:2, 6, 11  162:13,
15  172:6, 11, 16
**retired**  13:2
**return**  145:24  181:21
**review**  9:25  10:8
13:22  28:17  56:11
90:16  94:22  95:13
99:16, 22  101:13
113:10
**reviewed**  9:23  38:16
77:23  95:12  118:8
164:21
**reviewing**  47:6  51:6
56:21  57:2  68:11, 20
75:11  84:18  91:10,
24  96:1, 8  98:4
100:2  101:21  112:14
114:5  116:7  127:23
128:1  131:9  136:22
138:19  139:18  143:9
156:11  159:22  160:5
176:3
**reviews**  34:16  35:13,
25  36:8
**Rey**  109:5, 8, 9
**Rich**  11:15
**RICHARD**  1:10  3:1
5:10  11:12, 13  29:8
33:15  36:21  38:15
47:23  50:7  51:2
64:15  67:22, 25  70:6
71:13  72:7  73:17
76:20  80:11  83:10
89:2, 7  90:8  91:7
95:9  96:5, 10  97:21
101:12  102:5  103:24
112:11  118:4, 9
127:21  137:1  156:10,
23  160:3  165:25
182:3, 15
**right**  6:12  8:8  9:19
10:19  24:21  30:15
41:10  42:4  47:19
50:15  51:15  52:3
54:3, 21, 23, 24  56:16,
20  57:12  58:1, 19
61:4  64:6  65:24

66:9, 12  67:7, 14
68:24  73:25  75:22,
24  76:17  84:22  87:8,
22  92:21  93:9  97:14
99:1  101:8, 25  102:8
103:4, 14, 21, 25
108:1  109:22  112:6
113:4, 20, 25  115:8,
12, 24  116:4, 10
118:18  119:18, 25
121:8  128:10  129:12
131:1, 14  132:13, 19
134:3, 17  135:13, 19
137:16, 21  138:1, 6,
13, 18  139:25  142:6,
13  143:7, 22  146:9,
17  147:5  150:24
156:20  157:21  162:8
164:4  167:3  169:4
170:9  177:18  181:4
**right-hand**  96:20
**ring**  82:21
**ringing**  87:9
**Road**  2:9
**Roberts**  115:12
116:3
**Robin**  1:12  180:14
**role**  14:8  16:22
**Ronquillo**  13:25
24:15  41:4  100:7
139:24  159:4
**room**  30:2  173:25
**Rose**  126:19  128:8,
12, 19  129:6  131:12
134:2  139:4  140:20
141:8  167:24  168:6
**rotate**  58:3
**round**  7:12
**RPR**  1:12  180:14, 15
**rules**  7:12  181:22
**rung**  142:5

**< S >**
**sale**  49:12  57:16, 25
58:13  59:2, 11, 17
63:8, 14, 17, 25  64:13
69:6, 9, 12  70:2, 9, 21
73:14, 21  78:20  94:5
167:15, 17, 22
**Salem**  144:13

**sales**  48:19  59:11
69:22  78:23  80:7, 9
82:4  87:11, 12  99:3
125:19
**salon**  80:10  82:4
**Sanela**  57:13, 18
**Sarah**  109:5, 11, 12
**satisfactorily**  29:21
**satisfactory**  104:22
**satisfy**  93:3
**save**  6:14  76:25
82:16  101:15  162:25
**saved**  161:9
**saving**  163:10
**saw**  10:12, 15  80:9
**saying**  17:7  24:24
33:1  37:3  44:24
54:6  65:2  66:5
85:21  86:8  94:7
105:9  118:24  135:21
151:25  157:9, 19, 20
158:11
**says**  51:24  57:9, 12
58:23  76:17, 19
78:10, 15  80:4  81:25
82:1, 23  83:9  87:8
92:15, 16  93:11  94:4
97:2, 11, 14, 17  98:7,
10  101:23  102:3
103:16  111:19
112:20  114:6, 13, 17
115:2, 3, 11, 23  116:2,
4  117:10  118:4
120:21  129:5  130:24
131:11, 15, 21, 25
135:6, 13, 16  136:11
137:17, 19, 24  138:4,
5  140:4, 20  142:6
143:17, 18  144:11, 21
145:3, 11  148:6
156:17  157:11, 15
160:15
**school**  11:22, 25
12:1  15:3
**screen**  54:12  61:6
84:1  99:14  116:25
123:5  139:1  142:15
146:11  150:12
157:23  167:6  169:3,
7  176:25

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 69 of 83

Deposition of Richard Law                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**scroll** 75:*21* 95:*22*
  176:*8*
**sealing** 4:*2*
**second** 68:*8* 75:*3*
  78:*10, 14* 90:*20*
  91:*14* 124:*14* 141:*1*
  145:*13*
**section** 47:*15* 48:*5*
  92:*19*
**see** 50:*22, 24* 51:*25*
  52:*3* 57:*9* 58:*15, 16,*
  *19, 20* 59:*7, 8* 69:*23*
  70:*20* 73:*1* 75:*17, 23*
  77:*3* 78:*24* 82:*6*
  83:*4, 5* 93:*9* 95:*16,*
  *22* 97:*15* 98:*10, 16*
  101:*18* 103:*21, 25*
  109:*6* 111:*24* 112:*2,*
  *5* 113:*1, 4* 114:*11, 12,*
  *15, 22* 115:*8, 11*
  117:*9, 23* 118:*18*
  128:*14* 129:*12*
  131:*11, 19* 132:*6*
  135:*19* 136:*11, 14*
  138:*9* 141:*13* 143:*22*
  144:*17, 25* 145:*16*
  146:*4* 150:*3* 156:*20,*
  *25* 169:*7* 178:*9, 12,*
  *17*
**seeing** 19:*24* 53:*19,*
  *23* 60:*23* 65:*7* 75:*18*
  100:*18* 102:*10* 113:*6*
  115:*20* 136:*18* 137:*6,*
  *9, 11* 145:*18* 147:*14*
**seek** 107:*7*
**seeking** 38:*7*
**seen** 10:*12* 52:*15*
  61:*13* 62:*23* 65:*12*
  75:*17* 97:*4* 112:*16*
  115:*15, 17, 19* 128:*12*
  136:*16* 147:*12*
  156:*14*
**selection** 90:*2*
**self** 29:*18*
**sell** 69:*17* 124:*14*
**seller** 124:*13, 14*
**selling** 122:*25*
  128:*24* 137:*25*
**send** 105:*8* 114:*14*
  115:*23* 131:*24*

**137:**20 **138:**5, 8, 14
  144:*12*
**sender** 87:*8, 10, 17*
  116:*3*
**sending** 50:*6* 87:*24*
  88:*8* 123:*15* 126:*5*
  132:*9, 13, 17* 138:*21*
  142:*9* 152:*3* 164:*6,*
  *11* 168:*1, 4, 6*
**sends** 114:*21, 24*
**senior** 25:*3* 93:*1, 12,*
  *22* 94:*2, 5, 10, 15*
  144:*9*
**sense** 19:*24* 31:*21*
  48:*12* 81:*12* 90:*18*
  153:*9*
**sent** 43:*24* 65:*13*
  77:*24* 84:*19* 110:*9*
  114:*9* 117:*20* 118:*2*
  123:*10, 11* 129:*1, 17,*
  *24* 130:*2, 13, 25*
  131:*3* 132:*2* 135:*6*
  141:*23* 168:*2, 9*
**sentence** 78:*13* 93:*13*
  169:*11*
**separate** 47:*10* 48:*5*
  161:*10* 163:*1, 3, 11*
  172:*19*
**separated** 101:*11*
**Separately** 122:*15*
**services** 81:*14* 97:*3*
**setting** 7:*18* 172:*5, 9,*
  *12*
**seven** 68:*14, 17*
  78:*13* 178:*13*
**seventh** 78:*13*
**severely** 30:*10*
**sex** 21:*20*
**sexual** 18:*11* 152:*16,*
  *18, 21*
**Sgerber@bglaw.com**
  2:*15*
**share** 169:*3*
**Shaw** 109:*5, 11, 12*
**Shawn** 76:*1, 2, 17*
**SHEET** 181:*7, 10, 11,*
  *16, 21* 182:*11* 183:*1*
**shift** 118:*10*
**ship** 82:*14* 136:*1*
  176:*11, 18*

**shipped** 86:*4* 87:*4,*
  *17, 19* 116:*9* 124:*23*
  125:*17* 129:*6, 10*
  131:*13* 135:*8, 11*
  175:*8*
**shipping** 76:*23*
  82:*12* 86:*25* 124:*19*
  129:*8* 131:*16* 132:*2*
  135:*1, 2, 4, 10, 23*
  136:*9* 174:*12, 14, 16*
  178:*14*
**shoe** 80:*24* 81:*3, 5*
  82:*3, 4* 165:*2*
**shoes** 80:*11, 12, 14,*
  *21* 82:*2* 151:*11, 14*
  157:*17, 18, 20*
**shoot** 90:*23*
**short** 41:*20* 103:*9*
  128:*1*
**show** 63:*4* 94:*9, 13*
  169:*2*
**showed** 60:*23* 69:*2*
  150:*16*
**showing** 63:*6* 65:*1*
  75:*5* 90:*25*
**shown** 50:*18* 56:*9*
  67:*1* 69:*3* 74:*23*
  89:*15* 101:*6* 117:*5*
  127:*12* 139:*11* 143:*5*
  146:*19* 156:*4* 159:*18*
  169:*5* 175:*17, 21*
  178:*7*
**side** 25:*20*
**sign** 179:*1* 181:*11,*
  *13, 18*
**signature** 181:*20*
  182:*1, 13*
**signed** 113:*3*
**significant** 41:*14*
  47:*1*
**signing** 181:*15*
**Simultaneous** 95:*3*
**single** 92:*25* 98:*13*
**singled** 78:*21* 80:*5*
**sit** 40:*21* 90:*9*
  167:*16*
**situation** 31:*4* 38:*4*
  43:*16* 46:*2* 97:*19*
  98:*8* 166:*11*

**situations** 20:*3* 31:*6*
  37:*4* 40:*21*
**six** 78:*12* 178:*13*
**slow** 110:*4* 141:*19*
**smaller** 48:*13*
**SMITH** 2:*3* 5:*3*
**software** 17:*9* 33:*4,*
  *10, 22* 34:*7, 13*
**sold** 70:*17* 92:*24*
**solely** 4:*20* 61:*1*
**somebody** 31:*9*
  34:*11* 37:*14* 143:*24*
  158:*22*
**sorry** 27:*3* 47:*23*
  54:*9* 58:*24* 62:*19*
  67:*5* 70:*6* 75:*9* 91:*7*
  100:*14* 102:*20*
  110:*15* 127:*1* 131:*25*
  132:*21* 133:*1* 135:*2*
  136:*24* 139:*3* 140:*25*
  141:*19* 144:*22*
  160:*12* 165:*24* 167:*6*
  172:*7* 175:*19* 176:*7*
**sort** 34:*9* 35:*10*
  55:*17* 56:*18* 121:*22*
**Sounds** 41:*25* 54:*3*
  87:*22* 116:*10* 147:*22*
  150:*24*
**South** 144:*13*
**SOUTHERN** 1:*2*
**space** 181:*14, 18*
**speak** 10:*23* 32:*20*
  45:*24* 69:*18* 71:*24*
  104:*23*
**speaking** 8:*5* 18:*9*
  24:*25* 34:*8* 37:*16*
  88:*2* 95:*3* 109:*23, 24*
  124:*11* 125:*23*
**special** 69:*13, 15*
**specific** 17:*19* 21:*17*
  27:*9* 30:*3* 31:*16*
  33:*8* 41:*17* 46:*24*
  60:*25* 61:*15* 63:*15*
  64:*14, 22, 24* 69:*20*
  72:*13* 77:*7* 109:*19*
  153:*11* 166:*17* 178:*3*
**specifically** 15:*9*
  17:*24* 20:*24* 22:*24*
  25:*24* 27:*6* 29:*10*
  36:*1* 39:*25* 40:*9*

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 70 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

44:7  45:15, 22  55:9
61:16  70:2, 24  71:20
77:10  79:10  80:15,
23  81:12  85:19
86:10, 17  87:13  88:3,
4  95:19  99:9, 25
104:24  106:17
107:23  117:9  122:20
123:17  124:24
126:23  130:1  131:6
133:7, 12  134:25
140:19  142:11  146:8
148:2, 21  149:7, 14
151:13, 23  155:11, 17
157:9  158:2, 7
162:11, 17  163:8
167:21  173:24
177:17
**specifics**  84:10
150:19
**speculate**  164:2
**split**  93:2
**spoke**  9:23  119:15,
21  140:4  146:2
149:18
**spoken**  22:13  111:19
**spreadsheet**  114:18
**St**  2:10
**staff**  16:21  25:25
35:5
**stamp**  58:22  96:19
128:9  139:2  146:12
148:5  150:16  155:24
175:20
**stamped**  57:7  58:3
74:19  75:15  92:6
**Standards**  3:14
**stands**  145:22
**start**  13:16  14:9, 22
51:10  165:8
**started**  7:12  16:3
17:6  82:13
**state**  6:9  76:24
82:15  83:8, 9  86:5, 6
87:3  97:14  124:20
125:15  130:14  135:1,
2, 5  136:1  142:2
151:10  174:12, 14, 17
175:4, 9  176:11
178:15, 16

**stated**  52:16  64:10
83:18  86:14  118:8,
22  120:9  158:22
164:20, 22  173:11
177:2
**statement**  99:20
112:6, 9, 15  130:18
164:20  174:2, 7, 9
175:13  176:1  178:9,
10
**statements**  98:15
**STATES**  1:1, 13
57:23  69:4  78:11
82:11  86:25  118:7
**stating**  4:23  119:21
120:3  174:3
**status**  18:12  118:7
**stellar**  104:22
**stenographic**  180:4
**step**  40:4
**steps**  39:11, 13, 22
**Steve**  5:7  9:12  50:8
75:4, 9  100:21
**STEVEN**  2:13  24:16
**Stony**  12:23
**stop**  150:4
**store**  20:10  29:1, 2
30:6, 19  114:14, 20,
24  131:16  154:19
**stored**  33:10  35:8,
10  121:19
**Stores**  93:2
**Street**  16:22  24:25
25:4  26:25  27:1, 5,
14, 20, 22  30:17  34:3
36:24  37:18  39:9
76:19  114:19  152:14
**stricter**  48:11
**string**  67:24
**strong**  129:18
**subject**  102:4  114:14
117:22  125:21
139:23  181:15
**subjected**  149:1
**submit**  28:1  97:6
**submitted**  94:20
**submitting**  76:25
97:9
**subsequently**  145:20
**substance**  181:5, 9

**substantiate**  22:15
86:19
**succession**  25:25
**suffer**  8:17
**sufficient**  130:16
171:21
**suggest**  169:14
**Suite**  2:4, 9, 14
**Summaries**  3:17
**summary**  99:21
128:11  150:2  168:3
**Sunday**  57:13
**supervise**  24:9
**supervising**  34:1
**supervision**  180:22
**supervisor**  13:24
18:20  20:17  34:20
35:6  38:6
**supervisors**  39:3
**support**  15:15  130:17
**supporting**  126:16
**suppose**  121:1, 22
**supposed**  9:1  18:16
28:9, 14  44:13
106:23  120:11
**Sure**  16:20  43:17
56:16  61:12  63:19
94:12  106:16  112:12
128:3  142:12  160:22
161:22  170:24
**Susan**  24:16  139:24
140:15, 16
**suspect**  88:7, 11
145:4
**suspend**  31:8  111:10
**suspended**  77:12, 14
83:11, 12, 13, 19
84:13  123:9  134:5
**suspension**  39:6
43:25  77:18  102:25
118:7, 15  119:16, 22
122:17  140:6  157:25
158:9  170:2, 19
**suspensions**  139:23
**suspicion**  88:10
**suspicions**  125:1
**sworn**  5:11
**system**  104:14
105:12  161:13, 15

**< T >**
**take**  7:25  9:1, 13, 17
12:19  17:2  41:20
44:20  46:6  51:1
56:11  59:5  74:25
79:7  88:20, 24  89:3,
21  95:10, 14  112:11
117:7  127:20  128:1
143:7  146:21  153:22
156:6  159:20  174:15
**taken**  7:8  8:22
10:21  33:12  46:17
103:18  104:4  133:17
153:4  169:12  180:4
**takes**  139:12
**talent**  25:20, 22
**talk**  76:8  83:16, 18
84:22  104:9  158:1,
16  167:14  172:20
**talked**  67:12  167:23
**talking**  7:3  25:23
43:4  63:21  69:20
84:23  92:2  98:19
116:6  126:18
**talks**  67:16
**TALX**  97:2
**tax**  76:25  80:21
82:16  84:9, 22  86:15
125:16, 19  129:6
131:18, 22  168:18
169:15, 19  171:16
173:12, 21  174:5, 9,
18  175:10  176:6, 9,
14  178:16
**taxes**  84:25  85:2, 12,
18, 22  86:5  87:1
174:13, 15  175:9
176:12
**team**  15:15  16:20
30:25  47:8  65:10
78:19
**Tech**  2:19
**tell**  9:20  49:23
71:17  78:19  79:1, 4
80:13  82:8, 17  83:6
115:5  158:4
**telling**  50:1  57:24
64:4, 7  79:5  80:15

82:*18*  83:*7*  84:*3*

**ten**  178:*13*

**tender**  93:*3*

**tenure**  41:*13*  103:*20*

**term**  21:*21*  48:*11*
156:*22*

**termed**  144:*4*

**terminate**  37:*7, 10,
15, 17*  55:*4*  61:*11*
76:*22*  77:*19*  81:*2*
92:*10, 20*  99:*4*  100:*5*
105:*2*  116:*20*  151:*19*
152:*5*  158:*19*

**terminated**  13:*10*
46:*21, 22*  65:*14*  74:*6*
78:*17*  123:*19*  131:*17*
134:*19, 22*  135:*18*
150:*22*  151:*16*
155:*21*  157:*8*  169:*20*

**terminating**  130:*17*

**termination**  39:*6, 14,
21*  40:*5*  45:*18*  76:*13,
15*  77:*2, 10, 11*  80:*18,
19*  85:*12*  97:*7*
102:*25*  126:*17*
143:*19*  151:*22*
166:*19*  171:*22*  177:*7*

**terminations**  144:*1, 7*

**terming**  144:*3*

**terms**  28:*25*  40:*16*
41:*14*  59:*15*  60:*3*
120:*9*  122:*10*  129:*21*
165:*5*

**testified**  5:*11*  64:*16,
19*  65:*18*  66:*8*

**testify**  65:*11*

**testimony**  4:*14*  7:*9*
19:*17, 22*  22:*4*
181:*14*

**Text**  3:*1*  56:*18*  57:*5*
58:*6*  65:*11*  67:*20, 24*

**Thank**  41:*25*  54:*12*
57:*1, 21*  75:*9*  91:*3*
99:*14*  116:*25*  123:*5*
137:*4*  139:*1*  142:*15*
146:*11*  150:*12*  167:*6*
176:*24*  177:*19*  178:*6,
25*

**Thanks**  103:*20*

**theft**  31:*10, 19*
166:*15*

**Theodora**  147:*16*
172:*2*

**thing**  80:*10*  127:*22*
164:*23*

**things**  17:*22*  18:*11*
19:*16*  25:*21*  26:*5, 6,
7*  31:*9*  101:*11*
176:*11*

**think**  6:*4*  10:*5*
15:*25*  16:*7*  18:*9*
24:*18*  28:*24*  35:*19*
50:*7, 9*  51:*21*  54:*14,
17, 19*  57:*21*  64:*16*
66:*8, 13, 14*  68:*10, 14*
70:*11*  75:*12*  84:*16*
87:*17*  90:*8*  91:*4, 6,
11*  96:*9, 10*  103:*1*
107:*12*  109:*20*  111:*2*
116:*16*  117:*12*
120:*21*  124:*20*
125:*24*  129:*18*
140:*12*  153:*23*  159:*3,
4*  165:*4*  167:*24*
173:*3*  175:*15*

**third**  114:*13, 14*

**thirteenth**  178:*14*

**thought**  65:*3*  69:*19*
172:*17*

**three**  18:*22*  75:*7*
78:*12*  114:*19*  126:*8*
146:*2*  148:*8*  165:*3*
178:*12*

**Thursday**  114:*9*
117:*20*  118:*12*

**TIERNEY**  2:*8, 18*
3:*1*  5:*4*  6:*13, 19, 21*
7:*2*  9:*12*  16:*7*  17:*10*
19:*6*  20:*21*  21:*2, 14*
22:*10*  23:*22*  26:*21*
29:*7*  30:*22*  31:*13*
32:*18*  33:*14*  35:*17*
36:*4, 20*  38:*1, 14*
39:*15, 23*  40:*6*  41:*19,
25*  42:*8*  44:*4*  45:*2,
12, 19*  46:*8, 13*  47:*12,
22, 25*  48:*20*  49:*4, 14*
50:*5, 11, 22*  51:*13*
54:*13, 21, 25*  59:*12,*

25  60:*12, 20*  61:*18*
62:*2, 7, 17, 20*  63:*9,
24*  64:*13, 20*  65:*6, 18*
66:*3, 11, 18*  67:*2, 15,
21*  68:*5, 9*  70:*4, 22*
71:*12*  72:*6, 20*  73:*4,
16*  74:*8*  75:*3, 8*
77:*20*  79:*25*  81:*9, 19*
84:*14*  85:*13, 23*
86:*20*  88:*19*  89:*1, 18*
90:*1, 7, 15, 23*  91:*1, 4,
17, 23*  93:*17*  94:*24*
95:*5, 9, 25*  96:*3, 9, 14*
97:*21*  99:*6*  100:*20*
101:*1, 12*  103:*6*
104:*5*  105:*18*  106:*7,
14, 24*  107:*20*  108:*6*
110:*11, 18, 25*  111:*11*
112:*11*  116:*14*
117:*13*  120:*14, 24*
121:*10*  122:*2*  123:*21,
24*  124:*4*  125:*5, 20*
127:*7, 20, 25*  130:*19*
132:*20*  133:*4*  136:*2*
139:*16*  147:*1, 8, 18*
149:*4, 11, 24*  154:*11,
21*  155:*14*  156:*9*
157:*3*  159:*8*  160:*2,
10, 13*  161:*3, 20*
162:*2, 22*  163:*4, 20*
164:*1, 15*  165:*11, 22,
24*  167:*10*  168:*21*
169:*6, 22*  170:*21*
171:*6, 20, 25*  173:*16*
174:*19*  175:*2, 25*
176:*19*  177:*9, 20, 25*
178:*5, 8, 21*  179:*1*

**time**  4:*5, 17*  6:*8, 10,
24*  10:*11*  15:*3*  22:*19*
26:*6*  29:*16, 20*  40:*3,
12*  42:*10, 18*  44:*20*
49:*7*  61:*13*  83:*19*
95:*10, 15*  101:*15*
103:*3, 10*  109:*20*
111:*7*  127:*20*  128:*15,
17*  133:*24*  140:*17*
144:*1*  145:*7*  151:*16*
153:*10*  154:*23*  158:*5*
161:*14*  162:*20*  163:*2*
168:*11*  174:*22*

**timeframe**  43:*2, 5*
47:*2*  48:*14*  55:*21*
150:*24*

**times**  20:*17*  34:*11*
49:*1*  75:*7*  80:*8*  82:*3*
85:*7*  98:*15*  122:*4*
164:*16*

**Tinbite**  14:*1*  24:*16*
25:*7, 13*  100:*7*  102:*4*
103:*15, 23*  105:*13, 14*
106:*11, 18*  107:*8, 9*
109:*4, 5, 23*  110:*17,
24*  111:*6*  117:*21*
119:*20*  139:*24*

**title**  15:*14*  25:*9, 14*
76:*7*  102:*15*  109:*19*
140:*8*

**today**  8:*15, 20*  9:*6, 9*
118:*12*  166:*23*  167:*1,
16*  174:*15*

**today's**  6:*5*  9:*20*
10:*25*

**told**  44:*3, 21, 25*
49:*20*  63:*9*  70:*16*
78:*11, 16*  79:*25*
80:*11*  83:*12*  84:*7, 11*
118:*11*  145:*8*  148:*9*
162:*25*  163:*7*

**tolerance**  18:*10*

**tomorrow**  118:*8*

**top**  10:*1, 6*  16:*10*
21:*10*  24:*17*  33:*7*
34:*14*  36:*16*  51:*24*
57:*12*  58:*5*  75:*20, 21*
81:*1*  92:*15*  96:*24*
97:*2*  102:*3*  114:*14*
138:*3*  144:*11, 24*
147:*15*  155:*5*  156:*17*

**topic**  160:*4*

**total**  71:*9*

**track**  34:*22, 24*  81:*7,
22*

**tracked**  35:*5*  93:*7*

**traffic**  11:*8*

**trained**  17:*14*

**training**  17:*1, 3, 5, 6,
21*  23:*17*  115:*20*

**transaction**  10:*5*
85:*5*  87:*2, 3*  92:*25*
93:*4, 6*  98:*13*  116:*2*

133:*1, 3*  134:*10*
137:*20*  138:*16*
140:*21*  157:*14*
**transactions**  20:*6*
47:*8*  71:*1, 2*  88:*16*
93:2  111:*21*  116:*12*
130:*13*  138:*19*
141:*16*  142:4
**transcribed**  4:*20*
**Transcript**  3:*1*  4:*19*
62:5, *6, 9, 11*  64:5
65:*1, 4*  180:5, *21*
**transcription**  182:7
**transcripts**  10:*20*, 22
**transition**  55:*17*
**treatment**  148:*25*
149:*10*
**trial**  4:*5*
**tried**  19:*14*
**Trinity**  2:*19*  50:5, *11*
178:*5*
**trouble**  50:*10*
**true**  71:22  157:2, *5*
182:*6*
**truthful**  98:*14*
**truthfully**  8:*14, 19*
**try**  8:*6*  167:*11*
**trying**  38:*19*  63:*1*
73:7  86:*1*  162:5
174:*25*  177:*11*
**turn**  58:2  175:*18*
**twelve**  178:*14*
**two**  10:*6*  12:*11*
18:*21*  48:9  78:*12*
91:*18*  92:23  93:*3, 13*
126:8  135:9, *15*
140:5  152:7  156:*23*
157:7, *9, 12, 14*  173:5
178:*12*
**two-day**  71:*5*
**Tyler**  126:*18*  128:*8,*
*11, 19*  129:*1*  130:*14*
132:9  134:2  135:22
139:*4*  140:20  141:7
167:*24*  168:6
**Tyler's**  133:*3, 13*
**Tyndall**  2:*16*
**type**  15:*9*  17:*1*  19:*1*
34:7  44:22  124:*15*
170:*13*

**types**  31:*6*  33:*18*
40:*18*  70:*10*  93:*3*
113:*9*
**typically**  11:*13*  31:*3*
36:*25*  37:22  44:22
107:2  108:*1, 10*
110:22  113:*10*

**< U >**
**Uber**  59:*5*
**UCM**  97:*3*
**Uh-huh**  51:*4*  52:*1, 4*
96:*21*  97:*16*  98:9
102:*2*  103:22  143:*21*
**Ulanda**  140:5, *10*
**ultimately**  39:*6*
109:*14*
**Um**  17:*12*  93:*25*
102:*20*  123:22
137:*18*
**understand**  7:*19*  8:9
17:*13*  23:24  37:*8*
47:*14*  63:2  72:*14*
86:*1*  112:20  150:*6*
166:22  168:*17*
173:*18, 19*  176:*10*
**understanding**
160:*23*  162:5  168:*8,*
*16*  175:5
**understands**  67:22
**Understood**  8:*1*
112:*23*
**Unemployment**  94:*20,*
*21*
**unintelligible**  141:*17*
**union**  40:*12, 15, 17,*
*21, 24*  76:7  150:*25*
156:*18*
**UNITED**  1:*1*
**units**  98:*12*
**university**  12:*23*
**unrelated**  115:*4*
**unsatisfactory**  104:*22*
**unusual**  66:*14*
108:*17, 19*
**update**  60:*14*  103:*2,*
*5, 17*
**updated**  60:*11*
**upload**  50:*4*  127:*2, 3*
**UPS**  131:*16*  132:*2*

**use**  21:*21*  33:*4*
48:*11*  65:*4*  144:*14*
175:*8*  177:*11*
**usually**  32:*21*  108:*3*

**< V >**
**vacation**  58:*25*
**vaguely**  147:*22*
**Valecca**  24:*16*
**Vance**  1:*12*  180:*14*
**Various**  3:*15*  10:2
22:*4*  33:*17*  154:*24*
164:*11*  178:*15*
**vendors**  92:*16*  98:*11*
**verbal**  7:*23*  18:*10*
20:*17*  31:*24*  43:*9*
**verbally**  4:*13*
**versed**  138:*16*
**version**  53:*24*
**versus**  25:*17*  59:*11*
72:*18*  113:22
**vice**  109:*12*
**Victoria**  82:*13, 19*
**Video**  2:*19*  20:*4*
99:*16, 24*  100:*1, 2*
112:22  113:*7, 15*
166:*15*
**videoconference**  1:*9,*
*10*  2:2
**VIDEOGRAPHER**
56:*24*  146:*16*
**videos**  20:2  113:*11*
**view**  125:*8*  137:*1*
**violate**  134:*25*
**violating**  46:*23*
151:*17*
**violation**  11:*9*  86:*6*
88:*1*  125:*13, 24*
129:22  130:*4*  134:*23*
136:*7, 8*  141:*10*
165:*6*  166:7  168:*24*
**violations**  37:*1, 5, 9,*
*13*  129:5  131:*12*
135:*8*
**vision**  136:*25*
**volume**  88:*15*  124:*18*
**voluntarily**  13:*11*
**VOP**  156:*22*
**vs**  1:*5*

**< W >**
**wait**  8:*3*  50:*20*
127:2  147:*1*
**waiting**  59:*4*
**waive**  4:*16*
**waived**  4:*3*  49:6, *10*
129:*9*  135:*10*
**want**  7:2, *13*  14:*24*
15:*5*  16:*4*  50:*19, 21*
51:*13*  56:*12*  64:22
66:*9, 16, 20*  68:*3, 16*
72:*13*  88:24  89:*3, 23,*
*24*  90:*9*  92:*13*  94:22
95:*9*  97:22  101:*9, 17*
105:*12*  150:*5*  159:*23*
166:*25*  178:*1*  179:*2*
**wanted**  28:*5*  57:*25*
64:*18*  84:24  96:*10*
**warning**  39:*5*  134:*6*
**warranted**  141:*11*
**way**  36:7  95:*6*
97:*18*  101:*15*  132:*23*
137:*15*  156:*10*
174:*24*
**Wednesday**  118:*9*
**Weh**  55:*8*  134:*15, 16,*
*19*  135:*8*  138:*6, 11,*
*14*  141:*15*  151:22, *24*
**weight**  29:*15, 19*
155:*1*
**well**  7:*11, 14*  14:*13*
16:*24*  17:*5*  34:*19*
47:7  60:*17*  61:*23*
62:*15*  64:*3*  66:*3*
77:*25*  82:*3, 14*  84:*19*
88:*13, 14, 16*  115:*14*
118:22  119:*14*  120:*3*
132:*15*  133:22
138:*16*  147:*8*  148:*5*
166:*21*  174:*1, 6*
177:*20*
**went**  80:*11, 13*
145:*20*
**we're**  7:*3*  8:*5*  41:*19*
43:*4*  62:*3, 7*  68:*7*
78:*10*  89:*5*  91:*4, 18*
**we've**  5:*19*  51:*17*
88:*21*  122:*3*  165:*4*
**whatnot**  31:*20*

whatsoever  72:9
119:17
withdraw  110:15
withdrawn  17:19
23:18  27:1  32:11
41:6  42:24  52:17
59:21  60:9  61:9, 23
83:17  87:6  106:4
107:17  113:22
116:23  123:7  125:11,
12  126:3  138:12
154:18  155:21
158:21  173:11
WITNESS  3:1  4:9,
13  16:10  17:12  19:8,
17  20:23  21:4  22:12
23:24  26:23  29:9
30:24  31:15  32:20
33:16  35:19  36:6, 22
38:3, 16  39:17, 24
40:8  42:11  44:6
45:4, 14, 21  46:10, 14
47:14, 24  48:2, 22
49:5, 16  51:21  57:1
59:14  60:2, 13, 22
61:20  66:5  68:1, 20
70:8, 24  71:14  72:8,
22  73:6, 18  74:10
75:11  77:22  81:11,
21  84:16  85:15
86:22  89:16, 19  91:8,
24  93:19  95:21  96:1,
6, 12, 15  97:25  98:4
99:8  100:14, 17, 24
103:8  104:7  105:20
106:9, 16  107:1, 22
108:8  110:13, 20
111:2, 13  112:14
116:16  117:16
120:15  121:1, 12
123:22  124:1, 6
125:7, 23  127:14, 23
130:21  132:22  133:6
136:4  139:5, 14, 17
141:3  142:23  143:1
149:6, 13  154:13, 23
155:16  156:11  157:5
159:10  160:5, 12
161:5, 22  162:4
163:6, 22  164:2

165:13, 23  166:1
171:19  173:19  175:1,
6  176:2, 21  177:11
179:4  181:1, 19, 20
WITNESSED  182:19
witnesses  19:23  22:5
Word  33:6  62:18, 21
95:11
words  65:5  174:11
work  14:15, 20  15:7,
23  16:6, 11  21:22, 24
22:6, 22  30:20  31:2
32:2  41:11  42:14
100:3, 4  118:11
126:21  147:24  153:8,
17
worked  6:3  14:17
30:8  31:18  32:4
41:12  42:15  126:24
153:9
working  13:16  14:22
worried  89:2
worries  96:14  141:6
worry  89:2
wound  25:7
Wright  24:16
139:24  140:15, 16
write  122:15  177:6
write-up  20:18
134:8  168:5
writing  76:18
written  39:5  99:20
134:6  174:1, 6, 8
wrong  50:13  125:19
wrote  103:17  145:12
176:10

< X >
X-Closet  132:5, 18
137:16
XI  180:15

< Y >
Yeah  31:18, 25  47:3
50:11  88:23  89:1
96:3  100:20  127:4
148:5
year  52:14  54:1, 3
63:25  64:1  69:22

70:10  93:5
years  6:3  16:2  62:14
Yep  91:3
Yonas  14:1  24:16
25:8, 13  100:7  102:4
117:21  139:24
YORK  1:2  2:5
11:21  12:2  86:6
125:18  178:16
Younis  3:12  41:11
42:17  43:1  46:7
48:16  62:1  63:13
67:9  69:3  74:5
109:15  122:16
157:16
Yu  129:10  132:3
135:11  137:14  138:8,
14

< Z >
zero  18:10
Zhang  144:15
zoom  96:22

Deposition of Richard Law                                            Kristina Mikhaylova v. Bloomingdale's Inc., et al.

## WORD LIST

**< 0 >**
**0001510**  *(1)*
**0001511**  *(1)*
**0001514**  *(1)*
**0001996**  *(1)*
**0001997**  *(1)*
**000380**  *(2)*
**000420**  *(2)*
**001148**  *(1)*
**001161**  *(1)*
**001486**  *(1)*
**001510**  *(1)*
**001531**  *(1)*
**001576**  *(1)*
**00158**  *(1)*
**001584**  *(1)*
**001595**  *(1)*
**00197**  *(1)*
**00199**  *(3)*
**001994**  *(1)*
**00200**  *(1)*
**01995**  *(1)*
**02131**  *(1)*
**07004**  *(1)*

**< 1 >**
**1**  *(3)*
**1/25/17**  *(2)*
**1/25/2017**  *(1)*
**1/26/17**  *(1)*
**1/8/24**  *(1)*
**10**  *(1)*
**10/18/2017**  *(1)*
**10/23/2016**  *(1)*
**10:14**  *(1)*
**10:19**  *(1)*
**101**  *(1)*
**10119**  *(1)*
**107**  *(1)*
**11/3/2017**  *(1)*
**11:11**  *(1)*
**11:30**  *(1)*
**11477**  *(1)*
**1148**  *(1)*
**1160**  *(2)*
**117**  *(1)*
**1195**  *(1)*

**12**  *(4)*
**12:30**  *(1)*
**122**  *(1)*
**127**  *(1)*
**139**  *(1)*
**143**  *(1)*
**146**  *(1)*
**1486**  *(2)*
**1494**  *(1)*
**1496**  *(1)*
**1497**  *(2)*
**1498**  *(1)*
**15**  *(4)*
**1510**  *(2)*
**1511**  *(1)*
**1513**  *(3)*
**1514**  *(2)*
**1515**  *(3)*
**1531**  *(4)*
**1532**  *(1)*
**156**  *(1)*
**1576**  *(5)*
**1577**  *(2)*
**1578**  *(1)*
**158**  *(2)*
**1584**  *(1)*
**1589**  *(2)*
**159**  *(2)*
**1590**  *(1)*
**1591**  *(1)*
**1594**  *(1)*
**16**  *(4)*
**1605**  *(2)*
**165**  *(1)*
**167**  *(1)*
**16th**  *(1)*
**17**  *(2)*
**1709**  *(3)*
**173**  *(1)*
**177**  *(1)*
**182**  *(3)*
**19**  *(1)*
**19-8927**  *(1)*
**1995**  *(1)*
**1999**  *(1)*

**< 2 >**
**2/13/20**  *(1)*
**2/15/17**  *(1)*

**2/26/20**  *(1)*
**2/4/2017**  *(1)*
**2:20**  *(1)*
**20**  *(1)*
**2002**  *(1)*
**2003**  *(2)*
**2009**  *(3)*
**2011**  *(3)*
**2016**  *(6)*
**2017**  *(19)*
**2022**  *(1)*
**2036**  *(1)*
**2039**  *(1)*
**212-587-0760**  *(1)*
**215**  *(1)*
**24**  *(5)*

**< 3 >**
**3**  *(1)*
**3:58**  *(1)*
**30**  *(3)*
**32**  *(2)*
**35**  *(1)*
**379**  *(3)*
**380**  *(2)*
**381**  *(2)*

**< 4 >**
**4/21**  *(1)*
**4/21/17**  *(1)*
**4/21/2017**  *(1)*
**400**  *(1)*
**420**  *(6)*
**4905**  *(1)*

**< 5 >**
**5**  *(3)*
**51**  *(1)*
**56**  *(1)*
**59**  *(1)*
**59th**  *(17)*

**< 6 >**
**6**  *(1)*
**6/16/17**  *(2)*
**6/17[sic**  *(1)*
**6/6/17**  *(1)*
**60/20/20**  *(4)*
**60-day**  *(2)*

**63141**  *(1)*
**64**  *(1)*
**66**  *(1)*
**67**  *(3)*
**69**  *(1)*

**< 7 >**
**7**  *(2)*
**70**  *(1)*
**71**  *(2)*
**72**  *(1)*
**72061886**  *(4)*
**73**  *(1)*
**74**  *(1)*
**78**  *(3)*
**79**  *(1)*

**< 8 >**
**8**  *(1)*
**800**  *(1)*
**817327**  *(1)*
**83**  *(1)*
**89**  *(1)*
**8th**  *(1)*

**< 9 >**
**9/30/2017**  *(2)*
**90-day**  *(1)*
**973-256-9000**  *(1)*

**< A >**
**a.m**  *(3)*
**abide**  *(1)*
**ability**  *(2)*
**able**  *(6)*
**Abraham**  *(1)*
**absence**  *(1)*
**abuse**  *(8)*
**abusing**  *(1)*
**accommodate**  *(5)*
**accommodation**  *(14)*
**accommodations**  *(14)*
**account**  *(1)*
**accurately**  *(1)*
**accused**  *(1)*
**acknowledge**  *(3)*
**acknowledges**  *(1)*
**action**  *(16)*
**actions**  *(3)*

activity *(1)*
actual *(1)*
addition *(1)*
additional *(6)*
address *(24)*
addressed *(3)*
addresses *(10)*
adhere *(1)*
adherence *(2)*
adhering *(2)*
administered *(1)*
administration *(1)*
administrational *(1)*
administrative *(1)*
admit *(3)*
admitted *(6)*
admittedly *(1)*
admonish *(1)*
adult *(1)*
advice *(2)*
advised *(3)*
affect *(1)*
afternoon *(2)*
afterward *(1)*
age *(1)*
ago *(1)*
agree *(6)*
agreed *(1)*
agreement *(3)*
agrees *(1)*
ahead *(5)*
al *(1)*
allegation *(1)*
allegations *(4)*
alleged *(4)*
allowed *(15)*
alterations *(1)*
Amapara *(3)*
amount *(5)*
and/or *(2)*
annual *(1)*
answer *(110)*
answered *(3)*
answering *(1)*
answers *(3)*
anticipates *(1)*
anybody *(6)*
AP *(13)*
apiece *(1)*

apologies *(8)*
apologize *(5)*
appear *(2)*
appears *(7)*
applicable *(1)*
application *(3)*
applications *(3)*
apply *(5)*
appropriate *(2)*
approval *(9)*
approved *(2)*
approving *(1)*
approximately *(2)*
April *(1)*
archive *(3)*
Argaden *(1)*
argument *(1)*
argumentative *(2)*
arrangement *(1)*
asked *(19)*
asking *(24)*
asks *(2)*
aspect *(1)*
aspects *(1)*
Asset *(24)*
assign *(1)*
associate *(11)*
associated *(1)*
associates *(6)*
assume *(3)*
attached *(3)*
attend *(4)*
attention *(5)*
attorney *(5)*
attorneys *(1)*
audio *(3)*
authority *(7)*
authorized *(1)*
automatically *(1)*
available *(2)*
Avenue *(1)*
avenues *(1)*
avoid *(5)*
aware *(34)*

**< B >**
bachelor's *(2)*
back *(22)*
backwards *(1)*

bag *(1)*
bags *(8)*
Barbara *(15)*
BARTON *(1)*
based *(18)*
basically *(4)*
basis *(3)*
Bated *(1)*
Bates *(18)*
Bates-stamped *(1)*
Bear *(1)*
Becker *(3)*
beginning *(2)*
behalf *(2)*
belief *(1)*
believe *(61)*
believed *(1)*
bell *(1)*
benefits *(1)*
best *(4)*
BETTY *(8)*
Betty.tierney@macys.c
om *(1)*
big *(4)*
bit *(4)*
blank *(1)*
BLM *(32)*
BLOOMINGDALE'S
*(54)*
blurry *(2)*
Bobby *(4)*
Booker *(4)*
Boston *(6)*
bother *(2)*
bottom *(9)*
bought *(1)*
boutique *(3)*
branding *(1)*
break *(7)*
Brief *(4)*
bring *(4)*
Broadly *(5)*
Broadway *(1)*
Brook *(1)*
brought *(4)*
bunch *(1)*
business *(3)*

**< C >**

Cabin *(1)*
California *(1)*
call *(7)*
called *(2)*
calls *(1)*
cameras *(1)*
capabilities *(1)*
card *(9)*
care *(1)*
carefully *(1)*
Case *(8)*
cases *(1)*
Castellani *(9)*
category *(1)*
Cathy *(24)*
CC *(2)*
CC'd *(1)*
CCR *(2)*
CCR-NJ *(1)*
Centers *(3)*
central *(1)*
centrally *(1)*
certain *(4)*
certificate *(1)*
certification *(2)*
certify *(2)*
certifying *(1)*
cetera *(1)*
chain *(4)*
Chanel *(50)*
Chang *(1)*
change *(15)*
changed *(3)*
changes *(13)*
changing *(1)*
charge *(4)*
Chris *(12)*
Christopher *(8)*
claim *(1)*
claimed *(2)*
clarification *(1)*
clarify *(4)*
clarity *(1)*
classes *(1)*
clear *(8)*
clearly *(1)*
client *(2)*
clients *(2)*
Co-counsel *(1)*

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

colleagues (1)
college (1)
column (1)
come (11)
comes (3)
comfort (1)
comment (1)
comments (2)
Commission (1)
committed (1)
committing (1)
communication (2)
company (5)
company's (4)
competent (1)
complain (1)
complainant (3)
complained (3)
complaining (2)
Complaint (16)
complaints (8)
completely (4)
compliance (1)
computer (3)
computer-based (2)
concerned (2)
concerns (2)
concluded (1)
conclusion (2)
condition (3)
conditions (4)
Conduct (6)
conducted (4)
confident (1)
confirm (2)
consecutive (2)
consent (3)
consider (4)
considered (2)
consisted (1)
consistent (1)
constantly (1)
consult (7)
consultation (1)
consulted (2)
contact (1)
contacted (3)
contained (1)
context (1)

continue (2)
continued (1)
continuing (1)
contract (1)
contradict (1)
contribute (1)
control (4)
conversation (22)
conversations (13)
convicted (1)
copy (1)
corner (2)
corporate (14)
correct (64)
CORRECTION (1)
correctly (1)
correspond (1)
correspondence (3)
cosmetics (1)
cost (1)
Costa (1)
COUNSEL (23)
count (3)
counted (2)
counting (1)
couple (5)
courses (1)
COURT (8)
coworkers (6)
created (2)
credit (7)
crime (1)
criminal (1)
Critical (2)
current (4)
currently (1)
customer (2)
customers (4)

< D >
Dahan (6)
Dan (4)
dash (1)
date (14)
dated (7)
David (5)
day (4)
days (5)
day-to-day (6)

Dear (2)
December (3)
decided (1)
decision (17)
decisionmaking (2)
decisions (8)
declare (1)
deem (1)
Deer (1)
defendant (1)
Defendant(s (1)
Defendants (4)
defense (1)
degree (6)
degrees (4)
Delaware (1)
delineation (1)
Dennis (5)
department (37)
departments (2)
depended (1)
Depending (2)
depends (1)
depo (1)
deposition (16)
depositions (1)
DEREK (2)
described (1)
DESCRIPTION (1)
designation (1)
detail (2)
details (2)
determination (8)
determinations (1)
determine (1)
Diaz (5)
difference (21)
differences (1)
different (24)
differently (1)
difficult (1)
digitally (1)
direct (4)
directly (4)
director (6)
directors (2)
disciplinary (20)
discount (17)
discounts (1)

discrepancy (4)
discrimination (20)
discriminatory (2)
discuss (1)
discussed (2)
Discussion (9)
discussions (1)
dismissed (1)
DISTRICT (2)
diverter (14)
docs (1)
document (109)
documentation (4)
documented (4)
Documents (20)
doing (7)
door (1)
dot-dot-dot (1)
due (1)
duly (1)
duties (3)

< E >
earlier (5)
early (1)
eat (1)
economics (1)
educational (1)
EEO (1)
effect (2)
eight (1)
either (9)
elaborate (4)
Eleanor (2)
eleven (1)
E-mail (38)
e-mails (3)
employed (4)
employee (29)
employees (25)
employee's (4)
employer (3)
employment (7)
encompassed (1)
ended (1)
enforced (1)
enforcing (1)
ensure (1)
ensuring (2)

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

entail  (2)
entailed  (1)
enter  (1)
environment  (4)
Equifax  (1)
ERRATA  (7)
ESQUIRE  (3)
essential  (1)
essentially  (2)
et  (2)
Eunice's  (1)
evade  (2)
evader  (1)
evading  (2)
evasion  (17)
event  (1)
events  (1)
everybody  (1)
evidence  (4)
exact  (3)
EXAMINATION  (4)
examined  (1)
example  (2)
exceed  (2)
exceeded  (6)
exceeding  (5)
exceptions  (1)
excerpt  (2)
exchange  (2)
excuse  (3)
excused  (1)
executive  (3)
executives  (6)
exhibit  (10)
Exhibit-1  (1)
Exhibit-A  (4)
Exhibit-B  (7)
Exhibit-C  (3)
Exhibit-D  (4)
Exhibit-E  (8)
Exhibit-F  (6)
Exhibit-G  (4)
Exhibit-H  (4)
Exhibit-I  (4)
Exhibit-J  (2)
Exhibit-K  (4)
Exhibit-L  (3)
Exhibit-M  (2)
EXHIBITS  (3)

exist  (2)
expected  (2)
expensive  (1)
experience  (1)
Expertise  (4)
Expires  (1)
explain  (2)
explaining  (2)
explanation  (1)
expressing  (2)
extent  (1)

< F >
facilitated  (1)
fact  (5)
factor  (3)
facts  (1)
failure  (2)
Fair  (1)
Fairfield  (1)
fall  (4)
fallen  (2)
familiar  (4)
familiarize  (1)
family  (5)
far  (2)
fax  (1)
FBI  (3)
February  (1)
federal  (1)
fee  (2)
feel  (4)
fell  (4)
fellow  (1)
felt  (1)
file  (2)
filed  (2)
files  (5)
filing  (2)
filling  (2)
financially  (1)
find  (4)
findings  (5)
fine  (5)
fire  (5)
fired  (5)
firing  (3)
first  (28)
five  (5)

Flast  (3)
floor  (1)
FMLA  (11)
focused  (2)
folder  (7)
folders  (4)
folks  (1)
follow  (1)
followed  (1)
following  (1)
follows  (1)
follow-up  (2)
footage  (1)
foregoing  (3)
forgo  (1)
forgot  (1)
form  (95)
format  (1)
former  (2)
forms  (1)
forward  (2)
forwarded  (1)
found  (1)
four  (3)
fraud  (10)
fraudulent  (1)
Fred  (1)
frequency  (2)
frequent  (1)
friends  (4)
front  (8)
Fulford  (2)
full  (1)
fully  (2)
functions  (2)
further  (9)
FYI  (2)

< G >
gaps  (1)
gender  (1)
general  (5)
generally  (2)
GERBER  (15)
getting  (3)
gift  (3)
gifts  (2)
GILMAN  (1)
girl  (1)

give  (12)
given  (14)
glad  (1)
glancing  (1)
go  (45)
goes  (2)
going  (67)
Gonzalez  (1)
Good  (5)
gotten  (1)
graduate  (2)
grand  (1)
grant  (2)
Grievance  (10)
grievances  (3)
GROUP  (4)
guess  (7)
guidance  (4)
guidelines  (1)
guilty  (1)
guys  (1)

< H >
half  (1)
Hampshire  (10)
Handbag  (35)
Handbags  (32)
handbook  (22)
handle  (6)
handled  (4)
handling  (3)
happen  (1)
happened  (5)
happening  (3)
happy  (3)
harassment  (4)
Harris  (1)
hash  (1)
head  (13)
hear  (2)
heard  (3)
hearing  (1)
held  (8)
help  (1)
Hey  (4)
Hi  (3)
high  (4)
high-end  (1)
hire  (4)

history *(1)*
HOC *(2)*
Hoelz *(7)*
hold *(1)*
home *(2)*
honest *(1)*
honor *(1)*
hope *(1)*
hopefully *(1)*
hostile *(3)*
hostile-type *(1)*
hour *(2)*
hours *(2)*
housed *(1)*
HR *(34)*
human *(12)*

< I >
icon *(1)*
ID *(1)*
identification *(13)*
illegal *(1)*
imaging *(2)*
immediate *(1)*
immediately *(2)*
impair *(2)*
important *(1)*
improperly *(1)*
Inappropriate *(3)*
incidents *(1)*
included *(1)*
including *(1)*
indicate *(3)*
indicating *(2)*
individual *(4)*
individuals *(14)*
informal *(1)*
information *(24)*
informed *(6)*
IN-HOUSE *(1)*
Initially *(4)*
initiated *(1)*
input *(3)*
inquiring *(1)*
instance *(10)*
instances *(3)*
INSTRUCTIONS *(1)*
inter *(1)*
interaction *(3)*

interactions *(4)*
interest *(1)*
interested *(3)*
interesting *(1)*
interim *(3)*
intermittent *(3)*
interpret *(2)*
interpretation *(2)*
interpreted *(1)*
interview *(9)*
interviewed *(3)*
introduce *(3)*
introduced *(1)*
introducing *(1)*
invest *(1)*
investigate *(8)*
investigated *(2)*
investigating *(2)*
investigation *(49)*
investigations *(12)*
Investigative *(1)*
investigator *(1)*
investigators *(1)*
involve *(1)*
involved *(12)*
involvement *(5)*
involves *(1)*
Island *(1)*
issue *(1)*
items *(17)*
its *(2)*

< J >
January *(1)*
Jersey *(2)*
job *(6)*
jobs *(1)*
judge *(1)*
judgment *(1)*
June *(12)*
jury *(2)*

< K >
Kavanagh *(3)*
keep *(7)*
keeping *(1)*
Kemi *(1)*
kept *(2)*
kind *(2)*

knew *(6)*
knocking *(1)*
know *(111)*
knowing *(3)*
knowledge *(17)*
known *(6)*
Kotsovolos *(1)*
KRISTINA *(90)*
Kristina's *(21)*

< L >
Labor *(4)*
lactation *(1)*
Lai *(6)*
language *(1)*
large *(1)*
laugh *(1)*
LAW *(28)*
laws *(1)*
lawsuits *(1)*
lawyer *(1)*
lawyers *(1)*
leadership *(1)*
learn *(1)*
learned *(1)*
leased *(2)*
leave *(11)*
Lee *(1)*
left *(1)*
legal *(1)*
lend *(1)*
letter *(5)*
lettering *(1)*
letters *(3)*
level *(3)*
License *(1)*
lieu *(1)*
lift *(2)*
Lily *(3)*
limit *(35)*
limitations *(1)*
limited *(1)*
limits *(36)*
line *(5)*
lines *(2)*
link *(1)*
linked *(1)*
liquidate *(1)*
liquidation *(13)*

list *(1)*
little *(6)*
live *(2)*
LLP *(1)*
load *(1)*
locate *(1)*
location *(8)*
locations *(2)*
Long *(7)*
longer *(1)*
look *(48)*
looked *(5)*
looking *(24)*
looks *(1)*
loop *(2)*
loss *(1)*
lot *(1)*
loud *(1)*
Louis *(1)*
lower *(1)*
lunch *(4)*
luxury *(1)*

< M >
MACY'S *(11)*

Macy's/Bloomingdale's
 *(1)*
main *(1)*
maintain *(1)*
making *(10)*
management *(12)*
manager *(15)*
managers *(6)*
Manchester *(2)*
Margaret *(2)*
marital *(1)*
marked *(14)*
Martha *(11)*
Massachusetts *(4)*
masters *(1)*
master's *(4)*
matter *(5)*
matters *(1)*
max *(1)*
maximum *(3)*
mean *(20)*
means *(3)*
meant *(4)*

medical  (17)
medication  (2)
meet  (2)
meeting  (6)
meetings  (2)
MELISSA  (11)
Melissa@dereksmithla
w.com  (1)
members  (1)
MEMO  (3)
memory  (1)
MENDOZA  (255)
mental  (1)
mention  (4)
mentioned  (6)
mentioning  (3)
merchandise  (8)
message  (4)
messages  (4)
met  (1)
Michelle  (6)
Microsoft  (4)
MIKHAYLOVA  (34)
Mikhaylova's  (1)
mind  (5)
mine  (1)
minor  (1)
minutes  (2)
misrepresent  (1)
MLOA  (3)
MO  (1)
moment  (13)
moments  (1)
Monday  (2)
monitor  (1)
month  (2)
monthly  (2)
morning  (3)
move  (2)
multiple  (2)

< N >
name  (16)
name/address  (2)
named  (1)
names  (5)
nature  (4)
NCRA  (1)
necessarily  (16)

need  (11)
needed  (8)
needs  (1)
neither  (2)
Nevada  (1)
never  (7)
NEW  (23)
night  (1)
Nikola  (1)
Nikolakopoulos  (2)
Nikolakopulo  (1)
nine  (1)
Niski  (1)
NJ  (1)
nodding  (1)
non-icon  (1)
normal  (2)
normally  (2)
Notary  (3)
Note  (2)
noted  (3)
notes  (5)
notice  (2)
notification  (1)
notified  (2)
November  (1)
number  (18)
numbering  (1)
numbers  (6)
numerous  (6)
NY  (1)

< O >
oath  (2)
object  (85)
objecting  (1)
Objection  (31)
objections  (7)
obviously  (1)
occasions  (2)
Octoberish  (1)
offer  (1)
office  (5)
OfficeMax  (2)
officers  (1)
official  (2)
Oh  (10)
ok  (1)
okay  (558)

old  (3)
Olde  (1)
once  (4)
once-a-year  (1)
one-day  (1)
one-off  (1)
ones  (3)
one's  (1)
online  (1)
open  (3)
opening  (3)
operational  (1)
operations  (2)
opinion  (3)
order  (5)
organization  (1)
orientation  (1)
original  (1)
Orya  (1)
outcome  (4)
Outlook  (4)
out-of-state  (1)
outright  (1)
overall  (1)
oversee  (1)
overseeing  (2)
owned  (1)
owner  (1)

< P >
P&P  (1)
p.m  (3)
PAGE  (45)
pages  (10)
pairs  (1)
paperwork  (3)
paragraph  (8)
Paralegal  (1)
Park  (1)
part  (14)
PARTICIPANTS  (1)
participating  (1)
particular  (7)
particularly  (1)
parties  (3)
partner  (3)
partnered  (1)
partnering  (1)
party  (2)

pass  (1)
Passaic  (1)
passed  (1)
pay  (3)
paying  (1)
payment  (2)
payments  (1)
penalty  (1)
pending  (1)
Penn  (1)
pennies  (1)
Pennsylvania  (1)
people  (6)
PeopleSoft  (1)
perceived  (1)
percent  (1)
perform  (2)
performance  (14)
performances  (1)
period  (6)
perjury  (1)
person  (14)
Personal  (8)
personally  (4)
person's  (1)
pertaining  (2)
ph  (2)
phone  (5)
physical  (6)
physically  (2)
pickup  (1)
pieces  (2)
place  (2)
placed  (2)
places  (2)
Plaintiff  (8)
Plaintiff's  (15)
planning  (1)
played  (2)
Plaza  (1)
please  (19)
pled  (1)
PLLC  (1)
point  (9)
pointed  (1)
policies  (17)
Policy  (92)
popped  (1)
portion  (3)

Deposition of Richard Law                                        Kristina Mikhaylova v. Bloomingdale's Inc., et al.

position *(19)*
possible *(10)*
Possibly *(7)*
potential *(4)*
potentially *(2)*
preceding *(2)*
prefer *(1)*
pregnancy *(20)*
pregnant *(10)*
premise *(1)*
prepare *(1)*
presale *(1)*
prescription *(2)*
PRESENT *(4)*
presented *(2)*
preserve *(1)*
president *(1)*
prevent *(1)*
prevention *(1)*
previous *(1)*
previously *(4)*
primarily *(2)*
printout *(1)*
prior *(6)*
PRO *(2)*
Probably *(20)*
problem *(3)*
problems *(1)*
procedure *(6)*
procedures *(2)*
proceed *(2)*
proceeding *(2)*
proceedings *(1)*
process *(4)*
produced *(2)*
product *(9)*
PRODUCTION *(2)*
program *(3)*
programs *(1)*
progressive *(4)*
project *(1)*
proof *(2)*
propounded *(1)*
protected *(1)*
Protection *(24)*
proven *(1)*
provide *(1)*
provided *(6)*
provider *(1)*

provides *(1)*
Public *(3)*
pull *(8)*
pulled *(1)*
purchase *(26)*
purchased *(18)*
purchases *(22)*
purchasing *(4)*
purge *(2)*
purpose *(2)*
purposes *(4)*
purview *(1)*
put *(6)*
putting *(1)*

< Q >
quantities *(1)*
quantity *(1)*
question *(49)*
questioning *(1)*
questions *(32)*
quick *(4)*
quicker *(1)*
quickly *(1)*
quite *(3)*
quote-unquote *(3)*

< R >
rating *(3)*
Raul *(1)*
Ray *(1)*
reach *(1)*
reached *(2)*
reaching *(1)*
read *(31)*
reading *(3)*
reads *(1)*
ready *(5)*
real *(1)*
really *(5)*
reason *(5)*
reasons *(1)*
recall *(196)*
receipt *(4)*
receipts *(10)*
receive *(7)*
received *(5)*
receiver *(2)*
receiving *(2)*

recess *(5)*
recipient *(1)*
recipients *(1)*
recognize *(2)*
recollection *(16)*
recommend *(2)*
Recommendations *(1)*
record *(11)*
recorded *(1)*
recording *(1)*
recordings *(1)*
records *(2)*
recruiting *(2)*
reference *(4)*
references *(1)*
referred *(1)*
referring *(22)*
refresh *(11)*
refreshed *(4)*
refreshing *(2)*
regard *(5)*
regarding *(23)*
regardless *(3)*
regards *(4)*
regular *(1)*
related *(11)*
relating *(2)*
relations *(1)*
relationship *(2)*
relative *(1)*
relevance *(1)*
religion *(1)*
remember *(9)*
REMOTE *(2)*
remotely *(1)*
rep *(2)*
repeat *(3)*
repeating *(1)*
rephrase *(7)*
rephrasing *(1)*
replaced *(1)*
report *(9)*
reported *(3)*
REPORTER *(6)*
reporting *(2)*
repository *(1)*
represent *(1)*
representation *(1)*
Representative *(2)*

represented *(1)*
Representing *(4)*
reprimanded *(1)*
reproduction *(1)*
REQUEST *(12)*
requested *(1)*
requesting *(1)*
requests *(4)*
require *(2)*
requirement *(1)*
requirements *(1)*
reseller *(4)*
reselling *(1)*
reserve *(2)*
reserved *(1)*
resigned *(1)*
resolved *(1)*
resources *(12)*
respect *(3)*
respond *(5)*
responding *(1)*
response *(8)*
responses *(2)*
responsibilities *(3)*
responsibility *(2)*
responsible *(4)*
rest *(5)*
restate *(1)*
restricted *(1)*
restriction *(1)*
restrictions *(1)*
restroom *(3)*
result *(1)*
retained *(3)*
retaliation *(8)*
retaliatory *(2)*
retention *(10)*
retired *(1)*
return *(2)*
review *(12)*
reviewed *(6)*
reviewing *(29)*
reviews *(4)*
Rey *(3)*
Rich *(1)*
RICHARD *(44)*
right *(97)*
right-hand *(1)*
ring *(1)*

ringing *(1)*
Road *(1)*
Roberts *(2)*
Robin *(2)*
role *(2)*
Ronquillo *(6)*
room *(2)*
Rose *(12)*
rotate *(1)*
round *(1)*
RPR *(3)*
rules *(2)*
rung *(1)*

< S >
sale *(25)*
Salem *(1)*
sales *(11)*
salon *(2)*
Sanela *(2)*
Sarah *(3)*
satisfactorily *(1)*
satisfactory *(1)*
satisfy *(1)*
save *(5)*
saved *(1)*
saving *(1)*
saw *(3)*
saying *(19)*
says *(74)*
school *(4)*
screen *(15)*
scroll *(3)*
sealing *(1)*
second *(9)*
section *(3)*
see *(67)*
seeing *(16)*
seek *(1)*
seeking *(1)*
seen *(15)*
selection *(1)*
self *(1)*
sell *(2)*
seller *(2)*
selling *(3)*
send *(9)*
sender *(4)*
sending *(16)*

sends *(2)*
senior *(9)*
sense *(6)*
sent *(23)*
sentence *(3)*
separate *(7)*
separated *(1)*
Separately *(1)*
services *(2)*
setting *(4)*
seven *(5)*
seventh *(1)*
severely *(1)*
sex *(1)*
sexual *(4)*
Sgerber@bglaw.com *(1)*
share *(1)*
Shaw *(3)*
Shawn *(4)*
SHEET *(7)*
shift *(1)*
ship *(4)*
shipped *(14)*
shipping *(17)*
shoe *(6)*
shoes *(10)*
shoot *(1)*
short *(3)*
show *(5)*
showed *(3)*
showing *(4)*
shown *(18)*
side *(1)*
sign *(4)*
signature *(3)*
signed *(1)*
significant *(2)*
signing *(1)*
Simultaneous *(1)*
single *(2)*
singled *(2)*
sit *(3)*
situation *(7)*
situations *(4)*
six *(2)*
slow *(2)*
smaller *(1)*
SMITH *(2)*

software *(6)*
sold *(2)*
solely *(2)*
somebody *(5)*
sorry *(28)*
sort *(5)*
Sounds *(6)*
South *(1)*
SOUTHERN *(1)*
space *(2)*
speak *(6)*
speaking *(11)*
special *(2)*
specific *(21)*
specifically *(65)*
specifics *(2)*
speculate *(1)*
split *(1)*
spoke *(6)*
spoken *(2)*
spreadsheet *(1)*
St *(1)*
staff *(3)*
stamp *(9)*
stamped *(5)*
Standards *(1)*
stands *(1)*
start *(5)*
started *(4)*
state *(27)*
stated *(12)*
statement *(13)*
statements *(1)*
STATES *(8)*
stating *(4)*
status *(2)*
stellar *(1)*
stenographic *(1)*
step *(1)*
steps *(3)*
Steve *(6)*
STEVEN *(2)*
Stony *(1)*
stop *(1)*
store *(10)*
stored *(4)*
Stores *(1)*
Street *(17)*
stricter *(1)*

string *(1)*
strong *(1)*
subject *(6)*
subjected *(1)*
submit *(2)*
submitted *(1)*
submitting *(2)*
subsequently *(1)*
substance *(2)*
substantiate *(2)*
succession *(1)*
suffer *(1)*
sufficient *(2)*
suggest *(1)*
Suite *(3)*
Summaries *(1)*
summary *(4)*
Sunday *(1)*
supervise *(1)*
supervising *(1)*
supervision *(1)*
supervisor *(6)*
supervisors *(1)*
support *(2)*
supporting *(1)*
suppose *(2)*
supposed *(7)*
Sure *(13)*
Susan *(4)*
suspect *(3)*
suspend *(2)*
suspended *(9)*
suspension *(15)*
suspensions *(1)*
suspicion *(1)*
suspicions *(1)*
sworn *(1)*
system *(4)*

< T >
take *(30)*
taken *(11)*
takes *(1)*
talent *(2)*
talk *(9)*
talked *(2)*
talking *(10)*
talks *(1)*
TALX *(1)*

Case 1:19-cv-08927-GBD-SLC   Document 128-2   Filed 09/20/23   Page 82 of 83

Deposition of Richard Law                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

tax  (27)
taxes  (11)
team  (6)
Tech  (1)
tell  (12)
telling  (9)
ten  (1)
tender  (1)
tenure  (2)
term  (3)
termed  (2)
terminate  (18)
terminated  (16)
terminating  (1)
termination  (21)
terminations  (2)
terming  (1)
terms  (9)
testified  (5)
testify  (1)
testimony  (6)
Text  (8)
Thank  (19)
Thanks  (1)
theft  (3)
Theodora  (2)
thing  (3)
things  (10)
think  (49)
third  (2)
thirteenth  (1)
thought  (3)
three  (9)
Thursday  (3)
TIERNEY  (197)
time  (42)
timeframe  (6)
times  (10)
Tinbite  (23)
title  (7)
today  (9)
today's  (3)
told  (18)
tolerance  (1)
tomorrow  (1)
top  (25)
topic  (1)
total  (1)
track  (4)

tracked  (2)
traffic  (1)
trained  (1)
training  (7)
transaction  (16)
transactions  (12)
transcribed  (1)
Transcript  (11)
transcription  (1)
transcripts  (3)
transition  (1)
treatment  (2)
trial  (1)
tried  (1)
Trinity  (4)
trouble  (1)
true  (4)
truthful  (1)
truthfully  (2)
try  (2)
trying  (7)
turn  (2)
twelve  (1)
two  (21)
two-day  (1)
Tyler  (14)
Tyler's  (2)
Tyndall  (1)
type  (7)
types  (6)
typically  (10)

< U >
Uber  (1)
UCM  (1)
Uh-huh  (9)
Ulanda  (3)
ultimately  (2)
Um  (5)
understand  (16)
understanding  (5)
understands  (1)
Understood  (2)
Unemployment  (2)
unintelligible  (1)
union  (8)
UNITED  (1)
units  (1)
university  (1)

unrelated  (1)
unsatisfactory  (1)
unusual  (4)
update  (4)
updated  (1)
upload  (3)
UPS  (2)
use  (7)
usually  (2)

< V >
vacation  (1)
vaguely  (1)
Valecca  (1)
Vance  (2)
Various  (7)
vendors  (2)
verbal  (5)
verbally  (1)
versed  (1)
version  (1)
versus  (4)
vice  (1)
Victoria  (2)
Video  (10)
videoconference  (3)
VIDEOGRAPHER  (2)
videos  (2)
view  (2)
violate  (1)
violating  (2)
violation  (14)
violations  (7)
vision  (1)
volume  (2)
voluntarily  (1)
VOP  (1)
vs  (1)

< W >
wait  (4)
waiting  (1)
waive  (1)
waived  (5)
want  (33)
wanted  (5)
warning  (2)
warranted  (1)

way  (8)
Wednesday  (1)
Weh  (11)
weight  (3)
well  (32)
went  (3)
we're  (11)
we've  (5)
whatnot  (1)
whatsoever  (2)
withdraw  (1)
withdrawn  (26)
WITNESS  (144)
WITNESSED  (1)
witnesses  (1)
Word  (5)
words  (2)
work  (23)
worked  (9)
working  (2)
worried  (1)
worries  (2)
worry  (1)
wound  (1)
Wright  (4)
write  (2)
write-up  (3)
writing  (1)
written  (6)
wrong  (2)
wrote  (3)

< X >
X-Closet  (3)
XI  (1)

< Y >
Yeah  (10)
year  (8)
years  (3)
Yep  (1)
Yonas  (8)
YORK  (7)
Younis  (14)
Yu  (14)

< Z >
zero  (1)
Zhang  (1)

**zoom**  (*1*)