# EXHIBIT 3

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   --------------------------------

 3   KRISTINA MIKHAYLOVA

 4                    Plaintiff

 5       -against-                    CASE NO. 19-8927

 6   BLOOMINGDALE'S,INC., BLOOMINGDALE'S,
     INC. d/b/a BLOOMINGDALE'S AND FORTY
 7   CARROTS, BLOOMINGDALE'S, LLC,
     BLOOMINGDALE'S, LLC d/b/a BLOOMINGDALE'S
 8   NEW YORK, MACY'S, INC., MACY'S, INC. d/b/a
     MACY'S OF NEW YORK, UNITED STOREWORKERS
 9   RETAIL, WHOLESALE AND DEPARTMENT UNION
     AFL-CIO LOCAL 3 a/k/a LOCAL 3 UNITED
10   STOREWORKERS RWDSU/UFCW,
     DENNIS DIAZ,individually,
11   CHRISTOPHER CASTELLANI,individually,
     RICHARD LAW, individually,
12   and BOBBY BOOKER, individually,

13                    Defendants.

14                    - - -
                Monday, November 15, 2022
15                    - - -

16

17       Videoconference Deposition of CATHY YOUNIS, taken

18   pursuant to notice, commencing at 10:11 a.m. on the above

19   date, before Lori L. E. Agren, a Certified Court Reporter

20   and Notary Public.

21

22                    - - -

23

24
```

```
 1    APPEARANCES:    DEREK SMITH LAW GROUP, PLLC
                      BY: MELISSA MENDOZA, ESQUIRE
 2                    One Penn Plaza
                      Suite 4905
 3                    New York, New York 10119
                      (212) 587-0760
 4                    Melissa@DerekSmithlaw.com
                      Counsel for Plaintiff
 5

 6                    BY: BETTY TIERNEY, ESQUIRE
                      11477 Olde Cabin Road
 7                    Suite 400
                      St. Louis, Missouri  63141
 8                    (314)517-7814
                      Betty.Tierney@Macys.com
 9                    Counsel for Defendant

10                    BARTON GILMAN LLP
                      BY: STEVEN GERBER, ESQUIRE
11                    112 West 34th Street
                      18th Floor
12                    New York, New York  10120
                      (212) 792-6246
13                    SGerber@BGlaw.com
                      Counsel for Defendant

14

15    ALSO PRESENT: David Tyndall, Paralegal

16                   Catherine Barbour, Everest Technician

17

18

19

20

21

22

23

24
```

```
 1                    I   N   D   E   X

 2    WITNESS                              PAGE NO.

 3    CATHY YOUNIS

 4    Examination by Ms. Mendoza                    4

 5    Examination by Ms. Tierney                  108

 6

 7               E   X   H   I   B   I   T   S

 8

 9     EXHIBIT NO.                      DESCRIPTION

10     Plaintiff 1                  Handbag Policy

11     Plaintiff 2                  Group of E-mails

12     Plaintiff 3        Kristina Mikhaylova's Text Messages

13     Plaintiff 4                  Grievance Letter

14

15

16

17

18

19

20

21

22

23

24
```

Case 1:19-cv-08927-GBD-SLC   Document 128-3   Filed 09/20/23   Page 5 of 56

Deposition of Cathy Younis                                      Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 4

1    COURT REPORTER:  Would Counsel like a
2 copy of the transcript?
3    MS. MENDOZA:  Yes.
4    MS. TIERNEY:  I would like a condensed
5 and electronic copy.  Ms. Younis, definitely will read
6 and sign.
7    MR. GERBER:  Yes.
8    CATHY YOUNIS, having first been duly
9 sworn, was examined and testified as follows:
10 EXAMINATION BY MS. MENDOZA:
11    Q.   Good morning, Ms. Younis.
12    A.   Good morning.
13    Q.   My name is Melissa Mendoza, and I am the
14 attorney for Plaintiff in this case,
15 Kristina Mikhaylova.  And have you -- do you know who
16 Ms. Kristina Mikhaylova is?
17    A.   Yes.
18    Q.   And who is she?
19    A.   She was a past employer of Chanel
20 Accessories.
21    Q.   Okay.  All right.  So before we begin, I am
22 just going to go over a few different things.  I'm
23 going to go over just a few ground rules, essentially.
24 Just make sure that you respond with verbal responses

Page 5

1 instead of just a nodding of the head so the court
2 reporter can take down everything you are saying and
3 also, so that we don't speak over one another.  It is
4 important that you wait until I am done asking the
5 question and then vice versa I will wait until you are
6 done speaking so we are not speaking over one another.
7 Okay?
8    A.   Yes.
9    Q.   Have you ever been to a deposition before?
10    A.   Once before.
11    Q.   Okay.  And when was that?
12    A.   I am not sure.  At least, 10 years ago, I
13 think.
14    Q.   Okay.  And was your deposition taken?
15    A.   Yes.
16    Q.   Okay.  And were you a party to that case?
17    A.   I am not sure what you mean by that.
18    Q.   Were you a plaintiff or defendant?
19    A.   Yes, I believe so, yes.
20    Q.   Which one is the --
21    MS. TIERNEY:  I will object to the form.
22    THE WITNESS:  I am not sure if I
23 understand the question.
24 BY MS. MENDOZA:

Page 6

1    Q.   Yes.  Were you being sued?
2    A.   Oh, no.
3    Q.   Did you bring a lawsuit?
4    A.   Yes.
5    Q.   Okay.  And in what court did you bring that
6 lawsuit?
7    A.   New York.
8    Q.   Okay.  Was it state or federal?
9    A.   I don't know.
10    Q.   Okay.  And who was it against?
11    A.   New Jersey Port Authority.
12    Q.   Okay.  And what type of case was it?
13    A.   A slip and fall.
14    Q.   Okay.  And have you been -- so that is the
15 only deposition, and you said you don't recall when it
16 was, correct?
17    A.   Not exactly but I would say the best
18 estimate would be about 10 years ago.
19    Q.   Okay.  All right.  So are you aware of any
20 reason that may impair or prevent you from
21 understanding my questions today?
22    A.   No.
23    Q.   Okay.  Do you suffer from any condition
24 mental or physical that might impair your ability to

Page 7

1 understand my questions?
2    A.   No.
3    Q.   Did you take any medication, prescription or
4 otherwise in the past 24 hours?
5    A.   No.
6    Q.   Were you supposed to take any prescription
7 medication in the past 24 hours that you did not?
8    A.   No.
9    Q.   Okay.  All right.  And if you need to take a
10 break at any time, that is perfectly fine.  Just let me
11 know.  I am assuming we are probably going to go
12 through lunch or go past lunch.  So we will probably
13 take a break for lunch, but otherwise, I just ask that
14 you answer the last question that was asked before we
15 take the break.  Okay?
16    A.   Sure.
17    Q.   All right.  And how did you learn about
18 today's deposition?
19    A.   Through Betty.
20    MS. TIERNEY:  I will admonish the witness
21 not to talk about anything said.  Cathy, anything that
22 was said to me or Steve.  The fact that we spoke about
23 the depo.
24 BY MS. MENDOZA:

Deposition of Cathy Younis                                  Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 8

1  Q.  Okay.  And when did you learn about your
2  deposition being taken?
3  A.  Approximately, a month or so ago.  I am
4  guessing a month, 30 days, possibly 60.  I have to look
5  at my e-mails.
6  Q.  Okay.  Did you review any documents in
7  preparation for today's deposition?
8  A.  Yes.
9  Q.  Okay.  And what were those documents?
10  A.  Two relating to the handbag limits.
11  Q.  Okay.  And have you spoken with any of your
12  -- withdrawn.  Are you still employed by
13  Bloomingdale's?
14  A.  Yes.
15  Q.  Okay.  Have you -- did you speak with any of
16  your coworkers or former coworkers about today's
17  deposition?
18  A.  No.
19  Q.  Okay.  Did you review any transcripts for
20  today's deposition?
21  MS. TIERNEY:  I will object to the form.
22  You may answer.
23  BY MS. MENDOZA:
24  Q.  You can answer.

Page 9

1  A.  Can you explain what you mean by
2  "transcript"?
3  Q.  Sure.  Any deposition transcripts already
4  taken in this case, if you reviewed any of those?
5  A.  No.
6  Q.  Okay.  And so you said that you are still
7  employed.  You are currently employed at
8  Bloomingdale's, correct?
9  A.  Yes.
10  Q.  And when did you start working at
11  Bloomingdale's?
12  A.  September 1989.
13  Q.  Okay.  And what was your initial position
14  there?
15  A.  I was a sales professional in Boca Raton.
16  Q.  Okay.  And if you can explain since then the
17  position -- how you came to this current position?
18  A.  Sure.  So I started out on the sales floor.
19  I was quickly promoted to a management role.  I quickly
20  was promoted to a group manager role.  From my group
21  manager assignment in Boca Raton, I was promoted to my
22  first regional position which was a regional manager
23  merchandise manager.  So I ran all Ready to Wear for 18
24  stores.

Page 10

1  From that regional position, I became the
2  first regional customer of loyalty manager.  I did that
3  for about 11 years which was all of customer experience
4  and rolling out our clientele systems.  And then from
5  that position, I was promoted into the Chanel brand
6  director role which I did for a little over 11 years.
7  And just most recently effective October
8  1st, I became the principal of top client
9  relationships.  That was 33 years in two minutes.
10  Q.  Thank you.  So we will go back to the Chanel
11  brand director.  Did you hold that position in Boca or
12  here in New York?
13  A.  No, in New York City.
14  Q.  Okay.  And what store?
15  A.  59th Street, the flagship.
16  Q.  Okay.  Your current position you were
17  promoted to on October 1st.  Is that in Chanel or is
18  that for the whole store?
19  A.  That's nationally for all stores.
20  Q.  Okay.  So what is the difference between
21  your Chanel brand director position and the current
22  position?
23  A.  Taking a lot of the learnings from what I
24  was able to accomplish in Chanel around client

Page 11

1  relationships and really developing long lasting
2  relationships, taking that to a company perspective.
3  So going back to kind of, like, what I was doing as a
4  regional when I was in the regional customer loyalty
5  manager role and then some.
6  So I would say that these last, you know, 11
7  years have really given me an opportunity to see the
8  client at a much different level than what I was on the
9  regional position.
10  Q.  Okay.  The Chanel brand director position
11  that was -- you said that was for 11 years?
12  A.  A little more but approximately, 11, yes.
13  Q.  Okay.  So that was during the time -- this
14  case is about Kristina Mikhaylova's employment.  So
15  that would be -- is it correct that that -- you were in
16  that position at the time that she employed by
17  Bloomingdale's?
18  A.  Yes.
19  Q.  Okay.  So for today's deposition, I will
20  most likely be referring to -- if I don't say the
21  specific dates, I am referring to that time which was
22  April, May 2016 until June, let's say, '16, 2017, okay?
23  A.  (Witness indicates.)
24  Q.  All right.  So in your Chanel brand director

Page 12

1  position, you stated that you were in that position all
2  during your time in New York City, correct?
3      A.   Yes.
4      Q.   Okay.  And what were your responsibilities
5  in that position?
6      A.   So I had direct oversight over the Ready to
7  Wear -- Chanel Ready to Wear business.  Anywhere from
8  five to seven associates that worked in that boutique
9  reported directly to me.  The job was to spend most of
10 my time in Ready to Wear because that was the business
11 that we were most challenged with, and Chanel is a
12 fashion house.  It is all about the runway and the
13 Ready to Wear business.
14      I did have oversight of -- back then, I
15 think it was one executive in the business manager role
16 for Accessories and cross-functional responsibility for
17 the shoe business manager who ran shoes.  So they also
18 reported to the shoe senior business manager.  So I had
19 a lot of collaboration with Accessories and shoes, but
20 they were not my direct reports except for the
21 leadership.
22      Q.   Okay.  And who held the leadership
23 positions?
24      A.   At the time if we are talking about that

Page 13

1  specific year, I believe it was Dennis Diaz who was our
2  business manager for Accessories.
3      Q.   Okay.  What about for shoes?
4      A.   There has been a tremendous amount of
5  turnover in that role.  I would have to go back and
6  look at the reviews that had promotional roles.  I am
7  trying to think back to five years ago who was in
8  there.  I really -- I would be totally guessing right
9  now.
10      Q.   Okay, that's fine.  So you said five to
11 seven associates reported directly to you; is that
12 correct?
13      A.   Yes, in Ready to Wear.  We are up to seven
14 now.  I think then it was probably five.
15      Q.   Okay.  So did Kristina report directly to
16 you?
17      A.   No.  She reported to the business manager of
18 Accessories.
19      Q.   Which was Dennis Diaz; is that correct?
20      A.   At that time period, yes.
21      Q.   Okay.  Just to clarify, I believe that
22 Dennis came in -- correct me if I am wrong.  Did Dennis
23 come in in January of 2017?
24      A.   I am not sure.

Page 14

1      Q.   Okay.  So do you recall directly supervising
2  Kristina around when she first started May 2017 until
3  January -- until 2016 -- until January of 2017?
4      A.   No.  Because I never had direct supervision
5  of Accessories.  So whoever was my business manager
6  would have been the person doing it.
7      Q.   Okay.
8      A.   So if there was someone before Dennis or
9  after Dennis, that would have been the person who she
10 would have reported to.
11      Q.   Okay.  Do you know who Victoria is?
12      A.   Yes.
13      Q.   Okay.  Was that the business manager?
14      A.   I am not certain if she came before or after
15 Dennis.  I believe it was after Dennis to be honest.
16      Q.   Okay.  And what position did she hold?
17      A.   Business manager of Accessories.
18      Q.   Okay.  And I want to talk about specific
19 Chanel training.  What kind of specific training did
20 you have to take for Chanel?
21          MS. TIERNEY:  Objection.  You can answer.
22          THE WITNESS:  Myself personally?
23 BY MS. MENDOZA:
24      Q.   Yes.  So in your position -- withdrawn.  I

Page 15

1  will back it up.
2      So was there a specific training that you
3  had to undergo for the Chanel department?
4      A.   So if you can give me a specific timeline, I
5  think I could answer that question better because
6  pre-lease, no.  Leased, yes.
7      Q.   Okay.  What do you mean by "leased"?
8      A.   So our business when I first started the
9  position was what we call an owned business.  So
10 Bloomingdale's was buying the merchandise and then
11 post, it became a leased business approximately five
12 years ago.
13      Q.   Okay.
14      A.   Which is where Chanel buys the goods and
15 controls the inventory and the business model.
16      Q.   Okay.  So I believe that was around February
17 2017?
18          MS. TIERNEY:  I object to the form.
19          THE WITNESS:  I believe you are correct.
20 BY MS. MENDOZA:
21      Q.   Okay.  And so everything before February --
22 around February of 2017 is pre-leased, right?
23      A.   (Witness indicates.)
24      Q.   Okay.  So did you have to undergo any

Page 16

1  specific training separate from Bloomingdale's for --
2  to manage the Bloomingdale's department pre-lease?
3      A.  So we have message mode trainings which we
4  launch six product releases a year.  So we would bring
5  message mode to the store for all of the FA, Fashion
6  Advisors.  And for myself, I worked with the Chanel
7  team in Paris doing the buys.  So, obviously, they
8  helped elevate my buying skills because I would do the
9  buys.  That was the most.  We did have leadership
10 meetings that we would go to maybe once or twice a
11 year, but it wasn't extensive training not like what
12 you get from Bloomingdale's.
13     Q.  Okay.  Did you do -- did you have to take
14 any training for supervising your employees?
15     A.  From Bloomingdale's, extensive.
16     Q.  We will start with first Chanel only.
17     A.  In the pre-lease, no, not really.
18     Q.  Okay.  What, if any, did you have to do?
19     A.  In regards to people?  Can you be more
20 specific with what the question is?
21     Q.  Yes.  So was there any instructions or
22 training or policies on how to supervise your employees
23 that are in the Chanel department?
24         MS. TIERNEY:  I will object to the form.

Page 17

1  You can answer.
2          THE WITNESS:  So no, not really, no.  I
3  mean, there are policies and procedures from Chanel,
4  but they are not on how to manage people.
5  BY MS. MENDOZA:
6      Q.  Okay.  Are there any on reporting of --
7  reporting your associate's conduct?
8          MS. TIERNEY:  I will object to the form.
9  You can answer.
10         THE WITNESS:  No.
11 BY MS. MENDOZA:
12     Q.  Okay.  Are there any regarding purchases
13 made by your employee's -- associate's purchases?
14         MS. TIERNEY:  I will object to the form.
15 You can answer.
16         THE WITNESS:  There are product limits
17 that are very specific to the world of Chanel.
18 BY MS. MENDOZA:
19     Q.  Okay.  What were those product limits?
20         MS. TIERNEY:  What time frame, counsel?
21 '16, '17?
22         MS. MENDOZA:  Yes.
23 BY MS. MENDOZA:
24     Q.  Yes.

Page 18

1      A.  If we are talking about that specific time
2  period, it was much more lenient than it is today I can
3  tell you that, but they could go up to 24 handbags.
4  You know, for Chanel, it was, you know, one icon versus
5  which is a classic bag, basically, versus one fashion
6  bag per month.  Bloomingdale's did have a little bit
7  more lenience where they were letting them, you know,
8  at one point earlier on until that Chanel policy came
9  out, do the 24 -- the 24 was always consistent.  But
10 Bloomingdale's also had in their employee handbook --
11 the 59th Street handbook where they could buy up to
12 four but no more than two per transaction in a month.
13     Q.  Okay.  And when did this change?  The policy
14 change?
15         MS. TIERNEY:  I object to the form.  You
16 can answer.
17         THE WITNESS:  The policy change was in 20
18 -- I believe at the end of 2016.
19 BY MS. MENDOZA:
20     Q.  Okay.  Was it when Chanel was going leased?
21     A.  It was prior to.  They had communicated all
22 of this, what I just said, the one icon and the one
23 fashion bag.  I believe it was right before we went,
24 like, maybe a few months before we went leased.

Page 19

1      Q.  Okay.  But did the Bloomingdale's policy
2  change?
3          MS. TIERNEY:  I object to the form.
4          THE WITNESS:  I am not -- I can't.  I am
5  not certain of that if that changed in the exact timing
6  that Chanel did because I know there is union
7  negotiations to get things into that.  So I can't be
8  specific on the timeline with that.
9  BY MS. MENDOZA:
10     Q.  Okay.  So at that time, how did the
11 employees know how many bags they were allowed to
12 purchase?
13     A.  We had given them all a handout from Chanel
14 dictating what the policy was.  And by the way, the 24
15 handbags a year never changed, just how a little bit,
16 and we distributed it.  We had one-on-one meetings with
17 them, and we had multiple team meetings.  Like, the
18 managers conduct morning meetings daily.  So this was a
19 big topic of discussion, and we did it at our message
20 mode.  Wherever we had a touch point with the team, we
21 were communicating these changes.  And like I said,
22 they were very slight.
23     Q.  Okay.  Did Chanel have any tracking systems
24 for how many purchases made -- were made by the

Page 20

employees?

MS. TIERNEY:  Just clarification, before or after leasing?

BY MS. MENDOZA:

Q.  We will start with before.

A.  Before, no.  It was really more our AP teams were looking and then now, yes.

Q.  Okay.  So after it went leased is when it changed?

A.  When we had a lot more visibility into what people were doing.

Q.  Okay.  Do you recall around what time that was?  What year?

A.  That is only within the last two to -- I would say, two years.

Q.  Okay.

A.  Like, where we crystal clear say it.

Q.  So during that time of Kristina's employment 2016 to 2017, it was only Bloomingdale's Asset Protection that was responsible or in charge of tracking purchases made by employees?

A.  For the most part, yes, yes.

Q.  Okay.  Do you know who in Asset Protection?

A.  No.  And -- no, no.

Page 21

Q.  Okay.  Was anyone fired from making over -- withdrawn.  Was anyone fired for purchasing more than they were allowed under the policy limits pre-lease?

A.  I never really know the exact reason why.  I would think so, but I don't know that definitively.  Like, I know that there has been policy and procedure not followed.  And I know that, you know, we had circumstances that they were looking at people for different things.  But I really don't know the specifics to them.

Q.  Okay.

A.  We are just talking about Kristina at this point or other associates too?

Q.  Any associates just in general?

A.  No.

Q.  Okay.  And post lease, is it the same?

A.  Same thing, yeah.  I mean, it is more where I think we get to understand this information is more for scheduling purposes.  You know, I think that the team does a good job of making sure that we understand that we might have a scheduling challenge or something like that.  But it is more where I am asking for, like, just general counsel on what happened.

Q.  Okay.  So do you terminate employees?

Page 22

A.  Myself?

Q.  Yes.

A.  For performance counseling or more behavior based, yes.  So not using our clientele tools or customer service problems, things like that.  I don't believe I had to terminate anyone in my 33 years.  But certainly I have had a lot of performance counseling conversations.

Q.  Okay.  So at that time, did you have any input on HR's decision to terminate any of the employees in the Chanel department?

A.  No.

Q.  Okay.  I am going to go back to the policy on the bags.  We are going to look at the exhibits.

MS. MENDOZA:  Catherine, are you there?  We can go off the record.

(A discussion was held off the record at 10:36 a.m. to 10:40 a.m.)

BY MS. MENDOZA:

Q.  Ms. Younis, does Chanel have any policies regarding -- Chanel specific policies regarding abuse?

MS. TIERNEY:  I object to the form.  You can answer.  Go ahead.

THE WITNESS:  Yes.

Page 23

BY MS. MENDOZA:

Q.  Yes, you said, right?  So -- and what were those policies at that time 2016, 2017?

A.  The most important thing that has been -- one consistent thing for Chanel from beginning to end is that the products always go to the intended person who is purchasing.  So we have a lot of diversion and reselling and third parties and things like that.  So always the intent has been that the purchaser is the one who will enjoy the product.

Q.  Okay.

A.  And, of course, the limits that we've now discussed multiple times.  So everyone can enjoy the product.  So it is all from a customer service standpoint.  They want to make sure their best customers are getting the best product.

Q.  So we will come back to the product diversion, but we talked about the limits.  So what were the policies for Chanel specifically as to going over the limits?

A.  It would be -- it would, obviously, result in a warning and could be grounds for immediate termination.

Q.  Okay.  And who handled that?

Page 24

A.   Primarily, in that time period -- so we are talking about that time period because now it's a little different.

In that time period, it was more Asset Protection was watching that type of behavior.

Q.   Okay.  At that time, did you have any communications from Asset Protection that someone in the Chanel department, any of your employees were over-purchasing or purchasing more than the limit?

MS. TIERNEY:  I will object to the form. You can answer.

THE WITNESS:  Not to my knowledge during post, yes.

BY MS. MENDOZA:

Q.   Are you saying post lease?

A.   No, no.  Meaning post like after everything -- like, after someone was let go or something like that, there would be discussion about policy and procedure.  So, you know, it was either that or selling over the limits or things like that.

Q.   Okay.

A.   But it was not prior.  I will tell you Asset Protection is very private about what they are working on.  No one is more surprised than me.

Page 25

Q.   Okay.

MS. TIERNEY:  Counsel, I got the e-mail about the exhibits.

MS. MENDOZA:  Great.

BY MS. MENDOZA:

Q.   So just going on with the Asset Protection, so besides Asset Protection's investigation into those purchases, were you responsible at that time of doing any of your own investigation into the purchases made by your employees?

A.   No.  But I do believe, like, we have a responsibility, like, you know, if we see something, it is just like theft.  If we see something, say something.  And so it would be more like a gut reaction.

Q.   Right.  But how would you know that someone is exceeding the purchase limit?

A.   At that point in time, extremely difficult, if not impossible.

Q.   Okay.  Did you catch anyone exceeding the purchase limit at that time?

A.   Myself, no.

Q.   Did anyone else?

A.   Not that I am aware of.

Page 26

Q.   Okay.  All right.  So we will go back now.

MS. MENDOZA:  Okay.  Catherine, if you could upload Plaintiff's Exhibit 1.  It's a Handbag Policy.

(Exhibit viewed on Zoom screen.)

BY MS. MENDOZA:

Q.   Okay, Ms. Younis.  Do you see the document in front of you?

A.   Yes.

Q.   And that says Handbag Policy, right?

A.   Correct.

Q.   Have you seen this document before?

A.   Have I what?

Q.   Have you seen this document before?

A.   Yes.

Q.   Okay.  And is this the Handbag Policy that was in place in 2016 -- withdrawn.  Is this the Handbag Policy that was in place pre-lease?

A.   Yes, yes.

Q.   And was that specific -- and that's specific to the Chanel?

A.   It is specifically to the Chanel handbags specifically, and this is a document that they created.

Q.   They being Chanel, right?

Page 27

A.   Yes.

Q.   Okay.  So that is not the Bloomingdale's policy that you were talking about?

A.   No.

Q.   Okay.  And what changed after -- what in this policy was different after it went lease?

A.   So we go to 12 handbags a year, and it goes to six icons a year.  So everything kind of decreased immensely.

Q.   Okay.

A.   So, again, more towards the fashion handbags.

Q.   Okay.

A.   And that is our current policy with the exception of some more very specific things in the language.

Q.   Okay.  And before you had mentioned the fashion and the icon, right, the classic?

A.   Yes.  That means one non-icon.

Q.   Right.  So -- but the policy was two non-icon, right?

A.   Excuse me?

Q.   It is there on the first -- after the Revised Handbag Purchase Policy.  It says one icon and

Page 28

one non-icon or two non-icon handbags?

A. Correct.

Q. Per month?

A. Correct.

Q. Okay. So is that different than what you were saying before?

A. No, that's what I was saying.

Q. Okay. All right -- so -- all right.

MS. MENDOZA: We can get off the screen now. Thank you.

(Zoom sharing screen closed.)

BY MS. MENDOZA:

Q. So did Asset Protection -- do you know if Asset Protection was -- withdrawn.

Does this -- that policy conflict with the Bloomingdale's policy?

A. I am not certain when the handbooks were changed. So I am not certain about that. The 24 handbags holds in both scenarios that I am certain of.

Q. Except when it changed post lease, right?

A. Right, yes. I am assuming we are talking about the time prior, yes.

Q. Right. So then it went from under the Bloomingdale's policy, the 24 still stayed but under

Page 29

Chanel, it got reduced; is that correct?

MS. TIERNEY: I object to the form.

THE WITNESS: You need to be giving me specific time lines because it is the same if we are looking at the same period of time when she was employed. Twenty-four is the same.

BY MS. MENDOZA:

Q. Right. The 24 I am talking about post lease and pre-lease?

A. Okay. I am confused. Help me.

Q. Okay. What part are you confused?

A. What is the question you are asking me now?

Q. I am asking if the 24 changed post lease?

A. Yes.

Q. Okay. And that was in the middle of her employment?

MS. TIERNEY: I object to the form.

THE WITNESS: No. It didn't change then.

BY MS. MENDOZA:

Q. Okay.

A. The change came later into the lease period where we went to the 12 handbags.

Q. Okay. So then during her employment the entire time of her employment, the 24 for Chanel stayed

Page 30

the same as the Bloomingdale's 24?

A. Exactly.

Q. So did that Handbag Policy -- Plaintiff's Exhibit Number 1, was that the same policy throughout her entire employment?

A. The one that you had up, the Chanel one?

Q. Yes.

A. No.

Q. Okay. And we can bring that back up just to clarify.

(Zoom screen sharing open.)

BY MS. MENDOZA:

Q. So during Kristina's employment, what in this document changed in this policy?

A. So the one icon, one non. So here it is crystal clear telling you that you can only get two handbags a month. In the Bloomingdale's handbook at the earlier part of her -- you know, it states that they can buy up to four but no more than two per transaction. Still landing at 24 a year but it is slightly different in verbiage.

Q. Okay. But that's Bloomingdale's policy, right?

A. Correct. That is what was in our union

Page 31

handbook.

Q. Okay. And what about -- but Chanel's policy didn't change. This policy didn't change, right, during her employment?

A. The 24 handbags stays consistent.

Q. Right.

A. Both policies and procedures.

Q. Okay. It says there are Exceptions to Purchase Policy with management approval.

A. Correct.

Q. Who are the VIPs?

A. So we call them VVIPs and that means that they are very, very important customers, and we have made minimal exceptions to that policy. As the director, I do have the ability to take a VVIP client and like this example, if they are trying to buy three handbags for their three daughters or something like that for the holidays, we could make that exception, but we really try not to make that exception, so that all of our clients can enjoy the beautiful product.

Q. Okay.

A. That would have to come with a management sign off, and we share that with Chanel, by the way, when we do make those exceptions.

Page 32

Q.   Okay.  If a client wanted to --- so it says client with multiple daughters there, right?  So with the same iconic handbag for each child.  If that person wanted -- that client had a daughter in New Jersey, the client is making the purchases in New York.  The client's daughter lives in New Jersey, can the client say, I would just like to ship it to New Jersey instead of purchasing it today and being charged with the tax?

A.   We are very specific with billing address that it must be shipped to the billing address.  So if her charge card happens to be a billing address to New Jersey, yes, she could do that.  But if it is New York, it would be shipped to the New York address.  And then it would be up to the client to ship it to her daughter for the holidays.

Q.   Okay.

MS. MENDOZA:  You can get off the screen.  Thank you.

(Zoom screen sharing closed.)

BY MS. MENDOZA:

Q.   So if her address is -- the billing address is New Jersey, right, and if she says well, I -- you know -- withdrawn.

At that time, do employees tell customers I

Page 33

see that your billing address is in New Jersey.  You can just ship it there, and you don't have to pay the tax today if you were to purchase it and take it home today?

MS. TIERNEY:  I object to the form.  You can answer.

THE WITNESS:  I wouldn't know.  It would be hard for me to answer that question.  I don't think associates did that because our code of conduct is that we follow the tax system, but I can't hear every conversation at the register.  So I would say no, but it is an assumption.

BY MS. MENDOZA:

Q.   Okay.  So there weren't any conversations between managers and employees about suggesting that an employee who has a billing address in New Jersey, they could just ship it to New Jersey?

A.   That I can say, no.

Q.   Okay.  And so if a customer said, I want to ship it to New Jersey because I don't pay taxes there, can I just do that instead?  Would you go through with the transaction?

A.   So, no, we would not.  That would be, no.  That would be against our code of conduct and the tax

Page 34

laws.

Q.   Did Chanel's policy regarding shipping change in the past few years?

MS. TIERNEY:  I object to the form.  You can answer.

THE WITNESS:  Yes.  We've taken shipping inhouse.  So we no longer use the services of Bloomingdale's, and we now run our own shipping and receiving department.  So we are using FedEx now.  I think that happened about three to four years ago.

BY MS. MENDOZA:

Q.   So let me be a little more specific as to the shipping changes.  Can customers ship a purchase anywhere?

A.   No.

Q.   Okay.  What are the policies regarding that?

A.   There are multiple states, and I would need to have the document in front of me, but my shipping department certainly has it up on the wall where we cannot ship to unless we have a valid driver's license that says that the customer lives in that state.  So there are many places that are zero tax states that we do not ship to.

Q.   Okay.  But unless that customer has a valid

Page 35

driver's license?

A.   Exactly and is present.  So -- I want to be really clear on that.  It can't be a phone order and they say, oh, I have a New Jersey or I'll send you one over my mobile.  They must be present with the I.D.

Q.   Okay.  And when did that change?

A.   I know it was in effect for when we took over shipping.  So I would say Chanel dictating the no states would be three or four years ago and Bloomingdale's has had many policies and procedures also around that when we used to use a memo procedure and things like that for places that were, like, over the phone, phone calls and things like that.

Q.   So that was Chanel's policy change, correct, for the -- not shipping to specific states?

A.   Yes.  I would say it was a little more stringent with Macy's although Macy's was pretty much aligned on it too.

Q.   Okay.  So if I said I am purchasing, I am in the store.  I am purchasing this at the time.  I am purchasing a handbag as a gift for a friend.  Can I ship it to her address?

A.   You would be shipping it to the billing address.

Page 36

Q.   The billing address on the credit card being
used to make the purchase?

A.   Right.

Q.   Okay.  And that was -- that's what the
policy was at that time; is that correct?

A.   I believe so.  It might be a little gray on
when that was introduced because we had -- I think when
I first started, we were able to -- when it was a
Bloomingdale's business, I think we were able to do
gifts if it was a gift being sent.  I am just not sure
on the timeline as to when that was to be specific.

Q.   Okay.  And at the time were there any Chanel
policies regarding ensuring that was a gift and not a
purchase for the employee?

        MS. TIERNEY:  I object to the form.  You
can answer.

        THE WITNESS:  I would say that -- I don't
think Chanel had specifics about associates buying
gifts.  But there was very, very strong language around
diversion.  And that whoever is purchasing it
especially if you are using an employee discount, that
it is for yourself.  That has always been strong
language and continues to be to this day.

BY MS. MENDOZA:

Page 37

Q.   Okay.  And that's the same for
Bloomingdale's.  Would you say that's the same for
Bloomingdale's?

        MS. TIERNEY:  I object to the form as to
time.

BY MS. MENDOZA:

Q.   That time period?

A.   I think in that time period Bloomingdale's
was totally aligned with Chanel's policies and their
own about diversion.  So if you are buying gifts to
resell or do something with no, that was definitely
aligned to not allowed.  If you were truly buying your
mother a Christmas present, of course, they allowed
that.

Q.   Right.  So how did they ensure it was truly
your mother's Christmas or holiday gift?

A.   I think that's a very difficult job that
Asset Protection had.

Q.   Okay.  But did Chanel have any specifics?
Were you responsible in your position for making sure
that was truly a gift for Christmas or a holiday gift?

A.   No.  I don't think they had an expectation
that I would be the one who was policing that.

Q.   Okay.  Was there any expectation that Dennis

Page 38

Diaz was policing that.

A.   No.  I mean, we should be aware of what our
associates are doing.  Like, if something is really,
like -- but not to police something, no.  It is more
from a customer service which is our role.

Q.   Okay.  And did managers ring up associates'
purchases?

A.   Today we do.

Q.   At that time?

A.   At that time, I am very gray about that.
No, I believe associates rung one another up because
they were getting commission on it.  You couldn't ring
up your own -- the Bloomingdale's policy before we went
leased was you could never ring up your own sale, but a
colleague could ring up a sale for you, yes.

Q.   Okay.  And did you train
Kristina Mikhaylova?

A.   She wasn't really my direct report so any
training that she received from me would have been more
in the bigger format of message modes and things like
that or morning meetings that I was conducting for the
total team as a whole which I do often.

Q.   Okay.  So I am going to go into another
topic.  I don't know if you wanted to take a 10-minute

Page 39

break since we have been going.

A.   I am okay if everyone else is.

        MS. TIERNEY:  If you are okay, I am good.

BY MS. MENDOZA:

Q.   All right.  I wanted to talk about the
product diversion now, that part.  We talked about the
purchases.  So what were the policies regarding product
diversion for Bloomingdale's at that time?

A.   So, you know, as you can see, there was a
clear -- for it to be in the handbook was, I think, in
itself a major statement of saying that, you know,
there are limits on the amount of handbags you can
sell.  And clearly that they were intended for, you
know, personal use if you were purchasing and things
like that.  And there is a lot in our handbook, and in
our code of conduct that they take every year that
really talks to that.  And, you know, not reselling
anything that comes with a discount.  You know, even
buying something on your discount for a family member
and receiving payment for it.  It's not okay.

        So there was a lot in place from
Bloomingdale's in terms of making sure that the end who
was purchasing it was the end user.  I think that's the
consistent thread between both companies on the topic

Page 40

1 of diversion. Chanel gets a little bit more specific
2 on that topic to protect their brand.
3    Q.   Okay.  And was anyone terminated for product
4 diversion?
5    A.   Not that I specifically know that.  We did
6 have some AP losses in the department since I've been
7 there over the last 11 years so -- but I can't directly
8 say it was for that.  Like, I will say for policy and
9 procedure, yes.
10    Q.   Okay.
11    A.   But that's usually one of four things,
12 right, so...
13    Q.   And you mean the policy and procedure is one
14 of four things?
15    A.   Well, yes.  I think that, you know, it could
16 be diversion.  It could be miss-ringing.  It could be
17 theft.  It could be any of those kinds of behaviors.  I
18 don't know specifically which one it was.  I just know
19 that Asset Protection was involved.
20    Q.   Okay.  Now, for Chanel specifically, were
21 you -- did you have any duties or responsibilities for
22 product diversion at that time from Chanel?
23    A.   No.  I think it is more from the education
24 standpoint was probably the biggest expectation from

Page 41

1 them.  For me, it's making sure that I educated the
2 team on the policies and the procedures.  That I
3 educated and held accountable my leadership on the
4 policies and procedures.  And it was more from us
5 ensuring that everyone understood why we were doing
6 this and making sure that it always went back to the
7 customer experience.
8       So everything that I do is about customer
9 experience, and everything that the leadership does is
10 customer experience.  So we are talking about these
11 things not so much to be the police of these handbags
12 or products.  It is more to ensure that we have a
13 really great customer experience with our clients.
14    Q.   Okay.  And when you say the discount is
15 being used for family members and not receiving
16 reimbursement, right, so can someone use the discount
17 as a gift?  Can an employee just use the discount to
18 purchase a gift for someone else?
19    A.   Yes.
20    Q.   Okay.  So that's not considered discount
21 abuse?
22    A.   If you are buying your mother or your
23 brother or sister a gift, yes.  Of course, you can do
24 that as long as you are following all the other

Page 42

1 policies and procedures.  So if we are talking about
2 Chanel specifically, the limits would apply.
3    Q.   So how can someone purchase a gift for --
4 how can I purchase a gift for my mother with my billing
5 address -- withdrawn.
6       What billing address was the person ringing
7 the other -- oh, let me ask the question first.
8    A.   Okay.
9    Q.   What billing address does Bloomingdale's or
10 Chanel look at?
11       MS. TIERNEY:  I object to the form.  You
12 can answer.
13       THE WITNESS:  So if an associate was
14 ringing for another associate which is, I believe, what
15 the question was for a gift, they should be sending it
16 to that associate's billing address where the
17 Bloomingdale's account is.
18 BY MS. MENDOZA:
19    Q.   Okay.  So it the Bloomingdale's account is
20 the address?
21    A.   We would hope that's what they are using.
22    Q.   Okay.  So I ask because can someone use --
23 if I am an employee for Chanel and I use my credit card
24 that's not my Bloomingdale's account credit card, can I

Page 43

1 use my own personal credit card?
2    A.   I believe they are allowed to do that, yes.
3    Q.   Okay.
4    A.   I believe.  I am not certain.
5    Q.   Okay.  So at that time, could I use my
6 personal credit card that's a different billing address
7 than my Bloomingdale's account?
8    A.   If your personal credit card was being
9 billed at a different address, then -- I don't
10 understand the question, I guess.
11    Q.   Yes.  So if I use my personal credit card to
12 make the purchase, the person ringing me up is looking
13 at the billing address, right?  If the billing address
14 doesn't match my Bloomingdale's account billing
15 address, would I not be able to make that purchase?
16    A.   If it were me ringing you, I would want to
17 understand since I know you live in New York and if it
18 says California, I would be questioning that as an
19 associate and probably calling my friends at Asset
20 Protection.
21    Q.   Okay.
22    A.   Because that doesn't sound correct in any
23 format.
24    Q.   So I guess the specific question is if --

Page 44

1  let's say I am rung up -- you are ringing me up, right?
2      A.   (Witness indicates.)
3      Q.   And I give you my personal credit card, you
4  check the billing address.  My question is do the
5  employees have to go one step further and pull up their
6  Bloomingdale's account to check the billing address or
7  they don't even look at the billing address for the
8  Bloomingdale's account if I am using my personal credit
9  card?
10     A.   I am not sure.
11     Q.   Okay.
12     A.   I am not sure.  I am not being evasive.  I
13  don't ring on the register.  In my 33 years, I don't
14  really ring on the registers so I am not sure on that.
15     Q.   Okay.  So was there a policy in place at the
16  time that anybody ringing up another associate had to
17  pull up the Bloomingdale's account?
18     A.   I don't believe so.  I don't believe so.
19     Q.   Okay.  And there is -- what is the
20  difference between the Bloomingdale's account and a
21  loyalist account?
22     A.   The loyalist account you earn rewards on
23  which, again, should be tied to your Bloomingdale's
24  card and your billing address.  But it is a reward

Page 45

1  program for our best clients, and it gets richer as you
2  progress as a client.
3      Q.   Okay.
4          MS. MENDOZA:  Did we lose Betty or is it
5  just me?
6          THE WITNESS:  I think we did.
7          MR. GERBER:  I think we just did.
8          (Ms. Tierney reenters Zoom.)
9          MS. MENDOZA:  Lori, can you read back the
10  last question in case Ms. Tierney has an objection?
11         (The court reporter read back the last
12  question.)
13         MS. TIERNEY:  I have no objection.
14  BY MS. MENDOZA:
15     Q.   To be clear just for purpose of the record,
16  the loyalist, l-o-y-a-l-i-s-t.  Cathy, that is the
17  account?
18     A.   Yes.
19     Q.   Were there other supervisors besides Chanel
20  in the Chanel department on the same floor in other
21  departments?
22     A.   Yes.
23     Q.   Okay.  And were those managers?
24     A.   Yes.

Page 46

1      Q.   Okay.  And were they able to ring up
2  associates in the Chanel department at that time?
3      A.   Yes.
4      Q.   Okay.  So was anyone terminated for discount
5  abuse?
6          MS. TIERNEY:  I object to the form.  You
7  may answer.
8          THE WITNESS:  I am not sure.  Like I
9  said, I just know that we have terminations.  I don't
10  know if it was specifically for discount abuse.
11  BY MS. MENDOZA:
12     Q.   Okay.  And -- are you responsible at that
13  time for checking the sales each employee made?
14     A.   No.
15     Q.   Was anyone responsible for that?
16     A.   No.  We delved more into top client
17  purchases and things like that.
18     Q.   So at the time was the manager for the
19  department -- for each department responsible for
20  making sure each employee is meeting a certain goal of
21  sales each month?
22     A.   No.
23     Q.   Okay.  And did on -- were you responsible
24  for checking how many sales each employee was making?

Page 47

1      A.   No.  It is how you are asking the question,
2  no.
3      Q.   So did you supervise Dennis Diaz to check
4  how many sales each employee was making?
5      A.   No.
6      Q.   Was anyone terminated for not meeting a
7  certain amount of sales within a given time period?
8          MS. TIERNEY:  Are you talking about '16
9  and '17?
10         MS. MENDOZA:  Yes.
11         THE WITNESS:  No.
12  BY MS. MENDOZA:
13     Q.   Okay.  And did employees receive promotions
14  for exceeding a certain amount of sales at that time?
15     A.   In that time period, no.
16     Q.   Okay.  So in that time period, did it matter
17  how many sales each employee was making?
18     A.   No.
19     Q.   Okay.  Do you know if at that time period
20  Kristina was making -- exceeding a certain amount of
21  sales?
22     A.   She was definitely a top producer.
23     Q.   Okay.  Did you find that odd?
24     A.   No.

Page 48

Q.   Did you question why -- withdrawn.  Did anyone question why she was a top producer?

MS. TIERNEY:  I object to the form.  You can answer.

THE WITNESS:  No.

BY MS. MENDOZA:

Q.   Okay.  Do you know if there was any investigation into her being a top producer?

A.   No.

Q.   Okay.  And I guess we will enter this in as an exhibit.

You said that after -- withdrawn.  Why was Kristina terminated?

MS. TIERNEY:  I object to the form.  You may answer.

THE WITNESS:  She was terminated from Asset Protection for not following policy and procedure.

BY MS. MENDOZA:

Q.   And did you have any conversations with HR regarding Kristina's termination?

A.   After to try to understand what happened so I could help our team --

Q.   Okay.

Page 49

A.   -- so that other people didn't make the same mistake.

Q.   And what were those conversations?

A.   You know, honestly, to be very honest, I didn't remember them at all.  But it looked like I had just asked them about, you know, is there any learning from this?  What could I learn from this and you know, it definitely had to do with, you know, associates going over limits and things like that.  Not any great deal of content, so to speak, as there never is.

Q.   Okay.

A.   And that's for the privacy of our associates, obviously.

Q.   Okay.  So during those conversations, what were the specific reasons for why she was terminated?

A.   I don't have that handy right now.  I was shared on one e-mail because I totally did not recall it.  And I am sure it said something very brief about it.  But I don't recall it off the top of my head.  So I don't want to misquote something.

Q.   Okay.  I will pull it up --

A.   Thank you.

Q.   -- to refresh your memory.

A.   This is where the senior citizen age is

Page 50

hitting, sorry.

(Exhibit viewed on Zoom screen.)

BY MS. MENDOZA:

Q.   It is BLM1534.  So you see the document in front of you?  It says BLM bottom right?

A.   It says it.  Yes, I remember this.  I did not remember this but yes.

Q.   Okay.  So if you look at the bottom right-hand corner of the page, we can scroll down?

A.   It says BLM 001534.  It is bates stamped BLM 001534, and then the next page is the BLM 001535.  Do you see that there?

MS. TIERNEY:  I would admonish the witness to read the full exhibit before responding to questions, please.

(Witness reads document.)

BY MS. MENDOZA:

Q.   Okay.  You see it?

A.   Yes.  He is telling me to reinforce old policies and procedures.  That is kind of how I remember it, yep.

Q.   Okay.  And you've looked through the document?  The two pages?

A.   Yep, I see it.  It's a typical response of

Page 51

not knowing anything, yes.

Q.   Okay.

A.   And that is how I recall it.

Q.   So prior to this conversation, what was your understanding of Kristina's employment status?

A.   Prior to this?

MS. TIERNEY:  I object to the form.  You can answer.

THE WITNESS:  Prior to this?

BY MS. MENDOZA:

Q.   Yes.

A.   Prior to this, she was, you know, she was doing a good job.  I believe her service skills could have been enhanced a little bit.  We call it savoir faire in terms of her product knowledge and in terms of her presentation skills.  But overall, she was giving a good client experience and was pretty consistent and reliable.  So I would say, you know, an associate in good standing.

Q.   Okay.  So my question is more specific to right before this e-mail was sent to you from Richard because at the bottom it says it is June 16th.  BL001535 on June 16, 2017, at 1:02, Richard Law sent to you and Dennis that Kristina had been terminated.  Do

Page 52

1 you see that there?

2   A.   Yes.

3   Q.   So that's why I am asking if -- before that,

4 if you had another e-mail or correspondence

5 communication with Richard Law regarding Kristina's

6 employment status?

7   A.   Richard Law and I have very little

8 communication with one another over the years.  Like, I

9 didn't really recognize his name until I saw this

10 document so, no, I would say for the most part.

11   Q.   Okay.  So before -- so then after that

12 e-mail you respond, correct, to Richard Law, and that

13 is where it says there it is sent June 16th at 1:10

14 p.m.?

15   A.   Is that where I say, Thanks for the heads

16 up?

17   Q.   Right there.

18   A.   Yep.

19   Q.   And in the CC in the e-mail, it is CC'd

20 Dennis Diaz and then Barbara Hoelz.  Who is Barbara

21 Hoelz?

22   A.   She was an HR representative.  I think she

23 was just temporary in our store at the time.  She might

24 have been permanent too.  Barbara Hoelz is a long-term

Page 53

1 Bloomingdale's HR executive, senior executive.

2 Michelle Ravkin -- I saw Michelle Ravkin.  It's not the

3 Michelle I thought.  Our director was Michelle.  I

4 thought I saw her name on here.  She was probably the

5 director of HR at the time, Barbara Hoelz.

6   Q.   Okay.  And if you want us to zoom in to make

7 it easier?

8   A.   Can you go up?  I thought I saw a different

9 Michelle on here who used to be -- no, it was my

10 mistake.  It is Michelle.

11   Q.   And Tinbite Yonas, who is that?

12   A.   That's another person I didn't deal with a

13 lot.  I believe she is in human resources.  On this

14 list I know Marisa Brown and Michelle Ravkin better.

15 They were -- they helped with talent acquisition.

16   Q.   Okay.  And Miriam Landymore, do you know who

17 that was?

18   A.   No idea.  Chris I know is part of Asset

19 Protection.

20   Q.   And Leeza Torres or Milesska Contreras?

21   A.   I would think Asset Protection since I don't

22 think they are asset partners.

23   Q.   Okay.  And then you see Richard Law's

24 response to you on June 16th?

Page 54

1   A.   Yes.

2   Q.   It says, I am not in this weekend.  My

3 suggestion would be to reinforce to all associates that

4 they are to adhere to all store policies and

5 procedures.  If they have any questions about a policy

6 and procedure, they should consult with a manager

7 before proceeding?

8   A.   That's where we would use that form that you

9 had up prior to have these kinds of meetings ongoing.

10   Q.   What form?

11   A.   The one that said the Chanel policy and

12 procedures with limits and things likes that.  We would

13 use those.  We would refer back to things in the code

14 of conduct.  We would constantly be trying to make

15 everyone aware of doing the right thing.

16   Q.   After you received that suggestion, what

17 policies or procedures changed.

18   A.   Nothing changed.  It was just better

19 communication of everything.  Just continuing to

20 communicate all the policies and procedures which we

21 have many in Chanel.

22 BY MS. MENDOZA:

23   Q.   Was there anything specific to what Kristina

24 was terminated for?

Page 55

1   A.   No; because we would always protect an

2 associate even if we knew specifically what it was.  We

3 still keep it under the more general guidance of policy

4 and procedure which is many aspects.

5   Q.   Okay.

6       MS. MENDOZA:  We can take that off the

7 screen.

8       (Zoom screen sharing closed.)

9 BY MS. MENDOZA:

10   Q.   Was Kristina terminated for shipping gifts

11 to states that did not -- so that she didn't have to

12 pay the tax?

13   A.   I did not know that.

14       MS. TIERNEY:  I object to the form.  You

15 may answer.

16 BY MS. MENDOZA:

17   Q.   I am asking do you know if that's why she

18 was terminated?

19       MS. TIERNEY:  I am going to admonish you

20 not talk about anything about conversations with

21 counsel.

22       THE WITNESS:  Only recently.

23 BY MS. MENDOZA:

24   Q.   Okay.  Do you know if at the time of her

Page 56

1 termination -- did you have any conversations with
2 Christopher Castellani regarding her termination?
3     A.   I believe it was very similar to the e-mail
4 that I sent.  Is there any learning?  Is there anything
5 I could do?  And I think it was very general like that
6 and got a very general response.
7     Q.   So did you have any verbal communications
8 with Christopher?
9     A.   Of course, we are colleagues, and he covers
10 our Chanel door so, yes.
11     Q.   Okay.
12     A.   But not about this specifically.
13     Q.   Okay.  And what do you mean by "he covers
14 the Chanel door"?
15     A.   So Asset Protection would help rotate guards
16 to cover our door.  So that's how I might, you know,
17 talk to him about, like, I might talk to him about
18 anything, like, are they leaning on the wall?  Are they
19 greeting customers nicely?  That type of thing.
20     Q.   Okay.  And -- but did you talk to
21 Christopher about Kristina's termination?
22     A.   Not that I can recall, no.
23     Q.   But did you have any written communication
24 with Christopher about Kristina's termination?

Page 57

1     A.   I believe there may have been one e-mail
2 that looked very similar to the one you just had up
3 there.
4     Q.   Okay.  To the extent that those exist, we
5 will be requesting those, and I will send it in writing
6 afterwards?
7         MS. TIERNEY:  I believe you have it
8 actually so...
9 BY MS. MENDOZA:
10     Q.   Okay.  All right.  At the time of Kristina's
11 termination, was there any suspicion that Kristina was
12 a reseller?
13         MS. TIERNEY:  I object to the form.
14         THE WITNESS:  No.
15 BY MS. MENDOZA:
16     Q.   Did anyone tell you at the -- did
17 Christopher or Richard tell you at the time of
18 Kristina's termination that there was an investigation
19 still being conducted into Kristina's purchases?
20         MS. TIERNEY:  I object to the form.
21         THE WITNESS:  No, I don't think so.
22 BY MS. MENDOZA:
23     Q.   Okay.  Did anyone tell you that they were
24 sending Kristina's purchases to law enforcement for

Page 58

1 investigation?
2     A.   No.
3     Q.   Did anyone tell you that they were sending
4 any -- around that same time, any of the other
5 employees' purchases to law enforcement?
6     A.   No.
7     Q.   Okay.  After Kristina left, was there an
8 investigation that was sent to law enforcement?
9         MS. TIERNEY:  I object to the form.  You
10 may answer.
11         THE WITNESS:  Not that I am aware of.
12 BY MS. MENDOZA:
13     Q.   Okay.  And at the time that Kristina was
14 terminated, was she considered a diverter?
15         MS. TIERNEY:  I object to the form.
16         THE WITNESS:  Not to me.
17 BY MS. MENDOZA:
18     Q.   Okay.  Did anyone tell you that they
19 considered her a diverter?
20     A.   At the time, no.
21     Q.   Okay.  At any time has anyone told you that
22 they have considered her a diverter employee?
23         MS. TIERNEY:  I just admonish the witness
24 not to talk about conversations with counsel because,

Page 59

1 technically, I am an employee.
2         THE WITNESS:  No.
3 BY MS. MENDOZA:
4     Q.   Okay.  So after Kristina left, were there
5 any changes into checking -- withdrawn.
6         Did Kristina say that other people were
7 doing -- do you know if Kristina said that other people
8 were doing the shipping to states to avoid paying sales
9 tax?
10         MS. TIERNEY:  I will object.
11         THE WITNESS:  No.
12 BY MS. MENDOZA:
13     Q.   Okay.  Did anyone tell you that's what
14 Kristina said at that time?
15     A.   Said what?
16     Q.   That other people were also doing the same
17 things she was doing?
18     A.   No.
19     Q.   Okay.  And before you mentioned about the
20 shipping was inhouse.  Shipping was inhouse in
21 Bloomingdale's, correct?
22     A.   Yes.  Bloomingdale's up until three years
23 ago, four years ago Bloomingdale's did all of our
24 shipping, yes.

Deposition of Cathy Younis                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 60

Q.   Okay.  So if I am an employee and I make a purchase and I want to ship to my aunt in New Jersey, does it go through Asset Protection before it gets shipped out?

A.   No.  The associate ringing the sale would be the one who is responsible for getting it to shipping.  And Chanel handbags specifically, we were a little bit, you know, sometimes we would help the associates and bring them up for them.  But it was really on the ringing associate to make sure that it is getting to shipping properly.

Q.   And when it gets to shipping, I guess, at any point in time from the purchase until it gets sent out or shipped out, does Asset Protection check those purchases?

A.   I really have no idea what they are checking or not checking.

MS. TIERNEY:  I object.  I want to make sure I have my objection in there.

THE WITNESS:  Yes.

BY MS. MENDOZA:

Q.   Was there any policy regarding either a Chanel policy or a Bloomingdale's policy that all items that were purchased will go through or double checked

Page 61

by Asset Protection?

MS. TIERNEY:  I object to the form.  You can answer.

THE WITNESS:  What Asset Protection does or does not do, I wouldn't really know.  So I don't think I can answer that.

BY MS. MENDOZA:

Q.   Okay.  Did you have any meetings with Asset Protection regarding policies or procedures?

A.   Yes.  They hosted multiple meetings for us.

Q.   Okay.  And what were those meetings about?

A.   Memo orders, diversion, fraud, you know, tricksters at the POS with putting the credit card in and pulling it in and out.  Just any, like, they were really good partners to us because of the desirability of our product.  We had, you know, many customers trying to do things that they shouldn't be doing, and unfortunately, some associates do.  So they were good partners in terms of education and trying to make people aware of some of the things that were not okay to do.

Q.   Okay.  So Asset Protection was monitoring what was happening in the store purchases made in the store, correct?

Page 62

A.   Total store, yes.

Q.   Okay.  What do you mean by memo orders?  Are those what you said before about phone orders?

A.   So, yes, now we have newer systems in place.  Macy's has made much greater systems to protect against fraud.  But back then, we had to -- if a customer was calling in a sale and we didn't have the credit card present, we would have to do a memo order or even if it was another associate calling from another store.  Whenever the card wasn't present, they would have to go through this big procedure of getting it authorized, and the cash office would call the client, verify the purchase, the shipping, and all of the above.  So it wasn't -- it was a policy in place, the memo orders, and this is company wide not Chanel to, you know, protect our customers from fraud.

Q.   Okay.  And do you know if Kristina was investigated for a memo order?

A.   No.

Q.   Okay.  And what type of training was done for diversion by Asset -- what type of training by Asset Protection?

A.   They came and they had -- they did several meetings for us, but I think the best one was probably

Page 63

when they created, like, this PowerPoint that really talked to different scenarios and really made things a very high level of awareness, I think.  They kind of, like, I am trying to remember who was in charge then.  We have had some different players in that role, but they did a really nice job.  I know they are no longer with us whoever did it.  But it was probably one of the better ones, but often it was just really referring to the employee handbag or policy and procedure of memos that were out on what to do and what not to do.

Q.   And was that PowerPoint after Kristina's termination or before?

A.   I am not sure to be honest.  It was five years ago.

Q.   Okay.

A.   But I can say for sure we had multiple meetings.  Like, this is a topic that we talked about.

Q.   Okay.  Was there any change in the policy limits for the handbags at that time during Kristina's employment when there was a discount, an extra sale, an extra discount?

MS. TIERNEY:  I am going to object to the form, but you can answer.

THE WITNESS:  Just the ones we have been

Page 64

talking about, the 24 handbags a year and the two per
purchases.  Pretty much what we do for the customer
would apply for the associate too.  For the most part,
I think that would be the right answer.
BY MS. MENDOZA:
    Q.   Okay.  What were the shoe limits during that
time?
    A.   I don't recall.  '16, '17, I am not sure.  I
would have to look at the handbook.
    Q.   Okay.  Do you know if the shoe limits ever
changed?
    A.   Not like handbags, no.
    Q.   So when it went lease -- pre-lease or after
lease?
    A.   Shoes it's not leased.  It is still only
business.  What is there is what it is, but I am not
saying that officially.
    Q.   But the lease post and pre-lease doesn't
apply to shoes; is that correct?
    A.   No.  It is its own business and still
continues to be.
    Q.   Okay.  All right.  So I will enter Exhibit
-- Plaintiff's Exhibit 3, I think, discount and
employees.

Page 65

        (Exhibit viewed on Zoom screen.)
        Take a minute to look through this
document.  This is bates stamped at the bottom right
00197.
        MS. TIERNEY:  As with the previous
exhibits, I would ask that the witness review
everything before you start questioning her.
        THE WITNESS:  I am saying at the top
where it says, Hey, Sanela.  Is that the top of it?
BY MS. MENDOZA:
    Q.   Yes.
        VIDEO TECHNICIAN:  Would you like me to
pass over the control to the witness?
BY MS. MENDOZA:
    Q.   So, Ms. Younis, you can scroll?
    A.   Oh, I can scroll.  Okay, thank you.
        Where it goes Hi, Amapara, am I supposed to
be reading that too.
    Q.   Yes.  You can scroll through the whole
thing?
    A.   So I am assuming she is asking these
questions after she left.  Is that what she is saying
to Amapara?
        MS. TIERNEY:  And I would admonish the

Page 66

witness to read the exhibit and not to guess or
speculate.
BY MS. MENDOZA:
    Q.   I will ask you the questions after you are
done reviewing them.
        MS. TIERNEY:  Yes.  The main thing is you
read the whole thing, and then let the attorney ask
questions.
        (Witness reads document.)
        THE WITNESS:  Okay, I read it all.
BY MS. MENDOZA:
    Q.   Okay.  We will go back to the first page.
These are text messages between Kristina and coworkers.
The first one says Hey, Sanela, I have you my Sunday.
Do you know who Sanela is?
    A.   Yes.
    Q.   Who is that?
    A.   She is a fashion advisor in Chanel
Accessories, and she is still with us.
    Q.   And she worked with Kristina in the
Accessories department; is that correct?
    A.   Yes.
    Q.   Okay.  And then it says, I have a question,
was there a limit to how many handbags we can purchase

Page 67

during the sale?  The ones that were on additional.
        Do you see that?
    A.   Yep.
    Q.   So before I was asking you was there any
difference in the policy when there was a sale going
on.  So my question is, again, same as here, is there
any -- was there a limit?  A change in the limits --
handbag limits when there was a sale?
    A.   So this, what they are referring to in this
chain is not a sale.  These were one-off bags that were
old age that we created as special employee events for.
So this was only available to employees.  And we would
pull the bags to a special designation because these
were bags that, basically, we were going to sell back
to Chanel at pennies apiece so to speak.
        So when you said before limits, I just
thought you meant normal limits.  But this specific
what they are talking about here is what we would have,
these one off, like, maybe once a year kind of big
Chanel sales.
    Q.   Okay.  So during those big Chanel sales if I
was an employee and I purchased 24 and I purchase two
more so I am at 26 because of that extra sale, would I
be considered violating the policy?

Case 1:19-cv-08927-GBD-SLC   Document 128-3   Filed 09/20/23   Page 21 of 56

Deposition of Cathy Younis                                  Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 68

A.   No.  Because these were, like, liquidation handbags.  These were, like, final.  What they are saying here is true.  There wasn't really a limit on these handbags.  This wasn't considered the day in and day out policy.

Q.   Okay.  So how did -- withdrawn.  So how would Bloomingdale's or Macy's know that someone -- handbag purchases were the 24 -- withdrawn.

I guess how would they know if I purchased the extra two from this sale?  That it's not being counted towards the 24 policy limit?

A.   These sales were so far and few between and the dates were well known, and these were not supposed to be purchased as gifts.  These were for yourself because these were deeply discounted bags, and it would show how deeply discounted they were.  So for the most part by the time they got 40 or 50 or whatever it was with their 20/20, there was no way you could purchase a bag like this any other time of the year except for on these consolidation sales.  We never had a pricing like this, and we had to get permission from Chanel to do these sales.

Q.   So would the price show up, though, on the account as the full price?

Page 69

A.   You would see the original and you would see the discounted, and it is crystal clear that, you know, something was purchased on this if you were looking at it.

Q.   Right.

A.   No.  I wouldn't be looking at that because I don't see that level of detail.

Q.   Who would be looking at that?

A.   I think someone from AP could probably see something to this level.  They have screens that we don't, but we won't see this.

Q.   Okay.  So you wouldn't see the actual price that was paid you are saying?

A.   Oh, no -- well, we don't see history on an employee purchasing.  It is really Asset Protection that has those screens not sales managers.

Q.   Okay.  But on a Bloomingdale's account, would it show up that -- I guess is the discount taken out back of house?

A.   The first discount is front of house which is wise since Chanel doesn't do a discount front of house.  It would be so obvious the 20/20 or whatever the back offers was would be back of house.  It would show original and sale on the receipt.

Page 70

Q.   Right but not the final sale or yes, the final sale?

MS. TIERNEY:  I am going to object to the form.  You can answer.

THE WITNESS:  The final sale, yes, it is seen if you have the ability to see those screens.  I do not have that ability to see that.  Nor would any of my executives.

BY MS. MENDOZA:

Q.   Okay.  Would HR?

MS. TIERNEY:  I am going to object to the form.

THE WITNESS:  I don't know what they can see and can't see honestly.

BY MS. MENDOZA:

Q.   Okay.  So we will keep going.  Hi, Kristina, so she responds, Sanela.  And then the next message is, I just remember from Kristina that I just remember Cathy telling us we had no limits on any of the additional merchandise on sale so I wanted to confirm.

So that's correct, right?  That statement is correct?

A.   For the special sales that would happen, like, once a year.  I think one year maybe we had two;

Page 71

yes.  By the way, these special sales went away once we went lease, obviously.

Q.   Let me keep going.  The next page it is the same thing.  The next conversation, who is Amapara?

A.   She is also an FA in Chanel Accessories and is still there.

Q.   And she worked with Kristina; is that correct?

A.   Yes.

Q.   Okay.

MS. MENDOZA:  If we can rotate the page.

(Video technician rotates the page.)

MS. MENDOZA:  Thanks.

BY MS. MENDOZA:

Q.   Kristina asks, I have a question.  Was there a limit to how many handbags we could purchase during sale?  The ones that were on additional?

A.   What she is referring to is the big sale, yes.

Q.   Okay.  And then she says, Miss you too.  No, there's no limit, right?

Okay.  The next page Kristina writes, Hey Kemi.  Do you know who Kemi is?

A.   Yes, she is also an FA in Accessories.

Deposition of Cathy Younis                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 72

1   Q.   She worked with Kristina; is that correct?

2   A.   Yes.

3   Q.   And she still works there; is that correct?

4   A.   Yes.

5   Q.   And she wrote -- Kristina wrote, I just have

6   a question, was there a limit to how many handbags we

7   can purchase during sale?  The ones that were on

8   additional, right?  And then Kemi responds, No limit on

9   the 60/20/20.

10  A.   When you use the word "sale," that is any

11  sale.  But this is, again, they are being very

12  specific.  We did have some of them only 50/20/20, but

13  what they are referring to in this e-mail thread are

14  these one-off events that happened and like, literally,

15  it was, like, once a year.

16  Q.   Okay.  Is that different than the 60/20/20?

17  A.   No.  It was either one or the other.  So I

18  think the least amount was 40/20/20.  And then we had

19  50/20/20 and 60/20/20 --

20  Q.   Okay.

21  A.   -- over the different years.  That is over a

22  course of five years that I am talking about.  So one

23  year could be slightly different depending on how much

24  stock we were left with.

Page 73

1   Q.   Okay.  So to be clear then, that sale, this

2   one-off sale would either be 60/20/20 or 40/20/20 or

3   50/20/20; is that correct?

4   A.   Yes.  It could be anywhere from 40 to 60

5   percent front office, and then they get the 20/20 the

6   back of the house.

7   Q.   Got it.  And --

8   A.   Because this was a liquidation, we were

9   trying very hard to get rid of it.  We did not hold

10  them to the limits on this one specific day.

11  Q.   Right.

12  A.   Usually they were two-day events to be

13  honest with you.

14  Q.   Okay.  All right.  So we can take the screen

15  off or take the page off?

16       (Zoom screen sharing closed.)

17       MS. TIERNEY:  Melissa, we have been going

18  about two hours now.  If you are at a stopping point or

19  if you want to go forward a little bit more and then

20  take short breaks.

21       MS. MENDOZA:  No.  This is a good

22  stopping point.

23       MS. TIERNEY:  So you want to say 10

24  minutes?

Page 74

1        MS. MENDOZA:  Yes.

2        MR. GERBER:  Thank you.

3        MS. TIERNEY:  Thanks, guys.

4        MR. GERBER:  Ms. Younis, you can close

5   your video if you want to.

6        THE WITNESS:  Yes.

7        (A brief recess was taken from 11:58 a.m.

8   to 12:10 p.m.)

9   BY MS. MENDOZA:

10  Q.   So, Ms. Younis, when there was that special

11  sale, was there any -- were the shoes also on sale?

12  A.   There could have been one or two times that

13  happened, yes.

14  Q.   And the same would apply that shoes would

15  not go towards the limit?  The shoe limit?

16  A.   I believe so, yes.

17  Q.   Who was in charge of making those policies?

18       MS. TIERNEY:  I object to the form.  You

19  can answer.

20  BY MS. MENDOZA:

21  Q.   I can be more specific.  Who is in charge of

22  making the policy that those extra sales like you said

23  the Chanel -- withdrawn.

24       Who was pushing for that?  Those purchases

Page 75

1   to be sold?

2   A.   I don't think anyone was pushing for it.

3   Q.   Was Bloomingdale's the one that was saying

4   these are now going on 60 or 50 or 40/20/20 sale?

5   A.   That would be the buying organization --

6   Q.   Okay.

7   A.   -- that determined that.

8   Q.   Okay.  And so would Bloomingdale's also be

9   the decision maker to the fact that those purchases

10  don't count towards the handbag limit or shoe limit?

11  A.   Yes.

12  Q.   Okay.  And did you -- I asked you previously

13  if you had any conversations with Christopher

14  Castellani regarding Kristina's termination.  Did you

15  have any conversations with Dennis Diaz surrounding

16  Kristina's termination?

17  A.   I am sure we probably were trying to guess

18  as to what happened exactly from a policy and procedure

19  standpoint.  Yes, I am sure we did have some

20  conversation.  We would have talked about scheduling.

21  We would have talked about a lot of things.

22  Q.   Okay.  Did you discuss the reasons for her

23  termination?

24       MS. TIERNEY:  Objection.  You may answer.

Page 76

THE WITNESS:  I am not sure because I don't really recall the conversation.  So it is hard to answer.

BY MS. MENDOZA:

Q.   Okay.  What do you recall of the conversation?

A.   I don't recall anything.  Really to be honest, like, there is very little -- I don't remember us really spending a great deal of time on this topic to be honest.

Q.   Okay.  Did you inform Dennis that Kristina was terminated?

A.   We both found out together in that e-mail.

Q.   Okay.  And did Dennis tell you that he was having -- withdrawn.  Did Dennis tell you if there was any concerns regarding Kristina's purchases?

A.   Not that I recall, no.

Q.   Okay.  Was Dennis having -- are you aware if Dennis was having any separate conversations with Asset Protection prior to Kristina's termination?

A.   No.

Q.   Okay.  And any separate conversations with HR?

A.   No.

Page 77

Q.   Did you work with -- withdrawn.

How did the union work with Bloomingdale's?

MS. TIERNEY:  I object to the form.  You can answer.

THE WITNESS:  I have no idea.  You know, as far as the union, I just understand the policy and procedure in our handbook and really, that's a union that serves the associates.

BY MS. MENDOZA:

Q.   Okay.  Did you work with the union or did you have to correspond with the union as part of your daily duties?

A.   Never.

Q.   Were they to be made aware of policy limits or purchases by the employees?

MS. TIERNEY:  I object to the form.  You may answer.

THE WITNESS:  I have no idea whether human resources would tell them or not tell them.

BY MS. MENDOZA:

Q.   Okay.  But in the Chanel department, you didn't speak to a union person?

A.   No.

Q.   Were there union reps that were also

Page 78

employees -- withdrawn.

Were there union members that were, I guess, shop stewards that were also employees?

A.   We have one now, but I don't believe he was then.

Q.   Okay.  And who is it now?

A.   Eric.

Q.   Is that Eric Gutierrez?

A.   Yes.

Q.   And so was his -- can you elaborate on what his position is?

A.   He is a shop steward.

Q.   And that is for the union?

A.   He works for Bloomingdale's, but he is a shop steward.  That's all I know.

Q.   Okay.  And did he become a shop steward after he was employed by Bloomingdale's?

MS. TIERNEY:  I object to the form.

THE WITNESS:  To the best of my knowledge, yes.

BY MS. MENDOZA:

Q.   Okay.  Do you -- in your position, did you inform employees' addresses that employees were not allowed to ship to?

Page 79

MS. TIERNEY:  I am going to object to the form but you can answer.

THE WITNESS:  Can you be more specific?

BY MS. MENDOZA:

Q.   Could you tell employees that they are not allowed to ship to certain addresses that -- withdrawn.

Were there any in your experience in your position for Chanel, were there any diverters?  Employees that were diverters?

MS. TIERNEY:  I object to the form.  You can answer.

THE WITNESS:  No.

BY MS. MENDOZA:

Q.   Were there any that were found to be reselling?

MS. TIERNEY:  I object to the form.  You can answer, if you know.

THE WITNESS:  Again, I wouldn't know.  You would need to ask Asset Protection.  I wouldn't know that.

BY MS. MENDOZA:

Q.   Okay.  And so if -- were there any addresses that employees were shipping to that was no, you cannot ship to this address list?

Deposition of Cathy Younis                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 80

A.   We did get to that point with Chanel, but I don't know if that was during her tenure when that happened.  But we did get to a point where there were known diverters for addresses that we did not ship to.  So the exact date that happened, I am not sure, but we did get to that.

Q.   Okay.  And that was based on Asset Protection's investigations?

A.   A combination of our AP and Chanel's, I believe, was how they got to these addresses.

Q.   Okay.  And when you say "Chanel," what do you mean by that?

A.   Chanel's Asset Protection.  So they have their own department, and I know the two departments work very closely together.

Q.   Okay.  And during Kristina's employment, was there a Chanel Asset Protection department?

A.   Yes.

Q.   Okay.  And did you -- in your position, were you -- did you supervise that Asset Protection department?

A.   No.

Q.   Okay.  Who was the Asset Protection -- Chanel's Asset Protection head or director?

Page 81

MS. TIERNEY:  I object to the form.  You can answer.

THE WITNESS:  I believe Paige Thompson.  Whether she goes back five years, I am not actually certain, but I am pretty sure she does.

BY MS. MENDOZA:

Q.   Okay.  What was the difference between -- withdrawn.  Did that Asset Protection department have any training or specific policies for Chanel that was different than the regular Bloomingdale's Asset Protection?

A.   If we are talking about the time period that we were owned business, they just help support our Asset Protection.  They were not directing any policies or anything.  Once we went lease, a little bit more specific information.

Q.   Okay.  But I think we discussed this before that post lease, once you had leased -- but that was -- was that after Kristina's employment?

A.   Yes.  So only as we are just staying with Kristina, they just really -- they had little or no involvement really with us.  It was more with the Asset Protection to Asset Protection.

Q.   And so going back to the addresses and the

Page 82

known diverters, that was the Chanel AP, correct?

A.   No.  It was, I think, a combination of the two working together.

Q.   Okay.

A.   Yes.

Q.   Okay.  Did Chanel handbags have an authenticity card?

A.   Yes.  It did then, yes.

Q.   Okay.  When we say "then," we are saying during Kristina's employment, correct?

A.   Exactly.

Q.   And what were those for?

A.   To prove that the bag was authenticate.  So there was a hidden number on the bottom of the bag that matched the card.  And that was the way that we could tell if a bag was an authenticate Chanel bag.  It was, basically, the passport for that bag, I guess, is the best way to describe it.

Q.   Okay.  And do you know if that could also be used to track resellers?

A.   I would think so, yes.  Not formally but yes, using my intellect, yes, of course.

Q.   Right.  So do you know if anyone has ever been caught reselling based on those cards?

Page 83

A.   I don't.

Q.   Okay.  If an employee is sending to the same address as another employee, does that get flagged?

MS. TIERNEY:  I object to the form.  You can answer.

THE WITNESS:  Not that I am aware of.  It should.  But I am not sure if it does and who it would flag to.  I would think that maybe it flags to AP, but I don't have the exact answer on that.

BY MS. MENDOZA:

Q.   Okay.

MS. MENDOZA:  Let's pull up 158.

(Exhibit on Zoom screen.)

BY MS. MENDOZA:

Q.   Take a look at the document and when you are done reviewing it, let me know, and I will start asking my questions.

A.   (Witness reads the document.)  Okay.

Q.   At the bottom of the page it says -- the first page, it is bates stamped Mikhaylova 00158.  Do you see that there?  And then at the bottom of the next page, it says Mikhaylova 00159.  Do you see that there?  Those bates stamped numbers?

A.   Yes.

Page 84

Q. Okay. So this is from Kristina Mikhaylova. It's a Grievance and the date is June 20, 2017, and it is sent to Shawn Cavanaugh, the union rep. So where I want to turn your attention towards is the bottom of the second paragraph where it says, As far as me shipping the merchandise, I was advised by Victoria. Do you see that there?

A. Yep.

Q. When I first started that we were allowed to offer customers as well as coworkers to ship to a state with no Bloomingdale's or Macy's to save on tax.

Do you see that there?

A. Yep.

Q. Is that true?

A. No. There is a lot of falsehoods in this statement and throughout.

Q. Okay. So what's not true about that statement? What I just asked you about that one line?

A. So if you read our policies and procedures, you should not be trying to save on tax. It's a tax law, and we follow the laws very carefully at Macy's.

Q. Okay.

A. So we shouldn't be encouraging that by any means.

Page 85

Q. Right. Okay. So you are saying that there was no policy or there was no suggestion that you could offer to customers or coworkers to ship to a state with no Bloomingdale's or Macy's?

A. Not that I am aware of. And it is against everything that we are saying in terms of shipping to the billable address.

Q. Okay. But if I am --

A. If I am shipping a gift, I wouldn't be selling it to a customer to save on tax. If I am shipping a gift, I am shipping it to a gift recipient.

Q. Right. I guess that goes to my previous question. How could I be using the recipient's credit card?

A. I have no idea. You shouldn't be.

Q. Right. So then how could anyone make purchase gifts for people?

A. You can purchase a gift. You are purchasing the gift using your criteria. Of course, you can purchase a gift. We are a gift-giving business, but what you are saying is inaccurate.

Q. Right. But you can't ship to -- but you have to ship to the billing address. So --

A. At this point in time with Bloomingdale's, I

Page 86

believe you could ship a gift to a gift recipient.

Q. Okay. But did you have to have the same billing address?

A. For the credit card, yes. The shipping to -- only to the billable address even if it is a gift is what we did. So at this time we allowed them to ship to sell a gift as I said earlier. So the difference is now with Chanel since we have been leased, it must be shipped to the billable. It's not our responsibility to get your gift to the gift recipient. We want to make sure that it's going to the end user. At this point in time while it was Bloomingdale's own business, you could ship a gift to the gift recipient.

Q. Not to the billable address?

A. Yes.

Q. Okay. So it says in the next line afterwards looking back at the document, We do it constantly in our department to both customers and coworkers and it has not been a problem.

Do you see that there?

A. Yes.

Q. Did you ever see that being done?

A. No.

Q. Okay. So --

Page 87

A. And for the record, I would like to say we do not hold these sales monthly like she states also. That is, in fact, an egregious lie at best. We had two in a year and most years it was one. So saying that we did this monthly is --

Q. Okay. So my question, though, is about this bottom end of the paragraph there. It says that, We do it constantly in our department to both customers and coworkers.

A. Do what?

Q. Did you ever hear any of your employees saying that there is -- you could ship it to a location that does not have a Macy's or a Bloomingdale's?

MS. TIERNEY: I object to the form. You can answer, Cathy.

THE WITNESS: No.

BY MS. MENDOZA:

Q. Okay. And it says there afterwards in the next page, Managers are all aware that we do this, and never gave anyone any problems. Do you see that there?

A. Yes.

Q. And you are saying that's not true?

A. For myself, I can only speak for myself, no. And, in general, I don't think leadership is aware of

Page 88

1 that.
2    Q.   Okay.  Were there any policies or any --
3       MS. MENDOZA:  We can take this off the
4 screen.
5       (Zoom screen sharing closed.)
6 BY MS. MENDOZA:
7    Q.   Any conversations regarding location that
8 did not have any Bloomingdale's or Macy's?
9       MS. TIERNEY:  I am going to object to the
10 form.  You can answer.
11       THE WITNESS:  No.  I am really not aware
12 of that as being, like, a thing so to speak.
13 Especially a thing like it's being mentioned in this
14 grievance letter.
15 BY MS. MENDOZA:
16    Q.   Okay.  So at that time or before that time,
17 did you ever ring up an employee to send a gift to --
18 that was sending a handbag as a gift to another
19 address?
20    A.   Me personally?
21    Q.   Yes.
22    A.   I really don't use the registers.  So if I
23 rang something, it was someone guiding me through it
24 because I couldn't ring a transaction if my life

Page 89

1 depended on it.  So I don't think that probably
2 happened unless someone was guiding me through a
3 transaction.
4    Q.   Okay.
5    A.   And I was trying to do something for
6 someone.
7    Q.   Okay.
8    A.   No, I didn't really ring the register.
9    Q.   Okay.  So who trained for the registers?
10    A.   There was Macy's POS, I believe, and they
11 went through that on-boarding training and the business
12 managers.
13    Q.   Okay.  So at that time it would have been
14 Dennis; is that correct?
15    A.   Yes.
16    Q.   Okay.  Does Chanel do their own
17 investigation into boutiques?
18       MS. TIERNEY:  I am going to object to the
19 form.  You can answer.
20       THE WITNESS:  I believe Chanel certainly
21 has leased, yes.  But before I think they were just
22 trying to make sure that we were doing business the
23 right way.  So it's the products limits and not
24 encouraging diversion.

Page 90

1 BY MS. MENDOZA:
2    Q.   Okay.
3    A.   And they did that with their Asset
4 Protection partners not with me as the director.
5    Q.   Okay.  Did you have any conversations
6 regarding any investigations into boutiques?
7       MS. TIERNEY:  I am going to object to the
8 form.  You can answer.
9       THE WITNESS:  With who?  Are you saying
10 with Chanel's Asset Protection or with Bloomingdale's?
11 BY MS. MENDOZA:
12    Q.   First, with Chanel's Asset Protection?
13    A.   So just general conversation of things to be
14 aware of, like I said, minimal contact with Asset
15 Protection from Chanel.  But they did come through the
16 boutiques maybe once a year or you know, a few times.
17 So it was minimal, but you know, things to be watching
18 out for and things like that.  Very general.
19    Q.   Okay.  When I am saying "boutiques," I am
20 meaning, like, if there is any reselling boutiques like
21 a known unauthorized, I guess, dealer, right?  So did
22 you have any conversations with Chanel's Asset
23 Protection regarding unauthorized stores?
24    A.   No, I don't think so.  I am not sure, but I

Page 91

1 don't think so, no.
2    Q.   Did you have any conversations with any --
3 with Bloomingdale's Asset Protection regarding
4 unauthorized stores?
5       MS. TIERNEY:  I am going to object to the
6 form.  You can answer.
7       THE WITNESS:  Do you mean other
8 Bloomingdale's stores selling our product?
9 BY MS. MENDOZA:
10    Q.   Yes.
11    A.   Is that the question?
12    Q.   Yes.  Non-Bloomingdale's stores selling
13 Chanel?
14       MS. TIERNEY:  I object to the form.  You
15 can answer the question, Cathy.
16       THE WITNESS:  I am not sure what the
17 question is that I am answering.
18 BY MS. MENDOZA:
19    Q.   Yes.  So I am asking if there was any -- if
20 there were any -- have you had any conversations
21 regarding investigations into a store that was found
22 out to be having -- to be selling items that were
23 Chanel items that were not -- I guess, that were not
24 supposed to be sold by them?

Page 92

1    MS. TIERNEY:  I am going to object to the
2  form.  You can answer, Cathy.
3    THE WITNESS:  I am still really unclear
4  on the question.  I am sorry.
5  BY MS. MENDOZA:
6    Q.  That's fine.
7    A.  I am so sorry.
8    Q.  Are you aware if there is any stores that
9  are or have been known to be reselling items -- Chanel
10  items that they shouldn't be selling?
11    A.  When you say "stores," do you mean
12  Bloomingdale's stores or just other retailers in
13  general?
14    Q.  Other retailers?
15    A.  No, I am not aware.
16    Q.  Okay.  And so have you had any conversations
17  with Asset Protection, Chanel, regarding investigations
18  into these other stores?
19    A.  In other stores, could you mean resellers?
20    Q.  Yes.
21    A.  Perhaps, yes, I don't think it was during
22  this time, but it was probably while we were leased but
23  yes.
24    Q.  Okay.  So my next question is:  When did you

Page 93

1  have those conversations?
2    A.  I think more recently since we have been
3  leased, like, within the last five years.
4    Q.  Okay.  And what was the outcome of those
5  investigations?
6    A.  So just making sure our associates were
7  crystal clear that reselling on a platform like
8  The RealReal or something like that is not allowed.  So
9  just more for a clarification of policy and procedure.
10    Q.  Okay.  Were any employees found to be
11  reselling?
12    A.  Not that I know of, no.
13    Q.  Okay.
14    A.  I mean, nothing was ever brought to my
15  attention.
16    Q.  Okay.  Do you know what the Macy's Credit
17  and Customer Service Card Company is?
18    A.  Say again.
19    Q.  Like, there is a Macy's Credit and Customer
20  Service, Inc.  It's a separate company.  Do you know
21  anything about that?
22    A.  Really not enough, no.
23    Q.  That's fine.  So are you aware of any of
24  Chanel employees' purchases being flagged because of

Page 94

1  their Bloomingdale's account?
2    A.  No.
3    Q.  Okay.  And do you know who Angie Lee is?
4    A.  Who?
5    Q.  Angie Lee?
6    A.  She was a past Bloomingdale's associates in
7  Accessories.
8    Q.  Okay.  Do you recall if she was terminated?
9    A.  I believe she was, yes.
10    Q.  Do you know why she was terminated?
11    A.  Policy and procedure.
12    Q.  Okay.  Was she a reseller?
13    A.  I don't know that specifically, no.
14    Q.  Do you know if she was -- do you know when
15  she was terminated?
16    A.  No.
17    Q.  Okay.  Do you recall -- withdrawn.  Do you
18  recall if she was being investigated for fraud?
19    A.  No.
20    Q.  And do you know who Idris is or was?
21    A.  Yes.
22    Q.  And who is that?
23    A.  He was a Chanel Accessory associate.
24    Q.  Was he terminated?

Page 95

1    A.  Yes.
2    Q.  Why was he terminated?
3    A.  Policy and procedure.
4    Q.  Okay.  And do you know anything about his
5  termination besides policy and procedure?
6    A.  Nothing was ever formally communicated to
7  us, but at that time, there was a lot of conversation
8  about fraud and credit cards.  Never directed towards
9  him but that was just a general of what was coming out
10  from AP in terms of our meetings that we were having at
11  the time.  Whether that was him or not, I have no idea.
12  I just know it was policy and procedure.
13    Q.  Okay.  What was discussed about that?  The
14  fraud and the credit cards at that time?
15    A.  As I said earlier, it was like the dipping
16  of the cards to make sure that we have the card
17  present, and that if somebody was pulling it in and
18  out, it might be a fraudulent card and just giving the
19  team a lot of awareness on credit cards and credit card
20  abuse.  So I do remember Asset Protection around that
21  time doing a lot of meetings for us to help us with
22  policies and procedures.
23    Q.  Was that after Kristina's termination?
24    A.  That was before.

Deposition of Cathy Younis                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 96

1   Q.   Okay.  And do you know if she was being
2  investigated at that time?
3   A.   No.
4   Q.   And you mentioned before about Asset
5  Protection in the store that was at the door of Chanel,
6  correct?
7   A.   Yes.
8   Q.   Was Bobby -- do you know who Bobby Booker
9  was?
10   A.   The name doesn't ring a bell.  Was he a
11  guard?
12   Q.   Do you recall if he was a member of the
13  Asset Protection team?
14   A.   No.
15   Q.   Okay.  All right.  Now I will ask you
16  questions about Kristina's pregnancy.  So what did you
17  know at the time about Kristina pregnancy?
18   A.   I really don't know if I knew about it pre
19  or post, but I know that she had a baby.  That's about
20  the extent of it.
21   Q.   Okay.  And how did you learn that she was
22  pregnant?
23   A.   I think through Dennis.  I think through
24  Dennis.  I don't think she directly told me.

Page 97

1   Q.   Okay.  And do you recall what Dennis told
2  you?
3   A.   That she was pregnant.  It wasn't a big
4  discussion.
5   Q.   Okay.  What are the Bloomingdale's policies
6  regarding pregnancies and maternity leave?
7   A.   Well, that is a subject I'm an expert on
8  while I couldn't give you a lot of answers for the
9  policies and procedures with the credit card.  So we
10  have a very generous FMLA leave of absence program for
11  our colleagues.  I just had two go out on very long
12  maternity leaves so, yes.  So it is, you know, we are,
13  I think, a great employer in terms of, you know,
14  recognizing moms that work.  And you know, giving them
15  the due time that they need off with their newborns.
16   Q.   Okay.  So what's the policy for requesting
17  any pregnancy-related accommodations?
18        MS. TIERNEY:  I object to the form.  You
19  can answer to the extent you know.
20        THE WITNESS:  You go to my HR, and you
21  fill out a form, and basically, it gets approved.  And
22  if you need extended time, you would just fill that out
23  again.  And if, you know, happen to have a C-section,
24  you get even more time, but we are very generous with

Page 98

1  the time off to our colleagues for, you know, for
2  having children.  I recently just had two, like I said
3  before, that took the entire summer off, you know, to
4  bond with their newborns.
5  BY MS. MENDOZA:
6   Q.   Okay.  When you say with HR, is that
7  Richard Law?
8   A.   If he was the person at the time, I would
9  think so, but I don't remember him being our HR person.
10  So I am not quite sure how he got in there.  I think at
11  that time it was Susan Wright.
12   Q.   Okay.
13   A.   Again, all of that you can do online through
14  My Insight.  I don't even know if you would go
15  downstairs and tell anyone about it.  You would just
16  fill it out on My Insight.
17   Q.   So at that time during Kristina's
18  employment, it was the same that you would do it
19  online?
20   A.   Yes.  So now we have an Ask HR, but before
21  it was called My Insight and yes.
22   Q.   And were there any accommodations given for
23  pregnancy-related conditions?
24        MS. TIERNEY:  I will object to that.

Page 99

1  Subject to that, you can answer.
2        THE WITNESS:  Yes.
3  BY MS. MENDOZA:
4   Q.   Okay.  What were those accommodations?
5   A.   If you need breaks, you know, additional
6  breaks or time off the floor or whatever, of course, we
7  are going to accommodate any needs you have.
8   Q.   Okay.  And who made those decisions?  Who
9  made those accommodations?
10   A.   Dennis would have in her case, yes, but the
11  business managers in general.
12   Q.   Okay.  And where do employees at the time --
13  how do they know who to make these requests to?
14   A.   It is in the employee handbook.  I mean, it
15  is pretty clear that we do all of these things and on
16  My Insight.  This is part of our whole -- why we are
17  the employer of choice, I mean.
18   Q.   And do you know if Kristina made any
19  accommodation request to Dennis?
20   A.   I am not aware of any, no.
21   Q.   Do you know if Kristina made any to HR?
22   A.   I am not aware of any, no.
23   Q.   Were you aware that Kristina was coming in
24  late?

Page 100

1   A.   No.

2   Q.   Do you know if Kristina was on leave at the

3   time that she was terminated on FMLA leave?

4   A.   No.  I don't think so because that would

5   have been something I would have been made aware of.

6   No.  Well, I wouldn't have been made aware of it

7   because she reports to Dennis.  No, I am not aware.

8   Q.   Would Dennis inform you if she was on FMLA

9   leave?

10  A.   I would hope so, yes.

11  Q.   So it -- so was Dennis required to inform

12  you of any employees that were on FMLA leave?

13  A.   I don't think required.  I think it is

14  assumed.

15  Q.   Okay.  And is Dennis still employed by

16  Bloomingdale's?

17  A.   No, he is not.

18  Q.   And why not?

19  A.   He parted ways with us.  He left and he

20  pursued a career in sales in Bergdorf Goodman, I

21  believe.

22  Q.   Was he -- did you ever reprimand Dennis?

23       MS. TIERNEY:  I am going to object to the

24  form.  You may answer.

Page 101

1        THE WITNESS:  I wouldn't reprimand anyone

2   in my 33 years of business, but have we had coaching

3   conversations?  Yes.

4   BY MS. MENDOZA:

5   Q.   Okay.  And what were those conversations

6   about?

7   A.   Selling savoir fair, business acumen, you

8   know, I think typical things that a director would

9   coach their sales manager on.

10  Q.   Did you take any disciplinary action against

11  Dennis?

12  A.   No.  We had a few very formal conversations,

13  but I don't think anything went to a final warning or a

14  warning that it was something that made it to a formal

15  system.  I think he kind of started to see, you know,

16  that maybe this wasn't what he really wanted to do to

17  lead a big team like this, and I think that's really

18  why he left us.

19  Q.   And were these conversations more formal

20  conversations after Kristina's employment?

21  A.   I have no idea.  I am not sure of the year

22  when Dennis left.  So that would help if I had that

23  timeline.

24  Q.   Okay.  Do you recall if the conversations

Page 102

1   were during that last year that he was employed?

2   A.   Yes.  Him and I did have conversations about

3   his performance in his last year with us, yes.

4   Q.   Okay.  Have there ever been any complaints

5   about pregnancy discrimination?

6   A.   Never.  Quite the opposite.

7   Q.   Okay.  And have there been any complaints

8   about -- also, pregnancy discrimination but also

9   pregnancy-related medical conditions?  Accommodations?

10  A.   No.

11  Q.   Okay.

12  A.   If anything to the opposite, you know.

13  Q.   Have there been any complaints about sexual

14  harassment?

15  A.   No.

16  Q.   Or sex discrimination?

17  A.   No.

18  Q.   Did you and Dennis use a software that kept

19  track of employees' information?

20       MS. TIERNEY:  I am going to object to the

21  form.  You can answer.

22       THE WITNESS:  No.  I mean, the form that

23  we use the most is the client sales report.  Are you

24  talking to -- like something like that?

Page 103

1   BY MS. MENDOZA:

2   Q.   No.  I am talking about just in general.

3   For instance, if he -- if Kristina came to him and told

4   him I need -- I am going to take FMLA or I need an

5   accommodation, would he have to input it somewhere that

6   is a software that you are also using?

7   A.   No.

8   Q.   Okay.  And just going up to the client sales

9   report, what is that?

10  A.   So that's a report that is in our business

11  intelligence reporting, and it shows us the total sales

12  for an associate, the amount of business they do with

13  clients from their book.  If a client has shopped with

14  them two or more times.  It is just a very high level

15  report that kind of is a nice report card for us to

16  look at in terms of how much business they are driving

17  from their books.

18  Q.   And how often are those reports done?

19  A.   We look at it pretty much weekly.

20  Q.   Okay.  And has any issues come up from those

21  reports?

22  A.   No.

23  Q.   And who conducts those reports?

24       MS. TIERNEY:  I object to the form.  You

Case 1:19-cv-08927-GBD-SLC   Document 128-3   Filed 09/20/23   Page 30 of 56

Deposition of Cathy Younis                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 104

1  can answer.

2       THE WITNESS:  Bloomingdale's

3  intelligence.  It comes from our central organization.

4  BY MS. MENDOZA:

5       Q.   Is that corporate?

6       A.   Yes.

7       Q.   Did you have any conversations about

8  Kristina's sales?

9       A.   No.

10      Q.   Okay.  And did Dennis ever complain about

11  Kristina's performance?

12      A.   Nothing that I can recall, no.

13      Q.   Did Dennis ever complain to you about

14  Kristina in general?

15      A.   No.

16      Q.   Okay.  So you said that the other --

17  withdrawn.

18       So has any employee ever been given breaks

19  and accommodations such as breaks?

20      A.   Yes.

21      Q.   Okay.  Do you recall what the medical -- was

22  it for a medical condition?  Or was it for a

23  pregnancy-related medical condition?

24      A.   I think we have had a combination.  I know

Page 105

1  we have had some foot surgeries on the team and

2  definitely for pregnancy purposes, and I am trying to

3  think of what else.  I think it is the foot surgeries

4  and pregnancies are the two biggest ones, yes.

5       Q.   Do you recall when they were?

6       A.   This is the problem with being here so long.

7  It is timelines.  Susan was probably about five years

8  ago that we were doing her foot surgery so I would say

9  about four or five years.

10       MS. TIERNEY:  Cathy, I am sorry.  Let's

11  not use people's names because we are talking about

12  medical issues.  If you could talk about or do initials

13  or something, I just don't want to violate anybody's

14  HIPAA.

15       THE WITNESS:  I agree that was wrong.

16       I would say over the last 10 years that

17  I've been there, those are the typical ones which are

18  pregnancies and surgeries.

19  BY MS. MENDOZA:

20      Q.   Okay.  Have there been more breaks --

21  withdrawn.

22       Have there been more accommodations given in

23  the past three years?

24      A.   No.  I don't think there is any difference

Page 106

1  over the 11 years that I've been there.

2       Q.   Okay.  And do you know if Kristina

3  complained about pregnancy discrimination?

4       MS. TIERNEY:  I object to the form.  You

5  can answer, Cathy.

6       THE WITNESS:  I did not know that.

7  BY MS. MENDOZA:

8       Q.   Okay.  Did you know that Kristina had

9  morning sickness or nausea?

10      A.   I didn't know that either.

11      Q.   Okay.  Did you know that Kristina had

12  tardiness issues?

13      A.   No.

14      Q.   Okay.

15       MS. MENDOZA:  That is pretty much all my

16  questions right now unless you are going to ask any

17  questions, but otherwise, I will reserve time, but I

18  think I am done.  I will take one final look, but I

19  think I am done.

20       MS. TIERNEY:  I don't think I have

21  anything.  Let me chat with Steve, but I don't think I

22  have anything, okay.

23       (A discussion was held off the record.)

24

Page 107

1       MS. MENDOZA:  I have one question.  I

2  will ask my last question.

3       For Betty, I don't know if you have

4  anything.

5       MS. TIERNEY:  No.  I'm not going to ask

6  anything.  I am done.

7  BY MS. MENDOZA:

8       Q.   Ms. Younis, if Kristina was shipping gifts

9  to family and friends out of state during her

10  employment, was she violating any policies?

11       MS. TIERNEY:  I object to the form.  You

12  can answer.

13       THE WITNESS:  I believe so.

14  BY MS. MENDOZA:

15      Q.   What policies would she be violating?

16      A.   The using of the credit card, I think, with

17  the shipping and whatnot.  I think some of that when

18  you were saying the same addresses as duplicate people

19  and things like that.  That didn't feel right to me

20  when you were explaining the whole scenario.

21      Q.   Okay.  I will rephrase it.  My question

22  right now is just if she is shipping to family and

23  friends in another state, was she -- would she be

24  considered violating any company policy?

Page 108

1    A.   As long as she wasn't going over her limits,
2  I would say.
3    Q.   So as long as she is not going over her
4  limits, she is not --
5    A.   At that period of time, it would be okay,
6  yes.
7    Q.   Okay.  All right.
8         MS. MENDOZA:  That's it for me.
9         MS. TIERNEY:  I have one question based
10 on that.
11 EXAMINATION BY MS. TIERNEY:
12   Q.   If she were shipping out of state gifts and
13 she was doing it to avoid paying state taxes in
14 New York, would that be a violation?
15   A.   Yes, that is, and I said that multiple
16 times.  Avoiding taxes is a -- it is all over our code
17 of conduct and trainings that we do.  You know, Macy's
18 is a big corporation, and we have to follow these state
19 laws for taxes and tax evasion.
20        MS. TIERNEY:  That is all I have.
21        THE WITNESS:  I didn't hear it that time.
22 That's why I said it differently.
23        MS. TIERNEY:  No.  You are fine.  I
24 wanted to follow up.

Page 109

1         THE WITNESS:  Yep.
2         MS. MENDOZA:  Thank you.  I am done.
3         MS. TIERNEY:  We will read and sign.
4    (Videoconference Deposition concluded at 1:05 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1            I, CATHY YOUNIS, have read the foregoing

2    transcript of the questions asked of me and the answers

3    given by me at my Videoconference Deposition on

4    November 14, 2022, and I find this to be an accurate

5    report thereof, except for the list of changes, if any,

6    listed below:

7    Page     Line

     ‾‾‾‾     ‾‾‾‾

8    Correction

9    _____

10   Page     Line

     ‾‾‾‾     ‾‾‾‾

11

12   Correction

13   _____

14   Page     Line

     ‾‾‾‾     ‾‾‾‾

15   Correction

16

17   _____

18   Page     Line

     ‾‾‾‾     ‾‾‾‾

19

20   Correction

21   _____

22

23

     ‾‾‾

24   Date                              _____

                                          CATHY YOUNIS

1                            CERTIFICATE

2

3              I hereby certify that the proceedings,

4     evidence and objections are contained fully and

5     accurately in the stenographic notes taken by me upon

6     the Videoconference Deposition of CATHY YOUNIS, on

7     Monday, November 14, 2022, and that this is a true and

8     correct transcript.

9

10

11

12            _____
                 LORI L. E. AGREN, CSR, RPR
13

14

15              (The foregoing certification of this

16    transcript does not apply to any reproduction of the

17    same by any means, unless under the direct control

18    and/or of the certifying reporter.)

19

20

21

22

23

24

Case 1:19-cv-08927-GBD-SLC   Document 128-3   Filed 09/20/23   Page 34 of 56

Deposition of Cathy Younis                                          Kristina Mikhaylova v. Bloomingdale's Inc., et al.

## WORD INDEX

< 0 >
**001534**  50:*10*, 11
**001535**  50:*11*
**00158**  83:*20*
**00159**  83:22
**00197**  65:4

< 1 >
**1**  3:*10*  26:3  30:4
**1:02**  51:*23*
**1:05**  109:4
**1:10**  52:*13*
**10**  5:*12*  6:*18*  73:*23*
  105:*16*
**10:11**  1:*18*
**10:36**  22:*18*
**10:40**  22:*18*
**10119**  2:3
**10120**  2:*12*
**108**  3:5
**10-minute**  38:*24*
**11**  10:*3, 6*  11:*6, 11,
12*  40:7  106:*1*
**11:58**  74:7
**112**  2:*11*
**11477**  2:6
**12**  27:7  29:22
**12:10**  74:8
**14**  110:*4*  111:7
**15**  1:*14*
**158**  83:*12*
**16**  11:22  17:*21*  47:8
  51:*23*  64:8
**16th**  51:22  52:*13*
  53:*24*
**17**  17:*21*  47:9  64:8
**18**  9:*23*
**18th**  2:*11*
**1989**  9:*12*
**19-8927**  1:5
**1st**  10:*8, 17*

< 2 >
**2**  3:*11*
**20**  18:*17*  84:2
**20/20**  68:*18*  69:22
  73:5

**2016**  11:22  14:*3*
  18:*18*  20:*19*  23:*3*
  26:*17*
**2017**  11:22  13:*23*
  14:*2, 3*  15:*17, 22*
  20:*19*  23:*3*  51:*23*
  84:2
**2022**  1:*14*  110:4
  111:7
**212**  2:*3, 12*
**24**  7:*4, 7*  18:*3, 9*
  19:*14*  28:*18, 24*  29:*8,
13, 24*  30:*1, 20*  31:5
  64:*1*  67:22  68:*8, 11*
**26**  67:*23*

< 3 >
**3**  1:*9*  3:*12*  64:*23*
**30**  8:4
**314)517-7814**  2:8
**33**  10:9  22:6  44:*13*
  101:*2*
**34th**  2:*11*

< 4 >
**4**  3:*4, 13*
**40**  68:*17*  73:4
**40/20/20**  72:*18*  73:2
  75:4
**400**  2:7
**4905**  2:2

< 5 >
**50**  68:*17*  75:4
**50/20/20**  72:*12, 19*
  73:*3*
**587-0760**  2:3
**59th**  10:*15*  18:*11*

< 6 >
**60**  8:*4*  73:4  75:4
**60/20/20**  72:9, *16, 19*
  73:2
**63141**  2:7

< 7 >
**792-6246**  2:*12*

< A >

**a.m**  1:*18*  22:*18*  74:7
**a/k/a**  1:9
**ability**  6:*24*  31:*15*
  70:6, 7
**able**  10:*24*  36:8, 9
  43:*15*  46:*1*
**absence**  97:*10*
**abuse**  22:*21*  41:*21*
  46:5, *10*  95:20
**Accessories**  4:*20*
  12:*16, 19*  13:2, *18*
  14:*5, 17*  66:*19, 21*
  71:5, *24*  94:7
**Accessory**  94:*23*
**accommodate**  99:7
**accommodation**
  99:*19*  103:5
**accommodations**
  97:*17*  98:22  99:4, 9
  102:9  104:*19*  105:22
**accomplish**  10:*24*
**account**  42:*17, 19, 24*
  43:7, *14*  44:6, *8, 17,
20, 21, 22*  45:*17*
  68:*24*  69:*17*  94:*1*
**accountable**  41:*3*
**accurate**  110:*4*
**accurately**  111:*5*
**acquisition**  53:*15*
**action**  101:*10*
**actual**  69:*12*
**acumen**  101:*7*
**additional**  67:*1*
  70:20  71:*17*  72:8
  99:5
**address**  32:9, *10, 11,
13, 21*  33:*1, 16*  35:22,
24*  36:*1*  42:5, 6, 9, *16,
20*  43:6, 9, *13, 15*
  44:4, 6, 7, *24*  79:24
  83:*3*  85:7, *23*  86:*3, 5,
14*  88:19
**addresses**  78:*23*
  79:6, 22  80:4, *10*
  81:*24*  107:*18*
**adhere**  54:*4*
**admonish**  7:*20*
  50:*13*  55:*19*  58:23
  65:24

**advised**  84:6
**advisor**  66:*18*
**Advisors**  16:6
**AFL-CIO**  1:9
**age**  49:*24*  67:*11*
**ago**  5:*12*  6:*18*  8:3
  13:7  15:*12*  34:*10*
  35:9  59:23  63:*14*
  105:8
**agree**  105:*15*
**Agren**  1:*19*  111:*12*
**ahead**  22:23
**aligned**  35:*18*  37:9,
12
**allowed**  19:*11*  21:3
  37:*12, 13*  43:2  78:*24*
  79:6  84:9  86:6  93:8
**Amapara**  65:*17, 23*
  71:4
**amount**  13:4  39:*12*
  47:7, *14, 20*  72:*18*
  103:*12*
**and/or**  111:*18*
**Angie**  94:*3, 5*
**answer**  7:*14*  8:22, *24*
  14:*21*  15:*5*  17:*1, 9,
15*  18:*16*  22:23
  24:*11*  33:6, *8*  34:5
  36:*16*  42:*12*  46:7
  48:*4, 15*  51:8  55:*15*
  58:*10*  61:*3, 6*  63:*23*
  64:4  70:4  74:*19*
  75:*24*  76:*3*  77:4, *17*
  79:2, *11, 17*  81:2
  83:5, 9  87:*15*  88:*10*
  89:*19*  90:8  91:6, *15*
  92:2  97:*19*  99:*1*
  100:*24*  102:*21*  104:*1*
  106:5  107:*12*
**answering**  91:*17*
**answers**  97:8  110:2
**anybody**  44:*16*
**anybody's**  105:*13*
**AP**  20:6  40:6  69:9
  80:9  82:*1*  83:8
  95:*10*
**apiece**  67:*15*
**APPEARANCES**  2:*1*
**apply**  42:2  64:*3, 19*

Case 1:19-cv-08927-GBD-SLC   Document 128-3   Filed 09/20/23   Page 35 of 56

Deposition of Cathy Younis                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

74:14  111:16
**approval**  31:9
**approved**  97:21
**Approximately**  8:3
11:12  15:11
**April**  11:22
**asked**  7:14  49:6
75:12  84:18  110:2
**asking**  5:4  21:22
29:12, 13  47:1  52:3
55:17  65:21  67:4
83:16  91:19
**asks**  71:15
**aspects**  55:4
**Asset**  20:19, 23  24:4,
7, 22  25:6, 7  28:13,
14  37:18  40:19
43:19  48:17  53:18,
21, 22  56:15  60:3, 14
61:1, 4, 8, 22  62:21,
22  69:15  76:19
79:19  80:7, 13, 17, 20,
23, 24  81:8, 10, 14, 22,
23  90:3, 10, 12, 14, 22
91:3  92:17  95:20
96:4, 13
**assignment**  9:21
**associate**  42:13, 14
43:19  44:16  51:18
55:2  60:5, 10  62:9
64:3  94:23  103:12
**associates**  12:8
13:11  21:13, 14  33:9
36:18  38:3, 6, 11
46:2  49:8, 13  54:3
60:8  61:18  77:8
93:6  94:6
**associate's**  17:7, 13
42:16
**assumed**  100:14
**assuming**  7:11  28:21
65:21
**assumption**  33:12
**attention**  84:4  93:15
**attorney**  4:14  66:7
**aunt**  60:2
**authenticate**  82:13, 16
**authenticity**  82:7
**Authority**  6:11

**authorized**  62:11
**available**  67:12
**avoid**  59:8  108:13
**Avoiding**  108:16
**aware**  6:19  25:24
38:2  54:15  58:11
61:20  76:18  77:14
83:6  85:5  87:19, 24
88:11  90:14  92:8, 15
93:23  99:20, 22, 23
100:5, 6, 7
**awareness**  63:3
95:19

**< B >**
**baby**  96:19
**back**  10:10  11:3
12:14  13:5, 7  15:1
22:13  23:17  26:1
30:9  41:6  45:9, 11
54:13  62:6  66:12
67:14  69:19, 23  73:6
81:4, 24  86:17
**bag**  18:5, 6, 23  68:19
82:13, 14, 16, 17
**bags**  19:11  22:14
67:10, 13, 14  68:15
**Barbara**  52:20, 24
53:5
**Barbour**  2:16
**BARTON**  2:10
**based**  22:4  80:7
82:24  108:9
**basically**  18:5  67:14
82:17  97:21
**bates**  50:10  65:3
83:20, 23
**beautiful**  31:20
**beginning**  23:5
**behavior**  22:3  24:5
**behaviors**  40:17
**believe**  5:19  13:1, 21
14:15  15:16, 19
18:18, 23  22:6  25:11
36:6  38:11  42:14
43:2, 4  44:18  51:13
53:13  56:3  57:1, 7
74:16  78:4  80:10
81:3  86:1  89:10, 20

94:9  100:21  107:13
**bell**  96:10
**Bergdorf**  100:20
**best**  6:17  23:15, 16
45:1  62:24  78:19
82:18  87:3
**better**  15:5  53:14
54:18  63:8
**BETTY**  2:6  7:19
45:4  107:3
**Betty.Tierney@Macys.
com**  2:8
**big**  19:19  62:11
67:19, 21  71:18  97:3
101:17  108:18
**bigger**  38:20
**biggest**  40:24  105:4
**billable**  85:7  86:5, 9,
14
**billed**  43:9
**billing**  32:9, 10, 11,
21  33:1, 16  35:23
36:1  42:4, 6, 9, 16
43:6, 13, 14  44:4, 6, 7,
24  85:23  86:3
**bit**  18:6  19:15  40:1
51:14  60:7  73:19
81:15
**BL001535**  51:23
**BLM**  50:5, 10, 11
**BLM1534**  50:4
**BLOOMINGDALE'S**
1:6, 7  8:13  9:8, 11
11:17  15:10  16:1, 2,
12, 15  18:6, 10  19:1
20:19  27:2  28:16, 24
30:1, 17, 22  34:8
35:10  36:9  37:2, 3, 8
38:13  39:8, 22  42:9,
17, 19, 24  43:7, 14
44:6, 8, 17, 20, 23
53:1  59:21, 22, 23
60:23  68:7  69:17
75:3, 8  77:2  78:14,
17  81:10  84:11  85:4,
24  86:12  87:13  88:8
90:10  91:3, 8  92:12
94:1, 6  97:5  100:16
104:2

**BLOOMINGDALE'S,
INC**  1:6
**BOBBY**  1:12  96:8
**Boca**  9:15, 21  10:11
**bond**  98:4
**book**  103:13
**BOOKER**  1:12  96:8
**books**  103:17
**bottom**  50:5, 8  51:22
65:3  82:14  83:19, 21
84:4  87:7
**boutique**  12:8
**boutiques**  89:17
90:6, 16, 19, 20
**brand**  10:5, 11, 21
11:10, 24  40:2
**break**  7:10, 13, 15
39:1
**breaks**  73:20  99:5, 6
104:18, 19  105:20
**brief**  49:18  74:7
**bring**  6:3, 5  16:4
30:9  60:9
**brother**  41:23
**brought**  93:14
**Brown**  53:14
**business**  12:7, 10, 13,
15, 17, 18  13:2, 17
14:5, 13, 17  15:8, 9,
11, 15  36:9  64:16, 20
81:13  85:20  86:12
89:11, 22  99:11
101:2, 7  103:10, 12,
16
**buy**  18:11  30:19
31:16
**buying**  15:10  16:8
36:18  37:10, 12
39:19  41:22  75:5
**buys**  15:14  16:7, 9

**< C >**
**Cabin**  2:6
**California**  43:18
**call**  15:9  31:12
51:14  62:12
**called**  98:21
**calling**  43:19  62:7, 9
**calls**  35:13

card 32:11 36:1
42:23, 24 43:1, 6, 8,
11 44:3, 9, 24 61:13
62:7, 10 82:7, 15
85:14 86:4 93:17
95:16, 18, 19 97:9
103:15 107:16
cards 82:24 95:8, 14,
16, 19
career 100:20
carefully 84:21
CARROTS 1:7
CASE 1:5 4:14
5:16 6:12 9:4 11:14
45:10 99:10
cash 62:12
Castellani 56:2 75:14
CASTELLANI,individ
ually 1:11
catch 25:20
Catherine 2:16
22:15 26:2
CATHY 1:17 3:3
4:8 7:21 45:16
70:19 87:15 91:15
92:2 105:10 106:5
110:1, 24 111:6
caught 82:24
Cavanaugh 84:3
CC 52:19
CC'd 52:19
central 104:3
certain 14:14 19:5
28:17, 18, 19 43:4
46:20 47:7, 14, 20
79:6 81:5
certainly 22:7 34:19
89:20
CERTIFICATE
111:1
certification 111:15
Certified 1:19
certify 111:3
certifying 111:18
chain 67:10
challenge 21:21
challenged 12:11
Chanel 4:19 10:5, 10,
17, 21, 24 11:10, 24
12:7, 11 14:19, 20

15:3, 14 16:6, 16, 23
17:3, 17 18:4, 8, 20
19:6, 13, 23 22:11, 20,
21 23:5, 19 24:8
26:21, 22, 24 29:1, 24
30:6 31:23 35:8
36:12, 18 37:19 40:1,
20, 22 42:2, 10, 23
45:19, 20 46:2 54:11,
21 56:10, 14 60:7, 23
62:15 66:18 67:15,
20, 21 68:21 69:21
71:5 74:23 77:21
79:8 80:1, 11, 17
81:9 82:1, 6, 16 86:8
89:16, 20 90:15
91:13, 23 92:9, 17
93:24 94:23 96:5
Chanel's 31:2 34:2
35:14 37:9 80:9, 13,
24 90:10, 12, 22
change 18:13, 14, 17
19:2 29:18, 21 31:3
34:3 35:6, 14 63:18
67:7
changed 19:5, 15
20:9 27:5 28:18, 20
29:13 30:14 54:17,
18 64:11
changes 19:21 34:13
59:5 110:5
charge 20:20 32:11
63:4 74:17, 21
charged 32:8
chat 106:21
check 44:4, 6 47:3
60:14
checked 60:24
checking 46:13, 24
59:5 60:16, 17
child 32:3
children 98:2
choice 99:17
Chris 53:18
Christmas 37:13, 16,
21
CHRISTOPHER
1:11 56:2, 8, 21, 24
57:17 75:13

circumstances 21:8
citizen 49:24
City 10:13 12:2
clarification 20:2
93:9
clarify 13:21 30:10
classic 18:5 27:18
clear 20:17 30:16
35:3 39:10 45:15
69:2 73:1 93:7
99:15
clearly 39:13
client 10:8, 24 11:8
31:15 32:1, 2, 4, 5, 6,
14 45:2 46:16 51:17
62:12 102:23 103:8,
13
clientele 10:4 22:4
clients 31:20 41:13
45:1 103:13
client's 32:6
close 74:4
closed 28:11 32:19
55:8 73:16 88:5
closely 80:15
coach 101:9
coaching 101:2
code 33:9, 24 39:16
54:13 108:16
collaboration 12:19
colleague 38:15
colleagues 56:9
97:11 98:1
combination 80:9
82:2 104:24
come 13:23 23:17
31:22 90:15 103:20
comes 39:18 104:3
coming 95:9 99:23
commencing 1:18
commission 38:12
communicate 54:20
communicated 18:21
95:6
communicating 19:21
communication 52:5,
8 54:19 56:23
communications 24:7
56:7
companies 39:24

company 11:2 62:15
93:17, 20 107:24
complain 104:10, 13
complained 106:3
complaints 102:4, 7,
13
concerns 76:16
concluded 109:4
condensed 4:4
condition 6:23
104:22, 23
conditions 98:23
102:9
conduct 17:7 19:18
33:9, 24 39:16 54:14
108:17
conducted 57:19
conducting 38:21
conducts 103:23
confirm 70:20
conflict 28:15
confused 29:10, 11
considered 41:20
58:14, 19, 22 67:24
68:4 107:24
consistent 18:9 23:5
31:5 39:24 51:17
consolidation 68:20
constantly 54:14
86:18 87:8
consult 54:6
contact 90:14
contained 111:4
content 49:10
continues 36:23
64:21
continuing 54:19
Contreras 53:20
control 65:13 111:17
controls 15:15
conversation 33:11
51:4 71:4 75:20
76:2, 6 90:13 95:7
conversations 22:8
33:14 48:20 49:3, 14
55:20 56:1 58:24
75:13, 15 76:19, 22
88:7 90:5, 22 91:2,
20 92:16 93:1 101:3,

*5*, *12*, *19*, *20*, *24*   102:*2*
   104:*7*
**copy**   4:*2*, *5*
**corner**   50:*9*
**corporate**   104:*5*
**corporation**   108:*18*
**correct**   6:*16*   9:*8*
   11:*15*   12:2   13:*12*, *19*,
   *22*   15:*19*   26:*11*   28:*2*,
   *4*   29:*1*   30:*24*   31:*10*
   35:*14*   36:*5*   43:*22*
   52:*12*   59:*21*   61:*24*
   64:*19*   66:*21*   70:*21*,
   *22*   71:*8*   72:*1*, *3*   73:*3*
   82:*1*, *10*   89:*14*   96:*6*
   111:*8*
**Correction**   110:*7*, *12*,
   *14*, *20*
**correspond**   77:*11*
**correspondence**   52:*4*
**Counsel**   2:*4*, *9*, *13*
   *4*:*1*   17:*20*   21:*23*
   25:*2*   55:*21*   58:*24*
**counseling**   22:*3*, *7*
**count**   75:*10*
**counted**   68:*11*
**course**   23:*12*   37:*13*
   41:*23*   56:*9*   72:*22*
   82:*22*   85:*19*   99:*6*
**COURT**   1:*1*, *19*   4:*1*
   5:*1*   6:*5*   45:*11*
**cover**   56:*16*
**covers**   56:*9*, *13*
**coworkers**   8:*16*
   66:*13*   84:*10*   85:*3*
   86:*19*   87:*9*
**created**   26:*23*   63:*1*
   67:*11*
**credit**   36:*1*   42:*23*, *24*
   43:*1*, *6*, *8*, *11*   44:*3*, *8*
   61:*13*   62:*7*   85:*13*
   86:*4*   93:*16*, *19*   95:*8*,
   *14*, *19*   97:*9*   107:*16*
**criteria**   85:*19*
**cross-functional**   12:*16*
**crystal**   20:*17*   30:*16*
   69:*2*   93:*7*
**C-section**   97:*23*
**CSR**   111:*12*

**current**   9:*17*   10:*16*,
   *21*   27:*14*
**currently**   9:*7*
**customer**   10:*2*, *3*
   11:*4*   22:*5*   23:*14*
   33:*19*   34:*21*, *24*   38:*5*
   41:*7*, *8*, *10*, *13*   62:*6*
   64:*2*   85:*10*   93:*17*, *19*
**customers**   23:*16*
   31:*13*   32:*24*   34:*13*
   56:*19*   61:*16*   62:*16*
   84:*10*   85:*3*   86:*18*
   87:*8*

**< D >**
**d/b/a**   1:*6*, *7*, *8*
**daily**   19:*18*   77:*12*
**date**   1:*19*   80:*5*   84:*2*
   110:*24*
**dates**   11:*21*   68:*13*
**daughter**   32:*4*, *6*, *14*
**daughters**   31:*17*   32:*2*
**David**   2:*15*
**day**   36:*23*   68:*4*, *5*
   73:*10*
**days**   8:*4*
**deal**   49:*10*   53:*12*
   76:*9*
**dealer**   90:*21*
**decision**   22:*10*   75:*9*
**decisions**   99:*8*
**decreased**   27:*8*
**deeply**   68:*15*, *16*
**Defendant**   2:*9*, *13*
   5:*18*
**Defendants**   1:*13*
**definitely**   4:*5*   37:*11*
   47:*22*   49:*8*   105:*2*
**definitively**   21:*5*
**delved**   46:*16*
**DENNIS**   1:*10*   13:*1*,
   *19*, *22*   14:*8*, *9*, *15*
   37:*24*   47:*3*   51:*24*
   52:*20*   75:*15*   76:*11*,
   *14*, *15*, *18*, *19*   89:*14*
   96:*23*, *24*   97:*1*   99:*10*,
   *19*   100:*7*, *8*, *11*, *15*, *22*
   101:*11*, *22*   102:*18*
   104:*10*, *13*

**DEPARTMENT**   1:*9*
   15:*3*   16:*2*, *23*   22:*11*
   24:*8*   34:*9*, *19*   40:*6*
   45:*20*   46:*2*, *19*   66:*21*
   77:*21*   80:*14*, *17*, *21*
   81:*8*   86:*18*   87:*8*
**departments**   45:*21*
   80:*14*
**depended**   89:*1*
**depending**   72:*23*
**depo**   7:*23*
**Deposition**   1:*17*   5:*9*,
   *14*   6:*15*   7:*18*   8:*2*, *7*,
   *17*, *20*   9:*3*   11:*19*
   109:*4*   110:*3*   111:*6*
**DEREK**   2:*1*
**describe**   82:*18*
**DESCRIPTION**   3:*9*
**designation**   67:*13*
**desirability**   61:*15*
**detail**   69:*7*
**determined**   75:*7*
**developing**   11:*1*
**Diaz**   13:*1*, *19*   38:*1*
   47:*3*   52:*20*   75:*15*
**DIAZ,individually**
   1:*10*
**dictating**   19:*14*   35:*8*
**difference**   10:*20*
   44:*20*   67:*5*   81:*7*
   86:*7*   105:*24*
**different**   4:*22*   11:*8*
   21:*9*   24:*3*   27:*6*   28:*5*
   30:*21*   43:*6*, *9*   53:*8*
   63:*2*, *5*   72:*16*, *21*, *23*
   81:*10*
**differently**   108:*22*
**difficult**   25:*18*   37:*17*
**dipping**   95:*15*
**direct**   12:*6*, *20*   14:*4*
   38:*18*   111:*17*
**directed**   95:*8*
**directing**   81:*14*
**directly**   12:*9*   13:*11*,
   *15*   14:*1*   40:*7*   96:*24*
**director**   10:*6*, *11*, *21*
   11:*10*, *24*   31:*15*   53:*3*,
   *5*   80:*24*   90:*4*   101:*8*
**disciplinary**   101:*10*

**discount**   36:*21*
   39:*18*, *19*   41:*14*, *16*,
   *17*, *20*   46:*4*, *10*   63:*20*,
   *21*   64:*23*   69:*18*, *20*,
   *21*
**discounted**   68:*15*, *16*
   69:*2*
**discrimination**   102:*5*,
   *8*, *16*   106:*3*
**discuss**   75:22
**discussed**   23:*13*
   81:*17*   95:*13*
**discussion**   19:*19*
   22:*17*   24:*18*   97:*4*
   106:*23*
**distributed**   19:*16*
**DISTRICT**   1:*1*
**diversion**   23:*7*, *18*
   36:*20*   37:*10*   39:*6*, *8*
   40:*1*, *4*, *16*, *22*   61:*12*
   62:*21*   89:*24*
**diverter**   58:*14*, *19*, *22*
**diverters**   79:*8*, *9*
   80:*4*   82:*1*
**document**   26:*7*, *12*,
   *14*, *23*   30:*14*   34:*18*
   50:*4*, *16*, *23*   52:*10*
   65:*3*   66:*9*   83:*15*, *18*
   86:*17*
**documents**   8:*6*, *9*
**doing**   11:*3*   14:*6*
   16:*7*   20:*11*   25:*8*
   38:*3*   41:*5*   51:*13*
   54:*15*   59:*7*, *8*, *16*, *17*
   61:*17*   89:*22*   95:*21*
   105:*8*   108:*13*
**door**   56:*10*, *14*, *16*
   96:*5*
**double**   60:*24*
**downstairs**   98:*15*
**driver's**   34:*20*   35:*1*
**driving**   103:*16*
**due**   97:*15*
**duly**   4:*8*
**duplicate**   107:*18*
**duties**   40:*21*   77:*12*

**< E >**
**earlier**   18:*8*   30:*18*

earn  44:22
easier  53:7
educated  41:1, 3
education  40:23
  61:19
effect  35:7
effective  10:7
egregious  87:3
either  24:19  60:22
  72:17  73:2  106:10
elaborate  78:10
electronic  4:5
elevate  16:8
e-mail  25:2  49:17
  51:21  52:4, 12, 19
  56:3  57:1  72:13
  76:13
E-mails  3:11  8:5
employed  8:12  9:7
  11:16  29:6  78:17
  100:15  102:1
employee  18:10
  33:16  36:14, 21
  41:17  42:23  46:13,
  20, 24  47:4, 17  58:22
  59:1  60:1  63:9
  67:11, 22  69:15  83:2,
  3  88:17  99:14
  104:18
employees  16:14, 22
  19:11  20:1, 21  21:24
  22:11  24:8  25:10
  32:24  33:15  44:5
  47:13  58:5  64:24
  67:12  77:15  78:1, 3,
  23  79:5, 9, 23  87:11
  93:10, 24  99:12
  100:12  102:19
employee's  17:13
employer  4:19  97:13
  99:17
employment  11:14
  20:18  29:16, 23, 24
  30:5, 13  31:4  51:5
  52:6  63:20  80:16
  81:19  82:10  98:18
  101:20  107:10
encouraging  84:23
  89:24

enforcement  57:24
  58:5, 8
enhanced  51:14
enjoy  23:10, 13  31:20
ensure  37:15  41:12
ensuring  36:13  41:5
enter  48:10  64:22
entire  29:24  30:5
  98:3
Eric  78:7, 8
especially  36:21
  88:13
ESQUIRE  2:1, 6, 10
essentially  4:23
estimate  6:18
evasion  108:19
evasive  44:12
events  67:11  72:14
  73:12
Everest  2:16
evidence  111:4
exact  19:5  21:4
  80:5  83:9
exactly  6:17  30:2
  35:2  75:18  82:11
Examination  3:4, 5
  4:10  108:11
examined  4:9
example  31:16
exceeding  25:17, 20
  47:14, 20
exception  27:15
  31:18, 19
Exceptions  31:8, 14,
  24
Excuse  27:22
executive  12:15  53:1
executives  70:8
EXHIBIT  3:9  26:3,
  5  30:4  48:11  50:2,
  14  64:22, 23  65:1
  66:1  83:13
exhibits  22:14  25:3
  65:6
exist  57:4
expectation  37:22, 24
  40:24
experience  10:3  41:7,
  9, 10, 13  51:17  79:7

expert  97:7
explain  9:1, 16
explaining  107:20
extended  97:22
extensive  16:11, 15
extent  57:4  96:20
  97:19
extra  63:20, 21
  67:23  68:10  74:22
extremely  25:18

< F >
FA  16:5  71:5, 24
fact  7:22  75:9  87:3
fair  101:7
faire  51:15
fall  6:13
falsehoods  84:15
family  39:19  41:15
  107:9, 22
far  68:12  77:6  84:5
fashion  12:12  16:5
  18:5, 23  27:11, 18
  66:18
February  15:16, 21,
  22
federal  6:8
FedEx  34:9
feel  107:19
fill  97:21, 22  98:16
final  68:2  70:1, 2, 5
  101:13  106:18
find  47:23  110:4
fine  7:10  13:10
  92:6  93:23  108:23
fired  21:1, 2
first  4:8  9:22  10:2
  14:2  15:8  16:16
  27:23  36:8  42:7
  66:12, 14  69:20
  83:20  84:9  90:12
five  12:8  13:7, 10, 14
  15:11  63:13  72:22
  81:4  93:3  105:7, 9
flag  83:8
flagged  83:3  93:24
flags  83:8
flagship  10:15
Floor  2:11  9:18
  45:20  99:6

FMLA  97:10  100:3,
  8, 12  103:4
follow  33:10  84:21
  108:18, 24
followed  21:7
following  41:24
  48:17
follows  4:9
foot  105:1, 3, 8
foregoing  110:1
  111:15
form  5:21  8:21
  15:18  16:24  17:8, 14
  18:15  19:3  22:22
  24:10  29:2, 17  33:5
  34:4  36:15  37:4
  42:11  46:6  48:3, 14
  51:7  54:8, 10  55:14
  57:13, 20  58:9, 15
  61:2  63:23  70:4, 12
  74:18  77:3, 16  78:18
  79:2, 10, 16  81:1
  83:4  87:14  88:10
  89:19  90:8  91:6, 14
  92:2  97:18, 21
  100:24  102:21, 22
  103:24  106:4  107:11
formal  101:12, 14, 19
formally  82:21  95:6
format  38:20  43:23
former  8:16
FORTY  1:6
forward  73:19
found  76:13  79:14
  91:21  93:10
four  18:12  30:19
  34:10  35:9  40:11, 14
  59:23  105:9
frame  17:20
fraud  61:12  62:6, 16
  94:18  95:8, 14
fraudulent  95:18
friend  35:21
friends  43:19  107:9,
  23
front  26:8  34:18
  50:5  69:20, 21  73:5
full  50:14  68:24
fully  111:4

**further** 44:*5*

**< G >**
**general** 21:*14, 23*
55:*3* 56:5, *6* 87:*24*
90:*13, 18* 92:*13* 95:*9*
99:*11* 103:2 104:*14*
**generous** 97:*10, 24*
**GERBER** 2:*10* 4:*7*
45:*7* 74:2, *4*
**getting** 23:*16* 38:*12*
60:6, *10* 62:*11*
**gift** 35:*21* 36:*10, 13*
37:*16, 21* 41:*17, 18,
23* 42:*3, 4, 15* 85:*9,
11, 18, 19, 20* 86:*1, 5,
7, 10, 13* 88:*17, 18*
**gift-giving** 85:*20*
**gifts** 36:*10, 19* 37:*10*
55:*10* 68:*14* 85:*17*
107:8 108:*12*
**GILMAN** 2:*10*
**give** 15:*4* 44:*3* 97:*8*
**given** 11:*7* 19:*13*
47:*7* 98:22 104:*18*
105:22 110:*3*
**giving** 29:*3* 51:*16*
95:*18* 97:*14*
**go** 4:*22, 23* 7:*11, 12*
10:*10* 13:5 16:*10*
18:*3* 22:*13, 16, 23*
23:6 24:*17* 26:*1*
27:*7* 33:*21* 38:*23*
44:*5* 53:8 60:*3, 24*
62:*10* 66:*12* 73:*19*
74:*15* 97:*11, 20*
98:*14*
**goal** 46:*20*
**goes** 27:*7* 65:*17*
81:*4* 85:*12*
**going** 4:*22, 23* 7:*11*
11:*3* 18:*20* 22:*13, 14*
23:*19* 25:6 38:*23*
39:*1* 49:*9* 55:*19*
63:*22* 67:*5, 14* 70:*3,
11, 16* 71:*3* 73:*17*
75:*4* 79:*1* 81:*24*
86:*11* 88:*9* 89:*18*
90:*7* 91:*5* 92:*1* 99:*7*
100:*23* 102:*20* 103:*4,*

*8* 106:*16* 107:*5*
108:*1, 3*
**Good** 4:*11, 12* 21:*20*
39:*3* 51:*13, 17, 19*
61:*15, 18* 73:*21*
**Goodman** 100:*20*
**goods** 15:*14*
**gray** 36:*6* 38:*10*
**Great** 25:*4* 41:*13*
49:*9* 76:*9* 97:*13*
**greater** 62:*5*
**greeting** 56:*19*
**Grievance** 3:*13* 84:*2*
88:*14*
**ground** 4:*23*
**grounds** 23:22
**GROUP** 2:*1* 3:*11*
9:*20*
**guard** 96:*11*
**guards** 56:*15*
**guess** 43:*10, 24*
48:*10* 60:*12* 66:*1*
68:*9* 69:*18* 75:*17*
78:*2* 82:*17* 85:*12*
90:*21* 91:*23*
**guessing** 8:*4* 13:*8*
**guidance** 55:*3*
**guiding** 88:*23* 89:*2*
**gut** 25:*14*
**Gutierrez** 78:*8*
**guys** 74:*3*

**< H >**
**Handbag** 3:*10* 8:*10*
26:*3, 10, 16, 17* 27:*24*
30:*3* 32:*3* 35:*21*
63:*9* 67:*8* 68:*8*
75:*10* 88:*18*
**handbags** 18:*3*
19:*15* 26:*22* 27:*7, 12*
28:*1, 19* 29:*22* 30:*17*
31:*5, 17* 39:*12* 41:*11*
60:*7* 63:*19* 64:*1, 12*
66:*24* 68:*2, 4* 71:*16*
72:*6* 82:*6*
**handbook** 18:*10, 11*
30:*17* 31:*1* 39:*10, 15*
64:*9* 77:*7* 99:*14*
**handbooks** 28:*17*

**handled** 23:*24*
**handout** 19:*13*
**handy** 49:*16*
**happen** 70:*23* 97:*23*
**happened** 21:*23*
34:*10* 48:22 72:*14*
74:*13* 75:*18* 80:*3, 5*
89:*2*
**happening** 61:*23*
**happens** 32:*11*
**harassment** 102:*14*
**hard** 33:*8* 73:*9* 76:*2*
**head** 5:*1* 49:*19*
80:*24*
**heads** 52:*15*
**hear** 33:*10* 87:*11*
108:*21*
**held** 12:*22* 22:*17*
41:*3* 106:*23*
**Help** 29:*10* 48:*23*
56:*15* 60:*8* 81:*13*
95:*21* 101:*22*
**helped** 16:*8* 53:*15*
**Hey** 65:*9* 66:*14*
71:*22*
**Hi** 65:*17* 70:*16*
**hidden** 82:*14*
**high** 63:*3* 103:*14*
**HIPAA** 105:*14*
**history** 69:*14*
**hitting** 50:*1*
**Hoelz** 52:*20, 21, 24*
53:*5*
**hold** 10:*11* 14:*16*
73:*9* 87:*2*
**holds** 28:*19*
**holiday** 37:*16, 21*
**holidays** 31:*18* 32:*15*
**home** 33:*3*
**honest** 14:*15* 49:*4*
63:*13* 73:*13* 76:*8, 10*
**honestly** 49:*4* 70:*14*
**hope** 42:*21* 100:*10*
**hosted** 61:*10*
**hours** 7:*4, 7* 73:*18*
**house** 12:*12* 69:*19,
20, 22, 23* 73:6
**HR** 48:*20* 52:22
53:*1, 5* 70:*10* 76:*23*

97:*20* 98:*6, 9, 20*
99:*21*
**HR's** 22:*10*
**human** 53:*13* 77:*19*

**< I >**
**I.D** 35:*5*
**icon** 18:*4, 22* 27:*18,
24* 30:*15*
**iconic** 32:*3*
**icons** 27:*8*
**idea** 53:*18* 60:*16*
77:*5, 18* 85:*15* 95:*11*
101:*21*
**Idris** 94:*20*
**immediate** 23:*22*
**immensely** 27:*9*
**impair** 6:*20, 24*
**important** 5:*4* 23:*4*
31:*13*
**impossible** 25:*19*
**inaccurate** 85:*21*
**indicates** 11:*23*
15:*23* 44:*2*
**individually** 1:*11, 12*
**inform** 76:*11* 78:*23*
100:*8, 11*
**information** 21:*18*
81:*16* 102:*19*
**inhouse** 34:*7* 59:*20*
**initial** 9:*13*
**initials** 105:*12*
**input** 22:*10* 103:*5*
**Insight** 98:*14, 16, 21*
99:*16*
**instance** 103:*3*
**instructions** 16:*21*
**intellect** 82:22
**intelligence** 103:*11*
104:*3*
**intended** 23:*6* 39:*13*
**intent** 23:*9*
**introduced** 36:*7*
**inventory** 15:*15*
**investigated** 62:*18*
94:*18* 96:2
**investigation** 25:*7, 9*
48:*8* 57:*18* 58:*1, 8*
89:*17*

**investigations** 80:8
90:6 91:21 92:17
93:5
**involved** 40:19
**involvement** 81:22
**issues** 103:20 105:12
106:12
**items** 60:23 91:22,
23 92:9, 10
**its** 64:20

**< J >**
**January** 13:23 14:3
**Jersey** 6:11 32:4, 6,
7, 12, 22 33:1, 16, 17,
20 35:4 60:2
**job** 12:9 21:20
37:17 51:13 63:6
**June** 11:22 51:22, 23
52:13 53:24 84:2

**< K >**
**keep** 55:3 70:16
71:3
**Kemi** 71:23 72:8
**kept** 102:18
**kind** 11:3 14:19
27:8 50:20 63:3
67:19 101:15 103:15
**kinds** 40:17 54:9
**knew** 55:2 96:18
**know** 4:15 6:9 7:11
11:6 14:11 18:4, 7
19:6, 11 20:23 21:4,
5, 6, 7, 9, 19 24:19
25:12, 16 28:13
30:18 32:23 33:7
35:7 38:24 39:9, 11,
14, 17, 18 40:5, 15, 18
43:17 46:9, 10 47:19
48:7 49:4, 6, 7, 8
51:12, 18 53:14, 16,
18 55:13, 17, 24
56:16 59:7 60:8
61:5, 12, 16 62:15, 17
63:6 64:10 66:15
68:7, 9 69:2 70:13
71:23 77:5 78:15
79:17, 18, 20 80:2, 14
82:19, 23 83:16

90:16, 17 93:12, 16,
20 94:3, 10, 13, 14, 20
95:4, 12 96:1, 8, 17,
18, 19 97:12, 13, 14,
19, 23 98:1, 3, 14
99:5, 13, 18, 21 100:2
101:8, 15 102:12
104:24 106:2, 6, 8, 10,
11 107:3 108:17
**knowing** 51:1
**knowledge** 24:12
51:15 78:20
**known** 68:13 80:4
82:1 90:21 92:9
**KRISTINA** 1:3 3:12
4:15, 16 11:14 13:15
14:2 21:12 38:17
47:20 48:13 51:24
54:23 55:10 57:11
58:7, 13 59:4, 6, 7, 14
62:17 66:13, 20
70:16, 18 71:7, 15, 22
72:1, 5 76:11 81:21
84:1 96:17 99:18, 21,
23 100:2 103:3
104:14 106:2, 8, 11
107:8
**Kristina's** 20:18
30:13 48:21 51:5
52:5 56:21, 24 57:10,
18, 19, 24 63:11, 19
75:14, 16 76:16, 20
80:16 81:19 82:10
95:23 96:16 98:17
101:20 104:8, 11

**< L >**
**landing** 30:20
**Landymore** 53:16
**language** 27:16
36:19, 23
**lasting** 11:1
**late** 99:24
**launch** 16:4
**LAW** 1:11 2:1
51:23 52:5, 7, 12
57:24 58:5, 8 84:21
98:7
**laws** 34:1 84:21

108:19
**Law's** 53:23
**lawsuit** 6:3, 6
**lead** 101:17
**leadership** 12:21, 22
16:9 41:3, 9 87:24
**leaning** 56:18
**learn** 7:17 8:1 49:7
96:21
**learning** 49:6 56:4
**learnings** 10:23
**lease** 21:16 24:15
27:6 28:20 29:8, 13,
21 64:13, 14, 18 71:2
81:15, 18
**Leased** 15:6, 7, 11
18:20, 24 20:8 38:14
64:15 81:18 86:8
89:21 92:22 93:3
**leasing** 20:3
**leave** 97:6, 10 100:2,
3, 9, 12
**leaves** 97:12
**Lee** 94:3, 5
**Leeza** 53:20
**left** 58:7 59:4 65:22
72:24 100:19 101:18,
22
**lenience** 18:7
**lenient** 18:2
**Letter** 3:13 88:14
**letting** 18:7
**level** 11:8 63:3 69:7,
10 103:14
**license** 34:20 35:1
**lie** 87:3
**life** 88:24
**likes** 54:12
**limit** 24:9 25:17, 21
66:24 67:7 68:3, 11
71:16, 21 72:6, 8
74:15 75:10
**limits** 8:10 17:16, 19
21:3 23:12, 18, 20
24:20 39:12 42:2
49:9 54:12 63:19
64:6, 10 67:7, 8, 16,
17 70:19 73:10
77:14 89:23 108:1, 4

**line** 84:18 86:16
110:7, 14, 18
**lines** 29:4
**liquidation** 68:1 73:8
**list** 53:14 79:24
110:5
**listed** 110:6
**literally** 72:14
**little** 10:6 11:12
18:6 19:15 24:3
34:12 35:16 36:6
40:1 51:14 52:7
60:7 73:19 76:8
81:15, 21
**live** 43:17
**lives** 32:6 34:21
**LLC** 1:7
**LLP** 2:10
**LOCAL** 1:9
**location** 87:12 88:7
**long** 11:1 41:24
97:11 105:6 108:1, 3
**longer** 34:7 63:6
**long-term** 52:24
**look** 8:4 13:6 22:14
42:10 44:7 50:8
64:9 65:2 83:15
103:16, 19 106:18
**looked** 49:5 50:22
57:2
**looking** 20:7 21:8
29:5 43:12 69:3, 6, 8
86:17
**Lori** 1:19 45:9
111:12
**lose** 45:4
**losses** 40:6
**lot** 10:23 12:19
20:10 22:7 23:7
39:15, 21 53:13
75:21 84:15 95:7, 19,
21 97:8
**Louis** 2:7
**loyalist** 44:21, 22
45:16
**l-o-y-a-l-i-s-t** 45:16
**loyalty** 10:2 11:4
**lunch** 7:12, 13

**< M >**

**MACY'S**  1:*8*  35:*17*
62:*5*  68:*7*  84:*11, 21*
85:*4*  87:*13*  88:*8*
89:*10*  93:*16, 19*
108:*17*
**main**  66:*6*
**major**  39:*11*
**maker**  75:*9*
**making**  21:*1, 20*
32:*5*  37:*20*  39:*22*
41:*1, 6*  46:*20, 24*
47:*4, 17, 20*  74:*17, 22*
93:*6*
**manage**  16:*2*  17:*4*
**management**  9:*19*
31:*9, 22*
**manager**  9:*20, 21, 22,*
*23*  10:*2*  11:*5*  12:*15,*
*17, 18*  13:*2, 17*  14:*5,*
*13, 17*  46:*18*  54:*6*
101:*9*
**managers**  19:*18*
33:*15*  38:*6*  45:*23*
69:*16*  87:*19*  89:*12*
99:*11*
**Marisa**  53:*14*
**match**  43:*14*
**matched**  82:*15*
**maternity**  97:*6, 12*
**matter**  47:*16*
**mean**  5:*17*  9:*1*  15:*7*
17:*3*  21:*17*  38:*2*
40:*13*  56:*13*  62:*2*
80:*12*  91:*7*  92:*11, 19*
93:*14*  99:*14, 17*
102:*22*
**Meaning**  24:*16*  90:*20*
**means**  27:*19*  31:*12*
84:*24*  111:*17*
**meant**  67:*17*
**medical**  102:*9*
104:*21, 22, 23*  105:*12*
**medication**  7:*3, 7*
**meeting**  46:*20*  47:*6*
**meetings**  16:*10*
19:*16, 17, 18*  38:*21*
54:*9*  61:*8, 10, 11*
62:*24*  63:*17*  95:*10,*
*21*

**MELISSA**  2:*1*  4:*13*
73:*17*
**Melissa@DerekSmithl**
**aw.com**  2:*4*
**member**  39:*19*  96:*12*
**members**  41:*15*  78:*2*
**memo**  35:*11*  61:*12*
62:*2, 8, 14, 18*
**memory**  49:*23*
**memos**  63:*9*
**MENDOZA**  2:*1*  3:*4*
4:*3, 10, 13*  5:*24*  7:*24*
8:*23*  14:*23*  15:*20*
17:*5, 11, 18, 22, 23*
18:*19*  19:*9*  20:*4*
22:*15, 19*  23:*1*  24:*14*
25:*4, 5*  26:*2, 6*  28:*9,*
*12*  29:*7, 19*  30:*12*
32:*17, 20*  33:*13*
34:*11*  36:*24*  37:*6*
39:*4*  42:*18*  45:*4, 9,*
*14*  46:*11*  47:*10, 12*
48:*6, 19*  50:*3, 17*
51:*10*  54:*22*  55:*6, 9,*
*16, 23*  57:*9, 15, 22*
58:*12, 17*  59:*3, 12*
60:*21*  61:*7*  64:*5*
65:*10, 14*  66:*3, 11*
70:*9, 15*  71:*11, 13, 14*
73:*21*  74:*1, 9, 20*
76:*4*  77:*9, 20*  78:*21*
79:*4, 13, 21*  81:*6*
83:*10, 12, 14*  87:*17*
88:*3, 6, 15*  90:*1, 11*
91:*9, 18*  92:*5*  98:*5*
99:*3*  101:*4*  103:*1*
104:*4*  105:*19*  106:*7,*
*15*  107:*1, 7, 14*  108:*8*
109:*2*
**mental**  6:*24*
**mentioned**  27:*17*
59:*19*  88:*13*  96:*4*
**merchandise**  9:*23*
15:*10*  70:*20*  84:*6*
**message**  16:*3, 5*
19:*19*  38:*20*  70:*17*
**Messages**  3:*12*  66:*13*
**Michelle**  53:*2, 3, 9,*
*10, 14*
**middle**  29:*15*

**MIKHAYLOVA**  1:*3*
4:*15, 16*  38:*17*  83:*20,*
*22*  84:*1*
**Mikhaylova's**  3:*12*
11:*14*
**Milesska**  53:*20*
**minimal**  31:*14*  90:*14,*
*17*
**minute**  65:*2*
**minutes**  10:*9*  73:*24*
**Miriam**  53:*16*
**misquote**  49:*20*
**Missouri**  2:*7*
**miss-ringing**  40:*16*
**mistake**  49:*2*  53:*10*
**mobile**  35:*5*
**mode**  16:*3, 5*  19:*20*
**model**  15:*15*
**modes**  38:*20*
**moms**  97:*14*
**Monday**  1:*14*  111:*7*
**monitoring**  61:*22*
**month**  8:*3, 4*  18:*6,*
*12*  28:*3*  30:*17*  46:*21*
**monthly**  87:*2, 5*
**months**  18:*24*
**morning**  4:*11, 12*
19:*18*  38:*21*  106:*9*
**mother**  37:*13*  41:*22*
42:*4*
**mother's**  37:*16*
**multiple**  19:*17*  23:*13*
32:*2*  34:*17*  61:*10*
63:*16*  108:*15*

**< N >**
**name**  4:*13*  52:*9*
53:*4*  96:*10*
**names**  105:*11*
**nationally**  10:*19*
**nausea**  106:*9*
**need**  7:*9*  29:*3*  34:*17*
79:*19*  97:*15, 22*  99:*5*
103:*4*
**needs**  99:*7*
**negotiations**  19:*7*
**never**  14:*4*  19:*15*
21:*4*  38:*14*  49:*10*
68:*20*  77:*13*  87:*20*
95:*8*  102:*6*

**NEW**  1:*1, 8*  2:*3, 12*
6:*7, 11*  10:*12, 13*
12:*2*  32:*4, 5, 6, 7, 11,*
*12, 13, 22*  33:*1, 16, 17,*
*20*  35:*4*  43:*17*  60:*2*
108:*14*
**newborns**  97:*15*  98:*4*
**newer**  62:*4*
**nice**  63:*6*  103:*15*
**nicely**  56:*19*
**nodding**  5:*1*
**non**  30:*15*
**Non-Bloomingdale's**
91:*12*
**non-icon**  27:*19, 21*
28:*1*
**normal**  67:*17*
**Notary**  1:*20*
**notes**  111:*5*
**notice**  1:*18*
**November**  1:*14*
110:*4*  111:*7*
**Number**  30:*4*  82:*14*
**numbers**  83:*23*

**< O >**
**object**  5:*21*  8:*21*
15:*18*  16:*24*  17:*8, 14*
18:*15*  19:*3*  22:*22*
24:*10*  29:*2, 17*  33:*5*
34:*4*  36:*15*  37:*4*
42:*11*  46:*6*  48:*3, 14*
51:*7*  55:*14*  57:*13, 20*
58:*9, 15*  59:*10*  60:*18*
61:*2*  63:*22*  70:*3, 11*
74:*18*  77:*3, 16*  78:*18*
79:*1, 10, 16*  81:*1*
83:*4*  87:*14*  88:*9*
89:*18*  90:*7*  91:*5, 14*
92:*1*  97:*18*  98:*24*
100:*23*  102:*20*
103:*24*  106:*4*  107:*11*
**Objection**  14:*21*
45:*10, 13*  60:*19*
75:*24*
**objections**  111:*4*
**obvious**  69:*22*
**obviously**  16:*7*  23:*21*
49:*13*  71:*2*

Case 1:19-cv-08927-GBD-SLC    Document 128-3    Filed 09/20/23    Page 42 of 56

Deposition of Cathy Younis                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

October 10:7, *17*
odd 47:*23*
offer 84:*10* 85:*3*
offers 69:*23*
office 62:*12* 73:*5*
officially 64:*17*
Oh 6:*2* 35:*4* 42:*7*
65:*16* 69:*14*
Okay 4:*21* 5:*7, 11,*
*14, 16* 6:*5, 8, 10, 12,*
*14, 19, 23* 7:*9, 15* 8:*1,*
*6, 9, 11, 15, 19* 9:*6, 13,*
*16* 10:*14, 16, 20*
11:*10, 13, 19, 22* 12:*4,*
*22* 13:*3, 10, 15, 21*
14:*1, 7, 11, 13, 16, 18*
15:*7, 13, 16, 21, 24*
16:*13, 16, 18* 17:*6, 12,*
*19* 18:*13, 20* 19:*1, 10,*
*23* 20:*8, 12, 16, 23*
21:*1, 11, 16, 24* 22:*9,*
*13* 23:*11, 24* 24:*6, 21*
25:*1, 20* 26:*1, 2, 7, 16*
27:*2, 5, 10, 13, 17*
28:*5, 8* 29:*10, 11, 15,*
*20, 23* 30:*9, 22* 31:*2,*
*8, 21* 32:*1, 16* 33:*14,*
*19* 34:*16, 24* 35:*6, 19*
36:*4, 12* 37:*1, 19, 24*
38:*6, 16, 23* 39:*2, 3,*
*20* 40:*3, 10, 20* 41:*14,*
*20* 42:*8, 19, 22* 43:*3,*
*5, 21* 44:*11, 15, 19*
45:*3, 23* 46:*1, 4, 12,*
*23* 47:*13, 16, 19, 23*
48:*7, 10, 24* 49:*11, 14,*
*21* 50:*8, 18, 22* 51:*2,*
*20* 52:*11* 53:*6, 16, 23*
55:*5, 24* 56:*11, 13, 20*
57:*4, 10, 23* 58:*7, 13,*
*18, 21* 59:*4, 13, 19*
60:*1* 61:*8, 11, 20, 22*
62:*2, 17, 20* 63:*15, 18*
64:*6, 10, 22* 65:*16*
66:*10, 12, 23* 67:*21*
68:*6* 69:*12, 17* 70:*10,*
*16* 71:*10, 20, 22*
72:*16, 20* 73:*1, 14*
75:*6, 8, 12, 22* 76:*5,*
*11, 14, 18, 22* 77:*10,*

*21* 78:*6, 16, 22* 79:*22*
80:*7, 11, 16, 19, 23*
81:*7, 17* 82:*4, 6, 9, 19*
83:*2, 11, 18* 84:*1, 17,*
*22* 85:*1, 8* 86:*2, 16,*
*24* 87:*6, 18* 88:*2, 16*
89:*4, 7, 9, 13, 16* 90:*2,*
*5, 19* 92:*16, 24* 93:*4,*
*10, 13, 16* 94:*3, 8, 12,*
*17* 95:*4, 13* 96:*1, 15,*
*21* 97:*1, 5, 16* 98:*6,*
*12* 99:*4, 8, 12* 100:*15*
101:*5, 24* 102:*4, 7, 11*
103:*8, 20* 104:*10, 16,*
*21* 105:*20* 106:*2, 8,*
*11, 14, 22* 107:*21*
108:*5, 7*
old 50:*19* 67:*11*
Olde 2:*6*
on-boarding 89:*11*
Once 5:*10* 16:*10*
67:*19* 70:*24* 71:*1*
72:*15* 81:*15, 18*
90:*16*
one-off 67:*10* 72:*14*
73:*2*
one-on-one 19:*16*
ones 63:*8, 24* 67:*1*
71:*17* 72:*7* 105:*4, 17*
ongoing 54:*9*
online 98:*13, 19*
open 30:*11*
opportunity 11:*7*
opposite 102:*6, 12*
order 35:*3* 62:*8, 18*
orders 61:*12* 62:*2, 3,*
*14*
organization 75:*5*
104:*3*
original 69:*1, 24*
outcome 93:*4*
overall 51:*16*
over-purchasing 24:*9*
oversight 12:*6, 14*
owned 15:*9* 81:*13*

**< P >**
p.m 52:*14* 74:*8*
109:*4*

PAGE 3:*2* 50:*9, 11*
66:*12* 71:*3, 11, 12, 22*
73:*15* 83:*19, 20, 22*
87:*19* 110:*7, 14, 18*
pages 50:*23*
paid 69:*13*
Paige 81:*3*
paragraph 84:*5* 87:*7*
Paralegal 2:*15*
Paris 16:*7*
part 20:*22* 29:*11*
30:*18* 39:*6* 52:*10*
53:*18* 64:*3* 68:*17*
77:*11* 99:*16*
parted 100:*19*
parties 23:*8*
partners 53:*22*
61:*15, 19* 90:*4*
party 5:*16*
pass 65:*13*
passport 82:*17*
pay 33:*2, 20* 55:*12*
paying 59:*8* 108:*13*
payment 39:*20*
Penn 2:*2*
pennies 67:*15*
people 16:*19* 17:*4*
20:*11* 21:*8* 49:*1*
59:*6, 7, 16* 61:*20*
85:*17* 107:*18*
people's 105:*11*
percent 73:*5*
perfectly 7:*10*
performance 22:*3, 7*
102:*3* 104:*11*
period 13:*20* 18:*2*
24:*1, 2, 4* 29:*5, 21*
37:*7, 8* 47:*7, 15, 16,*
*19* 81:*12* 108:*5*
permanent 52:*24*
permission 68:*21*
person 14:*6, 9* 23:*6*
32:*3* 42:*6* 43:*12*
53:*12* 77:*22* 98:*8, 9*
personal 39:*14* 43:*1,*
*6, 8, 11* 44:*3, 8*
personally 14:*22*
88:*20*
perspective 11:*2*

phone 35:*3, 13* 62:*3*
physical 6:*24*
place 26:*17, 18*
39:*21* 44:*15* 62:*4, 14*
places 34:*22* 35:*12*
Plaintiff 1:*4* 2:*4*
3:*10, 11, 12, 13* 4:*14*
5:*18*
Plaintiff's 26:*3* 30:*3*
64:*23*
platform 93:*7*
players 63:*5*
Plaza 2:*2*
please 50:*15*
PLLC 2:*1*
point 18:*8* 19:*20*
21:*13* 25:*18* 60:*13*
73:*18, 22* 80:*1, 3*
85:*24* 86:*12*
police 38:*4* 41:*11*
policies 16:*22* 17:*3*
22:*20, 21* 23:*3, 19*
31:*7* 34:*16* 35:*10*
36:*13* 37:*9* 39:*7*
41:*2, 4* 42:*1* 50:*20*
54:*4, 17, 20* 61:*9*
74:*17* 81:*9, 14* 84:*19*
88:*2* 95:*22* 97:*5, 9*
107:*10, 15*
policing 37:*23* 38:*1*
Policy 3:*10* 18:*8, 13,*
*17* 19:*1, 14* 21:*3, 6*
22:*13* 24:*18* 26:*4, 10,*
*16, 18* 27:*3, 6, 14, 20,*
*24* 28:*15, 16, 24* 30:*3,*
*4, 14, 22* 31:*2, 3, 9, 14*
34:*2* 35:*14* 36:*5*
38:*13* 40:*8, 13* 44:*15*
48:*17* 54:*5, 11* 55:*3*
60:*22, 23* 62:*14* 63:*9,*
*18* 67:*5, 24* 68:*5, 11*
74:*22* 75:*18* 77:*6, 14*
85:*2* 93:*9* 94:*11*
95:*3, 5, 12* 97:*16*
107:*24*
Port 6:*11*
POS 61:*13* 89:*10*
position 9:*13, 17, 22*
10:*1, 5, 11, 16, 21, 22*
11:*9, 10, 16* 12:*1, 5*

14:*16, 24*  15:*9*  37:*20*
78:*11, 22*  79:*8*  80:*19*
**positions**  12:*23*
**possibly**  8:*4*
**post**  15:*11*  21:*16*
24:*13, 15, 16*  28:*20*
29:*8, 13*  64:*18*  81:*18*
96:*19*
**PowerPoint**  63:*1, 11*
**pre**  96:*18*
**pregnancies**  97:*6*
105:*4, 18*
**pregnancy**  96:*16, 17*
102:*5, 8*  105:*2*  106:*3*
**pregnancy-related**
97:*17*  98:*23*  102:*9*
104:*23*
**pregnant**  96:*22*  97:*3*
**pre-lease**  15:*6*  16:*2,*
*17*  21:*3*  26:*18*  29:*9*
64:*13, 18*
**pre-leased**  15:*22*
**preparation**  8:*7*
**prescription**  7:*3, 6*
**PRESENT**  2:*15*
35:*2, 5*  37:*13*  62:*8,*
*10*  95:*17*
**presentation**  51:*16*
**pretty**  35:*17*  51:*17*
64:*2*  81:*5*  99:*15*
103:*19*  106:*15*
**prevent**  6:*20*
**previous**  65:*5*  85:*12*
**previously**  75:*12*
**price**  68:*23, 24*  69:*12*
**pricing**  68:*20*
**Primarily**  24:*1*
**principal**  10:*8*
**prior**  18:*21*  24:*22*
28:*22*  51:*4, 6, 9, 12*
54:*9*  76:*20*
**privacy**  49:*12*
**private**  24:*23*
**probably**  7:*11, 12*
13:*14*  40:*24*  43:*19*
53:*4*  62:*24*  63:*7*
69:*9*  75:*17*  89:*1*
92:*22*  105:*7*
**problem**  86:*19*  105:*6*
**problems**  22:*5*  87:*20*

**procedure**  21:*6*
24:*19*  35:*11*  40:*9, 13*
48:*18*  54:*6*  55:*4*
62:*11*  63:*9*  75:*18*
77:*7*  93:*9*  94:*11*
95:*3, 5, 12*
**procedures**  17:*3*
31:*7*  35:*10*  41:*2, 4*
42:*1*  50:*20*  54:*5, 12,*
*17, 20*  61:*9*  84:*19*
95:*22*  97:*9*
**proceeding**  54:*7*
**proceedings**  111:*3*
**producer**  47:*22*  48:*2,*
*8*
**product**  16:*4*  17:*16,*
*19*  23:*10, 14, 16, 17*
31:*20*  39:*6, 7*  40:*3,*
*22*  51:*15*  61:*16*  91:*8*
**products**  23:*6*  41:*12*
89:*23*
**professional**  9:*15*
**program**  45:*1*  97:*10*
**progress**  45:*2*
**promoted**  9:*19, 20,*
*21*  10:*5, 17*
**promotional**  13:*6*
**promotions**  47:*13*
**properly**  60:*11*
**protect**  40:*2*  55:*1*
62:*5, 16*
**Protection**  20:*20, 23*
24:*5, 7, 23*  25:*6*
28:*13, 14*  37:*18*
40:*19*  43:*20*  48:*17*
53:*19, 21*  56:*15*  60:*3,*
*14*  61:*1, 4, 9, 22*
62:*22*  69:*15*  76:*20*
79:*19*  80:*13, 17, 20,*
*23, 24*  81:*8, 11, 14, 23*
90:*4, 10, 12, 15, 23*
91:*3*  92:*17*  95:*20*
96:*5, 13*
**Protection's**  25:*7*
80:*8*
**prove**  82:*13*
**Public**  1:*20*
**pull**  44:*5, 17*  49:*21*
67:*13*  83:*12*
**pulling**  61:*14*  95:*17*

**purchase**  19:*12*
25:*17, 21*  27:*24*  31:*9*
33:*3*  34:*13*  36:*2, 14*
41:*18*  42:*3, 4*  43:*12,*
*15*  60:*2, 13*  62:*13*
66:*24*  67:*22*  68:*18*
71:*16*  72:*7*  85:*17, 18,*
*20*
**purchased**  60:*24*
67:*22*  68:*9, 14*  69:*3*
**purchaser**  23:*9*
**purchases**  17:*12, 13*
19:*24*  20:*21*  25:*8, 9*
32:*5*  38:*7*  39:*7*
46:*17*  57:*19, 24*  58:*5*
60:*15*  61:*23*  64:*2*
68:*8*  74:*24*  75:*9*
76:*16*  77:*15*  93:*24*
**purchasing**  21:*2*
23:*7*  24:*9*  32:*8*
35:*19, 20, 21*  36:*20*
39:*14, 23*  69:*15*
85:*18*
**purpose**  45:*15*
**purposes**  21:*19*  105:*2*
**pursuant**  1:*18*
**pursued**  100:*20*
**pushing**  74:*24*  75:*2*
**putting**  61:*13*

**< Q >**
**question**  5:*5, 23*
7:*14*  15:*5*  16:*20*
29:*12*  33:*8*  42:*7, 15*
43:*10, 24*  44:*4*  45:*10,*
*12*  47:*1*  48:*1, 2*
51:*20*  66:*23*  67:*6*
71:*15*  72:*6*  85:*13*
87:*6*  91:*11, 15, 17*
92:*4, 24*  107:*1, 2, 21*
108:*9*
**questioning**  43:*18*
65:*7*
**questions**  6:*21*  7:*1*
50:*15*  54:*5*  65:*22*
66:*4, 8*  83:*17*  96:*16*
106:*16, 17*  110:*2*
**quickly**  9:*19*
**quite**  98:*10*  102:*6*

**< R >**
**ran**  9:*23*  12:*17*
**rang**  88:*23*
**Raton**  9:*15, 21*
**Ravkin**  53:*2, 14*
**reaction**  25:*15*
**read**  4:*5*  45:*9, 11*
50:*14*  66:*1, 7, 10*
84:*19*  109:*3*  110:*1*
**reading**  65:*18*
**reads**  50:*16*  66:*9*
83:*18*
**Ready**  9:*23*  12:*6, 7,*
*10, 13*  13:*13*
**really**  11:*1, 7*  13:*8*
16:*17*  17:*2*  20:*6*
21:*4, 9*  31:*19*  35:*3*
38:*3, 18*  39:*17*  41:*13*
44:*14*  52:*9*  60:*9, 16*
61:*5, 15*  63:*1, 2, 6, 8*
68:*3*  69:*15*  76:*2, 7, 9*
77:*7*  81:*21, 22*  88:*11,*
*22*  89:*8*  92:*3*  93:*22*
96:*18*  101:*16, 17*
**RealReal**  93:*8*
**reason**  6:*20*  21:*4*
**reasons**  49:*15*  75:*22*
**recall**  6:*15*  14:*1*
20:*12*  49:*17, 19*  51:*3*
56:*22*  64:*8*  76:*2, 5, 7,*
*17*  94:*8, 17, 18*  96:*12*
97:*1*  101:*24*  104:*12,*
*21*  105:*5*
**receipt**  69:*24*
**receive**  47:*13*
**received**  38:*19*  54:*16*
**receiving**  34:*9*  39:*20*
41:*15*
**recess**  74:*7*
**recipient**  85:*11*  86:*1,*
*10, 13*
**recipient's**  85:*13*
**recognize**  52:*9*
**recognizing**  97:*14*
**record**  22:*16, 17*
45:*15*  87:*1*  106:*23*
**reduced**  29:*1*
**reenters**  45:*8*
**refer**  54:*13*

Case 1:19-cv-08927-GBD-SLC   Document 128-3   Filed 09/20/23   Page 44 of 56

Deposition of Cathy Younis                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**referring** 11:*20*, *21*
63:*8* 67:*9* 71:*18*
72:*13*
**refresh** 49:*23*
**regarding** 17:*12*
22:*21* 34:*2*, *16* 36:*13*
39:*7* 48:*21* 52:*5*
56:*2* 60:*22* 61:*9*
75:*14* 76:*16* 88:*7*
90:*6*, *23* 91:*3*, *21*
92:*17* 97:*6*
**regards** 16:*19*
**regional** 9:*22* 10:*1*, *2*
11:*4*, *9*
**register** 33:*11* 44:*13*
89:*8*
**registers** 44:*14*
88:*22* 89:*9*
**regular** 81:*10*
**reimbursement** 41:*16*
**reinforce** 50:*19* 54:*3*
**relating** 8:*10*
**relationships** 10:*9*
11:*1*, *2*
**releases** 16:*4*
**reliable** 51:*18*
**remember** 49:*5* 50:*6*,
*7*, *21* 63:*4* 70:*18*
76:*8* 95:*20* 98:*9*
**rep** 84:*3*
**rephrase** 107:*21*
**report** 13:*15* 38:*18*
102:*23* 103:*9*, *10*, *15*
110:*5*
**reported** 12:*9*, *18*
13:*11*, *17* 14:*10*
**Reporter** 1:*19* 4:*1*
5:*2* 45:*11* 111:*18*
**reporting** 17:*6*, *7*
103:*11*
**reports** 12:*20* 100:*7*
103:*18*, *21*, *23*
**representative** 52:*22*
**reprimand** 100:*22*
101:*1*
**reproduction** 111:*16*
**reps** 77:*24*
**request** 99:*19*
**requesting** 57:*5*

97:*16*
**requests** 99:*13*
**required** 100:*11*, *13*
**resell** 37:*11*
**reseller** 57:*12* 94:*12*
**resellers** 82:*20* 92:*19*
**reselling** 23:*8* 39:*17*
79:*15* 82:*24* 90:*20*
92:*9* 93:*7*, *11*
**reserve** 106:*17*
**resources** 53:*13*
77:*19*
**respond** 4:*24* 52:*12*
**responding** 50:*14*
**responds** 70:*17* 72:*8*
**response** 50:*24*
53:*24* 56:*6*
**responses** 4:*24*
**responsibilities** 12:*4*
40:*21*
**responsibility** 12:*16*
25:*12* 86:*9*
**responsible** 20:*20*
25:*8* 37:*20* 46:*12*, *15*,
*19*, *23* 60:*6*
**result** 23:*21*
**RETAIL** 1:*9*
**retailers** 92:*12*, *14*
**review** 8:*6*, *19* 65:*6*
**reviewed** 9:*4*
**reviewing** 66:*5* 83:*16*
**reviews** 13:*6*
**Revised** 27:*24*
**reward** 44:*24*
**rewards** 44:*22*
**RICHARD** 1:*11*
51:*21*, *23* 52:*5*, *7*, *12*
53:*23* 57:*17* 98:*7*
**richer** 45:*1*
**rid** 73:*9*
**right** 4:*21* 6:*19* 7:*9*,
*17* 11:*24* 13:*8* 15:*22*
18:*23* 23:*2* 25:*16*
26:*1*, *10*, *24* 27:*18*, *20*,
*21* 28:*8*, *20*, *21*, *23*
29:*8* 30:*23* 31:*3*, *6*
32:*2*, *22* 36:*3* 37:*15*
39:*5* 40:*12* 41:*16*
43:*13* 44:*1* 49:*16*
50:*5* 51:*21* 52:*17*

54:*15* 57:*10* 64:*4*, *22*
65:*3* 69:*5* 70:*1*, *21*
71:*21* 72:*8* 73:*11*, *14*
82:*23* 85:*1*, *12*, *16*, *22*
89:*23* 90:*21* 96:*15*
106:*16* 107:*19*, *22*
108:*7*
**right-hand** 50:*9*
**ring** 38:*6*, *12*, *14*, *15*
44:*13*, *14* 46:*1* 88:*17*,
*24* 89:*8* 96:*10*
**ringing** 42:*6*, *14*
43:*12*, *16* 44:*1*, *16*
60:*5*, *10*
**Road** 2:*6*
**role** 9:*19*, *20* 10:*6*
11:*5* 12:*15* 13:*5*
38:*5* 63:*5*
**roles** 13:*6*
**rolling** 10:*4*
**rotate** 56:*15* 71:*11*
**rotates** 71:*12*
**RPR** 111:*12*
**rules** 4:*23*
**run** 34:*8*
**rung** 38:*11* 44:*1*
**runway** 12:*12*
**RWDSU/UFCW** 1:*10*

< S >
**sale** 38:*14*, *15* 60:*5*
62:*7* 63:*20* 67:*1*, *5*, *8*,
*10*, *23* 68:*10* 69:*24*
70:*1*, *2*, *5*, *20* 71:*17*,
*18* 72:*7*, *10*, *11* 73:*1*,
*2* 74:*11* 75:*4*
**sales** 9:*15*, *18* 46:*13*,
*21*, *24* 47:*4*, *7*, *14*, *17*,
*21* 59:*8* 67:*20*, *21*
68:*12*, *20*, *22* 69:*16*
70:*23* 71:*1* 74:*22*
87:*2* 100:*20* 101:*9*
102:*23* 103:*8*, *11*
104:*8*
**Sanela** 65:*9* 66:*14*,
*15* 70:*17*
**save** 84:*11*, *20* 85:*10*
**savoir** 51:*14* 101:*7*
**saw** 52:*9* 53:*2*, *4*, *8*

**saying** 5:*2* 24:*15*
28:*6*, *7* 39:*11* 64:*17*
65:*8*, *22* 68:*3* 69:*13*
75:*3* 82:*9* 85:*1*, *6*, *21*
87:*4*, *12*, *22* 90:*9*, *19*
107:*18*
**says** 26:*10* 27:*24*
31:*8* 32:*1*, *22* 34:*21*
43:*18* 50:*5*, *6*, *10*
51:*22* 52:*13* 54:*2*
65:*9* 66:*14*, *23* 71:*20*
83:*19*, *22* 84:*5* 86:*16*
87:*7*, *18*
**scenario** 107:*20*
**scenarios** 28:*19* 63:*2*
**scheduling** 21:*19*, *21*
75:*20*
**screen** 26:*5* 28:*9*, *11*
30:*11* 32:*17*, *19* 50:*2*
55:*7*, *8* 65:*1* 73:*14*,
*16* 83:*13* 88:*4*, *5*
**screens** 69:*10*, *16*
70:*6*
**scroll** 50:*9* 65:*15*, *16*,
*19*
**second** 84:*5*
**see** 11:*7* 25:*12*, *13*
26:*7* 33:*1* 39:*9* 50:*4*,
*12*, *18*, *24* 52:*1* 53:*23*
67:*2* 69:*1*, *7*, *9*, *11*, *12*,
*14* 70:*6*, *7*, *14* 83:*21*,
*22* 84:*7*, *12* 86:*20*, *22*
87:*20* 101:*15*
**seen** 26:*12*, *14* 70:*6*
**sell** 39:*13* 67:*14*
86:*7*
**selling** 24:*19* 85:*10*
91:*8*, *12*, *22* 92:*10*
101:*7*
**send** 35:*4* 57:*5*
88:*17*
**sending** 42:*15* 57:*24*
58:*3* 83:*2* 88:*18*
**senior** 12:*18* 49:*24*
53:*1*
**sent** 36:*10* 51:*21*, *23*
52:*13* 56:*4* 58:*8*
60:*13* 84:*3*
**separate** 16:*1* 76:*19*,

*22* 93:*20*
**September** 9:*12*
**serves** 77:8
**service** 22:5 23:*14*
38:5 51:*13* 93:*17*, 20
**services** 34:7
**seven** 12:8 13:*11*, 13
**sex** 102:*16*
**sexual** 102:*13*
**SGerber@BGlaw.com**
2:*13*
**share** 31:*23*
**shared** 49:*17*
**sharing** 28:*11* 30:*11*
32:*19* 55:8 73:*16*
88:5
**Shawn** 84:*3*
**ship** 32:7, *14* 33:2,
*17*, 20 34:*13*, 20, 23
35:22 60:2 78:*24*
79:6, *24* 80:4 84:*10*
85:*3*, 22, 23 86:*1*, 6,
*13* 87:*12*
**shipped** 32:*10*, *13*
60:4, *14* 86:9
**shipping** 34:2, 6, 8,
*13*, *18* 35:8, *15*, 23
55:*10* 59:8, 20, 24
60:6, *11*, 12 62:*13*
79:23 84:6 85:6, 9,
*11* 86:4 107:8, *17*, 22
108:*12*
**shoe** 12:*17*, *18* 64:6,
*10* 74:*15* 75:*10*
**shoes** 12:*17*, *19* 13:3
64:*15*, *19* 74:*11*, *14*
**shop** 78:*3*, *12*, *15*, *16*
**shopped** 103:*13*
**short** 73:*20*
**show** 68:*16*, *23*
69:*18*, *24*
**shows** 103:*11*
**sickness** 106:9
**sign** 4:6 31:*23* 109:*3*
**similar** 56:*3* 57:2
**sister** 41:*23*
**six** 16:*4* 27:8
**skills** 16:8 51:*13*, 16
**slight** 19:*22*

**slightly** 30:*21* 72:*23*
**slip** 6:*13*
**SMITH** 2:*1*
**software** 102:*18*
103:6
**sold** 75:*1* 91:*24*
**somebody** 95:*17*
**sorry** 50:*1* 92:4, 7
105:*10*
**sound** 43:*22*
**SOUTHERN** 1:*1*
**speak** 5:*3* 8:*15*
49:*10* 67:*15* 77:*22*
87:*23* 88:*12*
**speaking** 5:6
**special** 67:*11*, *13*
70:*23* 71:*1* 74:*10*
**specific** 11:*21* 13:*1*
14:*18*, *19* 15:2, *4*
16:*1*, *20* 17:*17* 18:*1*
19:8 22:*21* 26:*20*
27:*15* 29:*4* 32:9
34:*12* 35:*15* 36:*11*
40:*1* 43:*24* 49:*15*
51:*20* 54:*23* 67:*17*
72:*12* 73:*10* 74:*21*
79:*3* 81:9, *16*
**specifically** 23:*19*
26:*22*, *23* 40:*5*, *18*, 20
42:2 46:*10* 55:2
56:*12* 60:7 94:*13*
**specifics** 21:*10* 36:*18*
37:*19*
**speculate** 66:2
**spend** 12:9
**spending** 76:9
**spoke** 7:*22*
**spoken** 8:*11*
**St** 2:7
**stamped** 50:*10* 65:*3*
83:*20*, *23*
**standing** 51:*19*
**standpoint** 23:*15*
40:*24* 75:*19*
**start** 9:*10* 16:*16*
20:5 65:7 83:*16*
**started** 9:*18* 14:2
15:8 36:8 84:9
101:*15*

**state** 6:8 34:*21*
84:*10* 85:*3* 107:*9*, 23
108:*12*, *13*, *18*
**stated** 12:*1*
**statement** 39:*11*
70:*21* 84:*16*, *18*
**STATES** 1:*1* 30:*18*
34:*17*, 22 35:9, *15*
55:*11* 59:8 87:2
**status** 51:5 52:6
**stayed** 28:*24* 29:*24*
**staying** 81:*20*
**stays** 31:5
**stenographic** 111:5
**step** 44:5
**Steve** 7:*22* 106:*21*
**STEVEN** 2:*10*
**steward** 78:*12*, *15*, 16
**stewards** 78:*3*
**stock** 72:*24*
**stopping** 73:*18*, 22
**store** 10:*14*, *18* 16:5
35:*20* 52:*23* 54:4
61:*23*, *24* 62:*1*, 9
91:*21* 96:5
**stores** 9:*24* 10:*19*
90:*23* 91:4, 8, *12*
92:8, *11*, *12*, *18*, *19*
**STOREWORKERS**
1:8, *10*
**Street** 2:*11* 10:*15*
18:*11*
**stringent** 35:*17*
**strong** 36:*19*, 22
**subject** 97:7 99:*1*
**sued** 6:*1*
**suffer** 6:*23*
**suggesting** 33:*15*
**suggestion** 54:*3*, 16
85:2
**Suite** 2:2, 7
**summer** 98:*3*
**Sunday** 66:*14*
**supervise** 16:22 47:*3*
80:*20*
**supervising** 14:*1*
16:*14*
**supervision** 14:*4*
**supervisors** 45:*19*
**support** 81:*13*

**supposed** 7:6 65:*17*
68:*13* 91:*24*
**sure** 4:*24* 5:*12*, *17*,
22 7:*16* 9:*3*, *18*
13:*24* 21:*20* 23:*15*
36:*10* 37:*20* 39:*22*
41:*1*, 6 44:*10*, *12*, *14*
46:8, *20* 49:*18* 60:*10*,
*19* 63:*13*, *16* 64:8
75:*17*, *19* 76:*1* 80:5
81:5 83:7 86:*11*
89:*22* 90:*24* 91:*16*
93:6 95:*16* 98:*10*
101:*21*
**surgeries** 105:*1*, *3*, *18*
**surgery** 105:8
**surprised** 24:*24*
**surrounding** 75:*15*
**Susan** 98:*11* 105:7
**suspicion** 57:*11*
**sworn** 4:9
**system** 33:*10* 101:*15*
**systems** 10:4 19:*23*
62:4, 5

**< T >**
**take** 5:2 7:*3*, 6, 9, *13*,
*15* 14:*20* 16:*13*
31:*15* 33:*3* 38:*24*
39:*16* 55:6 65:2
73:*14*, *15*, 20 83:*15*
88:*3* 101:*10* 103:4
106:*18*
**taken** 1:*17* 5:*14* 8:2
9:*4* 34:6 69:*18* 74:7
111:5
**talent** 53:*15*
**talk** 7:*21* 14:*18*
39:5 55:*20* 56:*17*, 20
58:*24* 105:*12*
**talked** 23:*18* 39:6
63:2, *17* 75:*20*, *21*
**talking** 12:*24* 18:*1*
21:*12* 24:2 27:*3*
28:*21* 29:8 41:*10*
42:*1* 47:8 64:*1*
67:*18* 72:22 81:*12*
102:*24* 103:2 105:*11*
**talks** 39:*17*
**tardiness** 106:*12*

**tax** 32:8  33:3, 10, 24  34:22  55:12  59:9  84:11, 20  85:10  108:19

**taxes** 33:20  108:13, 16, 19

**team** 16:7  19:17, 20  21:20  38:22  41:2  48:23  95:19  96:13  101:17  105:1

**teams** 20:6

**technically** 59:1

**Technician** 2:16  65:12  71:12

**tell** 18:3  24:22  32:24  57:16, 17, 23  58:3, 18  59:13  76:14, 15  77:19  79:5  82:16  98:15

**telling** 30:16  50:19  70:19

**temporary** 52:23

**tenure** 80:2

**terminate** 21:24  22:6, 10

**terminated** 40:3  46:4  47:6  48:13, 16  49:15  51:24  54:24  55:10, 18  58:14  76:12  94:8, 10, 15, 24  95:2  100:3

**termination** 23:23  48:21  56:1, 2, 21, 24  57:11, 18  63:12  75:14, 16, 23  76:20  95:5, 23

**terminations** 46:9

**terms** 39:22  51:15  61:19  85:6  95:10  97:13  103:16

**testified** 4:9

**Text** 3:12  66:13

**Thank** 10:10  28:10  32:18  49:22  65:16  74:2  109:2

**Thanks** 52:15  71:13  74:3

**theft** 25:13  40:17

**thereof** 110:5

**thing** 21:17  23:4, 5  54:15  56:19  65:20  66:6, 7  71:4  88:12, 13

**things** 4:22  19:7  21:9  22:5  23:8  24:20  27:15  35:12, 13  38:20  39:14  40:11, 14  41:11  46:17  49:9  54:12, 13  59:17  61:17, 20  63:2  75:21  90:13, 17, 18  99:15  101:8  107:19

**think** 5:13  12:15  13:7, 14  15:5  21:5, 18, 19  33:8  34:10  36:7, 9, 18  37:8, 17, 22  39:10, 23  40:15, 23  45:6, 7  52:22  53:21, 22  56:5  57:21  61:6  62:24  63:3  64:4, 23  69:9  70:24  72:18  75:2  81:17  82:2, 21  83:8  87:24  89:1, 21  90:24  91:1  92:21  93:2  96:23, 24  97:13  98:9, 10  100:4, 13  101:8, 13, 15, 17  104:24  105:3, 24  106:18, 19, 20, 21  107:16, 17

**third** 23:8

**Thompson** 81:3

**thought** 53:3, 4, 8  67:17

**thread** 39:24  72:13

**three** 31:16, 17  34:10  35:9  59:22  105:23

**tied** 44:23

**TIERNEY** 2:6  3:5  4:4  5:21  7:20  8:21  14:21  15:18  16:24  17:8, 14, 20  18:15  19:3  20:2  22:22  24:10  25:2  29:2, 17  33:5  34:4  36:15  37:4  39:3  42:11  45:8, 10, 13  46:6  47:8  48:3, 14  50:13

**51:7  55:14, 19  57:7, 13, 20  58:9, 15, 23  59:10  60:18  61:2  63:22  65:5, 24  66:6  70:3, 11  73:17, 23  74:3, 18  75:24  77:3, 16  78:18  79:1, 10, 16  81:1  83:4  87:14  88:9  89:18  90:7  91:5, 14  92:1  97:18  98:24  100:23  102:20  103:24  105:10  106:4, 20  107:5, 11  108:9, 11, 20, 23  109:3

**time** 7:10  11:13, 16, 21  12:2, 10, 24  13:20  17:20  18:1  19:10  20:12, 18  22:9  23:3  24:1, 2, 4, 6  25:8, 18, 21  28:22  29:4, 5, 24  32:24  35:20  36:5, 12  37:5, 7, 8  38:9, 10  39:8  40:22  43:5  44:16  46:2, 13, 18  47:7, 14, 15, 16, 19  52:23  53:5  55:24  57:10, 17  58:4, 13, 20, 21  59:14  60:13  63:19  64:7  68:17, 19  76:9  81:12  85:24  86:6, 12  88:16  89:13  92:22  95:7, 11, 14, 21  96:2, 17  97:15, 22, 24  98:1, 8, 11, 17  99:6, 12  100:3  106:17  108:5, 21

**timeline** 15:4  19:8  36:11  101:23

**timelines** 105:7

**times** 23:13  74:12  90:16  103:14  108:16

**timing** 19:5

**Tinbite** 53:11

**today** 6:21  18:2  32:8  33:3, 4  38:8

**today's** 7:18  8:7, 16, 20  11:19

**told** 58:21  96:24  97:1  103:3

**tools** 22:4

**top** 10:8  46:16  47:22  48:2, 8  49:19  65:8, 9

**topic** 19:19  38:24  39:24  40:2  63:17  76:9

**Torres** 53:20

**total** 38:22  62:1  103:11

**totally** 13:8  37:9  49:17

**touch** 19:20

**track** 82:20  102:19

**tracking** 19:23  20:21

**train** 38:16

**trained** 89:9

**training** 14:19  15:2  16:1, 11, 14, 22  38:19  62:20, 21  81:9  89:11

**trainings** 16:3  108:17

**transaction** 18:12  30:20  33:22  88:24  89:3

**transcript** 4:2  9:2  110:2  111:8, 16

**transcripts** 8:19  9:3

**tremendous** 13:4

**tricksters** 61:13

**true** 68:3  84:14, 17  87:22  111:7

**truly** 37:12, 15, 21

**try** 31:19  48:22

**trying** 13:7  31:16  54:14  61:17, 19  63:4  73:9  75:17  84:20  89:5, 22  105:2

**turn** 84:4

**turnover** 13:5

**Twenty-four** 29:6

**twice** 16:10

**Two** 8:10  10:9  18:12  20:14, 15  27:20  28:1  30:16, 19  50:23  64:1  67:22  68:10  70:24  73:18  74:12  80:14  82:3  87:3  97:11  98:2  103:14  105:4

**two-day** 73:12

**Tyndall** 2:15

type  6:*12*  24:*5*
56:*19*  62:*20*, *21*
typical  50:*24*  101:*8*
105:*17*

**< U >**
unauthorized  90:*21*,
*23*  91:*4*
unclear  92:*3*
undergo  15:*3*, *24*
understand  5:*23*  7:*1*
21:*18*, *20*  43:*10*, *17*
48:*22*  77:*6*
understanding  6:*21*
51:*5*
understood  41:*5*
unfortunately  61:*18*
UNION  1:*9*  19:*6*
30:*24*  77:*2*, *6*, *7*, *10*,
*11*, *22*, *24*  78:*2*, *13*
84:*3*
UNITED  1:*1*, *8*, *9*
upload  26:*3*
use  34:*7*  35:*11*
39:*14*  41:*16*, *17*
42:*22*, *23*  43:*1*, *5*, *11*
54:*8*, *13*  72:*10*  88:*22*
102:*18*, *23*  105:*11*
user  39:*23*  86:*11*
usually  40:*11*  73:*12*

**< V >**
valid  34:*20*, *24*
verbal  4:*24*  56:*7*
verbiage  30:*21*
verify  62:*12*
versa  5:*5*
versus  18:*4*, *5*
vice  5:*5*
Victoria  14:*11*  84:*6*
VIDEO  65:*12*  71:*12*
74:*5*
Videoconference  1:*17*
109:*4*  110:*3*  111:*6*
viewed  26:*5*  50:*2*
65:*1*
violate  105:*13*
violating  67:*24*
107:*10*, *15*, *24*

violation  108:*14*
VIPs  31:*11*
visibility  20:*10*
VVIP  31:*15*
VVIPs  31:*12*

**< W >**
wait  5:*4*, *5*
wall  34:*19*  56:*18*
want  14:*18*  23:*15*
33:*19*  35:*2*  43:*16*
49:*20*  53:*6*  60:*2*, *18*
73:*19*, *23*  74:*5*  84:*4*
86:*10*  105:*13*
wanted  32:*1*, *4*
38:*24*  39:*5*  70:*20*
101:*16*  108:*24*
warning  23:*22*
101:*13*, *14*
watching  24:*5*  90:*17*
way  19:*14*  31:*23*
68:*18*  71:*1*  82:*15*, *18*
89:*23*
ways  100:*19*
Wear  9:*23*  12:*7*, *10*,
*13*  13:*13*
weekend  54:*2*
weekly  103:*19*
well  32:*22*  40:*15*
68:*13*  69:*14*  84:*10*
97:*7*  100:*6*
went  18:*23*, *24*  20:*8*
27:*6*  28:*23*  29:*22*
38:*13*  41:*6*  64:*13*
71:*1*, *2*  81:*15*  89:*11*
101:*13*
West  2:*11*
we've  23:*12*  34:*6*
whatnot  107:*17*
WHOLESALE  1:*9*
wide  62:*15*
wise  69:*21*
withdrawn  8:*12*
14:*24*  21:*2*  26:*17*
28:*14*  32:*23*  42:*5*
48:*1*, *12*  59:*5*  68:*6*, *8*
74:*23*  76:*15*  77:*1*
78:*1*  79:*6*  81:*8*
94:*17*  104:*17*  105:*21*

WITNESS  3:*2*  5:*22*
7:*20*  11:*23*  14:*22*
15:*19*, *23*  17:*2*, *10*, *16*
18:*17*  19:*4*  22:*24*
24:*12*  29:*3*, *18*  33:*7*
34:*6*  36:*17*  42:*13*
44:*2*  45:*6*  46:*8*
47:*11*  48:*5*, *16*  50:*14*,
*16*  51:*9*  55:*22*  57:*14*,
*21*  58:*11*, *16*, *23*  59:*2*,
*11*  60:*20*  61:*4*  63:*24*
65:*6*, *8*, *13*  66:*1*, *9*, *10*
70:*5*, *13*  74:*6*  76:*1*
77:*5*, *18*  78:*19*  79:*3*,
*12*, *18*  81:*3*  83:*6*, *18*
87:*16*  88:*11*  89:*20*
90:*9*  91:*7*, *16*  92:*3*
97:*20*  99:*2*  101:*1*
102:*22*  104:*2*  105:*15*
106:*6*  107:*13*  108:*21*
109:*1*
word  72:*10*
work  77:*1*, *2*, *10*
80:*15*  97:*14*
worked  12:*8*  16:*6*
66:*20*  71:*7*  72:*1*
working  9:*10*  24:*23*
82:*3*
works  72:*3*  78:*14*
world  17:*17*
Wright  98:*11*
writes  71:*22*
writing  57:*5*
written  56:*23*
wrong  13:*22*  105:*15*
wrote  72:*5*

**< Y >**
yeah  21:*17*
year  13:*1*  16:*4*, *11*
19:*15*  20:*13*  27:*7*, *8*
30:*20*  39:*16*  64:*1*
67:*19*  68:*19*  70:*24*
72:*15*, *23*  87:*4*  90:*16*
101:*21*  102:*1*, *3*
years  5:*12*  6:*18*
10:*3*, *6*, *9*  11:*7*, *11*
13:*7*  15:*12*  20:*15*
22:*6*  34:*3*, *10*  35:*9*
40:*7*  44:*13*  52:*8*

59:*22*, *23*  63:*14*
72:*21*, *22*  81:*4*  87:*4*
93:*3*  101:*2*  105:*7*, *9*,
*16*, *23*  106:*1*
yep  50:*21*, *24*  52:*18*
67:*3*  84:*8*, *13*  109:*1*
Yonas  53:*11*
YORK  1:*1*, *8*  2:*3*, *12*
6:*7*  10:*12*, *13*  12:*2*
32:*5*, *12*, *13*  43:*17*
108:*14*
YOUNIS  1:*17*  3:*3*
4:*5*, *8*, *11*  22:*20*  26:*7*
65:*15*  74:*4*, *10*  107:*8*
110:*1*, *24*  111:*6*

**< Z >**
zero  34:*22*
Zoom  26:*5*  28:*11*
30:*11*  32:*19*  45:*8*
50:*2*  53:*6*  55:*8*  65:*1*
73:*16*  83:*13*  88:*5*

Deposition of Cathy Younis
Kristina Mikhaylova v. Bloomingdale's Inc., et al.

## WORD LIST

**< 0 >**
**001534**  *(2)*
**001535**  *(1)*
**00158**  *(1)*
**00159**  *(1)*
**00197**  *(1)*

**< 1 >**
**1**  *(3)*
**1:02**  *(1)*
**1:05**  *(1)*
**1:10**  *(1)*
**10**  *(4)*
**10:11**  *(1)*
**10:36**  *(1)*
**10:40**  *(1)*
**10119**  *(1)*
**10120**  *(1)*
**108**  *(1)*
**10-minute**  *(1)*
**11**  *(7)*
**11:58**  *(1)*
**112**  *(1)*
**11477**  *(1)*
**12**  *(2)*
**12:10**  *(1)*
**14**  *(2)*
**15**  *(1)*
**158**  *(1)*
**16**  *(5)*
**16th**  *(3)*
**17**  *(3)*
**18**  *(1)*
**18th**  *(1)*
**1989**  *(1)*
**19-8927**  *(1)*
**1st**  *(2)*

**< 2 >**
**2**  *(1)*
**20**  *(2)*
**20/20**  *(3)*
**2016**  *(6)*
**2017**  *(10)*
**2022**  *(3)*
**212**  *(2)*
**24**  *(18)*

**26**  *(1)*

**< 3 >**
**3**  *(4)*
**30**  *(1)*
**314)517-7814**  *(1)*
**33**  *(4)*
**34th**  *(1)*

**< 4 >**
**4**  *(2)*
**40**  *(2)*
**40/20/20**  *(3)*
**400**  *(1)*
**4905**  *(1)*

**< 5 >**
**50**  *(2)*
**50/20/20**  *(3)*
**587-0760**  *(1)*
**59th**  *(2)*

**< 6 >**
**60**  *(3)*
**60/20/20**  *(4)*
**63141**  *(1)*

**< 7 >**
**792-6246**  *(1)*

**< A >**
**a.m**  *(4)*
**a/k/a**  *(1)*
**ability**  *(4)*
**able**  *(5)*
**absence**  *(1)*
**abuse**  *(5)*
**Accessories**  *(12)*
**Accessory**  *(1)*
**accommodate**  *(1)*
**accommodation**  *(2)*
**accommodations**  *(7)*
**accomplish**  *(1)*
**account**  *(15)*
**accountable**  *(1)*
**accurate**  *(1)*
**accurately**  *(1)*
**acquisition**  *(1)*
**action**  *(1)*

**actual**  *(1)*
**acumen**  *(1)*
**additional**  *(5)*
**address**  *(33)*
**addresses**  *(7)*
**adhere**  *(1)*
**admonish**  *(5)*
**advised**  *(1)*
**advisor**  *(1)*
**Advisors**  *(1)*
**AFL-CIO**  *(1)*
**age**  *(2)*
**ago**  *(11)*
**agree**  *(1)*
**Agren**  *(2)*
**ahead**  *(1)*
**aligned**  *(3)*
**allowed**  *(10)*
**Amapara**  *(3)*
**amount**  *(7)*
**and/or**  *(1)*
**Angie**  *(2)*
**answer**  *(52)*
**answering**  *(1)*
**answers**  *(2)*
**anybody**  *(1)*
**anybody's**  *(1)*
**AP**  *(7)*
**apiece**  *(1)*
**APPEARANCES**  *(1)*
**apply**  *(5)*
**approval**  *(1)*
**approved**  *(1)*
**Approximately**  *(3)*
**April**  *(1)*
**asked**  *(5)*
**asking**  *(11)*
**asks**  *(1)*
**aspects**  *(1)*
**Asset**  *(49)*
**assignment**  *(1)*
**associate**  *(12)*
**associates**  *(18)*
**associate's**  *(3)*
**assumed**  *(1)*
**assuming**  *(3)*
**assumption**  *(1)*
**attention**  *(2)*
**attorney**  *(2)*

**aunt**  *(1)*
**authenticate**  *(2)*
**authenticity**  *(1)*
**Authority**  *(1)*
**authorized**  *(1)*
**available**  *(1)*
**avoid**  *(2)*
**Avoiding**  *(1)*
**aware**  *(23)*
**awareness**  *(2)*

**< B >**
**baby**  *(1)*
**back**  *(24)*
**bag**  *(9)*
**bags**  *(6)*
**Barbara**  *(4)*
**Barbour**  *(1)*
**BARTON**  *(1)*
**based**  *(4)*
**basically**  *(4)*
**bates**  *(4)*
**beautiful**  *(4)*
**beginning**  *(1)*
**behavior**  *(2)*
**behaviors**  *(1)*
**believe**  *(32)*
**bell**  *(1)*
**Bergdorf**  *(1)*
**best**  *(8)*
**better**  *(4)*
**BETTY**  *(4)*
**Betty.Tierney@Macys.**
**com**  *(1)*
**big**  *(8)*
**bigger**  *(1)*
**biggest**  *(2)*
**billable**  *(4)*
**billed**  *(1)*
**billing**  *(22)*
**bit**  *(7)*
**BL001535**  *(1)*
**BLM**  *(4)*
**BLM1534**  *(1)*
**BLOOMINGDALE'S**
  *(72)*
**BLOOMINGDALE'S,**
**INC**  *(1)*
**BOBBY**  *(3)*

Boca  *(3)*
bond  *(1)*
book  *(1)*
**BOOKER**  *(2)*
books  *(1)*
bottom  *(9)*
boutique  *(1)*
boutiques  *(5)*
brand  *(6)*
break  *(4)*
breaks  *(6)*
brief  *(2)*
bring  *(5)*
brother  *(1)*
brought  *(1)*
Brown  *(1)*
business  *(29)*
buy  *(3)*
buying  *(8)*
buys  *(3)*

< C >
Cabin  *(1)*
California  *(1)*
call  *(4)*
called  *(1)*
calling  *(3)*
calls  *(1)*
card  *(25)*
cards  *(5)*
career  *(1)*
carefully  *(1)*
**CARROTS**  *(1)*
**CASE**  *(8)*
cash  *(1)*
Castellani  *(2)*
**CASTELLANI,individ**
ually  *(1)*
catch  *(1)*
Catherine  *(3)*
**CATHY**  *(14)*
caught  *(1)*
Cavanaugh  *(1)*
CC  *(1)*
CC'd  *(1)*
central  *(1)*
certain  *(12)*
certainly  *(3)*
**CERTIFICATE**  *(1)*

certification  *(1)*
**Certified**  *(1)*
certify  *(1)*
certifying  *(1)*
chain  *(1)*
challenge  *(1)*
challenged  *(1)*
**Chanel**  *(86)*
**Chanel's**  *(10)*
change  *(13)*
changed  *(11)*
changes  *(4)*
charge  *(5)*
charged  *(1)*
chat  *(1)*
check  *(4)*
checked  *(1)*
checking  *(5)*
child  *(1)*
children  *(1)*
choice  *(1)*
Chris  *(1)*
Christmas  *(3)*
**CHRISTOPHER**  *(7)*
circumstances  *(1)*
citizen  *(1)*
**City**  *(2)*
clarification  *(2)*
clarify  *(2)*
classic  *(2)*
clear  *(9)*
clearly  *(1)*
client  *(17)*
clientele  *(2)*
clients  *(4)*
client's  *(1)*
close  *(1)*
closed  *(5)*
closely  *(1)*
coach  *(1)*
coaching  *(1)*
code  *(5)*
collaboration  *(1)*
colleague  *(1)*
colleagues  *(3)*
combination  *(3)*
come  *(5)*
comes  *(2)*
coming  *(2)*

commencing  *(1)*
commission  *(1)*
communicate  *(1)*
communicated  *(2)*
communicating  *(1)*
communication  *(4)*
communications  *(2)*
companies  *(1)*
company  *(5)*
complain  *(2)*
complained  *(2)*
complaints  *(3)*
concerns  *(1)*
concluded  *(1)*
condensed  *(1)*
condition  *(3)*
conditions  *(2)*
conduct  *(7)*
conducted  *(1)*
conducting  *(2)*
conducts  *(1)*
confirm  *(1)*
conflict  *(1)*
confused  *(2)*
considered  *(7)*
consistent  *(5)*
consolidation  *(1)*
constantly  *(3)*
consult  *(1)*
contact  *(1)*
contained  *(1)*
content  *(1)*
continues  *(2)*
continuing  *(1)*
Contreras  *(1)*
control  *(2)*
controls  *(1)*
conversation  *(8)*
conversations  *(27)*
copy  *(2)*
corner  *(1)*
corporate  *(1)*
corporation  *(1)*
correct  *(33)*
**Correction**  *(4)*
correspond  *(1)*
correspondence  *(1)*
**Counsel**  *(9)*
counseling  *(2)*

count  *(1)*
counted  *(1)*
course  *(8)*
**COURT**  *(6)*
cover  *(1)*
covers  *(2)*
coworkers  *(7)*
created  *(3)*
credit  *(21)*
criteria  *(1)*
cross-functional  *(1)*
crystal  *(4)*
C-section  *(1)*
**CSR**  *(1)*
current  *(4)*
currently  *(1)*
customer  *(18)*
customers  *(11)*

< D >
d/b/a  *(3)*
daily  *(2)*
date  *(4)*
dates  *(2)*
daughter  *(3)*
daughters  *(2)*
David  *(1)*
day  *(4)*
days  *(1)*
deal  *(3)*
dealer  *(1)*
decision  *(2)*
decisions  *(1)*
decreased  *(1)*
deeply  *(1)*
**Defendant**  *(3)*
**Defendants**  *(1)*
definitely  *(5)*
definitively  *(1)*
delved  *(1)*
**DENNIS**  *(35)*
**DEPARTMENT**  *(21)*
departments  *(2)*
depended  *(1)*
depending  *(1)*
depo  *(1)*
**Deposition**  *(14)*
**DEREK**  *(1)*
describe  *(1)*

Case 1:19-cv-08927-GBD-SLC   Document 128-3   Filed 09/20/23   Page 50 of 56

Deposition of Cathy Younis                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**DESCRIPTION** *(1)*
**designation** *(1)*
**desirability** *(1)*
**detail** *(1)*
**determined** *(1)*
**developing** *(1)*
**Diaz** *(6)*
**DIAZ,individually** *(1)*
**dictating** *(2)*
**difference** *(6)*
**different** *(16)*
**differently** *(1)*
**difficult** *(2)*
**dipping** *(1)*
**direct** *(5)*
**directed** *(1)*
**directing** *(1)*
**directly** *(6)*
**director** *(11)*
**disciplinary** *(1)*
**discount** *(15)*
**discounted** *(3)*
**discrimination** *(4)*
**discuss** *(1)*
**discussed** *(3)*
**discussion** *(5)*
**distributed** *(1)*
**DISTRICT** *(2)*
**diversion** *(13)*
**diverter** *(3)*
**diverters** *(4)*
**document** *(15)*
**documents** *(2)*
**doing** *(18)*
**door** *(4)*
**double** *(1)*
**downstairs** *(1)*
**driver's** *(2)*
**driving** *(1)*
**due** *(1)*
**duly** *(1)*
**duplicate** *(1)*
**duties** *(2)*

**< E >**
**earlier** *(4)*
**earn** *(1)*
**easier** *(1)*
**educated** *(2)*

**education** *(2)*
**effect** *(1)*
**effective** *(1)*
**egregious** *(1)*
**either** *(5)*
**elaborate** *(1)*
**electronic** *(1)*
**elevate** *(1)*
**e-mail** *(10)*
**E-mails** *(2)*
**employed** *(8)*
**employee** *(23)*
**employees** *(30)*
**employee's** *(1)*
**employer** *(3)*
**employment** *(17)*
**encouraging** *(2)*
**enforcement** *(3)*
**enhanced** *(1)*
**enjoy** *(3)*
**ensure** *(2)*
**ensuring** *(2)*
**enter** *(2)*
**entire** *(3)*
**Eric** *(2)*
**especially** *(2)*
**ESQUIRE** *(3)*
**essentially** *(1)*
**estimate** *(1)*
**evasion** *(1)*
**evasive** *(1)*
**events** *(3)*
**Everest** *(1)*
**evidence** *(1)*
**exact** *(4)*
**exactly** *(5)*
**Examination** *(4)*
**examined** *(1)*
**example** *(1)*
**exceeding** *(4)*
**exception** *(3)*
**Exceptions** *(3)*
**Excuse** *(1)*
**executive** *(3)*
**executives** *(1)*
**EXHIBIT** *(12)*
**exhibits** *(3)*
**exist** *(1)*
**expectation** *(3)*

**experience** *(7)*
**expert** *(1)*
**explain** *(2)*
**explaining** *(1)*
**extended** *(1)*
**extensive** *(2)*
**extent** *(3)*
**extra** *(5)*
**extremely** *(1)*

**< F >**
**FA** *(3)*
**fact** *(3)*
**fair** *(1)*
**faire** *(1)*
**fall** *(1)*
**falsehoods** *(1)*
**family** *(4)*
**far** *(3)*
**fashion** *(7)*
**February** *(3)*
**federal** *(1)*
**FedEx** *(1)*
**feel** *(1)*
**fill** *(3)*
**final** *(6)*
**find** *(2)*
**fine** *(5)*
**fired** *(2)*
**first** *(15)*
**five** *(11)*
**flag** *(1)*
**flagged** *(2)*
**flags** *(1)*
**flagship** *(1)*
**Floor** *(4)*
**FMLA** *(5)*
**follow** *(4)*
**followed** *(1)*
**following** *(2)*
**follows** *(1)*
**foot** *(3)*
**foregoing** *(2)*
**form** *(56)*
**formal** *(3)*
**formally** *(2)*
**format** *(2)*
**former** *(1)*
**FORTY** *(1)*

**forward** *(1)*
**found** *(4)*
**four** *(8)*
**frame** *(1)*
**fraud** *(6)*
**fraudulent** *(1)*
**friend** *(1)*
**friends** *(3)*
**front** *(6)*
**full** *(2)*
**fully** *(1)*
**further** *(1)*

**< G >**
**general** *(13)*
**generous** *(2)*
**GERBER** *(5)*
**getting** *(5)*
**gift** *(28)*
**gift-giving** *(1)*
**gifts** *(8)*
**GILMAN** *(1)*
**give** *(28)*
**given** *(7)*
**giving** *(4)*
**go** *(28)*
**goal** *(1)*
**goes** *(4)*
**going** *(39)*
**Good** *(10)*
**Goodman** *(1)*
**goods** *(2)*
**gray** *(2)*
**Great** *(5)*
**greater** *(1)*
**greeting** *(1)*
**Grievance** *(3)*
**ground** *(1)*
**grounds** *(1)*
**GROUP** *(4)*
**guard** *(1)*
**guards** *(1)*
**guess** *(13)*
**guessing** *(2)*
**guidance** *(1)*
**guiding** *(2)*
**gut** *(1)*
**Gutierrez** *(1)*
**guys** *(1)*

Deposition of Cathy Younis                                          Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**< H >**
**Handbag** *(15)*
**handbags** *(23)*
**handbook** *(9)*
**handbooks** *(1)*
**handled** *(1)*
**handout** *(1)*
**handy** *(1)*
**happen** *(2)*
**happened** *(9)*
**happening** *(1)*
**happens** *(1)*
**harassment** *(1)*
**hard** *(3)*
**head** *(3)*
**heads** *(1)*
**hear** *(3)*
**held** *(4)*
**Help** *(7)*
**helped** *(2)*
**Hey** *(3)*
**Hi** *(2)*
**hidden** *(1)*
**high** *(2)*
**HIPAA** *(1)*
**history** *(1)*
**hitting** *(1)*
**Hoelz** *(4)*
**hold** *(4)*
**holds** *(1)*
**holiday** *(2)*
**holidays** *(2)*
**home** *(1)*
**honest** *(6)*
**honestly** *(2)*
**hope** *(2)*
**hosted** *(1)*
**hours** *(3)*
**house** *(6)*
**HR** *(11)*
**HR's** *(1)*
**human** *(2)*

**< I >**
**I.D** *(1)*
**icon** *(5)*
**iconic** *(1)*
**icons** *(1)*

**idea** *(7)*
**Idris** *(1)*
**immediate** *(1)*
**immensely** *(1)*
**impair** *(2)*
**important** *(3)*
**impossible** *(1)*
**inaccurate** *(1)*
**indicates** *(3)*
**individually** *(2)*
**inform** *(4)*
**information** *(3)*
**inhouse** *(3)*
**initial** *(1)*
**initials** *(1)*
**input** *(2)*
**Insight** *(4)*
**instance** *(1)*
**instructions** *(1)*
**intellect** *(1)*
**intelligence** *(2)*
**intended** *(2)*
**intent** *(1)*
**introduced** *(1)*
**inventory** *(1)*
**investigated** *(3)*
**investigation** *(7)*
**investigations** *(5)*
**involved** *(1)*
**involvement** *(1)*
**issues** *(3)*
**items** *(5)*
**its** *(1)*

**< J >**
**January** *(3)*
**Jersey** *(12)*
**job** *(5)*
**June** *(6)*

**< K >**
**keep** *(3)*
**Kemi** *(3)*
**kept** *(1)*
**kind** *(8)*
**kinds** *(2)*
**knew** *(2)*
**know** *(121)*
**knowing** *(1)*

**knowledge** *(3)*
**known** *(5)*
**KRISTINA** *(45)*
**Kristina's** *(26)*

**< L >**
**landing** *(1)*
**Landymore** *(1)*
**language** *(3)*
**lasting** *(1)*
**late** *(1)*
**launch** *(1)*
**LAW** *(11)*
**laws** *(3)*
**Law's** *(1)*
**lawsuit** *(2)*
**lead** *(1)*
**leadership** *(6)*
**leaning** *(1)*
**learn** *(4)*
**learning** *(2)*
**learnings** *(1)*
**lease** *(13)*
**Leased** *(13)*
**leasing** *(1)*
**leave** *(6)*
**leaves** *(1)*
**Lee** *(2)*
**Leeza** *(1)*
**left** *(7)*
**lenience** *(1)*
**lenient** *(1)*
**Letter** *(2)*
**letting** *(1)*
**level** *(5)*
**license** *(2)*
**lie** *(1)*
**life** *(1)*
**likes** *(1)*
**limit** *(15)*
**limits** *(25)*
**line** *(6)*
**lines** *(1)*
**liquidation** *(2)*
**list** *(3)*
**listed** *(1)*
**literally** *(1)*
**little** *(16)*
**live** *(1)*

**lives** *(2)*
**LLC** *(2)*
**LLP** *(1)*
**LOCAL** *(2)*
**location** *(2)*
**long** *(6)*
**longer** *(3)*
**long-term** *(1)*
**look** *(12)*
**looked** *(3)*
**looking** *(8)*
**Lori** *(3)*
**lose** *(1)*
**losses** *(1)*
**lot** *(14)*
**Louis** *(1)*
**loyalist** *(3)*
**l-o-y-a-l-i-s-t** *(1)*
**loyalty** *(2)*
**lunch** *(3)*

**< M >**
**MACY'S** *(16)*
**main** *(1)*
**major** *(1)*
**maker** *(1)*
**making** *(15)*
**manage** *(2)*
**management** *(3)*
**manager** *(17)*
**managers** *(8)*
**Marisa** *(1)*
**match** *(1)*
**matched** *(1)*
**maternity** *(2)*
**matter** *(1)*
**mean** *(17)*
**Meaning** *(2)*
**means** *(4)*
**meant** *(2)*
**medical** *(5)*
**medication** *(2)*
**meeting** *(2)*
**meetings** *(13)*
**MELISSA** *(3)*
**Melissa@DerekSmithl**
**aw.com** *(1)*
**member** *(2)*
**members** *(2)*

Case 1:19-cv-08927-GBD-SLC   Document 128-3   Filed 09/20/23   Page 52 of 56

Deposition of Cathy Younis                                        Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**memo** *(6)*
**memory** *(1)*
**memos** *(1)*
**MENDOZA** *(111)*
**mental** *(1)*
**mentioned** *(4)*
**merchandise** *(4)*
**message** *(5)*
**Messages** *(2)*
**Michelle** *(7)*
**middle** *(1)*
**MIKHAYLOVA** *(7)*
**Mikhaylova's** *(2)*
**Milesska** *(1)*
**minimal** *(3)*
**minute** *(1)*
**minutes** *(2)*
**Miriam** *(1)*
**misquote** *(1)*
**Missouri** *(1)*
**miss-ringing** *(1)*
**mistake** *(1)*
**mobile** *(1)*
**mode** *(3)*
**model** *(1)*
**modes** *(1)*
**moms** *(1)*
**Monday** *(2)*
**monitoring** *(1)*
**month** *(7)*
**monthly** *(2)*
**months** *(1)*
**morning** *(5)*
**mother** *(3)*
**mother's** *(1)*
**multiple** *(7)*

**< N >**
**name** *(4)*
**names** *(1)*
**nationally** *(1)*
**nausea** *(1)*
**need** *(9)*
**needs** *(1)*
**negotiations** *(1)*
**never** *(10)*
**NEW** *(28)*
**newborns** *(2)*
**newer** *(1)*

**nice** *(2)*
**nicely** *(1)*
**nodding** *(1)*
**non** *(1)*
**Non-Bloomingdale's** *(1)*
**non-icon** *(4)*
**normal** *(1)*
**Notary** *(1)*
**notes** *(1)*
**notice** *(1)*
**November** *(3)*
**Number** *(2)*
**numbers** *(1)*

**< O >**
**object** *(55)*
**Objection** *(5)*
**objections** *(1)*
**obvious** *(1)*
**obviously** *(4)*
**October** *(2)*
**odd** *(1)*
**offer** *(2)*
**offers** *(1)*
**office** *(2)*
**officially** *(1)*
**Oh** *(5)*
**Okay** *(290)*
**old** *(2)*
**Olde** *(1)*
**on-boarding** *(1)*
**Once** *(9)*
**one-off** *(3)*
**one-on-one** *(1)*
**ones** *(7)*
**ongoing** *(1)*
**online** *(2)*
**open** *(1)*
**opportunity** *(1)*
**opposite** *(2)*
**order** *(3)*
**orders** *(4)*
**organization** *(2)*
**original** *(2)*
**outcome** *(1)*
**overall** *(1)*
**over-purchasing** *(1)*
**oversight** *(2)*

**owned** *(2)*

**< P >**
**p.m** *(3)*
**PAGE** *(17)*
**pages** *(1)*
**paid** *(1)*
**Paige** *(1)*
**paragraph** *(2)*
**Paralegal** *(1)*
**Paris** *(1)*
**part** *(10)*
**parted** *(1)*
**parties** *(1)*
**partners** *(4)*
**party** *(1)*
**pass** *(1)*
**passport** *(1)*
**pay** *(3)*
**paying** *(2)*
**payment** *(1)*
**Penn** *(1)*
**pennies** *(1)*
**people** *(11)*
**people's** *(1)*
**percent** *(1)*
**perfectly** *(1)*
**performance** *(4)*
**period** *(15)*
**permanent** *(1)*
**permission** *(1)*
**person** *(10)*
**personal** *(7)*
**personally** *(2)*
**perspective** *(1)*
**phone** *(4)*
**physical** *(1)*
**place** *(6)*
**places** *(2)*
**Plaintiff** *(8)*
**Plaintiff's** *(3)*
**platform** *(1)*
**players** *(1)*
**Plaza** *(1)*
**please** *(1)*
**PLLC** *(1)*
**point** *(11)*
**police** *(2)*
**policies** *(30)*

**policing** *(2)*
**Policy** *(63)*
**Port** *(1)*
**POS** *(2)*
**position** *(24)*
**positions** *(1)*
**possibly** *(1)*
**post** *(11)*
**PowerPoint** *(2)*
**pre** *(1)*
**pregnancies** *(3)*
**pregnancy** *(6)*
**pregnancy-related** *(4)*
**pregnant** *(2)*
**pre-lease** *(8)*
**pre-leased** *(1)*
**preparation** *(1)*
**prescription** *(2)*
**PRESENT** *(7)*
**presentation** *(1)*
**pretty** *(7)*
**prevent** *(1)*
**previous** *(1)*
**previously** *(1)*
**price** *(3)*
**pricing** *(1)*
**Primarily** *(1)*
**principal** *(1)*
**prior** *(9)*
**privacy** *(1)*
**private** *(1)*
**probably** *(13)*
**problem** *(2)*
**problems** *(2)*
**procedure** *(17)*
**procedures** *(15)*
**proceeding** *(1)*
**proceedings** *(1)*
**producer** *(3)*
**product** *(15)*
**products** *(3)*
**professional** *(1)*
**program** *(2)*
**progress** *(1)*
**promoted** *(5)*
**promotional** *(1)*
**promotions** *(1)*
**properly** *(1)*
**protect** *(4)*

Protection  *(45)*
Protection's  *(2)*
prove  *(1)*
Public  *(1)*
pull  *(5)*
pulling  *(2)*
purchase  *(25)*
purchased  *(5)*
purchaser  *(1)*
purchases  *(22)*
purchasing  *(12)*
purpose  *(1)*
purposes  *(2)*
pursuant  *(1)*
pursued  *(1)*
pushing  *(2)*
putting  *(1)*

< Q >
question  *(33)*
questioning  *(2)*
questions  *(12)*
quickly  *(2)*
quite  *(2)*

< R >
ran  *(2)*
rang  *(1)*
Raton  *(2)*
Ravkin  *(3)*
reaction  *(1)*
read  *(10)*
reading  *(1)*
reads  *(3)*
Ready  *(6)*
really  *(40)*
RealReal  *(1)*
reason  *(2)*
reasons  *(2)*
recall  *(21)*
receipt  *(1)*
receive  *(1)*
received  *(2)*
receiving  *(3)*
recess  *(1)*
recipient  *(4)*
recipient's  *(1)*
recognize  *(1)*
recognizing  *(1)*

record  *(5)*
reduced  *(1)*
reenters  *(1)*
refer  *(1)*
referring  *(6)*
refresh  *(1)*
regarding  *(21)*
regards  *(1)*
regional  *(7)*
register  *(3)*
registers  *(3)*
regular  *(1)*
reimbursement  *(1)*
reinforce  *(2)*
relating  *(1)*
relationships  *(3)*
releases  *(1)*
reliable  *(1)*
remember  *(10)*
rep  *(1)*
rephrase  *(1)*
report  *(8)*
reported  *(5)*
Reporter  *(5)*
reporting  *(3)*
reports  *(5)*
representative  *(1)*
reprimand  *(2)*
reproduction  *(1)*
reps  *(1)*
request  *(1)*
requesting  *(2)*
requests  *(1)*
required  *(2)*
resell  *(1)*
reseller  *(2)*
resellers  *(2)*
reselling  *(8)*
reserve  *(1)*
resources  *(2)*
respond  *(2)*
responding  *(1)*
responds  *(2)*
response  *(3)*
responses  *(1)*
responsibilities  *(2)*
responsibility  *(3)*
responsible  *(8)*
result  *(1)*

RETAIL  *(1)*
retailers  *(2)*
review  *(3)*
reviewed  *(1)*
reviewing  *(2)*
reviews  *(1)*
Revised  *(1)*
reward  *(1)*
rewards  *(1)*
RICHARD  *(9)*
richer  *(1)*
rid  *(1)*
right  *(62)*
right-hand  *(1)*
ring  *(11)*
ringing  *(8)*
Road  *(1)*
role  *(1)*
roles  *(1)*
rolling  *(1)*
rotate  *(2)*
rotates  *(1)*
RPR  *(1)*
rules  *(1)*
run  *(1)*
rung  *(2)*
runway  *(1)*
RWDSU/UFCW  *(1)*

< S >
sale  *(26)*
sales  *(27)*
Sanela  *(4)*
save  *(3)*
savoir  *(2)*
saw  *(4)*
saying  *(21)*
says  *(23)*
scenario  *(1)*
scenarios  *(2)*
scheduling  *(3)*
screen  *(15)*
screens  *(3)*
scroll  *(4)*
second  *(1)*
see  *(32)*
seen  *(3)*
sell  *(3)*
selling  *(7)*

send  *(3)*
sending  *(5)*
senior  *(3)*
sent  *(8)*
separate  *(4)*
September  *(1)*
serves  *(1)*
service  *(6)*
services  *(1)*
seven  *(3)*
sex  *(1)*
sexual  *(1)*
SGerber@BGlaw.com
  *(1)*
share  *(1)*
shared  *(1)*
sharing  *(6)*
Shawn  *(1)*
ship  *(22)*
shipped  *(5)*
shipping  *(28)*
shoe  *(6)*
shoes  *(7)*
shop  *(4)*
shopped  *(1)*
short  *(1)*
show  *(4)*
shows  *(1)*
sickness  *(1)*
sign  *(3)*
similar  *(2)*
sister  *(1)*
six  *(2)*
skills  *(3)*
slight  *(1)*
slightly  *(2)*
slip  *(1)*
SMITH  *(1)*
software  *(2)*
sold  *(2)*
somebody  *(1)*
sorry  *(4)*
sound  *(1)*
SOUTHERN  *(1)*
speak  *(7)*
speaking  *(2)*
special  *(5)*
specific  *(32)*
specifically  *(12)*

Deposition of Cathy Younis                                        Kristina Mikhaylova v. Bloomingdale's Inc., et al.

specifics  (3)
speculate  (1)
spend  (1)
spending  (1)
spoke  (1)
spoken  (1)
St  (1)
stamped  (4)
standing  (1)
standpoint  (3)
start  (5)
started  (6)
state  (9)
stated  (1)
statement  (4)
STATES  (9)
status  (2)
stayed  (2)
staying  (1)
stays  (1)
stenographic  (1)
step  (1)
Steve  (2)
STEVEN  (1)
steward  (3)
stewards  (1)
stock  (1)
stopping  (2)
store  (12)
stores  (11)
STOREWORKERS
  (2)
Street  (3)
stringent  (1)
strong  (2)
subject  (2)
sued  (1)
suffer  (1)
suggesting  (1)
suggestion  (3)
Suite  (2)
summer  (1)
Sunday  (1)
supervise  (3)
supervising  (2)
supervision  (1)
supervisors  (1)
support  (1)
supposed  (4)

sure  (40)
surgeries  (3)
surgery  (1)
surprised  (1)
surrounding  (1)
Susan  (2)
suspicion  (1)
sworn  (1)
system  (2)
systems  (4)

< T >
take  (22)
taken  (8)
talent  (1)
talk  (9)
talked  (6)
talking  (17)
talks  (1)
tardiness  (1)
tax  (12)
taxes  (4)
team  (11)
teams  (1)
technically  (1)
Technician  (3)
tell  (16)
telling  (1)
temporary  (1)
tenure  (1)
terminate  (3)
terminated  (18)
termination  (15)
terminations  (1)
terms  (8)
testified  (1)
Text  (2)
Thank  (7)
Thanks  (3)
theft  (2)
thereof  (1)
thing  (11)
things  (29)
think  (70)
third  (1)
Thompson  (1)
thought  (4)
thread  (2)
three  (6)

tied  (1)
TIERNEY  (87)
time  (90)
timeline  (4)
timelines  (1)
times  (5)
timing  (2)
Tinbite  (1)
today  (6)
today's  (5)
told  (4)
tools  (1)
top  (8)
topic  (6)
Torres  (1)
total  (3)
totally  (3)
touch  (1)
track  (2)
tracking  (2)
train  (1)
trained  (1)
training  (12)
trainings  (2)
transaction  (5)
transcript  (5)
transcripts  (2)
tremendous  (1)
tricksters  (1)
true  (5)
truly  (3)
try  (2)
trying  (12)
turn  (1)
turnover  (1)
Twenty-four  (1)
twice  (1)
Two  (23)
two-day  (1)
Tyndall  (1)
type  (5)
typical  (3)

< U >
unauthorized  (3)
unclear  (1)
undergo  (2)
understand  (8)
understanding  (2)

understood  (1)
unfortunately  (1)
UNION  (13)
UNITED  (3)
upload  (1)
use  (17)
user  (2)
usually  (2)

< V >
valid  (2)
verbal  (2)
verbiage  (1)
verify  (1)
versa  (1)
versus  (2)
vice  (1)
Victoria  (2)
VIDEO  (3)
Videoconference  (4)
viewed  (3)
violate  (1)
violating  (4)
violation  (1)
VIPs  (1)
visibility  (1)
VVIP  (1)
VVIPs  (1)

< W >
wait  (2)
wall  (2)
want  (15)
wanted  (7)
warning  (3)
watching  (2)
way  (7)
ways  (1)
Wear  (6)
weekend  (1)
weekly  (1)
well  (7)
went  (14)
West  (1)
we've  (2)
whatnot  (1)
WHOLESALE  (1)
wide  (1)
wise  (1)

withdrawn  *(21)*
WITNESS  *(76)*
word  *(1)*
work  *(5)*
worked  *(5)*
working  *(3)*
works  *(2)*
world  *(1)*
Wright  *(1)*
writes  *(1)*
writing  *(1)*
written  *(1)*
wrong  *(2)*
wrote  *(2)*

< Y >
yeah  *(1)*
year  *(21)*
years  *(31)*
yep  *(7)*
Yonas  *(1)*
YORK  *(16)*
YOUNIS  *(14)*

< Z >
zero  *(1)*
Zoom  *(12)*



# Handbag Policy

- **Revised Handbag Purchase Policy**
  - 1 Icon & 1 Non-Icon OR 2 Non-Icon handbags per transaction **per month**
  - 24 HBGs per year (max of 12 of these HBGs can be Icons)
  - No Phone Order Policy for all Iconic handbags
  - No Charge Sends on all Iconic handbags
  - Reserves for all Iconic handbags must be in-person

  *Note: Icons = Fashion animations and 00Vs (black & beige)*

- **Exceptions to Purchase Policy** <u>with management approval</u>
  - VIPs
  - Extenuating scenarios (few examples)
    - Client with multiple daughters (3 or more) wants to buy same Iconic Handbag for each child
    - Husband & Wife want to purchase an Icon each
      - Yes, proceed with separate transactions
  - All exceptions should be made discreetly

CHANEL

PLAINTIFF
EXHIBIT

**1**

Younis 11/14/2022 L.A.