# EXHIBIT 4

Case 1:19-cv-08927-GBD-SLC   Document 128-4   Filed 09/20/23   Page 2 of 56

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X
KRISTINA MIKHAYLOVA,

       Plaintiff,       Case No.
                            19-8927
   -against-

BLOOMINGDALE'S INC., BLOOMINGDALE'S, INC.,
d/b/a BLOOMINGDALE'S abd FORTY CARROTS,
BLOOMINGDALE'S , LLC, BLOOMINGDALE'S
LLC d/b/a BLOOMINGDALE'S NEW YORK,
MACY'S INC., MACY'S INC. d/b/a MACY'S
OF NEW YORK, UNITED STOREWORKERS RETAIL,
WHOLESALE AND DEPARTMENT STORE UNION
AFL-CIO LOCAL 3 a/k/a LOCAL 3 UNITED
STOREWORKERS RWDSU/UFCW, DENNIS DIAZ,
individually, CHRISTOPHER CASTELLANI,
individually, RICHARD LAW, individually,
and BOBBY BOOKER, individually,

       Defendants.
-------------------------------------X

                 Zoom Video Communications


                 October 28, 2022
                 10:13 a.m.


     EXAMINATION BEFORE TRIAL of DENIS DIAZ, a

Defendant herein, taken by the Plaintiff, pursuant

to Article 31 of the Civil Practice Law & Rules of

Testimony, and Court Order, held at the

above-mentioned time and place, before

JOANNA MARTINEZ a Notary Public of the State of

New York

A P P E A R A N C E S:


DEREK SMITH LAW GROUP, PLLC
Attorney for Plaintiff
One Penn Plaza, Suite 4905
New York, New York 10119
(212) 587-0760
EMAIL:melissa@dreksmithlaw.com
BY:  MELISSA MENDOZA, ESQ.




BARTON GILMAN LLP
Attorney for Defendant
165 Passaic Avenue, Suite 107
Fairfield, NJ 07004
 973.256.9000
EMAIL: sgerber@bglaw.com
BY:  STEVEN GERBER, ESQ.


ALSO PRESENT:
David Tyndall, Macy's paralegal
Matt Messner, Everest Tech

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED,

by and among counsel for the respective parties

hereto, that the filing, sealing and certification

of the within deposition shall be and the same are

hereby waived;

IT IS FURTHER STIPULATED AND AGREED

that all objections, except as to form of the

question, shall be reserved to the time of the

trial;

IT IS FURTHER STIPULATED AND AGREED

that the within deposition may be signed before any

Notary Public with the same force and effect as if

signed and sworn to before the Court.

*       *       *

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 4

D E N I S   D I A Z, after having first been duly
sworn by a Notary Public of the State of New York,
was examined and testified as follows:
BY THE STENOGRAPHER:
   Q    State your name for the record, please.
   A    Denis Diaz.
   Q    State your address for the record, please.
   A    2540 Shore Boulevard, Astoria, New York
11102.
      MS. MENDOZA:  Good morning, Mr. Diaz.  My
name is Melissa Mendoza, and I am the
plaintiff's attorney.  The plaintiff in this
case is Kristina Mikhaylova.  I am her
attorney, and I will be taking deposition
today.  Okay?
      THE WITNESS:  Good morning.
      MS. MENDOZA:  Good morning.  And before we
begin, I am going to go over some ground rules
and kind of discuss the process for today,
okay.
      All right.  Have you ever been to a
deposition before?
      THE WITNESS:  No.
      MS. MENDOZA:  Okay.  And the court
reporter is taking down everything that we say,

Page 5

so it's very important that you respond
clearly, loudly, and also that you do not speak
while I am speaking so that she can take down
exactly what we're both saying and we're not
speaking over each other.  Okay?
      THE WITNESS:  Yes.
      MS. MENDOZA:  Okay.  And if you would like
to take any breaks at any point, that's
perfectly fine, just let me know, and we can
stop.  But, however, I do ask that you answer
the last question that was asked before we take
the break.  Okay?
      THE WITNESS:  Yes.
      MS. MENDOZA:  And you understand that you
are under oath today, correct?
      THE WITNESS:  Yes.
      MS. MENDOZA:  Which means that you swore
to tell the truth, correct?
      THE WITNESS:  Yes.
      MS. MENDOZA:  And even though we are in an
informal setting, your answers have the same
force and effect as if we were in front of a
judge or jury; do you understand?
      THE WITNESS:  Yes.
      MS. MENDOZA:  Okay.  And it's very

Page 6

important that you answer -- that you
understand my question.  So if there's any
question that you do not understand, please ask
me to rephrase it.  I'm happy to rephrase it as
many times so that you can understand the
question that is posed.  Okay?
      THE WITNESS:  Yes.
EXAMINATION
BY MS. MENDOZA:
   Q    Okay.  Are you aware of any reason that
might impair or prevent you from fully and
truthfully responding to the questions asked today?
   A    No.
   Q    Do you suffer from any condition either
mental or physical that might impair your ability to
understand my questions?
   A    No.
   Q    Have you taken any prescription medication
or otherwise in the last 24 hours?
   A    No.
   Q    And were you supposed to take any
prescription medication or otherwise in the last 24
hours which you did not take?
   A    No.
   Q    Okay.  And have you consumed any alcohol

Page 7

in the past 24 hours?
   A    No.
   Q    Okay.  So do you know why you are here
today?
   A    Yes.
   Q    And why is that?
      MR. GERBER:  Objection to the form of the
question.
      You can answer it, Mr. Diaz.
   A    I received a letter that there was --
Kristina -- I don't know her last name --
Mikhaylova, I guess, filed a suit against
Bloomingdale's.
   Q    Okay.  And did you work with Kristina
Mikhaylova?
   A    Yes.
   Q    Okay.  And when was that?
   A    I worked there from December 2016.  I
think we only worked together six months or so.
   Q    Okay.  And where did you work together?
   A    At Bloomingdale's in the Chanel handbags
accessory boutique.
   Q    Okay.  And were you her supervisor?
   A    Yes.
   Q    Okay.  So is it fair to say that you

Case 1:19-cv-08927-GBD-SLC   Document 128-4   Filed 09/20/23   Page 6 of 56

Deposition of Denis Diaz                                Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 8

1  worked with Kristina -- withdrawn.
2       Do you recall if Kristina Mikhaylova
3  worked at Bloomingdale's from May 2016 until
4  June 16th, 2017?
5       MR. GERBER:  Object to the form.
6       A   I'm sorry.  I don't understand.  Could you
7  can repeat that, please.
8       Q   Yeah.  So did you start -- did you work
9  with Kristina in May 2016?
10      A   Yes.
11      MS. MENDOZA:  Okay.  So for purposes of
12      this deposition I will be talking about that
13      time frame, that 2016 to 2017, unless I say
14      otherwise.  Okay?
15      THE WITNESS:  Okay.
16      Q   And how were you informed of today's
17  deposition?
18      A   I received an email from Betty.  I don't
19  know her last name.
20      Q   Is that your attorney?
21      MR. GERBER:  Together with me, Ms. Chang
22      wrote -- and I represent Ms. Diaz -- Betty
23      Chang.
24      Q   And tell me how you prepared for today's
25  deposition?

Page 9

1       MR. GERBER:  Object to the form of the
2       question.  You can indicate that you had
3       communications, if you did, with counsel.  You
4       cannot discuss the contents of those
5       communications.
6       A   Yes.  That surmises it, yes.
7       Q   Are you just you're agreeing with what
8  Mr. Gerber said?
9       A   No, I'm agreeing with Mr. Gerber.
10      Q   Which is what?
11      MR. GERBER:  Object to the form of
12      question.  Why don't you ask him if he
13      communicated with counsel to prepare for the
14      deposition, and then you can ask him if he did
15      anything else to prepare for the deposition.
16      MS. MENDOZA:  Counsel, are you telling me
17      what to ask the deponent?
18      MR. GERBER:  I'm telling you what to ask
19      so you can meet your deadline.  Obviously, we
20      represent the witness.  Obviously, I'm going to
21      direct the witness not to answer questions
22      about the content of his communications with
23      counsel.  If you want to ask him whether he
24      communicated with counsel to prepare for his
25      deposition, you're welcome to do so, but not

Page 10

1  about --
2       MS. MENDOZA:  Let me just ask you, what do
3       you mean by "deadline"?
4       MR. GERBER:  Your 2:30 deadline.
5       MS. MENDOZA:  Right.  So you're asking me
6       to ask him questions so that I --
7       MR. GERBER:  I objected to the form of the
8       question.  Just pose another question, Counsel.
9       Let's just move on.
10      MS. MENDOZA:  Counsel, let's get off the
11      record, please.
12      MR. GERBER:  There's no need to get off
13      the record.  You can ask him how he prepared
14      for the deposition, if he did.
15      MS. MENDOZA:  I would like to get off the
16      record, please.
17      (Discussion held off the record.)
18      Q   And before we begin, I want to put on the
19  record that I have informed the witness and his
20  counsel that I do have to stop by 2:30 this
21  afternoon, because I have to -- I have a medical
22  emergency for my daughter, in which have to take her
23  to the doctor.  And, therefore, to avoid having to
24  adjourn this deposition, we are going to try to
25  finish by 2:30, taking as many breaks as Mr. Diaz

Page 11

1  requests and, if not, then I will ask to call back
2  Mr. Diaz.
3       THE VIDEO TECH:  Sorry to interrupt,
4       Counsel, but Mr. Gerber is still not connected
5       to the audio yet.
6       (Technical issues.)
7       (Discussion held off the record.)
8       (Whereupon, the last question was read
9       back.)
10      Q   All right.  Mr. Diaz, did you review any
11  documents before today's -- withdrawn.
12      Did you review any documents to
13  prepare for today's deposition?
14      A   I spoke with Steve and Betty a couple of
15  days ago.
16      Q   Okay.  But did you look at any documents
17  in this case?
18      A   I did look at some, yes.
19      Q   Okay.  And what were those documents?
20      A   I think it was -- a couple of them were
21  just -- it's obviously been five years, so I don't
22  recall everything.  So just some write-ups or things
23  that had transpired at that time.
24      Q   Okay.  And was anyone else -- withdrawn.
25      Did you speak with anyone else

Page 12

1  besides your attorneys to prepare for today's
2  deposition?
3      A   I did not.
4      Q   And have you spoken with any employees of
5  Bloomingdale's -- withdrawn.
6          Are you still an employee of
7  Bloomingdale's?
8      A   I am not.
9      Q   And did you speak with any Bloomingdale's
10 or Macy's to prepare for today's deposition?
11     A   I did not.
12     Q   Okay.  When was the last time you spoke
13 with -- withdrawn.
14         Where were you born?
15     A   I was born in Camaguey, Cuba.
16     Q   And when did you move to the United
17 States?
18     A   When I was barely two years ago.
19     Q   And when was that?
20     A   1962.
21     Q   And where did you live at that time?
22     A   Originally Freeport, Long Island then we
23 moved to Astoria, New York.
24     Q   Okay.  And are those the only two
25 locations that you've resided in?

Page 13

1      A   No, for a job years ago I lived in
2  Minneapolis for one year, but aside from that I've
3  always been a New Yorker.
4      Q   Okay.  So where do you currently lived?
5      A   In Astoria, New York.
6      Q   Okay.  And are you married?
7      A   No.
8      Q   Have you ever been married?
9      A   No.
10     Q   And have you gone by any other name
11 besides Dennis?
12     A   No.
13     Q   Or Diaz?  Last name Diaz?
14     A   No, that's it.
15     Q   Okay.  And have you ever -- I know you
16 said you've never been at a deposition before,
17 correct?
18     A   Yes.
19     Q   So you've never had your deposition taken,
20 correct?
21     A   Right, yes.
22     Q   Have you ever testified in a case?
23     A   There was a case -- I think it was in the
24 80s that I testified.  I was working for Oscar de la
25 Renta.

Page 14

1      Q   Okay.  And what did you have to testify
2  about?
3      A   Oh, gosh.  Just that -- I think they just
4  wanted to know what I did there.  It was a licensee
5  and they wanted to know, I guess, if the licensee
6  rolled out and how it's managed in essence.
7      Q   Okay.  What was the case about?
8      A   I think if I remember correctly the
9  designer Oscar de la Renta did not like the
10 distribution of his product to other -- it was to
11 certain stores that weren't as high-end for him, I
12 guess.
13     Q   And were you a named party in that case?
14     A   I was not.
15     Q   What was the outcome of that case?
16     A   The outcome for the case; I think was
17 Mr. De la Renta won.
18     Q   Okay.  Have you ever been a plaintiff in a
19 lawsuit?
20     A   Never.
21     Q   And have you ever been a defendant in a
22 lawsuit?
23     A   No.
24     Q   Have you ever been convicted or pled
25 guilty to a crime other than a minor traffic

Page 15

1  violation?
2      A   None.
3      Q   So now I'm going ask you about your
4  employment.  Who is your current employer?
5      A   Bergdorf Goodman.
6      Q   And where is that?  Where do you work?
7      A   It's 754 Fifth Avenue.
8      Q   And how long have you been working there?
9      A   A little over three years.
10     Q   What's your position at Bergdorf?
11     A   Business manager of Celine.
12     Q   Was that the only position you've held for
13 Bergdorf?
14     A   When I started there I started as a
15 salesperson.  I was promoted after -- I guess right
16 after we went back from COVID, I was promoted.
17     Q   And all in the Celine department?
18     A   No, before I was a salesperson on the
19 second floor, which is the luxury floor for Giorgio
20 Armani and then after that I was promoted to Celine.
21     Q   Okay.  And where did you work before that?
22     A   Bloomingdale's.
23     Q   And why did you leave Bloomingdale's?
24     A   Better opportunity.  I worked at Bergdorf
25 Goodman before, so I wanted to go back to working

Case 1:19-cv-08927-GBD-SLC   Document 128-4   Filed 09/20/23   Page 8 of 56
Deposition of Denis Diaz
Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 16

1  there.
2    Q   Did you work at Bergdorf before
3  Bloomingdale's?
4    A   No.  It was a number of years before, but
5  I always loved the store and wanted to go back.
6    Q   Okay.  And when you say better
7  opportunity, what do you mean?
8    A   It's just a lovely store, a beautiful
9  store, you know, wonderful clients, that's all.
10   Q   Was there a pay increase?
11   A   No, it was the same.
12   Q   And what was your last title at
13  Bloomingdale's?
14   A   Business manager of Chanel accessories.
15   Q   So to clarify you went from business
16  manager to then a salesperson at Bergdorf, correct?
17   A   Yes.
18   Q   And is that a demotion, or is that a lower
19  level than the business manager position?
20   A   Oddly enough it's not a demotion, because
21  the sales associate at Bergdorf Goodman make a lot
22  commission and a lot more money than a manager.
23   Q   And going back to Bloomingdale's, when did
24  you start working at Bloomingdale's?
25   A   In the middle of December.  I don't know

Page 17

1  the exact date but December of 2016.
2    Q   Okay.  And how did you get that job?
3    A   I think a head hunter approached me about
4  it.
5    Q   Okay.  And what was your starting
6  position?
7    A   My starting position was business manager
8  of Chanel accessories.
9    Q   So you were in the same position the whole
10  time, correct?
11   A   Yes, yes, yes.
12   Q   Okay.  So then you left in 2019; is that
13  correct?
14   A   Yes.
15   Q   Did you ever receive any promotions or
16  raises while at Bloomingdale's?
17   A   Raises, yes.  Not promotions but raises.
18   Q   Did you receive a raise every year?
19   A   Yes.
20   Q   And what are the raises based on?
21   A   They're never as high as one hopes.
22  Usually a little less than cost of living so...
23   Q   But is it based on your performance
24  review?
25   A   It's both, but I'm usually geared toward

Page 18

1  the higher tier, because my business was actually
2  doing quite well so we were successful.
3    Q   Okay.  So is it based on how many sales or
4  how much is done in the year?
5    A   Yes.
6        MR. GERBER:  Object to the form of the
7    question.
8        Go ahead, sir.  Sorry.
9    A   It is based on -- on sales, yes.
10   Q   Okay.  And does everyone in that
11  department get a raise?
12       MR. GERBER:  Object to the form of he
13    question.  No foundation.
14       THE WITNESS:  Do I answer?
15       MR. GERBER:  Yes, go ahead.
16   A   No, not necessarily.  Most do.  I would
17  say if I remember correctly, most do, but it's --
18  again, since it's commission it's more so based you
19  -- you in essence you gurantee your own salary.  The
20  more you sell, the more you make.
21   Q   Right, okay.  Did you receive any
22  write-ups or disciplinary action while at
23  Bloomingdale's?
24   A   Yes.
25   Q   And how many?

Page 19

1    A   I think just one.
2    Q   Okay.  Can you explain what that one
3  write-up or disciplinary action was?
4    A   I'm sorry, I didn't hear you.
5    Q   Can you explain what that one disciplinary
6  action or write-up was?
7    A   It was based on -- if I'm not mistaken,
8  just not -- they wanted me to have more disciplinary
9  action towards the associates.  They wanted me to,
10  in essence, have a better follow through with them.
11   Q   Okay.  And did you receive any suspension
12  or a warning?
13   A   No.
14   Q   So what was the outcome of this?
15   A   Just a 30-day review -- sorry.  A
16  60-review and then to see where we -- you know, how
17  I proceeded, I guess, and I'm assuming things got
18  better because they didn't move forward.
19   Q   And when was this?
20   A   Oh, 2018, I think.  I don't remember
21  exactly.
22   Q   And did someone report you?
23   A   No one did.
24   Q   So how did this issue get raised?
25   A   It got raised because it was my -- through

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 20

1  any supervisor Cathy Younis.
2      Q   Okay.  And so did Cathy Younis approach
3  you about it?
4      A   Yes.
5      Q   Did she go to HR?
6      A   Yes.
7      Q   And was Richard Long the HR person that
8  she contacted?
9      A   I -- no.
10     Q   Who was the HR person?
11     A   I think it was Steve Vellecca.
12     Q   And after she contacted him, did they both
13  then contact you?
14     A   Yes.
15     Q   And was the meeting held?
16     A   Yes.
17     Q   And what was discussed at the meeting?
18     A   What was discussed was ensuring that I was
19  following all protocols with regards to ensuring all
20  associates followed the standards, so in essence,
21  you know, being more consistent with writing
22  associates up if there was latenesses or other
23  issues.
24     Q   Okay.  So did you have a manual that you
25  had to follow as a manager?

Page 21

1          MR. GERBER:  Object to the form.
2      A   Not per se.  A manual, you know, there
3  would be, you know, HR classes and things that we'd
4  go through.
5      Q   Just for managers alone; is that correct?
6      A   Yes.
7      Q   And what were those classes?
8      A   It depended on the class, obviously.  You
9  know, they were based on policy.  You know, where
10  they would go over policies with managers and any
11  new directors, they would go over with us.
12     Q   Okay.  And who led these classes?
13     A   They were led typically by human
14  resources.
15     Q   Okay.  By Steve Vellecca.
16     A   As well as other managers in HR.
17     Q   Okay.  Do you recall who?
18     A   I'm sorry, it's been some time.  Susan
19  Wright I know was one of the managers there, Steve
20  Vellecca, I don't remember the others.
21     Q   Okay.  Did you have to sign off anything
22  on these manager classes that you took then?
23     A   Not that I recall.
24     Q   Okay.  Was there like a record --
25  withdrawn.

Page 22

1          Did you have to attend these classes
2  as part of your job?
3      A   Yes.
4      Q   So is that written anywhere, that you have
5  to attend these classes.
6          MR. GERBER:  Object to the form of the
7  question.
8      A   It's not written anywhere.  We all
9  received an email inviting us to it and we would
10  attend.
11     Q   Okay.  And I'll go back a little bit.  So
12  was it at the beginning of your employment were you
13  told that as a manager you will have to take these
14  classes throughout the year?
15     A   I don't recall being told that.  I just
16  know that we received them as managers we would
17  attend.
18     Q   Okay.  Was there anything that prompted
19  these classes?
20     A   It was managers' meetings in general that
21  were held pretty much weekly.
22     Q   Okay.  And so the managers' meeting, was
23  including HR, or was that just for your department?
24     A   It included HR.
25     Q   Okay.

Page 23

1      A   And it was all managers.
2      Q   For the whole store?
3      A   Yes.
4      Q   Okay.  And to clarify, what store did you
5  work at?
6      A   Bloomingdale's on 59th Street.
7      Q   Okay.  And so you said Cathy Younis was
8  your supervisor, correct?
9      A   Yes.
10     Q   So for the whole time that you were there,
11  was it Cathy Younis that was at these meetings as
12  well with you?
13     A   Yes.
14     Q   And anyone else that you can recall at
15  these meetings?
16     A   Every single manager.
17     Q   Approximately how many?
18     A   I don't know, 50, 60 managers.  I'm not
19  really sure.
20     Q   Okay.  And so was it all on a call?
21     A   No.  It was back before COVID.  It was
22  in-person.
23     Q   Okay.  During these meetings, did you ever
24  discuss any policies regarding the discount use by
25  employees?

Case 1:19-cv-08927-GBD-SLC   Document 128-4   Filed 09/20/23   Page 10 of 56

Deposition of Denis Diaz                           Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 24

1    MR. GERBER: I'm sorry. I didn't hear the
2 question. Can I ask the reporter to read back
3 the trail off at the end.
4    (Whereupon, the last question was read
5 back.)
6    A   Yes, they were discussed.
7    Q   Okay. And can you explain what was
8 discussed?
9    A   What was discussed is, that we obviously
10 had an employee discount that we can use and during
11 certain times of year. They would offer additional
12 discounts for the employees as an incentive and
13 pretty much that's it. As time went on, they would
14 offer obviously more meetings and more -- more
15 directives for different things.
16    Q   Okay. Was there any discussion about
17 employees abusing the discount employee discount?
18    A   Yes.
19    Q   Okay. And what was discussed?
20    A   Certain policies that were in effect that
21 employees could not -- obviously, they could only
22 use their employee discount for themselves and
23 family. They could not let anyone else use their
24 employee discount. Pretty much standard stuff.
25    Q   And when was this discussed?

Page 25

1    A   I don't know honestly. I don't recall.
2 It's been some time.
3    Q   Was it during Kristina's employment?
4    A   I'm not sure. It was constant. It was
5 constantly being spoken about.
6    Q   And what oversight was there to ensure
7 that the policies were being followed?
8    A   Well, they would -- the oversight would be
9 that the employee would have -- it depended.
10 Managers sometimes would ring, not always. It
11 depended.
12    Q   What do you mean by ring?
13    A   Would ring on a register.
14    Q   Okay.
15    A   Or supervisors. Back then we had
16 supervisors that would have to ring the transaction,
17 which was most likely the case.
18    Q   Okay. And so when you say they would ring
19 it, would it -- what do you mean by that?
20    A   Meaning that the employee just couldn't go
21 to anyone to have a transaction to buy something.
22 They would have to go a supervisor or a manager if
23 they wanted to purchase something for themselves.
24    Q   Okay. And so you're saying that that's
25 the oversight, right?

Page 26

1    A   Yes.
2    Q   On the use? Okay. So going back to your
3 write-up, was it documented anywhere, your write-up?
4    A   Yes.
5    Q   So did you have to sign something?
6    A   Yes.
7    MS. MENDOZA: Okay. We will request for
8 that document.
9    Q   And after -- you said that afterwards
10 nothing happened? After the 30 days, correct?
11    A   Yes.
12    Q   Withdrawn. Was part of that write-up that
13 you would have to follow up in 30 days as to whether
14 you were meeting the expectation of the write-up?
15    A   I think it was 60 days that I said
16 originally. They gave you time.
17    Q   Okay, 60 days. So after 60 days then what
18 happened?
19    A   From what I recall nothing.
20    Q   So it wasn't even that you were told that
21 you had met the standard?
22    MR. GERBER: Object to the form of the
23 question.
24    MS. MENDOZA: I'll rephrase it.
25    Q   Did anyone -- did Cathy tell you that you

Page 27

1 did comply with the 60-day review?
2    A   Not -- we just -- it never came up again.
3 We didn't pursue anything going forward. Things
4 were running smoothly so...
5    Q   And you said this was in 2018, correct?
6    A   From what I recall that's what I said,
7 yes.
8    Q   Do you recall what time -- what month of
9 2018?
10    A   No, I'm sorry, I don't.
11    Q   Okay. So between 2018 and your departure
12 from Bloomingdale's, did you receive another
13 write-up?
14    A   I don't know. I don't think so, no.
15    Q   Okay. And did you receive any reprimands?
16    A   No.
17    Q   No. I'm sorry?
18    A   Nothing.
19    Q   Okay. So your position was business
20 manager of the Chanel boutique, correct?
21    A   Yes.
22    Q   And you said your supervisor was Cathy
23 Younis, correct?
24    A   Yes.
25    Q   And was she also -- withdrawn.

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 28

What was her position in the Chanel boutique?

A   She was director of Chanel or Bloomingdale's.

Q   So did you have to report to her on a daily basis?

A   Yes.

MR. GERBER:  Object to the form of the question.

Q   Okay.  Did she give you any assignments?

A   Not necessarily assignments.  You know, just to manage the business and if there was anything ridiculous, she would let me know; but, no it was a day-to-day function.

Q   And were you both in the boutique on a daily basis?

A   I was in the boutique on a daily basis. She would traditionally be in the Ready-to-Wear boutique.

Q   Okay.  And is there -- what's the difference?

A   Well, it's divided by -- it's separated by three floors.  The Ready-to-Wear boutique is on the first floor, the handbag boutique is on the ground floor.  It's also a different business and -- you

Page 29

know, than accessories.

Q   Okay.  But you spoke with Cathy on a daily basis; is that correct?

A   Yes.

Q   Did you report any of your employees to Cathy?

A   I'm sorry, I didn't hear you.

Q   Did you report any of your employees in the boutique to Cathy?

MR. GERBER:  Object to the form.

A   What do you mean by "report employees"? I'm sorry.

Q   Yeah.  So during those -- you spoke with her daily, do you recall if any -- that times you told her this is -- an employee is doing something that may be inappropriate?

A   If there was anything that I needed to advise her about I would, yes.

Q   Okay.  And do you recall when that was?

A   I had 17 associates, so it had happened, you know, a few times.

Q   And do you recall which associates they were?

A   I -- not at this point.  I don't recall, no.

Page 30

Q   Okay.  Were any of them -- was one of them Kristina Mikhaylova?

MR. GERBER:  Object to the form.

A   I think the only issue we had with Kristina was, you know, latenesses that she had.

Q   Okay.  So that's the only -- so again withdrawn.

So I'm asking about reporting -- complaining -- or reporting any of your employees of doing any wrongdoing, right?  That's what my initial question was asking about.  If you reported any of them.  And so my next question was, if one of those employees was Kristina?

A   And my answer was that there were some lateness issues that I did need to report to Cathy, which were addressed.

Q   And that's the only issue that you reported to Cathy about Kristina; is that correct?

A   Yes, that's correct.

Q   Okay.  And what was Cathy's responsible?

A   Cathy's response was to make sure to document and look up how many times she'd been absence in the 30-day period and record then speak to HR about that and then we proceed from there.

Page 31

Q   Okay.  And you mentioned you had 17 associates.  Did you have approximately 17 during the entire time of your employment at Bloomingdale's?

A   I think pretty close to it sometimes, yes.

Q   And were you the only manager on the floor?

A   Yes.

Q   Okay.  So just to understand the structure.  Was it sales associates then they reported -- or were supervised by and then you were supervised by Cathy; is that correct?

A   You broke up.

Q   Okay.  So who did you supervise?

A   I supervised the 17 associates.

Q   Okay.  And so just to clarify, was it just 17 associates supervised by you and then you were supervised by Cathy Younis, correct?

A   Yes.

Q   There's no other manager in the Chanel boutique, correct?

A   No.

Q   Okay.  When you were hired, did you replace someone?

A   I'm assuming I did.  I didn't know the

Deposition of Denis Diaz                       Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 32

1 person, yes.
2    Q   Okay.  Who trained you?
3    A   Cathy trained me.
4    Q   Okay.  Did you make any decisions to fire
5 any of your employees?
6    A   No.
7    Q   Did you recommend that any of your
8 employees be fired?
9    A   No.
10    Q   Did you recommend that any be suspended?
11    A   No.
12    Q   Okay.  And did you report any of your
13 employees directly to HR?
14    A   Only in cases of -- you know, there was a
15 write-up for, you know, latenesses or, you know,
16 those are the kind of things you have to partner
17 with HR, so that would be probably the only
18 instance.
19    Q   Okay.
20       THE WITNESS:  I'm sorry.  If I can get
21   some water.
22       (Discussion held off the record.)
23    Q   What training did you -- withdrawn.
24       Where did you work before
25 Bloomingdale's?

Page 33

1    A   Before Bloomingdale's I worked at Gucci.
2    Q   And what was your position at Gucci?
3    A   AGM, which is assistant store manager.
4    Q   Okay.  And why did you leave Gucci?
5    A   The opportunity to work in Chanel, because
6 it's obviously the top brand.  One of the top
7 brands.
8    Q   Okay.  And how long did you work at Gucci?
9    A   I think four years.
10    Q   And were you always assistant store
11 manager?
12    A   Yes, AGM.
13    Q   And where was this?
14    A   Fifth Avenue and 56th Street.
15    Q   Okay.  So it was a stand alone store?
16    A   Well, it's -- in Trump tower.
17    Q   And before that where did you work?
18    A   I worked at Barneys New York.
19    Q   And what was your position?
20    A   Senior manager of accessories.
21    Q   Okay.  Is it fair to say this is all in
22 the retail business; is that correct?
23    A   Yes, it is.
24    Q   Okay.  So how long -- how many years were
25 you working in the retail business?

Page 34

1    A   Between management and sales, because I
2 was a salesman for a number of years also, over 20
3 years.  Closer to 25, 30.
4    Q   Okay.  And were they all in New York?
5    A   Yes.
6    Q   Okay.  Have you ever been terminated or
7 fired from your employment?
8    A   Yes.
9    Q   And where -- which employer fired you?
10    A   Barneys after working there three times.
11    Q   Okay.  And why were you fired?
12    A   They dissolved the position.  There was no
13 longer a senior manager position.
14    Q   So you were laid off?
15    A   Yes.
16    Q   Okay.  Were you ever fired for any
17 wrongdoing?
18    A   No.
19    Q   And did you receive any disciplinary
20 action at Barneys?
21    A   No.
22    Q   And at Gucci?
23    A   No.
24    Q   And currently at Bergdorf?
25    A   No.

Page 35

1    Q   Okay.  So besides the Bloomingdale's
2 write-up, have you received any other write-up?
3    A   No.
4    Q   Okay.  Did you have to have a specific
5 training -- manager training to be considered for
6 the Bloomingdale's position?
7    A   I'm sorry, I don't know what you mean by
8 that.
9    Q   Yeah.  So I'm asking about the
10 qualifications for the management position that you
11 applied for at Bloomingdale's, right.  So did you
12 have to have any training or experience before to
13 get that position?
14    A   Not training, but experience from my
15 background, yes.
16    Q   Okay.  So do you recall -- withdrawn.
17       So can you describe your day-to-day
18 duties while at Bloomingdale's?
19    A   Yes.  I would go in each morning, I would
20 make sure the numbers for the day before versus
21 plan, to see where we were for the month.  I would
22 then answer any emails, obviously this is all before
23 going on the floor, and then afterwards I would meet
24 with Cathy, and we would go over business as far as
25 the numbers, where we stand for the month.  Any

Page 36

special, you know, if we had a trunk show or ready-to-wear or something that we needed to go over or things like that, and then we both come go downstairs to the Esesdris (phonetic) boutique, where we would then have our morning meeting with the team.

Q   Okay.  When you say that you had to go over the numbers, what do you mean?

A   Just looking at -- you just look at where you are to date and what's your plan and what you need to do for the week, what you need to do for the month.  You know, typical sales, business things that you have to go over.

Q   And were all of the sale associates commission based?

A   Yes.

Q   Okay.  And so they did not get a salary or hourly pay there, correct?

A   I don't recall whether they did or not.  I don't think they did.  I honestly don't remember.

Q   Okay.  And did you conduct any performance reviews on any of the associates?

A   Yes.

Q   Okay.  Did you do it for all 17?

A   Yes.

Page 37

Q   And how often did you do it?

A   It depends.  I mean, you know, if there was a situation where you had to meet with an employee for either productivity or, you know, their sales or their, you know, latenesses or anything like that and you would meet with them.

Q   But were there any, like, annual performance reviews that you had to do for each employee?

A   Yes.

Q   Okay.  And did you do it alone, or did you do it with Cathy as well?

A   Typically with Cathy and if not we would always partner with another manager.

Q   Okay.  And was it for the year, was it just annual, or was it quarterly?

A   It depends.  If it was a new associate you would meet with them first half of the 30 days and then you'd have to make sure to meet with them again before you did their 90-day.

Q   Okay.  And do you recall doing a performance review with Kristina Mikhaylova?

A   No, I do not recall.

Q   Okay.  You conducted the performance reviews and then would you get a raise, or was it

Page 38

just to discuss how they're doing?

A   There were two -- If I remember correctly, there were two reviews done each year by year, and a middle one just in essence to give them an update of their standing, and then at the end of the year it would be a formal review to then go to HR and HR would determine on the review, you know, if there were any monitary gains.

Q   And were these documented?

A   Yes.

    MS. MENDOZA:  We will request for any, if they exist for Kristina Mikhaylova.

Q   So you said another -- there was another manager; is that correct, that would conduct the reviews with you if it wasn't Cathy; is that correct?

A   Most times, yes.

Q   Who was the other -- withdrawn.
        Was there another manager in the Chanel boutique?

A   No.

Q   So then who would be the other manager?  What would be their title?

A   I'm partnering with a floor manager.  The main check floor manager.

Page 39

Q   So can you elaborate what you mean by main floor manager?

A   Sure.  The main floor of Bloomingdale's is the accessories floor and they had two floor managers, and often times you if you needed to sit with an employee, it was best to partner with another manager.  You couldn't -- it didn't always happen.  Obviously, because of availability, but most times if you could, it would be the best practice.

Q   Okay.  So the main floor manager, did they oversee you?

A   No.

Q   Okay.  Did they oversee the associates -- your associates?

A   No.

Q   So they didn't have any authority over those associates; is that correct?

A   None at all.

Q   So they were just serving as a witness, correct?

A   Yes.

Q   And did you conduct any trainings?

A   Yes.

Q   And what were those trainings?

Deposition of Denis Diaz
Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 40

1    A   Traditionally for new associates that came
2  on board.
3    Q   Okay.  And what did that entail?
4    A   That entailed -- well, teaching them
5  obviously.  They kind of get a crash course in
6  register training, you know, so I help them a little
7  bit more because I know a little bit more.  Assist
8  them with the register.  Assist them with their
9  client book.  There's a -- Bloomingdale's has a
10 system with a client book in the computer and each
11 associate gets their own, so in essence you get them
12 comfortable with that to get them to understand the
13 value of using it, and get them to -- so the
14 training was for that.  There was also product
15 training, which would be obviously the Chanel
16 product.  It's a number of different SKUs, number of
17 different products that they have to get training
18 on.  There was, you know, Chanel training.  So you'd
19 have to know the difference between the iconic bags,
20 you know the classic bags, basic bags.  There was a
21 lot.
22   Q   And so you're saying that that was all
23 layed for the new hires; is that correct?
24   A   Typically it was for the new hires only,
25 because the other associates were all seasoned.

Page 41

1  They were already from way before, so there already
2  well versed in these areas.
3    Q   Did you conduct any other training for the
4  associates?
5    A   What do you mean?  I'm sorry.
6    Q   Yeah.  So were there any annual trainings
7  that you had to do or that you were required to do?
8    A   Training only in the sense of if the
9  associate needed an -- and, frankly, we had a system
10 where they would typically ask me or Cathy that they
11 wanted to learn how to use the system better to
12 their advantage with regards to -- Bloomingdale's
13 does a lot of promotional activity.  So if there's a
14 lot of mailings or things like that that they can
15 use to their advantage, so for that kind of thing, I
16 would definitely help them with that.
17   Q   Okay.  And were there any purchase limits
18 on -- withdrawn.
19          Were there any limits on how many
20 purchases an associate can make?
21   A   Are you speaking in general throughout the
22 store or in Chanel?
23   Q   Both.
24   A   I've never heard of any limits in
25 purchasing from the store.  I do know that in Chanel

Page 42

1  we had limits that you can buy; everyone has.
2    Q   And what were those limits?
3    A   When an associate first came on board they
4  were given a handbook, if you will, that gave them
5  the maximum amount of -- not only applied to
6  customers, it also applied for associates, the
7  number of bags they could buy each month and per
8  year.
9    Q   And do you recall what the number was?
10   A   Not offhand, honestly, not anymore.
11   Q   Okay.  Do you recall if it changed during
12 your employment?
13   A   It did change.  In July of -- I think it
14 was 2017.  I don't recall exactly when, but we
15 became a lease boutique for Chanel and at that point
16 it got narrow.  They narrowed the scope of what
17 customers could buy.
18   Q   Okay.  You're saying customers, so was
19 there a different between employees and customers on
20 the purchase limit?
21   A   Not -- prior to be leased, no.  But after
22 being leased, yes.
23   Q   And what was the difference?
24   A   The difference was the customers could buy
25 -- would have to -- their shop, for example, what

Page 43

1  they call the classic bag or the iconic bags, if you
2  will, and any other handbag were limited less than
3  previously.  And associates actually -- we loss all
4  employee discounted and everything.
5    Q   Okay.  That's because it was leased,
6  right?
7    A   Yes.
8    Q   And how did you keep track of -- or how
9  did the department keep track of how many purchases
10 an employee was making?
11   A   That I -- I don't know.  I think that was
12 loss prevention that kept track of it.
13   Q   And is lost -- what is lost prevention?
14   A   I guess you can call it security also.
15 Store security.
16   Q   And was that in the store as well?
17   A   Yes.
18   Q   Yes, okay.  And is that the same as asset
19 protection?
20   A   I think Bloomingdale's calls it that, yes.
21   Q   So was there a separate department for
22 loss prevention?
23   A   Yes.
24   Q   Okay.  And was Christopher Castellani the
25 director of loss prevention?

Page 44

1  A   I don't remember him, but, yes, if he was
2  head then he would be.
3     Q   And so going back to the purchase limits.
4  Was there also any limits on the discount that --
5  withdrawn.
6         Was there any limit on the -- yeah,
7  the discounts that an employee could get on any
8  purchases?
9     A   Sorry.  What do you mean by limit?
10     MS. MENDOZA:  I'll introduce an exhibit.
11  Can we, Matt, introduce the handbag policies.
12     THE VIDEO TECH:  Would you like to mark
13  this as Exhibit 1?
14     MS. MENDOZA:  Yes.
15     MR. GERBER:  Can you give us a Bates
16  number?
17     MS. MENDOZA:  We don't have a Bates
18  number, but I will give you that after the
19  deposition.
20     MR. GERBER:  Okay, go ahead.
21     MS. MENDOZA:  All right.  So do you see
22  the document there in front of you, Mr. Diaz?
23     THE WITNESS:  Yes.
24     Q   Okay.  And you see it says handbag policy
25  at the top?

Page 45

1  A   Yes.
2     Q   And Chanel at the bottom?
3     A   Yes.
4     Q   Okay.  And do you want to take a minute to
5  look at it?
6     A   Yes.
7     Q   Have you seen this document before?
8     A   Yes.
9     Q   Okay.  When did you see it?
10     A   I don't recall exactly when but most -- I
11  guess most likely when I started.
12     Q   So was this the handbag policy in
13  place before Chanel the boutique was leased?
14     A   I think so, yes.  I think it was.
15     Q   Okay.  And so --
16     MR. GERBER:  Is it this being marked as an
17  exhibit?
18     MS. MENDOZA:  Yes, we marked it as Exhibit
19  1.
20     MR. GERBER:  Sorry, thank you.
21     Q   And so did you ever write up any associate
22  that was abusing this policy?
23     A   I did not, no.
24     Q   Okay.  And here it says 20- -- if you look
25  at the second bullet point under revised handbag

Page 46

1  policy it says 24HBGs, I'm assuming -- is that
2  handbags?
3     A   Yes.
4     Q   Max of year 12 of these HBGs can be icons,
5  is that what it says?
6     A   Yes.
7     Q   So the maximum was 24 handbags per year,
8  correct?
9     A   Yes.
10     Q   And so if an employee went over the 24
11  limit, then was lost prevention automatically
12  alerted?
13     MR. GERBER:  Object to the form of the
14  question.  No foundation.
15     A   No, so far as I know.  I didn't track it.
16  It was tracked with them.  So they would be the ones
17  that would know.
18     Q   Okay.  And then it says -- the next bullet
19  point says exceptions to purchase policy with
20  management approval and then there's -- do you see
21  there's other bullet points there, correct?
22     A   Yes.
23     Q   Okay.  So was there essentially --
24  withdrawn.
25         Was it up to your discretion or up to

Page 47

1  you if you wanted to allow an associate to exceed
2  the handbag purchase policy?
3     A   No.  I'm sorry this policy -- that portion
4  of it especially refers to clients.  Those are
5  exceptions made to clients.  You see it says, a
6  client with multiple daughters, three or more
7  husband and wives, so this is relative to clients.
8     Q   Okay, okay.  So do you recall where this
9  policy was -- withdrawn.
10         Do you recall how this policy was
11  distributed?
12     A   If I'm not mistaken, I think it was part
13  of the handbook.  I don't think I remember, but I
14  think it was.
15     Q   Okay, okay.  So did you have any employees
16  exceed the 24 or 12-hand back limit?
17     MR. GERBER:  Object to the form of the
18  question.
19     A   Again, that would be something that I
20  wouldn't be privy to.  I couldn't -- I couldn't
21  stand there with a $25 million dollar business and
22  micromanage that.  That's something loss prevention
23  would manage.
24     Q   So would loss prevention inform you that
25  an employee -- one of your associates has been

Page 48

1 flagged?
2   A   Not necessarily, no.
3      MS. MENDOZA:  Okay.  We can take that off
4   the screen.  Thank you.
5      And I'll introduce the next exhibit.  It
6   says discount and employees, this will be
7   marked as Exhibit 2.
8      MR. GERBER:  I'm sorry, we're seeing a
9   text message up there, is that what you
10  intended?
11     MS. MENDOZA:  Yes.  It start with
12  Mikhaylova00197, Bates stamped.
13     MR. GERBER:  And the last page of it is?
14     MS. MENDOZA:  201.
15     MR. GERBER:  Thank you.
16     MS. MENDOZA:  All right.  Mr. Diaz, take a
17  moment to look at this document and if you
18  would like to take control of it --
19     Matt, if you can give him control of it on
20  the screen.
21     THE WITNESS:  I don't think I need to take
22  control of it.
23     MR. GERBER:  There's a second page.
24  Q   So the question is, have you seen this
25  document -- these documents before, these text

Page 49

1 messages?
2   A   I have never seen these text messages, no,
3   not so far.  Hold on, they're sideways.
4      MS. MENDOZA:  Matt, is going to turn it
5   for you.
6   Q   All right.  And the next page, if you've
7   seen this before?  Thank you.  And then the last
8   page if you've seen this document before.
9   A   I have never seen this, no.
10  Q   Okay, all right.  So we'll go back to the
11  first page.  So these were text messages that were
12  provided by Kristina Mikhaylova and the first from
13  Kristina's phone -- it says, "Hey, Sanela."  Do you
14  recall an associate by that name?"
15  A   Yes.
16  Q   And did she work with Kristina at the same
17  time as Kristina 2016 to 2017?
18  A   Yes.
19  Q   And do you recall if that employee was
20  terminated?
21  A   No, she was not.
22  Q   Okay.  And do you recall if she was -- if
23  she had exceeded the handbag policy limit?
24     MR. GERBER:  Object to the form.
25  A   No.

Page 50

1   Q   Did you give her any write-ups regarding
2   her purchases.
3   A   Who Sanela?
4   Q   Yeah.
5   A   No.
6   Q   Okay.  So it says, "Hey Sanela.  I have
7   you on Sunday.  I have a question, is there a limit
8   to how many handbags we can purchase during sale,
9   the ones that were additional."  And the response
10  is, "Hi, Kristina.  Thank you much.  No, I don't
11  think they said anything."  So my question to you
12  is, because in that policy it didn't say anything
13  about a sale; is that correct?  The policy that we
14  looked at in Exhibit 1, correct?
15  A   Yes.
16  Q   So was there any limits on how many
17  handbags could be purchased during sale?
18  A   The same -- the same would apply.  That
19  would be -- I forget what the original document you
20  showed said.  I mean it was -- I think it -- as, you
21  know, two that you could buy per month or something.
22  It would be the same that would apply.
23  Q   Okay.  But was it written anywhere?
24     MR. GERBER:  Object to the form of the
25  question.

Page 51

1      MS. MENDOZA:  I'll rephrase.
2   Q   So was the policy of how many purchases be
3   made during a sale written anywhere?
4   A   Not that I recall, no.
5   Q   It says there that -- Kristina states, "I
6   just remember Cathy telling us we had no limits on
7   any of the additional merchandise on sale, so I
8   wanted to confirm."  Do you recall Cathy stating
9   that?
10  A   I've never heard that.
11  Q   Okay.  Is it true that there are no limits
12  on any of the additional purchase on sale?
13     MR. GERBER:  Object to the form of the
14  question.
15     MS. MENDOZA:  What was your response?
16  A   I've never heard that.
17  Q   Okay.  So are you saying, no, that that's
18  not true?
19  A   I'm saying, no, it's not true.
20  Q   And if we keep going to the next page.
21  There it says, "Hey, Amapara."  Do you know who
22  Amapara is?
23  A   Ampara, yes.
24  Q   And who is that?
25  A   She's one of the associates there?

Deposition of Denis Diaz

Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 52

1  Q   In the Chanel boutique; is that correct?
2  A   Yes.
3  Q   And was she ever written-up for exceeding
4 purchases?
5       MR. GERBER:  Objection to the form of the
6 question on foundation.
7  A   Not that I'm aware of, no.
8  Q   Okay.  And did she work with Kristina at
9 the same time?
10  A   Yes.
11  Q   Okay.  And you see there it says from
12 Kristina, "I have a question.  Was there a limit to
13 how many handbags we can purchase during sale?  The
14 ones that were additional" and then you see there
15 that says response is "Miss you too.  No, there's no
16 limit."  Do you see that?
17  A   Yes, I see it.
18  Q   Okay.  And you still disagree with this,
19 correct?
20  A   Yes.
21  Q   Okay.  Over to the next page.  At the top
22 it says, "Hey, Kemi.  Sorry to bother you.  I know
23 you're on vacation."  Do you know to Kemi is?
24  A   Yes.
25  Q   Who is Kemi?

Page 53

1  A   She's one of the associates also in the
2 boutique.
3  Q   Okay.  And did she work with Kristina at
4 the same time?
5  A   Yes.
6  Q   And did she receive any write-ups
7 regarding purchase limits?
8       MR. GERBER:  Objection to the form of the
9 question.
10       MS. MENDOZA:  I'll rephrase it.
11  Q   Was she ever reprimanded or received
12 disciplinary action for abusing the policy?
13       MR. GERBER:  Same objection?
14  A   Not that I'm aware.
15  Q   Okay.  And you see there that Kristina
16 says, "I just have a question.  Was there a limit to
17 how many handbags we can purchase during sales?  The
18 ones are on addition."  And her response is, "No
19 limit on the 60/20/20."
20  A   Okay.
21  Q   What is the 60/20/20?
22  A   I honestly don't remember.  I'm assuming
23 'cause I don't remember, but I'm assuming 60 percent
24 off and an additional 20 and an additional 20.
25  Q   Okay.  And so was that a Bloomingdale's

Page 54

1 policy, or was it just for the Chanel boutique?
2  A   That was a Bloomingdale's beside policy.
3  Q   So besides the handbag policy on Exhibit 1
4 there was also a separate Bloomingdale's policy; is
5 that correct?
6       MR. GERBER:  Object to the form.
7  A   Yes, there was.
8  Q   Okay.  And that's for the discount, right
9 on the purchase -- withdrawn.
10       And that 60/20/20 is regarding the
11 discount on the purchases being made in the store,
12 correct?
13  A   Yes.
14  Q   Okay.  And we can keep going.  I believe
15 that's it.  Did you have any training regarding --
16 withdrawn.
17       Did you conduct any training to your
18 employees in the boutique regarding discount abuse?
19  A   I did not, no.
20  Q   Did anyone?
21  A   Loss prevention did.
22  Q   And how often did they do that?
23       MR. GERBER:  Object to the form.  No
24 foundation.
25  A   From what I recall, probably a few times a

Page 55

1 year.  I don't remember how many.
2  Q   Okay.  And was it for the whole store, or
3 was it just for each department?
4  A   I can only speak for Chanel.  I don't
5 remember for the rest of the store, but I do
6 remember we did have to a number of times.
7       MS. MENDOZA:  I'll rephrase.
8  Q   My question is, did she conduct the
9 meeting with the whole store, or did they just have
10 it with each department or your department alone,
11 which is you're saying your department alone?
12  A   Yes, that I know of.
13  Q   And what was -- what did they address
14 during this training or discount abuse?
15  A   Depending on the training it would entail
16 things like -- that employees or anyone actually was
17 not allowed to purchase something and send it to
18 another address.  That that was against the law.
19 They could not do that.  There were discussions
20 about limitation of the product again.  That's
21 pretty much all I can remember offhand.
22  Q   Okay.  But that's regarding discount
23 abuse?
24  A   Yes.
25  Q   Okay.  Did you receive any documents, or

Deposition of Denis Diaz                                   Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 56

were there any documents distributed during these
training sessions?

A   Yes.  Loss prevention, whenever they
conducted a meeting they would bring documents and
would hand out to each associate.

MS. MENDOZA:  We will request those
documents.

MR. GERBER:  I'm -- I'm not going keep the
deposition, special video, of whatever you're
going to request.  Send us a follow-up document
when you can.

MS. MENDOZA:  Okay.

MR. GERBER:  And we'll respond to it
accordingly.

Q   And who led these -- withdrawn.

Did Christopher Castellani ever lead
any of these training sessions?

A   I honestly don't remember who that is.
It's possible.  It's been obviously over five years
now, so I don't recall.

Q   Okay.  And did any of the --

MR. GERBER:  Just to be clear, just so the
record is clear, you're saying you don't recall
a person named Chris Castellani, is that what
you're saying?

Page 57

THE WITNESS: It's been a long time, yeah.
I don't recall.

Q   And did any of those training sessions
regarding discount abuse, as you stated?  Did any of
those occur during Kristina's training?

MR. GERBER:  Objection to the form of the
question.

A   I can only assume that they did at this
point.  Obviously, again, it was five years ago.  I
think they did.

Q   Okay.  What were Chanel -- or what are
Chanel authenticity cards?

A   Just that.  It's to authenticate the
product.  It's almost, if you will, a credit card
and there's a number on it that matches inside the
handbag, which is actually embossed on there.  It
actually authenticates the bag, if you will.

Q   Okay.  So the card is only in the bag, or
is it also in the store as well?

A   Well, it's funny that you should ask,
because honestly they've changed.  In the past it
used to -- each handbag had an authenticity card,
especially what they call the icons or classic
handbags, which went to the bag and then you would
have to search throughout the bag and there was a

Page 58

sliver of fabric that was printed on there, the same
number, so it identified it.  That was in the past.
From what I understand from Chanel now, they no
longer use those cards any longer, but in past they
did.

Q   Oh, okay.  And do you recall when that
changed?

A   I -- actually, I don't know.  I wasn't
working for them.  I think it's more so in the last
couple of years that it changed.

Q   So during Kristina's employment,
2016/2017, these authenticity cards were still in
place; is that correct?

A   Yes, they were.

Q   So if someone was reselling a bag, right,
you could check the bag to see if it matches with a
bag that was sold from the store; is that correct?

A   Yes.

Q   Okay.  What is Macy's credit and customer
service, do you know?

A   Sorry?

Q   Macy's credit and customer service, MCCS,
do you know what or what that is?

A   I don't know what that is, no.

Q   When was the last time you spoke with

Page 59

Cathy Younis?

A   Probably when I left in October.  October
of 2019.

Q   Okay.  Besides the lateness that you
mentioned earlier, did you have any other
conversations about Kristina Mikhaylova with Cathy?

A   I did not, no.

Q   Okay.  So you did not discuss Kristina's
performance with Cathy; is that correct?

A   I did not, no.

Q   Okay.  I'll come back to her.  I mentioned
Richard Law before, and do you recall who that was?

A   I recall the name.  I couldn't tell you if
I saw him.  I recall the name.

Q   Okay.  Did you -- where was the human
resources department in the store?

MR. GERBER:  Object to the form of the
question.

A   I don't even remember.  I'm sorry.  I
think, if I'm not mistaken, it was on the fifth
floor.  I think it was on five.

Q   Okay.  And do you recall if Richard Law
was in human resources?

A   I think he was.

Q   Did you have any conversations with

Page 60

1   Richard Law during your employment?
2       A   Not that I can recall.
3       Q   Did you have any conversation regarding
4   Kristina with Richard Law?
5       A   No, I did not.
6       Q   And do you know if Richard fired Kristina.
7       A   I did not know that.
8       Q   Did you speak with anyone in loss
9   prevention during your employment?
10      A   Regarding?
11      Q   At all, did you speak with loss
12  prevention?
13      A   Yes, of course.  I mean, we worked
14  together.  We were friendly.  I would say hi to
15  people.
16      Q   So in what manner did you work with loss
17  prevention?
18      A   Typically there was a loss prevention
19  station guard in our boutique.  You would say hello
20  and that was pretty much it.
21      Q   Okay.  So there was like a security -- you
22  said earlier it was like security, correct?
23      A   Yes.
24      Q   So there was a security guard there that
25  you would speak to, correct?

Page 61

1       A   Yes.
2       Q   There are more employees in that
3   department besides just the security guard, correct?
4       A   Yes.  Well, more employees in sense of the
5   sale people, yes.
6       Q   So I'm stating -- besides the security
7   guard duties we discussed, that loss prevention was
8   responsible for tracking the bag purchases,
9   correct -- handbag purchases; is that correct?
10      A   Yes.
11      Q   Okay.  So I'm saying that the security
12  guard was not doing that as well, or was he?
13      A   No.
14          MR. GERBER:  Object to the form of the
15      question.  No foundation.
16      Q   No, he was not, you said?
17      A   No, he was not.
18      Q   Okay.  Besides the security guard, was
19  there a department in the store for loss prevention?
20      A   Yes.
21      Q   And where was that department?
22      A   Off the main floor there's a balcony
23  level, if you will, toward the 59th Street side.
24      Q   And who is Bobby Booker?
25      A   I don't know who that is.

Page 62

1       Q   Okay.  Do you recall a security guard with
2   the name Bobby Booker?
3       A   I do not.
4       Q   Okay.  During Kristina's employment, do
5   you recall if another employee was -- a male
6   employee was flirting with her?
7       A   Not to my knowledge.
8       Q   Do you recall any male employee talking
9   about Kristina's body?
10      A   Never.
11      Q   Do you hear any male employee make any
12  comment about Kristina in general?
13      A   I did not, no.
14      Q   Did you hear any male employee make any
15  sexual comments about another female employee?
16      A   Never.
17      Q   Do you recall having a conversation with
18  Kristina asking why another male employee, a
19  security -- withdrawn.
20          Do you recall having a conversation
21  with Kristina asking Kristina why another male
22  employee, a security guard was standing close to her
23  talking to her?
24      A   I never had that conversation.
25      Q   Okay.  Who is Angilee, do you recall who

Page 63

1   that is?
2       A   I think she was one of the associates
3   there, from what I recall.
4       Q   Do you recall if she was fired?
5       A   I -- I don't know.  I don't recall.
6       Q   Okay.  And what about Idris or Orea?
7       A   I don't know who that is.  I don't
8   remember that.
9       Q   You don't remember who that is?
10      A   No, sorry.
11      Q   Do you know what the diverter --
12  withdrawn.
13          Is there a diverter policy?
14      A   If you're referring to reselling Chanel
15  merchandise...
16      Q   Is that what is a diverter?
17      A   Yes.
18      Q   Okay.  And is there a policy on reselling
19  merchandise?
20      A   Yes.  You can't do it.
21      Q   Right.  Is it -- how are employees tracked
22  to ensure that they are not reselling merchandise?
23          MR. GERBER:  Object to the form of the
24      question.  No foundation.
25      A   I don't know how I would know that.

Page 64

That's not -- that's something I'm assuming would be a loss prevention -- something they would follow.  I wouldn't be able to know that.

Q    So you were never trained on anything that -- withdrawn.

During Kristina's employment, did she tell you that she was pregnant?

A    Yes.

Q    And when was that?

A    I couldn't give you an exact date.  I know that was further down the road.  I think we worked together six months.  It feels like the -- towards the end of us working together.

Q    Would you say about March 2016?

MR. GERBER:  Object to the form of the question.

Q    Would that refresh your recollection?

MR. GERBER:  Object to form of the question.

A    That doesn't refresh my memory.

Q    No.  And why did Kristina tell you that she was pregnant?

A    Well, I recall that.  We had sat down with HR, we had a couple of write-ups regarding her lateness.  I don't remember exact dates, but there

Page 65

was one when I first came on board and then there was one a couple of months, I think, and then it was after that that she started to slip up again with regard to -- you know, I was trying to be nice and say, listen, you have to be careful with these latenesses.  You're getting late again.  So you've got to watch that, and at that point is when she told me, oh, well, I'm pregnant, which, of course, I congratulated her, because it's amazing.  And then, you know, followed that up by telling her, please, go to HR and if she needs any accommodations, you know, whatever she needs.

Q    Okay.  Okay.  So did she tell you that she needed an accommodation?

A    She only told me that she was pregnant.  I was the one who said, do me a favor and please go to HR and if you need anything, any accommodation, they would be more than happy to help you with that. That was it.

Q    Okay.  And you're saying the HR, the same HR that we talked about before, right?

MR. GERBER:  Object to the form of the question.

MS. MENDOZA:  I'll rephrase it.

Q    When you say HR, is there a specific

Page 66

department in HR that handles accommodation requests?

A    Yeah.  HR is HR.  You go there, you tell them what your issue is, and then however they filter it out, they filter it out.  As far as me suggesting to go to HR, to go to HR.

Q    Did you receive any training regarding accommodation requests or disabilities -- employees with disabilities?

A    Training would have been anything, you know, anyone who needs something specific to make sure to partner with human resources and ensure that they meet and that they -- you know, HR then takes over.

Q    Okay.  And so is it policy just that you're there to come to you -- withdrawn.

Is the policy that if you are aware of an accommodation request that you are to report it to HR, right, that's what you're saying?

A    I don't -- the policy as I've always known it, is that -- first of all, often times the associate doesn't always come to the manager, sometimes they go directly to the human resources, but if they came to me, I would then direct them to go to the human resources.

Page 67

Q    And could you also suggest that they need an accommodation?

A    That's not for me to determine, that's for human resources.

Q    Okay.  But could you say that -- withdrawn.

If an employee needs an accommodation -- withdrawn.

So after you told Kristina to go to HR, then what happened?

A    Well, I can only speak for myself.  I went and I spoke to Cathy Younis to let her know and she said the same thing; absolutely, make sure you -- you know, make sure to tell her to check in, to go to human resources, and Cathy and I actually -- if I remember correctly went to human resources just to let them know in case, you know -- so the information doesn't get lost.

Q    Okay.  So you and Cathy went to tell human resources that she needed an accommodation?

A    No, that's not what I said.

Q    Okay.

A    What I said that Cathy and I went to HR to notify them that she had told us -- had told me that she was pregnant and she would be coming to speak

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 68

1  with them.
2      Q    Okay.  Do you recall who you spoke with in
3  HR?
4      A    No, I don't recall.
5      Q    Okay.  Was it documented anywhere?
6      A    I couldn't tell you that.  I don't know.
7      Q    I'm saying, did you send an email or put
8  anything in writing, you or Cathy put anything in
9  writing to HR?
10     A    No.  We went directly to human resources,
11 so I'm sure they documented it.
12     Q    So your conversation was all in person,
13 just verbal, correct?
14     A    Correct, verbal.
15     Q    All right.  Were you aware of any
16 accommodation that was given to Kristina?
17     A    I was not, no.
18     Q    And this is not -- as manager are you
19 supposed to know any accomodations that are given to
20 associates?
21     A    Not necessarily because, you know, it's
22 private information.  If it was that case that
23 someone was continually late and -- you know, I
24 would I -- would approach HR then they would
25 probably notify me and say oh, this is why.

Page 69

1      Q    Okay, okay.  Did you have any discussions
2  with Kristina after -- withdrawn.
3           After that, did you have any other
4  conversations with Kristina about her pregnancy?
5      A    No, I did not.
6      Q    Did you talk about her morning sickness?
7      A    No, I would never do that.
8      Q    Okay.  And I'm saying if she ever
9  discussed with you her morning sickness?
10     A    No, never.
11     Q    Did she ever tell you that she was
12 nauseous?
13     A    No, not me.
14     Q    Were you aware that she was --
15        MS. MENDOZA:  Just one moment.  Can we go
16 off the record for two minutes.
17        (Discussion held off the record.)
18     Q    Okay.  Did Kristina request to come in
19 late because she was pregnant?
20     A    I don't recall, she may have.  I don't
21 remember.
22     Q    Okay.  Did you give Kristina any
23 permission to come in late because she's pregnant?
24     A    If she would have asked me -- had she
25 needed to come in late, I'm sure I would have been

Page 70

1  fine with that.
2      Q    Right.  I'm just asking if you recall that
3  you give her any permission, or there was any
4  conversation of her coming in late and you give her
5  permission?
6      A    I'm sorry, it was five years ago.  I don't
7  remember those conversations.
8      Q    Okay.  And did she ever request to lean on
9  a counter?
10     A    To leave when?
11     Q    To lean on a counter if she wasn't feeling
12 well?
13     A    I never had that conversation, no.
14     Q    Okay.  Did you ever see her leaning on the
15 counter?
16     A    I don't recall ever see her leaning, no.
17     Q    Were the employees not allowed to lean on
18 the counter?
19     A    I don't think anybody wants anyone leaning
20 on the counter, you know, when a customer walks in.
21 It's not very professional.
22     Q    So is that no?
23     A    No.
24     Q    Did she ever request to take any brakes
25 because she wasn't feeling well?

Page 71

1      A    I don't remember.
2      Q    Okay.  Did she ever request to sit down
3  because she wasn't feeling well because of her
4  pregnancy?
5      A    Again, I don't remember.
6      Q    Okay.  Did Kristina ever vomit while at
7  work?
8      A    Not that I'm aware of, no.
9      Q    Okay.  And did Kristina have to go --
10 withdrawn.
11        Was there a break room upstairs?
12     A    Yes.
13     Q    Okay.  And so did Kristina request to go
14 to the break room upstairs at any point during her
15 employment?
16     A    Again, she may have.  I don't recall.
17     Q    To be more specific, did she ever say
18 during a shift I don't feel well?  I need to go
19 upstairs?
20     A    Not that I remember, no.
21     Q    Okay.  And could Cristina sit on a chair
22 on the floor as an accommodation if she wasn't
23 feeling well because of her pregnancy?
24        MR. GERBER:  Object to the form.  No
25 foundation.

Page 72

1    A    That would be something that would be
2  determined by human resources and they would let me
3  know or let me and Cathy know.
4    Q    And so the only -- so do you have any
5  involvement as to any accommodations that are made
6  for the employees that you oversee?
7    A    No, I do not.
8    Q    Okay.  Did you ever tell Kristina that her
9  write-up would be removed -- withdrawn.
10        Did you tell Kristina that the
11  write-up in March 2017 to April 2017, that that
12  write-up would be removed after she informed HR
13  about her pregnancy?
14    A    That's not something I can determine.
15  That's not up to me.
16    Q    Right.  But did you tell her it would be
17  up to HR to remove that write-up?
18    A    I did not.
19    Q    Okay.  Did you know that Kristina had
20  intermittent -- FMLA intermittent leave?
21    A    I did not, no.
22    Q    So you mentioned before that you spoke
23  with Cathy about Cristina's pregnancy, correct?
24    A    Yes.
25    Q    And did you discuss her due date?

Page 73

1    A    I did not know her due date.
2    Q    Okay.  And so you discussed it with Cathy,
3  did you discuss -- withdrawn.
4        You discussed Kristina's pregnancy
5  with Cathy and with HR, right?
6    MR. GERBER:  Object to the form of the
7    question.
8    Q    That's what you said?
9    A    Yes.
10    Q    Is there anyone else that you spoke with
11  Bloomingdale's Macy's regarding Kristina's
12  pregnancy?
13    A    No.
14    Q    Okay.  And after that conversation with
15  HR, did you have any other conversations with Cathy
16  about Kristina's pregnancy?
17    A    I did not, no.
18    Q    Okay.  And did you have any other
19  conversations with Kristina about her pregnancy
20  after that?
21    A    No, I did not.
22    Q    Okay.  Do you recall if Kristina was
23  suspended?
24    A    Do I recall what?  I'm sorry.
25    Q    If Kristina suspended?

Page 74

1    A    Yes.
2    Q    And what do you know about that?
3    A    The only thing I was told at the time -- I
4  wasn't there, but I was told there were some
5  procedural issues.  That was all.
6    Q    What do you mean by procedural issues?
7    A    That's what I was told.
8    Q    And who told you that?
9    A    I think it was Cathy actually.
10    Q    And was Cathy there?
11    A    When she spoke to me, yes.
12    Q    Okay.  And did they say -- so just to be
13  clear, Cathy said that Kristina was suspended
14  because of procedural issues?
15    A    Yes.
16    Q    So let's back up a little bit.  In
17  June 2017, do you recall Kristina being pulled from
18  the floor by loss prevention?
19    A    I do not because I was not there.  I was
20  off that day.
21    Q    Okay.  Did anyone inform you they were
22  going to call Kristina to loss prevention?
23    A    No one did.
24    Q    So you didn't know beforehand that they
25  were going -- that loss prevention was going to call

Page 75

1  Kristina; is that correct?
2    A    That is correct.
3    Q    Okay.  And so you found out afterwards as
4  to the fact that Kristina was called by loss
5  prevention; is that correct?
6    A    That is correct.
7    Q    And what happened while Kristina was out
8  on suspension?
9    MR. GERBER:  Object to the form.
10    A    I'm sorry.  I'm not sure what that means.
11    Q    Yeah, so I'm asking as far as -- because
12  you're overseeing her, right, so I'm assuming you
13  create the schedule; is that correct?
14    A    Yes.
15    Q    So if you don't have an employee and your
16  employee is on suspension, I'm asking what happened
17  as far as her position while she was out on
18  suspension?
19    MR. GERBER:  Object to the form.
20    A    You know it was a day-to-day business.
21  Obviously, we have 16 other associates, so we still
22  managed the business.  I had enough coverage so it
23  wasn't that.  It was -- if anything, if I needed to
24  help any of her clients, obviously that would be the
25  only extent of it.

Deposition of Denis Diaz                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 76

1    Q   Okay.  Well, I'll be a little bit more
2  specific here.  Were you given any instruction as to
3  what would be done if there was an investigation
4  into Kristina's employment at Bloomingdale's?
5       MR. GERBER:  Object to the form of the
6  question.
7    A   I was not given any other information
8  besides that.
9    Q   Besides what?
10   A   The procedural issues.  That's all I was
11 told.
12   Q   Okay.  And but were you told that you can
13 start looking for a new replacement?
14   A   I was not told that, no.
15   Q   Okay.  Did you ask when could you start
16 looking for a new replacement?
17   A   I did not because it was a suspension and
18 I didn't know what the outcome would be.
19   Q   Were you given an approximate time as to
20 when a date would be as to her return?
21   A   No, I would not -- I was not.
22   Q   Were you kept informed as to what was
23 being done regarding her suspension?
24   A   No, I was not.
25   Q   Okay.  And who was handling her

Page 77

1  suspension?
2    A   Loss prevention was handling it.
3    Q   Okay.
4    A   I'm assuming human resources was also.
5    Q   So were you cc'ed on any correspondence at
6  that time regarding Kristina's employment?
7    A   Most -- I'm sure I was most likely.  I
8  don't remember each email, but most likely I'm sure
9  I was.
10   Q   So do you recall anything about Kristina's
11 -- withdrawn.
12       Do you recall anything as to what
13 Kristina was being investigated or -- withdrawn.
14       Do you recall anything as to what was
15 in those emails?
16   A   No, I don't.
17   Q   Okay.  But it was from loss prevention; is
18 that correct?
19   A   From what I remember either loss
20 prevention or human resources, I don't remember.
21   Q   And Cathy as well?
22   A   Yes.
23   Q   And do you recall if it had something to
24 do with her credit card usage?
25   A   I never saw anything in writing about

Page 78

1  anything in particular any specifics, no.
2    Q   Okay.  And after her suspension after
3  Kristina's suspension she was terminated, correct?
4    A   Yes.
5    Q   And how did you learn she was terminated?
6    A   If I'm -- if I remember, there was an
7  email that -- I don't remember who it was from, but
8  it was either human resources or loss prevention.
9  It was probably both; indicating that she was no
10 longer with the company.
11   Q   And do you recall when that was?
12   A   No.  Honestly, I don't.
13   Q   Okay.  And did they explain why she was no
14 longer with the company?
15   A   They did not.
16   Q   And did you ask why?
17   A   Yes.
18   Q   And what was the reason given?
19   A   They didn't elaborate.
20   Q   Did they give any reason?
21   A   No.  They just said they had grounds for
22 termination.  That was it.
23   Q   And was this HR that gave this response?
24   A   I don't remember.
25   Q   And after that, did you have any

Page 79

1  discussions with Cathy regarding Kristina's
2  termination?
3       (telephonic interruption)
4       THE WITNESS:  I'm sorry.  I have to
5  answer.  That's my doctor.  Sorry.  Would you
6  repeat that, please.
7       MS. MENDOZA:  Joanna read that back,
8  please.
9       (Whereupon, the last question was read
10 back.)
11       MR. GERBER:  Object to the form.  It's
12 been two minutes, I'm not sure what that refers
13 to at this point myself.  If you could just
14 include that in your question, Ms. Mendoza.
15       MS. MENDOZA:  I was repeating it back
16 because he didn't hear it.  So if you want
17 her -- Joanna what was the last thing before
18 that.
19       MR. GERBER:  Go ahead, Mr. Diaz.  I've
20 objected to the form.
21   A   I did and it was just, you know, we don't
22 have specifics.  Let's just keep moving.  Let's just
23 running our business it was all about the business
24 every day and we have a number of associates we have
25 to work with, so let's keep moving.

Deposition of Denis Diaz

Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 80

1  Q   Okay.  But did you discuss any -- did you
2  discuss the reason why she was terminated?
3  A   I did not, no.
4  Q   And did you ever ring up Kristina's
5  merchandise purchases?
6  A   Not that I'm aware of, no.
7  Q   You stated earlier though that manager
8  have to ring up the merchandise for the employees;
9  is that correct?
10 A   No, what I said was manager or
11 supervisors.
12 Q   Okay.  So it would either would be you or
13 Cathy, is what you're saying?
14 A   No, we also had on the floor
15 supervisors -- in essence like assistant managers
16 that would be on each floor, and they would actually
17 ring.
18 Q   And when you say on each floor, you mean
19 they're not just exclusive to the Chanel boutique,
20 correct?
21 A   Correct.  They are part of the main floor.
22 Q   And so how many manager were there?
23 A   I think there were two supervisors, I
24 think you're asking.
25 Q   Assistant managers, yeah.  Supervisors.

Page 81

1  A   I think there were two -- at least two per
2  floor.
3  Q   Okay.  Do you recall the names of those
4  supervisors at that time 2016/2017?
5  A   Sorry, I do not.
6  Q   No, okay.  And was it written anywhere --
7  withdrawn.
8  Was it documented anywhere that these
9  supervisors could -- had to ring up the employees?
10 A   I don't recall it being in writing, but I
11 know that it was a policy that all manager knew that
12 we had to get a supervisor or ourselves to ring up.
13 Q   Okay.  And that was Bloomingdale's/Macy's
14 policy not Chanel's, correct?
15 A   At that point it would have been both.
16 Q   Okay.  Do you know who replaced Kristina?
17 A   I do not, I don't remember.
18 Q   Do you recall an employee by the name of
19 Zain?
20 A   I think you mean Zaid.
21 Q   Zaid?
22 A   Yes.
23 Q   Okay.  Did he work in the boutique after
24 Kristina?
25 A   Yes.

Page 82

1  Q   Do you recall if he replaced Kristina?
2  A   I don't think so because he came on board
3  much later.
4  Q   Okay.  Do you know his last name?
5  A   I think it's Constantine.
6  Q   Okay.
7  A   He's in my phone.  If you wait a second
8  I'll verify.  Yes, it's Constantine.
9  Q   Did you interview -- withdrawn.
10 Were you responsible for interviewing
11 the associates?
12 A   Yes.
13 Q   Was it you and Cathy that reviewed the
14 associates?
15 A   Yes.
16 Q   Did anyone else?
17 A   Human resources.
18 Q   Okay.
19 A   Oh, and later Cathy also got involved.
20 Q   After Kristina's termination, was there
21 any training regarding employees shipping to other
22 states to avoid the New York sales tax?
23 A   That was a conversation that was had
24 pretty much from the get-go when I was there.  So it
25 was a continual conversation.  It was not -- it was

Page 83

1  not something that was new because of what occurred.
2  It was actually done beforehand as throughout.
3  Q   Okay.  And a conversation between whom?
4  A   That would be loss prevention, like we
5  spoke about a moment ago, would come through and
6  have a meeting with the team and would hand out the
7  policy directives to just reiterate them each time.
8  Q   Okay.  But were employees able to suggest
9  to customers that they could ship to states to avoid
10 the sales tax?
11 A   No, they could not.
12 Q   Okay.  Was Kristina ever -- do you recall
13 if Kristina was questioned regarding her sales?
14 A   Her personal sales?
15 MR. GERBER:  Regarding what?
16 MS. MENDOZA:  Her sales.
17 A   Not to my knowledge, no.
18 Q   Did you check the sales for each employee
19 every month?
20 A   Yes.  It's my responsibilities, yes.
21 Q   Okay.  So you kept track of who was making
22 the most sales every month, correct?
23 MR. GERBER:  Object to the form of the
24 question.
25 A   Yes.

Page 84

Q   And did you report -- withdrawn.
     If an employee was making an excessive amount of sales in a given month, was that ever a concern for you?
     MR. GERBER:  Object to the form.
A   What do you mean by an excessive amount of sales.
Q   What was the typical amount of sales on a particular month for an employee?
A   You know, it depends.  Like anywhere you have top producers, and you have middle producers, and you have low producers.  It depends.  You can have an employee that can sell, you know, 300,000 in a month and you might have someone who sells 100,000, so I don't know what you're asking.
Q   So was Kristina a top producer?
A   From what I recall Kristina was -- yeah, she was right up there.  She was one of the better producers.
Q   And --
A   I wouldn't say top, top, but she was definitely upper middle.
Q   And was there any large -- withdrawn.
     So by saying that she was in the upper middle, right, than there was not a large

Page 85

discrepancy between her sales and the next associate; is that correct?
     MR. GERBER:  Object to the form of the question.
Q   I can give an example.  Was Kristina making say a million dollars in sales and then the next person underneath her was making 50,000 in sales?
A   No, no.  Thank goodness that wasn't the case.  It was more so like if she was 2 million, the next person below her would be at -- could be at 950-, 970-, you know, depending.
Q   Okay.  And did you ever question --
     Did you have any concerns with the amount of sale that is Kristina was making during her employment?
A   I did not, no.
Q   Okay.  Do you know if there was any concern by Cathy regarding Cristina's sells during her employment?
A   Not that I know of, no.
Q   And do you know if loss prevention had any concerns regarding her sales?
A   Not that I know of, no.
Q   Do you recall any of the employees that

Page 86

you supervised or were managing that were flagged by loss prevention for their sales?
     MR. GERBER:  Objection.  No foundation.
A   I was not privy to that, no.
Q   Would you be privy to that?
A   No, I wouldn't.
Q   No, okay.  What are sends in the handbag department?
A   Sends are when a client wants to purchase something, but they don't want to carry it home.  They want to send it to their home.
Q   And of those sales that occurred, what is the percentage of sends?
A   I couldn't tell you.
Q   Is it the majority?
A   No.
     MR. GERBER:  Object to the form of the question.
A   No, wouldn't say so.
Q   Okay.  And you said a client or could it be an employee as well?
A   It could be an employee.  If they sent it to their billing address, then it would be fine.
Q   Okay.  So what do you mean by billing address?

Page 87

A   Where they live.
Q   But is it a billing address on their credit card?
A   On their credit card.  I'm sorry.
Q   Okay.  And is the Loyallist card, is that a Bloomingdale's card?
     MR. GERBER:  Object to the form of the question.
Q   Is the Loyallist a Bloomingdale's credit card?
A   From what I remember, yes.
Q   Okay.  And when you say the billing address, is that what you're referring to, the billing address on that card?
A   The billing address, whichever credit card they use.
Q   Okay, all right.  So I want to be clear because you mentioned the billing address only for employees not for customers?
A   I did not say that.
Q   Okay.
A   It is for both.
Q   Okay.  So the customer could send to the billing address on the credit card that they used, correct?

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 88

1     A   That they're using, yes.

2     Q   And the same goes for the employee,

3 correct?

4     A   Yes.

5     Q   Could either the employee or the customer

6 ship to any other location besides the billing

7 address on the credit card that they're using?

8     A   They cannot.

9     Q   Okay. And is that a policy written

10 anywhere?

11     MR. GERBER: Object to the form of the

12 question.

13     A   I'm sure it is, but I don't remember now,

14 but I'm sure it is. I know it was a policy and it

15 remains.

16     Q   Okay. Is that how you were made aware of

17 this policy?

18     MR. GERBER: Object to the form of the

19 question.

20     A   I was made aware of the policy and when I

21 went through my training there.

22     Q   Okay. Were you present during the sales

23 of the handbags?

24     MR. GERBER: Object to the form.

25     A   Do you mean the every day sales or what

Page 89

1 specifically.

2     Q   So let's go back to the 60/20/20, right.

3 So if there was like a special sale going on, were

4 you present during those sales?

5     A   The first sale they had I was not -- I was

6 on the late shift, so I wasn't there in the morning

7 and it started -- if I'm not mistaken, it started

8 like eight o'clock in the morning or something,

9 'cause they would allow the employees to come in

10 earlier. I was in the late shift. I was closing.

11 I didn't get there until 11:30 or 12:30 to close.

12     Q   And would you recall if Cathy would also

13 be there during those sales?

14     MR. GERBER: Object to the form.

15     A   She was there for that, yeah.

16     Q   Okay. So you were able to see if --

17 withdrawn.

18     So as you mentioned, it was open to

19 the employees before the customers?

20     A   Correct. I think there needs to be some

21 clarity. It wasn't a sale for customers. It was

22 only a sale for employees, which is why we would

23 open the store at eight o'clock, for the employees.

24 And by the time the store opened at 10:00 a.m. there

25 was no longer a store happening. It would be back

Page 90

1 to regular business.

2     Q   Okay. And do you recall if there was any

3 -- withdrawn.

4     Do you recall any limitations on any

5 purchases during those sales?

6     A   I recall the same policy that adhere to on

7 a daily basis. In other words, there was always

8 limitations.

9     Q   Okay. And did that apply to shoes as

10 well?

11     A   Shoes was a separate entity. I don't know

12 what exactly happened there. I didn't manage shoes.

13     Q   Did you ever question any of your

14 employees regarding sends?

15     A   No, I did not.

16     Q   Okay. And did you ever question any

17 Bloomingdale's employees regarding sends?

18     A   No. Same question, no.

19     Q   I was first saying in your boutique -- in

20 the Chanel boutique versus any Bloomingdale's

21 employee?

22     A   Oh, I'm sorry. Yeah, no, I didn't.

23     Q   And have you ever been involved in an

24 investigation to any of your employees purchases?

25     A   I have not, no.

Page 91

1     Q   Okay. Is the 60/20/20 also a double

2 discount?

3     A   I would think so, yes.

4     Q   And I say double discount, because I don't

5 know if that is a term used in the Chanel department

6 or in Bloomingdale's, that's why I'm asking if

7 60/20/20 is the same as saying double discount?

8     A   I've never heard of it referred to as

9 that. I've only heard it referred to as 60/20/20.

10     Q   So have you ever heard of a double

11 discount?

12     A   I have not.

13     Q   Okay. And was there any other discount

14 besides the 60/20/20?

15     A   Only your regular discount, which I think

16 was 30 percent. I don't remember.

17     Q   Okay. Do you recall any employees that

18 were terminated for shipping to states to avoid

19 paying the New York sale's tax?

20     A   Not specifically. I know that other

21 employees were terminated. I didn't know the

22 specifics as to why that you were terminated.

23     Q   And who were those employees?

24     A   I don't remember offhand. I couldn't

25 guess at this point. Remember, I was only there at

Deposition of Denis Diaz                                        Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 92

that point only about six months; so, although, I
did get to know the staff, I didn't know them
completely.

Q   Okay.  And were any employees terminated
from exceeding the handbag policy purchase limit?

A   Not that I'm aware.

MR. GERBER:  Object to the form.  I'm
sorry.  I didn't hear your answer.  I didn't
mean to speak over you.

THE WITNESS:  Not that I'm aware.

Q   Okay.  Were any employees suspended for
exceeding the handbag purchase policy limit?

MR. GERBER:  Object to the form.  No
foundation.

A   Not that I'm aware of.

Q   Did you ever ship merchandise to states
for customers to -- in which they wouldn't have to
pay the New York sales tax?

A   I did not.

Q   Did you ever see employees ship their
purchases to states to avoid paying the sales tax?

A   I did not.

Q   And so if an employee is making a purchase
for a friend, right, and lives in New Hampshire,
let's say, right... if I'm an employee that's making

Page 93

this purchase for my friend in New Hampshire, is
that employee -- or would I be questioned then as to
why I'm sending my purchase to new Hampshire?

MR. GERBER:  Object to the form of the
question.

A   Yes, you would.

Q   And who would question me?

A   That would be loss prevention.

Q   Okay.  And is that because they're the
ones that are keeping track of the purchases?

MR. GERBER:  Object to the form of the
question.  No foundation for this witness.

A   Yes, they are keeping track.

Q   Do you know if Kristina was suspended for
reselling?

A   I'm sorry?

Q   Do you know if Kristina was suspended for
reselling?

A   I do not know that.

Q   Do you recall there being any
conversations regarding Kristina potentially
reselling?

A   I never heard that conversation.

Q   Were you aware of any conversations
regarding Kristina reselling?

Page 94

A   I was not aware.

Q   Do you know Sandy -- no, no.  My
apologizes.

Were there any sexual harassment
training in the store?

A   Yes.

Q   Was it a general sexual harassment
training, or was it specific to Chanel?

A   It was general to the store.

Q   And how often were there sexual harassment
training?

A   When I was there a number of times
throughout the year.  I don't know how many.  A few
times.

Q   And who led those trainings?

A   They were led by HR.

Q   Okay.  And was it documented?

A   Yes.

Q   Okay.  So when I say it's documented, were
there handouts during those trainings?

A   There were handouts and also a discussion.

MS. MENDOZA:  Okay.  We'll be requesting
those documents.

Q   And did you ever report anyone sexually
harrassing another employee?

Page 95

A   Never.

Q   Did anyone report to you about another
employee sexually harrassing another employee?

A   Never.

Q   Did any employee ever explain to you about
sexual harassment?

A   Never.

Q   Did any employee ever -- withdrawn.

Was there also discrimination and
retaliation training in the store?

A   Yes.

Q   And did anyone ever complain to you about
any discrimination or retaliation?

A   No.

Q   Did you ever report any discrimination or
retaliation?

A   No.

Q   Okay.  So I want to go back to an exhibit
now.  The conversation you had with Kristina
regarding her pregnancy -- and we'll enter exhibit
-- it says EOC charge.

MS. MENDOZA:  This is going be marked as
Exhibit 3.

MR. GERBER:  Can I get Bates numbers on
that, please.  I know what the document is, but

Page 96

1    I can't see --
2       MS. MENDOZA:  Mikhaylova0016 and it ends
3    at 157.
4    Q    All right.  So this marked as Plaintiff's
5    Exhibit 3.  Mr. Diaz, this a document that was
6    submitted by your attorneys.  It says at the top
7    there -- actually, correction.  It's by Macy's Inc.,
8    right?  It says at the top there Taryn Filo.  Do you
9    say see that?
10   A    I see that.
11   Q    Do you know who Taryn Filo is?
12   A    No idea.
13   Q    This was sent -- if you look at the left
14   it says it's addressed to the U.S. Equal Employment
15   Opportunity Commission and it's to Anthony Pino.  Do
16   you see that in the left?
17   A    I see that, yes.
18   Q    And the date is June 6th, 2019.  It's
19   addressed to -- I mean, it states Kristina
20   Mikhaylova versus Bloomingdale's LLC.  And if you
21   turn to page 120 -- if you go down to 120 -- Bates
22   stamp 120.  At the top there, the first paragraph.
23   A    Yes.
24   Q    It says, "Sometime After her April 2017
25   Formal Reminder Form, complainant disclosed to

Page 97

1    Mr. Diaz that she was pregnant.  Mr. Diaz
2    congratulated her good news and advised her to
3    contact the Leave of Absence Department, the central
4    HR team that handling requests for leaves of absence
5    and intermittent leaves."  Do you see that there?
6    A    Yes.
7    Q    So to go back to your testimony, did you
8    send her -- is that true that you sent her to the
9    leave the absence department?
10      MR. GERBER:  Object to the form of the
11   question.
12   A    I'm sorry, but what I said was I sent her
13   to to human resources.  I don't know about that
14   department.
15   Q    Right.  So my question is, is this
16   correct, what's written here?
17      MR. GERBER:  Object to the form of the
18   question.
19   A    I would have told her, like I said, to
20   contact human resources, not to contact the leave
21   the absence department.  I don't know.
22   Q    So this is not accurate is my point?  That
23   you did send her to contacts the leave the absence
24   department, correct?
25      MR. GERBER:  Object to the form of the

Page 98

1    question.
2    A    What I told her was to, as I said, contact
3    human resources and they obviously would then refer
4    her to whoever.
5    Q    Right.  But did you advise her to contact
6    a leave of absence department, which is what it says
7    in this document?
8       MR. GERBER:  Objection.
9    A    I think I answered that.
10   Q    No, you're saying that you sent her to HR,
11   correct?
12   A    That's what I said, yes.
13   Q    That's not what I'm asking.  I'm asking if
14   you advised her -- what it says right here.  You
15   advised her to contact the leave of absence
16   department?
17   A    I said that I advised her to go to human
18   resources.  They would then determine who -- who
19   takes this over.
20   Q    Right.  That is not to say the same as you
21   advising her to go the leave the absence department,
22   correct?
23      MR. GERBER:  Object to the form of the
24   question.  It's just argumentative.
25   A    I did not write this document, so I can

Page 99

1    only tell you -- I can only be honest.
2    Q    Right.  And I just want there to be
3    clarification.  It's not intended to be
4    argumentative at all.  I know that you didn't write
5    this.  I'm just asking for purposes of clarification
6    not to misunderstand what's written here versus your
7    testimony.  That's why I just want to know if it is
8    true that you did not advise her to contact a leave
9    of absence department, that's all?
10      MR. GERBER:  He's just answered five times
11   now.
12      You can answer again, sir.
13   A    Yes, I did not.  I told her to contact
14   human resources.
15   Q    Yes, you told her to contact human
16   resources, is that your answer?
17   A    Yes, that's what I said.
18   Q    And that's what you've been saying,
19   correct?
20   A    Yes.
21   Q    Okay.  And are you aware of a leave of
22   absence department?
23   A    Not offhand, no.  I'm sure there's one, I
24   just don't know it.
25   Q    Were you aware of a leave of absence

Page 100

1 department at the time?
2    A  I'm assuming that fell under the umbrella
3 of human resources.
4    Q  I'm not asking now of your assumption.
5 It's, did you know at that time that there was a
6 leave of absence department?
7    A  I can't tell you what I -- you know, what
8 I knew, you know, over five years ago.  I don't
9 remember.
10    Q  Okay.  And then if we can go down to 146
11 -- Bates stamp 146.  Have you ever seen this
12 document before?
13    A  Possible, I don't recall seeing it.
14    Q  Okay.  So during your employment -- do you
15 recall during your employment at Bloomingdale's, do
16 you recall seeing this document?
17    A  I don't recall, no.
18    Q  Okay.  And it says there "New York City"
19 at the top.  "New York City is a family friendly
20 city with a strong and vibrant work force, including
21 pregnant woman and people with children."  This is
22 the NYC Commission On Human rights regarding
23 accommodation for pregnant employees, right?  That's
24 what it says there?
25      MR. GERBER:  Objection.  He just said he

Page 101

1 doesn't recall seeing this document.
2      MS. MENDOZA:  I'm asking about the
3 document.
4      MR. GERBER:  Object to the form of the
5 question.
6    Q  That's what this document is, correct?
7    A  From what I testified, yes.
8    Q  And did you refer to any document --
9 withdrawn.
10      You did not provide accommodations
11 for your associates, correct?
12      MR. GERBER:  Asked and answered.
13    A  That was provided by human resources.
14    Q  Okay.  And were employees aware --
15 withdrawn.
16      Were your associates aware that they
17 are to go to HR for accommodation requests?
18    A  Yes, they were.
19    Q  How were they made aware of that?
20    A  Sorry.  I couldn't hear.
21    Q  And how were they made aware of that?
22    A  Through human resources.
23      MS. MENDOZA:  We can get off this page.
24    Q  Was there a sales force -- withdrawn.
25      Was there any program that you used

Page 102

1 to keep track of an employee's status?
2      MR. GERBER:  Object to the form.
3    A  What do you mean by status.
4    Q  So to keep track of their -- anything
5 regarding their employment?
6      MR. GERBER:  Object to the form.
7    A  I mean, in regards to, like, sales and
8 things like that.
9    Q  Did they have a file?  Did each employee
10 have a file on a soft -- on a software program that
11 was used by you?
12    A  Not by me.  It would have been something
13 through HR.
14    Q  Okay.  So did you have to -- so regarding
15 the sales that you checked every day, did you have
16 to add anything to each person's file?
17    A  No.  I did not, no.
18    Q  No?
19    A  No.
20    Q  So let's go do BLM754.
21      MR. GERBER:  That will be Exhibit 4; is
22 that correct?
23      MS. MENDOZA:  Matt; is that correct?
24      THE VIDEO TECH:  Yes.
25      MS. MENDOZA:  I think it is.

Page 103

1    Q  Okay.  Let's take a minute to look at this
2 document.
3      MR. GERBER:  Is there a question pending?
4      MS. MENDOZA:  He was looking at the
5 document.
6    Q  Are you done looking at it?
7    A  Yes.
8    Q  Okay, great.  Have you seen this before?
9    A  I have never seen this.
10    Q  No, okay.  So this is -- what I was asking
11 you before is to -- if you used a software for each
12 employee.  I was referring to something here.  It
13 says employee ID at the top and an employee number
14 and Kristina Mikhaylova, payroll status terminated.
15 So going back to my question, did you use any
16 software program that you would input her sales or
17 daily performance such as this?
18      MR. GERBER:  Such as this document?
19      MS. MENDOZA:  Correct.
20    A  That's a different question if you ask me,
21 because this looks like it's something that's
22 related to human resources, which I would not be
23 privy to.
24    Q  Right.  And I'm not saying this document,
25 because you've already said you've never seen this

Case 1:19-cv-08927-GBD-SLC   Document 128-4   Filed 09/20/23   Page 30 of 56

Deposition of Denis Diaz                                Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 104

1  before, right?
2      A   Right.
3      Q   So I'm not saying this.  I'm saying such
4  as this format, where you would input -- like a
5  program like this where you would keep track of each
6  employee, that's what I'm asking trying to ask.  If
7  you used any program?
8      A   It was more so done on a day-to-day or a
9  monthly conversation with the employee, you know, to
10 look at their sales versus the department sales,
11 that kind of thing.
12     Q   Okay.  So there wasn't a Bloomingdale's
13 software program that you had to use that would keep
14 track of each employee's sales?
15     A   No.  Not that I recall, no.
16     Q   Okay.  So was that on a spreadsheet?
17     A   No.  The conversations were in-person and
18 they would be -- yeah, they would be in front of you
19 in the sense that we would print out what the sales
20 were and then you would actually talk to the
21 associate about where they landed for the month, et
22 cetera.
23     Q   Okay.  And did you have to submit any of
24 those documents to Bloomingdale's or anybody else?
25         MR. GERBER:  Object to the form of the

Page 105

1  question.
2      Q   Besides your department?
3      A   I don't -- I don't understand the
4  question.  I'm sorry.
5      Q   Yeah.  So you're saying that you would
6  have these reports of each employee's sales, right?
7      A   Yes.
8      Q   Besides talking to the employee about it,
9  did you talk or submit these documents to anyone
10 else?
11     A   Only in the case of where an associate was
12 failing productivity then that would be a discussion
13 with human resources and then that would involve
14 most likely a warning or counsel.  Counsel is first.
15     Q   When you say lack of productivity, is that
16 they're just not meeting the sales numbers?
17     A   They're not meeting the department
18 standard, which is -- I don't remember what the
19 formulation was there, but, if I'm not mistaken, it
20 was whatever the total sales were for the month
21 divided by the number of associates and then you
22 also have to take into account the numbers of hours
23 worked and then it would look at where they would
24 fall in their hourly sales.  And that would
25 determine whether an associate was falling below the

Page 106

1  average or if they were on average or above.
2      Q   And that's what you mean by productivity?
3      A   That's it.
4      Q   So going back to the document now, Exhibit
5  4.  It says, Kristina Mikhaylova at the top there
6  and it says reason, "A series health condition that
7  prevents me from performing the essential functions
8  of my job."  Did Kristina ever say that to you?
9      A   She did not.
10     Q   Okay.  So we can get off this page.  So
11 how did you keep track of each employee's
12 performance on a day-to-day basis?
13         MR. GERBER:  Objection, asked and
14     answered.
15     A   Again, going over the previous days,
16 numbers, meeting with them, you know, talking about
17 their productivity, or how they did, et cetera, and
18 then also doing it on a monthly basis.
19     Q   Right.  My question is, where did you
20 document each employee's day-to-day performance?
21     A   I -- that's not something I documented.
22 It would come up.  There was a computer, and I'm not
23 sure what it was exactly, but it would come up with
24 everyone's sales.  You can print it out and then
25 have the discussion.

Page 107

1      Q   Do you recall what the program was that
2  would come up?
3      A   I do not.
4      Q   Okay.  And did that come from
5  Bloomingdale's or Macy's?
6      A   It came from Bloomingdale's.
7      Q   Okay.  Was it just for the sales?
8      A   Yes.
9      Q   Did it also include their write-ups such
10 as tardiness?
11     A   No.
12     Q   Okay.  So my question is for you, then how
13 did you document tardiness or any other performance
14 besides the sales for each employee that you were
15 supervising?
16     A   Any other performance issues we can look
17 at another, I guess, it was an HR-related printout
18 that would show us our time clocks, when they
19 clocked in and out, et cetera.  And at that point I
20 think it was -- you had to have three for more -- I
21 don't remember how many there were, but either two
22 or three latenesses per month that you would then
23 have to counsel at the end of that month.
24     Q   Okay.  And so part of your duties was to
25 look at the schedules to see the printouts from the

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 108

1 HR that you're talking about and see if anyone went
2 past -- withdrawn.
3          Was part of your duties to go and
4 look at the schedule to see if anyone was
5 excessively late?
6    A   Yes.
7    Q   Okay.  And what are other responsibilities
8 did you have for checking on each employee's
9 performance?
10   A   You know, there was that.  There was the
11 employee sales obviously, pretty much the
12 day-to-day.  I was in the boutique, you know, quite
13 a while, so I would make sure that they were
14 performing and, you know, assisting clients at all
15 times.  That was pretty much it.
16       MS. MENDOZA:  Okay.  Okay.  I just want to
17    go over the last document, the complaint.  We
18    can pull that up.  All right.  This is
19    Plaintiff's Exhibit 5.  And it's plaintiff's
20    amended complaint.
21       Do you see the document, Mr. Diaz?
22       THE WITNESS:  Yes, I see it.
23   Q   And have you seen this document before?
24 And you can scroll if you want.
25   A   I think this was -- hold on a second.  I

Page 109

1 think, if I'm not mistaken -- this was the first
2 document I received back in February of this year.
3    Q   And if we turn to page 7, please.  And if
4 you look at paragraph number 39.  I know, Mr. Diaz,
5 you said previously that you don't recall
6 Mr. Booker, correct?
7    A   That's correct.
8    Q   So this is plaintiff's complaint and here
9 it says, "Defendant Booker unwelcomely touched
10 plaintiff's arm when he spoke to her and regularly
11 stood uncomfortably close to plaintiff on purpose."
12 Do you recall any male employee touching plaintiff's
13 arm?
14   A   I do not.
15   Q   And going down to paragraph 45.  It says
16 "In or around April 6th, 2017, defendant Diaz issued
17 plaintiff a write-up for tardiness in the month of
18 March 2017."  Do you see that?
19   A   Yes, I see it.
20   Q   And is that true?
21   A   I don't think it was March.
22   Q   Okay.
23   A   I think -- I think that's wrong.  I think
24 it was way after that.
25   Q   Okay.  Was it around April 6th, 2017?

Page 110

1    A   Frankly, I remember that there were two
2 separate write-ups.  I don't know the exact dates,
3 but I know there were two separate write-ups, and it
4 was well after the second write-up that she informed
5 me.  So these dates are not correct.
6    Q   In paragraph --
7    A   In all honestly, I wouldn't have been
8 there April 6th anyway because that's my mother's
9 birthday and I usually go to Miami, so I wouldn't
10 have been here.
11   Q   Okay.  So going to the next paragraph, 46.
12 It says, "Plaintiff immediately informed Diaz that
13 she recently learned she was pregnant with a
14 tentative due date in 2017."  See that there?
15   A   Yes, I see it.
16   Q   Is that true?
17   A   That is not true.
18   Q   And why not?
19   A   Because she informed me she was pregnant
20 well after this date, and I never knew what the due
21 date was.  I don't ask those questions.  I would not
22 know that.
23   Q   Okay.  But she did not share that with
24 you?
25   A   She did not.

Page 111

1    Q   Is that correct?
2    A   Exactly, she did not share that with me.
3    Q   "Plaintiff further explained the reason
4 for her tardiness was due to terrible morning
5 sickness."  Do you see that there.
6    A   I do see that, yes.
7    Q   Is that true?
8    A   I don't -- I never had that conversation.
9    Q   Okay.  Then it says "Defendant Diaz
10 informed plaintiff that he still had to write her up
11 for tardiness and human resources would make a
12 decision as to considering that write-up."  Do you
13 see that?
14   A   Yes.
15   Q   Is that true?
16   A   That is not true.
17   Q   And what part of it is not true?
18   A   I would not write-up anyone who was
19 pregnant for tardiness.  I mean, I'm not an animal.
20 I'm sorry.  This is not true.  This is not correct.
21   Q   Okay.  Did you tell Kristina that human
22 resources would have to make a decision considering
23 the write-up?
24   A   Not -- I never did, no.
25   Q   Okay.  And paragraph 49 it says, "On or

Case 1:19-cv-08927-GBD-SLC   Document 128-4   Filed 09/20/23   Page 32 of 56

Deposition of Denis Diaz                                      Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 112

1  about May 15, 2017 plaintiff informed defendant
2  Bloomingdale's of her nausea and fatigue related to
3  her pregnancy." Do you see that there?
4      A   I see that, yes.
5      Q   And do you recall Kristina telling you
6  that?
7      A   I do not.
8      Q   Were you aware of Kristina's nausea or
9  fatigue?
10     A   I was not.
11     Q   And it says --
12     A   You're hitting all the dates. May 15th is
13  my sister's birthday, and I would also be in Miami.
14  So you're hitting all the days that I'm not even
15  here.
16     Q   So it says on or about, so it's not the
17  exact date but --
18     A   I don't go to Miami for one day. I go for
19  a number of days, I'm just saying.
20     Q   Right. And I state that just so you
21  understand the question, that it's on or about, not
22  just the exact date. So then it states in the same
23  paragraph on 49, "Plaintiff informed defendants that
24  on occasion she has to arrive at work late and leave
25  work early because of the extreme nausea and fatigue

Page 113

1  she was experiencing from her pregnancy." Do you
2  see there?
3      A   I do see that. Who are defendants?
4      Q   So that would be Bloomingdale's and
5  including yourself.
6      A   That may be Bloomingdale's, not me.
7      Q   Did she tell you that she had to arrive
8  work late or leave work early due to nausea or
9  fatigue?
10     A   She did not.
11     Q   Okay. And you previously stated that you
12  didn't know about Kristina's FLMA intermittent leave
13  request, correct?
14     A   I did not know about the request, no.
15     Q   Did you ever receive any doctor's note
16  from Kristina regarding her pregnancy?
17     A   Not that I remember or I'm aware of.
18     Q   Did you ever see any doctor's note in
19  general from Kristina?
20     A   Not that I remember, no.
21     Q   Do you recall discussing a doctor's note
22  regarding Kristina?
23     A   No, I did not.
24         MS. MENDOZA: Okay. And that's all the
25  questions that I have.

Page 114

1          MR. GERBER: Just one question.
2  EXAMINATION
3  BY MR. GERBER:
4      Q   Mr. Diaz, you talked about a two-step
5  process in terms of Ms. Mikhaylova's lateness. Did
6  you prepare or work with somebody else to prepare a
7  counseling summary and thereafter an attendance and
8  performance reminder you talked about two of them,
9  correct?
10     A   Yes.
11     Q   And one of those documents -- the earlier
12  one is dated February 2017 and the second one is
13  dated April 19, 2017. And you are clear and certain
14  that any knowledge you have of Ms. Mikhaylova's
15  pregnancy was subsequent to the second of those
16  counseling or write-ups for lateness, correct?
17     A   It was directly after.
18     Q   Thank you nothing further.
19              (Whereupon, the deposition
20              concluded at 1:11 p.m.)

```
1            I N D E X   O F   W I T N E S S E S

2

   EXAMINATION BY                           PAGE
3

4  MS. MENDOZA                               6

5  MR. GERBER                               114

6          I N D E X   O F   E X H I B I T S

7                     DESCRIPTION              PAGE

8  Exhibit 1        HANDBAG POLICY              45

9  Exhibit 2        TEXT MESSAGES               48

10 Exhibit 3        LETTER                      95

11 Exhibit 4        SOFTWARE PRINTOUT          102

12 Exhibit 5        PLAINTIFF'S AMENDED COMPLAINT  108

13         I N D E X   O F   R E Q U E S T S

14 DESCRIPTION                      PAGE

15 WRITE-UP                          26

16 FORMAL REVIEW                     38

17 DOCUMENTS DISTRIBUTED             56

18 HANDOUTS                          94

19

20         I N D E X   O F   R U L I N G S

21                                  PAGE

22 NONE

23      I N D E X   O F   I N S E R T I O N S

24 DESCRIPTION                      PAGE

25 NONE
```

```
 1              C E R T I F I C A T E
 2   STATE OF NEW YORK     )
                           :
 3   COUNTY OF KINGS
 4
 5        I, JOANNA MARTINEZ, a Notary Public within and
 6   for the State of New York, do hereby certify:
 7        THAT DENIS DIAZ, the witness whose deposition
 8   is hereinbefore set forth, was duly sworn by me and
 9   that such deposition is a true record of the
10   testimony given by such witness.
11        I further certify that I am not related to any
12   of the parties to this action by blood or marriage;
13   and that I am in no way interested in the outcome of
14   this matter.
15        IN WITNESS WHEREOF, I have hereunto set my
16   hand this 10th of December 2022.
17
18                      _____
                        JOANNA MARTINEZ
19
20
21
22
23
24
25
```

Case 1:19-cv-08927-GBD-SLC   Document 128-4   Filed 09/20/23   Page 35 of 56

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

## WORD INDEX

< $ >
**$25**  47:*21*

< 0 >
**07004**  2:*10*

< 1 >
**1**  44:*13*  45:*19*  50:*14*
  54:*3*  115:*8*
**1:11**  114:*20*
**10:00**  89:*24*
**10:13**  1:*17*
**100,000**  84:*15*
**10119**  2:*4*
**102**  115:*11*
**107**  2:*10*
**108**  115:*12*
**10th**  116:*16*
**11:30**  89:*11*
**11102**  4:*9*
**114**  115:*5*
**12**  46:*4*
**12:30**  89:*11*
**120**  96:*21, 22*
**12-hand**  47:*16*
**146**  100:*10, 11*
**15**  112:*1*
**157**  96:*3*
**15th**  112:*12*
**16**  75:*21*
**165**  2:*10*
**16th**  8:*4*
**17**  29:*20*  31:*1, 2, 15,
  17*  36:*24*
**19**  114:*13*
**1962**  12:*20*
**19-8927**  1:*5*

< 2 >
**2**  48:*7*  85:*10*  115:*9*
**2:30**  10:*4, 20, 25*
**20**  34:*2*  45:*24*  53:*24*
**201**  48:*14*
**2016**  7:*18*  8:*3, 9, 13*
  17:*1*  49:*17*  64:*14*
**2016/2017**  58:*12*  81:*4*
**2017**  8:*4, 13*  42:*14*
  49:*17*  72:*11*  74:*17*

**96:24**  109:*16, 18, 25*
  110:*14*  112:*1*  114:*12,
  13*
**2018**  19:*20*  27:*5, 9,
  11*
**2019**  17:*12*  59:*3*
  96:*18*
**2022**  1:*15*  116:*16*
**212**  2:*5*
**24**  6:*19, 22*  7:*1*  46:*7,
  10*  47:*16*
**24HBGs**  46:*1*
**25**  34:*3*
**2540**  4:*8*
**26**  115:*15*
**28**  1:*15*

< 3 >
**3**  1:*10*  95:*23*  96:*5*
  115:*10*
**30**  26:*10, 13*  34:*3*
  37:*18*  91:*16*
**300,000**  84:*13*
**30-day**  19:*15*  30:*23*
**31**  1:*21*
**38**  115:*16*
**39**  109:*4*

< 4 >
**4**  102:*21*  106:*5*
  115:*11*
**45**  109:*15*  115:*8*
**46**  110:*11*
**48**  115:*9*
**49**  111:*25*  112:*23*
**4905**  2:*4*

< 5 >
**5**  108:*19*  115:*12*
**50**  23:*18*
**50,000**  85:*7*
**56**  115:*17*
**56th**  33:*14*
**587-0760**  2:*5*
**59th**  23:*6*  61:*23*

< 6 >
**6**  115:*4*
**60**  23:*18*  26:*15, 17*
  53:*23*

**60/20/20**  53:*19, 21*
  54:*10*  89:*2*  91:*1, 7, 9,
  14*
**60-day**  27:*1*
**60-review**  19:*16*
**6th**  96:*18*  109:*16, 25*
  110:*8*

< 7 >
**7**  109:*3*
**754**  15:*7*

< 8 >
**80s**  13:*24*

< 9 >
**90-day**  37:*20*
**94**  115:*18*
**95**  115:*10*
**950**  85:*12*
**970**  85:*12*
**973.256.9000**  2:*11*

< A >
**a.m**  1:*17*  89:*24*
**a/k/a**  1:*10*
**abd**  1:*7*
**ability**  6:*15*
**able**  64:*3*  83:*8*  89:*16*
**above-mentioned**  1:*23*
**absence**  30:*23*  97:*3,
  4, 9, 21, 23*  98:*6, 15,
  21*  99:*9, 22, 25*  100:*6*
**absolutely**  67:*13*
**abuse**  54:*18*  55:*14,
  23*  57:*4*
**abusing**  24:*17*  45:*22*
  53:*12*
**accessories**  16:*14*
  17:*8*  29:*1*  33:*20*
  39:*4*
**accessory**  7:*22*
**accommodation**
  65:*14, 17*  66:*1, 8, 18*
  67:*2, 8, 20*  68:*16*
  71:*22*  100:*23*  101:*17*
**accommodations**
  65:*11*  72:*5*  101:*10*
**accomodations**  68:*19*

**account**  105:*22*
**accurate**  97:*22*
**action**  18:*22*  19:*3, 6,
  9*  34:*20*  53:*12*
  116:*12*
**activity**  41:*13*
**add**  102:*16*
**addition**  53:*18*
**additional**  24:*11*
  50:*9*  51:*7, 12*  52:*14*
  53:*24*
**address**  4:*7*  55:*13,
  18*  86:*23, 25*  87:*2, 13,
  14, 15, 18, 24*  88:*7*
**addressed**  30:*16*
  96:*14, 19*
**adhere**  90:*6*
**adjourn**  10:*24*
**advantage**  41:*12, 15*
**advise**  29:*18*  98:*5*
  99:*8*
**advised**  97:*2*  98:*14,
  15, 17*
**advising**  98:*21*
**AFL-CIO**  1:*10*
**afternoon**  10:*21*
**AGM**  33:*3, 12*
**ago**  11:*15*  12:*18*
  13:*1*  57:*9*  70:*6*  83:*5*
  100:*8*
**AGREED**  3:*2, 7, 11*
**agreeing**  9:*7, 9*
**ahead**  18:*8, 15*  44:*20*
  79:*19*
**alcohol**  6:*25*
**alerted**  46:*12*
**allow**  47:*1*  89:*9*
**allowed**  55:*17*  70:*17*
**Amapara**  51:*21, 22*
**amazing**  65:*9*
**amended**  108:*20*
  115:*12*
**amount**  42:*5*  84:*3, 6,
  8*  85:*15*
**Ampara**  51:*23*
**Angilee**  62:*25*
**animal**  111:*19*
**annual**  37:*7, 16*  41:*6*
**answer**  5:*10*  6:*1*  7:*9*
  9:*21*  18:*14*  30:*14*

35:22  79:5  92:8
99:*12*, *16*
**answered**  98:9  99:*10*
101:*12*  106:*14*
**answers**  5:*21*
**Anthony**  96:*15*
**anybody**  70:*19*
104:*24*
**anymore**  42:*10*
**anyway**  110:8
**apologizes**  94:*3*
**applied**  35:*11*  42:5, 6
**apply**  50:*18*, 22  90:9
**approach**  20:2  68:*24*
**approached**  17:*3*
**approval**  46:*20*
**approximate**  76:*19*
**Approximately**  23:*17*
31:2
**April**  72:*11*  96:*24*
109:*16*, 25  110:8
114:*13*
**areas**  41:2
**argumentative**  98:*24*
99:*4*
**arm**  109:*10*, 13
**Armani**  15:*20*
**arrive**  112:*24*  113:7
**Article**  1:*21*
**aside**  13:2
**asked**  5:*11*  6:*12*
69:*24*  101:*12*  106:*13*
**asking**  10:5  30:8, *11*
35:9  62:*18*, 21  70:2
75:*11*, 16  80:*24*
84:*15*  91:6  98:*13*
99:5  100:*4*  101:2
103:*10*  104:6
**asset**  43:*18*
**assignments**  28:*10*, 11
**Assist**  40:7, 8
**assistant**  33:*3*, *10*
80:*15*, 25
**assisting**  108:*14*
**associate**  16:*21*
37:*17*  40:*11*  41:9, 20
42:*3*  45:*21*  47:1
49:*14*  56:5  66:22
85:2  104:*21*  105:*11*,
25

**associates**  19:9
20:*20*, 22  29:*20*, 22
31:2, *10*, *15*, *17*  36:*14*,
22  39:*14*, *15*, *18*  40:*1*,
25  41:*4*  42:6  43:*3*
47:*25*  51:*25*  53:*1*
63:2  68:*20*  75:*21*
79:*24*  82:*11*, *14*
101:*11*, *16*  105:*21*
**assume**  57:8
**assuming**  19:*17*
31:*25*  46:*1*  53:22, 23
64:*1*  75:*12*  77:*4*
100:2
**assumption**  100:*4*
**Astoria**  4:*8*  12:*23*
13:5
**attend**  22:*1*, 5, *10*, *17*
**attendance**  114:7
**Attorney**  2:3, 9  4:*12*,
*14*  8:*20*
**attorneys**  12:*1*  96:6
**audio**  11:5
**authenticate**  57:*13*
**authenticates**  57:*17*
**authenticity**  57:*12*, 22
58:*12*
**authority**  39:*17*
**automatically**  46:*11*
**availability**  39:8
**Avenue**  2:*10*  15:7
33:*14*
**average**  106:*1*
**avoid**  10:*23*  82:22
83:9  91:*18*  92:*21*
**aware**  6:*10*  52:7
53:*14*  66:*17*  68:*15*
69:*14*  71:8  80:6
88:*16*, 20  92:6, *10*, *15*
93:*24*  94:*1*  99:*21*, 25
101:*14*, *16*, *19*, 21
112:8  113:*17*

**< B >**
**back**  11:*1*, 9  15:*16*,
25  16:5, *23*  22:*11*
23:*21*  24:2, 5  25:*15*
26:2  44:*3*  47:*16*
49:*10*  59:*11*  74:*16*
79:7, *10*, *15*  89:2, 25

95:*18*  97:7  103:*15*
106:*4*  109:2
**background**  35:*15*
**bag**  43:*1*  57:*17*, *18*,
*24*, 25  58:*15*, *16*, *17*
61:8
**bags**  40:*19*, 20  42:7
43:*1*
**balcony**  61:22
**barely**  12:*18*
**Barneys**  33:*18*  34:*10*,
20
**BARTON**  2:9
**based**  17:*20*, 23  18:*3*,
9, *18*  19:7  21:9
36:*15*
**basic**  40:*20*
**basis**  28:6, *16*, *17*
29:*3*  90:7  106:*12*, *18*
**Bates**  44:*15*, 17
48:*12*  95:*24*  96:*21*
100:*11*
**beautiful**  16:8
**beginning**  22:*12*
**believe**  54:*14*
**Bergdorf**  15:5, *10*, *13*,
*24*  16:2, *16*, 21  34:*24*
**best**  39:6, 9
**Better**  15:*24*  16:6
19:*10*, *18*  41:*11*
84:*18*
**Betty**  8:*18*, 22  11:*14*
**billing**  86:*23*, *24*
87:2, *12*, *14*, *15*, *18*, *24*
88:6
**birthday**  110:9
112:*13*
**bit**  22:*11*  40:7
74:*16*  76:*1*
**BLM754**  102:*20*
**blood**  116:*12*
**BLOOMINGDALE'S**
1:7, 8  7:*13*, 21  8:*3*
12:5, 7, 9  15:22, 23
16:*3*, *13*, *23*, *24*  17:*16*
18:*23*  23:6  27:*12*
28:*4*  31:*4*  32:*25*
33:*1*  35:*1*, 6, *11*, *18*
39:*3*  40:9  41:*12*
43:*20*  53:25  54:2, *4*

73:*11*  76:*4*  87:6, 9
90:*17*, 20  91:6  96:*20*
100:*15*  104:*12*, *24*
107:5, 6  112:2  113:*4*,
6

**Bloomingdale's/Macy's**
81:*13*
**board**  40:2  42:*3*
65:*1*  82:2
**BOBBY**  1:*12*  61:*24*
62:2
**body**  62:9
**book**  40:9, *10*
**BOOKER**  1:*12*
61:*24*  62:2  109:6, 9
**born**  12:*14*, 15
**bother**  52:22
**bottom**  45:2
**Boulevard**  4:*8*
**boutique**  7:22  27:*20*
28:2, *15*, *17*, 19, *23*, *24*
29:9  31:*21*  36:*4*
38:*20*  42:*15*  45:*13*
52:*1*  53:2  54:*1*, *18*
60:*19*  80:*19*  81:*23*
90:*19*, 20  108:*12*
**brakes**  70:*24*
**brand**  33:6
**brands**  33:7
**break**  5:*12*  71:*11*, *14*
**breaks**  5:8  10:*25*
**bring**  56:*4*
**broke**  31:*13*
**bullet**  45:*25*  46:*18*,
*21*
**Business**  15:*11*
16:*14*, *15*, *19*  17:7
18:*1*  27:*19*  28:*12*, 25
33:22, 25  35:*24*
36:*12*  47:*21*  75:*20*,
22  79:*23*  90:*1*
**buy**  25:*21*  42:*1*, 7,
*17*, *24*  50:*21*

**< C >**
**call**  11:*1*  23:*20*  43:*1*,
*14*  57:*23*  74:22, 25
**called**  75:*4*

calls 43:20
Camaguey 12:15
card 57:14, 18, 22
   77:24 87:3, 4, 5, 6, 10,
   14, 15, 24 88:7
cards 57:12 58:4, 12
careful 65:5
CARROTS 1:7
carry 86:10
Case 1:5 4:13 11:17
   13:22, 23 14:7, 13, 15,
   16 25:17 67:17
   68:22 85:10 105:11
cases 32:14
CASTELLANI 1:11
   43:24 56:16, 24
Cathy 20:1, 2 23:7,
   11 26:25 27:22 29:2,
   6, 9 30:15, 18 31:12,
   18 32:3 35:24 37:12,
   13 38:15 41:10 51:6,
   8 59:1, 6, 9 67:12, 15,
   19, 23 68:8 72:3, 23
   73:2, 5, 15 74:9, 10,
   13 77:21 79:1 80:13
   82:13, 19 85:19
   89:12
Cathy's 30:20, 21
cause 53:23 89:9
cc'ed 77:5
Celine 15:11, 17, 20
central 97:3
certain 14:11 24:11,
   20 114:13
certification 3:4
certify 116:6, 11
cetera 104:22 106:17
   107:19
chair 71:21
Chanel 7:21 16:14
   17:8 27:20 28:1, 3
   31:20 33:5 38:20
   40:15, 18 41:22, 25
   42:15 45:2, 13 52:1
   54:1 55:4 57:11, 12
   58:3 63:14 80:19
   90:20 91:5 94:8
Chanel's 81:14
Chang 8:21, 23
change 42:13

changed 42:11 57:21
   58:7, 10
charge 95:21
check 38:25 58:16
   67:14 83:18
checked 102:15
checking 108:8
children 100:21
Chris 56:24
CHRISTOPHER
   1:11 43:24 56:16
City 100:18, 19, 20
Civil 1:21
clarification 99:3, 5
clarify 16:15 23:4
   31:16
clarity 89:21
class 21:8
classes 21:3, 7, 12, 22
   22:1, 5, 14, 19
classic 40:20 43:1
   57:23
clear 56:22, 23 74:13
   87:17 114:13
clearly 5:2
client 40:9, 10 47:6
   86:9, 20
clients 16:9 47:4, 5,
   7 75:24 108:14
clocked 107:19
clocks 107:18
close 31:5 62:22
   89:11 109:11
Closer 34:3
closing 89:10
come 36:3 59:11
   66:16, 22 69:18, 23,
   25 83:5 89:9 106:22,
   23 107:2, 4
comfortable 40:12
coming 67:25 70:4
comment 62:12
comments 62:15
commission 16:22
   18:18 36:15 96:15
   100:22
communicated 9:13,
   24
Communications

1:15 9:3, 5, 22
company 78:10, 14
complain 95:12
complainant 96:25
complaining 30:9
complaint 108:17, 20
   109:8 115:12
completely 92:3
comply 27:1
computer 40:10
   106:22
concern 84:4 85:19
concerns 85:14, 23
concluded 114:20
condition 6:14 106:6
conduct 36:21 38:14
   39:23 41:3 54:17
   55:8
conducted 37:24
   56:4
confirm 51:8
congratulated 65:9
   97:2
connected 11:4
considered 35:5
considering 111:12,
   13
consistent 20:21
constant 25:4
Constantine 82:5, 8
constantly 25:5
consumed 6:25
contact 20:13 97:3,
   20 98:2, 5, 15 99:8,
   13, 15
contacted 20:8, 12
contacts 97:23
content 9:22
contents 9:4
continual 82:25
continually 68:23
control 48:18, 19, 22
conversation 60:3
   62:17, 20, 24 68:12
   70:4, 13 73:14 82:23,
   25 83:3 93:23 95:19
   104:9 111:8
conversations 59:6,
   25 69:4 70:7 73:15,

19 93:21, 24 104:17
convicted 14:24
correct 5:15, 18
   13:17, 20 16:16
   17:10, 13 21:5 23:8
   26:10 27:5, 20, 23
   29:3 30:18, 19 31:12,
   18, 21 33:22 36:18
   38:14, 16 39:18, 21
   40:23 46:8, 21 50:13,
   14 52:1, 19 54:5, 12
   58:13, 17 59:9 60:22,
   25 61:3, 9 68:13, 14
   72:23 75:1, 2, 5, 6, 13
   77:18 78:3 80:9, 20,
   21 81:14 83:22 85:2
   87:25 88:3 89:20
   97:16, 24 98:11, 22
   99:19 101:6, 11
   102:22, 23 103:19
   109:6, 7 110:5 111:1,
   20 113:13 114:9, 16
correction 96:7
correctly 14:8 18:17
   38:2 67:16
correspondence 77:5
cost 17:22
counsel 3:3 9:3, 13,
   16, 23, 24 10:8, 10, 20
   11:4 105:14 107:23
counseling 114:7, 16
counter 70:9, 11, 15,
   18, 20
COUNTY 116:3
couple 11:14, 20
   58:10 64:24 65:2
course 40:5 60:13
   65:8
COURT 1:1, 22
   3:14 4:24
coverage 75:22
COVID 15:16 23:21
crash 40:5
create 75:13
credit 57:14 58:19,
   22 77:24 87:3, 4, 9,
   15, 24 88:7
crime 14:25
Cristina 71:21

Case 1:19-cv-08927-GBD-SLC   Document 128-4   Filed 09/20/23   Page 38 of 56

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Cristina's 72:*23*
85:*19*
Cuba 12:*15*
current 15:*4*
currently 13:*4* 34:*24*
customer 58:*19, 22*
70:*20* 87:*23* 88:*5*
customers 42:*6, 17,*
*18, 19, 24* 83:*9* 87:*19*
89:*19, 21* 92:*17*

< D >
d/b/a 1:*7, 8, 9*
daily 28:*6, 16, 17*
29:*2, 14* 90:*7* 103:*17*
date 17:*1* 36:*10*
64:*10* 72:*25* 73:*1*
76:*20* 96:*18* 110:*14,*
*20, 21* 112:*17, 22*
dated 114:*12, 13*
dates 64:*25* 110:*2, 5*
112:*12*
daughter 10:*22*
daughters 47:*6*
David 2:*14*
day 35:*20* 74:*20*
79:*24* 88:*25* 102:*15*
112:*18*
days 11:*15* 26:*10, 13,*
*15, 17* 37:*18* 106:*15*
112:*14, 19*
day-to-day 28:*14*
35:*17* 75:*20* 104:*8*
106:*12, 20* 108:*12*
de 13:*24* 14:*9, 17*
deadline 9:*19* 10:*3, 4*
December 7:*18*
16:*25* 17:*1* 116:*16*
decision 111:*12, 22*
decisions 32:*4*
Defendant 1:*20* 2:*9*
14:*21* 109:*9, 16*
111:*9* 112:*1*
Defendants 1:*12*
112:*23* 113:*3*
definitely 41:*16*
84:*22*
demotion 16:*18, 20*
DENIS 1:*19* 4:*6*

116:*7*
DENNIS 1:*11* 13:*11*
DEPARTMENT 1:*10*
15:*17* 18:*11* 22:*23*
43:*9, 21* 55:*3, 10, 11*
59:*16* 61:*3, 19, 21*
66:*1* 86:*8* 91:*5* 97:*3,*
*9, 14, 21, 24* 98:*6, 16,*
*21* 99:*9, 22* 100:*1, 6*
104:*10* 105:*2, 17*
departure 27:*11*
depended 21:*8* 25:*9,*
*11*
Depending 55:*15*
85:*12*
depends 37:*2, 17*
84:*10, 12*
deponent 9:*17*
deposition 3:*5, 12*
4:*14, 22* 8:*12, 17, 25*
9:*14, 15, 25* 10:*14, 24*
11:*13* 12:*2, 10* 13:*16,*
*19* 44:*19* 56:*9*
114:*19* 116:*7, 9*
DEREK 2:*3*
describe 35:*17*
DESCRIPTION
115:*7, 14, 24*
designer 14:*9*
determine 38:*7* 67:*3*
72:*14* 98:*18* 105:*25*
determined 72:*2*
DIAZ 1:*11, 19* 4:*6,*
*10* 7:*9* 8:*22* 10:*25*
11:*2, 10* 13:*13* 44:*22*
48:*16* 79:*19* 96:*5*
97:*1* 108:*21* 109:*4,*
*16* 110:*12* 111:*9*
114:*4* 116:*7*
difference 28:*21*
40:*19* 42:*23, 24*
different 24:*15*
28:*25* 40:*16, 17*
42:*19* 103:*20*
direct 9:*21* 66:*24*
directives 24:*15* 83:*7*
directly 32:*13* 66:*23*
68:*10* 114:*17*
director 28:*3* 43:*25*

directors 21:*11*
disabilities 66:*8, 9*
disagree 52:*18*
disciplinary 18:*22*
19:*3, 5, 8* 34:*19*
53:*12*
disclosed 96:*25*
discount 23:*24*
24:*10, 17, 22, 24* 44:*4*
48:*6* 54:*8, 11, 18*
55:*14, 22* 57:*4* 91:*2,*
*4, 7, 11, 13, 15*
discounted 43:*4*
discounts 24:*12* 44:*7*
discrepancy 85:*1*
discretion 46:*25*
discrimination 95:*9,*
*13, 15*
discuss 4:*19* 9:*4*
23:*24* 38:*1* 59:*8*
72:*25* 73:*3* 80:*1, 2*
discussed 20:*17, 18*
24:*6, 8, 9, 19, 25* 61:*7*
69:*9* 73:*2, 4*
discussing 113:*21*
Discussion 10:*17*
11:*7* 24:*16* 32:*22*
69:*17* 94:*21* 105:*12*
106:*25*
discussions 55:*19*
69:*1* 79:*1*
dissolved 34:*12*
distributed 47:*11*
56:*1* 115:*17*
distribution 14:*10*
DISTRICT 1:*1, 2*
diverter 63:*11, 13, 16*
divided 28:*22* 105:*21*
doctor 10:*23* 79:*5*
doctor's 113:*15, 18,*
*21*
document 26:*8*
30:*22* 44:*22* 45:*7*
48:*17, 25* 49:*8* 50:*19*
56:*10* 95:*25* 96:*5*
98:*7, 25* 100:*12, 16*
101:*1, 3, 6, 8* 103:*2, 5,*
*18, 24* 106:*4, 20*
107:*13* 108:*17, 21, 23*
109:*2*

documented 26:*3*
38:*9* 68:*5, 11* 81:*8*
94:*17, 19* 106:*21*
documents 11:*11, 12,*
*16, 19* 48:*25* 55:*25*
56:*1, 4, 7* 94:*23*
104:*24* 105:*9* 114:*11*
115:*17*
doing 18:*2* 29:*15*
30:*10* 37:*21* 38:*1*
61:*12* 106:*18*
dollar 47:*21*
dollars 85:*6*
double 91:*1, 4, 7, 10*
downstairs 36:*4*
due 72:*25* 73:*1*
110:*14, 20* 111:*4*
113:*8*
duly 4:*1* 116:*8*
duties 35:*18* 61:*7*
107:*24* 108:*3*

< E >
earlier 59:*5* 60:*22*
80:*7* 89:*10* 114:*11*
early 112:*25* 113:*8*
effect 3:*13* 5:*22*
24:*20*
eight 89:*8, 23*
either 6:*14* 37:*4*
77:*19* 78:*8* 80:*12*
88:*5* 107:*21*
elaborate 39:*1* 78:*19*
EMAIL 2:*11* 8:*18*
22:*9* 68:*7* 77:*8* 78:*7*
EMAIL:melissa@drek
smithlaw.com 2:*5*
emails 35:*22* 77:*15*
embossed 57:*16*
emergency 10:*22*
employee 12:*6* 24:*10,*
*17, 22, 24* 25:*9, 20*
29:*15* 37:*4, 9* 39:*6*
43:*4, 10* 44:*7* 46:*10*
47:*25* 49:*19* 62:*5, 6,*
*8, 11, 14, 15, 18, 22*
67:*7* 75:*15, 16* 81:*18*
83:*18* 84:*2, 9, 13*
86:*21, 22* 88:*2, 5*
90:*21* 92:*23, 25* 93:*2*

94:25  95:3, 5, 8
102:9  103:12, 13
104:6, 9  105:8
107:14  108:11
109:12
**employees**  12:4
23:25  24:12, 17, 21
29:5, 8, 11  30:9, 13
32:5, 8, 13  42:19
47:15  48:6  54:18
55:16  61:2, 4  63:21
66:8  70:17  72:6
80:8  81:9  82:21
83:8  85:25  87:19
89:9, 19, 22, 23  90:14,
17, 24  91:17, 21, 23
92:4, 11, 20  100:23
101:14
**employee's**  102:1
104:14  105:6  106:11,
20  108:8
**employer**  15:4  34:9
**employment**  15:4
22:12  25:3  31:3
34:7  42:12  58:11
60:1, 9  62:4  64:6
71:15  76:4  77:6
85:16, 20  96:14
100:14, 15  102:5
**ends**  96:2
**ensure**  25:6  63:22
66:12
**ensuring**  20:18, 19
**entail**  40:3  55:15
**entailed**  40:4
**enter**  95:20
**entire**  31:3
**entity**  90:11
**EOC**  95:21
**Equal**  96:14
**Esesdris**  36:4
**especially**  47:4  57:23
**ESQ**  2:6, 12
**essence**  14:6  18:19
19:10  20:20  38:4
40:11  80:15
**essential**  106:7
**essentially**  46:23
**et**  104:21  106:17

107:19
**Everest**  2:15
**everyone's**  106:24
**exact**  17:1  64:10, 25
110:2  112:17, 22
**exactly**  5:4  19:21
42:14  45:10  90:12
106:23  111:2
**EXAMINATION**
1:19  6:8  114:2
115:1
**examined**  4:3
**example**  42:25  85:5
**exceed**  47:1, 16
**exceeded**  49:23
**exceeding**  52:3  92:5,
12
**exceptions**  46:19
47:5
**excessive**  84:3, 6
**excessively**  108:5
**exclusive**  80:19
**exhibit**  44:10, 13
45:17, 18  48:5, 7
50:14  54:3  95:18, 20,
23  96:5  102:21
106:4  108:19  115:8,
9, 10, 11, 12
**exist**  38:12
**expectation**  26:14
**experience**  35:12, 14
**experiencing**  113:1
**explain**  19:2, 5  24:7
78:13  95:5
**explained**  111:3
**extent**  75:25
**extreme**  112:25

< F >
**fabric**  58:1
**fact**  75:4
**failing**  105:12
**fair**  7:25  33:21
**Fairfield**  2:10
**fall**  105:24
**falling**  105:25
**family**  24:23  100:19
**far**  35:24  46:15
49:3  66:5  75:11, 17

**fatigue**  112:2, 9, 25
113:9
**favor**  65:16
**February**  109:2
114:12
**feel**  71:18
**feeling**  70:11, 25
71:3, 23
**feels**  64:12
**fell**  100:2
**female**  62:15
**Fifth**  15:7  33:14
59:20
**file**  102:9, 10, 16
**filed**  7:12
**filing**  3:4
**Filo**  96:8, 11
**filter**  66:5
**fine**  5:9  70:1  86:23
**finish**  10:25
**fire**  32:4
**fired**  32:8  34:7, 9, 11,
16  60:6  63:4
**first**  4:1  28:24
37:18  42:3  49:11, 12
65:1  66:21  89:5
90:19  96:22  105:14
109:1
**five**  11:21  56:19
57:9  59:21  70:6
99:10  100:8
**flagged**  48:1  86:1
**flirting**  62:6
**FLMA**  113:12
**floor**  15:19  28:24, 25
31:7  35:23  38:24, 25
39:2, 3, 4, 11  59:21
61:22  71:22  74:18
80:14, 16, 18, 21  81:2
**floors**  28:23
**FMLA**  72:20
**follow**  19:10  20:25
26:13  64:2
**followed**  20:20  25:7
65:10
**following**  20:19
**follows**  4:3
**follow-up**  56:10
**force**  3:13  5:22

100:20  101:24
**forget**  50:19
**form**  3:8  7:7  8:5
9:1, 11  10:7  18:6, 12
21:1  22:6  26:22
28:8  29:10  30:3
46:13  47:17  49:24
50:24  51:13  52:5
53:8  54:6, 23  57:6
59:17  61:14  63:23
64:15, 18  65:22
71:24  73:6  75:9, 19
76:5  79:11, 20  83:23
84:5  85:3  86:17
87:7  88:11, 18, 24
89:14  92:7, 13  93:4,
11  96:25  97:10, 17,
25  98:23  101:4
102:2, 6  104:25
**formal**  38:6  96:25
115:16
**format**  104:4
**formulation**  105:19
**forth**  116:8
**FORTY**  1:7
**forward**  19:18  27:3
**found**  75:3
**foundation**  18:13
46:14  52:6  54:24
61:15  63:24  71:25
86:3  92:14  93:12
**four**  33:9
**frame**  8:13
**frankly**  41:9  110:1
**Freeport**  12:22
**friend**  92:24  93:1
**friendly**  60:14
100:19
**front**  5:22  44:22
104:18
**fully**  6:11
**function**  28:14
**functions**  106:7
**funny**  57:20
**FURTHER**  3:7, 11
64:11  111:3  114:18
116:11

< G >

gains 38:8
geared 17:25
general 22:20 41:21
62:12 94:7, 9 113:19
GERBER 2:12 7:7
8:5, 21 9:1, 8, 9, 11,
18 10:4, 7, 12 11:4
18:6, 12, 15 21:1
22:6 24:1 26:22
28:8 29:10 30:3
44:15, 20 45:16, 20
46:13 47:17 48:8, 13,
15, 23 49:24 50:24
51:13 52:5 53:8, 13
54:6, 23 56:8, 13, 22
57:6 59:17 61:14
63:23 64:15, 18
65:22 71:24 73:6
75:9, 19 76:5 79:11,
19 83:15, 23 84:5
85:3 86:3, 17 87:7
88:11, 18, 24 89:14
92:7, 13 93:4, 11
95:24 97:10, 17, 25
98:8, 23 99:10
100:25 101:4, 12
102:2, 6, 21 103:3, 18
104:25 106:13 114:1,
3 115:5
get-go 82:24
getting 65:6
GILMAN 2:9
Giorgio 15:19
give 28:10 38:4
44:15, 18 48:19 50:1
64:10 69:22 70:3, 4
78:20 85:5
given 42:4 68:16, 19
76:2, 7, 19 78:18
84:3 116:10
go 4:18 15:25 16:5
18:8, 15 20:5 21:4,
10, 11 22:11 25:20,
22 35:19, 24 36:2, 3,
7, 13 38:6 44:20
49:10 65:11, 16 66:3,
6, 23, 25 67:9, 14
69:15 71:9, 13, 18
79:19 89:2 95:18
96:21 97:9 98:17, 21

100:10 101:17
102:20 108:3, 17
110:9 112:18
goes 88:2
going 4:18 9:20
10:24 15:3 16:23
26:2 27:3 35:23
44:3 49:4 51:20
54:14 56:8, 10 74:22,
25 89:3 95:22
103:15 106:4, 15
109:15 110:11
Good 4:10, 16, 17
97:2
Goodman 15:5, 25
16:21
goodness 85:9
gosh 14:3
great 103:8
ground 4:18 28:24
grounds 78:21
GROUP 2:3
guard 60:19, 24 61:3,
7, 12, 18 62:1, 22
Gucci 33:1, 2, 4, 8
34:22
guess 7:12 14:5, 12
15:15 19:17 43:14
45:11 91:25 107:17
guilty 14:25
gurantee 18:19

< H >
half 37:18
Hampshire 92:24
93:1, 3
hand 56:5 83:6
116:16
handbag 28:24 43:2
44:11, 24 45:12, 25
47:2 49:23 54:3
57:16, 22 61:9 86:7
92:5, 12 115:8
handbags 7:21 46:2,
7 50:8, 17 52:13
53:17 57:24 88:23
handbook 42:4 47:13
handles 66:1
handling 76:25 77:2
97:4

handouts 94:20, 21
115:18
happen 39:8
happened 26:10, 18
29:20 67:10 75:7, 16
90:12
happening 89:25
happy 6:4 65:18
harassment 94:4, 7,
10 95:6
harrassing 94:25
95:3
HBGs 46:4
head 17:3 44:2
health 106:6
hear 19:4 24:1 29:7
62:11, 14 79:16 92:8
101:20
heard 41:24 51:10,
16 91:8, 9, 10 93:23
held 1:22 10:17
11:7 15:12 20:15
22:21 32:22 69:17
hello 60:19
help 40:6 41:16
65:18 75:24
hereinbefore 116:8
hereto 3:4
hereunto 116:15
Hey 49:13 50:6
51:21 52:22
Hi 50:10 60:14
high 17:21
high-end 14:11
higher 18:1
hired 31:23
hires 40:23, 24
hitting 112:12, 14
Hold 49:3 108:25
home 86:10, 11
honest 99:1
honestly 25:1 36:20
42:10 53:22 56:18
57:21 78:12 110:7
hopes 17:21
hourly 36:18 105:24
hours 6:19, 23 7:1
105:22
HR 20:5, 7, 10 21:3,
16 22:23, 24 30:24

32:13, 17 38:6 64:24
65:11, 17, 20, 21, 25
66:1, 3, 6, 13, 19
67:10, 23 68:3, 9, 24
72:12, 17 73:5, 15
78:23 94:16 97:4
98:10 101:17 102:13
108:1
HR-related 107:17
human 21:13 59:15,
23 66:12, 23, 25 67:4,
15, 16, 19 68:10 72:2
77:4, 20 78:8 82:17
97:13, 20 98:3, 17
99:14, 15 100:3, 22
101:13, 22 103:22
105:13 111:11, 21
hunter 17:3
husband 47:7

< I >
iconic 40:19 43:1
icons 46:4 57:23
ID 103:13
idea 96:12
identified 58:2
Idris 63:6
immediately 110:12
impair 6:11, 15
important 5:1 6:1
inappropriate 29:16
incentive 24:12
include 79:14 107:9
included 22:24
including 22:23
100:20 113:5
increase 16:10
indicate 9:2
indicating 78:9
individually 1:11, 12
inform 47:24 74:21
informal 5:21
information 67:18
68:22 76:7
informed 8:16 10:19
72:12 76:22 110:4,
12, 19 111:10 112:1,
23
initial 30:10

**in-person** 23:22
104:17
**input** 103:16 104:4
**inside** 57:15
**instance** 32:18
**instruction** 76:2
**intended** 48:10 99:3
**interested** 116:13
**intermittent** 72:20
97:5 113:12
**interrupt** 11:3
**interruption** 79:3
**interview** 82:9
**interviewing** 82:10
**introduce** 44:10, 11
48:5
**investigated** 77:13
**investigation** 76:3
90:24
**inviting** 22:9
**involve** 105:13
**involved** 82:19 90:23
**involvement** 72:5
**Island** 12:22
**issue** 19:24 30:4, 17
66:4
**issued** 109:16
**issues** 11:6 20:23
30:15 74:5, 6, 14
76:10 107:16

**< J >**
**JOANNA** 1:24 79:7,
17 116:5, 18
**job** 13:1 17:2 22:2
106:8
**judge** 5:23
**July** 42:13
**June** 8:4 74:17
96:18
**jury** 5:23

**< K >**
**keep** 43:8, 9 51:20
54:14 56:8 79:22, 25
102:1, 4 104:5, 13
106:11
**keeping** 93:10, 13
**Kemi** 52:22, 23, 25

**kept** 43:12 76:22
83:21
**kind** 4:19 32:16
40:5 41:15 104:11
**KINGS** 116:3
**knew** 81:11 100:8
110:20
**know** 5:9 7:3, 11
8:19 13:15 14:4, 5
16:9, 25 19:16 20:21
21:2, 3, 9, 19 22:16
23:18 25:1 27:14
28:11, 13 29:1, 21
30:5 31:25 32:14, 15
35:7 36:1, 12 37:2, 4,
5 38:7 40:6, 7, 18, 19,
20 41:25 43:11
46:15, 17 50:21
51:21 52:22, 23
55:12 58:8, 20, 23, 24
60:6, 7 61:25 63:5, 7,
11, 25 64:3, 10 65:4,
10, 12 66:11, 13
67:12, 14, 17 68:6, 19,
21, 23 70:20 72:3, 19
73:1 74:2, 24 75:20
76:18 79:21 81:11,
16 82:4 84:10, 13, 15
85:12, 18, 21, 22, 24
88:14 90:11 91:5, 20,
21 92:2 93:14, 17, 19
94:2, 13 95:25 96:11
97:13, 21 99:4, 7, 24
100:5, 7, 8 104:9
106:16 108:10, 12, 14
109:4 110:2, 3, 22
113:12, 14
**knowledge** 62:7
83:17 114:14
**known** 66:20
**KRISTINA** 1:3 4:13
7:11, 14 8:1, 2, 9
30:2, 5, 13, 18 37:22
38:12 49:12, 16, 17
50:10 51:5 52:8, 12
53:3, 15 59:6 60:4, 6
62:12, 18, 21 64:21
67:9 68:16 69:2, 4,
18, 22 71:6, 9, 13
72:8, 10, 19 73:19, 22,

25 74:13, 17, 22 75:1,
4, 7 77:13 81:16, 24
82:1 83:12, 13 84:16,
17 85:5, 15 93:14, 17,
21, 25 95:19 96:19
103:14 106:5, 8
111:21 112:5 113:16,
19, 22
**Kristina's** 25:3
49:13 57:5 58:11
59:8 62:4, 9 64:6
73:4, 11, 16 76:4
77:6, 10 78:3 79:1
80:4 82:20 112:8
113:12

**< L >**
**la** 13:24 14:9, 17
**lack** 105:15
**landed** 104:21
**large** 84:23, 25
**late** 65:6 68:23
69:19, 23, 25 70:4
89:6, 10 108:5
112:24 113:8
**lateness** 30:15 59:4
64:25 114:5, 16
**latenesses** 20:22
30:5 32:15 37:5
65:6 107:22
**LAW** 1:12, 21 2:3
55:18 59:12, 22 60:1,
4
**lawsuit** 14:19, 22
**layed** 34:14 40:23
**lead** 56:16
**lean** 70:8, 11, 17
**leaning** 70:14, 16, 19
**learn** 41:11 78:5
**learned** 110:13
**lease** 42:15
**leased** 42:21, 22
43:5 45:13
**leave** 15:23 33:4
70:10 72:20 97:3, 9,
20, 23 98:6, 15, 21
99:8, 21, 25 100:6
112:24 113:8, 12
**leaves** 97:4, 5

**led** 21:12, 13 56:15
94:15, 16
**left** 17:12 59:2
96:13, 16
**letter** 7:10 115:10
**level** 16:19 61:23
**licensee** 14:4, 5
**limit** 42:20 44:6, 9
46:11 47:16 49:23
50:7 52:12, 16 53:16,
19 92:5, 12
**limitation** 55:20
**limitations** 90:4, 8
**limited** 43:2
**limits** 41:17, 19, 24
42:1, 2 44:3, 4 50:16
51:6, 11 53:7
**listen** 65:5
**little** 15:9 17:22
22:11 40:6, 7 74:16
76:1
**live** 12:21 87:1
**lived** 13:1, 4
**lives** 92:24
**living** 17:22
**LLC** 1:8 96:20
**LLP** 2:9
**LOCAL** 1:10
**location** 88:6
**locations** 12:25
**Long** 12:22 15:8
20:7 33:8, 24 57:1
**longer** 34:13 58:4
78:10, 14 89:25
**look** 11:16, 18 30:22
36:9 45:5, 24 48:17
96:13 103:1 104:10
105:23 107:16, 25
108:4 109:4
**looked** 50:14
**looking** 36:9 76:13,
16 103:4, 6
**looks** 103:21
**loss** 43:3, 12, 22, 25
47:22, 24 54:21 56:3
60:8, 11, 16, 18 61:7,
19 64:2 74:18, 22, 25
75:4 77:2, 17, 19
78:8 83:4 85:22
86:2 93:8

**lost** 43:*13* 46:*11*
67:*18*
**lot** 16:*21, 22* 40:*21*
41:*13, 14*
**loudly** 5:*2*
**loved** 16:*5*
**lovely** 16:*8*
**low** 84:*12*
**lower** 16:*18*
**Loyallist** 87:*5, 9*
**luxury** 15:*19*

**< M >**
**MACY'S** 1:*9* 2:*14*
12:*10* 58:*19, 22*
73:*11* 96:*7* 107:*5*
**mailings** 41:*14*
**main** 38:*25* 39:*1, 3,*
*11* 61:*22* 80:*21*
**majority** 86:*15*
**making** 43:*10* 83:*21*
84:*2* 85:*6, 7, 15*
92:*23, 25*
**male** 62:*5, 8, 11, 14,*
*18, 21* 109:*12*
**manage** 28:*12* 47:*23*
90:*12*
**managed** 14:*6* 75:*22*
**management** 34:*1*
35:*10* 46:*20*
**manager** 15:*11*
16:*14, 16, 19, 22* 17:*7*
20:*25* 21:*22* 22:*13*
23:*16* 25:*22* 27:*20*
31:*6, 20* 33:*3, 11, 20*
34:*13* 35:*5* 37:*14*
38:*14, 19, 22, 24, 25*
39:*2, 7, 11* 66:*22*
68:*18* 80:*7, 10, 22*
81:*11*
**managers** 21:*5, 10,*
*16, 19* 22:*16, 20, 22*
23:*1, 18* 25:*10* 39:*5*
80:*15, 25*
**managing** 86:*1*
**manner** 60:*16*
**manual** 20:*24* 21:*2*
**March** 64:*14* 72:*11*
109:*18, 21*
**mark** 44:*12*

**marked** 45:*16, 18*
48:*7* 95:*22* 96:*4*
**marriage** 116:*12*
**married** 13:*6, 8*
**MARTINEZ** 1:*24*
116:*5, 18*
**matches** 57:*15* 58:*16*
**Matt** 2:*15* 44:*11*
48:*19* 49:*4* 102:*23*
**matter** 116:*14*
**Max** 46:*4*
**maximum** 42:*5* 46:*7*
**MCCS** 58:*22*
**mean** 10:*3* 16:*7*
25:*12, 19* 29:*11* 35:*7*
36:*8* 37:*2* 39:*1* 41:*5*
44:*9* 50:*20* 60:*13*
74:*6* 80:*18* 81:*20*
84:*6* 86:*24* 88:*25*
92:*9* 96:*19* 102:*3, 7*
106:*2* 111:*19*
**Meaning** 25:*20*
**means** 5:*17* 75:*10*
**medical** 10:*21*
**medication** 6:*18, 22*
**meet** 9:*19* 35:*23*
37:*3, 6, 18, 19* 66:*13*
**meeting** 20:*15, 17*
22:*22* 26:*14* 36:*5*
55:*9* 56:*4* 83:*6*
105:*16, 17* 106:*16*
**meetings** 22:*20*
23:*11, 15, 23* 24:*14*
**MELISSA** 2:*6* 4:*11*
**memory** 64:*20*
**MENDOZA** 2:*6*
4:*10, 11, 17, 24* 5:*7,*
*14, 17, 20, 25* 6:*9*
8:*11* 9:*16* 10:*2, 5, 10,*
*15* 26:*7, 24* 38:*11*
44:*10, 14, 17, 21*
45:*18* 48:*3, 11, 14, 16*
49:*4* 51:*1, 15* 53:*10*
55:*7* 56:*6, 12* 65:*24*
69:*15* 79:*7, 14, 15*
83:*16* 94:*22* 95:*22*
96:*2* 101:*2, 23*
102:*23, 25* 103:*4, 19*
108:*16* 113:*24* 115:*4*
**mental** 6:*15*

**mentioned** 31:*1* 59:*5,*
*11* 72:*22* 87:*18*
89:*18*
**merchandise** 51:*7*
63:*15, 19, 22* 80:*5, 8*
92:*16*
**message** 48:*9*
**messages** 49:*1, 2, 11*
115:*9*
**Messner** 2:*15*
**met** 26:*21*
**Miami** 110:*9* 112:*13,*
*18*
**micromanage** 47:*22*
**middle** 16:*25* 38:*4*
84:*11, 22, 25*
**MIKHAYLOVA** 1:*3*
4:*13* 7:*12, 15* 8:*2*
30:*2* 37:*22* 38:*12*
49:*12* 59:*6* 96:*20*
103:*14* 106:*5*
**Mikhaylova0016** 96:*2*
**Mikhaylova00197**
48:*12*
**Mikhaylova's** 114:*5,*
*14*
**million** 47:*21* 85:*6,*
*10*
**Minneapolis** 13:*2*
**minor** 14:*25*
**minute** 45:*4* 103:*1*
**minutes** 69:*16* 79:*12*
**mistaken** 19:*7* 47:*12*
59:*20* 89:*7* 105:*19*
109:*1*
**misunderstand** 99:*6*
**moment** 48:*17* 69:*15*
83:*5*
**money** 16:*22*
**monitary** 38:*8*
**month** 27:*8* 35:*21,*
*25* 36:*12* 42:*7* 50:*21*
83:*19, 22* 84:*3, 9, 14*
104:*21* 105:*20*
107:*22, 23* 109:*17*
**monthly** 104:*9*
106:*18*
**months** 7:*19* 64:*12*
65:*2* 92:*1*

**morning** 4:*10, 16, 17*
35:*19* 36:*5* 69:*6, 9*
89:*6, 8* 111:*4*
**mother's** 110:*8*
**move** 10:*9* 12:*16*
19:*18*
**moved** 12:*23*
**moving** 79:*22, 25*
**multiple** 47:*6*

**< N >**
**name** 4:*5, 11* 7:*11*
8:*19* 13:*10, 13* 49:*14*
59:*13, 14* 62:*2* 81:*18*
82:*4*
**named** 14:*13* 56:*24*
**names** 81:*3*
**narrow** 42:*16*
**narrowed** 42:*16*
**nausea** 112:*2, 8, 25*
113:*8*
**nauseous** 69:*12*
**necessarily** 18:*16*
28:*11* 48:*2* 68:*21*
**need** 10:*12* 30:*15*
36:*11* 48:*21* 65:*17*
67:*1* 71:*18*
**needed** 29:*17* 36:*2*
39:*5* 41:*9* 65:*14*
67:*20* 69:*25* 75:*23*
**needs** 65:*11, 12*
66:*11* 67:*7* 89:*20*
**never** 13:*16, 19*
14:*20* 17:*21* 27:*2*
41:*24* 49:*2, 9* 51:*10,*
*16* 62:*10, 16, 24* 64:*4*
69:*7, 10* 70:*13* 77:*25*
91:*8* 93:*23* 95:*1, 4, 7*
103:*9, 25* 110:*20*
111:*8, 24*
**NEW** 1:*2, 8, 9, 25*
2:*4* 4:*2, 8* 12:*23*
13:*3, 5* 21:*11* 33:*18*
34:*4* 37:*17* 40:*1, 23,*
*24* 76:*13, 16* 82:*22*
83:*1* 91:*19* 92:*18, 24*
93:*1, 3* 100:*18, 19*
116:*2, 6*
**news** 97:*2*

nice 65:*4*
NJ 2:*10*
Notary 1:*24* 3:*13*
4:2 116:5
note 113:*15, 18, 21*
notify 67:*24* 68:*25*
number 16:*4* 34:2
40:*16* 42:7, *9* 44:*16,
18* 55:*6* 57:*15* 58:2
79:*24* 94:*12* 103:*13*
105:*21* 109:*4* 112:*19*
numbers 35:*20, 25*
36:8 95:*24* 105:*16,
22* 106:*16*
NYC 100:*22*

< O >
oath 5:*15*
Object 8:5 9:*1, 11*
18:*6, 12* 21:*1* 22:6
26:22 28:8 29:*10*
30:*3* 46:*13* 47:*17*
49:*24* 50:*24* 51:*13*
54:*6, 23* 59:*17* 61:*14*
63:*23* 64:*15, 18*
65:22 71:*24* 73:6
75:*9, 19* 76:5 79:*11*
83:*23* 84:5 85:*3*
86:*17* 87:7 88:*11, 18,
24* 89:*14* 92:7, *13*
93:*4, 11* 97:*10, 17, 25*
98:*23* 101:*4* 102:*2, 6*
104:*25*
objected 10:7 79:*20*
Objection 7:7 52:5
53:8, *13* 57:6 86:*3*
98:8 100:*25* 106:*13*
objections 3:*8*
Obviously 9:*19, 20*
11:*21* 21:8 24:*9, 14,
21* 33:6 35:22 39:8
40:*5, 15* 56:*19* 57:*9*
75:*21, 24* 98:*3*
108:*11*
occasion 112:*24*
occur 57:5
occurred 83:*1* 86:*12*
o'clock 89:8, *23*
October 1:*15* 59:2

Oddly 16:*20*
offer 24:*11, 14*
offhand 42:*10* 55:*21*
91:*24* 99:*23*
Oh 14:*3* 19:*20* 58:6
65:8 68:*25* 82:*19*
90:*22*
Okay 4:*15, 20, 24*
5:5, *7, 12, 25* 6:*6, 10,
25* 7:*3, 14, 17, 20, 23,
25* 8:*11, 14, 15* 11:*16,
19, 24* 12:*12, 24* 13:*4,
6, 15* 14:*1, 7, 18*
15:*21* 16:6 17:*2, 5,
12* 18:*3, 10, 21* 19:*2,
11* 20:*2, 24* 21:*12, 15,
17, 21, 24* 22:*11, 18,
22, 25* 23:*4, 7, 20, 23*
24:*7, 16, 19* 25:*14, 18,
24* 26:*2, 7, 17* 27:*11,
15, 19* 28:*10, 20* 29:*2,
19* 30:*1, 6, 20* 31:*1, 9,
14, 16, 23* 32:*2, 4, 12,
19* 33:*4, 8, 15, 21, 24*
34:*4, 6, 11, 16* 35:*1, 4,
16* 36:*7, 17, 21, 24*
37:*11, 15, 21, 24*
39:*11, 14* 40:*3* 41:*17*
42:*11, 18* 43:*5, 18, 24*
44:*20, 24* 45:*4, 9, 12,
15, 24* 46:*18, 23* 47:8,
15* 48:*3* 49:*10, 22*
50:*6, 23* 51:*11, 17*
52:*8, 11, 18, 21* 53:*3,
15, 20, 25* 54:*8, 14*
55:*2, 22, 25* 56:*12, 21*
57:*11, 18* 58:*6, 19*
59:*4, 8, 11, 15, 22*
60:*21* 61:*11, 18* 62:*1,
4, 25* 63:*6, 18* 65:*13,
20* 66:*15* 67:*5, 19, 22*
68:2, *5* 69:*1, 8, 18, 22*
70:*8, 14* 71:*2, 6, 9, 13,
21* 72:*8, 19* 73:*2, 14,
18, 22* 74:*12, 21* 75:*3*
76:*1, 12, 15, 25* 77:*3,
17* 78:*2, 13* 80:*1, 12*
81:*3, 6, 13, 16, 23*
82:*4, 6, 18* 83:*3, 8, 12,
21* 85:*13, 18* 86:*7, 20,*

24 87:*5, 12, 17, 21, 23*
88:*9, 16, 22* 89:*16*
90:*2, 9, 16* 91:*1, 13,
17* 92:*4, 11* 93:*9*
94:*17, 19, 22* 95:*18*
99:*21* 100:*10, 14, 18*
101:*14* 102:*14* 103:*1,
8, 10* 104:*12, 16, 23*
106:*10* 107:*4, 7, 12,
24* 108:*7, 16* 109:*22,
25* 110:*11, 23* 111:*9,
21, 25* 113:*11, 24*
ones 46:*16* 50:9
52:*14* 53:*18* 93:*10*
open 89:*18, 23*
opened 89:*24*
opportunity 15:*24*
16:7 33:5 96:*15*
Order 1:22
Orea 63:*6*
original 50:*19*
Originally 12:22
26:*16*
Oscar 13:*24* 14:*9*
outcome 14:*15, 16*
19:*14* 76:*18* 116:*13*
oversee 39:*12, 14*
72:6
overseeing 75:*12*
oversight 25:*6, 8, 25*

< P >
p.m 114:*20*
page 48:*13, 23* 49:*6,
8, 11* 51:*20* 52:*21*
96:*21* 101:*23* 106:*10*
109:*3* 115:*1, 7, 14, 21,
24*
paragraph 96:*22*
109:*4, 15* 110:*6, 11*
111:*25* 112:*23*
paralegal 2:*14*
part 22:2 26:*12*
47:*12* 80:*21* 107:*24*
108:*3* 111:*17*
particular 78:*1* 84:*9*
parties 3:*3* 116:*12*
partner 32:*16* 37:*14*
39:6 66:*12*

partnering 38:*24*
party 14:*13*
Passaic 2:*10*
pay 16:*10* 36:*18*
92:*18*
paying 91:*19* 92:*21*
payroll 103:*14*
pending 103:*3*
Penn 2:*4*
people 60:*15* 61:5
100:*21*
percent 53:*23* 91:*16*
percentage 86:*13*
perfectly 5:*9*
performance 17:*23*
36:*21* 37:*8, 22, 24*
59:*9* 103:*17* 106:*12,
20* 107:*13, 16* 108:*9*
114:*8*
performing 106:*7*
108:*14*
period 30:*23*
permission 69:*23*
70:*3, 5*
person 20:*7, 10* 32:*1*
56:*24* 68:*12* 85:*7, 11*
personal 83:*14*
person's 102:*16*
phone 49:*13* 82:7
phonetic 36:*4*
physical 6:*15*
Pino 96:*15*
place 1:*23* 45:*13*
58:*13*
Plaintiff 1:5, *20* 2:*3*
4:*12* 14:*18* 109:*11,
17* 110:*12* 111:*3, 10*
112:*1, 23*
plaintiff's 4:*12* 96:*4*
108:*19* 109:*8, 10, 12*
115:*12*
plan 35:*21* 36:*10*
Plaza 2:*4*
please 4:5, 7 6:*3*
8:7 10:*11, 16* 65:*10,
16* 79:*6, 8* 95:*25*
109:*3*
pled 14:*24*
PLLC 2:*3*

point 5:8 29:24 42:15 45:25 46:19 57:9 65:7 71:14 79:13 81:15 91:25 92:1 97:22 107:19
points 46:21
policies 21:10 23:24 24:20 25:7 44:11
policy 21:9 44:24 45:12, 22 46:1, 19 47:2, 3, 9, 10 49:23 50:12, 13 51:2 53:12 54:1, 2, 3, 4 63:13, 18 66:15, 17, 20 81:11, 14 83:7 88:9, 14, 17, 20 90:6 92:5, 12 115:8
portion 47:3
pose 10:8
posed 6:6
position 15:10, 12 16:19 17:6, 7, 9 27:19 28:1 33:2, 19 34:12, 13 35:6, 10, 13 75:17
possible 56:19 100:13
potentially 93:21
Practice 1:21 39:10
pregnancy 69:4 71:4, 23 72:13, 23 73:4, 12, 16, 19 95:20 112:3 113:1, 16 114:15
pregnant 64:7, 22 65:8, 15 67:25 69:19, 23 97:1 100:21, 23 110:13, 19 111:19
prepare 9:13, 15, 24 11:13 12:1, 10 114:6
prepared 8:24 10:13
prescription 6:18, 22
PRESENT 2:14 88:22 89:4
pretty 22:21 24:13, 24 31:5 55:21 60:20 82:24 108:11, 15
prevent 6:11
prevention 43:12, 13, 22, 25 46:11 47:22, 24 54:21 56:3 60:9,

12, 17, 18 61:7, 19 64:2 74:18, 22, 25 75:5 77:2, 17, 20 78:8 83:4 85:22 86:2 93:8
prevents 106:7
previous 106:15
previously 43:3 109:5 113:11
print 104:19 106:24
printed 58:1
printout 107:17 115:11
printouts 107:25
prior 42:21
private 68:22
privy 47:20 86:4, 5 103:23
probably 32:17 54:25 59:2 68:25 78:9
procedural 74:5, 6, 14 76:10
proceed 30:24
proceeded 19:17
process 4:19 114:5
producer 84:16
producers 84:11, 12, 19
product 14:10 40:14, 16 55:20 57:14
productivity 37:4 105:12, 15 106:2, 17
products 40:17
professional 70:21
program 101:25 102:10 103:16 104:5, 7, 13 107:1
promoted 15:15, 16, 20
promotional 41:13
promotions 17:15, 17
prompted 22:18
protection 43:19
protocols 20:19
provide 101:10
provided 49:12 101:13
Public 1:24 3:13

4:2 116:5
pull 108:18
pulled 74:17
purchase 25:23 41:17 42:20 44:3 46:19 47:2 50:8 51:12 52:13 53:7, 17 54:9 55:17 86:9 92:5, 12, 23 93:1, 3
purchased 50:17
purchases 41:20 43:9 44:8 50:2 51:2 52:4 54:11 61:8, 9 80:5 90:5, 24 92:21 93:10
purchasing 41:25
purpose 109:11
purposes 8:11 99:5
pursuant 1:20
pursue 27:3
put 10:18 68:7, 8

< Q >
qualifications 35:10
quarterly 37:16
question 3:9 5:11 6:2, 3, 6 7:8 9:2, 12 10:8 11:8 18:7, 13 22:7 24:2, 4 26:23 28:9 30:11, 12 46:14 47:18 48:24 50:7, 11, 25 51:14 52:6, 12 53:9, 16 55:8 57:7 59:18 61:15 63:24 64:16, 19 65:23 73:7 76:6 79:9, 14 83:24 85:4, 13 86:18 87:8 88:12, 19 90:13, 16, 18 93:5, 7, 12 97:11, 15, 18 98:1, 24 105:5 103:3, 15, 20 105:1, 4 106:19 107:12 112:21 114:1
questioned 83:13 93:2
questions 6:12, 16 9:21 10:6 110:21 113:25
quite 18:2 108:12

< R >
raise 17:18 18:11 37:25
raised 19:24, 25
raises 17:16, 17, 20
read 11:8 24:2, 4 79:7, 9
Ready-to-Wear 28:18, 23 36:2
really 23:19
reason 6:10 78:18, 20 80:2 106:6 111:3
recall 8:2 11:22 21:17, 23 22:15 23:14 25:1 26:19 27:6, 8 29:14, 19, 22, 24 35:16 36:19 37:21, 23 42:9, 11, 14 45:10 47:8, 10 49:14, 19, 22 51:4, 8 54:25 56:20, 23 57:2 58:6 59:12, 13, 14, 22 60:2 62:1, 5, 8, 17, 20, 25 63:3, 4, 5 64:23 68:2, 4 69:20 70:2, 16 71:16 73:22, 24 74:17 77:10, 12, 14, 23 78:11 81:3, 10, 18 82:1 83:12 84:17 85:25 89:12 90:2, 4, 6 91:17 93:20 100:13, 15, 16, 17 101:1 104:15 107:1 109:5, 12 112:5 113:21
receive 17:15, 18 18:21 19:11 27:12, 15 34:19 53:6 55:25 66:7 113:15
received 7:10 8:18 22:9, 16 35:2 53:11 109:2
recollection 64:17
recommend 32:7, 10
record 4:5, 7 10:11, 13, 16, 17, 19 11:7 21:24 30:23 32:22 56:23 69:16, 17

116:*9*
**refer** 98:*3* 101:*8*
**referred** 91:*8, 9*
**referring** 63:*14*
87:*13* 103:*12*
**refers** 47:*4* 79:*12*
**refresh** 64:*17, 20*
**regard** 65:*4*
**regarding** 23:*24*
50:*1* 53:*7* 54:*10, 15,*
*18* 55:*22* 57:*4* 60:*3,*
*10* 64:*24* 66:*7* 73:*11*
76:*23* 77:*6* 79:*1*
82:*21* 83:*13, 15*
85:*19, 23* 90:*14, 17*
93:*21, 25* 95:*20*
100:*22* 102:*5, 14*
113:*16, 22*
**regards** 20:*19* 41:*12*
102:*7*
**register** 25:*13* 40:*6, 8*
**regular** 90:*1* 91:*15*
**regularly** 109:*10*
**reiterate** 83:*7*
**related** 103:*22* 112:*2*
116:*11*
**relative** 47:*7*
**remains** 88:*15*
**remember** 14:*8*
18:*17* 19:*20* 21:*20*
36:*20* 38:*2* 44:*1*
47:*13* 51:*6* 53:*22, 23*
55:*1, 5, 6, 21* 56:*18*
59:*19* 63:*8, 9* 64:*25*
67:*16* 69:*21* 70:*7*
71:*1, 5, 20* 77:*8, 19,*
*20* 78:*6, 7, 24* 81:*17*
87:*11* 88:*13* 91:*16,*
*24, 25* 100:*9* 105:*18*
107:*21* 110:*1* 113:*17,*
*20*
**Reminder** 96:*25*
114:*8*
**remove** 72:*17*
**removed** 72:*9, 12*
**Renta** 13:*25* 14:*9, 17*
**repeat** 8:*7* 79:*6*
**repeating** 79:*15*

**rephrase** 6:*4* 26:*24*
51:*1* 53:*10* 55:*7*
65:*24*
**replace** 31:*24*
**replaced** 81:*16* 82:*1*
**replacement** 76:*13, 16*
**report** 19:*22* 28:*5*
29:*5, 8, 11* 30:*15*
32:*12* 66:*18* 84:*1*
94:*24* 95:*2, 15*
**reported** 30:*11, 18*
31:*11*
**reporter** 4:*25* 24:*2*
**reporting** 30:*8, 9*
**reports** 105:*6*
**represent** 8:*22* 9:*20*
**reprimanded** 53:*11*
**reprimands** 27:*15*
**request** 26:*7* 38:*11*
56:*6, 10* 66:*18* 69:*18*
70:*8, 24* 71:*2, 13*
113:*13, 14*
**requesting** 94:*22*
**requests** 11:*1* 66:*2, 8*
97:*4* 101:*17*
**required** 41:*7*
**reselling** 58:*15*
63:*14, 18, 22* 93:*15,*
*18, 22, 25*
**reserved** 3:*9*
**resided** 12:*25*
**resources** 21:*14*
59:*16, 23* 66:*12, 23,*
*25* 67:*4, 15, 16, 20*
68:*10* 72:*2* 77:*4, 20*
78:*8* 82:*17* 97:*13, 20*
98:*3, 18* 99:*14, 16*
100:*3* 101:*13, 22*
103:*22* 105:*13*
111:*11, 22*
**respective** 3:*3*
**respond** 5:*1* 56:*13*
**responding** 6:*12*
**response** 30:*21* 50:*9*
51:*15* 52:*15* 53:*18*
78:*23*
**responsibilities** 83:*20*
108:*7*
**responsible** 30:*20*

61:*8* 82:*10*
**rest** 55:*5*
**RETAIL** 1:*9* 33:*22,*
*25*
**retaliation** 95:*10, 13,*
*16*
**return** 76:*20*
**review** 11:*10, 12*
17:*24* 19:*15* 27:*1*
37:*22* 38:*6, 7* 115:*16*
**reviewed** 82:*13*
**reviews** 36:*22* 37:*8,*
*25* 38:*3, 15*
**revised** 45:*25*
**RICHARD** 1:*12*
20:*7* 59:*12, 22* 60:*1,*
*4, 6*
**ridiculous** 28:*13*
**right** 4:*21* 10:*5*
11:*10* 13:*21* 15:*15*
18:*21* 25:*25* 30:*10*
35:*11* 43:*6* 44:*21*
48:*16* 49:*6, 10* 54:*8*
58:*15* 63:*21* 65:*21*
66:*19* 68:*15* 70:*2*
72:*16* 73:*5* 75:*12*
84:*18, 25* 87:*17* 89:*2*
92:*24, 25* 96:*4, 8*
97:*15* 98:*5, 14, 20*
99:*2* 100:*23* 103:*24*
104:*1, 2* 105:*6*
106:*19* 108:*18*
112:*20*
**rights** 100:*22*
**ring** 25:*10, 12, 13, 16,*
*18* 80:*4, 8, 17* 81:*9,*
*12*
**road** 64:*11*
**rolled** 14:*6*
**room** 71:*11, 14*
**Rules** 1:*21* 4:*18*
**running** 27:*4* 79:*23*
**RWDSU/UFCW** 1:*11*

**< S >**
**salary** 18:*19* 36:*17*
**sale** 36:*14* 50:*8, 13,*
*17* 51:*3, 7, 12* 52:*13*
61:*5* 85:*15* 89:*3, 5,*
*21, 22*

**sales** 16:*21* 18:*3, 9*
31:*10* 34:*1* 36:*12*
37:*5* 53:*17* 82:*22*
83:*10, 13, 14, 16, 18,*
*22* 84:*3, 7, 8* 85:*1, 6,*
*8, 23* 86:*2, 12* 88:*22,*
*25* 89:*4, 13* 90:*5*
92:*18, 21* 101:*24*
102:*7, 15* 103:*16*
104:*10, 14, 19* 105:*6,*
*16, 20, 24* 106:*24*
107:*7, 14* 108:*11*
**sale's** 91:*19*
**salesman** 34:*2*
**salesperson** 15:*15, 18*
16:*16*
**Sandy** 94:*2*
**Sanela** 49:*13* 50:*3, 6*
**sat** 64:*23*
**saw** 59:*14* 77:*25*
**saying** 5:*4* 25:*24*
40:*22* 42:*18* 51:*17,*
*19* 55:*11* 56:*23, 25*
61:*11* 65:*20* 66:*19*
68:*7* 69:*8* 80:*13*
84:*24* 90:*19* 91:*7*
98:*10* 99:*18* 103:*24*
104:*3* 105:*5* 112:*19*
**says** 44:*24* 45:*24*
46:*1, 5, 18, 19* 47:*5*
48:*6* 49:*13* 50:*6*
51:*5, 21* 52:*11, 15, 22*
53:*16* 95:*21* 96:*6, 8,*
*14, 24* 98:*6, 14*
100:*18, 24* 103:*13*
106:*5, 6* 109:*9, 15*
110:*12* 111:*9, 25*
112:*11, 16*
**schedule** 75:*13* 108:*4*
**schedules** 107:*25*
**scope** 42:*16*
**screen** 48:*4, 20*
**scroll** 108:*24*
**se** 21:*2*
**sealing** 3:*4*
**search** 57:*25*
**seasoned** 40:*25*
**second** 15:*19* 45:*25*
48:*23* 82:*7* 108:*25*
110:*4* 114:*12, 15*

Case 1:19-cv-08927-GBD-SLC   Document 128-4   Filed 09/20/23   Page 46 of 56

Deposition of Denis Diaz                                          Kristina Mikhaylova v. Bloomingdale's Inc., et al.

security 43:*14*, *15*
60:*21*, *22*, *24* 61:*3*, *6*,
*11*, *18* 62:*1*, *19*, *22*
see 19:*16* 35:*21*
44:*21*, *24* 45:*9* 46:*20*
47:*5* 52:*11*, *14*, *16*, *17*
53:*15* 58:*16* 70:*14*,
*16* 89:*16* 92:*20* 96:*1*,
*9*, *10*, *16*, *17* 97:*5*
107:*25* 108:*1*, *4*, *21*,
*22* 109:*18*, *19* 110:*14*,
*15* 111:*5*, *6*, *13* 112:*3*,
*4* 113:*2*, *3*, *18*
seeing 48:*8* 100:*13*,
*16* 101:*1*
seen 45:*7* 48:*24*
49:*2*, *7*, *8*, *9* 100:*11*
103:*8*, *9*, *25* 108:*23*
sell 18:*20* 84:*13*
sells 84:*14* 85:*19*
send 55:*17* 56:*10*
68:*7* 86:*11* 87:*23*
97:*8*, *23*
sending 93:*3*
sends 86:*7*, *9*, *13*
90:*14*, *17*
Senior 33:*20* 34:*13*
sense 41:*8* 61:*4*
104:*19*
sent 86:*22* 96:*13*
97:*8*, *12* 98:*10*
separate 43:*21* 54:*4*
90:*11* 110:*2*, *3*
separated 28:*22*
series 106:*6*
service 58:*20*, *22*
serving 39:*20*
sessions 56:*2*, *17* 57:*3*
set 116:*8*, *15*
setting 5:*21*
sexual 62:*15* 94:*4*, *7*,
*10* 95:*6*
sexually 94:*24* 95:*3*
sgerber@bglaw.com
2:*11*
share 110:*23* 111:*2*
she'd 30:*22*
shift 71:*18* 89:*6*, *10*
ship 83:*9* 88:*6*

92:*16*, *20*
shipping 82:*21* 91:*18*
shoes 90:*9*, *11*, *12*
shop 42:*25*
Shore 4:*8*
show 36:*1* 107:*18*
showed 50:*20*
sickness 69:*6*, *9*
111:*5*
side 61:*23*
sideways 49:*3*
sign 21:*21* 26:*5*
signed 3:*12*, *14*
single 23:*16*
sir 18:*8* 99:*12*
sister's 112:*13*
sit 39:*5* 71:*2*, *21*
situation 37:*3*
six 7:*19* 64:*12* 92:*1*
SKUs 40:*16*
slip 65:*3*
sliver 58:*1*
SMITH 2:*3*
smoothly 27:*4*
soft 102:*10*
software 102:*10*
103:*11*, *16* 104:*13*
115:*11*
sold 58:*17*
somebody 114:*6*
sorry 8:*6* 11:*3* 18:*8*
19:*4*, *15* 21:*18* 24:*1*
27:*10*, *17* 29:*7*, *12*
32:*20* 35:*7* 41:*5*
44:*9* 45:*20* 47:*3*
48:*8* 52:*22* 58:*21*
59:*19* 63:*10* 70:*6*
73:*24* 75:*10* 79:*4*, *5*
81:*5* 87:*4* 90:*22*
92:*8* 93:*16* 97:*12*
101:*20* 105:*4* 111:*20*
SOUTHERN 1:*2*
speak 5:*2* 11:*25*
12:*9* 30:*24* 55:*4*
60:*8*, *11*, *25* 67:*11*, *25*
92:*9*
speaking 5:*3*, *5* 41:*21*
special 36:*1* 56:*9*
89:*3*

specific 35:*4* 65:*25*
66:*11* 71:*17* 76:*2*
94:*8*
specifically 89:*1*
91:*20*
specifics 78:*1* 79:*22*
91:*22*
spoke 11:*14* 12:*12*
29:*2*, *13* 58:*25* 67:*12*
68:*2* 72:*22* 73:*10*
74:*11* 83:*5* 109:*10*
spoken 12:*4* 25:*5*
spreadsheet 104:*16*
staff 92:*2*
stamp 96:*22* 100:*11*
stamped 48:*12*
stand 33:*15* 35:*25*
47:*21*
standard 24:*24*
26:*21* 105:*18*
standards 20:*20*
standing 38:*5* 62:*22*
start 8:*8* 16:*24*
48:*11* 76:*13*, *15*
started 15:*14* 45:*11*
65:*3* 89:*7*
starting 17:*5*, *7*
State 1:*24* 4:*2*, *5*, *7*
112:*20* 116:*2*, *6*
stated 57:*4* 80:*7*
113:*11*
STATES 1:*1* 12:*17*
51:*5* 82:*22* 83:*9*
91:*18* 92:*16*, *21*
96:*19* 112:*22*
stating 51:*8* 61:*6*
station 60:*19*
status 102:*1*, *3*
103:*14*
STENOGRAPHER
4:*4*
Steve 11:*14* 20:*11*
21:*15*, *19*
STEVEN 2:*12*
STIPULATED 3:*2*, *7*,
*11*
stood 109:*11*
stop 5:*10* 10:*20*
STORE 1:*10* 16:*5*, *8*,
*9* 23:*2*, *4* 33:*3*, *10*, *15*

41:*22*, *25* 43:*15*, *16*
54:*11* 55:*2*, *5*, *9*
57:*19* 58:*17* 59:*16*
61:*19* 89:*23*, *24*, *25*
94:*5*, *9* 95:*10*
stores 14:*11*
STOREWORKERS
1:*9*, *11*
Street 23:*6* 33:*14*
61:*23*
strong 100:*20*
structure 31:*10*
stuff 24:*24*
submit 104:*23* 105:*9*
submitted 96:*6*
subsequent 114:*15*
successful 18:*2*
suffer 6:*14*
suggest 67:*1* 83:*8*
suggesting 66:*6*
suit 7:*12*
Suite 2:*4*, *10*
summary 114:*7*
Sunday 50:*7*
supervise 31:*14*
supervised 31:*11*, *12*,
*15*, *17*, *18* 86:*1*
supervising 107:*15*
supervisor 7:*23* 20:*1*
23:*8* 25:*22* 27:*22*
81:*12*
supervisors 25:*15*, *16*
80:*11*, *15*, *23*, *25* 81:*4*,
*9*
supposed 6:*21* 68:*19*
sure 23:*19* 25:*4*
30:*21* 35:*20* 37:*19*
39:*3* 66:*12* 67:*13*, *14*
68:*11* 69:*25* 75:*10*
77:*7*, *8* 79:*12* 88:*13*,
*14* 99:*23* 106:*23*
108:*13*
surmises 9:*6*
Susan 21:*18*
suspended 32:*10*
73:*23*, *25* 74:*13*
92:*11* 93:*14*, *17*
suspension 19:*11*
75:*8*, *16*, *18* 76:*17*, *23*

77:1  78:2, *3*
**swore**  5:*17*
**sworn**  3:*14*  4:2
116:8
**system**  40:*10*  41:9,
*11*

**< T >**
**take**  5:*3*, 8, *11*  6:*21*,
*23*  10:22  22:*13*  45:4
48:*3*, *16*, *18*, *21*  70:*24*
103:*1*  105:22
**taken**  1:*20*  6:*18*
13:*19*
**takes**  66:*13*  98:*19*
**talk**  69:6  104:*20*
105:9
**talked**  65:*21*  114:*4*, 8
**talking**  8:*12*  62:8, *23*
105:8  106:*16*  108:*1*
**tardiness**  107:*10*, *13*
109:*17*  111:4, *11*, *19*
**Taryn**  96:8, *11*
**tax**  82:22  83:*10*
91:*19*  92:*18*, *21*
**teaching**  40:4
**team**  36:6  83:6  97:4
**Tech**  2:*15*  11:*3*
44:*12*  102:*24*
**Technical**  11:6
**telephonic**  79:*3*
**tell**  5:*18*  8:24  26:25
59:*13*  64:7, *21*  65:*13*
66:*3*  67:*14*, *19*  68:6
69:*11*  72:8, *10*, *16*
86:*14*  99:*1*  100:7
111:*21*  113:7
**telling**  9:*16*, *18*  51:6
65:*10*  112:5
**tentative**  110:*14*
**term**  91:5
**terminated**  34:6
49:*20*  78:*3*, 5  80:2
91:*18*, *21*, *22*  92:4
103:*14*
**termination**  78:22
79:2  82:*20*
**terms**  114:5
**terrible**  111:4

**testified**  4:*3*  13:22,
*24*  101:7
**testify**  14:*1*
**Testimony**  1:22  97:7
99:7  116:*10*
**text**  48:9, *25*  49:2, *11*
115:9
**thank**  45:*20*  48:*4*, *15*
49:7  50:*10*  85:9
114:*18*
**thing**  41:*15*  67:*13*
74:*3*  79:*17*  104:*11*
**things**  11:22  19:*17*
21:*3*  24:*15*  27:*3*
32:*16*  36:*3*, *12*  41:*14*
55:*16*  102:8
**think**  7:*19*  11:20
13:*23*  14:*3*, 8, *16*
17:*3*  19:*1*, *20*  20:*11*
26:*15*  27:*14*  30:4
31:5  33:9  36:20
42:*13*  43:*11*, *20*
45:*14*  47:*12*, *13*, *14*
48:*21*  50:*11*, *20*
57:*10*  58:9  59:*20*, *21*,
*24*  63:2  64:*11*  65:2
70:*19*  74:9  80:*23*, *24*
81:*1*, *20*  82:2, 5
89:*20*  91:*3*, *15*  98:9
102:*25*  107:*20*
108:*25*  109:*1*, *21*, *23*
**three**  15:9  28:*23*
34:*10*  47:6  107:*20*,
*22*
**tier**  18:*1*
**time**  1:*23*  3:9  8:*13*
11:*23*  12:*12*, *21*
17:*10*  21:*18*  23:*10*
24:*13*  25:2  26:*16*
27:8  31:*3*  49:*17*
52:9  53:4  57:*1*
58:*25*  74:*3*  76:*19*
77:6  81:4  83:7
89:*24*  100:*1*, 5
107:*18*
**times**  6:5  24:*11*
29:*14*, *21*  30:22
34:*10*  38:*17*  39:5, 9
54:*25*  55:6  66:*21*

94:*12*, *14*  99:*10*
108:*15*
**title**  16:*12*  38:*23*
**today**  4:*15*, *19*  5:*15*
6:*12*  7:4
**today's**  8:*16*, *24*
11:*11*, *13*  12:*1*, *10*
**told**  22:*13*, *15*  26:*20*
29:*15*  65:8, *15*  67:9,
*24*  74:*3*, 4, 7, 8  76:*11*,
*12*, *14*  97:*19*  98:2
99:*13*, *15*
**top**  33:6  44:*25*
52:*21*  84:*11*, *16*, *21*
96:6, 8, *22*  100:*19*
103:*13*  106:5
**total**  105:*20*
**touched**  109:9
**touching**  109:*12*
**tower**  33:*16*
**track**  43:8, 9, *12*
46:*15*  83:*21*  93:*10*,
*13*  102:*1*, 4  104:5, *14*
106:*11*
**tracked**  46:*16*  63:*21*
**tracking**  61:8
**traditionally**  28:*18*
40:*1*
**traffic**  14:*25*
**trail**  24:*3*
**trained**  32:2, *3*  64:4
**training**  32:*23*  35:5,
*12*, *14*  40:6, *14*, *15*, *17*,
*18*  41:*3*, 8  54:*15*, *17*
55:*14*, *15*  56:2, *17*
57:*3*, 5  66:7, *10*
82:*21*  88:*21*  94:5, 8,
*11*  95:*10*
**trainings**  39:*23*, *25*
41:6  94:*15*, *20*
**transaction**  25:*16*, *21*
**transpired**  11:*23*
**TRIAL**  1:*19*  3:*10*
**true**  51:*11*, *18*, *19*
97:8  99:8  109:*20*
110:*16*, *17*  111:7, *15*,
*16*, *17*, *20*  116:9
**Trump**  33:*16*
**trunk**  36:*1*

**truth**  5:*18*
**truthfully**  6:*12*
**try**  10:*24*
**trying**  65:4  104:6
**turn**  49:4  96:*21*
109:*3*
**two**  12:*18*, *24*  38:2, *3*
39:4  50:*21*  69:*16*
79:*12*  80:*23*  81:*1*
107:*21*  110:*1*, *3*
114:8
**two-step**  114:*4*
**Tyndall**  2:*14*
**typical**  36:*12*  84:8
**typically**  21:*13*
37:*13*  40:*24*  41:*10*
60:*18*

**< U >**
**U.S**  96:*14*
**umbrella**  100:2
**uncomfortably**  109:*11*
**underneath**  85:7
**understand**  5:*14*, *23*
6:2, *3*, 5, *16*  8:6  31:9
40:*12*  58:*3*  105:*3*
112:*21*
**UNION**  1:*10*
**UNITED**  1:*1*, 9, *10*
12:*16*
**unwelcomely**  109:9
**update**  38:*4*
**upper**  84:22, *25*
**upstairs**  71:*11*, *14*, *19*
**usage**  77:*24*
**use**  23:*24*  24:*10*, *22*,
*23*  26:2  41:*11*, *15*
58:*4*  87:*16*  103:*15*
104:*13*
**Usually**  17:22, *25*
110:9

**< V >**
**vacation**  52:*23*
**value**  40:*13*
**Vellecca**  20:*11*  21:*15*,
*20*
**verbal**  68:*13*, *14*
**verify**  82:8
**versed**  41:2

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**versus**  35:*20*  90:*20*  96:*19*  99:6  104:*10*
**vibrant**  100:*20*
**Video**  1:*15*  11:*3*  44:*12*  56:9  102:24
**violation**  15:*1*
**vomit**  71:6

**< W >**
**wait**  82:7
**waived**  3:6
**walks**  70:*20*
**want**  9:*23*  10:*18*  45:*4*  79:*16*  86:*10*, *11*  87:*17*  95:*18*  99:2, 7  108:*16*, *24*
**wanted**  14:*4*, *5*  15:*25*  16:5  19:*8*, *9*  25:*23*  41:*11*  47:*1*  51:*8*
**wants**  70:*19*  86:9
**warning**  19:*12*  105:*14*
**watch**  65:7
**water**  32:*21*
**way**  41:*1*  109:*24*  116:*13*
**week**  36:*11*
**weekly**  22:*21*
**welcome**  9:*25*
**well**  18:2  21:*16*  23:*12*  25:8  28:22  33:16  37:*12*  40:*4*  41:2  43:*16*  57:*19*, *20*  61:*4*, *12*  64:*23*  65:8  67:*11*  70:*12*, *25*  71:*3*, *18*, *23*  76:*1*  77:*21*  86:*21*  90:*10*  110:*4*, *20*
**went**  15:*16*  16:*15*  24:*13*  46:*10*  57:*24*  67:*11*, *16*, *19*, *23*  68:*10*  88:*21*  108:*1*
**we're**  5:*4*  48:*8*
**WHEREOF**  116:*15*
**whichever**  87:*15*
**WHOLESALE**  1:*10*
**withdrawn**  8:*1*  11:*11*, *24*  12:5, *13*  21:*25*  26:*12*  27:*25*

30:7  32:*23*  35:*16*  38:*18*  41:*18*  44:*5*  46:*24*  47:9  54:9, *16*  56:*15*  62:*19*  63:*12*  64:*5*  66:*16*  67:6, 8  69:2  71:*10*  72:9  73:*3*  77:*11*, *13*  81:7  82:9  84:*1*, *23*  89:*17*  90:*3*  95:*8*  101:*9*, *15*, *24*  108:2
**WITNESS**  4:*16*, *23*  5:6, *13*, *16*, *19*, *24*  6:7  8:*15*  9:*20*, *21*  10:*19*  18:*14*  32:*20*  39:*20*  44:*23*  48:*21*  57:*1*  79:*4*  92:*10*  93:*12*  108:*22*  116:*7*, *10*, *15*
**wives**  47:7
**woman**  100:*21*
**won**  14:*17*
**wonderful**  16:9
**words**  90:7
**work**  7:*14*, *20*  8:8  15:*6*, *21*  16:2  23:5  32:*24*  33:*5*, 8, *17*  49:*16*  52:8  53:*3*  60:*16*  71:7  79:*25*  81:*23*  100:*20*  112:*24*, *25*  113:8  114:6
**worked**  7:*18*, *19*  8:*1*, *3*  15:*24*  33:*1*, *18*  60:*13*  64:*11*  105:*23*
**working**  13:*24*  15:*8*, *25*  16:*24*  33:*25*  34:*10*  58:9  64:*13*
**Wright**  21:*19*
**write**  45:*21*  98:*25*  99:*4*  111:*10*
**write-up**  19:*3*, 6  26:*3*, *12*, *14*  27:*13*  32:*15*  35:*2*  72:9, *11*, *12*, *17*  109:*17*  110:*4*  111:*12*, *18*, *23*  115:*15*
**write-ups**  11:*22*  18:*22*  50:*1*  53:6  64:*24*  107:*9*  110:*2*, *3*  114:*16*
**writing**  20:*21*  68:*8*, 9  77:*25*  81:*10*

**written**  22:*4*, 8  50:*23*  51:*3*  81:6  88:9  97:*16*  99:6
**written-up**  52:*3*
**wrong**  109:*23*
**wrongdoing**  30:*10*  34:*17*
**wrote**  8:22

**< Y >**
**Yeah**  8:8  29:*13*  35:9  41:6  44:6  50:*4*  57:*1*  66:*3*  75:*11*  80:*25*  84:*17*  89:*15*  90:*22*  104:*18*  105:*5*
**year**  13:2  17:*18*  18:*4*  22:*14*  24:*11*  37:*15*  38:*3*, 5  42:8  46:*4*, 7  55:*1*  94:*13*  109:*2*
**years**  11:*21*  12:*18*  13:*1*  15:9  16:*4*  33:9, *24*  34:*2*, 3  56:*19*  57:9  58:*10*  70:6  100:8
**YORK**  1:*2*, 8, 9, *25*  2:*4*  4:2, 8  12:*23*  13:*5*  33:*18*  34:*4*  82:22  91:*19*  92:*18*  100:*18*, *19*  116:*2*, 6
**Yorker**  13:*3*
**Younis**  20:*1*, 2  23:7, *11*  27:*23*  31:*18*  59:*1*  67:*12*

**< Z >**
**Zaid**  81:*20*, *21*
**Zain**  81:*19*
**Zoom**  1:*15*

Case 1:19-cv-08927-GBD-SLC   Document 128-4   Filed 09/20/23   Page 49 of 56

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

## WORD LIST

< $ >
$25  (1)

< 0 >
07004  (1)

< 1 >
1  (5)
1:11  (1)
10:00  (1)
10:13  (1)
100,000  (1)
10119  (1)
102  (1)
107  (1)
108  (1)
10th  (1)
11:30  (1)
11102  (1)
114  (1)
12  (1)
12:30  (1)
120  (3)
12-hand  (1)
146  (2)
15  (1)
157  (1)
15th  (1)
16  (1)
165  (1)
16th  (1)
17  (6)
19  (1)
1962  (1)
19-8927  (1)

< 2 >
2  (3)
2:30  (3)
20  (4)
201  (1)
2016  (7)
2016/2017  (2)
2017  (15)
2018  (4)
2019  (3)
2022  (2)

212  (1)
24  (6)
24HBGs  (1)
25  (1)
2540  (1)
26  (1)
28  (1)

< 3 >
3  (5)
30  (5)
300,000  (1)
30-day  (2)
31  (1)
38  (1)
39  (1)

< 4 >
4  (3)
45  (2)
46  (1)
48  (1)
49  (2)
4905  (1)

< 5 >
5  (2)
50  (1)
50,000  (1)
56  (1)
56th  (1)
587-0760  (1)
59th  (2)

< 6 >
6  (1)
60  (5)
60/20/20  (8)
60-day  (1)
60-review  (1)
6th  (4)

< 7 >
7  (1)
754  (1)

< 8 >
80s  (1)

< 9 >
90-day  (1)
94  (1)
95  (1)
950  (1)
970  (1)
973.256.9000  (1)

< A >
a.m  (2)
a/k/a  (1)
abd  (1)
ability  (1)
able  (3)
above-mentioned  (1)
absence  (13)
absolutely  (1)
abuse  (4)
abusing  (3)
accessories  (5)
accessory  (1)
accommodation  (12)
accommodations  (3)
accomodations  (1)
account  (1)
accurate  (1)
action  (7)
activity  (1)
add  (1)
addition  (1)
additional  (7)
address  (12)
addressed  (3)
adhere  (1)
adjourn  (1)
advantage  (2)
advise  (3)
advised  (4)
advising  (1)
AFL-CIO  (1)
afternoon  (1)
AGM  (2)
ago  (7)
AGREED  (3)
agreeing  (2)
ahead  (4)
alcohol  (1)
alerted  (1)
allow  (2)

allowed  (2)
Amapara  (2)
amazing  (1)
amended  (2)
amount  (5)
Ampara  (1)
Angilee  (1)
animal  (1)
annual  (3)
answer  (11)
answered  (4)
answers  (1)
Anthony  (1)
anybody  (2)
anymore  (1)
anyway  (1)
apologizes  (1)
applied  (3)
apply  (3)
approach  (2)
approached  (1)
approval  (1)
approximate  (1)
Approximately  (2)
April  (6)
areas  (1)
argumentative  (2)
arm  (2)
Armani  (1)
arrive  (2)
Article  (1)
aside  (1)
asked  (5)
asking  (19)
asset  (1)
assignments  (2)
Assist  (2)
assistant  (4)
assisting  (1)
associate  (15)
associates  (31)
assume  (1)
assuming  (9)
assumption  (1)
Astoria  (3)
attend  (4)
attendance  (1)
Attorney  (5)
attorneys  (2)

Case 1:19-cv-08927-GBD-SLC   Document 128-4   Filed 09/20/23   Page 50 of 56

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

audio *(1)*
authenticate *(1)*
authenticates *(1)*
authenticity *(3)*
authority *(1)*
automatically *(1)*
availability *(1)*
Avenue *(3)*
average *(2)*
avoid *(5)*
aware *(23)*

< B >
back *(27)*
background *(1)*
bag *(9)*
bags *(5)*
balcony *(1)*
barely *(1)*
Barneys *(3)*
BARTON *(1)*
based *(8)*
basic *(1)*
basis *(7)*
Bates *(6)*
beautiful *(1)*
beginning *(1)*
believe *(1)*
Bergdorf *(8)*
best *(2)*
Better *(6)*
Betty *(3)*
billing *(9)*
birthday *(2)*
bit *(5)*
BLM754 *(1)*
blood *(1)*
BLOOMINGDALE'S
*(53)*

Bloomingdale's/Macy's
*(1)*
board *(4)*
BOBBY *(3)*
body *(1)*
book *(2)*
BOOKER *(5)*
born *(2)*
bother *(1)*

bottom *(1)*
Boulevard *(1)*
boutique *(24)*
brakes *(1)*
brand *(1)*
brands *(1)*
break *(3)*
breaks *(2)*
bring *(1)*
broke *(1)*
bullet *(3)*
Business *(19)*
buy *(6)*

< C >
call *(7)*
called *(1)*
calls *(1)*
Camaguey *(1)*
card *(13)*
cards *(3)*
careful *(1)*
CARROTS *(1)*
carry *(1)*
Case *(14)*
cases *(1)*
CASTELLANI *(4)*
Cathy *(44)*
Cathy's *(2)*
cause *(2)*
cc'ed *(1)*
Celine *(3)*
central *(1)*
certain *(4)*
certification *(1)*
certify *(2)*
cetera *(3)*
chair *(1)*
Chanel *(27)*
Chanel's *(1)*
Chang *(2)*
change *(1)*
changed *(4)*
charge *(1)*
check *(4)*
checked *(1)*
checking *(1)*
children *(1)*
Chris *(1)*

CHRISTOPHER *(3)*
City *(3)*
Civil *(1)*
clarification *(2)*
clarify *(3)*
clarity *(1)*
class *(1)*
classes *(8)*
classic *(3)*
clear *(1)*
clearly *(1)*
client *(5)*
clients *(6)*
clocked *(1)*
clocks *(1)*
close *(4)*
Closer *(1)*
closing *(1)*
come *(13)*
comfortable *(1)*
coming *(2)*
comment *(1)*
comments *(1)*
commission *(5)*
communicated *(2)*
Communications *(4)*
company *(2)*
complain *(1)*
complainant *(1)*
complaining *(1)*
complaint *(4)*
completely *(1)*
comply *(1)*
computer *(2)*
concern *(2)*
concerns *(2)*
concluded *(1)*
condition *(2)*
conduct *(6)*
conducted *(2)*
confirm *(1)*
congratulated *(2)*
connected *(1)*
considered *(1)*
considering *(2)*
consistent *(1)*
constant *(1)*
Constantine *(2)*
constantly *(1)*

consumed *(1)*
contact *(10)*
contacted *(2)*
contacts *(1)*
content *(1)*
contents *(1)*
continual *(1)*
continually *(1)*
control *(3)*
conversation *(15)*
conversations *(9)*
convicted *(1)*
correct *(79)*
correction *(1)*
correctly *(4)*
correspondence *(1)*
cost *(1)*
counsel *(13)*
counseling *(2)*
counter *(5)*
COUNTY *(1)*
couple *(5)*
course *(3)*
COURT *(4)*
coverage *(1)*
COVID *(2)*
crash *(1)*
create *(1)*
credit *(10)*
crime *(1)*
Cristina *(1)*
Cristina's *(2)*
Cuba *(1)*
current *(1)*
currently *(2)*
customer *(5)*
customers *(10)*

< D >
d/b/a *(3)*
daily *(7)*
date *(12)*
dated *(2)*
dates *(1)*
daughter *(1)*
daughters *(1)*
David *(1)*
day *(6)*
days *(10)*

Deposition of Denis Diaz

Kristina Mikhaylova v. Bloomingdale's Inc., et al.

day-to-day  *(7)*
de  *(3)*
deadline  *(3)*
December  *(4)*
decision  *(2)*
decisions  *(1)*
Defendant  *(7)*
Defendants  *(3)*
definitely  *(2)*
demotion  *(2)*
DENIS  *(3)*
DENNIS  *(2)*
DEPARTMENT  *(32)*
departure  *(1)*
depended  *(3)*
Depending  *(2)*
depends  *(4)*
deponent  *(1)*
deposition  *(22)*
DEREK  *(1)*
describe  *(1)*
DESCRIPTION  *(3)*
designer  *(1)*
determine  *(5)*
determined  *(1)*
DIAZ  *(24)*
difference  *(4)*
different  *(6)*
direct  *(2)*
directives  *(2)*
directly  *(4)*
director  *(2)*
directors  *(1)*
disabilities  *(2)*
disagree  *(1)*
disciplinary  *(6)*
disclosed  *(1)*
discount  *(20)*
discounted  *(1)*
discounts  *(2)*
discrepancy  *(1)*
discretion  *(1)*
discrimination  *(3)*
discuss  *(9)*
discussed  *(11)*
discussing  *(1)*
Discussion  *(8)*
discussions  *(3)*
dissolved  *(1)*

distributed  *(3)*
distribution  *(1)*
DISTRICT  *(2)*
diverter  *(3)*
divided  *(2)*
doctor  *(2)*
doctor's  *(3)*
document  *(30)*
documented  *(8)*
documents  *(14)*
doing  *(7)*
dollar  *(1)*
dollars  *(1)*
double  *(4)*
downstairs  *(1)*
due  *(6)*
duly  *(2)*
duties  *(4)*

< E >
earlier  *(5)*
early  *(2)*
effect  *(3)*
eight  *(2)*
either  *(7)*
elaborate  *(2)*
EMAIL  *(6)*
EMAIL:melissa@drek
smithlaw.com  *(1)*
emails  *(2)*
embossed  *(1)*
emergency  *(1)*
employee  *(56)*
employees  *(45)*
employee's  *(6)*
employer  *(2)*
employment  *(20)*
ends  *(1)*
ensure  *(3)*
ensuring  *(2)*
entail  *(2)*
entailed  *(1)*
enter  *(1)*
entire  *(1)*
entity  *(1)*
EOC  *(1)*
Equal  *(1)*
Esesdris  *(1)*
especially  *(2)*

ESQ  *(2)*
essence  *(7)*
essential  *(1)*
essentially  *(1)*
et  *(3)*
Everest  *(1)*
everyone's  *(1)*
exact  *(6)*
exactly  *(7)*
EXAMINATION  *(4)*
examined  *(1)*
example  *(2)*
exceed  *(2)*
exceeded  *(1)*
exceeding  *(3)*
exceptions  *(2)*
excessive  *(2)*
excessively  *(1)*
exclusive  *(1)*
exhibit  *(20)*
exist  *(1)*
expectation  *(1)*
experience  *(2)*
experiencing  *(1)*
explain  *(5)*
explained  *(1)*
extent  *(1)*
extreme  *(1)*

< F >
fabric  *(1)*
fact  *(1)*
failing  *(1)*
fair  *(2)*
Fairfield  *(1)*
fall  *(1)*
falling  *(1)*
family  *(2)*
far  *(6)*
fatigue  *(4)*
favor  *(1)*
February  *(2)*
feel  *(1)*
feeling  *(4)*
feels  *(1)*
fell  *(1)*
female  *(1)*
Fifth  *(3)*
file  *(3)*

filed  *(1)*
filing  *(1)*
Filo  *(2)*
filter  *(2)*
fine  *(3)*
finish  *(1)*
fire  *(1)*
fired  *(7)*
first  *(13)*
five  *(7)*
flagged  *(2)*
flirting  *(1)*
FLMA  *(1)*
floor  *(22)*
floors  *(1)*
FMLA  *(1)*
follow  *(4)*
followed  *(3)*
following  *(1)*
follows  *(1)*
follow-up  *(1)*
force  *(4)*
forget  *(1)*
form  *(59)*
formal  *(3)*
format  *(1)*
formulation  *(1)*
forth  *(1)*
FORTY  *(1)*
forward  *(2)*
found  *(1)*
foundation  *(10)*
four  *(1)*
frame  *(1)*
frankly  *(2)*
Freeport  *(1)*
friend  *(2)*
friendly  *(2)*
front  *(3)*
fully  *(1)*
function  *(1)*
functions  *(1)*
funny  *(1)*
FURTHER  *(6)*

< G >
gains  *(1)*
geared  *(1)*
general  *(6)*

Deposition of Denis Diaz

Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**GERBER**  *(93)*
**get-go**  *(1)*
**getting**  *(1)*
**GILMAN**  *(1)*
**Giorgio**  *(1)*
**give**  *(12)*
**given**  *(9)*
**go**  *(49)*
**goes**  *(1)*
**going**  *(24)*
**Good**  *(4)*
**Goodman**  *(3)*
**goodness**  *(1)*
**gosh**  *(1)*
**great**  *(1)*
**ground**  *(2)*
**grounds**  *(1)*
**GROUP**  *(1)*
**guard**  *(8)*
**Gucci**  *(5)*
**guess**  *(9)*
**guilty**  *(1)*
**gurantee**  *(1)*

**< H >**
**half**  *(1)*
**Hampshire**  *(3)*
**hand**  *(3)*
**handbag**  *(16)*
**handbags**  *(9)*
**handbook**  *(2)*
**handles**  *(1)*
**handling**  *(3)*
**handouts**  *(3)*
**happen**  *(1)*
**happened**  *(7)*
**happening**  *(1)*
**happy**  *(2)*
**harassment**  *(4)*
**harrassing**  *(2)*
**HBGs**  *(1)*
**head**  *(2)*
**health**  *(1)*
**hear**  *(8)*
**heard**  *(7)*
**held**  *(8)*
**hello**  *(1)*
**help**  *(4)*
**hereinbefore**  *(1)*

**hereto**  *(1)*
**hereunto**  *(1)*
**Hey**  *(4)*
**Hi**  *(2)*
**high**  *(1)*
**high-end**  *(1)*
**higher**  *(1)*
**hired**  *(1)*
**hires**  *(2)*
**hitting**  *(1)*
**Hold**  *(2)*
**home**  *(2)*
**honest**  *(1)*
**honestly**  *(8)*
**hopes**  *(1)*
**hourly**  *(2)*
**hours**  *(4)*
**HR**  *(41)*
**HR-related**  *(1)*
**human**  *(30)*
**hunter**  *(1)*
**husband**  *(1)*

**< I >**
**iconic**  *(2)*
**icons**  *(2)*
**ID**  *(1)*
**idea**  *(1)*
**identified**  *(1)*
**Idris**  *(1)*
**immediately**  *(1)*
**impair**  *(2)*
**important**  *(2)*
**inappropriate**  *(1)*
**incentive**  *(1)*
**include**  *(2)*
**included**  *(1)*
**including**  *(3)*
**increase**  *(1)*
**indicate**  *(1)*
**indicating**  *(1)*
**individually**  *(4)*
**inform**  *(2)*
**informal**  *(1)*
**information**  *(3)*
**informed**  *(10)*
**initial**  *(1)*
**in-person**  *(2)*
**input**  *(2)*

**inside**  *(1)*
**instance**  *(1)*
**instruction**  *(1)*
**intended**  *(2)*
**interested**  *(1)*
**intermittent**  *(4)*
**interrupt**  *(1)*
**interruption**  *(1)*
**interview**  *(1)*
**interviewing**  *(1)*
**introduce**  *(3)*
**investigated**  *(1)*
**investigation**  *(2)*
**inviting**  *(1)*
**involve**  *(1)*
**involved**  *(2)*
**involvement**  *(1)*
**Island**  *(1)*
**issue**  *(4)*
**issued**  *(1)*
**issues**  *(8)*

**< J >**
**JOANNA**  *(5)*
**job**  *(4)*
**judge**  *(1)*
**July**  *(1)*
**June**  *(3)*
**jury**  *(1)*

**< K >**
**keep**  *(12)*
**keeping**  *(2)*
**Kemi**  *(3)*
**kept**  *(3)*
**kind**  *(5)*
**KINGS**  *(1)*
**knew**  *(3)*
**know**  *(131)*
**knowledge**  *(3)*
**known**  *(1)*
**KRISTINA**  *(75)*
**Kristina's**  *(20)*

**< L >**
**la**  *(3)*
**lack**  *(1)*
**landed**  *(1)*
**large**  *(2)*

**late**  *(11)*
**lateness**  *(5)*
**latenesses**  *(6)*
**LAW**  *(8)*
**lawsuit**  *(2)*
**layed**  *(2)*
**lead**  *(1)*
**lean**  *(3)*
**leaning**  *(3)*
**learn**  *(2)*
**learned**  *(1)*
**lease**  *(1)*
**leased**  *(4)*
**leave**  *(18)*
**leaves**  *(2)*
**led**  *(5)*
**left**  *(4)*
**letter**  *(2)*
**level**  *(2)*
**licensee**  *(2)*
**limit**  *(13)*
**limitation**  *(1)*
**limitations**  *(2)*
**limited**  *(1)*
**limits**  *(11)*
**listen**  *(1)*
**little**  *(7)*
**live**  *(1)*
**lived**  *(2)*
**lives**  *(1)*
**living**  *(1)*
**LLC**  *(3)*
**LLP**  *(1)*
**LOCAL**  *(2)*
**location**  *(1)*
**locations**  *(1)*
**Long**  *(6)*
**longer**  *(6)*
**look**  *(15)*
**looked**  *(1)*
**looking**  *(5)*
**looks**  *(1)*
**loss**  *(27)*
**lost**  *(4)*
**lot**  *(5)*
**loudly**  *(1)*
**loved**  *(1)*
**lovely**  *(1)*
**low**  *(1)*

Deposition of Denis Diaz                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

lower *(1)*
Loyallist *(2)*
luxury *(1)*

< M >
MACY'S *(10)*
mailings *(1)*
main *(6)*
majority *(1)*
making *(8)*
male *(7)*
manage *(3)*
managed *(2)*
management *(3)*
manager *(34)*
managers *(13)*
managing *(1)*
manner *(1)*
manual *(2)*
March *(4)*
mark *(1)*
marked *(5)*
marriage *(1)*
married *(2)*
MARTINEZ *(3)*
matches *(2)*
Matt *(5)*
matter *(1)*
Max *(1)*
maximum *(2)*
MCCS *(1)*
mean *(25)*
Meaning *(1)*
means *(2)*
medical *(1)*
medication *(2)*
meet *(7)*
meeting *(11)*
meetings *(5)*
MELISSA *(2)*
memory *(1)*
MENDOZA *(54)*
mental *(1)*
mentioned *(6)*
merchandise *(7)*
message *(1)*
messages *(4)*
Messner *(1)*
met *(1)*

Miami *(3)*
micromanage *(1)*
middle *(5)*
MIKHAYLOVA *(13)*
Mikhaylova0016 *(1)*
Mikhaylova00197 *(1)*
Mikhaylova's *(2)*
million *(3)*
Minneapolis *(1)*
minor *(1)*
minute *(2)*
minutes *(2)*
mistaken *(6)*
misunderstand *(1)*
moment *(3)*
money *(1)*
monitary *(1)*
month *(16)*
monthly *(2)*
months *(4)*
morning *(10)*
mother's *(1)*
move *(3)*
moved *(1)*
moving *(2)*
multiple *(1)*

< N >
name *(12)*
named *(2)*
names *(2)*
narrow *(1)*
narrowed *(1)*
nausea *(4)*
nauseous *(1)*
necessarily *(4)*
need *(8)*
needed *(8)*
needs *(5)*
never *(28)*
NEW *(31)*
news *(1)*
nice *(1)*
NJ *(1)*
Notary *(4)*
note *(3)*
notify *(2)*
number *(17)*
numbers *(7)*

NYC *(1)*

< O >
oath *(1)*
Object *(51)*
objected *(2)*
Objection *(9)*
objections *(1)*
Obviously *(18)*
occasion *(1)*
occur *(1)*
occurred *(2)*
o'clock *(2)*
October *(3)*
Oddly *(1)*
offer *(2)*
offhand *(4)*
Oh *(7)*
Okay *(272)*
ones *(5)*
open *(2)*
opened *(1)*
opportunity *(4)*
Order *(1)*
Orea *(1)*
original *(1)*
Originally *(2)*
Oscar *(2)*
outcome *(5)*
oversee *(3)*
overseeing *(1)*
oversight *(3)*

< P >
p.m *(1)*
page *(16)*
paragraph *(7)*
paralegal *(1)*
part *(7)*
particular *(2)*
parties *(2)*
partner *(4)*
partnering *(1)*
party *(1)*
Passaic *(1)*
pay *(3)*
paying *(2)*
payroll *(1)*
pending *(1)*

Penn *(1)*
people *(3)*
percent *(2)*
percentage *(1)*
perfectly *(1)*
performance *(13)*
performing *(2)*
period *(1)*
permission *(3)*
person *(7)*
personal *(1)*
person's *(1)*
phone *(2)*
phonetic *(1)*
physical *(1)*
Pino *(1)*
place *(3)*
Plaintiff *(12)*
plaintiff's *(8)*
plan *(1)*
Plaza *(1)*
please *(12)*
pled *(1)*
PLLC *(1)*
point *(14)*
points *(1)*
policies *(5)*
policy *(35)*
portion *(1)*
pose *(1)*
posed *(1)*
position *(16)*
possible *(2)*
potentially *(1)*
Practice *(2)*
pregnancy *(14)*
pregnant *(13)*
prepare *(8)*
prepared *(2)*
prescription *(2)*
PRESENT *(3)*
pretty *(9)*
prevent *(1)*
prevention *(28)*
prevents *(1)*
previous *(1)*
previously *(3)*
print *(2)*
printed *(1)*

printout *(2)*
printouts *(1)*
prior *(1)*
private *(1)*
privy *(4)*
probably *(5)*
procedural *(4)*
proceed *(1)*
proceeded *(1)*
process *(2)*
producer *(1)*
producers *(4)*
product *(5)*
productivity *(5)*
products *(1)*
professional *(1)*
program *(7)*
promoted *(3)*
promotional *(1)*
promotions *(2)*
prompted *(1)*
protection *(1)*
protocols *(1)*
provide *(1)*
provided *(2)*
Public *(4)*
pull *(1)*
pulled *(1)*
purchase *(19)*
purchased *(1)*
purchases *(14)*
purchasing *(1)*
purpose *(1)*
purposes *(2)*
pursuant *(1)*
pursue *(1)*
put *(3)*

< Q >
qualifications *(1)*
quarterly *(1)*
question *(71)*
questioned *(2)*
questions *(6)*
quite *(2)*

< R >
raise *(3)*
raised *(2)*

raises *(4)*
read *(5)*
Ready-to-Wear *(3)*
really *(1)*
reason *(6)*
recall *(87)*
receive *(11)*
received *(7)*
recollection *(1)*
recommend *(2)*
record *(15)*
refer *(2)*
referred *(2)*
referring *(3)*
refers *(2)*
refresh *(2)*
regard *(1)*
regarding *(31)*
regards *(3)*
register *(3)*
regular *(2)*
regularly *(1)*
reiterate *(1)*
related *(3)*
relative *(1)*
remains *(1)*
remember *(44)*
Reminder *(2)*
remove *(1)*
removed *(2)*
Renta *(3)*
repeat *(2)*
repeating *(1)*
rephrase *(7)*
replace *(1)*
replaced *(2)*
replacement *(2)*
report *(12)*
reported *(3)*
reporter *(2)*
reporting *(2)*
reports *(1)*
represent *(2)*
reprimanded *(1)*
reprimands *(1)*
request *(12)*
requesting *(1)*
requests *(5)*
required *(1)*

reselling *(8)*
reserved *(1)*
resided *(1)*
resources *(29)*
respective *(1)*
respond *(2)*
responding *(1)*
response *(6)*
responsibilities *(2)*
responsible *(3)*
rest *(1)*
RETAIL *(3)*
retaliation *(3)*
return *(1)*
review *(9)*
reviewed *(1)*
reviews *(5)*
revised *(1)*
RICHARD *(7)*
ridiculous *(1)*
right *(45)*
rights *(1)*
ring *(10)*
road *(1)*
rolled *(1)*
room *(2)*
Rules *(2)*
running *(2)*
RWDSU/UFCW *(1)*

< S >
salary *(2)*
sale *(14)*
sales *(47)*
sale's *(1)*
salesman *(1)*
salesperson *(3)*
Sandy *(1)*
Sanela *(3)*
sat *(1)*
saw *(2)*
saying *(25)*
says *(35)*
schedule *(2)*
schedules *(1)*
scope *(1)*
screen *(2)*
scroll *(1)*
se *(1)*

sealing *(1)*
search *(1)*
seasoned *(1)*
second *(8)*
security *(12)*
see *(40)*
seeing *(4)*
seen *(11)*
sell *(2)*
sells *(2)*
send *(7)*
sending *(1)*
sends *(5)*
Senior *(2)*
sense *(3)*
sent *(5)*
separate *(5)*
separated *(1)*
series *(1)*
service *(2)*
serving *(1)*
sessions *(3)*
set *(2)*
setting *(1)*
sexual *(5)*
sexually *(2)*
sgerber@bglaw.com *(1)*
share *(2)*
she'd *(1)*
shift *(3)*
ship *(4)*
shipping *(2)*
shoes *(3)*
shop *(1)*
Shore *(1)*
show *(2)*
showed *(1)*
sickness *(3)*
side *(1)*
sideways *(1)*
sign *(2)*
signed *(2)*
single *(1)*
sir *(2)*
sister's *(1)*
sit *(3)*
situation *(1)*
six *(3)*

SKUs *(1)*
slip *(1)*
sliver *(1)*
SMITH *(1)*
smoothly *(1)*
soft *(1)*
software *(5)*
sold *(1)*
somebody *(1)*
sorry *(36)*
SOUTHERN *(1)*
speak *(11)*
speaking *(3)*
special *(3)*
specific *(6)*
specifically *(2)*
specifics *(3)*
spoke *(12)*
spoken *(2)*
spreadsheet *(1)*
staff *(1)*
stamp *(2)*
stamped *(1)*
stand *(3)*
standard *(3)*
standards *(1)*
standing *(2)*
start *(5)*
started *(6)*
starting *(2)*
State *(7)*
stated *(3)*
STATES *(10)*
stating *(2)*
station *(1)*
status *(3)*
STENOGRAPHER
 *(1)*
Steve *(4)*
STEVEN *(1)*
STIPULATED *(3)*
stood *(1)*
stop *(2)*
STORE *(27)*
stores *(1)*
STOREWORKERS
 *(2)*
Street *(3)*
strong *(1)*

structure *(1)*
stuff *(1)*
submit *(2)*
submitted *(1)*
subsequent *(1)*
successful *(1)*
suffer *(1)*
suggest *(2)*
suggesting *(1)*
suit *(1)*
Suite *(2)*
summary *(1)*
Sunday *(1)*
supervise *(1)*
supervised *(6)*
supervising *(1)*
supervisor *(6)*
supervisors *(8)*
supposed *(2)*
sure *(20)*
surmises *(1)*
Susan *(1)*
suspended *(7)*
suspension *(9)*
swore *(1)*
sworn *(3)*
system *(3)*

< T >
take *(15)*
taken *(3)*
takes *(2)*
talk *(3)*
talked *(3)*
talking *(6)*
tardiness *(6)*
Taryn *(2)*
tax *(5)*
teaching *(1)*
team *(3)*
Tech *(4)*
Technical *(1)*
telephonic *(1)*
tell *(20)*
telling *(5)*
tentative *(1)*
term *(1)*
terminated *(10)*
termination *(3)*

terms *(1)*
terrible *(1)*
testified *(4)*
testify *(1)*
Testimony *(4)*
text *(5)*
thank *(7)*
thing *(5)*
things *(11)*
think *(55)*
three *(6)*
tier *(1)*
time *(28)*
times *(16)*
title *(2)*
today *(5)*
today's *(6)*
told *(20)*
top *(14)*
total *(1)*
touched *(1)*
touching *(1)*
tower *(1)*
track *(12)*
tracked *(2)*
tracking *(1)*
traditionally *(2)*
traffic *(1)*
trail *(1)*
trained *(3)*
training *(28)*
trainings *(5)*
transaction *(2)*
transpired *(1)*
TRIAL *(2)*
true *(14)*
Trump *(1)*
trunk *(1)*
truth *(1)*
truthfully *(1)*
try *(1)*
trying *(2)*
turn *(3)*
two *(15)*
two-step *(1)*
Tyndall *(1)*
typical *(2)*
typically *(5)*

< U >
U.S *(1)*
umbrella *(1)*
uncomfortably *(1)*
underneath *(1)*
understand *(12)*
UNION *(1)*
UNITED *(4)*
unwelcomely *(1)*
update *(1)*
upper *(2)*
upstairs *(3)*
usage *(1)*
use *(11)*
Usually *(3)*

< V >
vacation *(1)*
value *(1)*
Vellecca *(3)*
verbal *(2)*
verify *(1)*
versed *(1)*
versus *(5)*
vibrant *(1)*
Video *(5)*
violation *(1)*
vomit *(1)*

< W >
wait *(1)*
waived *(1)*
walks *(1)*
want *(12)*
wanted *(10)*
wants *(2)*
warning *(2)*
watch *(1)*
water *(1)*
way *(3)*
week *(1)*
weekly *(1)*
welcome *(1)*
well *(28)*
went *(12)*
we're *(3)*
WHEREOF *(1)*
whichever *(1)*
WHOLESALE *(1)*

**withdrawn**  *(42)*
**WITNESS**  *(25)*
**wives**  *(1)*
**woman**  *(1)*
**won**  *(1)*
**wonderful**  *(1)*
**words**  *(1)*
**work**  *(24)*
**worked**  *(10)*
**working**  *(8)*
**Wright**  *(1)*
**write**  *(4)*
**write-up**  *(20)*
**write-ups**  *(9)*
**writing**  *(5)*
**written**  *(8)*
**written-up**  *(1)*
**wrong**  *(1)*
**wrongdoing**  *(2)*
**wrote**  *(1)*

**< Y >**
**Yeah**  *(15)*
**year**  *(15)*
**years**  *(14)*
**YORK**  *(19)*
**Yorker**  *(1)*
**Younis**  *(8)*

**< Z >**
**Zaid**  *(2)*
**Zain**  *(1)*
**Zoom**  *(1)*