# EXHIBIT 5

Case 1:19-cv-08927-GBD-SLC   Document 128-5   Filed 09/20/23   Page 2 of 63

Deposition of Christopher Castellani                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2
   KRISTINA MIKHAYLOVA,           : CASE NO. 19-8927
3                     PLAINTIFF   :
                                  : PLAINTIFF DEMANDS
4              VS.                : A TRIAL BY JURY
                                  :
5  BLOOMINGDALE'S, INC., BLOOMINGDALE'S,:
   INC. D/B/A BLOOMINGDALE'S AND FORTY  :
6  CARROTS, BLOOMINGDALE'S, LLC,        :
   BLOOMINGDALE'S, LLC D/B/A            :
7  BLOOMINGDALE'S NEW YORK, MACY'S,     :
   INC., MACY'S, INC. D/B/A MACY'S OF   :
8  NEW YORK, UNITED STOREWORKERS RETAIL,:
   WHOLESALE AND DEPARTMENT STORE UNION :
9  AFL-CIO LOCAL 3 A/K/A LOCAL 3 UNITED :
   STOREWORKERS RWDSU/UFCW, DENNIS DIAZ,:
10 INDIVIDUALLY, CHRISTOPHER CASTELLANI,:
   INDIVIDUALLY, RICHARD LAW,           :
11 INDIVIDUALLY, AND BOBBY BOOKER,      :
   INDIVIDUALLY,                        :
12                     DEFENDANTS  :

13

14

15

16      REMOTE
        DEPOSITION OF:  CHRISTOPHER CASTELLANI
17
        TAKEN BY      :  PLAINTIFF
18
        BEFORE        :  BETHANN M. ROGERS, NOTARY PUBLIC
19                       REGISTERED PROFESSIONAL REPORTER

20      DATE          :  NOVEMBER 15, 2022, 11:07 A.M.

21

22

23

24

25
```

```
 1    APPEARANCES:

 2         DEREK SMITH LAW GROUP
           BY:  MELISSA MENDOZA, ESQUIRE
 3              ONE PENN PLAZA
                SUITE 4905
 4              NEW YORK, NEW YORK 10119
                (212)587-0760
 5              melissa@dereksmithlaw.com

 6              REPRESENTING THE PLAINTIFF

 7         MACY'S
           BY:  BETTY TIERNEY, ESQUIRE
 8              DAVID TYNDALL, PARALEGAL
                151 WEST 34TH STREET
 9              NEW YORK, NEW YORK 10001
                (212)494-1621
10              betty.tierney@macys.com

11              REPRESENTING THE DEFENDANTS

12         BARTON GILMAN LLP
           BY:  STEVEN GERBER, ESQUIRE
13              165 PASSAIC AVENUE, SUITE 107
                FAIRFIELD, NEW JERSEY 07004
14              (973)256-9000
                sgerber@bglaw.com
15
                CO-COUNSEL FOR DEFENDANTS
16
      ALSO PRESENT:  MATT MESSNER, EVEREST TECHNICIAN
17

18

19

20

21

22

23

24

25
```

```
1                    TABLE OF CONTENTS

2                     W I T N E S S

3
   CHRISTOPHER CASTELLANI                    EXAMINATION
4
       By Ms. Mendoza                           4
5

6

7                     E X H I B I T S

8  PLAINTIFF'S EXHIBITS                          PAGE

9  Exhibit 1  - Standards of Conduct             42
               BLM000379-BLM000456
10
   Exhibit 2  - Handwritten Statement; Consent   69
11               to Interview BLM000888-BLM000889

12 Exhibit 3  - Case Detail BLM000884-BLM000885  73

13 Exhibit 4  - Collection of Documents          79
               BLM001456-BLM001485
14
   Exhibit 5  - Associate Discount and Credit    89
15               Account Information
               BLM001098-BLM001110
16
   Exhibit 6  - Colleague Discount and Credit    93
17               Account Information
               BLM002040-BLM002055
18
   Exhibit 7  - Your Professional Development     95
19               BLM000061-BLM000066

20 Exhibit 8  - Collection of Documents          100
               BLM001486-BLM001515
21
   Exhibit 9  - Investigative Summary - Tyler    107
22               Rose BLM001576-BLM001605

23 Exhibit 10 - Suspension Notification and      115
               Related Documents
24              BLM001952-BLM002035

25
```

Page 4

CHRISTOPHER CASTELLANI, called as a
witness, having been duly sworn, testified as follows:
EXAMINATION
BY MS. MENDOZA:
Q.    Good morning, Mr. Castellani.  My name is
Melissa Mendoza, and I am the attorney for Kristina
Mikhaylova who is the plaintiff in this case against
Bloomingdale's.  Do you know who Kristina is?
A.    Yes.
Q.    And how do you know her?
A.    She worked at the Bloomingdale's at
59th Street while I was there.
Q.    Okay.  And for purposes of today's deposition
unless stated otherwise I will be asking you questions
referring to the time period of Kristina's employment
which was around April 2016 until June 20th, 2017.
Understood?
A.    Yes.
Q.    And, Mr. Castellani, are you on your
telephone?
A.    I am.
Q.    I would ask that you please not be on your
telephone during today's deposition, okay?
A.    I'm using my phone for the deposition.
Q.    I understand.  But if there's any -- I

Page 5

understand that part, but just -- I'm just asking that
you not look at your phone for -- if there's any
messages or anything.  And if you need to take a break
at any time, I'm happy to let you take a break.  I just
ask that you answer the last question that was asked,
okay?
A.    I will not use my phone other than for the
deposition.
Q.    Good.  Great.  Thank you.  So just to quickly
go over some ground rules, I will be asking you
questions today, and you must answer them truthfully
unless your attorney tells you clearly not to answer.
Although a judge is not present here today, this is a
formal legal proceeding just like testifying in court,
and you are under the same legal obligations to tell the
truth.  Do you understand?
A.    I do.
Q.    All right.  And the court reporter is taking
down everything that we say, so it is important that you
answer with audible responses and not -- you answer
audibly and not with shaking of the head or nodding,
okay?
A.    No problem.
Q.    Great.  And to make it easier for the court
reporter to take down what we say, I ask that you wait

Page 6

until I'm done asking my question and respond, and I
will try to do the same so that we're not speaking over
one another, okay?
A.    Great.
Q.    And if you do not understand any of my
questions, I'm more than happy to rephrase it as many
times as you like, but unless you tell me that you do
not understand, I will assume that you did understand my
question, okay?
A.    Yes.
Q.    All right.  And are you aware of any reason
that might impair you or prevent you from fully and
truthfully answering my questions today?
A.    No.
Q.    And do you suffer from any condition, mental
or physical, that might impair your ability to answer my
questions?
A.    No.
Q.    Have you taken any prescription medication or
otherwise in the last 24 hours?
A.    No.
Q.    Were you supposed to take any prescription
medication or otherwise in the last 24 hours that you
did not take?
A.    Nope.

Page 7

Q.    Okay.  And are you represented by counsel
today?
A.    Yes.
Q.    Okay.  And who is that?
A.    Betty Tierney.
Q.    And how were you informed of today's
deposition?
A.    Via e-mail.  We've had a couple attempts at
it.
Q.    Yes, we have.  And how long ago were you --
withdrawn.  So tell me how you prepared for today's
deposition not informing me of conversations between
your counsel, though.
A.    I reviewed some of the documentation from I
guess it was about five years ago.
Q.    Okay.  And what documents were those?
A.    The case file, the witness statement,
Kristina Mikhaylova's written statement.
Q.    And did you have any conversations with any
former coworkers --
A.    No.
Q.    -- regarding today's deposition?
A.    No.
Q.    No.  And was anyone present during your
conversation -- withdrawn.  Did you have any

Deposition of Christopher Castellani                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 8

1 conversations with your attorney?
2     A.   I'm sorry?
3     Q.   Did you have any conversations with your
4 attorney?
5     A.   Yes.
6         MS. TIERNEY:  Chris, I'll just admonish
7 you not to talk about anything we did say.  The fact
8 that we did speak is certainly discoverable, so.
9 BY MS. MENDOZA:
10    Q.   Was anyone else present during your
11 conversations with your attorney?
12    A.   David and Steven at different points.
13    Q.   But all part of your counsel, your
14 representation, right, your attorney?
15    A.   Yes.
16    Q.   And have you ever been to a deposition
17 before?
18    A.   Yes.
19    Q.   And when was that?
20        MS. TIERNEY:  Object to the form.  You
21 can answer.
22        THE WITNESS:  I don't remember the
23 specific dates.  It was a few years prior to this
24 situation.
25 BY MS. MENDOZA:

Page 9

1     Q.   And when you say this situation, are you
2 talking about Kristina's lawsuit or her employment?
3     A.   Both I guess.  I don't recall if I was
4 deposed while she was working, but it was within my time
5 at Bloomingdale's.
6     Q.   Okay.  So your deposition was taken.  Is that
7 correct?
8     A.   Yes.
9     Q.   And are you stating that your deposition was
10 taken in this case?
11    A.   No, another case during my employment at
12 Bloomingdale's.
13    Q.   And do you know what that case was about?
14    A.   It was another internal issue.  I don't
15 recall specifics about it, another employee internal
16 issue.
17    Q.   Were you a defendant?
18    A.   I was representing Bloomingdale's, so, yes, I
19 guess so.
20    Q.   And where -- do you recall if -- what court
21 the case was filed in?
22    A.   I don't remember specifically, no.
23    Q.   Do you know the case name?
24    A.   I believe the employee's last name was Yang.
25    Q.   And what was the outcome of that case?

Page 10

1     A.   I don't recall specifically what the outcome
2 was.  I just gave my deposition.  I don't recall being
3 informed what the outcome was.
4     Q.   Okay.  Besides that deposition did you --
5 have you ever had your deposition taken before?
6     A.   I do not believe so.  I've testified in other
7 courts but not a deposition.
8     Q.   Okay.  And where have you testified?
9     A.   In a grand jury to indict external fraud
10 issues.  I've testified a couple times in the grand
11 jury.
12    Q.   Have you given any sworn statements?
13    A.   I'm sorry, I couldn't --
14        MS. TIERNEY:  Go ahead, Chris, I'm sorry.
15 BY MS. MENDOZA:
16    Q.   Have you given any sworn statements?
17        MS. TIERNEY:  And I'm going to object to
18 the form.  Subject to that, you can answer, Chris.
19        THE WITNESS:  Sworn statements in other
20 situations?
21 BY MS. MENDOZA:
22    Q.   Yes.
23    A.   Yes.
24    Q.   And in what situations?
25    A.   I've been involved in the prosecution of

Page 11

1 numerous internal cases where I've had to give a
2 statement as well as external criminal activity that I
3 played a part in investigating.
4     Q.   Have you ever been a plaintiff in a lawsuit?
5         MS. TIERNEY:  I'm going to object to the
6 form.  You can answer.
7         THE WITNESS:  No.
8 BY MS. MENDOZA:
9     Q.   Have you ever been a defendant in a lawsuit?
10    A.   I don't recall if I was directly named in the
11 Yang, when I gave the deposition for Yang, so I would
12 say no, but I don't recall.
13    Q.   Okay.  And have you ever been convicted or
14 pled guilty to any crime other than a minor traffic
15 violation?
16    A.   No.
17    Q.   Have you ever been known by any other name
18 besides Christopher?
19    A.   No.
20    Q.   And have you always had the same last name?
21    A.   Yes.
22    Q.   Are you married?
23    A.   Divorced.
24    Q.   Do you have children?
25    A.   Yes.

Page 12

1  Q.  How many?
2  A.  Two.
3  Q.  Did you attend high school?
4  A.  I'm sorry, did I attend high school?
5  Q.  Yes.
6  A.  Yes, I did.
7  Q.  And where did you attend high school?
8  A.  Monroe-Woodbury High School in Orange County,
9  New York.
10  Q.  And did you graduate?
11  A.  I did.
12  Q.  And what year was that?
13  A.  1986.
14  Q.  Did you attend college?
15  A.  I did.
16  Q.  And where did you go to college?
17  A.  Fashion Institute of Technology in New York.
18  Q.  Did you graduate?
19  A.  I qualified for an associate's, but I
20  continued for another year, so I did not complete the
21  bachelor's.
22  Q.  But you have your associate's degree.  Is
23  that correct?
24  A.  Yes.
25  Q.  And what year was that?

Page 13

1  A.  '89 was the associate's, and then I left for
2  a year, so '91 I was back in school.
3  Q.  And then after that did you attend any
4  other -- did you -- any other school -- schools?
5  A.  No.
6  Q.  I want to ask you some questions about your
7  employment.  Who is your current employer?
8  A.  Housing Works.
9  Q.  And where is that?
10  A.  In New York.
11  Q.  What's your position?
12  A.  I'm the asset protection manager for the
13  thrift organization.
14  Q.  And when did you start working there?
15  A.  Two years ago.  It will be three years in
16  March, so two and a half years ago.
17  Q.  So end of 2019?
18  A.  March 2020 it would be.
19  Q.  March 2020, okay.  And where did you work
20  before that?
21  A.  Bloomingdale's.
22  Q.  And where in Bloomingdale's?  What store?
23  A.  I worked at three different locations.  My
24  final location was the Soho location.
25  Q.  And why did you leave the Soho location?

Page 14

1  A.  I had differing opinions with the store
2  director.
3  Q.  And who is the store director?
4  A.  I believe her name was Sarah Shaw.
5  Q.  Were you terminated?
6  A.  Yes.
7  Q.  And why were you terminated?
8      MS. TIERNEY:  I'm going to object to the
9  form.  You may answer.
10      THE WITNESS:  I believe on the -- their
11  information they would say substandard job performance.
12  BY MS. MENDOZA:
13  Q.  And when you say they, are you distinguishing
14  from your opinion?
15  A.  Yes.
16  Q.  Okay.  So what is your opinion?
17  A.  My opinion is there were a lot of changes
18  going on.  Sarah and I did not agree on the way to run
19  the department, and because they realigned and made her
20  in charge -- or store directors in charge of the asset
21  protection department that she didn't want me there.
22  Q.  And when were you terminated?
23  A.  I don't remember the exact date.  I believe
24  it was in October of 2019.
25  Q.  And how long were you working at the Soho

Page 15

1  store before you were terminated?
2  A.  Rough estimate a year, almost a year and a
3  half.
4  Q.  And did you receive any disciplinary action
5  before that termination?
6  A.  I believe there was a corrective action, yes.
7  Q.  And when did you receive that corrective
8  action?
9  A.  I don't recall the exact date.
10  Q.  Approximate, what year?
11  A.  That year, 2019.
12  Q.  So it was in 2019.  What was it for, the
13  corrective action?
14  A.  Same thing, substandard job performance.
15  Q.  Did you receive any -- a probation period to
16  improve your performance?
17      MS. TIERNEY:  I'm going to object to the
18  form.  You can answer.
19      THE WITNESS:  As part of the corrective
20  action process, you're put on notice, so I assume that's
21  what you mean by a probation period.
22  BY MS. MENDOZA:
23  Q.  Yes.  Was there a time that you had from that
24  corrective action to termination that you were being
25  reviewed?

Page 16

1   A.   Yes.
2   Q.   Okay.  And what were you to improve upon?
3   A.   I don't recall the specifics.
4   Q.   Did you receive a document stating your --
5   withdrawn.  Did you receive a document with the
6   corrective action?
7   A.   I would have, yes.
8   Q.   And did you also receive a document with your
9   termination?
10  A.   Yes.
11  Q.   So can you elaborate as to what were you not
12  doing properly that warranted the corrective action?
13       MS. TIERNEY:  I'm going to object to the
14  form.  You can answer.
15       THE WITNESS:  Sure.  What it boiled down
16  to is Sarah didn't like how I held my team accountable
17  to certain store I don't want to say policies but
18  standards.  There were a lot of changes at that time.  I
19  had a young team.  She wanted me to discipline them
20  more.  And I was following our old AP guidelines and
21  trying to develop the team.
22  BY MS. MENDOZA:
23  Q.   So why don't we back up a little bit.
24  Before -- what was your end position at the Soho store?
25  A.   The asset protection manager.

Page 17

1   Q.   And were you just the asset protection
2   manager for that store?
3   A.   Yes, for the most part.
4   Q.   And can you elaborate what you mean by for
5   the most part?
6   A.   If they needed assistance anywhere that my
7   experience helped, I had helped at other locations
8   throughout my career.  So I've helped at Bloomingdale's
9   outlets if they needed an investigation or a
10  conversation to be taken place or temporary oversight.
11  Q.   And before that Soho store -- withdrawn.  And
12  you said that you were working at the Soho store for a
13  year and a half before your termination, correct,
14  approximately?
15  A.   Approximately.
16  Q.   Okay.
17  A.   I don't recall the exact dates.
18  Q.   So then before that where did you work?
19  A.   The 59th Street flagship.
20  Q.   And what was your position there?
21  A.   Basically the same, asset protection manager.
22  Q.   Okay.
23  A.   I oversaw various parts of our team
24  throughout my time there, so at one point I was
25  considered the manager of investigations.  But it was

Page 18

1   still an asset protection manager level job.
2   Q.   At what point were you the head of
3   investigations?
4   A.   Pretty much my entire time there, but I also
5   took on responsibilities as the external manager.  I ran
6   the uniform garb part of the business, but through the
7   entire time of the business I was managing the internal
8   team.
9   Q.   Okay.  And when did you start that position?
10  A.   I was probably there for the two years prior
11  to going to Soho.
12  Q.   So Kristina was employed from approximately
13  April 2016 until June 2017.  Would you say that during
14  that entire time period you were at the flagship store
15  as the asset protection manager?
16  A.   The majority of that time.  I'm trying to
17  think, I was in Hackensack prior to that, so it was
18  probably right around that time frame in 2016 that I
19  transitioned to 59th Street, but I don't recall the
20  exact dates.
21  Q.   And why did you transition to the 59th
22  Street?
23  A.   Our vice president of asset protection asked
24  me to become the manager of investigations.
25  Q.   And who was that?  Do you know the name?

Page 19

1   A.   Chad McIntosh.
2   Q.   And why did you leave the 59th Street store
3   to go to Soho?
4   A.   Because the former director of that location
5   asked me to fill the open position.
6   Q.   And who is the former director?
7   A.   I'm trying to think of her last name.  It was
8   Mary.  I don't recall her last name right now.
9   Q.   And can you repeat her position?
10  A.   She was the store director.
11  Q.   At the flagship store or the Soho location?
12  A.   At the Soho location.
13  Q.   Did your duties change from Hackensack to the
14  flagship store?
15  A.   Because I was moved from being a general
16  asset protection manager to a store with multiple asset
17  protection managers and given the position of manager of
18  investigations, it was more specific to the internal
19  issues, although we all contributed to the overall
20  running of the department for the store, but I was more
21  focused on internal issues.
22  Q.   In the 59th Street store you're saying?
23  A.   Yes.
24  Q.   In the 59th Street store were you managing --
25  or in charge of the asset protection just for that

Deposition of Christopher Castellani                                Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 20

store?

A.   Yes, unless, like I said, they needed help at our outlet or something like that, they might ask us to contribute elsewhere.

Q.   And did you receive any disciplinary action at the Hackensack location?

A.   No.

Q.   And prior to the Hackensack location where did you work?

A.   For Gap, Inc.

Q.   And what years did you work -- or what time period did you work at Gap, Inc.?

A.   I want to say 1995 or '96 to two thousand -- it was approximately 19 years.  I'm trying to think of the exact dates.

Q.   Okay.  And why did you leave Gap, Inc.?

A.   There were a lot of changes going on, and my former boss, Mary Kelly, had moved to Bloomingdale's, and there was a good opportunity, and I'd been with Gap for nearly 20 years.  And based on the change and wanting to do something new, I followed her over to Bloomingdale's.

Q.   Okay.  And what was your position at Gap, Inc. or what were your positions if there was more than one?

Page 21

A.   I started out as a door guard, became a supervisor, then a store asset protection manager, then the field guard supervisor which was like a corporate level job.  Then I became -- for Gap, Inc. which was cross-divisional I was the area investigator for the Northeast, and then I was for Gap brand specifically the regional loss prevention manager for the Northeast.

Q.   Okay.  Was that last position the last position that you held there?

A.   Yes.

Q.   Okay.  And who was your supervisor when you transitioned to the 59th Street location?

A.   I'm sorry, from Hackensack to 59th Street?

Q.   Yes.

A.   Fred Becker.

Q.   And how did he supervise you?

MS. TIERNEY:  Object to the form.  You can answer.

THE WITNESS:  I mean, we met formally I guess on a weekly basis.  We would have recaps.  But we worked together every day.  We shared the same office complex.  So there was the formal side and then the informal side of it.

BY MS. MENDOZA:

Q.   Okay.  So I'll step back a little bit.  So

Page 22

Fred -- what was Fred Becker's position?

A.   I believe the title was director of asset protection.

Q.   So besides the corrective action in the Soho location, have you received at any employment any disciplinary action against you?

A.   I would -- I don't recall specifics, but I'm sure at Gap there were times where for early on time and attendance or something like that but nothing other than that type of corrective action.

Q.   And were you terminated from any employment besides the Soho location?

A.   No.

Q.   So we'll go back to -- we'll come back to the -- your termination, the details surrounding that, but first I wanted -- I want to know what your duties and responsibilities were at the 59th Street location.

A.   My primary responsibility was to manage a team of four to five internal investigators focused on identifying and resolving internal theft or fraud issues, any policy issues pertaining to asset protection, so violation of the discount policy.  Those kind of things were the focus of my team.

Q.   And who was in your team?

A.   I had four to five.  Shanine Gray was one

Page 23

person.  I'm trying to think of the other names, Robert Rivera, George -- and I'll butcher his name -- Kornyveh.  There's another young lady named Teala.  I can't think of her last name.  And the fifth I can't think of her name which is terrible, but there was another young lady.

Q.   Okay, that's fine.  And how did you -- I'll come back to that.  Can you explain what the asset protection department entails in Bloomingdale's?

MS. TIERNEY:  I'm going to object to the form.  You can answer, Chris.

THE WITNESS:  The overall asset protection department?

BY MS. MENDOZA:

Q.   Yes.

A.   We were there to protect the assets of the company, everything from the building through managing alarm systems, that kind of thing, to the fixtures, anything used to do business, the merchandise, the people through various methods.

So we had a team that was focused on -- they were the door guards who were focused on access control.  We had external detectives that were focused on external threats like shoplifters, fraudsters, counterfeiters.  We had the internal team which I managed which was

Deposition of Christopher Castellani                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 24

1  focused on the internal side of things.  And then we had
2  various people that did jobs around technology, running
3  the camera systems, the alarm systems, all of those
4  things.
5      Q.   Did you manage all those people?
6      A.   Like I said, my focus was the five-man
7  internal investigations team, but at various times at
8  59th Street I did have responsibility to each of those
9  groups.
10     Q.   Is asset protection the same as loss
11 prevention?
12     A.   Yes, for the most part.
13     Q.   What is the difference between the two?
14     A.   I think it's more of the connotation.  Old
15 school loss prevention was just catching shoplifters.  I
16 think they're synonymous.  I think the industry moved to
17 asset protection because it was more encompassing of all
18 of the other parts of managing the business, supply
19 chain and all of those things.
20     Q.   Where was your office located?
21     A.   I'm sorry?
22     Q.   Where was your office located?
23          MS. TIERNEY:  Object to the form.  You
24 can answer.  I assume you mean 59th Street.
25 BY MS. MENDOZA:

Page 25

1      Q.   Within the building because you said it was
2  next to Fred, correct?
3      A.   It was in the same little complex.  It's what
4  we called the mezzanine.  It was kind of a -- the
5  building was multiple buildings kind of mashed together
6  a hundred years ago to create the Bloomingdale's.  It's
7  a block -- takes up the entire block.  We were on what
8  was I think called 2M, but it was the mezzanine level of
9  the store.
10     Q.   Okay.  Was it next to HR?
11     A.   No.
12     Q.   Did you supervise -- withdrawn.  Was one of
13 the guards Bobby Booker?
14     A.   No.  Bobby was an asset protection manager.
15     Q.   Was he employed during Kristina's employment?
16     A.   I don't know the exact dates, but I believe
17 he was there for at least part of it.  Bobby was with us
18 for -- I don't remember exactly, but he wasn't there
19 extremely long that I recall.
20     Q.   Do you know the date that he was -- that he
21 left?
22     A.   I don't recall, no.
23     Q.   Was it before or after -- when you left the
24 Soho location, was he still working at the 59th Street
25 store?

Page 26

1      A.   I believe so.  I don't recall 100 percent,
2  but I believe he was still there.
3      Q.   Okay.  And what were his duties as asset
4  protection manager?
5          MS. TIERNEY:  I'll object to the form.
6  You may answer.
7          THE WITNESS:  I don't recall specifically
8  which department of asset protection.  I believe he was
9  overseeing at one point the external detective team, and
10 at one point I believe he oversaw the door guards or
11 the -- the door guard part of it, the uniform black
12 suited team.
13 BY MS. MENDOZA:
14     Q.   Okay.  And did he ever work on the floor?
15          MS. TIERNEY:  Object to the form.  You
16 may answer.
17          THE WITNESS:  I mean we all worked on the
18 floor sometimes.
19 BY MS. MENDOZA:
20     Q.   Okay.  And how did you work on the floor?
21     A.   Part of our job was to do trainings on the
22 floor.  Part of our job was to check in with the -- our
23 various employees so the door guards.  So we would be on
24 the floor to check in and make sure people were doing
25 their jobs, support the store.

Page 27

1      Q.   Okay.  Did you take any -- withdrawn.  Do you
2  know if any disciplinary action was taken against Bobby
3  Booker?
4      A.   No, I wasn't part of that.  I didn't manage
5  him, so I wouldn't be aware of that.
6      Q.   Okay.  You said you didn't manage him.  Is
7  that correct?
8      A.   We were peers, yes.  I did not manage him.
9  He was my peer.
10     Q.   I see.  Did -- was it Fred Becker that
11 managed him?
12     A.   Yes.
13     Q.   Do you know if anyone made a complaint of
14 sexual harassment against Bobby Booker?
15     A.   I'm not aware of any.
16     Q.   Do you know if anyone made a complaint of
17 discrimination against Bobby Booker?
18     A.   Not that I'm aware of, no.
19     Q.   Okay.  Do you know if Bobby Booker is still
20 working at Bloomingdale's?
21     A.   I don't believe so, but I couldn't tell you a
22 hundred percent, but I do not believe he is still there.
23     Q.   Do you know any details surrounding his
24 employment -- withdrawn.  Do you know any details
25 surrounding the end of his employment at Bloomingdale's?

Page 28

1    A.   No.

2    Q.   Do you know who Richard Law was or is?

3    A.   Richard was when I was at 59th Street one of

4  the HR managers.

5    Q.   Okay.  And how often did you interact with

6  Richard?

7    A.   It depended on the situation.  Other than

8  occasional meetings or occasional cases, I would

9  probably see him around weekly, but unless he was

10 managing an area we had a specific issue in, we didn't

11 really spend a lot of time together.

12   Q.   Okay.  Did you have to report to Richard Law?

13        MS. TIERNEY:  Object to the form.  You

14 can answer.

15        THE WITNESS:  It depends on your

16 definition of report to.  I would keep him informed if

17 we were doing an investigation and were going to have a

18 conversation with an employee that fell under his area

19 so it was more of a dotted line informational reporting.

20 He didn't manage me.

21 BY MS. MENDOZA:

22   Q.   And what do you mean by his -- it fell under

23 his department?

24   A.   If I remember correctly, we had maybe four HR

25 managers that covered different areas of the store

Page 29

1  because 59th Street had I'm going to say thousands of

2  employees.  They had multiple HR managers, and they

3  split the store up where they each had an area, whether

4  it was a department, a floor.  I'm not sure how they

5  broke it down.  But if we were investigating or about to

6  have a conversation with an employee based on an

7  investigation, we would put that manager -- that HR

8  manager in the loop that at such date and time we will

9  be talking to this employee to expect a partnership.

10   Q.   Do you know Cathy Younis?

11   A.   Cathy was the manager for Chanel, I believe.

12 I'm not sure if she had a different title.  But she ran

13 the Chanel department for a while.

14   Q.   So during Kristina's employment, she was --

15 is it fair to say that Cathy was the manager or the

16 director of Chanel's department at that time?

17   A.   Yes.

18   Q.   Did you have any conversations with Cathy as

19 part of your duties and responsibilities?

20        MS. TIERNEY:  Object to the form.  You

21 can answer.

22        THE WITNESS:  In a general sense, yeah, I

23 spoke to the majority of the managers at some point,

24 whether it was about training, any particular issues,

25 controls, policies.  They would come to me or the asset

Page 30

1  protection team if they felt there was a lot of external

2  theft going on.  Part of when we spoke about being on

3  the floor would be to touch base with the various

4  managers and see what support they needed.  So, yes, in

5  general conversation, yes, I would have had contact with

6  her.

7  BY MS. MENDOZA:

8    Q.   Did Chanel have their own asset protection

9  department?

10        MS. TIERNEY:  Object to the form.  You

11 can answer.

12        THE WITNESS:  Not within Bloomingdale's

13 itself.  I don't know if they had a corporate loss

14 prevention that looked at anything, but within

15 Bloomingdale's they fell under our asset protection

16 team.

17 BY MS. MENDOZA:

18   Q.   Did you speak to Cathy about your

19 investigations that you were conducting if they involved

20 Chanel employees?

21   A.   Potentially on a high level she would know

22 that, for instance, there was a lot of fraud activity in

23 the building or in Chanel and what to look for from a

24 training perspective but not detailed about any specific

25 investigation.

Page 31

1    Q.   So did Cathy ever report anyone for fraud?

2    A.   I don't recall Cathy specifically bringing

3  anything forward.

4    Q.   Do you recall any conversations with Cathy

5  about any of her employees committing fraud?

6    A.   Not specific employees.  I don't recall any

7  specific names, no.

8    Q.   Okay.

9    A.   Potentially she brought up there's a lot of

10 activity or high purchasing but nothing specific to an

11 employee.

12   Q.   And do you know who Denis Diaz is?

13   A.   I recall the name, and I think he worked for

14 or with Cathy in Chanel.

15   Q.   Okay.  And so did you correspond with him in

16 your duties and responsibilities in asset protection?

17        MS. TIERNEY:  And I'm going to object to

18 the form.  You can answer.

19        THE WITNESS:  In the same way I would any

20 manager in the store, like I said before, whether it was

21 from training or touch base on the floor to say how can

22 we support you or that kind of thing.

23 BY MS. MENDOZA:

24   Q.   Did he -- do you recall if Dennis ever

25 reported any of the employees to the asset protection

Page 32

1 department?

2    A.   I don't recall any specific employees, no.

3    Q.   Did he report any issues that were occurring

4 in the Chanel department?

5    A.   I would say both Dennis and Cathy at

6 different times were concerned about external fraud

7 occurring, a lot of what we called diverters, but they

8 were resellers, and they had concerns about that.

9    Q.   Okay.  And when did they inform you about

10 these concerns?

11    A.   I don't remember exact dates.

12    Q.   Was it during Kristina's employment?

13    A.   I'm going to say I'm sure there were

14 conversations about that during that time frame.  Chanel

15 as you can imagine was -- is an attractive brand for all

16 kinds of fraudsters, so they would have been one of --

17 both from an external or internal perspective would be

18 something we would focus on.

19    Q.   Is there anything that I can show you that

20 could refresh your recollection during that time?

21        MS. TIERNEY:  Object to the form.  You

22 can answer.

23        THE WITNESS:  I don't know.

24 BY MS. MENDOZA:

25    Q.   Was there any emails?  Like did they e-mail

Page 33

1 you saying, hey, we have something going on here, please

2 look into it, something to that nature?

3    A.   I don't recall, but if you have them, it

4 might help my recollection.

5    Q.   Okay.  No, I do not have any.  I asked for

6 other employees, but I just wanted to know if -- that's

7 why I'm asking -- if Cathy or Denis at that time ever

8 alerted you or raised any issues with you with the

9 department.

10    A.   No, I don't recall any specifics.  I know

11 there was concern in a lot of our bigger brand name

12 areas for the diverter and fraud, the reselling side of

13 things.  I don't recall specifics from either of them,

14 you know, but we would get quite a few e-mails or

15 conversations on the floor.  So I don't know how they

16 communicated at the time, but, you know, it could have

17 been one of four or five other asset protection managers

18 that would have gotten some of that communication.

19    Q.   Did either Cathy or Denis have any

20 conversations with you about Kristina and fraud?

21    A.   Not that I recall, no.

22    Q.   Or a possible diversion or diversion?

23    A.   Not specifically pertaining to her.

24    Q.   Not specifically, I did not hear that last

25 part.  What did you say?

Page 34

1    A.   Pertaining to Kristina.

2    Q.   Pertaining to Kristina, okay.  Who was it

3 pertaining to?

4    A.   The majority that I remember the concerns

5 were from an external point of view, people either doing

6 fraudulent transactions or diverters that would come in

7 and buy low to sell high so to speak.  They were more

8 focused on the external element.

9    Q.   All right, so as part of your

10 responsibilities in your position -- withdrawn.  Is it

11 fair to say that part of your job was to conduct

12 investigations?

13    A.   Yes.  Through my team I oversaw the four to

14 five investigators.

15    Q.   Okay.  And what type of investigations did

16 you do?

17    A.   My team was focused on internal

18 investigations, so it could be anything from theft of

19 merchandise by an employee, theft of cash by an

20 employee, different types of return fraud by an employee

21 down to and including more policy violations around

22 discount abuse and those kind of things.

23    Q.   Now, how do you determine what kind of -- how

24 do you start an investigation?

25    A.   It could be any number of ways.  It could be

Page 35

1 from a tip, an anonymous tip, the team reviewing various

2 reports, return reports, credit card reports.  There are

3 a number of ways to initiate an investigation.

4    Q.   And is it documented anywhere how the

5 investigation is started or prompted?

6    A.   Within the overall summary of the

7 investigation there would be notes on how it started,

8 yes.

9    Q.   And what is central investigation?

10    A.   Corporate, so our corporate investigations

11 team that had responsibility to all of the

12 Bloomingdale's locations.

13    Q.   And how did your department work with central

14 investigations?

15    A.   They may come across information that could

16 initiate an investigation into the store.  They may be

17 working on a broader investigation that they coordinate

18 with us in the store.  The majority of their time was

19 focused on the branch stores that didn't have the

20 resources we have at 59th Street.  But on occasion they

21 would find something or get information that pertained

22 to our store, and we would work together to investigate

23 it and resolve the issues.

24    Q.   And did they work with the Macy's credit card

25 customer service?

Case 1:19-cv-08927-GBD-SLC  Document 128-5  Filed 09/20/23  Page 13 of 63

Deposition of Christopher Castellani                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 36

1    MS. TIERNEY:  Object to the form.  You
2  may answer.
3    THE WITNESS:  I would say if MCCS had
4  information they would share it with our central team
5  and possibly the store team.
6  BY MS. MENDOZA:
7    Q.   So in your experience, I'm asking
8  hypothetically, was it MCCS would contact central
9  investigations and then central investigations would
10  contact you, or could it be MCCS would contact you?
11    MS. TIERNEY:  I'm going to object to
12  form.  You can answer.
13    THE WITNESS:  My recollection they would
14  generally go through the central team, and then it would
15  come to the store.
16  BY MS. MENDOZA:
17    Q.   And when you say central investigations as
18  corporate, are you saying that those are synonymous?
19    A.   Well, I guess the technical title of our
20  asset protection team in corporate we called them
21  central AP.
22    Q.   So central investigations is essentially also
23  another asset protection.  Is that correct?
24    A.   They're the corporate level asset protection,
25  yes.

Page 37

1    Q.   Right, okay.  And where are they located?
2    A.   I don't remember the exact address, but they
3  were in Manhattan.  There was a separate office in
4  Manhattan.
5    Q.   And did their office also have HR?
6    MS. TIERNEY:  Object to the form.
7    MS. MENDOZA:  I'll rephrase that.
8  BY MS. MENDOZA:
9    Q.   Did their office -- was that corporate office
10  corporate for each department of the Bloomingdale's 59th
11  Street store?
12    MS. TIERNEY:  Object to the form.  You
13  can answer.
14    THE WITNESS:  I don't recall there being
15  other -- perhaps within the building there were other
16  divisions like asset protection HR.  I do not recall
17  them being in the same offices.  And HR for 59th Street
18  was at 59th Street.
19  BY MS. MENDOZA:
20    Q.   And did you use any specific software to
21  track your investigations, keep track of your
22  investigations?
23    A.   There was an internal reporting system.  I
24  don't remember the name of it.
25    Q.   Who had access to that system?

Page 38

1    A.   The majority of asset protection team.  The
2  external team would have to do external investigations
3  and case input.  We would have access as the internal
4  team depending -- I don't know that everyone had the
5  same level of access that could go in and -- you know, I
6  could go in and approve certain things.  Other people
7  could not.
8    Q.   And do you know if it was -- withdrawn.  Did
9  you also -- did the asset protection department also
10  have access to other software for employees?
11    MS. TIERNEY:  Object to the form.  You
12  may answer.
13    THE WITNESS:  We had access to look at
14  scheduling.  We had access to look at anything that
15  occurred through the register so we could track
16  purchases, credit card numbers to a point, but only a
17  couple of us had access to unencrypting credit cards or
18  anything along those lines.  But there was a general
19  reporting system pulled from the registers.
20  BY MS. MENDOZA:
21    Q.   Did you have the same access to employees'
22  files as HR?
23    A.   No, not employee files.
24    Q.   So what besides employee files did you have
25  access to that HR did?

Page 39

1    MS. TIERNEY:  Object to the form.  You
2  may answer.
3    THE WITNESS:  I think the only thing we
4  would have used would be like the scheduling tool to see
5  when an employee was in.  I didn't have access to or my
6  team wouldn't have access to any corrective
7  documentation or any of those kind of things.
8  BY MS. MENDOZA:
9    Q.   What about if they were on leave?
10    A.   I don't know that we would see that.  We
11  would get their basic information.  We could see I guess
12  what you call a cover page, their employee ID, their
13  name, their address, and we could pull up their
14  schedules.  If they were on leave, we would probably
15  have to find that out through HR.
16    MS. TIERNEY:  Counsel, when you get to a
17  break, could we take a restroom break for a few minutes?
18    MS. MENDOZA:  Yes.  We can stop now.
19    (Recess taken)
20  BY MS. MENDOZA:
21    Q.   I want to ask you going back to the
22  investigations how is a discount abuse investigation
23  conducted?
24    A.   Could be a number of ways, but if we receive
25  information or felt there was discount abuse based on

Page 40

reporting, we would pull up individual transactions, see how it was paid for.

Generally at Bloomingdale's everybody had a Bloomingdale's account they had to use for their discount.  Some were basic credit card accounts, normal credit card accounts.  Some were prepaid.

If there was a prepaid account, we would see how that account was being paid off.  So a prepaid account you'd have to have a balance on your account in order to use the credit card.  So we would look for payments that were made, were any payments made with a debit card, are any of them not associated with the employee, were payments made at a register prior to the purchase in which somebody else paid for the payment so to speak.  I mean those are the general parameters that we would look for to prove discount abuse, did somebody else pay to the card for the benefit of the discount.

Q.   Did Bloomingdale's have a specific Bloomingdale's -- does Bloomingdale's have a specific discount policy?

A.   Yes.

Q.   And was that different than the Chanel department discount policy?

MS. TIERNEY:  Object to the form.  You may answer.

Page 41

THE WITNESS:  I believe initially it would have been the same because Chanel employees at different times either worked for Bloomingdale's or became a lease, and the lease agreements may have different discount policies but not necessarily discount rules.  They may get a different discount amount, but they still had the general policies.

MS. MENDOZA:  So let's take a look at one of them.  And this is 380.

MR. MESSNER:  You said 380, Counsel?

MS. MENDOZA:  Yes.

MS. TIERNEY:  Melissa, are you marking that as Exhibit 1?

MS. MENDOZA:  Yes.

MR. GERBER:  Just give us a minute to get it up on our screen, Melissa.

MR. MESSNER:  Counsel, would it be under different Bates number?  I don't have a 380 in the folder.

MS. MENDOZA:  Yeah, I don't see it either.  I will upload it.  It starts at 379.

MS. TIERNEY:  Melissa, are you marking this whole thing or just the one page?

MS. MENDOZA:  Just the one page.  But this is --

Page 42

MS. TIERNEY:  I mean it looks like it's a three-page document, 379 through 380.

MS. MENDOZA:  Yes.

MS. TIERNEY:  Chris, I would just ask you to read the whole document before you start asking questions about it or at least look through it to your comfort level.  And you may need to ask the tech to move it for you.

THE WITNESS:  Yeah, if you can go back to the previous view, I can read that.  I can't read this.

MS. TIERNEY:  I'm sorry, did you want him to start on Page 379, Melissa?

MS. MENDOZA:  Yes.

THE WITNESS:  Okay, read that part.

MS. MENDOZA:  I just wanted him looking at the first section.

MS. TIERNEY:  I'm sorry, Counsel, but since this is an exhibit of two pages, I do want him to see both pages before he answers questions.

MS. MENDOZA:  Oh, sure.  That's fine.

(Plaintiff's Exhibit 1 marked for identification)

BY MS. MENDOZA:

Q.   This is going to be marked Plaintiff's Exhibit 1.  It's Bates stamped at the bottom BLM000379

Page 43

to BLM000380.  Do you see those there, those numbers?

A.   Yes.

Q.   So I want to direct your attention to 380.  So when we're talking about this kind of abuse, did the Chanel handbags over-purchasing limits would that be considered discount abuse?

A.   No.  When you say discount abuse, to me it means the employee discount abuse where the employee abuses their personal discount.  This part if I'm reading correctly is the number of handbags that can be sold to any customer because of the diverter or reselling concerns.  And to make sure they had stock on hand, there was a limit to the number of bags anyone could buy within the department.

Q.   Okay.  So you're saying this policy here was not specific to employees.  This is for customers?

MS. TIERNEY:  Object to the form.  You can answer.

THE WITNESS:  It would apply to anybody including employees, but this particular part is talking about the number of handbags that could be purchased, not the discount associated with it.

BY MS. MENDOZA:

Q.   And do you know if the number of handbags policy changed during Kristina's employment?

Page 44

A. I do not recall specifically. I think at some point when they were talking about becoming leased there may have been adjustments, but I don't remember specifically one that occurred and what the numbers would be.

Q. And was there -- withdrawn. Was Kristina investigated for violating this policy?

A. I don't recall that it was being specific to this policy, but this policy would have been included in any diverter or fraud type of investigation, so it would have been part of it, not specific to this policy.

Q. Okay. Do you know if Kristina exceeded the number of handbag purchases allowed in this policy?

A. I don't recall specifically. I don't recall exactly how many of each bag she was selling to each individual customer.

Q. Back up a little bit. Do you know why Kristina -- withdrawn. Was Kristina investigated?

A. Yes.

Q. Why was she investigated?

A. Initially there was a larger fraud investigation that involved collusion with outside resellers, diverters that were targeting a number of our brands, but Chanel was heavily hit. Kristina was, I'm assuming, I don't recall specific numbers, but one of

Page 45

the higher sellers, and there was a significant amount of fraud within her sales history. So that was the initial investigation.

Q. Do you recall then what time period that was?

A. I want to say it was early 2017. I believe we had a conversation with Kristina in February of 2017 pertaining to the fraud aspect.

Q. And how was this issue raised?

MS. TIERNEY: Object to the form. You may answer.

THE WITNESS: I think initially it was a combination of both one of my investigators as well as information from MCCS and the central team because there was a larger investigation into an external fraud ring that had compromised a number of proprietary cards. And upon investigating Kristina had an inordinately high amount of the fraud associated with the sales she had conducted.

BY MS. MENDOZA:

Q. And when -- what was the outcome of that investigation?

A. The initial investigation after we spoke to Kristina was inconclusive. There was documentation that she had followed the -- what we called the memo order process. And we didn't have an admission or any

Page 46

additional information that she was directly related to the fraud, so she was sent back to work.

Q. So were these frauds -- withdrawn. These transactions, were these transactions that Kristina was making -- ringing up and not purchases that she was making herself?

A. The initial investigation was, yes, resellers and fraudsters using stolen credit card information.

Q. And when did that investigation conclude?

A. With Kristina specifically --

Q. Yes.

A. -- or the overall -- with Kristina?

Q. Yes.

A. I believe we interviewed her on February 4th. That was the -- I wouldn't say that was the conclusion, but at that point she was not a primary target of the investigation I guess you could say. We had gotten some information from her. We had researched the memo order process to the satisfaction that we did not have enough evidence there to proceed with any kind of corrective action at that point or termination.

Q. So that was just for Kristina. Did the investigation continue for anyone else?

A. It went on for quite a while. Central handled a number of other employee issues around the

Page 47

same set of facts.

Q. What do you mean other employee issues?

A. Other employees were involved in the same general investigation for the same dealings. So Kristina was not the only person -- only employee involved in a much broader investigation into the fraud where other employees were investigated. Some were interviewed by our central investigations team, and we supported their investigations.

Q. And did that -- when did that conclude for those other employees?

A. I do not remember the exact date. It went on for some time around that -- between the February and probably parts of it were still going on in May, June when we had the second interview with Kristina.

Q. And why did you have the second interview with Kristina?

A. Because additional reporting from my team as well as the MCCS, the credit services, indicated a severe spike in her spending habits to the tune of I think over a handful of months $65,000 worth of employee purchases which would be indicative of -- it would be a red flag for employee discount abuse and potentially employee reselling merchandise outside the store.

Q. And you said that this was initiated by your

Page 48

1  team and MCCS.  Is that correct?
2     A.   I think it was a combination.  I think MCCS
3  highlighted just how much was there, but it was both
4  working together.
5     Q.   And did MCCS see the -- well, withdrawn.  You
6  said that it was a high amount, 65,000, correct?
7     A.   I want to say approximately $65,000.
8     Q.   And does that include -- is that the full
9  sale price of the purchases, or does that include all
10 discounts taken off?
11    A.   I'm going to say that included the discounts.
12 That was the final amount paid.
13    Q.   And does MCCS monitor the prepaid cards that
14 you entered before?
15    A.   I believe so.
16    Q.   And they monitor the Bloomingdale's account,
17 correct?
18    A.   Yeah.  I mean, they were all considered
19 Bloomingdale's accounts.
20    Q.   Okay.
21    A.   But based on the employee's I guess credit
22 history, you would either have to get a prepaid if you
23 wanted to get a discount if you couldn't qualify for a
24 full-blown Bloomingdale's/Macy's credit card.
25    Q.   And so what happened after you -- your team

Page 49

1  learned about these purchases?
2     A.   We pulled some of the purchase history.  We
3  looked at different transactions, the level of activity.
4  We identified that a good number of the purchased items
5  from Chanel were shipped out of state which is
6  indicative of either reselling, sending them to a
7  reseller, reselling yourself, and potentially tax fraud
8  to evade New York sales tax.  So based on that
9  information, we decided to do another interview or
10 conversation with Kristina.
11    Q.   If she paid -- if she used the prepaid card,
12 does that include payment for tax as well?
13         MS. TIERNEY:  Object to the form.  You
14 can answer.
15         THE WITNESS:  The prepaid card would just
16 be an amount on the card available for a sale.  It
17 didn't take in account of anything other than the final
18 price.
19 BY MS. MENDOZA:
20    Q.   Which would include the tax, correct?
21    A.   It would include the applicable tax wherever
22 it was being sent to.
23    Q.   Right.  Did Kristina pay New York tax?
24         MS. TIERNEY:  Object to the form.  You
25 may answer.

Page 50

1         THE WITNESS:  Not on the bags that were
2  shipped to New Hampshire and I believe Mississippi.
3  BY MS. MENDOZA:
4     Q.   But she did pay New York sales tax for other
5  purchases, correct?
6         MS. TIERNEY:  Object to the form.  You
7  may answer.
8         THE WITNESS:  If it was bought and not
9  shipped to someplace without tax, yes, she would have
10 paid the applicable tax.
11 BY MS. MENDOZA:
12    Q.   But I'm asking in your investigation did you
13 find that she did pay New York sales tax for some
14 purchases?
15    A.   For some purchases, yes.
16    Q.   At that time could employees ship items,
17 purchases to -- as gifts out of state?
18    A.   I do not believe there was any policy
19 directly saying you cannot.
20    Q.   So how did you -- why did you assume that her
21 shipping out of state to those locations -- to locations
22 had to be for reasons other than for gifts?
23    A.   I don't think we assumed any of that.  We did
24 the investigation.  There were multiple red flags based
25 on her -- the amount.  $65,000 over a few months of

Page 51

1  activity is a pretty extreme amount for a sales
2  associate to spend.  There was the prepaid aspect of it,
3  where was the money coming from and the shipping out of
4  state.  They were all red flags.  They do not mean
5  anybody was doing anything in particular wrong, but
6  based on the investigation, we had three or four
7  different red flags around her purchases, her purchase
8  history and behavior that indicated there could be
9  discount abuse up to and including potential reselling
10 and the tax implications of shipping somewhere else.
11 There was no assumption that she definitely did it.
12 There was -- the information came through the
13 investigation that indicated they were potential issues.
14    Q.   And has any other employee had as high an
15 amount of purchases?
16         MS. TIERNEY:  Object to the form.  You
17 may answer.
18         THE WITNESS:  To my recollection, no.  I
19 don't recall anyone having that high, but there were
20 several that were high that were included in some of
21 this activity and in the investigation.
22 BY MS. MENDOZA:
23    Q.   Okay.  And when -- we'll come back to those
24 people.  But with Kristina did you interview her?
25    A.   We did.

Page 52

1  Q.   And was this around June 6th, 2017?
2  A.   It was on June 6th, yes.
3  Q.   Okay.  And did you -- you personally
4 interviewed her with another investigator, correct?
5  A.   Yes.  I believe it was Shanine.
6  Q.   Did you record that interview?
7  A.   We recorded all of the interviews.
8  Q.   And do you still have that video?
9  A.   I do not personally have the video.
10  Q.   Do you know what happened to the video?
11  A.   It was left with Bloomingdale's.
12  Q.   Do you know if the video was deleted after
13 you left Bloomingdale's to the -- the flagship store to
14 the Soho location?
15  A.   I don't know if it was deleted.  I didn't
16 delete it.  It was on my computer and should have been
17 backed up with the report.
18  Q.   And have you seen that video since you left
19 Bloomingdale's?
20  A.   No.
21       MS. MENDOZA:  We will re-request the
22 video.  I know it was previously stated it was deleted,
23 but we will re-request it.
24       MS. TIERNEY:  And, Counsel, the answer's
25 going to be the same.  And if you want to put something

Page 53

1 in writing, we'll respond similarly.
2       MS. MENDOZA:  Okay, thank you.
3 BY MS. MENDOZA:
4  Q.   So what happened during that interview?  What
5 was discussed?
6  A.   We talked about general loss prevention
7 similar to what we would have had in our first
8 conversation.  And then we would have specifically asked
9 her about her purchase history, talked about the
10 scenario we just discussed and asked her questions
11 around that, did she accept money, was there any third
12 party involved, why was she shipping it out of state.
13 And she expressed that she made all of the purchases
14 with her own money, that she shipped it out of state to
15 avoid taxes like she had done for other customers.  And
16 we concluded the investigation.
17  Q.   And what was the conclusion?
18       MS. TIERNEY:  Object to the form.  You
19 can answer.
20       THE WITNESS:  That she had admitted to
21 shipping goods out of state to avoid New York sales tax,
22 retail tax, whatever you want to call it.
23 BY MS. MENDOZA:
24  Q.   So instead of her taking home -- purchasing
25 an item for a friend in New Hampshire, instead of taking

Page 54

1 it home, paying the tax, she was not allowed to just
2 ship it straight to that person?
3       MS. TIERNEY:  I'm going to object to the
4 form.  You can answer, Chris.
5       THE WITNESS:  She would be allowed to
6 send it to a friend, but she admitted that she did it to
7 avoid the taxes.
8 BY MS. MENDOZA:
9  Q.   Right.  Is that tax avoidance, or is that tax
10 evasion?
11       MS. TIERNEY:  Object to the form to the
12 extent that it calls for a legal conclusion.  You can
13 answer to the extent you have the knowledge.
14       THE WITNESS:  I'm not a lawyer, so I
15 don't know how you would categorize it, but she admitted
16 to doing it to not pay the New York State tax.
17 BY MS. MENDOZA:
18  Q.   For just those purchases, correct?
19  A.   For the purchases that were shipped to
20 New Hampshire and Mississippi.
21  Q.   Right.  And what is the policy for shipping
22 out of state to not pay the sales tax?
23  A.   I don't know that we have a written policy,
24 but it's illegal to do so in the state of New York from
25 my understanding, so it would be an illegal act.

Page 55

1  Q.   And did you make that determination?
2  A.   The determination, no.  I made the
3 determination that we were doing the investigation and
4 this is the outcome that she put in her statement.
5  Q.   Did you tell her what to write in the
6 statement?
7  A.   No.  I told her we were going to write a
8 statement about what we discussed, and we walked through
9 it and talked about what we had discussed in our
10 conversation, and she documented it.
11  Q.   And did she have a union representative
12 present?
13  A.   I do not recall there being one or her asking
14 for one.
15  Q.   As part of the collective bargaining
16 agreement, are you required to have a union
17 representative present?
18  A.   At that point -- I don't know how it is
19 today -- but no.  If they ask for a union
20 representative, we would stop the conversation and have
21 one brought in.  But if they did not ask for a union
22 representative, it was not our job to offer.
23  Q.   Did anyone take any notes during that
24 interview?
25  A.   Shanine would have as the witness.

Page 56

Q. So was Kristina pulled for exceeding the discount -- withdrawn. Was Kristina investigated initially and interviewed by you because she exceeded the handbag purchase limit?

A. In this the second interview?

Q. Yes.

A. It was -- could have possibly been part of it, but it was the discount abuse aspect and the potential diverter reselling aspect that initiated the case.

Q. Okay. So do you recall asking her questions about how many purchases that she had made?

A. How many purchases?

Q. How many purchases exceeding the purchase limit.

A. I don't recall that specifically.

Q. Did the 65,000 also include shoes?

A. I don't recall the individual items.

Q. Would it have included all items purchased in the Chanel department including shoes?

MS. TIERNEY: Object to the form. You may answer.

THE WITNESS: I would say yes. I don't recall there being any other items, but it's potentially shoes as well.

Page 57

BY MS. MENDOZA:

Q. How do you prove -- withdrawn. Has your team found that some employees are resellers?

A. Yes.

Q. And how did you come to that conclusion?

A. There's various methods of reselling. There's selling to a known diverter, someone who resells. There's been, and I don't recall specific names, but people that have resold on eBay or the Poshmarks of the world which would be a form of reselling so looking at those different outlets and if they're involved in any of that activity.

Q. So as far as the reseller decides to -- a known diverter, how do you know that someone is a diverter? How do you establish that?

A. It depends on the person, but looking if they have a website, if they're buying multiple items from our store and then reselling them on their personal website or if they have a store front that they advertise and they're selling merchandise that they've purchased from us.

Q. So are you saying that -- I'm asking if any employee has sold an item from the Chanel department to a known diverter and if it's known because -- withdrawn. Has any employee sold an item from the Chanel store --

Page 58

the department of the 59th Street store to a known diverter?

MS. TIERNEY: What time frame, Counsel?

MS. MENDOZA: During that time period to present.

MS. TIERNEY: I'm going to object to the form. Otherwise you can answer.

THE WITNESS: I would say yes.

BY MS. MENDOZA:

Q. Right. And I'm asking to your knowledge from your team if you know.

MS. TIERNEY: Object to the form.

BY MS. MENDOZA:

Q. Is your answer still yes?

A. My team including the central team and the larger investigation, yes.

Q. Yes, okay. So how did you know that that diverter had items purchased from that Chanel department?

A. Because the employees involved admitted selling them to them for that specific reason.

Q. Besides that, how else do you know?

A. I wasn't conducting the majority of those investigations, so I don't know if there's any more detail. I know that in the other employee

Page 59

investigations there were specific resellers that came to light that employee admitted to selling some of which involved the fraud.

Q. Okay. So does your team or any -- withdrawn. Is part of the investigation to go to these stores and find out if those items are actually from the Chanel department of the flagship store?

MS. TIERNEY: I'm going to object to the form. You can answer, Chris.

THE WITNESS: It wouldn't be the normal course of business unless we were working with potentially a law enforcement agency. Our job usually, at least my team's job, ends with the employee investigation. Whether the central team was working with law enforcement, there are times when you will look for the serial numbers, that kind of thing. If law enforcement wants to go into the potential reseller's location and match some of those things, it's possible.

I do not know if this happened in this case because my team focused on the internal aspect. And once somebody would admit to doing whatever act or indiscretion they were doing, we would not go trace that bag. If they said I did it, that's where our investigation ends. So anything beyond that that the central team did I'm not aware of.

Page 60

BY MS. MENDOZA:

Q.   And you said serial numbers.  Are you talking about the Chanel authenticity card?

A.   If that's what it's called, yeah.

Q.   Was there another name?  Is there any other --

A.   I'm not aware of any other number.  They have the authenticity card.

Q.   And during Kristina's employment, at that time there were Chanel authenticity cards, correct?

A.   I believe so, yes.

Q.   So after Kristina -- after your investigation with Kristina, what happened -- withdrawn.  After your interview, then what did you do next with her investigation findings?

A.   Because there was an admission of some violation in this case, shipping to avoid the New York State tax, we suspended Kristina after partnering with Richard.  He couldn't give a disposition on the case immediately.  I don't remember if they were in a meeting or something, but he would have been forwarded the information.  She would have been suspended by myself and instructed that she would be informed within a certain time frame by HR not to return to work until HR reached out with a final disposition on the case.

Page 61

Q.   So did you do anything else after that, after giving it to Richard?

A.   I might have answered questions he had or if someone in central had questions about that or the larger investigation but not directly with Kristina, no.

Q.   Okay.  So is it possible -- withdrawn.  If Kristina is saying that she's shipping out of state these gifts to states where she wouldn't have to pay the tax versus taking it home today, paying the tax unnecessarily, is that what you consider to be avoiding taxes?

MS. TIERNEY:  I'm going to object to the form.  You may answer.

THE WITNESS:  I consider the fact that she stated that she was doing it to avoid taxes, like they meaning her and her peers did for customers, the infraction.

BY MS. MENDOZA:

Q.   So did customers do the same thing?

A.   That's what she stated, yes.  She stated --

Q.   You can finish.

A.   She stated that she did it to avoid the taxes like they do for customers.

Q.   Okay.  And did customers do that?

MS. TIERNEY:  Object to the form.  You

Page 62

may answer.

MS. MENDOZA:  I'll restate it.  I'll elaborate.

BY MS. MENDOZA:

Q.   Did customers also ship to states that they wouldn't have had to pay tax instead of taking it home and paying the tax today at the time of purchase?

MS. TIERNEY:  Object to the form.  You can answer.

THE WITNESS:  There's -- yes, there's a possibility that they do.

BY MS. MENDOZA:

Q.   And were those customers sent to law enforcement?

A.   Again, I focus on the employee issues.  Part of the larger investigation that had been ongoing, part of the initial conversation with Kristina was around fraud and diverters, and that is part of the way they operate would be to ship things to various other places.

Q.   Right.  But I'm saying once Kristina explained to you this is why I'm sending to these addresses, then is that when you determined that she was paying -- she was shipping it to avoid paying tax, New York State tax?

A.   I determined she was doing it to avoid

Page 63

New York State tax because she stated she was doing it to avoid New York State tax like they do for customers.

Q.   Right.  So was there anything wrong in what she was doing?

MS. TIERNEY:  Object to the form.  You may answer.

THE WITNESS:  She admitted to doing it to evade taxes, to avoid paying taxes which I'm not an attorney, but I believe that is legally not allowed.

BY MS. MENDOZA:

Q.   And did you ask an attorney -- withdrawn.  Did you -- how did you determine that it was not allowed or that it's illegal?

A.   I didn't determine that it was illegal other than she stated it was, and the information was passed on to HR who does the final disposition.

Q.   So did you determine -- I just want to be clear I understand your response.  Did you determine that what she was doing was illegal?

MS. TIERNEY:  Objection.

THE WITNESS:  I personally --

MS. TIERNEY:  Go ahead, Chris.

THE WITNESS:  I personally did not determine it was illegal.

BY MS. MENDOZA:

Page 64

Q.   Okay.  And after you sent it to Richard, was there any suspicion that she was still a diverter or reseller?

A.   Suspicion?  I think that the suspicion was that she was sending to places where diverters were known to be, and there were other associates that sent to those same diverters.

Q.   And so you're saying -- so she was sending to an address, right, that was -- you're saying that that address -- those addresses were known diverters.  Is that correct?

A.   I believe they were associated with a name that we knew as a diverter.

Q.   And how did you know that that was a diverter?

A.   Because eventually other associates had admitted that they were sending to a diverter.

Q.   And just to be clear, so if a diverter could be -- withdrawn.  Could it be that someone was sending to the same address to avoid paying the New York State tax?

MS. TIERNEY:  Object to the form.

THE WITNESS:  Is it possible?

BY MS. MENDOZA:

Q.   Yes.

Page 65

A.   It's possible, yes, but they also admitted sending to a diverter.

Q.   Okay.  And when you say diverter, is that synonymous with a reseller?

A.   Yes.

Q.   So was there any proof that that person was a reseller?

A.   Not that I investigated.  That would have been part of the bigger central investigation.

Q.   So do you know before you left that location at any point did you learn if that person was a known diverter or reseller?

A.   I didn't see any direct evidence other than the fact that they sold the type of merchandise and that the other associates involved said they were selling them to a known reseller.

Q.   Was one of those people Angy Lee?

A.   Angy Lee I believe was one of the associates involved.

Q.   Do you recall if she was one of the people that said that it was to a known reseller?

A.   I think I saw it in the notes at some point, yes.

Q.   We'll come back to her.  So after you left -- or after you gave it to Richard, was there still an

Page 66

investigation?  Were you conducting an investigation into Kristina's purchases?

A.   No.

Q.   Why not?

A.   Because we do the interview or the conversation at the end of the investigation.  We had gotten what we felt was all the information she was going to willingly give us.  So we turned it over to HR for the final disposition, and we had the documentation that we had available.  If there was more to investigate, we would have spoken to her prior to completing the investigation.

Q.   At that time did you ask her about the 65,000, where she was getting the money from?

A.   I believe so, yes.

Q.   And when she told you that other people were doing the same thing, did you investigate those other people?

A.   We were already aware with our central partners that there were multiple associates involved, so if she said there were other people, I probably would have told her we're aware of that but we're talking about your involvement.

Q.   But if the manager -- did she say if the managers told her she could do it?

Page 67

A.   I do not recall her stating that.  And can you clarify that the manager said she could do what?

Q.   To ship out of state to avoid -- instead of having to pay New York State tax you can ship the item.

A.   I don't recall her saying that, no.

Q.   And did you ask the manager about what she had stated which is that if you could ship out of state instead of paying the New York State tax?

A.   I don't recall asking the managers specifically about that.

Q.   Was there any training done afterwards pertaining to that?

MS. TIERNEY:  Object to the form.  You can answer.

THE WITNESS:  I do not recall specifically.  I was not involved in that aspect of it.

BY MS. MENDOZA:

Q.   And why not?

A.   Why wasn't I involved in the training aspect?

Q.   Yes.

A.   Because we have other people in the department that focused on training and awareness and that probably would have been part of their focus rather than the internal team.

Q.   Do you know the names of those people?

Page 68

A. I don't recall all of their names. There was a handful of people that work for one of the other asset protection managers. I don't recall which asset protection manager. It might have been David Ray at that point oversaw the awareness team, but I don't recall specifically.

Q. So when you -- withdrawn. Is there a policy for -- withdrawn. Did Kristina state that she didn't know there wasn't -- that there was a policy that she could not ship her gifts out of state instead of -- to avoid paying the New York State tax?

MS. TIERNEY: Object to the form. You can answer.

THE WITNESS: I don't recall her stating that.

BY MS. MENDOZA:

Q. Did she say if she was purchasing items for herself and shipping them out of state to avoid paying New York State tax?

A. I believe she said she made purchases for herself and her family.

Q. Okay.

A. Or friends, family and friends.

Q. Okay. All right, so we'll pull up the BLM888.

Page 69

MS. TIERNEY: The Bates Number 888 is what you're looking at?

MS. MENDOZA: Yes.

MS. TIERNEY: It's Exhibit 2?

MS. MENDOZA: Yes.

MS. TIERNEY: And is it a one-page exhibit?

MS. MENDOZA: Yes.

(Plaintiff's Exhibit 2 marked for identification)

BY MS. MENDOZA:

Q. So once the document's up, if you can just make sure you read through the entire document and then let me know when you're done with regard to Plaintiff's Exhibit 2.

MS. TIERNEY: Are you able to read it, Chris?

THE WITNESS: Um-hum.

BY MS. MENDOZA:

Q. So where in the document does it say -- well, withdrawn. This is a statement from Kristina. It says at the top June 6, 2017, 1:48 p.m., right, that's what it says at the top?

A. Correct.

Q. And is this the statement that Kristina wrote

Page 70

with you on that date?

MS. TIERNEY: Object to the form. You may answer.

THE WITNESS: Yes.

BY MS. MENDOZA:

Q. And where in this document does it say that she was shipping items for herself to avoid paying taxes?

A. It says about halfway down, I made the purchases now to get the best discount I could. The purchases were all for myself or gifts.

Q. Right. So part of what was discussed at the top it says, right, I made -- well, we'll start with the top what she says. My name is Kristina Mikhaylova. I have worked in Bloomingdale's since May 2016. Today I had a conversation with Chris and Shanine regarding issues with my Bloomingdale's account. We discussed that there is an excessive amount of purchases. So, again, you were inquiring about what her purchases were, correct?

A. Yes.

Q. And some of her purchases were not shipped out of state, correct?

A. Correct.

Q. So in February we found out that we will be

Page 71

going leased and as of that the discount will not be as good. I made the purchases now to get the best discount I could. The purchases were all for myself or gifts. You see that there, right?

A. Um-hum.

Q. Is she referring to discount abuse as in -- withdrawn. Is she referring to a violation of the handbag or the purchase limit?

MS. TIERNEY: Object to form.

THE WITNESS: At that point she's just saying she bought them for herself or as gifts.

BY MS. MENDOZA:

Q. Okay. So do you recall during the conversation with her if she was -- if it was discussed that she was potentially exceeding the handbag limit or purchase limit?

A. I believe she goes on to say that she never took reimbursement which is a reference to discount abuse.

Q. Right. That doesn't answer my question.

MS. TIERNEY: Object to the tone.

THE WITNESS: I don't recall there being a dialogue about the number of bags purchased as much as where the money was coming from in reference to discount abuse.

Page 72

1    MS. MENDOZA:  And there is no tone,
2  Counselor.  I just want to make sure I understand what
3  was discussed that day with --
4    MS. TIERNEY:  And you're entitled to say
5  that.  But I heard a tone.  I thought it was pretty
6  sharp.  And it's getting argumentative.  And I think we
7  need to focus on facts and not the arguments.  That's
8  for a summary judgment motion.
9    MS. MENDOZA:  Let's continue.  So if we
10 can just read back, please, Beth, right where
11 Ms. Tierney said my tone, before that, the question that
12 was asked -- or the response and then the question
13 before that.
14    (The referred-to portion of the testimony
15 was read back by the court reporter.)
16 BY MS. MENDOZA:
17   Q.   So going back to my question, when you --
18 prior to interviewing Kristina what was your
19 understanding -- what was the investigation findings at
20 that point?
21    MS. TIERNEY:  Object to the form.  You
22 may answer.
23    THE WITNESS:  Based on the investigation,
24 we were looking at potential discount abuse, potential
25 reselling, and on the periphery the shipping indicated

Page 73

1  more towards the diverter issue that we were concerned
2  about, the reselling issue.  But there was also an
3  implication to the tax avoidance.
4  BY MS. MENDOZA:
5    Q.   Okay.  And so part of the discount abuse is
6  investigating the number of purchases made, correct?
7    A.   We would look at her overall purchases.  If
8  you mean the specific number of bags that were
9  purchased --
10   Q.   No, no.
11   A.   -- in reference, we would look at her
12 purchases.
13   Q.   Right, okay.  And so then how you determine
14 if it's discount abuse is if she's taking -- if she's
15 seeking reimbursement for the purchases, correct?
16   A.   Yes.
17   Q.   Okay.  So we can move on.
18    MS. MENDOZA:  Actually if we can go off
19 the screen, we can mark this as Plaintiff's Exhibit 3.
20    (Plaintiff's Exhibit 3 marked for
21 identification)
22    MS. TIERNEY:  What Bates numbers are you
23 marking as 3, Counsel?
24    MS. MENDOZA:  It's 884, my apologies.
25    MS. TIERNEY:  And 5?

Page 74

1    MS. MENDOZA:  Yes.
2  BY MS. MENDOZA:
3    Q.   All right.  Just take a moment to look
4  through those two documents and let me know when you're
5  done.  And if you want to see anything more, that's
6  fine.
7    A.   Okay.
8    Q.   So before when we -- I was discussing the
9  software is this document here, BLM000884 to 885, is
10 that the software that you used to keep track of the
11 investigation into Kristina's purchases?
12   A.   Yeah.  That was our basic case management
13 system.
14   Q.   And you don't recall the name of it, though,
15 right, if it had a name?
16   A.   No, I don't.
17   Q.   Okay.  And if you turn to 885, it says,
18 investigative resources there.  Do you see that?
19   A.   Um-hum.
20   Q.   Okay.  What is -- it says, initiated by -
21 category, central investigation partner/fraud/ORC.  What
22 is ORC the abbreviation for?
23   A.   Organized retail crime.
24   Q.   And was that a team in your department?
25   A.   The organized retail crime refers to any

Page 75

1  organized group doing retail crime such as fraud, theft
2  rings.  So our central investigation partners are one
3  group.  Fraud and ORC were two other categories that
4  helped initiate the investigation.  So the initial
5  investigation was part of that larger investigation into
6  the proprietary credit card fraud where we initially
7  interviewed Kristina.  That fraud would be considered
8  organized retail crime.
9    Q.   And then underneath that it says, assisted by
10 - category CCTV.  What is that an abbreviation for?
11   A.   Closed circuit television, the camera system.
12   Q.   And what does that mean?
13   A.   Our camera systems within 59th Street were
14 used to identify transactions, to watch transactions to
15 see what goes on around the store.  So during the
16 investigation, we used our camera system.  That's what
17 assisted by - category means.
18   Q.   Understood.  And then underneath that, the
19 narrative, is that -- did you put -- input this
20 information there?
21   A.   Yes.
22   Q.   Okay.  And it says, during -- if you look at
23 the third line down, during review of Mikhaylova's
24 purchase history (Bloomingdale's account review Loyalist
25 account review and personal credit card review) it was

Case 1:19-cv-08927-GBD-SLC   Document 128-5   Filed 09/20/23   Page 23 of 63

Deposition of Christopher Castellani                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 76

1  determined that Mikhaylova had made 26 employee
2  purchases from 10/16 to 4/21/17 totaling 65,988.  Do you
3  see that there?
4      A.   I do.
5      Q.   So that -- looking at those accounts, was
6  that done by the asset protection team?
7      A.   I believe MCCS provided the overall
8  information, and then we drilled down looking at her
9  Bloomingdale's account, her Loyalist account to verify
10  and review those purchases.
11      Q.   And why during that specific time period?
12      A.   Because that's when there was the spike in
13  purchasing that they were concerned about.
14      Q.   And was it documented anywhere that that was
15  what MCCS was looking at?
16      A.   I believe there were e-mails about that and a
17  file containing the -- at least a brief purchase
18  history --
19      Q.   Okay.
20      A.   -- that documented the concerns.
21      Q.   Okay.  Was it typical -- withdrawn.  So if
22  MCCS is looking for a longer time period, right, if it
23  looks at a year for another employee, it could be the
24  same amount, right?
25          MS. TIERNEY:  Object to the form.  You

Page 77

1  can answer.
2          THE WITNESS:  I assume, yes.
3  Hypothetically you could look at any time frame and find
4  a similar amount if you were to say year or two years,
5  or.
6  BY MS. MENDOZA:
7      Q.   Right.  So did they -- in your experience did
8  MCCS look at various time periods for employees to
9  determine if there was a high amount?
10          MS. TIERNEY:  Object to the form.  You
11  can answer.
12          THE WITNESS:  I do not work for or really
13  with MCCS.  I just know that when they have a perceived
14  concern they will forward it to us, the bigger asset
15  protection department, to investigate.  So I don't know
16  how they run the reports.
17  BY MS. MENDOZA:
18      Q.   But did you have in your experience MCCS send
19  you a report for another employee for a high amount?
20          MS. TIERNEY:  I'm going to object to the
21  form.
22          THE WITNESS:  I believe they may have
23  pulled for a number of the employees.  I don't recall
24  specifically who that might have involved.  But they
25  were not specifically looking at Kristina.  I believe

Page 78

1  they were running a report that her along with other
2  employees ended up at the top of that report as a red
3  flag, so they forwarded that information for
4  investigation.
5  BY MS. MENDOZA:
6      Q.   Okay.  All right, we'll come back to this.  I
7  think -- and this isn't argumentative.  I just -- I want
8  to be clear because I think at the time wasn't Kristina
9  being investigated for her transactions as ringing up as
10  well as her purchases on her Bloomingdale's account?  Is
11  that correct?
12          MS. TIERNEY:  Object to the form.  You
13  can answer.
14          THE WITNESS:  Can you repeat that.
15  BY MS. MENDOZA:
16      Q.   Yes.  Was she being investigated for --
17  withdrawn.  In February 2017 you said that there was a
18  larger fraud investigation done that involved Kristina's
19  transactions that she was ringing out, correct?
20      A.   That was the initial investigation, yes.
21      Q.   And so in May that investigation was still
22  ongoing, correct?
23      A.   The larger investigation?
24      Q.   Yes.
25      A.   I'm not sure if it was still ongoing, but it

Page 79

1  had gone on for an extended period beyond our
2  conversation with Kristina.
3      Q.   Okay.
4          MS. MENDOZA:  So let's pull up 1456 to
5  1485.
6          MS. TIERNEY:  I'm sorry, what were those
7  Bates numbers, Counsel?
8          MS. MENDOZA:  1456 to 1485.
9          (Plaintiff's Exhibit 4 marked for
10  identification)
11          (Discussion held off the record)
12          MS. TIERNEY:  Chris, you should look
13  through this whole exhibit.
14  BY MS. TIERNEY:
15      Q.   So what I'm trying to understand is at the
16  time -- my previous question was at the time that
17  Kristina was interviewed in June was she being
18  investigated for the initial fraud February
19  investigation?
20      A.   She was not specifically being investigated.
21  We had -- the larger investigation started to grow
22  actually after we had interviewed Kristina for the
23  initial fraud part.  So she was still on the periphery
24  of that, but we had interviewed her for the fraud
25  pertaining to some of this information prior to this

Deposition of Christopher Castellani                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 80

1  e-mail.

2  Q.   Okay.  And so -- but the fraud part has to do
3  with her purchases or her -- her purchases meaning her
4  Bloomingdale's account or is that separate from her --
5  A.   That's separate.
6  Q.   -- ringing up transactions?
7  A.   That's separate.  The fraud part has to do
8  with diverters and an out -- external group that were
9  compromising our proprietary cards, our Bloomingdale's
10  cards, and doing large amounts of fraudulent purchases
11  and having them sent to various locations.
12  Q.   So BLM1462 if we can go there, this is an
13  e-mail from Abraham Gonzalez?
14  A.   Um-hum.
15  Q.   And who is that?
16  A.   He was one of our central partners in asset
17  protection.
18  Q.   Did you report to him, or did you work
19  together?
20  A.   No.  I reported to Fred at 59th Street.  Abe
21  was a central partner that you could call as peers.  He
22  worked for -- on the corporate central side.  I was in
23  the store.
24  Q.   And so the -- if you look at cc -- who's cc'd
25  on the e-mail, it's Chad McIntosh, right?

Page 81

1  A.   Yes.
2  Q.   Who is that?
3  A.   Chad was the VP of asset protection.
4  Q.   And Peter C-h-i-e?
5  A.   Chie.  Peter was the -- I don't recall his
6  title.  He was Chad's second in command I guess you
7  would say.  I don't remember his title.  Gina, Kaitlin,
8  and Abe were all part of the central team.  They were
9  central investigations.
10  Q.   Okay.  So these are all people in asset
11  protection, correct?
12  A.   Other than Fred and myself, yes -- well, yes,
13  they're all central investigations or AP.  Fred and
14  myself were store.
15  Q.   Right, okay.  And then at the bottom there it
16  says, Chris, Fred.  This is from Abraham to you and to
17  Fred Becker dated June 1st, 2017, I've attached a
18  spreadsheet with information pertaining to three
19  individuals at 59th Street that contribute to 35 percent
20  of all fraud store sends.  And it says that Associate
21  72061886 is the highest fraud store send associate in
22  all of Macy's, Inc. for 2017.
23  A.   Okay.
24  Q.   Was 72061886 is that Kristina?
25  A.   Yes.

Page 82

1  Q.   And Abraham says that for -- in all Macy's,
2  Inc. for 2017.  This is June 1st, 2017.  Did you
3  typically -- was it typically conducted in the middle of
4  the year to see the highest fraud store sends?
5  A.   Not by myself.  I don't know what central
6  did, but I believe this was forwarded from our partners
7  at MCCS or one of those.
8  Q.   And this is again not her purchases on her
9  Bloomingdale's account, these are what she was ringing
10  up, correct?
11  A.   Yes.
12  Q.   And then it says, you can tell it's fraud
13  because the addresses and phone numbers come back to
14  different folks as do the card numbers.  Do you see that
15  there?
16  A.   Yes.
17  Q.   So those addresses that were being
18  investigated were those the same addresses that she was
19  sending to in her Bloomingdale's account -- with her
20  Bloomingdale's account?
21  A.   I don't recall.  This was -- I don't recall
22  specifically what addresses.  There were numerous
23  accounts and addresses.
24  Q.   So at any point did the two conflate I guess
25  the purchases that she was making with her

Page 83

1  Bloomingdale's account with the items that she was
2  ringing up?  Did those two ever -- like I said, did they
3  come together at one point?
4  A.   I don't recall there being a connection.
5  Q.   And so it says 72061886 might have
6  disregarded process to make a sale but we would not --
7  we would not know without an interview.  Can we verify
8  that 72061886 was following the correct process?  Do you
9  see that there?
10  A.   Um-hum.
11  Q.   So is that what you did, meet with your --
12  A.   We actually did that prior to this e-mail
13  being sent, yes.
14  Q.   Was that the February?
15  A.   Yes.
16  Q.   So then at that point in time that 90,000 --
17  what happened after -- well, withdrawn.  If you already
18  did that, then what happened after you informed Abraham
19  that that was already investigated?
20  A.   I think one of -- either my investigators or
21  central investigators continued to look at some of the
22  other people involved.
23  Q.   So then this -- I'm sorry, go ahead.
24  A.   Go ahead.  No, that's fine.
25  Q.   No, please finish.  What were you saying?

Page 84

A.   I was just saying, like I said, we had interviewed Kristina for this information in the initial investigation, the initial conversation, but she would still be in the periphery as you can see they had more information they were documenting.

Q.   So but at that point in time that 90,000 did it have any significance?

MS. TIERNEY:  Objection.

THE WITNESS:  It was the number one person in Macy's, Inc. for write-off which is money we lost for fraudulent activity.

BY MS. TIERNEY:

Q.   And so then did you have a conversation with her about that after?

A.   Not after because she had answered the questions that this posed, so we weren't going to reinterview her unless additional information came forward.  As Abe stated there, she may be disregarding policy or the correct process.  She had already answered those questions.

Q.   And was she found to have been disregarding process or policy?

A.   Not according to the information we had, no.

MS. MENDOZA:  All right, we can stop here.

Page 85

(Recess taken)

BY MS. MENDOZA:

Q.   So going back to Exhibit -- Plaintiff's Exhibit 3 I think it was we determined.  Let's go back to that.  If we go to 885, please.  So looking at the narrative part -- section from you, Christopher.

A.   I have to scroll down more?

Q.   Yes.  I'm looking at the 26 employee purchases part from 10/16 to 4/21/2017 totaling 65,988.  So that came from MCCS.  Is that correct?

A.   Along with our review, yes.

Q.   And, again, that -- the amount is before or after the discount?

A.   I would assume after the discount, that that's the total spent.

Q.   And then it states, if you keep going down, during the conversation where it says API Shanine Gray, during the conversation, Ms. Mikhaylova denied using her discount stating that she paid for all of the merchandise and never received any reimbursement of any kind.  Do you see that?

A.   Um-hum.

Q.   And then it states, she also stated that she bought most of the merchandise for herself as the Chanel shop was going leased and she would not have as good a

Page 86

discount.  Do you see that there?

A.   Yes, correct.

Q.   So again this is going to -- was she stating that she was not -- was she stating there that she had made those purchases for herself because of the discount?

MS. TIERNEY:  Object to the form.  You can answer.

THE WITNESS:  She stated she was making the purchases because they were going to be leased.  They were not going to be a Bloomingdale's-owned merchandise shop, they would be a leased shop.  And under the lease agreement it seemed she was saying their discount would not be as good as the Bloomingdale's employee discount.

BY MS. MENDOZA:

Q.   And then after that it says she did admit that she was shipping the merchandise to friends out of state to avoid the New York State sales tax which employees always do for customers.  Do you see that there?

A.   Yes.

Q.   And so that going back to my previous question in the statement there she did not state that she was making -- she was shipping purchases out of

Page 87

state for herself, right?

MS. TIERNEY:  I'm going to object to the form.  You can answer that.

THE WITNESS:  Could you ask the question again.

BY MS. MENDOZA:

Q.   Yes.  In that sentence she's not stating that she was shipping -- in that sentence she's stating -- withdrawn.  In that sentence she's stating that she was shipping the merchandise out of state for friends to avoid the New York State sales tax, right?

A.   She was shipping it to friends to avoid the sales tax, yes.

Q.   Right.  But she doesn't say there that she was making the purchases for herself, correct?

MS. TIERNEY:  Object to the form.

THE WITNESS:  It was one continuous thought that she bought most of the merchandise for herself and shipped it to friends to avoid New York State sales tax.

BY MS. MENDOZA:

Q.   Is that considered discount abuse?

A.   No.

Q.   Okay.  So discount abuse was for exceeding the amount of -- withdrawn.  Discount abuse would have

Page 88

1 been for making too many purchases with the discount.
2 Is that correct?
3        MS. TIERNEY:  Object to the form.
4        THE WITNESS:  No.
5 BY MS. MENDOZA:
6    Q.   Can you explain what the discount abuse
7 aspect was?
8    A.   Discount abuse is when --
9        MS. TIERNEY:  Object to the form.  You
10 may -- now you may answer, Chris, sorry.
11        THE WITNESS:  Discount abuse is when you
12 make purchases using your personal Bloomingdale's
13 discount and getting reimbursed for it.
14 BY MS. MENDOZA:
15    Q.   Okay.  And she was not doing that here,
16 correct?
17        MS. TIERNEY:  Objection.  You can answer,
18 Chris.  Go ahead.
19        THE WITNESS:  That's what she stated.
20 BY MS. MENDOZA:
21    Q.   Okay.  And did you find that she was?
22    A.   We had no direct proof that she had taken
23 reimbursement, so we did not find discount abuse as part
24 of the investigation.
25    Q.   And so the part that she did admit that she

Page 89

1 was shipping the merchandise to friends out of state to
2 avoid the New York State sales tax, is that discount
3 abuse?
4    A.   No.  That's tax fraud or tax evadance --
5 avoidance, whatever you would like to label it.
6        MS. MENDOZA:  Let's go to Bates stamp
7 1098 to 1110.
8        (Plaintiff's Exhibit 5 marked for
9 identification)
10        THE WITNESS:  You'll have to zoom in a
11 little bit on that.
12 BY MS. MENDOZA:
13    Q.   Take your time in reviewing the document in
14 its entirety and let me know when you're done.
15    A.   Okay.
16    Q.   So this here is Bates stamped if you look at
17 the bottom of it 1098, right?  Do you see that there,
18 that's 1098, right?
19    A.   Um-hum.
20    Q.   So it says -- this is discount guidelines.
21 Is this the discount policy that was in effect during
22 Kristina's employment?
23    A.   Yes, it appears to be.
24    Q.   And is that the same policy that we were --
25 that we've been discussing that you were using or

Page 90

1 applying during your investigation into Kristina's
2 account?
3    A.   Yes.
4    Q.   And it says there at the bottom if you go
5 down, it is your responsibility to maintain your account
6 in good standing and to ensure you and your eligible
7 family members (referred to in this document as
8 authorized buyers) follow the associate discount policy.
9 So do the family members, could spouses and children
10 use the discount as well?
11    A.   If they were listed as authorized users, yes,
12 I believe children up to the -- I'm not sure what age,
13 but if they were in college, I believe they could still
14 use it if you listed them as an authorized user.
15    Q.   Okay.  So then -- and when you say the
16 discount, is it that they had their own -- if they were
17 listed, did they have their own copy of the card, or was
18 it just that they were able to use the same card or same
19 discount?
20    A.   I don't recall if they provided additional
21 cards or not.
22    Q.   And then it says discount guidelines, to
23 qualify for the associate discount a purchase must be --
24 do you see that line there -- must be for your personal
25 use, the personal use of an authorized buyer?

Page 91

1    A.   Yes.
2    Q.   Or a bona fide gift, do you see that
3 bona fide?
4    A.   I do.
5    Q.   So is that -- a bona fide gift, that's what
6 Kristina said she was doing, correct?
7    A.   That's what she told us, yeah.
8    Q.   At any point was Kristina not allowed to use
9 her discount?
10    A.   I believe that -- I believe the MCCS at some
11 point may have locked her account because of their
12 concern with how it was being used.
13    Q.   Do you recall if that was around the
14 February 2017 investigation?
15        MS. TIERNEY:  Object to the form.
16        THE WITNESS:  I believe it was after
17 that.  I think it was in conjunction with later on.
18 BY MS. MENDOZA:
19    Q.   Do you recall if it was unblocked by MCCS?
20    A.   I don't recall that part.
21    Q.   If it was unblocked, what would that mean?
22        MS. TIERNEY:  Object to the form.  You
23 may answer.
24        THE WITNESS:  If it was unblocked, it
25 would mean she could use it again.

Page 92

BY MS. MENDOZA:

Q.   So would it mean that any issues that they had found that those issues no longer exist?

MS. TIERNEY:  Object to the form.  You may answer.

THE WITNESS:  I can't speak for MCCS, but I would say if they decided to unblock it their concerns may have been taken away.  It doesn't necessarily mean there were no other concerns.

BY MS. MENDOZA:

Q.   Right.  And I asked in the sense of what you know in the investigation -- during your investigations if you knew that at a certain point MCCS would say we're going to block this account while you conduct your investigation.  Did they ever do that?

A.   No.  I believe it was blocked as -- prior to our investigation into the discount part we were not -- we did not dictate it being blocked.  It was blocked because of the activity on the card which was then sent to central I believe and possibly copied to us.

MS. MENDOZA:  Can we pull up Exhibit 2040 -- not exhibit sorry, Bates stamp 2040.

MR. GERBER:  Excuse me, what exhibit number will this be?

MS. TIERNEY:  Would be 6.

Page 93

(Plaintiff's Exhibit 6 marked for identification)

MR. GERBER:  That's what I thought.  Thank you.

MS. TIERNEY:  Are there Bates numbers on this one?

MS. MENDOZA:  Yes, there are.

MS. TIERNEY:  I'm not seeing them.

MS. MENDOZA:  Right there, 2040.

BY MS. MENDOZA:

Q.   Are you all done reading it, reviewing it?

A.   Yep.

Q.   Okay, great.  So you see there at the top -- bottom right hand corner, it's the first page there, BLM2040, Bates stamped BLM2040, and this is marked as Plaintiff's Exhibit 6.

A.   Okay.

Q.   At the top of that document it says, the colleague -- your colleague discount privileges.  What was the colleague discount?

A.   I'm sorry?

Q.   What was the difference between the colleague discount versus what Kristina had -- was using?

A.   It's the same.  It's the employee discount.

Q.   Okay.  So then the two are synonymous.  Is

Page 94

that correct?

A.   Yes.

Q.   So why are there two separate documents called --

MS. TIERNEY:  Objection.

BY MS. MENDOZA:

Q.   -- a colleague discount?  And if you know, if you don't know, that's fine, but if you know why there are two separate documents.

A.   I don't know for sure, but I think one may be used for Macy's and one may be used for Bloomingdale's.  It's essentially the same document.

Q.   And when you -- withdrawn.  Did asset protection check items before they were shipped to their destination?

MS. TIERNEY:  Object to the form.  You can answer.

THE WITNESS:  Did asset protection, no, we did not specifically check all items.  There was too high a volume.

BY MS. MENDOZA:

Q.   Which items did you check?

A.   If there was anything checked, it was by another part of asset protection, and it would have been random.

Page 95

MS. MENDOZA:  And 61 to 66 if you could pull that up as the next exhibit.  This will be marked Plaintiff's Exhibit 7 Bates stamped BLM61 to 66.

(Plaintiff's Exhibit 7 marked for identification)

BY MS. MENDOZA:

Q.   Going to BLM 000063 it says, the associate discount.  Do you see that there?

A.   Yes.

Q.   All right.  The employee discount it talks about it there.  And then the next part says, violations are serious and discount rules.  Was this in the employee handbook during -- withdrawn.  Was this the policy at the time of Kristina's employment?

A.   It appears to be, yes.

Q.   And was this the policy that you referred to during your investigation into Kristina's purchases?

A.   It would have been part of it, yes.

Q.   And it doesn't talk about shipping, correct?  Is there any mention about shipping there?

MS. TIERNEY:  Object to the form.

THE WITNESS:  Shipping isn't part of the discount policy.

BY MS. MENDOZA:

Q.   Right.  But you're not -- it doesn't say that

Page 96

1  you're not allowed to use the discount to ship items,
2  correct?
3      A.   Correct, because shipping is not part of the
4  discount policy.  Shipping is paid separately if there's
5  a shipping fee.
6      Q.   And then at the bottom it says, who is
7  eligible, all Bloomingdale's employees are eligible for
8  an employee discount, in addition, your spouse and your
9  unmarried, dependent children.  Is that fair?
10     A.   Um-hum.
11     Q.   So could an employee say I am purchasing this
12 for my husband, or did it have to be that -- or was it
13 that the husband or spouse had to make the purchase on
14 their own using the employee discount?
15          MS. TIERNEY:  Object to the form.  You
16 can answer.
17          THE WITNESS:  An employee can buy
18 anything they want for anybody they want as long as they
19 paid for it, they were not reimbursed.  That statement
20 is talking about an eligible dependent or a spouse
21 that's listed as -- a user can also use the account, but
22 as far as discount abuse is concerned, it's when an
23 employee receives reimbursement for purchases made for
24 someone else.
25 BY MS. MENDOZA:

Page 97

1      Q.   I'm referring to the bottom portion, the who
2  is eligible, and so I just want to know if the -- if in
3  looking at a Bloomingdale's account, so, for example, if
4  you're looking at Kristina's account and there is
5  purchases on there, would it say the purchase was made
6  by the spouse who is an authorized buyer?
7      A.   In looking at a transaction specifically?
8      Q.   Yes.
9      A.   No.  It would be under her account.
10     Q.   Okay.  So all of it would show up that it was
11 as if she purchased it all, correct?
12     A.   Yes.  She's responsible for that account.
13     Q.   Okay.  And so in part of your investigation
14 do you -- did you distinguish if the purchases were made
15 by any other authorized buyer?
16     A.   We didn't see any evidence that there was
17 anyone else making a purchase, nor do I recall her
18 having any other authorized buyers.  You have to state
19 who an authorized buyer is.
20     Q.   And then if we keep going down to the policy,
21 it says that on 64, BLM000064, the last paragraph,
22 employees and dependents must use an associate charge or
23 prepaid card to receive a discount.  The discount will
24 be taken back office from the charge account bill each
25 month.  In other words, the discount will not appear on

Page 98

1  the transaction receipt but will be reflected as a
2  credit on the bill.  See that there?
3      A.   I'm trying to find it.
4      Q.   Sorry, you're not looking at it.  It's not
5  showing up.  There it is, that last paragraph, employees
6  and dependents.
7      A.   Okay, I see it.
8      Q.   Okay.  So during you investigation, did you
9  look at Kristina -- for the 65,000 was it looking at the
10 receipts, or was it looking at her bill for each month?
11     A.   It was a combination of both through the MCCS
12 and our systems.
13     Q.   But they would reflect the different amount
14 on each, correct?  Based on this, wouldn't the
15 transaction receipts not include the discount but the
16 credit -- but the bill for each month would appear --
17 would have the discount, correct?
18     A.   That's what that's stating, I believe, yes.
19     Q.   And do you recall if there was a difference
20 during your investigation that you found between the
21 two?
22     A.   I don't recall.  We were working mainly off
23 the numbers from the MCCS to determine the numbers.  We
24 pulled the receipts to verify the transactions.  We
25 didn't add up every transaction.  We pulled all of her

Page 99

1  receipts to verify that it was her card.  But the
2  majority of the numbers were crunched by MCCS.
3      Q.   When you say those were her numbers, those
4  were the charges made on the card.  Is that correct?
5      A.   Yes.  So the 65,000 that was supplied by MCCS
6  was her total from her account.
7      Q.   Right.  But looking at her receipts, correct?
8      A.   No.  That would be them pulling it directly
9  from her account.
10     Q.   And you looked at -- but you looked at the
11 receipts?
12     A.   We pulled the matching receipts to verify
13 that it was her account.
14     Q.   And we can go to -- if you go down to 66, and
15 in here it talks about Federated Employee Discount
16 Program.  See that there?
17     A.   Um-hum.
18     Q.   Do you know what that was?
19     A.   It's the employee discount program for
20 Federated which is Macy's/Bloomingdale's, whatever they
21 own.
22     Q.   So was this an additional discount?
23     A.   No.  It's -- it extended to Macy's or
24 Bloomingdale's employees.  I never shopped in any of
25 those places, but I'm assuming that you could use your

Page 100

1  discount at other locations.
2      Q.   And then you see it says, when you cross-shop
3  at other Federated divisions, keep the following
4  important points in mind.  You see that there?
5      A.   Um-hum.
6      Q.   And it says, the discount is 20 percent on
7  most items, 10 percent for selected home departments.
8  The discount is applied back office.  And then it says,
9  all purchases will be charged to the revolving/flex
10  account type only.  What is the revolving/flex account?
11      A.   I don't know what a revolving/flex account
12  is.  I know that we had two options, to have a regular
13  Bloomingdale's account in our name or a prepaid card.
14      Q.   So you're not aware if Kristina had a
15  revolving flex account?
16      A.   I do not know what that is.  I know she had a
17  prepaid account.
18      Q.   Let's look at 1486-1515.
19      A.   Is there more than one page?
20      Q.   Yes.
21          (Plaintiff's Exhibit 8 marked for
22  identification)
23  BY MS. MENDOZA:
24      Q.   Let's turn to Bates stamp 1497 and 1498.  So
25  when you're -- just for clarification purposes, are

Page 101

1  you -- when you were looking at the -- when you look at
2  the receipts for a purchase made by Kristina, what --
3  how does it differentiate than this document -- this
4  document here which is 1498?  If you look at 1498, you
5  see there it says, send to name, and then there's
6  Margaret Roberts and then sender Kristina Chanel?
7      A.   They're essentially the same printout except
8  one would be with Kristina's card number and her
9  information.
10      Q.   So it would say sender Kristina, send to, and
11  then the address would be Kristina as well?
12      A.   No.  If she was shipping it somewhere else,
13  she would put another name perhaps if she was sending it
14  to a friend.
15      Q.   So then you're looking at the -- so then to
16  distinguish that that is for her, a purchase for her and
17  not that she's ringing up someone, you're saying that
18  you would look at the -- where would you --
19      A.   She wouldn't be allowed to ring up herself.
20  That would be a problem.
21      Q.   Okay.
22      A.   So it would be another associate number at
23  the top.  This one has Kristina's number at the top
24  under where it says journal start time all that is
25  Kristina ringing up a customer.

Page 102

1      Q.   Right.
2      A.   So if Kristina got rung up by someone else,
3  it would be -- we would be looking at -- instead of
4  American Express, we would be looking at Bloomingdale's
5  account that is Kristina's account number.
6      Q.   Okay.
7      A.   And if she sent it somewhere, she would
8  put -- she would have the associate input the address
9  she wanted to send it to.
10      Q.   Right, okay.  But it wouldn't be the 7 -- or,
11  no, it would be the 720 as the journal --
12      A.   No.  That would be another associate.  The
13  72061886 that's at the top of this transaction is
14  Kristina as the associate ringing or the employee
15  ringing the sale.
16      Q.   Okay.
17      A.   So under hers there were other associates
18  ringing her sales.
19      Q.   And if we keep going down to -- no.  I think
20  that's it.  As part of the investigation, do you collect
21  bank statements from employees?
22      A.   Collect bank statements?
23      Q.   Yes.
24      A.   Their personal bank statements?
25      Q.   Yes.

Page 103

1      A.   No.
2      Q.   How do you verify where they're getting money
3  from?
4      A.   We would only have an issue if they admitted
5  they took money from somebody else, or in some instances
6  we may see them take money from someone else, or someone
7  else may use a bank card to have paid a balance to their
8  card if they were paying a prepaid card.
9      Q.   As part of your investigation, why wouldn't
10  you collect bank statements, personal bank statements,
11  from employees if they are potential resellers?
12      A.   Because I'm not law enforcement and I don't
13  have the power of subpoena for them to give me their
14  bank statements.
15      Q.   And do you know if once it's handed over --
16  withdrawn.  Have any of the investigations been handed
17  over to law enforcement during Kristina's employment?
18      A.   During this particular investigation, I
19  believe there were some referred to law enforcement, but
20  I was not involved in those.
21          MS. MENDOZA:  And sorry to pull it back
22  up.  The last Plaintiff's Exhibit was it 7 or 8, the
23  last one we just had up, 1486 to 1515?
24          MR. MESSNER:  It would be Exhibit 8,
25  Counsel.

Deposition of Christopher Castellani

Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 104

1  MS. MENDOZA: If you go to page Bates
2 stamped BLM001491 of Plaintiff's Bates stamp -- marked
3 Plaintiff's Bates stamp -- marked Plaintiff's Exhibit 8,
4 my apologies.
5 BY MS. MENDOZA:
6  Q. If we go to the bottom of that page, do you
7 see there's an e-mail from you Sunday, June 4th, 2017 to
8 Abraham Gonzalez and Fred Becker? Do you see that
9 there?
10  A. I do.
11  Q. And the last paragraph you state that this
12 same associate, which at the top you mention is
13 associate Kristina Mikhaylova, at the bottom you state
14 in the last paragraph, this same associate is scheduled
15 to be interviewed again on Tuesday, June 6th as through
16 further investigation it now appears she is violating
17 the employee discount policy and potentially reselling
18 through her family members. Do you see that there?
19  A. Yes.
20  Q. Okay. So at that time did you believe that
21 she was reselling through her family members?
22  A. I believe she was reselling and based on some
23 of the information she was shipping to family members,
24 so that's the tie-in.
25  Q. How did you know they were family members?

Page 105

1  A. Because on some of her purchases I believe
2 she used the last name Mikhaylova where she was sending
3 them to.
4  Q. When you did your investigation and you took
5 Kristina's statement, was she allowed to not give a
6 statement if she didn't want to?
7  A. She could have refused, yes.
8  Q. And have any employees been suspended or
9 received any repercussions for not writing a statement?
10  A. I'm sorry, can you repeat that.
11  Q. Do all employees that are interviewed write a
12 statement?
13  A. Generally speaking, yes, if it's a formal
14 interview, we'll ask everyone to write a statement.
15  Q. And if -- and what if they refuse?
16  A. Then we will make note that they refused, and
17 we'll write up our summary including the fact that they
18 refused to write their own statement.
19  Q. And do they get a suspension notice if they
20 refuse to write a statement?
21  A. They get a suspension notice if we're
22 suspending them for what the interview and the
23 investigation uncovered, not because they refused to
24 write a statement.
25  Q. And did some -- but were some suspensions --

Page 106

1 were the employees -- withdrawn. Were the employees
2 required to contact HR within a certain amount of time
3 period or else it was considered a voluntary
4 resignation?
5  A. I believe that is part of the suspension
6 notice, yes.
7  Q. And did Kristina get that?
8  A. Yes.
9  Q. Do you know what the protocol is while
10 someone is suspended?
11  MS. TIERNEY: Object to the form. You
12 may answer.
13  THE WITNESS: I don't know the specifics.
14 I know that we direct them to contact within I think
15 it's 48 hours. Other than that, that's HR's realm.
16 BY MS. MENDOZA:
17  Q. But you're not involved in any decision
18 making regarding that employee's continued employment?
19  A. No.
20  Q. Okay. And do you know who Tyler Rose is or
21 was?
22  A. I believe that's another associate. I know
23 the name.
24  Q. Do you know if he was shipping to the same
25 address as Kristina?

Page 107

1  A. I do not recall if he was.
2  Q. Do you know if he was terminated?
3  A. Not a hundred percent but -- no, I don't
4 know -- I don't recall if Tyler was.
5  Q. Meaning you don't recall that he was
6 terminated?
7  A. I do not remember if Tyler was terminated or
8 not.
9  MS. MENDOZA: Let's pull up 1576 to 1605,
10 please, mark this as Plaintiff's Exhibit 9.
11  (Plaintiff's Exhibit 9 marked for
12 identification.)
13  MS. TIERNEY: What were the Bates, 1576
14 to what?
15  MS. MENDOZA: 1605.
16  MS. TIERNEY: Thank you.
17 BY MS. MENDOZA:
18  Q. So starting with this exhibit -- the document
19 marked Plaintiff's Exhibit 9 Bates stamped the first
20 page there at the bottom you see there Bates stamped
21 BLM001576. See that there?
22  A. Yes.
23  Q. And so this is about Tyler Rose, right? Do
24 you see that there, investigative summary?
25  A. Yes.

Deposition of Christopher Castellani                      Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 108

1  Q.   And was this done after Kristina's
2  termination?
3  A.   I believe so, yes.
4  Q.   And then if you go down, it says discount
5  abuse, and it looks -- appears that Tyler Rose shipped
6  his personal Chanel handbag a purchase address in
7  New Hampshire where the shipping fee is waived on
8  4/21/2017, purchases were made and shipped to Yu Yu Lai
9  at that address.  Do you see that there?
10  A.   Yes.
11  Q.   And then if you go down, you continue going
12  past that to the -- yes, the transactions.  So it says
13  the journal -- as you stated before, so the date send
14  purchase 4/21/2017, and then journal you see it says
15  72061886.  You see that there?
16  A.   Yes.
17  Q.   So that would be based on what you said
18  before that Kristina rung up Tyler Rose.  Is that
19  correct?
20  A.   She's the cashier, yes.
21  Q.   So then would it be that Kristina was sending
22  to -- if we go back up to the investigative summary, so
23  was it that Tyler Rose was shipping to that Yu Yu Lai
24  address on that date, or was it Kristina?
25  A.   I believe there was one transaction, if I'm

Page 109

1  reading it correctly, that Tyler made and shipped to
2  Yu Yu.
3  Q.   Okay.  And going to 1577 there in the second
4  paragraph it says, after explaining how investigations
5  were conducted, Rose was asked to speak about the last
6  time that he'd gained profit from a purchase he'd made.
7  And in this here it's requested that Rose make a
8  statement, but do you recall if Rose declined to make a
9  statement -- to write a statement?
10  A.   I believe Tyler did refuse.
11  Q.   And then it states that after he refused, if
12  you look at the fourth line from the second paragraph,
13  the end of the second paragraph, there it says, Asset
14  Protection Manager Chris Castellani was updated on the
15  conversation and stepped into the office to continue the
16  conversation.  Upon exiting, Castellani advised Rivera
17  to take a statement from Rose.  Rivera stepped back into
18  the office and began explaining the purposes of the
19  written statement.  Rose stated that he did not want to
20  make a statement.  Rivera exited the office again and
21  spoke with Castellani.  At this point after partnering
22  with central investigation team, Castellani suspended
23  Rose pending further review by employee relations.  Why
24  did you suspend Rose at that point?
25  A.   Because the central investigations team who

Page 110

1  was leading this investigation was not present, and in
2  partnering with them they told me to suspend until it
3  could be further reviewed.
4  Q.   Okay.  And was it encouraged for employees to
5  write a statement?
6  A.   If by encouraged you mean we let them know
7  that they can write a statement in their words to
8  present their side of it to employee relations or HR, I
9  guess that's encouragement.
10  Q.   But are they encouraged again after they
11  refuse?
12  A.   I think we would just reiterate that it's
13  your opportunity to write a statement about what we
14  spoke about, and if you don't care to that that's fine,
15  we'll submit our summary.
16  Q.   And is there a difference between employee
17  relations and HR?
18  A.   No.
19  Q.   After reviewing that document, do you recall
20  if Tyler was suspended -- my apologies, do you recall if
21  Tyler was terminated?
22  A.   I don't recall, no.  There was nothing there
23  to indicate.
24  Q.   Do you recall your conversations with HR
25  afterwards?

Page 111

1  A.   I don't know that I had any direct
2  conversations.  It would have either been Robert who did
3  the investigation and the interview or someone from
4  central who was overseeing the larger interview.
5  Q.   Okay.
6  A.   Only a manager could suspend, so one of us
7  had to be present if we were going to suspend an
8  employee.
9  Q.   I see.  At the time that you investigated
10  Kristina did you know that she was pregnant?
11  A.   No.
12  Q.   And at the time that you interviewed Kristina
13  did you know that she was pregnant?
14  A.   No.
15  Q.   At any point did you know that she was on
16  FMLA leave?
17  MS. TIERNEY:  Object to the form.  You
18  may answer.
19  THE WITNESS:  I think after the fact of
20  everything someone may have said she was pregnant but
21  not during the investigative process.
22  BY MS. MENDOZA:
23  Q.   So you're saying after everything.  Do you
24  mean that after her termination?
25  A.   Yeah.  It was shortly after we closed out the

Page 112

1  investigation, so I would say it was after the
2  investigation was done.
3       Q.   Was it during her suspension?
4       A.   I don't think so.  I don't recall being told
5  in those few days interim anything about a pregnancy.
6       Q.   And did you have any conversations with Cathy
7  Younis regarding the investigation into Kristina's
8  account?
9       A.   Other than to inform them that we would be
10 doing a conversation through I believe e-mail.  That's
11 the only conversation I recall.
12      Q.   And at what point did you have that
13 conversation?
14      A.   We would have sent out an e-mail maybe a day
15 prior to the conversation, so June 5th maybe we would
16 have sent an e-mail to any stakeholder, HR who oversaw
17 the department which apparently was Richard, Cathy as
18 her manager so they would know that we would be taking
19 one of their employees off the floor for a conversation.
20      Q.   So that's for the interview, correct?
21      A.   Yes.
22      Q.   And did you have any conversations with Denis
23 regarding the investigation into Kristina Mikhaylova's
24 purchases?
25      A.   No.

Page 113

1       Q.   Did you have any conversations with Denis
2  regarding Kristina's suspension?
3       A.   No.
4       Q.   Did you have any conversations with Denis
5  regarding her -- Kristina's potential for reselling?
6       A.   No.
7       Q.   And did you have any conversations with Cathy
8  or Denis regarding the addresses that Kristina was
9  shipping to?
10      A.   Not that I recall, no.
11      Q.   And now going back to your termination from
12 Soho, was it -- withdrawn.  Was your termination
13 regarding your investigation into employee discount
14 abuse?
15      A.   I'm sorry, my termination?
16      Q.   Yes.
17      A.   Was it related to me investigating employee
18 discount abuse, no.
19      Q.   So we'll go back.  So you were -- why were
20 you terminated again?
21           MS. TIERNEY:  Object to form.  You may
22 answer.
23           THE WITNESS:  As I said, they put
24 substandard job performance.
25 BY MS. MENDOZA:

Page 114

1       Q.   Okay.  And did you state that it was because
2  of the way that Sarah -- withdrawn.  Was it because you
3  didn't agree with the director's policies at that time?
4       A.   We disagreed on how my team should be managed
5  and how certain aspects of loss prevention and asset
6  protection in the store were carried out.
7       Q.   And did any of those issues involve the same
8  issues in which Kristina was investigated?
9       A.   No.
10           MS. MENDOZA:  I will reserve time for now
11 if you have any questions, but otherwise I'll take a few
12 minutes to look back, but I think I'm pretty much done.
13           MS. TIERNEY:  Yeah, I don't have
14 anything.
15           MS. MENDOZA:  Okay.  Just give me two
16 minutes to doublecheck.  Thank you.
17           (Recess taken)
18 BY MS. MENDOZA:
19      Q.   Do you recall when Angy Lee was terminated?
20           MS. TIERNEY:  Are you back?  Okay, okay.
21 Sorry, didn't know you were back.
22           THE WITNESS:  I'm sorry, what was that?
23 BY MS. MENDOZA:
24      Q.   Do you want the question again?
25      A.   Yes, please.

Page 115

1       Q.   Okay.  The question is do you recall when
2  Angy Lee was terminated?
3       A.   I don't know an exact date.  I believe it was
4  a few months after Kristina.
5       Q.   Does September 26th sound about right, 2017?
6       A.   Again, I don't remember a specific date, but
7  it would be in the records.
8           MS. MENDOZA:  Let's pull 1964.
9           MS. TIERNEY:  This is Exhibit 10.
10          MS. MENDOZA:  Yes.
11          (Plaintiff's Exhibit 10 marked for
12 identification)
13 BY MS. MENDOZA:
14      Q.   Go ahead, take a look at the document,
15 Plaintiff's Exhibit 10 Bates stamped BLM001952.
16      A.   Okay.
17      Q.   So you see the date there is September 26th,
18 2017?
19      A.   Correct.
20      Q.   And do you see that -- so does that refresh
21 your recollection that -- withdrawn.  So do you recall
22 if during that time Angy Lee was being investigated for
23 potential reselling?
24      A.   It appears to be, yes.
25      Q.   Did you conduct the investigation into --

Page 116

1   A.   No.
2   Q.   -- Angy Lee?
3   A.   No, I didn't.
4   Q.   Did you supervise it?
5   A.   No.  Gina who is there was a central manager
6   of investigations.
7   Q.   And do you know why it took so long between
8   June when Kristina was terminated and September why Angy
9   was -- why it took so long for Angy to be investigated?
10  A.   I don't believe it took long to be
11  investigated.  It took -- I believe it took a longer
12  time to complete the investigation because of some of
13  the information developed throughout the investigation.
14  Q.   But was Angy being investigated for the fraud
15  of credit card use -- credit card --
16  A.   She was part of the overall investigation
17  into fraudulent credit card purchases and shipping to
18  resellers.
19  Q.   Shipping to resellers from her account?
20  A.   I don't recall.  I know that she is connected
21  to Yu Yu Lai I believe who is a reseller.  There are
22  numerous transactions I believe involved that were being
23  shipped to other places as well.  There's a connection
24  between Yu Yu Lai and what Kristina was shipping to the
25  same address.

Page 117

1   Q.   Was there any determination of that?
2   A.   Any determination of what?
3   Q.   That you're saying that Yu Yu Lai was a
4   reseller.
5   A.   As we discussed earlier, that was part of the
6   investigation in which people like Angy Lee admitted to
7   selling and shipping to Yu Yu Lai as a reseller.
8   Q.   Right, because -- right, that's what she has
9   stated, right?  But there was no proof or evidence
10  besides her statement, correct?
11       MS. TIERNEY:  Object to the form.  You
12  can answer.
13       THE WITNESS:  So if you go through all of
14  those documents we scrolled through earlier, those are
15  all her website and articles about her selling.  We did
16  not to my knowledge prosecute Yu Yu Lai.  We
17  investigated the internal side, and their admission was
18  that they were selling to Yu Yu Lai and other people
19  that were known resellers.
20  BY MS. MENDOZA:
21  Q.   Okay.  But my question is, did you have any
22  proof that that location that you're mentioning was a
23  known reseller of the merchandise being purchased at
24  Bloomingdale's at 59th Street?
25       MS. TIERNEY:  Object to form.  You can

Page 118

1   answer.
2       THE WITNESS:  Only based on what the
3   employees told us during their conversations.
4   BY MS. MENDOZA:
5   Q.   Okay, thank you.  And have you understood all
6   my questions today?
7   A.   Yes.
8   Q.   And would you like to change any of your
9   answers?
10  A.   No.
11       MS. MENDOZA:  I have no further
12  questions.
13       MS. TIERNEY:  We don't have anything.
14  Thank you so much, Chris.
15       THE COURT REPORTER:  Would you like a
16  copy, Attorney Tierney?
17       MS. TIERNEY:  Steve and I are partners,
18  so I just need one copy.
19       (The deposition concluded at 4:12 p.m.)
20
21
22
23
24
25

1              COMMONWEALTH OF PENNSYLVANIA :

2              COUNTY OF YORK                    :

3                   I, Bethann M. Rogers, Reporter and Notary
     Public in and for the Commonwealth of Pennsylvania and
4    County of York, do hereby certify that the foregoing
     deposition was taken before me at the time and place
5    hereinbefore set forth, and that it is the testimony of:

6                   CHRISTOPHER CASTELLANI

7                   I further certify that said witness was
     by me duly sworn to testify the whole and complete truth
8    in said cause; that the testimony then given was
     reported by me stenographically, and subsequently
9    transcribed under my direction and supervision; and that
     the foregoing is a full, true and correct transcript of
10   my original shorthand notes.

11

12                  I further certify that I am not counsel
     for or related to any of the parties to the foregoing
13   cause, or employed by them or their attorneys, and am
     not interested in the subject matter or outcome thereof.

14

15                  Dated at York, Pennsylvania this 23rd day
     of November, 2022.

16

17

18                                  _____
                                    Bethann M. Rogers
19                                  Registered Professional Reporter
                                    Notary Public

20

21                  The foregoing certification of this
     transcript does not apply to any reproduction of the
22   same by any means unless under the direct control and/or
     supervision of the certifying reporter.

23

24

25

```
 1                INSTRUCTIONS TO WITNESS

 2             Please read your deposition over

 3   carefully and make any necessary corrections.  You

 4   should state the reason in the appropriate space on the

 5   Errata Sheet for any corrections that are made.  After

 6   doing so, please sign the errata sheet and date it.

 7             You are signing same subject to the

 8   changes you have noted on the errata sheet, which will

 9   be attached to your deposition.

10             It is imperative that you return the

11   original errata sheet to the deposing attorney within

12   thirty (30) days of receipt of the deposition transcript

13   by you, copying all other counsel and myself.  If you

14   fail to do so, the deposition transcript may be deemed

15   to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24

25
```

```
 1                 E R R A T A   S H E E T

 2     PAGE      LINE        CHANGE

 3     _____   _____     _____

 4     _____   _____     _____

 5     _____   _____     _____

 6     _____   _____     _____

 7     _____   _____     _____

 8     _____   _____     _____

 9     _____   _____     _____

10     _____   _____     _____

11     _____   _____     _____

12     _____   _____     _____

13     _____   _____     _____

14     _____   _____     _____

15     _____   _____     _____

16     _____   _____     _____

17     _____   _____     _____

18     _____   _____     _____

19     _____   _____     _____

20     _____   _____     _____

21     _____   _____     _____

22     _____   _____     _____

23     _____   _____     _____

24     _____   _____     _____

25     _____   _____     _____
```

1                   ACKNOWLEDGMENT OF DEPONENT

2        I, CHRISTOPHER CASTELLANI, do hereby certify that
   I have read the foregoing pages and that the same is a
3  correct transcription of the answers given by me to the
   questions therein propounded, except for the corrections
4  or changes in form or substance, if any, noted in the
   attached Errata Sheet.

5

6                          _____

7                          CHRISTOPHER CASTELLANI

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:19-cv-08927-GBD-SLC   Document 128-5   Filed 09/20/23   Page 38 of 63

Deposition of Christopher Castellani                          Kristina Mikhaylova v. Bloomingdale's Inc., et al.

## WORD INDEX

**< $ >**
**$65,000**   47:*21*   48:7
50:*25*

**< 0 >**
**000063**   95:7
**07004**   2:*13*

**< 1 >**
**1**   3:9   41:*13*   42:*21,*
*25*
**1:48**   69:22
**10**   3:*23*   100:7   115:*9,*
*11, 15*
**10/16**   76:2   85:9
**100**   3:*20*   26:*1*
**10001**   2:9
**10119**   2:4
**107**   2:*13*   3:*20*
**1098**   89:7, *17, 18*
**11:07**   1:*20*
**1110**   89:7
**115**   3:*23*
**1456**   79:*4, 8*
**1485**   79:*5, 8*
**1486**   103:*23*
**1486-1515**   100:*18*
**1497**   100:*24*
**1498**   100:*24*   101:*4*
**15**   1:*20*
**151**   2:8
**1515**   103:*23*
**1576**   107:*9, 13*
**1577**   109:*3*
**1605**   107:*9, 15*
**165**   2:*13*
**19**   20:*14*
**1964**   115:8
**1986**   12:*13*
**19-8927**   1:*1*
**1995**   20:*13*
**1st**   81:*17*   82:2

**< 2 >**
**2**   3:9   69:*4, 9, 15*
**20**   20:*20*   100:6
**2016**   4:*16*   18:*13, 18*
70:*15*

**2017**   4:*16*   18:*13*
45:*5, 6*   52:*1*   69:22
78:*17*   81:*17, 22*   82:2
91:*14*   104:7   115:*5,*
*18*
**2019**   13:*17*   14:*24*
15:*11, 12*
**2020**   13:*18, 19*
**2022**   1:*20*   119:*15*
**2040**   92:*22*   93:9
**20th**   4:*16*
**212)494-1621**   2:9
**212)587-0760**   2:4
**23rd**   119:*13*
**24**   6:*20, 23*
**26**   76:*1*   85:8
**26th**   115:*5, 17*
**2M**   25:8

**< 3 >**
**3**   1:9   3:*12*   73:*19, 20,*
*23*   85:4
**30**   120:*12*
**34TH**   2:8
**35**   81:*19*
**379**   41:*21*   42:2, *12*
**380**   41:*9, 10, 18*   42:2
43:*3*

**< 4 >**
**4**   3:2, *13*   79:9
**4/21/17**   76:2
**4/21/2017**   85:9   108:*8,*
*14*
**4:12**   118:*19*
**42**   3:9
**48**   106:*15*
**4905**   2:3
**4th**   46:*14*   104:7

**< 5 >**
**5**   3:*13*   73:*25*   89:8
**59th**   4:*12*   17:*19*
18:*19, 21*   19:2, *22, 24*
21:*12, 13*   22:*17*   24:8,
*24*   25:*24*   28:*3*   29:*1*
35:*20*   37:*10, 17, 18*
58:*1*   75:*13*   80:*20*
81:*19*   117:*24*

**5th**   112:*15*

**< 6 >**
**6**   3:*15*   69:22   92:*25*
93:*1, 16*
**61**   95:*1*
**64**   97:*21*
**65,000**   48:6   56:*17*
66:*14*   98:9   99:5
**65,988**   76:2   85:9
**66**   95:*1, 3*   99:*14*
**69**   3:9
**6th**   52:*1, 2*   104:*15*

**< 7 >**
**7**   3:*17*   95:*3, 4*
102:*10*   103:22
**720**   102:*11*
**72061886**   81:*21, 24*
83:*5, 8*   102:*13*
108:*15*
**73**   3:*12*
**79**   3:*13*

**< 8 >**
**8**   3:*20*   100:*21*
103:*22, 24*   104:*3*
**884**   73:*24*
**885**   74:9, *17*   85:5
**888**   69:*1*
**89**   3:*13*   13:*1*

**< 9 >**
**9**   3:*20*   107:*10, 11, 19*
**90,000**   83:*16*   84:6
**91**   13:2
**93**   3:*15*
**95**   3:*17*
**96**   20:*13*
**973)256-9000**   2:*14*

**< A >**
**A.M**   1:*20*
**A/K/A**   1:9
**abbreviation**   74:22
75:*10*
**Abe**   80:*20*   81:8
84:*18*
**ability**   6:*16*
**able**   69:*16*   90:*18*

**Abraham**   80:*13*
81:*16*   82:*1*   83:*18*
104:8
**abuse**   34:22   39:22,
*25*   40:*16*   43:*4, 6, 7, 8*
47:*23*   51:9   56:8
71:*6, 19, 25*   72:*24*
73:*5, 14*   87:22, *24, 25*
88:*6, 8, 11, 23*   89:*3*
96:22   108:5   113:*14,*
*18*
**abuses**   43:9
**accept**   53:*11*
**access**   23:22   37:*25*
38:*3, 5, 10, 13, 14, 17,*
*21, 25*   39:*5, 6*
**Account**   3:*15, 17*
40:*4, 7, 8, 9*   48:*16*
49:*17*   70:*17*   75:*24,*
*25*   76:9   78:*10*   80:4
82:9, *19, 20*   83:*1*
90:*2, 5*   91:*11*   92:*14*
96:*21*   97:*3, 4, 9, 12,*
*24*   99:*6, 9, 13*   100:*10,*
*11, 13, 15, 17*   102:5
112:8   116:*19*
**accountable**   16:*16*
**accounts**   40:*5, 6*
48:*19*   76:5   82:*23*
**accurate**   120:*15*
**ACKNOWLEDGMEN
T**   122:*1*
**act**   54:*25*   59:*21*
**action**   15:*4, 6, 8, 13,*
*20, 24*   16:*6, 12*   20:5
22:*4, 6, 10*   27:2
46:*21*
**activity**   11:2   30:22
31:*10*   49:*3*   51:*1, 21*
57:*12*   84:*11*   92:*19*
**add**   98:*25*
**addition**   96:8
**additional**   46:*1*
47:*18*   84:*17*   90:*20*
99:22
**address**   37:2   39:*13*
64:9, *10, 20*   101:*11*
102:8   106:*25*   108:*6,*
*9, 24*   116:*25*

Case 1:19-cv-08927-GBD-SLC   Document 128-5   Filed 09/20/23   Page 39 of 63

Deposition of Christopher Castellani                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

addresses 62:22
64:10 82:13, 17, 18,
22, 23 113:8
adjustments 44:3
admission 45:25
60:16 117:17
admit 59:21 86:17
88:25
admitted 53:20 54:6,
15 58:20 59:2 63:7
64:17 65:1 103:4
117:6
admonish 8:6
advertise 57:20
advised 109:16
AFL-CIO 1:9
age 90:12
agency 59:12
ago 7:10, 15 13:15,
16 25:6
agree 14:18 114:3
agreement 55:16
86:13
agreements 41:4
ahead 10:14 63:22
83:23, 24 88:18
115:14
alarm 23:18 24:3
alerted 33:8
allowed 44:13 54:1,
5 63:9, 12 91:8 96:1
101:19 105:5
American 102:4
amount 41:6 45:1,
17 48:6, 12 49:16
50:25 51:1, 15 70:18
76:24 77:4, 9, 19
85:12 87:25 98:13
106:2
amounts 80:10
and/or 119:22
Angy 65:17, 18
114:19 115:2, 22
116:2, 8, 9, 14 117:6
anonymous 35:1
answer 5:5, 11, 12, 20
6:16 8:21 10:18
11:6 14:9 15:18
16:14 21:18 23:11
24:24 26:6, 16 28:14

29:21 30:11 31:18
32:22 36:2, 12 37:13
38:12 39:2 40:25
43:18 45:10 49:14,
25 50:7 51:17 53:19
54:4, 13 56:22 58:7,
14 59:9 61:13 62:1,
9 63:6 67:14 68:13
70:3 71:20 72:22
77:1, 11 78:13 86:8
87:3 88:10, 17 91:23
92:5 94:17 96:16
106:12 111:18
113:22 117:12 118:1
answered 61:3 84:15,
19
answering 6:13
answers 42:19 118:9
122:3
answer's 52:24
anybody 43:19 51:5
96:18
AP 16:20 36:21
81:13
API 85:17
apologies 73:24
104:4 110:20
apparently 112:17
appear 97:25 98:16
APPEARANCES 2:1
appears 89:23 95:15
104:16 108:5 115:24
applicable 49:21
50:10
applied 100:8
apply 43:19 119:21
applying 90:1
appropriate 120:4
approve 38:6
Approximate 15:10
approximately 17:14,
15 18:12 20:14 48:7
April 4:16 18:13
area 21:5 28:10, 18
29:3
areas 28:25 33:12
argumentative 72:6
78:7
arguments 72:7
articles 117:15

asked 5:5 18:23
19:5 33:5 53:8, 10
72:12 92:11 109:5
asking 4:14 5:1, 10
6:1 33:7 36:7 42:5
50:12 55:13 56:11
57:22 58:10 67:9
aspect 45:7 51:2
56:8, 9 59:20 67:16,
19 88:7
aspects 114:5
asset 13:12 14:20
16:25 17:1, 21 18:1,
15, 23 19:16, 25 21:2
22:2, 21 23:8, 12
24:10, 17 25:14 26:3,
8 29:25 30:8, 15
31:16, 25 33:17
36:20, 23, 24 37:16
38:1, 9 68:2, 3 76:6
77:14 80:16 81:3, 10
94:13, 18, 24 109:13
114:5
assets 23:16
assistance 17:6
assisted 75:9, 17
Associate 3:13 51:2
81:20, 21 90:8, 23
95:7 97:22 101:22
102:8, 12, 14 104:12,
13, 14 106:22
associated 40:12
43:22 45:17 64:12
associates 64:6, 16
65:15, 18 66:20
102:17
associate's 12:19, 22
13:1
assume 6:8 15:20
24:24 50:20 77:2
85:14
assumed 50:23
assuming 44:25
99:25
assumption 51:11
attached 81:17
120:9 122:4
attempts 7:8
attend 12:3, 4, 7, 14

13:3
attendance 22:9
attention 43:3
attorney 4:6 5:12
8:1, 4, 11, 14 63:9, 11
118:16 120:11
attorneys 119:12
attractive 32:15
audible 5:20
audibly 5:21
authenticity 60:3, 8,
10
authorized 90:8, 11,
14, 25 97:6, 15, 18, 19
available 49:16 66:10
AVENUE 2:13
avoid 53:15, 21 54:7
60:17 61:15, 22
62:23, 25 63:2, 8
64:20 67:3 68:11, 18
70:7 86:19 87:11, 12,
19 89:2
avoidance 54:9 73:3
89:5
avoiding 61:10
aware 6:11 27:5, 15,
18 59:25 60:7 66:19,
22 100:14
awareness 67:22
68:5

< B >
bachelor's 12:21
back 13:2 16:23
21:25 22:14 23:8
39:21 42:9 44:17
46:2 51:23 65:24
72:10, 15, 17 78:6
82:13 85:3, 4 86:23
97:24 100:8 103:21
108:22 109:17
113:11, 19 114:12, 20,
21
backed 52:17
bag 44:15 59:23
bags 43:13 50:1
71:23 73:8
balance 40:9 103:7
bank 102:21, 22, 24

Case 1:19-cv-08927-GBD-SLC    Document 128-5    Filed 09/20/23    Page 40 of 63

Deposition of Christopher Castellani                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

103:7, *10*, *14*
**bargaining**  55:*15*
**BARTON**  2:*12*
**base**  30:*3*  31:*21*
**based**  20:*20*  29:6
39:*25*  48:*21*  49:8
50:*24*  51:6  72:*23*
98:*14*  104:*22*  108:*17*
118:2
**basic**  39:*11*  40:5
74:*12*
**Basically**  17:*21*
**basis**  21:*20*
**Bates**  41:*18*  42:*25*
69:*1*  73:22  79:7
89:*6*, *16*  92:22  93:5,
*15*  95:3  100:*24*
104:*1*, *2*, *3*  107:*13*, *19*,
*20*  115:*15*
**Becker**  21:*15*  27:*10*
81:*17*  104:8
**Becker's**  22:*1*
**becoming**  44:*2*
**began**  109:*18*
**behavior**  51:8
**believe**  9:*24*  10:6
14:*4*, *10*, *23*  15:6
22:2  25:*16*  26:*1*, *2*, *8*,
*10*  27:*21*, 22  29:*11*
41:*1*  45:5  46:*14*
48:*15*  50:*2*, *18*  52:5
60:*11*  63:9  64:*12*
65:*18*  66:*15*  68:*20*
71:*17*  76:7, *16*  77:22,
*25*  82:6  90:*12*, *13*
91:*10*, *16*  92:*16*, *20*
98:*18*  103:*19*  104:*20*,
*22*  105:*1*  106:5, *22*
108:*3*, *25*  109:*10*
112:*10*  115:*3*  116:*10*,
*11*, *21*, *22*
**benefit**  40:*17*
**best**  70:*10*  71:2
**Beth**  72:*10*
**BETHANN**  1:*16*
119:*3*, *18*
**BETTY**  2:7  7:5
betty.tierney@macys.c
om  2:*10*
**beyond**  59:*24*  79:*1*

**bigger**  33:*11*  65:9
77:*14*
**bill**  97:*24*  98:2, *10*,
*16*
**bit**  16:*23*  21:*25*
44:*17*  89:*11*
**black**  26:*11*
**BLM**  95:7
**BLM000061-**
**BLM000066**  3:*19*
**BLM000064**  97:*21*
**BLM000379**  42:*25*
**BLM000379-**
**BLM000456**  3:9
**BLM000380**  43:*1*
**BLM000884**  74:9
**BLM000884-**
**BLM000885**  3:*12*
**BLM000888-**
**BLM000889**  3:*11*
**BLM001098-**
**BLM001110**  3:*15*
**BLM001456-**
**BLM001485**  3:*13*
**BLM001486-**
**BLM001515**  3:*20*
**BLM001491**  104:2
**BLM001576**  107:*21*
**BLM001576-**
**BLM001605**  3:*22*
**BLM001952**  115:*15*
**BLM001952-**
**BLM002035**  3:*24*
**BLM002040-**
**BLM002055**  3:*17*
**BLM1462**  80:*12*
**BLM2040**  93:*15*
**BLM61**  95:*3*
**BLM888**  68:*25*
**block**  25:7  92:*14*
**blocked**  92:*16*, *18*
**BLOOMINGDALE'S**
1:*5*, *6*, *7*  4:8, *11*  9:5,
*12*, *18*  13:*21*, *22*  17:8
20:*18*, *22*  23:9  25:6
27:*20*, *25*  30:*12*, *15*
35:*12*  37:*10*  40:*3*, *4*,
*18*, *19*  41:*3*  48:*16*, *19*
52:*11*, *13*, *19*  70:*15*,
*17*  75:*24*  76:9  78:*10*

80:*4*, *9*  82:*9*, *19*, *20*
83:*1*  86:*14*  88:*12*
94:*11*  96:7  97:*3*
99:*24*  100:*13*  102:*4*
117:*24*

**Bloomingdale's/Macy's**
48:*24*
**Bloomingdale's-**
**owned**  86:*11*
**BOBBY**  1:*11*  25:*13*,
*14*, *17*  27:2, *14*, *17*, *19*
**boiled**  16:*15*
**bona**  91:2, *3*, 5
**BOOKER**  1:*11*
25:*13*  27:*3*, *14*, *17*, *19*
**boss**  20:*18*
**bottom**  42:*25*  81:*15*
89:*17*  90:4  93:*14*
96:*6*  97:*1*  104:*6*, *13*
107:*20*
**bought**  50:8  71:*11*
85:*24*  87:*18*
**branch**  35:*19*
**brand**  21:6  32:*15*
33:*11*
**brands**  44:*24*
**break**  5:*3*, *4*  39:*17*
**brief**  76:*17*
**bringing**  31:2
**broader**  35:*17*  47:6
**broke**  29:5
**brought**  31:9  55:*21*
**building**  23:*17*  25:*1*,
*5*  30:23  37:*15*
**buildings**  25:5
**business**  18:6, *7*
23:*19*  24:*18*  59:*11*
**butcher**  23:2
**buy**  34:7  43:*14*
96:*17*
**buyer**  90:*25*  97:6, *15*,
*19*
**buyers**  90:8  97:*18*
**buying**  57:*17*

**< C >**
**call**  39:*12*  53:22
80:*21*

**called**  4:*1*  25:*4*, 8
32:7  36:*20*  45:*24*
60:*4*  94:*4*
**calls**  54:*12*
**camera**  24:*3*  75:*11*,
*13*, *16*
**card**  35:2, *24*  38:*16*
40:5, *6*, *10*, *12*, *17*
46:*8*  48:*24*  49:*11*, *15*,
*16*  60:*3*, *8*  75:6, *25*
82:*14*  90:*17*, *18*
92:*19*  97:*23*  99:*1*, *4*
100:*13*  101:8  103:*7*,
*8*  116:*15*, *17*
**cards**  38:*17*  45:*15*
48:*13*  60:*10*  80:*9*, *10*
90:*21*
**care**  110:*14*
**career**  17:8
**carefully**  120:*3*
**carried**  114:6
**CARROTS**  1:6
**CASE**  1:*1*  3:*12*  4:7
7:*17*  9:*10*, *11*, *13*, *21*,
*23*, *25*  38:*3*  56:*10*
59:*20*  60:*17*, *19*, *25*
74:*12*
**cases**  11:*1*  28:8
**cash**  34:*19*
**cashier**  108:*20*
**CASTELLANI**  1:*10*,
*16*  3:2  4:*1*, *5*, *19*
109:*14*, *16*, *21*, *22*
119:6  122:2, *6*
**catching**  24:*15*
**categories**  75:*3*
**categorize**  54:*15*
**category**  74:*21*
75:*10*, *17*
**Cathy**  29:*10*, *11*, *15*,
*18*  30:*18*  31:*1*, *2*, *4*,
*14*  32:5  33:7, *19*
112:6, *17*  113:7
**cause**  119:8, *12*
**cc**  80:*24*
**cc'd**  80:*24*
**CCTV**  75:*10*
**central**  35:9, *13*  36:*4*,
*8*, *9*, *14*, *17*, *21*, *22*
45:*13*  46:*24*  47:8

58:*15*  59:*14, 25*  61:*4*
65:*9*  66:*19*  74:*21*
75:*2*  80:*16, 21, 22*
81:*8, 9, 13*  82:*5*
83:*21*  92:*20*  109:*22,*
*25*  111:*4*  116:*5*
**certain**  16:*17*  38:*6*
60:*24*  92:*13*  106:*2*
114:*5*
**certainly**  8:*8*
**certification**  119:*21*
**certify**  119:*4, 7, 10*
122:*2*
**certifying**  119:*22*
**Chad**  19:*1*  80:*25*
81:*3*
**Chad's**  81:*6*
**chain**  24:*19*
**Chanel**  29:*11, 13*
30:*8, 20, 23*  31:*14*
32:*4, 14*  40:*22*  41:*2*
43:*5*  44:*24*  49:*5*
56:*20*  57:*23, 25*
58:*18*  59:*6*  60:*3, 10*
85:*24*  101:*6*  108:*6*
**Chanel's**  29:*16*
**change**  19:*13*  20:*20*
118:*8*  121:*2*
**changed**  43:*25*
**changes**  14:*17*  16:*18*
20:*17*  120:*8*  122:*4*
**charge**  14:*20*  19:*25*
97:*22, 24*
**charged**  100:*9*
**charges**  99:*4*
**check**  26:*22, 24*
94:*14, 19, 22*
**checked**  94:*23*
**Chie**  81:*5*
**C-h-i-e**  81:*4*
**children**  11:*24*  90:*9,*
*12*  96:*9*
**Chris**  8:*6*  10:*14, 18*
23:*11*  42:*4*  54:*4*
59:*9*  63:*22*  69:*17*
70:*16*  79:*12*  81:*16*
88:*10, 18*  109:*14*
118:*14*
**CHRISTOPHER**
1:*10, 16*  3:*2*  4:*1*

11:*18*  85:*6*  119:*6*
122:*2, 6*
**circuit**  75:*11*
**clarification**  100:*25*
**clarify**  67:*2*
**clear**  63:*18*  64:*18*
78:*8*
**clearly**  5:*12*
**Closed**  75:*11*  111:*25*
**CO-COUNSEL**  2:*14*
**Colleague**  3:*15*
93:*19, 20, 22*  94:*7*
**collect**  102:*20, 22*
103:*10*
**Collection**  3:*13, 20*
**collective**  55:*15*
**college**  12:*14, 16*
90:*13*
**collusion**  44:*22*
**combination**  45:*12*
48:*2*  98:*11*
**come**  12:*24*  23:*8*
29:*25*  34:*6*  35:*15*
36:*15*  51:*23*  57:*5*
65:*24*  78:*6*  82:*13*
83:*3*
**comfort**  42:*7*
**coming**  51:*3*  71:*24*
**command**  81:*6*
**committing**  31:*5*
**COMMONWEALTH**
119:*1, 3*
**communicated**  33:*16*
**communication**  33:*18*
**company**  23:*17*
**complaint**  27:*13, 16*
**complete**  12:*20*
116:*12*  119:*7*
**completing**  66:*12*
**complex**  21:*22*  25:*3*
**compromised**  45:*15*
**compromising**  80:*9*
**computer**  52:*16*
**concern**  33:*11*  77:*14*
91:*12*
**concerned**  32:*6*  73:*1*
76:*13*  96:*22*
**concerns**  32:*8, 10*
34:*4*  43:*12*  76:*20*

92:*7, 9*
**conclude**  46:*9*  47:*10*
**concluded**  53:*16*
118:*19*
**conclusion**  46:*15*
53:*17*  54:*12*  57:*5*
**condition**  6:*15*
**Conduct**  3:*9*  34:*11*
92:*14*  115:*25*
**conducted**  39:*23*
45:*18*  82:*3*  109:*5*
**conducting**  30:*19*
58:*23*  66:*1*
**conflate**  82:*24*
**conjunction**  91:*17*
**connected**  116:*20*
**connection**  83:*4*
116:*23*
**connotation**  24:*14*
**Consent**  3:*9*
**consider**  61:*10, 14*
**considered**  17:*25*
43:*6*  48:*18*  75:*7*
87:*22*  106:*3*
**contact**  30:*5*  36:*8, 10*
106:*2, 14*
**containing**  76:*17*
**CONTENTS**  3:*1*
**continue**  46:*23*  72:*9*
108:*11*  109:*15*
**continued**  12:*20*
83:*21*  106:*18*
**continuous**  87:*17*
**contribute**  20:*4*
81:*19*
**contributed**  19:*19*
**control**  23:*22*  119:*22*
**controls**  29:*25*
**conversation**  7:*25*
17:*10*  28:*18*  29:*6*
30:*5*  45:*6*  49:*10*
53:*8*  55:*10, 20*  62:*17*
66:*6*  70:*16*  71:*14*
79:*2*  84:*3, 13*  85:*17,*
*18*  109:*15, 16*  112:*10,*
*11, 13, 15, 19*
**conversations**  7:*12,*
*19*  8:*1, 3, 11*  29:*18*
31:*4*  32:*14*  33:*15, 20*

110:*24*  111:*2*  112:*6,*
*22*  113:*1, 4, 7*  118:*3*
**convicted**  11:*13*
**coordinate**  35:*17*
**copied**  92:*20*
**copy**  90:*17*  118:*16,*
*18*
**copying**  120:*13*
**corner**  93:*14*
**corporate**  21:*3*
30:*13*  35:*10*  36:*18,*
*20, 24*  37:*9, 10*  80:*22*
**correct**  9:*7*  12:*23*
17:*13*  25:*2*  27:*7*
36:*23*  48:*1, 6, 17*
49:*20*  50:*5*  52:*4*
54:*18*  60:*10*  64:*11*
69:*24*  70:*20, 23, 24*
73:*6, 15*  78:*11, 19, 22*
81:*11*  82:*10*  83:*8*
84:*19*  85:*10*  86:*2*
87:*15*  88:*12, 16*  91:*6*
94:*1*  95:*19*  96:*2, 3*
97:*11*  98:*14, 17*  99:*4,*
*7*  108:*19*  112:*20*
115:*19*  117:*10*  119:*9*
122:*3*
**corrections**  120:*3, 5*
122:*3*
**corrective**  15:*6, 7, 13,*
*19, 24*  16:*6, 12*  22:*4,*
*10*  39:*6*  46:*20*
**correctly**  28:*24*
43:*10*  109:*1*
**correspond**  31:*15*
**counsel**  7:*1, 13*  8:*13*
39:*16*  41:*10, 17*
42:*17*  52:*24*  58:*3*
73:*23*  79:*7*  103:*25*
119:*10*  120:*13*
**Counselor**  72:*2*
**counterfeiters**  23:*24*
**County**  12:*8*  119:*2, 4*
**couple**  7:*8*  10:*10*
38:*17*
**course**  59:*11*
**COURT**  1:*1*  5:*14,*
*18, 24*  9:*20*  72:*15*
118:*15*  120:*15*

courts 10:7
cover 39:12
covered 28:25
coworkers 7:20
create 25:6
Credit 3:13, 15 35:2,
24 38:16, 17 40:5, 6,
10 46:8 47:19 48:21,
24 75:6, 25 98:2, 16
116:15, 17
crime 11:14 74:23,
25 75:1, 8
criminal 11:2
cross-divisional 21:5
cross-shop 100:2
crunched 99:2
current 13:7
customer 35:25
43:11 44:16 101:25
customers 43:16
53:15 61:16, 19, 23,
24 62:5, 13 63:2
86:20

< D >
D/B/A 1:5, 6, 7
DATE 1:20 14:23
15:9 25:20 29:8
47:12 70:1 108:13,
24 115:3, 6, 17 120:6
dated 81:17 119:13
dates 8:23 17:17
18:20 20:15 25:16
32:11
DAVID 2:8 8:12
68:4
day 21:21 72:3
112:14 119:13
days 112:5 120:12
dealings 47:4
debit 40:12
decided 49:9 92:7
decides 57:13
decision 106:17
declined 109:8
deemed 120:14
defendant 9:17 11:9
DEFENDANTS 1:12
2:11, 14

definitely 51:11
definition 28:16
degree 12:22
delete 52:16
deleted 52:12, 15, 22
DEMANDS 1:3
denied 85:18
Denis 31:12 33:7, 19
112:22 113:1, 4, 8
DENNIS 1:9 31:24
32:5
DEPARTMENT 1:8
14:19, 21 19:20 23:9,
13 26:8 28:23 29:4,
13, 16 30:9 32:1, 4
33:9 35:13 37:10
38:9 40:23 43:14
56:20 57:23 58:1, 19
59:7 67:22 74:24
77:15 112:17
departments 100:7
depended 28:7
dependent 96:9, 20
dependents 97:22
98:6
depending 38:4
depends 28:15 57:16
DEPONENT 122:1
deposed 9:4
deposing 120:11
DEPOSITION 1:16
4:13, 23, 24 5:8 7:7,
12, 22 8:16 9:6, 9
10:2, 4, 5, 7 11:11
118:19 119:4 120:2,
9, 12, 14
DEREK 2:2
destination 94:15
Detail 3:12 58:25
detailed 30:24
details 22:15 27:23,
24
detective 26:9
detectives 23:23
determination 55:1, 2,
3 117:1, 2
determine 34:23
63:12, 14, 17, 18, 24
73:13 77:9 98:23

determined 62:22, 25
76:1 85:4
develop 16:21
developed 116:13
Development 3:17
dialogue 71:23
DIAZ 1:9 31:12
dictate 92:18
difference 24:13
93:22 98:19 110:16
different 8:12 13:23
28:25 29:12 32:6
34:20 40:22 41:3, 5,
6, 18 49:3 51:7
57:11 82:14 98:13
differentiate 101:3
differing 14:1
direct 43:3 65:13
88:22 106:14 111:1
119:22
direction 119:9
directly 11:10 46:1
50:19 61:5 99:8
director 14:2, 3 19:4,
6, 10 22:2 29:16
directors 14:20
director's 114:3
disagreed 114:4
disciplinary 15:4
20:5 22:6 27:2
discipline 16:19
Discount 3:13, 15
22:22 34:22 39:22,
25 40:5, 16, 17, 20, 23
41:5, 6 43:6, 7, 8, 9,
22 47:23 48:23 51:9
56:2, 8 70:10 71:1, 2,
6, 18, 24 72:24 73:5,
14 85:13, 14, 19 86:1,
6, 14, 15 87:22, 24, 25
88:1, 6, 8, 11, 13, 23
89:2, 20, 21 90:8, 10,
16, 19, 22, 23 91:9
92:17 93:19, 20, 23,
24 94:7 95:8, 10, 12,
23 96:1, 4, 8, 14, 22
97:23, 25 98:15, 17
99:15, 19, 22 100:1, 6,
8 104:17 108:4

113:13, 18
discounts 48:10, 11
discoverable 8:8
discrimination 27:17
discussed 53:5, 10
55:8, 9 70:12, 17
71:14 72:3 117:5
discussing 74:8 89:25
Discussion 79:11
disposition 60:19, 25
63:16 66:9
disregarded 83:6
disregarding 84:18,
21
distinguish 97:14
101:16
distinguishing 14:13
DISTRICT 1:1
diversion 33:22
diverter 33:12 43:11
44:10 56:9 57:7, 14,
15, 24 58:2, 18 64:2,
13, 15, 17, 18 65:2, 3,
12 73:1
diverters 32:7 34:6
44:23 62:18 64:5, 7,
10 80:8
divisions 37:16 100:3
Divorced 11:23
document 16:4, 5, 8
42:2, 5 69:13, 20
70:6 74:9 89:13
90:7 93:18 94:12
101:3, 4 107:18
110:19 115:14
documentation 7:14
39:7 45:23 66:9
documented 35:4
55:10 76:14, 20
documenting 84:5
Documents 3:13, 20,
23 7:16 74:4 94:3, 9
117:14
document's 69:12
doing 16:12 26:24
28:17 34:5 51:5
54:16 55:3 59:21, 22
61:15 62:25 63:1, 4,
7, 19 66:17 75:1

80:*10*  88:*15*  91:*6*
112:*10*  120:*6*
**door**  21:*1*  23:*22*
26:*10*, *11*, *23*
**dotted**  28:*19*
**doublecheck**  114:*16*
**drilled**  76:*8*
**duly**  4:*2*  119:*7*
**duties**  19:*13*  22:*16*
26:*3*  29:*19*  31:*16*

**< E >**
**earlier**  117:*5*, *14*
**early**  22:*8*  45:*5*
**easier**  5:*24*
**eBay**  57:*9*
**effect**  89:*21*
**either**  33:*13*, *19*  34:*5*
41:*3*, *21*  48:*22*  49:*6*
83:*20*  111:*2*
**elaborate**  16:*11*  17:*4*
62:*3*
**element**  34:*8*
**eligible**  90:*6*  96:*7*, *20*
97:*2*
**e-mail**  7:*8*  32:*25*
80:*1*, *13*, *25*  83:*12*
104:*7*  112:*10*, *14*, *16*
**emails**  32:*25*
**e-mails**  33:*14*  76:*16*
**employed**  18:*12*
25:*15*  119:*12*
**employee**  9:*15*  28:*18*
29:*6*, *9*  31:*11*  34:*19*,
*20*  38:*23*, *24*  39:*5*, *12*
40:*13*  43:*8*  46:*25*
47:*2*, *5*, *21*, *23*, *24*
51:*14*  57:*23*, *25*
58:*25*  59:*2*, *13*  62:*15*
76:*1*, *23*  77:*19*  85:*8*
86:*15*  93:*24*  95:*10*,
*13*  96:*8*, *11*, *14*, *17*, *23*
99:*15*, *19*  102:*14*
104:*17*  109:*23*  110:*8*,
*16*  111:*8*  113:*13*, *17*
**employees**  26:*23*
29:*2*  30:*20*  31:*5*, *6*,
*25*  32:*2*  33:*6*  38:*10*,
*21*  41:*2*  43:*16*, *20*
47:*3*, *7*, *11*  50:*16*

57:*3*  58:*20*  77:*8*, *23*
78:*2*  86:*20*  96:*7*
97:*22*  98:*5*  99:*24*
102:*21*  103:*11*  105:*8*,
*11*  106:*1*  110:*4*
112:*19*  118:*3*
**employee's**  9:*24*
48:*21*  106:*18*
**employer**  13:*7*
**employment**  4:*15*
9:*2*, *11*  13:*7*  22:*5*, *11*
25:*15*  27:*24*, *25*
29:*14*  32:*12*  43:*25*
60:*9*  89:*22*  95:*14*
103:*17*  106:*18*
**encompassing**  24:*17*
**encouraged**  110:*4*, *6*,
*10*
**encouragement**  110:*9*
**ended**  78:*2*
**ends**  59:*13*, *24*
**enforcement**  59:*12*,
*15*, *17*  62:*14*  103:*12*,
*17*, *19*
**ensure**  90:*6*
**entails**  23:*9*
**entered**  48:*14*
**entire**  18:*4*, *7*, *14*
25:*7*  69:*13*
**entirety**  89:*14*
**entitled**  72:*4*
**Errata**  120:*5*, *6*, *8*, *11*
122:*4*
**ESQUIRE**  2:*2*, *7*, *12*
**essentially**  36:*22*
94:*12*  101:*7*
**establish**  57:*15*
**estimate**  15:*2*
**evadance**  89:*4*
**evade**  49:*8*  63:*8*
**evasion**  54:*10*
**eventually**  64:*16*
**EVEREST**  2:*14*
**everybody**  40:*3*
**evidence**  46:*20*
65:*13*  97:*16*  117:*9*
**exact**  14:*23*  15:*9*
17:*17*  18:*20*  20:*15*
25:*16*  32:*11*  37:*2*

47:*12*  115:*3*
**exactly**  25:*18*  44:*15*
**EXAMINATION**  3:*2*
4:*3*
**example**  97:*3*
**exceeded**  44:*12*  56:*3*
**exceeding**  56:*1*, *14*
71:*15*  87:*24*
**excessive**  70:*18*
**Excuse**  92:*23*
**Exhibit**  3:*9*, *12*, *13*,
*15*, *17*, *20*, *23*  41:*13*
42:*18*, *21*, *25*  69:*4*, *7*,
*9*, *15*  73:*19*, *20*  79:*9*,
*13*  85:*3*, *4*  89:*8*
92:*21*, *22*, *23*  93:*1*, *16*
95:*2*, *3*, *4*  100:*21*
103:*22*, *24*  104:*3*
107:*10*, *11*, *18*, *19*
115:*9*, *11*, *15*
**EXHIBITS**  3:*8*
**exist**  92:*3*
**exited**  109:*20*
**exiting**  109:*16*
**expect**  29:*9*
**experience**  17:*7*  36:*7*
77:*7*, *18*
**explain**  23:*8*  88:*6*
**explained**  62:*21*
**explaining**  109:*4*, *18*
**Express**  102:*4*
**expressed**  53:*13*
**extended**  79:*1*  99:*23*
**extent**  54:*12*, *13*
**external**  10:*9*  11:*2*
18:*5*  23:*23*  26:*9*
30:*1*  32:*6*, *17*  34:*5*, *8*
38:*2*  45:*14*  80:*8*
**extreme**  51:*1*
**extremely**  25:*19*

**< F >**
**fact**  8:*7*  61:*14*
65:*14*  105:*17*  111:*19*
**facts**  47:*1*  72:*7*
**fail**  120:*14*
**fair**  29:*15*  34:*11*
96:*9*
**FAIRFIELD**  2:*13*

**family**  68:*21*, *23*
90:*7*, *9*  104:*18*, *21*, *23*,
*25*
**far**  57:*13*  96:*22*
**Fashion**  12:*17*
**February**  45:*6*  46:*14*
47:*13*  70:*25*  78:*17*
79:*18*  83:*14*  91:*14*
**Federated**  99:*15*, *20*
100:*3*
**fee**  96:*5*  108:*7*
**fell**  28:*18*, *22*  30:*15*
**felt**  30:*1*  39:*25*  66:*7*
**fide**  91:*2*, *3*, *5*
**field**  21:*3*
**fifth**  23:*4*
**file**  7:*17*  76:*17*
**filed**  9:*21*
**files**  38:*22*, *23*, *24*
**fill**  19:*5*
**final**  13:*24*  48:*12*
49:*17*  60:*25*  63:*16*
66:*9*
**find**  35:*21*  39:*15*
50:*13*  59:*6*  77:*3*
88:*21*, *23*  98:*3*
**findings**  60:*15*  72:*19*
**fine**  23:*7*  42:*20*
74:*6*  83:*24*  94:*8*
110:*14*
**finish**  61:*21*  83:*25*
**first**  22:*16*  42:*16*
53:*7*  93:*14*  107:*19*
**five**  7:*15*  22:*19*, *25*
33:*17*  34:*14*
**five-man**  24:*6*
**fixtures**  23:*18*
**flag**  47:*23*  78:*3*
**flags**  50:*24*  51:*4*, *7*
**flagship**  17:*19*  18:*14*
19:*11*, *14*  52:*13*  59:*7*
**flex**  100:*15*
**floor**  26:*14*, *18*, *20*, *22*,
*24*  29:*4*  30:*3*  31:*21*
33:*15*  112:*19*
**FMLA**  111:*16*
**focus**  22:*23*  24:*6*
32:*18*  62:*15*  67:*23*
72:*7*

focused 19:*21* 22:*19* 23:*21, 22, 23* 24:*1* 34:*8, 17* 35:*19* 59:*20* 67:*22*
folder 41:*19*
folks 82:*14*
follow 90:*8*
followed 20:*21* 45:*24*
following 16:*20* 83:*8* 100:*3*
follows 4:*2*
foregoing 119:*4, 9, 12, 21* 122:*2*
form 8:*20* 10:*18* 11:*6* 14:*9* 15:*18* 16:*14* 21:*17* 23:*11* 24:*23* 26:*5, 15* 28:*13* 29:*20* 30:*10* 31:*18* 32:*21* 36:*1, 12* 37:*6, 12* 38:*11* 39:*1* 40:*24* 43:*17* 45:*9* 49:*13, 24* 50:*6* 51:*16* 53:*18* 54:*4, 11* 56:*21* 57:*10* 58:*7, 12* 59:*9* 61:*13, 25* 62:*8* 63:*5* 64:*22* 67:*13* 68:*12* 70:*2* 71:*9* 72:*21* 76:*25* 77:*10, 21* 78:*12* 86:*7* 87:*3, 16* 88:*3, 9* 91:*15, 22* 92:*4* 94:*16* 95:*21* 96:*15* 106:*11* 111:*17* 113:*21* 117:*11, 25* 122:*4*
formal 5:*14* 21:*22* 105:*13*
formally 21:*19*
former 7:*20* 19:*4, 6* 20:*18*
forth 119:*5*
FORTY 1:*5*
forward 31:*3* 77:*14* 84:*18*
forwarded 60:*21* 78:*3* 82:*6*
found 57:*3* 70:*25* 84:*21* 92:*3* 98:*20*
four 22:*19, 25* 28:*24* 33:*17* 34:*13* 51:*6*
fourth 109:*12*

frame 18:*18* 32:*14* 58:*3* 60:*24* 77:*3*
fraud 10:*9* 22:*20* 30:*22* 31:*1, 5* 32:*6* 33:*12, 20* 34:*20* 44:*10, 21* 45:*2, 7, 14, 17* 46:*2* 47:*6* 49:*7* 59:*3* 62:*18* 75:*1, 3, 6, 7* 78:*18* 79:*18, 23, 24* 80:*2, 7* 81:*20, 21* 82:*4, 12* 89:*4* 116:*14*
frauds 46:*3*
fraudsters 23:*24* 32:*16* 46:*8*
fraudulent 34:*6* 80:*10* 84:*11* 116:*17*
Fred 21:*15* 22:*1* 25:*2* 27:*10* 80:*20* 81:*12, 13, 16, 17* 104:*8*
friend 53:*25* 54:*6* 101:*14*
friends 68:*23* 86:*18* 87:*10, 12, 19* 89:*1*
front 57:*19*
full 48:*8* 119:*9*
full-blown 48:*24*
fully 6:*12*
further 104:*16* 109:*23* 110:*3* 118:*11* 119:*7, 10*

< G >
gained 109:*6*
Gap 20:*10, 12, 16, 19, 23* 21:*4, 6* 22:*8*
garb 18:*6*
general 19:*15* 29:*22* 30:*5* 38:*18* 40:*15* 41:*7* 47:*4* 53:*6*
generally 36:*14* 40:*3* 105:*13*
George 23:*2*
GERBER 2:*12* 41:*15* 92:*23* 93:*3*
getting 66:*14* 72:*6* 88:*13* 103:*2*
gift 91:*2, 5*
gifts 50:*17, 22* 61:*8*

68:*10* 70:*11* 71:*3, 11*
GILMAN 2:*12*
Gina 81:*7* 116:*5*
give 11:*1* 41:*15* 60:*19* 66:*8* 103:*13* 105:*5* 114:*15*
given 10:*12, 16* 19:*17* 119:*8* 122:*3*
giving 61:*2*
go 5:*10* 10:*14* 12:*16* 19:*3* 22:*14* 36:*14* 38:*5, 6* 42:*9* 59:*5, 17, 22* 63:*22* 73:*18* 80:*12* 83:*23, 24* 85:*4, 5* 88:*18* 89:*6* 90:*4* 99:*14* 104:*1, 6* 108:*4, 11, 22* 113:*19* 115:*14* 117:*13*
goes 71:*17* 75:*15*
going 10:*17* 11:*5* 14:*8, 18* 15:*17* 16:*13* 18:*11* 20:*17* 23:*10* 28:*17* 29:*1* 30:*2* 31:*17* 32:*13* 33:*1* 36:*11* 39:*21* 42:*24* 47:*14* 48:*11* 52:*25* 54:*3* 55:*7* 58:*6* 59:*8* 61:*12* 66:*8* 71:*1* 72:*17* 77:*20* 84:*16* 85:*3, 16, 25* 86:*3, 10, 11, 23* 87:*2* 92:*14* 95:*7* 97:*20* 102:*19* 108:*11* 109:*3* 111:*7* 113:*11*
Gonzalez 80:*13* 104:*8*
Good 4:*5* 5:*9* 20:*19* 49:*4* 71:*2* 85:*25* 86:*14* 90:*6*
goods 53:*21*
gotten 33:*18* 46:*17* 66:*7*
graduate 12:*10, 18*
grand 10:*9, 10*
Gray 22:*25* 85:*17*
Great 5:*9, 24* 6:*4* 93:*13*
ground 5:*10*
GROUP 2:*2* 75:*1, 3*

80:*8*
groups 24:*9*
grow 79:*21*
guard 21:*1, 3* 26:*11*
guards 23:*22* 25:*13* 26:*10, 23*
guess 7:*15* 9:*3, 19* 21:*20* 36:*19* 39:*11* 46:*17* 48:*21* 81:*6* 82:*24* 110:*9*
guidelines 16:*20* 89:*20* 90:*22*
guilty 11:*14*

< H >
habits 47:*20*
Hackensack 18:*17* 19:*13* 20:*6, 8* 21:*13*
half 13:*16* 15:*3* 17:*13*
halfway 70:*9*
Hampshire 50:*2* 53:*25* 54:*20* 108:*7*
hand 43:*13* 93:*14*
handbag 44:*13* 56:*4* 71:*8, 15* 108:*6*
handbags 43:*5, 10, 21, 24*
handbook 95:*13*
handed 103:*15, 16*
handful 47:*21* 68:*2*
handled 46:*25*
Handwritten 3:*9*
happened 48:*25* 52:*10* 53:*4* 59:*19* 60:*13* 83:*17, 18*
happy 5:*4* 6:*6*
harassment 27:*14*
head 5:*21* 18:*2*
hear 33:*24*
heard 72:*5*
heavily 44:*24*
he'd 109:*6*
held 16:*16* 21:*9* 79:*11*
help 20:*2* 33:*4*
helped 17:*7, 8* 75:*4*
hereinbefore 119:*5*
hey 33:*1*

Case 1:19-cv-08927-GBD-SLC   Document 128-5   Filed 09/20/23   Page 45 of 63

Deposition of Christopher Castellani                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**high**   12:*3, 4, 7, 8*
30:*21*   31:*10*   34:7
45:*16*   48:6   51:*14, 19,
20*   77:9, *19*   94:*20*
**higher**   45:*1*
**highest**   81:*21*   82:4
**highlighted**   48:*3*
**history**   45:2   48:22
49:*2*   51:8   53:9
75:*24*   76:*18*
**hit**   44:*24*
**home**   53:*24*   54:*1*
61:9   62:6   100:7
**hours**   6:*20, 23*
106:*15*
**Housing**   13:8
**HR**   25:*10*   28:4, *24*
29:*2, 7*   37:*5, 16, 17*
38:22, *25*   39:*15*
60:*24*   63:*16*   66:8
106:2   110:8, *17, 24*
112:*16*
**HR's**   106:*15*
**hundred**   25:6   27:22
107:*3*
**husband**   96:*12, 13*
**hypothetically**   36:8
77:*3*

**< I >**
**ID**   39:*12*
**identification**   42:22
69:*10*   73:*21*   79:*10*
89:9   93:2   95:5
100:22   107:*12*
115:*12*
**identified**   49:*4*
**identify**   75:*14*
**identifying**   22:*20*
**illegal**   54:*24, 25*
63:*13, 14, 19, 24*
**imagine**   32:*15*
**immediately**   60:*20*
**impair**   6:*12, 16*
**imperative**   120:*10*
**implication**   73:*3*
**implications**   51:*10*
**important**   5:*19*   100:*4*
**improve**   15:*16*   16:2

**include**   48:*8, 9*
49:*12, 20, 21*   56:*17*
98:*15*
**included**   44:9   48:*11*
51:*20*   56:*19*
**including**   34:*21*
43:*20*   51:9   56:*20*
58:*15*   105:*17*
**inconclusive**   45:*23*
**indicate**   110:*23*
**indicated**   47:*19*   51:8,
*13*   72:*25*
**indicative**   47:22   49:6
**indict**   10:*9*
**indiscretion**   59:*22*
**individual**   40:*1*
44:*16*   56:*18*
**INDIVIDUALLY**
1:*10, 11*
**individuals**   81:*19*
**industry**   24:*16*
**inform**   32:9   112:*9*
**informal**   21:*23*
**Information**   3:*15, 17*
14:*11*   35:*15, 21*   36:*4*
39:*11, 25*   45:*13*   46:*1,
8, 18*   49:9   51:*12*
60:22   63:*15*   66:7
75:*20*   76:8   78:*3*
79:*25*   81:*18*   84:2, *5,
17, 23*   101:9   104:*23*
116:*13*
**informational**   28:*19*
**informed**   7:6   10:*3*
28:*16*   60:*23*   83:*18*
**informing**   7:*12*
**infraction**   61:*17*
**initial**   45:*3, 22*   46:7
62:*17*   75:4   78:*20*
79:*18, 23*   84:*2, 3*
**initially**   41:*1*   44:*21*
45:*11*   56:*3*   75:6
**initiate**   35:*3, 16*   75:*4*
**initiated**   47:*25*   56:*9*
74:*20*
**inordinately**   45:*16*
**input**   38:*3*   75:*19*
102:*8*
**inquiring**   70:*19*

**instance**   30:*22*
**instances**   103:*5*
**Institute**   12:*17*
**instructed**   60:*23*
**INSTRUCTIONS**
120:*1*
**interact**   28:*5*
**interested**   119:*13*
**interim**   112:*5*
**internal**   9:*14, 15*
11:*1*   18:7   19:*18, 21*
22:*19, 20*   23:25   24:*1,
7*   32:*17*   34:*17*   37:*23*
38:*3*   59:*20*   67:*24*
117:*17*
**Interview**   3:*11*   47:*15,
16*   49:9   51:*24*   52:6
53:*4*   55:*24*   56:5
60:*14*   66:5   83:7
105:*14, 22*   111:*3, 4*
112:*20*
**interviewed**   46:*14*
47:8   52:4   56:*3*   75:7
79:*17, 22, 24*   84:2
104:*15*   105:*11*
111:*12*
**interviewing**   72:*18*
**interviews**   52:7
**investigate**   35:*22*
66:*11, 17*   77:*15*
**investigated**   44:7, *18,
20*   47:7   56:2   65:8
78:9, *16*   79:*18, 20*
82:*18*   83:*19*   111:9
114:8   115:22   116:9,
*11, 14*   117:*17*
**investigating**   11:*3*
29:5   45:*16*   73:6
113:*17*
**investigation**   17:9
28:*17*   29:7   30:*25*
34:*24*   35:*3, 5, 7, 9, 16,
17*   39:22   44:*10, 22*
45:*3, 14, 21, 22*   46:7,
9, 17, 23*   47:*4, 6*
50:*12, 24*   51:*6, 13, 21*
53:*16*   55:*3*   58:*16*
59:*5, 14, 24*   60:*12, 15*
61:5   62:*16*   65:9
66:*1, 6, 12*   72:*19, 23*

**instance**   74:*11, 21*   75:*2, 4, 5,
16*   78:*4, 18, 20, 21, 23*
79:*19, 21*   84:*3*   88:*24*
90:*1*   91:*14*   92:*12, 15,
17*   95:*17*   97:*13*   98:*8,
20*   102:*20*   103:9, *18*
104:*16*   105:*4, 23*
109:*22*   110:*1*   111:*3*
112:*1, 2, 7, 23*   113:*13*
115:*25*   116:*12, 13, 16*
117:6
**investigations**   17:*25*
18:*3, 24*   19:*18*   24:7
30:*19*   34:*12, 15, 18*
35:*10, 14*   36:9, *17, 22*
37:*21, 22*   38:2   39:22
47:*8, 9*   58:*24*   59:*1*
81:9, *13*   92:*12*
103:*16*   109:*4, 25*
116:6
**Investigative**   3:*20*
74:*18*   107:*24*   108:22
111:*21*
**investigator**   21:*5*
52:*4*
**investigators**   22:*19*
34:*14*   45:*12*   83:*20,
21*
**involve**   114:7
**involved**   10:*25*
30:*19*   44:22   47:*3, 6*
53:*12*   57:*12*   58:*20*
59:*3*   65:*15, 19*   66:*20*
67:*16, 19*   77:*24*
78:*18*   83:22   103:*20*
106:*17*   116:22
**involvement**   66:*23*
**issue**   9:*14, 16*   28:*10*
45:*8*   73:*1, 2*   103:*4*
**issues**   10:*10*   19:*19,
21*   22:*21*   29:24   32:*3*
33:8   35:*23*   46:*25*
47:2   51:*13*   62:*15*
70:*17*   92:*2, 3*   114:*7,
8*
**item**   53:*25*   57:*23, 25*
67:*4*
**items**   49:*4*   50:*16*
56:*18, 19, 24*   57:*17*
58:*18*   59:6   68:*17*

70:7  83:1  94:14, 19, 22  96:1  100:7
its  89:14

< J >
JERSEY  2:13
job  14:11  15:14 18:1  21:4  26:21, 22 34:11  55:22  59:12, 13  113:24
jobs  24:2  26:25
journal  101:24 102:11  108:13, 14
judge  5:13
judgment  72:8
June  4:16  18:13 47:14  52:1, 2  69:22 79:17  81:17  82:2 104:7, 15  112:15 116:8
JURY  1:4  10:9, 11

< K >
Kaitlin  81:7
keep  28:16  37:21 74:10  85:16  97:20 100:3  102:19
Kelly  20:18
kind  22:23  23:18 25:4, 5  31:22  34:22, 23  39:7  43:4  46:20 59:16  85:21
kinds  32:16
knew  64:13  92:13
know  4:8, 10  9:13, 23  18:25  22:16 25:16, 20  27:2, 13, 16, 19, 23, 24  28:2  29:10 30:13, 21  31:12 32:23  33:6, 10, 14, 15, 16  38:4, 5, 8  39:10 43:24  44:12, 17 52:10, 12, 15, 22 54:15, 23  55:18 57:14  58:11, 17, 22, 24, 25  59:19  64:14 65:10  67:25  68:9 69:14  74:4  77:13, 15 82:5  83:7  89:14 92:12  94:7, 8, 10

97:2  99:18  100:11, 12, 16  103:15  104:25 106:9, 13, 14, 20, 22, 24  107:2, 4  110:6 111:1, 10, 13, 15 112:18  114:21  115:3 116:7, 20
knowledge  54:13 58:10  117:16
known  11:17  57:7, 14, 24  58:1  64:6, 10 65:11, 16, 21  117:19, 23
Kornyveh  23:2
KRISTINA  1:1  4:6, 8  7:18  18:12  33:20 34:1, 2  44:6, 12, 18, 24  45:6, 16, 23  46:4, 10, 12, 22  47:5, 15, 17 49:10, 23  51:24  56:1, 2  60:12, 13, 18  61:5, 7  62:17, 20  68:8 69:21, 25  70:14 72:18  75:7  77:25 78:8  79:2, 17, 22 81:24  84:2  91:6, 8 93:23  98:9  100:14 101:2, 6, 10, 11, 25 102:2, 14  104:13 106:7, 25  108:18, 21, 24  111:10, 12  112:23 113:8  114:8  115:4 116:8, 24
Kristina's  4:15  9:2 25:15  29:14  32:12 43:25  60:9  66:2 74:11  78:18  89:22 90:1  95:14, 17  97:4 101:8, 23  102:5 103:17  105:5  108:1 112:7  113:2, 5

< L >
label  89:5
lady  23:3, 6
Lai  108:8, 23  116:21, 24  117:3, 7, 16, 18
large  80:10
larger  44:21  45:14 58:16  61:5  62:16

75:5  78:18, 23  79:21 111:4
LAW  1:10  2:2  28:2, 12  59:12, 15, 16 62:13  103:12, 17, 19
lawsuit  9:2  11:4, 9
lawyer  54:14
leading  110:1
learn  65:11
learned  49:1
lease  41:4  86:13
leased  44:2  71:1 85:25  86:10, 12
leave  13:25  19:2 20:16  39:9, 14 111:16
Lee  65:17, 18  114:19 115:2, 22  116:2 117:6
left  13:1  25:21, 23 52:11, 13, 18  65:10, 24
legal  5:14, 15  54:12
legally  63:9
level  18:1  21:4  25:8 30:21  36:24  38:5 42:7  49:3
light  59:2
limit  43:13  56:4, 15 71:8, 15, 16
limits  43:5
line  28:19  75:23 90:24  109:12  121:2
lines  38:18
listed  90:11, 14, 17 96:21
little  16:23  21:25 25:3  44:17  89:11
LLC  1:6
LLP  2:12
LOCAL  1:9
located  24:20, 22 37:1
location  13:24, 25 19:4, 11, 12  20:6, 8 21:12  22:5, 12, 17 25:24  52:14  59:18 65:10  117:22

locations  13:23  17:7 35:12  50:21  80:11 100:1
locked  91:11
long  7:10  14:25 25:19  96:18  116:7, 9, 10
longer  76:22  92:3 116:11
look  5:2  30:23  33:2 38:13, 14  40:10, 16 41:8  42:6  59:15 73:7, 11  74:3  75:22 77:3, 8  79:12  80:24 83:21  89:16  98:9 100:18  101:1, 4, 18 109:12  114:12 115:14
looked  30:14  49:3 99:10
looking  42:15  57:11, 16  69:2  72:24  76:5, 8, 15, 22  77:25  85:5, 8  97:3, 4, 7  98:4, 9, 10  99:7  101:1, 15 102:3, 4
looks  42:1  76:23 108:5
loop  29:8
loss  21:7  24:10, 15 30:13  53:6  114:5
lost  84:11
lot  14:17  16:18 20:17  28:11  30:1, 22 31:9  32:7  33:11
low  34:7
Loyalist  75:24  76:9

< M >
MACY'S  1:7  2:7 35:24  81:22  82:1 84:10  94:11  99:23

Macy's/Bloomingdale's 99:20
maintain  90:5
majority  18:16 29:23  34:4  35:18 38:1  58:23  99:2

**making** 46:5, 6
82:25 86:9, 25 87:15
88:1 97:17 106:18
**manage** 22:18 24:5
27:4, 6, 8 28:20
**managed** 23:25
27:11 114:4
**management** 74:12
**manager** 13:12
16:25 17:2, 21, 25
18:1, 5, 15, 24 19:16,
17 21:2, 7 25:14
26:4 29:7, 8, 11, 15
31:20 66:24 67:2, 6
68:4 109:14 111:6
112:18 116:5
**managers** 19:17
28:4, 25 29:2, 23
30:4 33:17 66:25
67:9 68:3
**managing** 18:7
19:24 23:17 24:18
28:10
**Manhattan** 37:3, 4
**March** 13:16, 18, 19
**Margaret** 101:6
**mark** 73:19 107:10
**marked** 42:21, 24
69:9 73:20 79:9
89:8 93:1, 15 95:2, 4
100:21 104:2, 3
107:11, 19 115:11
**marking** 41:12, 22
73:23
**married** 11:22
**Mary** 19:8 20:18
**mashed** 25:5
**match** 59:18
**matching** 99:12
**MATT** 2:14
**matter** 119:13
**MCCS** 36:3, 8, 10
45:13 47:19 48:1, 2,
5, 13 76:7, 15, 22
77:8, 13, 18 82:7
85:10 91:10, 19 92:6,
13 98:11, 23 99:2, 5
**McIntosh** 19:1 80:25
**mean** 15:21 17:4
21:19 24:24 26:17

28:22 40:15 42:1
47:2 48:18 51:4
73:8 75:12 91:21, 25
92:2, 8 110:6 111:24
**meaning** 61:16 80:3
107:5
**means** 43:8 75:17
119:22
**medication** 6:19, 23
**meet** 83:11
**meeting** 60:20
**meetings** 28:8
**MELISSA** 2:2 4:6
41:12, 16, 22 42:12
melissa@dereksmithla
w.com 2:5
**members** 90:7, 9
104:18, 21, 23, 25
**memo** 45:24 46:18
**MENDOZA** 2:2 3:2
4:4, 6 8:9, 25 10:15,
21 11:8 14:12 15:22
16:22 21:24 23:14
24:25 26:13, 19
28:21 30:7, 17 31:23
32:24 36:6, 16 37:7,
8, 19 38:20 39:8, 18,
20 41:8, 11, 14, 20, 24
42:3, 13, 15, 20, 23
43:23 45:19 49:19
50:3, 11 51:22 52:21
53:2, 3, 23 54:8, 17
57:1 58:4, 9, 13 60:1
61:18 62:2, 4, 12
63:10, 25 64:24
67:17 68:16 69:3, 5,
8, 11, 19 70:5 71:12
72:1, 9, 16 73:4, 18,
24 74:1, 2 77:6, 17
78:5, 15 79:4, 8
84:24 85:2 86:16
87:6, 21 88:5, 14, 20
89:6, 12 91:18 92:1,
10, 21 93:7, 9, 10
94:6, 21 95:1, 6, 24
96:25 100:23 103:21
104:1, 5 106:16
107:9, 15, 17 111:22
113:25 114:10, 15, 18,

23 115:8, 10, 13
117:20 118:4, 11
**mental** 6:15
**mention** 95:20
104:12
**mentioning** 117:22
**merchandise** 23:19
34:19 47:24 57:20
65:14 85:20, 24
86:12, 18 87:10, 18
89:1 117:23
**messages** 5:3
**MESSNER** 2:14
41:10, 17 103:24
**met** 21:19
**methods** 23:20 57:6
**mezzanine** 25:4, 8
**middle** 82:3
**MIKHAYLOVA** 1:1
4:7 70:14 76:1
85:18 104:13 105:2
**Mikhaylova's** 7:18
75:23 112:23
**mind** 100:4
**minor** 11:14
**minute** 41:15
**minutes** 39:17
114:12, 16
**Mississippi** 50:2
54:20
**moment** 74:3
**money** 51:3 53:11,
14 66:14 71:24
84:10 103:2, 5, 6
**monitor** 48:13, 16
**Monroe-Woodbury**
12:8
**month** 97:25 98:10,
16
**months** 47:21 50:25
115:4
**morning** 4:5
**motion** 72:8
**move** 42:7 73:17
**moved** 19:15 20:18
24:16
**multiple** 19:16 25:5
29:2 50:24 57:17
66:20

**< N >**
**name** 4:5 9:23, 24
11:17, 20 14:4 18:25
19:7, 8 23:2, 4, 5
31:13 33:11 37:24
39:13 60:5 64:12
70:14 74:14, 15
100:13 101:5, 13
105:2 106:23
**named** 11:10 23:3
**names** 23:1 31:7
57:9 67:25 68:1
**narrative** 75:19 85:6
**nature** 33:2
**nearly** 20:20
**necessarily** 41:5 92:8
**necessary** 120:3
**need** 5:3 42:7 72:7
118:18
**needed** 17:6, 9 20:2
30:4
**never** 71:17 85:20
99:24
**NEW** 1:1, 7, 8 2:4, 9,
13 12:9, 17 13:10
20:21 49:8, 23 50:2,
4, 13 53:21, 25 54:16,
20, 24 60:17 62:23
63:1, 2 64:20 67:4, 8
68:11, 19 86:19
87:11, 19 89:2 108:7
**nodding** 5:21
**Nope** 6:25
**normal** 40:5 59:10
**Northeast** 21:6, 7
**NOTARY** 1:16
119:3, 19
**note** 105:16
**noted** 120:8 122:4
**notes** 35:7 55:23
65:22 119:10
**notice** 15:20 105:19,
21 106:6
**Notification** 3:23
**NOVEMBER** 1:20
119:15
**number** 34:25 35:3
39:24 41:18 43:10,
13, 21, 24 44:13, 23

45:15  46:25  49:4
60:7  69:1  71:23
73:6, 8  77:23  84:9
92:24  101:8, 22, 23
102:5
**numbers**  38:16  43:1
44:4, 25  59:16  60:2
73:22  79:7  82:13, 14
93:5  98:23  99:2, 3
**numerous**  11:1
82:22  116:22

**< O >**
**Object**  8:20  10:17
11:5  14:8  15:17
16:13  21:17  23:10
24:23  26:5, 15  28:13
29:20  30:10  31:17
32:21  36:1, 11  37:6,
12  38:11  39:1  40:24
43:17  45:9  49:13, 24
50:6  51:16  53:18
54:3, 11  56:21  58:6,
12  59:8  61:12, 25
62:8  63:5  64:22
67:13  68:12  70:2
71:9, 21  72:21  76:25
77:10, 20  78:12  86:7
87:2, 16  88:3, 9
91:15, 22  92:4  94:16
95:21  96:15  106:11
111:17  113:21
117:11, 25
**Objection**  63:20
84:8  88:17  94:5
**obligations**  5:15
**occasion**  35:20
**occasional**  28:8
**occurred**  38:15  44:4
**occurring**  32:3, 7
**October**  14:24
**offer**  55:22
**office**  21:21  24:20,
22  37:3, 5, 9  97:24
100:8  109:15, 18, 20
**offices**  37:17
**Oh**  42:20
**Okay**  4:13, 23  5:6,
22  6:3, 9  7:1, 4, 16
9:6  10:4, 8  11:13

13:19  14:16  16:2
17:16, 22  18:9  20:16,
23  21:8, 11, 25  23:7
25:10  26:3, 14, 20
27:1, 6, 19  28:5, 12
31:8, 15  32:9  33:5
34:2, 15  37:1  42:14
43:15  44:12  48:20
51:23  52:3  53:2
56:11  58:17  59:4
61:6, 24  64:1  65:3
68:22, 24  71:13  73:5,
13, 17  74:7, 17, 20
75:22  76:19, 21  78:6
79:3  80:2  81:10, 15,
23  87:24  88:15, 21
89:15  90:15  93:13,
17, 25  97:10, 13  98:7,
8  101:21  102:6, 10,
16  104:20  106:20
109:3  110:4  111:5
114:1, 15, 20  115:1,
16  117:21  118:5
**old**  16:20  24:14
**once**  59:21  62:20
69:12  103:15
**one-page**  69:6
**ongoing**  62:16  78:22,
25
**open**  19:5
**operate**  62:19
**opinion**  14:14, 16, 17
**opinions**  14:1
**opportunity**  20:19
110:13
**options**  100:12
**Orange**  12:8
**ORC**  74:22  75:3
**order**  40:10  45:24
46:18
**organization**  13:13
**Organized**  74:23, 25
75:1, 8
**original**  119:10
120:11
**outcome**  9:25  10:1, 3
45:20  55:4  119:13
**outlet**  20:3
**outlets**  17:9  57:11
**outside**  44:22  47:24

**overall**  19:19  23:12
35:6  46:12  73:7
76:7  116:16
**over-purchasing**  43:5
**oversaw**  17:23  26:10
34:13  68:5  112:16
**overseeing**  26:9
111:4
**oversight**  17:10

**< P >**
**p.m**  69:22  118:19
**PAGE**  3:8  39:12
41:23, 24  42:12
93:14  100:19  104:1,
6  107:20  121:2
**pages**  42:18, 19
122:2
**paid**  40:2, 8, 14
48:12  49:11  50:10
85:19  96:4, 19  103:7
**paragraph**  97:21
98:5  104:11, 14
109:4, 12, 13
**PARALEGAL**  2:8
**parameters**  40:15
**part**  5:1  8:13  11:3
15:19  17:3, 5  18:6
24:12  25:17  26:11,
21, 22  27:4  29:19
30:2  33:25  34:9, 11
42:14  43:9, 20  44:11
55:15  56:7  59:5
62:15, 16, 18  65:9
67:23  70:12  73:5
75:5  79:23  80:2, 7
81:8  85:6, 9  88:23,
25  91:20  92:17
94:24  95:11, 18, 22
96:3  97:13  102:20
103:9  106:5  116:16
117:5
**particular**  29:24
43:20  51:5  103:18
**parties**  119:12
**partner**  80:21
**partner/fraud/ORC**
74:21
**partnering**  60:18
109:21  110:2

**partners**  66:20  75:2
80:16  82:6  118:17
**partnership**  29:9
**parts**  17:23  24:18
47:14
**party**  53:12
**PASSAIC**  2:13
**passed**  63:15
**pay**  40:17  49:23
50:4, 13  54:16, 22
61:8  62:6  67:4
**paying**  54:1  61:9
62:7, 23  63:8  64:20
67:8  68:11, 18  70:7
103:8
**payment**  40:14  49:12
**payments**  40:11, 13
**peer**  27:9
**peers**  27:8  61:16
80:21
**pending**  109:23
**PENN**  2:3
**PENNSYLVANIA**
119:1, 3, 13
**people**  23:20  24:2, 5
26:24  34:5  38:6
51:24  57:9  65:17, 20
66:16, 18, 21  67:21,
25  68:2  81:10  83:22
117:6, 18
**perceived**  77:13
**percent**  26:1  27:22
81:19  100:6, 7  107:3
**performance**  14:11
15:14, 16  113:24
**period**  4:15  15:15,
21  18:14  20:12  45:4
58:4  76:11, 22  79:1
106:3
**periods**  77:8
**periphery**  72:25
79:23  84:4
**person**  23:1  47:5
54:2  57:16  65:6, 11
84:10
**personal**  43:9  57:18
75:25  88:12  90:24,
25  102:24  103:10
108:6

**personally** 52:*3, 9*
63:*21, 23*
**perspective** 30:*24*
32:*17*
**pertained** 35:*21*
**pertaining** 22:*21*
33:*23* 34:*1, 2, 3* 45:*7*
67:*12* 79:*25* 81:*18*
**Peter** 81:*4, 5*
**phone** 4:*24* 5:*2, 7*
82:*13*
**physical** 6:*16*
**place** 17:*10* 119:*4*
**places** 62:*19* 64:*5*
99:*25* 116:*23*
**PLAINTIFF** 1:*3, 16*
2:*6* 4:*7* 11:*4*
**PLAINTIFF'S** 3:*8*
42:*21, 24* 69:*9, 14*
73:*19, 20* 79:*9* 85:*3*
89:*8* 93:*1, 16* 95:*3, 4*
100:*21* 103:*22* 104:*2,
3* 107:*10, 11, 19*
115:*11, 15*
**played** 11:*3*
**PLAZA** 2:*3*
**please** 4:*22* 33:*1*
72:*10* 83:*25* 85:*5*
107:*10* 114:*25* 120:*2,
6*
**pled** 11:*14*
**point** 17:*24* 18:*2*
26:*9, 10* 29:*23* 34:*5*
38:*16* 44:*2* 46:*16, 21*
55:*18* 65:*11, 22* 68:*5*
71:*10* 72:*20* 82:*24*
83:*3, 16* 84:*6* 91:*8,
11* 92:*13* 109:*21, 24*
111:*15* 112:*12*
**points** 8:*12* 100:*4*
**policies** 16:*17* 29:*25*
41:*5, 7* 114:*3*
**policy** 22:*21, 22*
34:*21* 40:*20, 23*
43:*15, 25* 44:*7, 9, 11,
13* 50:*18* 54:*21, 23*
68:*7, 9* 84:*19, 22*
89:*21, 24* 90:*8* 95:*14,
16, 23* 96:*4* 97:*20*

104:*17*
**portion** 72:*14* 97:*1*
**posed** 84:*16*
**Poshmarks** 57:*10*
**position** 13:*11* 16:*24*
17:*20* 18:*9* 19:*5, 9,
17* 20:*23* 21:*8, 9*
22:*1* 34:*10*
**positions** 20:*24*
**possibility** 62:*11*
**possible** 33:*22* 59:*18*
61:*6* 64:*23* 65:*1*
**possibly** 36:*5* 56:*7*
92:*20*
**potential** 51:*9, 13*
56:*9* 59:*17* 72:*24*
103:*11* 113:*5* 115:*23*
**Potentially** 30:*21*
31:*9* 47:*23* 49:*7*
56:*24* 59:*12* 71:*15*
104:*17*
**power** 103:*13*
**pregnancy** 112:*5*
**pregnant** 111:*10, 13,
20*
**prepaid** 40:*6, 7, 8*
48:*13, 22* 49:*11, 15*
51:*2* 97:*23* 100:*13,
17* 103:*8*
**prepared** 7:*11*
**prescription** 6:*19, 22*
**PRESENT** 2:*14*
5:*13* 7:*24* 8:*10*
55:*12, 17* 58:*5* 110:*1,
8* 111:*7*
**president** 18:*23*
**Pretty** 18:*4* 51:*1*
72:*5* 114:*12*
**prevent** 6:*12*
**prevention** 21:*7*
24:*11, 15* 30:*14* 53:*6*
114:*5*
**previous** 42:*10*
79:*16* 86:*23*
**previously** 52:*22*
**price** 48:*9* 49:*18*
**primary** 22:*18* 46:*16*
**printout** 101:*7*
**prior** 8:*23* 18:*10, 17*
20:*8* 40:*13* 66:*11*

72:*18* 79:*25* 83:*12*
92:*16* 112:*15*
**privileges** 93:*19*
**probably** 18:*10, 18*
28:*9* 39:*14* 47:*14*
66:*21* 67:*23*
**probation** 15:*15, 21*
**problem** 5:*23* 101:*20*
**proceed** 46:*20*
**proceeding** 5:*14*
**process** 15:*20* 45:*25*
46:*19* 83:*6, 8* 84:*19,
22* 111:*21*
**PROFESSIONAL**
1:*19* 3:*17* 119:*19*
**profit** 109:*6*
**Program** 99:*16, 19*
**prompted** 35:*5*
**proof** 65:*6* 88:*22*
117:*9, 22*
**properly** 16:*12*
**propounded** 122:*3*
**proprietary** 45:*15*
75:*6* 80:*9*
**prosecute** 117:*16*
**prosecution** 10:*25*
**protect** 23:*16*
**protection** 13:*12*
14:*21* 16:*25* 17:*1, 21*
18:*1, 15, 23* 19:*16, 17,
25* 21:*2* 22:*3, 22*
23:*9, 13* 24:*10, 17*
25:*14* 26:*4, 8* 30:*1, 8,
15* 31:*16, 25* 33:*17*
36:*20, 23, 24* 37:*16*
38:*1, 9* 68:*3, 4* 76:*6*
77:*15* 80:*17* 81:*3, 11*
94:*14, 18, 24* 109:*14*
114:*6*
**protocol** 106:*9*
**prove** 40:*16* 57:*2*
**provided** 76:*7* 90:*20*
**PUBLIC** 1:*16* 119:*3,
19*
**pull** 39:*13* 40:*1*
68:*24* 79:*4* 92:*21*
95:*2* 103:*21* 107:*9*
115:*8*

**pulled** 38:*19* 49:*2*
56:*1* 77:*23* 98:*24, 25*
99:*12*
**pulling** 99:*8*
**purchase** 40:*14* 49:*2*
51:*7* 53:*9* 56:*4, 14*
62:*7* 71:*8, 16* 75:*24*
76:*17* 90:*23* 96:*13*
97:*5, 17* 101:*2, 16*
108:*6, 14* 109:*6*
**purchased** 43:*21*
49:*4* 56:*19* 57:*21*
58:*18* 71:*23* 73:*9*
97:*11* 117:*23*
**purchases** 38:*16*
44:*13* 46:*5* 47:*22*
48:*9* 49:*1* 50:*5, 14,
15, 17* 51:*7, 15* 53:*13*
54:*18, 19* 56:*12, 13,
14* 66:*2* 68:*20* 70:*10,
11, 18, 19, 22* 71:*2, 3*
73:*6, 7, 12, 15* 74:*11*
76:*2, 10* 78:*10* 80:*3,
10* 82:*8, 25* 85:*9*
86:*5, 10, 25* 87:*15*
88:*1, 12* 95:*17* 96:*23*
97:*5, 14* 100:*9* 105:*1*
108:*8* 112:*24* 116:*17*
**purchasing** 31:*10*
53:*24* 68:*17* 76:*13*
96:*11*
**purposes** 4:*13*
100:*25* 109:*18*
**put** 15:*20* 29:*7*
52:*25* 55:*4* 75:*19*
101:*13* 102:*8* 113:*23*

< Q >
**qualified** 12:*19*
**qualify** 48:*23* 90:*23*
**question** 5:*5* 6:*1, 9*
71:*20* 72:*11, 12, 17*
79:*16* 86:*24* 87:*4*
114:*24* 115:*1* 117:*21*
**questions** 4:*14* 5:*11*
6:*6, 13, 17* 13:*6* 42:*6,
19* 53:*10* 56:*11* 61:*3,
4* 84:*16, 20* 114:*11*
118:*6, 12* 122:*3*

quickly  5:9
quite  33:14  46:24

< R >
raised  33:8  45:8
ran  18:5  29:12
random  94:25
Ray  68:4
reached  60:25
read  42:5, 10, 14
  69:13, 16  72:10, 15
  120:2  122:2
reading  43:10  93:11
  109:1
realigned  14:19
really  28:11  77:12
realm  106:15
reason  6:11  58:21
  120:4
reasons  50:22
recall  9:3, 15, 20
  10:1, 2  11:10, 12
  15:9  16:3  17:17
  18:19  19:8  22:7
  25:19, 22  26:1, 7
  31:2, 4, 6, 13, 24  32:2
  33:3, 10, 13, 21  37:14,
  16  44:1, 8, 14, 25
  45:4  51:19  55:13
  56:11, 16, 18, 24  57:8
  65:20  67:1, 5, 9, 15
  68:1, 3, 6, 14  71:13,
  22  74:14  77:23  81:5
  82:21  83:4  90:20
  91:13, 19, 20  97:17
  98:19, 22  107:1, 4, 5
  109:8  110:19, 20, 22,
  24  112:4, 11  113:10
  114:19  115:1, 21
  116:20
recaps  21:20
receipt  98:1  120:12
receipts  98:10, 15, 24
  99:1, 7, 11, 12  101:2
receive  15:4, 7, 15
  16:4, 5, 8  20:5  39:24
  97:23
received  22:5  85:20
  105:9
receives  96:23

Recess  39:19  85:1
  114:17
recollection  32:20
  33:4  36:13  51:18
  115:21
record  52:6  79:11
recorded  52:7
records  115:7
red  47:23  50:24
  51:4, 7  78:2
reference  71:18, 24
  73:11
referred  90:7  95:16
  103:19
referred-to  72:14
referring  4:15  71:6,
  7  97:1
refers  74:25
reflect  98:13
reflected  98:1
refresh  32:20  115:20
refuse  105:15, 20
  109:10  110:11
refused  105:7, 16, 18,
  23  109:11
regard  69:14
regarding  7:22
  70:16  106:18  112:7,
  23  113:2, 5, 8, 13
regional  21:7
register  38:15  40:13
REGISTERED  1:19
  119:19
registers  38:19
regular  100:12
reimbursed  88:13
  96:19
reimbursement  71:18
  73:15  85:20  88:23
  96:23
reinterview  84:17
reiterate  110:12
Related  3:23  46:1
  113:17  119:12
relations  109:23
  110:8, 17
remember  8:22  9:22
  14:23  25:18  28:24
  32:11  34:4  37:2, 24

44:3  47:12  60:20
  81:7  107:7  115:6
REMOTE  1:16
repeat  19:9  78:14
  105:10
repercussions  105:9
rephrase  6:6  37:7
report  28:12, 16
  31:1  32:3  52:17
  77:19  78:1, 2  80:18
reported  31:25
  80:20  119:8
REPORTER  1:19
  5:18, 25  72:15
  118:15  119:3, 19, 22
reporting  28:19
  37:23  38:19  40:1
  47:18
reports  35:2  77:16
representation  8:14
representative  55:11,
  17, 20, 22
represented  7:1
REPRESENTING
  2:6, 11  9:18
reproduction  119:21
requested  109:7
required  55:16  106:2
re-request  52:21, 23
researched  46:18
reseller  49:7  57:13
  64:3  65:4, 7, 12, 16,
  21  116:21  117:4, 7,
  23
resellers  32:8  44:23
  46:7  57:3  59:1
  103:11  116:18, 19
  117:19
reseller's  59:17
reselling  33:12
  43:12  47:24  49:6, 7
  51:9  56:9  57:6, 11,
  18  72:25  73:2
  104:17, 21, 22  113:5
  115:23
resells  57:8
reserve  114:10
resignation  106:4
resold  57:9

resolve  35:23
resolving  22:20
resources  35:20
  74:18
respond  6:1  53:1
response  63:18  72:12
responses  5:20
responsibilities  18:5
  22:17  29:19  31:16
  34:10
responsibility  22:18
  24:8  35:11  90:5
responsible  97:12
restate  62:2
restroom  39:17
RETAIL  1:8  53:22
  74:23, 25  75:1, 8
return  34:20  35:2
  60:24  120:10
review  75:23, 24, 25
  76:10  85:11  109:23
reviewed  7:14  15:25
  110:3
reviewing  35:1
  89:13  93:11  110:19
revolving  100:15
revolving/flex  100:9,
  10, 11
RICHARD  1:10
  28:2, 3, 6, 12  60:19
  61:2  64:1  65:25
  112:17
right  5:18  6:11
  8:14  18:18  19:8
  34:9  37:1  49:23
  54:9, 21  58:10  62:20
  63:3  64:9  68:24
  69:22  70:12, 13  71:4,
  20  72:10  73:13  74:3,
  15  76:22, 24  77:7
  78:6  80:25  81:15
  84:24  87:1, 11, 14
  89:17, 18  92:11  93:9,
  14  95:10, 25  99:7
  102:1, 10  107:23
  115:5  117:8, 9
ring  45:14  101:19
ringing  46:5  78:9,
  19  80:6  82:9  83:2

Case 1:19-cv-08927-GBD-SLC   Document 128-5   Filed 09/20/23   Page 51 of 63

Deposition of Christopher Castellani                Kristina Mikhaylova v. Bloomingdale's Inc., et al.

101:*17*, *25*   102:*14*, *15*, *18*

**rings** 75:*2*

**Rivera** 23:*2* 109:*16*, *17*, *20*

**Robert** 23:*1* 111:*2*

**Roberts** 101:*6*

**ROGERS** 1:*16* 119:*3*, *18*

**Rose** 3:*22* 106:*20* 107:*23* 108:*5*, *18*, *23* 109:*5*, *7*, *8*, *17*, *19*, *23*, *24*

**Rough** 15:*2*

**rules** 5:*10* 41:*6* 95:*12*

**run** 14:*18* 77:*16*

**rung** 102:*2* 108:*18*

**running** 19:*20* 24:*2* 78:*1*

**RWDSU/UFCW** 1:*9*

**< S >**

**sale** 48:*9* 49:*16* 83:*6* 102:*15*

**sales** 45:*2*, *17* 49:*8* 50:*4*, *13* 51:*1* 53:*21* 54:*22* 86:*19* 87:*11*, *13*, *20* 89:*2* 102:*18*

**Sarah** 14:*4*, *18* 16:*16* 114:*2*

**satisfaction** 46:*19*

**saw** 65:*22*

**saying** 19:*22* 33:*1* 36:*18* 43:*15* 50:*19* 57:*22* 61:*7* 62:*20* 64:*8*, *9* 67:*5* 71:*11* 83:*25* 84:*1* 86:*13* 101:*17* 111:*23* 117:*3*

**says** 69:*21*, *23* 70:*9*, *13*, *14* 74:*17*, *20* 75:*9*, *22* 81:*16*, *20* 82:*1*, *12* 83:*5* 85:*17* 86:*17* 89:*20* 90:*4*, *22* 93:*18* 95:*7*, *11* 96:*6* 97:*21* 100:*2*, *6*, *8* 101:*5*, *24* 108:*4*, *12*, *14* 109:*4*, *13*

**scenario** 53:*10*

**scheduled** 104:*14*

**schedules** 39:*14*

**scheduling** 38:*14* 39:*4*

**school** 12:*3*, *4*, *7*, *8* 13:*2*, *4* 24:*15*

**schools** 13:*4*

**screen** 41:*16* 73:*19*

**scroll** 85:*7*

**scrolled** 117:*14*

**second** 47:*15*, *16* 56:*5* 81:*6* 109:*3*, *12*, *13*

**section** 42:*16* 85:*6*

**see** 27:*10* 28:*9* 30:*4* 39:*4*, *10*, *11* 40:*1*, *7* 41:*20* 42:*19* 43:*1* 48:*5* 65:*13* 71:*4* 74:*5*, *18* 75:*15* 76:*3* 82:*4*, *14* 83:*9* 84:*4* 85:*21* 86:*1*, *20* 89:*17* 90:*24* 91:*2* 93:*13* 95:*8* 97:*16* 98:*2*, *7* 99:*16* 100:*2*, *4* 101:*5* 103:*6* 104:*7*, *8*, *18* 107:*20*, *21*, *24* 108:*9*, *14*, *15* 111:*9* 115:*17*, *20*

**seeing** 93:*8*

**seeking** 73:*15*

**seen** 52:*18*

**selected** 100:*7*

**sell** 34:*7*

**sellers** 45:*1*

**selling** 44:*15* 57:*7*, *20* 58:*21* 59:*2* 65:*15* 117:*7*, *15*, *18*

**send** 54:*6* 77:*18* 81:*21* 101:*5*, *10* 102:*9* 108:*13*

**sender** 101:*6*, *10*

**sending** 49:*6* 62:*21* 64:*5*, *8*, *17*, *19* 65:*2* 82:*19* 101:*13* 105:*2* 108:*21*

**sends** 81:*20* 82:*4*

**sense** 29:*22* 92:*11*

**sent** 46:*2* 49:*22* 62:*13* 64:*1*, *6* 80:*11*

83:*13* 92:*19* 102:*7* 112:*14*, *16*

**sentence** 87:*7*, *8*, *9*

**separate** 37:*3* 80:*4*, *5*, *7* 94:*3*, *9*

**separately** 96:*4*

**September** 115:*5*, *17* 116:*8*

**serial** 59:*16* 60:*2*

**serious** 95:*12*

**service** 35:*25*

**services** 47:*19*

**set** 47:*1* 119:*5*

**severe** 47:*20*

**sexual** 27:*14*

**sgerber@bglaw.com** 2:*14*

**shaking** 5:*21*

**Shanine** 22:*25* 52:*5* 55:*25* 70:*16* 85:*17*

**share** 36:*4*

**shared** 21:*21*

**sharp** 72:*6*

**Shaw** 14:*4*

**Sheet** 120:*5*, *6*, *8*, *11* 122:*4*

**ship** 50:*16* 54:*2* 62:*5*, *19* 67:*3*, *4*, *7* 68:*10* 96:*1*

**shipped** 49:*5* 50:*2*, *9* 53:*14* 54:*19* 70:*22* 87:*19* 94:*14* 108:*5*, *8* 109:*1* 116:*23*

**shipping** 50:*21* 51:*3*, *10* 53:*12*, *21* 54:*21* 60:*17* 61:*7* 62:*23* 68:*18* 70:*7* 72:*25* 86:*18*, *25* 87:*8*, *10*, *12* 89:*1* 95:*19*, *20*, *22* 96:*3*, *4*, *5* 101:*12* 104:*23* 106:*24* 108:*7*, *23* 113:*9* 116:*17*, *19*, *24* 117:*7*

**shoes** 56:*17*, *20*, *25*

**shop** 85:*25* 86:*12*

**shoplifters** 23:*24* 24:*15*

**shopped** 99:*24*

**shorthand** 119:*10*

**shortly** 111:*25*

**show** 32:*19* 97:*10*

**showing** 98:*5*

**side** 21:*22*, *23* 24:*1* 33:*12* 80:*22* 110:*8* 117:*17*

**sign** 120:*6*

**significance** 84:*7*

**significant** 45:*1*

**signing** 120:*7*

**similar** 53:*7* 77:*4*

**similarly** 53:*1*

**situation** 8:*24* 9:*1* 28:*7*

**situations** 10:*20*, *24*

**SMITH** 2:*2*

**software** 37:*20* 38:*10* 74:*9*, *10*

**Soho** 13:*24*, *25* 14:*25* 16:*24* 17:*11*, *12* 18:*11* 19:*3*, *11*, *12* 22:*4*, *12* 25:*24* 52:*14* 113:*12*

**sold** 43:*11* 57:*23*, *25* 65:*14*

**somebody** 40:*14*, *16* 59:*21* 103:*5*

**someplace** 50:*9*

**sorry** 8:*2* 10:*13*, *14* 12:*4* 21:*13* 24:*21* 42:*11*, *17* 79:*6* 83:*23* 88:*10* 92:*22* 93:*21* 98:*4* 103:*21* 105:*10* 113:*15* 114:*21*, *22*

**sound** 115:*5*

**SOUTHERN** 1:*1*

**space** 120:*4*

**speak** 8:*8* 30:*18* 34:*7* 40:*15* 92:*6* 109:*5*

**speaking** 6:*2* 105:*13*

**specific** 8:*23* 19:*18* 28:*10* 30:*24* 31:*6*, *7*, *10* 32:*2* 37:*20* 40:*18*, *19* 43:*16* 44:*8*, *11*, *25* 57:*8* 58:*21* 59:*1* 73:*8* 76:*11* 115:*6*

**specifically** 9:*22* 10:*1* 21:*6* 26:*7* 31:*2* 33:*23*, *24* 44:*1*, *4*, *14*

Case 1:19-cv-08927-GBD-SLC   Document 128-5   Filed 09/20/23   Page 52 of 63

Deposition of Christopher Castellani                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

46:10   53:8   56:16
67:10, 16   68:6   77:24,
25   79:20   82:22
94:19   97:7
**specifics** 9:15   16:3
22:7   33:10, 13
106:13
**spend** 28:11   51:2
**spending** 47:20
**spent** 85:15
**spike** 47:20   76:12
**split** 29:3
**spoke** 29:23   30:2
45:22   109:21   110:14
**spoken** 66:11
**spouse** 96:8, 13, 20
97:6
**spouses** 90:9
**spreadsheet** 81:18
**stakeholder** 112:16
**stamp** 89:6   92:22
100:24   104:2, 3
**stamped** 42:25
89:16   93:15   95:3
104:2   107:19, 20
115:15
**Standards** 3:9   16:18
**standing** 90:6
**start** 13:14   18:9
34:24   42:5, 12   70:13
101:24
**started** 21:1   35:5, 7
79:21
**starting** 107:18
**starts** 41:21
**state** 49:5   50:17, 21
51:4   53:12, 14, 21
54:16, 22, 24   60:18
61:7   62:24   63:1, 2
64:20   67:3, 4, 7, 8
68:8, 10, 11, 18, 19
70:23   86:19, 24   87:1,
10, 11, 20   89:1, 2
97:18   104:11, 13
114:1   120:4
**stated** 4:14   52:22
61:15, 20, 22   63:1, 15
67:7   84:18   85:23
86:9   88:19   108:13
109:19   117:9

**Statement** 3:9   7:17,
18   11:2   55:4, 6, 8
69:21, 25   86:24
96:19   105:5, 6, 9, 12,
14, 18, 20, 24   109:8, 9,
17, 19, 20   110:5, 7, 13
117:10
**statements** 10:12, 16,
19   102:21, 22, 24
103:10, 14
**STATES** 1:1   61:8
62:5   85:16, 23
109:11
**stating** 9:9   16:4
67:1   68:14   85:19
86:3, 4   87:7, 8, 9
98:18
**stenographically**
119:8
**step** 21:25
**stepped** 109:15, 17
**Steve** 118:17
**STEVEN** 2:12   8:12
**stock** 43:12
**stolen** 46:8
**stop** 39:18   55:20
84:24
**STORE** 1:8   13:22
14:1, 3, 20   15:1
16:17, 24   17:2, 11, 12
18:14   19:2, 10, 11, 14,
16, 20, 22, 24   20:1
21:2   25:9, 25   26:25
28:25   29:3   31:20
35:16, 18, 22   36:5, 15
37:11   47:24   52:13
57:18, 19, 25   58:1
59:7   75:15   80:23
81:14, 20, 21   82:4
114:6
**stores** 35:19   59:5
**STOREWORKERS**
1:8, 9
**straight** 54:2
**STREET** 2:8   4:12
17:19   18:19, 22   19:2,
22, 24   21:12, 13
22:17   24:8, 24   25:24
28:3   29:1   30:20
37:11, 17, 18   58:1

75:13   80:20   81:19
117:24
**Subject** 10:18
119:13   120:7
**submit** 110:15
**subpoena** 103:13
**subsequently** 119:8
**substance** 122:4
**substandard** 14:11
15:14   113:24
**suffer** 6:15
**SUITE** 2:3, 13
**suited** 26:12
**Summary** 3:20   35:6
72:8   105:17   107:24
108:22   110:15
**Sunday** 104:7
**supervise** 21:16
25:12   116:4
**supervision** 119:9, 22
**supervisor** 21:2, 3, 11
**supplied** 99:5
**supply** 24:18
**support** 26:25   30:4
31:22
**supported** 47:9
**supposed** 6:22
**Sure** 16:15   22:8
26:24   29:4, 12   32:13
42:20   43:12   69:13
72:2   78:25   90:12
94:10
**surrounding** 22:15
27:23, 25
**suspend** 109:24
110:2   111:6, 7
**suspended** 60:18, 22
105:8   106:10   109:22
110:20
**suspending** 105:22
**Suspension** 3:23
105:19, 21   106:5
112:3   113:2
**suspensions** 105:25
**suspicion** 64:2, 4
**sworn** 4:2   10:12, 16,
19   119:7
**synonymous** 24:16
36:18   65:4   93:25

**system** 37:23, 25
38:19   74:13   75:11,
16
**systems** 23:18   24:3
75:13   98:12

**< T >**
**TABLE** 3:1
**take** 5:3, 4, 25   6:22,
24   27:1   39:17   41:8
49:17   55:23   74:3
89:13   103:6   109:17
114:11   115:14
**TAKEN** 1:16   6:19
9:6, 10   10:5   17:10
27:2   39:19   48:10
85:1   88:22   92:8
97:24   114:17   119:4
**takes** 25:7
**talk** 8:7   95:19
**talked** 53:6, 9   55:9
**talking** 9:2   29:9
43:4, 20   44:2   60:2
66:22   96:20
**talks** 95:10   99:15
**target** 46:16
**targeting** 44:23
**tax** 49:7, 8, 12, 20, 21,
23   50:4, 9, 10, 13
51:10   53:21, 22   54:1,
9, 16, 22   60:18   61:9
62:6, 7, 23, 24   63:1, 2
64:21   67:4, 8   68:11,
19   73:3   86:19   87:11,
13, 20   89:2, 4
**taxes** 53:15   54:7
61:11, 15, 22   63:8
70:8
**Teala** 23:3
**team** 16:16, 19, 21
17:23   18:8   22:19, 23,
24   23:21, 25   24:7
26:9, 12   30:1, 16
34:13, 17   35:1, 11
36:4, 5, 14, 20   38:1, 2,
4   39:6   45:13   47:8,
18   48:1, 25   57:2
58:11, 15   59:4, 14, 20,
25   67:24   68:5   74:24

76:6   81:8   109:22, 25
114:4
team's   59:13
tech   42:7
technical   36:19
TECHNICIAN   2:14
Technology   12:17
24:2
telephone   4:20, 23
television   75:11
tell   5:15   6:7   7:11
27:21   55:5   82:12
tells   5:12
temporary   17:10
terminated   14:5, 7,
22   15:1   22:11   107:2,
6, 7   110:21   113:20
114:19   115:2   116:8
termination   15:5, 24
16:9   17:13   22:15
46:21   108:2   111:24
113:11, 12, 15
terrible   23:5
testified   4:2   10:6, 8,
10
testify   119:7
testifying   5:14
testimony   72:14
119:5, 8
Thank   5:9   53:2
93:4   107:16   114:16
118:5, 14
theft   22:20   30:2
34:18, 19   75:1
thereof   119:13
thing   15:14   23:18
31:22   39:3   41:23
59:16   61:19   66:17
things   22:23   24:1, 4,
19   33:13   34:22   38:6
39:7   59:18   62:19
think   18:17   19:7
20:14   23:1, 3, 4
24:14, 16   25:8   31:13
39:3   44:1   45:11
47:21   48:2   50:23
64:4   65:22   72:6
78:7, 8   83:20   85:4
91:17   94:10   102:19

106:14   110:12
111:19   112:4   114:12
third   53:11   75:23
thirty   120:12
thought   72:5   87:18
93:3
thousand   20:13
thousands   29:1
threats   23:24
three   13:15, 23   51:6
81:18
three-page   42:2
thrift   13:13
tie-in   104:24
TIERNEY   2:7   7:5
8:6, 20   10:14, 17
11:5   14:8   15:17
16:13   21:17   23:10
24:23   26:5, 15   28:13
29:20   30:10   31:17
32:21   36:1, 11   37:6,
12   38:11   39:1, 16
40:24   41:12, 22   42:1,
4, 11, 17   43:17   45:9
49:13, 24   50:6   51:16
52:24   53:18   54:3, 11
56:21   58:3, 6, 12
59:8   61:12, 25   62:8
63:5, 20, 22   64:22
67:13   68:12   69:1, 4,
6, 16   70:2   71:9, 21
72:4, 11, 21   73:22, 25
76:25   77:10, 20
78:12   79:6, 12, 14
84:8, 12   86:7   87:2,
16   88:3, 9, 17   91:15,
22   92:4, 25   93:5, 8
94:5, 16   95:21   96:15
106:11   107:13, 16
111:17   113:21
114:13, 20   115:9
117:11, 25   118:13, 16,
17
time   4:15   5:4   9:4
15:23   16:18   17:24
18:4, 7, 14, 16, 18
20:11   22:8   28:11
29:8, 16   32:14, 20
33:7, 16   35:18   45:4
47:13   50:16   58:3, 4

60:10, 24   62:7   66:13
76:11, 22   77:3, 8
78:8   79:16   83:16
84:6   89:13   95:14
101:24   104:20   106:2
109:6   111:9, 12
114:3, 10   115:22
116:12   119:4
times   6:7   10:10
22:8   24:7   32:6   41:3
59:15
tip   35:1
title   22:2   29:12
36:19   81:6, 7
today   5:11, 13   6:13
7:2   55:19   61:9   62:7
70:15   118:6
today's   4:13, 23   7:6,
11, 22
told   55:7   66:16, 22,
25   91:7   110:2   112:4
118:3
tone   71:21   72:1, 5, 11
tool   39:4
top   69:22, 23   70:13,
14   78:2   93:13, 18
101:23   102:13
104:12
total   85:15   99:6
totaling   76:2   85:9
touch   30:3   31:21
trace   59:22
track   37:21   38:15
74:10
traffic   11:14
training   29:24   30:24
31:21   67:11, 19, 22
trainings   26:21
transaction   97:7
98:1, 15, 25   102:13
108:25
transactions   34:6
40:1   46:4   49:3
75:14   78:9, 19   80:6
98:24   108:12   116:22
transcribed   119:9
transcript   119:9, 21
120:12, 14
transcription   122:3
transition   18:21

transitioned   18:19
21:12
TRIAL   1:4
true   119:9
truth   5:16   119:7
truthfully   5:11   6:13
try   6:2
trying   16:21   18:16
19:7   20:14   23:1
79:15   98:3
Tuesday   104:15
tune   47:20
turn   74:17   100:24
turned   66:8
Two   12:2   13:15, 16
18:10   20:13   24:13
42:18   74:4   75:3
77:4   82:24   83:2
93:25   94:3, 9   98:21
100:12   114:15
Tyler   3:20   106:20
107:4, 7, 23   108:5, 18,
23   109:1, 10   110:20,
21
TYNDALL   2:8
type   22:10   34:15
44:10   65:14   100:10
types   34:20
typical   76:21
typically   82:3

< U >
Um-hum   69:18   71:5
74:19   80:14   83:10
85:22   89:19   96:10
99:17   100:5
unblock   92:7
unblocked   91:19, 21,
24
uncovered   105:23
underneath   75:9, 18
understand   4:25   5:1,
16   6:5, 8   63:18   72:2
79:15
understanding   54:25
72:19
Understood   4:17
75:18   118:5
unencrypting   38:17
uniform   18:6   26:11

UNION  1:*8*  55:*11,*
*16, 19, 21*
UNITED  1:*1, 8, 9*
unmarried  96:*9*
unnecessarily  61:*10*
updated  109:*14*
upload  41:*21*
use  5:7  37:*20*  40:*4,*
*10*  90:*10, 14, 18, 25*
91:*8, 25*  96:*1, 21*
97:*22*  99:*25*  103:*7*
116:*15*
user  90:*14*  96:*21*
users  90:*11*
usually  59:*12*

**< V >**
various  17:*23*  23:*20*
24:*2, 7*  26:*23*  30:*3*
35:*1*  57:*6*  62:*19*
77:*8*  80:*11*
verify  76:*9*  83:*7*
98:*24*  99:*1, 12*  103:*2*
versus  61:*9*  93:*23*
vice  18:*23*
video  52:*8, 9, 10, 12,*
*18, 22*
view  34:*5*  42:*10*
violating  44:*7*  104:*16*
violation  11:*15*
22:*22*  60:*17*  71:*7*
violations  34:*21*
95:*11*
volume  94:*20*
voluntary  106:*3*
VP  81:*3*
VS  1:*4*

**< W >**
wait  5:*25*
waived  108:*7*
walked  55:*8*
want  13:6  14:*21*
16:*17*  20:*13*  22:*16*
39:*21*  42:*11, 18*  43:*3*
45:*5*  48:*7*  52:*25*
53:*22*  63:*17*  72:*2*
74:*5*  78:*7*  96:*18*
97:*2*  105:*6*  109:*19*
114:*24*

wanted  16:*19*  22:*16*
33:*6*  42:*15*  48:*23*
102:*9*
wanting  20:*21*
wants  59:*17*
warranted  16:*12*
watch  75:*14*
way  14:*18*  31:*19*
62:*18*  114:*2*
ways  34:*25*  35:*3*
39:*24*
website  57:*17, 19*
117:*15*
weekly  21:*20*  28:*9*
well  11:2  36:*19*
45:*12*  47:*19*  48:*5*
49:*12*  56:*25*  69:*20*
70:*13*  78:*10*  81:*12*
83:*17*  90:*10*  101:*11*
116:*23*
went  46:*24*  47:*12*
we're  6:2  43:*4*
66:*22*  92:*13*  105:*21*
WEST  2:*8*
We've  7:*8*  89:*25*
WHOLESALE  1:*8*
willingly  66:*8*
withdrawn  7:*11, 25*
16:*5*  17:*11*  25:*12*
27:*1, 24*  34:*10*  38:*8*
44:*6, 18*  46:*3*  48:*5*
56:*2*  57:*2, 24*  59:*4*
60:*13*  61:*6*  63:*11*
64:*19*  68:*7, 8*  69:*21*
71:*7*  76:*21*  78:*17*
83:*17*  87:*9, 25*  94:*13*
95:*13*  103:*16*  106:*1*
113:*12*  114:*2*  115:*21*
witness  4:2  7:*17*
8:*22*  10:*19*  11:*7*
14:*10*  15:*19*  16:*15*
21:*19*  23:*12*  26:*7, 17*
28:*15*  29:*22*  30:*12*
31:*19*  32:*23*  36:*3, 13*
37:*14*  38:*13*  39:*3*
41:*1*  42:*9, 14*  43:*19*
45:*11*  49:*15*  50:*1, 8*
51:*18*  53:*20*  54:*5, 14*
55:*25*  56:*23*  58:*8*
59:*10*  61:*14*  62:*10*

63:*7, 21, 23*  64:*23*
67:*15*  68:*14*  69:*18*
70:*4*  71:*10, 22*  72:*23*
77:*2, 12, 22*  78:*14*
84:*9*  86:*9*  87:*4, 17*
88:*4, 11, 19*  89:*10*
91:*16, 24*  92:*6*  94:*18*
95:*22*  96:*17*  106:*13*
111:*19*  113:*23*
114:*22*  117:*13*  118:*2*
119:*7*  120:*1*
words  97:*25*  110:*7*
work  13:*19*  17:*18*
20:*9, 11, 12*  26:*14, 20*
35:*13, 22, 24*  46:*2*
60:*24*  68:*2*  77:*12*
80:*18*
worked  4:*11*  13:*23*
21:*21*  26:*17*  31:*13*
41:*3*  70:*15*  80:*22*
working  9:4  13:*14*
14:*25*  17:*12*  25:*24*
27:*20*  35:*17*  48:*4*
59:*11, 14*  98:*22*
Works  13:*8*
world  57:*10*
worth  47:*21*
write  55:5, 7  105:*11,*
*14, 17, 18, 20, 24*
109:*9*  110:*5, 7, 13*
write-off  84:*10*
writing  53:*1*  105:*9*
written  7:*18*  54:*23*
109:*19*
wrong  51:5  63:*3*
wrote  69:*25*

**< Y >**
Yang  9:*24*  11:*11*
yeah  29:*22*  41:*20*
42:*9*  48:*18*  60:*4*
74:*12*  91:7  111:*25*
114:*13*
year  12:*12, 20, 25*
13:*2*  15:*2, 10, 11*
17:*13*  76:*23*  77:*4*
82:*4*
years  7:*15*  8:*23*
13:*15, 16*  18:*10*

20:*11, 14, 20*  25:*6*
77:*4*
Yep  93:*12*
YORK  1:*1, 7, 8*  2:*4,*
*9*  12:*9, 17*  13:*10*
49:*8, 23*  50:*4, 13*
53:*21*  54:*16, 24*
60:*17*  62:*24*  63:*1, 2*
64:*20*  67:*4, 8*  68:*11,*
*19*  86:*19*  87:*11, 19*
89:*2*  119:*2, 4, 13*
young  16:*19*  23:*3, 5*
Younis  29:*10*  112:*7*
Yu  108:*8, 23*  109:*2*
116:*21, 24*  117:*3, 7,*
*16, 18*

**< Z >**
zoom  89:*10*

## WORD LIST

**< $ >**
$65,000  *(3)*

**< 0 >**
000063  *(1)*
07004  *(1)*

**< 1 >**
1  *(4)*
1:48  *(1)*
10  *(5)*
10/16  *(2)*
100  *(2)*
10001  *(1)*
10119  *(1)*
107  *(2)*
1098  *(3)*
11:07  *(1)*
1110  *(1)*
115  *(1)*
1456  *(2)*
1485  *(2)*
1486  *(1)*
1486-1515  *(1)*
1497  *(1)*
1498  *(3)*
15  *(1)*
151  *(1)*
1515  *(1)*
1576  *(2)*
1577  *(1)*
1605  *(2)*
165  *(1)*
19  *(1)*
1964  *(1)*
1986  *(1)*
19-8927  *(1)*
1995  *(1)*
1st  *(2)*

**< 2 >**
2  *(4)*
20  *(2)*
2016  *(4)*
2017  *(15)*
2019  *(4)*
2020  *(2)*

**2022**  *(2)*
**2040**  *(3)*
**20th**  *(1)*
212)494-1621  *(1)*
212)587-0760  *(1)*
23rd  *(1)*
24  *(2)*
26  *(2)*
26th  *(2)*
2M  *(1)*

**< 3 >**
3  *(7)*
30  *(1)*
34TH  *(1)*
35  *(1)*
379  *(3)*
380  *(5)*

**< 4 >**
4  *(3)*
4/21/17  *(1)*
4/21/2017  *(3)*
4:12  *(1)*
42  *(1)*
48  *(1)*
4905  *(1)*
4th  *(2)*

**< 5 >**
5  *(3)*
59th  *(24)*
5th  *(1)*

**< 6 >**
6  *(5)*
61  *(1)*
64  *(1)*
65,000  *(5)*
65,988  *(2)*
66  *(3)*
69  *(1)*
6th  *(3)*

**< 7 >**
7  *(5)*
720  *(1)*
72061886  *(6)*
73  *(1)*

**79**  *(1)*

**< 8 >**
8  *(5)*
884  *(1)*
885  *(3)*
888  *(1)*
89  *(2)*

**< 9 >**
9  *(4)*
90,000  *(2)*
91  *(1)*
93  *(1)*
95  *(1)*
96  *(1)*
973)256-9000  *(1)*

**< A >**
A.M  *(1)*
A/K/A  *(1)*
Abe  *(3)*
ability  *(1)*
able  *(2)*
Abraham  *(5)*
abuse  *(29)*
abuses  *(1)*
accept  *(1)*
access  *(12)*
Account  *(43)*
accountable  *(1)*
accounts  *(5)*
accurate  *(1)*
ACKNOWLEDGMEN
T  *(1)*
act  *(2)*
action  *(14)*
activity  *(9)*
add  *(1)*
addition  *(1)*
additional  *(5)*
address  *(12)*
addresses  *(8)*
adjustments  *(1)*
admission  *(3)*
admit  *(3)*
admitted  *(10)*
admonish  *(1)*

advertise  *(1)*
advised  *(1)*
AFL-CIO  *(1)*
age  *(1)*
agency  *(1)*
ago  *(5)*
agree  *(2)*
agreement  *(2)*
agreements  *(1)*
ahead  *(6)*
alarm  *(2)*
alerted  *(1)*
allowed  *(9)*
American  *(1)*
amount  *(18)*
amounts  *(1)*
and/or  *(1)*
Angy  *(10)*
anonymous  *(1)*
answer  *(66)*
answered  *(3)*
answering  *(1)*
answers  *(3)*
answer's  *(1)*
anybody  *(3)*
AP  *(3)*
API  *(1)*
apologies  *(3)*
apparently  *(1)*
appear  *(2)*
APPEARANCES  *(1)*
appears  *(5)*
applicable  *(2)*
applied  *(1)*
apply  *(2)*
applying  *(1)*
appropriate  *(1)*
approve  *(1)*
Approximate  *(1)*
approximately  *(5)*
April  *(2)*
area  *(4)*
areas  *(2)*
argumentative  *(2)*
arguments  *(1)*
articles  *(1)*
asked  *(9)*
asking  *(13)*
aspect  *(8)*

aspects  (1)
asset  (45)
assets  (1)
assistance  (1)
assisted  (2)
Associate  (16)
associated  (4)
associates  (6)
associate's  (3)
assume  (6)
assumed  (1)
assuming  (2)
assumption  (1)
attached  (3)
attempts  (1)
attend  (5)
attendance  (1)
attention  (1)
attorney  (10)
attorneys  (1)
attractive  (1)
audible  (1)
audibly  (1)
authenticity  (3)
authorized  (8)
available  (2)
AVENUE  (1)
avoid  (20)
avoidance  (3)
avoiding  (1)
aware  (9)
awareness  (2)

< B >
bachelor's  (1)
back  (30)
backed  (1)
bag  (2)
bags  (4)
balance  (2)
bank  (7)
bargaining  (1)
BARTON  (1)
base  (2)
based  (12)
basic  (3)
Basically  (1)
basis  (1)
Bates  (19)

Becker  (4)
Becker's  (1)
becoming  (1)
began  (1)
behavior  (1)
believe  (57)
benefit  (1)
best  (2)
Beth  (1)
BETHANN  (3)
BETTY  (2)
betty.tierney@macys.c
om  (1)
beyond  (2)
bigger  (3)
bill  (4)
bit  (4)
black  (1)
BLM  (1)
BLM000061-
BLM000066  (1)
BLM000064  (1)
BLM000379  (1)
BLM000379-
BLM000456  (1)
BLM000380  (1)
BLM000884  (1)
BLM000884-
BLM000885  (1)
BLM000888-
BLM000889  (1)
BLM001098-
BLM001110  (1)
BLM001456-
BLM001485  (1)
BLM001486-
BLM001515  (1)
BLM001491  (1)
BLM001576  (1)
BLM001576-
BLM001605  (1)
BLM001952  (1)
BLM001952-
BLM002035  (1)
BLM002040-
BLM002055  (1)
BLM1462  (1)
BLM2040  (2)
BLM61  (1)

BLM888  (1)
block  (3)
blocked  (3)
BLOOMINGDALE'S
  (55)

Bloomingdale's/Macy's
  (1)
Bloomingdale's-
owned  (1)
BOBBY  (8)
boiled  (1)
bona  (3)
BOOKER  (6)
boss  (1)
bottom  (10)
bought  (4)
branch  (1)
brand  (3)
brands  (3)
break  (4)
brief  (1)
bringing  (1)
broader  (2)
broke  (1)
brought  (2)
building  (5)
buildings  (1)
business  (5)
butcher  (1)
buy  (3)
buyer  (4)
buyers  (2)
buying  (1)

< C >
call  (3)
called  (8)
calls  (1)
camera  (4)
card  (32)
cards  (7)
care  (1)
career  (1)
carefully  (1)
carried  (1)
CARROTS  (1)
CASE  (17)
cases  (2)

cash  (1)
cashier  (1)
CASTELLANI  (13)
catching  (1)
categories  (1)
categorize  (1)
category  (3)
Cathy  (15)
cause  (2)
cc  (1)
cc'd  (1)
CCTV  (1)
central  (33)
certain  (6)
certainly  (1)
certification  (1)
certify  (4)
certifying  (1)
Chad  (3)
Chad's  (1)
chain  (1)
Chanel  (23)
Chanel's  (1)
change  (4)
changed  (1)
changes  (5)
charge  (5)
charged  (1)
charges  (1)
check  (5)
checked  (1)
Chie  (1)
C-h-i-e  (1)
children  (4)
Chris  (16)
CHRISTOPHER  (9)
circuit  (1)
clarification  (1)
clarify  (1)
clear  (3)
clearly  (1)
Closed  (2)
CO-COUNSEL  (1)
Colleague  (6)
collect  (1)
Collection  (2)
collective  (1)
college  (3)
collusion  (1)

combination  (3)
come  (12)
comfort  (1)
coming  (2)
command  (1)
committing  (1)
COMMONWEALTH
  (2)
communicated  (1)
communication  (1)
company  (1)
complaint  (2)
complete  (3)
completing  (1)
complex  (2)
compromised  (1)
compromising  (1)
computer  (1)
concern  (3)
concerned  (4)
concerns  (7)
conclude  (1)
concluded  (2)
conclusion  (4)
condition  (1)
Conduct  (4)
conducted  (4)
conducting  (3)
conflate  (1)
conjunction  (1)
connected  (1)
connection  (2)
connotation  (1)
Consent  (1)
consider  (2)
considered  (6)
contact  (6)
containing  (1)
CONTENTS  (1)
continue  (4)
continued  (3)
continuous  (1)
contribute  (2)
contributed  (1)
control  (2)
controls  (1)
conversation  (26)
conversations  (18)
convicted  (1)

coordinate  (1)
copied  (1)
copy  (3)
copying  (1)
corner  (1)
corporate  (10)
correct  (49)
corrections  (3)
corrective  (11)
correctly  (1)
correspond  (1)
counsel  (14)
Counselor  (1)
counterfeiters  (1)
County  (3)
couple  (3)
course  (1)
COURT  (8)
courts  (1)
cover  (1)
covered  (1)
coworkers  (1)
create  (1)
Credit  (20)
crime  (5)
criminal  (1)
cross-divisional  (1)
cross-shop  (1)
crunched  (1)
current  (1)
customer  (4)
customers  (10)

< D >
D/B/A  (3)
DATE  (13)
dated  (2)
dates  (6)
DAVID  (3)
day  (4)
days  (2)
dealings  (1)
debit  (1)
decided  (2)
decides  (1)
decision  (1)
declined  (1)
deemed  (1)
defendant  (2)

DEFENDANTS  (3)
definitely  (1)
definition  (1)
degree  (1)
delete  (1)
deleted  (3)
DEMANDS  (1)
denied  (1)
Denis  (7)
DENNIS  (3)
DEPARTMENT  (29)
departments  (1)
depended  (1)
dependent  (2)
dependents  (2)
depending  (1)
depends  (2)
DEPONENT  (1)
deposed  (1)
deposing  (1)
DEPOSITION  (22)
DEREK  (1)
destination  (1)
Detail  (2)
detailed  (1)
details  (3)
detective  (1)
detectives  (1)
determination  (5)
determine  (9)
determined  (4)
develop  (1)
developed  (1)
Development  (1)
dialogue  (1)
DIAZ  (2)
dictate  (1)
difference  (4)
different  (16)
differentiate  (1)
differing  (1)
direct  (6)
direction  (1)
directly  (5)
director  (7)
directors  (1)
director's  (1)
disagreed  (1)
disciplinary  (4)

discipline  (1)
Discount  (89)
discounts  (2)
discoverable  (1)
discrimination  (1)
discussed  (9)
discussing  (2)
Discussion  (1)
disposition  (4)
disregarded  (1)
disregarding  (2)
distinguish  (2)
distinguishing  (1)
DISTRICT  (2)
diversion  (19)
diverter  (19)
diverters  (8)
divisions  (2)
Divorced  (1)
document  (18)
documentation  (4)
documented  (1)
documenting  (1)
Documents  (8)
document's  (1)
doing  (22)
door  (5)
dotted  (1)
doublecheck  (1)
drilled  (1)
duly  (2)
duties  (5)

< E >
earlier  (2)
early  (2)
easier  (1)
eBay  (1)
effect  (1)
either  (9)
elaborate  (3)
element  (1)
eligible  (5)
e-mail  (10)
emails  (1)
e-mails  (2)
employed  (3)
employee  (51)
employees  (36)

employee's  (3)
employer  (1)
employment  (17)
encompassing  (1)
encouraged  (3)
encouragement  (1)
ended  (1)
ends  (2)
enforcement  (7)
ensure  (1)
entails  (1)
entered  (1)
entire  (5)
entirety  (1)
entitled  (1)
Errata  (5)
ESQUIRE  (3)
essentially  (3)
establish  (1)
estimate  (1)
evadance  (1)
evade  (2)
evasion  (1)
eventually  (1)
EVEREST  (1)
everybody  (1)
evidence  (4)
exact  (10)
exactly  (2)
EXAMINATION  (2)
example  (1)
exceeded  (2)
exceeding  (4)
excessive  (1)
Excuse  (1)
Exhibit  (44)
EXHIBITS  (1)
exist  (1)
exited  (1)
exiting  (1)
expect  (1)
experience  (4)
explain  (2)
explained  (1)
explaining  (2)
Express  (1)
expressed  (1)
extended  (2)
extent  (2)

external  (15)
extreme  (1)
extremely  (1)

< F >
fact  (5)
facts  (2)
fail  (1)
fair  (3)
FAIRFIELD  (1)
family  (8)
far  (2)
Fashion  (1)
February  (8)
Federated  (3)
fee  (2)
fell  (3)
felt  (3)
fide  (3)
field  (1)
fifth  (1)
file  (2)
filed  (1)
files  (3)
fill  (1)
final  (6)
find  (8)
findings  (2)
fine  (6)
finish  (2)
first  (5)
five  (5)
five-man  (1)
fixtures  (1)
flag  (2)
flags  (3)
flagship  (6)
flex  (1)
floor  (10)
FMLA  (1)
focus  (6)
focused  (11)
folder  (1)
folks  (1)
follow  (1)
followed  (2)
following  (3)
follows  (1)
foregoing  (5)

form  (68)
formal  (3)
formally  (1)
former  (4)
forth  (1)
FORTY  (1)
forward  (3)
forwarded  (3)
found  (5)
four  (6)
fourth  (1)
frame  (5)
fraud  (36)
frauds  (1)
fraudsters  (3)
fraudulent  (4)
Fred  (11)
friend  (3)
friends  (7)
front  (1)
full  (2)
full-blown  (1)
fully  (1)
further  (6)

< G >
gained  (1)
Gap  (8)
garb  (1)
general  (8)
generally  (3)
George  (1)
GERBER  (4)
getting  (4)
gift  (2)
gifts  (7)
GILMAN  (1)
Gina  (2)
give  (7)
given  (5)
giving  (1)
go  (32)
goes  (2)
going  (47)
Gonzalez  (2)
Good  (8)
goods  (1)
gotten  (3)
graduate  (2)

grand  (2)
Gray  (2)
Great  (4)
ground  (1)
GROUP  (4)
groups  (1)
grow  (1)
guard  (3)
guards  (4)
guess  (11)
guidelines  (3)
guilty  (1)

< H >
habits  (1)
Hackensack  (5)
half  (3)
halfway  (1)
Hampshire  (4)
hand  (2)
handbag  (5)
handbags  (4)
handbook  (1)
handed  (2)
handful  (2)
handled  (1)
Handwritten  (1)
happened  (7)
happy  (2)
harassment  (1)
head  (2)
hear  (1)
heard  (1)
heavily  (1)
he'd  (2)
held  (3)
help  (2)
helped  (4)
hereinbefore  (1)
hey  (1)
high  (15)
higher  (1)
highest  (2)
highlighted  (1)
history  (7)
hit  (1)
home  (5)
hours  (3)
Housing  (1)

**HR**  (20)
**HR's**  (1)
**hundred**  (3)
**husband**  (2)
**hypothetically**  (2)

**< I >**
**ID**  (1)
**identification**  (10)
**identified**  (1)
**identify**  (1)
**identifying**  (1)
**illegal**  (6)
**imagine**  (1)
**immediately**  (1)
**impair**  (2)
**imperative**  (1)
**implication**  (1)
**implications**  (1)
**important**  (2)
**improve**  (2)
**include**  (7)
**included**  (4)
**including**  (6)
**inconclusive**  (1)
**indicate**  (1)
**indicated**  (4)
**indicative**  (2)
**indict**  (1)
**indiscretion**  (1)
**individual**  (3)
**INDIVIDUALLY**  (4)
**individuals**  (1)
**industry**  (1)
**inform**  (2)
**informal**  (1)
**Information**  (29)
**informational**  (1)
**informed**  (5)
**informing**  (1)
**infraction**  (1)
**initial**  (10)
**initially**  (5)
**initiate**  (3)
**initiated**  (3)
**inordinately**  (1)
**input**  (3)
**inquiring**  (1)
**instance**  (1)

**instances**  (1)
**Institute**  (1)
**instructed**  (1)
**INSTRUCTIONS**  (1)
**interact**  (1)
**interested**  (1)
**interim**  (1)
**internal**  (18)
**Interview**  (17)
**interviewed**  (12)
**interviewing**  (1)
**interviews**  (1)
**investigate**  (4)
**investigated**  (19)
**investigating**  (5)
**investigation**  (90)
**investigations**  (30)
**Investigative**  (5)
**investigator**  (2)
**investigators**  (5)
**involve**  (1)
**involved**  (20)
**involvement**  (1)
**issue**  (7)
**issues**  (18)
**item**  (4)
**items**  (16)
**its**  (1)

**< J >**
**JERSEY**  (1)
**job**  (11)
**jobs**  (2)
**journal**  (4)
**judge**  (1)
**judgment**  (1)
**June**  (13)
**JURY**  (3)

**< K >**
**Kaitlin**  (1)
**keep**  (7)
**Kelly**  (1)
**kind**  (12)
**kinds**  (1)
**knew**  (2)
**know**  (88)
**knowledge**  (3)
**known**  (13)

**Kornyveh**  (1)
**KRISTINA**  (74)
**Kristina's**  (24)

**< L >**
**label**  (1)
**lady**  (2)
**Lai**  (8)
**large**  (1)
**larger**  (10)
**LAW**  (11)
**lawsuit**  (3)
**lawyer**  (1)
**leading**  (1)
**learn**  (1)
**learned**  (1)
**lease**  (3)
**leased**  (5)
**leave**  (6)
**Lee**  (7)
**left**  (8)
**legal**  (3)
**legally**  (1)
**level**  (8)
**light**  (1)
**limit**  (6)
**limits**  (1)
**line**  (5)
**lines**  (1)
**listed**  (4)
**little**  (5)
**LLC**  (2)
**LLP**  (1)
**LOCAL**  (2)
**located**  (3)
**location**  (17)
**locations**  (7)
**locked**  (1)
**long**  (7)
**longer**  (3)
**look**  (28)
**looked**  (4)
**looking**  (23)
**looks**  (3)
**loop**  (1)
**loss**  (6)
**lost**  (1)
**lot**  (9)
**low**  (1)

**Loyalist**  (2)

**< M >**
**MACY'S**  (10)

**Macy's/Bloomingdale's**
 (1)
**maintain**  (1)
**majority**  (7)
**making**  (9)
**manage**  (6)
**managed**  (3)
**management**  (1)
**manager**  (28)
**managers**  (10)
**managing**  (5)
**Manhattan**  (2)
**March**  (3)
**Margaret**  (1)
**mark**  (2)
**marked**  (16)
**marking**  (3)
**married**  (1)
**Mary**  (2)
**mashed**  (1)
**match**  (1)
**matching**  (1)
**MATT**  (1)
**matter**  (1)
**MCCS**  (25)
**McIntosh**  (2)
**mean**  (19)
**meaning**  (3)
**means**  (3)
**medication**  (2)
**meet**  (1)
**meeting**  (1)
**meetings**  (1)
**MELISSA**  (6)
**melissa@dereksmithla**
**w.com**  (1)
**members**  (6)
**memo**  (2)
**MENDOZA**  (131)
**mental**  (1)
**mention**  (2)
**mentioning**  (1)
**merchandise**  (13)
**messages**  (1)

**MESSNER**  *(4)*
**met**  *(1)*
**methods**  *(2)*
**mezzanine**  *(2)*
**middle**  *(1)*
**MIKHAYLOVA**  *(7)*
**Mikhaylova's**  *(3)*
**mind**  *(1)*
**minor**  *(1)*
**minute**  *(1)*
**minutes**  *(3)*
**Mississippi**  *(2)*
**moment**  *(1)*
**money**  *(9)*
**monitor**  *(2)*
**Monroe-Woodbury**
  *(1)*
**month**  *(3)*
**months**  *(3)*
**morning**  *(1)*
**motion**  *(1)*
**move**  *(2)*
**moved**  *(3)*
**multiple**  *(6)*

**< N >**
**name**  *(26)*
**named**  *(2)*
**names**  *(5)*
**narrative**  *(2)*
**nature**  *(1)*
**nearly**  *(1)*
**necessarily**  *(2)*
**necessary**  *(1)*
**need**  *(4)*
**needed**  *(4)*
**never**  *(3)*
**NEW**  *(36)*
**nodding**  *(1)*
**Nope**  *(1)*
**normal**  *(2)*
**Northeast**  *(2)*
**NOTARY**  *(3)*
**note**  *(1)*
**noted**  *(2)*
**notes**  *(4)*
**notice**  *(4)*
**Notification**  *(1)*
**NOVEMBER**  *(2)*

**number**  *(25)*
**numbers**  *(15)*
**numerous**  *(3)*

**< O >**
**Object**  *(67)*
**Objection**  *(4)*
**obligations**  *(1)*
**occasion**  *(1)*
**occasional**  *(2)*
**occurred**  *(2)*
**occurring**  *(2)*
**October**  *(1)*
**offer**  *(1)*
**office**  *(12)*
**offices**  *(1)*
**Oh**  *(1)*
**Okay**  *(102)*
**old**  *(1)*
**once**  *(4)*
**one-page**  *(1)*
**ongoing**  *(3)*
**open**  *(1)*
**operate**  *(1)*
**opinion**  *(3)*
**opinions**  *(1)*
**opportunity**  *(2)*
**options**  *(1)*
**Orange**  *(1)*
**ORC**  *(2)*
**order**  *(3)*
**organization**  *(1)*
**Organized**  *(4)*
**original**  *(2)*
**outcome**  *(6)*
**outlet**  *(1)*
**outlets**  *(2)*
**outside**  *(2)*
**overall**  *(7)*
**over-purchasing**  *(1)*
**oversaw**  *(5)*
**overseeing**  *(2)*
**oversight**  *(1)*

**< P >**
**p.m**  *(2)*
**PAGE**  *(11)*
**pages**  *(3)*
**paid**  *(10)*

**paragraph**  *(7)*
**PARALEGAL**  *(1)*
**parameters**  *(1)*
**part**  *(54)*
**particular**  *(4)*
**parties**  *(1)*
**partner**  *(1)*
**partner/fraud/ORC**
  *(1)*
**partnering**  *(3)*
**partners**  *(5)*
**partnership**  *(1)*
**parts**  *(3)*
**party**  *(1)*
**PASSAIC**  *(1)*
**passed**  *(1)*
**pay**  *(9)*
**paying**  *(12)*
**payment**  *(2)*
**payments**  *(3)*
**peer**  *(1)*
**peers**  *(3)*
**pending**  *(1)*
**PENN**  *(1)*
**PENNSYLVANIA**  *(3)*
**people**  *(20)*
**perceived**  *(1)*
**percent**  *(6)*
**performance**  *(4)*
**period**  *(11)*
**periods**  *(1)*
**periphery**  *(3)*
**person**  *(7)*
**personal**  *(9)*
**personally**  *(4)*
**perspective**  *(2)*
**pertained**  *(1)*
**pertaining**  *(9)*
**Peter**  *(2)*
**phone**  *(4)*
**physical**  *(1)*
**place**  *(2)*
**places**  *(4)*
**PLAINTIFF**  *(6)*
**PLAINTIFF'S**  *(24)*
**played**  *(1)*
**PLAZA**  *(1)*
**please**  *(9)*
**pled**  *(1)*

**point**  *(27)*
**points**  *(2)*
**policies**  *(5)*
**policy**  *(28)*
**portion**  *(2)*
**posed**  *(1)*
**Poshmarks**  *(1)*
**position**  *(12)*
**positions**  *(1)*
**possibility**  *(1)*
**possible**  *(5)*
**possibly**  *(1)*
**potential**  *(9)*
**Potentially**  *(8)*
**power**  *(1)*
**pregnancy**  *(1)*
**pregnant**  *(3)*
**prepaid**  *(12)*
**prepared**  *(1)*
**prescription**  *(2)*
**PRESENT**  *(10)*
**president**  *(1)*
**Pretty**  *(4)*
**prevent**  *(1)*
**prevention**  *(6)*
**previous**  *(3)*
**previously**  *(1)*
**price**  *(2)*
**primary**  *(2)*
**printout**  *(1)*
**prior**  *(11)*
**privileges**  *(1)*
**probably**  *(7)*
**probation**  *(2)*
**problem**  *(2)*
**proceed**  *(1)*
**proceeding**  *(1)*
**process**  *(8)*
**PROFESSIONAL**  *(3)*
**profit**  *(1)*
**Program**  *(2)*
**prompted**  *(1)*
**proof**  *(4)*
**properly**  *(1)*
**propounded**  *(1)*
**proprietary**  *(3)*
**prosecute**  *(1)*
**prosecution**  *(1)*
**protect**  *(1)*

Deposition of Christopher Castellani                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

protection *(45)*
protocol *(1)*
prove *(2)*
provided *(2)*
PUBLIC *(3)*
pull *(9)*
pulled *(7)*
pulling *(1)*
purchase *(20)*
purchased *(9)*
purchases *(56)*
purchasing *(5)*
purposes *(3)*
put *(8)*

< Q >
qualified *(1)*
qualify *(2)*
question *(13)*
questions *(18)*
quickly *(1)*
quite *(2)*

< R >
raised *(2)*
ran *(2)*
random *(1)*
Ray *(1)*
reached *(1)*
read *(10)*
reading *(3)*
realigned *(1)*
really *(2)*
realm *(1)*
reason *(3)*
reasons *(1)*
recall *(81)*
recaps *(1)*
receipt *(2)*
receipts *(8)*
receive *(9)*
received *(3)*
receives *(1)*
Recess *(3)*
recollection *(5)*
record *(2)*
recorded *(1)*
records *(1)*
red *(5)*

reference *(3)*
referred *(3)*
referred-to *(1)*
referring *(4)*
refers *(1)*
reflect *(1)*
reflected *(1)*
refresh *(2)*
refuse *(4)*
refused *(5)*
regard *(1)*
regarding *(9)*
regional *(1)*
register *(2)*
REGISTERED *(2)*
registers *(1)*
regular *(1)*
reimbursed *(2)*
reimbursement *(5)*
reinterview *(1)*
reiterate *(1)*
Related *(4)*
relations *(3)*
remember *(15)*
REMOTE *(1)*
repeat *(3)*
repercussions *(1)*
rephrase *(2)*
report *(9)*
reported *(3)*
REPORTER *(8)*
reporting *(5)*
reports *(4)*
representation *(1)*
representative *(4)*
represented *(1)*
REPRESENTING *(3)*
reproduction *(1)*
requested *(1)*
required *(2)*
re-request *(2)*
researched *(1)*
reseller *(12)*
resellers *(9)*
reseller's *(1)*
reselling *(17)*
resells *(1)*
reserve *(1)*
resignation *(1)*

resold *(1)*
resolve *(1)*
resolving *(1)*
resources *(2)*
respond *(2)*
response *(2)*
responses *(1)*
responsibilities *(5)*
responsibility *(4)*
responsible *(1)*
restate *(1)*
restroom *(1)*
RETAIL *(6)*
return *(4)*
review *(7)*
reviewed *(3)*
reviewing *(4)*
revolving *(1)*
revolving/flex *(3)*
RICHARD *(10)*
right *(49)*
ring *(2)*
ringing *(11)*
rings *(1)*
Rivera *(4)*
Robert *(2)*
Roberts *(1)*
ROGERS *(3)*
Rose *(13)*
Rough *(1)*
rules *(3)*
run *(2)*
rung *(2)*
running *(3)*
RWDSU/UFCW *(1)*

< S >
sale *(4)*
sales *(14)*
Sarah *(4)*
satisfaction *(1)*
saw *(1)*
saying *(18)*
says *(34)*
scenario *(1)*
scheduled *(1)*
schedules *(1)*
scheduling *(2)*
school *(7)*

schools *(1)*
screen *(2)*
scroll *(1)*
scrolled *(1)*
second *(7)*
section *(1)*
see *(50)*
seeing *(1)*
seeking *(1)*
seen *(1)*
selected *(1)*
sell *(1)*
sellers *(1)*
selling *(9)*
send *(7)*
sender *(2)*
sending *(11)*
sends *(2)*
sense *(2)*
sent *(11)*
sentence *(3)*
separate *(6)*
separately *(1)*
September *(3)*
serial *(2)*
serious *(1)*
service *(1)*
services *(1)*
set *(2)*
severe *(1)*
sexual *(1)*
sgerber@bglaw.com
 *(1)*
shaking *(1)*
Shanine *(5)*
share *(1)*
shared *(1)*
sharp *(1)*
Shaw *(1)*
Sheet *(5)*
ship *(9)*
shipped *(12)*
shipping *(34)*
shoes *(3)*
shop *(3)*
shoplifters *(2)*
shopped *(1)*
shorthand *(1)*
shortly *(1)*

Deposition of Christopher Castellani                     Kristina Mikhaylova v. Bloomingdale's Inc., et al.

show  *(2)*
showing  *(1)*
side  *(7)*
sign  *(1)*
significance  *(1)*
significant  *(1)*
signing  *(1)*
similar  *(2)*
similarly  *(1)*
situation  *(3)*
situations  *(2)*
SMITH  *(1)*
software  *(4)*
Soho  *(15)*
sold  *(4)*
somebody  *(4)*
someplace  *(1)*
sorry  *(19)*
sound  *(1)*
SOUTHERN  *(1)*
space  *(1)*
speak  *(6)*
speaking  *(2)*
specific  *(21)*
specifically  *(22)*
specifics  *(6)*
spend  *(2)*
spending  *(1)*
spent  *(1)*
spike  *(2)*
split  *(1)*
spoke  *(5)*
spoken  *(1)*
spouse  *(4)*
spouses  *(1)*
spreadsheet  *(1)*
stakeholder  *(1)*
stamp  *(5)*
stamped  *(8)*
Standards  *(2)*
standing  *(1)*
start  *(7)*
started  *(4)*
starting  *(1)*
starts  *(1)*
state  *(40)*
stated  *(16)*
Statement  *(29)*
statements  *(9)*

STATES  *(6)*
stating  *(11)*
stenographically  *(1)*
step  *(1)*
stepped  *(2)*
Steve  *(1)*
STEVEN  *(2)*
stock  *(1)*
stolen  *(1)*
stop  *(3)*
STORE  *(48)*
stores  *(2)*
STOREWORKERS
  *(2)*
straight  *(1)*
STREET  *(25)*
Subject  *(3)*
submit  *(1)*
subpoena  *(1)*
subsequently  *(1)*
substance  *(1)*
substandard  *(3)*
suffer  *(1)*
SUITE  *(2)*
suited  *(1)*
Summary  *(7)*
Sunday  *(1)*
supervise  *(3)*
supervision  *(2)*
supervisor  *(3)*
supplied  *(1)*
supply  *(1)*
support  *(3)*
supported  *(1)*
supposed  *(1)*
Sure  *(13)*
surrounding  *(3)*
suspend  *(4)*
suspended  *(6)*
suspending  *(1)*
Suspension  *(6)*
suspensions  *(1)*
suspicion  *(3)*
sworn  *(5)*
synonymous  *(4)*
system  *(6)*
systems  *(5)*

< T >

TABLE  *(1)*
take  *(16)*
TAKEN  *(15)*
takes  *(1)*
talk  *(2)*
talked  *(3)*
talking  *(8)*
talks  *(2)*
target  *(1)*
targeting  *(1)*
tax  *(40)*
taxes  *(8)*
Teala  *(1)*
team  *(48)*
team's  *(1)*
tech  *(1)*
technical  *(1)*
TECHNICIAN  *(1)*
Technology  *(2)*
telephone  *(2)*
television  *(1)*
tell  *(6)*
tells  *(1)*
temporary  *(1)*
terminated  *(13)*
termination  *(11)*
terrible  *(1)*
testified  *(4)*
testify  *(1)*
testifying  *(1)*
testimony  *(3)*
Thank  *(7)*
theft  *(5)*
thereof  *(1)*
thing  *(8)*
things  *(10)*
think  *(33)*
third  *(2)*
thirty  *(1)*
thought  *(3)*
thousand  *(1)*
thousands  *(1)*
threats  *(1)*
three  *(4)*
three-page  *(1)*
thrift  *(1)*
tie-in  *(1)*
TIERNEY  *(108)*
time  *(52)*

times  *(7)*
tip  *(2)*
title  *(5)*
today  *(9)*
today's  *(5)*
told  *(8)*
tone  *(4)*
tool  *(1)*
top  *(11)*
total  *(2)*
totaling  *(2)*
touch  *(2)*
trace  *(1)*
track  *(4)*
traffic  *(1)*
training  *(6)*
trainings  *(1)*
transaction  *(6)*
transactions  *(13)*
transcribed  *(1)*
transcript  *(4)*
transcription  *(1)*
transition  *(1)*
transitioned  *(2)*
TRIAL  *(1)*
true  *(1)*
truth  *(2)*
truthfully  *(2)*
try  *(1)*
trying  *(7)*
Tuesday  *(1)*
tune  *(1)*
turn  *(2)*
turned  *(1)*
Two  *(18)*
Tyler  *(12)*
TYNDALL  *(1)*
type  *(5)*
types  *(1)*
typical  *(1)*
typically  *(2)*

< U >
Um-hum  *(10)*
unblock  *(1)*
unblocked  *(3)*
uncovered  *(1)*
underneath  *(2)*
understand  *(9)*

understanding  *(2)*
Understood  *(3)*
unencrypting  *(1)*
uniform  *(2)*
UNION  *(5)*
UNITED  *(3)*
unmarried  *(1)*
unnecessarily  *(1)*
updated  *(1)*
upload  *(1)*
use  *(17)*
user  *(2)*
users  *(1)*
usually  *(1)*

< V >
various  *(11)*
verify  *(6)*
versus  *(2)*
vice  *(1)*
video  *(6)*
view  *(2)*
violating  *(2)*
violation  *(4)*
violations  *(2)*
volume  *(1)*
voluntary  *(1)*
VP  *(1)*
VS  *(1)*

< W >
wait  *(1)*
waived  *(1)*
walked  *(1)*
want  *(23)*
wanted  *(6)*
wanting  *(1)*
wants  *(1)*
warranted  *(1)*
watch  *(1)*
way  *(4)*
ways  *(3)*
website  *(3)*
weekly  *(2)*
well  *(15)*
went  *(2)*
we're  *(6)*
WEST  *(1)*
We've  *(2)*

WHOLESALE  *(1)*
willingly  *(1)*
withdrawn  *(37)*
witness  *(77)*
words  *(2)*
work  *(15)*
worked  *(8)*
working  *(11)*
Works  *(1)*
world  *(1)*
worth  *(1)*
write  *(12)*
write-off  *(1)*
writing  *(2)*
written  *(3)*
wrong  *(2)*
wrote  *(1)*

< Y >
Yang  *(3)*
yeah  *(9)*
year  *(12)*
years  *(11)*
Yep  *(1)*
YORK  *(33)*
young  *(3)*
Younis  *(2)*
Yu  *(18)*

< Z >
zoom  *(1)*