# EXHIBIT 6

Case 1:19-cv-08927-GBD-SLC   Document 128-6   Filed 09/20/23   Page 2 of 79

Deposition of Fred Becker                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2                       -  -  -

 3   KRISTINA MIKHAYLOVA,          :   Case No.: 19-8927

 4              Plaintiff,    :
          vs.
 5                                 :
     BLOOMINGDALE'S, INC.,
 6   BLOOMINGDALE'S, INC. d/b/a    :
     BLOOMINGDALE'S AND FORTY
 7   CARROTS, BLOOMINGDALE'S NEW   :
     YORK, MACY'S, INC., MACY'S,
 8   INC., d/b/a MACY'S OF NEW     :
     YORK, UNITED STOREWORKERS
 9   RETAIL, WHOLESALE AND         :
     DEPARTMENT STORE UNION AFL-CIO
10   LOCAL 3 a/k/a LOCAL 3 UNITED  :
     STOREWORKERS RWDSU/UFCW,
11   DENNIS DIAZ, individually,    :
     CHRISTOPHER CASTELLANI,
12   individually, RICHARD LAW,    :
     individually, and BOBBY
13   BOOKER, individually,         :

14              Defendants.   :

15                       -  -  -

16        Oral deposition of FRED BECKER, taken via Zoom

17   Conference on Thursday, November 10, 2022, commencing at

18   approximately 10:09 a.m., before Kori Skinner, RPR and

19   Notary Public, there being present:

20

21

22

23

24
```

 1   A P P E A R A N C E S:

 2

 3

 4   DEREK SMITH LAW GROUP, PLLC
     BY:  MELISSA MENDOZA, ESQUIRE
     One Penn Plaza
 5   Suite 4905
     New York, New York 10119
 6   (212) 587-0760
     melissa@dereksmithlaw.com
 7   Counsel for the Plaintiff

 8

 9

10   BARTON GILMAN, LLP
     BY:  STEVEN GERBER, ESQUIRE
11   165 Passaic Avenue
     Suite 107
12   Fairfield, New Jersey 07004
     sgerber@bglaw.com
13   Counsel for the Defendants, Bloomingdale's, Inc.
     Defendants and Christopher Castellani
14

15

16   MACY'S, INC.
     BY:  BETTY TIERNEY, ESQUIRE
17   11477 Olde Cabin Road
     Suite 400
18   St. Louis, Missouri 63141
     betty.tierney@macys.com
19   Pro Hac Vice Counsel for the Defendant, Macy's, Inc.

20

21

22   ALSO PRESENT VIA ZOOM:

23   Alex Marothy, Tech Assistant
     David Tyndall
24

```
 1                    -- I N D E X --

 2   WITNESS                INTERROGATION BY          PAGE

 3   FRED BECKER

 4                          MS. MENDOZA              5, 138

 5                          MS. TIERNEY              119

 6

 7

 8

 9                  -- E X H I B I T S --

10   EXHIBIT NUMBER         DESCRIPTION               PAGE

11   P-1                    Investigative Detail      61

12   P-2                    Suspension notification   76

13   P-3                    EEOC Charge               100

14   P-4                    Email                     129

15

16

17

18

19

20

21

22

23

24
```

```
 1                    LITIGATION SUPPORT INDEX

 2                Direction to Witness Not to Answer

 3    PAGE   LINE         PAGE   LINE         PAGE   LINE

 4    (NONE)

 5

 6

 7            Request for Production of Documents

 8    PAGE   LINE         PAGE   LINE         PAGE   LINE

 9    53     22

10

11

12

13                        STIPULATIONS

14    PAGE   LINE         PAGE   LINE         PAGE   LINE

15    5      1

16

17

18

19

20

21

22

23

24
```

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 5

1   (It is hereby stipulated and agreed by
2   and among counsel for the respective parties that all
3   objections, except as to the form of the questions, be
4   reserved until the time of trial.)
5          - - -
6          THE COURT REPORTER:  Would you like to order
7   the transcript?
8          MS. TIERNEY:  Definitely would like -- you
9   know, obviously, I guess, Melissa would be ordering
10  the original, but I do want a copy and I'd like the
11  condensed and the electronic if you can do that.
12         - - -
13         FRED BECKER, having been first duly sworn, was
14  examined and testified as follows:
15         - - -
16         EXAMINATION
17         - - -
18  BY MS. MENDOZA:
19  Q   Good morning, Mr. Becker.
20  A   Good morning.
21  Q   Have you ever been to a deposition before?
22  A   I have.
23  Q   Okay.  And when was that?
24  A   Few years back.  Few years ago.  I don't remember

Page 6

1   the timeframe, but three, maybe.
2   Q   Okay.  So I'll go over just a couple of ground
3   rules.  Was it that your deposition was being taken?
4   A   Yes.  I've gone to several throughout my career.
5   The last one was about three years ago.  Yeah.
6   Q   Okay.  And so as Kori stated that it's important
7   that you wait until I'm done speaking to respond so that
8   we're not speaking over one another.  Verbal responses.
9          And also you understand that you are under
10  oath today, correct?
11  A   Correct.
12  Q   Which means that you've sworn to tell the truth?
13  A   Right.
14  Q   And if you do not understand any of my questions,
15  please feel free to ask me to rephrase, and I'm more
16  than happy to rephrase.
17         If you need to take a break at any point,
18  that's fine, just let me know.  And I only ask that you
19  wait until I'm done asking -- respond to the last
20  question that was asked so that there's no question
21  pending, and then you can take a break, okay?
22  A   Okay.
23  Q   And is there any reason that might impair or
24  prevent you from truthfully answering my questions

Page 7

1   today?
2   A   No.
3   Q   Okay.  And do you suffer from any mental or
4   physical condition that might impair your ability to
5   understand my questions?
6   A   I do not.
7   Q   Okay.  Have you taken any prescription medication
8   or otherwise in the last 24 hours?
9   A   No.
10  Q   Were you supposed to take any prescription
11  medication in the last 24 hours that you did not take?
12  A   No.
13  Q   All right.  And so you said that you've -- three
14  years ago you had your deposition taken; is that
15  correct?
16  A   About, yes.
17  Q   Approximately?
18  A   Yeah.
19  Q   Okay.  And was it for a lawsuit against
20  Bloomingdale's?
21  A   It was, yes.
22  Q   Okay.  And do you recall what court that was in?
23  A   I do not, no.  It was virtual.  I think it was
24  virtual.  It was in New York.  I'm based in New York.

Page 8

1   I -- yeah.
2   Q   Do you recall what the case was about?
3   A   I -- yes, I remember -- I don't remember every
4   detail, but it was about an associate that -- no, it was
5   not an associate, it was an employee of a vendor that
6   had been caught stealing, and there was a lawsuit
7   pending around that.
8   Q   Okay.  And were you a named defendant?
9   A   I was.
10  Q   Okay.  And what happened with that case?
11  A   I believe it was settled.  Or -- yeah, I believe it
12  was settled.
13         MS. TIERNEY:  I admonish the witness not to
14  talk about anything he learned from counsel with
15  respect to the result, resolution of that lawsuit.
16  That would be privileged.
17         MS. MENDOZA:  Okay.
18  BY MS. MENDOZA:
19  Q   And besides that deposition, have you ever had your
20  deposition taken before?
21  A   Yes.  Over the course of my career, I've presented
22  to grand juries.  I've been deposed -- yes, I've been to
23  various trials.  And the line of work I'm in, that is
24  not uncommon.

Deposition of Fred Becker                           Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 9

1  Q   Besides that case that you just stated, three
2  years -- approximately three years ago, have you been a
3  named defendant in any other case?
4  A   I don't -- I don't recall, because the previous
5  times had been many, many years ago, and I just don't --
6  they were not with Bloomingdale's, I don't believe.
7  Q   Okay.  Have you ever been a named plaintiff in any
8  case?
9  A   No.
10  Q   Okay.  Have you testified -- withdrawn.
11      Besides your depositions that were taken, have
12  you ever testified in a case before?
13  A   Before a grand jury.
14  Q   Okay.  And do you recall when that was?
15  A   It was over 20 years ago, I'll be honest.  I don't
16  remember anything other than that.
17  Q   Okay.  All right.  And so who's your current
18  employer?
19  A   Bloomingdale's.
20  Q   Okay.  And how did you learn about today's
21  deposition?
22  A   In discussions with Betty and Steve on the phone.
23      MS. TIERNEY:  And, once again, same admonish,
24      don't talk about any content of conversation.

Page 10

1      But what you said is fine.
2  BY MS. MENDOZA:
3  Q   Do you know what this case is about?
4  A   I do.
5  Q   Okay.  And you know that the plaintiff in this case
6  is Kristina Mikhaylova, correct?
7  A   Correct.
8  Q   Did you work with Christina Mikhaylova?
9      MS. TIERNEY:  Objection to the form.
10      You may answer.
11      THE WITNESS:  Kristina worked in the store 59
12      Street while I was in role here as well.
13  BY MS. MENDOZA:
14  Q   Okay.  And what did you do to prepare for today's
15  deposition?
16  A   Review case documents, just trying to refresh what
17  access I had to details of the -- of this.
18  Q   Okay.  So you're familiar with -- withdrawn.
19      So did you review documents that were
20  exchanged in this case already?
21  A   Some documents I did review, yes.
22  Q   Okay.  Did you have any conversations with anyone
23  else besides your attorneys about your deposition today?
24  A   No.

Page 11

1  Q   Okay.  So we'll talk about Bloomingdale's.
2      When did you start working at Bloomingdale's?
3  A   January 15th, 2012.
4  Q   What was your starting position?
5  A   Corporate director of loss prevention for
6  Bloomingdale's.
7  Q   What does that position entail?
8  A   A brief overview at the time, that
9  role/responsibilities were to manage the budget for all
10  the asset protection department for Bloomingdale's,
11  manage the budget, manage the investigations, manage
12  physical security.  Anything corporate related to
13  support the field programs for the asset protection
14  department, at that time called loss prevention.  I just
15  want to be accurate.
16          - - -
17      (Whereupon, the connection was
18  interrupted.)
19          - - -
20  BY MS. MENDOZA:
21  Q   So you said asset protection and loss prevention
22  are synonymous, same thing?
23  A   Yes.  A few years, 2015 or so, the name was changed
24  to asset protection instead of loss prevention.

Page 12

1  Q   Okay.  And so did you hold that position --
2  withdrawn.
3      So did you change positions since 2012?
4  A   Yes.
5  Q   Okay.  What was the next position after your
6  initial position in 2012?
7  A   That would be the current position I'm in, which is
8  the trade area leader for New York City asset protection
9  trade leader for New York City, and that was
10  February 1st, 2016, I believe.
11  Q   So when you say New York City, is it that you are
12  responsible for all Bloomingdale's across New York City?
13  A   Correct.  There's three locations in Manhattan.
14  Q   Okay.  And does that also include Macy's?
15  A   No.
16  Q   Okay.  And then -- and your position before, it was
17  only specifically for the 59th Street location,
18  Bloomingdale's?
19  A   No.  So my position before was corporate, and I
20  supported all locations from a -- from the areas of
21  responsibility.  So I reported directly to the VP and
22  supported all stores.
23  Q   So what's the difference between your previous
24  position and current?

Deposition of Fred Becker                                        Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 13

A   So previous position was corporate, so developing
strategies, vision, managing programs to support all
stores.

Today, my role is specific to managing the
teams in New York City.  I'm responsible for all
programs in New York City.  It's execution of programs
and process responsible for specific stores.

Q   Okay.  What type of training do you need to have
for your position?

MS. TIERNEY:  Object to form.

You may answer.

THE WITNESS:  Well, it relies heavily on
experience.  Training would be knowledge of
specific processes and procedures relating to
investigations internally, external investigations,
shortage, strategies, inventory taking, partnering
with -- how to partner with the correct people from
a loss perspective, fraud perspective, leadership,
competencies relating to leading teams, developing
partnerships, liaison with law enforcement, problem
solving in how -- you know, reacting to different
problems that come up during business to protect
the brand.

So experience.  Obviously, 30 years of

Page 14

experience doing this through multiple retailers.
And then training would be on Bloomingdale's
specific policies and processes to address those
issues as they come up.

BY MS. MENDOZA:

Q   Okay.  And what type of investigations do you
conduct?

A   Well, I manage individuals that conduct
investigation, so I have teams that do that.  I don't
necessarily conduct investigations myself unless
there's -- for some reason I need to insert myself in
those investigations.

So that's kind of how it's structured.

Q   So how many teams do you have -- are you
responsible for managing, conducting investigations?

A   So from an internal investigation process, I have
currently three, but there's four positions.  One open
hire.  Three investigators that spend their time
investigating internal theft.  They report in to a
manager who reports in to me.

I also have an external team that basically
investigates external theft that reports in to a manager
that reports in to me.

And then there's other noninvestigatory

Page 15

personnel and guards and supervisors and such that
report into managers that report into me, as -- same in
Soho, that store, and the upper west side outlets.  So
there's teams that have specialized responsibilities
that report in to executives that report in to me.

Q   Okay.  And what managers report to you?

A   Currently, the manager -- the APM of Soho, the
asset protection manager in Soho.  There is an asset
protection manager at 59th Street that reports in to me.
There is another asset protection manager that reports
in to me that's currently open.  There is a newly filled
assistant asset protection manager that reports in to
me.  There's a fire safety director that reports in to
me.  And I have an administrative assistant.

Q   Okay.  And who's the manager at the 59th Street
store?

A   The current asset protection manager reporting to
me at 59th Street is Marvin Amador.

Q   Okay.  And when did that -- did he replace someone?

A   Yeah.  There's been -- yes, there has been change
over the last few years.  Some folks have left on a
bigger opportunity.  Some have been promoted.  So he
came over in December of last year.  He was promoted
from the White Plains store.

Page 16

Q   Okay.  So given that this case is about Kristina
Mikhaylova's employment with Bloomingdale's, I'll be
asking about the time that she was employed there.

So from 2016 to about June 20 -- April 2016,
June 2017.  So who was the asset protection manager for
the 59th Street store at that time?

A   Well, again, there's multiple, but the asset
protection manager responsible for investigations was
Chris Castellani.

Q   So when you say there's multiple, that means that
Castellani was supervising those other managers, asset
protection managers?

A   No.  Chris Castellani was supervising the asset --
the internal investigations team.  The other asset
protection managers, I think David Rey was one, I don't
recall exactly which -- that time period, but they would
have other responsibilities.

The external team, the overnight team, the
guards, the physical security programs, so there's other
responsibilities that they would have had.

Q   I see.

And so why do you specifically reference
Christopher Castellani?

A   In reference to this case of employee, he managed

Page 17

1 the internal investigations team.  He would have
2 conducted an investigation regarding any associate.
3 Q   Okay.  Do all of the asset protection managers
4 report to you?
5 A   In New York City, yes.
6 Q   No.  At the 59th Street store?
7 A   Yes.
8 Q   Okay.  And do you recall their names, the other
9 asset protection managers at the time?
10     MS. TIERNEY:  And, Melissa, I don't mean to
11 interrupt, but you're talking about 2016-17, just
12 to make sure?
13     MS. MENDOZA:  Yes.
14     MS. TIERNEY:  I'm sorry, I think you said
15 that, but I just want to make sure I was on the
16 right page.
17     THE WITNESS:  I believe -- and, again, I'm
18 going by memory, Bobby Booker may have been here at
19 that time and David Rey may have been here at that
20 time.
21     I don't recall if -- because at one point I
22 had four.  I don't recall if Dorothy -- or Doris D.
23 Connelly was here at that -- within that two-year
24 span.

Page 18

1 BY MS. MENDOZA:
2 Q   Okay.  And was Bobby Booker responsible for the
3 security guard area of asset protection?
4 A   I believe, during that timeframe, Bobby Booker was
5 responsible for the store detectives, if I remember
6 correctly.
7 Q   And what are store detectives?
8 A   The -- it's our external team.  They do external
9 investigations.  They're store detectives.  They
10 basically investigate external theft, people coming from
11 the outside to steal, professional groups, and they
12 catch shoplifters, that type of thing.  So it's the team
13 that catches shoplifters, is the easiest way to describe
14 it.
15 Q   Okay.  So are they -- but are they physically
16 present in the store?
17 A   Yes.
18 Q   Okay.  Is Bobby Booker still the manager for the
19 store detectives?
20 A   No, Bobby Booker is not.  He left at some point.  I
21 don't remember what year.
22 Q   Okay.  And do you know why he left?
23 A   He wanted to move to Texas.
24 Q   Okay.  And did you ever -- withdrawn.

Page 19

1     Do you oversee the disciplinary files for the
2 asset protection managers?
3     MS. TIERNEY:  Object to the form.
4     You can answer.
5     THE WITNESS:  I am responsible for their --
6 I'm responsible for ensuring they follow policy and
7 procedure, et cetera.  I partner with HR when
8 there's disciplinary or performance, conduct type
9 of violations.
10     Yes, I do manage that team.  But any
11 disciplinary conduct is a partnership with HR.
12 BY MS. MENDOZA:
13 Q   Okay.  Are you aware of any misconduct by Bobby
14 Booker?
15 A   Misconduct?  No, I'm not.
16 Q   Any complaints against Bobby Booker?
17 A   I don't recall any conduct -- any complaints about
18 Bobby Booker, no.
19 Q   Okay.  So in -- there was nothing -- withdrawn.
20     Was there any investigations into Bobby
21 Booker's actions and his position?
22     MS. TIERNEY:  Object to form.
23     You can answer.
24     THE WITNESS:  I don't recall any

Page 20

1 investigations.  Nothing comes to find.  Certainly
2 it wouldn't have been anything major, or I would
3 remember that.
4 BY MS. MENDOZA:
5 Q   Okay.  So were there any complaints of sexual
6 harassment against Bobby Booker?
7 A   Not to my knowledge.  Sexual harassment claims
8 would go through HR.  If I were made aware of them, I
9 would bring them to HR.  I'm not aware of any -- I can't
10 recall any sexual harassment claims against Bobby
11 Booker.
12 Q   Okay.  Are you aware of any sexual harassment
13 claims against your -- the store detectives?
14     MS. TIERNEY:  Object to the form.  What
15 timeframe are we talking?
16     MS. MENDOZA:  Same time, 2016-2017.
17     THE WITNESS:  No, I do not recall any sexual
18 harassment claims, 2016, 2017.
19 BY MS. MENDOZA:
20 Q   Okay.  And what about from 2017 to present?
21 A   No, I don't recall sexual harassment claims by
22 anyone on the team -- anyone on the team.  Off the top
23 of my head, no.
24 Q   Okay.  So going back to your position, so you said

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 21

1  that Christopher Castellani would report to you about
2  internal investigations, correct?
3  A    Correct.
4  Q    And is that from 2016 until present?
5  A    No.  At one point Christopher -- after 20 -- I
6  don't remember the exact timeframe.
7       But 2016-17, he was in 59th Street.  At
8  some -- at one point Christopher moved over to Soho to
9  be the asset protection manager in Soho.
10 Q    Okay.  Is he currently in Soho?
11 A    He's not currently employed by Bloomingdale's.
12 Q    Okay.  And why did he leave?
13 A    Christopher left based off of a warning that he was
14 given, and he was terminated for leadership within his
15 position at Soho.
16 Q    Okay.  And when was that?
17 A    I don't recall -- I'm going to -- maybe 2018, I
18 think.
19 Q    Okay.  And what was the warning about?
20 A    It was about his leadership of the team, and the
21 program at Soho.  More specifically, follow up
22 communication, managing the team.
23 Q    Okay.  And did you make the decision to terminate
24 him?

Page 22

1  A    Again, our process is we bring the facts to HR, we
2  consult.  There's a process, a multistep process, that
3  includes different levels of warnings.  We then
4  consult -- and measure the progress, consult with HR.
5  HR has the decision to terminate.  We do not.  Team
6  leaders do not.
7  Q    And why did he leave the 59th Street location?
8  A    To just take on different responsibilities.
9  Q    Okay.  Was he reassigned?
10 A    It was a mutual discussion.  He expressed interest
11 and I thought it would be a good opportunity for him to
12 do something different.  He had come to 59th Street from
13 a store in New Jersey, and Soho was just a different
14 responsibility.
15 Q    Okay.  All right.  So how often did Christopher
16 report to you about any internal investigations?
17      MS. TIERNEY:  Object to the form.
18      You can answer.
19      THE WITNESS:  I cannot speak to exactly how
20 often it happened in 2016 and '17.
21      I will say it was probably on a biweek --
22 bimonthly, so every few weeks we would meet and he
23 would update me on status of different
24 investigations.

Page 23

1  BY MS. MENDOZA:
2  Q    Okay.  Did Christopher work in the store?
3  A    Yes.
4  Q    At the 59th Street location?
5  A    Yes.
6  Q    And is that also where your office is?
7  A    Yes.
8  Q    Okay.  So back it up a little bit.
9       What kind of investigations -- withdrawn.
10      This case is about discount abuse, so can you
11 explain to me what the discount abuse policy is for
12 Bloomingdale's?
13 A    I'm not sure that this case is just about discount
14 abuse, but the discount abuse policy for Bloomingdale's
15 is associate's are given a benefit to buy merchandise at
16 a certain discount.  Part of that benefit, there are
17 rules around that.  Some of those rules include it is
18 for the associate only.  They cannot extend their
19 discount to others.  They cannot take money from other
20 outside individuals and use that to purchase for them.
21      They also -- with the exception of like a
22 spouse or a dependent.  They also cannot purchase
23 merchandise at a discount to resell.
24 Q    And, yes, you're right.  This isn't just about

Page 24

1  discount abuse, but one aspect about it is discount
2  abuse.
3       And so I guess how does Bloomingdale's keep
4  track of the purchases made by the employees?
5  A    I do not think -- I do not believe that there is a
6  process to necessarily keep track of every purchase of
7  employees.  There are different exception reporting
8  processes that report red flags, not just around
9  employee purchases, but around all different types of
10 transactions within the organization.
11      If -- and through these algorithm, if
12 something comes up as unusual or a red flag, it may be
13 something that is looked into.  Another piece maybe if
14 there is confidential information from another associate
15 that somebody is abusing their discount, then maybe that
16 may be looked at as well.
17 Q    Okay.  Are employees required to use a certain card
18 to make their purchases?
19 A    The only way to -- so the employee discount is back
20 of house, meaning that the discount is taken off at
21 the -- after the point of sale electronically,
22 automatically.  So you have to use your Bloomingdale's
23 card for that to happen.
24      If you don't use your Bloomingdale's card, you

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 25

1  won't get the discount.
2  Q   Okay.  So just to be clear, the employees have a
3  specific Bloomingdale's card that they -- are they given
4  that at the time that they're hired?
5  A   Correct.  When you're hired, you -- as long as
6  you're there, you qualify, because it is a credit card.
7  You are given your Bloomingdale's house account card to
8  shop with.
9  Q   Okay.  And can an employee use another credit card
10 instead of that card to make a purchase?
11      MS. TIERNEY:  Object to the form.
12      You can answer.
13      THE WITNESS:  Yeah, certainly, they can.  They
14   will not have the benefit of the discount.
15 BY MS. MENDOZA:
16 Q   Okay.  So unless you use that card, you don't get
17 the discount, right?
18 A   Correct.
19 Q   So if -- withdrawn.
20      So as far as the discount abuse
21 investigations, does your department look at the -- at
22 that account, the purchases made on the house account
23 for that employee?
24      MS. TIERNEY:  I'm going to object to the form.

Page 26

1      You can answer.
2      THE WITNESS:  So the -- yes, we will look at
3   the account activity if there is suspected
4   dishonest activity or policy violations in any --
5   for any policy violations, we will look at the
6   account.
7  BY MS. MENDOZA:
8  Q   Okay.  And if an employee makes excessive
9  purchases, is that alerted to your department?
10      MS. TIERNEY:  Object to the form.
11      You can answer.
12      THE WITNESS:  The internal investigation, my
13   team, spends most of their time looking at internal
14   theft or fraud or dishonest activity.
15      If policy violations are brought to our
16   attention and it's -- we will investigate that as
17   well.
18      We do not look -- we do not monitor associate
19   transactions at the store level.  There are, again,
20   algorithms and -- if there are any type of -- any
21   type of activity that's excessive from a credit
22   card perspective, that usually will come from
23   Macy's ink fraud team or credit team that will then
24   communicate the exceptions found from those

Page 27

1   algorithms, those reports.  So if there's some sort
2   of unusual activity that maybe passed on to my team
3   to investigate.
4  BY MS. MENDOZA:
5  Q   Okay.  So you said there's this Macy's credit team.
6  Is that the same as the credit and customer service,
7  inc.?
8  A   Correct.
9  Q   And -- so how often do you communicate with them?
10      MS. TIERNEY:  Object to the form.
11   2016-17 or currently?
12      MS. MENDOZA:  2016-17.
13      THE WITNESS:  2016 and '17, on a normal basis,
14   maybe every few months.  It really depends on the
15   activity.  If there's a rise in activity that we
16   may need their help or they need our help, we may
17   communicate more often, but there was no, at that
18   time, recurring communication unless there was a
19   need to.
20 BY MS. MENDOZA:
21 Q   Okay.  So can -- if an employee in your department
22 finds something suspicious, can they then have requests
23 that Macy's credit, that other company, look into any
24 activity on the account?

Page 28

1  A   Yes.  But there's also -- so there was also a
2  corporate investigation team that helps support all
3  stores, more than likely my team would communicate
4  through them to see if they can assist first before
5  reaching out to Macy's credit services.
6  Q   Okay.  And where is that corporate investigation
7  team?
8  A   In 2016 and '17, they were located at the corporate
9  offices at 919 3rd Avenue.
10 Q   Okay.  And what role did they play in the
11 investigation?
12      MS. TIERNEY:  Object to the form.
13      You can answer.
14      THE WITNESS:  In this -- in that -- in this
15   particular case, they would be a liaison, again,
16   with Macy's credit services.  If I remember
17   correctly, they help support the investigation team
18   for fraud at that time.
19      Yeah, they would provide support for any
20   investigation.  And in this case, I believe they
21   also helped facilitate communication with Macy's
22   credit services.
23 BY MS. MENDOZA:
24 Q   Okay.  And when you say from this case, you're

Case 1:19-cv-08927-GBD-SLC   Document 128-6   Filed 09/20/23   Page 12 of 79

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 29

1 saying in regards to Kristina Mikhaylova?
2 A    Correct.
3 Q    So do you recall any of the names of the employees
4 from corporate that were involved in her investigation?
5 A    Yes, Abraham Gonzalez.
6 Q    Did you work with him in the investigation?
7 A    Again, I did not personally manage this
8 investigation.  I know Chris and his team did work with,
9 him, yes.  But I know -- I knew, and still know, Abe.
10 Q    Okay.  And is he still in that position, working in
11 that position?
12 A    No, he's not.
13 Q    Is he still employed by Bloomingdale's?
14 A    No, he's not.
15 Q    Okay.  And when did he leave?
16 A    He -- again, he did not report directly in to me at
17 that point.  I want to say around 2019.
18 Q    Was he terminated?
19 A    No, he left for another opportunity.
20 Q    Okay.  So to be clear then, Christopher Castellani
21 and his team was working with Abraham Gonzalez and the
22 Macy's credit card company, the other company, in
23 investigating Kristina Mikhaylova's account; is that
24 correct?

Page 30

1        MS. TIERNEY:  Objection.
2        THE WITNESS:  I would phrase it more that they
3    supported him in the team here if they needed
4    additional information, but it was Chris and his
5    team that ran the investigation.
6 BY MS. MENDOZA:
7 Q    And I'm just saying, so you were not involved in
8 the investigation, the day-to-day of the investigation
9 for Kristina Mikhaylova; is that correct?
10 A    That is correct.
11 Q    Okay.  Did you -- did they ultimately report to you
12 their findings?
13 A    Yes.
14 Q    Okay.  And what did they report?
15 A    As my memory serves, from 20 -- from that time
16 period of 2016, '17, they gave me an overview of the
17 scenario at that time, what the findings were, the
18 results of the conversation, and the results of the
19 conversation with Kristina.
20 Q    And what were those?
21 A    The results of the investigation from where it
22 started with, again, some red flags that popped up, to
23 looking in to transactions, specific transactions, to
24 the conversation with her and the resulting of violation

Page 31

1 of company policy when it came to that -- well, avoiding
2 taxes and the statement that was part of that discussion
3 that was -- that was the result from the start to the
4 conclusion.
5 Q    Okay.  And then what happened?
6        MS. TIERNEY:  Object to the form.
7        You can answer.
8 BY MS. MENDOZA:
9 Q    After they gave you the findings, then what
10 happened?
11 A    So as our typical process is, when we have findings
12 of any investigation, we then share that directly with
13 HR for a disposition.
14 Q    Okay.  And then what is your involvement -- what
15 was your involvement after that?
16 A    After the HR disposition?
17 Q    Giving it to HR, yes.
18 A    If any question -- I may have -- if HR has any
19 questions, they may reach out to my team or me directly.
20 I don't have any direct involvement after that, if --
21 unless there's some exception.
22 Q    Okay.  And what started the investigation in to
23 Kristina's account?
24 A    From my -- as I recall, the -- there was

Page 32

1 communication from Macy's credit services, through Abe
2 corporate asset protection investigations to my team
3 that there was unusual activity -- purchasing activity
4 on an individual's -- in an associate's account,
5 Kristina.
6        So that is -- there was that, and then there
7 was a lot of fraud happening, and, again, red flag
8 exception report.  Kristina, she was also on that.
9 That's -- in terms of the fraud that we were incurring,
10 she was part of those transactions when we were
11 incurring fraud.
12        So my memory was there was those two things
13 that kind of started us looking at what was happening in
14 the Chanel department and with Kristina at the time.
15 Q    Okay.  And were these conversations between Macy's
16 credit card and Abe documented?
17 A    There may have been some emails going -- you know,
18 again, it's -- when you talk about exceptions and/or red
19 flags or unusual activity, it's just something to look
20 into, so there may have been some email communication
21 to -- that's sent to Abe and then to my team to look
22 at -- in to this.
23 Q    Okay.  And is there a -- was there an ongoing
24 document report as to the findings and what was going

Deposition of Fred Becker                                        Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 33

1  on?
2      MS. TIERNEY: I'm going to object to the form.
3  But you can answer, Fred.
4      THE WITNESS: Other than documentation that is
5  part of -- the final case resolution, I don't
6  recall any other documentation.
7  BY MS. MENDOZA:
8  Q   So how did they -- how did they keep track of what
9  Macy's credit card found and then what Abe was doing,
10  his involvement, his findings, and then Christopher
11  Castellani? I want to know how that was all kept track
12  of.
13      MS. TIERNEY: And I'm going to object to the
14  form.
15      You can answer.
16      THE WITNESS: In 2016, '17, if there was a
17  case they were investigating, they would create a
18  folder any documentation that was part of the
19  investigation that they could reference as they
20  investigated. I think that's the answer to your
21  question.
22  BY MS. MENDOZA:
23  Q   Yes.
24      And who maintained that file?

Page 34

1  A   The investigator would that reported in to Chris.
2  Q   The investigator that reported to Chris, is that
3  what you said?
4  A   Yes.
5  Q   And was that Abe?
6  A   No. Abe reported in to corporate. It would've
7  been one of Chris's internal investigators. Shanine may
8  have been part of that -- may have been -- I don't
9  recall who the actual investigator was at the time.
10  Q   Okay. So at what point of the investigation in to
11  Kristina's account did you become involved?
12  A   I don't recall. I know that Chris would update me
13  on multiple investigations every other week, or if need
14  be, more often. I don't recall exactly when I was
15  brought into the loop on that particular investigation.
16  Q   Okay. So you said that there was fraud --
17  withdrawn.
18      Did you say that there was fraud occurring or
19  incurring at the time?
20  A   There was -- we were -- there was fraud -- we were
21  incurring fraud in the Chanel department around that
22  time.
23  Q   Okay. And can you elaborate what you mean by
24  fraud?

Page 35

1  A   Charge backs, so customers were reporting that
2  their cards were being used fraudulently, which -- in
3  disputing charges, which means that those charge backs
4  would come back as fraud to Bloomingdale's.
5  Q   Okay. Was anyone else at the time investigated for
6  the same reasons that Kristina was investigated?
7      MS. TIERNEY: Object to the form.
8      You can answer.
9      THE WITNESS: So going back to my initial
10  mention of an exception report, so there was a
11  ranking of -- the fraud, all of a sudden, became
12  very high during that time, and there was a
13  report -- or there was a report that was run with a
14  top -- the associates that were ringing the most
15  fraud, so had the most transactions associated with
16  the associates in Chanel at the time. And Kristina
17  was the -- was associated with most of those
18  transactions. And there was associates -- it was a
19  ranking, so there were other associates that were
20  also incurring fraud or their transactions were
21  related to fraud transactions.
22      So, yes, we would investigate any associate
23  that we -- to find out why we were incur -- or we
24  would investigate the transactions to see why we

Page 36

1  were incurring fraud.
2      So, yes, there was multiple, it wasn't just
3  Kristina, from a fraud perspective.
4  BY MS. MENDOZA:
5  Q   Okay. And how did they check the fraud that
6  they're -- how they're incurring fraud?
7  A   That would be -- that was handled by Macy's credit
8  services. So they worked directly with -- and I don't
9  recall in 2016, '17, if it was Citibank at the time, but
10  worked directly with the bank that manages our credit
11  cards, Bloomingdale's credit cards, to determine fraud.
12  Sometimes that can usually be delayed, but that is
13  usually determined, again, from customers claiming that
14  there were fraud charges -- disputing charges as fraud
15  and that would go back to Macy's credit services.
16  Q   Okay. So did anyone -- withdrawn.
17      Did any customer complain that their card was
18  being used in relation to Kristina's purchases?
19      MS. TIERNEY: I'm going to object to the form.
20      You may answer.
21      THE WITNESS: So can you restate that
22  question? Is it Kristina's purchases or the
23  transactions that she -- her transactions with the
24  customers?

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 37

BY MS. MENDOZA:

Q   So I'll go back.

So you're -- correct me if I'm wrong.  Is the fraud that customers -- at the time, was the fraud issue that the customers cards were being used without their permission?

A   Correct.  And she was the sales associate that rang the transactions.

Q   Okay.  So were there any customers that complained that their card was being used by Kristina's transactions?

A   My assumption, based off the fact that that reporting came to us, that that would have been vetted and, yes, that was confirmed fraud.  My understanding is the customers would have complained.

Q   Okay.  And when you say it's confirmed fraud, is that because -- what do you mean by that that was confirmed fraud?

A   That the customers weren't present -- there's different ways to confirm fraud.  The customers weren't present, the signatures didn't match, it was not their transaction.

Q   Okay.  Is there a record of that?

A   There, I'm sure, is a record of that.  I mean, I

Page 38

believe I saw in one of the documents that -- a list of transactions that were from Kristina that were confirmed fraud.

Q   But I'm saying they were confirmed fraud because they were from customers' cards that they did not give permission for her to use, right?

A   Correct.

Q   So is there a record of those customers calling in or complaining about that?

A   That -- you're beyond my scope of responsibility.  That would be more the liaison -- that would be more Macy's credit services or Citibank, if Citibank was the bank holder at the time.  That is not an area of responsibility that I have, and I don't feel comfortable speaking to that process because I'm not sure.

Q   Okay.  But Macy's credit customer service, that's a part of the same company that you work for, correct?

MS. TIERNEY:  Object to the form.

You can answer.

THE WITNESS:  Correct.

BY MS. MENDOZA:

Q   It's not a separate whole different entity, correct?

A   It's a division of Macy's Inc. as is

Page 39

Bloomingdale's.

Q   Okay.  Do you recall who else was found to be committing fraud the same as Kristina?

A   Well, I want to clarify that I don't know that Kristina was found to be committing fraud.  That wasn't the reason she was -- that wasn't the conclusion of our investigation.  There were individuals that were investigated for fraud -- that were investigated as part of the fraud investigation in the Chanel department.

Q   Okay.  So I'll go back to that.  What I meant by confirmed -- I thought that you said that she was confirmed -- the transactions were confirmed fraud?

A   Her -- so she was the sales associate that rang the transactions that were confirmed fraud, yes.

Q   So does that mean that she -- that she was found to have committed fraud?

A   No, those are two separate things.  There are -- any associate -- you know, there could be fraud from any type of sale.  There's always a potential.  The -- it's whether the associate is allowing it is a completely separate thing.  For them to perpetrate fraud is separate than being the sales associate that rang a fraud transaction.

Q   Okay.  So was Kristina found to not have committed

Page 40

fraud?

A   Kristina was -- along with other associates in Chanel, was investigated as part of the overall fraud investigation that was actually turned over to the NYPD.  And I don't recall the results of that investigation.  Kristina was not employed at the time that investigation was concluded.

Q   Okay.  But was she --

A   Kristina was not terminated from our organization for perpetrating fraud.

Q   Right.  Okay.  So what was her -- so then was it just that she was the person that just rang the transactions, is that what the finding was for that issue?

A   She -- that was a red flag, the number of transactions that she rang that were fraudulent.  That information was used as part of the investigation to determine why we were incurring that fraud, who was responsible for that fraud.  And that -- again, that information at that point was turned over to the -- to law enforcement as part of a bigger fraud investigation from that department.

Q   Okay.  But even if she was already terminated, she could have still been found to have been committing

Page 41

1  fraud if she was --
2  A   Yes.
3  Q   -- had the findings to that effect, correct?
4  A   That is correct.  She could have.
5  Q   Okay.  And so she wasn't terminated for that
6  reason, right, so what was the other reason that she was
7  terminated for?
8      MS. TIERNEY:  I'm going to object to the form.
9      You may answer.
10     THE WITNESS:  Our investigation at that time
11     was around avoiding state taxes by -- yes, it
12     was -- she had rang transactions and didn't charge
13     state taxes.  And, again, that was all presented to
14     HR and they made a decision to terminate.
15 BY MS. MENDOZA:
16 Q   Okay.  How did they know that she rang these
17 charges to avoid state taxes?
18 A   Well, the types of transactions she rang, but I
19 think she admitted it to my team during the discussion.
20 Q   Okay.  But at the initial stage of the
21 investigation, was that a part of the investigations
22 into her account?
23 A   That is -- if I recall, that was not the initial
24 reason we looked at Kristina and other associates'

Page 42

1  transaction activity.  It was -- the initial was the --
2  the sales, her purchase history, and then the fraud
3  piece came later, if I remember correctly.  The number
4  of fraud transactions that we were seeing came after
5  that.  I think initially it was the number of sales --
6  purchases she was making which led us to investigate.
7  Q   Okay.  When you say the number of sales, are you
8  saying the total amount?
9  A   There are -- going back to the exception reporting
10 process and the algorithms and unusual activity, for an
11 associate that has an unusual amount of purchases, it
12 could be numbers or more often it's the dollar amount of
13 those purchases that may create an exception for us to
14 look at.
15 Q   Okay.  So in her case, the red flag or the reason
16 for her initial investigation was -- a part of it
17 because of the dollar amount of her purchases; is that
18 correct?
19 A   I believe so.  I think it was the dollar amount of
20 her purchases.
21 Q   Okay.  And then what -- withdrawn.
22     And then how is that investigated?
23 A   Well, I want to clarify.  I don't recall which came
24 first, the fraud -- we started looking at the fraud or

Page 43

1  whether we started looking at -- whether it was her
2  purchases.  I don't recall which came first.
3  Q   Okay.
4  A   Can you repeat the question?
5  Q   So how -- what is conducted -- how was the
6  investigation conducted in to the dollar amount of her
7  purchases?
8  A   That's simply looking at her account history, in
9  her purchase history, what is she buying and is there a
10 potential abuse or policy violation.
11 Q   Okay.  When you say you're looking at her purchase
12 history, are you looking at that account that we
13 previously talked about that the employees get at the
14 time of hire?
15 A   Yes.
16 Q   Okay.  Is there a name for that -- yeah, that
17 credit card name?
18 A   I'm sorry, is there a need for it?
19 Q   Name.
20 A   Oh, we call it the house account card, I believe.
21 Employee card.
22 Q   Okay.  And on the purchase history on the account,
23 in the account, does it show -- withdrawn.
24     If she made a purchase with that house account

Page 44

1  card, if she -- if she purchased an item that was on a
2  discount and then she received the discount being an
3  employee, does the amount that she paid show up on that
4  charge, or is it the amount -- the full price amount?
5      MS. TIERNEY:  I'm going to object to the form.
6      You may answer.
7      THE WITNESS:  I don't recall if the amount to
8      the back of the house discount is included in that
9      report or not.  I don't recall.  If there is a --
10     if the merchandise is on sale before the purchase
11     is made, just if a bag is 50 percent off or a coat
12     is 50 percent off, that 50 percent off price would
13     definitely show up.
14     I don't recall if the other discount that
15     happens back of house is the number we're looking
16     at or not.  I don't recall.
17 BY MS. MENDOZA:
18 Q   Okay.  Right.  And that's what I'm asking, is the
19 back of house discount, if that would have been included
20 in the, I guess, report, transaction report, for her
21 house account, and you're saying that you don't recall?
22 A   I'm not sure.
23 Q   Okay.  Is there anything that you can look at that
24 would refresh your memory?

Page 45

1  A   No.  I may have -- no, I may have to go to another
2  source to find out if that's -- because, again, it's not
3  our report we're running, it's -- I'd have to understand
4  whether it's the pre-employee discount number we're
5  looking at or the post-employee discount we're looking
6  at --
7  Q   Right.
8  A   -- in the report.
9  Q   So what would be wrong with the dollar amount of
10 purchases that an employee makes?
11       MS. TIERNEY:  I'm going to object to the form.
12       You can answer.
13 BY MS. MENDOZA:
14 Q   I can rephrase that if you'd like.
15 A   Well, I'll try to answer that.
16       So it doesn't necessarily mean -- an exception
17 or red flag doesn't mean anything is wrong.  It means
18 there could be something for us to look at.  But
19 potentially what we're looking at is is there a
20 violation of our policy.  As I mentioned earlier, is an
21 associate -- is there a potential the associate is using
22 their employee discount for others, taking money to then
23 give them -- extend that discount to them.  Or are they
24 potentially reselling product and then taking advantage

Page 46

1  of our discount policy.
2  Q   Right.  But how do you know that if -- that they're
3  making those purchases for those reasons?
4  A   We would investigate and try to determine the best,
5  to our ability, whether that -- prove or disprove that,
6  and then -- and/or have a conversation with the
7  associates.
8  Q   Okay.  Do you look at how much the associate is
9  making and then compare it to how much they're spending?
10 A   That would not be part of our investigation.  That
11 may be part of an algorithm, I'm not sure, from an
12 exception reporting, but I don't believe so.
13 Q   Okay.  So as to the reselling, what is done --
14 withdrawn.
15       How is the investigation done to find out if
16 the employee is reselling?
17 A   Again, we would try to pull as much information to
18 our ability.  Is it -- is the merchandise being sent?
19 Is it just to particular individuals, particular
20 addresses?  Is there any other potential confirmation
21 and did something happen in the store where we have
22 video of an interaction?  Do we have any firsthand
23 observations by management?
24       So those are all things we may take in to

Page 47

1  account as part of an investigation.  And then, again,
2  you know, sitting down with the individual and having
3  the discussion and asking the questions about it.
4  Q   Okay.  As far as with Kristina specifically, was
5  she investigated for reselling?
6  A   I don't recall every element of that investigation.
7  The information that was provided had red flags or the
8  indications that there was unusual activity, it would be
9  an assumption to say it was reselling.  But we would ask
10 those questions, look into it and try to understand that
11 unusual activity.
12 Q   Okay.  Were there any findings that Kristina was
13 reselling?
14 A   My understanding is the findings were more on an
15 avoidance of taxes.
16 Q   Okay.  And do the Chanel handbags have an
17 authenticity card in them?
18 A   I'll be honest, I don't know.
19 Q   Okay.
20 A   I know every bag is serialized, but I don't know
21 if -- I'm not familiar with the Chanel handbag process
22 to that level.
23 Q   Okay.  Is that -- withdrawn.
24       Does your team -- or does the investigation,

Page 48

1  as part of the investigation, do they look to see, as
2  far as reselling, where those serial numbers -- if they
3  can find those serial numbers elsewhere?
4  A   No, that would be very -- my team doesn't spend
5  a lot of time on those type of issues.  Their priority
6  is internal theft, dishonesty, et cetera, not
7  necessarily policy-type violations.
8       Chanel itself has their own department and
9  processes for tracking bags and resellers, et cetera.
10 Q   Okay.  And does that -- the Chanel department, was
11 that the case at the time as well in 2016/2017?
12 A   Yes.
13 Q   Okay.  And so did the Chanel department work with
14 you or your team in determining if Kristina or any of
15 the other employees there were resellers?
16 A   We would have worked with the Chanel leadership
17 team at the time, if necessary, to determine that.  I
18 don't remember all the details of that particular part
19 of the investigation or how much time we really spent on
20 a reseller question.
21 Q   Okay.  And who was part of that leadership team?
22 A   At the time, I believe it was Dennis Diaz and Cathy
23 Younis.
24 Q   Okay.  So at the time for Kristina, were Dennis

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 49

1  Diaz and Cathy involved in the investigation into her
2  accounts?
3  A    We would only involve Dennis or Cathy if we had
4  questions.  We do not share the results -- I mean,
5  the -- we do not share investigation -- we do not share
6  details of investigations unless there's some
7  extenuating need, because not all investigations turn
8  out to be what they initially started as.  We would --
9  we may have partnered with them with questions on
10  process or policy.  And then at the conclusion of the
11  investigation, HR may have involved them as part of the
12  disposition.
13  Q    Okay.  But did they -- I guess my question is were
14  they involved in the investigation for Kristina?
15       MS. TIERNEY:  Object to the form.
16       You may answer.
17       THE WITNESS:  I don't recall what level they
18       may have been in.  I can -- I can tell you what our
19       normal process would be, and that would be not to
20       involve managers unless we need to get information.
21       I don't recall that specific investigation.
22  BY MS. MENDOZA:
23  Q    Okay.  I guess I'll make it more specific, is that
24  if they were -- were they also conducting their own

Page 50

1  Chanel investigation as well?
2       MS. TIERNEY:  Object to the form.
3       You may answer.
4       THE WITNESS:  In to reselling?
5  BY MS. MENDOZA:
6  Q    Yes.
7  A    I don't recall.  Chanel has that -- Chanel, the
8  organization, has that as an issue that they get
9  involved with.  I don't recall if Cathy or Dennis were
10  involved with Chanel in looking at reseller activity.
11  Q    Okay.  And so I guess my question is, just if the
12  two -- the Chanel department, Cathy and Dennis, were
13  talking to you before the ultimate -- if they were any
14  questions in your investigation, but if you guys were
15  exchanging information that was found in each separate
16  investigation, that's what I'm asking.
17  A    I don't recall.
18  Q    All right.  Besides the reselling, was there any
19  other involvement that Cathy and Dennis were discussing
20  with your team?
21       I'll rephrase it.
22       Not involvement, but were there any other
23  issues in the investigation that Cathy and Dennis were
24  discussing with your team?

Page 51

1  A    I don't recall specifically.  I do -- I do recall
2  the -- when we first started looking at fraud and trying
3  to determine why we were seeing such high fraud rates,
4  we may have partnered with them on that.  But I don't
5  recall any other conversations with them with any other
6  issues at that time.
7  Q    Did you talk about the issue of shipping out of
8  state or to other states to avoid paying taxes?
9  A    I personally did not have -- don't recall having
10  conversations around that.  But that being part of this
11  investigation, Chris or the investigations team again
12  may have had conversations with them about that.  I
13  don't recall.
14  Q    Okay.  And do you recall if there was any --
15  withdrawn.
16       Do you make any -- I don't know, I guess
17  advice or recommendations to HR or to the department
18  regarding policies based on findings that you receive
19  or, you know, things that people have been doing,
20  misconduct that you find.  Do you make any suggestions
21  or recommendations to HR?
22  A    If they ask for my advice, I will give it.  I've
23  always -- as a rule of thumb for me, I've always wanted
24  consistency in making sure that, as we apply to one, we

Page 52

1  apply to all.  I don't recall in that particular case
2  whether they did or didn't reach out to me about the
3  disposition.
4  Q    Okay.  Do you recall Kristina accusing or saying
5  that other people were shipping to other states to avoid
6  taxes?
7  A    I don't recall personally her saying that.  I do
8  know that we looked at -- as part, again, the bigger
9  investigation, we looked at every associate and their
10  activity.
11  Q    Okay.  And was anyone else terminated or
12  disciplined for doing the same thing?
13  A    I don't recall -- I don't recall specifically
14  anybody being terminated for the same thing.  I know
15  there were multiple -- we investigated every associate
16  in those associates that looked like there may have been
17  policy violations we spoke to and we would have provided
18  those -- that information over to Human Resources.
19  There may have been -- there may have been -- I don't
20  recall, but there may have been a few other terminations
21  for violation of policy.  I don't recall if it was that
22  exact policy.  I just don't recall.
23  Q    Okay.  What do you mean by policy violations?
24  A    Policy violation -- so a policy violation could be

Deposition of Fred Becker                                     Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 53

1  anything from an associate not -- going out the wrong
2  entrance that they're not supposed to, they're violating
3  a policy.  They could be violating any of our standards
4  of conduct in how they interact.  They could be
5  violating discount abuse policy.  They could be
6  violating any policy or procedure we have as an
7  organization, I guess is the way to answer that.
8        We do not investigate all of those.  If
9  something comes up in our investigations on fraud and
10 theft, we will then turn those over again to Human
11 Resources, with exception, we do not investigate sexual
12 harassment.  AP doesn't write those types of things.
13 Q   Okay.  Was there an ultimate report as to the
14 findings against -- or in to Kristina's accounts, or
15 account?
16 A   I believe there was a summary that was put
17 together.
18 Q   Okay.  And was that after she was terminated?
19 A   Typically there's a summary that's put together
20 before, so it gets turned over to Human Resources as
21 part of here's our findings.
22        MS. MENDOZA:  Okay.  And to the extent that we
23    don't have those, we'll be requesting those
24    documents.

Page 54

1        MS. TIERNEY:  You have everything, but -- and
2    if you have any requests, you can put them in
3    writing and we'll take a look at them.
4        MS. MENDOZA:  Yes.
5        MS. TIERNEY:  But I'm not agreeing to anything
6    in the course of deposition.
7        MS. MENDOZA:  Right.
8  BY MS. MENDOZA:
9  Q   So the addresses that -- withdrawn.
10       Was there an investigation done to the
11 addresses that Kristina was shipping to?
12 A   I cannot say for sure.  That would normally be --
13 we would look at the addresses as part of the
14 investigation.  I can't say for sure what the result of
15 that was.
16 Q   Okay.  So is it typical that that is part of the
17 investigation, you go through each single address that
18 she shipped to, right?
19 A   We would look at each address, and when we look at
20 the transactions, we look at the -- all the components
21 of that transaction, including where was it shipped to.
22 Yes, that would be the extent of looking into the
23 address, yes.
24 Q   Right.  What would it be that you're looking for in

Page 55

1  looking at the address?
2  A   From a fraud perspective, these organized fraud
3  groups would ship to the same location over and over.
4  So if multiple people had their cards compromised, these
5  fraud groups would make the purchases using compromised
6  credit cards, but have them all shipped to a single
7  location.  That would be something we would look at.
8        Another thing that we would look at, if there
9  is a reselling -- if there is reselling happening,
10 typically that reselling -- that merchandise is being
11 shipped to, again, the same location over and over
12 again.
13 Q   Okay.  So in Kristina's instance, was -- she was
14 being investigated for -- as part of that organized
15 fraud, correct?
16 A   We looked -- we were looking at every associate in
17 terms of the fraud, and Kristina had the most
18 transactions associated with her from a fraud
19 standpoint, so we did look at -- yes, she was part of
20 that investigation.
21 Q   Right.  So those -- and those addresses, right?
22 A   Correct.
23 Q   Okay.  And those addresses -- withdrawn.
24       But then ultimately she wasn't found to be

Page 56

1  part of that fraud scheme, correct?
2  A   No, that's not correct.  Kristina -- when we looked
3  in to Kristina's transactions and had the conversation
4  with her about the avoidance of taxes, the fraud
5  investigation was continuing and did continue for
6  several months.
7        Again, we turned that information over to law
8  enforcement.  What they did with the results, whether
9  they spoke to Kristina, whether they prosecuted
10 Kristina, I am not aware of what they did when they took
11 the investigation over.
12 Q   Okay.
13 A   Or whether they absolved her of anything, I'm not
14 aware of what they did.
15 Q   Okay.  What about the other people that were --
16 withdrawn.
17       Were other associates or employees sending to
18 those same addresses?
19       MS. TIERNEY:  I'm going to object to the form.
20    You can answer.
21       Did you mean that Kristina Mikhaylova was
22    sending to?
23       MS. MENDOZA:  Yes.
24       THE WITNESS:  I don't have all the details of

Page 57

1 the investigations in front of me.  I can't say for
2 certain.  I don't know.
3 BY MS. MENDOZA:
4 Q   Were any of those associates or employees
5 terminated or -- yeah, were terminated for being found
6 to have been committing fraud?
7 A   I would have to go back and look at the
8 investigation files of each of those individuals.  I
9 will say we follow -- I know for a fact we followed our
10 same process that we investigated any associate that
11 were associated with fraud transactions in that
12 department because it ended up being well over a million
13 dollars in fraud.
14      Any associate that we found policy violations
15 or -- and/or committing fraud, we would have concluded
16 the investigation, put everything together, spoken to
17 that associate, and provided that information to HR.
18 Q   Okay.  But I guess I'm asking -- because you said
19 once you hand it over to law enforcement, they handle
20 it.
21      Did anything come back from law enforcement
22 for the employees that were still working there?
23 A   I don't recall any of the associates being
24 prosecuted, but I could be wrong on that.  I don't

Page 58

1 recall any of the associates actually being prosecuted
2 while they worked for us.  I could be wrong, but I don't
3 recall.
4 Q   Okay.  So then did you terminate any of the
5 employees or suspend/discipline any of the employees
6 while law enforcement took over?
7      MS. TIERNEY:  I'm going to object to the form.
8      You can answer.
9      THE WITNESS:  Again, I would have to look at
10      other employee files or investigation notes to see
11      if we did end up terminating associates and why we
12      terminated them during that timeframe.
13 BY MS. MENDOZA:
14 Q   Okay.  So then was there any conclusion to whether
15 there was this organized fraud occurring?
16 A   There was -- there was a conclusion where I believe
17 some outside individuals were arrested that were
18 involved in this fraud.  Again, I don't recall -- I
19 don't recall the individuals that were terminated or if
20 we terminated our associates during that time.  I do not
21 know if, during that investigation, any of our ex
22 associates were prosecuted and -- as part of that fraud
23 ring.  I do know there were arrests made.  I do not -- I
24 know there were arrests made that were not part of the

Page 59

1 Bloomingdale's employees.  I don't know if others were
2 made.
3 Q   Okay.
4      MS. TIERNEY:  Hey, Counsel, we've been going
5      for about an hour and forty minutes.  I'm not
6      saying we have to break right this second, but if
7      you get to a place we could take a comfort break.
8      MS. MENDOZA:  I think now actually would be a
9      good stop.
10                - - -
11      (Whereupon, a brief break was taken.)
12                - - -
13 BY MS. MENDOZA:
14 Q   What's the -- does Bloomingdale's have a diverter
15 policy?
16 A   There are -- do we -- I don't know if we have a
17 specific diverter policy.  There are policies associated
18 with different vendors, so Chanel will have a policy,
19 Gucci will have a separate policy, those types of
20 things.
21 Q   Okay.  And do you know what the Chanel policy is?
22 A   I don't.
23 Q   So would it be the Chanel department, meaning, at
24 the time, Cathy and Dennis would investigate if there

Page 60

1 was a Chanel diverter?
2 A   Yes.  And we may assist with that, but that's not
3 our primary purview.  You know, going back to
4 investigations and fraud, et cetera, if they need
5 assistance, we will support.
6 Q   Okay.  Do you know if that was done -- an
7 investigation into that was done for Kristina?
8 A   I don't know how much that was involved in the
9 investigation.  Based off the quantity of bags, it may
10 have been something that -- questions may have been
11 raised, because I know there's a certain number of
12 bags Chanel -- there's a certain number of bags that any
13 customer is allowed to purchase, but there's different
14 variances of -- by bag type or something.  I can't speak
15 exactly to what that policy is.
16 Q   But as far as with Kristina and your understanding
17 of -- withdrawn.
18      Was there a policy -- was there a
19 consideration that she had violated that policy
20 simultaneously being done while you were doing your
21 investigation?
22      MS. TIERNEY:  I'm going to object to the form.
23      You may answer.
24      THE WITNESS:  Potentially.  I don't know.  I

Page 61

1  can speak to the results of our investigation and I
2  don't recall that being part of the final
3  discussion.
4  BY MS. MENDOZA:
5  Q   Okay.  So then do you report your findings and your
6  investigation directly to HR?
7      MS. TIERNEY:  Object to the form.
8      THE WITNESS:  My team and/or myself would
9  present our findings to HR, yes.
10 BY MS. MENDOZA:
11 Q   Do you present it also to Cathy -- or to the Chanel
12 leadership team?
13 A   No.  They may be brought in, but this -- they're
14 not the decision-makers on our associates.
15 Q   Okay.  So I'll introduce an exhibit, Plaintiff's
16 Exhibit 1.
17              - - -
18      (Whereupon, the document was marked, for
19 identification purposes, as P-1.)
20              - - -
21 BY MS. MENDOZA:
22 Q   Can you see the document in front of you,
23 Mr. Becker?
24 A   I can.  Yes.  Thank you for doing that.  Yes, I can

Page 62

1  see it.
2  Q   So it says there Bloomingdale's at the top, and at
3  the bottom right-hand corner of the page it says
4  BLM 00033.
5      You see that, right?
6  A   I do.
7  Q   Okay.  Is this the document, the summary, that you
8  were discussing or referencing before regarding Kristina
9  Mikhaylova's investigation?
10 A   This is the summary that I was referencing.
11 Q   Okay.  And is that you that wrote this?
12 A   No, it is not.
13 Q   Who wrote this?
14 A   Based off of how I'm reading this, this says, I,
15 Chris Castellani, had a specific -- so this sounds --
16 this looks like Chris wrote this.
17 Q   Okay.  So then, for Kristina, was it that
18 Christopher did the investigation, made the conclusion,
19 and then did he have to get your -- did you review it or
20 did he just -- he can make the final decision and send
21 it to HR?
22 A   I will answer -- there's different pieces to that
23 question.  So his team may have put this together.  They
24 work as a team putting an investigation together.  From

Page 63

1  how I'm reading this, Chris had the conversation.  The
2  team could have the conversation, or Chris can be
3  involved in that conversation.  This looks like he had
4  the conversation with Kristina.
5      There is no decision as to whether we present
6  to HR.  They don't have to go to me to present to HR.
7  Every investigation that we include from an
8  investigative standpoint, it's -- as part of our
9  process, it goes to HR.
10     So there's no decision there whether to get HR
11 involved or to present our findings to HR.  That's going
12 to happen.  They don't need my permission to do that.
13     Chris would have, again, kept me abreast of
14 this as well as any other investigations occurring at
15 that time.
16 Q   Okay.  I guess I'm asking in the sense of if it was
17 part of a bigger investigation that was being conducted
18 at the time, did he have to send you his findings?
19     MS. TIERNEY:  Object to the form.
20     You can answer.
21     THE WITNESS:  Chris would update me on all
22 investigations, so there -- again, I do recall that
23 we did investigate the activity in Chanel starting
24 with the initial exceptions received from the

Page 64

1  corporate teams to the fraud activity -- the
2  potential fraud activity we were starting to see.
3  So there was an overall investigation.  The team
4  was -- again, he would keep me abreast of that.  He
5  would definitely keep me abreast of investigations
6  into the individual associates, and I do know there
7  was investigations in to multiple associates in
8  Chanel.
9      Does that answer your question?
10 BY MS. MENDOZA:
11 Q   Yes.
12     Okay.  So at the top there, it says:  On
13 May 4th -- the first paragraph:  On May 4th, 2017,
14 central investigations forwarded an issue.
15     Do you see that there?
16 A   Yes.
17 Q   So with Kristina -- it says:  With Kristina
18 Mikhaylova's employee account, which had been blocked
19 for potential reselling activity.
20     So my understanding is that, first, Kristina's
21 account was blocked for reselling, correct?
22 A   That's how I would interpret this.
23 Q   Okay.  So were you aware that Kristina's account
24 was first blocked for reselling?

Deposition of Fred Becker                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 65

1  A   I don't recall that being a part of it until I read
2  the documentation.
3  Q   Okay.  And then is that typical, what typically
4  happens in these investigations?
5  A   It's not a very common occurrence, but if there --
6  if the organization feels that there is significant red
7  flags for reselling activity by our associates, they can
8  block the activity on the card.  And they can do that
9  for any reason if they feel that there is exposure.  It
10 could be fraud, it could be anything, but they have the
11 ability to block transaction activity -- the selling
12 activity on accounts.
13 Q   Okay.  And who makes that decision?
14 A   The -- I do not know who specifically makes that
15 decision.  I would -- it would come from Macy's credit
16 services, the folks who manage our accounts.
17 Q   Okay.  And so who is central investigations?
18 A   Central investigations would be our corporate asset
19 protection team.  As described earlier, that 919 3rd
20 Avenue, Abe Gonzalez was part of that corporate
21 investigations team.
22 Q   Okay.  Right.  And so can anyone call in to
23 corporate and say, hey, there's something going on here,
24 do an investigation for potential reselling?

Page 66

1       MS. TIERNEY:  Object to the form.
2       You may answer.
3       THE WITNESS:  Absolutely.  I mean anybody
4   can -- any associate or even a customer can call
5   and say that there's suspicious activity for any
6   reason.
7       So, yes, theoretically, anybody can call and
8   say there's suspicious activity around reselling,
9   yes.
10 BY MS. MENDOZA:
11 Q   Okay.  And how often has that happened?
12      MS. TIERNEY:  Object to the form.
13      You can answer.
14      THE WITNESS:  I cannot speak to how often that
15  happens.  It is not a very common -- that we --
16  that I have seen associates call with suspicious
17  activity around reselling.  It has happened.  I
18  don't recall how often.  And I don't think it's
19  that often.
20 BY MS. MENDOZA:
21 Q   So is it -- but is it common that central
22 investigations would forward an issue?
23 A   Yes.  Central -- and I use those words
24 interchangeably, central and corporate investigations

Page 67

1  are the liaison with Macy's fraud teams.  And Macy's
2  credit services teams.  And in any enterprise wide
3  support team, they would go through Bloomingdale's --
4  again, we are a division of Macy's Inc.  That would be
5  their first point of contact would be to reach out to
6  the central or corporate investigations team.
7       They then would look at it and forward it on
8  to the field team.  So New York City, being part of the
9  field for Bloomingdale's, a part of the store
10 organization, they would send it to my team for further
11 investigation.
12 Q   Okay.  And you may have stated this already, but do
13 you know -- withdrawn.
14      What was the reason -- what was the initial
15 issue with Kristina's account?
16      MS. TIERNEY:  Object to the form.
17      You can answer.
18      THE WITNESS:  Based off of documentation I've
19 seen and not full recollection of 2017, this --
20 it's actually described here in this document that
21 a algorithm exception came up with a number of
22 purchases or dollar amount of purchases on
23 Kristina's account, and it was flagged for unusual
24 activity.  That's from this document, which -- and,

Page 68

1  again, I don't remember the timing of it, but it
2  was also the communication that she was on a list
3  of fraud transactions that she was the selling
4  associate.  So it's two separate communications
5  around Kristina.
6  BY MS. MENDOZA:
7  Q   Right.  To be more specific, do you know if someone
8  called central investigation corporate and said to look
9  at her account?
10 A   I do not know if that happened.  I don't recall if
11 that happened.  Based off this information, the
12 documentation, it doesn't seem like that happened, but I
13 do not know.
14 Q   Okay.  And central investigations or corporate
15 would have that information, right, if it was -- if it
16 did happen?
17      MS. TIERNEY:  Object to the form.
18      THE WITNESS:  I do not know what they do or do
19 not have.  I do know that very often this would --
20 it may be -- you would think it would be -- I would
21 think it would be in this summary that this is
22 based off a tip, but this looks like it was a
23 review of purchase history from Macy's -- from
24 Macy's credit services which matches my

Deposition of Fred Becker                                                Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 69

1   recollection.
2   BY MS. MENDOZA:
3   Q   Okay.  And it says:  During review of -- the second
4   paragraph:  During review of Mikhaylova's purchase
5   history, Bloomingdale's account review, loyalist account
6   review and personal credit card review.
7           Right?  You see that there?
8   A   Yes.
9   Q   Okay.  So before we had only been talking about
10  that house account, right?  That was the credit card
11  we were talking about?
12  A   Yes.
13  Q   This -- okay.  So is the loyalist account the same
14  as the house account?
15  A   So the loyalist account is our rewards program.
16  You get points for how many purchases you make, the
17  dollar amounts, you get points.  So that is a loyalist
18  program.  So that usually is attached to your account,
19  but it could be attached to multiple accounts.
20          So it's separate, but it's part of, again, the
21  same -- your purchase history.  So it's not an account
22  you charge to.  It's a rewards account.  That's what a
23  loyalist account is.
24  Q   Okay.  So then -- so nonemployees can have the

Page 70

1   loyalist account, right?
2   A   Unless you opt out, every employee should have a
3   loyalist account because you get rewards the same as our
4   customers do.
5   Q   Right.  So I'm asking any customer then can have
6   the same, it's not just employees get that, right?
7   A   Correct, yes.
8   Q   And then the Bloomingdale's account review, is that
9   specific to employees?
10  A   That would be -- so, yes, my understanding is that
11  is referencing the Bloomingdale's house account or the
12  employee card or however we want to call it, the account
13  that's used to make purchases for employees.
14  Q   Okay.  And so then in looking at this document, all
15  of her accounts, all of Kristina's accounts, were
16  reviewed, correct?
17  A   This mentions personal credit card review.  If she
18  had a -- I don't recall or have knowledge of what the
19  results of a personal card, if she used a personal card
20  that was attached to her that may have come up in our
21  reporting, and they may -- the team may have looked at
22  it.  I don't recall that being part of it -- this, but
23  if my team had that information, we'd certainly look to
24  see if there was purchases on a personal card.  It's

Page 71

1   mentioned here.  So if they had that, they would have
2   looked at it.
3           But, yes, this is her purchase history.
4   Q   Okay.  And going back to -- you mentioned that at
5   the top, that central investigations forwarding an issue
6   with Kristina Mikhaylova's employee account.
7           I mean, it doesn't say that that was -- it
8   doesn't say there that she was reselling, that it was
9   for reselling, right?  It just says an issue, forwarded
10  an issue with her account?
11  A   That's what it says, correct.
12  Q   Okay.  And do you know what that issue was?
13  A   I can't speak to exactly what the issue mentioned
14  in this document is.  I didn't write it.  However, based
15  off of my knowledge of the investigation, the issue was
16  the sales that -- the purchase activity on her account.
17  Q   Okay.  And we can get off the screen now.  Thank
18  you.
19          So -- but how many employees are -- how many
20  employees are there at --
21  A   Can you define --
22          MS. TIERNEY:  Object to the form.
23          You can answer.
24          Are you talking 59th Street or company wide?

Page 72

1   What are you asking?
2           MS. MENDOZA:  At the 59th Street store.
3           MS. TIERNEY:  In 2017?
4           MS. MENDOZA:  Yes.
5           THE WITNESS:  That was going to be my question
6   2017?  I can't give you an exact number.  So we
7   have used -- because there are direct paid
8   employees, there are other employees that we
9   consider not paid by us that do go into -- and I
10  assigned an employee ID number but are paid by
11  vendors.  There are executives.  There are
12  employees that come here that actually aren't paid
13  by us at all and don't have our number, so -- and
14  that number fluctuates.  And there's support, sales
15  et cetera.
16          At the time, I'm going to estimate, and it
17  being in the spring, probably up around 2,500
18  employees.
19  BY MS. MENDOZA:
20  Q   Okay.  So is corporate -- the corporate central
21  investigations responsible for overseeing those 2,500
22  employees?
23  A   No.  The corporate investigations team is tasked
24  with supporting the store teams with their internal

Deposition of Fred Becker

Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 73

investigations.

Q   So it seems to me that there is -- with all those employees, how -- withdrawn.

So is it the algorithm that picked up for Kristina that her -- the purchases that she was making, the number of purchases that she was making that was a red flag?

A   Yes.  It is my understanding that -- and there are a number of exceptions that come out of those processes and algorithms.  Everything from unusual purchase activity for a customer to associates -- to exception reporting that could be associated with potential violations of policy to -- et cetera.  There are a lot of different algorithms, as you would expect.  My recollection is the initial information that came regarding with Kristina's purchase history came out of a -- an exception report based off an algorithm.

Q   Okay.

A   Because, again, that came from Macy's credit services where the associates that they look at include Macy's and Bloomingdale's and all the other divisions of Macy's corporate.

Q   Right.  I guess I'm trying to figure out if the -- my question is:  Does -- which comes first, do you first

Page 74

go look at this person's account and then see -- enter -- see the algorithms, see how it works out. Okay.  This seems -- there's a red flag, or is it the reverse, that all of a sudden it highlights FYI, this person needs to be flagged, this person needs to be reviewed?

A   If you're talking in general investigations, it could go any way.  If we're looking at somebody investigating someone for a particular reason and we want to get more in-depth information or detail around their transactions, we could request that.

My understanding from this was, based off her purchase history, it came out as an exception, and our credit services team would then forward that to the relevant division investigations team.  If this was Macy's, they would have sent -- if it was a Macy's associate, they would have sent it to the Macy's investigation team.  Our central investigations team, Abe, is my recollection -- part of my recollection, would then send that to the field, my team, to investigate further.

Q   And do you recall if her card was unblocked at any point?

A   No, I don't recall.

Page 75

Q   Okay.  And if the card is no longer blocked, does that mean that she's absolved of the potential reselling accusation?

A   If the card is unblocked, that means she can continue to utilize the card.  The reason for -- which is separate from the reason for the card being unblocked.  It could be she was absolved from reselling. That's potential.  I'm not stating that's what happened in this case.

Q   Okay.  So if you're -- but if the card is blocked initially, it's for potential reselling, right?

MS. TIERNEY:  Object to the form.

You may answer.

THE WITNESS:  In this particular case, based off the information that was provided, that would be the assumption I would make.  Cards could be blocked for other reasons.  In this particular case, that would be the assumption that would make that -- it would be blocked -- or blocked for that exception, the reason why that was blocked in the first place, which would have been the unusual purchase activity.

BY MS. MENDOZA:

Q   Okay.  If we look at Plaintiff's Exhibit 2.

Page 76

- - -

(Whereupon, the document was marked, for identification purposes, as P-2.)

- - -

BY MS. MENDOZA:

Q   Do you see the document in front of you?

A   I do.

Q   Okay.  It says there at the bottom right-hand corner, BLM 001952.

You see that, right?

A   I do.

Q   Have you seen this before?  It's a suspension notification there.  It says associate name, Angi Lee.

A   I am familiar with this form, and I do recall Angi Lee.

Q   Okay.  Was she accused of -- withdrawn.

Was she investigated for the same reasons that Kristina was investigated?

MS. TIERNEY:  Objection to form.

THE WITNESS:  Angi Lee was investigated along with Kristina and the other Chanel associates for the reasons I described above, the concerns over fraud.  And, again, the fraud is what initiated a lot of the bigger investigation.

Case 1:19-cv-08927-GBD-SLC   Document 128-6   Filed 09/20/23   Page 24 of 79

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 77

BY MS. MENDOZA:

Q   Okay.  All right.  So if you keep going down -- actually, is this document part of that file that we talked about before, that there would be an investigation file for Kristina, we'll say in this case, for her investigation?

A   It should be.  This is a standard document because asset protection, we're not decision makers.  If at the end of an investigation -- at the end of a investigation and any discussion with an associate, we suspend the associate and then, again, turn the information over to HR, or, as it's listed here, employee relations.  And then they take it from there.

So this a standard document you give the associate so they have the phone number for HR/employee relations, et cetera.  Should be part of that file.  I don't know that it's required to be part of that file.  But this is the document.  We usually have two.  We give one to the associate and we try to keep one as well.

Q   But usually at the -- well, in this case, Kristina was suspended, right?  Do you recall?

A   My -- I don't recall.  She -- that's our standard process.

Q   Okay.  So at the point of the suspension, is the

Page 78

investigation already done and now it's just handing it over to HR?

A   Yes.  So after we speak to the associate about the issue at hand, in this case, the -- Kristina's transactions, we then have the conversation, statement, suspend, turn the information over to HR.

Again, at the time there was a bigger fraud investigation, that was not done.

Q   Right.  Okay.  And so if we go down to the next page, to 1954.  You see the line:  Spoke about -- we also spoke about transactions shipped to YuYu to NH.

Do you see that there?

A   Yes.

Q   Do you know who YuYu is?

A   I do not know who YuYu is.  It sounds like that was an individual or a customer, shipped to New Hampshire.

Q   Okay.  But do you know, as far as Kristina's investigation, if that person was relevant in the investigation?

A   No, I do not.  It sounds familiar.  I cannot speak to it, though.

Q   Okay.  And if you go to the next page where it says 1 -- BLM 001955.

At the top right-hand corner, see it says Abe,

Page 79

witness?

A   Yup.

Q   Well, actually -- withdrawn.

Was this written by Christopher Castellani, do you know?

A   I do not know who wrote this document.

Q   Okay.  Have you seen this before?

A   If I've seen this before, it hasn't been recently.  I don't recall.  This looks like notes.  I'm not sure.

Q   Okay.  We can continue on.

And if you keep going to the next page, 1957.  All right.  You see there at the top, it says investigative summary, Angi Lee?

A   Yup.

Q   Was this written by you?

A   It was not.

Q   Okay.  And you see it says, subject details, then investigation details?

A   Yes.

Q   Okay.  And you see it says violations?

A   Yes.

Q   Then it's discount abuse, tax evasion and reselling?

A   Yes.

Page 80

Q   Is this -- and we can go back.

So findings and recommendation, and then you see there different events.

You see all that there?

A   Yup, I do.

Q   So was all of this similarly done to Kristina?

A   So a summary of the activity, along with this statement, would be done with any investigation.  And then that -- this is the documentation and turned over to HR.

Is that your question?

Q   Yeah.  Were there any -- do you recall seeing any incidents like this where it says on the date of and then her transactions ringing up, and then victim, the account, all of that.  Was that done to Kristina?

A   In terms of the format of the summary, I don't know that -- I don't know if there's a document that has the exact same formatting as this document does, this summary.

Q   Okay.  Besides the formatting, just was it done for Kristina?

MS. TIERNEY:  I'm going to object to the form.

You may answer.

BY MS. MENDOZA:

Deposition of Fred Becker                                          Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 81

1  Q   When I say was it done, did you see anything --
2  A   I don't -- I don't recall.  I don't recall
3  specifically what summary was done for Kristina.
4  Q   Okay.  But were there any videos reviewed for
5  Kristina and the purchases that she rang up?
6  A   That is part of the process, an investigative
7  process, to review any video.  I don't know if that did
8  or didn't happen with Kristina.  I will say that
9  Kristina was one -- again, being the -- at the beginning
10 of the overall investigation, she was one of the first
11 associates we spoke to.  And there's only a few weeks of
12 video to review, so I don't know if her transactions
13 were within that few weeks of video we had at the time
14 that this was -- these transactions.  We were already
15 conducting the bigger investigation.
16      So it's a little different in terms of the
17 investigative process.  We were already investigating
18 when these transactions happened, so we would have
19 absolutely reviewed video here if Kristina -- if there
20 was video available for the transactions in question for
21 Kristina as part of our process, we would have reviewed
22 the video then as well.
23      Does that answer your question?
24 Q   Yes, yes.  And so -- right, because you see here it

Page 82

1  says June 13th, 2017, right?
2  A   Yes.
3  Q   And do you recall when Kristina was terminated?
4  A   No.  No, I don't.
5  Q   Okay.  Do you recall how long the investigation had
6  started, like before her termination when it started?
7  A   I don't recall, no.
8  Q   Okay.  Because if we look back to -- I guess we can
9  look back to the -- Plaintiff's Exhibit 1, it said:  On
10 May 4th, 2017, central investigations forwarded an issue
11 with Kristina Mikhaylova, right?
12 A   Right.
13 Q   And then here, in looking at Angi who was also part
14 of the accused alleged fraud scheme, right, she was also
15 a part of that with Kristina; is that correct?
16 A   Again, we did look at every associate in the Chanel
17 fraud activity and the fraud, et cetera.  So, yes, all
18 associates were investigated.
19 Q   Okay.  And here it starts from June 13th.  And up
20 at the top it says May 26th, 2017, June 30th purchases.
21      So was the investigation done -- when I say
22 investigation, I say -- yeah, the investigation.  As far
23 as for the alleged fraud that she was -- that Kristina
24 was accused of or alerted, red flagged for, was that --

Page 83

1  that started around May 4th, 2017?
2      MS. TIERNEY:  Object to the form.
3      You may answer.
4      THE WITNESS:  I would need to see the
5  documentation as to when that exception report was
6  communicated about the high rates of fraud.  If my
7  memory serves me, that was before the documentation
8  here about the investigation in to Kristina's
9  purchases.
10     So we -- that initial communication of fraud
11 was earlier, which is -- would have led us to look
12 at those specific fraud transactions as well as the
13 other -- any other potential fraud transactions in
14 the department and the associates ringing them.
15     So the overall fraud investigation I think
16 would kind of gotten kicked off a little earlier
17 than the review of -- which was separate, but the
18 communication of the transactions for Kristina.
19 BY MS. MENDOZA:
20 Q   Okay.  And if you go down to 1965, you see that
21 there, it looks like a receipt, right?
22 A   This, yes, looks like the information from our
23 electronic journal about a send transaction and a
24 purchase.

Page 84

1  Q   Okay.  And is that part of what was reviewed for
2  Kristina as far as her purchases?
3      MS. TIERNEY:  Object to the form.
4      You may answer.
5      THE WITNESS:  This exact -- are you asking me
6  if this exact purchase?
7  BY MS. MENDOZA:
8  Q   No, I'm saying is that how the process is and the
9  investigation, is that you go through the receipts such
10 as that, you go through each of her receipts?
11 A   It can be, yes.  As part of investigation, we can
12 get overall information, reporting, et cetera.  We can
13 use -- this is another tool available to the
14 investigators to go in and see more detailed
15 investigation -- or, I'm sorry, more details about
16 specific transactions.
17     So that would be -- if there was suspicion or
18 if there was -- we wanted to see more detail about an
19 investigation, we would utilize this electronic journal
20 tool to look at the details of the receipt.  That would
21 be normal for an investigation.
22 Q   Okay.  And then if we go down to 1971, BLM 001971.
23     See there -- you see the document?
24 A   I see it.

Deposition of Fred Becker                                   Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 85

1  Q   Okay.  And it says case detail, case number.

2  A   Yes.

3  Q   Okay.  Is this part of the file that is opened when

4  an investigation is open for an employee?

5  A   This -- this is -- this document is part of our

6  electronic case management system.  So when we come to a

7  conclusion on a case, this information is entered in to

8  this case management system to ensure we keep the

9  details of any particular case.  All this -- this being

10 an employee, it would be coded differently.  It says

11 record type Bloomingdale's internal.  If we catch a

12 shoplifter, it would have been Bloomingdale's external.

13      If it was Macy's, they would have had Macy's

14 internal.  So anyone that we come to a disposition on,

15 from an employee perspective, for -- resulting in an

16 asset protection investigation, we would enter their

17 information in to this case management system.

18 Q   Okay.  But you're saying at the end of the

19 investigation?

20 A   That's correct.

21 Q   So then while the investigation is going on,

22 you stated -- withdrawn.

23      So -- but, however is there a document -- or

24 is there a case management system that keeps track of

Page 86

1  the ongoing investigation?

2      MS. TIERNEY:  I'm going to object to the form.

3      You can answer.

4      THE WITNESS:  I don't recall back in 2017 --

5  '16, '17, '18 if we were utilizing a -- a portion.

6  I don't think we were utilizing because this had

7  been new, this system.  I don't think we were using

8  a system to track investigations, per se, because

9  some investigations could be over in a day and we

10 find there's no merit to it and we move on.  So we

11 don't necessarily track all of those things.  We

12 would track -- the investigator would track their

13 own caseload individually.

14 BY MS. MENDOZA:

15 Q   Do you know if Angi Lee was terminated?

16 A   I do not know if she was terminated.

17 Q   Do you know if she committed fraud?

18 A   I do not know if she committed fraud.  I will say

19 the same thing I did with Kristina Mikhaylova, it is

20 that, you know, we provided all the details of any

21 potential fraud over to the task force that was, again,

22 prioritizing the external person if they determined that

23 any of our associates or external associates were

24 involved, and that would be separate from a process

Page 87

1  where we handled violations of policy.

2  Q   Okay.  So what was the ultimate conclusion then

3  for --

4  A   My -- so my -- I don't recall exactly, but I'm

5  looking at this document.  And as I look at this

6  document, since the case was -- was entered in here, I

7  would make the assumption that the associate was

8  terminated, and it was -- the associate was not

9  terminated for dishonesty but for administrative -- it

10 was administrative discharge meaning it was a violation

11 of company policy if the person was -- if it was

12 someone -- if an associate was found to be dishonest,

13 that would be coded differently.

14 Q   Okay.  And do you recall who Idress Orya is?

15 A   No, I don't recall.

16 Q   No?  Okay.

17      MS. MENDOZA:  You can go down to 2004.

18 BY MS. MENDOZA:

19 Q   Okay.  You see that document there?

20 A   I do.

21 Q   And at the bottom it says BLM 002004.  So -- and we

22 can go to the next page, there's a receipt.

23      Does this refresh your memory in any way of

24 who this person was?

Page 88

1  A   Refresh my memory, no.  From the documentation, it

2  looks like it was an associate that was suspended.

3  Q   Okay.  And then we can keep going down to 2011.

4  And you see there it says:  I, Jeana Pantoliano Asset

5  Protection Central Investigations Manager.

6      Do you see that?

7  A   Yes.

8  Q   Did she work with Abraham Gonzalez?

9  A   She did.

10 Q   So she was -- the asset protection central

11 investigations, that's the corporate, right?

12 A   Correct.

13 Q   Okay.  And it says there about conversation -- I

14 had a conversation with store 001 Chanel handbag

15 employee Angi Lee while asset protection manager of

16 fraud and e-commerce, Abraham Gonzalez, sat as witness.

17      Do you see that?

18 A   Yes.

19 Q   It says:  During that -- the next paragraph says:

20 During that conversation, we discussed Lee's involvement

21 with Boston X-Closet and boutique owner YuYu Lai Lee --

22 I'm sorry, YuYu Lai.

23      Do you see that there?

24 A   Yup.

Case 1:19-cv-08927-GBD-SLC   Document 128-6   Filed 09/20/23   Page 27 of 79

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 89

1  Q   Do you know what Boston X-Closet is?
2  A   No, I have no idea.
3  Q   Was that part of the investigation?
4      MS. TIERNEY: Object to the form.
5      You may answer.
6      THE WITNESS: I don't know.  I would make an
7   assumption it was based off this.
8  BY MS. MENDOZA:
9  Q   Okay.  But you don't recall if that was --
10  withdrawn.
11     So you're saying that you do recall Boston
12  X-Closet being investigated or being a part of
13  Kristina's investigation?
14  A   No, I did not state that.  I stated that I don't
15  recall the details of the investigation.  My -- I would
16  make an assumption, based off this, that there was some
17  relevance to Boston X-Closet boutique, or whatever it
18  is, as part of the investigation.
19  Q   Okay.  And do you recall anything about -- or the
20  significance of X-Closet or YuYu Lai in Kristina's
21  investigation?
22  A   I do not recall.  I would just make any assumptions
23  based off this document.
24  Q   Okay.  Do you recall when Kristina was suspended?

Page 90

1  A   I do not specifically recall when Kristina was
2  suspended.
3  Q   Okay.
4  A   I was not present, that I do recall.
5  Q   When you say you were not present, are you saying
6  physically in the conversation with Kristina?
7  A   I'm saying I was not there when she was given the
8  notice and saying you're suspended.  I may have
9  remembered that, but I don't recall all the
10  investigations and the interviews and the -- you know,
11  there's been a lot of investigations between 2017 and
12  today.  I do not recall if -- I do not recall being in
13  the room when Kristina would have been suspended or been
14  part of that process.
15  Q   Okay.  So we can get off this screen.
16     So if at the time that -- because at the time
17  of the suspension that -- withdrawn.  I'll take it back.
18     Why are employees suspended after an
19  investigation?
20  A   They're suspended -- well, that's not -- so I'll
21  answer that question with that's not my purview.  I'm
22  not part of the decision as to why that process is in
23  place.
24     It is our policy that if there is a violation

Page 91

1  or potential violation, all -- whether it's a small
2  violation or larger, more an issue like theft, anyone
3  who, at the conclusion of the discussion we have with
4  the associate, they are suspended and then that
5  information is turned over to HR.
6      Why that process is in place, I can't speak
7  to.
8  Q   Okay.  But can there be a determination to not
9  suspend someone after an investigation?
10  A   Yeah.  Yes.  That is possible.  If an
11  investigation -- during an investigation it reveals that
12  there was absolutely no wrongdoing, there was no
13  relevance to the issue at hand, we interview, an
14  explanation was made, and there was absolutely no -- no
15  further activity would probably be taken as an
16  exception, which would not be common.  We would not
17  suspend and send the associate back to the floor.
18  Q   Okay.  So -- right.  So you would -- and you would
19  not hand it over to HR, or would you?
20  A   We would still bring HR in to the loop that --
21  because we did have a conversation.  Again, you know,
22  there's lots of different types of conversations, but if
23  we suspected an associate violating a policy and during
24  the discussion we were completely wrong and we have the

Page 92

1  wrong associate or there was a logical explanation that
2  we hadn't thought of, we would not suspend, we would
3  allow the associate to go back to the floor and we would
4  inform HR of -- just as a record of the conversation.
5  Q   Okay.  So in Kristina's case, at the time that she
6  was suspended in June -- early June 2017, at that point
7  there was no -- she had not been found to have committed
8  fraud, correct?
9  A   That is correct.
10  Q   Okay.  So why was she still questioned or
11  investigated by Christopher Castellani?
12     MS. TIERNEY: Object to the form.
13     You may answer.
14     THE WITNESS: She -- during the course of the
15  investigation, it was -- there was enough
16  information -- or I don't want to use the word
17  evidence because that's not correct, but there was
18  enough potential violations of policy for us to sit
19  down and have a conversation with her.  We -- we
20  needed an explanation to some of the unusual
21  activity, including why merchandise was being sent
22  without tax being charged.  So we then had that
23  conversation with her.
24     So when we -- during the course of the

Page 93

investigation, if a policy violation is uncovered we are required to include that in the investigation and understand what happened. And that -- in this particular case, when we saw that activity, we needed to get an explanation from the associate and then we've have that conversation, an associate admitted to violation of our policy, we then followed our process where we suspended and turned the information over to HR, which was separate from any fraud investigation that was ongoing at the time.

BY MS. MENDOZA:

Q   Okay. But how can -- how does Bloomingdale's or the investigation team, how can they determine if something's being purchased to avoid paying sales tax?

MS. TIERNEY:  Object to the form.

You can answer.

THE WITNESS:  Well, there's -- again, determining and proving, it's all different ways of describing that. Again, when we see something we don't understand and we need an explanation for, that's when we would go further or have that conversation. If a -- if there is a sent transaction and the person walks out of the store

Page 94

with the -- so if a -- during a transaction, if it's being sent to an individual's home address, that home address, if it's in a different state, that state tax will be applied. Or if there's no state tax, then there wouldn't be any state tax applied.

If we see a sent transaction but the person walks out of the store with it, that's clear violation of our policies because if the person walks out of the store, they should have been charged the whole tax. That's the law.

So that's one way.

Another way is looking at the number of personal purchases being sent to -- being sent out of state. I live in New Jersey -- I'll give as an example. I live in New Jersey. I think the tax rate is much less in New York. I can have a purchase sent to my home address. If I had a -- if I made a purchase and I had it sent to a different state that had no tax but I didn't live there, that would be suspicious to me.

So when we look at those transaction histories, if we see something that doesn't look -- that looks unusual, that would make us, again, look

Page 95

further to understand why are these transactions being sent -- being purchased by an associate and not sent to their home address and what would be the benefit of that, and if there's a violation of two things, our company policy and the law.

BY MS. MENDOZA:

Q   Okay. Right. So I -- and you stated earlier that there's a difference between proving and how you know. And I'm wondering how, at the time Bloomingdale's or the investigation team flagged Kristina for shipping out of state to avoid taxes, not proving it, but how did they know to -- that that was -- that she was potentially violating that policy?

A   Well, so it wasn't initially flagged as that. It was flagged as unusual purchase activity, the number of transactions, the number of Chanel bags she was purchasing and the dollar amount flagged as unusual purchase history.

What that means could be reselling, it could be -- it just -- it was unusual activity. We then looked further into it, and then it looked like -- it still could have looked like -- it did look like reseller activity when you look at it on the surface, but one of the things that we saw was merchandise was

Page 96

being purchased by Kristina and sent to an address with no taxes being charged that was not her address.

So that led us down that road from an investigative standpoint, that we needed answers to those questions.

Q   But that could be the same as it could have been for reselling, right? Using an address that's not hers, that could be because she's reselling it to that address, right?

A   That could be. We don't -- there are a number of reasons why that -- and we didn't know the reasons why that activity was occurring. That's why we investigate, get all the details and then have a conversation with the associate.

Q   Right. So my question is: At the time that they sat down with Kristina, was one of the considerations that she is shipping out of state to avoid paying sales tax?

MS. TIERNEY:  Object to the form.

THE WITNESS:  Again, not being there, not remembering the specific details of the investigation, I can't say 100 percent that was the mindset of the investigators going in.

I can say that, based off the information,

Deposition of Fred Becker

Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 97

1 that would be something that we would definitely
2 have asked questions about if that's -- those
3 transactions we needed answers as to why that was
4 happening.
5     So, yes, they would have walked into that -- I
6 would think they would walk into that
7 investigation -- I'm sorry, conversation wanting
8 those questions answered.
9 BY MS. MENDOZA:
10 Q  Okay.  And how many other employees do you know of
11 that were flagged or were sat down and questioned
12 because they were potentially selling or sending their
13 purchases to avoid paying sales tax?
14     MS. TIERNEY:  I'm going to object to the form.
15     You may answer.
16     THE WITNESS:  I don't have a number.  I don't
17 know.
18 BY MS. MENDOZA:
19 Q  Is it a lot, a large amount?
20 A  No, it is not.
21 Q  Okay.  So does it not happen often?
22     MS. TIERNEY:  Objection to form.
23     You can answer.
24     THE WITNESS:  It does not happen often because

Page 98

1 that's not within the purview of the priorities of
2 an investigation team.  If during the investigation
3 we come across something like potential reselling
4 or potential avoidance of taxes, we will
5 investigate and follow our process.  We aren't
6 looking for that.  I know it has happened and I
7 know that has been brought to HR in the past, and
8 they've dispositioned those cases.
9     It's not common, but as a protection team,
10 we're more looking for theft and fraud.  That's the
11 primary reason for the investigation team.  And any
12 policy violations we find along the way, we'll
13 certainly address, and that's what happened in this
14 case.
15 BY MS. MENDOZA:
16 Q  Okay.  And why aren't you looking for that policy
17 violation?
18     MS. TIERNEY:  Objection to form.
19     You may answer.
20     THE WITNESS:  There are lots of different
21 policy violations, and the purview of the asset
22 protection team is really to look at theft and
23 fraud, not to police all -- bad choice of words --
24 not to investigate every policy violation including

Page 99

1 that one.  It's not our primary purpose.  That is
2 more of a -- again, the team spends most of their
3 time investigating dishonesty.
4 BY MS. MENDOZA:
5 Q  And dishonesty you're saying is for theft and
6 fraud, correct?
7 A  Correct.  Prosecutable cases is usually -- is one
8 way to describe it.
9     MS. MENDOZA:  Okay.  I don't know if you want.
10 This could be a good place if you want to stop to
11 eat something.
12         - - -
13     (Whereupon, a brief break was taken.)
14         - - -
15 BY MS. MENDOZA:
16 Q  At what point -- withdrawn.
17     Do you know at what point a customer, an
18 employee's account is flagged?
19     MS. TIERNEY:  I'm going to object to form.
20 BY MS. MENDOZA:
21 Q  I'll be a little bit more specific.  Is it after so
22 many months -- I'll rephrase it.
23     Does central investigations or Macy's credit
24 card services, do they watch an employee's account for

Page 100

1 several months and then raise the issue with your team,
2 or is it immediate, as soon as the algorithm picks it
3 up?
4 A  No, it's normally more immediate.  And, again, the
5 parameters of those algorithms or exception reports can
6 be changed at any point.  So what those parameters are
7 now could very well be very different from what they
8 were in 2017.  They are not investigators.  They are
9 analysts, and anything they see as suspicious or, you
10 know, something that should be investigated, they just
11 send it on to the relevant division, AP teams.
12 Q  Okay.  So let's look at Plaintiff's Exhibit 3.
13         - - -
14     (Whereupon, the document was marked, for
15 identification purposes, as P-3.)
16         - - -
17 BY MS. MENDOZA:
18 Q  When you say the algorithm can be changed --
19 withdrawn.
20     When you say exception report -- is that what
21 you're saying?
22 A  Yes.
23 Q  What is that?
24 A  You're putting an algorithm or some sort of process

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 101

1 in place to sort through data to pull out exceptions to
2 parameters. So, for example, if an -- from an
3 investigative standpoint, I have reports that show
4 associates that make a purchase along with a gift card,
5 right? So there may be some -- that is -- so if any
6 associate in the perimeter that I put in, so say 59th
7 Street, I put in a -- I want to see an exception that an
8 associate bought something in tandem with a gift card,
9 if that happens, it would pop up on a report. So that
10 would be an exception report. It's an exception to the
11 rules that we put in.
12 Q   Okay. So with Kristina, was it an exception report
13 that found the red flag?
14 A   Yes. My understanding, it was a version of their
15 exception reporting system that monitors account
16 activity, and it was resolved, except -- the number of
17 purchases that goes over the norm, it was an exception
18 to the standard purchasing activity of most associates.
19 Q   Okay. So then that means that -- is that the same
20 as saying that there's not -- that someone -- that
21 you -- they went in to Macy's credit card customer
22 service, that they went into her account to look to see
23 if it was going over a certain number?
24 A   No. It would strictly be -- and I had seen these

Page 102

1 before. It's strictly the purchases was beyond the
2 parameters creating an exception. That just pops up on
3 a report.
4        They would not look at any account. They
5 would send that information on to the relevant division.
6 So they weren't monitoring, they weren't looking, they
7 didn't investigate. When I say they, I mean MCCS.
8 That's not their normal -- I was not there. Obviously,
9 I can't say 100 percent anything of what happened. I
10 can talk to you of what the process is, and having seen
11 that happen in the past, that is the process.
12 Q   Okay. So -- and has there been times where it just
13 pops up because somebody just made a certain number of
14 purchases at that time, it just happened to be a lot,
15 and not -- there wasn't any policy violation. It just
16 happened to be the case?
17 A   An exception report does not mean there's a policy
18 violation. It's just based off a certain number of --
19 usually the parameters are more -- they're big numbers,
20 their excessive in some opinions, which would create the
21 report. Otherwise it could -- we don't want reports
22 coming out every ten minutes. So the number of
23 transactions, I can't speak to what the exact parameters
24 are today or were back then. But, again, it does, from

Page 103

1 my professional opinion, make sense that the number of
2 purchases of Chanel handbags would, in a short period of
3 time, create an exception that we'd want to look at as
4 an organization.
5 Q   Not because there was any wrongdoing, but just
6 because it would be a high number, is that --
7 A   That is correct. An exception report doesn't mean
8 there's wrongdoing, it means that, hey, this is
9 something we might want to look at. Not just that
10 exception report, but any exception report we look at.
11 Q   Right. So when Macy's credit card customer
12 service, when they sent it over, it's not because
13 they're saying, hey, red flag, something improper is
14 happening. It's just this is just what's going on, you
15 take a look, is that kind of how it goes?
16 A   Yeah. I don't know that I would phrase it that
17 way. I'd say, hey, there's a red flag -- red flag
18 meaning something unusual, right? So, yes, something
19 unusual, you need to look into it. Doesn't mean there's
20 any wrongdoing. It could have -- there could have been
21 an explanation. It's -- all that is is getting -- for
22 other people to look further in to it.
23 Q   Okay. And so you said that obviously you don't
24 want an unusual report happening every ten minutes, so

Page 104

1 in 2016, 2017, do you recall how often it would happen
2 for Chanel?
3 A   I cannot specifically recall how often that
4 happened. I can tell you since I've been with the
5 company, I can recall four or five instances where I've
6 seen those types of exception reports coming in since
7 2012.
8 Q   Okay. So looking at this document, EOC charge,
9 Plaintiff's Exhibit 3.
10        - - -
11        (Whereupon the document was marked, for
12 identification purposes, as P-3.)
13        - - -
14 BY MS. MENDOZA:
15 Q   Go to the bottom of the first page. It says
16 Mikhaylova 00116. Do you see that there?
17 A   I do see it.
18 Q   Have you seen this document before? At the top it
19 says Macy's Inc.?
20 A   I briefly did see this.
21        MS. TIERNEY: I apologize, Melissa. It's not
22 showing up in the exhibit folder.
23        MS. MENDOZA: I think you have to refresh the
24 page and then it should come up.

Case 1:19-cv-08927-GBD-SLC   Document 128-6   Filed 09/20/23   Page 31 of 79

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 105

1  MS. TIERNEY:  Yeah, I did, and it wasn't for
2  some reason.  Maybe it will now.
3         - - -
4     (Whereupon, a brief discussion was held
5  off the record.)
6         - - -
7  BY MS. MENDOZA:
8  Q   So you see that document there, right?
9  A   I see it.
10 Q   Okay.  So -- and you said -- you were answering, I
11 think, have you seen this before?
12 A   I briefly -- I believe I briefly saw this before,
13 yes.
14 Q   Okay.  And this is from Macy's Law Department to
15 the U.S. Equal Employment Opportunity Commission.  And
16 if you look at Page 00119, if you'd turn to that page,
17 at the third paragraph.
18     Okay.  So you see it says:  Around this time,
19 but unbeknownst to complainant, the entity which handles
20 Macy's and Bloomingdale's credit cards.
21     Do you see that there?
22 A   Yes.
23 Q   The next sentence over says:  Namely, between
24 October 2016 and April 21, 2017, complainant had made 26

Page 106

1  employee purchases totaling over 65,000.
2     Do you see that there?
3  A   I do see it.
4  Q   So for that time period, October 2016 to
5  April 21st, 2017, is that typically how long the --
6  either the algorithm is checking, is it looking for
7  those certain amount of type of months, like you were
8  saying, parameters?  Or is it that April 21 all of a
9  sudden there's an unusual activity, now it gets sent to
10 internal investigations?
11     MS. TIERNEY:  I'm going to object to the form.
12     You can answer.
13     THE WITNESS:  I do not -- I'm not familiar
14 with the exact parameters that are put in place for
15 the algorithm, and I am not familiar about the --
16 the same, the algorithms and the parameters put in
17 place for that time for what was being put in in
18 2016 or 2017.
19     Those exception reporting and that information
20 comes from a different division, Macy's credit
21 services.  It is -- there are numerous ways to put
22 in parameters.  It could be for 12 months, it could
23 be over two weeks, it could be over different
24 dollar amounts, et cetera.  I would even suspect

Page 107

1  that whatever is in place today is not what was in
2  place back then, so I can't speak to how that was
3  set up or why that period of time is on here.
4  BY MS. MENDOZA:
5  Q   Okay.  But -- so then who -- so are you saying that
6  Macy's credit customer service, they control the
7  parameters of the --
8  A   That is correct.
9  Q   Okay.
10 A   That's where the information initially came from.
11 Q   Okay.  And so is it typical that -- after six
12 months, that -- withdrawn.
13     Is it typical that there's a review of an
14 employee's six-month purchase history?
15     MS. TIERNEY:  I'm going to object to the form.
16     You may answer.
17     THE WITNESS:  It is typical of a review when
18 we get an exception of 26 employee purchases for
19 $65,000, yes, that we would look into the purchase
20 history.
21 BY MS. MENDOZA:
22 Q   So I guess what comes -- what -- for Kristina
23 Mikhaylova, we'll say, what triggered, is it that it
24 was -- the amount of purchases within the timeframe, was

Page 108

1  it the amount paid within the timeframe?  Which is it?
2     MS. TIERNEY:  Object to the form.
3     You may answer.
4     THE WITNESS:  Are you asking, in my opinion,
5  what makes this unusual?
6  BY MS. MENDOZA:
7  Q   No, what -- right.  At the time, what was it that
8  would have flagged or been part of the exception report?
9     MS. TIERNEY:  I'm going to object to the form.
10     THE WITNESS:  Again, not being familiar with
11 the exact parameters of this, my -- based on my
12 experience, the fact that there were 26 purchases
13 that totaled $65,000 sounds as an outlier when you
14 look at typical associate purchasing behavior.  And
15 on top of that, does the associate work in the
16 department where these purchases made, which,
17 again, we later determined.
18 BY MS. MENDOZA:
19 Q   I'm sorry, I don't understand the last part.
20     What do you mean by were later determined?
21 A   Well, when we got the information, we looked at the
22 purchases and we saw they were Chanel purchases.
23 Q   Okay.  But are you saying that those were part of
24 the fraud review?

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 109

1  A   No.  So fraud -- the fraud piece of it, the fraud
2  part of the investigation is separate.  The information
3  that came from MCCS was there was unusual purchase
4  activity, which would be here, this 26 pieces at 65,000.
5  That initiated our review of that exception to see what
6  kind of activity these purchases were.
7        And then we determined, when we looked at it,
8  it was predominantly or all 26 Chanel purchases, if my
9  memory serves me, which, again, allows us to look into
10  that, which makes us want to look into that further,
11  investigate further.
12  Q   Okay.  So when you say the fraud was separate,
13  you're saying that --
14        MS. MENDOZA:  We can get off the screen for
15    now.
16  BY MS. MENDOZA:
17  Q   But you're saying that the -- because I believe
18  before you stated that there was -- it was a question as
19  to the transactions that she rang up, right, but not
20  that she purchased herself that was being investigated?
21        MS. TIERNEY:  Object to the form.
22        You can answer.
23        THE WITNESS:  Correct.  My memory serves me
24    there was communication initially about overall

Page 110

1  fraud concerns in Chanel.  And we got a report of
2  the top, I don't know, three, five, ten associates.
3        And the number one associate that was
4  ringing -- that had rang sales that turned out to
5  be fraudulent was Kristina.
6        That started us looking at those transactions
7  and looking at trying -- and starting the
8  investigation, okay, what's happening in Chanel,
9  why are we seeing this fraud come up, because these
10  were big numbers coming up at a short period of
11  time, and Kristina, there was a large number of
12  them being rung by Kristina.  That was one piece of
13  it.
14        That kind of kicked off the fraud like
15  investigation overall in Chanel.  We wanted to know
16  what was going on with Chanel.
17        Secondarily to that and separately to that --
18  and I think it's -- it was a timeframe that was
19  after that, we received the exception saying that
20  Kristina's purchases had popped up and we wanted --
21  and we needed to look at that to see was -- why was
22  there unusual, out of the norm, an exception to
23  what typical purchase activity looks like?  What
24  was driving that?  What was -- what were in those

Page 111

1  purchases?  Was there something that we needed to
2  investigate?
3        So there's two separate things that Kristina
4  popped up on.
5  BY MS. MENDOZA:
6  Q   Okay.  And they had no -- but one did not create
7  these -- I guess, initiate the investigation of the
8  other?
9  A   That's -- that's accurate.  They were two separate
10  things.
11  Q   Okay.  And so the first one was the -- about the
12  fraud transactions that she was ringing up?
13  A   I believed -- I believe that was before -- yes, I
14  believe that was first.
15  Q   Okay.  And do you recall if that was in February
16  when it started, that investigation?
17  A   I don't recall.  It sounds right, but I don't
18  recall without looking at any case summary.
19  Q   Okay.  Was that the same investigation that Angi
20  Lee was also being investigated for?
21        MS. TIERNEY:  Object to the form.
22        You can answer.
23        THE WITNESS:  I'm going to say yes, because,
24    again, we look at an overall fraud problem, that

Page 112

1  was the start of the fraud investigation.
2        Like any investigation, it kind of morphed as
3    we understood more of the activity that was
4    happening.  So I would definitely say that that
5    would have been the start of it, yes.
6  BY MS. MENDOZA:
7  Q   Okay.  So you do not recall if it was in February
8  of 2017?
9  A   I have -- no, I don't recall specifically if it was
10  February 2017.
11  Q   Okay.  And do you recall if Kristina was
12  investigated or questioned by asset protection before
13  May 2017 for any other incident?
14  A   I don't from -- I don't have memory of the exact
15  events that happened in 2017.  Based off of the case
16  file I remember reading, there was an initial
17  discussion, again, based off that initial communication
18  on fraud, where she was ranked number one and her
19  sales -- she was the sales associate that rang the
20  transactions that came back as fraud.
21        I believe we -- in our trying to determine
22  what was going on overall with fraud -- because there
23  were other associates on that list -- I believe we spoke
24  to her.  I believe we asked her about those

Deposition of Fred Becker                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 113

1  transactions.
2  Q   Okay.  Was that -- were they regarding phone
3  orders?
4  A   I believe -- I believe they were regarding phone
5  orders, yes.
6  Q   Okay.  And then what happened after that, after
7  that investigation of her phone number?
8  A   Well, I know we spoke to her.  I don't recall if we
9  spoke to the other associates or whatnot.  We looked at
10 the transactions.  Back in 2017, we had a process called
11 the memo order process.  We would have -- I believe we
12 validated whether or not a policy was followed.  And
13 then we would continue -- we'd continue the
14 investigation.
15      So we're trying to see what caused the fraud.
16 So did an associate, Kristina or any other, do something
17 that they'd violate a policy that led to us incurring
18 fraud, or was somebody coming in and -- like what was
19 the reason -- what was driving the fraud?  So we did
20 continue the investigation after we spoke to Kristina or
21 any of the associates.
22 Q   Okay.  And that was the fraud that she -- that was
23 ultimately sent over to law enforcement for her,
24 correct?

Page 114

1  A   That fraud, and then there was much more after
2  that.  The fraud -- we got more data -- yes, it wasn't
3  just that fraud.  That was -- that fraud was part of it,
4  yes.
5  Q   Okay.  So I'm just saying for Kristina, what other
6  fraud was part of it?
7      MS. TIERNEY:  Object to the form.
8      You can answer.
9      THE WITNESS:  I don't know what part -- I
10     don't recall what part Kristina -- what transaction
11     she was part of or not.  I remember -- I'm just
12     going by my recollection, as a total, over the
13     months as we discovered the fraud, because the
14     fraud is not instantaneous, we don't know something
15     is fraud immediately.  But I remember that there
16     was over a million dollars in fraud overall.  I
17     don't recall how many transactions Kristina may
18     have rung that were fraudulent.
19 BY MS. MENDOZA:
20 Q   Okay.  But none that she was found to have been
21 committing -- those -- and none that she had been found
22 to be committing, at least per your department, your
23 team?  Not law enforcement, your team I'm saying.
24 A   My team did not have any evidence to prove she was

Page 115

1  facilitating fraud.
2  Q   Okay.  And these are just transactions that she
3  rang up, not that she made for herself, correct?
4  A   That is correct, yes.
5  Q   Okay.  So the transactions that she made for
6  herself then were that Macy's credit card other issue,
7  right?
8  A   Yes, that's a separate issue, yes.
9  Q   Did, at any point, those two merge, those two
10 issues?
11 A   I don't recall whether -- where any of those issues
12 merged.  I don't recall.  I don't recall any
13 conversations where they merged, but there was fraud and
14 the purchasing and tax thing.  I don't recall that ever
15 being a conversation.
16 Q   Okay.  And so if -- so the addresses, going back to
17 the addresses, were they a part of investigating --
18 withdrawn.
19      Was investigating the addresses that she was
20 sending the purchases to part of the credit card issue
21 or the fraud issue?
22      MS. TIERNEY:  Object to the form.
23      You can answer.
24      THE WITNESS:  I -- I would have to go through

Page 116

1  the investigation to answer any questions about
2  specific addresses or whether there was any
3  crossover.
4      My memory was that the -- her purchase -- I
5  don't recall if any of her purchases went to
6  similar addresses to there's the fraud.  If that's
7  your question, I don't recall that.
8  BY MS. MENDOZA:
9  Q   Okay.  Right.  And that's where I'm asking, it
10 could have merged at that point.
11      If it was that the addresses that she was
12 ringing up were the same addresses that she was sending
13 to?
14 A   That would be something I would think we would look
15 at.
16 Q   Okay.  And you don't recall looking at that?
17 A   I don't.  I didn't run the investigation myself.  I
18 don't recall that being part of any summary or
19 conversation I was involved with.
20 Q   Okay.  So going back to my question initially about
21 the October 2016 to April 21, 2017 purchases, so do you
22 know or recall that if they -- if it was -- withdrawn.
23      Do you recall what the parameters were at that
24 time?

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 117

A   I don't know what the parameters were.  I don't
know what the parameters are today and I would not have
known what the parameters are at that time.
Q   Okay.  At the time that Kristina was terminated,
was she terminated for her statement that she was
shipping her purchases out of state to avoid sales tax?
        MS. TIERNEY:  Object to the form.
        THE WITNESS:  I can't -- because I don't make
    the decision on her termination, I don't want to
    make a statement as to why she was terminated.
        I can -- my recollection is that HR utilized all
    the information we provided to make a decision on
    her employment, which in that case ended in
    termination.
BY MS. MENDOZA:
Q   Okay.  But at that time, for your part for the
investigation, the only finding -- conclusionary finding
that you had or evidence was just her statement,
correct?
A   Her statement, along with the data, which had been
the list of transactions.
Q   But the data didn't prove anything?
A   Data doesn't -- data doesn't prove anything other
than she sent purchases to an address that she didn't

Page 118

live and taxes were not paid.
Q   Right.
A   Yes.
Q   Okay.  And after she left and was terminated, did
any -- did her -- did any findings for her change?
        MS. TIERNEY:  Objection to form.
        You can answer.
        THE WITNESS:  From -- I don't recall where any
    findings for her changed.  Any information we would
    have had we would have provided at that point to
    law enforcement as part of their bigger
    investigation.
BY MS. MENDOZA:
Q   Okay.  So what I'm saying is, were there any --
besides the data then -- because if that's all that you
had -- besides her statement, were there any other --
was there any other proof that you had --
A   Not to my recollection.
Q   Okay.  So is there anything else besides this --
her statement of the shipping and the taxes besides that
that she had violated?
A   Not to my recollection.  And we -- when she -- when
she was terminated, we would not have looked for any
other policy violations either, so I don't recall

Page 119

anything else coming up.
        MS. MENDOZA:  Okay.  And that's it for right
    now.  And I'll reserve in case after you ask
    questions.  But I thank you.
        MS. TIERNEY:  Okay.  Well, I want to jump back
    to Exhibit 2.  I don't know if you can put that up,
    Alex.
                    - - -
                 EXAMINATION
                    - - -
BY MS. TIERNEY:
Q   But let me -- it's on the screen for you, but let
me look and ask you -- this was Angi Lee, this is her
statement.
        Now, if I told you that some of
Ms. Mikhaylova's purchases for herself were mailed to a
New Hampshire address to a woman name YuYu Lai, and then
Angi Lee, on page 1954 --
        MS. TIERNEY:  If you can move that down, Alex.
BY MS. TIERNEY:
Q   -- says that she was shipping to YuYu in New
Hampshire, does that have any significance to you, or
would it have as an investigator?
A   Absolutely.

Page 120

Q   What is that significance?
A   So when you look at it as an investigator, it
certainly looks like there's coordination between
associates to utilize their accounts, their discounts,
to purchase merchandise that's going to a business.  And
to me, as an investigator, looks like that that's being
resold.  As an investigator, we're going to look into
all of those things, all that suspicious activity, and
then follow up.
        It may be different than what we can prove,
but that -- as an investigator, there is definitely
a lot of questions there.  And what it looks like on the
surface is multiple violations.
Q   And could it be diversion?
A   Diversion, discount abuse, avoiding taxes, multiple
policy violations.
Q   Can you state for the record what the date of Angi
Lee's statement is?
A   9/26/17.
Q   And that was several months after Ms. Mikhaylova
was terminated, right?
A   That's correct.
Q   Now, if you look at Angi Lee's statement, she also
goes:  My former co-worker asked me to purchase and send

Deposition of Fred Becker                                                                 Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 121

1  to YuYu.  I benefited from earning reward points and
2  compensated.
3          And once again, as an investigator, does that
4  have any significance to you?
5  A   Absolutely.  So there, one co-worker is indicating
6  that another co-worker was, in fact, doing the same
7  thing and that other co-worker was actually initiating
8  the activity, sending it to this diverter or reseller or
9  whatever this company is.  On top of that, they're using
10 their own personal loyalist accounts to get the reward
11 points.  And compensated means that she was being paid
12 somehow.
13         That's, as an investigator, how I read that.
14 Q   Okay.  Now, let --
15         MS. TIERNEY:  And if you can -- Alex, if you
16     could go down to 1555.
17 BY MS. TIERNEY:
18 Q   If you look to the far right, there's -- on the far
19 side close to the bottom, YuYu sells, I think that's
20 what that says.  I'm not sure what that says actually.
21         Right around 314, do you see that?
22 A   Yes.
23 Q   And then if we go to the next page -- and once
24 again, we haven't seen the name of the co-worker, but

Page 122

1  let's look at 1956.  If you look at 406, it looks like
2  Kristina Mikhaylova ships to YuYu.
3          Does it look like I read that right?
4  A   Yes.  That's how -- yes, that's what it looks like
5  to me.
6  Q   So then I want to go further into 1957.  And if you
7  would read that first bullet under discount abuse, tax
8  evasion and reselling to yourself.
9          Starting with Lee ships, all the way through
10 the next couple of lines, can you read that to yourself
11 and tell me if that has any impact on you -- or any
12 significance to you as an investigator in AP?
13 A   Okay.  So, again, as an investigator, this looks
14 like there is -- this sounds like this -- these two
15 associates are involved in, again, facilitating multiple
16 policy violations by using their personal accounts to
17 purchase merchandise at a discount, shipping them to a
18 business, a UPS store, associated with a business run by
19 this YuYu person, which more than likely is a reseller
20 based off the number of bags being shipped.
21         And this being Chanel, which is never
22 discounted, unless it's old merchandise, which is never
23 discounted more than likely making a good profit off of
24 this process, on top of the sales tax not even being

Page 123

1  collected.
2  Q   How about the fact that the shipping fee is waved,
3  is that normal?
4          MS. MENDOZA:  Objection.
5  BY MS. TIERNEY:
6  Q   You can answer.
7  A   Is it normal?  Sometimes -- that's not -- it's not
8  normal, but it's not also completely inconsistent.  The
9  associates have the ability to waive shipping fees if
10 it's a good customer if -- or that type of thing.  They
11 can never waive taxes, because that's guided by law.
12 Shipping fees, there is some flexibility if it's a good
13 customer.  I certainly would not put YuYu in that
14 category based upon the fact that this person looks like
15 a reseller.  But shipping fees can be waived from time
16 to time.
17 Q   What about one associate ringing a purchase for
18 another associate, should they -- or do they have the
19 authority to waive shipping fees for an employee?
20 A   I don't recall the exact policy on that.  However,
21 associates should not be waiving fees, shipping fees,
22 for another associate.  I would definitely question why
23 that would happen, why that would be.
24 Q   And is manager approver -- excuse me, let me

Page 124

1  rephrase that.  I -- strike that.
2          Is manager approval required to waive shipping
3  fees to your knowledge?  And if you don't know, that's
4  fine.
5  A   I don't think so.
6          MS. TIERNEY:  Okay.  If we could go, Alex, to
7      1964, please.
8  BY MS. TIERNEY:
9  Q   And there's a section that's entitled UPS shipping
10 location.  Can you take a look at that and see if
11 that's -- if there's any significance to you as an AP
12 investigator?
13         MS. MENDOZA:  Objection.  Are you asking about
14     now, his opinion now?
15         MS. TIERNEY:  I'm asking about his opinion at
16     any point in time that he's been an AP
17     investigator.
18         THE WITNESS:  So the significance of this
19     looks like -- first the associate, Lee, is not
20     following process -- or procedure in which looks
21     suspicious on the surface of how we conduct
22     transactions by taking the information off of a
23     piece of paper and not having a credit card in
24     front of her.

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 125

1   So that right off the bat is a violation of
2   our policy and suspicious.
3   BY MS. TIERNEY:
4   Q   Let me ask you this -- and I don't want to
5   interrupt -- well, go ahead. I don't want to interrupt
6   you. You're on a roll and I want to let you get through
7   that. I apologize.
8   A   So assuming the fact that the credit card -- that
9   is synonymous with how a fraudulent -- an outside
10  fraudulent person handles -- tries to facilitate fraud.
11  They'll come in with cards on paper or on their phones,
12  et cetera, et cetera, not that that's exactly what is
13  happening here, but this -- that looks like that and is
14  suspicious to me as an investigator. And the fact that
15  it's going to YuYu, again, I don't know if on that date
16  6/3, I -- if -- I think that's after the date we
17  terminated Mikhaylova. If that's the case, here's the
18  next associate coming in with a account being asked to
19  ring by Lee going back to this suspected reseller, yeah,
20  that's all very, very suspicious to me.
21  Q   And I will tell you. I think Mikhaylova was let go
22  like around June 16th of '17, so she was still employed
23  at this particular time.
24  A   Okay. Even still, that is suspicious, why wouldn't

Page 126

1   an associate not use their employee card and why would
2   she want her purchase going to New Hampshire and this
3   YuYu person, all questions that I would have, and we
4   more than likely would have provided to law enforcement
5   as part of the bigger investigation.
6   Q   Okay. Now, the fact that YuYu apparently has this
7   boutique -- and I think counsel asked you about it. I
8   don't know if she showed you this particular provision,
9   does that inform you in any way as to whether or not
10  she's a reseller?
11  A   That would make me believe she is a reseller based
12  off my experience. That's what we have seen, you know,
13  someone who has their own business, they're resellers.
14  That's typically how they operate.
15  Q   Okay. And then if we look 1965 and 1966, which is
16  the transactional journal record, this is a transaction,
17  and it was rung by -- I can't tell who it was rung by.
18  My recollection is 72061886 is Mikhaylova's associate
19  number, but if we look down at where it says: Sent to
20  YuYu Lai, sender, Kristina, Chanel handbags, does this
21  mean that Kristina Mikhaylova was the ringer? Is that
22  what that sender means?
23          What does that mean to you?
24  A   Where it says send to?

Page 127

1   Q   Well, it says send to and then it has YuYu Lai, but
2   underneath that it says, sender, Kristina, Chanel
3   handbags.
4           Does that mean that's who is sending the
5   merchandise?
6   A   Yes. And that sender's phone would have been our
7   Chanel shop.
8   Q   Can you just state for the record where MCCS is
9   located?
10  A   It's right outside Cincinnati. It's one of the
11  towns right outside of Cincinnati. I don't remember the
12  town.
13  Q   But it's in Ohio?
14  A   Yes.
15  Q   Now, if you look at 2011.
16          MS. TIERNEY: If you can move that down, Alex,
17  please, on Exhibit 2.
18          Oh, I'm sorry, Alex. Exhibit 2, page 2011.
19  BY MS. TIERNEY:
20  Q   This is Angi Lee's former report, I think you said
21  was in the database. If you read that last sentence, it
22  says: Lee resigned and is coded non-rehirable.
23          Does this mean that she resigned while she was
24  on suspension?

Page 128

1   A   That is -- that is typically how that would be
2   worded, if that's what she did. I don't have direct
3   knowledge if that's what happened.
4           But, yes, if an associate resigns while
5   they're suspended, they will be -- it will be noted as
6   such and they will be coded as non-rehirable.
7   Q   Okay. With respect to memo orders -- well, let me
8   go back.
9           When Ms. Mikhaylova had such high fraud sends,
10  I think you mentioned something about the memo orders.
11          How does the memo order process play in to
12  that issue?
13  A   Well, the memo order process, which is not a
14  process that's in place anymore as we've updated our
15  technology. But the memo order process was a check -- a
16  check and balance against phone orders sent. We don't
17  have the card in front of us, we can't swipe a card.
18  There's -- the -- it was an -- one check against
19  potential fraud by the associate getting the information
20  of the transaction, that would then be reviewed by our
21  cash office team and they would do a simple address
22  verification of the sent.
23          So, for example, if I called up and was
24  placing a phone order, I would give the information to

Page 129

1  the associate, the associate would ring up the -- that
2  information would go to cash office, they would verify
3  that Fred Becker lives at the address it's being shipped
4  to by calling the bank.  And if that is verified, then
5  it's authorized and gives the associate the
6  authorization to ring the transaction.
7        So instead of having the associate try to
8  verify the address, that was the process to do that.  It
9  did not prevent all fraud.  It was a simple check that
10 it was being shipped to an authorized address.
11 Q   Okay.  Now, with respect -- let me show you a
12 document -- I think we got -- we're on Exhibit 4.  And I
13 don't know how to upload it, so I am just going to share
14 my screen.  Hopefully this will work.
15       - - -
16       (Whereupon, the document was marked, for
17 identification purposes, as P-4.)
18       - - -
19 BY MS. TIERNEY:
20 Q   I am going to -- do you see my screen, Mr. Becker?
21 A   I do.
22 Q   Okay.  Now, I want to name as Exhibit 4 -- I'm
23 going to put Bates Number Bloomingdale's 1488 -- yeah, I
24 guess just 1488 for the moment.

Page 130

1        And -- well, no, let me -- I'm going to take
2  that back, 1488 to 1489.  And I'm going to start with
3  1489 and let you read that, and then I'm going to move
4  up.
5  A   Okay.  I read it.
6  Q   When it says the employee -- which is 72061886 is
7  Mikhaylova -- might have disregarded process to make a
8  sale.
9        Do you know what that refers to?
10 A   For the most part, the phone order process, memo
11 order process.
12 Q   Then if you look at the next page, there is a list
13 and the top one, 72061886, Kristina Mikhaylova, and then
14 there are two other names, which she -- looks like her
15 write-offs were about $90,000.  The next closest one was
16 27,000.
17       Did I read that correctly?
18 A   Yes.
19 Q   And this is an email, according to the header, that
20 Abraham Gonzalez sent to Castellani and to you; is that
21 correct?
22 A   That is correct.
23 Q   You, in fact, received this email?
24 A   I did.

Page 131

1  Q   And was this the email you were talking about that
2  you had mentioned that you had got some information
3  about her being number one in fraud transactions that
4  she rang?
5  A   This is -- yes, this is the email.
6  Q   Now, it appears that Mr. Chris Castellani then
7  responds -- and you're copied on this.
8        Would you read that, please, to yourself and
9  then I'll ask you some questions about it?
10 A   Sure.
11       Okay.
12 Q   Okay.  Now I know that counsel asked you whether or
13 not the fraud investigation into Ms. Mikhaylova was in
14 February.  Does this refresh you as to what happened
15 with Ms. Mikhaylova as to the fraud issue?
16 A   Yes.  This is jogging my memory, yes.
17 Q   Okay.  Now, Mr. Castellani says that he had
18 actually interviewed Ms. Mikhaylova on this issue in
19 February of 2017, about four months before this email,
20 correct?
21 A   That's -- yes, that's what this states.
22 Q   What is the procedure, if any, in the 59th Street
23 store that would alert asset protection staff to the
24 issue that is being talked about in this email?

Page 132

1        MS. MENDOZA:  Objection.
2        You can answer.
3        THE WITNESS:  My recollection from 2017, we --
4  I'm trying to remember.  I think there was
5  different reports that we could pull looking at
6  hand key transactions, and we would look at them to
7  see were they part of the memo order process, was
8  that being followed?  So it was more -- it was more
9  like an audit -- manual audit process to check on
10 associates to see if they were following the memo
11 order process.
12       We would talk about it with the associates.
13 Again, it was one check against fraud, so we
14 would -- we would talk about it, we would try and
15 check on it through like an audit process at the
16 time.  So that's when we would have -- that's how
17 we would pick up on some of -- any potential
18 violations of the process.
19       Does that answer your question?
20 BY MS. TIERNEY:
21 Q   It absolutely does.
22       I guess what I'm trying to find out is, if
23 there are ways that Chris Castellani could have found
24 out about this issue before he got the email from Abe,

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 133

1  because obviously he did?
2      MS. MENDOZA:  Objection.
3  BY MS. TIERNEY:
4  Q   You can answer.
5  A   Well, I don't specifically know what happened with
6  this back then.  I can -- my recollection of the process
7  would be that we spent lot of time in designer handbags,
8  which was our number one fraud department in the
9  company.  It is an -- it's -- just there's a lot of
10 fraud in general.
11     We spent time looking at memo orders, so I
12 would just -- it would be an assumption on my part to
13 say that something -- he saw volume of transactions and
14 Chanel being certainly a target, they were checking on
15 the memo order process at that time.
16 Q   So it's not just through corporate that you can get
17 information related to something like this; is that
18 correct?
19 A   Correct.  At the time, there was reporting of hand
20 key -- there was a hand key transaction report and we
21 would check it to see -- we would do random checks to
22 see if it should have been part of the memo order
23 process or not.
24 Q   Okay.  Now, with respect to the memo order process,

Page 134

1  it says that Ms. Mikhaylova was, in fact, following that
2  process, correct?
3  A   Correct.
4  Q   Does that mean that she was not committing fraud?
5  A   It does not mean she was not committing fraud.  It
6  means she was taking the information and filling out the
7  forms, sending it to the cash office to validate an
8  address, and that was coming back to facilitate the
9  fraud.
10     Does it mean she was or was not facilitating
11 fraud?
12 Q   Does it mean either one?
13 A   It does not mean either one.
14 Q   Okay.  Fair enough.
15     Does that mean that you would no longer be
16 investigating her for this issue because she was
17 complying with the memo order process?
18 A   No.  That's more of a first place to start.
19 Q   Okay.  With respect to Ms. Mikhaylova -- and I
20 believe it was Exhibit 1.
21     Now, I know that -- if you look at the bottom
22 of Exhibit 1, it says she did admit that she was
23 shipping the merchandise to friends, in quotes, out of
24 state to avoid the New York State sales tax which

Page 135

1  employees always do for customers.
2      So she admits to tax evasion, correct?
3  A   Correct.
4  Q   Does that mean that she was not committing -- I
5  mean, so -- and the interview ends after that.  Is that
6  consistent with policy?
7  A   Yes, that was -- if those were the questions that
8  we wanted to get out of -- that we wanted answered as
9  part of that discussion, yes, if all those questions
10 were answered, then that would be the end of the
11 discussion.
12 Q   Okay.  Now, does that mean that we no longer
13 believe she was involved in diverting or reselling?
14     MS. MENDOZA:  Objection.
15 BY MS. TIERNEY:
16 Q   You can answer.
17 A   No, it does not mean she was -- it doesn't mean she
18 was part of or it doesn't mean she was absolved of the
19 fraud investigation.
20 Q   Okay.  But -- well, strike that.
21     With the information that came out from Angi
22 Lee in September, I think you said you would have turned
23 that over to the police, the NYPD, about --
24 A   Yes.  We would have as part of process, and I

Page 136

1  believe we did.
2  Q   Do you know if any other people who were
3  investigated as part of the Chanel fraud implicated
4  Mikhaylova?
5      MS. MENDOZA:  Objection.
6  BY MS. TIERNEY:
7  Q   You can answer.
8  A   I don't know personally.
9  Q   No, no, that's okay.  Yeah, I just want to know if
10 you remember.
11     We talked a little bit about the credit card.
12 I mean, you're an employee of Bloomingdale's.  Do you --
13 is your account -- your discount attached to your
14 Bloomingdale's card?
15 A   Yes.  If I make a purchase, I only get the discount
16 if I use my Bloomingdale's employee card, house card.
17 Q   Do you know if that card is any different than a
18 customer gets, other than back house discount is not
19 associated with it?
20 A   Yeah, it does look a little different, I believe.
21 Q   Is there anything on it to indicate that it's an
22 employee card or anything of that nature?
23 A   I can look.  I don't know off the top of my head.
24 Q   That's okay.  Go ahead take it out and look at it.

Page 137

1   MS. TIERNEY:  Just let the record reflect that
2   the Mr. Becker is looking at his Bloomingdale's
3   card, but we will not record the number for obvious
4   reasons.
5   THE WITNESS:  Thank you.  It does not -- it
6   does not say employee card on it.
7   BY MS. TIERNEY:
8   Q   Okay.  Does it look like just a regular
9   Bloomingdale's card?
10  A   It does.  And you would not be able to tell it
11  wasn't a Bloomingdale's --
12  Q   If an employee's hired that has a credit card
13  already, do they have to get a new one, or is the
14  discount just tied to their existing card?
15  A   They would get a new account.
16  Q   They do get a new account, your understanding is
17  it's a new account?
18  A   My understanding is they would get a -- they would
19  have a new account opened.
20  Q   With respect to the fraud that the Chanel
21  department was being investigated for during 2017, do
22  you know if there was any evidence of other people
23  diverting or reselling, other than what we've already
24  seen today?  Just what you recall, Mr. Becker.

Page 138

1   A   I don't recall evidence.  I know we investigated
2   and looked in to multiple associates.
3   Q   I know you said that Mr. Castellani had spoken to
4   you about his investigations.  Would you agree that he
5   would be the most knowledgeable about what he was
6   thinking and what he did in this investigation?
7   A   Yes, I would agree with that.
8   MS. TIERNEY:  Let me chat with my local
9   counsel, but I think that may be everything.
10  Can we just take a five-minute break, Melissa?
11  MS. MENDOZA:  Yeah.  And I'll have questions
12  afterwards.
13  - - -
14  (Whereupon, a brief break was taken.)
15  - - -
16  MS. TIERNEY:  And I'll just state for the
17  record, thank you, Mr. Becker.  I have nothing
18  further.
19  - - -
20  FURTHER EXAMINATION
21  - - -
22  BY MS. MENDOZA:
23  Q   Mr. Becker, you mentioned diversion before in
24  responding to -- there was a question about diversion.

Page 139

1   Can you explain what diversion is?
2   A   I'll explain what it means to me.  Diverting --
3   similar to reselling, diverting merchandise to a
4   different -- a third-party.  So it's a little bit like
5   reselling where a reseller would buy merchandise and
6   resell it to individuals, diverter would more buy it and
7   then divert it more in bulk.
8   So a diverter may say what's common, a
9   diverter buys it -- buys merchandise and diverts it to a
10  location where you can't buy it.  For example, it used
11  to be popular to divert jeans to China because there was
12  a big market for that.  So the diverter can mark it
13  up -- buy it, mark it up and sell it to a different
14  location.
15  Q   Okay.  And can a person that sends it to a
16  third-party to avoid paying taxes, could that be
17  considered diversion?
18  A   The way you explained it, I would not put that as a
19  definition of diversion.  That could be a part of the
20  process of a diverter, but that -- just selling
21  something to someone to avoid taxes does not constitute
22  diversion itself.
23  Q   Okay.  But could that be flagged as possible
24  diversion?

Page 140

1   A   It could be flagged as something to investigate
2   that could be part of diversion.
3   Q   Okay.  And you stated earlier -- withdrawn.
4   And is diversion part of your team's
5   investigation duties?
6   A   It is not part of our priority or our initial -- or
7   our focus.  If it's something that, as an organization
8   that's important or something we come across that needs
9   to be investigated, my team will investigate that.
10  There's a lot of variables, including the type
11  of product, that type of thing.  Relationships,
12  et cetera.
13  Q   And for the Chanel department, was the Chanel
14  department leadership team responsible for investigating
15  diverters?
16  A   The -- I think a better way to say it would be the
17  Chanel leadership is responsible for ensuring that
18  reselling and diverting does not happen within their
19  shop, so they will investigate, they'll communicate,
20  they'll make -- they're responsible to make sure it
21  doesn't happen.  If they suspect it does, they have --
22  their resources could be us, it could be their own
23  Chanel investigators.
24  Q   So with respect to Angi Lee -- withdrawn.

Page 141

1  So in 2016, 2017, did Chanel conduct their own
2  diverter-diversion investigation?
3      MS. TIERNEY:  I'm going to object to the form.
4      And Melissa, just for a point of
5  clarification, you're talking about -- not talking
6  about our Chanel department at the store, you're
7  talking about Chanel, the vendor?
8      MS. MENDOZA:  Before he stated Chanel
9  leadership team as to Cathy and Dennis, so I'm
10  referring to like that, what he previously stated.
11      MS. TIERNEY:  So not the vendor.  Okay.
12      THE WITNESS:  I do not recall there being a
13  conversation around them investigating themselves.
14  I don't remember that being a discussion.
15  BY MS. MENDOZA:
16  Q    Okay.  Was there a concern at that time that there
17  was diversion?
18      MS. TIERNEY:  I'll object to the form as to
19  time.
20      THE WITNESS:  I would answer that question as
21  yes, as we dig in to and investigated the fraud and
22  looked at the transactions, that was a part --
23  something that we looked at.  Yes, we wanted to --
24  as we investigated all the transactions, it was a

Page 142

1  component we looked at.
2  BY MS. MENDOZA:
3  Q    Okay.  But not you, your team.  I'm talking
4  about --
5  A    My team, yes.
6  Q    What about the Chanel team, did you work together
7  on that?
8      MS. TIERNEY:  Object to the form.
9      You can answer.
10      THE WITNESS:  I don't recall.  I wouldn't --
11  since I didn't work on it directly, I don't have
12  firsthand knowledge of the communication that went
13  back and forth between the Chanel team and my team.
14  I know that -- I know there was some because
15  there was concern around fraud.  I don't recall
16  there being conversations that got down to the
17  details around transactions or reseller, et cetera.
18  I don't know if those conversations did -- they may
19  have happened.  I'm not aware of them.
20  BY MS. MENDOZA:
21  Q    Okay.  And I can pull back up the document, the
22  exhibit if you'd like.  Just let me know.
23      But your counsel had asked you a question
24  about Angi Lee and the address that she had sent to YuYu

Page 143

1  Lai.  And isn't it possible that the address that it was
2  being shipped to was to avoid paying sales tax?
3      MS. TIERNEY:  Object to the form.
4      THE WITNESS:  Is it possible?  Yes, it is
5  possible.
6  BY MS. MENDOZA:
7  Q    All right.  So before -- because Kristina had
8  shipped to the same address -- as it was alleged by Angi
9  Lee in her statement, that she had shipped to the same
10  address that her former co-worker had told her, right,
11  that was what was in the statement?  And we can pull it
12  up if it's easier.
13      MS. TIERNEY:  That's probably a good idea,
14  just to give him the benefit of seeing it.
15      MS. MENDOZA:  All right.  I think it was
16  Exhibit 2.  Go to 1954, I think.
17      Okay.
18      THE WITNESS:  Can you repeat the question,
19  ma'am?
20  BY MS. MENDOZA:
21  Q    Yeah.  I'll repeat it.
22      So, first off, is -- 1954, is this how a
23  statement is typically taken in the asset protection
24  department?

Page 144

1      MS. TIERNEY:  I'm going to object.
2      THE WITNESS:  Yes.  Sometimes yes.  We have
3  the associate write it themselves.  We try to ask
4  them to include the components of the discussion.
5  Ultimately we don't control what they write.  But,
6  yes, we ask them to write it and this looks
7  consistent with other statements that I've seen.
8  BY MS. MENDOZA:
9  Q    Okay.  And if you go to 1955, right, you looked
10  at -- we stated earlier that -- do you know who wrote
11  this?
12  A    Do I know who wrote this?  I do not.  This is
13  consistent with a witness that was in the room, notes of
14  a witness.
15  Q    Right.  But somebody's taking the notes down,
16  correct?
17  A    That's correct.
18  Q    All right.  And then it says they're to revisit
19  this after on the right-hand side, if you go down.  You
20  see it says YuYu, and then something with an S?
21  A    Yeah.  Sale -- I don't know what that reads.  It's
22  not unusual for a witness in the room, as they're
23  writing notes to -- that witness is always -- is usually
24  a member of my investigations team.  As they're writing

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 145

1  notes to track how the conversation went, they may write
2  notes as to -- you know, if they have thoughts on other
3  parts of an investigation related or not.
4      So if there's follow up, they might write
5  notes around that.  So that's kind of what that looks
6  like.
7  Q   Okay.  The next page, 1957, it says:  Discount
8  abuse, tax evasion, Lee ships her personal handbag
9  purchases.  See that there, two addresses in New
10 Hampshire?
11 A   Which line are you looking at?
12 Q   Discount abuse is the subheading.
13 A   Okay.  Yes.  Lee ships her personal --
14 Q   Right.  And this address is for a UPS shipping
15 store, same address used by Mikhaylova?
16 A   Yes.
17 Q   You see that there of what she claimed to be tax
18 evasion, that's what it says there, right?
19 A   Yes.
20 Q   So that doesn't mean that Ms. Mikhaylova was
21 reselling, correct?
22 A   That does not necessarily mean that she was
23 reselling.
24 Q   And it's possible that Ms. Lee here, Angi Lee, was

Page 146

1  also sending to the same address to avoid paying sales
2  tax, which Kristina had admitted to, correct?
3  A   So I want to make sure I understand.  You're asking
4  me what's possible or what is -- what we were able to
5  prove?
6  Q   Let's start with what's possible.
7  A   Sure.
8      MS. TIERNEY:  I'm going to object to the form.
9      THE WITNESS:  It's possible that that was
10     being shipped to avoid taxes, if that was the
11     question, yes.
12 BY MS. MENDOZA:
13 Q   And then what did you prove?
14 A   All we were able to prove is what was in the
15 statement and the summary, which I believe we'd have to
16 go back to -- our shipping fee was waived.  So I think,
17 when you look at the statement, what she admitted to is
18 ultimately what we were able to prove based off of an
19 admission, and then this is just the supporting
20 documentation of what we found.
21     MS. TIERNEY:  Do you want to see the statement
22     again, or do you recall what she said?
23     THE WITNESS:  I don't recall what she said.
24     MS. MENDOZA:  I want to be clear, so you're

Page 147

1  saying the statement of Angi Lee, right?
2      MS. TIERNEY:  Yeah.
3      MS. MENDOZA:  Okay.  So go up to 1954.
4      THE WITNESS:  So based off this -- and then
5  we'd have to look at the actual reason for
6  termination, this makes it look like she was
7  admitting to the -- violating policy regarding
8  discount abuse.  We would again turn this
9  information over to HR, and then we would make that
10 determination based off this statement and any
11 other supporting evidence from the summary to me.
12     This looks -- my opinion, she's admitting to
13 discount abuse.  But, again, I'm not -- I was not
14 the decision maker on dispositioning the employment
15 status of this associate.
16 BY MS. MENDOZA:
17 Q   So when you're saying discount abuse, are you
18 saying that by using her card to ship to that same
19 address?
20 A   She was shipping to YuYu -- yes, she -- because she
21 was asked to purchase and to send to YuYu, who is not
22 entitled to the discount, she benefited by earning
23 reward points and being compensated.  Again, without
24 going through every case and looking through everything

Page 148

1  again, the policy violation here looks to me like
2  discount abuse.
3  Q   Okay.
4  A   If that's the question you're asking.
5  Q   And -- but she doesn't say Kristina there, right?
6  It says my former co-worker?
7  A   Correct.
8  Q   And she doesn't say reselling there, correct?
9  A   She doesn't -- she does not state who YuYu is or
10 what she does.  So there's no mention of reselling here
11 by the associate.
12 Q   Okay.  So then can't anyone then claim my former
13 co-worker told me to do this?  Anyone can say that,
14 right?  Anyone can accuse another co-worker of telling
15 them to do something, right?
16     MS. TIERNEY:  Object to the form.
17     You can answer.
18     THE WITNESS:  Any co-worker can make any
19 statement.  And, again, we go into our process of
20 validating those statements before we take any
21 action on that.  In this particular case, if this
22 associate was referring to -- I assume we are
23 making an assumption on this, and she wasn't
24 referring to Kristina, that that case had already

Page 149

1  been closed and Kristina was already terminated
2  from her position.
3  BY MS. MENDOZA:
4  Q   Okay.  But was that statement validated against
5  Kristina?
6  A   The -- once Kristina was separated from the
7  organization, we did not reach out to her to inquire
8  about any other transactions or any other results of the
9  investigation.  Not that we would necessarily do that
10 anyway just based off an accusation.
11      We would go for more corroborating data to
12 substantiate that any way.
13 Q   Okay.  And besides that, you would have needed
14 corroborating data.  Why not -- if you did have
15 corroborating data, why not still contact Kristina?
16 A   At that point, we moved on.  We were actively
17 involved in the rest of the investigation.  As far as
18 Kristina was concerned, from a policy violation, she no
19 longer worked at -- she no longer was employed by the
20 company.  We -- almost like case closed, we were not
21 going to follow up on any other potential policy
22 violations with Kristina.
23      MS. MENDOZA:  Okay.  And so if we can go back
24   to 2011, second paragraph.

Page 150

1  BY MS. MENDOZA:
2  Q   And you were asked before about Boston X-Closet
3  boutique owner, YuYu Lai.  You see that there in the
4  second paragraph?
5  A   Yes.
6  Q   So between 2017, from Angi's statement, September
7  2017 until today, to present, do you know if -- has it
8  been determined that YuYu, Boston X-Closet is a
9  reseller?
10 A   No.  I do not know if that is a reseller or not.
11 During the previous questions about that, I was asked,
12 as an investigator, what does that look like to me,
13 which is different than what I would know today as to
14 what that business is in -- as well.
15      So I do not know what -- if there's been any
16 follow up on what Boston X-Closet business really is.
17 Q   Okay.  And why have there -- why hasn't there been
18 any follow up?
19 A   Well, I'm not saying -- I don't know whether there
20 was or was not.  I'm not aware of any follow up with the
21 Boston X-Closet boutique.  I would -- it could very well
22 possible that once we were done with this investigation,
23 we refused to ship, there was no more -- associates were
24 not allowed to ship to that address or that person going

Page 151

1  forward.
2  Q   Okay.  And that would have been documented
3  somewhere, correct?
4  A   No.  I don't know that.  Again, I'm going by what's
5  typically done after an investigation, if we look at
6  what are our next steps and we want to make sure that
7  associates are not part of the investigation.  We make
8  sure that there's an understanding -- or a re-education
9  of policy and procedure.
10      So I'm making an assumption that we may have
11 said we cannot send to that person.
12 Q   Okay.  And I may have misheard you, but are Chanel
13 products items, merchandise, never discounted; is that
14 correct?
15 A   Again, my understanding of Chanel, the way their
16 policy states, is they don't -- I know for a fact that
17 they are not part of our normal sales.  Chanel will
18 only -- when I say sale, like Bloomingdale's events,
19 selling events, promotions.  They do not participate in
20 that.
21      And then the only time their product actually
22 goes on sale is when they're trying to liquidate older
23 bags that haven't been sold.  They are not promotional
24 in any way like other vendors are.

Page 152

1      That hopefully gives more clarity to that
2  statement.
3      MS. MENDOZA:  Okay.  We can get off the
4    screen.
5  BY MS. MENDOZA:
6  Q   Are you talking about since 2017?  Or are you
7  talking about at the time as well, 2016?
8  A   I'm talking about my understanding on how Chanel's
9  business model works and how they run the business.
10 They don't -- since I've been with the store, they --
11 that's my understanding about they -- how their
12 merchandise goes on sale, it's either old merchandise
13 and they advertise it, or they -- nothing else goes on
14 sale.  They're not promotional, is my understanding of
15 their business.
16 Q   Was there a change in around 2017 when they were
17 leased?
18      MS. TIERNEY:  Object to the form.
19      You may answer.
20      THE WITNESS:  I don't believe there was a
21    change in their business -- their pricing, if you
22    will, or their sale.  That process was more -- the
23    ownership of the product, so instead of us -- so it
24    was owned, meaning we cut the P/O and we purchase

Deposition of Fred Becker                                Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 153

1  it from Chanel and resell it.  Or -- and so that
2  was the process.  But still had to follow all
3  Chanel policies and procedures.  In fact, those
4  associates are back of the house paid by Chanel.
5       And then for its lease where we don't buy it
6  at all, because we're basically renting the space,
7  and they sell their product.  It's more complex
8  than that, but that's a simple way to explain it.
9       MS. MENDOZA:  Okay.  We'll pull the document
10  again.  I don't know what number it is.  It's
11  page 15.
12  BY MS. MENDOZA:
13  Q   You see that in front of you?  It's BLM 001966?
14  A   Yes.
15  Q   I think you took a look at this before, correct?
16  A   I believe this is what I looked at before.
17  Q   Okay.  And at the top it said to send to YuYu Lai,
18  right?
19  A   Yes.
20  Q   And then underneath that it says loyalist, Angi
21  Lee?
22  A   Yes.
23  Q   Do you see that there?
24  A   Yep.

Page 154

1  Q   Do you know why there's a discrepancy there?
2       And I'll clarify it.  The vendor says
3  Kristina, Chanel handbags as well.  That's the
4  discrepancy I'm asking, between the loyalist Angi Lee
5  and the sender Kristina?
6  A   I would need to verify.  However, what this looks
7  like to me is, during a sale, Angi Lee's loyalist
8  account was used.
9  Q   Okay.
10  A   So Angi Lee would be benefiting for the reward
11  points.
12       MS. MENDOZA:  Okay.  And go to -- what was the
13  exhibit that Defense Counsel Betty introduced?
14       MS. TIERNEY:  It was just for my -- I was not
15  able to download it, so it's just 1488 and 1489
16  from produced docs.  I'll have to email it to the
17  court reporter.
18       MS. MENDOZA:  Okay.
19       - - -
20       (Whereupon, a brief discussion was held
21  off the record.)
22       - - -
23  BY MS. MENDOZA:
24  Q   I don't think you'll need it, but if so, I can pull

Page 155

1  it myself.
2       But if you recall you looked at -- when we
3  looked at Betty's screen, that it was a document that
4  showed, from Abe, the dates of purchases.  It was a high
5  amount of sales, I believe.
6  A   Yes.  The three -- yes.
7  Q   Three, right.
8       And that was for -- was that for the fraud
9  involving Angi Lee?
10  A   That -- so that was fraud by a person for Macy's
11  Incorporated, so not just Bloomingdale's, that was
12  confirmed fraud sales rung by associates for Macy's
13  Incorporated, which is all Macy's stores and all
14  Bloomingdale's stores, and those were the top three
15  sellers that came back associated with fraud
16  transactions.
17  Q   Okay.  And that was -- the date of that email was
18  around June 1st, 2017.  So my question is:  Is that --
19  was that based on an algorithm, like the credit card?
20  A   No.  That would be -- that would be more of a
21  straight pull data.  So as I look at -- employee fraud
22  is actually very complex because it's not immediate.
23  There's a time lapse because by the time people realize
24  that there's charges on their card, that could be

Page 156

1  months.
2       So -- but what they do is when they confirm
3  fraud, that goes into a database, and then that's just
4  sorted by who are the sellers.  So that was strictly a
5  pull by all is fraud and then somebody pulled it by
6  associate, the selling associate of that fraud.
7       So those fraud transactions, you can sort the
8  data in many ways.  That was a sort by Macy's
9  Incorporated sales associates, including Bloomingdale's.
10  Q   So when you say that that's Abraham, right?
11  A   Yes.
12  Q   Macy's Incorporated, that's the corporate office
13  that we talked about before?
14  A   That is the Bloomingdale's investigations person,
15  and I believe an email stated that it was sent to him by
16  the Macy's -- the MCCS fraud team.
17  Q   So then did the MCCS conduct two separate red flags
18  reports, because the one before we talked about was just
19  about her purchases?
20  A   Yes.  Two separate things, probably from different
21  individuals.  One is an exception report, something that
22  pops up, and would be forwarded.  That would have been
23  the purchase history of Kristina.  So that is a separate
24  function, that just came out of a algorithm as a

Deposition of Fred Becker                                      Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 157

1 function of the parameter.

2      But the fraud, as our fraud team, associated
3 with Macy's credit services, they're responsible for
4 doing data analysis of the fraud and looking at it by
5 what department, is there certain departments within the
6 organization, is there certain regions that have high
7 rates of fraud, et cetera.  And one of the things
8 they'll do is look at associates, what are the top
9 associates that are ringing fraud transactions.  That's
10 what that data was.

11 Q   Okay.  Did you train Mr. Castellani?

12 A   I trained Chris Castellani in the specific tactical
13 things that he needed for 59th Street, but Chris was an
14 experienced asset protection executive prior to coming
15 to Bloomingdale's and prior to coming to 59th Street.
16 He had come from another store.  So he had a wealth of
17 experience on investigations before he came to me.

18 Q   And investigations for Bloomingdale's and Macy's?

19 A   Yes, because he was in -- yes.

20 Q   Okay.  So you -- but you trained him, you said?

21 A   Well, I would have helped trained him and on board
22 him to a new role in a new store.

23 Q   Okay.  And are the policies different from the
24 store that he came from?

Page 158

1 A   No.

2 Q   Okay.  And the last thing, last question is
3 Exhibit 1, so you see here that it says that she had
4 made -- the second paragraph, the -- it says employee
5 purchases from October 2016 to April, right?  And then
6 it says:  The further investigation uncovered the
7 associate purchases had been sent out of state to six
8 different addresses.

9      Do you see that there?

10 A   Yes.

11 Q   So those are both for her purchases, correct?

12 A   Yes.

13 Q   And does it say anywhere there about the other
14 charges, fraud charges?

15 A   No, I don't believe there's anything mentioned in
16 here, and I don't believe the purpose of this part --
17 this investigation was around the fraud piece.

18 Q   But this was after the conclusion -- at the
19 conclusion of asset protections investigation, correct?

20 A   No, no, the larger fraud investigation went well
21 past this period of time.  That involved other
22 associates and our review, et cetera.  No, this -- that
23 continued past this -- yeah.

24 Q   Right.  And I'm not saying that it wasn't closed,

Page 159

1 that that was not -- I know that it continued, but does
2 it state anywhere in there, I'm saying, about any
3 investigation into the fraud?

4 A   No.  There's no mention of fraud in this document,
5 or I don't believe we talked about it during the
6 interview.

7 Q   And that was the last interview before she was
8 suspended, correct?

9 A   Correct.  So, again, I wasn't at the interview, I'm
10 going by my recollection and this document.

11      MS. MENDOZA:  All right.  No further
12 questions.  Thank you.

13      MS. TIERNEY:  I don't have anything.  We will
14 read and sign.

15                - - -

16           (Witness excused.)

17                - - -

18      (Whereupon, the deposition concluded at
19 approximately 3:02 p.m.)

20                - - -

21

22

23

24

1                              CERTIFICATION

2

3           I hereby certify that the proceedings and

4    evidence are contained fully and accurately in the

5    stenographic notes taken by me upon the foregoing matter

6    and that this is a correct transcript of the same.

7

8

9

10

11           _____

12           Kori Skinner, RPR and Notary Public

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                   INSTRUCTIONS TO WITNESS

 2

 3            Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the appropriate

 6    space on the errata sheet for any corrections

 7    that are made.

 8                 After doing so, please sign the errata

 9    sheet and date it.

10                 You are signing same subject to the

11    changes you have noted on the errata sheet,

12    which will be attached to your deposition.

13                 It is imperative that you return the

14    original errata sheet to the deposing attorney

15    within thirty (30) days of receipt of the

16    deposition transcript by you.  If you fail to do

17    so, the deposition transcript may be deemed to

18    be accurate and may be used in court.

19

20

21

22

23

24
```

```
 1                              -  -  -

 2              E  R  R  A  T  A     S  H  E  E  T

 3                              -  -  -

 4

 5      PAGE         LINE         CHANGE

 6      _____       _____       _____

 7      _____       _____       _____

 8      _____       _____       _____

 9      _____       _____       _____

10      _____       _____       _____

11      _____       _____       _____

12      _____       _____       _____

13      _____       _____       _____

14      _____       _____       _____

15      _____       _____       _____

16      _____       _____       _____

17      _____       _____       _____

18      _____       _____       _____

19      _____       _____       _____

20      _____       _____       _____

21      _____       _____       _____

22      _____       _____       _____

23      _____       _____       _____

24      _____       _____       _____
```

1            ACKNOWLEDGMENT OF DEPONENT

2

3        I,                        , do hereby

4  certify that I have read the foregoing pages and

5  that the same is a correct transcription of the

6  answers given by me to the questions therein

7  propounded, except for the corrections or

8  changes in form or substance, if any, noted in

9  the attached Errata Sheet.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Deposition of Fred Becker

Kristina Mikhaylova v. Bloomingdale's Inc., et al.

## WORD INDEX

**< $ >**
**$65,000** 107:*19*
108:*13*
**$90,000** 130:*15*

**< 0 >**
**00033** 62:*4*
**001** 88:*14*
**00116** 104:*16*
**00119** 105:*16*
**001952** 76:*9*
**001955** 78:*23*
**001966** 153:*13*
**001971** 84:*22*
**002004** 87:*21*
**07004** 2:*12*

**< 1 >**
**1** 4:*15* 61:*16* 78:*23*
82:*9* 134:*20, 22*
158:*3*
**10** 1:*17*
**10:09** 1:*18*
**100** 3:*13* 96:*22*
102:*9*
**10119** 2:*5*
**107** 2:*11*
**11477** 2:*17*
**119** 3:*5*
**12** 106:*22*
**129** 3:*14*
**138** 3:*4*
**13th** 82:*1, 19*
**1488** 129:*23, 24*
130:*2* 154:*15*
**1489** 130:*2, 3* 154:*15*
**15** 153:*11*
**1555** 121:*16*
**15th** 11:*3*
**16** 86:*5*
**165** 2:*11*
**16th** 125:*22*
**17** 22:*20* 27:*13* 28:*8*
30:*16* 33:*16* 36:*9*
86:*5* 125:*22*
**18** 86:*5*
**1954** 78:*10* 119:*18*

**143**:*16, 22* 147:*3*
**1955** 144:*9*
**1956** 122:*1*
**1957** 79:*11* 122:*6*
145:*7*
**1964** 124:*7*
**1965** 83:*20* 126:*15*
**1966** 126:*15*
**1971** 84:*22*
**19-8927** 1:*3*
**1st** 12:*10* 155:*18*

**< 2 >**
**2** 75:*24* 119:*6*
127:*17, 18* 143:*16*
**2,500** 72:*17, 21*
**20** 9:*15* 16:*4* 21:*5*
30:*15*
**2004** 87:*17*
**2011** 88:*3* 127:*15, 18*
149:*24*
**2012** 11:*3* 12:*3, 6*
104:*7*
**2015** 11:*23*
**2016** 12:*10* 16:*4*
20:*18* 21:*4* 22:*20*
27:*13* 28:*8* 30:*16*
33:*16* 36:*9* 104:*1*
105:*24* 106:*4, 18*
116:*21* 141:*1* 152:*7*
158:*5*
**2016/2017** 48:*11*
**2016-17** 17:*11* 21:*7*
27:*11, 12*
**2016-2017** 20:*16*
**2017** 16:*5* 20:*18, 20*
64:*13* 67:*19* 72:*3, 6*
82:*1, 10, 20* 83:*1*
86:*4* 90:*11* 92:*6*
100:*8* 104:*1* 105:*24*
106:*5, 18* 112:*8, 10,*
*13, 15* 113:*10* 116:*21*
131:*19* 132:*3* 137:*21*
141:*1* 150:*6, 7* 152:*6,*
*16* 155:*18*
**2018** 21:*17*
**2019** 29:*17*
**2022** 1:*17*
**21** 105:*24* 106:*8*

**116**:*21*
**212** 2:*6*
**21st** 106:*5*
**22** 4:*9*
**24** 7:*8, 11*
**26** 105:*24* 107:*18*
108:*12* 109:*4, 8*
**26th** 82:*20*
**27,000** 130:*16*

**< 3 >**
**3** 1:*10* 100:*12* 104:*9*
**3:02** 159:*19*
**30** 13:*24* 161:*15*
**30th** 82:*20*
**314** 121:*21*
**3rd** 28:*9* 65:*19*

**< 4 >**
**4** 129:*12, 22*
**400** 2:*17*
**406** 122:*1*
**4905** 2:*5*
**4th** 64:*13* 82:*10*
83:*1*

**< 5 >**
**5** 3:*4* 4:*15*
**50** 44:*11, 12*
**53** 4:*9*
**587-0760** 2:*6*
**59** 10:*11*
**59th** 12:*17* 15:*9, 15,*
*18* 16:*6* 17:*6* 21:*7*
22:*7, 12* 23:*4* 71:*24*
72:*2* 101:*6* 131:*22*
157:*13, 15*

**< 6 >**
**6/3** 125:*16*
**61** 3:*11*
**63141** 2:*18*
**65,000** 106:*1* 109:*4*

**< 7 >**
**72061886** 126:*18*
130:*6, 13*
**76** 3:*12*

**< 9 >**
**9/26/17** 120:*19*
**919** 28:*9* 65:*19*

**< A >**
**a.m** 1:*18*
**a/k/a** 1:*10*
**Abe** 29:*9* 32:*1, 16,*
*21* 33:*9* 34:*5, 6*
65:*20* 74:*19* 78:*24*
132:*24* 155:*4*
**ability** 7:*4* 46:*5, 18*
65:*11* 123:*9*
**able** 137:*10* 146:*4,*
*14, 18* 154:*15*
**Abraham** 29:*5, 21*
88:*8, 16* 130:*20*
156:*10*
**abreast** 63:*13* 64:*4, 5*
**Absolutely** 66:*3*
81:*19* 91:*12, 14*
119:*24* 121:*5* 132:*21*
**absolved** 56:*13* 75:*2,*
*7* 135:*18*
**abuse** 23:*10, 11, 14*
24:*1, 2* 25:*20* 43:*10*
53:*5* 79:*22* 120:*15*
122:*7* 145:*8, 12*
147:*8, 13, 17* 148:*2*
**abusing** 24:*15*
**access** 10:*17*
**account** 25:*7, 22*
26:*3, 6* 27:*24* 29:*23*
31:*23* 32:*4* 34:*11*
41:*22* 43:*8, 12, 20, 22,*
*23, 24* 44:*21* 47:*1*
53:*15* 64:*18, 21, 23*
67:*15, 23* 68:*9* 69:*5,*
*10, 13, 14, 15, 18, 21,*
*22, 23* 70:*1, 3, 8, 11,*
*12* 71:*6, 10, 16* 74:*1*
80:*15* 99:*18, 24*
101:*15, 22* 102:*4*
125:*18* 136:*13*
137:*15, 16, 17, 19*
154:*8*
**accounts** 49:*2* 53:*14*
65:*12, 16* 69:*19*
70:*15* 120:*4* 121:*10*
122:*16*

Deposition of Fred Becker                                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

accurate 11:*15*
111:*9* 161:*18*
accurately 160:*4*
accusation 75:*3*
149:*10*
accuse 148:*14*
accused 76:*16* 82:*14*,
*24*
accusing 52:*4*
ACKNOWLEDGMEN
T 163:*1*
action 148:*21*
actions 19:*21*
actively 149:*16*
activity 26:*3, 4, 14,
21* 27:*2, 15, 24* 32:*3,
19* 42:*1, 10* 47:*8, 11*
50:*10* 52:*10* 63:*23*
64:*1, 2, 19* 65:*7, 8, 11,
12* 66:*5, 8, 17* 67:*24*
71:*16* 73:*11* 75:*22*
80:*7* 82:*17* 91:*15*
92:*21* 93:*5* 95:*15, 20,
23* 96:*12* 101:*16, 18*
106:*9* 109:*4, 6*
110:*23* 112:*3* 120:*8*
121:*8*
actual 34:*9* 147:*5*
additional 30:*4*
address 14:*3* 54:*17,
19, 23* 55:*1* 94:*2, 3,
18* 95:*3* 96:*1, 2, 7, 9*
98:*13* 117:*24* 119:*17*
128:*21* 129:*3, 8, 10*
134:*8* 142:*24* 143:*1,
8, 10* 145:*14, 15*
146:*1* 147:*19* 150:*24*
addresses 46:*20*
54:*9, 11, 13* 55:*21, 23*
56:*18* 115:*16, 17, 19*
116:*2, 6, 11, 12* 145:*9*
158:*8*
administrative 15:*14*
87:*9, 10*
admission 146:*19*
admit 134:*22*
admits 135:*2*
admitted 41:*19* 93:*7*
146:*2, 17*

admitting 147:*7, 12*
admonish 8:*13* 9:*23*
advantage 45:*24*
advertise 152:*13*
advice 51:*17, 22*
AFL-CIO 1:*9*
ago 5:*24* 6:*5* 7:*14*
9:*2, 5, 15*
agree 138:*4, 7*
agreed 5:*1*
agreeing 54:*5*
ahead 125:*5* 136:*24*
alert 131:*23*
alerted 26:*9* 82:*24*
Alex 2:*23* 119:*7, 19*
121:*15* 124:*6* 127:*16,
18*
algorithm 24:*11*
46:*11* 67:*21* 73:*4, 17*
100:*2, 18, 24* 106:*6,
15* 155:*19* 156:*24*
algorithms 26:*20*
27:*1* 42:*10* 73:*10, 14*
74:*2* 100:*5* 106:*16*
alleged 82:*14, 23*
143:*8*
allow 92:*3*
allowed 60:*13* 150:*24*
allowing 39:*20*
allows 109:*9*
Amador 15:*18*
amount 42:*8, 11, 12,
17, 19* 43:*6* 44:*3, 4, 7*
45:*9* 67:*22* 95:*17*
97:*19* 106:*7* 107:*24*
108:*1* 155:*5*
amounts 69:*17*
106:*24*
analysis 157:*4*
analysts 100:*9*
and/or 32:*18* 46:*6*
57:*15* 61:*8*
Angi 76:*13, 14, 20*
79:*13* 82:*13* 86:*15*
88:*15* 111:*19* 119:*13,
18* 120:*17, 23* 127:*20*
135:*21* 140:*24*
142:*24* 143:*8* 145:*24*
147:*1* 153:*20* 154:*4,

7, 10* 155:*9*
Angi's 150:*6*
Answer 4:*2* 10:*10*
13:*11* 19:*4, 23* 22:*18*
25:*12* 26:*1, 11* 28:*13*
31:*7* 33:*3, 15, 20*
35:*8* 36:*20* 38:*19*
41:*9* 44:*6* 45:*12, 15*
49:*16* 50:*3* 53:*7*
56:*20* 58:*8* 60:*23*
62:*22* 63:*20* 64:*9*
66:*2, 13* 67:*17* 71:*23*
75:*13* 80:*23* 81:*23*
83:*3* 84:*4* 86:*3* 89:*5*
90:*21* 92:*13* 93:*17*
97:*15, 23* 98:*19*
106:*12* 107:*16* 108:*3*
109:*22* 111:*22* 114:*8*
115:*23* 116:*1* 118:*7*
123:*6* 132:*2, 19*
133:*4* 135:*16* 136:*7*
141:*20* 142:*9* 148:*17*
152:*19*
answered 97:*8* 135:*8,
10*
answering 6:*24*
105:*10*
answers 96:*4* 97:*3*
163:*6*
anybody 52:*14* 66:*3,
7*
anymore 128:*14*
anyway 149:*10*
AP 53:*12* 100:*11*
122:*12* 124:*11, 16*
APM 15:*7*
apologize 104:*21*
125:*7*
apparently 126:*6*
appears 131:*6*
applied 94:*4, 6*
apply 51:*24* 52:*1*
appropriate 161:*5*
approval 124:*2*
approver 123:*24*
approximately 1:*18*
7:*17* 9:*2* 159:*19*
April 16:*4* 105:*24*
106:*5, 8* 116:*21*
158:*5*

area 12:*8* 18:*3*
38:*13*
areas 12:*20*
arrested 58:*17*
arrests 58:*23, 24*
asked 6:*20* 97:*2*
112:*24* 120:*24*
125:*18* 126:*7* 131:*12*
142:*23* 147:*21* 150:*2,
11*
asking 6:*19* 16:*3*
44:*18* 47:*3* 50:*16*
57:*18* 63:*16* 70:*5*
72:*1* 84:*5* 108:*4*
116:*9* 124:*13, 15*
146:*3* 148:*4* 154:*4*
aspect 24:*1*
asset 11:*10, 13, 21, 24*
12:*8* 15:*8, 10, 12, 17*
16:*5, 7, 11, 13, 14*
17:*3, 9* 18:*3* 19:*2*
21:*9* 32:*2* 65:*18*
77:*8* 85:*16* 88:*4, 10,
15* 98:*21* 112:*12*
131:*23* 143:*23*
157:*14* 158:*19*
assigned 72:*10*
assist 28:*4* 60:*2*
assistance 60:*5*
Assistant 2:*23* 15:*12,
14*
associate 8:*4, 5* 17:*2*
23:*18* 24:*14* 26:*18*
35:*22* 37:*7* 39:*13, 18,
20, 22* 42:*11* 45:*21*
46:*8* 52:*9, 15* 53:*1*
55:*16* 57:*10, 14, 17*
66:*4* 68:*4* 74:*17*
76:*13* 77:*10, 11, 15,
19* 78:*3* 82:*16* 87:*7,
8, 12* 88:*2* 91:*4, 17,
23* 92:*1, 3* 93:*6, 7*
95:*2* 96:*14* 101:*6, 8*
108:*14, 15* 110:*3*
112:*19* 113:*16*
123:*17, 18, 22* 124:*19*
125:*18* 126:*1, 18*
128:*4, 19* 129:*1, 5, 7*
144:*3* 147:*15* 148:*11,
22* 156:*6* 158:*7*

**associated**  35:*15, 17*
55:*18*  57:*11*  59:*17*
73:*12*  122:*18*  136:*19*
155:*15*  157:2

**associates**  35:*14, 16,
18, 19*  40:2  41:*24*
46:7  52:*16*  56:*17*
57:*4, 23*  58:*1, 11, 20,
22*  61:*14*  64:*6, 7*
65:7  66:*16*  73:*11, 20*
76:*21*  81:*11*  82:*18*
83:*14*  86:*23*  101:*4,
18*  110:2  112:*23*
113:*9, 21*  120:*4*
122:*15*  123:*9, 21*
132:*10, 12*  138:2
150:*23*  151:7  153:*4*
155:*12*  156:9  157:*8,
9*  158:*22*

**associate's**  23:*15*
32:*4*

**assume**  148:*22*

**assuming**  125:*8*

**assumption**  37:*12*
47:9  75:*16, 18*  87:7
89:*7, 16*  133:*12*
148:*23*  151:*10*

**assumptions**  89:*22*

**attached**  69:*18, 19*
70:*20*  136:*13*  161:*12*
163:*9*

**attention**  26:*16*

**attorney**  161:*14*

**attorneys**  10:*23*

**audit**  132:*9, 15*

**authenticity**  47:*17*

**authority**  123:*19*

**authorization**  129:6

**authorized**  129:*5, 10*

**automatically**  24:*22*

**available**  81:*20*  84:*13*

**Avenue**  2:*11*  28:*9*
65:*20*

**avoid**  41:*17*  51:*8*
52:5  93:*15*  95:*11*
96:*17*  97:*13*  117:6
134:*24*  139:*16, 21*
143:2  146:*1, 10*

**avoidance**  47:*15*
56:4  98:*4*

**avoiding**  31:*1*  41:*11*
120:*15*

**aware**  19:*13*  20:*8, 9,
12*  56:*10, 14*  64:*23*
142:*19*  150:*20*

**< B >**

**back**  5:*24*  20:*24*
23:*8*  24:*19*  35:*4, 9*
36:*15*  37:2  39:*10*
42:9  44:*8, 15, 19*
57:*7, 21*  60:*3*  71:*4*
80:*1*  82:*8, 9*  86:*4*
90:*17*  91:*17*  92:*3*
102:*24*  107:2  112:*20*
113:*10*  115:*16*
116:*20*  119:5  125:*19*
128:*8*  130:2  133:*6*
134:*8*  136:*18*  142:*13,
21*  146:*16*  149:*23*
153:*4*  155:*15*

**backs**  35:*1, 3*

**bad**  98:*23*

**bag**  44:*11*  47:*20*
60:*14*

**bags**  48:*9*  60:*9, 12*
95:*16*  122:*20*  151:*23*

**balance**  128:*16*

**bank**  36:*10*  38:*13*
129:*4*

**BARTON**  2:*10*

**based**  7:*24*  21:*13*
37:*12*  51:*18*  60:*9*
62:*14*  67:*18*  68:*11,
22*  71:*14*  73:*17*
74:*12*  75:*14*  89:*7, 16,
23*  96:*24*  102:*18*
108:*11*  112:*15, 17*
122:*20*  123:*14*
126:*11*  146:*18*  147:*4,
10*  149:*10*  155:*19*

**basically**  14:*21*
18:*10*  153:*6*

**basis**  27:*13*

**bat**  125:*1*

**Bates**  129:*23*

**BECKER**  1:*16*  3:*3*
5:*13, 19*  61:*23*  129:*3,
20*  137:2, *24*  138:*17,*

*23*

**beginning**  81:*9*

**behavior**  108:*14*

**believe**  8:*11*  9:6
12:*10*  17:*17*  18:*4*
24:5  28:*20*  38:*1*
42:*19*  43:*20*  46:*12*
48:*22*  53:*16*  58:*16*
105:*12*  109:*17*
111:*13, 14*  112:*21, 23,
24*  113:*4, 11*  126:*11*
134:*20*  135:*13*  136:*1,
20*  146:*15*  152:*20*
153:*16*  155:5  156:*15*
158:*15, 16*  159:*5*

**believed**  111:*13*

**benefit**  23:*15, 16*
25:*14*  95:*4*  143:*14*

**benefited**  121:*1*
147:*22*

**benefiting**  154:*10*

**best**  46:*4*

**better**  140:*16*

**BETTY**  2:*16*  9:*22*
154:*13*

**betty.tierney@macys.c
om**  2:*18*

**Betty's**  155:*3*

**beyond**  38:*10*  102:*1*

**big**  102:*19*  110:*10*
139:*12*

**bigger**  15:*22*  40:*21*
52:*8*  63:*17*  76:*24*
78:7  81:*15*  118:*11*
126:*5*

**bimonthly**  22:*22*

**bit**  23:*8*  99:*21*
136:*11*  139:*4*

**biweek**  22:*21*

**BLM**  62:*4*  76:*9*
78:*23*  84:*22*  87:*21*
153:*13*

**block**  65:*8, 11*

**blocked**  64:*18, 21, 24*
75:*1, 10, 17, 19, 20*

**BLOOMINGDALE'S**
1:*5, 6, 7*  2:*13*  7:*20*
9:*6, 19*  11:*1, 2, 6, 10*
12:*12, 18*  14:2  16:2
21:*11*  23:*12, 14*  24:*3,*

*23*

**beginning**  81:*9*

*22, 24*  25:*3, 7*  29:*13*
35:*4*  36:*11*  39:*1*
59:*1, 14*  62:2  67:*3, 9*
69:*5*  70:*8, 11*  73:*21*
85:*11, 12*  93:*13*  95:*9*
105:*20*  129:*23*
136:*12, 14, 16*  137:2,
9, 11  151:*18*  155:*11,
14*  156:*9, 14*  157:*15,
18*

**board**  157:*21*

**BOBBY**  1:*12*  17:*18*
18:2, *4, 18, 20*  19:*13,
16, 18, 20*  20:6, *10*

**BOOKER**  1:*13*
17:*18*  18:2, *4, 18, 20*
19:*14, 16, 18*  20:6, *11*

**Booker's**  19:*21*

**Boston**  88:*21*  89:*1,
11, 17*  150:2, *8, 16, 21*

**bottom**  62:*3*  76:*8*
87:*21*  104:*15*  121:*19*
134:*21*

**bought**  101:*8*

**boutique**  88:*21*
89:*17*  126:7  150:*3,
21*

**brand**  13:*23*

**break**  6:*17, 21*  59:*6,
7, 11*  99:*13*  138:*10,
14*

**brief**  11:*8*  59:*11*
99:*13*  105:*4*  138:*14*
154:*20*

**briefly**  104:*20*  105:*12*

**bring**  20:9  22:*1*
91:*20*

**brought**  26:*15*  34:*15*
61:*13*  98:7

**budget**  11:9, *11*

**bulk**  139:*7*

**bullet**  122:7

**business**  13:*22*  120:*5*
122:*18*  126:*13*
150:*14, 16*  152:*9, 15,
21*

**buy**  23:*15*  139:*5, 6,
10, 13*  153:*5*

**buying**  43:*9*

**buys** 139:*9*

< C >
**Cabin** 2:*17*
**call** 43:*20* 65:*22*
66:*4, 7, 16* 70:*12*
**called** 11:*14* 68:8
113:*10* 128:*23*
**calling** 38:8 129:*4*
**card** 24:*17, 23, 24*
25:*3, 6, 7, 9, 10, 16*
26:*22* 29:*22* 32:*16*
33:*9* 36:*17* 37:*10*
43:*17, 20, 21* 44:*1*
47:*17* 65:8 69:6, *10*
70:*12, 17, 19, 24*
74:*22* 75:*1, 4, 5, 6, 10*
99:*24* 101:*4, 8, 21*
103:*11* 115:6, *20*
124:*23* 125:8 126:*1*
128:*17* 136:*11, 14, 16,*
*17, 22* 137:*3, 6, 9, 12,*
*14* 147:*18* 155:*19, 24*
**cards** 35:*2* 36:*11*
37:*5* 38:*5* 55:*4, 6*
75:*16* 105:*20* 125:*11*
**career** 6:*4* 8:*21*
**carefully** 161:*4*
**CARROTS** 1:*7*
**Case** 1:*3* 8:*2, 10* 9:*1,*
*3, 8, 12* 10:*3, 5, 16, 20*
16:*1, 24* 23:*10, 13*
28:*15, 20, 24* 33:*5, 17*
42:*15* 48:*11* 52:*1*
75:*9, 14, 18* 77:*5, 20*
78:*4* 85:*1, 6, 7, 8, 9,*
*17, 24* 87:*6* 92:*5*
93:*4* 98:*14* 102:*16*
111:*18* 112:*15*
117:*13* 119:*3* 125:*17*
147:*24* 148:*21, 24*
149:*20*
**caseload** 86:*13*
**cases** 98:*8* 99:*7*
**cash** 128:*21* 129:*2*
134:*7*
**CASTELLANI** 1:*11*
2:*13* 16:*9, 11, 13, 23*
21:*1* 29:*20* 33:*11*
62:*15* 79:*4* 92:*11*

130:*20* 131:*6, 17*
132:*23* 138:*3* 157:*11,*
*12*
**catch** 18:*12* 85:*11*
**catches** 18:*13*
**category** 123:*14*
**Cathy** 48:*22* 49:*1, 3*
50:*9, 12, 19, 23* 59:*24*
61:*11* 141:*9*
**caught** 8:*6*
**caused** 113:*15*
**central** 64:*14* 65:*17,*
*18* 66:*21, 23, 24* 67:*6*
68:*8, 14* 71:*5* 72:*20*
74:*18* 82:*10* 88:*5, 10*
99:*23*
**certain** 23:*16* 24:*17*
57:*2* 60:*11, 12*
101:*23* 102:*13, 18*
106:*7* 157:*5, 6*
**Certainly** 20:*1* 25:*13*
70:*23* 98:*13* 120:*3*
123:*13* 133:*14*
**CERTIFICATION**
160:*1*
**certify** 160:*3* 163:*4*
**cetera** 19:*7* 48:*6, 9*
60:*4* 72:*15* 73:*13*
77:*16* 82:*17* 84:*12*
106:*24* 125:*12*
140:*12* 142:*17* 157:*7*
158:*22*
**Chanel** 32:*14* 34:*21*
35:*16* 39:*9* 40:*3*
47:*16, 21* 48:*8, 10, 13,*
*16* 50:*1, 7, 10, 12*
59:*18, 21, 23* 60:*1, 12*
61:*11* 63:*23* 64:*8*
76:*21* 82:*16* 88:*14*
95:*16* 103:*2* 104:*2*
108:*22* 109:*8* 110:*1,*
*8, 15, 16* 122:*21*
126:*20* 127:*2, 7*
133:*14* 136:*3* 137:*20*
140:*13, 17, 23* 141:*1,*
*6, 7, 8* 142:*6, 13*
151:*12, 15, 17* 153:*1,*
*3, 4* 154:*3*
**Chanel's** 152:*8*

**change** 12:*3* 15:*20*
118:*5* 152:*16, 21*
162:*5*
**changed** 11:*23* 100:*6,*
*18* 118:*9*
**changes** 161:*11*
163:*8*
**Charge** 3:*13* 35:*1, 3*
41:*12* 44:*4* 69:*22*
104:*8*
**charged** 92:*22* 94:*11*
96:*2*
**charges** 35:*3* 36:*14*
41:*17* 155:*24* 158:*14*
**chat** 138:*8*
**check** 36:*5* 128:*15,*
*16, 18* 129:*9* 132:*9,*
*13, 15* 133:*21*
**checking** 106:*6*
133:*14*
**checks** 133:*21*
**China** 139:*11*
**choice** 98:*23*
**Chris** 16:*9, 13* 29:*8*
30:*4* 34:*1, 2, 12*
51:*11* 62:*15, 16* 63:*1,*
*2, 13, 21* 131:*6*
132:*23* 157:*12, 13*
**Chris's** 34:*7*
**Christina** 10:*8*
**CHRISTOPHER**
1:*11* 2:*13* 16:*23*
21:*1, 5, 8, 13* 22:*15*
23:*2* 29:*20* 33:*10*
62:*18* 79:*4* 92:*11*
**Cincinnati** 127:*10, 11*
**Citibank** 36:*9* 38:*12*
**City** 12:*8, 9, 11, 12*
13:*5, 6* 17:*5* 67:*8*
**claim** 148:*12*
**claimed** 145:*17*
**claiming** 36:*13*
**claims** 20:*7, 10, 13,*
*18, 21*
**clarification** 141:*5*
**clarify** 39:*4* 42:*23*
154:*2*
**clarity** 152:*1*
**clear** 25:*2* 29:*20*

94:*8* 146:*24*
**close** 121:*19*
**closed** 149:*1, 20*
158:*24*
**closest** 130:*15*
**coat** 44:*11*
**coded** 85:*10* 87:*13*
127:*22* 128:*6*
**collected** 123:*1*
**come** 13:*22* 14:*4*
22:*12* 26:*22* 35:*4*
57:*21* 65:*15* 70:*20*
72:*12* 73:*9* 85:*6, 14*
98:*3* 104:*24* 110:*9*
125:*11* 140:*8* 157:*16*
**comes** 20:*1* 24:*12*
53:*9* 73:*24* 106:*20*
107:*22*
**comfort** 59:*7*
**comfortable** 38:*14*
**coming** 18:*10*
102:*22* 104:*6* 110:*10*
113:*18* 119:*1* 125:*18*
134:*8* 157:*14, 15*
**commencing** 1:*17*
**Commission** 105:*15*
**committed** 39:*16, 24*
86:*17, 18* 92:*7*
**committing** 39:*3, 5*
40:*24* 57:*6, 15*
114:*21, 22* 134:*4, 5*
135:*4*
**common** 65:*5* 66:*15,*
*21* 91:*16* 98:*9* 139:*8*
**communicate** 26:*24*
27:*9, 17* 28:*3* 140:*19*
**communicated** 83:*6*
**communication** 21:*22*
27:*18* 28:*21* 32:*1, 20*
68:*2* 83:*10, 18*
109:*24* 112:*17*
142:*12*
**communications** 68:*4*
**company** 27:*23*
29:*22* 31:*1* 38:*17*
71:*24* 87:*11* 95:*5*
104:*5* 121:*9* 133:*9*
149:*20*
**compare** 46:*9*

**compensated** 121:2, 11 147:23

**competencies** 13:19

**complain** 36:17

**complainant** 105:19, 24

**complained** 37:9, 15

**complaining** 38:9

**complaints** 19:16, 17 20:5

**completely** 39:20 91:24 123:8

**complex** 153:7 155:22

**complying** 134:17

**component** 142:1

**components** 54:20 144:4

**compromised** 55:4, 5

**concern** 141:16 142:15

**concerned** 149:18

**concerns** 76:22 110:1

**concluded** 40:7 57:15 159:18

**conclusion** 31:4 39:6 49:10 58:14, 16 62:18 85:7 87:2 91:3 158:18, 19

**conclusionary** 117:17

**condensed** 5:11

**condition** 7:4

**conduct** 14:7, 8, 10 19:8, 11, 17 53:4 124:21 141:1 156:17

**conducted** 17:2 43:5, 6 63:17

**conducting** 14:15 49:24 81:15

**Conference** 1:17

**confidential** 24:14

**confirm** 37:20 156:2

**confirmation** 46:20

**confirmed** 37:14, 16, 17 38:2, 4 39:11, 12, 14 155:12

**connection** 11:17

**Connelly** 17:23

**consider** 72:9

**consideration** 60:19

**considerations** 96:16

**considered** 139:17

**consistency** 51:24

**consistent** 135:6 144:7, 13

**constitute** 139:21

**consult** 22:2, 4

**contact** 67:5 149:15

**contained** 160:4

**content** 9:24

**continue** 56:5 75:5 79:10 113:13, 20

**continued** 158:23 159:1

**continuing** 56:5

**control** 107:6 144:5

**conversation** 9:24 30:18, 19, 24 46:6 56:3 63:1, 2, 3, 4 78:5 88:13, 14, 20 90:6 91:21 92:4, 19, 23 93:6, 23 96:13 97:7 115:15 116:19 141:13 145:1

**conversations** 10:22 32:15 51:5, 10, 12 91:22 115:13 142:16, 18

**coordination** 120:3

**copied** 131:7

**copy** 5:10

**corner** 62:3 76:9 78:24

**Corporate** 11:5, 12 12:19 13:1 28:2, 6, 8 29:4 32:2 34:6 64:1 65:18, 20, 23 66:24 67:6 68:8, 14 72:20, 23 73:22 88:11 133:16 156:12

**correct** 6:10, 11 7:15 10:6, 7 12:13 13:17 21:2, 3 25:5, 18 27:8 29:2, 24 30:9, 10 37:3, 7 38:7, 17, 20, 23 41:3, 4 42:18 55:15, 22 56:1, 2 64:21 70:7, 16 71:11 82:15 85:20 88:12

92:8, 9, 17 99:6, 7 103:7 107:8 109:23 113:24 115:3, 4 117:19 120:22 130:21, 22 131:20 133:18, 19 134:2, 3 135:2, 3 144:16, 17 145:21 146:2 148:7, 8 151:3, 14 153:15 158:11, 19 159:8, 9 160:6 163:5

**corrections** 161:4, 6 163:7

**correctly** 18:6 28:17 42:3 130:17

**corroborating** 149:11, 14, 15

**Counsel** 2:7, 13, 19 5:2 8:14 59:4 126:7 131:12 138:9 142:23 154:13

**couple** 6:2 122:10

**course** 8:21 54:6 92:14, 24

**COURT** 1:1 5:6 7:22 154:17 161:18

**co-worker** 120:24 121:5, 6, 7, 24 143:10 148:6, 13, 14, 18

**create** 33:17 42:13 102:20 103:3 111:6

**creating** 102:2

**credit** 25:6, 9 26:21, 23 27:5, 6, 23 28:5, 16, 22 29:22 32:1, 16 33:9 36:7, 10, 11, 15 38:12, 16 43:17 55:6 65:15 67:2 68:24 69:6, 10 70:17 73:19 74:14 99:23 101:21 103:11 105:20 106:20 107:6 115:6, 20 124:23 125:8 136:11 137:12 155:19 157:3

**crossover** 116:3

**current** 9:17 12:7, 24 15:17

**currently** 14:17 15:7, 11 21:10, 11 27:11

**customer** 27:6 36:17 38:16 60:13 66:4 70:5 73:11 78:16 99:17 101:21 103:11 107:6 123:10, 13 136:18

**customers** 35:1 36:13, 24 37:4, 5, 9, 15, 19, 20 38:5, 8 70:4 135:1

**cut** 152:24

**< D >**

**d/b/a** 1:6, 8

**data** 101:1 114:2 117:20, 22, 23 118:15 149:11, 14, 15 155:21 156:8 157:4, 10

**database** 127:21 156:3

**date** 80:13 120:17 125:15, 16 155:17 161:9

**dates** 155:4

**David** 2:23 16:15 17:19

**day** 86:9

**days** 161:15

**day-to-day** 30:8

**December** 15:23

**decision** 21:23 22:5 41:14 62:20 63:5, 10 65:13, 15 77:8 90:22 117:9, 12 147:14

**decision-makers** 61:14

**deemed** 161:17

**Defendant** 2:19 8:8 9:3

**Defendants** 1:14 2:13

**Defense** 154:13

**define** 71:21

**Definitely** 5:8 44:13 64:5 97:1 112:4 120:11 123:22

**definition** 139:19

**delayed** 36:12

**DENNIS** 1:11 48:22, 24 49:3 50:9, 12, 19, 23 59:24 141:9

**DEPARTMENT** 1:*9*
11:*10, 14* 25:*21* 26:*9*
27:*21* 32:*14* 34:*21*
39:*9* 40:*22* 48:*8, 10,
13* 50:*12* 51:*17*
57:*12* 59:*23* 83:*14*
105:*14* 108:*16*
114:*22* 133:*8* 137:*21*
140:*13, 14* 141:*6*
143:*24* 157:*5*
**departments** 157:*5*
**dependent** 23:*22*
**depends** 27:*14*
**DEPONENT** 163:*1*
**deposed** 8:*22*
**deposing** 161:*14*
**deposition** 1:*16* 5:*21*
6:*3* 7:*14* 8:*19, 20*
9:*21* 10:*15, 23* 54:*6*
159:*18* 161:*3, 12, 16,
17*
**depositions** 9:*11*
**DEREK** 2:*1*
**describe** 18:*13* 99:*8*
**described** 65:*19*
67:*20* 76:*22*
**describing** 93:*20*
**DESCRIPTION** 3:*10*
**designer** 133:*7*
**Detail** 3:*11* 8:*4*
74:*10* 84:*18* 85:*1*
**detailed** 84:*14*
**details** 10:*17* 48:*18*
49:*6* 56:*24* 79:*17, 18*
84:*15, 20* 85:*9* 86:*20*
89:*15* 96:*13, 21*
142:*17*
**detectives** 18:*5, 7, 9,
19* 20:*13*
**determination** 91:*8*
147:*10*
**determine** 36:*11*
40:*18* 46:*4* 48:*17*
51:*3* 93:*14* 112:*21*
**determined** 36:*13*
86:*22* 108:*17, 20*
109:*7* 150:*8*
**determining** 48:*14*
93:*19*
**developing** 13:*1, 19*

**DIAZ** 1:*11* 48:*22*
49:*1*
**difference** 12:*23* 95:*8*
**different** 13:*21* 22:*3,
8, 12, 13, 23* 24:*7, 9*
37:*20* 38:*22* 59:*18*
60:*13* 62:*22* 73:*14*
80:*3* 81:*16* 91:*22*
93:*19* 94:*3, 19* 98:*20*
100:*7* 106:*20, 23*
120:*10* 132:*5* 136:*17,
20* 139:*4, 13* 150:*13*
156:*20* 157:*23* 158:*8*
**differently** 85:*10*
87:*13*
**direct** 31:*20* 72:*7*
128:*2*
**Direction** 4:*2*
**directly** 12:*21* 29:*16*
31:*12, 19* 36:*8, 10*
61:*6* 142:*11*
**director** 11:*5* 15:*13*
**discharge** 87:*10*
**disciplinary** 19:*1, 8,
11*
**disciplined** 52:*12*
**discount** 23:*10, 11, 13,
14, 16, 19, 23* 24:*1, 15,
19, 20* 25:*1, 14, 17, 20*
44:*2, 8, 14, 19* 45:*4, 5,
22, 23* 46:*1* 53:*5*
79:*22* 120:*15* 122:*7,
17* 136:*13, 15, 18*
137:*14* 145:*7, 12*
147:*8, 13, 17, 22*
148:*2*
**discounted** 122:*22, 23*
151:*13*
**discounts** 120:*4*
**discovered** 114:*13*
**discrepancy** 154:*1, 4*
**discussed** 88:*20*
**discussing** 50:*19, 24*
62:*8*
**discussion** 22:*10*
31:*2* 41:*19* 47:*3*
61:*3* 77:*10* 91:*3, 24*
105:*4* 112:*17* 135:*9,
11* 141:*14* 144:*4*

154:*20*
**discussions** 9:*22*
**dishonest** 26:*4, 14*
87:*12*
**dishonesty** 48:*6* 87:*9*
99:*3, 5*
**disposition** 31:*13, 16*
49:*12* 52:*3* 85:*14*
**dispositioned** 98:*8*
**dispositioning** 147:*14*
**disprove** 46:*5*
**disputing** 35:*3* 36:*14*
**disregarded** 130:*7*
**DISTRICT** 1:*1*
**diversion** 120:*14, 15*
138:*23, 24* 139:*1, 17,
19, 22, 24* 140:*2, 4*
141:*17*
**divert** 139:*7, 11*
**diverter** 59:*14, 17*
60:*1* 121:*8* 139:*6, 8,
9, 12, 20*
**diverter-diversion**
141:*2*
**diverters** 140:*15*
**diverting** 135:*13*
137:*23* 139:*2, 3*
140:*18*
**diverts** 139:*9*
**division** 38:*24* 67:*4*
74:*15* 100:*11* 102:*5*
106:*20*
**divisions** 73:*21*
**docs** 154:*16*
**document** 32:*24*
61:*18, 22* 62:*7* 67:*20,
24* 70:*14* 71:*14* 76:*2,
6* 77:*3, 7, 14, 18* 79:*6*
80:*17, 18* 84:*23* 85:*5,
23* 87:*5, 6, 19* 89:*23*
100:*14* 104:*8, 11, 18*
105:*8* 129:*12, 16*
142:*21* 153:*9* 155:*3*
159:*4, 10*
**documentation** 33:*4,
6, 18* 65:*2* 67:*18*
68:*12* 80:*9* 83:*5, 7*
88:*1* 146:*20*
**documented** 32:*16*
151:*2*

**Documents** 4:*7*
10:*16, 19, 21* 38:*1*
53:*24*
**doing** 14:*1* 33:*9*
51:*19* 52:*12* 60:*20*
61:*24* 121:*6* 157:*4*
161:*8*
**dollar** 42:*12, 17, 19*
43:*6* 45:*9* 67:*22*
69:*17* 95:*17* 106:*24*
**dollars** 57:*13* 114:*16*
**Doris** 17:*22*
**Dorothy** 17:*22*
**download** 154:*15*
**driving** 110:*24*
113:*19*
**dug** 141:*21*
**duly** 5:*13*
**duties** 140:*5*

**< E >**
**earlier** 45:*20* 65:*19*
83:*11, 16* 95:*7* 140:*3*
144:*10*
**early** 92:*6*
**earning** 121:*1* 147:*22*
**easier** 143:*12*
**easiest** 18:*13*
**eat** 99:*11*
**e-commerce** 88:*16*
**EEOC** 3:*13*
**effect** 41:*3*
**either** 106:*6* 118:*24*
134:*12, 13* 152:*12*
**elaborate** 34:*23*
**electronic** 5:*11*
83:*23* 84:*19* 85:*6*
**electronically** 24:*21*
**element** 47:*6*
**Email** 3:*14* 32:*20*
130:*19, 23* 131:*1, 5,
19, 24* 132:*24* 154:*16*
155:*17* 156:*15*
**emails** 32:*17*
**employed** 16:*3*
21:*11* 29:*13* 40:*6*
125:*22* 149:*19*
**employee** 8:*5* 16:*24*
24:*9, 19* 25:*9, 23*
26:*8* 27:*21* 43:*21*

44:*3*   45:*10, 22*   46:*16*
58:*10*   64:*18*   70:*2, 12*
71:*6*   72:*10*   77:*12*
85:*4, 10, 15*   88:*15*
106:*1*   107:*18*   123:*19*
126:*1*   130:*6*   136:*12,*
*16, 22*   137:*6*   155:*21*
158:*4*
**employees**   24:*4, 7, 17*
25:*2*   29:*3*   43:*13*
48:*15*   56:*17*   57:*4, 22*
58:*5*   59:*1*   70:*6, 9, 13*
71:*19, 20*   72:*8, 12, 18,*
*22*   73:*3*   90:*18*   97:*10*
135:*1*
**employee's**   99:*18, 24*
107:*14*   137:*12*
**employer**   9:*18*
**employment**   16:*2*
105:*15*   117:*13*
147:*14*
**ended**   57:*12*   117:*13*
**ends**   135:*5*
**enforcement**   13:*20*
40:*21*   56:*8*   57:*19, 21*
58:*6*   113:*23*   114:*23*
118:*11*   126:*4*
**ensure**   85:*8*
**ensuring**   19:*6*   140:*17*
**entail**   11:*7*
**enter**   74:*2*   85:*16*
**entered**   85:*7*   87:*6*
**enterprise**   67:*2*
**entitled**   124:*9*   147:*22*
**entity**   38:*22*   105:*19*
**entrance**   53:*2*
**EOC**   104:*8*
**Equal**   105:*15*
**errata**   161:*6, 8, 11,*
*14*   163:*9*
**ESQUIRE**   2:*4, 10, 16*
**estimate**   72:*16*
**et**   19:*7*   48:*6, 9*   60:*4*
72:*15*   73:*13*   77:*16*
82:*17*   84:*12*   106:*24*
125:*12*   140:*12*
142:*17*   157:*7*   158:*22*
**evasion**   79:*22*   122:*8*
135:*2*   145:*8, 18*

**events**   80:*3*   112:*15*
151:*18, 19*
**evidence**   92:*17*
114:*24*   117:*18*
137:*22*   138:*1*   147:*11*
160:*4*
**ex**   58:*21*
**exact**   21:*6*   52:*22*
72:*6*   80:*18*   84:*5, 6*
102:*23*   106:*14*
108:*11*   112:*14*
123:*20*
**exactly**   16:*16*   22:*19*
34:*14*   60:*15*   71:*13*
87:*4*   125:*12*
**EXAMINATION**
5:*16*   119:*9*   138:*20*
**examined**   5:*14*
**example**   94:*16*   101:*2*
128:*23*   139:*10*
**exception**   23:*21*   24:*7*
31:*21*   32:*8*   35:*10*
42:*9, 13*   45:*16*   46:*12*
53:*11*   67:*21*   73:*11,*
*17*   74:*13*   75:*20*   83:*5*
91:*16*   100:*5, 20*
101:*7, 10, 12, 15, 17*
102:*2, 17*   103:*3, 7, 10*
104:*6*   106:*19*   107:*18*
108:*8*   109:*5*   110:*19,*
*22*   156:*21*
**exceptions**   26:*24*
32:*18*   63:*24*   73:*9*
101:*1*
**excessive**   26:*8, 21*
102:*20*
**exchanged**   10:*20*
**exchanging**   50:*15*
**excuse**   123:*24*
**excused**   159:*16*
**execution**   13:*6*
**executive**   157:*14*
**executives**   15:*5*   72:*11*
**EXHIBIT**   3:*10, 15*
61:*15, 16*   75:*24*   82:*9*
100:*12*   104:*9, 22*
119:*6*   127:*17, 18*
129:*12, 22*   134:*20, 22*
142:*22*   143:*16*

154:*13*   158:*3*
**existing**   137:*14*
**expect**   73:*14*
**experience**   13:*13, 24*
14:*1*   108:*12*   126:*12*
157:*17*
**experienced**   157:*14*
**explain**   23:*11*   139:*1,*
*2*   153:*8*
**explained**   139:*18*
**explanation**   91:*14*
92:*1, 20*   93:*5, 21*
103:*21*
**exposure**   65:*9*
**expressed**   22:*10*
**extend**   23:*18*   45:*23*
**extent**   53:*22*   54:*22*
**extenuating**   49:*22*
**external**   13:*15*   14:*21,*
*22*   16:*18*   18:*8, 10*
85:*12*   86:*22, 23*

**< F >**
**facilitate**   28:*21*
125:*10*   134:*8*
**facilitating**   115:*1*
122:*15*   134:*10*
**fact**   37:*12*   57:*9*
108:*12*   121:*6*   123:*2,*
*14*   125:*8, 14*   126:*6*
130:*23*   134:*1*   151:*16*
153:*3*
**facts**   22:*1*
**fail**   161:*16*
**Fair**   134:*14*
**Fairfield**   2:*12*
**familiar**   10:*18*   47:*21*
76:*14*   78:*20*   106:*13,*
*15*   108:*10*
**far**   25:*20*   47:*4*   48:*2*
60:*16*   78:*17*   82:*22*
84:*2*   121:*18*   149:*17*
**February**   12:*10*
111:*15*   112:*7, 10*
131:*14, 19*
**fee**   123:*2*   146:*16*
**feel**   6:*15*   38:*14*   65:*9*
**feels**   65:*6*
**fees**   123:*9, 12, 15, 19,*
*21*   124:*3*

**field**   11:*13*   67:*8, 9*
74:*20*
**figure**   73:*23*
**file**   33:*24*   77:*3, 5, 16,*
*17*   85:*3*   112:*16*
**files**   19:*1*   57:*8*   58:*10*
**filled**   15:*11*
**filling**   134:*6*
**final**   33:*5*   61:*2*
62:*20*
**find**   20:*1*   35:*23*
45:*2*   46:*15*   48:*3*
51:*20*   86:*10*   98:*12*
132:*22*
**finding**   40:*13*   117:*17*
**findings**   30:*12, 17*
31:*9, 11*   32:*24*   33:*10*
41:*3*   47:*12, 14*   51:*18*
53:*14, 21*   61:*5, 9*
63:*11, 18*   80:*2*   118:*5,*
*9*
**finds**   27:*22*
**fine**   6:*18*   10:*1*   124:*4*
**fire**   15:*13*
**first**   5:*13*   28:*4*
42:*24*   43:*2*   51:*2*
64:*13, 20, 24*   67:*5*
73:*24*   75:*21*   81:*10*
104:*15*   111:*11, 14*
122:*7*   124:*19*   134:*18*
143:*22*
**firsthand**   46:*22*
142:*12*
**five**   104:*5*   110:*2*
**five-minute**   138:*10*
**flag**   24:*12*   32:*7*
40:*15*   42:*15*   45:*17*
73:*7*   74:*3*   101:*13*
103:*13, 17*
**flagged**   67:*23*   74:*5*
82:*24*   95:*10, 14, 15,*
*17*   97:*11*   99:*18*
108:*8*   139:*23*   140:*1*
**flags**   24:*8*   30:*22*
32:*19*   47:*7*   65:*7*
156:*17*
**flexibility**   123:*12*
**floor**   91:*17*   92:*3*
**fluctuates**   72:*14*

**focus** 140:7
**folder** 33:18 104:22
**folks** 15:21 65:16
**follow** 19:6 21:21
57:9 98:5 120:9
145:4 149:21 150:16,
18, 20 153:2
**followed** 57:9 93:8
113:12 132:8
**following** 124:20
132:10 134:1
**follows** 5:14
**force** 86:21
**foregoing** 160:5
163:4
**form** 5:3 10:9
13:10 19:3, 22 20:14
22:17 25:11, 24
26:10 27:10 28:12
31:6 33:2, 14 35:7
36:19 38:18 41:8
44:5 45:11 49:15
50:2 56:19 58:7
60:22 61:7 63:19
66:1, 12 67:16 68:17
71:22 75:12 76:14,
19 80:22 83:2 84:3
86:2 89:4 92:12
93:16 96:19 97:14,
22 98:18 99:19
106:11 107:15 108:2,
9 109:21 111:21
114:7 115:22 117:7
118:6 141:3, 18
142:8 143:3 146:8
148:16 152:18 163:8
**format** 80:16
**formatting** 80:18, 20
**former** 120:24
127:20 143:10 148:6,
12
**forms** 134:7
**forth** 142:13
**FORTY** 1:6 59:5
**forward** 66:22 67:7
74:14 151:1
**forwarded** 64:14
71:9 82:10 156:22
**forwarding** 71:5

**found** 26:24 33:9
39:2, 5, 15, 24 40:24
50:15 55:24 57:5, 14
87:12 92:7 101:13
114:20, 21 132:23
146:20
**four** 14:17 17:22
104:5 131:19
**fraud** 13:18 26:14,
23 28:18 32:7, 9, 11
34:16, 18, 20, 21, 24
35:4, 11, 15, 20, 21
36:1, 3, 5, 6, 11, 14
37:4, 14, 16, 18, 20
38:3, 4 39:3, 5, 8, 9,
12, 14, 16, 18, 21, 23
40:1, 3, 10, 18, 19, 21
41:1 42:2, 4, 24 51:2,
3 53:9 55:2, 5, 15, 17,
18 56:1, 4 57:6, 11,
13, 15 58:15, 18, 22
60:4 64:1, 2 65:10
67:1 68:3 76:23
78:7 82:14, 17, 23
83:6, 10, 12, 13, 15
86:17, 18, 21 88:16
92:8 93:10 98:10, 23
99:6 108:24 109:1,
12 110:1, 9, 14
111:12, 24 112:1, 18,
20, 22 113:15, 18, 19,
22 114:1, 2, 3, 6, 13,
14, 15, 16 115:1, 13,
21 116:6 125:10
128:9, 19 129:9
131:3, 13, 15 132:13
133:8, 10 134:4, 5, 9,
11 135:19 136:3
137:20 141:21
142:15 155:8, 10, 12,
15, 21 156:3, 5, 6, 7,
16 157:2, 4, 7, 9
158:14, 17, 20 159:3,
4
**fraudulent** 40:16
110:5 114:18 125:9,
10
**fraudulently** 35:2
**FRED** 1:16 3:3

5:13 33:3 129:3
**free** 6:15
**friends** 134:23
**front** 57:1 61:22
76:6 124:24 128:17
153:13
**full** 44:4 67:19
**fully** 160:4
**function** 156:24
157:1
**further** 67:10 74:21
91:15 93:22 95:1, 21
103:22 109:10, 11
122:6 138:18, 20
158:6 159:11
**FYI** 74:4

**< G >**
**general** 74:7 133:10
**GERBER** 2:10
**getting** 103:21
128:19
**gift** 101:4, 8
**GILMAN** 2:10
**give** 38:5 45:23
51:22 72:6 77:14, 18
94:15 128:24 143:14
**given** 16:1 21:14
23:15 25:3, 7 90:7
163:6
**gives** 129:5 152:1
**Giving** 31:17
**go** 6:2 20:8 36:15
37:2 39:10 45:1
54:17 57:7 63:6
67:3 72:9 74:1, 8
78:9, 22 80:1 83:20
84:9, 10, 14, 22 87:17,
22 92:3 93:22
104:15 115:24
121:16, 23 122:6
124:6 125:5, 21
128:8 129:2 136:24
143:16 144:9, 19
146:16 147:3 148:19
149:11, 23 154:12
**goes** 63:9 101:17
103:15 120:24
151:22 152:12, 13
156:3

**going** 17:18 20:24
21:17 25:24 32:17,
24 33:2, 13 35:9
36:19 41:8 42:9
44:5 45:11 53:1
56:19 58:7 59:4
60:3, 22 63:11 65:23
71:4 72:5, 16 77:2
79:11 80:22 85:21
86:2 88:3 96:23
97:14 99:19 101:23
103:14 106:11
107:15 108:9 110:16
111:23 112:22
114:12 115:16
116:20 120:5, 7
125:15, 19 126:2
129:13, 20, 23 130:1,
2, 3 141:3 144:1
146:8 147:24 149:21
150:24 151:4 159:10
**Gonzalez** 29:5, 21
65:20 88:8, 16
130:20
**Good** 5:19, 20 22:11
59:9 99:10 122:23
123:10, 12 143:13
**gotten** 83:16
**grand** 8:22 9:13
**ground** 6:2
**GROUP** 2:1
**groups** 18:11 55:3, 5
**guard** 18:3
**guards** 15:1 16:19
**Gucci** 59:19
**guess** 5:9 24:3
44:20 49:13, 23
50:11 51:16 53:7
57:18 63:16 73:23
82:8 107:22 111:7
129:24 132:22
**guided** 123:11
**guys** 50:14

**< H >**
**Hac** 2:19
**Hampshire** 78:16
119:17, 22 126:2
145:10

**hand** 57:*19* 78:*4* 91:*13, 19* 132:*6* 133:*19, 20*

**handbag** 47:*21* 88:*14* 145:*8*

**handbags** 47:*16* 103:2 126:*20* 127:*3* 133:7 154:*3*

**handing** 78:*1*

**handle** 57:*19*

**handled** 36:7 87:*1*

**handles** 105:*19* 125:*10*

**happen** 24:*23* 46:*21* 63:*12* 68:*16* 81:8 97:*21, 24* 102:*11* 104:*1* 123:*23* 140:*18, 21*

**happened** 8:*10* 22:20 31:5, *10* 66:*11, 17* 68:*10, 11, 12* 75:8 81:*18* 93:*3* 98:*6, 13* 102:9, *14, 16* 104:*4* 112:*15* 113:6 128:*3* 131:*14* 133:5 142:*19*

**happening** 32:*7, 13* 55:9 97:*4* 103:*14, 24* 110:8 112:*4* 125:*13*

**happens** 44:*15* 65:*4* 66:*15* 101:9

**happy** 6:*16*

**harassment** 20:*6, 7, 10, 12, 18, 21* 53:*12*

**head** 20:*23* 136:*23*

**header** 130:*19*

**heavily** 13:*12*

**held** 105:*4* 154:*20*

**help** 27:*16* 28:*17*

**helped** 28:*21* 157:*21*

**helps** 28:2

**Hey** 59:*4* 65:*23* 103:8, *13, 17*

**high** 35:*12* 51:*3* 83:6 103:6 128:*9* 155:*4* 157:6

**highlights** 74:*4*

**hire** 14:*18* 43:*14*

**hired** 25:4, *5* 137:*12*

**histories** 94:*23*

**history** 42:2 43:8, *9, 12, 22* 68:*23* 69:*5, 21* 71:*3* 73:*16* 74:*13* 95:*18* 107:*14, 20* 156:*23*

**hold** 12:*1*

**holder** 38:*13*

**home** 94:2, *3, 18* 95:*3*

**honest** 9:*15* 47:*18*

**Hopefully** 129:*14* 152:*1*

**hour** 59:*5*

**hours** 7:8, *11*

**house** 24:20 25:7, *22* 43:20, *24* 44:8, *15, 19, 21* 69:*10, 14* 70:*11* 136:*16, 18* 153:*4*

**HR** 19:*7, 11* 20:8, *9* 22:*1, 4, 5* 31:*13, 16, 17, 18* 41:*14* 49:*11* 51:*17* 57:*17* 61:6, *9* 62:*21* 63:6, *9, 10, 11* 77:*12* 78:2, *6* 80:*10* 91:*5, 19, 20* 92:*4* 93:9 98:*7* 117:*11* 147:*9*

**HR/employee** 77:*15*

**Human** 52:*18* 53:*10, 20*

**< I >**

**ID** 72:*10*

**idea** 89:2 143:*13*

**identification** 61:*19* 76:*3* 100:*15* 104:*12* 129:*17*

**Idress** 87:*14*

**immediate** 100:2, *4* 155:*22*

**immediately** 114:*15*

**impact** 122:*11*

**impair** 6:*23* 7:*4*

**imperative** 161:*13*

**implicated** 136:*3*

**important** 6:*6* 140:8

**improper** 103:*13*

**incident** 112:*13*

**incidents** 80:*13*

**include** 12:*14* 23:*17* 63:7 73:*20* 93:2 144:*4*

**included** 44:8, *19*

**includes** 22:*3*

**including** 54:*21* 92:*21* 98:*24* 140:*10* 156:9

**inconsistent** 123:*8*

**Incorporated** 155:*11, 13* 156:9, *12*

**incur** 35:*23*

**incurring** 32:9, *11* 34:*19, 21* 35:20 36:*1, 6* 40:*18* 113:*17*

**in-depth** 74:*10*

**INDEX** 4:*1*

**indicate** 136:*21*

**indicating** 121:*5*

**indications** 47:*8*

**individual** 47:2 64:6 78:*16*

**individually** 1:*11, 12, 13* 86:*13*

**individuals** 14:8 23:20 39:7 46:*19* 57:8 58:*17, 19* 139:6 156:*21*

**individual's** 32:*4* 94:2

**inform** 92:*4* 126:9

**information** 24:*14* 30:*4* 40:*17, 20* 46:*17* 47:7 49:20 50:*15* 52:*18* 56:7 57:*17* 68:*11, 15* 70:*23* 73:*15* 74:*10* 75:*15* 77:*11* 78:6 83:22 84:*12* 85:7, *17* 91:5 92:*16* 93:9 96:24 102:5 106:*19* 107:*10* 108:*21* 109:2 117:*12* 118:9 124:22 128:*19, 24* 129:2 131:2 133:*17* 134:6 135:*21* 147:9

**initial** 12:6 35:9 41:20, *23* 42:*1, 16* 63:*24* 67:*14* 73:*15*

**83**:*10* 112:*16, 17* 140:6

**initially** 42:*5* 49:8 75:*11* 95:*14* 107:*10* 109:*24* 116:20

**initiate** 111:7

**initiated** 76:*23* 109:5

**initiating** 121:7

**ink** 26:*23*

**inquire** 149:*7*

**insert** 14:*11*

**instance** 55:*13*

**instances** 104:5

**instantaneous** 114:*14*

**INSTRUCTIONS** 161:*1*

**interact** 53:*4*

**interaction** 46:22

**interchangeably** 66:*24*

**interest** 22:*10*

**internal** 14:*16, 19* 16:*14* 17:*1* 21:2 22:*16* 26:*12, 13* 34:7 48:*6* 72:*24* 85:*11, 14* 106:*10*

**internally** 13:*15*

**interpret** 64:22

**INTERROGATION** 3:2

**interrupt** 17:*11* 125:5

**interrupted** 11:*18*

**interview** 91:*13* 135:5 159:6, *7, 9*

**interviewed** 131:*18*

**interviews** 90:*10*

**introduce** 61:*15*

**introduced** 154:*13*

**inventory** 13:*16*

**investigate** 18:*10* 26:*16* 27:*3* 35:22, *24* 42:6 46:*4* 53:8, *11* 59:*24* 63:*23* 74:*21* 96:*12* 98:5, *24* 102:7 109:*11* 111:2 140:*1, 9, 19*

**investigated** 33:*20* 35:5, *6* 39:8 40:*3* 42:22 47:5 52:*15*

55:*14* 57:*10* 76:*17*,
*18, 20* 82:*18* 89:*12*
92:*11* 100:*10* 109:*20*
111:*20* 112:*12* 136:*3*
137:*21* 138:*1* 140:*9*
141:*21, 24*
**investigates** 14:*22*
**investigating** 14:*19*
29:*23* 33:*17* 74:*9*
81:*17* 99:*3* 115:*17*,
*19* 134:*16* 140:*14*
141:*13*
**investigation** 14:*9, 16*
17:*2* 26:*12* 28:*2, 6,*
*11, 17, 20* 29:*4, 6, 8*
30:*5, 8, 21* 31:*12, 22*
33:*19* 34:*10, 15* 39:*7,*
*9* 40:*4, 5, 6, 17, 21*
41:*10, 21* 42:*16* 43:*6*
46:*10, 15* 47:*1, 6, 24*
48:*1, 19* 49:*1, 5, 11,*
*14, 21* 50:*1, 14, 16, 23*
51:*11* 52:*9* 54:*10, 14,*
*17* 55:*20* 56:*5, 11*
57:*8, 16* 58:*10, 21*
60:*7, 9, 21* 61:*1, 6*
62:*9, 18, 24* 63:*7, 17*
64:*3* 65:*24* 67:*11*
68:*8* 71:*15* 74:*18*
76:*24* 77:*5, 6, 9* 78:*1,*
*8, 18, 19* 79:*18* 80:*8*
81:*10, 15* 82:*5, 21, 22*
83:*8, 15* 84:*9, 11, 15,*
*19, 21* 85:*4, 16, 19, 21*
86:*1* 89:*3, 13, 15, 18,*
*21* 90:*19* 91:*9, 11*
92:*15* 93:*1, 3, 10, 14*
95:*10* 96:*22* 97:*7*
98:*2, 11* 109:*2* 110:*8,*
*15* 111:*7, 16, 19*
112:*1, 2* 113:*7, 14, 20*
116:*1, 17* 117:*17*
118:*12* 126:*5* 131:*13*
135:*19* 138:*6* 140:*5*
141:*2* 145:*3* 149:*9,*
*17* 150:*22* 151:*5, 7*
158:*6, 17, 19, 20*
159:*3*
**investigations** 11:*11*
13:*15* 14:*6, 10, 12, 15*

16:*8, 14* 17:*1* 18:*9*
19:*20* 20:*1* 21:*2*
22:*16, 24* 23:*9* 25:*21*
32:*2* 34:*13* 41:*21*
49:*6, 7* 51:*11* 53:*9*
57:*1* 60:*4* 63:*14, 22*
64:*5, 7, 14* 65:*4, 17,*
*18, 21* 66:*22, 24* 67:*6*
68:*14* 71:*5* 72:*21, 23*
73:*1* 74:*7, 15, 18*
82:*10* 86:*8, 9* 88:*5,*
*11* 90:*10, 11* 99:*23*
106:*10* 138:*4* 144:*24*
156:*14* 157:*17, 18*
**Investigative** 3:*11*
63:*8* 79:*13* 81:*6, 17*
96:*4* 101:*3*
**investigator** 34:*1, 2, 9*
86:*12* 119:*23* 120:*2,*
*6, 7, 11* 121:*3, 13*
122:*12, 13* 124:*12, 17*
125:*14* 150:*12*
**investigators** 14:*18*
34:*7* 84:*14* 96:*23*
100:*8* 140:*23*
**involve** 49:*3, 20*
**involved** 29:*4* 30:*7*
34:*11* 49:*1, 11, 14*
50:*9, 10* 58:*18* 60:*8*
63:*3, 11* 86:*24*
116:*19* 122:*15*
135:*13* 149:*17*
158:*21*
**involvement** 31:*14,*
*15, 20* 33:*10* 50:*19,*
*22* 88:*20*
**involving** 155:*9*
**issue** 37:*4* 40:*14*
50:*8* 51:*7* 64:*14*
66:*22* 67:*15* 71:*5, 9,*
*10, 12, 13, 15* 78:*4*
82:*10* 91:*2, 13* 100:*1*
115:*6, 8, 20, 21*
128:*12* 131:*15, 18, 24*
132:*24* 134:*16*
**issues** 14:*4* 48:*5*
50:*23* 51:*6* 115:*10,*
*11*
**item** 44:*1*

**items** 151:*13*
**its** 153:*5*

**< J >**
**January** 11:*3*
**Jeana** 88:*4*
**jeans** 139:*11*
**Jersey** 2:*12* 22:*13*
94:*15, 16*
**jogging** 131:*16*
**journal** 83:*23* 84:*19*
126:*16*
**jump** 119:*5*
**June** 16:*4, 5* 82:*1, 19,*
*20* 92:*6* 125:*22*
155:*18*
**juries** 8:*22*
**jury** 9:*13*

**< K >**
**keep** 24:*3, 6* 33:*8*
64:*4, 5* 77:*2, 19*
79:*11* 85:*8* 88:*3*
**keeps** 85:*24*
**kept** 33:*11* 63:*13*
**key** 132:*6* 133:*20*
**kicked** 83:*16* 110:*14*
**kind** 14:*13* 23:*9*
32:*13* 83:*16* 103:*15*
109:*6* 110:*14* 112:*2*
145:*5*
**knew** 29:*9*
**know** 5:*9* 6:*18* 10:*3,*
*5* 13:*21* 18:*22* 29:*8,*
*9* 32:*17* 33:*11* 34:*12*
39:*4, 18* 41:*16* 46:*2*
47:*2, 18, 20* 51:*16, 19*
52:*8, 14* 57:*2, 9*
58:*21, 23, 24* 59:*1, 16,*
*21* 60:*3, 6, 8, 11, 24*
64:*6* 65:*14* 67:*13*
68:*7, 10, 13, 18, 19*
71:*12* 77:*17* 78:*14,*
*15, 17* 79:*5, 6* 80:*16,*
*17* 81:*7, 12* 86:*15, 16,*
*17, 18, 20* 89:*1, 6*
90:*10* 91:*21* 95:*8, 12*
96:*11* 97:*10, 17* 98:*6,*
*7* 99:*9, 17* 100:*10*
103:*16* 110:*2, 15*

113:*8* 114:*9, 14*
116:*22* 117:*1, 2*
119:*6* 124:*3* 125:*15*
126:*8, 12* 129:*13*
130:*9* 131:*12* 133:*5*
134:*21* 136:*2, 8, 9, 17,*
*23* 137:*22* 138:*1, 3*
142:*14, 18, 22* 144:*10,*
*12, 21* 145:*2* 150:*7,*
*10, 13, 15, 19* 151:*4,*
*16* 153:*10* 154:*1*
159:*1*
**knowledge** 13:*13*
20:*7* 70:*18* 71:*15*
124:*3* 128:*3* 142:*12*
**knowledgeable** 138:*5*
**known** 117:*3*
**Kori** 1:*18* 6:*6*
160:*12*
**KRISTINA** 1:*3* 10:*6,*
*11* 16:*1* 29:*1, 23*
30:*9, 19* 32:*5, 8, 14*
35:*6, 16* 36:*3* 38:*2*
39:*3, 5, 24* 40:*2, 6, 9*
41:*24* 47:*4, 12* 48:*14,*
*24* 49:*14* 52:*4* 54:*11*
55:*17* 56:*2, 9, 10, 21*
60:*7, 16* 62:*8, 17*
63:*4* 64:*17* 68:*5*
71:*6* 73:*5* 76:*18, 21*
77:*5, 20* 80:*6, 15, 21*
81:*3, 5, 8, 9, 19, 21*
82:*3, 11, 15, 23* 83:*18*
84:*2* 86:*19* 89:*24*
90:*1, 6, 13* 95:*10*
96:*1, 16* 101:*12*
107:*22* 110:*5, 11, 12*
111:*3* 112:*11* 113:*16,*
*20* 114:*5, 10, 17*
117:*4* 122:*2* 126:*20,*
*21* 127:*2* 130:*13*
143:*7* 146:*2* 148:*5,*
*24* 149:*1, 5, 6, 15, 18,*
*22* 154:*3, 5* 156:*23*
**Kristina's** 31:*23*
34:*11* 36:*18, 22*
37:*10* 53:*14* 55:*13*
56:*3* 64:*20, 23* 67:*15,*
*23* 70:*15* 73:*16* 78:*4,*

*17* 83:*8* 89:*13*, *20*
92:*5* 110:*20*

**< L >**
**Lai** 88:*21, 22* 89:*20*
*119:17* 126:*20* 127:*1*
*143:1* 150:*3* 153:*17*
**lapse** 155:*23*
**large** 97:*19* 110:*11*
**larger** 91:*2* 158:*20*
**LAW** 1:*12* 2:*1*
13:*20* 40:*21* 56:7
57:*19, 21* 58:6 94:*11*
95:*5* 105:*14* 113:*23*
114:*23* 118:*11*
123:*11* 126:4
**lawsuit** 7:*19* 8:6, *15*
**leader** 12:8, *9*
**leaders** 22:6
**leadership** 13:*18*
21:*14, 20* 48:*16, 21*
61:*12* 140:*14, 17*
141:*9*
**leading** 13:*19*
**learn** 9:*20*
**learned** 8:*14*
**lease** 153:*5*
**leased** 152:*17*
**leave** 21:*12* 22:7
29:*15*
**led** 42:6 83:*11* 96:*3*
113:*17*
**Lee** 76:*13, 15, 20*
79:*13* 86:*15* 88:*15,*
*21* 111:*20* 119:*13, 18*
122:*9* 124:*19* 125:*19*
127:*22* 135:*22*
140:*24* 142:*24* 143:*9*
145:*8, 13, 24* 147:*1*
153:*21* 154:*4, 10*
155:*9*
**Lee's** 88:*20* 120:*18,*
*23* 127:*20* 154:7
**left** 15:*21* 18:*20, 22*
21:*13* 29:*19* 118:*4*
**level** 26:*19* 47:*22*
49:*17*
**levels** 22:*3*
**liaison** 13:*20* 28:*15*
38:*11* 67:*1*

**LINE** 4:*3, 8, 14* 8:*23*
78:*10* 145:*11* 162:*5*
**lines** 122:*10*
**liquidate** 151:*22*
**list** 38:*1* 68:*2*
112:*23* 117:*21*
130:*12*
**listed** 77:*12*
**LITIGATION** 4:*1*
**little** 23:8 81:*16*
83:*16* 99:*21* 136:*11,*
*20* 139:*4*
**live** 94:*15, 16, 20*
118:*1*
**lives** 129:*3*
**LLP** 2:*10*
**LOCAL** 1:*10* 138:*8*
**located** 28:*8* 127:*9*
**location** 12:*17* 22:7
23:*4* 55:*3, 7, 11*
124:*10* 139:*10, 14*
**locations** 12:*13, 20*
**logical** 92:*1*
**long** 25:*5* 82:*5*
106:*5*
**longer** 75:*1* 134:*15*
135:*12* 149:*19*
**look** 25:*21* 26:2, *5,*
*18* 27:*23* 32:*19, 21*
42:*14* 44:*23* 45:*18*
46:*8* 47:*10* 48:*1*
54:*3, 13, 19, 20* 55:7,
*8, 19* 57:7 58:*9* 67:7
68:*8* 70:*23* 73:*20*
74:*1* 75:*24* 82:*8, 9,*
*16* 83:*11* 84:*20* 87:*5*
94:*22, 23, 24* 95:*22,*
*23* 98:*22* 100:*12*
101:*22* 102:*4* 103:*3,*
*9, 10, 15, 19, 22*
105:*16* 107:*19*
108:*14* 109:*9, 10*
110:*21* 111:*24*
116:*14* 119:*13* 120:*2,*
*7, 23* 121:*18* 122:*1, 3*
124:*10* 126:*15, 19*
127:*15* 130:*12* 132:*6*
134:*21* 136:*20, 23, 24*
137:*8* 146:*17* 147:*5,*

*6* 150:*12* 151:*5*
153:*15* 155:*21* 157:*8*
**looked** 24:*13, 16*
41:*24* 52:*8, 9, 16*
55:*16* 56:*2* 70:*21*
71:*2* 95:*21, 22*
108:*21* 109:7 113:*9*
118:*23* 138:*2* 141:*22,*
*23* 142:*1* 144:*9*
153:*16* 155:*2, 3*
**looking** 26:*13* 30:*23*
32:*13* 42:*24* 43:*1, 8,*
*11, 12* 44:*15* 45:*5, 19*
50:*10* 51:*2* 54:*22, 24*
55:*1, 16* 70:*14* 74:*8*
82:*13* 87:*5* 94:*13*
98:6, *10, 16* 102:*6*
104:*8* 106:6 110:*6, 7*
111:*18* 116:*16* 132:*5*
133:*11* 137:*2* 145:*11*
147:*24* 157:*4*
**looks** 62:*16* 63:*3*
68:*22* 79:*9* 83:*21, 22*
88:*2* 94:*24* 110:*23*
120:*3, 6, 12* 122:*1, 4,*
*13* 123:*14* 124:*19, 20*
125:*13* 130:*14* 144:6
145:*5* 147:*12* 148:*1*
154:*6*
**loop** 34:*15* 91:*20*
**loss** 11:*5, 14, 21, 24*
13:*18*
**lot** 32:7 48:*5* 73:*13*
76:*24* 90:*11* 97:*19*
102:*14* 120:*12* 133:*7,*
*9* 140:*10*
**lots** 91:*22* 98:*20*
**Louis** 2:*18*
**loyalist** 69:*5, 13, 15,*
*17, 23* 70:*1, 3* 121:*10*
153:*20* 154:*4, 7*

**< M >**
**ma'am** 143:*19*
**MACY'S** 1:7, *8* 2:*16,*
*19* 12:*14* 26:*23* 27:*5,*
*23* 28:*5, 16, 21* 29:*22*
32:*1, 15* 33:*9* 36:7,
*15* 38:*12, 16, 24*
65:*15* 67:*1, 4* 68:*23,*

*24* 73:*19, 21, 22*
74:*16, 17* 85:*13*
99:*23* 101:*21* 103:*11*
104:*19* 105:*14, 20*
106:*20* 107:6 115:*6*
155:*10, 12, 13* 156:*8,*
*12, 16* 157:*3, 18*
**mailed** 119:*16*
**maintained** 33:*24*
**major** 20:*2*
**maker** 147:*14*
**makers** 77:*8*
**making** 42:6 46:*3, 9*
51:*24* 73:*5, 6* 122:*23*
148:*23* 151:*10*
**manage** 11:*9, 11*
14:*8* 19:*10* 29:7
65:*16*
**managed** 16:*24*
**management** 46:*23*
85:6, *8, 17, 24*
**manager** 14:*20, 22*
15:7, *8, 9, 10, 12, 15,*
*17* 16:*5, 8* 18:*18*
21:*9* 88:*5, 15* 123:*24*
124:*2*
**managers** 15:*2, 6*
16:*11, 12, 15* 17:*3, 9*
19:*2* 49:*20*
**manages** 36:*10*
**managing** 13:*2, 4*
14:*15* 21:*22*
**Manhattan** 12:*13*
**manual** 132:*9*
**mark** 139:*12, 13*
**marked** 61:*18* 76:*2*
100:*14* 104:*11*
129:*16*
**market** 139:*12*
**Marothy** 2:*23*
**Marvin** 15:*18*
**match** 37:*21*
**matches** 68:*24*
**matter** 160:*5*
**MCCS** 102:7 109:*3*
127:*8* 156:*16, 17*
**mean** 17:*10* 34:*23*
37:*17, 24* 39:*15*
45:*16, 17* 49:*4* 52:*23*
56:*21* 66:*3* 71:7

75:2  102:7, 17  103:7, 19  108:20  126:21, 23  127:4, 23  134:4, 5, 10, 12, 13, 15  135:4, 5, 12, 17, 18  136:12  145:20, 22

**meaning**  24:20  59:23  87:10  103:18  152:24

**means**  6:12  16:10  35:3  45:17  75:4  95:19  101:19  103:8  121:11  126:22  134:6  139:2

**meant**  39:10

**measure**  22:4

**medication**  7:7, 11

**meet**  22:22

**MELISSA**  2:4  5:9  17:10  104:21  138:10  141:4

**melissa@dereksmithlaw.com**  2:6

**member**  144:24

**memo**  113:11  128:7, 10, 11, 13, 15  130:10  132:7, 10  133:11, 15, 22, 24  134:17

**memory**  17:18  30:15  32:12  44:24  83:7  87:23  88:1  109:9, 23  112:14  116:4  131:16

**MENDOZA**  2:4  3:4  5:18  8:17, 18  10:2, 13  11:20  14:5  17:13  18:1  19:12  20:4, 16, 19  23:1  25:15  26:7  27:4, 12, 20  28:23  30:6  31:8  33:7, 22  36:4  37:1  38:21  41:15  44:17  45:13  49:22  50:5  53:22  54:4, 7, 8  56:23  57:3  58:13  59:8, 13  61:4, 10, 21  64:10  66:10, 20  68:6  69:2  72:2, 4, 19  75:23  76:5  77:1  80:24  83:19  84:7  86:14  87:17, 18  89:8  93:12  95:6  97:9, 18

98:15  99:4, 9, 15, 20  100:17  104:14, 23  105:7  107:4, 21  108:6, 18  109:14, 16  111:5  112:6  114:19  116:8  117:15  118:13  119:2  123:4  124:13  132:1  133:2  135:14  136:5  138:11, 22  141:8, 15  142:2, 20  143:6, 15, 20  144:8  146:12, 24  147:3, 16  149:3, 23  150:1  152:3, 5  153:9, 12  154:12, 18, 23  159:11

**mental**  7:3

**mention**  35:10  148:10  159:4

**mentioned**  45:20  71:1, 4, 13  128:10  131:2  138:23  158:15

**mentions**  70:17

**merchandise**  23:15, 23  44:10  46:18  55:10  92:21  95:24  120:5  122:17, 22  127:5  134:23  139:3, 5, 9  151:13  152:12

**merge**  115:9

**merged**  115:12, 13  116:10

**merit**  86:10

**MIKHAYLOVA**  1:3  10:6, 8  29:1  30:9  56:21  82:11  86:19  104:16  107:23  120:20  122:2  125:17, 21  126:21  128:9  130:7, 13  131:13, 15, 18  134:1, 19  136:4  145:15, 20

**Mikhaylova's**  16:2  29:23  62:9  64:18  69:4  71:6  119:16  126:18

**million**  57:12  114:16

**mindset**  96:23

**minutes**  59:5  102:22  103:24

**misconduct**  19:13, 15  51:20

**misheard**  151:12

**Missouri**  2:18

**model**  152:9

**moment**  129:24

**money**  23:19  45:22

**monitor**  26:18

**monitoring**  102:6

**monitors**  101:15

**months**  27:14  56:6  99:22  100:1  106:7, 22  107:12  114:13  120:20  131:19  156:1

**morning**  5:19, 20

**morphed**  112:2

**move**  18:23  86:10  119:19  127:16  130:3

**moved**  21:8  149:16

**multiple**  14:1  16:7, 10  34:13  36:2  52:15  55:4  64:7  69:19  120:13, 15  122:15  138:2

**multistep**  22:2

**mutual**  22:10

**< N >**

**name**  11:23  43:16, 17, 19  76:13  119:17  121:24  129:22

**named**  8:8  9:3, 7

**names**  17:8  29:3  130:14

**nature**  136:22

**necessarily**  14:10  24:6  45:16  48:7  86:11  145:22  149:9

**necessary**  48:17  161:4

**need**  6:17  13:8  14:11  27:16, 19  34:13  43:18  49:7, 20  60:4  63:12  83:4  93:21  103:19  154:6, 24

**needed**  30:3  92:20  93:5  96:4  97:3  110:21  111:1  149:13

157:13

**needs**  74:5  140:8

**never**  122:21, 22  123:11  151:13

**NEW**  1:1, 7, 8  2:5, 12  7:24  12:8, 9, 11, 12  13:5, 6  17:5  22:13  67:8  78:16  86:7  94:15, 16, 17  119:17, 21  126:2  134:24  137:13, 15, 16, 17, 19  145:9  157:22

**newly**  15:11

**NH**  78:11

**nonemployees**  69:24

**noninvestigatory**  14:24

**non-rehirable**  127:22  128:6

**norm**  101:17  110:22

**normal**  27:13  49:19  84:21  102:8  123:3, 7, 8  151:17

**normally**  54:12  100:4

**Notary**  1:19  160:12

**noted**  128:5  161:11  163:8

**notes**  58:10  79:9  144:13, 15, 23  145:1, 2, 5  160:5

**notice**  90:8

**notification**  3:12  76:13

**November**  1:17

**NUMBER**  3:10  40:15  42:3, 5, 7  44:15  45:4  60:11, 12  67:21  72:6, 10, 13, 14  73:6, 9  77:15  85:1  94:13  95:15, 16  96:10  97:16  101:16, 23  102:13, 18, 22  103:1, 6  110:3, 11  112:18  113:7  122:20  126:19  129:23  131:3  133:8  137:3  153:10

**numbers**  42:12  48:2, 3  102:19  110:10

numerous 106:*21*
NYPD 40:*4* 135:*23*

< O >
oath 6:*10*
Object 13:*10* 19:*3*,
*22* 20:*14* 22:*17*
25:*11*, *24* 26:*10*
27:*10* 28:*12* 31:*6*
33:*2*, *13* 35:*7* 36:*19*
38:*18* 41:*8* 44:*5*
45:*11* 49:*15* 50:*2*
56:*19* 58:*7* 60:*22*
61:*7* 63:*19* 66:*1*, *12*
67:*16* 68:*17* 71:*22*
75:*12* 80:*22* 83:*2*
84:*3* 86:*2* 89:*4*
92:*12* 93:*16* 96:*19*
97:*14* 99:*19* 106:*11*
107:*15* 108:*2*, *9*
109:*21* 111:*21* 114:*7*
115:*22* 117:*7* 141:*3*,
*18* 142:*8* 143:*3*
144:*1* 146:*8* 148:*16*
152:*18*
Objection 10:*9* 30:*1*
76:*19* 97:*22* 98:*18*
118:*6* 123:*4* 124:*13*
132:*1* 133:*2* 135:*14*
136:*5*
objections 5:*3*
observations 46:*23*
obvious 137:*3*
obviously 5:*9* 13:*24*
102:*8* 103:*23* 133:*1*
occurrence 65:*5*
occurring 34:*18*
58:*15* 63:*14* 96:*12*
October 105:*24*
106:*4* 116:*21* 158:*5*
office 23:*6* 128:*21*
129:*2* 134:*7* 156:*12*
offices 28:*9*
Oh 43:*20* 127:*18*
Ohio 127:*13*
Okay 5:*23* 6:*2*, *6*, *21*,
*22* 7:*3*, *7*, *19*, *22* 8:*8*,
*10*, *17* 9:*7*, *10*, *14*, *17*,
*20* 10:*5*, *14*, *18*, *22*
11:*1* 12:*1*, *5*, *14*, *16*

13:*8* 14:*6* 15:*6*, *15*,
*19* 16:*1* 17:*3*, *8* 18:*2*,
*15*, *18*, *22*, *24* 19:*13*,
*19* 20:*5*, *12*, *20*, *24*
21:*10*, *12*, *16*, *19*, *23*
22:*9*, *15* 23:*2*, *8*
24:*17* 25:*2*, *9*, *16*
26:*8* 27:*5*, *21* 28:*6*,
*10*, *24* 29:*10*, *15*, *20*
30:*11*, *14* 31:*5*, *14*, *22*
32:*15*, *23* 34:*10*, *16*,
*23* 35:*5* 36:*5*, *16*
37:*9*, *16*, *23* 38:*16*
39:*2*, *10*, *24* 40:*8*, *11*,
*23* 41:*5*, *16*, *20* 42:*7*,
*15*, *21* 43:*3*, *11*, *16*, *22*
44:*18*, *23* 46:*8*, *13*
47:*4*, *12*, *16*, *19*, *23*
48:*10*, *13*, *21*, *24*
49:*13*, *23* 50:*11*
51:*14* 52:*4*, *11*, *23*
53:*13*, *18*, *22* 54:*16*
55:*13*, *23* 56:*12*, *15*
57:*18* 58:*4*, *14* 59:*3*,
*21* 60:*6* 61:*5*, *15*
62:*7*, *11*, *17* 63:*16*
64:*12*, *23* 65:*3*, *13*, *17*,
*22* 66:*11* 67:*12*
68:*14* 69:*3*, *9*, *13*, *24*
70:*14* 71:*4*, *12*, *17*
72:*20* 73:*18* 74:*3*
75:*1*, *10*, *24* 76:*8*, *16*
77:*2*, *24* 78:*9*, *17*, *22*
79:*7*, *10*, *17*, *20* 80:*20*
81:*4* 82:*5*, *8*, *19*
83:*20* 84:*1*, *22* 85:*1*,
*3*, *18*, *21* 87:*2*, *14*, *16*,
*19* 88:*3*, *13* 89:*9*, *19*,
*24* 90:*3*, *15* 91:*8*, *18*
92:*5*, *10* 93:*13* 95:*7*
97:*10*, *21* 98:*16* 99:*9*
100:*12* 101:*12*, *19*
102:*12* 103:*23* 104:*8*
105:*10*, *14*, *18* 107:*5*,
*9*, *11* 108:*23* 109:*12*
110:*8* 111:*6*, *11*, *15*,
*19* 112:*7*, *11* 113:*2*, *6*,
*22* 114:*5*, *20* 115:*2*, *5*,
*16* 116:*9*, *16*, *20*
117:*4*, *10* 118:*4*, *14*,

*19* 119:*2*, *5* 121:*14*
122:*13* 124:*6* 125:*24*
126:*6*, *15* 128:*7*
129:*11*, *22* 130:*5*
131:*11*, *12*, *17* 133:*24*
134:*14*, *19* 135:*12*, *20*
136:*9*, *24* 137:*8*
139:*15*, *23* 140:*3*
141:*11*, *16* 142:*3*, *21*
143:*17* 144:*9* 145:*7*,
*13* 147:*3* 148:*3*, *12*
149:*4*, *13*, *23* 150:*17*
151:*2*, *12* 152:*3*
153:*9*, *17* 154:*9*, *12*,
*18* 155:*17* 157:*11*, *20*,
*23* 158:*2*
old 122:*22* 152:*12*
Olde 2:*17*
older 151:*22*
once 9:*23* 57:*19*
121:*3*, *23* 149:*6*
150:*22*
ongoing 32:*23* 86:*1*
93:*11*
open 14:*17* 15:*11*
85:*4*
opened 85:*3* 137:*19*
operate 126:*14*
opinion 103:*1* 108:*4*
124:*14*, *15* 147:*12*
opinions 120:*20*
opportunity 15:*22*
22:*11* 29:*19* 105:*15*
opt 70:*2*
Oral 1:*16*
order 5:*6* 113:*11*
128:*11*, *13*, *15*, *24*
130:*10*, *11* 132:*7*, *11*
133:*15*, *22*, *24* 134:*17*
ordering 5:*9*
orders 113:*3*, *5*
128:*7*, *10*, *16* 133:*11*
organization 24:*10*
40:*9* 50:*8* 53:*7* 65:*6*
67:*10* 103:*4* 140:*7*
149:*7* 157:*6*
organized 55:*2*, *14*
58:*15*
original 5:*10* 161:*14*

Orya 87:*14*
outlets 15:*3*
outlier 108:*13*
outside 18:*11* 23:*20*
58:*17* 125:*9* 127:*10*,
*11*
overall 40:*3* 64:*3*
81:*10* 83:*15* 84:*12*
109:*24* 110:*15*
111:*24* 112:*22*
114:*16*
overnight 16:*18*
oversee 19:*1*
overseeing 72:*21*
overview 11:*8* 30:*16*
owned 152:*24*
owner 88:*21* 150:*3*
ownership 152:*23*

< P >
p.m 159:*19*
P/O 152:*24*
P-1 3:*11* 61:*19*
P-2 3:*12* 76:*3*
P-3 3:*13* 100:*15*
104:*12*
P-4 3:*14*, *15* 129:*17*
PAGE 3:*2*, *10* 4:*3*, *8*,
*14* 17:*16* 62:*3* 78:*10*,
*22* 79:*11* 87:*22*
104:*15*, *24* 105:*16*
119:*18* 121:*23*
127:*18* 130:*12* 145:*7*
153:*11* 162:*5*
pages 10:*3*
paid 44:*3* 72:*7*, *9*, *10*,
*12* 108:*1* 118:*1*
121:*11* 153:*4*
Pantoliano 88:*4*
paper 124:*23* 125:*11*
paragraph 64:*13*
69:*4* 88:*19* 105:*17*
149:*24* 150:*4* 158:*4*
parameter 157:*1*
parameters 100:*5*, *6*
101:*2* 102:*2*, *19*, *23*
106:*8*, *14*, *16*, *22*
107:*7* 108:*11* 116:*23*
117:*1*, *2*, *3*

**Part** 23:*16* 31:2
32:*10* 33:5, *18* 34:8
38:*17* 39:8 40:*3, 17,
21* 41:21 42:16
46:*10, 11* 47:1 48:*1,
18, 21* 49:11 51:10
52:8 53:21 54:*13, 16*
55:*14, 19* 56:1 58:22,
*24* 61:2 63:8, *17*
65:*1, 20* 67:8, *9*
69:20 70:22 74:*19*
77:*3, 16, 17* 81:6, *21*
82:*13, 15* 84:*1, 11*
85:*3, 5* 89:*3, 12, 18*
90:*14, 22* 108:8, *19,
23* 109:2 114:*3, 6, 9,
10, 11* 115:*17, 20*
116:*18* 117:*16*
118:*11* 126:5 130:*10*
132:7 133:*12, 22*
135:9, *18, 24* 136:*3*
139:*19* 140:2, *4, 6*
141:22 151:7, *17*
158:*16*
**participate** 151:*19*
**particular** 28:*15*
34:*15* 46:*19* 48:*18*
52:*1* 74:9 75:*14, 17*
85:9 93:4 125:*23*
126:8 148:*21*
**parties** 5:2
**partner** 13:*17* 19:7
**partnered** 49:9 51:4
**partnering** 13:*16*
**partnership** 19:*11*
**partnerships** 13:*20*
**parts** 145:*3*
**Passaic** 2:*11*
**passed** 27:2
**paying** 51:8 93:*15*
96:*17* 97:*13* 139:*16*
143:2 146:*1*
**pending** 6:*21* 8:7
**Penn** 2:*4*
**people** 13:*17* 18:*10*
51:*19* 52:5 55:4
56:*15* 103:22 136:2
137:22 155:*23*
**percent** 44:*11, 12*

**Plaintiff** 1:*4* 2:7 9:7
10:5
**Plaintiff's** 61:*15*
75:*24* 82:9 100:*12*
104:9
**play** 28:*10* 128:*11*
**Plaza** 2:4
**please** 6:*15* 124:7
127:*17* 131:8 161:*3,
8*
**PLLC** 2:*1*
**point** 6:*17* 17:*21*
18:20 21:5, 8 24:*21*
29:*17* 34:*10* 40:20
67:5 74:*23* 77:*24*
92:6 99:*16, 17* 100:6
115:9 116:*10* 118:*10*
124:*16* 141:4 149:*16*
**points** 69:*16, 17*
121:*1, 11* 147:*23*
154:*11*
**police** 98:*23* 135:*23*
**policies** 14:*3* 51:*18*
59:*17* 94:9 153:*3*
157:*23*
**policy** 19:6 23:*11, 14*
26:*4, 5, 15* 31:*1*
43:*10* 45:20 46:*1*
49:*10* 52:*17, 21, 22,
23, 24* 53:*3, 5, 6*
57:*14* 59:*15, 17, 18,
19, 21* 60:*15, 18, 19*
73:*13* 87:*1, 11* 90:24
91:23 92:*18* 93:*1, 7*
95:*5, 13* 98:*12, 16, 21,
24* 102:*15, 17* 113:*12,
17* 118:*24* 120:*16*
122:*16* 123:20 125:2
135:6 147:7 148:*1*
149:*18, 21* 151:*9, 16*
**policy-type** 48:7
**pop** 101:*9*
**popped** 30:22
110:20 111:*4*
**pops** 102:2, *13*
156:22
**popular** 139:*11*
**portion** 86:5
**position** 11:*4, 7* 12:*1,
5, 6, 7, 16, 19, 24* 13:*1,*

**96**:22 102:*9*
**performance** 19:*8*
**perimeter** 101:*6*
**period** 16:*16* 30:*16*
103:2 106:*4* 107:*3*
110:*10* 158:*21*
**permission** 37:*6*
38:*6* 63:*12*
**perpetrate** 39:*21*
**perpetrating** 40:*10*
**person** 40:*12* 74:*5*
78:*18* 86:22 87:*11,
24* 93:24 94:7, *9*
122:*19* 123:*14*
125:*10* 126:*3* 139:*15*
150:*24* 151:*11*
155:*10* 156:*14*
**personal** 69:6 70:*17,
19, 24* 94:*14* 121:*10*
122:*16* 145:8, *13*
**personally** 29:7 51:9
52:7 136:8
**personnel** 15:*1*
**person's** 74:*1*
**perspective** 13:*18*
26:22 36:*3* 55:2
85:*15*
**phone** 9:22 77:*15*
113:2, *4, 7* 127:6
128:*16, 24* 130:*10*
**phones** 125:*11*
**phrase** 30:2 103:*16*
**physical** 7:*4* 11:*12*
16:*19*
**physically** 18:*15* 90:6
**pick** 132:*17*
**picked** 73:*4*
**picks** 100:2
**piece** 24:*13* 42:*3*
109:*1* 110:*12* 124:*23*
158:*17*
**pieces** 62:22 109:*4*
**place** 59:7 75:*21*
90:23 91:6 99:*10*
101:*1* 106:*14, 17*
107:*1, 2* 128:*14*
134:*18*
**placing** 128:*24*
**Plains** 15:*24*

**9** 19:*21* 20:24 21:*15*
29:*10, 11* 149:2
**positions** 12:*3* 14:*17*
**possible** 91:*10*
139:*23* 143:*1, 4, 5*
145:*24* 146:*4, 6, 9*
150:22
**post-employee** 45:5
**potential** 39:*19*
43:*10* 45:*21* 46:20
64:*2, 19* 65:*24* 73:*12*
75:*2, 8, 11* 83:*13*
86:*21* 91:*1* 92:*18*
98:*3, 4* 128:*19*
132:*17* 149:*21*
**potentially** 45:*19, 24*
60:*24* 95:*12* 97:*12*
**predominantly** 109:*8*
**pre-employee** 45:*4*
**prepare** 10:*14*
**prescription** 7:7, *10*
**present** 1:*19* 2:22
18:*16* 20:20 21:*4*
37:*19, 21* 61:*9, 11*
63:*5, 6, 11* 90:*4, 5*
150:7
**presented** 8:*21* 41:*13*
**prevent** 6:*24* 129:9
**prevention** 11:*5, 14,
21, 24*
**previous** 9:*4* 12:*23*
13:*1* 150:*11*
**previously** 43:*13*
141:*10*
**price** 44:*4, 12*
**pricing** 152:*21*
**primary** 60:*3* 98:*11*
99:*1*
**prior** 157:*14, 15*
**priorities** 98:*1*
**prioritizing** 86:22
**priority** 48:*5* 140:6
**privileged** 8:*16*
**Pro** 2:*19*
**probably** 22:*21*
72:*17* 91:*15* 143:*13*
156:20
**problem** 13:*20*
111:*24*
**problems** 13:22

**procedure** 19:7 53:6
124:20 131:22 151:9
**procedures** 13:14
153:3
**proceedings** 160:3
**process** 13:7 14:16
22:1, 2 24:6 31:11
38:15 42:10 47:21
49:10, 19 57:10 63:9
77:23 81:6, 7, 17, 21
84:8 86:24 90:14, 22
91:6 93:8 98:5
100:24 102:10, 11
113:10, 11 122:24
124:20 128:11, 13, 14,
15 129:8 130:7, 10,
11 132:7, 9, 11, 15, 18
133:6, 15, 23, 24
134:2, 17 135:24
139:20 148:19
152:22 153:2
**processes** 13:14 14:3
24:8 48:9 73:9
**produced** 154:16
**product** 45:24
140:11 151:21
152:23 153:7
**Production** 4:7
**products** 151:13
**professional** 18:11
103:1
**profit** 122:23
**program** 21:21
69:15, 18
**programs** 11:13
13:2, 6 16:19
**progress** 22:4
**promoted** 15:22, 23
**promotional** 151:23
152:14
**promotions** 151:19
**proof** 118:17
**propounded** 163:7
**Prosecutable** 99:7
**prosecuted** 56:9
57:24 58:1, 22
**protect** 13:22
**protection** 11:10, 13,
21, 24 12:8 15:8, 9,
10, 12, 17 16:5, 8, 12,

15 17:3, 9 18:3 19:2
21:9 32:2 65:19
77:8 85:16 88:5, 10,
15 98:9, 22 112:12
131:23 143:23
157:14
**protections** 158:19
**prove** 46:5 114:24
117:22, 23 120:10
146:5, 13, 14, 18
**provide** 28:19
**provided** 47:7 52:17
57:17 75:15 86:20
117:12 118:10 126:4
**proving** 93:19 95:8,
11
**provision** 126:8
**Public** 1:19 160:12
**pull** 46:17 101:1
132:5 142:21 143:11
153:9 154:24 155:21
156:5
**pulled** 156:5
**purchase** 23:20, 22
24:6 25:10 42:2
43:9, 11, 22, 24 44:10
60:13 68:23 69:4, 21
71:3, 16 73:10, 16
74:13 75:22 83:24
84:6 94:18, 19 95:15,
18 101:4 107:14, 19
109:3 110:23 116:4
120:5, 24 122:17
123:17 126:2 136:15
147:21 152:24
156:23
**purchased** 44:1
93:15 95:2 96:1
109:20
**purchases** 24:4, 9, 18
25:22 26:9 36:18, 22
42:6, 11, 13, 17, 20
43:2, 7 45:10 46:3
55:5 67:22 69:16
70:13, 24 73:5, 6
81:5 82:20 83:9
84:2 94:14 97:13
101:17 102:1, 14
103:2 106:1 107:18,
24 108:12, 16, 22

109:6, 8 110:20
111:1 115:20 116:5,
21 117:6, 24 119:16
145:9 155:4 156:19
158:5, 7, 11
**purchasing** 32:3
95:17 101:18 108:14
115:14
**purpose** 99:1 158:16
**purposes** 61:19 76:3
100:15 104:12
129:17
**purview** 60:3 90:21
98:1, 21
**put** 53:16, 19 54:2
57:16 62:23 101:6, 7,
11 106:14, 16, 17, 21
119:6 123:13 129:23
139:18
**putting** 62:24 100:24

**< Q >**
**qualify** 25:6
**quantity** 60:9
**question** 6:20 31:18
33:21 36:22 43:4
48:20 49:13 50:11
62:23 64:9 72:5
73:24 80:11 81:20,
23 90:21 96:15
109:18 116:7, 20
123:22 132:19
138:24 141:20
142:23 143:18
146:11 148:4 155:18
158:2
**questioned** 92:10
97:11 112:12
**questions** 5:3 6:14,
24 7:5 31:19 47:3,
10 49:4, 9 50:14
60:10 96:5 97:2, 8
116:1 119:4 120:12
126:3 131:9 135:7, 9
138:11 150:11
159:12 163:6
**quotes** 134:23

**< R >**

**raise** 100:1
**raised** 60:11
**ran** 30:5
**random** 133:21
**rang** 37:7 39:13, 22
40:12, 16 41:12, 16,
18 81:5 109:19
110:4 112:19 115:3
131:4
**ranked** 112:18
**ranking** 35:11, 19
**rate** 94:17
**rates** 51:3 83:6
157:7
**reach** 31:19 52:2
67:5 149:7
**reaching** 28:5
**reacting** 13:21
**read** 65:1 121:13
122:3, 7, 10 127:21
130:3, 5, 17 131:8
159:14 161:3 163:4
**reading** 62:14 63:1
112:16
**reads** 144:21
**realize** 155:23
**really** 27:14 48:19
98:22 150:16
**reason** 6:23 14:11
39:6 41:6, 24 42:15
65:9 66:6 67:14
74:9 75:5, 6, 20
98:11 105:2 113:19
147:5 161:5
**reasons** 35:6 46:3
75:17 76:17, 22
96:11 137:4
**reassigned** 22:9
**recall** 7:22 8:2 9:4,
14 16:16 17:8, 21, 22
19:17, 24 20:10, 17,
21 21:17 29:3 31:24
33:6 34:9, 12, 14
36:9 39:2 40:5
41:23 42:23 43:2
44:7, 9, 14, 16, 21
47:6 49:17, 21 50:7,
9, 17 51:1, 5, 9, 13, 14
52:1, 4, 7, 13, 20, 21,
22 57:23 58:1, 3, 18,

Case 1:19-cv-08927-GBD-SLC   Document 128-6   Filed 09/20/23   Page 64 of 79

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

*19* 61:2 63:22 65:1
66:18 68:10 70:*18,*
*22* 74:22, *24* 76:14
77:21, *22* 79:9 80:12
81:2 82:*3, 5, 7* 86:4
87:*4, 14, 15* 89:9, *11,*
*15, 19, 22, 24* 90:*1, 4,*
*9, 12* 104:*1, 3, 5*
111:*15, 17, 18* 112:7,
*9, 11* 113:8 114:*10,*
*17* 115:*11, 12, 14*
116:5, *7, 16, 18, 22, 23*
118:8, *24* 123:20
137:24 138:*1* 141:*12*
142:*10, 15* 146:22, *23*
155:2
**receipt** 83:*21* 84:20
87:22 161:*15*
**receipts** 84:9, *10*
**receive** 51:*18*
**received** 44:2 63:*24*
110:*19* 130:*23*
**recollection** 67:*19*
69:*1* 73:15 74:*19*
114:*12* 117:*11*
118:*18, 22* 126:*18*
132:3 133:6 159:*10*
**recommendation** 80:2
**recommendations**
51:*17, 21*
**record** 37:23, *24*
38:8 85:*11* 92:4
105:5 120:*17* 126:*16*
127:8 137:*1, 3*
138:*17* 154:*21*
**recurring** 27:*18*
**red** 24:8, *12* 30:22
32:7, *18* 40:15 42:15
45:*17* 47:7 65:6
73:7 74:3 82:24
101:*13* 103:*13, 17*
156:*17*
**re-education** 151:8
**reference** 16:22, *24*
33:*19*
**referencing** 62:8, *10*
70:*11*
**referring** 141:*10*
148:22, *24*

**refers** 130:9
**reflect** 137:*1*
**refresh** 10:*16* 44:24
87:23 88:*1* 104:23
131:*14*
**refused** 150:23
**regarding** 17:2
51:*18* 62:8 73:16
113:2, *4* 147:7
**regards** 29:*1*
**regions** 157:6
**regular** 137:8
**related** 11:*12* 35:21
133:*17* 145:3
**relating** 13:*14, 19*
**relation** 36:*18*
**relations** 77:*12, 16*
**Relationships** 140:*11*
**relevance** 89:*17*
91:*13*
**relevant** 74:*15* 78:18
100:*11* 102:5
**relies** 13:*12*
**remember** 5:*24* 8:*3*
9:*16* 18:5, *21* 20:*3*
21:6 28:*16* 42:*3*
48:*18* 68:*1* 112:*16*
114:*11, 15* 127:*11*
132:*4* 136:*10* 141:*14*
**remembered** 90:9
**remembering** 96:*21*
**renting** 153:6
**repeat** 43:4 143:*18,*
*21*
**rephrase** 6:*15, 16*
45:*14* 50:*21* 99:22
124:*1*
**replace** 15:*19*
**report** 14:*19* 15:2, *5,*
*6* 17:4 21:*1* 22:*16*
24:8 29:*16* 30:*11, 14*
32:8, *24* 35:*10, 13*
44:9, *20* 45:*3, 8*
53:*13* 61:5 73:*17*
83:5 100:*20* 101:*9,*
*10, 12* 102:*3, 17, 21*
103:*7, 10, 24* 108:8
110:*1* 127:*20* 133:*20*
156:*21*

**reported** 12:*21* 34:*1,*
*2, 6*
**REPORTER** 5:*6*
154:*17*
**reporting** 15:*17* 24:7
35:*1* 37:*13* 42:*9*
46:*12* 70:*21* 73:*12*
84:*12* 101:*15* 106:*19*
133:*19*
**reports** 14:*20, 22, 23*
15:*9, 10, 12, 13* 27:*1*
100:5 101:*3* 102:*21*
104:6 132:5 156:*18*
**Request** 4:7 74:*11*
**requesting** 53:*23*
**requests** 27:22 54:2
**required** 24:*17*
77:*17* 93:2 124:2
**resell** 23:23 139:6
153:*1*
**reseller** 48:*20* 50:*10*
95:*23* 121:8 122:*19*
123:*15* 125:*19*
126:*10, 11* 139:5
142:*17* 150:9, *10*
**resellers** 48:9, *15*
126:*13*
**reselling** 45:*24*
46:*13, 16* 47:*5, 9, 13*
48:2 50:*4, 18* 55:9,
*10* 64:*19, 21, 24* 65:7,
*24* 66:8, *17* 71:8, *9*
75:2, *7, 11* 79:*23*
95:*19* 96:7, *8* 98:*3*
122:8 135:*13* 137:*23*
139:*3, 5* 140:*18*
145:*21, 23* 148:8, *10*
**reserve** 119:*3*
**reserved** 5:4
**resigned** 127:22, *23*
**resigns** 128:*4*
**resold** 120:7
**resolution** 8:*15* 33:5
**resolved** 101:*16*
**Resources** 52:*18*
53:*11, 20* 140:22
**respect** 8:*15* 128:7
129:*11* 133:24
134:*19* 137:20

140:*24*
**respective** 5:2
**respond** 6:7, *19*
**responding** 138:*24*
**responds** 131:7
**responses** 6:8
**responsibilities** 15:4
16:*17, 20* 22:8
**responsibility** 12:*21*
22:*14* 38:*10, 14*
**responsible** 12:*12*
13:*5, 7* 14:*15* 16:8
18:2, *5* 19:*5, 6* 40:*19*
72:*21* 140:*14, 17, 20*
157:*3*
**rest** 149:*17*
**restate** 36:*21*
**result** 8:*15* 31:*3*
54:*14*
**resulting** 30:*24* 85:*15*
**results** 30:*18, 21*
40:5 49:*4* 56:8 61:*1*
70:*19* 149:8
**RETAIL** 1:9
**retailers** 14:*1*
**retained** 3:*15*
**return** 161:*13*
**reveals** 91:*11*
**reverse** 74:4
**Review** 10:*16, 19, 21*
62:*19* 68:23 69:*3, 4,*
*5, 6* 70:8, *17* 81:7, *12*
83:*17* 107:*13, 17*
108:24 109:5 158:22
**reviewed** 70:*16* 74:6
81:*4, 19, 21* 84:*1*
128:20
**revisit** 144:*18*
**reward** 121:*1, 10*
147:23 154:*10*
**rewards** 69:*15, 22*
70:3
**Rey** 16:*15* 17:*19*
**RICHARD** 1:*12*
**Right** 6:*13* 7:*13*
9:*17* 17:*16* 22:*15*
23:*24* 25:*17* 38:6
40:*11* 41:6 44:*18*
45:*7* 46:2 50:*18*
54:7, *18, 24* 55:21

59:6  62:5  65:22
68:7, 15  69:7, 10
70:1, 5, 6  71:9  73:23
75:11  76:10  77:2, 21
78:9  79:12  81:24
82:1, 11, 12, 14  83:21
88:11  91:18  95:7
96:7, 9, 15  101:5
103:11, 18  105:8
108:7  109:19  111:17
115:7  116:9  118:2
119:2  120:21  121:18,
21  122:3  125:1
127:10, 11  143:7, 10,
15  144:9, 15, 18
145:14, 18  147:1
148:5, 14, 15  153:18
155:7  156:10  158:5,
24  159:11
**right-hand**  62:3
76:8  78:24  144:19
**ring**  58:23  125:19
129:1, 6
**ringer**  126:21
**ringing**  35:14  80:14
83:14  110:4  111:12
116:12  123:17  157:9
**rise**  27:15
**Road**  2:17  96:3
**role**  10:12  13:4
28:10  157:22
**role/responsibilities**
11:9
**roll**  125:6
**room**  90:13  144:13,
22
**RPR**  1:18  160:12
**rule**  51:23
**rules**  6:3  23:17
101:11
**run**  35:13  116:17
122:18  152:9
**rung**  110:12  114:18
126:17  155:12
**running**  45:3
**RWDSU/UFCW**  1:10

< S >
**safety**  15:13

**sale**  24:21  39:19
44:10  130:8  144:21
151:18, 22  152:12, 14,
22  154:7
**sales**  37:7  39:13, 22
42:2, 5, 7  71:16
72:14  93:15  96:17
97:13  110:4  112:19
117:6  122:24  134:24
143:2  146:1  151:17
155:5, 12  156:9
**sat**  88:16  96:16
97:11
**saw**  38:1  93:4
95:24  105:12  108:22
133:13
**saying**  29:1  30:7
38:4  42:8  44:21
52:4, 7  59:6  84:8
85:18  89:11  90:5, 7,
8  99:5  100:21
101:20  103:13  106:8
107:5  108:23  109:13,
17  110:19  114:5, 23
118:14  147:1, 17, 18
150:19  158:24  159:2
**says**  62:2, 3, 14
64:12, 17  69:3  71:9,
11  76:8, 13  78:22, 24
79:12, 17, 20  80:13
82:1, 20  85:1, 10
87:21  88:4, 13, 19
104:15, 19  105:18, 23
119:21  121:20
126:19, 24  127:1, 2,
22  130:6  131:17
134:1, 22  144:18, 20
145:7, 18  148:6
153:20  154:2  158:3,
4, 6
**scenario**  30:17
**scheme**  56:1  82:14
**scope**  38:10
**screen**  71:17  90:15
109:14  119:12
129:14, 20  152:4
155:3
**se**  86:8
**second**  59:6  69:3

149:24  150:4  158:4
**Secondarily**  110:17
**section**  124:9
**security**  11:12  16:19
18:3
**see**  16:21  28:4
35:24  48:1  58:10
61:22  62:1, 5  64:2,
15  69:7  70:24  74:1,
2  76:6, 10  78:10, 12,
24  79:12, 17, 20  80:3,
4  81:1, 24  83:4, 20
84:14, 18, 23, 24
87:19  88:4, 6, 17, 23
93:20  94:7, 23  100:9
101:7, 22  104:16, 17,
20  105:8, 9, 18, 21
106:2, 3  109:5
110:21  113:15
121:21  124:10
129:20  132:7, 10
133:21, 22  144:20
145:9, 17  146:21
150:3  153:13, 23
158:3, 9
**seeing**  42:4  51:3
80:12  110:9  143:14
**seen**  66:16  67:19
76:12  79:7, 8  101:24
102:10  104:6, 18
105:11  121:24
126:12  137:24  144:7
**sell**  139:13  153:7
**sellers**  155:15  156:4
**selling**  65:11  68:3
97:12  139:20  151:19
156:6
**sells**  121:19
**send**  62:20  63:18
67:10  74:20  83:23
91:17  100:11  102:5
120:24  126:24  127:1
147:21  151:11
153:17
**sender**  126:20, 22
127:2  154:5
**sender's**  127:6
**sending**  56:17, 22
97:12  115:20  116:12

121:8  127:4  134:7
146:1
**sends**  128:9  139:15
**sense**  63:16  103:1
**sent**  32:21  46:18
74:16, 17  92:21
93:23  94:2, 7, 14, 18,
19  95:2, 3  96:1
103:12  106:9  113:23
117:24  126:19
128:16, 22  130:20
142:24  156:15  158:7
**sentence**  105:23
127:21
**separate**  38:22  39:17,
21, 22  50:15  59:19
68:4  69:20  75:6
83:17  86:24  93:10
109:2, 12  111:3, 9
115:8  156:17, 20, 23
**separated**  149:6
**separately**  110:17
**September**  135:22
150:6
**serial**  48:2, 3
**serialized**  47:20
**serves**  30:15  83:7
109:9, 23
**service**  27:6  38:16
101:22  103:12  107:6
**services**  28:5, 16, 22
32:1  36:8, 15  38:12
65:16  67:2  68:24
73:20  74:14  99:24
106:21  157:3
**set**  107:3
**settled**  8:11, 12
**sexual**  20:5, 7, 10, 12,
17, 21  53:11
**sgerber@bglaw.com**
2:12
**Shanine**  34:7
**share**  31:12  49:4, 5
129:13
**sheet**  161:6, 9, 11, 14
163:9
**ship**  55:3  147:18
150:23, 24
**shipped**  54:18, 21
55:6, 11  78:11, 16

Case 1:19-cv-08927-GBD-SLC   Document 128-6   Filed 09/20/23   Page 66 of 79

Deposition of Fred Becker
Kristina Mikhaylova v. Bloomingdale's Inc., et al.

122:*20*  129:*3*, *10*
143:*2*, *8*, *9*  146:*10*
**shipping**  51:*7*  52:*5*
54:*11*  95:*10*  96:*17*
117:*6*  118:*20*  119:*21*
122:*17*  123:*2*, *9*, *12*,
*15*, *19*, *21*  124:*2*, *9*
134:*23*  145:*14*
146:*16*  147:*20*
**ships**  122:*2*, *9*  145:*8*,
*13*
**shop**  25:*8*  127:*7*
140:*19*
**shoplifter**  85:*12*
**shoplifters**  18:*12*, *13*
**short**  103:2  110:*10*
**shortage**  13:*16*
**show**  43:*23*  44:*3*, *13*
101:*3*  129:*11*
**showed**  126:8  155:*4*
**showing**  104:22
**side**  15:*3*  121:*19*
144:*19*
**sign**  159:*14*  161:8
**signatures**  37:*21*
**significance**  89:*20*
119:22  120:*1*  121:*4*
122:*12*  124:*11*, *18*
**significant**  65:*6*
**signing**  161:*10*
**similar**  116:6  139:*3*
**similarly**  80:*6*
**simple**  128:*21*  129:*9*
153:8
**simply**  43:*8*
**simultaneously**  60:*20*
**single**  54:*17*  55:*6*
**sit**  92:*18*
**sitting**  47:*2*
**six**  107:*11*  158:*7*
**six-month**  107:*14*
**Skinner**  1:*18*  160:*12*
**small**  91:*1*
**SMITH**  2:*1*
**Soho**  15:*3*, *7*, *8*  21:*8*,
*9*, *10*, *15*, *21*  22:*13*
**sold**  151:*23*
**solving**  13:*21*

**somebody**  24:*15*
74:8  102:*13*  113:*18*
156:*5*
**somebody's**  144:*15*
**something's**  93:*15*
**soon**  100:*2*
**sorry**  17:*14*  43:*18*
84:*15*  88:22  97:7
108:*19*  127:*18*
**sort**  27:*1*  100:*24*
101:*1*  156:*7*, *8*
**sorted**  156:*4*
**sounds**  62:*15*  78:*15*,
*20*  108:*13*  111:*17*
122:*14*
**source**  45:*2*
**SOUTHERN**  1:*1*
**space**  153:6  161:6
**span**  17:*24*
**speak**  22:*19*  60:*14*
61:*1*  66:*14*  71:*13*
78:*3*, *20*  91:6  102:*23*
107:*2*
**speaking**  6:*7*, *8*  38:*15*
**specialized**  15:*4*
**specific**  13:*4*, *7*, *14*
14:*3*  25:*3*  30:*23*
49:*21*, *23*  59:*17*
62:*15*  68:*7*  70:*9*
83:*12*  84:*16*  96:*21*
99:*21*  116:*2*  157:*12*
**specifically**  12:*17*
16:22  21:*21*  47:*4*
51:*1*  52:*13*  65:*14*
81:*3*  90:*1*  104:*3*
112:*9*  133:*5*
**spend**  14:*18*  48:*4*
**spending**  46:*9*
**spends**  26:*13*  99:*2*
**spent**  48:*19*  133:*7*, *11*
**spoke**  52:*17*  56:*9*
78:*10*, *11*  81:*11*
112:*23*  113:*8*, *9*, *20*
**spoken**  57:*16*  138:*3*
**spouse**  23:22
**spring**  72:*17*
**St**  2:*18*
**staff**  131:*23*
**stage**  41:*20*

**standard**  77:*7*, *14*, *22*
101:*18*
**standards**  53:*3*
**standpoint**  55:*19*
63:8  96:*4*  101:*3*
**start**  11:*2*  31:*3*
112:*1*, *5*  130:*2*
134:*18*  146:*6*
**started**  30:22  31:22
32:*13*  42:*24*  43:*1*
49:*8*  51:*2*  82:*6*  83:*1*
110:*6*  111:*16*
**starting**  11:*4*  63:*23*
64:*2*  110:7  122:*9*
**starts**  82:*19*
**state**  41:*11*, *13*, *17*
51:8  89:*14*  94:*3*, *4*, *5*,
*15*, *20*  95:*11*  96:*17*
117:6  120:*17*  127:8
134:*24*  138:*16*  148:*9*
158:*7*  159:*2*  161:*5*
**stated**  6:6  9:*1*  67:*12*
85:22  89:*14*  95:7
109:*18*  140:*3*  141:8,
*10*  144:*10*  156:*15*
**statement**  31:2  78:*5*
80:8  117:*5*, *10*, *18*, *20*
118:*16*, *20*  119:*14*
120:*18*, *23*  143:*9*, *11*,
*23*  146:*15*, *17*, *21*
147:*1*, *10*  148:*19*
149:*4*  150:*6*  152:*2*
**statements**  144:*7*
148:*20*
**STATES**  1:*1*  51:8
52:*5*  131:*21*  151:*16*
**stating**  75:*8*
**status**  22:*23*  147:*15*
**steal**  18:*11*
**stealing**  8:*6*
**stenographic**  160:*5*
**steps**  151:*6*
**Steve**  9:22
**STEVEN**  2:*10*
**stipulated**  5:*1*
**STIPULATIONS**
4:*13*
**stop**  59:*9*  99:*10*
**STORE**  1:*9*  10:*11*
15:*3*, *16*, *24*  16:6

17:6  18:*5*, *7*, *9*, *16*, *19*
20:*13*  22:*13*  23:2
26:*19*  46:*21*  67:*9*
72:2, *24*  88:*14*  93:*24*
94:8, *10*  122:*18*
131:*23*  141:6  145:*15*
152:*10*  157:*16*, *22*, *24*
**stores**  12:22  13:*3*, *7*
28:*3*  155:*13*, *14*
**STOREWORKERS**
1:8, *10*
**straight**  155:*21*
**strategies**  13:2, *16*
**Street**  10:*12*  12:*17*
15:*9*, *15*, *18*  16:6
17:6  21:*7*  22:*7*, *12*
23:*4*  71:*24*  72:2
101:*7*  131:22  157:*13*,
*15*
**strictly**  101:*24*  102:*1*
156:*4*
**strike**  124:*1*  135:*20*
**structured**  14:*13*
**subheading**  145:*12*
**subject**  79:*17*  161:*10*
**substance**  163:8
**substantiate**  149:*12*
**sudden**  35:*11*  74:*4*
106:*9*
**suffer**  7:*3*
**suggestions**  51:*20*
**Suite**  2:*5*, *11*, *17*
**summary**  53:*16*, *19*
62:*7*, *10*  68:*21*  79:*13*
80:*7*, *16*, *19*  81:*3*
111:*18*  116:*18*
146:*15*  147:*11*
**supervising**  16:*11*, *13*
**supervisors**  15:*1*
**SUPPORT**  4:*1*
11:*13*  13:2  28:2, *17*,
*19*  60:*5*  67:*3*  72:*14*
**supported**  12:*20*, *22*
30:*3*
**supporting**  72:*24*
146:*19*  147:*11*
**supposed**  7:*10*  53:2
**sure**  17:*12*, *15*  23:*13*
37:*24*  38:*15*  44:22
46:*11*  51:*24*  54:*12*,

Case 1:19-cv-08927-GBD-SLC   Document 128-6   Filed 09/20/23   Page 67 of 79

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

*14* 79:9 121:2*0*
131:*10* 140:*20* 146:*3,
7* 151:6, *8*
surface 95:23 120:*13*
124:*21*
suspect 106:*24*
140:*21*
suspected 26:*3*
91:23 125:*19*
suspend 77:*10* 78:6
91:9, *17* 92:2
suspend/discipline
58:*5*
suspended 77:2*1*
88:2 89:*24* 90:2, *8,
13, 18, 20* 91:*4* 92:6
93:8 128:5 159:8
Suspension 3:*12*
76:*12* 77:*24* 90:*17*
127:*24*
suspicion 84:*17*
suspicious 27:22
66:*5, 8, 16* 94:*21*
100:9 120:8 124:*21*
125:2, *14, 20, 24*
swipe 128:*17*
sworn 5:*13* 6:*12*
synonymous 11:22
125:*9*
system 85:6, *8, 17, 24*
86:7, *8* 101:*15*

< T >
tactical 157:*12*
take 6:*17, 21* 7:*10,
11* 22:8 23:*19* 46:*24*
54:*3* 59:7 77:*13*
90:*17* 103:*15* 124:*10*
130:*1* 136:*24* 138:*10*
148:*20*
taken 1:*16* 6:*3* 7:7,
*14* 8:20 9:*11* 24:20
59:*11* 91:15 99:*13*
138:*14* 143:23 160:*5*
talk 8:*14* 9:24 11:*1*
32:*18* 51:7 102:*10*
132:12, *14*
talked 43:*13* 77:*4*
131:*24* 136:*11*
156:*13, 18* 159:*5*

talking 17:*11* 20:*15*
50:*13* 69:9, *11* 71:24
74:7 131:*1* 141:5, *7*
142:*3* 152:6, *7, 8*
tandem 101:*8*
target 133:*14*
task 86:2*1*
tasked 72:23
tax 79:22 92:22
93:*15* 94:*4, 5, 11, 16,
20* 96:*18* 97:*13*
115:*14* 117:6 122:7,
*24* 134:24 135:*2*
143:*2* 145:8, *17*
146:*2*
taxes 31:2 41:*11, 13,
17* 47:*15* 51:8 52:6
56:*4* 95:*11* 96:2
98:*4* 118:*1, 20*
120:*15* 123:*11*
139:*16, 21* 146:*10*
team 14:2*1* 16:*14, 18*
17:*1* 18:*8, 12* 19:*10*
20:22 21:20, *22* 22:*5*
26:*13, 23* 27:2, *5*
28:2, *3, 7, 17* 29:8, *21*
30:*3, 5* 31:*19* 32:2,
*21* 41:*19* 47:*24* 48:*4,
14, 17, 21* 50:20, *24*
51:*11* 61:8, *12* 62:*23,
24* 63:*2* 64:*3* 65:*19,
21* 67:*3, 6, 8, 10*
70:*21, 23* 72:23
74:*14, 15, 18, 20*
93:*14* 95:*10* 98:2, *9,
11, 22* 99:2 100:*1*
114:*23, 24* 128:2*1*
140:9, *14* 141:*9*
142:*3, 5, 6, 13* 144:*24*
156:*16* 157:*2*
teams 13:5, *19* 14:9,
*14* 15:*4* 64:*1* 67:*1, 2*
72:24 100:*11*
team's 140:*4*
Tech 2:*23*
technology 128:*15*
tell 6:*12* 49:*18*
104:*4* 122:*11* 125:2*1*
126:*17* 137:*10*
telling 148:*14*

ten 102:22 103:2*4*
110:*2*
terminate 21:*23*
22:*5* 41:*14* 58:*4*
terminated 21:*14*
29:*18* 40:9, *23* 41:5,
*7* 52:*11, 14* 53:*18*
57:*5* 58:*12, 19, 20*
82:*3* 86:*15, 16* 87:8,
*9* 117:4, *5, 10* 118:4,
*23* 120:2*1* 125:*17*
149:*1*
terminating 58:*11*
termination 82:6
117:9, *14* 147:6
terminations 52:20
terms 32:9 55:*17*
80:*16* 81:*16*
testified 5:*14* 9:*10,
12*
Texas 18:*23*
Thank 61:2*4* 71:*17*
119:*4* 137:*5* 138:*17*
159:*12*
theft 14:*19, 22* 18:*10*
26:*14* 48:6 53:*10*
91:2 98:*10, 22* 99:*5*
theoretically 66:*7*
thing 11:22 18:*12*
39:*21* 52:*12, 14* 55:8
86:*19* 115:*14* 121:7
123:*10* 140:*11* 158:*2*
things 32:*12* 39:*17*
46:*24* 51:*19* 53:*12*
59:20 86:*11* 95:5, *24*
111:*3, 10* 120:8
156:*20* 157:*7, 13*
think 7:*23* 16:*15*
17:*14* 21:*18* 24:5
33:20 41:*19* 42:5, *19*
59:8 66:*18* 68:20, *21*
83:*15* 86:6, *7* 94:*16*
97:6 104:*23* 105:*11*
110:*18* 116:*14*
121:*19* 124:*5* 125:*16,
21* 126:*7* 127:*20*
128:*10* 129:*12* 132:*4*
135:22 138:9 140:*16*
143:*15, 16* 146:*16*

153:*15* 154:24
thinking 138:*6*
third 105:*17*
third-party 139:*4, 16*
thirty 161:*15*
thought 22:*11* 39:*11*
92:2
thoughts 145:*2*
three 6:*1, 5* 7:*13*
9:*1, 2* 12:*13* 14:*17,
18* 110:2 155:6, *7, 14*
thumb 51:*23*
Thursday 1:*17*
tied 137:*14*
TIERNEY 2:*16* 3:*5*
5:*8* 8:*13* 9:23 10:9
13:*10* 17:*10, 14* 19:*3,
22* 20:*14* 22:*17*
25:*11, 24* 26:*10*
27:*10* 28:*12* 30:*1*
31:*6* 33:2, *13* 35:*7*
36:*19* 38:*18* 41:*8*
44:*5* 45:*11* 49:*15*
50:2 54:*1, 5* 56:*19*
58:7 59:*4* 60:22
61:*7* 63:*19* 66:*1, 12*
67:*16* 68:*17* 71:22
72:*3* 75:*12* 76:*19*
80:22 83:2 84:*3*
86:2 89:*4* 92:*12*
93:*16* 96:*19* 97:*14,
22* 98:*18* 99:*19*
104:2*1* 105:*1* 106:*11*
107:*15* 108:2, *9*
109:2*1* 111:2*1* 114:7
115:22 117:7 118:*6*
119:5, *11, 19, 20*
121:*15, 17* 123:*5*
124:6, *8, 15* 125:*3*
127:*16, 19* 129:*19*
132:20 133:*3* 135:*15*
136:6 137:*1, 7* 138:*8,
16* 141:*3, 11, 18*
142:*8* 143:*3, 13*
144:*1* 146:*8, 21*
147:2 148:*16* 152:*18*
154:*14* 159:*13*
time 5:*4* 11:*8, 14*
14:*18* 16:*3, 6, 16*
17:*9, 19, 20* 20:*16*

25:4  26:13  27:18
28:18  30:15, 17
32:14  34:9, 19, 22
35:5, 12, 16  36:9
37:4  38:13  40:6
41:10  43:14  48:5, 11,
17, 19, 22, 24  51:6
58:20  59:24  63:15,
18  72:16  78:7  81:13
90:16  92:5  93:11
95:9  96:15  99:3
102:14  103:3  105:18
106:4, 17  107:3
108:7  110:11  116:24
117:3, 4, 16  123:15,
16  124:16  125:23
132:16  133:7, 11, 15,
19  141:16, 19  151:21
152:7  155:23  158:21
**timeframe**  6:1  18:4
20:15  21:6  58:12
107:24  108:1  110:18
**times**  9:5  102:12
**timing**  68:1
**tip**  68:22
**today**  6:10  7:1
10:23  13:4  90:12
102:24  107:1  117:2
137:24  150:7, 13
**today's**  9:20  10:14
**told**  119:15  143:10
148:13
**tool**  84:13, 20
**top**  20:22  35:14
62:2  64:12  71:5
78:24  79:12  82:20
104:18  108:15  110:2
121:9  122:24  130:13
136:23  153:17
155:14  157:8
**total**  42:8  114:12
**totaled**  108:13
**totaling**  106:1
**town**  127:12
**towns**  127:11
**track**  24:4, 6  33:8,
11  85:24  86:8, 11, 12
145:1
**tracking**  48:9

**trade**  12:8, 9
**train**  157:11
**trained**  157:12, 20, 21
**training**  13:8, 13
14:2
**transaction**  37:22
39:23  42:1  44:20
54:21  65:11  83:23
93:24  94:1, 7, 22
114:10  126:16
128:20  129:6  133:20
**transactional**  126:16
**transactions**  24:10
26:19  30:23  32:10
35:15, 18, 20, 21, 24
36:23  37:8, 11  38:2
39:12, 14  40:13, 16
41:12, 18  42:4  54:20
55:18  56:3  57:11
68:3  74:11  78:5, 11
80:14  81:12, 14, 18,
20  83:12, 13, 18
84:16  95:1, 16  97:3
102:23  109:19  110:6
111:12  112:20  113:1,
10  114:17  115:2, 5
117:21  124:22  131:3
132:6  133:13  141:22,
24  142:17  149:8
155:16  156:7  157:9
**transcript**  5:7  160:6
161:16, 17
**transcription**  163:5
**trial**  5:4
**trials**  8:23
**tries**  125:10
**triggered**  107:23
**truth**  6:12
**truthfully**  6:24
**try**  45:15  46:4, 17
47:10  77:19  129:7
132:14  144:3
**trying**  10:16  51:2
73:23  110:7  112:21
113:15  132:4, 22
151:22
**turn**  49:7  53:10
77:11  78:6  105:16
147:8

**turned**  40:4, 20
53:20  56:7  80:9
91:5  93:9  110:4
135:22
**two**  32:12  39:17
50:12  68:4  77:18
95:5  106:23  111:3, 9
115:9  122:14  130:14
145:9  156:17, 20
**two-year**  17:23
**Tyndall**  2:23
**type**  13:8  14:6
18:12  19:8  26:20, 21
39:19  48:5  60:14
85:11  106:7  123:10
140:10, 11
**types**  24:9  41:18
53:12  59:19  91:22
104:6
**typical**  31:11  54:16
65:3  107:11, 13, 17
108:14  110:23
**Typically**  53:19
55:10  65:3  106:5
126:14  128:1  143:23
151:5

< U >
**U.S**  105:15
**ultimate**  50:13  53:13
87:2
**ultimately**  30:11
55:24  113:23  144:5
146:18
**unbeknownst**  105:19
**unblocked**  74:22
75:4, 7
**uncommon**  8:24
**uncovered**  93:1
158:6
**underneath**  127:2
153:20
**understand**  6:9, 14
7:5  45:3  47:10  93:3,
21  95:1  108:19
146:3
**understanding**  37:14
47:14  60:16  64:20
70:10  73:8  74:12
101:14  137:16, 18

151:8, 15  152:8, 11,
14
**understood**  112:3
**UNION**  1:9
**UNITED**  1:1, 8, 10
**unusual**  24:12  27:2
32:3, 19  42:10, 11
47:8, 11  67:23  73:10
75:21  92:20  94:24
95:15, 17, 20  103:18,
19, 24  106:9  108:5
109:3  110:22  144:22
**update**  22:23  34:12
63:21
**updated**  128:14
**upload**  129:13
**upper**  15:3
**UPS**  122:18  124:9
145:14
**use**  23:20  24:17, 22,
24  25:9, 16  38:6
66:23  84:13  92:16
126:1  136:16
**usually**  26:22  36:12,
13  69:18  77:18, 20
99:7  102:19  144:23
**utilize**  75:5  84:19
120:4
**utilized**  117:11
**utilizing**  86:5, 6

< V >
**validate**  134:7
**validated**  113:12
149:4
**validating**  148:20
**variables**  140:10
**variances**  60:14
**various**  8:23
**vendor**  8:5  141:7, 11
154:2
**vendors**  59:18  72:11
151:24
**Verbal**  6:8
**verification**  128:22
**verified**  129:4
**verify**  129:2, 8  154:6
**version**  101:14
**vetted**  37:13

Case 1:19-cv-08927-GBD-SLC    Document 128-6    Filed 09/20/23    Page 69 of 79

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**Vice**  2:*19*
**victim**  80:*14*
**video**  46:22  81:7, *12,*
*13, 19, 20, 22*
**videos**  81:*4*
**violate**  113:*17*
**violated**  60:*19*
118:*21*
**violating**  53:2, *3, 5, 6*
91:*23*  95:*13*  147:7
**violation**  30:*24*
43:*10*  45:20  52:*21,*
*24*  87:*10*  90:24  91:*1,*
*2*  93:*1, 7*  94:9  95:*4*
98:*17, 24*  102:*15, 18*
125:*1*  148:*1*  149:*18*
**violations**  19:9  26:*4,*
*5, 15*  48:7  52:*17, 23*
57:*14*  73:*13*  79:20
87:*1*  92:18  98:*12, 21*
118:24  120:*13, 16*
122:*16*  132:*18*
149:22
**virtual**  7:*23, 24*
**vision**  13:2
**volume**  133:*13*
**VP**  12:*21*
**vs**  1:*4*

**< W >**
**wait**  6:7, *19*
**waive**  123:9, *11, 19*
124:2
**waived**  123:*15*
146:*16*
**waiving**  123:*21*
**walk**  97:6
**walked**  97:5
**walks**  93:*24*  94:8, *10*
**want**  5:*10*  11:*15*
17:*15*  29:*17*  33:*11*
39:*4*  42:23  70:*12*
74:*10*  92:16  99:9, *10*
101:*7*  102:*21*  103:*3,*
*9, 24*  109:*10*  117:9
119:5  122:6  125:*4, 5,*
*6*  126:2  129:22
136:9  146:*3, 21, 24*
151:6

**wanted**  18:*23*  51:*23*
84:*18*  110:*15, 20*
135:8  141:*23*
**wanting**  97:7
**warning**  21:*13, 19*
**warnings**  22:*3*
**watch**  99:*24*
**waved**  123:2
**way**  18:*13*  24:*19*
53:*7*  74:*8*  87:*23*
94:*12, 13*  98:*12*  99:8
103:*17*  122:9  126:9
139:*18*  140:*16*
149:*12*  151:*15, 24*
153:8
**ways**  37:*20*  93:*19*
106:*21*  132:*23*  156:8
**wealth**  157:*16*
**week**  34:*13*
**weeks**  22:22  81:*11,*
*13*  106:*23*
**well**  10:*12*  13:*12*
14:8  16:7  24:*16*
26:*17*  31:*1*  39:*4*
41:*18*  42:*23*  45:*15*
48:*11*  50:*1*  57:*12*
63:*14*  77:*19, 20*  79:*3*
81:22  83:*12*  90:*20*
93:*18*  95:*14*  100:7
108:*21*  113:8  119:5
125:5  127:*1*  128:7,
*13*  130:*1*  133:5
135:*20*  150:*14, 19, 21*
152:7  154:*3*  157:*21*
158:*20*
**went**  101:*21, 22*
116:5  142:*12*  145:*1*
158:*20*
**we're**  6:8  44:*15*
45:*3, 4, 5, 19*  74:8
77:8  98:*10*  113:*15*
120:7  129:*12*  153:6
**west**  15:*3*
**we've**  59:*4*  93:6
128:*14*  137:*23*
**whatnot**  113:*9*
**White**  15:*24*
**WHOLESALE**  1:*9*
**wide**  67:2  71:*24*

**withdrawn**  9:*10*
10:*18*  12:2  18:*24*
19:*19*  23:9  25:*19*
34:*17*  36:*16*  42:*21*
43:*23*  46:*14*  47:*23*
51:*15*  54:9  55:*23*
56:*16*  60:*17*  67:*13*
73:*3*  76:*16*  79:*3*
85:22  89:*10*  90:*17*
99:*16*  100:*19*  107:*12*
115:*18*  116:22  140:*3,*
*24*
**WITNESS**  3:*2*  4:*2*
8:*13*  10:*11*  13:*12*
17:*17*  19:*5, 24*  20:*17*
22:*19*  25:*13*  26:*2, 12*
27:*13*  28:*14*  30:2
33:*4, 16*  35:*9*  36:*21*
38:20  41:*10*  44:7
49:*17*  50:*4*  56:*24*
58:9  60:*24*  61:*8*
63:*21*  66:*3, 14*  67:*18*
68:*18*  72:5  75:*14*
76:*20*  79:*1*  83:*4*
84:*5*  86:*4*  88:*16*
89:6  92:*14*  93:*18*
96:*20*  97:*16, 24*
98:*20*  106:*13*  107:*17*
108:*4, 10*  109:*23*
111:*23*  114:9  115:*24*
117:*8*  118:*8*  124:*18*
132:*3*  137:*5*  141:*12,*
*20*  142:*10*  143:*4, 18*
144:*2, 13, 14, 22, 23*
146:*9, 23*  147:*4*
148:*18*  152:*20*
159:*16*  161:*1*
**woman**  119:*17*
**wondering**  95:*9*
**word**  92:*16*
**worded**  128:2
**words**  66:*23*  98:*23*
**work**  8:*23*  10:*8*
23:*2*  29:*6, 8*  38:*17*
48:*13*  62:*24*  88:8
108:*15*  129:*14*  142:*6,*
*11*
**worked**  10:*11*  36:*8,*
*10*  48:*16*  58:2
149:*19*

**working**  11:2  29:*10,*
*21*  57:22
**works**  74:2  152:9
**would've**  34:*6*
**write**  53:*12*  71:*14*
144:*3, 5, 6*  145:*1, 4*
**write-offs**  130:*15*
**writing**  54:*3*  144:*23,*
*24*
**written**  79:*4, 15*
**wrong**  37:*3*  45:9, *17*
53:*1*  57:*24*  58:2
91:*24*  92:*1*
**wrongdoing**  91:*12*
103:*5, 8, 20*
**wrote**  62:*11, 13, 16*
79:6  144:*10, 12*

**< X >**
**X-Closet**  88:*21*  89:*1,*
*12, 17, 20*  150:2, *8, 16,*
*21*

**< Y >**
**Yeah**  6:*5*  7:*18*  8:*1,*
*11*  15:20  25:*13*
28:*19*  43:*16*  57:5
80:*12*  82:22  91:*10*
103:*16*  105:*1*  125:*19*
129:*23*  136:9, *20*
138:*11*  143:*21*
144:*21*  147:2  158:*23*
**year**  15:*23*  18:*21*
**years**  5:*24*  6:*5*  7:*14*
9:2, *5, 15*  11:*23*
13:*24*  15:*21*
**Yep**  153:*24*
**YORK**  1:*1, 7, 8*  2:*5*
7:*24*  12:8, *9, 11, 12*
13:*5, 6*  17:*5*  67:*8*
94:*17*  134:*24*
**Younis**  48:*23*
**Yup**  79:2, *14*  80:*5*
88:*24*
**YuYu**  78:*11, 14, 15*
88:*21, 22*  89:*20*
119:*17, 21*  121:*1, 19*
122:2, *19*  123:*13*
125:*15*  126:*3, 6, 20*
127:*1*  142:*24*  144:*20*

147:*20, 21*  148:*9*
150:*3, 8*  153:*17*

**< Z >**
**Zoom**  1:*16*  2:*22*

Case 1:19-cv-08927-GBD-SLC    Document 128-6    Filed 09/20/23    Page 71 of 79

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

## WORD LIST

**< $ >**
**$65,000** *(2)*
**$90,000** *(1)*

**< 0 >**
**00033** *(1)*
**001** *(1)*
**00116** *(1)*
**00119** *(1)*
**001952** *(1)*
**001955** *(1)*
**001966** *(1)*
**001971** *(1)*
**002004** *(1)*
**07004** *(1)*

**< 1 >**
**1** *(7)*
**10** *(1)*
**10:09** *(1)*
**100** *(3)*
**10119** *(1)*
**107** *(1)*
**11477** *(1)*
**119** *(1)*
**12** *(1)*
**129** *(1)*
**138** *(1)*
**13th** *(2)*
**1488** *(4)*
**1489** *(3)*
**15** *(1)*
**1555** *(1)*
**15th** *(1)*
**16** *(1)*
**165** *(1)*
**16th** *(1)*
**17** *(8)*
**18** *(1)*
**1954** *(5)*
**1955** *(1)*
**1956** *(1)*
**1957** *(3)*
**1964** *(1)*
**1965** *(2)*
**1966** *(1)*
**1971** *(1)*

**19-8927** *(1)*
**1st** *(2)*

**< 2 >**
**2** *(5)*
**2,500** *(2)*
**20** *(4)*
**2004** *(1)*
**2011** *(4)*
**2012** *(4)*
**2015** *(1)*
**2016** *(19)*
**2016/2017** *(1)*
**2016-17** *(4)*
**2016-2017** *(1)*
**2017** *(34)*
**2018** *(1)*
**2019** *(1)*
**2022** *(1)*
**21** *(3)*
**212** *(1)*
**21st** *(1)*
**22** *(1)*
**24** *(2)*
**26** *(5)*
**26th** *(1)*
**27,000** *(1)*

**< 3 >**
**3** *(4)*
**3:02** *(1)*
**30** *(2)*
**30th** *(1)*
**314** *(1)*
**3rd** *(2)*

**< 4 >**
**4** *(2)*
**400** *(1)*
**406** *(1)*
**4905** *(1)*
**4th** *(4)*

**< 5 >**
**5** *(2)*
**50** *(3)*
**53** *(1)*
**587-0760** *(1)*
**59** *(1)*

**59th** *(16)*

**< 6 >**
**6/3** *(1)*
**61** *(1)*
**63141** *(1)*
**65,000** *(2)*

**< 7 >**
**72061886** *(3)*
**76** *(1)*

**< 9 >**
**9/26/17** *(1)*
**919** *(2)*

**< A >**
**a.m** *(1)*
**a/k/a** *(1)*
**Abe** *(12)*
**ability** *(5)*
**able** *(5)*
**Abraham** *(6)*
**abreast** *(3)*
**Absolutely** *(7)*
**absolved** *(4)*
**abuse** *(18)*
**abusing** *(1)*
**access** *(1)*
**account** *(58)*
**accounts** *(10)*
**accurate** *(3)*
**accurately** *(1)*
**accusation** *(2)*
**accuse** *(1)*
**accused** *(3)*
**accusing** *(1)*
**ACKNOWLEDGMENT** *(1)*
**action** *(1)*
**actions** *(1)*
**actively** *(1)*
**activity** *(50)*
**actual** *(2)*
**additional** *(1)*
**address** *(30)*
**addresses** *(16)*
**administrative** *(3)*
**admission** *(1)*

**admit** *(1)*
**admits** *(1)*
**admitted** *(4)*
**admitting** *(2)*
**admonish** *(2)*
**advantage** *(1)*
**advertise** *(1)*
**advice** *(2)*
**AFL-CIO** *(1)*
**ago** *(6)*
**agree** *(2)*
**agreed** *(1)*
**agreeing** *(1)*
**ahead** *(2)*
**alert** *(1)*
**alerted** *(2)*
**Alex** *(7)*
**algorithm** *(12)*
**algorithms** *(8)*
**alleged** *(3)*
**allow** *(1)*
**allowed** *(2)*
**allowing** *(1)*
**allows** *(1)*
**Amador** *(1)*
**amount** *(18)*
**amounts** *(2)*
**analysis** *(1)*
**analysts** *(1)*
**and/or** *(4)*
**Angi** *(24)*
**Angi's** *(1)*
**Answer** *(66)*
**answered** *(3)*
**answering** *(2)*
**answers** *(3)*
**anybody** *(3)*
**anymore** *(1)*
**anyway** *(1)*
**AP** *(5)*
**APM** *(1)*
**apologize** *(2)*
**apparently** *(1)*
**appears** *(1)*
**applied** *(2)*
**apply** *(2)*
**appropriate** *(1)*
**approval** *(1)*
**approver** *(1)*

approximately *(4)*
April *(6)*
area *(3)*
areas *(1)*
arrested *(1)*
arrests *(2)*
asked *(11)*
asking *(17)*
aspect *(1)*
asset *(33)*
assigned *(1)*
assist *(2)*
assistance *(1)*
Assistant *(3)*
associate *(73)*
associated *(10)*
associates *(49)*
associate's *(2)*
assume *(1)*
assuming *(1)*
assumption *(10)*
assumptions *(1)*
attached *(6)*
attention *(1)*
attorney *(1)*
attorneys *(1)*
audit *(3)*
authenticity *(1)*
authority *(1)*
authorization *(1)*
authorized *(2)*
automatically *(1)*
available *(2)*
Avenue *(3)*
avoid *(14)*
avoidance *(3)*
avoiding *(3)*
aware *(9)*

< B >
back *(43)*
backs *(2)*
bad *(1)*
bag *(3)*
bags *(7)*
balance *(1)*
bank *(3)*
BARTON *(1)*
based *(29)*

basically *(3)*
basis *(1)*
bat *(1)*
Bates *(1)*
BECKER *(11)*
beginning *(1)*
behavior *(1)*
believe *(38)*
believed *(1)*
benefit *(5)*
benefited *(2)*
benefiting *(1)*
best *(1)*
better *(1)*
BETTY *(3)*
betty.tierney@macys.c
om *(1)*
Betty's *(1)*
beyond *(1)*
big *(3)*
bigger *(9)*
bimonthly *(1)*
bit *(4)*
biweek *(1)*
BLM *(6)*
block *(2)*
blocked *(9)*
BLOOMINGDALE'S
*(56)*
board *(1)*
BOBBY *(12)*
BOOKER *(11)*
Booker's *(1)*
Boston *(8)*
bottom *(6)*
bought *(1)*
boutique *(5)*
brand *(1)*
break *(8)*
brief *(6)*
briefly *(3)*
bring *(3)*
brought *(4)*
budget *(2)*
bulk *(1)*
bullet *(1)*
business *(11)*
buy *(6)*
buying *(1)*

buys *(2)*

< C >
Cabin *(1)*
call *(6)*
called *(4)*
calling *(2)*
card *(60)*
cards *(10)*
career *(2)*
carefully *(1)*
CARROTS *(1)*
Case *(51)*
caseload *(1)*
cases *(2)*
cash *(3)*
CASTELLANI *(19)*
catch *(2)*
catches *(1)*
category *(1)*
Cathy *(10)*
caught *(1)*
caused *(1)*
central *(16)*
certain *(11)*
Certainly *(7)*
CERTIFICATION
*(1)*
certify *(2)*
cetera *(16)*
Chanel *(60)*
Chanel's *(1)*
change *(6)*
changed *(4)*
changes *(2)*
Charge *(7)*
charged *(3)*
charges *(7)*
chat *(1)*
check *(9)*
checking *(2)*
checks *(1)*
China *(1)*
choice *(1)*
Chris *(18)*
Chris's *(1)*
Christina *(1)*
CHRISTOPHER *(14)*
Cincinnati *(2)*

Citibank *(3)*
City *(8)*
claim *(1)*
claimed *(1)*
claiming *(1)*
claims *(5)*
clarification *(1)*
clarify *(3)*
clarity *(1)*
clear *(4)*
close *(1)*
closed *(3)*
closest *(1)*
coat *(1)*
coded *(4)*
collected *(1)*
come *(18)*
comes *(6)*
comfort *(1)*
comfortable *(1)*
coming *(10)*
commencing *(1)*
Commission *(1)*
committed *(5)*
committing *(10)*
common *(6)*
communicate *(5)*
communicated *(1)*
communication *(11)*
communications *(1)*
company *(12)*
compare *(1)*
compensated *(3)*
competencies *(1)*
complain *(1)*
complainant *(1)*
complained *(2)*
complaining *(1)*
complaints *(3)*
completely *(3)*
complex *(2)*
complying *(1)*
component *(1)*
components *(2)*
compromised *(1)*
concern *(2)*
concerned *(1)*
concerns *(2)*
concluded *(3)*

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

conclusion *(11)*
conclusionary *(1)*
condensed *(1)*
condition *(1)*
conduct *(10)*
conducted *(4)*
conducting *(3)*
Conference *(1)*
confidential *(1)*
confirm *(2)*
confirmation *(1)*
confirmed *(10)*
connection *(1)*
Connelly *(1)*
consider *(1)*
consideration *(1)*
considerations *(1)*
considered *(1)*
consistency *(1)*
consistent *(3)*
constitute *(1)*
consult *(3)*
contact *(2)*
contained *(1)*
content *(1)*
continue *(6)*
continued *(2)*
continuing *(1)*
control *(2)*
conversation *(27)*
conversations *(9)*
coordination *(1)*
copied *(1)*
copy *(1)*
corner *(3)*
Corporate *(25)*
correct *(73)*
corrections *(3)*
correctly *(4)*
corroborating *(3)*
Counsel *(11)*
couple *(2)*
course *(4)*
COURT *(5)*
co-worker *(10)*
create *(5)*
creating *(1)*
credit *(44)*
crossover *(1)*

current *(4)*
currently *(6)*
customer *(15)*
customers *(13)*
cut *(1)*

< D >
d/b/a *(2)*
data *(14)*
database *(2)*
date *(6)*
dates *(1)*
David *(3)*
day *(1)*
days *(1)*
day-to-day *(1)*
December *(1)*
decision *(13)*
decision-makers *(1)*
deemed *(1)*
Defendant *(3)*
Defendants *(3)*
Defense *(1)*
define *(1)*
Definitely *(7)*
definition *(1)*
delayed *(1)*
DENNIS *(10)*
DEPARTMENT *(28)*
departments *(1)*
dependent *(1)*
depends *(1)*
DEPONENT *(1)*
deposed *(1)*
deposing *(1)*
deposition *(15)*
depositions *(1)*
DEREK *(1)*
describe *(2)*
described *(3)*
describing *(1)*
DESCRIPTION *(1)*
designer *(1)*
Detail *(5)*
detailed *(1)*
details *(14)*
detectives *(5)*
determination *(2)*
determine *(7)*

determined *(6)*
determining *(2)*
developing *(2)*
DIAZ *(3)*
difference *(2)*
different *(34)*
differently *(2)*
direct *(3)*
Direction *(1)*
directly *(8)*
director *(2)*
discharge *(1)*
disciplinary *(3)*
disciplined *(1)*
discount *(42)*
discounted *(3)*
discounts *(1)*
discovered *(1)*
discrepancy *(2)*
discussed *(1)*
discussing *(3)*
discussion *(15)*
discussions *(1)*
dishonest *(3)*
dishonesty *(4)*
disposition *(5)*
dispositioned *(1)*
dispositioning *(1)*
disprove *(1)*
disputing *(2)*
disregarded *(1)*
DISTRICT *(2)*
diversion *(12)*
divert *(2)*
diverter *(9)*
diverter-diversion *(1)*
diverters *(1)*
diverting *(5)*
diverts *(1)*
division *(6)*
divisions *(1)*
docs *(1)*
document *(36)*
documentation *(11)*
documented *(1)*
Documents *(6)*
doing *(9)*
dollar *(9)*
dollars *(2)*

Doris *(1)*
Dorothy *(1)*
download *(1)*
driving *(2)*
dug *(1)*
duly *(1)*
duties *(1)*

< E >
earlier *(7)*
early *(1)*
earning *(2)*
easier *(1)*
easiest *(1)*
eat *(1)*
e-commerce *(1)*
EEOC *(1)*
effect *(1)*
either *(5)*
elaborate *(1)*
electronic *(4)*
electronically *(1)*
element *(1)*
Email *(12)*
emails *(1)*
employed *(6)*
employee *(35)*
employees *(27)*
employee's *(4)*
employer *(1)*
employment *(4)*
ended *(2)*
ends *(1)*
enforcement *(10)*
ensure *(1)*
ensuring *(2)*
entail *(1)*
enter *(2)*
entered *(2)*
enterprise *(1)*
entitled *(2)*
entity *(2)*
entrance *(1)*
EOC *(1)*
Equal *(1)*
errata *(5)*
ESQUIRE *(3)*
estimate *(1)*
et *(16)*

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

evasion  *(5)*
events  *(4)*
evidence  *(7)*
ex  *(1)*
exact  *(11)*
exactly  *(7)*
**EXAMINATION**  *(3)*
examined  *(1)*
example  *(4)*
exception  *(39)*
exceptions  *(5)*
excessive  *(3)*
exchanged  *(1)*
exchanging  *(1)*
excuse  *(1)*
excused  *(1)*
execution  *(1)*
executive  *(1)*
executives  *(2)*
**EXHIBIT**  *(20)*
existing  *(1)*
expect  *(1)*
experience  *(6)*
experienced  *(1)*
explain  *(4)*
explained  *(1)*
explanation  *(6)*
exposure  *(1)*
expressed  *(1)*
extend  *(2)*
extent  *(2)*
extenuating  *(1)*
external  *(10)*

**< F >**
facilitate  *(3)*
facilitating  *(3)*
fact  *(13)*
facts  *(1)*
fail  *(1)*
Fair  *(1)*
Fairfield  *(1)*
familiar  *(7)*
far  *(10)*
February  *(6)*
fee  *(2)*
feel  *(3)*
feels  *(1)*
fees  *(7)*

field  *(4)*
figure  *(1)*
file  *(7)*
files  *(3)*
filled  *(1)*
filling  *(1)*
final  *(3)*
find  *(9)*
finding  *(3)*
findings  *(19)*
finds  *(1)*
fine  *(3)*
fire  *(1)*
first  *(20)*
firsthand  *(2)*
five  *(2)*
five-minute  *(1)*
flag  *(11)*
flagged  *(12)*
flags  *(6)*
flexibility  *(1)*
floor  *(2)*
fluctuates  *(1)*
focus  *(1)*
folder  *(2)*
folks  *(2)*
follow  *(11)*
followed  *(4)*
following  *(3)*
follows  *(1)*
force  *(1)*
foregoing  *(2)*
form  *(66)*
format  *(1)*
formatting  *(2)*
former  *(5)*
forms  *(1)*
forth  *(1)*
**FORTY**  *(2)*
forward  *(4)*
forwarded  *(4)*
forwarding  *(1)*
found  *(18)*
four  *(4)*
fraud  *(168)*
fraudulent  *(5)*
fraudulently  *(1)*
**FRED**  *(5)*
free  *(1)*

friends  *(1)*
front  *(6)*
full  *(2)*
fully  *(1)*
function  *(2)*
further  *(14)*
**FYI**  *(1)*

**< G >**
general  *(2)*
**GERBER**  *(1)*
getting  *(2)*
gift  *(2)*
**GILMAN**  *(1)*
give  *(9)*
given  *(7)*
gives  *(2)*
Giving  *(1)*
go  *(45)*
goes  *(8)*
going  *(64)*
Gonzalez  *(6)*
Good  *(9)*
gotten  *(2)*
grand  *(2)*
ground  *(1)*
**GROUP**  *(1)*
groups  *(3)*
guard  *(1)*
guards  *(2)*
Gucci  *(1)*
guess  *(16)*
guided  *(1)*
guys  *(1)*

**< H >**
Hac  *(1)*
Hampshire  *(5)*
hand  *(7)*
handbag  *(3)*
handbags  *(6)*
handing  *(1)*
handle  *(1)*
handled  *(2)*
handles  *(2)*
happen  *(12)*
happened  *(24)*
happening  *(9)*
happens  *(4)*

happy  *(1)*
harassment  *(7)*
head  *(2)*
header  *(1)*
heavily  *(1)*
held  *(2)*
help  *(3)*
helped  *(2)*
helps  *(1)*
Hey  *(5)*
high  *(7)*
highlights  *(1)*
hire  *(2)*
hired  *(3)*
histories  *(1)*
history  *(15)*
hold  *(1)*
holder  *(1)*
home  *(4)*
honest  *(2)*
Hopefully  *(2)*
hour  *(1)*
hours  *(2)*
house  *(15)*
**HR**  *(35)*
**HR/employee**  *(1)*
Human  *(3)*

**< I >**
**ID**  *(1)*
idea  *(2)*
identification  *(5)*
**Idress**  *(1)*
immediate  *(3)*
immediately  *(1)*
impact  *(2)*
impair  *(2)*
imperative  *(1)*
implicated  *(1)*
important  *(2)*
improper  *(1)*
incident  *(1)*
incidents  *(1)*
include  *(6)*
included  *(2)*
includes  *(1)*
including  *(5)*
inconsistent  *(1)*
**Incorporated**  *(4)*

incur (1)
incurring (9)
in-depth (1)
INDEX (1)
indicate (1)
indicating (1)
indications (1)
individual (3)
individually (5)
individuals (9)
individual's (2)
inform (2)
information (43)
initial (13)
initially (7)
initiate (1)
initiated (2)
initiating (1)
ink (1)
inquire (1)
insert (1)
instance (1)
instances (1)
instantaneous (1)
INSTRUCTIONS (1)
interact (1)
interaction (1)
interchangeably (1)
interest (1)
internal (14)
internally (1)
interpret (1)
INTERROGATION (1)
interrupt (3)
interrupted (1)
interview (5)
interviewed (1)
interviews (1)
introduce (1)
introduced (1)
inventory (1)
investigate (21)
investigated (27)
investigates (1)
investigating (11)
investigation (157)
investigations (61)
Investigative (7)

investigator (17)
investigators (6)
involve (2)
involved (18)
involvement (7)
involving (1)
issue (28)
issues (6)
item (1)
items (1)
its (1)

< J >
January (1)
Jeana (1)
jeans (1)
Jersey (4)
jogging (1)
journal (3)
jump (1)
June (9)
juries (1)
jury (1)

< K >
keep (10)
keeps (1)
kept (2)
key (3)
kicked (2)
kind (9)
knew (1)
know (120)
knowledge (7)
knowledgeable (1)
known (1)
Kori (3)
KRISTINA (102)
Kristina's (21)

< L >
Lai (9)
lapse (1)
large (2)
larger (1)
LAW (16)
lawsuit (3)
leader (2)
leaders (1)

leadership (9)
leading (1)
learn (1)
learned (1)
lease (1)
leased (1)
leave (3)
led (4)
Lee (27)
Lee's (5)
left (6)
level (3)
levels (1)
liaison (4)
LINE (13)
lines (1)
liquidate (1)
list (5)
listed (1)
LITIGATION (1)
little (7)
live (4)
lives (1)
LLP (1)
LOCAL (3)
located (2)
location (9)
locations (2)
logical (1)
long (3)
longer (5)
look (85)
looked (25)
looking (39)
looks (25)
loop (2)
loss (5)
lot (11)
lots (2)
Louis (1)
loyalist (11)

< M >
ma'am (1)
MACY'S (52)
mailed (1)
maintained (1)
major (1)
maker (1)

makers (1)
making (9)
manage (8)
managed (1)
management (5)
manager (17)
managers (9)
manages (1)
managing (4)
Manhattan (1)
manual (1)
mark (2)
marked (5)
market (1)
Marothy (1)
Marvin (1)
match (1)
matches (1)
matter (1)
MCCS (5)
mean (37)
meaning (5)
means (12)
meant (1)
measure (1)
medication (2)
meet (1)
MELISSA (6)
melissa@dereksmithla
w.com (1)
member (1)
memo (14)
memory (12)
MENDOZA (121)
mental (1)
mention (3)
mentioned (8)
mentions (1)
merchandise (18)
merge (1)
merged (3)
merit (1)
MIKHAYLOVA (26)
Mikhaylova's (8)
million (1)
mindset (1)
minutes (3)
misconduct (3)
misheard (1)

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

**Missouri**  *(1)*
**model**  *(1)*
**moment**  *(1)*
**money**  *(2)*
**monitor**  *(1)*
**monitoring**  *(1)*
**monitors**  *(1)*
**months**  *(11)*
**morning**  *(2)*
**morphed**  *(1)*
**move**  *(5)*
**moved**  *(2)*
**multiple**  *(13)*
**multistep**  *(1)*
**mutual**  *(1)*

**< N >**
**name**  *(8)*
**named**  *(3)*
**names**  *(3)*
**nature**  *(1)*
**necessarily**  *(7)*
**necessary**  *(2)*
**need**  *(17)*
**needed**  *(9)*
**needs**  *(3)*
**never**  *(4)*
**NEW**  *(34)*
**newly**  *(1)*
**NH**  *(1)*
**nonemployees**  *(1)*
**noninvestigatory**  *(1)*
**non-rehirable**  *(2)*
**norm**  *(2)*
**normal**  *(8)*
**normally**  *(2)*
**Notary**  *(2)*
**noted**  *(3)*
**notes**  *(9)*
**notice**  *(1)*
**notification**  *(2)*
**November**  *(1)*
**NUMBER**  *(41)*
**numbers**  *(5)*
**numerous**  *(1)*
**NYPD**  *(2)*

**< O >**
**oath**  *(1)*

**Object**  *(59)*
**Objection**  *(12)*
**objections**  *(1)*
**observations**  *(1)*
**obvious**  *(1)*
**obviously**  *(5)*
**occurrence**  *(1)*
**occurring**  *(4)*
**October**  *(4)*
**office**  *(5)*
**offices**  *(1)*
**Oh**  *(2)*
**Ohio**  *(1)*
**Okay**  *(298)*
**old**  *(2)*
**Olde**  *(1)*
**older**  *(1)*
**once**  *(6)*
**ongoing**  *(3)*
**open**  *(3)*
**opened**  *(2)*
**operate**  *(1)*
**opinion**  *(5)*
**opinions**  *(1)*
**opportunity**  *(4)*
**opt**  *(1)*
**Oral**  *(1)*
**order**  *(14)*
**ordering**  *(1)*
**orders**  *(6)*
**organization**  *(10)*
**organized**  *(3)*
**original**  *(2)*
**Orya**  *(1)*
**outlets**  *(1)*
**outlier**  *(1)*
**outside**  *(6)*
**overall**  *(10)*
**overnight**  *(1)*
**oversee**  *(1)*
**overseeing**  *(1)*
**overview**  *(2)*
**owned**  *(1)*
**owner**  *(2)*
**ownership**  *(1)*

**< P >**
**p.m**  *(1)*
**P/O**  *(1)*

**P-1**  *(2)*
**P-2**  *(2)*
**P-3**  *(3)*
**P-4**  *(3)*
**PAGE**  *(28)*
**pages**  *(1)*
**paid**  *(9)*
**Pantoliano**  *(1)*
**paper**  *(2)*
**paragraph**  *(7)*
**parameter**  *(1)*
**parameters**  *(16)*
**Part**  *(87)*
**participate**  *(1)*
**particular**  *(14)*
**parties**  *(1)*
**partner**  *(2)*
**partnered**  *(1)*
**partnering**  *(1)*
**partnership**  *(1)*
**partnerships**  *(1)*
**parts**  *(1)*
**Passaic**  *(1)*
**passed**  *(1)*
**paying**  *(7)*
**pending**  *(2)*
**Penn**  *(1)*
**people**  *(10)*
**percent**  *(5)*
**performance**  *(1)*
**perimeter**  *(1)*
**period**  *(7)*
**permission**  *(3)*
**perpetrate**  *(1)*
**perpetrating**  *(1)*
**person**  *(19)*
**personal**  *(10)*
**personally**  *(4)*
**personnel**  *(1)*
**person's**  *(1)*
**perspective**  *(6)*
**phone**  *(9)*
**phones**  *(1)*
**phrase**  *(2)*
**physical**  *(3)*
**physically**  *(2)*
**pick**  *(1)*
**picked**  *(1)*
**picks**  *(1)*

**piece**  *(6)*
**pieces**  *(2)*
**place**  *(12)*
**placing**  *(1)*
**Plains**  *(1)*
**Plaintiff**  *(4)*
**Plaintiff's**  *(5)*
**play**  *(2)*
**Plaza**  *(1)*
**please**  *(6)*
**PLLC**  *(1)*
**point**  *(22)*
**points**  *(6)*
**police**  *(2)*
**policies**  *(6)*
**policy**  *(59)*
**policy-type**  *(1)*
**pop**  *(1)*
**popped**  *(3)*
**pops**  *(3)*
**popular**  *(1)*
**portion**  *(1)*
**position**  *(17)*
**positions**  *(2)*
**possible**  *(10)*
**post-employee**  *(1)*
**potential**  *(20)*
**potentially**  *(5)*
**predominantly**  *(1)*
**pre-employee**  *(1)*
**prepare**  *(1)*
**prescription**  *(2)*
**present**  *(15)*
**presented**  *(2)*
**prevent**  *(2)*
**prevention**  *(4)*
**previous**  *(4)*
**previously**  *(2)*
**price**  *(2)*
**pricing**  *(1)*
**primary**  *(3)*
**prior**  *(2)*
**priorities**  *(1)*
**prioritizing**  *(1)*
**priority**  *(2)*
**privileged**  *(1)*
**Pro**  *(1)*
**probably**  *(5)*
**problem**  *(2)*

problems *(1)*
procedure *(5)*
procedures *(2)*
proceedings *(1)*
process *(57)*
processes *(5)*
produced *(1)*
product *(5)*
Production *(1)*
products *(1)*
professional *(2)*
profit *(1)*
program *(3)*
programs *(5)*
progress *(1)*
promoted *(2)*
promotional *(2)*
promotions *(1)*
proof *(1)*
propounded *(1)*
Prosecutable *(1)*
prosecuted *(4)*
protect *(1)*
protection *(32)*
protections *(1)*
prove *(9)*
provide *(1)*
provided *(8)*
proving *(3)*
provision *(1)*
Public *(2)*
pull *(9)*
pulled *(1)*
purchase *(41)*
purchased *(5)*
purchases *(57)*
purchasing *(5)*
purpose *(2)*
purposes *(5)*
purview *(4)*
put *(16)*
putting *(2)*

< Q >
qualify *(1)*
quantity *(1)*
question *(31)*
questioned *(3)*
questions *(25)*

quotes *(1)*

< R >
raise *(1)*
raised *(1)*
ran *(1)*
random *(1)*
rang *(14)*
ranked *(2)*
ranking *(2)*
rate *(1)*
rates *(3)*
reach *(4)*
reaching *(1)*
reacting *(1)*
read *(13)*
reading *(3)*
reads *(1)*
realize *(1)*
really *(4)*
reason *(19)*
reasons *(8)*
reassigned *(1)*
recall *(123)*
receipt *(4)*
receipts *(2)*
receive *(1)*
received *(4)*
recollection *(13)*
recommendation *(1)*
recommendations *(2)*
record *(13)*
recurring *(1)*
red *(18)*
re-education *(1)*
reference *(3)*
referencing *(3)*
referring *(3)*
refers *(1)*
reflect *(1)*
refresh *(6)*
refused *(1)*
regarding *(7)*
regards *(1)*
regions *(1)*
regular *(1)*
related *(4)*
relating *(2)*
relation *(1)*

relations *(2)*
Relationships *(1)*
relevance *(2)*
relevant *(4)*
relies *(1)*
remember *(19)*
remembered *(1)*
remembering *(1)*
renting *(1)*
repeat *(3)*
rephrase *(6)*
replace *(1)*
report *(43)*
reported *(4)*
REPORTER *(2)*
reporting *(12)*
reports *(14)*
Request *(2)*
requesting *(1)*
requests *(2)*
required *(4)*
resell *(3)*
reseller *(13)*
resellers *(3)*
reselling *(39)*
reserve *(1)*
reserved *(2)*
resigned *(1)*
resigns *(1)*
resold *(1)*
resolution *(2)*
resolved *(1)*
Resources *(4)*
respect *(7)*
respective *(1)*
respond *(2)*
responding *(1)*
responds *(1)*
responses *(1)*
responsibilities *(4)*
responsibility *(4)*
responsible *(15)*
rest *(1)*
restate *(1)*
result *(3)*
resulting *(2)*
results *(9)*
RETAIL *(1)*
retailers *(1)*

retained *(1)*
return *(1)*
reveals *(1)*
reverse *(1)*
Review *(20)*
reviewed *(7)*
revisit *(1)*
reward *(4)*
rewards *(3)*
Rey *(2)*
RICHARD *(1)*
Right *(85)*
right-hand *(4)*
ring *(4)*
ringer *(1)*
ringing *(8)*
rise *(1)*
Road *(2)*
role *(4)*
role/responsibilities *(1)*
roll *(1)*
room *(3)*
RPR *(2)*
rule *(1)*
rules *(4)*
run *(4)*
rung *(5)*
running *(1)*
RWDSU/UFCW *(1)*

< S >
safety *(1)*
sale *(11)*
sales *(23)*
sat *(3)*
saw *(6)*
saying *(33)*
says *(51)*
scenario *(1)*
scheme *(2)*
scope *(1)*
screen *(8)*
se *(1)*
second *(5)*
Secondarily *(1)*
section *(1)*
security *(3)*
see *(73)*

Case 1:19-cv-08927-GBD-SLC   Document 128-6   Filed 09/20/23   Page 78 of 79

Deposition of Fred Becker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

seeing  (5)
seen  (14)
sell  (2)
sellers  (2)
selling  (6)
sells  (1)
send  (14)
sender  (4)
sender's  (1)
sending  (9)
sends  (2)
sense  (2)
sent  (26)
sentence  (2)
separate  (20)
separated  (1)
separately  (1)
September  (2)
serial  (2)
serialized  (1)
serves  (4)
service  (5)
services  (15)
set  (1)
settled  (2)
sexual  (7)
sgerber@bglaw.com
 (1)
Shanine  (1)
share  (5)
sheet  (5)
ship  (4)
shipped  (13)
shipping  (21)
ships  (4)
shop  (3)
shoplifter  (1)
shoplifters  (2)
short  (2)
shortage  (1)
show  (5)
showed  (2)
showing  (1)
side  (3)
sign  (2)
signatures  (1)
significance  (7)
significant  (1)
signing  (1)

similar  (2)
similarly  (1)
simple  (3)
simply  (1)
simultaneously  (1)
single  (2)
sit  (1)
sitting  (1)
six  (2)
six-month  (1)
Skinner  (2)
small  (1)
SMITH  (1)
Soho  (9)
sold  (1)
solving  (1)
somebody  (5)
somebody's  (1)
something's  (1)
soon  (1)
sorry  (7)
sort  (5)
sorted  (1)
sounds  (6)
source  (1)
SOUTHERN  (1)
space  (2)
span  (1)
speak  (10)
speaking  (3)
specialized  (1)
specific  (18)
specifically  (12)
spend  (2)
spending  (1)
spends  (2)
spent  (3)
spoke  (9)
spoken  (2)
spouse  (1)
spring  (1)
St  (1)
staff  (1)
stage  (1)
standard  (4)
standards  (1)
standpoint  (4)
start  (7)
started  (12)

starting  (5)
starts  (1)
state  (23)
stated  (12)
statement  (24)
statements  (2)
STATES  (5)
stating  (1)
status  (2)
steal  (1)
stealing  (1)
stenographic  (1)
steps  (1)
Steve  (1)
STEVEN  (1)
stipulated  (1)
STIPULATIONS  (1)
stop  (2)
STORE  (32)
stores  (6)
STOREWORKERS
 (2)
straight  (1)
strategies  (2)
Street  (17)
strictly  (3)
strike  (2)
structured  (1)
subheading  (1)
subject  (2)
substance  (1)
substantiate  (1)
sudden  (3)
suffer  (1)
suggestions  (1)
Suite  (1)
summary  (14)
supervising  (2)
supervisors  (1)
SUPPORT  (9)
supported  (3)
supporting  (3)
supposed  (2)
sure  (18)
surface  (3)
suspect  (2)
suspected  (3)
suspend  (5)
suspend/discipline  (1)

suspended  (13)
Suspension  (5)
suspicion  (1)
suspicious  (12)
swipe  (1)
sworn  (2)
synonymous  (2)
system  (7)

< T >
tactical  (1)
take  (17)
taken  (13)
talk  (8)
talked  (7)
talking  (15)
tandem  (1)
target  (1)
task  (1)
tasked  (1)
tax  (21)
taxes  (18)
team  (81)
teams  (10)
team's  (1)
Tech  (1)
technology  (1)
tell  (7)
telling  (1)
ten  (3)
terminate  (4)
terminated  (27)
terminating  (1)
termination  (4)
terminations  (1)
terms  (4)
testified  (3)
Texas  (1)
Thank  (6)
theft  (10)
theoretically  (1)
thing  (12)
things  (15)
think  (39)
thinking  (1)
third  (1)
third-party  (2)
thirty  (1)
thought  (3)

Deposition of Fred Becker                                  Kristina Mikhaylova v. Bloomingdale's Inc., et al.

| | | | |
|---|---|---|---|
| thoughts *(1)* | < U > | violation *(21)* | write *(7)* |
| three *(12)* | U.S *(1)* | violations *(20)* | write-offs *(1)* |
| thumb *(1)* | ultimate *(3)* | virtual *(2)* | writing *(3)* |
| Thursday *(1)* | ultimately *(5)* | vision *(1)* | written *(2)* |
| tied *(1)* | unbeknownst *(1)* | volume *(1)* | wrong *(8)* |
| TIERNEY *(106)* | unblocked *(3)* | VP *(1)* | wrongdoing *(4)* |
| time *(79)* | uncommon *(1)* | vs *(1)* | wrote *(6)* |
| timeframe *(8)* | uncovered *(2)* | | |
| times *(2)* | underneath *(2)* | < W > | < X > |
| timing *(1)* | understand *(10)* | wait *(2)* | X-Closet *(9)* |
| tip *(1)* | understanding *(15)* | waive *(4)* | |
| today *(11)* | understood *(1)* | waived *(2)* | < Y > |
| today's *(2)* | UNION *(1)* | waiving *(1)* | Yeah *(23)* |
| told *(3)* | UNITED *(3)* | walk *(1)* | year *(2)* |
| tool *(2)* | unusual *(24)* | walked *(1)* | years *(11)* |
| top *(18)* | update *(3)* | walks *(3)* | Yep *(1)* |
| total *(2)* | updated *(1)* | want *(31)* | YORK *(17)* |
| totaled *(1)* | upload *(1)* | wanted *(8)* | Younis *(1)* |
| totaling *(1)* | upper *(1)* | wanting *(1)* | Yup *(4)* |
| town *(1)* | UPS *(3)* | warning *(2)* | YuYu *(26)* |
| towns *(1)* | use *(12)* | warnings *(1)* | |
| track *(10)* | usually *(9)* | watch *(1)* | < Z > |
| tracking *(1)* | utilize *(3)* | waved *(1)* | Zoom *(2)* |
| trade *(2)* | utilized *(1)* | way *(18)* | |
| train *(1)* | utilizing *(2)* | ways *(5)* | |
| trained *(3)* | | wealth *(1)* | |
| training *(3)* | < V > | week *(1)* | |
| transaction *(16)* | validate *(1)* | weeks *(4)* | |
| transactional *(1)* | validated *(2)* | well *(41)* | |
| transactions *(64)* | validating *(1)* | went *(6)* | |
| transcript *(4)* | variables *(1)* | we're *(13)* | |
| transcription *(1)* | variances *(1)* | west *(1)* | |
| trial *(1)* | various *(1)* | we've *(4)* | |
| trials *(1)* | vendor *(4)* | whatnot *(1)* | |
| tries *(1)* | vendors *(3)* | White *(1)* | |
| triggered *(1)* | Verbal *(1)* | WHOLESALE *(1)* | |
| truth *(1)* | verification *(1)* | wide *(2)* | |
| truthfully *(1)* | verified *(1)* | withdrawn *(32)* | |
| try *(8)* | verify *(3)* | WITNESS *(79)* | |
| trying *(9)* | version *(1)* | woman *(1)* | |
| turn *(6)* | vetted *(1)* | wondering *(1)* | |
| turned *(9)* | Vice *(1)* | word *(1)* | |
| two *(16)* | victim *(1)* | worded *(1)* | |
| two-year *(1)* | video *(7)* | words *(2)* | |
| Tyndall *(1)* | videos *(1)* | work *(13)* | |
| type *(14)* | violate *(1)* | worked *(6)* | |
| types *(6)* | violated *(2)* | working *(4)* | |
| typical *(8)* | violating *(7)* | works *(2)* | |
| Typically *(8)* | | would've *(1)* | |