# EXHIBIT 8

Case 1:19-cv-08927-GBD-SLC  Document 128-8  Filed 09/20/23  Page 2 of 43

Deposition of Bobby Booker                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

```
 1                   UNITED STATES DISTRICT COURT

 2                   SOUTHERN DISTRICT OF NEW YORK

 3

 4   KRISTINA MIKHAYLOVA,

 5        Plaintiff,

 6   v.                                   CASE NO. 19-8927

 7   BLOOMINGDALE'S, INC. BLOOMINGDALE'S,

 8   INC., et al.,

 9        Defendants.

10   _____

11

12             **********************************

13             REMOTE DEPOSITION OF BOBBY BOOKER

14                     MARCH 3, 2023

15             **********************************

16

17             REMOTE DEPOSITION OF BOBBY BOOKER taken via Zoom

18   in the above-styled and numbered cause on March 3, 2023,

19   commencing at 10:37 a.m. Eastern Standard Time, before Gina

20   Williams, Registered Professional Reporter, Certified

21   Realtime Reporter, and Certified Realtime Captioner.

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3    On behalf of Plaintiff:

 4         DEREK SMITH LAW GROUP, PLLC
           One Penn Plaza, Suite 4905
 5         New York, New York 10119
      By:  MELISSA MENDOZA, ESQUIRE
 6         melissa@dereksmithlaw.com

 7

 8
      On behalf of Defendants and Witness:
 9

10         KANE RUSSELL COLEMAN LOGAN
           Bank of America Plaza
11         901 Main Street, Suite 5200
           Dallas, Texas 75202
12    By:  BRUCE M. FLOWERS, ESQUIRE
           bflowers@krcl.com
13

14

15    ALSO PRESENT:  BETTY TIERNEY, ESQUIRE
                      Associate General Counsel, Macy's
16                    St. Louis, Missouri
                      betty.tierney@macys.com.
17
      LEGAL VIDEO TECHNICIAN:  ANDREW WHITNER
18

19

20

21

22

23          QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
                NECESSARILY REFLECT A DIRECT QUOTE
24

25
```

Case 1:19-cv-08927-GBD-SLC   Document 128-8   Filed 09/20/23   Page 4 of 43

Deposition of Bobby Booker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

```
 1                        I N D E X

 2   WITNESS                                          PAGE

 3   BOBBY BOOKER

 4   Examination by Ms. Mendoza                        4

 5                        - - - -

 6                    E X H I B I T S

 7   Number
```

```
 8      Exhibit 1   Photograph                         31

 9      Exhibit 2   Photograph                         35

10      Exhibit 3   Employee Handbook, Bates BLM001021  52
                    through _1086
11
        Exhibit 4   Amended Complaint                   66
12
        Exhibit 5   Video, Bates _2180                  69
13
        Exhibit 6   Video, Bates _2181                  69
14
```

```
15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Bobby Booker

Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 4

1  WHEREUPON,
2           BOBBY BOOKER
3  was called as a witness and, after having been first duly
4  sworn, was deposed and testified as follows:
5  EXAMINATION
6  BY MS. MENDOZA:
7      Q    Good morning.  Thank you, Mr. Booker.  I
8  apologize for the technical difficulties.
9           I am Melissa Mendoza.  I am the attorney for
10 Kristina Mikhaylova.  She is the plaintiff in this case
11 against Bloomingdale's.
12          Do you know who Kristina Mikhaylova is?
13     A    I don't recall who that is.
14     Q    Okay.  Did you work at Bloomingdale's?
15     A    I did.
16     Q    When did you work at Bloomingdale's?
17     A    I believe --
18          I'm not sure of months, but I believe the 59th
19 Street store, somewhere between 2016.  I believe I left that
20 store around 2017.
21     Q    Okay.  And I'll get back to Kristina in a moment.
22 But before I go there, I just want to ask you -- go over a
23 few ground rules.
24          Have you ever had your deposition taken before?
25     A    No.

Page 5

1      Q    No, okay.
2           So I will be asking you questions, and you must
3  answer them truthfully.  As you know, you are under oath;
4  correct?
5      A    Yes.
6      Q    You understand, okay.
7           And although a judge is not present, this as
8  formal as if we were in front of a judge in a courtroom or
9  in front of a jury.
10          Do you understand that?
11     A    Yeah.
12     Q    And because the court reporter is taking down
13 everything that we say, it's very important that you respond
14 with verbal responses, okay?
15     A    Okay.
16     Q    And if you do not understand any of my questions,
17 I just ask that you please let me know, and I'm more than
18 happy to rephrase the question, okay?
19     A    Okay.
20     Q    And are you aware of any reason that might impair
21 or prevent you from fully or truthfully answering my
22 questions today?
23     A    No.
24     Q    Do you suffer from any condition, either mental
25 or physical, that may prevent you from fully and truthfully

Page 6

1  answering my questions today?
2      A    No.
3      Q    Have you taken any prescription medication
4  otherwise in the past 24 hours?
5      A    No.
6      Q    Were you supposed to take any prescription
7  medication in the past 24 hours, but did not?
8      A    No.
9      Q    If you need to take a break, just let me know.
10 I'm more than happy to.  I'd just ask that you answer the
11 last question that was asked, okay?
12     A    Got it.
13     Q    Okay.  Are you represented by counsel today?
14     A    I am.
15     Q    And how did you locate your present attorney?
16     A    Macy's provided.
17     Q    Okay.  Is Macy's paying your legal expenses?
18     A    I'm not paying anything.
19     Q    Okay.  Tell me how you prepared for today's
20 deposition.
21          Did not disclose any confidential information
22 discussed between you and your attorney.
23     A    I discussed with my attorney that there was a
24 deposition, and he gave me whatever information he had, and
25 we talked about what time I need to show up.

Page 7

1      Q    Okay.  And did you review any documents in this
2  case?
3      A    I did not.
4      Q    Okay.  Did you discuss this --
5           Withdrawn.
6           Did you prepare for today's deposition with
7  anyone else besides your attorney?
8      A    No.
9      Q    Did you speak with anyone else regarding today's
10 deposition besides your attorney?
11     A    No.
12     Q    And have you spoken to any of your former
13 co-workers from Bloomingdale's in regards to this case?
14     A    Yes.
15     Q    Who did you speak with?
16     A    I spoke with Fred Becker, who put me in contact
17 with Macy's legal team.
18     Q    Okay.  And when was that?
19     A    Maybe two weeks ago -- two or three weeks ago.
20     Q    And did you discuss any details about the case?
21     A    No.
22     Q    Okay.  All right.  Have you ever testified in a
23 case before?
24     A    No.
25     Q    Have you ever been a plaintiff in a lawsuit?

Deposition of Bobby Booker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 8

1   A   No.
2   Q   Have you ever been a defendant?
3   A   No.
4   Q   Have you ever been arrested?
5   A   No.
6   Q   Okay.  Now just some background questions about
7   you.
8       Have you ever gone by any other names?
9   A   No.
10  Q   Okay.  So your full name is Bobby Booker; is that
11  correct?
12  A   Full name is Bobby Roy Booker, III.
13  Q   Okay.  And then you've gone by the name Bobby;
14  correct?
15  A   That's correct.
16  Q   And what is your date of birth?
17  A   January 3, '84.
18  Q   And your place of birth?
19  A   Dallas, Texas.
20  Q   And where is your current home address?
21      What is your current home address?
22  A   9631 Kerrville Street, Dallas, Texas.
23  Q   Do you own or rent?
24  A   Own.
25  Q   How long have you lived there?

Page 9

1   A   You cut out.
2   Q   How long have you lived there?
3   A   I've had the address for maybe 20-something
4   years.
5   Q   Okay.  When you say you've had the address, what
6   do you mean by that?
7   A   I mean that at one point I didn't live in Texas,
8   but I still had that -- that's always been my home address.
9   Q   So do your parents live there?
10      Did your parents live --
11  A   I had the home, and I went into the military, and
12  I wasn't stationed in Texas, and I'm back home in Dallas,
13  and that is my house.  I live there.
14  Q   Okay.  Where did you live before --
15      Yeah.
16      Do you have any other residences?
17  A   No.
18  Q   At one point were you living in New Jersey?
19  A   Yes.
20  Q   When was that?
21  A   When I left the Bloomingdale's store, 59th
22  Street, so sometime in 2017, 2018.
23  Q   Okay.  Where did you move to?
24  A   You mean when I left New Jersey?
25  Q   Yes?

Page 10

1   A   When I left New Jersey, I moved to Texas.
2   Q   That 9631 address?
3   A   Correct.
4   Q   Okay.  So during your employment with
5   Bloomingdale's, you were living at the New Jersey address;
6   is that correct?
7   A   Yes.
8   Q   Okay.  Were you living at any other address?
9   A   When I initially --
10      So their service stores that I worked for with
11  Bloomingdale's, when I worked at the 59th Street store, I
12  believe I initially lived in maybe Manhattan, and then I
13  moved to New Jersey somewhere in that tenure before I left
14  Manhattan -- or before I left the 59th Street store.
15  Q   Okay.  All right.  So we'll backtrack a little
16  bit.
17      So when did you --
18      What other store did you work at for
19  Bloomingdale's?
20  A   I worked at the 59th Street store initially in
21  Manhattan, and maybe for a year, if that long.  And I left
22  that store, I want to say I believe 2017 and worked in -- or
23  maybe it was 2016, I'm not sure -- and worked in New Jersey,
24  the New Jersey store.  I believe it's called Short Hills, if
25  I'm not mistaken.

Page 11

1   Q   Okay.  Are you married?
2   A   I am.
3   Q   And have you been married before?
4   A   I have, yes.
5   Q   Okay.  And so what is the name of your current
6   spouse?
7   A   Victoria.
8   Q   Okay.  And when did you and Victoria get married?
9   A   Maybe 2021.
10  Q   Okay.  And where did you get married?
11  A   Dallas.
12  Q   And are you currently living together?
13  A   We are.
14  Q   And before that when were you married --
15      Withdrawn.
16      Before that, when did you get a divorce?
17  A   I believe 2019.
18  Q   Okay.  And who were you married to?
19  A   A woman named Gillian.
20  Q   And when did you get married to Gillian?
21  A   Maybe 2014.
22      I don't recall.
23  Q   Okay.  And where did you live with Gillian?
24  A   We lived in North Carolina, Virginia, and then
25  New York and New Jersey.

Deposition of Bobby Booker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 12

1  Q   Okay.  And did you --
2      So in 2019 when you --
3      Withdrawn.
4      Did you stop living together at a certain point?
5  A   No.
6  Q   Okay.  So in 2019 were you living with Gillian?
7  A   Yes.
8  Q   Okay.  And where were you living at that time?
9  A   We were in Texas.
10 Q   Okay.  Was there any infidelity?
11 A   No.
12 Q   Did you have an open marriage?
13 A   No.
14 Q   And before your marriage to Gillian, were you
15 married before that?
16 A   Yes.
17 Q   And who were you married to?
18 A   A lady named Kendra.
19 Q   And when did you marry Kendra?
20 A   That's maybe --
21     I'm not sure.
22     Early 2000s.
23 Q   Okay.  And then when did you get a divorce?
24 A   Mid-2000s.
25     No idea.

Page 13

1  Q   If you married Gillian in 2014, was it well
2  before that --
3  A   Yes.
4  Q   -- your divorce?
5      Did any of these relationships overlap?
6  A   No.
7  Q   Okay.  So you were not seeing any of these women
8  at the same time?
9  A   That's correct.
10 Q   Was there any infidelity by either party in any
11 of these marriages?
12 A   No.
13 Q   Okay.  And before Kendra, were you married before
14 that?
15 A   No.
16 Q   Okay.  So during your employment at
17 Bloomingdale's 2016 to 2017, you were married to Gillian; is
18 that correct?
19 A   That's correct.
20 Q   At any point did you and Gillian, during your
21 employment 2016 and 2017, did you separate?
22 A   No.
23 Q   Were you having marital problems?
24 A   Nope.
25 Q   And were you seeing anyone on the side?

Page 14

1  A   No.
2  Q   Okay.  And do you have any children with any of
3  these women?
4  A   My first wife, yes.
5  Q   Okay.  And what was the reason for your divorce
6  with Gillian?
7  A   Irreconcilable differences.
8  Q   Okay.  I'm assuming that's filed in court;
9  correct?
10 A   That's correct.
11 Q   And that would be in Texas?
12 A   Yes.
13 Q   Okay.  Have you ever had a marriage annulled?
14 A   No.
15 Q   All right.  Now a few questions about your
16 educational background.
17     Did you graduate from high school?
18 A   Yes.
19 Q   And when was that?
20 A   2002.
21 Q   Did you attend college?
22 A   I did.
23 Q   Okay.  And where did you attend college?
24 A   Everett University.
25 Q   Did you obtain any degrees?

Page 15

1  A   Yes.
2  Q   What degree?
3  A   My bachelor's of business.
4  Q   And when did you graduate?
5  A   Either 2007, 2008.
6  Q   Did you attend any secondary school post-graduate
7  school, any of that afterwards?
8  A   I did, yes.
9  Q   Okay.  And where did you go?
10 A   Texas A&M.
11 Q   And did you obtain any degrees?
12 A   Yes.
13 Q   Okay.  And what was that?
14 A   My MBA.
15 Q   And when was that?
16 A   Maybe 2017/2018 time frame.
17 Q   Okay.  So that was after you left Bloomingdale's?
18 A   Correct.  I was --
19     No, I believe I completed it before I left
20 Bloomingdale's, if I'm not mistaken.
21 Q   Okay.  Any other degrees?
22     Any other training courses?
23 A   Nope.
24 Q   Now just asking about your employment.
25     Who is your current employer?

Page 16

1   A   Green Hall Logistics.
2   Q   And what is your position?
3   A   I'm CEO.
4   Q   When did you start working there?
5   A   2020.  Yeah, 2020.
6   Q   Okay.  And were you hired to be the CEO?
7   A   I started the company.
8   Q   Okay.  And do you work in Texas -- Dallas, Texas?
9   A   Yes.
10  Q   Where did you work before that?
11  A   Bloomingdale's and --
12      Between Bloomingdale's and Green Hall was Trident
13  Alliance Group.
14  Q   So directly before 2020, where did you work?
15  A   Trident Alliance Group.
16  Q   And where was that?
17  A   Dallas.
18  Q   What was your position?
19  A   CEO.
20  Q   And why did you leave there?
21  A   I sold the company.
22  Q   So Trident, you sold the company; is that
23  correct?
24  A   Correct.
25  Q   How long was the company in existence?

Page 17

1       When did you create the company?
2   A   In 2019.
3   Q   And why did you sell the company?
4   A   It was --
5       It worked out for me is why.  No other reason.
6   Q   Did you have any employees at Trident?
7   A   Yeah.
8   Q   How many employees did you have?
9   A   I believe last count was maybe somewhere between
10  105, 115.
11  Q   Did any of those employees make a complaint
12  against you?
13  A   No.
14  Q   Did you have a relationship with any of those
15  employees?
16  A   Only as their boss.
17  Q   So in 2018 before you created Trident, where did
18  you work?
19  A   Until 19 --
20      So before Trident, when I left, so I worked --
21      Okay.  So I left Bloomingdale's.  I actually left
22  due to reorganization.  So because I was a senior executive,
23  I received a severance package, and that was mostly the
24  capital I used to start creating the companies that I
25  founded.

Page 18

1   Q   So in 2019 where were you working?
2   A   Here in Dallas.
3   Q   Okay.  So when did you --
4       I guess would you say you were laid off by
5   Bloomingdale's?
6   A   Yes.
7   Q   Right, okay.
8       So when were you laid off from Bloomingdale's?
9   A   Your audio cut out in the beginning.
10  Q   When were you laid off?
11  A   It should have been 2019.
12  Q   Okay.  And which store?
13      Withdrawn.
14      That was from the Short Hill store; is that
15  correct?
16  A   I was at the Short Hill store, yes, but it was
17  from the company.
18  Q   Okay.  And before that where did you work?
19  A   For Bloomingdale's?
20  Q   Anywhere.
21      So I would assume before that would be
22  Bloomingdale's 59th Street location; correct?
23  A   Correct.
24  Q   Okay.  And I'll come back to that.
25      Before that, where did you work?

Page 19

1   A   Standard & Poors.
2   Q   And when did you work there?
3   A   That would have been 2015/2016 up until I started
4   working for Bloomingdale's.
5   Q   Why did you leave?
6   A   Why did I leave Standard & Poors?
7   Q   Yes.
8   A   Because Bloomingdale's was a better company.
9   Q   Were you recruited, or did you apply for a
10  position at Bloomingdale's?
11  A   I was recruited.
12  Q   Okay.  And can you just spell that employer?
13  A   Standard like the common spelling,
14  S-t-a-n-d-a-r-d & Poors, P-o-o-r-s with the S&P 500.
15  Q   What was your position?
16  A   I was a financial analyst.
17  Q   And was that your starting position?
18  A   Yes.
19  Q   Correct me if I'm wrong.  That's 2015 to 2017,
20  right, that you worked there?
21  A   Yes, it was --
22      It would have either been 2015/'16 up until I
23  went to Bloomingdale's.
24  Q   Okay.
25  A   I'm not sure which year I started at either one.

Deposition of Bobby Booker                                     Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 20

1    Q   Okay.  And Standard & Poors, did you receive any
2  disciplinary action?
3    A   No.
4    Q   Did anyone make a complaint against you?
5    A   No.
6    Q   Did you have a relationship with anyone there --
7    A   No.
8    Q   -- besides professional?
9        Any personal relationship?
10   A   No personal --
11       Or no romantic relationships.
12   Q   Okay.  And then before that in 2015, where did
13 you work?
14   A   Before '15 was the United States Marine Corps.
15   Q   Okay.  And why did you leave there?
16   A   Personal reasons.
17   Q   Were you fired or told to leave?
18   A   Nope.
19   Q   Okay.  So did you resign?
20   A   I did.
21   Q   Okay.  Did you receive any disciplinary action
22 against you?
23   A   Nope.
24   Q   Okay.  How long were you in the Marine Corps?
25   A   15'ish years.

Page 21

1    Q   Okay.
2    A   I think 15 years.
3    Q   At any of these employers, did anyone accuse you
4  of sexual harassment?
5    A   No.
6    Q   So now we're going to go back to your employment
7  with Bloomingdale's.
8        So you left Standard & Poors where you were a
9  financial analyst and then went to Bloomingdale's; correct?
10   A   Correct.
11   Q   What was your starting position at
12 Bloomingdale's?
13   A   I was a senior executive in asset protection.
14   Q   Did you have the same position all the way
15 through 2017 -- I guess 2016/'17?
16   A   Yes, both.  The entire of my tenure with
17 Bloomingdale's, I had the same position.
18   Q   Okay.  So even at Short Hills it was the same
19 position?
20   A   Yes.
21   Q   Okay.  Who did you interview with?
22   A   I do not recall.
23   Q   Were you a manager?
24   A   Yes.
25   Q   And who did you supervise?

Page 22

1    A   For both Short Hills and 59th Street --
2        At the 59th Street, I supervised a portion of the
3  asset protection team.
4        And at Short Hills, New Jersey, I supervised the
5  entire team.
6    Q   Okay.  Can you elaborate what's the asset
7  protection team?
8    A   Loss prevention, minimizing store loss.
9    Q   Okay.  So is it just people stealing in the
10 store?
11   A   It is minimizing store loss caused by, yes,
12 customers, but also employees in the logistics chain itself.
13   Q   Who did you report to?
14   A   I reported to Fred Becker, the one I reached out
15 to regarding this deposition.
16   Q   Okay.  Can you describe your job duties,
17 responsibilities?
18   A   Essentially managing the team who, you know,
19 directly interacted with, you know, the customers, employees
20 regarding any potential loss or loss investigations, and
21 making sure everyone was within the company policies
22 regarding asset protection and interaction with all of those
23 entities.
24   Q   Okay.  So did you watch like the cameras --
25       Were you monitoring the cameras on a daily basis?

Page 23

1    A   Me specifically, no.
2        As senior executive, would I look at the camera
3  from time to time, yes, maybe for a few minutes if something
4  was going on in that moment, but there were employees --
5        The asset protection team, the external team
6  monitored -- they had a rotating schedule of who was
7  monitoring the cameras on an hourly basis every day.
8    Q   Okay.  Did you go on the floor and monitor what
9  was going on there as well?
10   A   Yes.
11   Q   Okay.  Were you given --
12       Were you given an employee handbook when you
13 started?
14   A   I don't recall.  I'm sure that I did receive one.
15   Q   Was it updated every year?
16   A   That I can't answer.  I don't recall.
17   Q   Were you given any information regarding sexual
18 harassment or discrimination when you started?
19   A   Yes.
20   Q   What was that information?
21   A   I don't remember specifically, but it started off
22 obviously it's not tolerated, and that's -- you know,
23 whether that is a higher-position person to a lower-position
24 person, peers, or a lower-position person to a
25 higher-position person or customers or vendors.

Deposition of Bobby Booker                                       Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 24

1  There were ways to report.  I don't recall all of
2  them, but there were, you know, direct reports to your boss,
3  of course HR you could reach out to, headquarters, and there
4  were anonymous -- ways to report anonymous, third-party.  I
5  believe Macy's had -- they hired a company.
6      Q   Okay.  And was there any training done every year
7  regarding sexual harassment?
8      A   I don't recall.  Yeah, I don't recall.
9      Q   Okay.  As a manager, did you receive any separate
10 training regarding reporting sexual harassment,
11 discrimination?
12     A   I believe we did from one of the HR managers.
13     Q   Okay.  Did you have to sign off on anything?
14     A   Possibly.  I can't say for sure whether we did or
15 not.
16     Q   Okay.  During your tenure at Bloomingdale's, was
17 anyone accused of sexual harassment?
18     A   I don't recall anyone or any investigation or
19 anything regarding that.
20         Not saying it didn't happen.  I just don't recall
21 it.
22     Q   Okay.  Did you report any discrimination, sexual
23 harassment, anything like that?
24     A   No.
25     Q   Did you receive any disciplinary action --

Page 25

1      A   No.
2      Q   -- during your tenure at Bloomingdale's?
3      A   I did not.
4      Q   Were you written up?
5      A   No.
6      Q   Did you receive an evaluation every year?
7      A   I'm assuming so.
8          I just don't recall.
9      Q   Okay.  So do you recall having a review with
10 Mr. Becker?
11     A   Yes, I believe we sat down and went over --
12         I don't know the time frame, whether it was
13 quarterly, annually or what it was, but I believe we sat
14 down and did some type of review.
15     Q   Okay.  At any point did Mr. Becker tell you --
16         Withdrawn.
17         Do you maintain any social or personal
18 relationships with any of your former Bloomingdale's
19 co-workers?
20     A   I believe on birthdays there's --
21 You know, when I used to have social media, yeah,
22 wish someone a happy birthday, but that's about the extent
23 of it.
24     Q   Okay.  And besides Bloomingdale's, how about at
25 Standard & Poors, did you have any personal -- maintain any

Page 26

1  personal relationships?
2      A   No.
3      Q   Have you ever been fired from any of your
4  employers?
5      A   No.
6      Q   Okay.  You said that --
7          Withdrawn.
8          Did you work in the Chanel department?
9      A   No.  I worked in asset protection.
10     Q   Did you visit the Chanel department?
11     A   Yes, I visited all the departments there.
12     Q   So on a daily basis, did you go to every
13 department?
14     A   No.  Just key areas that we do check every day
15 like fine jewelry, the jewelry department, just because of
16 the expense, things like that, but --
17         That's generally kind of how it worked.  Some of
18 the more high-dollar or more vulnerable places we do visit
19 on a daily basis.
20         Other than that, you make your rounds around the
21 entire store.
22     Q   Did you assign who went to which location?
23     A   No.
24     Q   Who assigned it?
25     A   So for the external team would be -- the

Page 27

1  supervisor would be the external team supervisor sets the
2  daily and hourly schedules.
3      Q   What do you mean by "external team"?
4      A   So there's the asset protection team as a whole
5  just at 59th Street was around 100 employees.  So that's
6  broken down between the external team and the internal team.
7          And if you want to call -- I forget what the term
8  is, but the logistics side, if you will, and each of those
9  has a supervisor for their team who would handle something
10 like assigning who goes where on the daily and hourly
11 schedules.
12     Q   Okay.  So were you part of the external team
13 then?
14     A   Yeah, so as one of the executives, we all had a
15 team.  All of the executives aren't there, so we would cover
16 all the silos, if you will, at some point.
17     Q   Okay.  So then did you assist in assigning who
18 went to what location?
19     A   No.  That was a supervisor's job to post
20 schedules or set up and post schedules.
21         The only time I believe we got involved with
22 scheduling is if, you know, there were like haul-outs or
23 some weather-related issue that, you know, we had to assist
24 getting people in or moving people around or approving
25 overtime, things like that.

Page 28

1  Q   Okay.  So you going to visit each department or
2  whichever department was at your discretion; is that
3  correct?
4  A   Yes.
5  Q   And what was your workweek?
6      Like what were your shifts, your schedule?
7  A   It's retail, so it changes.  Sometimes we're
8  opening.  Sometimes we're a missed schedule.  Sometimes
9  we're a closer.  It depends on the needs of the store
10 itself.
11 Q   Did you have an office?
12 A   Yes.  We have an asset protection office.
13 Q   Did you have your own desk --
14 A   Yes.
15 Q   -- or a cubicle?
16 A   No.
17     I did have my own --
18 Q   Okay.  So then you would go to your desk, and
19 then at times then go down to the floor or different
20 departments; is that correct?
21 A   Correct.
22 Q   Did you ever have an employee investigated?
23 A   Can you explain?
24     Did I have an employee investigated?
25 Q   Yeah.  Did you accuse someone or say that they

Page 29

1  had been stealing or doing any -- there was any wrongdoing
2  by that employee?
3  A   No.
4      So the way our team worked, our internal term
5  would focus what it sounds like internally specifically on
6  employees.  And our external team is, you know, specifically
7  focused on the customer not associated with the store
8  itself.
9      The internal team does investigations.  Their job
10 specifically is to do investigations, to run reports, to try
11 to figure out what's going on.  From there, they would bring
12 the information to us before we go to -- before we present a
13 package to HR, and essentially HR can tell us if we can, you
14 know, further that investigation or interview or not.
15     The investigating executives, we don't get to
16 just investigate someone.
17 Q   Okay.  So did anyone come to you with a report or
18 something so that you could bring it to HR to investigate?
19 A   Yes, the internal team would put their packages
20 together, if you will, and they would bring them up to the
21 senior executive, whoever was available.
22     They'd go through it, and we'd talk with the
23 human resources manager if we, you know, could go further or
24 not.
25     The only difference is, the external team, it's

Page 30

1  usually something happening live, and that doesn't go
2  through HR itself in the moment.
3  Q   Okay.  Was any of those people that were reported
4  Kristina Mikhaylova?
5  A   I don't recall.
6      And like I said, I was assigned the external
7  team.  One of the other senior executives was over the
8  internal team.
9      So that would come to me if he wasn't available,
10 so it would have been very minimal times that that would
11 happen.  However, I don't recall Kristina at all.
12 Q   Okay.  And did you work with Christopher
13 Castellani?
14 A   I did, yes.
15 Q   In what capacity did you work with him?
16 A   He was my peer.
17 Q   Okay.  Can you elaborate as to how you worked
18 together?
19 A   We were both senior executives.  He was primarily
20 over -- at least when I was there, he was primary over the
21 internal team.
22 Q   Okay.  And that was at the 59th Street store;
23 correct?
24 A   Correct.
25     MS. MENDOZA:  If you don't mind, if we could take

Page 31

1  a five-minute break.  I just want to upload an exhibit.
2      (Recess was taken.)
3      MS. MENDOZA:  I'm going to be entering
4  Plaintiff's Exhibit 1.
5      (Exhibit 1 was marked for identification.)
6  BY MS. MENDOZA:
7  Q   Mr. Booker, you said that you do not recall who
8  Kristina Mikhaylova is; correct?
9  A   Correct.
10 Q   Does this photo refresh your recollection?
11 A   That photo, she doesn't look familiar, no.
12 Q   No, okay.
13     You don't recall anyone from the Chanel
14 department during your tenure at the 59th Street location
15 that looked like that?
16 A   No.
17     MS. MENDOZA:  You can take that off the screen.
18 Thank you.
19     MS. TIERNEY:  Melissa, was that produced in
20 discovery?  Is there a Bates number, because I don't
21 remember that?
22     MS. MENDOZA:  No, it was not.
23     MS. TIERNEY:  I would ask that you produce that
24 then since you used it in this deposition.
25     MS. MENDOZA:  Yes.  I know defendants, I believe,

Deposition of Bobby Booker                                   Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 32

1  you guys did produce --
2        I don't know if you want to go off the record,
3  but you did produce a photo.  We're trying to get that
4  photo with that Bates stamp.
5        MS. TIERNEY:  I was just saying I haven't seen
6  that one.
7        MS. MENDOZA:  Yeah.  But just for purposes of
8  because Mr. Booker did not recall who she was, I just
9  was trying to see if it --
10       MS. TIERNEY:  I'm not objecting to the photo.
11  But since you've used it, I want a copy of it.
12       MS. MENDOZA:  Okay.  Will do.
13  BY MS. MENDOZA:
14    Q    All right.  So do you recall how many employees
15  were in the Chanel department when you worked there?
16    A    I don't.  They had a small store.  I wasn't
17  responsible for the Chanel department.
18        The store is responsible for 59th Street, and we
19  have close to 2,000 employees at that one store.
20    Q    Okay.  Do you recall --
21        Withdrawn.
22        Going back to where we left off, we were
23  discussing your relationship or your peer, Christopher
24  Castellani; right?
25        So were you involved in any investigations with

Page 33

1  Mr. Castellani, or were they completely separate
2  departments?
3    A    So they're not completely separate, but they are
4  separate departments.
5        When it comes to investigation, the team handles
6  that, and the supervisor or the senior executive, the
7  primary was Chris.
8        If there was a sit-in on interviews --
9        So our interviews are -- by policy, are recorded.
10  If there's a female, there's always a female witness.
11  Whether they're from HR, there's always a female witness as
12  well.
13        As far as helping Chris with the investigations,
14  I do recall sitting in on some of the interviews with him.
15  But other than that, I'm not sure what you're asking.
16    Q    Okay.  Did you fire any employees?
17    A    We can't fire anyone.  We can recommend to human
18  resources.
19        If the HR manager, going through their policy
20  requirements for the company, they deem firing or
21  termination is in line with company policy, they can handle
22  that.  We don't fire anyone.
23    Q    Did you recommend anyone -- that anyone was
24  fired?
25    A    I believe so, yes.  I believe on the external

Page 34

1  team, yes, we had some employees who violated
2  Bloomingdale's/Macy's policy as far as handling customers.
3        Where that can happen --
4        And I believe this particular was in the street.
5  It happened outside the store in the street and, by our
6  requirements, you know, had to recommend that, you know,
7  these are policy violations -- terminal violations, and we'd
8  recommend that to human resources.  They go back and review
9  everything, even regardless of what we've done, and the HR
10  manager ultimately determines if they are in violation and
11  if they will be terminated.
12    Q    Okay.  I'm assuming that particularly was not
13  Kristina, correct, Kristina Mikhaylova?
14    A    No, Kristina didn't work on the external team.
15        As far as recommending store employees outside of
16  the asset protection team, no, we don't, unless they were
17  investigated by the internal team, and that is already
18  handled by human resources.
19    Q    Right.
20        So my question is, did you recommend to human
21  resources that anyone outside of the external asset
22  protection department -- any Bloomingdale's employee be
23  fired?
24    A    Not that I recall.
25    Q    Were you involved in any investigations regarding

Page 35

1  fraud?
2    A    There's a possibility.  I just don't recall.
3    Q    Okay.  Was any of --
4        Were any of them involving Kristina Mikhaylova?
5    A    Not that I recall.
6        I believe a fraud that I recall was a customer on
7  the upper east side who was buying things there and finding
8  a way to reattach tags and return them for somewhere upwards
9  of like $100,000 sticks out in my head.
10        Other than that, I honestly have no recollection
11  of your client at all.
12    Q    I uploaded another picture of the plaintiff --
13  this will be Plaintiff's Exhibit 2 -- to see if this
14  refreshes your recollection of who she is.
15        MS. MENDOZA:  And that was not produced, so I'll
16  be producing this as well.
17        MS. TIERNEY:  Okay.
18        (Exhibit 2 was marked for identification.)
19  BY MS. MENDOZA:
20    Q    Does this refresh your recollection of who
21  Kristina Mikhaylova is?
22    A    It doesn't.  I'm sorry.
23    Q    You can take that off the screen.  Thank you.
24        What authority did you have over Chanel
25  department employees?

Deposition of Bobby Booker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 36

1   A    So I believe Chanel department employees are not
2  Bloomingdale's employees, if I'm not mistaken. So they had
3  an individual security personnel -- supervisor stationed
4  there in Chanel just because of high-dollar items that they
5  had. They had one that was stationed specifically in their
6  store.
7       As long as there were no reported violations that
8  were against Macy's policy, we didn't have any direct
9  control of those employees. As long as they follow whoever
10 hired them or Chanel's policies, and they didn't violate
11 Macy's policies or Bloomingdale's policies that we were
12 aware of, we had no -- we didn't control them all. I don't
13 believe they were Bloomingdale's employees.
14  Q    Okay. Were you friends with any of the Chanel
15 department employees?
16  A    I was with security because, you know, we're
17 obviously a part of the security team. But as far as the
18 employees, other than being cordial, you know, friendly and,
19 you know, making sure they had someone they could report,
20 you know, whatever to that may happen in their store as a
21 possible violation or was theft, that's about it.
22  Q    Okay. Do you know who Eleanor Dahan is?
23  A    Name sounds familiar. The first name sounds
24 familiar, but I can't say for sure.
25  Q    Do you recall an Eleanor -- speaking to an

Page 37

1  Eleanor in the Chanel department -- that worked in the
2  Chanel department?
3   A    Possibly. I mean, I had conversations with
4  everyone.
5   Q    Okay. When you say you have conversations, did
6  you go into the Chanel department just to check in, or did
7  you stay like as security, and you watched the door?
8   A    No, I didn't stay there as security because they
9  had their own security.
10      One of the asset protection employees, external
11 employees, we would go to visit to make sure our
12 personnel -- our asset protection personnel were good, they
13 didn't need anything, that whatever the time was like if
14 they were supposed to be relieved, that they got relieved.
15      Yes, that includes Prada, Louis Vuitton. In the
16 59th Street store, they're all generally in the same
17 location. They're all high-dollar. They're close to a door
18 that leads outside and to the subway.
19      So throughout the rounds, yes, we stopped by
20 there because they're a high-risk area and, yes, talked to
21 our security, talking to the employees, in all of the
22 handbag stores that were there.
23  Q    Okay. So I'll come back to that.
24      Do you know who Cathy -- who is Cathy Eunice?
25  A    I don't by the name recall who that is.

Page 38

1   Q    Okay. Did you ever speak with Richard Law during
2  your tenure?
3   A    I don't recall. Just by the name, I don't
4  recall.
5   Q    Okay. Did you ever correspond with a human
6  resources representative during your employment?
7   A    Of course. We --
8       Again, we don't --
9       We're managers of the department but, you know,
10 as far as policy, firing people, investigating, you know,
11 investigations going further than the initial, we have an HR
12 partner, or I think we had a couple of HR partners, human
13 resource manager that we, you know, worked with to make sure
14 that we were also, you know, within policy.
15  Q    Okay. And do you recall if any of those people
16 went by the name of Richard Law?
17  A    Possibly. I just don't recall at this moment.
18  Q    Do you know who is Dennis Diaz?
19  A    Not by the name.
20  Q    Did you correspond with the managers for the
21 Chanel department -- the Chanel handbag department or
22 accessories department during your tenure at Bloomingdale's?
23  A    I don't think so. Again, they weren't
24 Bloomingdale's employees.
25      So I believe usually when one of them -- one of

Page 39

1  them or Gucci or any of those high-dollar satellite stores,
2  if you will, had an issue, they would reach out to us, but
3  we didn't have an ongoing like corresponding relationship
4  with any of those satellite stores, if you will, high-dollar
5  stores.
6   Q    Do you recall any female employees that were
7  pregnant during your employment at Bloomingdale's?
8   A    I don't.
9       I'm sure that there were. I just don't recall
10 specifically a pregnant woman at Bloomingdale's.
11  Q    Did you correspond with anyone that was pregnant,
12 like communicate cordially?
13  A    Explain "communication cordially."
14  Q    Like when you were going and doing your rounds or
15 walking around, did you ever speak with any employee -- were
16 you on friendly terms with an employee regularly that you
17 knew was pregnant?
18  A    I don't recall, but regularly, friendly with
19 everyone in the store as part of my job and part of our
20 policy to make sure that they can report anything to us.
21      So I imagine some of the employees may have been
22 pregnant.
23  Q    I'm saying this just to refresh your recollection
24 as to Kristina Mikhaylova because at the time she was
25 pregnant in 2016/2017, so I'm trying to see if maybe that

Deposition of Bobby Booker                                      Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 40

1  would help refresh your recollection, in the Chanel
2  department, that woman you saw in those pictures, if she was
3  pregnant, if you recall, if that maybe will help refresh
4  your recollection.
5       Does that help?
6  A    It does not.
7       MR. FLOWERS:  I'm going to object to the form.
8  You can answer.
9  BY MS. MENDOZA:
10 Q    You said it does not refresh your recollection?
11 A    No.
12 Q    Okay.  Did you have any conversations --
13      Withdrawn.
14      Did you work with corporate regarding asset
15 protection or handling your daily duties, responsibilities?
16 A    Daily would have come from I believe large cases
17 maybe or when we had to work with multiple stores or there
18 was, you know, some organized crime, which happens a lot up
19 there in the East Coast, was something we'd work with
20 corporate with.
21      But as far as talking with them on a daily basis,
22 no.
23 Q    So did you --
24      As far as with organized crime, were you involved
25 in any investigations?

Page 41

1  A    We would essentially corroborate any information
2  that we had that they may have been asking for, or we made
3  sure they had information that we received so we were
4  basically on the same page with each other when it came to
5  those type of investigations.
6  Q    Okay.  Do you recall --
7       When you say "those type of investigations," was
8  there -- did it happen often?
9  A    It didn't happen often, but it's a very big --
10 very big issue, you know, for big retail stores, especially
11 high-dollar, like Bloomingdale's, where there were these
12 organized crimes or crime organizations were, you know,
13 hitting the stores -- high-dollar stores in large
14 quantities, you know, repeatedly, and kind of giving the
15 store a big loss.
16      So it wasn't something we had to focus on daily.
17 Again, with 2,000 employees and countless customers, we had
18 a lot to deal with, but at some times we did recognize
19 people we were supposed to be on the lookout for, recognize
20 who NYPD or whoever had identified as part of a much larger
21 like retail criminal organization.
22      But short of coming across one of those or
23 recognizing one of those or being alerted by either one of
24 those, either corporate or NYPD, no, it wasn't a daily thing
25 that we focused on.

Page 42

1  Q    Okay.  Were you --
2       About how many were you involved in?
3  A    I can't say.  Yeah, I don't recall.
4  Q    Was it because it's a large number or because you
5  just --
6       Withdrawn.
7       Was it because it's a large number?
8  A    Not that it's a large number.  So that's a lot of
9  manpower that takes a lot of focus and efforts from
10 everyone.  Those large crime organizations aren't hitting
11 you every day.
12      So if we did get something or we suspected
13 something, we'd communicate with them, but it's not
14 something that's happening every day.
15      When it happens, it's really big and really
16 expensive, but it's not happening every single day.
17 Q    Okay.  Do you recall if it involved anyone in the
18 Chanel department?
19 A    No.  I believe the one I can positively remember,
20 it was legitimately a large crime organization, and they
21 were doing some interstate things, and I don't believe it
22 was specifically a Chanel issue.
23 Q    Do you recall the outcome of any of those
24 investigations?
25 A    No, because, like you mentioned, those are --

Page 43

1  that is handled mostly by the corporate team and the -- at
2  least up there, the New Jersey and New York police
3  departments once it's kind of off the ground.
4  Q    Okay.  Did you have any conversations with
5  anyone --
6       Withdrawn.
7       Was there anyone specific in corporate that you
8  corresponded with or communicated with?
9  A    I don't think specifically.  They have a team as
10 well at the corporate office.  I want to say it may have
11 been five or six of them at the corporate office there.
12      Again, it probably usually was everyone is on the
13 e-mail together versus just talking to one individual, so
14 the entire team is aware of what's going on.
15 Q    Okay.  Were you involved in any investigations
16 regarding diverters?
17 A    Explain "diverters."
18 Q    Anyone that was reselling or making a profit off
19 of purchases that they made with their employee discount?
20 A    No.  I do recall our external team, that's one of
21 the things that they did focus on because I believe that is
22 against the policy, basically using your discount.  Taking
23 that and reselling I believe is against both Macy's and
24 Bloomingdale's policy.
25      I don't remember any specific incidents.  I'm not

Page 44

1 saying --
2      I'm sure those investigations happened while I
3 was there.  I just don't recall specifically.
4      Q   So you didn't accuse anyone or state that "I
5 believe that this person is a diverter."
6          Is that correct?
7      A   No.
8      Q   No, you don't recall or, no, you didn't do that?
9      A   No.  And like I said, we can't fire or we can't
10 investigate someone without human resources involved to look
11 into something or to provide, you know, whatever more
12 information to take those steps.
13         But no, there's no one that I recall of singling
14 out an employee and saying this person is a diverter.
15     Q   Did you do any investigations regarding discount
16 abuse?
17     A   I've seen investigations started by the internal
18 team, but I did not do any investigations for discount abuse
19 that I recall, but as part of --
20         I definitely, like I said, went to human
21 resources, and the investigation continues, stops, or the
22 interview happened from there from that aspect.
23     Q   Did you tip off --
24         When I say "tip off," were you suspicious of any
25 employees regarding any violation?

Page 45

1      A   I'd say, generally speaking, there's some
2 suspicion, as asset protection senior executive.
3          The loss pie chart internally is, I believe,
4 around 75 or 80 percent our loss happens internally.  The
5 customer, yes, they're the other big part of that, and the
6 logistics side is somewhere around 1 percent.
7          So, yes, there's always a suspicion -- healthy
8 suspicion to be curious to investigate and, you know, leave
9 doors open for people to report.
10         Those things, we also incentivize those that
11 actually saw it so employees who may be causing a loss to a
12 store will report those things to us.  In that aspect, yes.
13         Was there anyone specifically that we were
14 targeting?
15         I don't recall that.
16     Q   So do you recall --
17         You don't recall tipping off someone that you
18 thought --
19         When I say "someone," tipping off to the internal
20 team, to corporate, asset protection -- someone in the asset
21 protection department that this person needs to be
22 investigated?
23         Did you do that for any employee?
24     A   No.  Not that I recall, no.
25     Q   Okay.  Give me one moment.

Page 46

1      Q   What department in Bloomingdale's had the most
2 fraud?
3      A   I don't recall.
4          When it comes to fraud, I'd say that probably
5 came externally and probably through credit cards.
6          ApplePay was a newer and a big issue back then
7 when I was at 59th Street.
8          As far as store department, I really don't -- I
9 really can't say that.  I don't recall that information.
10     Q   Do you recall about how many times a day you went
11 into the Chanel department?
12     A   A day, you know, it would be less than zero.  If
13 we're talking a week, a handful of times a week.
14     Q   Okay.  Did anyone ever tell you not to speak to
15 another female employee?
16     A   No.
17     Q   Did any female employee tell you that they were
18 uncomfortable about you?
19     A   No.
20     Q   Did you ever have any conversations about your
21 personal life --
22         Withdrawn.
23         Did you have any conversations regarding your
24 marriage with any female employee?
25     A   Other than me being married and maybe some events

Page 47

1 that we would attend and things like that, no.
2      Q   Okay.  Do you recall, did you have any
3 conversations about cheating on your spouse?
4      A   No.
5      Q   Did you have any conversations regarding having
6 an affair --
7      A   No.
8      Q   -- or having a side person?
9      A   No.
10     Q   Did you ever compliment any females on their
11 clothing, female employees at Bloomingdale's?
12     A   Say the last part again.
13     Q   Female employees at Bloomingdale's.
14     A   I assume I probably would tell someone that an
15 outfit or shoes or something looked good, but other than
16 that, I'd have to say no.
17     Q   Did you compliment any female on their body?
18     A   No.
19     Q   Any body part?
20     A   No.
21     Q   How did you greet your female co-workers?
22     A   Same way I greet my male co-workers.
23     Q   And how is that?
24     A   "Good morning, good afternoon, how you doing,
25 have a good day," things like that.

Deposition of Bobby Booker                                Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 48

1   Q   Did you ever hug them?
2   A   I may have, depending on our relationship --
3   individual relationship.
4   Q   So did you hug any male employees?
5   A   Yes.
6   Q   And female employees?
7   A   Yes.
8   Q   And did you ever physically touch any female
9   employee, besides hugging?
10      Like did you physically touch them in any other
11  way?
12  A   No.
13  Q   Did you ever discuss or have any conversations
14  about exploring a side relationship?
15  A   Nope.
16  Q   Did you ever have any conversations with female
17  employees about motorcycles?
18  A   Possibly.
19      I have a lot of motorcycles.
20  Q   You have a lot of motorcycles?
21  A   Yes.
22  Q   Does that help refresh your recollection as to
23  having a conversation with Kristina Mikhaylova about
24  motorcycles?
25  A   No.

Page 49

1       I'm pretty sure most of those employees at the
2   time had seen -- I would sometimes ride my bike to work --
3   one of my bikes to work, so there is a garage specifically
4   for us up there or discounted garage, rather, and I'm
5   certain that they have seen my motorcycles or my riding gear
6   or any of those things, and they may have sparked a
7   conversation.
8   Q   Okay.  But that doesn't refresh your recollection
9   if that woman that you saw before in the pictures, if that
10  was who that person is?
11  A   No.
12  Q   Okay.  So just going back to when you went into
13  the departments, why would you stay in there for an extended
14  period of time?
15  A   Well, there's --
16      I don't know what "extended period of time" is.
17      We'd visit all the departments.  We'd talk to --
18      For the ones that had their own or assigned
19  security, we'd talk to those guys to make sure everything
20  was okay, if they needed anything, that type of thing.
21      Of course we are cordial to the employees, you
22  know, if they need anything, they had anything to report,
23  how the day is going, if they needed anything from us.
24      But again, that's not really geared to just a
25  handbag store, but to all 11 floors in the 59th Street

Page 50

1   building.
2   Q   Right.
3       So was it that you would just check in, then keep
4   on going, or did you stay, talk to people, and just hang out
5   and then go move on to the next place?
6   A   Well, there's no hanging out.  Again, it's 11
7   floors and 2,000 employees that, you know, we have to have
8   some type of oversight or watch over.
9       So if we're hanging out, it's probably something
10  going on external at that moment and our presence, as we
11  dress and look different, allows us to be a little closer to
12  someone who may be committing an offense against the store
13  in that moment by some of the other employees.
14      So, again, that's all departments throughout the
15  entire store.
16  Q   You said that you possibly recalled a female
17  employee by the name of Eleanor.
18      Do you recall if she told you that Kristina
19  Mikhaylova was a married woman with children?
20  A   Not that I recall.
21  Q   And do you recall having a conversation with
22  Eleanor, if you recall who she is, about Kristina being in a
23  committed relationship?
24  A   No, I don't.
25      I remember the name Eleanor because it's kind of

Page 51

1   a unique name by comparison.  So I do remember the name.
2       The person, what she looks like, where she is,
3   what department she works in, I'm not sure, but the name
4   sounds familiar as in its uniqueness compared to most names.
5   Q   Do you remember a female employee that was
6   Russian in the Chanel department?
7   A   I don't.
8       MS. MENDOZA:  I'm going to be moving on to the
9   next part.  I don't know if you want to take a break.
10  I'm going to be asking -- moving to another section
11  now.  It's up to you.
12      MR. FLOWERS:  We're fine with going on.
13      MS. MENDOZA:  Keep going?
14      MR. FLOWERS:  Yes.
15  BY MS. MENDOZA:
16  Q   All right.  So just going back to the policies
17  regarding sexual harassment, discrimination, did you -- you
18  said that you believe that there was training when you
19  started, correct, policies in training?
20  A   Yes.
21  Q   And did you conduct any training for any of the
22  employees that you supervised regarding reporting sexual
23  harassment, discrimination?
24  A   We may have had to review or, you know, inform
25  our guys of some updates or something along those lines.

Deposition of Bobby Booker                                       Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 52

1  I honestly don't recall.
2  MS. MENDOZA:  Okay.  I think if we have Bates
3  stamped Exhibit 2, if we can put that on the screen,
4  please.
5  Yeah, we have --
6  I uploaded documents as Exhibit 2.  This will be
7  Plaintiff's Exhibit 3, if you want to take a moment to
8  look at that document, Mr. Booker.
9  (Exhibit 3 was marked for identification.)
10  MS. TIERNEY:  Can you state the Bates for the
11  record, Melissa?
12  MS. MENDOZA:  Yeah, it's BLM001021 to _1086.
13  MR. FLOWERS:  For the record, we can see about a
14  half page of contents.
15  MS. MENDOZA:  Yeah, so if you can give them --
16  I don't know if you want to have control or just
17  let him know, and we'll keep moving down the screen.
18  It's up to you if you want control of the document.
19  MR. FLOWERS:  That's fine.
20  BY MS. MENDOZA:
21  Q   So just keep scrolling.  Just take a full look at
22  it.  This is the Employee Handbook for 59th Street that was
23  produced in this case, if you want to take a look through it
24  first before I ask you questions on it.
25  As he's scrolling through it, do you recall this

Page 53

1  document that you see in front of you?
2  A   It does look familiar.
3  Q   Okay.  If you'd turn to --
4  If you go to _1032, Bates stamp _1032.  You can
5  stop -- not go that far.
6  This is regarding the sexual harassment policy.
7  I just want to know if you recall seeing this.
8  Do you recall seeing that?
9  A   Yes, it looks familiar.
10  Q   Okay.  And do you recall if this was the policy
11  that you're describing as to the sexual harassment policy
12  that Bloomingdale's had while you were working there?
13  A   If it is what they provided for the time frame
14  that I was there, then yes.
15  Other than that, I don't know.
16  MS. MENDOZA:  So we can get off the screen.
17  BY MS. MENDOZA:
18  Q   Do you recall what --
19  Withdrawn.
20  According to Bloomingdale's policies, would
21  complimenting another female employee's body be considered
22  sexual harassment?
23  A   I believe so, yeah.
24  Q   Okay.  So if you heard someone complimenting
25  another female's body, would you report that?

Page 54

1  A   It depends on the very specific situation.
2  Q   Okay.  And can you elaborate?
3  What do you mean by that?
4  A   If two good friends are having a conversation
5  that I overhear, and they're comfortable with each other,
6  and it's, you know, not outwardly inappropriate, then
7  there's no reason to report them for a personal conversation
8  that they were having based on their relationship.
9  Q   Okay.  How can you tell if someone is
10  uncomfortable?
11  A   Well, if you were --
12  Well, if you're in their space, and they are
13  joking and having a good time, and no one steps away or
14  appears, you know, like they're uncomfortable or they have
15  an issue or, you know, they're looking around for someone to
16  help them in the situation, the assumption is that they are
17  okay with that.
18  And especially for us, the store knew who we
19  were.  If they had an issue, they're informed numerous times
20  that they can report to us that information, or they can go
21  right to HR, you know, or do the anonymous thing through the
22  third party and say, hey, you know, this senior executive,
23  blah, blah, blah, you know, mentioned that, was around,
24  and they may have overheard it.  So there's, you know --
25  To say every situation, every conversation is

Page 55

1  inappropriate is a bit much.  I don't know everyone's
2  relationship, but I just know outwardly signs that show that
3  that relationship or that conversation is inappropriate and
4  got to kind of leave it there.
5  Q   Okay.  And according to Bloomingdale's policies,
6  were there any comments that were off-limits?
7  A   Inappropriate comments, which is subjective to --
8  for the most part subjective to the individuals and the
9  conversation and those in earshot.
10  So it's subjective.
11  Q   What do you mean by that?
12  A   Where me and Bruce may be having a conversation
13  that we're okay with, you know.  Our relationship is that we
14  can say certain things or we can, you know, poke at each
15  other about certain things, but someone who may not have a
16  relationship may overhear that and think that --
17  So it's subjective to the relationship,
18  subjective to the people, subjective to the situation.
19  Q   My question is, were there any objective comments
20  that were off limits that were inappropriate and you were
21  not allowed to have at Bloomingdale's?
22  A   I think anything that, you know --
23  Objectively, anything that is overtly harassing
24  or demeaning, those are -- and that's both sexual or
25  nonsexual, those are inappropriate.

Page 56

1  Q   Okay.  Can you give an example?
2  A   If a customer came in the store and, as you put
3  it, complimented on or spoke outwardly about a woman's body,
4  you know, that would be inappropriate.
5  Q   And what about talking about --
6     So would you consider then talking about cheating
7  or affairs or relationships, that's all subjective and
8  personal to the relationship?
9  A   I think during work times those are conversations
10 that shouldn't happen on the clock, if people are having
11 those conversations.  And so in that aspect, yes, that
12 wouldn't be a work conversation or appropriate for work.
13 Regardless of the relationship, it's a private conversation
14 that they shouldn't be having while they're on the clock.
15 Q   Would you consider that sexual harassment?
16 A   Consider what sexual harassment?
17 Q   Inquiring or asking questions about another
18 employee's relationships.
19    MR. FLOWERS:  Objection to form.  You can answer.
20 A   State it again, please.
21 BY MS. MENDOZA:
22 Q   Yeah, so is asking another person about another
23 person's relationship, intimate relationship with a
24 significant other, is that a form of sexual harassment
25 according to Bloomingdale's policies?

Page 57

1     MR. FLOWERS:  Objection to form.
2  A   It could be.
3  BY MS. MENDOZA:
4  Q   Okay.  And is any touching, according to --
5     Any physical touch, according to the
6  Bloomingdale's policies, is that considered sexual
7  harassment, intimidation?
8  A   Any touch, no.  There's a --
9     Obviously there's a gray area there where, you
10 know, an innocent touch or inappropriate touch, where that
11 line is.
12    So, again, it could be based on the very specific
13 circumstances.
14 Q   Okay.  Can you give me an example of an innocent
15 touch?
16 A   An innocent touch could be hello/good-bye hug or
17 handshake or pat on the back.
18 Q   And inappropriate?
19 A   Maybe grabbing someone in their groin area or
20 things like that.
21 Q   Okay.  During your employment at Bloomingdale's,
22 did you ever see anyone make any sexual advances on another
23 employee?
24 A   Not that I recall.
25 Q   Can you give an example of what would be

Page 58

1  considered a sexual advance under the Bloomingdale's
2  policies?
3  A   A very overt one could be just, like I say, maybe
4  one employee, male or female, touches another employee in
5  the groin area.
6  Q   Okay.  You said that you transferred to the Short
7  Hills Bloomingdale's, right, in 2017; is that correct?
8  A   I believe that's --
9     I believe it was 2017, yes.
10 Q   Okay.  Why did you transfer?
11 A   We just did --
12    So they did a small reorganization.
13 Bloomingdale's did a small reorganization throughout the
14 Bloomingdale's stores.  So we moved me to the New Jersey
15 store as they now had holes in their senior staff.
16 Q   So you were recommended to go to Short Hills?
17 A   Correct.
18 Q   Okay.  Who recommended that you go there?
19 A   I don't remember.  Probably conversations between
20 Fred and the corporate office.
21 Q   Do you recall when that was?
22 A   When what was?
23 Q   Your transfer, or the discussions.
24 A   Discussions I was part of.  I was informed it was
25 part of the reorg, and then I believe I left, you know,

Page 59

1  shortly after that.
2  Q   So you were informed --
3     Do you recall if it was the summer?
4  A   I don't.  I don't recall.
5  Q   Is there any document that would help you to
6  remember when you transferred?
7  A   I don't think so.
8     Maybe in the corporate office, but no.
9  Q   Okay.  And you said that shortly after you
10 arrived at the Short Hills location, you left.
11    Were you let go then?
12 A   It wasn't shortly.  I was there a while.
13    How long that while is, I don't recall.
14    And they did a second reorg, so I assume it was
15 probably a year later in business terms.
16    When they restructured, my regional boss, which I
17 forget his last name, but Michael, I believe he had the New
18 Jersey/PA stores, and I was sitting at the flagship store
19 for that region, and during the reorg --
20    Whatever they worked out between him and
21 corporate, he wanted to be at the store he was at, and I had
22 the flagship store that I was sitting at.  So during the
23 reorg, he needed to be at my store per the corporate office.
24    I forget the options I had, but either way I had
25 to leave, and one of the options was to take a severance

Case 1:19-cv-08927-GBD-SLC   Document 128-8   Filed 09/20/23   Page 19 of 43

Deposition of Bobby Booker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 60

1  package, and I was happy to leave the East Coast, so I did.
2    Q    Were you replaced by that gentleman that you're
3  talking about?
4    A    Yes.  So Michael was my boss once I left New
5  York.  He was the boss for all of New Jersey and PA.
6        I wouldn't necessarily replace.  I was sitting at
7  his store where he should have been.  So they required him
8  to be at his store, so I had to leave.
9    Q    So you said you had to leave no matter what; is
10 that correct?
11   A    Correct.
12   Q    Why did you have to leave no matter what?
13   A    Because the flagship store for the company at
14 59th Street has 2000 some employees.  The store at Short
15 Hills is maybe 100, 150 employees.  It's an anchor store for
16 the mall there.
17       We're both senior executives, even though he's a
18 regional, if you will, so there's just not space.
19 Economically in business, it doesn't make sense to have two
20 senior personnel at that store without the footprint or need
21 for us both to be there.
22   Q    Okay.  But could you have taken any other
23 position within Bloomingdale's?
24   A    I don't recall what the offer was with them.
25       I do recall that I couldn't remain at the store,

Page 61

1  and I was more than happy to accept the severance package so
2  I could leave the East Coast.
3    Q    Okay.  And you said that was --
4        Would you say that was before --
5        Would you say that was at some point between
6  January -- well, January 2017 to December 2017, so before
7  2018?
8    A    Possibly.  I'm not sure.  I believe I was still
9  up there in early 2018.  I don't recall the exact dates,
10 however.
11   Q    Okay.  Just to be clear, they had a
12 reorganization at the 59th Street location or at the New
13 Jersey -- when you transferred to the New Jersey location?
14       Was it the reorganization that started at the New
15 Jersey location?
16   A    So, it was several years.  So the reorg was
17 corporate, so it's company-wide.  And as I said, they did
18 the reorganization throughout the company.  And all the
19 stores that they moved around, there were holes now in the
20 New Jersey/PA market, and we're kind of heavy, for good
21 reason, at the 59th Street.
22       I believe I was the most junior senior executive,
23 so that may have played a part in it, and I believe I was
24 probably already living in Jersey at this point.
25       So as there were holes there for senior

Page 62

1  executives, I moved to New Jersey, and it just worked out
2  for everyone.
3        A year later, as they continued to make
4  operations more efficient as a company, they needed the
5  regional boss to sit at the store that I was sitting at,
6  which means that I had to leave.
7    Q    Right.
8        So when you say a year later, because it sounds
9  like it's all within the same year, but then you're saying
10 it's a year later, so that's where I'm getting a little
11 confused.
12       So what do you mean by a year later?
13   A    So I say year later just specifically in business
14 terms in that in any reorganization.  So companies don't do
15 reorganizations multiple times a year unless something is
16 going really bad.
17       So, yes, they may do one per calendar year,
18 fiscal year, every three years, but those were the
19 circumstances that caused me to leave New York, and
20 ultimately those were the circumstances for the next
21 evolution or next phase.
22       However, it was set up, I'm not sure.  That's a
23 conversation you have to have with the corporate office.
24 But there was a next step and a next step that required the
25 regional boss to be at the flagship store, which I sat at.

Page 63

1    Q    Were you opposed to the transfer to the Short
2  Hills location?
3    A    I don't believe so.  I believe I was already
4  living in New Jersey at that time, so it was going across
5  the tunnel or the bridge or the train across the waters, you
6  know, not the cheapest thing, so I imagine that I wasn't too
7  upset about it.
8    Q    Okay.  Did anyone else --
9        Was anyone else transferred at the time?
10   A    Not right when I was.  I believe Chris left
11 shortly after I did.  As far as my peers, I don't believe
12 so.
13   Q    What about when you --
14       I understand that your position was -- not that
15 you were replaced, but the person that you were in the
16 position for had to come now to take over.
17       Was anyone else let go or transferred or moved
18 from their position besides you?
19   A    Yeah, so it was a big reorg.  I remember some
20 people moving around in the other Manhattan stores and the
21 Boston area.
22       Who they were specifically, I don't recall what
23 happened with the rest of the company.  I'm not sure.  I
24 know some stories were closed after the reorg out west, but
25 I don't recall the specifics.

Deposition of Bobby Booker                                   Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 64

1  Q   This is 2017; right?
2  A   Yes.
3  Q   Could you be transferred --
4      Could you have been transferred to a
5  Bloomingdale's or Macy's in Texas?
6  A   Macy's, yes.
7      Bloomingdale's, no.
8      Again, I don't remember the full offer.  Again, I
9  was excited to be able to receive a severance package, and I
10 was excited to, you know, move back South.  So that was my
11 choice when I heard and, you know, that's kind of what that
12 was.
13 Q   Okay.  And at that point were there any
14 conversations --
15     Did you have any conversations regarding any
16 complaints against you by any female employees?
17 A   No.
18 Q   Okay.  And when you --
19     When you went to Texas, that's when you
20 started working for -- you created your own company;
21 correct?
22 A   Correct.
23 Q   Trident, okay.
24     Did Bloomingdale's agree --
25     Withdrawn.

Page 65

1      Did you have a letter of reference or
2  recommendation from Bloomingdale's after you left?
3  A   I believe I remember my bosses letting me know
4  that if I needed one, they could give me one, a letter of
5  recommendation.
6      I think there's a Bloomingdale's policy that they
7  don't actually give that, but I think my former bosses would
8  give me a personal -- I believe we had a conversation where
9  they'd give me a personal recommendation -- you know, letter
10 of recommendation or reference for any future employment
11 past when I actually left Bloomingdale's.
12 Q   Who was that specifically?
13 A   I believe both Fred and Michael.
14 Q   Okay.  What's Michael's last name?
15     Did you say it already?
16 A   I don't recall.  Michael --
17     Yeah, I don't recall what his last name is.
18 Q   Okay.  Did you learn that anyone --
19     Withdrawn.
20     Did you know that a former female employee of
21 Bloomingdale's was making sexual harassment claims against
22 you?
23 A   Not until this deposition.
24 Q   Okay.  So before this deposition, you did not
25 know that a former employee was making a complaint

Page 66

1  against or claims against you; is that correct?
2  A   That's correct.
3  Q   And when you say "before this deposition," do you
4  mean before the subpoena -- you received the subpoena?
5  A   Before I talked to the attorneys, I didn't know
6  that there was any claim against me of any type.
7  Q   Okay.  And when you learned about the claims --
8      Do you know the specific claims that were made
9  against you?
10 A   I don't.
11     MS. MENDOZA:  Okay.  So just give me five
12 minutes.  We're going to upload --
13     I'm going to go on to this document, and then I
14 should be done within the next 30 minutes unless,
15 Betty, you have questions.
16     If we could just take a 10-minute break.
17     (Recess was taken.)
18     MS. MENDOZA:  If we can introduce the Amended
19 Complaint Plaintiff's Exhibit 4.
20     (Exhibit 4 was marked for identification.)
21 Q   Take a moment to look at that document.
22     MS. MENDOZA:  Do you want to have control over
23 the document, or would you rather him attempt to scroll
24 it?
25     MR. FLOWERS:  I don't have control over it here,

Page 67

1  so I guess we need to scroll it.
2      Of course, you know, it's not realistic that
3  Mr. Booker is going to be able to read it as it goes.
4  It looks like it's very long.
5  BY MS. MENDOZA:
6  Q   The question, Mr. Booker, this is the Amended
7  Complaint in front of you.
8      Have you seen this document before?
9      I'll scroll from top to bottom to refresh.  If
10 you have seen this document before, let me know.
11 A   I don't believe I've seen that.
12 Q   Okay.  And at the top there it says, "Case Number
13 1:19-cv-08927-GBD Document 21 filed January 10, 2020."
14     Do you see that at the top there?
15 A   Yes.
16 Q   Okay.  And you can keep going down to the very
17 end.
18     Just going through this, again, you do not recall
19 seeing this document; correct?
20 A   No.
21 Q   Okay.  All right.  So this is Plaintiff's filed
22 Amended Complaint, and we can go back to the top.
23     Before we go to this, let's go to --
24     I think the video has been uploaded, so we'll go
25 to the first video.

Page 68

1    Again, this is trying to refresh your
2 recollection as to who Kristina Mikhaylova is, the Plaintiff
3 in this case, but this is marked "Confidential," so this is
4 confidential. Please do not disclose this to anyone.
5    We can do the first video, the _2180. Again,
6 this is a video that was produced in this case.
7    But taking the pictures that you've seen earlier
8 today and now this video, do you recall who Kristina
9 Mikhaylova is?
10   A   I do not.
11   Q   Okay. Is there any document or anything that
12 could help you to refresh your recollection who she was or
13 who she is?
14   MR. FLOWERS: Objection to form.
15   A   Not that I'm aware of.
16   MS. MENDOZA: Okay. So let's try the next video,
17 _2181, please.
18   MR. FLOWERS: Are these marked as exhibits?
19   MS. MENDOZA: Would you want them to be marked as
20 exhibits?
21   MS. TIERNEY: The content, I'm not particularly
22 concerned that there's any secrets being revealed. I
23 think we marked it "Confidential" just because it was
24 of your client, and we didn't want that on the Internet
25 or something, but it's up to you.

Page 69

1    If you don't mind having it marked, I don't, but
2 if you don't want it marked, I don't know that it needs
3 to be.
4    You've identified them by their Bates number and
5 so we can, you know, find them if we need to.
6    MS. MENDOZA: We'll mark this. We'll mark it, so
7 5 and 6, I think.
8    (Exhibit 5 was marked for identification.)
9    (Exhibit 6 was marked for identification.)
10 BY MS. MENDOZA:
11   Q   Does that refresh your recollection who that is?
12   A   It does not.
13   Q   Looking at the video again, this doesn't refresh
14 your recollection?
15   A   It does.
16   MS. MENDOZA: Okay. We can get off the screen
17 now. Thank you.
18 BY MS. MENDOZA:
19   Q   Do you recall speaking to a female by the name of
20 Kristina during your tenure -- female employee of the Chanel
21 department during your tenure at Bloomingdale's?
22   A   I don't recall speaking to a female employee by
23 the name of Kristina. But I do recall, yes, speaking to
24 both female and male employees at Chanel.
25   Q   Right.

Page 70

1    And you don't recall speaking to that female that
2 you just saw in the video; is that correct?
3   A   That's correct.
4   Q   Nor in the photos you saw earlier, correct, you
5 don't recall speaking to that person?
6   A   That's correct.
7   Q   All right. We can go back to Plaintiff's
8 Exhibit 4, the Amended Complaint, and we'll turn to page 7.
9    Again, that woman you saw on the screen, Kristina
10 Mikhaylova, former employee of Bloomingdale's, is making
11 these accusations or is stating that this is what happened,
12 so I'm going to be reading her Amended Complaint now that's
13 in front of you, page 7.
14   So we'll start at paragraph 37. "Around
15 October of 2016, Defendant Booker of Defendants' Loss
16 Prevention Unit began to sexually pursue Plaintiff Kristina
17 Mikhaylova by unnecessarily appearing at Plaintiff's work
18 station uninvited. Defendant Booker's sexual advances made
19 Plaintiff overtly uncomfortable."
20   Is that a true statement?
21   A   No.
22   Q   Why not?
23   A   Because it is an untrue statement.
24   Q   What makes it untrue?
25   A   It's a lie. Those didn't happen. The incident

Page 71

1 didn't happen.
2   Q   Okay, because why?
3   MR. FLOWERS: Objection to form.
4   A   Because what I'm being accused of is not
5 something that happened.
6 BY MS. MENDOZA:
7   Q   Okay. So you did not --
8    Did you sexually pursue the woman in the video,
9 Kristina Mikhaylova, or the photos you saw earlier?
10   A   No, I did not.
11   MR. FLOWERS: Objection to form.
12 BY MS. MENDOZA:
13   Q   Okay. And around October 2016 --
14   Look at that paragraph, though.
15   Around October of 2016, were you -- you were an
16 employee of Bloomingdale's in the Loss Prevention Unit; is
17 that correct?
18   MR. FLOWERS: Objection to form.
19   A   Yes, I was a senior executive in asset
20 protection.
21 BY MS. MENDOZA:
22   Q   Okay. All right. Well, turn now to the
23 paragraph -- next paragraph of the filed Amended Complaint.
24   "At the same time, Defendant Booker made sexual
25 innuendos towards Plaintiff's commenting on Plaintiff's

Deposition of Bobby Booker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

Page 72

1 buttocks and appearances."
2      Is that a true statement?
3    A    It is not.
4    Q    Why not?
5    A    Because, again what I'm being accused of is not
6 what happened.
7    Q    Okay.  So did you comment on any female
8 employee's buttocks or appearances?
9    A    No.
10   Q    Okay.  Paragraph 39, "Defendant Booker
11 unwelcomingly touched Plaintiff's arm when he spoke to her
12 and regularly stood uncomfortably close to Plaintiff on
13 purpose."
14     Is that a true statement?
15   A    No.
16   Q    And why not?
17   A    Again, what I'm being accused of is not accurate
18 or true.
19   Q    Okay.  Is that because you don't recall who
20 Kristina Mikhaylova is?
21   A    It's not because I don't recall who Kristina
22 Mikhaylova is.
23     It's because I wouldn't dare put myself in this
24 position with any employee.
25   Q    Okay.  And what do you mean, "in this position"?

Page 73

1    A    For someone to later say that they were --
2 something was unwelcome that I did to them sexually.
3    Q    Okay.  The next paragraph, paragraph 40, "Between
4 October of 2016 and late March 2017 Defendant Booker made
5 unconcealed, unwelcomed sexual advances toward Plaintiff
6 such that Plaintiff's female co-workers and former security
7 guards commented on Booker's inappropriate behavior."
8      Is that a true statement?
9      MR. FLOWERS:  Objection to form.
10   A    It is not.
11 BY MS. MENDOZA:
12   Q    Okay.  Did you make, during --
13     Between October 2016 and late March 2017, were
14 you employed at the Bloomingdale's 59th Street location?
15   A    I can't say the date for sure for March of '17.
16 I'm not sure when I transferred to New Jersey.
17     So I'm not sure if I was still at 59th Street
18 during that time.
19   Q    Okay.  And did you make any sexual advances on a
20 female employee at the 59th Street location?
21   A    No.
22   Q    Paragraph 41, turning back to Plaintiff's
23 Exhibit 4, "Plaintiff repeatedly denied Booker's sexual
24 advances."
25     Is that a true statement?

Page 74

1    A    No.
2      MR. FLOWERS:  Objection to form.
3 BY MS. MENDOZA:
4    Q    Okay.  And paragraph 42, "Around the same time,
5 another employee of the Defendants' Loss Prevention Unit
6 told Plaintiff, 'how can you run with that ass.'  Defendant
7 Booker and other employees in the Loss Prevention Unit
8 frequently called Plaintiff over to ogle at her buttocks."
9      Is that a true statement?
10     MR. FLOWERS:  Objection to form.
11   A    No.
12 BY MS. MENDOZA:
13   Q    Did you --
14     Do you recall looking at any female's buttocks
15 during your employment?
16   A    No.
17   Q    Do you recall talking about anyone else's -- any
18 female employee's buttocks with any of the other security
19 guards?
20   A    No.
21   Q    And do you recall hearing anyone say, "How can
22 you run with that ass"?
23   A    No, I did not.
24   Q    Okay.  Do you recall hearing anyone in the
25 security loss prevention, asset protection department making

Page 75

1 any comment about a female employee's buttocks?
2    A    No, I don't.
3    Q    And that's all the questions --
4      Actually, withdrawn.
5      We can get off the screen.  This question is for
6 the Amended Complaint.
7      Have you understood all the questions I've asked
8 you today?
9      MR. FLOWERS:  Objection to form.
10   A    Yes.
11 BY MS. MENDOZA:
12   Q    Would you like to change any of your prior
13 answers today?
14   A    No.
15     MS. MENDOZA:  Okay's.  And then that's all the
16 questions that I have.
17     MS. TIERNEY:  Mr. Booker, thank you so much for
18 your time today.  I have nothing for you, unless your
19 counsel has questions that he wants to pose, but I have
20 nothing.
21     MR. FLOWERS:  We'll reserve our questions until
22 time of trial.
23     MS. MENDOZA:  Thank you all for your patience.
24     (Whereupon, the deposition was concluded at
25 1:03 p.m.)

Case 1:19-cv-08927-GBD-SLC   Document 128-8   Filed 09/20/23   Page 23 of 43

Deposition of Bobby Booker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

```
 1                        CERTIFICATE

 2            I, Gina Williams, Registered Professional Court

 3    Reporter, do certify that the above deposition was reported

 4    by me and that the foregoing transcript is a true and

 5    accurate record to the best of my knowledge, skills, and

 6    ability.

 7            I further certify that I am not an employee of

 8    counsel or any of the parties, nor a relative or employee of

 9    any attorney or counsel connected with the action, nor

10    financially interested in the action.

11            Subscribed and sworn to before me when taken this

12    3rd day of March, 2023.

13

14                          _____

15                          GINA WILLIAMS, RPR, CRR

16

17

18

19

20

21

22

23

24

25
```

1                    ACKNOWLEDGMENT OF DEPONENT

2

3           I, BOBBY BOOKER, do hereby certify that I have

4    read the foregoing pages and that the same is a correct

5    transcription of the answers given by me to the questions

6    therein propounded, except for the corrections or changes in

7    form or substance, if any, noted in the attached Errata

8    Sheet.

9

10

11   _____

12   BOBBY BOOKER                                          Date

13

14   Subscribed and sworn to before me this

15   ___ day of _____, 2023.

16   My commission expires:_____

17

18   _____

19   Notary Public

20

21

22

23

24

25

```
 1                    – – – – – – –

 2                       ERRATA

 3                    – – – – – – –

 4    PAGE    LINE                    CHANGE/REASON

 5    _____   _____   _____

 6    _____   _____   _____

 7    _____   _____   _____

 8    _____   _____   _____

 9    _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25
```

Case 1:19-cv-08927-GBD-SLC   Document 128-8   Filed 09/20/23   Page 26 of 43

Deposition of Bobby Booker                              Kristina Mikhaylova v. Bloomingdale's Inc., et al.

## WORD INDEX

**< $ >**
**$100,000**   35:9

**< 1 >**
**1**   3:8   31:4, 5   45:6
**1:03**   75:25
**1:19-cv-08927-GBD**
67:13
**10**   67:13
**10:37**   1:19
**100**   27:5   60:15
**10119**   2:5
**1032**   53:4
**105**   17:10
**1086**   3:10   52:12
**10-minute**   66:16
**11**   49:25   50:6
**115**   17:10
**15**   20:14   21:2
**150**   60:15
**15'ish**   20:25
**17**   73:15
**19**   17:19
**19-8927**   1:6

**< 2 >**
**2**   3:9   35:13, 18   52:3,
6
**2,000**   32:19   41:17
50:7
**2000**   60:14
**2000s**   12:22
**2002**   14:20
**2007**   15:5
**2008**   15:5
**2014**   11:21   13:1
**2015**   19:19   20:12
**2015/'16**   19:22
**2015/2016**   19:3
**2016**   4:19   10:23
13:17, 21   70:15
71:13, 15   73:4, 13
**2016/'17**   21:15
**2016/2017**   39:25
**2017**   4:20   9:22
10:22   13:17, 21
19:19   21:15   58:7, 9

**61:6**   64:1   73:4, 13
**2017/2018**   15:16
**2018**   9:22   17:17
61:7, 9
**2019**   11:17   12:2, 6
17:2   18:1, 11
**2020**   16:5, 14   67:13
**2021**   11:9
**2023**   1:14, 18   76:12
77:15
**20-something**   9:3
**21**   67:13
**2180**   3:10   68:5
**2181**   3:10   68:17
**24**   6:4, 7

**< 3 >**
**3**   1:14, 18   3:10   8:17
52:7, 9
**30**   66:14
**31**   3:8
**35**   3:9
**37**   70:14
**39**   72:10
**3rd**   76:12

**< 4 >**
**4**   3:4, 10   66:19, 20
70:8   73:23
**40**   73:3
**41**   73:22
**42**   74:4
**4905**   2:4

**< 5 >**
**5**   3:10   69:7, 8
**500**   19:14
**52**   3:10
**5200**   2:11
**59th**   4:18   9:21
10:11, 14, 20   18:22
22:1, 2   27:5   30:22
31:14   32:18   37:16
46:7   49:25   52:22
60:14   61:12, 21
73:14, 17, 20

**< 6 >**
**6**   3:10   69:7, 9

**66**   3:10
**69**   3:10

**< 7 >**
**7**   70:8, 13
**75**   45:4
**75202**   2:11

**< 8 >**
**80**   45:4
**84**   8:17

**< 9 >**
**901**   2:11
**9631**   8:22   10:2

**< A >**
**A&M**   15:10
**a.m**   1:19
**ability**   76:6
**able**   64:9   67:3
**above-styled**   1:18
**abuse**   44:16, 18
**accept**   61:1
**accessories**   38:22
**accurate**   72:17   76:5
**accusations**   70:11
**accuse**   21:3   28:25
44:4
**accused**   24:17   71:4
72:5, 17
**ACKNOWLEDGMEN
T**   77:1
**action**   20:2, 21
24:25   76:9, 10
**address**   8:20, 21   9:3,
5, 8   10:2, 5, 8
**advance**   58:1
**advances**   57:22
70:18   73:5, 19, 24
**affair**   47:6
**affairs**   56:7
**afternoon**   47:24
**ago**   7:19
**agree**   64:24
**al**   1:8
**alerted**   41:23
**Alliance**   16:13, 15
**allowed**   55:21
**allows**   50:11

**Amended**   3:10
66:18   67:6, 22   70:8,
12   71:23   75:6
**America**   2:10
**analyst**   19:16   21:9
**anchor**   60:15
**ANDREW**   2:16
**annually**   25:13
**annulled**   14:13
**anonymous**   24:4
54:21
**answer**   5:3   6:10
23:16   40:8   56:19
**answering**   5:21   6:1
**answers**   75:13   77:5
**apologize**   4:8
**appearances**   72:1, 8
**appearing**   70:17
**appears**   54:14
**ApplePay**   46:6
**apply**   19:9
**appropriate**   56:12
**approving**   27:24
**area**   37:20   57:9, 19
58:5   63:21
**areas**   26:14
**arm**   72:11
**arrested**   8:4
**arrived**   59:10
**asked**   6:11   75:7
**asking**   5:2   15:24
33:15   41:2   51:10
56:17, 22
**aspect**   44:22   45:12
56:11
**ass**   74:6, 22
**asset**   21:13   22:3, 6,
22   23:5   26:9   27:4
28:12   34:16, 21
37:10, 12   40:14   45:2,
20   71:19   74:25
**assign**   26:22
**assigned**   26:24   30:6
49:18
**assigning**   27:10, 17
**assist**   27:17, 23
**Associate**   2:15
**associated**   29:7
**assume**   18:21   47:14
59:14

**assuming**  14:*8*  25:*7*
34:*12*
**assumption**  54:*16*
**attached**  77:*7*
**attempt**  66:*23*
**attend**  14:*21*, *23*
15:*6*  47:*1*
**attorney**  4:*9*  6:*15*, *22*,
*23*  7:*7*, *10*  76:*9*
**attorneys**  66:*5*
**audio**  18:*9*
**authority**  35:*24*
**available**  29:*21*  30:*9*
**aware**  5:*20*  36:*12*
43:*14*  68:*15*

**< B >**
**bachelor's**  15:*3*
**back**  4:*21*  9:*12*
18:*24*  21:*6*  32:*22*
34:*8*  37:*23*  46:*6*
49:*12*  51:*16*  57:*17*
64:*10*  67:*22*  70:*7*
73:*22*
**background**  8:*6*
14:*16*
**backtrack**  10:*15*
**bad**  62:*16*
**Bank**  2:*10*
**based**  54:*8*  57:*12*
**basically**  41:*4*  43:*22*
**basis**  22:*25*  23:*7*
26:*12*, *19*  40:*21*
**Bates**  3:*10*  31:*20*
32:*4*  52:*2*, *10*  53:*4*
69:*4*
**Becker**  7:*16*  22:*14*
25:*10*, *15*
**began**  70:*16*
**beginning**  18:*9*
**behalf**  2:*3*, *6*
**behavior**  73:*7*
**believe**  4:*17*, *18*, *19*
10:*12*, *22*, *24*  11:*17*
15:*19*  17:*9*  24:*5*, *12*
25:*11*, *13*, *20*  27:*21*
31:*25*  33:*25*  34:*4*
35:*6*  36:*1*, *13*  38:*25*
40:*16*  42:*19*, *21*
43:*21*, *23*  44:*5*  45:*3*

51:*18*  53:*23*  58:*8*, *9*,
*25*  59:*17*  61:*8*, *22*, *23*
63:*3*, *10*, *11*  65:*3*, *8*,
*13*  67:*11*
**best**  76:*5*
**better**  19:*8*
**BETTY**  2:*15*  66:*15*
**betty.tierney@macys.c
om**  2:*16*
**bflowers@krcl.com**
2:*12*
**big**  41:*9*, *10*, *15*
42:*15*  45:*5*  46:*6*
63:*19*
**bike**  49:*2*
**bikes**  49:*3*
**birth**  8:*16*, *18*
**birthday**  25:*22*
**birthdays**  25:*20*
**bit**  10:*16*  55:*1*
**blah**  54:*23*
**BLM001021**  3:*10*
52:*12*
**BLOOMINGDALE'S**
1:*7*  4:*11*, *14*, *16*  7:*13*
9:*21*  10:*5*, *11*, *19*
13:*17*  15:*17*, *20*
16:*11*, *12*  17:*21*  18:*5*,
*8*, *19*, *22*  19:*4*, *8*, *10*,
*23*  21:*7*, *9*, *12*, *17*
24:*16*  25:*2*, *18*, *24*
34:*22*  36:*2*, *11*, *13*
38:*22*, *24*  39:*7*, *10*
41:*11*  43:*24*  46:*1*
47:*11*, *13*  53:*12*, *20*
55:*5*, *21*  56:*25*  57:*6*,
*21*  58:*1*, *7*, *13*, *14*
60:*23*  64:*5*, *7*, *24*
65:*2*, *6*, *11*, *21*  69:*21*
70:*10*  71:*16*  73:*14*

**Bloomingdale's/Macy's**
34:*2*
**BOBBY**  1:*13*, *17*  3:*3*
4:*2*  8:*10*, *12*, *13*  77:*3*,
*12*
**body**  47:*17*, *19*
53:*21*, *25*  56:*3*
**BOOKER**  1:*13*, *17*
3:*3*  4:*2*, *7*  8:*10*, *12*

31:*7*  32:*8*  52:*8*  67:*3*,
*6*  70:*15*  71:*24*  72:*10*
73:*4*  74:*7*  75:*17*
77:*3*, *12*
**Booker's**  70:*18*  73:*7*,
*23*
**boss**  17:*16*  24:*2*
59:*16*  60:*4*, *5*  62:*5*,
*25*
**bosses**  65:*3*, *7*
**Boston**  63:*21*
**bottom**  67:*9*
**break**  6:*9*  31:*1*  51:*9*
66:*16*
**bridge**  63:*5*
**bring**  29:*11*, *18*, *20*
**broken**  27:*6*
**BRUCE**  2:*12*  55:*12*
**building**  50:*1*
**business**  15:*3*  59:*15*
60:*19*  62:*13*
**buttocks**  72:*1*, *8*
74:*8*, *14*, *18*  75:*1*
**buying**  35:*7*

**< C >**
**calendar**  62:*17*
**call**  27:*7*
**called**  4:*3*  10:*24*
74:*8*
**camera**  23:*2*
**cameras**  22:*24*, *25*
23:*7*
**capacity**  30:*15*
**capital**  17:*24*
**Captioner**  1:*21*
**cards**  46:*5*
**Carolina**  11:*24*
**CASE**  1:*6*  4:*10*  7:*2*,
*13*, *20*, *23*  52:*23*
67:*12*  68:*3*, *6*
**cases**  40:*16*
**Castellani**  30:*13*
32:*24*  33:*1*
**Cathy**  37:*24*
**cause**  1:*18*
**caused**  22:*11*  62:*19*
**causing**  45:*11*
**CEO**  16:*3*, *6*, *19*

**certain**  12:*4*  49:*5*
55:*14*, *15*
**CERTIFICATE**  76:*1*
**Certified**  1:*20*, *21*
**certify**  76:*3*, *7*  77:*3*
**chain**  22:*12*
**Chanel**  26:*8*, *10*
31:*13*  32:*15*, *17*
35:*24*  36:*1*, *4*, *14*
37:*1*, *2*, *6*  38:*21*  40:*1*
42:*18*, *22*  46:*11*  51:*6*
69:*20*, *24*
**Chanel's**  36:*10*
**change**  75:*12*
**CHANGE/REASON**
78:*4*
**changes**  28:*7*  77:*6*
**chart**  45:*3*
**cheapest**  63:*6*
**cheating**  47:*3*  56:*6*
**check**  26:*14*  37:*6*
50:*3*
**children**  14:*2*  50:*19*
**choice**  64:*11*
**Chris**  33:*7*, *13*  63:*10*
**Christopher**  30:*12*
32:*23*
**circumstances**  57:*13*
62:*19*, *20*
**claim**  66:*6*
**claims**  65:*21*  66:*1*, *7*,
*8*
**CLARITY**  2:*23*
**clear**  61:*11*
**client**  35:*11*  68:*24*
**clock**  56:*10*, *14*
**close**  32:*19*  37:*17*
72:*12*
**closed**  63:*24*
**closer**  28:*9*  50:*11*
**clothing**  47:*11*
**Coast**  40:*19*  60:*1*
61:*2*
**COLEMAN**  2:*10*
**college**  14:*21*, *23*
**come**  18:*24*  29:*17*
30:*9*  37:*23*  40:*16*
63:*16*
**comes**  33:*5*  46:*4*

comfortable 54:5
coming 41:22
commencing 1:19
comment 72:7 75:1
commented 73:7
commenting 71:25
comments 55:6, 7, 19
commission 77:16
committed 50:23
committing 50:12
common 19:13
communicate 39:12
42:13
communicated 43:8
communication 39:13
companies 17:24
62:14
company 16:7, 21, 22,
25 17:1, 3 18:17
19:8 22:21 24:5
33:20, 21 60:13
61:18 62:4 63:23
64:20
company-wide 61:17
compared 51:4
comparison 51:1
Complaint 3:10
17:11 20:4 65:25
66:19 67:7, 22 70:8,
12 71:23 75:6
complaints 64:16
completed 15:19
completely 33:1, 3
compliment 47:10, 17
complimented 56:3
complimenting 53:21,
24
concerned 68:22
concluded 75:24
condition 5:24
conduct 51:21
confidential 6:21
68:3, 4, 23
confused 62:11
connected 76:9
consider 56:6, 15, 16
considered 53:21
57:6 58:1
contact 7:16

content 68:21
contents 52:14
continued 62:3
continues 44:21
control 36:9, 12
52:16, 18 66:22, 25
conversation 48:23
49:7 50:21 54:4, 7,
25 55:3, 9, 12 56:12,
13 62:23 65:8
conversations 37:3, 5
40:12 43:4 46:20, 23
47:3, 5 48:13, 16
56:9, 11 58:19 64:14,
15
copy 32:11
cordial 36:18 49:21
cordially 39:12, 13
corporate 40:14, 20
41:24 43:1, 7, 10, 11
45:20 58:20 59:8, 21,
23 61:17 62:23
Corps 20:14, 24
correct 5:4 8:11, 14,
15 10:3, 6 13:9, 18,
19 14:9, 10 15:18
16:23, 24 18:15, 22,
23 19:19 21:9, 10
28:3, 20, 21 30:23, 24
31:8, 9 34:13 44:6
51:19 58:7, 17 60:10,
11 64:21, 22 66:1, 2
67:19 70:2, 3, 4, 6
71:17 77:4
corrections 77:6
correspond 38:5, 20
39:11
corresponded 43:8
corresponding 39:3
corroborate 41:1
Counsel 2:15 6:13
75:19 76:8, 9
count 17:9
countless 41:17
couple 38:12
course 24:3 38:7
49:21 67:2
courses 15:22
COURT 1:1 5:12

14:8 76:2
courtroom 5:8
cover 27:15
co-workers 7:13
25:19 47:21, 22 73:6
create 17:1
created 17:17 64:20
creating 17:24
credit 46:5
crime 40:18, 24
41:12 42:10, 20
crimes 41:12
criminal 41:21
CRR 76:15
cubicle 28:15
curious 45:8
current 8:20, 21
11:5 15:25
currently 11:12
customer 29:7 35:6
45:5 56:2
customers 22:12, 19
23:25 34:2 41:17
cut 9:1 18:9

< D >
Dahan 36:22
daily 22:25 26:12,
19 27:2, 10 40:15, 16,
21 41:16, 24
Dallas 2:11 8:19, 22
9:12 11:11 16:8, 17
18:2
dare 72:23
date 8:16 73:15
77:12
dates 61:9
day 23:7 26:14
42:11, 14, 16 46:10,
12 47:25 49:23
76:12 77:15
deal 41:18
December 61:6
deem 33:20
defendant 8:2 70:15,
18 71:24 72:10 73:4
74:6
Defendants 1:9 2:6
31:25 70:15 74:5

definitely 44:20
degree 15:2
degrees 14:25 15:11,
21
demeaning 55:24
denied 73:23
Dennis 38:18
department 26:8, 10,
13, 15 28:1, 2 31:14
32:15, 17 34:22
35:25 36:1, 15 37:1,
2, 6 38:9, 21, 22 40:2
42:18 45:21 46:1, 8,
11 51:3, 6 69:21
74:25
departments 26:11
28:20 33:2, 4 43:3
49:13, 17 50:14
depending 48:2
depends 28:9 54:1
DEPONENT 77:1
deposed 4:4
DEPOSITION 1:13,
17 4:24 6:20, 24 7:6,
10 22:15 31:24
65:23, 24 66:3 75:24
76:3
DEREK 2:4
describe 22:16
describing 53:11
desk 28:13, 18
details 7:20
determines 34:10
Diaz 38:18
difference 29:25
differences 14:7
different 28:19 50:11
difficulties 4:8
DIRECT 2:23 24:2
36:8
directly 16:14 22:19
disciplinary 20:2, 21
24:25
disclose 6:21 68:4
discount 43:19, 22
44:15, 18
discounted 49:4
discovery 31:20
discretion 28:2

Deposition of Bobby Booker                                          Kristina Mikhaylova v. Bloomingdale's Inc., et al.

discrimination  23:*18*
24:*11*, *22*  51:*17*, *23*
discuss  7:*4*, *20*  48:*13*
discussed  6:*22*, *23*
discussing  32:*23*
discussions  58:*23*, *24*
DISTRICT  1:*1*, *2*
diverter  44:*5*, *14*
diverters  43:*16*, *17*
divorce  11:*16*  12:*23*
13:*4*  14:*5*
document  52:*8*, *18*
53:*1*  59:*5*  66:*13*, *21*,
*23*  67:*8*, *10*, *13*, *19*
68:*11*
documents  7:*1*  52:*6*
doing  29:*1*  39:*14*
42:*21*  47:*24*
door  37:*7*, *17*
doors  45:*9*
dress  50:*11*
due  17:*22*
duly  4:*3*
duties  22:*16*  40:*15*

< E >
earlier  68:*7*  70:*4*
71:*9*
Early  12:*22*  61:*9*
earshot  55:*9*
east  35:*7*  40:*19*
60:*1*  61:*2*
Eastern  1:*19*
Economically  60:*19*
educational  14:*16*
efficient  62:*4*
efforts  42:*9*
either  5:*24*  13:*10*
15:*5*  19:*22*, *25*  41:*23*,
*24*  59:*24*
elaborate  22:*6*  30:*17*
54:*2*
Eleanor  36:*22*, *25*
37:*1*  50:*17*, *22*, *25*
else's  74:*17*
e-mail  43:*13*
employed  73:*14*
Employee  3:*10*
23:*12*  28:*22*, *24*  29:*2*
34:*22*  39:*15*, *16*

43:*19*  44:*14*  45:*23*
46:*15*, *17*, *24*  48:*9*
50:*17*  51:*5*  52:*22*
57:*23*  58:*4*  65:*20*, *25*
69:*20*, *22*  70:*10*
71:*16*  72:*24*  73:*20*
74:*5*  76:*7*, *8*
employees  17:*6*, *8*, *11*,
*15*  22:*12*, *19*  23:*4*
27:*5*  29:*6*  32:*14*, *19*
33:*16*  34:*1*, *15*  35:*25*
36:*1*, *2*, *9*, *13*, *15*, *18*
37:*10*, *11*, *21*  38:*24*
39:*6*, *21*  41:*17*  44:*25*
45:*11*  47:*11*, *13*  48:*4*,
*6*, *17*  49:*1*, *21*  50:*7*,
*13*  51:*22*  60:*14*, *15*
64:*16*  69:*24*  74:*7*
employee's  53:*21*
56:*18*  72:*8*  74:*18*
75:*1*
employer  15:*25*
19:*12*
employers  21:*3*  26:*4*
employment  10:*4*
13:*16*, *21*  15:*24*  21:*6*
38:*6*  39:*7*  57:*21*
65:*10*  74:*15*
entering  31:*3*
entire  21:*16*  22:*5*
26:*21*  43:*14*  50:*15*
entities  22:*23*
Errata  77:*7*  78:*2*
especially  41:*10*
54:*18*
ESQUIRE  2:*5*, *12*, *15*
Essentially  22:*18*
29:*13*  41:*1*
et  1:*8*
Eunice  37:*24*
evaluation  25:*6*
events  46:*25*
Everett  14:*24*
everyone's  55:*1*
evolution  62:*21*
exact  61:*9*
Examination  3:*4*  4:*5*
example  56:*1*  57:*14*,
*25*
excited  64:*9*, *10*

executive  17:*22*
21:*13*  23:*2*  29:*21*
33:*6*  45:*2*  54:*22*
61:*22*  71:*19*
executives  27:*14*, *15*
29:*15*  30:*7*, *19*  60:*17*
62:*1*
Exhibit  3:*8*, *9*, *10*
31:*1*, *4*, *5*  35:*13*, *18*
52:*3*, *6*, *7*, *9*  66:*19*, *20*
69:*8*, *9*  70:*8*  73:*23*
exhibits  68:*18*, *20*
existence  16:*25*
expense  26:*16*
expenses  6:*17*
expensive  42:*16*
expires  77:*16*
explain  28:*23*  39:*13*
43:*17*
exploring  48:*14*
extended  49:*13*, *16*
extent  25:*22*
external  23:*5*  26:*25*
27:*1*, *3*, *6*, *12*  29:*6*, *25*
30:*6*  33:*25*  34:*14*, *21*
37:*10*  43:*20*  50:*10*
externally  46:*5*

< F >
familiar  31:*11*  36:*23*,
*24*  51:*4*  53:*2*, *9*
far  33:*13*  34:*2*, *15*
36:*17*  38:*10*  40:*21*,
*24*  46:*8*  53:*5*  63:*11*
female  33:*10*, *11*
39:*6*  46:*15*, *17*, *24*
47:*11*, *13*, *17*, *21*  48:*6*,
*8*, *16*  50:*16*  51:*5*
53:*21*  58:*4*  64:*16*
65:*20*  69:*19*, *20*, *22*,
*24*  70:*1*  72:*7*  73:*6*,
*20*  74:*18*  75:*1*
females  47:*10*
female's  53:*25*  74:*14*
figure  29:*11*
filed  14:*8*  67:*13*, *21*
71:*23*
financial  19:*16*  21:*9*
financially  76:*10*

find  69:*5*
finding  35:*7*
fine  26:*15*  51:*12*
52:*19*
fire  33:*16*, *17*, *22*
44:*9*
fired  20:*17*  26:*3*
33:*24*  34:*23*
firing  33:*20*  38:*10*
first  4:*3*  14:*4*  36:*23*
52:*24*  67:*25*  68:*5*
fiscal  62:*18*
five  43:*11*  66:*11*
five-minute  31:*1*
flagship  59:*18*, *22*
60:*13*  62:*25*
floor  23:*8*  28:*19*
floors  49:*25*  50:*7*
FLOWERS  2:*12*
40:*7*  51:*12*, *14*  52:*13*,
*19*  56:*19*  57:*1*  66:*25*
68:*14*, *18*  71:*3*, *11*, *18*
73:*9*  74:*2*, *10*  75:*9*,
*21*
focus  29:*5*  41:*16*
42:*9*  43:*21*
focused  29:*7*  41:*25*
follow  36:*9*
follows  4:*4*
footprint  60:*20*
foregoing  76:*4*  77:*4*
forget  27:*7*  59:*17*, *24*
form  40:*7*  56:*19*, *24*
57:*1*  68:*14*  71:*3*, *11*,
*18*  73:*9*  74:*2*, *10*
75:*9*  77:*7*
formal  5:*8*
former  7:*12*  25:*18*
65:*7*, *20*, *25*  70:*10*
73:*6*
founded  17:*25*
frame  15:*16*  25:*12*
53:*13*
fraud  35:*1*, *6*  46:*2*, *4*
Fred  7:*16*  22:*14*
58:*20*  65:*13*
frequently  74:*8*
friendly  36:*18*  39:*16*,
*18*
friends  36:*14*  54:*4*

**front** 5:8, 9  53:1
67:7  70:13
**full** 8:10, 12  52:21
64:8
**fully** 5:21, 25
**further** 29:14, 23
38:11  76:7
**future** 65:10

**< G >**
**garage** 49:3, 4
**gear** 49:5
**geared** 49:24
**General** 2:15
**generally** 26:17
37:16  45:1
**gentleman** 60:2
**getting** 27:24  62:10
**Gillian** 11:19, 20, 23
12:6, 14  13:1, 17, 20
14:6
**Gina** 1:19  76:2, 15
**Give** 45:25  52:15
56:1  57:14, 25  65:4,
7, 8, 9  66:11
**given** 23:11, 12, 17
77:5
**giving** 41:14
**go** 4:22  15:9  21:6
23:8  26:12  28:18, 19
29:12, 22, 23  30:1
32:2  34:8  37:6, 11
50:5  53:4, 5  54:20
58:16, 18  59:11
63:17  66:13  67:22,
23, 24  70:7
**goes** 27:10  67:3
**going** 21:6  23:4, 9
28:1  29:11  31:3
32:22  33:19  38:11
39:14  40:7  43:14
49:12, 23  50:4, 10
51:8, 10, 12, 13, 16
62:16  63:4  66:12, 13
67:3, 16, 18  70:12
**Good** 4:7  37:12
47:15, 24, 25  54:4, 13
61:20
**grabbing** 57:19

**graduate** 14:17  15:4
**gray** 57:9
**Green** 16:1, 12
**greet** 47:21, 22
**groin** 57:19  58:5
**ground** 4:23  43:3
**GROUP** 2:4  16:13,
15
**guards** 73:7  74:19
**Gucci** 39:1
**guess** 18:4  21:15
67:1
**guys** 32:1  49:19
51:25

**< H >**
**half** 52:14
**Hall** 16:1, 12
**handbag** 37:22
38:21  49:25
**Handbook** 3:10
23:12  52:22
**handful** 46:13
**handle** 27:9  33:21
**handled** 34:18  43:1
**handles** 33:5
**handling** 34:2  40:15
**handshake** 57:17
**hang** 50:4
**hanging** 50:6, 9
**happen** 24:20  30:11
34:3  36:20  41:8, 9
56:10  70:25  71:1
**happened** 34:5  44:2,
22  63:23  70:11  71:5
72:6
**happening** 30:1
42:14, 16
**happens** 40:18  42:15
45:4
**happy** 5:18  6:10
25:22  60:1  61:1
**harassing** 55:23
**harassment** 21:4
23:18  24:7, 10, 17, 23
51:17, 23  53:6, 11, 22
56:15, 16, 24  57:7
65:21
**haul-outs** 27:22

**head** 35:9
**headquarters** 24:3
**healthy** 45:7
**heard** 53:24  64:11
**hearing** 74:21, 24
**heavy** 61:20
**hello/good-bye** 57:16
**help** 40:1, 3, 5  48:22
54:16  59:5  68:12
**helping** 33:13
**hey** 54:22
**high** 14:17
**high-dollar** 26:18
36:4  37:17  39:1, 4
41:11, 13
**higher-position** 23:23,
25
**high-risk** 37:20
**Hill** 18:14, 16
**Hills** 10:24  21:18
22:1, 4  58:7, 16
59:10  60:15  63:2
**hired** 16:6  24:5
36:10
**hitting** 41:13  42:10
**holes** 58:15  61:19, 25
**home** 8:20, 21  9:8,
11, 12
**honestly** 35:10  52:1
**hourly** 23:7  27:2, 10
**hours** 6:4, 7
**house** 9:13
**HR** 24:3, 12  29:13,
18  30:2  33:11, 19
34:9  38:11, 12  54:21
**hug** 48:1, 4  57:16
**hugging** 48:9
**human** 29:23  33:17
34:8, 18, 20  38:5, 12
44:10, 20

**< I >**
**idea** 12:25
**identification** 31:5
35:18  52:9  66:20
69:8, 9
**identified** 41:20  69:4
**III** 8:12
**imagine** 39:21  63:6

**impair** 5:20
**important** 5:13
**inappropriate** 54:6
55:1, 3, 7, 20, 25  56:4
57:10, 18  73:7
**incentivize** 45:10
**incident** 70:25
**incidents** 43:25
**includes** 37:15
**individual** 36:3
43:13  48:3
**individuals** 55:8
**infidelity** 12:10  13:10
**inform** 51:24
**information** 6:21, 24
23:17, 20  29:12  41:1,
3  44:12  46:9  54:20
**informed** 54:19
58:24  59:2
**initial** 38:11
**initially** 10:9, 12, 20
**innocent** 57:10, 14, 16
**innuendos** 71:25
**Inquiring** 56:17
**interacted** 22:19
**interaction** 22:22
**interested** 76:10
**internal** 27:6  29:4, 9,
19  30:8, 21  34:17
44:17  45:19
**internally** 29:5  45:3,
4
**Internet** 68:24
**interstate** 42:21
**interview** 21:21
29:14  44:22
**interviews** 33:8, 9, 14
**intimate** 56:23
**intimidation** 57:7
**introduce** 66:18
**investigate** 29:16, 18
44:10  45:8
**investigated** 28:22, 24
34:17  45:22
**investigating** 29:15
38:10
**investigation** 24:18
29:14  33:5  44:21
**investigations** 22:20
29:9, 10  32:25  33:13

34:25  38:11  40:25
41:5, 7  42:24  43:15
44:2, 15, 17, 18
**involved**  27:21
32:25  34:25  40:24
42:2, 17  43:15  44:10
**involving**  35:4
**Irreconcilable**  14:7
**issue**  27:23  39:2
41:10  42:22  46:6
54:15, 19
**items**  36:4
**its**  51:4

**< J >**
**January**  8:17  61:6
67:13
**Jersey**  9:18, 24  10:1,
5, 13, 23, 24  11:25
22:4  43:2  58:14
60:5  61:13, 15, 24
62:1  63:4  73:16
**Jersey/PA**  59:18
61:20
**jewelry**  26:15
**job**  22:16  27:19
29:9  39:19
**joking**  54:13
**judge**  5:7, 8
**junior**  61:22
**jury**  5:9

**< K >**
**KANE**  2:10
**keep**  50:3  51:13
52:17, 21  67:16
**Kendra**  12:18, 19
13:13
**Kerrville**  8:22
**key**  26:14
**kind**  26:17  41:14
43:3  50:25  55:4
61:20  64:11
**knew**  39:17  54:18
**know**  4:12  5:3, 17
6:9  22:18, 19  23:22
24:2  25:12, 21  27:22,
23  29:6, 14, 23  31:25
32:2  34:6  36:16, 18,
19, 20, 22  37:24  38:9,

10, 13, 14, 18  40:18
41:10, 12, 14  44:11
45:8  46:12  49:16, 22
50:7  51:9, 24  52:16,
17  53:7, 15  54:6, 14,
15, 21, 22, 23, 24  55:1,
2, 13, 14, 22  56:4
57:10  58:25  63:6, 24
64:10, 11  65:3, 9, 20,
25  66:5, 8  67:2, 10
69:2, 5
**knowledge**  76:5
**KRISTINA**  1:4  4:10,
12, 21  30:4, 11  31:8
34:13, 14  35:4, 21
39:24  48:23  50:18,
22  68:2, 8  69:20, 23
70:9, 16  71:9  72:20,
21

**< L >**
**lady**  12:18
**laid**  18:4, 8, 10
**large**  40:16  41:13
42:4, 7, 8, 10, 20
**larger**  41:20
**late**  73:4, 13
**LAW**  2:4  38:1, 16
**lawsuit**  7:25
**leads**  37:18
**learn**  65:18
**learned**  66:7
**leave**  16:20  19:5, 6
20:15, 17  45:8  55:4
59:25  60:1, 8, 9, 12
61:2  62:6, 19
**left**  4:19  9:21, 24
10:1, 13, 14, 21  15:17,
19  17:20, 21  21:8
32:22  58:25  59:10
60:4  63:10  65:2, 11
**LEGAL**  2:16  6:17
7:17
**legitimately**  42:20
**letter**  65:1, 4, 9
**letting**  65:3
**lie**  70:25
**life**  46:21
**limits**  55:20

**line**  33:21  57:11
78:4
**lines**  51:25
**little**  10:15  50:11
62:10
**live**  9:7, 9, 10, 13, 14
11:23  30:1
**lived**  8:25  9:2  10:12
11:24
**living**  9:18  10:5, 8
11:12  12:4, 6, 8
61:24  63:4
**locate**  6:15
**location**  18:22  26:22
27:18  31:14  37:17
59:10  61:12, 13, 15
63:2  73:14, 20
**LOGAN**  2:10
**Logistics**  16:1  22:12
27:8  45:6
**long**  8:25  9:2  10:21
16:25  20:24  36:7, 9
59:13  67:4
**look**  23:2  31:11
44:10  50:11  52:8, 21,
23  53:2  66:21  71:14
**looked**  31:15  47:15
**looking**  54:15  69:13
74:14
**lookout**  41:19
**looks**  51:2  53:9  67:4
**Loss**  22:8, 11, 20
41:15  45:3, 4, 11
70:15  71:16  74:5, 7,
25
**lot**  40:18  41:18
42:8, 9  48:19, 20
**Louis**  2:16  37:15
**lower-position**  23:23,
24

**< M >**
**Macy's**  2:15  6:16, 17
7:17  24:5  36:8, 11
43:23  64:5, 6
**Main**  2:11
**maintain**  25:17, 25
**making**  22:21  36:19
43:18  65:21, 25
70:10  74:25

**male**  47:22  48:4
58:4  69:24
**mall**  60:16
**manager**  21:23  24:9
29:23  33:19  34:10
38:13
**managers**  24:12
38:9, 20
**managing**  22:18
**Manhattan**  10:12, 14,
21  63:20
**manpower**  42:9
**MARCH**  1:14, 18
73:4, 13, 15  76:12
**Marine**  20:14, 24
**marital**  13:23
**mark**  69:6
**marked**  31:5  35:18
52:9  66:20  68:3, 18,
19, 23  69:1, 2, 8, 9
**market**  61:20
**MARKS**  2:23
**marriage**  12:12, 14
14:13  46:24
**marriages**  13:11
**married**  11:1, 3, 8, 10,
14, 18, 20  12:15, 17
13:1, 13, 17  46:25
50:19
**marry**  12:19
**matter**  60:9, 12
**MBA**  15:14
**mean**  9:6, 7, 24  27:3
37:3  54:3  55:11
62:12  66:4  72:25
**means**  62:6
**media**  25:21
**medication**  6:3, 7
**MELISSA**  2:5  4:9
31:19  52:11
**melissa@dereksmithla
w.com**  2:6
**MENDOZA**  2:5  3:4
4:6, 9  30:25  31:3, 6,
17, 22, 25  32:7, 12, 13
35:15, 19  40:9  51:8,
13, 15  52:2, 12, 15, 20
53:16, 17  56:21  57:3
66:11, 18, 22  67:5
68:16, 19  69:6, 10, 16,

*18* 71:6, *12, 21* 73:11
74:*3, 12* 75:11, *15, 23*
**mental** 5:*24*
**mentioned** 42:*25*
54:*23*
**Michael** 59:*17* 60:*4*
65:*13, 16*
**Michael's** 65:*14*
**Mid-2000s** 12:*24*
**MIKHAYLOVA** 1:*4*
4:*10, 12* 30:4 31:*8*
34:*13* 35:4, *21* 39:*24*
48:*23* 50:*19* 68:2, *9*
70:*10, 17* 71:9 72:*20,*
*22*
**military** 9:*11*
**mind** 30:*25* 69:*1*
**minimal** 30:*10*
**minimizing** 22:8, *11*
**minutes** 23:*3* 66:*12,*
*14*
**missed** 28:*8*
**Missouri** 2:*16*
**mistaken** 10:*25*
15:*20* 36:2
**moment** 4:*21* 23:*4*
30:2 38:*17* 45:*25*
50:*10, 13* 52:7 66:*21*
**monitor** 23:*8*
**monitored** 23:*6*
**monitoring** 22:*25*
23:*7*
**months** 4:*18*
**morning** 4:7 47:*24*
**motorcycles** 48:*17, 19,*
*20, 24* 49:*5*
**move** 9:*23* 50:5
64:*10*
**moved** 10:*1, 13*
58:*14* 61:*19* 62:*1*
63:*17*
**moving** 27:*24* 51:*8,*
*10* 52:*17* 63:*20*
**multiple** 40:*17* 62:*15*

**< N >**
**name** 8:*10, 12, 13*
11:*5* 36:*23* 37:*25*
38:*3, 16, 19* 50:*17, 25*

51:*1, 3* 59:*17* 65:*14,*
*17* 69:*19, 23*
**named** 11:*19* 12:*18*
**names** 8:8 51:*4*
**NECESSARILY** 2:*23*
60:*6*
**need** 6:9, *25* 37:*13*
49:*22* 60:*20* 67:*1*
69:*5*
**needed** 49:*20, 23*
59:*23* 62:*4* 65:*4*
**needs** 28:*9* 45:*21*
69:*2*
**NEW** 1:2 2:5 9:*18,*
*24* 10:*1, 5, 13, 23, 24*
11:*25* 22:4 43:2
58:*14* 59:*17* 60:*4, 5*
61:*12, 13, 14, 20* 62:*1,*
*19* 63:*4* 73:*16*
**newer** 46:*6*
**nonsexual** 55:*25*
**Nope** 13:*24* 15:*23*
20:*18, 23* 48:*15*
**North** 11:*24*
**Notary** 77:*19*
**noted** 77:*7*
**Number** 3:7 31:*20*
42:*4, 7, 8* 67:*12* 69:*4*
**numbered** 1:*18*
**numerous** 54:*19*
**NYPD** 41:*20, 24*

**< O >**
**oath** 5:*3*
**object** 40:*7*
**objecting** 32:*10*
**Objection** 56:*19*
57:*1* 68:*14* 71:*3, 11,*
*18* 73:9 74:2, *10*
75:*9*
**objective** 55:*19*
**Objectively** 55:*23*
**obtain** 14:*25* 15:*11*
**obviously** 23:*22*
36:*17* 57:9
**October** 70:*15* 71:*13,*
*15* 73:*4, 13*
**offense** 50:*12*
**offer** 60:*24* 64:*8*

**office** 28:*11, 12*
43:*10, 11* 58:*20* 59:*8,*
*23* 62:*23*
**off-limits** 55:*6*
**ogle** 74:*8*
**Okay** 4:*14, 21* 5:*1, 6,*
*14, 15, 18, 19* 6:*11, 13,*
*17, 19* 7:*1, 4, 18, 22*
8:*6, 10, 13* 9:*5, 14, 23*
10:*4, 8, 15* 11:*1, 5, 8,*
*10, 18, 23* 12:*1, 6, 8,*
*10, 23* 13:*7, 13, 16*
14:*2, 5, 8, 13, 23* 15:*9,*
*13, 17, 21* 16:*6, 8*
17:*21* 18:*3, 7, 12, 18,*
*24* 19:*12, 24* 20:*1, 12,*
*15, 19, 21, 24* 21:*1, 18,*
*21* 22:*6, 9, 16, 24*
23:*8, 11* 24:*6, 9, 13,*
*16, 22* 25:*9, 15, 24*
26:*6* 27:*12, 17* 28:*1,*
*18* 29:*17* 30:*3, 12, 17,*
*22* 31:*12* 32:*12, 20*
33:*16* 34:*12* 35:*3, 17*
36:*14, 22* 37:*5, 23*
38:*1, 5, 15* 40:*12*
41:6 42:*1, 17* 43:*4,*
*15* 45:*25* 46:*14* 47:*2*
49:*8, 12, 20* 52:*2*
53:*3, 10, 24* 54:*2, 9,*
*17* 55:*5, 13* 56:*1, 5*
57:*4, 14, 21* 58:*6, 10,*
*18* 59:*9* 60:*22* 61:*3,*
*11* 63:*8* 64:*13, 18, 23*
65:*14, 18, 24* 66:*7, 11*
67:*12, 16, 21* 68:*11,*
*16* 69:*16* 71:*2, 7, 13,*
*22* 72:*7, 10, 19, 25*
73:*3, 12, 19* 74:*4, 24*
**Okay's** 75:*15*
**once** 43:*3* 60:*4*
**ones** 49:*18*
**ongoing** 39:*3*
**open** 12:*12* 45:*9*
**opening** 28:*8*
**operations** 62:*4*
**opposed** 63:*1*
**options** 59:*24, 25*
**organization** 41:*21*
42:*20*

**organizations** 41:*12*
42:*10*
**organized** 40:*18, 24*
41:*12*
**outcome** 42:*23*
**outfit** 47:*15*
**outside** 34:*5, 15, 21*
37:*18*
**outwardly** 54:*6* 55:*2*
56:*3*
**overhear** 54:*5* 55:*16*
**overheard** 54:*24*
**overlap** 13:*5*
**oversight** 50:*8*
**overt** 58:*3*
**overtime** 27:*25*
**overtly** 55:*23* 70:*19*

**< P >**
**p.m** 75:*25*
**PA** 60:*5*
**package** 17:*23* 29:*13*
60:*1* 61:*1* 64:*9*
**packages** 29:*19*
**PAGE** 3:2 41:*4*
52:*14* 70:*8, 13* 78:*4*
**pages** 77:*4*
**paragraph** 70:*14*
71:*14, 23* 72:*10* 73:*3,*
*22* 74:*4*
**parents** 9:*9, 10*
**part** 27:*12* 36:*17*
39:*19* 41:*20* 44:*19*
45:*5* 47:*12, 19* 51:*9*
55:*8* 58:*24, 25* 61:*23*
**particular** 34:*4*
**particularly** 34:*12*
68:*21*
**parties** 76:*8*
**partner** 38:*12*
**partners** 38:*12*
**party** 13:*10* 54:*22*
**pat** 57:*17*
**patience** 75:*23*
**paying** 6:*17, 18*
**peer** 30:*16* 32:*23*
**peers** 23:*24* 63:*11*
**Penn** 2:*4*
**people** 22:9 27:*24*
30:*3* 38:*10, 15* 41:*19*

Case 1:19-cv-08927-GBD-SLC Document 128-8 Filed 09/20/23 Page 33 of 43

Deposition of Bobby Booker
Kristina Mikhaylova v. Bloomingdale's Inc., et al.

45:9  50:4  55:18
56:10  63:20
**percent**  45:4, 6
**period**  49:14, 16
**person**  23:23, 24, 25
44:5, 14  45:21  47:8
49:10  51:2  56:22
63:15  70:5
**personal**  20:9, 10, 16
25:17, 25  26:1  46:21
54:7  56:8  65:8, 9
**personnel**  36:3
37:12  60:20
**person's**  56:23
**phase**  62:21
**photo**  31:10, 11  32:3,
4, 10
**Photograph**  3:8, 9
**photos**  70:4  71:9
**physical**  5:25  57:5
**physically**  48:8, 10
**picture**  35:12
**pictures**  40:2  49:9
68:7
**pie**  45:3
**place**  8:18  50:5
**places**  26:18
**Plaintiff**  1:5  2:3
4:10  7:25  35:12
68:2  70:16, 19  72:12
73:5, 23  74:6, 8
**Plaintiff's**  31:4
35:13  52:7  66:19
67:21  70:7, 17  71:25
72:11  73:6, 22
**played**  61:23
**Plaza**  2:4, 10
**please**  5:17  52:4
56:20  68:4, 17
**PLLC**  2:4
**point**  9:7, 18  12:4
13:20  25:15  27:16
61:5, 24  64:13
**poke**  55:14
**police**  43:2
**policies**  22:21  36:10,
11  51:16, 19  53:20
55:5  56:25  57:6
58:2

**policy**  33:9, 19, 21
34:2, 7  36:8  38:10,
14  39:20  43:22, 24
53:6, 10, 11  65:6
**Poors**  19:1, 6, 14
20:1  21:8  25:25
**P-o-o-r-s**  19:14
**portion**  22:2
**pose**  75:19
**position**  16:2, 18
19:10, 15, 17  21:11,
14, 17, 19  60:23
63:14, 16, 18  72:24,
25
**positively**  42:19
**possibility**  35:2
**possible**  36:21
**Possibly**  24:14  37:3
38:17  48:18  50:16
61:8
**post**  27:19, 20
**post-graduate**  15:6
**potential**  22:20
**Prada**  37:15
**pregnant**  39:7, 10, 11,
17, 22, 25  40:3
**prepare**  7:6
**prepared**  6:19
**prescription**  6:3, 6
**presence**  50:10
**PRESENT**  2:15  5:7
6:15  29:12
**pretty**  49:1
**prevent**  5:21, 25
**prevention**  22:8
70:16  71:16  74:5, 7,
25
**primarily**  30:19
**primary**  30:20  33:7
**prior**  75:12
**private**  56:13
**probably**  43:12  46:4,
5  47:14  50:9  58:19
59:15  61:24
**problems**  13:23
**produce**  31:23  32:1,
3
**produced**  31:19
35:15  52:23  68:6
**producing**  35:16

**Professional**  1:20
20:8  76:2
**profit**  43:18
**propounded**  77:6
**protection**  21:13
22:3, 7, 22  23:5  26:9
27:4  28:12  34:16, 22
37:10, 12  40:15  45:2,
20, 21  71:20  74:25
**provide**  44:11
**provided**  6:16  53:13
**Public**  77:19
**purchases**  43:19
**purpose**  72:13
**purposes**  32:7
**pursue**  70:16  71:8
**put**  7:16  29:19  52:3
56:2  72:23

**< Q >**
**quantities**  41:14
**quarterly**  25:13
**question**  5:18  6:11
34:20  55:19  67:6
75:5
**questions**  5:2, 16, 22
6:1  8:6  14:15  52:24
56:17  66:15  75:3, 7,
16, 19, 21  77:5
**QUOTATION**  2:23
**QUOTE**  2:23

**< R >**
**reach**  24:3  39:2
**reached**  22:14
**read**  67:3  77:4
**reading**  70:12
**realistic**  67:2
**really**  42:15  46:8, 9
49:24  62:16
**Realtime**  1:21
**reason**  5:20  14:5
17:5  54:7  61:21
**reasons**  20:16
**reattach**  35:8
**recall**  4:13  11:22
21:22  23:14, 16  24:1,
8, 18, 20  25:8, 9  30:5,
11  31:7, 13  32:8, 14,
20  33:14  34:24  35:2,

5, 6  36:25  37:25
38:3, 4, 15, 17  39:6, 9,
18  40:3  41:6  42:3,
17, 23  43:20  44:3, 8,
13, 19  45:15, 16, 17,
24  46:3, 9, 10  47:2
50:18, 20, 21, 22  52:1,
25  53:7, 8, 10, 18
57:24  58:21  59:3, 4,
13  60:24, 25  61:9
63:22, 25  65:16, 17
67:18  68:8  69:19, 22,
23  70:1, 5  72:19, 21
74:14, 17, 21, 24
**recalled**  50:16
**receive**  20:1, 21
23:14  24:9, 25  25:6
64:9
**received**  17:23  41:3
66:4
**Recess**  31:2  66:17
**recognize**  41:18, 19
**recognizing**  41:23
**recollection**  31:10
35:10, 14, 20  39:23
40:1, 4, 10  48:22
49:8  68:2, 12  69:11,
14
**recommend**  33:17, 23
34:6, 8, 20
**recommendation**
65:2, 5, 9, 10
**recommended**  58:16,
18
**recommending**  34:15
**record**  32:2  52:11,
13  76:5
**recorded**  33:9
**recruited**  19:9, 11
**reference**  65:1, 10
**REFLECT**  2:23
**refresh**  31:10  35:20
39:23  40:1, 3, 10
48:22  49:8  67:9
68:1, 12  69:11, 13
**refreshes**  35:14
**regarding**  7:9  22:15,
20, 22  23:17  24:7, 10,
19  34:25  40:14
43:16  44:15, 25

Case 1:19-cv-08927-GBD-SLC   Document 128-8   Filed 09/20/23   Page 34 of 43

Deposition of Bobby Booker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

46:23  47:5  51:17, 22
53:6  64:15
**regardless**  34:9
56:13
**regards**  7:13
**region**  59:19
**regional**  59:16  60:18
62:5, 25
**Registered**  1:20  76:2
**regularly**  39:16, 18
72:12
**relationship**  17:14
20:6, 9  32:23  39:3
48:2, 3, 14  50:23
54:8  55:2, 3, 13, 16,
17  56:8, 13, 23
**relationships**  13:5
20:11  25:18  26:1
56:7, 18
**relative**  76:8
**relieved**  37:14
**remain**  60:25
**remember**  23:21
31:21  42:19  43:25
50:25  51:1, 5  58:19
59:6  63:19  64:8
65:3
**REMOTE**  1:13, 17
**rent**  8:23
**reorg**  58:25  59:14,
19, 23  61:16  63:19,
24
**reorganization**  17:22
58:12, 13  61:12, 14,
18  62:14
**reorganizations**  62:15
**repeatedly**  41:14
73:23
**rephrase**  5:18
**replace**  60:6
**replaced**  60:2  63:15
**report**  22:13  24:1, 4,
22  29:17  36:19
39:20  45:9, 12  49:22
53:25  54:7, 20
**reported**  22:14  30:3
36:7  76:3
**Reporter**  1:20, 21
5:12  76:3

**reporting**  24:10
51:22
**reports**  24:2  29:10
**representative**  38:6
**represented**  6:13
**required**  60:7  62:24
**requirements**  33:20
34:6
**reselling**  43:18, 23
**reserve**  75:21
**residences**  9:16
**resign**  20:19
**resource**  38:13
**resources**  29:23
33:18  34:8, 18, 21
38:6  44:10, 21
**respond**  5:13
**responses**  5:14
**responsibilities**  22:17
40:15
**responsible**  32:17, 18
**rest**  63:23
**restructured**  59:16
**retail**  28:7  41:10, 21
**return**  35:8
**revealed**  68:22
**review**  7:1  25:9, 14
34:8  51:24
**Richard**  38:1, 16
**ride**  49:2
**riding**  49:5
**right**  7:22  10:15
14:15  18:7  19:20
32:14, 24  34:19  50:2
51:16  54:21  58:7
62:7  63:10  64:1
67:21  69:25  70:7
71:22
**romantic**  20:11
**rotating**  23:6
**rounds**  26:20  37:19
39:14
**Roy**  8:12
**RPR**  76:15
**rules**  4:23
**run**  29:10  74:6, 22
**RUSSELL**  2:10
**Russian**  51:6

**< S >**
**S&P**  19:14
**sat**  25:11, 13  62:25
**satellite**  39:1, 4
**saw**  40:2  45:11
49:9  70:2, 4, 9  71:9
**saying**  24:20  32:5
39:23  44:1, 14  62:9
**says**  67:12
**schedule**  23:6  28:6, 8
**schedules**  27:2, 11, 20
**scheduling**  27:22
**school**  14:17  15:6, 7
**screen**  31:17  35:23
52:3, 17  53:16  69:16
70:9  75:5
**scroll**  66:23  67:1, 9
**scrolling**  52:21, 25
**second**  59:14
**secondary**  15:6
**secrets**  68:22
**section**  51:10
**security**  36:3, 16, 17
37:7, 8, 9, 21  49:19
73:6  74:18, 25
**see**  32:9  35:13
39:25  52:13  53:1
57:22  67:14
**seeing**  13:7, 25  53:7,
8  67:19
**seen**  32:5  44:17
49:2, 5  67:8, 10, 11
68:7
**sell**  17:3
**senior**  17:22  21:13
23:2  29:21  30:7, 19
33:6  45:2  54:22
58:15  60:17, 20
61:22, 25  71:19
**sense**  60:19
**separate**  13:21  24:9
33:1, 3, 4
**service**  10:10
**set**  27:20  62:22
**sets**  27:1
**severance**  17:23
59:25  61:1  64:9
**sexual**  21:4  23:17
24:7, 10, 17, 22  51:17,
22  53:6, 11, 22  55:24

56:15, 16, 24  57:6, 22
58:1  65:21  70:18
71:24  73:5, 19, 23
**sexually**  70:16  71:8
73:2
**Sheet**  77:8
**shifts**  28:6
**shoes**  47:15
**Short**  10:24  18:14,
16  21:18  22:1, 4
41:22  58:6, 16  59:10
60:14  63:1
**shortly**  59:1, 9, 12
63:11
**show**  6:25  55:2
**side**  13:25  27:8
35:7  45:6  47:8
48:14
**sign**  24:13
**significant**  56:24
**signs**  55:2
**silos**  27:16
**single**  42:16
**singling**  44:13
**sit**  62:5
**sit-in**  33:8
**sitting**  33:14  59:18,
22  60:6  62:5
**situation**  54:1, 16, 25
55:18
**six**  43:11
**skills**  76:5
**small**  32:16  58:12, 13
**SMITH**  2:4
**social**  25:17, 21
**sold**  16:21, 22
**sorry**  35:22
**sounds**  29:5  36:23
51:4  62:8
**South**  64:10
**SOUTHERN**  1:2
**space**  54:12  60:18
**sparked**  49:6
**speak**  7:9, 15  38:1
39:15  46:14
**speaking**  36:25  45:1
69:19, 22, 23  70:1, 5
**specific**  43:7, 25
54:1  57:12  66:8

**specifically** 23:*1, 21*
29:*5, 6, 10* 36:*5*
39:*10* 42:22 43:*9*
44:*3* 45:*13* 49:*3*
62:*13* 63:22 65:*12*
**specifics** 63:25
**spell** 19:*12*
**spelling** 19:*13*
**spoke** 7:*16* 56:*3*
72:*11*
**spoken** 7:*12*
**spouse** 11:*6* 47:*3*
**St** 2:*16*
**staff** 58:*15*
**stamp** 32:*4* 53:*4*
**stamped** 52:*3*
**Standard** 1:*19* 19:*1,
6, 13* 20:*1* 21:*8*
25:*25*
**S-t-a-n-d-a-r-d** 19:*14*
**start** 16:*4* 17:*24*
70:*14*
**started** 16:*7* 19:*3, 25*
23:*13, 18, 21* 44:*17*
51:*19* 61:*14* 64:*20*
**starting** 19:*17* 21:*11*
**state** 44:*4* 52:*10*
56:*20*
**statement** 70:*20, 23*
72:*2, 14* 73:*8, 25*
74:*9*
**STATES** 1:*1* 20:*14*
**stating** 70:*11*
**station** 70:*18*
**stationed** 9:*12* 36:*3,
5*
**stay** 37:*7, 8* 49:*13*
50:*4*
**stealing** 22:*9* 29:*1*
**step** 62:*24*
**steps** 44:*12* 54:*13*
**sticks** 35:*9*
**stood** 72:*12*
**stop** 12:*4* 53:*5*
**stopped** 37:*19*
**stops** 44:*21*
**store** 4:*19, 20* 9:*21*
10:*11, 14, 18, 20, 22,
24* 18:*12, 14, 16* 22:*8,
10, 11* 26:*21* 28:*9*

29:*7* 30:22 32:*16, 18,
19* 34:*5, 15* 36:*6, 20*
37:*16* 39:*19* 41:*15*
45:*12* 46:*8* 49:25
50:*12, 15* 54:*18* 56:*2*
58:*15* 59:*18, 21, 22,
23* 60:*7, 8, 13, 14, 15,
20, 25* 62:*5, 25*
**stores** 10:*10* 37:22
39:*1, 4, 5* 40:*17*
41:*10, 13* 58:*14*
59:*18* 61:*19* 63:*20*
**stories** 63:*24*
**Street** 2:*11* 4:*19*
8:*22* 9:*22* 10:*11, 14,
20* 18:*22* 22:*1, 2*
27:*5* 30:*22* 31:*14*
32:*18* 34:*4, 5* 37:*16*
46:*7* 49:*25* 52:*22*
60:*14* 61:*12, 21*
73:*14, 17, 20*
**subjective** 55:*7, 8, 10,
17, 18* 56:*7*
**subpoena** 66:*4*
**Subscribed** 76:*11*
77:*14*
**substance** 77:*7*
**subway** 37:*18*
**suffer** 5:*24*
**Suite** 2:*4, 11*
**summer** 59:*3*
**supervise** 21:*25*
**supervised** 22:*2, 4*
51:*22*
**supervisor** 27:*1, 9*
33:*6* 36:*3*
**supervisor's** 27:*19*
**supposed** 6:*6* 37:*14*
41:*19*
**sure** 4:*18* 10:*23*
12:*21* 19:*25* 22:*21*
23:*14* 24:*14* 33:*15*
36:*19, 24* 37:*11*
38:*13* 39:*9, 20* 41:*3*
44:*2* 49:*1, 19* 51:*3*
61:*8* 62:*22* 63:*23*
73:*15, 16, 17*
**suspected** 42:*12*
**suspicion** 45:*2, 7, 8*
**suspicious** 44:*24*

**sworn** 4:*4* 76:*11*
77:*14*

**< T >**
**tags** 35:*8*
**take** 6:*6, 9* 30:*25*
31:*17* 35:*23* 44:*12*
51:*9* 52:*7, 21, 23*
59:*25* 63:*16* 66:*16,
21*
**taken** 1:*17* 4:*24* 6:*3*
31:*2* 60:*22* 66:*17*
76:*11*
**takes** 42:*9*
**talk** 29:*22* 49:*17, 19*
50:*4*
**talked** 6:*25* 37:*20*
66:*5*
**talking** 37:*21* 40:*21*
43:*13* 46:*13* 56:*5, 6*
60:*3* 74:*17*
**targeting** 45:*14*
**team** 7:*17* 22:*3, 5, 7,
18* 23:*5* 26:*25* 27:*1,
3, 4, 6, 9, 12, 15* 29:*4,
6, 9, 19, 25* 30:*7, 8, 21*
33:*5* 34:*1, 14, 16, 17*
36:*17* 43:*1, 9, 14, 20*
44:*18* 45:*20*
**technical** 4:*8*
**TECHNICIAN** 2:*16*
**Tell** 6:*19* 25:*15*
29:*13* 46:*14, 17*
47:*14* 54:*9*
**tenure** 10:*13* 21:*16*
24:*16* 25:*2* 31:*14*
38:*2, 22* 69:*20, 21*
**term** 27:*7* 29:*4*
**terminal** 34:*7*
**terminated** 34:*11*
**termination** 33:*21*
**terms** 39:*16* 59:*15*
62:*14*
**testified** 4:*4* 7:*22*
**Texas** 2:*11* 8:*19, 22*
9:*7, 12* 10:*1* 12:*9*
14:*11* 15:*10* 16:*8*
64:*5, 19*

**Thank** 4:*7* 31:*18*
35:*23* 69:*17* 75:*17,
23*
**theft** 36:*21*
**thing** 41:*24* 49:*20*
54:*21* 63:*6*
**things** 26:*16* 27:*25*
35:*7* 42:*21* 43:*21*
45:*10, 12* 47:*1, 25*
49:*6* 55:*14, 15* 57:*20*
**think** 21:*2* 38:*12, 23*
43:*9* 52:*2* 55:*16, 22*
56:*9* 59:*7* 65:*6, 7*
67:*24* 68:*23* 69:*7*
**third** 54:*22*
**third-party** 24:*4*
**thought** 45:*18*
**three** 7:*19* 62:*18*
**TIERNEY** 2:*15*
31:*19, 23* 32:*5, 10*
35:*17* 52:*10* 68:*21*
75:*17*
**Time** 1:*19* 6:*25*
12:*8* 13:*8* 15:*16*
23:*3* 25:*12* 27:*21*
37:*13* 39:*24* 49:*2, 14,
16* 53:*13* 54:*13* 63:*4,
9* 71:*24* 73:*18* 74:*4*
75:*18, 22*
**times** 28:*19* 30:*10*
41:*18* 46:*10, 13*
54:*19* 56:*9* 62:*15*
**tip** 44:*23, 24*
**tipping** 45:*17, 19*
**today** 5:*22* 6:*1, 13*
68:*8* 75:*8, 13, 18*
**today's** 6:*19* 7:*6, 9*
**told** 20:*17* 50:*18*
74:*6*
**tolerated** 23:*22*
**top** 67:*9, 12, 14, 22*
**touch** 48:*8, 10* 57:*5,
8, 10, 15, 16*
**touched** 72:*11*
**touches** 58:*4*
**touching** 57:*4*
**train** 63:*5*
**training** 15:*22* 24:*6,
10* 51:*18, 19, 21*

transcript 76:*4*
transcription 77:*5*
transfer 58:*10, 23*
63:*1*
transferred 58:*6*
59:*6* 61:*13* 63:*9, 17*
64:*3, 4* 73:*16*
trial 75:*22*
Trident 16:*12, 15, 22*
17:*6, 17, 20* 64:*23*
true 70:*20* 72:*2, 14,*
*18* 73:*8, 25* 74:*9*
*76:4*
truthfully 5:*3, 21, 25*
try 29:*10* 68:*16*
trying 32:*3, 9* 39:*25*
68:*1*
tunnel 63:*5*
turn 53:*3* 70:*8*
71:*22*
turning 73:*22*
two 7:*19* 54:*4* 60:*19*
type 25:*14* 41:*5, 7*
49:*20* 50:*8* 66:*6*

< U >
ultimately 34:*10*
62:*20*
uncomfortable 46:*18*
54:*10, 14* 70:*19*
uncomfortably 72:*12*
unconcealed 73:*5*
understand 5:*6, 10,*
*16* 63:*14*
understood 75:*7*
uninvited 70:*18*
unique 51:*1*
uniqueness 51:*4*
Unit 70:*16* 71:*16*
74:*5, 7*
UNITED 1:*1* 20:*14*
University 14:*24*
unnecessarily 70:*17*
untrue 70:*23, 24*
unwelcome 73:*2*
unwelcomed 73:*5*
unwelcomingly 72:*11*
updated 23:*15*
updates 51:*25*
upload 31:*1* 66:*12*

uploaded 35:*12* 52:*6*
67:*24*
upper 35:*7*
upset 63:*7*
upwards 35:*8*
usually 30:*1* 38:*25*
43:*12*

< V >
vendors 23:*25*
verbal 5:*14*
versus 43:*13*
Victoria 11:*7, 8*
VIDEO 2:*16* 3:*10*
67:*24, 25* 68:*5, 6, 8,*
*16* 69:*13* 70:*2* 71:*8*
violate 36:*10*
violated 34:*1*
violation 34:*10*
36:*21* 44:*25*
violations 34:*7* 36:*7*
Virginia 11:*24*
visit 26:*10, 18* 28:*1*
37:*11* 49:*17*
visited 26:*11*
Vuitton 37:*15*
vulnerable 26:*18*

< W >
walking 39:*15*
want 4:*22* 10:*22*
27:*7* 31:*1* 32:*2, 11*
43:*10* 51:*9* 52:*7, 16,*
*18, 23* 53:*7* 66:*22*
68:*19, 24* 69:*2*
wanted 59:*21*
wants 75:*19*
watch 22:*24* 50:*8*
watched 37:*7*
waters 63:*5*
way 21:*14* 29:*4*
35:*8* 47:*22* 48:*11*
59:*24*
ways 24:*1, 4*
weather-related 27:*23*
week 46:*13*
weeks 7:*19*
well 13:*1* 23:*9*
33:*12* 35:*16* 43:*10*

49:*15* 50:*6* 54:*11, 12*
61:*6* 71:*22*
went 9:*11* 19:*23*
21:*9* 25:*11* 26:*22*
27:*18* 38:*16* 44:*20*
46:*10* 49:*12* 64:*19*
we're 21:*6* 28:*7, 8, 9*
32:*3* 36:*16* 38:*9*
46:*13* 50:*9* 51:*12*
55:*13* 60:*17* 61:*20*
66:*12*
west 63:*24*
we've 34:*9*
whichever 28:*2*
WHITNER 2:*16*
wife 14:*4*
Williams 1:*20* 76:*2,*
*15*
wish 25:*22*
Withdrawn 7:*5*
11:*15* 12:*3* 18:*13*
25:*16* 26:*7* 32:*21*
40:*13* 42:*6* 43:*6*
46:*22* 53:*19* 64:*25*
65:*19* 75:*4*
Witness 2:*6* 3:*2* 4:*3*
33:*10, 11*
woman 11:*19* 39:*10*
40:*2* 49:*9* 50:*19*
70:*9* 71:*8*
woman's 56:*3*
women 13:*7* 14:*3*
work 4:*14, 16* 10:*18*
16:*8, 10, 14* 17:*18*
18:*18, 25* 19:*2* 20:*13*
26:*8* 30:*12, 15* 34:*14*
40:*14, 17, 19* 49:*2, 3*
56:*9, 12* 70:*17*
worked 10:*10, 11, 20,*
*22, 23* 17:*5, 20* 19:*20*
26:*9, 17* 29:*4* 30:*17*
32:*15* 37:*1* 38:*13*
59:*20* 62:*1*
working 16:*4* 18:*1*
19:*4* 53:*12* 64:*20*
works 51:*3*
workweek 28:*5*
written 25:*4*
wrong 19:*19*

wrongdoing 29:*1*

< Y >
Yeah 5:*11* 9:*15*
16:*5* 17:*7* 24:*8*
25:*21* 27:*14* 28:*25*
32:*7* 42:*3* 52:*5, 12,*
*15* 53:*23* 56:*22*
63:*19* 65:*17*
year 10:*21* 19:*25*
23:*15* 24:*6* 25:*6*
59:*15* 62:*3, 8, 9, 10,*
*12, 13, 15, 17, 18*
years 9:*4* 20:*25*
21:*2* 61:*16* 62:*18*
YORK 1:*2* 2:*5*
11:*25* 43:*2* 60:*5*
62:*19*

< Z >
zero 46:*12*
Zoom 1:*17*

Case 1:19-cv-08927-GBD-SLC    Document 128-8    Filed 09/20/23    Page 37 of 43
Deposition of Bobby Booker
Kristina Mikhaylova v. Bloomingdale's Inc., et al.

## WORD LIST

**< $ >**
**$100,000** *(1)*

**< 1 >**
**1** *(4)*
**1:03** *(1)*
**1:19-cv-08927-GBD** *(1)*
**10** *(1)*
**10:37** *(1)*
**100** *(2)*
**10119** *(1)*
**1032** *(2)*
**105** *(1)*
**1086** *(2)*
**10-minute** *(1)*
**11** *(2)*
**115** *(1)*
**15** *(2)*
**150** *(1)*
**15'ish** *(1)*
**17** *(1)*
**19** *(1)*
**19-8927** *(1)*

**< 2 >**
**2** *(5)*
**2,000** *(3)*
**2000** *(1)*
**2000s** *(1)*
**2002** *(1)*
**2007** *(1)*
**2008** *(1)*
**2014** *(2)*
**2015** *(2)*
**2015/'16** *(1)*
**2015/2016** *(1)*
**2016** *(9)*
**2016/'17** *(1)*
**2016/2017** *(1)*
**2017** *(14)*
**2017/2018** *(1)*
**2018** *(4)*
**2019** *(6)*
**2020** *(4)*
**2021** *(1)*
**2023** *(4)*

**20-something** *(1)*
**21** *(1)*
**2180** *(2)*
**2181** *(2)*
**24** *(2)*

**< 3 >**
**3** *(6)*
**30** *(1)*
**31** *(1)*
**35** *(1)*
**37** *(1)*
**39** *(1)*
**3rd** *(1)*

**< 4 >**
**4** *(6)*
**40** *(1)*
**41** *(1)*
**42** *(1)*
**4905** *(1)*

**< 5 >**
**5** *(3)*
**500** *(1)*
**52** *(1)*
**5200** *(1)*
**59th** *(22)*

**< 6 >**
**6** *(3)*
**66** *(1)*
**69** *(2)*

**< 7 >**
**7** *(2)*
**75** *(1)*
**75202** *(1)*

**< 8 >**
**80** *(1)*
**84** *(1)*

**< 9 >**
**901** *(1)*
**9631** *(2)*

**< A >**
**A&M** *(1)*

**a.m** *(1)*
**ability** *(1)*
**able** *(2)*
**above-styled** *(1)*
**abuse** *(2)*
**accept** *(1)*
**accessories** *(1)*
**accurate** *(2)*
**accusations** *(1)*
**accuse** *(3)*
**accused** *(4)*
**ACKNOWLEDGMENT** *(1)*
**action** *(5)*
**address** *(8)*
**advance** *(1)*
**advances** *(5)*
**affair** *(1)*
**affairs** *(1)*
**afternoon** *(1)*
**ago** *(2)*
**agree** *(1)*
**al** *(1)*
**alerted** *(1)*
**Alliance** *(2)*
**allowed** *(1)*
**allows** *(1)*
**Amended** *(8)*
**America** *(1)*
**analyst** *(2)*
**anchor** *(1)*
**ANDREW** *(1)*
**annually** *(1)*
**annulled** *(1)*
**anonymous** *(3)*
**answer** *(5)*
**answering** *(2)*
**answers** *(2)*
**apologize** *(1)*
**appearances** *(2)*
**appearing** *(1)*
**appears** *(1)*
**ApplePay** *(1)*
**apply** *(1)*
**appropriate** *(1)*
**approving** *(1)*
**area** *(5)*
**areas** *(1)*
**arm** *(1)*

**arrested** *(1)*
**arrived** *(1)*
**asked** *(2)*
**asking** *(7)*
**aspect** *(3)*
**ass** *(2)*
**asset** *(18)*
**assign** *(1)*
**assigned** *(3)*
**assigning** *(2)*
**assist** *(2)*
**Associate** *(1)*
**associated** *(1)*
**assume** *(3)*
**assuming** *(3)*
**assumption** *(1)*
**attached** *(1)*
**attempt** *(1)*
**attend** *(4)*
**attorney** *(7)*
**attorneys** *(1)*
**audio** *(1)*
**authority** *(1)*
**available** *(2)*
**aware** *(4)*

**< B >**
**bachelor's** *(1)*
**back** *(15)*
**background** *(2)*
**backtrack** *(1)*
**bad** *(1)*
**Bank** *(1)*
**based** *(2)*
**basically** *(2)*
**basis** *(5)*
**Bates** *(9)*
**Becker** *(4)*
**began** *(1)*
**beginning** *(1)*
**behalf** *(2)*
**behavior** *(1)*
**believe** *(47)*
**best** *(1)*
**better** *(1)*
**BETTY** *(2)*
**betty.tierney@macys.com** *(1)*
**bflowers@krcl.com**

Case 1:19-cv-08927-GBD-SLC   Document 128-8   Filed 09/20/23   Page 38 of 43

Deposition of Bobby Booker                                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

(1)
big  (8)
bike  (1)
bikes  (1)
birth  (2)
birthday  (1)
birthdays  (1)
bit  (2)
blah  (3)
BLM001021  (2)
BLOOMINGDALE'S
  (68)

Bloomingdale's/Macy's
  (1)
BOBBY  (9)
body  (5)
BOOKER  (20)
Booker's  (3)
boss  (7)
bosses  (2)
Boston  (1)
bottom  (1)
break  (4)
bridge  (1)
bring  (3)
broken  (1)
BRUCE  (2)
building  (1)
business  (4)
buttocks  (6)
buying  (1)

< C >
calendar  (1)
call  (1)
called  (3)
camera  (1)
cameras  (3)
capacity  (1)
capital  (1)
Captioner  (1)
cards  (1)
Carolina  (1)
CASE  (10)
cases  (1)
Castellani  (3)
Cathy  (2)
cause  (1)

caused  (2)
causing  (1)
CEO  (3)
certain  (4)
CERTIFICATE  (1)
Certified  (2)
certify  (3)
chain  (1)
Chanel  (21)
Chanel's  (1)
change  (1)
CHANGE/REASON
  (1)
changes  (2)
chart  (1)
cheapest  (1)
cheating  (2)
check  (3)
children  (2)
choice  (1)
Chris  (3)
Christopher  (2)
circumstances  (3)
claim  (1)
claims  (4)
CLARITY  (1)
clear  (1)
client  (2)
clock  (2)
close  (3)
closed  (1)
closer  (2)
clothing  (1)
Coast  (3)
COLEMAN  (1)
college  (2)
come  (6)
comes  (2)
comfortable  (1)
coming  (1)
commencing  (1)
comment  (2)
commented  (1)
commenting  (1)
comments  (3)
commission  (1)
committed  (1)
committing  (1)
common  (1)

communicate  (2)
communicated  (1)
communication  (1)
companies  (2)
company  (17)
company-wide  (1)
compared  (1)
comparison  (1)
Complaint  (11)
complaints  (1)
completed  (1)
completely  (2)
compliment  (2)
complimented  (1)
complimenting  (2)
concerned  (1)
concluded  (1)
condition  (1)
conduct  (1)
confidential  (4)
confused  (1)
connected  (1)
consider  (3)
considered  (3)
contact  (1)
content  (1)
contents  (1)
continued  (1)
continues  (1)
control  (6)
conversation  (13)
conversations  (15)
copy  (1)
cordial  (2)
cordially  (2)
corporate  (14)
Corps  (2)
correct  (45)
corrections  (1)
correspond  (1)
corresponded  (1)
corresponding  (1)
corroborate  (1)
Counsel  (5)
count  (1)
countless  (1)
couple  (1)
course  (4)
courses  (1)

COURT  (4)
courtroom  (1)
cover  (1)
co-workers  (5)
create  (1)
created  (2)
creating  (1)
credit  (1)
crime  (5)
crimes  (1)
criminal  (1)
CRR  (1)
cubicle  (1)
curious  (1)
current  (4)
currently  (1)
customer  (4)
customers  (5)
cut  (2)

< D >
Dahan  (1)
daily  (10)
Dallas  (8)
dare  (1)
date  (3)
dates  (1)
day  (11)
deal  (1)
December  (1)
deem  (1)
defendant  (7)
Defendants  (5)
definitely  (1)
degree  (1)
degrees  (3)
demeaning  (1)
denied  (1)
Dennis  (1)
department  (30)
departments  (8)
depending  (1)
depends  (2)
DEPONENT  (1)
deposed  (1)
DEPOSITION  (14)
DEREK  (1)
describe  (1)
describing  (1)

desk *(2)*
details *(1)*
determines *(1)*
Diaz *(1)*
difference *(1)*
differences *(1)*
different *(2)*
difficulties *(1)*
DIRECT *(3)*
directly *(2)*
disciplinary *(3)*
disclose *(2)*
discount *(4)*
discounted *(1)*
discovery *(1)*
discretion *(1)*
discrimination *(5)*
discuss *(3)*
discussed *(2)*
discussing *(1)*
discussions *(2)*
DISTRICT *(2)*
diverter *(2)*
diverters *(2)*
divorce *(4)*
document *(12)*
documents *(2)*
doing *(4)*
door *(2)*
doors *(1)*
dress *(1)*
due *(1)*
duly *(1)*
duties *(2)*

< E >
earlier *(3)*
Early *(2)*
earshot *(1)*
east *(4)*
Eastern *(1)*
Economically *(1)*
educational *(1)*
efficient *(1)*
efforts *(1)*
either *(8)*
elaborate *(3)*
Eleanor *(6)*
else's *(1)*

e-mail *(1)*
employed *(1)*
Employee *(32)*
employees *(45)*
employee's *(5)*
employer *(2)*
employers *(2)*
employment *(10)*
entering *(1)*
entire *(5)*
entities *(1)*
Errata *(2)*
especially *(2)*
ESQUIRE *(3)*
Essentially *(3)*
et *(1)*
Eunice *(1)*
evaluation *(1)*
events *(1)*
Everett *(1)*
everyone's *(1)*
evolution *(1)*
exact *(1)*
Examination *(2)*
example *(3)*
excited *(2)*
executive *(9)*
executives *(7)*
Exhibit *(21)*
exhibits *(2)*
existence *(1)*
expense *(1)*
expenses *(1)*
expensive *(1)*
expires *(1)*
explain *(3)*
exploring *(1)*
extended *(2)*
extent *(1)*
external *(15)*
externally *(1)*

< F >
familiar *(6)*
far *(10)*
female *(30)*
females *(1)*
female's *(2)*
figure *(1)*

filed *(4)*
financial *(2)*
financially *(1)*
find *(1)*
finding *(1)*
fine *(3)*
fire *(4)*
fired *(4)*
firing *(2)*
first *(6)*
fiscal *(1)*
five *(2)*
five-minute *(1)*
flagship *(4)*
floor *(2)*
floors *(2)*
FLOWERS *(19)*
focus *(4)*
focused *(2)*
follow *(1)*
follows *(1)*
footprint *(1)*
foregoing *(2)*
forget *(3)*
form *(13)*
formal *(1)*
former *(7)*
founded *(1)*
frame *(3)*
fraud *(4)*
Fred *(4)*
frequently *(1)*
friendly *(3)*
friends *(2)*
front *(5)*
full *(4)*
fully *(2)*
further *(4)*
future *(1)*

< G >
garage *(2)*
gear *(1)*
geared *(1)*
General *(1)*
generally *(3)*
gentleman *(1)*
getting *(2)*
Gillian *(9)*

Gina *(3)*
Give *(10)*
given *(4)*
giving *(1)*
go *(30)*
goes *(4)*
going *(29)*
Good *(9)*
grabbing *(1)*
graduate *(2)*
gray *(1)*
Green *(2)*
greet *(2)*
groin *(2)*
ground *(2)*
GROUP *(3)*
guards *(2)*
Gucci *(1)*
guess *(3)*
guys *(3)*

< H >
half *(1)*
Hall *(2)*
handbag *(3)*
Handbook *(3)*
handful *(1)*
handle *(2)*
handled *(2)*
handles *(1)*
handling *(2)*
handshake *(1)*
hang *(1)*
hanging *(2)*
happen *(9)*
happened *(7)*
happening *(3)*
happens *(3)*
happy *(5)*
harassing *(1)*
harassment *(16)*
haul-outs *(1)*
head *(1)*
headquarters *(1)*
healthy *(1)*
heard *(2)*
hearing *(2)*
heavy *(1)*
hello/good-bye *(1)*

help *(7)*
helping *(1)*
hey *(1)*
high *(1)*
high-dollar *(7)*
higher-position *(2)*
high-risk *(1)*
Hill *(2)*
Hills *(9)*
hired *(3)*
hitting *(2)*
holes *(3)*
home *(5)*
honestly *(2)*
hourly *(3)*
hours *(2)*
house *(1)*
HR *(12)*
hug *(3)*
hugging *(1)*
human *(9)*

< I >
idea *(1)*
identification *(6)*
identified *(2)*
III *(1)*
imagine *(2)*
impair *(1)*
important *(1)*
inappropriate *(10)*
incentivize *(1)*
incident *(1)*
incidents *(1)*
includes *(1)*
individual *(3)*
individuals *(1)*
infidelity *(2)*
inform *(1)*
information *(10)*
informed *(3)*
initial *(1)*
initially *(3)*
innocent *(3)*
innuendos *(1)*
Inquiring *(1)*
interacted *(1)*
interaction *(1)*
interested *(1)*

internal *(9)*
internally *(3)*
Internet *(1)*
interstate *(1)*
interview *(3)*
interviews *(3)*
intimate *(1)*
intimidation *(1)*
introduce *(1)*
investigate *(4)*
investigated *(4)*
investigating *(2)*
investigation *(4)*
investigations *(16)*
involved *(8)*
involving *(1)*
Irreconcilable *(1)*
issue *(7)*
items *(1)*
its *(1)*

< J >
January *(4)*
Jersey *(19)*
Jersey/PA *(2)*
jewelry *(2)*
job *(4)*
joking *(1)*
judge *(2)*
junior *(1)*
jury *(1)*

< K >
KANE *(1)*
keep *(5)*
Kendra *(3)*
Kerrville *(1)*
key *(1)*
kind *(7)*
knew *(2)*
know *(75)*
knowledge *(1)*
KRISTINA *(25)*

< L >
lady *(1)*
laid *(3)*
large *(7)*
larger *(1)*

late *(2)*
LAW *(3)*
lawsuit *(1)*
leads *(1)*
learn *(1)*
learned *(1)*
leave *(15)*
left *(20)*
LEGAL *(3)*
legitimately *(1)*
letter *(3)*
letting *(1)*
lie *(1)*
life *(1)*
limits *(1)*
line *(3)*
lines *(1)*
little *(3)*
live *(7)*
lived *(4)*
living *(9)*
locate *(1)*
location *(12)*
LOGAN *(1)*
Logistics *(4)*
long *(9)*
look *(10)*
looked *(2)*
looking *(3)*
lookout *(1)*
looks *(3)*
Loss *(14)*
lot *(6)*
Louis *(2)*
lower-position *(2)*

< M >
Macy's *(10)*
Main *(1)*
maintain *(2)*
making *(7)*
male *(4)*
mall *(1)*
manager *(6)*
managers *(3)*
managing *(1)*
Manhattan *(4)*
manpower *(1)*
MARCH *(6)*

Marine *(2)*
marital *(1)*
mark *(2)*
marked *(12)*
market *(1)*
MARKS *(1)*
marriage *(4)*
marriages *(1)*
married *(14)*
marry *(1)*
matter *(2)*
MBA *(1)*
mean *(10)*
means *(1)*
media *(1)*
medication *(2)*
MELISSA *(4)*
melissa@dereksmithla
w.com *(2)*
MENDOZA *(46)*
mental *(1)*
mentioned *(2)*
Michael *(4)*
Michael's *(1)*
Mid-2000s *(1)*
MIKHAYLOVA *(18)*
military *(1)*
mind *(2)*
minimal *(1)*
minimizing *(2)*
minutes *(3)*
missed *(1)*
Missouri *(1)*
mistaken *(3)*
moment *(9)*
monitor *(1)*
monitored *(1)*
monitoring *(2)*
months *(1)*
morning *(2)*
motorcycles *(5)*
move *(3)*
moved *(6)*
moving *(5)*
multiple *(2)*

< N >
name *(20)*
named *(2)*

Deposition of Bobby Booker                    Kristina Mikhaylova v. Bloomingdale's Inc., et al.

names *(2)*
**NECESSARILY** *(2)*
need *(7)*
needed *(5)*
needs *(3)*
**NEW** *(27)*
newer *(1)*
nonsexual *(1)*
**Nope** *(5)*
**North** *(1)*
**Notary** *(1)*
noted *(1)*
**Number** *(7)*
numbered *(1)*
numerous *(1)*
**NYPD** *(2)*

**< O >**
oath *(1)*
object *(1)*
objecting *(1)*
**Objection** *(10)*
objective *(1)*
**Objectively** *(1)*
obtain *(2)*
obviously *(3)*
**October** *(5)*
offense *(1)*
offer *(2)*
office *(8)*
off-limits *(1)*
ogle *(1)*
**Okay** *(166)*
**Okay's** *(1)*
once *(2)*
ones *(1)*
ongoing *(1)*
open *(2)*
opening *(1)*
operations *(1)*
opposed *(1)*
options *(2)*
organization *(2)*
organizations *(2)*
organized *(3)*
outcome *(1)*
outfit *(1)*
outside *(4)*
outwardly *(3)*

overhear *(2)*
overheard *(1)*
overlap *(1)*
oversight *(1)*
overt *(1)*
overtime *(1)*
overtly *(2)*

**< P >**
p.m *(1)*
**PA** *(1)*
package *(5)*
packages *(1)*
**PAGE** *(6)*
pages *(1)*
paragraph *(9)*
parents *(2)*
part *(14)*
particular *(1)*
particularly *(2)*
parties *(1)*
partner *(1)*
partners *(1)*
party *(2)*
pat *(1)*
patience *(1)*
paying *(2)*
peer *(2)*
peers *(2)*
**Penn** *(1)*
people *(12)*
percent *(2)*
period *(2)*
person *(13)*
personal *(11)*
personnel *(4)*
person's *(1)*
phase *(1)*
photo *(5)*
**Photograph** *(2)*
photos *(2)*
physical *(2)*
physically *(2)*
picture *(1)*
pictures *(3)*
pie *(1)*
place *(2)*
places *(1)*
**Plaintiff** *(13)*

**Plaintiff's** *(12)*
played *(1)*
**Plaza** *(2)*
please *(5)*
**PLLC** *(1)*
point *(9)*
poke *(1)*
police *(1)*
policies *(11)*
policy *(15)*
**Poors** *(6)*
**P-o-o-r-s** *(1)*
portion *(1)*
pose *(1)*
position *(15)*
positively *(1)*
possibility *(1)*
possible *(1)*
**Possibly** *(6)*
post *(2)*
post-graduate *(1)*
potential *(1)*
**Prada** *(1)*
pregnant *(7)*
prepare *(1)*
prepared *(1)*
prescription *(2)*
presence *(1)*
**PRESENT** *(4)*
pretty *(1)*
prevent *(1)*
prevention *(6)*
primarily *(1)*
primary *(2)*
prior *(1)*
private *(1)*
probably *(8)*
problems *(1)*
produce *(3)*
produced *(4)*
producing *(1)*
**Professional** *(3)*
profit *(1)*
propounded *(1)*
protection *(18)*
provide *(1)*
provided *(2)*
**Public** *(1)*
purchases *(1)*

purpose *(1)*
purposes *(1)*
pursue *(2)*
put *(5)*

**< Q >**
quantities *(1)*
quarterly *(1)*
question *(6)*
questions *(15)*
**QUOTATION** *(1)*
**QUOTE** *(1)*

**< R >**
reach *(2)*
reached *(1)*
read *(2)*
reading *(1)*
realistic *(1)*
really *(6)*
**Realtime** *(2)*
reason *(5)*
reasons *(1)*
reattach *(1)*
recall *(86)*
recalled *(1)*
receive *(7)*
received *(3)*
**Recess** *(2)*
recognize *(2)*
recognizing *(1)*
recollection *(14)*
recommend *(5)*
recommendation *(4)*
recommended *(2)*
recommending *(1)*
record *(4)*
recorded *(1)*
recruited *(2)*
reference *(2)*
**REFLECT** *(1)*
refresh *(13)*
refreshes *(1)*
regarding *(19)*
regardless *(2)*
regards *(1)*
region *(1)*
regional *(4)*
**Registered** *(2)*

regularly *(3)*
relationship *(19)*
relationships *(6)*
relative *(1)*
relieved *(2)*
remain *(1)*
remember *(12)*
REMOTE *(2)*
rent *(1)*
reorg *(7)*
reorganization *(7)*
reorganizations *(1)*
repeatedly *(2)*
rephrase *(1)*
replace *(1)*
replaced *(2)*
report *(13)*
reported *(4)*
Reporter *(4)*
reporting *(2)*
reports *(2)*
representative *(1)*
represented *(1)*
required *(1)*
requirements *(2)*
reselling *(2)*
reserve *(1)*
residences *(1)*
resign *(1)*
resource *(1)*
resources *(8)*
respond *(1)*
responses *(1)*
responsibilities *(2)*
responsible *(2)*
rest *(1)*
restructured *(1)*
retail *(3)*
return *(1)*
revealed *(1)*
review *(5)*
Richard *(2)*
ride *(1)*
riding *(1)*
right *(19)*
romantic *(1)*
rotating *(1)*
rounds *(3)*
Roy *(1)*

RPR *(1)*
rules *(1)*
run *(3)*
RUSSELL *(1)*
Russian *(1)*

< S >
S&P *(1)*
sat *(3)*
satellite *(2)*
saw *(7)*
saying *(6)*
says *(1)*
schedule *(3)*
schedules *(4)*
scheduling *(1)*
school *(3)*
screen *(8)*
scroll *(3)*
scrolling *(2)*
second *(1)*
secondary *(1)*
secrets *(1)*
section *(1)*
security *(11)*
see *(7)*
seeing *(5)*
seen *(8)*
sell *(1)*
senior *(15)*
sense *(1)*
separate *(5)*
service *(1)*
set *(2)*
sets *(1)*
severance *(4)*
sexual *(24)*
sexually *(3)*
Sheet *(1)*
shifts *(1)*
shoes *(1)*
Short *(12)*
shortly *(4)*
show *(2)*
side *(6)*
sign *(1)*
significant *(1)*
signs *(1)*
silos *(1)*

single *(1)*
singling *(1)*
sit *(1)*
sit-in *(1)*
sitting *(5)*
situation *(4)*
six *(1)*
skills *(1)*
small *(3)*
SMITH *(1)*
social *(2)*
sold *(2)*
sorry *(1)*
sounds *(5)*
South *(1)*
SOUTHERN *(1)*
space *(2)*
sparked *(1)*
speak *(5)*
speaking *(7)*
specific *(5)*
specifically *(15)*
specifics *(1)*
spell *(1)*
spelling *(1)*
spoke *(3)*
spoken *(1)*
spouse *(2)*
St *(1)*
staff *(1)*
stamp *(2)*
stamped *(1)*
Standard *(7)*
S-t-a-n-d-a-r-d *(1)*
start *(3)*
started *(10)*
starting *(2)*
state *(3)*
statement *(7)*
STATES *(2)*
stating *(1)*
station *(1)*
stationed *(3)*
stay *(4)*
stealing *(2)*
step *(2)*
steps *(2)*
sticks *(1)*
stood *(1)*

stop *(2)*
stopped *(1)*
stops *(1)*
store *(50)*
stores *(13)*
stories *(1)*
Street *(26)*
subjective *(7)*
subpoena *(2)*
Subscribed *(2)*
substance *(1)*
subway *(1)*
suffer *(1)*
Suite *(2)*
summer *(1)*
supervise *(1)*
supervised *(3)*
supervisor *(5)*
supervisor's *(1)*
supposed *(3)*
sure *(25)*
suspected *(1)*
suspicion *(1)*
suspicious *(1)*
sworn *(3)*

< T >
tags *(1)*
take *(14)*
taken *(7)*
takes *(1)*
talk *(4)*
talked *(3)*
talking *(8)*
targeting *(1)*
team *(36)*
technical *(1)*
TECHNICIAN *(1)*
Tell *(7)*
tenure *(9)*
term *(2)*
terminal *(1)*
terminated *(1)*
termination *(1)*
terms *(3)*
testified *(2)*
Texas *(13)*
Thank *(6)*
theft *(1)*

thing *(4)*
things *(13)*
think *(14)*
third *(1)*
third-party *(1)*
thought *(1)*
three *(2)*
TIERNEY *(9)*
Time *(23)*
times *(8)*
tip *(2)*
tipping *(2)*
today *(7)*
today's *(3)*
told *(3)*
tolerated *(1)*
top *(4)*
touch *(8)*
touched *(1)*
touches *(1)*
touching *(1)*
train *(1)*
training *(6)*
transcript *(1)*
transcription *(1)*
transfer *(3)*
transferred *(8)*
trial *(1)*
Trident *(7)*
true *(8)*
truthfully *(3)*
try *(2)*
trying *(4)*
tunnel *(1)*
turn *(3)*
turning *(1)*
two *(4)*
type *(6)*

< U >
ultimately *(2)*
uncomfortable *(4)*
uncomfortably *(1)*
unconcealed *(1)*
understand *(4)*
understood *(1)*
uninvited *(1)*
unique *(1)*
uniqueness *(1)*

Unit *(4)*
UNITED *(2)*
University *(1)*
unnecessarily *(1)*
untrue *(2)*
unwelcome *(1)*
unwelcomed *(1)*
unwelcomingly *(1)*
updated *(1)*
updates *(1)*
upload *(2)*
uploaded *(3)*
upper *(1)*
upset *(1)*
upwards *(1)*
usually *(3)*

< V >
vendors *(1)*
verbal *(1)*
versus *(1)*
Victoria *(2)*
VIDEO *(12)*
violate *(1)*
violated *(1)*
violation *(3)*
violations *(3)*
Virginia *(1)*
visit *(5)*
visited *(1)*
Vuitton *(1)*
vulnerable *(1)*

< W >
walking *(1)*
want *(17)*
wanted *(1)*
wants *(1)*
watch *(2)*
watched *(1)*
waters *(1)*
way *(6)*
ways *(2)*
weather-related *(1)*
week *(2)*
weeks *(2)*
well *(11)*
went *(11)*
we're *(14)*

west *(1)*
we've *(1)*
whichever *(1)*
WHITNER *(1)*
wife *(1)*
Williams *(3)*
wish *(1)*
Withdrawn *(15)*
Witness *(5)*
woman *(7)*
woman's *(1)*
women *(2)*
work *(24)*
worked *(17)*
working *(5)*
works *(1)*
workweek *(1)*
written *(1)*
wrong *(1)*
wrongdoing *(1)*

< Y >
Yeah *(17)*
year *(15)*
years *(5)*
YORK *(7)*

< Z >
zero *(1)*
Zoom *(1)*