# EXHIBIT 18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

THEODORA NIKOLAKOPOULOS,                    Civil Action No.: 20-1641

               Plaintiff,                    Plaintiff Demands
                                    A Jury Trial

     -against-

                                         **COMPLAINT**

MACY'S INC., BLOOMINGDALE'S RETAIL
HOLDINGS, INC., BLOOMINGDALE'S, INC.
d/b/a BLOOMINGDALE'S and FORTY CARROT,
ANGELA KOTSOVOLOS individually, ROSA DI
FRANCO individually, APRIL DITO individually,
ALYSSA MIRZA individually, MARK
MORROW, individually, and MONICA TONEY,
individually,

               Defendants.

------------------------------------------------------------------X

    Plaintiff, THEODORA NIKOLAKOPOULOS, by and through her attorneys, DEREK SMITH LAW GROUP, PLLC, hereby complains of Defendants MACY'S INC., BLOOMINGDALE'S RETAIL HOLDINGS, INC., BLOOMINGDALE'S, INC. d/b/a BLOOMINGDALE'S and FORTY CARROT (collectively referred to as the "Corporate Defendants"), ANGELA KOTSOVOLOS individually, ROSA DI FRANCO individually, APRIL DITO individually, ALYSSA MIRZA individually, MARK MORROW, individually, and MONICA TONEY, individually, upon information and belief as follows:

## NATURE OF CASE

1.  Plaintiff NIKOLAKOPOULOS, complains pursuant to Americans with Disabilities Act of 1990 ("ADA"), the Family and Medical Leave Act of 1993 ("FMLA"), the

BLM001148

New York State Human Rights Law, and the New York City Human Rights Law, based upon the supplemental jurisdiction of this Court pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966), and 28 U.S.C. § 1367.  Plaintiff seeks declaratory and injunctive relief and damages to redress the injuries that she has suffered as a result of Defendants' unlawful conduct, which includes disability discrimination, hostile work environment, and retaliation.

## **JURISDICTION AND VENUE**

2.  Jurisdiction of this action is conferred upon this Court as this case involves a federal question under the ADA and FMLA.  The Court also has jurisdiction pursuant to 29 U.S.C. § 2617; 28 U.S.C. §§ 1331 & 1343, and pendent jurisdiction thereto.

3.  Additionally, the Court has supplemental jurisdiction under the State and City laws.

4.  On or about December 14, 2018, Plaintiff submitted a Charge with the New York State Division of Human Rights (DHR).

5.  On or about November 26, 2019, Plaintiff received a Right to Sue Letter from the DHR.

6.  Plaintiff has satisfied all administrative prerequisites and is filing this case within ninety (90) days of receiving the Right to Sue Letter.

7.  This Court has personal jurisdiction over all Defendants because each of them is domiciled in, does substantial work or business in, or committed the acts and omissions alleged in this Complaint, in New York and in this District.

8.  Venue is proper in this District based upon the fact that the events or omissions which gave rise to the claims asserted herein occurred within the Southern District of New York.

BLM001149

## PARTIES

8.  Plaintiff is a fifty-nine year-old woman, and a resident of the State of New Jersey, Hudson County, who has worked for Defendants at all times relevant to this Complaint.

9.  At all times relevant, Plaintiff was and is an employee of Corporate Defendants, holding the position of "Quality Control in Alterations" and working at Corporate Defendants' location at 1000 Third Avenue, New York, New York 10022, where the discriminatory and retaliatory conduct took place.

10. Defendant MACY'S INC. (hereinafter referred to as "MACY'S") is a foreign business corporation duly organized and existing under, and by the virtue of, the laws of the State of Delaware, with a principal place of business at 7 West 7th Street, Cincinnati, Ohio, 45202.

11. Upon information and belief, MACY'S employs over 100 individuals on a full-time or full-time equivalent basis and is thus subject to all statutes upon which Plaintiff is proceeding herein.

12. Defendant BLOOMINGDALE'S, INC., d/b/a BLOOMINGDALE'S AND FORTY CARROTS (hereinafter referred to as "BLOOMINGDALE'S") is a foreign business corporation duly organized and existing under, and by the virtue of, the laws of the State of Ohio, with a principal place of business at 7 West 7th Street, Cincinnati, Ohio 45202.

13. Upon information and belief, Defendant BLOOMINGDALE'S employs over 100 individuals on a full-time or full-time-equivalent basis and thus is subject to all statutes upon which Plaintiff is proceeding herein.

BLM001150

14. Upon information and belief, Defendant BLOOMINGDALE'S RETAIL HOLDINGS, INC. (hereinafter referred to as "BLOOMINGDALE'S RETAIL") is a wholly owned subsidiary of BLOOMINGDALE'S.

15. Upon information and belief, BLOOMINGDALE'S RETAIL employs over 100 individuals on a full-time or full-time equivalent basis and thus is subject to all statutes upon which Plaintiff is proceeding herein.

16. Upon information and belief, at all time relevant to the Complaint the Corporate Defendants have been joint employers of Plaintiff with overlapping power to hire, fire, discipline, supervise, compensate, and document Plaintiff.

17. By way of example, MACY'S and BLOOMINGDALE'S maintain the same principal executive office at 7 West 7th Street, Cincinnati, Ohio 45202.

18. By way of example, Plaintiff's paystubs list BLOOMINGDALE'S as her employer, yet her W-2 lists MACY'S as her employer.

19. By way of example, MACY'S maintains Plaintiff's benefits plans and is listed as Plaintiff's employer on her Short-Term Disability documents.

20. Upon information and belief, at times relevant hereto, Defendant ANGELA KOTSOVOLOS was and is an employee of the Corporate Defendants, holding the position of "Alterations Manager"; as such, she has held the authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decision-making regarding the same.

21. Upon information and belief, at times relevant hereto, Defendant ROSA DI FRANCO was and is an employee of the Corporate Defendants, holding the position of "Fitter-Tailor."

4

BLM001151

22. Upon information and belief, at times relevant hereto, Defendant APRIL DITO was and is an employee of the Corporate Defendants, holding the position of "Human Resources Manager"; as such, she has held the authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decision-making regarding the same.

23. Upon information and belief, at times relevant hereto, Defendant ALYSSA MIRZA was and is an employee of the Corporate Defendants, holding the position of "Employee Relations Manager" and most recently "Human Resources Director-Men's and Home and Cosmetics Department"; as such, she has held authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision-making regarding the same.

24. Upon information and belief, at all times relevant hereto, Defendant MARK MORROW was and is the Operations Manager for BLOOMINGDALE'S; as such, he held authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision-making regarding the same.

25. Upon information and belief, at all times relevant hereto, Defendant MONICA TONEY was and is Associate Manager in MACY'S "Accommodation Disability Leave Management Office"; as such, she has held authority to affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision-making regarding the same.

BLM001152

## FACTUAL ALLEGATIONS

26. On or about June 24, 2014, Plaintiff began working for Corporate Defendants as a "Fitter Tailor" in the Men's Alterations Department, and was paid at a rate of $25.00 per hour and $37.50 per each overtime hour.

27. Plaintiff's current rate of pay is $28.10 per hour.

28. Plaintiff expected earnings in 2019 of $54,795.00 in salary, plus the value of her benefits, which include, but are not limited to: a 40l(k) Plan, Pension Plan; Transit Pass; Medical, Dental, Vision, and Pharmacy Insurance; two life insurance plans; and short-term disability and long-term disability insurance.

29. On or about August 20, 2016, Plaintiff was transferred to work in a full-time Quality Control position, within the Alterations Department.

30. Previously, in or around the Spring of 2009, Plaintiff had been diagnosed with Osteoarthritis in her left knee, which impedes her ability to walk, including going up or down stairs. Plaintiff's disability qualifies as a disability under the ADA (as well as the New York State Human Rights Law and New York City Human Rights Law), as it limits Plaintiff's major life function (walking).

31. On or about January 20, 2017, Plaintiff was diagnosed with fibromyalgia, which limits Plaintiff because of muscle pains throughout her body, preventing her from being able to perform fittings and concentrate on her job. Plaintiff's disability qualifies under the ADA (as well as the New York State Human Rights Law and New York City Human Rights Law), as it limits Plaintiff's major life function (performing manual tasks).

BLM001153

32. On or about March 8, 2016, Plaintiff was diagnosed with carpel tunnel syndrome, which limits Plaintiff's daily activities including writing and opening locks. Plaintiff's disability qualifies under the ADA (as well as the New York State Human Rights Law and New York City Human Rights Law), as it limits Plaintiff's major life function (performing manual tasks and lifting).

33. In or around February 2017, Plaintiff was diagnosed with sinus arrhythmia/bradycardia, which limits Plaintiff by making her feel dizzy and prone to fainting spells. Plaintiff's disability qualifies under the ADA (as well as the New York State Human Rights Law and New York City Human Rights Law), as it limits her major life function (cognition).

34. On or about October 4, 2017, Plaintiff suffered a rotator cuff tear within her right shoulder, but the injury was not fully diagnosed until in or about February of 2018. Plaintiff's rotator cuff tear severely limits the rotation movements of her arm and prevents Plaintiff from lifting her right arm above her head, including to hang clothing on clothes racks. Then, in or around March 2018, Plaintiff's left shoulder began to have pain, since Plaintiff was using her right arm less. On or about February 13, 2019, when the left shoulder pain worsened, Plaintiff informed Defendants that she had a left shoulder injury as well. Plaintiff's shoulder injuries qualify under the ADA (as well as the New York State Human Rights Law and New York City Human Rights Law), as it limits Plaintiff's major life function (lifting and performing manual tasks).

35. On or about March 22, 2016, Plaintiff was diagnosed by Dr. Lawrence Daniels, her neurosurgeon, as having "trigger finger" in nine fingers. Dr. Daniels instructed

BLM001154

Plaintiff not to participate in any work that required repetitive movements of her hands, until she completed a course of six weeks of conservative management, in order to avoid surgery on her median nerve, which was as a result of Plaintiff's carpal tunnel syndrome.  Plaintiff's disability qualifies under the ADA (as well as the New York State Human Rights Law and New York City Human Rights Law), as it limits Plaintiff's major life function (performing manual tasks).

36. These instructions limited Plaintiff's major life functions in her ability to perform manual tasks.

37. On or about March 27, 2016, Plaintiff informed Bea Bagdziunas, then-Director of Human Resources for the 59th Street store location at which Plaintiff worked, that Plaintiff would need a reasonable accommodation of three times off per week to attend occupational/physical therapy for her carpal tunnel syndrome.

38. On or about April 1, 2016, Plaintiff informed Bagdziunas by letter about the medical limitations imposed on her by Daniels.   This letter was later forwarded to KOTSOVOLOS on or about April 4, 2016.

39. On or about April 4, 2016, Plaintiff also informed KOTSOVOLOS, Bagdziunas, and Raul Argudin, then-Director of Logistics and Guest Services at the 59th Street store location, that she would require bilateral carpal tunnel release and tenosynovectomy surgery.

40. In response, Bagdziunas informed Plaintiff that the medical notes she had provided did not specifically state that Plaintiff was unable to work at all, and only limited her repetitive motions.

BLM001155

41. Later that day, Plaintiff informed Bagdziunas, Argudin, and KOTSOVOLOS that she would be able to return to work on light duty, with restrictions, including instructions to not tailor clothing, due to Plaintiff's carpal tunnel syndrome.

42. Later that evening, Plaintiff complained to Bagdziunas that KOTSOVOLOS was forcing her to rip sleeves and tailor clothing, despite her medical restrictions. Bagdziunas responded by telling Plaintiff to use the sewing machines.  However, Plaintiff explained that she could not do so because it would require her to perform repetitive motions with her hands, against doctor's orders.

43. On or about April 9, 2016, KOTSOVOLOS scheduled Plaintiff to work on Sunday, April 10, 2016, despite it being her day off, and instead instructed Plaintiff not to come into work on Monday, April 11, 2016.

44. On or about April 12, 2016, in retaliation for requesting a reasonable accommodation, KOTSOVOLOS began publicly chastising Plaintiff for not coming in on her scheduled day to work (i.e., Monday, April 11, 2016) despite KOTSOVOLOS' previous instruction to her to not come into work that day.

45. Later that day, Plaintiff complained to Bagdziunas and Argudin regarding KOTSOVOLOS' retaliatory conduct and showed them that her work schedule had previously been changed to exclude Monday, April 11, 2016.

46. On or about May 6, 2016, DI FRANCO accused Plaintiff of not doing her job, when a tuxedo needed to be brought to another floor.

47. Upon information and belief, DI FRANCO did this in order to frame Plaintiff as a poor employee.

BLM001156

48. On or about May 10, 2016, Plaintiff complained to Dorothy Kiely, then-Senior Vice President General Manager, and Stephen Vellecca, then-Director of Human Resources for Bloomingdale's, that DI FRANCO had been lodging false complaints against her with KOTSOVOLOS in order to get her in trouble.

49. Upon information and belief, KOTSOVOLOS and Homa Tarzi, then-Alterations Director and Plaintiff's former manager, were attempting to paint a narrative that Plaintiff was not a good employee, in order to have an excuse to fire her.

50. On or about June 8, 2016, Plaintiff provided both Argudin and the "Leave of Absence Department" of Corporate Defendants with updated information regarding her medical leave.

51. This medical update informed Corporate Defendants that Plaintiff was scheduled to have tenosynovectomy surgery on her left-hand on or about June 14, 2016, which would require her to remain out of work until on or about June 23, 2016, and thereafter Plaintiff would have the same surgery on her right hand on or about August 23, 2016.

52. However, Plaintiff's second surgery was eventually rescheduled to a later date.

53. On or about June 14, 2016, Plaintiff went out on a medical leave of absence to have surgery on her left hand due to trigger finger issues on four of her fingers on her left hand. This medical leave qualified under the FMLA as, upon information and belief, Plaintiff had worked for Corporate Defendants for a period of over one year and Plaintiff worked over 1,250 hours prior to requesting the medical leave.

54. On or about June 22, 2016, Plaintiff informed Argudin and KOTSOVOLOS that she would be able to return to work on or about July 20, 2016, on a light duty basis, with

BLM001157

the restriction that she would not be able to do tailoring, but would be able to do

fittings.

55. On or about July 1, 2016, Plaintiff re-sent the June 22 letter to Argudin. Soon after,

Plaintiff and Argudin e-mailed back and forth to confirm that Plaintiff had gone

through the proper channels to return to work.

56. In or around early July 2016, Plaintiff returned to work.

57. Upon returning to work, Plaintiff experienced that the hostile work environment

created by Defendants had worsened.

58. On August 20, 2016, Plaintiff was unofficially transferred to the Quality Control

Department, while still partially working in the Tailoring/Fitting Department.

59. On August 31, 2016, Ms. Tarzi informed Plaintiff and others around her, that Plaintiff

would be doing Quality Control for both the Women's and Men's Departments.

60. A few days later, Ms. Tarzi took Plaintiff to KOTSOVOLOS, who provided Plaintiff

with a job description for the Quality Control position, which included duties that

Defendants were aware that Plaintiff was physically unable to perform.

61. These duties included performing basic alterations and marking and cutting pants,

which Plaintiff reiterated she was physically incapable of performing.

62. In response, Plaintiff was instructed by KOTSOVOLOS to do Quality Control for the

Men's Department only, as upon information and belief, KOTSOVOLOS' main

position dealt with the Women's Department and she did not want Plaintiff reviewing

the clothing.

BLM001158

63. On or about September 19, 2016, Plaintiff informed Argudin and KOTSOVOLOS that she had received a new light-duty restriction from her doctor that meant she could not tailor clothing.

64. On or about September 21, 2016, Plaintiff learned that MONICA TONEY, Associate Manager in the "Accommodation Disability Leave Management Office" for MACY'S, had informed Argudin that they would not continue to provide reasonable accommodations for Plaintiff's disabilities.

65. In or around October 2016, Plaintiff began having pain in her right shoulder.

66. On October 20, 2016, KOTSOVOLOS told Plaintiff that she could not have two breaks a day, like other coworkers.

67. Soon thereafter, Plaintiff complained to her union that she was not being permitted to take her breaks and her complaint got back to ARGUDIN.

68. As a result, Argudin met with KOTSOVOLOS and Ms. Tarzi and, thereafter, KOTSOVOLOS called Plaintiff into her office and claimed that she had not known that Plaintiff needed breaks.

69. On or about November 30, 2016, Plaintiff informed Mr. Law and KOTSOVOLOS that another doctor, hand surgeon Nelson Botwinick, had put her on more restrictions and she now required fifteen-minute breaks, every two hours.

70. On or about December 19, 2016, Plaintiff informed Mr. Law and KOTSOVOLOS that she was currently scheduled for right-hand surgery with Dr. Botwinick on February 21, 2017, and could return with her previous restrictions, including fifteen-minute breaks every two hours. However, this surgery was eventually rescheduled to a later date.

BLM001159

71. Since, in or around April 2017, Mr. Law called Plaintiff into his office on at least three occasions and told Plaintiff that she should leave her job with the Corporate Defendants.

72. Upon information and belief, Mr. Law's offensive request was in retaliation for Plaintiff's requests for reasonable accommodations.

73. On or about April 18, 2017, after wrongfully accusing Plaintiff of making a mistake that another employee had made, KOTSOVOLOS threated Plaintiff by telling her that she would be sent home.

74. Soon thereafter, Plaintiff reported this incident to Ms. Tarzi.

75. However, Ms. Tarzi did not respond to Plaintiff's complaint.

76. Ms. Tarzi thereby acquiesced to KOTSOVOLOS' discriminatory conduct.

77. On or about April 26, 2017, Plaintiff informed Mr. Vellecca, KOTSOVOLOS, and Mr. Law that she had received updated restrictions from Dr. Nelson Boltwinick, including needing fifteen-minute breaks every two hours.

78. On or about April 28, 2017, Ms. Tarzi called Plaintiff into KOTSOVOLOS' office, where she asked Plaintiff to sign a "Responsibility-Based Performance Counseling Summary Form." Ms. Tarzi stated to Plaintiff that the form provided notice that if Plaintiff were to receive two more written warnings, she would be terminated. However, Plaintiff refused to sign the form because it was inaccurate.

79. On or about May 1, 2017, Plaintiff complained to Ms. Kiely, Mr. Vellecca, and Mr. Law about continued discriminatory and retaliatory conduct by KOTSOVOLOS. Plaintiff's complaint also addressed discriminatory conduct by Ms. Tarzi, which included over supervision of Plaintiff and reprimanding her for her limited abilities.

13

BLM001160

In addition, Plaintiff complained that KOTSOVOLOS refused to follow Plaintiff's medical restrictions.

80. Upon information and belief, KOTSOVOLOS and Ms. Tarzi have not similarly scrutinized any other employees in Plaintiff's department.

81. On or about May 3, 2017, Ms. Tarzi and KOTSOVOLOS began attacking Plaintiff about the fitting of a pair of pants.

82. On or about May 11, 2017, Plaintiff e-mailed Mr. Vellecca and Ms. Kiely explaining that she had concerns about her ability to perform the Quality Control position in the Alterations Department, as KOTSOVOLOS was not adhering to Plaintiff's medical restrictions. Plaintiff further complained that she had reported KOTSOVOLOS' discriminatory and retaliatory conduct before, to no avail.

83. On or about May 15, 2017, Plaintiff again complained to Mr. Law about the continued discriminatory and retaliatory treatment she was being subjected to by KOTSOVOLOS.

84. In response, heaping unlawful conduct upon unlawful conduct, Mr. Law told Plaintiff to sign a Permanent Leave of Absence, due to her medical condition. However, Plaintiff refused to sign the form.

85. On or about May 18, 2017, Mr. Law called Plaintiff into the Human Resources office, where Plaintiff explained that she had to leave the country to take care of her sick mother. However, KOTSOVOLOS refused to let Plaintiff use her vacation time. Mr. Law told Plaintiff that she had to bring a translated doctor's note as proof of her mother's condition.

BLM001161

86. From around May 21 through around May 29, 2017, Plaintiff was out of the country to take care of her ailing mother in Greece.

87. On or about June 7, 2017, Plaintiff was accommodated in the Quality Control Department and told that she would only work Monday to Friday from 8:30 a.m. until 5:00 p.m. In addition, Plaintiff would not be required to work on weekends.

88. On or about June 15, 2017, Plaintiff went out on medical leave for right-hand surgery and was on short term disability until July 16, 2017.  This medical leave qualified under the FMLA as, upon information and belief, Plaintiff had worked for Corporate Defendants for a period of over one year and Plaintiff worked over 1,250 hours prior to requesting the medical leave.

89. On or about June 15, 2017, Plaintiff had surgery on her right hand and four fingers for tenosynovitis release.

90. One day later, on June 16, 2017, an unknown female employee in MACY'S "Accommodation Office" called Plaintiff and informed her that Corporate Defendants could no longer accommodate her disabilities.

91. Plaintiff explained to the employee that she just had surgery one day prior. The employee responded that "they" did not care, that Plaintiff could not work for MACY'S, and that Plaintiff had two surgeries since on or about June 14, 2016.  The employee continued by saying:  "No more accommodation for you."

92. Plaintiff was extremely offended by the MACY'S employee's offensive and discriminatory conduct.

BLM001162

93. On or about July 17, 2017, Plaintiff returned to work and was informed that she was being assigned to the Tailoring Department despite her obvious physical limitations and stated medical restrictions, which made such work impossible for her.

94. Later that day, Ms. Tarzi came to the Tailoring Department and showed DI FRANCO how to prepare garments for the machines. Ms. Tarzi then told KOTSOVOLOS that KOTSOVOLOS should report Plaintiff to Human Resources, because preparing garments for the machines was an assignment that Plaintiff should have been doing.

95. On both July 25 and 26, 2017, KOTSOVOLOS accused Plaintiff of sending garments out without any identifiable information on each item. KOTSOVOLOS also told Plaintiff that she would speak to Human Resources about removing Plaintiff.

96. Upon information and belief, KOTSOVOLOS conducted herself in this manner, in order to frame Plaintiff as a poor employee.

97. On or about September 11, 2017, as a result of Plaintiff being forced to remain late at work to correct another employee's tailoring mistake, KOTSOVOLOS verbally attacked Plaintiff various times over a period of four hours.

98. As a result of this, Plaintiff fainted on the train while returning home.

99. In or around early October 2017, Ms. Tarzi called Plaintiff into Human Resources, where she asked Plaintiff about her accommodations. Plaintiff explained that she would need fifteen minute breaks every two hours.

100. In or around late October 4, 2017, Plaintiff went to see Dr. David Friedman because her right shoulder was causing her significant pain when she moved her right arm over her head.

BLM001163

101. As a result, Plaintiff reported to KOTSOVOLOS that she needed to start going to physical therapy and should not lift her right arm above her head while at work. This was a qualified disability as Plaintiff was unable to perform a major life function of lifting.

102. On or about November 17, 2017, Plaintiff went to Richard Law, thenEmployee Relations Manager, and reported to him that she needed to get medical restrictions. However, Mr. Law told her if she had too many medical restrictions that she could be fired.

103. On or about November 25, 2017, Plaintiff met with KOTSOVOLOS, Ms. Tarzi, and Joseph Borio, Women's Department Clerk.  During this meeting, these individuals asked Plaintiff to assist with clerical work for the Men's Department.  Plaintiff agreed to assist in this position when she had free time.

104. Thereafter, for a period of fourteen months, Plaintiff was required to not only continue her duties in the Quality Control Department but was also required to do clerical work for the Men's Department, without additional compensation.

105. During this time, KOTSOVOLOS would also call Plaintiff into work, on her days off, which put additional stress on Plaintiff.

106. From February 15 through February 23, 2018, Plaintiff visited the Mayo Clinic in Florida for treatment of her right shoulder.

107. On or about February 27, 2018, Plaintiff returned to work.

108. On or about March 12, 2018, Plaintiff informed KOTSOVOLOS that she would be in late on March 14, 2018, because she had a doctor's appointment.

BLM001164

109. KOTSOVOLOS responded by telling Plaintiff that she could not come in late and should go to the doctor during the weekend instead. Plaintiff explained that she could not because the doctor did not work on weekends.

110. From April 9 through May 14, 2018, Plaintiff went on short term disability due to her right shoulder. This medical leave qualified under the FMLA as, upon information and belief, Plaintiff had worked for Corporate Defendants for a period of over one year and Plaintiff worked over 1,250 hours prior to requesting the medical leave.

111. On or about May 14, 2018, Plaintiff returned to work without restrictions out of fear that she would be terminated otherwise.

112. On or about May 18, 2018, KOTSOVOLOS called Narcisa Lakhdar, Tailor in the Tailoring Department, into her office and told Ms. Lakhdar that she was not to help Plaintiff with anything and that she should inform Dionisio Vasquez, a "presser," of the same instruction. Ms. Lakhdar responded to KOTSOVOLOS that she would do no such thing because Plaintiff was her friend.

113. Upon information and belief, KOTSOVOLOS' conduct was m further retaliation to Plaintiff's complaints of discrimination and requests for accommodations.

114. On or about May 20, 2018, Plaintiff complained to Defendant DITO that KOTSOVOLOS refused to follow Plaintiff's medical restrictions and that it was causing her severe distress.

115. On or about May 23, 2018, Plaintiff emailed KOTSOVOLOS to complain that KOTSOVOLOS was forcing Plaintiff to hang garments on a wall rack, despite Plaintiff not being able to reach it.

BLM001165

116. On or about May 26, 2018, KOTSOVOLOS forced Plaintiff to hang garments on the higher racks, despite her medical restrictions to not lift her arm above her head.  As a result, Plaintiff was in severe pain due to the repetitive movements.

117. On or about June 13, 2018, Plaintiff went to see orthopedic surgeon Dr. Alexis Colvin.  Plaintiff explained to Dr. Colvin that her manager was not adhering to her medical restrictions and that it was causing her severe pain.

118. On or about June 21, 2018, Dr. Colvin issued new medical restrictions for Plaintiff, stating that she should not do rotating movements with either arm, or raise either arm over her head.  Plaintiff discussed this restriction with MIRZA in her office.  MIRZA indicated that that would not be a problem, but then Plaintiff never received any written confirmation that such accommodation was recognized or would be honored.  And thereafter, until October 2018, Plaintiff was repeatedly asked to (and felt compelled to) engage in the rotating arm-raising movements that her doctor had proscribed.

119. Also on or about June 21, 2018, Plaintiff complained to Dawn (Last Name Unknown), an employee with MACY'S Dispute Program, stating that her manager was discriminating against her.  Plaintiff went into detail about the near-daily abuse.  Dawn responded that the conduct was not harassment or discrimination.

120. On or about June 21, 2018, Plaintiff went to Human Resources and met with KOTSOVOLOS, MIRZA, and DITO, as well as James Eisenberg, a Shop Steward.  As a result of the meeting, Plaintiff was provided with a discipline letter alleging that Plaintiff was insubordinate to her supervisors/managers.

BLM001166

121. Upon information and belief, the disciplinary letter was in retaliation for Plaintiff's continued complaints of discrimination.

122. On June 25 and 26, 2018, Plaintiff was out sick from work.

123. Upon her return, on or about June 27, 2018, another employee informed Plaintiff that DI FRANCO had instructed KOTSOVOLOS not to take in four racks of garments, which resulted in Plaintiff not being able to do her job upon her return.

124. On or about June 29, 2018, DI FRANCO told Plaintiff that Plaintiff was not good for the job, and that "this job is for me."

125. Plaintiff was extremely offended by DI FRANCO's comment and believed it to be a discriminatory comment about her disability.

126. On or about July 5, 2018, Plaintiff met with MIRZA and explained that she had medical restrictions in place since 2016, and although some of those restrictions had been previously removed, Plaintiff now needed them reinstated. Specifically, Plaintiff explained that the medical issues with her shoulder prevented her from lifting her arm higher than her shoulder and that she would need fifteen-minute breaks every two hours.

127. MIRZA told Plaintiff that she would let MACY'S Human Resources know of Plaintiff's request.

128. As a result of her break request, Plaintiff was instructed to break up her meal break and other breaks, in order to meet her reasonable accommodation request without affecting her job duties.

BLM001167

129. As a result of her lifting restrictions, Plaintiff was instructed to seek the assistance of other employees when she needed to lift anything above her shoulders. Plaintiff also requested low racks, so that she could perform her job duties.

130. However, Plaintiff did not receive these racks until in or around October 2018.

131. In addition, Plaintiff was not required to use heavy scissors, cut garments, or use the sewing machines, because Dr. Botwinick had imposed such restrictions following her surgery – as demonstrated by the documentation she submitted to Defendants.

132. These accommodations were approved permanently, unless her position changed in any way, requiring a new interactive dialog.

133. On or about August 3 and August 10, 2018, DI FRANCO failed to process certain jackets received by the Tailoring Department.

134. Upon information and belief, this was done in order to cause Plaintiff to be late sending the jackets to the "pickup room."

135. On or about August 21, 2018, MIRZA e-mailed Plaintiff to schedule a meeting to discuss issues in the Alterations Department.

136. In or around the middle of September 2018, DITO, KOTSOVOLOS, and MIRZA called Plaintiff into a meeting to discuss Plaintiff's multiple medical leaves of absence and alleged unprofessional behavior. Plaintiff explained that she was taking leaves for surgeries, physical therapy, and doctors' visits. However, DITO, MIRZA, and KOTSOVOLOS disregarded Plaintiff's explanation.

137. On or about September 5, 2018, KOTSOVOLOS again tried to make Plaintiff put nearly two hundred suits onto higher racks. Plaintiff explained that she was not able

BLM001168

to do that because of her medical restrictions.  In response, KOTSOVOLOS yelled at Plaintiff and told her to go home.

138. Later that morning, Plaintiff complained to Defendant DITO about KOTSOVOLOS' conduct.  Defendant DITO simply told Plaintiff to go back to work and told Plaintiff she had to whatever her manager said, even though this was impossible for Plaintiff.

139. On or about September 28, 2018, DI FRANCO began questioning Plaintiff about her medical limitations, and told Plaintiff that she should just stay home or else take disability benefits if she was not able to do her job.  Plaintiff was extremely offended by DI FRANCO's discriminatory comment.

140. Soon thereafter, Plaintiff complained to KOTSOVOLOS about DI FRANCO's conduct.  However, KOTSOVOLOS did not respond.

141. Upon information and belief, KOTSOVOLOS acquiesced to Defendants' discriminatory conduct.

142. Plaintiff also complained to DITO and MIRZA about DI FRANCO's conduct.  They responded by stating that DI FRANCO did not mean it in a discriminatory or offensive manner.

143. Upon information and belief, DITO and MIRZA were acquiescing to Defendants' discriminatory conduct.

144. On or about October 4 and again on October 9, 2018, KOTSOVOLOS screamed at Plaintiff after she returned from the bathroom, and told Plaintiff that she was only permitted to use the bathroom when she was on her lunch break.

145. On or about October 23, 2018, KOTSOVOLOS angrily told Plaintiff that she was "a big problem" for Human Resources.

BLM001169

146. Later that day, Plaintiff met with MIRZA and asked for a copy of her approved reasonable accommodations.  In response, MIRZA gave Plaintiff a document with no date on it.

147. On or about October 24, 2018, MIRZA called Plaintiff into the Human Resources office.  DITO was also present during this meeting.

148. During the meeting, Plaintiff complained about KOTSOVOLOS' conduct on the day prior.

149. On or about October 25, 2018, KOTSOVOLOS e-mailed DITO and accused *Plaintiff* of creating a hostile work environment for the Alterations Department.

150. Upon information and belief, KOTSOVOLOS was attempting to paint a picture of Plaintiff acting in an insubordinate manner, in order to set Plaintiff up for termination.

151. On or about October 26, 2018, KOTSOVOLOS accused Plaintiff of not doing her job, despite KOTSOVOLOS ignoring Plaintiff when she asked for work.

152. On or about November 16, 2018, DI FRANCO began to create a storyline that Plaintiff was causing a hostile work environment, by alleging to KOTSOVOLOS that Plaintiff bothers her.

153. In or around late November 2018, upon information and belief, KOTSOVOLOS began instructing employees, including Giuseppe Policheti, Tailor; Leonardo Sierra, a Fitter; and Maria Gjinaj, another Tailor, to not speak with Plaintiff.

154. As a result, upon information and belief, Gjinaj reported KOTSOVOLOS' inappropriate request to DITO.

BLM001170

155. On or about December 7, 2018, KOTSOVOLOS instructed Plaintiff to send clothing out of the Tailoring Department without doing quality control.  Plaintiff reluctantly complied, due to prior accusations of insubordination.

156. Upon information and belief, this was done in order to paint a picture that Plaintiff was not doing her job.

157. As a result, on or about December 10, 2018, KOTSOVOLOS reprimanded Plaintiff for not performing quality control on the clothing that was sent out on December 7, 2018.

158. On or about December 12, 2018, KOTSOVOLOS called Plaintiff into her office and told Plaintiff that she had many issues with Plaintiff's quality control and that William Jennings, the Men's Floor Manager, also had big issues with one of the suits Plaintiff had handled.

159. When Plaintiff asked for proof, KOTSOVOLOS told her that Jennings had it.

160. However, when Plaintiff spoke to Mr. Jennings, he told Plaintiff that the suit was from the weekend and that it was not from Plaintiff since she did not work weekends.

161. On or about December 14, 2018, KOTSOVOLOS and DI FRANCO taunted Plaintiff by restricting her workspace, causing Plaintiff to have a severe migraine and stomach pains.

162. Due to the continued hostile work environment, Plaintiff left work early and went to file a complaint of discrimination with the New York State Division of Human Rights.

163. On or about December 18 and 21, 2018, upon returning from lunch, KOTSOVOLOS accused Plaintiff of performing her quality control duties poorly.  Plaintiff calmly

BLM001171

explained each time that the garments at issue had not been completed prior to her taking her lunch break.

164. On or about December 20, 2018, KOTSOVOLOS told Cenaida (Last Name Unknown), a Fitter/Tailor in the Women's Department, that Plaintiff "had to go." Cenaida responded by telling KOTSOVOLOS that she was being inappropriate. KOTSOVOLOS responded that she did not care and wanted Plaintiff terminated.

165. On or about December 21, 2018, Plaintiff checked the work schedule to find that she was scheduled to work January 1, 2019, despite KOTSOVOLOS being well-aware that Plaintiff would be out of the country from on or about December 29, 2018.

166. On December 24, 2018, Plaintiff asked KOTSOVOLOS to correct the schedule. However, KOTSOVOLOS refused to do so.

167. Upon information and belief, KOTSOVOLOS scheduled Plaintiff in this manner, in order to write Plaintiff up for not showing up to work.

168. Soon thereafter, Plaintiff complained to Human Resources and was instructed to speak to her manager. As a result, KOTSOVOLOS listed Plaintiff as taking the day off, rather than putting it as a paid holiday.

169. From December 29, 2018 through January 8, 2019, Plaintiff was off from work.

170. Upon information and belief, while Plaintiff was out of work, Defendants formulated a plan to remove Plaintiff from employment by disciplining her for trivial infractions that other employees regularly engaged in but were not disciplined for. Thereafter, during 2019, Plaintiff received eight discipline letters from Human Resources, in each case after attending a meeting with MORROW and others, where he repeatedly told Plaintiff "what are we going to do with you," and "we can't keep you."

BLM001172

171. On or about January 9, 2019, despite being aware of Plaintiff's lifting restrictions, garments that Plaintiff was assigned to work on were placed on a bar above her head, requiring Plaintiff to lift her arms above her head.

172. Plaintiff asked Mr. Policheti to assist her with getting the items down.

173. However, Mr. Policheti rudely told Plaintiff: "Do it by yourself."

174. Eventually, KOTSOVOLOS instructed Emmanuelle Vasquez, Presser, to help Plaintiff with the clothing by putting them at a lower level.

175. On or about January 22, 2019, Plaintiff had an MRI on her right shoulder. As a result, Dr. Alexis Colvin informed Plaintiff that her right shoulder had two complete rotator cuff tears.

176. On January 24, 2019, KOTSOVOLOS called Plaintiff to her office and told Plaintiff that she wanted Plaintiff to cut garments that day. Plaintiff explained that she could not do that because it was against her restrictions. KOTSOVOLOS responded that the restriction indicated was an old restriction and was no longer applicable. Plaintiff explained that the cutting restriction was permanent. While KOTSOVOLOS continued to insist that Plaintiff cut the garments, Plaintiff was unable to do so.

177. On or about January 30, 2019, upon information and belief, KOTSOVOLOS asked fire safety employee Tom Latera to remove the low racks near Plaintiff because of alleged "safety concerns."

178. After a number of subsequent discussions where Plaintiff repeatedly explained that the low racks were given to her as a reasonable accommodation for her medical restrictions, the low racks were not removed.

BLM001173

179. On or about January 31, 2019, KOTSOVOLOS directed Plaintiff to send all documents in her charge upstairs to another department, despite the garments not being ready to leave the Tailoring Department.

180. Later that day, Plaintiff called Human Resources and spoke to Megan O'Connor, in order to schedule a meeting with MIRZA to discuss further reasonable accommodations.

181. On or about February 1, 2019, KOTSOVOLOS took all of the tailoring documentation from Plaintiff, in order to input the information into the system. Before walking away, KOTSOVOLOS told Plaintiff that Christine Zabielski, National Alterations Director, was disappointed with Plaintiff because the inputting the information from the tailoring documentation was something that Plaintiff should be doing. The actions that KOTSOVOLOS was referencing required use of a scanner and repeated rotating arm movements, which Plaintiff was not (upon her doctors' orders, and Defendants' purported agreement) supposed to perform.

182. On or about February 4, 2019, KOTSOVOLOS, alleging that Human Resources did not have any computer restrictions on file, forced Plaintiff to input tickets on the computer, despite Plaintiff's medical restrictions, prior to her upcoming surgery.

183. On or about February 12, 2019, Plaintiff met with DITO, MIRZA, KOTSOVOLOS, MORROW, and Mr. Eisenberg.

184. During this meeting, the group accused Plaintiff of poor performance and insubordination and provided her with a disciplinary letter.

185. Upon information and belief, this disciplinary letter was in retaliation for Plaintiff's repeated complaints of discrimination.

BLM001174

186. On or about February 13, 2019, Plaintiff was informed that she would need surgery on her right shoulder and it would take place on or about March 28, 2019.  However, this surgery was eventually rescheduled to a later date.

187. On or about February 20, 2019, KOTSOVOLOS accused Plaintiff of not taking a garment to the pickup room but refused to provide proof about which garment that was.

188. From February 21 through 28, 2019, Plaintiff was treated at the Mayo Clinic for various medical conditions, particularly her damaged right shoulder.

189. On or about March 4, 2019, after Plaintiff returned from medical treatments in Arizona at the Mayo Clinic, she again found garments she had to work on hung from a level that she could not reach.

190. When Plaintiff asked KOTSOVOLOS for help, KOTSOVOLOS told Plaintiff to ask DI FRANCO instead.

191. Soon thereafter, DI FRANCO retorted that if "you try to fight me, you found the wrong person!" Plaintiff did not respond to DI FRANCO's threat.

192. After an hour of no one helping Plaintiff, she returned to KOTSOVOLOS and again asked for help.  However, KOTSOVOLOS told Plaintiff to do it herself.

193. Soon thereafter, KOTSOVOLOS finally instructed Mr. Vasquez to lower the garments, so that Plaintiff could work on them.

194. On or about March 5, 2019, DI FRANCO began yelling at Plaintiff for asking Ms. Gjinaj to help her empty a rack of clothing.  DI FRANCO continued by yelling for KOTSOVOLOS to stop Plaintiff from doing her work.  However, KOTSOVOLOS did not come.

BLM001175

195. On or about March 14, 2019, Plaintiff overheard KOTSOVOLOS telling other women in the Alterations Department that Plaintiff would have to work hard doing clerical work and if Plaintiff refused, that Human Resources would fire Plaintiff.

196. On or about March 18, 2019, KOTSOVOLOS informed Plaintiff that they had an appointment with Defendant DITO.

197. Upon entering the meeting, Plaintiff was met by DITO and KOTSOVOLOS, MORROW, and Mr. Eisenberg.

198. At this meeting, Plaintiff was informed that she was being given a disciplinary letter for allegedly unprofessional behavior towards her manager and co-workers, which included the January 9 incident.

199. Upon information and belief, this disciplinary letter was in retaliation for Plaintiff's repeated complaints of discrimination and requests for reasonable accommodations.

200. On March 22, 2019, Plaintiff overheard KOTSOVOLOS telling the Women's Department that she had to clean the place and that Plaintiff had to go. KOTSOVOLOS continued that she had been working with other individuals, including but not limited to Borio, MORROW, and Rowant Kalotumba, Human Resources employee, in order to get rid of Plaintiff.

201. On or about March 24, 2019, Plaintiff filed a workers' compensation claim regarding her shoulder injury. There were ultimately three hearings held in 2019 (August 8, October 10, and December 12) and one on February 14, 2020 regarding whether Plaintiff's shoulder injury was work-related. At the conclusion of the October hearing, the administrative law judge determined that Plaintiff's injury was indeed work-related. At the conclusion of the 2020 hearing, the Workers' Compensation

BLM001176

Board determined that MACY'S insurance had to cover 75% of Plaintiff's medical costs.  (The remaining 25% was to be covered by the insurance carrier for Plaintiff's other, part-time, employer.)

202. On or about March 26, 2019, Plaintiff again came into work to find garments hung in a manner that made them impossible for her to reach. It then took KOTSOVOLOS almost half a day to come and help Plaintiff take the garments down so that Plaintiff could work on them.

203. On or about March 27, 2019, Plaintiff went to Dr. Boltwinick, who put Plaintiff on additional restrictions, which prevented her from using the computer.

204. Later that day, Plaintiff provided DITO and MACY'S Leave of Absence Department with updates on her medical restrictions. In addition, Plaintiff informed them that she would be undergoing surgery on or about April 9, 2019 and would be totally disabled for a period of approximately two months thereafter.

205. On or about March 29, 2019, DITO informed Plaintiff that her accommodation request had not yet been approved.

206. On or about April 2, 2019, Plaintiff met with KOTSOVOLOS, who rudely instructed Plaintiff to file paperwork on the computer.  Plaintiff explained that she could not do it anymore, that she had additional restrictions, and that KOTSOVOLOS could check with Human Resources about those additional restrictions. Plaintiff continued that she would be having surgery in approximately four days and could not be pushed to do more than she was able to handle.   KOTSOVOLOS responded that Plaintiff was using the computer before. Plaintiff responded that it was not yet a restriction.

BLM001177

207. Later that day, KOTSOVOLOS called Plaintiff to the Human Resources office, where Plaintiff met with MIRZA and DITO.

208. During this meeting, Plaintiff explained to MIRZA and DITO that although she had a restriction in place regarding breaks, she had been denied the ability to take those breaks from about March 30, 2016 until about June 10, 2017. MIRZA responded that Plaintiff should take her breaks and did not respond to Plaintiff's complaint about previously not being permitted breaks.

209. On April 5, 2019, Borio sent Tim Benson to remove Plaintiff's low racks, despite them being an approved reasonable accommodation. After Plaintiff explained to the male employee that the low racks were there as a reasonable accommodation for her medical restrictions, the male employee walked away angrily without taking the racks.

210. From April 9, 2019 until on or about June 17, 2019, Plaintiff was on medical leave for her carpal tunnel surgery and tenosynovitis release on her small finger on her right hand, despite being cleared to return to work earlier. This medical leave qualified under the FMLA as, upon information and belief, Plaintiff had worked for Corporate Defendants for a period of over one year and Plaintiff worked over 1,250 hours prior to requesting the medical leave.

211. On or about April 9, 2019, Plaintiff had surgery.

212. On or about May 13, 2019, Plaintiff was informed that she could return to work on or about May 15, 2019, with restrictions.

213. On or about May 15, 2019, Plaintiff updated MACY'S Leave of Absence Department and DITO regarding her doctor's note and medical restrictions.

BLM001178

214. When Plaintiff returned to work, she requested that Defendants supply her with a new supermarket-style scanner, which would enable her to read clothing labels or tags without as much repetitive or rotating arm movements.  Defendants never did.

215. On or about May 17, 2019, MIRZA called Plaintiff and discussed her ability to return back to work, including the medical restriction of not being able to use the computer. MIRZA continued that Plaintiff would not be permitted to take fifteen-minute break every two hours, as the labor office does not permit breaks of less than thirty minutes.

216. However, this was the first time Defendants informed Plaintiff of this restriction, despite her requesting the breaks since around March 2016.

217. Later that day, Plaintiff received a call from Prudential, Plaintiff's short-term disability provider. Plaintiff was informed that since she was released to return to work, Prudential would be unable to continue providing her with disability pay.

218. On or about June 7, 2019, Plaintiff called Macy's Accommodations Office and spoke with TONEY.  Plaintiff asked why Defendants were not allowing her to return to work.  TONEY responded that Plaintiff's manager (KOTSOVOLOS) and the HR Office (DITO and MIRZA) had informed TONEY that Plaintiff's assigned work was using a computer (only), so if Plaintiff could not use a computer, she could not return to work.  This was simply not true, and Plaintiff explained to TONEY that she was responsible for quality control.  TONEY responded that she would have to contact them again.  TONEY called Plaintiff back and asked her to return to work as Plaintiff had requested.

32

BLM001179

219. On or about June 10, 2019, Plaintiff returned to work. But Defendants' efforts to deny her reasonable accommodations, harass her for being disabled, and punish her for advocating for herself continued.

220. On or about June 19, 2019, Plaintiff was attempting to do work at her worktable. For approximately forty minutes, ROSA DI FRANCO placed her own materials all of the table and refused to make space at the table for Plaintiff to do her work, after which KOTSOVOLOS appeared and chastised Plaintiff for not having accomplished any work thus far that morning. Upon information and belief, DI FRANCO and KOTSOVOLOS conspired to prevent Plaintiff from doing any work so Plaintiff would be disciplined.

221. On or about September 12, 2019, Plaintiff's coworker Policheti demanded that she help him with work that would exacerbate her shoulder and hand injuries; when she refused, he flew into a rage, screamed at Plaintiff, seized a large pair of scissors nearby, and threw them at Plaintiff, nearly hitting and injuring her.

222. On the following day, September 13, 2019, Plaintiff approached KOTSOVOLOS and told her what had occurred. KOTSOVOLOS asked Plaintiff if she wanted Polichetti in the office to hear what Plaintiff had to say, and Plaintiff said yes. So KOTSOVOLOS called Policheti to her office, and he immediately began shouting about Plaintiff: "She's a liar, don't believe her! And if I did anything to her, so what?" KOTSOVOLOS joined him in yelling at Plaintiff, and they followed Plaintiff out of the office, still yelling at her.

223. Plaintiff attempted to return to her work table and continue working, but Policheti and KOTSOVOLOS followed her, still yelling. Plaintiff started feeling shortness of

33

BLM001180

breath, heart palpitations, tremors, and blurred vision; she asked KOTSOVOLOS to call her an ambulance.

224. When an ambulance arrived a short while later and Plaintiff attempted to speak to the EMTs, KOTSOVOLOS interceded and informed them that the ambulance was for Polichetti, not Plaintiff, and blamed Plaintiff for starting the incident.  After Plaintiff begged the EMTs to take her anyway, they did, and after several hours at the hospital she was diagnosed with a panic attack.

225. On September 26, 2019, DITO called Plaintiff to the Human Resources office and informed her that she was being suspended and placed on "DML" – decision-making leave, i.e., a leave of absence while Plaintiff's fate was determined.  When she asked why, Plaintiff was informed that she had behaved "unprofessionally" toward her supervisor, and was ultimately suspended without pay for one workweek.

226. Upon information and belief, this was not the first incident in which Polichetti behaved violently at work, and he has been known to threaten, and even throw objects at, his coworkers on other occasions.  And yet, Polichetti was not suspended.

227. On or about October 8, 2019, Plaintiff visited her spinal doctor, Eugene Bulkin.  Dr. Bulkin diagnosed Plaintiff with degenerative neural disease in her spine, and instructed Plaintiff in a letter that after every fifty minutes of standing on her feet, she needed to sit for ten minutes.

228. Plaintiff sent Dr. Bulkin's letter to MONICA TONEY in MACY'S Accommodation Office, but TONEY refused to approve Plaintiff's request for accommodation.  She sent Plaintiff a three-page questionnaire for Dr. Bulkin regarding the requested accommodation.  Dr. Bulkin submitted the questionnaire, but TONEY informed

34

BLM001181

Plaintiff that his responses were insufficient.  So Plaintiff sent the questionnaire to Dr. Bulkin a second time, he resubmitted it, and Plaintiff's requested accommodation was again denied.  As a result, Plaintiff was required to stand virtually the entire workday, causing her great personal discomfort and exacerbating her spinal injury.

229. On or about November 11, 2019, it was announced that KOTSOVOLOS would no longer be Plaintiff's manager.  However, Defendants' attempts to punish Plaintiff for her disabilities and attempts to work with reasonable accommodations continued.

230. On January 6, 2020, Plaintiff's new manager, Natalia Surazhsky, repeatedly grilled Plaintiff about her workers' compensation hearing, asking Plaintiff whether she was certain that her injury had been suffered on the job, or could have been a preexisting condition.  Upon information and belief, Surazhsky was seeking reasons to deny Plaintiff her requested accommodations.

231. On January 8, 2020, "fitter" Abdul "Karim" Barry approached Plaintiff with two shirts, and asked Plaintiff to fix them.  In accordance with her role as head Quality Control for the department, Plaintiff checked the shirts, saw that they had not been properly tailored, and explained that to Barry.

232. At that point, DI FRANCO came running, and told Barry to give the shirts to her, not to Plaintiff.  Plaintiff responded:  "do your job, don't interrupt."  DI FRANCO immediately went to Surazhsky to complain about Plaintiff's behavior.

233. Surazhsky heard what happened, told Plaintiff and DI FRANCO that they needed to work together, and that Plaintiff's role was quality control.  So DI FRANCO next turned to Human Resources, and accused Plaintiff of being unprofessional.

BLM001182

234. Human Resources called Plaintiff to a termination meeting with DITO on January 8, 2020.  Plaintiff explained that DI FRANCO had interrupted and interfered with her quality control work, and that Plaintiff had simply been trying to do her job.  Plaintiff was not terminated at that time.

235. The next morning, January 9, another coworker named Geraldina approached Plaintiff and Polichetti about a coat whose sleeves and buttons needed work. Surazhsky had sent Plaintiff a message specifically asking that Plaintiff check the sleeves.  Yet when Plaintiff attempted to do so, Polichetti once again began screaming at her, telling her not to speak to Geraldina.

236. Earlier, Surazhsky had also specifically instructed Plaintiff to take pictures documenting whatever was not done correctly, so Plaintiff attempted to do so on January 9.  She was then accused of further insubordination.  Additionally, DI FRANCO approached MORROW and falsely accused Plaintiff of "slashing" the same coat, in order to make Geraldina feel bad.  At the conclusion of the meeting, MORROW informed Plaintiff that she was being terminated because of her purportedly insubordinate behavior.

237. On January 13, 2020 Plaintiff visited orthopedic surgeon Frank Cordasco in the Hospital for Special Surgery.  He determined that it was necessary to perform rotator cuff surgery on Plaintiff's right shoulder; the surgery was set for February 26.

238. Plaintiff e-mailed the paperwork demonstrating that she required rotator cuff surgery to Ms. Surazhsky and MACY'S Leave of Absence Office.

239. The following day Plaintiff informed Ms. Surazhsky that she needed to reschedule the surgery for February 12, 2019.  Plaintiff informed Surazhsky that she was willing to

BLM001183

use four weeks of her accrued vacation time for the surgery and recovery.  Surazhsky looked unhappy, but ultimately told Plaintiff that that was acceptable.

240. Upon information and belief, in addition to their lingering resentment of Plaintiff for her disabilities and prior requests for accommodation, Plaintiff's request for time off in February to undergo further surgery and recover from it was another motivation for Defendants to fire her.

241. Only three days later, on February 16, 2020, Defendants called Plaintiff to the Human Resources office.  MORROW, DITO, Surazhsky, and Eisenberg were present. MORROW and DITO told Plaintiff that she was terminated.

242. Upon information and belief, Plaintiff's termination was proximately triggered by Plaintiff's request to have surgery, as well as by the outcome of her workers' compensation hearing.

243. Plaintiff's disabilities substantially limit one or more of her major life activities within the meaning of ADA Sections 12102(l)(A), including but not limited to the ability to stand for extended periods of time, lift her arm above her head, cut garments, and move her hands in repetitive motions.

244. But Plaintiff is a qualified individual who can perform the essential functions of her employment with a reasonable accommodation as defined by ADA Section 12111(8).

245. Defendants failed to engage in the interactive process by not taking any steps to determine whether they could accommodate Plaintiff in her current department or role and/or another department or role.

BLM001184

246. Despite being aware of Plaintiff's medical restrictions, Defendants continued to force Plaintiff to work outside of those medical restrictions, including but not limited to placing garments in racks above Plaintiff's head.

247. In addition, since returning to work, Plaintiff continues to face a severely hostile work environment, due to her repeated complaints of discrimination and requests for reasonable accommodations.

248. Upon information and belief, KOTSOVOLOS is a repeat offender who harasses other employees in the Alterations Department who have actual or perceived disabilities.

249. Defendants discriminated and retaliated against Plaintiff because of her disability, her request for a reasonable accommodation in order to complete her workplace responsibilities, and because she complained or opposed the unlawful conduct of Defendants related to the above protected classes.

250. Plaintiff has been unlawfully discriminated and retaliated against, and humiliated and degraded; as a result, she has suffered loss of rights and emotional distress.

251. Defendants' actions and conduct were intentional and intended to harm Plaintiff.

252. As a result of Defendants' unlawful and discriminatory actions, Plaintiff has endured unwarranted professional humiliation resulting in emotional distress, severe depression, and extreme anxiety.  Plaintiff has become so physically and emotionally distressed that she is having difficulty eating and sleeping.

253. As a result of Defendants' unlawful and discriminatory actions, Plaintiff has also endured unwarranted financial hardships and irreparable damage to her professional reputation.

BLM001185

254. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation. Plaintiff has also suffered pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

255. Defendants' actions were systematic, malicious, willful, outrageous, and conducted with full knowledge of the law. Accordingly, Plaintiff demands punitive damages against Defendants.

256. The above are just some examples of the unlawful discrimination and retaliation to which Defendants subjected Plaintiff.

257. Defendants' conduct has also constituted a continuing violation.

**FIRST CAUSE OF ACTION**
**AMERICANS WITH DISABILITIES ACT – DISCRIMINATION**
**(Not Against the Individual Defendants)**

227. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

228. Section 102 of the Americans With Disabilities Act provides in pertinent part: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

229. The exact number of employees at each Defendant is unknown, but upon information and belief, more than satisifies the statutory minimum.

BLM001186

230. Throughout the course of Plaintiff's employment with Defendants, on numerous occasions, Defendants refused to reasonably accommodate Plaintiff's disability, and otherwise discriminated against her on the basis of her disability as alleged above.

231. Defendants thereby violated the Americans With Disabilities Act and Plaintiff suffered numerous damages as a result.

## SECOND CAUSE OF ACTION
## AMERICANS WITH DISABILITIES ACT – RETALIATION
### (Not Against the Individual Defendants)

232. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

233. Section 503 of the Americans With Disabilities Act states:  "(a) Retaliation.  No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203.

234. Defendants engaged in an unlawful retaliation against Plaintiff in the manner described above, because of her requests for reasonable accommodation of her disabilities, and her opposition to Defendants' unlawful employment practices as also described above.

BLM001187

**THIRD CAUSE OF ACTION**
**AMERICANS WITH DISABILITIES ACT – HOSTILE WORK ENVIRONMENT**
**(Not Against the Individual Defendants)**

235. "Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose – the prohibition of illegal discrimination in employment – it follows that disabled Americans should be able to assert hostile work environment claims under the ADA." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019)

236. By harassing Plaintiff about her disability and requests for reasonable accommodation as described above, Defendants created, maintained, and subjected Plaintiff to an unlawful hostile work environment.

**FOURTH CAUSE OF ACTION**
**FAMILY AND MEDICAL LEAVE ACT**
**(Not Against the Individual Defendants)**

237. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

238. FMLA Section 2612(a)(1)(D) states that in general, an employee is entitled to a total of twelve workweeks of leave in any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

239. Plaintiff had multiple documented serious health conditions that rendered her unable to perform certain functions of her position.

240. Nevertheless, Defendants repeatedly refused to allow Plaintiff to take the leave to which she was entitled and which she repeatedly requested, so that she could treat her serious health conditions.

41

BLM001188

241. Defendants thereby repeatedly violated the FMLA.

### FIFTH CAUSE OF ACTION
### FAMILY AND MEDICAL LEAVE ACT – RETALIATION AND INTERFERENCE
### (Not Against the Individual Defendants)

242. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

243. FMLA Section 2615(a)(1) states: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

244. FMLA Section 2615(a)(2) states: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

245. The Corporate Defendants unlawfully interfered, restrained, and denied Plaintiff's right to exercise and attempts to exercise her FMLA rights, and discriminated and retaliated against Plaintiff for opposing Defendant's unlawful employment practices with regard to her attempts to exercise FMLA rights.

246. The Corporate Defendants thereby violated FMLA Section 2615(a).

### SIXTH CAUSE OF ACTION
### NEW YORK STATE HUMAN RIGHTS LAW – DISCRIMINATION

236. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

237. The New York State Human Rights Law provides in pertinent part that it "shall be an unlawful discriminatory practice" for an employer "because of an individual's . . .

42

BLM001189

disability . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Executive Law § 296(1)(a).

238. Defendants violated this provision by discriminating against Plaintiff on the basis of her disabilities as set forth above.

## SEVENTH CAUSE OF ACTION
## NEW YORK STATE HUMAN RIGHTS LAW – RETALIATION

239. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

240. The New York State Human Rights Law provides in pertinent part that it shall be an unlawful discriminatory practice "[f]or any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article."  N.Y. Executive Law § 297.

241. Defendants engaged in an unlawful discriminatory practice by unlawfully retaliating against Plaintiff because of her opposition to Defendants' unlawful employment practices as described above.

## EIGHTH CAUSE OF ACTION
## N.Y.S. HUMAN RIGHTS LAW – HOSTILE WORK ENVIRONMENT

242. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

243. A work environment is "hostile" in violation of the NYSHRL when it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)

BLM001190

244. By repeatedly harassing Plaintiff about her disability and requests for reasonable accommodation as described above, Defendants created, maintained, and subjected Plaintiff to an unlawful hostile work environment.

## NINTH CAUSE OF ACTION
## NEW YORK STATE HUMAN RIGHTS LAW – AIDING AND ABETTING

245. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

246. The New York State Human Rights Law provides in pertinent part that it shall be an unlawful discriminatory practice "[f]or any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."  N.Y. Executive Law § 296(6).

247. Each Defendant violated this provision by aiding, abetting, inciting, compelling, and coercing unlawful disability discrimination or retaliation carried out by the other Defendants as described above.

## TENTH CAUSE OF ACTION
## NEW YORK CITY HUMAN RIGHTS LAW – DISCRIMINATION

248. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

249. The New York City Human Rights Law makes it an "unlawful discriminatory practice" for any "employer or an employee or agent thereof, because of the . . . disability . . . of any person, . . . to discriminate against such person in compensation or in terms, conditions or privileges of employment."  N.Y.C. Admin. Code § 8-107(1).

250. To prevail on a NYCHRL discrimination claim, an employee need only show "differential treatment" – that she was "treated less well" because of a discriminatory

BLM001191

intent, whether through a "tangible" employment action such as firing, or through workplace harassment, which need not be "severe or pervasive." *Forrester v. Corizon Health, Inc.*, 278 F. Supp. 3d 618, 625-26 (E.D.N.Y. 2017), *aff'd*, 752 Fed. App'x 64 (2d Cir. 2018)

251. Defendants violated the NYCHRL by creating and maintaining discriminatory working conditions, by harassing, and by otherwise discriminating against Plaintiff on the basis of her disability as set forth herein.

### ELEVENTH CAUSE OF ACTION
### NEW YORK CITY HUMAN RIGHTS LAW – RETALIATION

252. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

253. The New York City Human Rights Law makes it an "unlawful discriminatory practice" for any employer to "discriminate against any person because such person has opposed any practices forbidden under this chapter." N.Y.C. Admin. Code § 8-107(7).

254. Defendants violated this provision by discriminating against the Plaintiff when she demanded reasonable accommodation of her disabilities and then complained that Defendants were failing to provide such reasonable accommodation, as described above.

### TWELFTH CAUSE OF ACTION
### NEW YORK CITY HUMAN RIGHTS LAW – INTERFERENCE

255. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

256. The New York City Human Rights Law makes it an "unlawful discriminatory practice" for "any person" to "coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on

45

BLM001192

account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section."  N.Y.C. Admin. Code § 8-107(19).

257. Defendants violated this provision after Plaintiff demanded reasonable accommodation of her disabilities and then complained that Defendants were failing to provide such reasonable accommodation.   As described above, Defendants attempted to and did coerce, intimidate, threaten, and interfere with Plaintiff's enjoyment of the reasonable accommodations that she had requested and to which she was entitled.

## THIRTEENTH CAUSE OF ACTION
## NEW YORK CITY HUMAN RIGHTS LAW – AIDING AND ABETTING

258. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

259. The New York City Human Rights Law provides that it shall be an "unlawful discriminatory practice" for "any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."  N.Y.C. Admin. Code § 8-107(6).

260. As described above, Defendants violated this provision by aiding, abetting, inciting, compelling, and coercing the discriminatory, retaliatory, and harassing conduct also described above.

## FOURTEENTH CAUSE OF ACTION
## NEW YORK CITY HUMAN RIGHTS LAW – EMPLOYER LIABILITY

261. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

46

BLM001193

262. The New York City Human Rights Law provides for "Employer liability for discriminatory conduct by employee, agent or independent contractor."  N.Y.C. Admin. Code § 8-107(13).  Specifically, it states:  "An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent" where:  "(1) the employee or agent exercised managerial or supervisory responsibility"; or "(2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action"; or "(3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct."

263. As described above, Defendants' employees or agents who exercised managerial responsibility for Plaintiff and her work were aware or reasonably should have known of their agents' or employees' discriminatory conduct toward Plaintiff, but acquiesced in such conduct or failed to exercise reasonable diligence to prevent such conduct.

264. Defendants are therefore liable for their agents' discriminatory conduct.

## INJURY AND DAMAGES

265. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of her salary,  health, medical bills and other out-of-pocket medical     expenses. Plaintiff will also suffer future pecuniary loss, emotional pain, suffering, inconvenience, injury to her reputation, loss of enjoyment of life, and other non-pecuniary  losses. Plaintiff has further experienced  severe emotional and physical distress.

BLM001194

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a jury trial on all issues to be tried.


Dated:   New York, New York
        February 25, 2020

DEREK SMITH LAW GROUP, PLLC

By:    <u>*/s/ Daniel S. Kirschbaum*</u>
        Daniel S. Kirschbaum, Esq.
        One Penn Plaza, Suite 4905
        New York, New York 10119
        (212) 587-0760

BLM001195