# EXHIBIT 24



Law Department -11th floor
11 Penn Plaza
New York, New York 10001

**Taryn M. Filo**
**Direct:** 646-429-7513
**Facsimile:** 646-429-7521/22
**Email:** Taryn.Filo@macys.com

June 6, 2019

**VIA EMAIL AND U.S. MAIL**

Anthony Pino
U.S. Equal Employment Opportunity Commission
Boston Area Office
JFK Federal Building
Government Center, Room 475
Boston, MA 02203
Anthony.pino@eeoc.gov

        Re:    Kristina Mikhaylova v. Bloomingdale's LLC
               EEOC Charge No.: 520-2019-02748[1]

Dear Mr. Pino:

    I represent Respondent Bloomingdale's, Inc. ("Bloomingdale's" or "Company"), incorrectly identified as Bloomindale's LLC, in the above-referenced matter. Please accept this correspondence as the Company's Position Statement in response to the allegations of Complainant Kristina Mikhaylova ("Complainant").[2]

    In her Charge, Complainant alleges that she was subject to discrimination on the basis of her sex, pregnancy, and disability and in retaliation for requesting an accommodation/intermittent FMLA leave.  These allegations are without merit.  Rather,

---

[1] Please note that the original charge served upon Respondent was numbered EEOC charge no. 520-2018-02748.
[2] This position statement is submitted upon information and belief, is directed solely at the allegations contained in the Complaint and is limited to facts presently known to Bloomingdale's.  Should additional evidence be presented to the U.S. Equal Employment Opportunity Commission ("EEOC"), Bloomingdale's requests that it be advised of that information on a timely basis.  The Company reserves the right to amend or supplement this response or produce additional evidence should additional information be discovered subsequently or should the Complainant provide further information or make additional allegations.  This position statement is provided to aid the EEOC in its investigation and should not be used for any other purpose.

BLM000917

June 6, 2019
Page 2

Complainant was terminated after Bloomingdale's HR was provided with information that she admitted to shipping her purchases out of state for the purpose of avoiding sales tax, along with other evidence of likely misconduct. For these reasons, and the reasons described more fully herein, Bloomingdale's respectfully requests that Complainant's Charge be dismissed and a finding of no probable cause be issued.

## DESCRIPTION OF BLOOMINGDALE'S

Respondent Bloomingdale's, Inc. is a wholly owned subsidiary of its parent company, Macy's Retail Holdings, Inc. Macy's Retail Holdings, Inc. is, in turn, a wholly owned subsidiary of Macy's, Inc. Bloomingdale's is a retail organization, which sells a wide range of merchandise, including apparel and accessories, cosmetics, home furnishings and other consumer goods. In addition to its websites and mobile applications, Bloomingdale's operates stores around the country, including at 1000 Third Avenue, New York, NY 10022 ("59th Street Bloomingdale's Store").

## BLOOMINGDALE'S APPLICABLE POLICIES AND PROCEDURES

### A. Equal Employment Opportunity and No Harassment Policies

Bloomingdale's is committed in both policy and practice to preventing unlawful discrimination and harassment in the workplace. The Company's "Equal Employment Opportunities" policy and "No Harassment Policy," contained in the Bloomingdale's associate guide, strictly prohibits workplace discrimination and harassment on the basis of race, religion, color, sex, age, disability, national origin, sexual orientation or any other protected category. (*See* Bloomingdale's Handbook Excerpts, Equal Employment Opportunities policy; Bloomingdale's No Harassment Policy, attached as Exhibit A.)[3] Such conduct is not tolerated and can lead to discipline, up to and including termination of employment. (*See also* Macy's, Inc. Code of Conduct, EEO & Anti-Harassment Policy; Diversity and Equal Opportunity Policy, attached as Exhibit B.)

Bloomingdale's policy requires that any associate who believes that he or she may have observed or been subject to discrimination or harassment report the situation immediately using any of the Company's reporting avenues, including through a manger or supervisor, a Human Resources representative, the Office of Compliance hotline,[4] or Bloomingdale's hotline. (Exhibit A.) Retaliation for reporting is strictly prohibited and can lead to disciplinary action up to and including termination. (Exhibit A.)

---

[3] Respondent requests the EEOC not use, disclose or release any of the contents contained in this response (including any confidential exhibits submitted herewith), except as necessary in communications with and between the parties in connection with pending claim as required by law.

[4] ComplianceConnections is the Company's reporting program that allows associates to report compliance and ethics concerns – either anonymously or by identifying themselves – via a telephone line or website operated by an independent third-party service provider.

June 6, 2019
Page 3

### B. Americans with Disabilities Act Policy

Pursuant to applicable Bloomindale's policy, "[a] qualified individual with a disability who meets legitimate skill, experience or other requirements for a position that he or she holds or seeks, and who can perform the 'essential functions' of the position, with or without reasonable accommodation, shall be considered equally with other candidates or employees with the same or similar qualifications." (*See* Bloomindale's Handbook Excerpt, Americans with Disabilities Act, attached as Exhibit A.) "Any reasonable request for assistance should be accommodated." (*See* Exhibit A.)

### C. Associate Discount and Credit Account Information Policy

Another policy to which Bloomingdale's employees are bound relates to a colleague's associate discount. "One advantage of working for the Company as an associate . . . is the privilege of purchasing most items at a discount." (*See* Associate Discount and Credit Account Information and Mikhaylova acknowledgment, attached as Exhibit C.) "To receive the discount on your purchases you must first obtain a Macy's or Bloomingdale's credit card or pre-pay card ("credit card" or "pre-pay card") . . . and keep your account in good standing." (*See* Exhibit C.) However, the policy is clear that employees must not misuse their discount. "Associate discount abuse is a serious offense and may result in termination of the discount, [or] termination of employment for associates[.]" (*See* Exhibit C.) Discount abuse includes, but is not limited to:

- Allowing an ineligible person to receive your discount by loaning your credit card or pre-pay card.
- Making a purchase with your discount when someone else will reimburse you (in full or in part) for the price of the item.
- Purchasing items you intend to resell.

(*See* Exhibit C.)

### D. Notice of Policies

During the course of her employment, Complainant acknowledged having access to the above-referenced policies. (*See, e.g.,* Kristina Mikhaylova Acknowledgment of Associate Handbook and Code of Conduct, attached as Exhibit D; *see also* Exhibit C.) Complainant also received notice of her rights under the law, including the New York Pregnancy and Employment Rights Notice, attached as Exhibit E.

### COMPLAINANT'S EMPLOYMENT WITH BLOOMINGDALE'S

Complainant was hired by Respondent on May 3, 2016 as a Sales Associate responsible for selling Chanel handbags. In this position, Complainant's responsibilities included providing excellent service to customers, meeting sales and new account goals, being familiar with the

June 6, 2019
Page 4

product she was responsible for selling, and performing associated tasks. From December 2016 through her termination, Complainant reported to Business Manager Denis Diaz.

Complainant's short employment with Respondent was generally uneventful. However, several months into her employment, she did begin to demonstrate some difficulty getting to work on time. For instance, on February 21, 2017, Complainant was issued a Counseling Summary Form – the first step in the disciplinary process known as Responsibility Based Performance ("RBP").[5] (*See* Kristina Mikhaylova Counseling Summary Form, attached as Exhibit F.) Specifically, Complainant was written up for tardiness incidents occurring on January 6, 7, 8, 17, 18, 28, and 31, 2017. As is evident from the document, Complainant had the opportunity to write objections or clarifications regarding these incidents in the "Associate Comments" section, however, she failed to identify any, including any claim that her lateness was caused by pregnancy or disability.[6]

Despite this counseling, Complainant's tardiness issues continued. As a result of her lateness on March 9, 18 and 22, 2017, Complainant was issued the second step in the RBP process – a Formal Reminder Form – on April 19, 2017. (*See* Kristina Mikhaylova Formal Reminder Form, attached as Exhibit G.) Complainant again had the opportunity to write objections or clarifications regarding these incidents in the "Associate Comments" section, however, she mentioned nothing about her pregnancy or disability that would cause her to be late. Rather, she committed to leaving 40 minutes earlier for her shifts and to checking for subway delays to determine whether she should take the subway or bus. (*See* Exhibit G)

Around this time – but unbeknownst to Complainant – the entity which handles Macy's and Bloomingdale's credit cards – Macy's Credit and Customer Service, Inc. ("MCCS"), identified Complainant's pre-paid Bloomingdale's account as having a pattern of suspicious activity. Namely, between October 2016 and April 21, 2017, Complainant had made 26 employee purchases totaling over $65,000. Complainant earned $13.50 per hour and with a pre-paid credit card, she would have been required to pre-pay for all purchases made on her card. Therefore, Complainant's transaction history suggested that Complainant might be violating Bloomingdale's Associate Discount and Credit Account Information policy in some way. (*See* Exhibit C.) Due to her transaction history, MCCS forwarded the information to Bloomingdale's Central Asset Protection ("AP") Team. The Central AP Team shared this information with the AP personnel at the 59th Street Store, who initiated an investigation into Complainant's transaction history.

---

[5] The first step in the RBP process is to issue an employee a Counseling Summary Form. If, after coaching from his or her supervisor, an associate continues to demonstrate a gap between performance and/or conduct and Bloomingdale's expectations, the Company will administer a written Reminder. If the employee continues to fall short of expectations, the Company will administer a Decision Making Leave (i.e., the next shift off with pay for the employee to think about whether he/she is willing to commit to meeting all performance and/or conduct expectations). If no improvement is demonstrated after a Decision Making Leave, termination may follow. Notably, however, RBP is not progressive. The Company may proceed immediately to Reminder, Decision Making Leave, or termination depending on the seriousness of the performance and/or conduct issues.

[6] Indeed, based off the due date that Complainant's healthcare provider listed on the medical certification that Complainant would submit months later, Complainant was not yet pregnant at this time.

June 6, 2019
Page 5


      Some time after her April 2017 Formal Reminder Form, Complainant disclosed to Mr. Diaz that she was pregnant.  Mr. Diaz congratulated her on the good news and advised her to contact the Leave of Absence Department, the centralized HR team that handles requests for leaves of absence and intermittent leaves.  Complainant did so on May 15, 2017 to request an intermittent leave due to her medical condition.  Complainant was asked to provide a completed Certification of Healthcare Provider form outlining her medical needs by May 31, 2017.  However, it was not until early June when Complainant ultimately provided this information.

      Meanwhile, the 59th Street Store was still investigating Complainant's purchase history.  In addition to her multiple and expensive transactions, it was also discovered that Complainant had shipped her purchases to six separate addresses out of state, which would have avoided the requirement that she pay sales tax on these purchases.  This further supported a potential violation of the Company's associate discount policy – namely that she was either reselling the product or receiving reimbursement from others for her purchases.

      Ultimately, on June 6, 2017, Complainant was interviewed by AP Manager Christopher Castellani and AP Detective Shanine Gray about the information they had uncovered during their investigation.  When asked about the excessive purchases she had completed, Complainant stated that all of her purchases were for personal use or gifts.  Complainant denied purchasing merchandise with the intent to resell it or to receive reimbursement for her purchases.  However, Complainant conceded that she had been shipping her merchandise out of state to "various friends and family" to avoid being charged sales tax.  The sales tax that Complainant avoided paying amounted to over $5,000 as calculated by the Store's AP Team.  Complainant wrote a statement outlining the contents of what she told Mr. Castellani and Ms. Gray.  (*See* Kristina Mikhaylova AP Statement, attached as Exhibit H.)  Complainant was suspended until further notice at the conclusion of her AP interview.

      On June 9, 2017, while Complainant was suspended, Respondent's Leave of Absence Department issued Complainant a letter informing her that her requested intermittent leave had been approved.  (*See* June 9, 2017 Letter to Mikhaylova Approving Intermittent FMLA Leave, attached as Exhibit I.)  Based on the information submitted by her healthcare provider, Complainant was retroactively approved to begin her intermittent leave of absence on April 23, 2017.  Even so, Complainant had never been issued discipline for any tardiness occurring after March 22, 2017 – well before her approved intermittent leave began.

      After her suspension, Complainant's misconduct was referred to the 59th Street Store's HR Department for review.  Critically, Complainant had expressly admitted to evading taxes by shipping her personal purchases out of state to avoid taxes.  In addition to that, it was strongly suspected that (in spite of her denials) her excessive volume of purchases coupled with her act of shipping them to out of state addresses indicated that she was either reselling merchandise or receiving reimbursement from non-Bloomingdale's employees for merchandise she purchased with her employee discount.  Ultimately, based upon this conduct, it was determined by Human Resources Manager Richard Law that Complainant's employment would be terminated.

June 6, 2019
Page 6

## COMPLAINANT'S SPECIFIC ALLEGATIONS

In her Complaint, Complainant alleges that she was subject to discrimination on the basis of her sex and disability and in retaliation for requesting an accommodation/intermittent FMLA leave. These allegations are baseless.

First, Complainant alleges that AP Detective Bobby Booker was frequently near her work station, made sexual innuendoes toward Complainant, touched her arm when he spoke to her and would stand uncomfortably close to Claimant. Respondent denies these allegations. Respondent has no record of Complainant ever raising concerns or complaints about Mr. Booker. Mr. Diaz similarly has no recollection of observing Mr. Booker near Complainant. Put plainly, those at the store did not observe inappropriate behavior between Complainant and Mr. Booker, nor did Complainant raise concerns about him.

Next, Complainant alleges that she was written up for attendance on April 6, 2017 and she immediately revealed to Mr. Diaz that she was pregnant. This allegation mischaracterizes the timeline of events. Rather, as described above, it was not until after Complainant's Formal Reminder Form that Complainant revealed her pregnancy. This is supported by the fact that Complainant raised no objections to her attendance discipline when it was issued, as evidenced by the lack of comments about pregnancy or a disability. When she *did* disclose her pregnancy, Mr. Diaz directed her to the Leave of Absence department, who promptly processed her request. Ultimately, when her request was approved, Complainant's approved intermittent FMLA leave covered a time period well *after* the incidents leading to her discipline. Put another way, her intermittent FMLA leave – even retroactively approved – did not excuse the tardy occurrences for which she was disciplined.

Finally, Complainant alleges that Respondent discriminated against Complainant on the basis of her pregnancy, sex, and disability, and retaliated against her for requesting an accommodation/intermittent FMLA leave in connection with her pregnancy. Again, this allegation is baseless. As an initial matter, Complainant does not identify her disability; therefore, Respondent is unable to respond to her allegations in this regard. And as noted above, Respondent was not aware of any alleged sexual harassment Complaints and, therefore, could not have retaliated against Complainant for such complaints.

Notably, Complainant does not identify that anyone ever made disparaging or negative remarks regarding her pregnancy during her employment with Respondent – let alone in connection with her interview with AP and termination. Therefore, Complainant is left to rely on timing, apparently claiming that it was her request for intermittent FMLA leave that triggered the AP Team's investigation and interview of her. However, Complainant overlooks that her transaction history and conduct was being investigated *long* before her FMLA request was ever made. In fact, at the time the investigation was initiated, it's not even clear that she had disclosed her pregnancy to *anyone* at Bloomingdale's. And even if she had, it was not Mr. Diaz or even the 59th Street Store's AP Team that made the decision to investigate Complainant. Rather, it was employees of MCCS who noticed Complainant's excessive spending pattern. These individuals did not supervise Complainant, were not located in the 59th Street Store with her, and would have had no way of knowing she was pregnant. Put simply, the investigation into

BLM000922

June 6, 2019
Page 7

Complainant's transaction history was initiated by those with no knowledge of Complainant's pregnancy and may even have been initiated before Complainant told *anyone* at work she was pregnant.

     Just as Complainant's sex, pregnancy, alleged disability and request for intermittent FMLA leave had no bearing on initiating the investigation into her misconduct, they also had no bearing on her termination. By the time Mr. Law was tasked with assessing Complainant's misconduct after she was suspended, he was faced with Complainant's admission that she purposefully evaded sales taxes. This admitted misconduct, in addition to her likely violation of the Bloomingdale's associate discount policy (evidenced by her extremely high volume of purchases and her shipment of those purchases to the addresses of "friends and family" out of state), left little room to equivocate regarding the appropriate level of discipline. Because of Complainant's serious misconduct, her employment was terminated.

## **CONCLUSION**

     Based on the forgoing, Bloomingdale's respectfully requests that Complainant's charge be dismissed and a finding of no probable cause be issued.

Sincerely,

Taryn Filo

BLM000923