# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

KRISTINA MIKHAYLOVA,

                          *Plaintiff,*

   v.

BLOOMINGDALE'S, INC., BLOOMINGDALE'S, INC. d/b/a BLOOMINGDALE'S AND FORTY CARROTS, BLOOMINGDALE'S, LLC, BLOOMINGDALE'S, LLC d/b/a BLOOMINGDALE'S NEW YORK, MACY'S, INC., MACY'S, INC. d/b/a MACY'S OF NEW YORK, UNITED STOREWORKERS RETAIL, WHOLESALE AND DEPARTMENT STORE UNION AFL-CIO LOCAL 3 a/k/a LOCAL 3 UNITED STOREWORKERS RWDSU/UFCW, DENNIS DIAZ, individually, CHRISTOPHER CASTELLANI, individually, RICHARD LAW, individually, and BOBBY BOOKER, individually,

                          *Defendants.*

Case No. 1:19-cv-08927-GDB-SLC

## DEFENDANTS' REPLY TO PLAINTIFF'S COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS AND ADDITIONAL STATEMENT OF FACTS PURSUANT TO RULE 56.1

Pursuant to Rule 56.1(a) of the Local Civil Rules of this Court, Defendants Bloomingdale's, LLC, Macy's, Inc., and Christopher Castellani respectfully submit the following Reply Counter-Statement of Undisputed Material Facts ("Counter SUF") in support of their Motion for Summary judgment.

## INTRODUCTION

1.      Plaintiff, Kristina Mikhaylova ("Plaintiff"), began working for Bloomingdale's on April 30, 2016 in the Chanel Handbag Department in the Bloomingdale's store located at 59th Street as a commissioned sales associate. Deposition of Kristina Mikhaylova ("Mikhaylova Dep."), pp. 9:21-25; 16:16-21; 17:7-15 (Excerpts from Mikhaylova Dep. are attached as Exhibit

1

A to the accompanying Declaration of Steven Gerber, Esq. ("Gerber Decl.")).

**Plaintiff's Response:** Partially disputed. Undisputed to the extent that Plaintiff worked for Bloomingdale's in the Chanel Handbag Department at the 59th Street location. Disputed that Plaintiff began on April 30, 2016 as Plaintiff started on May 3, 2016 as seen in the record and request for admissions. Exh. 13, paragraph 2 and 3; Mikh. Decl. paragraph 3-4; Exh 10, bates 754.

**Defendants' Reply:** Plaintiff is correct. April 30, 2016 was the day she interviewed. Mikhaylova Declaration, ¶ 3. Defendants agree she began work on May 3, 2016.

2.     Plaintiff's employment was terminated as of June 16, 2017 for various policy violations related to her mailing personal merchandise purchases out of state.  Mikhaylova Dep., pp. 140:12- 143:8; Deposition of Richard Law ("Law Dep."), pp. 80:4-23; 86:1-7; 88:4-17; 171:13-23; 150:22- 24 (Excerpts from Law Dep. are attached as Exhibit B to the accompanying Gerber Decl.)

**Plaintiff's Response:** Partially Disputed. Becker testified Plaintiff did not violate any policies. Becker Dep. P. 134:19-135:11.

**Defendants' Reply:** Mikhaylova grossly misstates Becker's testimony. Becker did not testify that Plaintiff did not violate policy. Becker stated, after a question confirming that Plaintiff admitted to tax evasion, the following:

Q.     Does that mean that she was not committing – I mean so – and the interview ends after that. Is that consistent with policy?

A.     Yes, that was – if those were the questions that we wanted to get out of – that we wanted answered as part of that discussion, yes, if all those questions were answered, then that would be the end of the discussion.

Becker Dep., 135:4-11 (Ex. H to moving Gerber Decl.). The question was not whether Plaintiff violated policy but whether it was consistent with policy to end the interview after getting an admission. That is explained by Becker in the very next sentence. This is further demonstrated

by comments by Becker previously in which he noted that Plaintiff violated policy by avoiding taxes. Becker Dep. 30:11-31:4; 41:5-14. Additionally, in his moving Declaration, Mr. Becker noted that mailing product out of state to avoid taxes is a policy violation. Becker Decl. ¶ 20. He further attested to the fact that every employee of which he is aware who has admitted to tax evasion has been discharged from employment. Becker Decl., ¶ 24. More importantly, the decision maker as to Mikhaylova's termination, Richard Law, stated that tax evasion was a sufficient basis for termination. Law Dep., p. 171:13-23 (Ex. B to moving Gerber Decl.).

3.       From the beginning of 2017 until her termination, Denis Diaz was Plaintiff's Direct Supervisor. He reported to Cathy Younis who was the Chanel Brand Director. Younis focused most of her time on the Chanel Ready-to-Wear area but also regularly spent time in the Chanel Handbag area. See accompanying Declaration of Cathy Younis, ("Younis Decl."), ¶¶ 2-3; Mikhaylova Dep., pp. 43:16-19; 45:12-14; 150:19-151:12; Deposition of Cathy Younis ("Younis Dep."), pp. 12:4-13:20; (Excerpts from Younis Dep. are attached as Exhibit C to Gerber Decl.); Deposition of Denis Diaz ("Diaz Dep."), pp. 7:24; 27:19-24 (Excerpts from Diaz Dep. are attached as Exhibit D to Gerber Decl.)

**Plaintiff's Response:** Partially disputed. Disputed to the extent that Diaz was Plaintiff's supervisor starting December 2016. Exh. 13, ¶8. Further disputed because Victoria S. was Plaintiff's direct supervisor when she started working for Defendants in 2017 (Plaintiff Dep., pp. 44:12-45:8; Mikhay. Decl. ¶6). Undisputed to the rest. extent that Diaz reported to Cathy Younis who was the Chanel Brand Director and that Younis focused most of her time on the Chanel Ready-to-Wear area but also regularly spent time in the Chanel Handbag area.

**Defendants' Reply:** Plaintiff misstates her dates. In her declaration, she correctly notes Viktoria Somek was her supervisor between May 3, 2016 and September 2016.

4.      Diaz left Bloomingdale's employ in 2019. Diaz Dep. at pp. 12:6-8; 17:9-14.

**Plaintiff's Response:** Admitted to the extent that is what Diaz testified to.

**Defendants' Reply:** No additional response.

5.      Richard Law was a Human Resources Manager in the 59th Street Bloomingdale's in 2017. He began working for the Company in June 2016. He resigned from his position in December 2017. Law Dep., pp. 13:4-14:14.

**Plaintiff's Response:** Admitted and in addition, Law resigned December 17, 2017. Exh. 16 paragraph 4.

**Defendants' Reply:** No additional response.

## Bloomingdale's Policies

6.      Bloomingdale's (occasionally referred to as the "Company") is an Equal Opportunity Employer and its "EEO & Anti-Harassment Policy," set forth in Bloomingdale's Code of Conduct, strictly prohibits workplace discrimination. This policy is also in the employee handbook. Plaintiff received and signed off on the employee handbook and Code of Conduct. See accompanying Declaration of Courtney Cox, ("Cox Decl."), ¶¶ 5, 10, 17, and Exhibits A-C; Mikhaylova Dep., pp. 39:16-41:16; 193:6-195:9, 211:7-212:2, Exs. L and Q.

**Plaintiff's Response:** Admitted to the extent that that is Defendants' policy.

**Defendants' Reply:** No additional response.

7.      The Company policy requires equal treatment of all employees as to job-related qualifications, abilities and performance, regardless of race, ancestry, color, ethnicity, age, religion, sexual orientation, gender, gender identity, gender expression, national origin, physical or mental disability, genetic information, military and veteran status, marital status, medical condition, or any other category protected by law or unrelated to job performance. Cox Decl., ¶¶

5, 10, Exhibit A.

**Plaintiff's Response:** Admitted to the extent that that is Defendants' policy.

**Defendants' Reply:** No additional response.

8.      Discrimination and harassment are viewed as employee misconduct and will lead to discipline up to and including termination. Cox Decl., ¶ 11.

**Plaintiff's Response:** Admitted to the extent that that is Defendants' policy.

**Defendants' Reply:** No additional response.

9.      Any employee who believes they have been subjected to or observed discrimination or harassment must report the situation immediately. Cox Decl., ¶ 12.

**Plaintiff's Response:** Admitted to the extent that that is Defendants' policy.

**Defendants' Reply:** No additional response.

10.     Bloomingdale's 59th Street location has four avenues for an employee to complain about any workplace issue: the employee's manager or supervisor; Bloomingdale's human resources department; the Union (59th Street employees are members of the Local 3 RWDSU bargaining unit); or the Compliance Connections hotline (a reporting program accessible via a toll-free telephone line and website). Cox Decl., ¶ 13.

**Plaintiff's Response:** Admitted to the extent that that is Defendants' policy.

**Defendants' Reply:** No additional response.

11.     Retaliation in any form against an employee who complains of discrimination or harassment is strictly prohibited and will itself be cause for disciplinary action up to and including termination. Cox Decl., ¶ 14.

**Plaintiff's Response:** Disputed.

**Defendants' Reply:** Defendants' fact must be deemed admitted since Plaintiff does not

provide a citation in the record refuting the fact.

12.    Bloomingdale's also has a Reasonable Accommodation Policy to provide reasonable accommodations to those who have requested or need an accommodation for a medical condition or a limitation arising from a disability or a pregnancy-related condition to enable them to perform the essential functions of their job or any other job they are qualified to perform, and to enjoy equal access to the benefits and privileges of employment. Cox Decl., ¶¶ 5-6 , Ex. A.

**Plaintiff's Response:** Disputed. Disputed to the extent the cited document Exhibit A does not say reasonable accommodation for pregnancy-related condition. Also, defendants produced different handbook where this was not included. Exh 10, BLM 22- 84.

**Defendants' Reply:** Defendants' fact is not properly refuted. Cox's declaration states that the company disability policy applies to pregnancy related issues. This is based on her knowledge of applying the policy as the Employee Relations Manager. The policy speaks in terms of disabilities in general and does not specify *any* illness or malady that is covered. Also, the handbook is not required to include every single policy, so the absence of a specific written policy does not put into dispute that Macy's had a reasonable accommodations policy.

13.    Whether to grant an accommodation is decided by a part of the central human resources organization, the Accommodations, Disability, and Leave Management team. Store Managers – including department managers – cannot decide whether to grant an accommodation. After the central group determines an accommodation is appropriate, they then work with the store (normally the department manager) to decide what form the accommodation will take. Cox. Decl., ¶ 7; Law Dep., pp. 28:5-29:5.

**Plaintiff's Response:** Disputed. Younis testified that managers such as Diaz decided which accommodations to give for pregnancy related conditions including breaks, time off the floor, etc.

6

Younis Dep. P. 98:22-99:11. Also defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply:** As noted in Defendants' stated fact, after the ADLM team determines if an accommodation is to be granted, they work with the department manager to determine the form the accommodation will take (e.g., breaks, time off the floor, etc.). The alleged dispute is consistent with the stated fact. As previously stated, this too is not required to be in a handbook and does not refute the stated fact.

14.     Bloomingdale's also has several leaves of absence policies. The only one relevant to this case is the Family and Medical Leave Act policy. This policy provides for either a continuous leave or intermittent leave as designated by health care professional submitting the require certification. Cox Decl., ¶¶ 5, 8, Ex. A.

**Plaintiff's Response:** Partially disputed. Undisputed to the extent that is what is in Cox declaration. Disputed to the extent this is inadmissible draws a conclusion that the FMLA leave was the only relevant leave of absence policy to this case as it is not supported by evidentiary materials. Also defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply:** FMLA intermittent leave was the only leave requested by the Plaintiff in this case, and thus, the only leave applicable and relevant to this matter. Plaintiff has not alleged any other leave that she requested. In addition, the handbook cited does contain Bloomingdale's leave policies. BLM00069-71.

15.     The approval for leaves of absence is given by a central a part of the central human resources organization, the Leave of Absence Team. Once that team approves the leave, they notify the store and the appropriate manager of the type of leave approved and its duration. Cox Decl, ¶

9; Law Dep., p. 27:10-24.

**Plaintiff's Response:** Disputed. Defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply:** This dispute is not properly supported by evidence and does not address the stated fact. Macy's leave policies are in fact in its handbooks and Code of Conduct as set forth in Defendants' supporting evidence.

16.     Bloomingdale's handbook and the Company Code of Conduct have specific policies that require employees to comply with all applicable laws. Employees who violate this or other Company policies are subject to discipline up to and including termination. Cox Decl., ¶ 35, Exs. B-C; Law Dep. 168:13-16.

**Plaintiff's Response:** Disputed. Defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply:**  Plaintiff's citation does not refute the stated fact. See Ex. 10, BLM 36 ("Bloomingdale's is committed to compliance with all laws…We cannot do this without your help and cooperation. Each of us must avoid even the appearance of wrongdoing, at all times, and must conduct our business in compliance with all applicable laws…Violation of a law, which affects the Company's business, by you or those within your area of responsibility, may be grounds for disciplinary action, including dismissal.").

17.     Bloomingdale's employee disciplinary process in 2017 was called Responsibility Based Performance ("RBP").  One key part of this RBP process was to explain to the employee the shortcomings the employee had exhibited in her work and have the employee acknowledge his or her short-comings and to own their behavior. In this way the employee would be responsible for their ultimate success or failure to succeed. Cox Decl., ¶ 26.

**Plaintiff's Response:** Disputed as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produced in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Also defendants produced different handbook that plaintiff signed where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply:** The evidence to dispute the stated fact is insufficient. The citation to Ms. Cox's deposition relates to colloquy of counsel in Ms. Cox's 30(b)(6) deposition when Plaintiff went beyond requested topics into time-and-attendance issues. There was no questioning about the disciplinary process in the deposition nor was there a request that a 30(b)(6) witness be produced for that issue. Cox is in the human resources area and can speak to the disciplinary process based on the company documents and handbooks. The proper foundations were laid in the declaration.

18.     There were different types of write-ups under the RBP process that proceeded separately from each other. An employee could be placed on the process for attendance issues (being tardy or missing days of work); performance issues (the work was not getting done properly); or for conduct (behavioral issues). Cox Decl., ¶ 27.

**Plaintiff's Response:** Disputed as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produce in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Undisputed to the extent that that is Defendants' policy. Defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply:** The evidence to dispute the stated fact is insufficient. The citation to Ms. Cox's deposition relates to colloquy of counsel in Ms. Cox's 30(b)(6) deposition when Plaintiff went beyond requested topics into time-and-attendance issues. There was no questioning about the disciplinary process in the deposition nor was there a request that a 30(b)(6) witness be

produced for that issue. Cox is in the human resources area and can speak to the disciplinary process based on the company documents and handbooks. The proper foundations were laid in the declaration.

19.    Plaintiff was on one type of the RBP process during her employment because of her attendance. Cox Decl., ¶ 28.

**Plaintiff's Response:** Disputed as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produce in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Further disputed because Plaintiff did not have any disciplinary action in her file at the time of her termination. Exh. 10, BLM 1516 to 1535. Defendants produced different handbook that plaintiff signed where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply:** The evidence to dispute the stated fact is insufficient. The citation to Ms. Cox's deposition relates to colloquy of counsel in Ms. Cox's 30(b)(6) deposition when Plaintiff went beyond requested topics into time-and-attendance issues. There was no questioning about the disciplinary process in the deposition nor was there a request that a 30(b)(6) witness be produced for that issue. Cox is in the human resources area and can speak to the disciplinary process based on the company documents and handbooks. Additionally, the reference to the document at BLM 1516 was an email with Law stating there were "no disciplinary actions on file in the Imaging System." He was not asked about this in his deposition and this is not testimony under oath. However, most importantly, Plaintiff has admitted to having been written up twice for her attendance. *See* Response to Request for Admissions, Numbers 14-17, attached as Exhibit I to the moving Gerber Decl.; and responses to Statement of Undisputed Facts, Nos. 23-25.

20.    The RBP process had three written steps. The first step was a Counseling Summary. During the conversation about the Counseling Summary, the issues with the employee would be

discussed along with possible ways to resolve the situation. At the end of the meeting, the employee and her supervisor would sign the document. A human resources executive – who assisted in drafting the write up – would either sign the document during the meeting or would sign later if not present for the meeting. Cox Decl., ¶ 29.

**Plaintiff's Response:** Disputed as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produce in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Undisputed to the extent that that is Defendants' policy. Defendants produced different handbook that plaintiff signed where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply:** The evidence to dispute the stated fact is insufficient. The citation to Ms. Cox's deposition relates to colloquy of counsel in Ms. Cox's 30(b)(6) deposition when Plaintiff went beyond requested topics into time-and-attendance issues. There was no questioning about the disciplinary process in the deposition nor was there a request that a 30(b)(6) witness be produced for that issue. Cox is in the human resources area and can speak to the disciplinary process based on the company documents and handbooks. The proper foundations were laid in the Cox Declaration.

21.    The second RBP step was a Formal Reminder. This was also written and the employee would be given a chance to put in writing on the document any comments she had on the issues being discussed. The same signatures were captured on this Formal Reminder as on the previous document. Cox Decl., ¶ 30.

**Plaintiff's Response:** Disputed as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produce in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Undisputed to the extent that that is Defendants' policy. Defendants

produced different handbook that plaintiff signed where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply:**  The evidence to dispute the stated fact is insufficient. The citation to Ms. Cox's deposition relates to colloquy of counsel in Ms. Cox's 30(b)(6) deposition when Plaintiff went beyond requested topics into time-and-attendance issues. There was no questioning about the disciplinary process in the deposition nor was there a request that a 30(b)(6) witness be produced for that issue. Cox is in the human resources area and can speak to the disciplinary process based on the company documents and handbooks. The proper foundations were laid in the Cox Declaration.

22.     The final step in the RBP process was called a Decision Making Leave ("DML").If a DML was being issued, the same people as were present for the Formal Reminder meeting would meet to discuss the DML write-up and sign the DML document as the meeting concluded. After the DML meeting, the employee was given the next scheduled shift off with pay. This paid shift off was for the employee to think about her issues and decide if she wanted to stay employed by the Company and was able to commit to resolving her issues, or if the employee wanted to resign from employment by the Company. Cox Decl., ¶ 31.

**Plaintiff's Response:** Disputed as this assertion is not supported. By admissible evidence. Cox was employed after Plaintiff's termination and was not produce in this case for this purpose. Exh. Cox Dep. P. 34:8-35:9. Undisputed to the extent that that is Defendants' policy. Defendants produced different handbook that plaintiff signed where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply:** The evidence to dispute the stated fact is insufficient. The citation to Ms. Cox's deposition relates to colloquy of counsel in Ms. Cox's 30(b)(6) deposition when

Plaintiff went beyond requested topics into time-and-attendance issues. There was no questioning about the disciplinary process in the deposition nor was there a request that a 30(b)(6) witness be produced for that issue. Cox is in the human resources area and can speak to the disciplinary process based on the company documents and handbooks. The proper foundations were laid in the Cox Declaration.

### Plaintiff's Employment At Bloomingdale's

23.     During her employment, Plaintiff received both a formal Counseling and a Formal Reminder for her attendance. The Counseling Summary was dated February 21, 2017 and listed the numerous times that Plaintiff was tardy. The dates of her tardiness that were listed are as follows: January 6, 2017; January 7, 2017; January 8, 2017; January 17, 2017; January 18, 2017; January 28, 2017; and January 31, 2017. Employees are only allowed two lates per month before discipline is administered. Cox Decl., ¶ 32, Ex. I; Mikhaylova Dep., pp. 157:4-159:23, Ex. C.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

24.     Plaintiff's attendance did not improve over the next few months and she was given a Formal Reminder on April 19, 2017. The dates Plaintiff was tardy related to this write up were: March 9, March 18, and March 22. Cox Decl., ¶ 33, Ex. J.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

25.     On the Formal Reminder, in the section where the employee is allowed to state their comments, Plaintiff referenced the need to check bus and subway schedules to make sure they were running properly and thus, allow her to timely report to work. Specifically, Plaintiff wrote the following on her Formal Reminder:

I will leave 40 minutes earlier then [sic] what I usually leave.  I will check subway delays earlier on to know if I should take the subway or the bus.
Cox Decl, ¶ 32, Ex. J; Mikhaylova Dep., pp. 159:24-160:25; 164:6-18, Ex. D.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

26.      Plaintiff told her supervisor, Deniz Diaz, about her pregnancy sometime after this meeting. Diaz congratulated Plaintiff and directed her to human resources for any assistance she might need including a leave and/or accommodation. That was the only conversation Diaz had with Plaintiff related to her pregnancy. Diaz Dep., pp. 64:7-65;19; 69:1-13; 110:1-113:10; Mikhaylova Dep., p. 88:1-90:25.

**Plaintiff's Response:** Admitted.

**Defendants' Reply:** No additional response.

27.      Plaintiff never mentioned her morning sickness to Diaz. Diaz Dep., p. 69:6-13.

**Plaintiff's Response:** Disputed,  Plaintiff told Diaz she had morning sickness. Exh 1, Mikhay Dep. P.  88:5-94:8.

**Defendants' Reply:** No additional response.

28.      Diaz informed Younis that Plaintiff was pregnant, but Plaintiff never told Younis directly that she was pregnant. Younis Decl., ¶ 16; Diaz Dep., pp. 67:9-68:4; Younis Dep., pp. 96:15-98:4.

**Plaintiff's Response:** Partially Disputed. Undisputed she never told her but Plaintiff testified seeing Younis daily on her shift while visibly pregnant. Exh 1 Dep p. 150:24-151:8.

**Defendants' Reply:**  Hearsay and speculation as to whether Younis understood from looking at Plaintiff that she was pregnant. Plaintiff alleges she was pregnant after mid-February. Her doctor's notes are that she had her last period as of February 14 and the doctor states her

pregnancy began in mid-March. Even assuming Plaintiff was pregnant at the end of February, on June 1, she would only have been three months pregnant. There is no admissible evidence that Plaintiff was visibly pregnant between March until she was discharged in mid-June. Cox Decl., Ex. G; Mikhaylova Document Production, bates numbers 2, 21 (documents produced by Mikhaylova in discovery are attached to moving Gerber Decl. as Ex. E).

29.     Diaz and Younis let human resources know that Plaintiff was pregnant and would be coming to discuss that issue with them. Diaz Dep., pp. 67:9-68:4.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

30.     Diaz had no further conversations with anyone about Plaintiff being pregnant. Diaz Dep., p. 73:4-21.

**Plaintiff's Response:** Undisputed to the extent that that is what Diaz testified to.

**Defendants' Reply:** No additional response.

31.     After her Formal Warning on April 21, 2017, Plaintiff had 11 more instances of being tardy and one absence (including the two shifts immediately after the April 21 meeting) but she received no further write ups or discipline, and specifically did not escalate to a Decision Making Leave. All of the additional instances of tardiness and the absence occurred before she was formally approved for Intermittent Leave. Cox Decl., ¶ 34 Ex. K; Mikhaylova Dep., p. 100:5-101:25.

**Plaintiff's Response:** Disputed. Disputed as to the assertion that Plaintiff was approved for intermittent leave because Plaintiff was not approved for intermittent leave. Defendants sent Plaintiff a letter on June 9, 2017 (while she was still on unpaid suspension) asking for more information to be submitted  for her to to her by June 24, 2017. Mendoza Decl. Exh. 10, bates

BLM000804-806. Cox was not employed at the time and did not have any involvement or knowledge in Plaintiff's leave approval. Cox Decl. ¶

**Defendants' Reply**: Ms. Cox was able to attest to the content of Bloomingdale's records and the proper foundation was laid in her declaration for that testimony based on business records. Additionally, Plaintiff admitted in her deposition that her leave of absence was approved on June 9, 2017. Mikhaylova Dep., p. 169:10-12.

32.      Plaintiff gave birth to her child on November 23, 2017. Mikhaylova Dep., 36:19-22.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

### Leaves of Absence/Reasonable Accommodation

33.      Plaintiff never told Diaz she needed an accommodation, nor was he aware that she had requested intermittent leave. Diaz Dep., pp. 72:19-21; 106:4-9.

**Plaintiff's Response:** Disputed and in that Plaintiff testified she told Diaz that the reason she was coming in late was because of morning sickness related to her pregnancy and Diaz told her that she needed to go to HR and once they accommodate her they will remove the formal reminder for tardiness from her file. Exh.1, Mikh dep. P. 92:20-93:4.

**Defendants' Reply**: The dispute language does not challenge the stated fact. The language of the deposition cite is that Plaintiff told Diaz she was late because she was pregnant, not because of morning sickness. He told her to speak to HR and that if they approve, he could remove the attendance write up from her file. There is nothing in the citation to support that Diaz knew that she had gone to HR and requested an accommodation or that he knew she had requested intermittent leave.

34.     Plaintiff never asked Cathy Younis for an accommodation nor did she ever tell Younis that she was not being accommodated by Diaz. Younis Decl., ¶ 17.

**Plaintiff's Response:** Partially Disputed. Disputed because Plaintiff testified she was not allowed to sit down or lean on the counter and Younis told her to stand up and not lean when Plaintiff was not feeling well. Exh 1, Mikhay Dep. P. 99:7-17.

**Defendants' Reply:** The deposition cite does not state that Plaintiff told Younis she was leaning on the counter because of her pregnancy. Moreover, there is no medical evidence that Bloomingdale's was told Mikhaylova needed to "lean" while she was working. Plaintiff has admitted breaks were to be taken off the floor. Plaintiff has not alleged she was not allowed to take a break when necessary. Mikhaylova Dep., pp. 101:7 -102:23.

35.     Plaintiff requested intermittent leave in mid-May but did not submit the required doctor's certification until the company made a second request on June 1, 2017. She then submitted the certification on June 2, 2017. Her intermittent leave was approved on June 9, 2017. Cox Decl., ¶¶ 20-24, Exs. E-H; Mikhaylova Dep., pp. 165:19-169:12, Exs, E-H.

**Plaintiff's Response:** Disputed to the extent that Plaintiff testified her doctor provided the certification while Plaintiff was at the doctor's office but could not recall the date that it was sent. Ex 1, Mikhay dep. P. 97:15-98:4**.** Disputed to the extent that Defendants assert Plaintiff requested intermittent leave. Disputed to the assertion that her leave was approved as Defendants letter issued on June 9, 2017 states that in order for plaintiff to receive approval she needed to submit more information by June 24, 2017 or face denial of her leave. Exh. 10, bates 792-794, 797, 804-806. Also defendants documents states as of June 8, 2017 Plaintiff's leave request was cancelled. Exh 10 bates BLM 754.

**Defendants' Reply:** Ms. Cox was able to attest to the content of Bloomingdale's records

and the proper foundation was laid in her declaration for that testimony based on business records. Plaintiff's evidence does not refute Macy's business records as to the dates of receipt of the information related to her leave. Additionally, Plaintiff admitted in her deposition that her leave of absence was approved on June 9, 2017. Mikhaylova Dep., p. 169:10-12. Plaintiff's physician changed the start date of Mikhaylova's leave. The leave of absence team cancelled the first request which was to begin in May and opened a second request with an April start date. This second leave request was approved. If a leave if denied, it is noted as Denied (DEN) not cancelled. See accompanying Declaration of Juana-marie Lippman ("Lippman Decl.), ¶¶ 8-10, 14.

36.     The medical documentation submitted by Plaintiff for her leave of absence did not request any specific accommodation other than to note that approximately one time per week, Plaintiff might need a couple of hours to deal with her nausea and vomiting and would need time off for medical appointments. There was no other information in the certification related to the need for any other accommodation. Cox Decl., Ex. G; Mikhaylova Dep., pp. 167:18-168:13, Ex. G.

**Plaintiff's Response:** Disputed. Plaintiff testified the paperwork said she needed to be allowed to come in an hour late and accommodate with extra breaks. Exh 1, Mikhay Dep p. 97:5-16. to the extent Plaintiff's medical certification included Plaintiff needed to be seen every 4 weeks until 28 weeks and every 2 weeks until 36 weeks then every week until delivery. Exh. 10 bates BLM 792-794. Further disputed as Plaintiff requested 5 times per 1 week 6 months 2 hours per episode. Exh. 10, BLM 788. Further the medical documentation states Plaintiff had morning sickness, "vomiting and feeling dizzy. Exh. 10 BLM 768.

**Defendants' Reply:** Plaintiff's claimed dispute is not based in fact. The medical documentation does not request that Plaintiff be allowed to arrive to work an hour late and take

extra breaks. Plaintiff's hearsay testimony as to what she recalled the note saying does not trump the note. However, the note does state that she may need up to two hours to address her nausea and vomiting one time per week for six months. Ex. 10, BLM 768. This was apparently modified on June 14, 2017 for up to five times per week. Ex. 10, BLM 788. Her doctor did not request any accommodation other than time for Plaintiff to address her nausea as it occurred. It is undisputed that the note did not reference any need for additional breaks or any other accommodation.

37.     The medical certification stated that her medical condition requiring intermittent leave - her pregnancy - began on or about March 15, 2017. This is consistent with the medical records produced by the Plaintiff which state that her last menstruation cycle began on February 15, 2017. Cox Decl., Ex. G; Mikhaylova Document Production, bates numbers 2, 21 (documents produced by Mikhaylova in discovery are attached to Gerber Decl. as Ex. E).

**Plaintiff's Response:** Partially disputed. Disputed to the extent that plaintiff's condition requiring intermittent leave was nausea, vomiting, dizziness. Exh. 10 BLM 768; Exh 1, Mikhay Dep p. 93:11-97:5-16. Undisputed to the rest.

**Defendants' Reply:** The medical document states that Plaintiff was pregnant. The symptoms requiring intermittent leave were nausea, vomiting and dizziness.

38.     Plaintiff alleges she became pregnant sometime in February 2017. Mikhaylova Dep., p. 78:13-15.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

39.     Younis had numerous employees during her career with Bloomingdale's receive accommodations related to medical or pregnancy issues. Younis Decl., ¶ 16; Younis Dep., 98:22-99:22; 104:21-105:4; 105:22-106:1.

**Plaintiff's Response:** Undisputed that is what Younis testified.

**Defendants' Reply:** No additional response.

40.     Plaintiff says the accommodation she wanted was to be able to come in late and not be penalized for it. She also wanted to be able to sit down if she needed to. Mikhaylova Dep., pp. 91:19-94:8.

**Plaintiff's Response:** Partially Disputed for omission of Plaintiffs testimony.  Plaintiff testified she wanted to lean on the counter. Exh 1, Mikhay Dep. P. 99:7-17.

**Defendants' Reply:** There is no medical evidence that Mikhaylova needed to "lean" while she was working. Her physician did not even state she needed additional breaks. However, Plaintiff has admitted breaks were to be taken off the floor not while leaning on a counter. Plaintiff has not alleged she was not allowed to take a break when necessary. Mikhaylova Dep., pp. 101:7 -102:23.

41.     She asked for intermittent leave as an accommodation which was granted. Mikhaylova Dep., pp. 94:14-96:13.

**Plaintiff's Response:** Disputed. Plaintiff did not ask for intermittent leave as an accommodation but Plaintiff told HR that she needed an accommodation and Defendants gave Plaintiff no other option except to complete the paperwork for intermittent leave. Exh 1, Mikh dep. P. 90:19-25. Further intermittent leave was not granted as Defendants were still asking Plaintiff for medical information on June 9, 2017 for Plaintiff to receive approval for intermittent leave. Exh 10, bates BLM 804-806 and Plaintiff's doctor was submitting this medical information on June 14, 2017. Exh 10, bates BLM 792-794. Plaintiff requested an accommodation to sit down or leave her area if she became sick from her pregnancy. Exh. 1, Mikh dep. P. 91:10-92:9.

**Defendants' Reply:** The medical documentation states that Plaintiff may need up to two hours to address her nausea and vomiting one time a week for six months. Ex. 10, BLM 768. This

was apparently modified on June 14, 2017 for up to five times per week. Ex. 10, BLM 788. Her doctor did not request any accommodation other than time for Plaintiff to address her nausea as it occurred. Intermittent leave is the mechanism that allows an employee to take time when needed for a medical condition. It is undisputed Plaintiff completed the paperwork for an intermittent leave and it was granted. Plaintiff admitted in her deposition that her leave of absence was approved on June 9, 2017. Mikhaylova Dep., p. 169:10-12; Lippman Decl., ¶¶ 9-11.

42.     Plaintiff alleges that she was not allowed to sit or lean on the floor which she believes her doctor authorized. She admits breaks were to be taken in the break room. Mikhaylova Dep., pp. 100:24-102:23.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

**Hostile Work Environment**

43.     Plaintiff alleges that she was harassed by an Asset Protection Manager named Bobby Booker. Mikhaylova Dep., pp. 47:9-48:7.

**Plaintiff's Response:** Partially disputed Undisputed.

**Defendants' Reply:** No additional response.

44.     Despite seeing Younis on a daily basis, and having numerous contacts with her, Mikhaylova never told Younis that she was being harassed by Booker or anyone else. Younis Decl., ¶ 18; Mikhaylova Dep., p. 48:12-22; 150:19-151:12.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

45.     While Plaintiff alleges she told Diaz she was uncomfortable with Booker, she does not allege that she told him anything else; Diaz denies that Mikhaylova or anyone else who

reported to him ever complained of sex harassment. Mikhaylova Dep., pp. 56:16-57:10; Diaz Dep., pp. 62:1-24; 94:24-95:17; 109:3-14.

**Plaintiff's Response:** Partially disputed for mischaracterization of plaintiffs testimony. Plaintiff testified to telling Diaz several times she was uncomfortable by Booker and the materials cited for this assertion do not support Plaintiff testified she did not tell Diaz anything else. Ex 1, Mikhay Dep p. 57:3-59:13.

**Defendants' Reply:** Plaintiff's response misstates the evidence. The cited testimony does not state that Plaintiff told Diaz several times she was uncomfortable with Booker. Plaintiff's testimony is that she mentioned to Diaz that Booker made her uncomfortable. There is no evidence this was more than once. Plaintiff has not submitted any evidence – even in her declaration – that she told Diaz anything more about Booker.

46.     Richard Law stated that he had not received any allegations of harassment from Plaintiff. Law Dep., p. 152:9-19.

**Plaintiff's Response:**

**Defendants' Reply:** Defendants' fact must be deemed admitted since Plaintiff does not provide a response or citation in the record refuting the fact.

47.     Plaintiff alleged the issues with Bobby Booker began during the time that Diaz was her supervisor. Mikhaylova Dep., pp. 47:9-48:7.

**Plaintiff's Response:** undisputed

**Defendants' Reply:** No additional response.

48.     Plaintiff's complaints as to Booker were that he was "looking very deeply" in her eyes and talking to her in a flirtatious manner. She described the flirtatiousness as his body language. The only time he touched her was to allegedly hug her when he first greeted her. He

hugged her both from the side and the front. Mikhaylova Dep., 49:24-51:14.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

49.    Plaintiff admits that he never touched her butt or other improper parts of her anatomy but she states that he stared at her butt and chest. Mikhaylova Dep., pp. 5:1-56:9.

**Plaintiff's Response:** undisputed.

**Defendants' Reply:** No additional response.

50.    Plaintiff never reported this conduct to anyone. Mikhaylova Dep., p. 56: 7-15.

**Plaintiff's Response:** Admitted.

**Defendants' Reply:** No additional response.

51.    Plaintiff did state that while she did not report the specific conduct, she did tell Denis Diaz that Booker made her uncomfortable. She said nothing else to any member of management. Mikhaylova Dep., pp. 56:16-57:16; 59:5-9.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

52.    Plaintiff never spoke to Human Resources about Booker's alleged conduct. Mikhaylova Dep., p. 58:5-13.

**Plaintiff's Response:** undisputed.

**Defendants' Reply:** No additional response.

53.    The only comments that Plaintiff could recall is that Booker allegedly asked her out. When she said she was with someone, he said he was married. When she told him she was not interested, he left the department. Plaintiff believes that because Booker allegedly left the department that he was angry. She had no other facts to support that conclusion. Mikhaylova Dep.,

pp. 59:10-61:13.

   **Plaintiff's Response:** Undisputed.

   **Defendants' Reply:** No additional response.

   54.   Mikhaylova alleged that Booker made comments to her of a sexual nature but she could not recall any of them. Mikhaylova Dep., pp. 139:14-140:11.

   **Plaintiff's Response:** Disputed mischaracterization of testimony cited and omission. Plaintiff testified to not recalling the conversation but previously testified to the comments he made in number 53 above. Further Plaintiff testified Booker said oh your butt looks really good. Exh 1 Mikhay Dep p. 151:25-152:7.

   **Defendants' Reply**: This statement of fact relates to "other" comments that Plaintiff alleged were made. She could not recall any other than those noted in previous statements of fact as stated in the cited deposition testimony. Therefore, Plaintiff's response does not raise any dispute and in substance agrees with Defendants.

   55.   Later, when prompted by the content of the Amended Complaint, Plaintiff recalled that Booker told her her butt looked good and she thanked him. She recalled no other comments. Mikhaylova Dep., pp. 151:21-152:153:14.

   **Plaintiff's Response:** Undisputed.

   **Defendants' Reply:** No additional response.

   56.   Plaintiff also stated that other AP employees would come over – at Booker's request – to look at her butt. No one told her that Booker told others to do this but she believes that is what happened. Mikhaylova Dep., pp. 154:25-156:18.

   **Plaintiff's Response:** Disputed, Mercedes Modesto was a female employee in the asset protection department and told Plaintiff what they were saying about her. Mikhay. Decl. ¶ 31.

**Defendants' Reply**: The alleged statements by Mercedes Modesto are hearsay and should not be considered. This alleged conversation was also not disclosed in discovery. During her deposition, Mikhaylova stated no one told her Booker sent other AP detectives to look at her, she just assumed or read lips of the alleged people staring at her. Mikhaylova Dep., pp. 155:6-156:18. For these reasons, Defendants' stated fact should be deemed admitted.

57.     Mikhaylova had no further facts related to conduct by Booker. Mikhaylova Dep., pp. 138:23-139:13; 150:13-20; 173:5-13.

**Plaintiff's Response: Partially disputed.** Disputed to the extent that plaintiff said that was all she could recall. Exh 1, Mikhay Dep p. 151:13-154;2 and further disputed this assertion is drawing a conclusion.

**Defendants' Reply**: As Mikhaylova is making the allegation, not recalling is the same as not having anything additional. Therefore, Defendants' stated fact should be deemed admitted.

58.     Denis Diaz does not recall who Bobby Booker was but never saw any inappropriate conduct by anyone of the type described by Plaintiff. Diaz Dep., pp. 61:24-62:24.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

59.     Booker does not specifically recall Plaintiff but denies making sexual advances or comments to anyone at the 59th Street location. Deposition of Bobby Booker ("Booker Dep."), pp. 68:1-10; 70:14-75:2 (Excerpts from Booker Dep. are attached as Exhibit F to Gerber Decl.).

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

60.     Booker noted that there are 2000 employees in the 59th Street Store location and 11 Floors. There was no "hanging out" in the Chanel or any other area unless there was something of

importance going on in that area related to Asset Protection. Booker Dep., pp. 32:14-19; 50:2-15.

**Plaintiff's Response:** Disputed. Booker testified to socializing with the employees. Booker Dep. P. 48:8-49:23.

**Defendants' Reply:** The citation to Booker's deposition does not contain an admission to "socializing" with employees. He states that he greeted employees, asked how they were doing, and was otherwise cordial, but did not state he was socializing on the floor. Therefore, Defendants' stated fact should be deemed admitted.

61.      Booker stated that he often hugged people with whom he had a friendly relationship and that included men as well as women. He denies ever making comments about any woman's body parts while with Bloomingdale's. Booker Dep., pp. 47:17-48:12.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

62.      Bloomingdale's conducts regular training on sexual harassment. Booker Dep., pp. 23:17-24:21; 53:6-9; Diaz Dep., p. 94:1-18.

**Plaintiff's Response:** Disputed. Booker testified he could not recall training done every year for sexual harassment but did recall he received separate training reporting sexual harassment or discrimination from one of the HR managers. Booker Dep., p. 24:9-15. Plaintiff also did not recall discrimination and harassment training during her employment. Mikh. Dep. P. 39:7-11. Younis testified to not receiving training when Chanel was "owned" not "leased." Younis dep. P. 14:18-15:12.

**Defendants' Reply**: Plaintiff's dispute does not challenge the stated fact nor does her evidence support her dispute. The citation to Younis' deposition relates to questions about training she received from Chanel and does not discuss training from Bloomingdale's. Plaintiff's not

recalling does not refute Diaz's testimony that it occurred. As for Booker, while he could not recall if the training happened every year, he stated that when he first started, he was given information about sexual harassment and he recited the company's policy in general terms. He also stated he had received separate training as a manager from an HR manager. Booker Dep., pp. 23:11-24:15.

### Asset Protection Investigations and Plaintiff's Termination

63.    In 2017, there was an approximately $1 million fraud in the Chanel Handbag department. Fraudsters were compromising charge cards of legitimate customers and using those cards to purchase items that were sent to another address where the fraudster was located. Becker decl., ¶¶ 5-6; Deposition of Christopher Castellani ("Castellani Dep."), pp. 44:20-45:18; 74:20-75:8 (Excerpts from Castellani Dep. are attached as Exhibit G to Gerber Decl.); Deposition of Fred Becker ("Becker Dep."), p. 57:4-17 (Excerpts from Becker Dep. are attached as Exhibit H to Gerber Decl.).

**Plaintiff's Response:** Undisputed and further supported with Exh. 10, bates 1554- 1555, Exh. 6, Becker Dep., Exh. P-2, BLM 1953-1956, BLM 1982-1987,BLM.

**Defendants' Reply:** No additional response.

64.    Asset Protection conducted training on red flags for fraud and other improper activities that could cause loss to the company. Mikhaylova Dep., pp. 41:17-43:12.

**Plaintiff's Response:** Undisputed and supported with Exh. 10, bates 1554-1555.

**Defendants' Reply:** No additional response.

65.    In February 2017, Asset Protection in the 59th Street Location learned through Macy's Credit and Customer Service ("MCCS") employee, Kim Taylor, that Plaintiff had a high amount of frauds on her "send" orders – orders that were made over the phone and mailed to the customers. Plaintiff had rung $67,000 in fraudulent sales over 5 days. Becker decl., ¶ 7, Ex. A.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

66.     MCCS, a division of Macy's, is located in Ohio. Becker Dep., pp. 38:22-39:1;

127:8-14;

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

67.     In 2017, Chris Castellani was an Asset Protection Manager at the 59th Street

location for Internal Investigations. He supervised a team of 4 to 5 investigators who identified

and resolved internal fraud. Castellani Dep., pp. 17:18-21; 22:14-24:4.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

68.     In investigating the issue received from MCCS, Chris Castellani spoke to Plaintiff

and looked to see if she was following the policy and process for handling "send" or phone orders.

Castellani Dep., pp. 44:17-47:1; Becker Decl., ¶¶ 8-9, Ex. A; Mikhaylova Dep., pp. 113:5-122:5.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

69.     At that time and presently, established customers have the option of having their

contact information and charge card information stored in Bloomingdale's electronic customer

book – "b-connected".  Becker Decl., ¶ 10; Mikhaylova Dep., p. 106:17-23.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

70.     When a customer in b-connected wants to make a purchase by phone, the associate

can pull up all of the necessary information from b-connected. Since the consumer added the

information to his/her "b-connected" account, it is a safe way to transact a phone order without fear of fraud. Becker Decl., ¶ 11.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

71.     If the customer is not in b-connected, the employee would only be able to make a telephone sale through keying in the credit card information of the person on the phone. This is risky as the credit card is not present for the transaction and there is heightened risk of fraud. Bloomingdale's developed a process called a memo order that was used to validate the credit card was being properly used in a telephone sale. Becker Decl., ¶ 12.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

72.     In 2017, the memo order process was manual and the employee had to complete a form that had the customer's name, the address to which the merchandise was being shipped, the merchandise ordered, and the credit card account information. The employee would then take the memo order to the Bloomingdale's cash office, where the personnel there would confirm that the name and address on the credit card account matched what was on the "memo" order. The cash office would put a bar code on the memo order form and remove all credit card account information. The employee would then come back to the cash office to get the form and use the bar code to complete the sales transaction. Becker Decl., ¶ 13, Ex. B; Mikhaylova Dep., pp. 107:9-108:10.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

73.     This process was only able to catch fraud where the card had not been compromised

and the mailing address had not been changed. Becker Decl., Ex. ¶ 14, Ex. B.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

74.     The memo order process is now systemically conducted on the point-of-sale (POS) register and no longer paper/manual. Becker Decl., ¶ 15.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

75.     When Castellani interviewed Plaintiff on February 4, 2017 about the fraudulent transactions, she stated that she followed the memo order process and they were authorized. Becker Decl., Ex. A., p. 2139-2140.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

76.     Castellani was able to confirm that Plaintiff had in fact completed memo orders for the sales in question. As there was no evidence of collusion, Bloomingdale's could not take further action and Plaintiff was returned to work. Plaintiff was not reprimanded in any way. Castellani Dep., pp. 44:17-47:1 ; Becker Decl., ¶ 16; Mikhaylova Dep., pp. 113:5-122:5.

**Plaintiff's Response:** Partially disputed. Disputed to the extent this assertion omits Castellani testified Plaintiff had followed the memo order process. Castellani Dep. P.45:20-46:2. Not disputed to the rest.

**Defendants' Reply:** The dispute misstates Castellani's deposition. Castellani stated he was able to locate copies of the memo orders for the transactions in question. He did not state the Plaintiff was cleared of wrongdoing. Castellani noted that the investigation involving the memo order process was inconclusive, and there was no basis to take further action. Castellani Dep., pp.

45:20-46:2; 46:9-21.

77.     As there are ways around the memo order process if a card is compromised, Plaintiff was not cleared of wrong doing but there was no proof at that time to take further action. Becker Dep., pp. 133:24-134:18.

**Plaintiff's Response:** Disputed. Castellani testified Plaintiff had followed the memo order process. Castellani Dep. P.45:20-46:2.

**Defendants' Reply**: The fact that Plaintiff claims there is a dispute suggests that Plaintiff assumes that following the memo order is congruent to being cleared of wrongdoing. This would be factually incorrect. Similar to Becker, Castellani noted that the investigation involving the memo order process was inconclusive, and there was no basis to take further action. Castellani Dep., pp. 45:20-46:2; 46:9-21.

78.     Asset Protection received a second notice about Plaintiff from Central Investigations – located in another section of New York City - on June 1, 2017 that Plaintiff had the highest fraud "sends" in all of Macy's and Bloomingdale's for 2017 at that point. For that period, Plaintiff had over $90,000 in fraud for the transactions she rang. The next closest employee to her had $27,000 in fraud transaction. The third employee had $20,000 in fraudulent transactions. The three of them had over 35% of the fraudulent transactions for the entire company.  Becker Decl., ¶ 17, Ex. C; Castellani Dep., pp. 35:9-37:4; 79:15-82:15; and Ex. 4.

**Plaintiff's Response:** Partially disputed, Undisputed that is what it says. Disputed in that Diaz testified Plaintiff was not one of the highest producers but in the middle to top. Exh Diaz dep. P. 84:1-85:4.

**Defendants' Reply**:  Plaintiff's dispute does not disprove Defendants' stated fact, and in fact, makes the impact of Defendants' statement even worse. Diaz's response relates to Plaintiff's

overall ability as a seller (i.e., how many dollars in sales she had per month), and Diaz described her as "upper middle." He was not referring to fraud sends. However, despite not being the highest producer, Mikhaylova had the highest fraud sends in the company. Mikhaylova, with over $90,000 in fraudulent sends, had over 333% more fraudulent sales than the co-worker closest to her with $27,000.

79.     When Castellani received an email on June 1, 2017 from Central Investigations, he was already scheduled to have a second interview with Plaintiff on June 6 due to an investigation that was begun by MCCS because of some red flags they had seen on Plaintiff's credit account. Plaintiff was suspected of violating the employee discount policy and potentially reselling merchandise. Becker Decl., ¶¶ 18-19, Exs. D-E; Castellani Dep., pp. 77:18-78:4; 84:6-23; 104:6-105:7.

**Plaintiff's Response:** Disputed. Castellani was scheduled to meet with Plaintiff regarding her purchase limits which was overseen internally by Asset Protection not MCCS. Younis Dep. p. 23:17-24:13. Additionally, on April 19, 2017, the same person Abraham Gonzalez in central investigations asset protection not MCCS that sent an email to Castellani asking to meet with Plaintiff for violating the diverter policy of 6 Chanel handbags and likely discount abuse. Exh 10, BLM 1884-1905.

**Defendants' Reply**: Plaintiff's dispute is not supported by the evidence, and the alleged distinction she is making is factually inaccurate. The parties involved in investigating Mikhaylova were all working together. Younis' testimony is that purchase limits were overseen by Asset Protection to her knowledge. However, according to "Exhibit D" to Becker's declaration, Castellani was going to interview Mikhaylova a second time to see if she was violating the employee discount policy and reselling through her family members. Mikhaylova has presented

no evidence to dispute this. Additionally, as noted by Fred Becker in the cited paragraphs in his declaration, MCCS is responsible for managing the branded credit cards. Finally, in the documents cited by Plaintiff, Abe Gonzalez noted that MCCS was asking if Mikhaylova had been investigated for discount abuse and diversion. This process started with Jenn Schell of MCCS sending an email to Abe Gonzalez about Mikhaylova's purchases.

80.     The specific concern related to an estimated $65,000 plus of charges that Plaintiff had made to her account. Castellani Dep., pp. 47:16-49:10; 50:20-51:21; Becker Decl., ¶¶ 18-19, Exs. D-E.

**Plaintiff's Response:** Disputed there were separate investigations regarding Plaintiffs purchases and the transactions she was ringing up. Becker Dep. P. 109:1-115:15.

**Defendants' Reply**: Plaintiff's alleged dispute does not address the stated facts. See also Ex. 10, BLM 1898 which is the investigation summary for Mikhaylova which states the purchases in question for the June investigation totaled over $65,000. Accordingly, Defendants' fact should be deemed admitted.

81.     During the interview on June 6, 2017, Plaintiff admitted that she had made over $65,000 in purchases of Chanel product and mailed the items to friends and relatives to avoid paying New York State taxes. She denied reselling the product or exceeding the product limits. Mailing merchandise to another state to avoid paying sales tax is a violation of company policy. Becker Decl., ¶¶ 20-22, Exs. F-G; Castellani Dep., pp. 51:23-56:10; 71:13-25; 72:17-73:3; 75:22-76:3; Mikhaylova Dep., pp. 125:17-130:23; 228:21-233:18, Ex. Y.

**Plaintiff's Response:** Disputed. Mischaracterizes Plaintiffs testimony that she said she had the money to pay for her purchases not as to that specific amount. Plaintiff also testified that Castellani did not tell her the specific amount on June 6, 2017. Exh 1 Mikhay Dep p. 239:7-25.

Becker testified Plaintiff did not violate any policies. Becker Dep. P. 134: 19- 135:11. Plaintiff was shipping gifts to friends and family out of state where they don't have taxes. Exh 1 Mikhay Dep p. 128:18-129:21. Plaintiff paid New York taxes on most if not all of her purchases. Exh 5, Castellani Dep. p. 49:23-50:15; Younis Decl. Exh. D; Exh 12, Mikhaylova 525.

**Defendants' Reply**: Plaintiff Mikhaylova admitted in her written statement some of the purchases were for herself, they were not all allegedly for friends and family. Of note, there is no record evidence that any friend or family received the purchases. The items sent to New Hampshire were all sent to a UPS Store box number. The Mississippi purchase was addressed to Mikhaylova. The amount of the purchases in the investigation, and Mikhaylova's written statement, is set forth in "Exhibit F" and "Exhibit G" to Fred Becker's declaration. Plaintiff misstates Castellani's testimony. He stated unequivocally that Plaintiff did not pay sales tax on the bags mailed to New Hampshire and Mississippi. Castellani testified that Mikhaylova paid sales tax on "some purchases" and specified it was on those purchases not shipped to a state without sales tax. Castellani Dep., pp. 49:23-50:15. Finally, as noted earlier, Mikhaylova grossly misstates Becker's testimony. Becker did not state that Plaintiff did not violate policy. Becker stated, after a question confirming that Plaintiff admitted to tax evasion, the following:

Q.  Does that mean that she was not committing – I mean so – and the interview ends after that. Is that consistent with policy?

A.  Yes, that was – if those were the questions that we wanted to get out of – that we wanted answered as part of that discussion, yes, if all those questions were answered, then that would be the end of the discussion.

Becker Dep., 135:4-11. The question was not whether Plaintiff violated policy but whether it was consistent with policy to end the interview after getting an admission.

82.  There were 28 transaction receipts of Plaintiff's purchases that were part of the investigation. Becker Decl., ¶ 22, Ex. G.

**Plaintiff's Response:** Disputed, Castellani refused to give plaintiff the receipts of transactions that day and only showed her the addresses. Mikhay Decl. ¶43. Further disputed by Becker's testimony stating the receipts were related to fraud transactions not specific to plaintiff. Exh. Becker dep. P. 83:1-84:21.

**Defendants' Reply**: Plaintiff's dispute does not challenge the cited fact. Additionally, once again, she misstates Becker's testimony. He is speaking, in the cited testimony, about the fraud investigation in general. He does not address the receipts that were at issue in the investigation into Plaintiff's improper purchases in any way.[1]

83.     Castellani spoke to Richard Law, the human resources manager for the Chanel department, who directed that Plaintiff be suspended. Castellani Dep., pp. 60:12-61:23; Law Dep., pp. 31:6-11; 32:12-15; 77:11-16; Mikhaylova Dep., pp. 131: 8-132:14.

**Plaintiff's Response:** Disputed, Castellani told plaintiff that Law was unavailable therefore she was suspended until Law called her. Mikhay Decl. ¶42; Ex 1 Mikhay Dep p. 131:8-20.

**Defendants' Reply:** No additional response.

84.     Plaintiff was suspended that day and she was discharged from employment by Richard Law on June 16, 2017. Castellani Dep., p. 60:12-25; Becker Decl., ¶ 20, Ex. F: Law Dep., pp. 36:10-38:17; 46:20-23; 80:17-23; 150:22-24; Mikhaylova Dep., pp. 131: 8-132:14.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

85.     During the time she was suspended, Plaintiff inexplicably sent an email to Law and asked if the fact that she was pregnant was a reason she was suspended. Law contacted her and assured her that her medical condition had nothing to do with her suspension. Law Dep., pp.

---

[1] Out of the 28 receipts, 26 receipts reflect purchases that were sent to out of New York State addresses without payment of sales tax.

118:20-119:24, Ex. G; Mikhaylova Dep., pp. 132:15-136:25.

**Plaintiff's Response:** Undisputed

**Defendants' Reply:** No additional response.

86.     Law made the decision to discharge Plaintiff. The primary reason for his decision was that Plaintiff exceeded the purchase limits for the merchandise she purchased and he believed based on the amount of money she was spending, the number of purchases she was making, and the fact that she was sending them out of state to someone else that she was a diverter/selling the product for profit which was a violation of the discount policy. Plaintiff also admitted to purposefully evading taxes which was also a terminable offense. Law alone made the termination decision. Law Dep., pp. 46:20-48:17; 69:25-71:15; 80:17-23; 86:1-87:4; 88:1-17; 168:17-169:24; 171:13-23; 173:11-175:10; 177:2-17; 178:12-23.

**Plaintiff's Response:** Disputed and controverted by evidence in the record. Evidence cited does not support each fact and/or conclusion. Law testified the reason for Plaintiffs termination was based primarily on the Chanel handbags and possibly the tax evasion. The shoes could have played a part in it but he could not recall. Law Dep. P. 80:1-23. Additionally, Law looked at Plaintiff's performance. Exh 10, BLM 1516-1523. Becker testified Plaintiff was terminated because she rang transactions and didn't charge state taxes. Becker Dep. P. 41:5-14. Becker testified Plaintiff did not violate any policies. Becker Dep. P. 134:19-135:11. Further disputed to the extent Defendants assert Law believed that Plaintiff was a diverter and/or reselling at the time of her termination. Exh. 22, BLM 901. Further disputed because Becker testified diversion is not the same as reselling and avoiding taxes is not diversion. Becker dep. P. 139:1-22.

**Defendants' Reply**: Plaintiff misstates Law's testimony. In the testimony cited by Defendants above, Law stated that his primary reason for the termination was that Mikhaylova

violated the discount policy (reselling/diversion) and exceeded the purchase limits for products. He stated that tax evasion was a terminable offense and was part of his decision. He also noted that the excessive number of shoes she purchased could also have played a role but he did not recall specifically. Law stated unequivocally that he believed Mikhaylova was a diverter. There is no evidence that Law looked at Plaintiff's performance nor is such a statement relevant. Becker stated that Plaintiff admitted to evading taxes and because of that admission, they suspended her and turned the issue over to human resources. Becker admitted he did not make the termination decision. The statement about Becker saying Mikhaylova did not violate a policy is wrong as has been stated at least twice and will not be repeated but the same argument applies. Plaintiff misstates Becker's testimony, however, for the third time. Becker stated that reselling and diversion are similar but diverting is selling to a third party who buys and resells in bulk. Reselling is the employee buying something and selling it to someone to use themselves. Tax evasion is obviously not diversion but Becker noted that it can be part of the process of a diverter. Becker Dep. pp. 139:1-22.

87. The termination conversation was in person. The reason Plaintiff says she was given for her discharge was she purchased too many pairs of shoes and that she had engaged in tax evasion. Mikhaylova Dep., pp. 140:12-144:23.

**Plaintiff's Response:** Partially Disputed. Law testified he could not recall if it was in person or over the phone. He also could not recall mentioning shoes but may have mentioned handbags. Law Dep. P. 150:22-151:14.

**Defendants' Reply:** Defendants' fact should be deemed admitted as there is no dispute. Plaintiff testified that the termination conversation was in person, and that she was discharged for purchasing too many shoes and engaging in tax evasion. Law could not recall if it was in person

or if he mentioned shoes, but he also did not dispute either of those facts. Plaintiff's response attempts to create a dispute where none exists.

88.     Law was not aware that Plaintiff was pregnant until she sent the email on June 8, 2017 referenced above. He also was not aware that she had requested FMLA leave. Law Dep., pp. 43:22-45:4; 118:20-119:10; 169:25-171:12, Ex. G.

**Plaintiff's Response:** Disputed. Diaz and Younis told him she was pregnant in April 2017 when Plaintiff requested an accommodation. Diaz testified to informing Human Resources when an employee has write ups for lateness. Diaz Depo, P. 32:12-18. Further disputed as Plaintiff would see Law in the HR office/floor when she submitted her FMLA paperwork. Mikhay Decl. ¶ 34. Law saw Plaintiff regularly at work and she was visibly showing she was pregnant. Mikhay Decl. paragraph ¶27.

**Defendants' Reply**: Plaintiff provides no citation in the record supporting the claimed fact that Diaz and Younis told Law she was pregnant. Diaz did not testify that the person he spoke to in HR was Law. In fact, Diaz gave no names nor did he state that he mentioned her pregnancy. There were numerous people in HR to whom Diaz could have spoken. Law Dep., 24:5-25:1. This speculation does not refute the stated fact. Mikhaylova's statement that Law's office was in the same area where she submitted her FMLA paperwork does not mean Law was aware that she was pregnant or knew she submitted FMLA paperwork. Mikhaylova testified that the person she spoke to in HR was a woman. Mikhaylova Dep., p. 91:5-7. There is no admissible evidence that Mikhaylova who was three months or less pregnant at the time of her termination was visibly pregnant. Additionally, Mikhaylova is also speculating that Law saw her among the 2000 employees in the building, that he knew who she was, and that he knew she was pregnant. There is no admissible evidence to establish Plaintiff's speculative beliefs, and this does not refute Law's

statements under oath.

89.    Neither Becker nor Castellani was involved in the decision to terminate Plaintiff's employment. Castellani Dep., pp. 106:17-19; Becker Dep., pp. 21:23-22:6; 41:5-14.

**Plaintiff's Response:** Partially disputed, as Law made the decision based on the information given from Asset protection which includes Castellani and Becker. Ex 10 BLM 1516-1535.

**Defendants' Reply:** Plaintiff's claimed dispute appears to be a matter of semantics, not substance. Becker and Castellani's cited testimony is clear that neither of them is part of the decision-making process when it comes to terminations, and at most they would provide information to HR.

90.    Castellani was not aware that Plaintiff was pregnant or seeking leave while investigating her purchases or during the interview. Castellani Dep., pp. 111:9-112:5.

**Plaintiff's Response:** Disputed Castellani saw Plaintiff regularly at work and she was visibly showing she was pregnant. Mikhay Decl. paragraph ¶27.

**Defendants' Reply**: There is no admissible evidence that Mikhaylova, who was three months or less pregnant at the time of her termination, was visibly pregnant. Additionally, Mikhaylova is also speculating that Castellani saw her among the 2000 employees in the building, that he knew who she was, and that he knew she was pregnant. There is no admissible evidence to establish Plaintiff's speculative beliefs, and this does not refute Castellani's statements under oath.

91.    Becker did not know that Plaintiff was pregnant nor did that subject come up in any conversations that he had with Chris Castellani. Becker Decl., ¶ 23.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

92.     Asset Protection did not make the decision to discharge Plaintiff from employment with Bloomingdale's. They simply investigated the situation and provided Human Resources with the results of that investigation. Human resources determined the level of discipline or termination. Becker Decl., ¶ 21; Castellani Dep., pp. 106:17-19; Becker Dep., pp. 21:23-22:6; 41:5-14.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

93.     Cathy Younis and Denis Diaz were not involved in the AP investigation or the decision to terminate Plaintiff's employment. While AP let them know that there was an interview, and Law let them know of the termination, neither was asked for a recommendation nor were they told the details of why the termination occurred. Diaz Dep., Younis Decl., ¶ 14, and Ex. E; Younis Dep., pp. 22:9-12; 52:3-10; Diaz Dep., pp. 60:3-7; 76:7-78:24; Castellani Dep., pp. 33:19-23;112:6-113:19; Law Dep., pp. 42:25-43:21.

**Plaintiff's Response:** Disputed. Becker testified Chanel has their own department and processes for tracking bags and resellers. Becker Dep. P. 48:13-23. Becker testified that Cathy Younis and Denis Diaz were part of the Chanel Leadership team during Plaintiff's employment. Becker Dep. P. 48:13-23. Cathy and Denis would have worked with Asset Protection to determine if Plaintiff and other employees were resellers. Becker Dep. P. 48:13-23.

**Defendants' Reply**: The evidence submitted does not refute the stated fact. Becker testified just a few lines after the cited section, when asked about Diaz and Younis's involvement in the AP investigation: "We would only involve Dennis or Cathy if we had questions. We do not share the results –I mean, the – we do not share investigation – we do not share details of investigations unless there's some extenuating need, because not all investigations turn out to be what they initially started as...I don't recall what level they may have been in. I can – I can tell you

what our normal process would be, and that would be not to involve managers unless we need to get information. I don't recall that specific investigation." Becker Dep., p. 49:1-21. Additionally, as cited in the initial fact, Castellani who conducted the investigation stated they were not involved.

94.     Bloomingdale's discount policy prevents reselling merchandise. Diversion is a form of reselling and constitutes discount abuse. Diaz Dep., pp. 63:13-20; Law Dep., pp. 124:3-125:2; Younis Dep., pp. 37:7-14; 39:5-40:2.

**Plaintiff's Response:** Disputed. Becker testified diversion is not the same as reselling and avoiding taxes is not diversion. Becker dep. P. 139:1-22.

**Defendants' Reply**: Plaintiff misstates Becker's testimony. Becker stated that reselling and diversion are similar but diverting is selling to a third party who buys and resells in bulk. Reselling is the employee buying something and selling it to someone to use themselves. Tax evasion is obviously not diversion but Becker noted that it can be part of the process of a diverter. Becker Dep. pp. 139:1-22. See also Cox Decl., Ex. D, p. 3, BLM 187.

95.     Diversion was a serious issue for Chanel in particular; Plaintiff was aware of the Bloomingdale's diversion policy, and that the Company terminated employees for selling to known diverters. Mikhaylova Dep., pp. 61:14-62:6; 64:5-11; 65:7-22; Gerber Decl., Ex. I, Plaintiff's Responses to Defendants' Requests for Admission, Number 50.

**Plaintiff's Response:** Disputed and the evidence cited does not support this assertion. Becker testified Bloomingdales did not have a diverter policy and each vendor had their own policies. Becker Dep. 59:14-22.  Plaintiff testified she did not speak to anyone about diversion being a terminable offense. Mikhay. Dep. P. 64:5-11. In Plaintiff's responses to defendants request for admissions, Plaintiff only admitted that selling to a known diverter was a violation of Bloomingdales policy. Gerber Decl. Exhibit I, number 50. Younis testified that for the past 11 years

no one has been terminated for product diversion. Younis Depo p. 40:3-9. Further Plaintiff was unaware of the diverter policy during her deposition and Counsel said they were not talking about the same thing. Exh 1, Mikahy dep. P. 65:7- 24.

**Defendants' Reply**: Becker did not state Bloomingdale's did not have a diverter policy. He stated that he was unaware if the company had a specific diverter policy but that different vendors such as Chanel had such policies. Becker also testified about discount abuse. Becker Dep., pp. 23:13-23; 52:23-53:12; 147:17-148:2. Plaintiff admitted in her deposition that she was aware of the diversion policies at her various employers and while she was at Bloomingdale's. Mikhaylova Dep., p. 64:5-7. In her responses to admissions, Mikhaylova admitted both that selling to a diverter was a violation of policy and that Bloomingdale's policy was to terminate employees for selling to a diverter. Plaintiff's  Response to Request for Admissions, Nos. 50 and 51 (Ex. I to Gerber Decl.). See also Cox Decl., Ex. D, p. 3, BLM 187 (discount policy prohibition on reselling). Plaintiff misstates Younis' testimony. Younis stated that there had been Asset Protection terminations in the department but she was not aware of the reason. So, while she was not aware of anyone being discharged for selling to a diverter, she was not aware of the reasons for the Asset Protection terminations. Younis Dep. p. 40:4-19.

96.     Law also believed that Plaintiff was a diverter based on the number of purchases, the dollar amount and the fact that she mailed merchandise to addresses outside of the state that were not hers. Law Dep., pp. 124:4-125:2; 171:13-19.

**Plaintiff's Response:** Partially disputed. Disputed to the extent that in the materials cited Law says these were all suspicions. Law dep. P. 124:18-125:2.

**Defendants' Reply**: Again, Plaintiff attempts to create a dispute where none exists. Law said they were suspicions – not proven facts. However, Law believed his suspicions and that

formed part of the reason for his decision to terminate Mikhaylova's employment. Law Dep., p. 171:13-22.

### Plaintiff's Purchases

97.     According to the Asset Protection investigation, Plaintiff had purchased, over $65,000 in merchandise between October 2016 and April 2017. Because Plaintiff mailed the products out of state, she avoided paying $5,856 in New York state taxes. Becker Decl., ¶ 20, Ex. F.

**Plaintiff's Response:** Disputed, the materials cited do not support the assertion there is no breakdown in numbers just statements. Further Plaintiff was shipping out of state gifts to her family and friends. Exh 1, Mikhay dep p. 128:8-129:22. Defendants did not factor which were gifts. Last Plaintiff's statement from April 2017 shows plaintiff paid taxes on her handbags. Exh 12, Mikhyalova 525.

98.     **Defendants' Reply**: Plaintiff's alleged dispute does not address the stated facts, so Defendants' facts should be admitted. See also Becker Decl., Ex. F which is the investigation summary for Mikhaylova which states the purchases in question for the June investigation totaled over $65,000, BLM 1898. Becker Decl., Ex. G lists the receipts for the out of state purchases. Of note, none of the "gifts" were sent to the recipients. The New Hampshire packages were all sent to a UPS Store box number. The Mississippi package was actually addressed to Mikhaylova. When questioned in her deposition, Mikhaylova could not remember which "family member" received the bag sent to Mississippi. Mikhaylova Dep., pp. 72:16:74:4. Plaintiff admitted in her handwritten statement that her purchases were for herself or gifts. She stated that she had not received any reimbursement. However, she also admitted that she mailed the merchandise to other states to avoid New York state taxes. In her statement she says: "I was shipping to various friends and

family out of state to avoid New York State tax." Becker Decl., ¶ 20, Ex. F, BLM 1894.

**Plaintiff's Response:** Disputed, Plaintiff testified that she told Castellani about the gifts she was sending out of state to her friends addresses where she would not get charged taxes. Exh. 1, Mikahy Dep p. 128:18-129:22.

**Defendants' Reply**: Plaintiff also stated she was sending personal purchases out of state to avoid paying taxes. Becker Decl., ¶ 20, Ex. F, BLM 1894; Mikhaylova Dep., p. 66:11-25. In addition, while allegedly being sent to family and friends, she was not sending to their addresses. She was sending to an address in New Hampshire which was the address for a UPS Store. Becker Decl., Exs. F-G. The one mailing to Mississippi was for a $4,800 dollar purse to Mikhaylova allegedly. Becker Decl., Ex. G, BLM1943. When questioned in her deposition, Mikhaylova could not remember which "family member" received the bag. Mikhaylova Dep., pp. 72:16:74:4.

99.     During this case, Plaintiff served a subpoena on MCCS to secure documents related to Plaintiff's credit account. Those records demonstrate that Plaintiff spent far more than $65,000 in the months from October 2016 and June 2017. Her purchases at Bloomingdale's, which included all purchases and not just those she mailed out of state, totaled $264,990.44. During this time, she made payments (including credits she received because of her employee discount) of $261,114.16. That left a difference of $3,876.28 which was never paid. See accompanying Custodial Affidavit of Linda Gentry ("Gentry Aff.") and Plaintiff's credit card statements from July 2016 through February 2018. The account number and Plaintiff's address have been redacted to protect her privacy.

**Plaintiff's Response:** Disputed and inadmissible, unsupported by evidence in the record. Defendants did not produce an Affidavit from Gentry with their motion.

**Defendants' Reply**: Gentry's custodial affidavit and attachments were attached as Exhibit

K to the moving Gerber Decl.

100. Plaintiff's final monthly statement totals are misleading. During the month, Plaintiff made several payments – some in the amount of several thousand dollars and often several times in one day– so that her end of month statement total did not outwardly reflect the amount of purchases and payments made during the month. To understand the amounts spent and paid, you have to review the Activity Detail found in each statement. Gentry Aff. and attachments.

**Plaintiff's Response:** Disputed and inadmissible, unsupported by evidence in the record. Defendants did not produce an Affidavit from Gentry with their motion.

**Defendants' Reply**: Gentry's custodial affidavit and attachments were attached as Exhibit K to the moving Gerber Decl.

101. In the months between October 2016 and April 2017, Plaintiff purchased at least 46 handbags from Chanel and 29 pairs of Salon Shoes, among many other items. Gentry Aff. and attachments.

**Plaintiff's Response:** Disputed, first this is not supported by any materials in the record. Second, defendants previously stated that Plaintiff had made 26 employee purchases from October 2016 to April 21, 2017. Exh. 10, Bates blm 442.

**Defendants' Reply**: Plaintiff's quarter of a million dollars in purchases can be found by reviewing the attachments to Gentry's custodial affidavit. The affidavit and attachments were attached as Exhibit K to the moving Gerber Decl. The credit card charges shown on Exhibit K to the Gerber Decl. are Plaintiff's purchases. The  purchases sent out of state were only a part of the charges Mikhaylova made on her Bloomingdale's card. Becker Decl., Ex. G.

102. Plaintiff made a little over $100,000 per year. She alleged that the money she used to make her purchases came from her grandmother and her boyfriend – neither of whom were

authorized users of her credit card. Mikhaylova Dep., pp. 80:17-85:25; 208:3-11.

**Plaintiff's Response:** Disputed, mischaracterizes plaintiffs testimony.  Plaintiff testified that she was able to afford her spending because she worked, her grandmother was giving her an inheritance, and her boyfriend supported her by paying rent and giving her money to spend. Exh 1, Mikhay Dep. P. 80:17-82:4.

**Defendants' Reply:** No additional response.

103.    The Chanel Handbag policy that was found in the Bloomingdale's handbook was in effect until the end of 2016. It states that:

In order to make handbags available to as many of our customers as possible, two handbags are the maximum number that may be sold in a single transaction, without senior management approval….Four (4) bags per month may be purchased and up to 24 bags per year. Cox Decl., Ex. A; Younis Decl., ¶ 6, Ex. B; Mikhaylova Dep., pp. 192:22-193:5; 195:13- 197:3,Ex. M.

**Plaintiff's Response:** Disputed to the extent that Defendants assert this policy was in effect until the end of 2016. This policy was still in effect during plaintiff's employment and until July 17, 2017 when Chanel went leased. Exh. 10, BLM 1554-1555**.** Further disputed because as seen in investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029; Mikhay Decl. paragraph 13-26. Also defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply**: Plaintiff has admitted the policy in her deposition and cannot now change it in her declaration. There is no evidence that Younis ever approved any of Plaintiff's purchases that violated policy and certainly did not approve the purchase of 46 handbags in eight months.

104.     The Chanel handbag purchase policy that came into effect in early 2017 was more restrictive and limited purchases to one (1) Icon (classic handbag) and one (1) Non-Icon handbag or two (2) Non-Icon handbags per transaction per month. The maximum of 24 handbags per year was the same but the monthly limits were different. Icon handbags had to be purchased in person (not over the phone). Any exceptions had to be authorized by the manager. Younis Decl., ¶ 7, Ex. C; Younis Dep., pp. 17:12-19:22; 30:13-21.

**Plaintiff's Response: Disputed.** The policy was announced around January 31, 2017 but the policy did not go into effect until July 2017. Exhibit 10, bates BLM001552.; Younis testified it did not go into effect until July 2017. Younis depo Further, the policy states four bags per month Exhibit 10, BLM001554-1555. Law testified he was not familiar with this policy and had not seen it before his deposition. Exh. 2, Law Dep. Ex. A, p.51:1-52:16.  Further disputed to the extent this assertion omits employees could buy handbags on sale and those were not included in the purchase limit policy. Exh. 23, bates  MIKHAYLOVA 197-201. Further disputed because as seen in investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029; Also the Chanel policy was for employees to use when selling to customers it did not apply to employees. Mikhay Decl. paragraph 13-26. Also defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

105.         **Defendants' Reply**: The cited evidence does not support Plaintiff's claimed dispute. BLM 1552 announces that Chanel would be a leased business as of July 2017 but does not address the handbag policy, and there is no citation to Younis' deposition. The citation to statements by unsworn persons taken by unidentified persons in an Asset Protection investigation are not admissible evidence. Plaintiff is also attempting to change her deposition testimony through

her declaration which is not allowed under the law. At the time of Plaintiff's discharge, the Chanel purchase policy that limited purchases to two per month was the one employees were directed to follow. Younis Decl., ¶ 7, Ex. B.

**Plaintiff's Response:** Disputed and controverted by the cited materials. The Bloomingdale's policy was still in effect at plaintiff's termination and employees were instructed to follow the Bloomingdale's handbook policy of four bags a month on or before July 10, 2017. Exhibit 10, BLM001554-1555. Further disputed because Defendants submitted to the Department of labor the relevant policy to plaintiff's termination was "all vendors and departments have a purchase limit of 12 units of merchandise by category per customer in a single transaction or within a 90 day period" Exh. 22, BLM 901. Defendants also attach the Bloomingdales policy and not the Chanel policy. Exh. 22, BLM 905.Further disputed to the extent this assertion omits the additional handbags that could be purchased on sale that were not included in the purchase limit policy. Exh. 23, bates  MIKHAYLOVA 197-201. Further disputed because as seen in investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029. Also the Chanel policy was for employees to use when selling to customers it did not apply to employees. Mikhay Decl. paragraph 13-26. Also defendants produced different handbook where this was not included. Exh 10, BLM 22-84.

**Defendants' Reply**: The cited evidence does not support the dispute. BLM 1554-55 are notes written by an unknown person as part of an investigation and they are not under oath. Additionally, the employment records from the Department of Labor are not sworn and there is no indication who gave the information contained in them. However, as noted in this motion, other than specific policies of vendors, Bloomingdale's had a general policy – aimed at stopping

diversion – that only allowed 12 of an item to be purchased in 90 days. Younis Decl., Ex. B. This applied to the shoes purchased by Plaintiff for example. It is unclear why Plaintiff thinks the policy is a Bloomingdale's policy and not a Chanel policy. There is also no indication in the record that any handbags purchased by Plaintiff were "on sale." Younis Decl., ¶ 10 (discount in these sales is shown on the sales receipt). The citation to statements by unsworn persons taken by unidentified persons in an Asset Protection investigation are not admissible evidence. Plaintiff also is attempting to change her deposition testimony through her declaration which is not allowed under the law. The citations to the evidence do not support the dispute.

106.    Plaintiff was aware that she was limited to purchasing two handbags per month. Mikhaylova. Gerber Decl., Ex. E, bates number Mikhaylova 211; Mikhaylova Dep., pp. 190:10-16.

**Plaintiff's Response: Disputed.** Plaintiff was unaware that the sale handbags were included in the two handbags per month limit as everyone knew there was no limit on sale. Exh. 12, bates Mikhaylova 2; Exhibit 10, BLM001554-1555; Exh. 23, bates  MIKHAYLOVA 197-201; Mikhay Decl. paragraph 13-26.. Further disputed because as seen in investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029.

**Defendants' Reply**: The cited evidence does not support the dispute. BLM 1554-55 are notes written by an unknown person as part of an investigation and they are not under oath. There is also no indication in the record that any handbags purchased by Plaintiff were "on sale." Younis Decl., ¶ 10 (discount in these sales is shown on the sales receipt). The citation to statements by unsworn persons taken by unidentified persons in an Asset Protection investigation are not admissible evidence. There is also no admissible evidence that Younis approved Plaintiff's

purchase of 46 handbags in eight months. The citations to the evidence do not support the dispute.

107.     These limits were discussed with employees on a regular basis at morning meetings and in various touch bases with the team. It was a critical policy for the department and Chanel as the vendor. Younis Decl., ¶ 8.

**Plaintiff's Response:** Disputed, the other employees besides Plaintiff were unaware of the policy limits. Exh. 23, bates  MIKHAYLOVA 197-201. Further disputed because as seen in investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029.

**Defendants' Reply**: The evidence does not refute the stated fact. The citations to the evidence are unidentified and unsworn text messages that are not admissible evidence. The citation to statements by unsworn persons taken by unidentified persons in an Asset Protection investigation are not admissible evidence. There is also no admissible evidence that Younis approved Plaintiff's purchase of 46 handbags in eight months. The citations to the evidence do not support the dispute.

108.    The limits for other items are in the handbook as well. The handbook states that there is a limit of 12 units of merchandise per customer in a single transaction or within a 90-day period. Younis Decl., ¶ 6, Ex. B; Cox Decl., Ex. A; Becker Decl., ¶ 26, Ex. J.

**Plaintiff's Response:** Partially disputed. Disputed to the extent this assertion omits this policy applies to all vendors and departments except Cosmetics and Chanel handbags and "with the exception of purchases in Towels, Tabletop, Table Linens, Hosiery and Gift Registry (where purchases of multiple items is common, and not a reason to suspect the customer is an unauthorized reseller)." Cox Decl., Ex. A, BLM 1051; Exh. 22, BLM905. Further disputed because as seen in

investigation interview from Chanel employee around September 2017, stating Younis could approve beyond policy the limits. Exh. 10, BLM 2027-2029. The policy is not consistent. Exh. 10, BLM 2027-2029.Not disputed to the rest.

**Defendants' Reply**: The evidence does not refute the stated fact. The citation to statements by unsworn persons taken by unidentified persons in an Asset Protection investigation are not admissible evidence. There is also no admissible evidence that Younis approved Plaintiff's purchase of 46 handbags in eight months. The citations to the evidence do not support the claimed dispute.

109.    If you violate the purchase limits, you could be terminated. Younis Dep., pp. 22:20,23:23.

**Plaintiff's Response:** Partially disputed for omission of her testimony. Younis testified that the policies for going over purchase limits was a warning and could be grounds for immediate termination. Younis Depo, P. 23:17-24.

**Defendants' Reply:** Plaintiff's claimed dispute appears to be a matter of semantics, not substance. There is no dispute as the parties agree Younis testified that violation of the referenced policies could result in termination.

110.    Plaintiff admits that she was sending merchandise for herself as well as gifts to YuYu Lai in New Hampshire to avoid New York State and City sales tax. Mikhaylova Dep., pp. 65:25-67:12; 198:7-199:20.

**Plaintiff's Response:** Partially disputed to the extent that the evidence cited does not distinguish between New York state and city sales tax.  Mikhaylova Dep., pp. 65:25-67:12; 198:7-199:20.

**Defendants' Reply:** Plaintiff's claimed dispute appears to be a matter of semantics, not

substance. Plaintiff testified that she was intending to avoid paying tax, which would necessarily include state and city taxes. Furthermore, as stated throughout Defendants' motion and the instant Reply, Plaintiff's actions constituted policy violations, regardless of whether Plaintiff intended to avoid only state or city taxes.

111.     YuYu Lai would bring the purchases to Plaintiff when Lai came to New York. Plaintiff gave some of the merchandise to Lai. Mikhaylova Dep., p. 68:5-18.

**Plaintiff's Response:** Partially disputed. Undisputed to the extent Plaintiff would get her own purchases from Yu Yu Lai when Yu Yu Lai was in New York. Disputed that Plaintiff "gave" some of the merchandise to Lai. Rather Plaintiff testified she "gifted" some of the products to Yu Yu Lai. Mikhaylova Dep., p. 68:5-18.

**Defendants' Reply:** There is no factual dispute. Both parties agree that Plaintiff gave Lai merchandise, and whether the items were "gifted" is a matter of semantics. It is undisputed the items were not mailed to Lai to keep and it was only after she provided the service of receiving the goods and returning them to New York (without taxes being paid) that she received any of the goods to keep.

112.     When questioned about employees who said Lai paid them for their purchases mailed to her, Plaintiff initially said that was not correct because her co-workers never told her this. She then stated that she never allowed her co-workers to speak directly to Lai – she picked their products up for them. Plaintiff had no answer as to why these employees would admit to diversion if it were not occurring. Mikhaylova Dep., pp. 69:8-71:2.

**Plaintiff's Response:** Disputed, this is a mischaracterization of the testimony. Plaintiff testified Yu Yu Lai did not give money to any of her coworkers for the bags they sent Yu Yu Lai because they did not tell Plaintiff. Mikh. Dep. p. 69:12-17. Plaintiff did not testify she did not allow

her coworkers to speak directly to Lai but that to her knowledge her coworkers did not have any communication with Lai. Plaintiff testified she picked up her coworkers' stuff from Lai. Nowhere in the cited evidence to support this assertion does it say diversion. Exh. 1 Mikh. Dep., pp. 69:8-71:2.

**Defendants' Reply**: No foundation for Plaintiff's belief that others were not getting money from YuYu Lai or communicating with Lai. Her belief is nothing more than speculation and inadmissible hearsay. Plaintiff also misstates her testimony. She stated unequivocally that her co-workers, other than mailing bags to Lai, "never had any communication with Yuyu Lai." Plaintiff Dep., pp. 70:16-71:2.

113.    Plaintiff initially said managers also sent bags out of state to avoid tax but then changed her testimony that it was not Diaz but she could not give the names of anyone in management who had in fact done this. Mikhaylova Dep., 71:3-73:22.

**Plaintiff's Response:** Disputed, this is a mischaracterization of the testimony, controverted, and this assertion impermissibly draws a conclusion. Plaintiff testified she was allowed by management to send bags to New Hampshire to avoid sales tax. Exh. 1, Mikh. Dep., 71:3-73:22. Plaintiff testified that managers Denis and Viktoria approved sending merchandise to a state for herself that did not have taxes for the purpose of avoiding taxes. Exh. 1, Mikh. Dep., 74:7-22.; Exh. 10 BLM 20. When asked which manager approved Plaintiff mailing bags to New Hampshire to avoid sales tax Plaintiff testified Denis Diaz and testified that management was doing it too. Mikhaylova Dep., 71:8-15. Plaintiff also testified that Younis sent her stuff to New Jersey to avoid sales tax. Exh 1 Mikhay Dep p. 76:5-16.

**Defendants' Reply**: Plaintiff's testimony changed on this topic throughout questioning. However, when pointedly asked if Denis Diaz told her she could mail product out of state to avoid

taxes, Mikhaylova stated: "Did he say, no. But he has rung me up and I gave him the address." Plaintiff Dep., p. 75:13-18. She continued to state that he knew she was buying the bag for herself and mailing out of state because he saw her "try on the bag." He rung up her sale and she gave him the address. When pushed on the question of whether Diaz ever stated it was okay to mail items out of state to avoid taxes, Plaintiff then stated that she did not recall. Plaintiff Dep., pp. 75:13-76:4. Plaintiff's conclusory statements that everyone was doing it or that managers knew what she is doing is not admissible evidence as there is no proof as to what any manager saw or knew. Her allegations that Younis sent merchandise to New Jersey is also unsupported speculation as there is no record evidence of any such purchase mailed to New Jersey by Younis. When asked if she ever spoke to Younis about mailing product out of state, Mikhaylova once again, did not recall. Mikhaylova Dep., p. 76:5-23. Of the 28 receipts involved in the investigation that led to her termination, none were rung by Diaz or Younis. Becker Decl., Exhibit G. See accompanying Supplemental Declaration of Courtney Cox ("Supp. Cox Decl."), ¶¶ 4-6.

114.    Later she admitted that she could not recall Diaz ever saying anything suggesting that mailing bags out of state to avoid taxes was acceptable conduct. Mikhaylova Dep., p. 76:1-4.

**Plaintiff's Response: Partially disputed** and mischaracterization of testimony.

**Defendants' Reply**: Plaintiff testified that she could not recall Diaz saying that mailing bags out of state to avoid taxes was acceptable. Mikhaylova Dep., p. 76:1-4.

## Discount Policy

115.    The discount policy states that abusing the discount can result in termination. Discount abuse is defined as letting someone not eligible for the discount use your card or making a purchase with the discount and being reimbursed in full or part, or buying merchandise with the intent to resell it. Becker Decl., ¶ 25, Ex. J; Cox Decl, Ex. A; Younis Decl., ¶ 13.

**Plaintiff's Response:** Partially disputed. Disputed because Cox was not produced as the corporate representative to address the discount policies. Exh. Cox Dep. P. 34:8- 35:9. Second, disputed as to the omission that abusing the discount can result in termination of the discount or termination of employment for associates. Exh. 24,bates BLM 919. Admitted to the extent assertion repeats what is said in the policy cited.

**Defendants' Reply**: Cox's Declaration laid the foundation for the business records attached to her Declaration. There was no request to produce anyone to speak on the discount policy in Plaintiff's 30(b)(6) notice.

116.    Plaintiff signed off on the discount policy when she was hired. In addition to the discount policy being separately signed off by employees, it is also found in the employee handbook. Cox Decl., ¶¶ 16-19, Exs. A, D; Mikhaylova Dep., pp. 212:13-213:21, Ex. R.

**Plaintiff's Response: Disputed** the materials do not support the assertion and Defendants provided another handbook that plaintiff signed off which does not mention the discount policy cited.  Exh 10, BLM 22-84.

**Defendants' Reply**: There is no evidence to challenge the fact that Plaintiff signed off on the discount policy when hired. Additionally, Plaintiff is wrong in her assertion that the handbook she cites does not contain the discount policy. The information on the discount policy can be found at pages BLM63-67.

117.    Plaintiff alleges she purchased some of the purses at a special sale where they were 60% off of their original price. She alleges there was no limit on how many of these bags that could be purchased. However, those liquidation sales were infrequent. The discounts for those sales were 40, 50 or 60% off. Younis Decl., ¶ 10; Younis Dep., pp 72:5-73:13.

**Plaintiff's Response:** Partially disputed. Not disputed that Plaintiff said there was no limit,

Mikhay. Dep. P. 189:19-192:17.

**Defendants' Reply**: There is no evidentiary citation to support a dispute as to any part of Fact No. 117, and thus it should be deemed admitted.

118.    The discounts for the liquidation sales were what is known as "front of house" as they were shown on the receipt. Young Decl, ¶ 10, Ex. D.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** No additional response.

119.    The employee discount that every employee receives on eligible purchases was known as "back of house" and that discount amount was taken off of the monthly statement. The statements show the discount as a credit to any amounts purchased. Younis Decl., ¶ 10; Gentry Aff. and credit statements attached.

**Plaintiff's Response:** Partially disputed for inadmissible evidence and this assertion is not supported with materials in the record.

**Defendants' Reply**: Plaintiff's response is incorrect. Younis' Declaration supports the statement. Mikhaylova's credit statements were produced as Exhibit K to the moving Gerber Decl. The employee discount is shown on the statements.

120.    None of the receipts that were part of the AP investigation show that any of the purses that were purchased were discounted or part of a liquidation sale as they would be if they were part of such an event. Becker Decl., ¶ 22, Ex. G.

**Plaintiff's Response:** Disputed. Becker's testimony stating the receipts were related to fraud transactions not specific to plaintiff. Exh. Becker dep. P. 83:1-84:21.

**Defendants' Reply**: Plaintiff misstates Becker's testimony. His testimony was discussing the investigative process in general, and he made no statements related to Mikhaylova. Also,

Plaintiff's comment fails to challenge the stated fact. Exhibit G to Becker's Declaration shows the receipts that were part of the investigation that led to Mikhaylova's termination. A review of the receipts shows no discount which would be present for a purchase that was made as part of a sales event.

121.    The salon shoe receipts show discounts but they were not part of the liquidation sale and there was no exception to the limit of 12 items set forth in the employee handbook. Becker Decl., Younis Decl., ¶ 11.

**Plaintiff's Response:**  Disputed. Younis testified she could not recall the shoe limit at the time and would have to look at the handbook. She also testified that shoes on sale did not count towards the shoe limit. Younis Dep. P. 64:1-10; p. 75:10-16.

**Defendants' Reply**: In the cited portion of her deposition, Younis was speaking about the special sales when the shoes would be included. She stated that perhaps once or twice shoes were included in the liquidation sales and they would not count against the maximum limit of 12 pairs in 90 days but she was not definitive. Younis Dep., pp. 74:10-75:11. Of note, there is no evidence that any of the shoes purchased by Mikhaylova were purchased during one of these infrequent liquidation sales.

<u>**Miscellaneous**</u>

122.    The transaction receipts that refer to handbags are from the Chanel department if they show the number 54/5. The number 57/76 is the department number for shoes sold in the Chanel department (Salon Shoes). Younis Decl., ¶ 4.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply**: No additional response.

123.    Bloomingdale's handbook and Code of Conduct requires all employees to comply

with state and federal law. Young Decl., ¶ 12; Becker Decl., ¶ 20; Cox Decl., ¶ 35, Exs. A, C; Younis Dep., pp. 33:14-34:1.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply**: No additional response.

124.    It is a violation of company policy to ship merchandise to states that do not charge sales tax in order to avoid paying New York State sales tax. Managers do not have the authority to authorize a violation of the law. Employees also were not authorized to suggest this type of shipping process to customers. Bloomingdale's has been consistent in its application of this policy. Younis Decl., ¶ 12; Becker Decl., 20; Cox Decl., ¶¶ 36-37, and Ex. L; Younis Dep., pp. 84:9-85:7; 108:12-19; Diaz Dep., p. 83:8-11.

**Plaintiff's Response:** Disputed. Plaintiff testified she told Castellani on June 6, 2017 that Diaz had approved her purchases. Exh 1,  Mikhaylova Dep., 130:5-23, 71:8-15.

**Defendants' Reply**: Plaintiff testified that she told Castellani that Diaz approved her purchases but that is not contained in her handwritten statement or the notes of the interview. Additionally, even if true, that does not refute the content of Fact No. 124. See also, Becker Decl., Exhibit F, BLM 1894-1900.

125.    There are numerous employees who have been discharged for admitting tax evasion. There is no one who admitted tax evasion who was not discharged. Becker Decl., Ex. H; Cox Decl., ¶ 37, Ex. L.

**Plaintiff's Response:** Disputed. Tyler Rose admitted to shipping to the same state as Plaintiff and he was not terminated by Richard Law.  Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577; Further disputed to the extent the assertion implies employees that admitted tax evasion were discharged for that reason as defendants did not terminate any other employees for

tax evasion. Law Dep. P. 126:4-134:14; Diaz Dep., p. 91:17-22; Exh. 10, bates BLM1576-1577; They were suspended and resigned. Further disputed as the evidence cited is controverted by evidence in the record. Employee Exh. 21, BLM 2224-2225, Employee number 72664210 falsified business records to circumvent taxes and made a profit off of it for customers. She was not terminated but only suspended at the conclusion of the investigation. Exh. 21, BLM 2255-2256. Employee number 72043055 stated that she was using her discount to buy Chanel at discounted prices for her friends at NYU and using their credit cards to pay her account. . Exh. 21, BLM 2259-2260. Employee number 72026718 after admitting to avoiding taxes there was further investigation done which revealed employee lied during investigation and was making a profit warranting termination. Exh. 21BLM 2229-2230. Employee number 72028976 terminated for return fraud unrelated to taxes. Exh 21, BLM 2224-2225. Employee number 72043089 did not mention taxes he was falsifying time sheets and using his discount for customers. exh 21 BLM 2187-2188. employee Number 72001188 was using relatives' addresses to save on taxes but the items were going home with him they were not actually shipped. Exh 21 BLM 2199-2200. On September 29, 2016, Employee number 72043192 was getting reimbursed from family and friends for using his discount to buy their purchases. Exh 21 BLM 2209-2210. Employee number 72071094 was investigated because rung up by employee under investigation and the employee ringing her up sent this employees purchase to address to avoid sales tax. Employee number 72071094 was not terminated only suspended and did not return to work which Employee relations then takes as resignation.  Ex 21, BLM 2235-2236; Castellani Dep. P. 105:8-106:15. Employee number 72063603, Angy Lee resigned after she was investigated and cooperating with the FBI for processing 26 fraudulent transactions for various suspects using fraudulent Bloomingdales credit cards to purchase $128,926.23 in Chanel handbags. Exh. 21 BLM 2194. Employee number

72063570 Idress Orya was involved in the same fraudulent scheme as Angy Lee processing fraudulent transactions. Nowhere does it mention terminated for tax evasion. Exh 21 bates BLM 2218-2219. Employee number 72607568 was suspended and not terminated but because she did not respond to HR within 48 hours she was terminated. Exh 21, BLM 2213-2214. Employee number 72051456 was making large cash payments from her business in NJ. Exh 21 bates BLM 2265-2266. Employee number 72029423 did not properly ring up a client who asked for item to be shipped. Unclear what date that employee was terminated. Exh. 21 bates BLM 2250-2253. Employee Number 72073466 was reselling merchandise, profiting off her discount, besides sending to NJ addresses to avoid taxes. Ex 21 BLM 2244-2249.

**Defendants' Reply**: Tyler Rose did not admit to tax evasion. He steadfastly maintained that the package he mailed was a gift for a friend. As for the other employees, at least one violation that they admitted was tax evasion, and all either resigned during the investigation (and thus were not eligible for rehire) or were terminated. Plaintiff's argument that Defendants' cannot prove that tax evasion was the only reason for the terminations misses the point. In some instances, there were several violations and the person was discharged or resigned before the company could terminate them. The salient piece of this fact is that there is no one who *admitted tax evasion* – either as their only violation or as part of a group of violations who was not discharged. If the employee resigned during the investigation, they were deemed not eligible for rehire. Plaintiff's two-page argument does not refute that fact. Of the employees listed by Plaintiff, their termination information was attached to the Cox Decl. as Ex. L. Employee 72664210 was discharged, see document number BLM2258; 72043055 – BLM2262; 72026718 – BLM2233; 72028976 – BLM2227; 72048359 (Plaintiff lists the number as 72043089) – BLM2191; 72001188 – BLM2201; 72071094 – BLM2237 (Resign – No Rehire); 72063603 – BLM 2197 (Resigned – No

Rehire – implicated Mikhaylova in diversion); 72063570 – BLM2222; 72607568 – BLM2216 (implicated Mikhaylova in diversion); 72051456 – BLM2269; 72029423 – BLM2253; 72073466 – BLM2249.

126.   Law also had to decide whether to discharge two other employees – Martha Weh and Tyler Rose who were mailing merchandise to the same New Hampshire address to which the Plaintiff was mailing. Law discharged Weh and not Rose. His rationale was that Weh had made numerous transactions and had no argument that they were for personal use or a gift. Rose, however, made only one transaction and did not admit to any wrongdoing but stated he was mailing the item as a gift. Law did not feel he had enough evidence to discharge Rose. Mikhaylova admits that Rose only sent to the same address one time and that it was Rose's personal item. Law Dep., pp. 128:8-142:12; 168:4-12, Exs. H and I; Mikhaylova Dep., pp. 247:22-249:13.

**Plaintiff's Response:** Partially disputed. Undisputed to the extent that that is what Law stated. Disputed in that Rose said he shipped to two different addresses Massachusetts and New Hampshire. Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577. Further disputed for mischaracterization of plaintiff's testimony. Plaintiff testified she had no knowledge as to how many times Rose shipped his items. Exh 1, Mikhaylova Dep. 246:22- 248:22.

**Defendants' Reply**: The investigation file for Rose only has one transaction. There was some miscommunication in the investigation summary referencing both Boston and the New Hampshire address that Mikhaylova mailed to, but only one transaction is referenced in the investigation. Law Dep., Ex. H, BLM 1578, 1589, and I.

127.   There were numerous other employees who were discharged as part of the investigation into the $1 million fraud going on in the Chanel department. This investigation included the involvement of the NYPD. Becker Dep., pp. 39:15-40:10; Becker Decl., ¶ 27, Ex. H.

**Plaintiff's Response:** Disputed. Becker testified he did not recall any Bloomingdales employees terminated and/or prosecuted for this fraud scheme. Becker Dep. p. 58:4-59:2. Further disputed because assertion is unsupported by evidence. Becker's declaration states other employees were investigated not discharged. Becker Decl., ¶ 27, Ex. H. Nor does ¶ 27 of Becker's declaration mention the $1 million fraud or the NYPD. Becker Decl., ¶ 27, Ex. H.

**Defendants' Reply**: See Becker Dep. at p. 57:4-17; 114:5-18 for reference to over a million dollars in fraud. Becker stated he would have to review the files to determine who was discharged. The terminations are set forth in Exhibit H to his declaration and Ex. L to Cox Declaration.

128.    At least two additional employees mailed merchandise to the same address as Plaintiff had. Two of those employees admitted that they had gotten the address from Plaintiff and one employee admitted that she was reselling to the person at the address and Plaintiff recruited her. Becker Decl., ¶¶ 24, 27, Ex. H; Castellani Dep., 64:1-65:16; 115:20-117:19; Law Dep., p. 126:4-17; Mikhaylova Dep., p. 204:20-23; 245:18-249:13; 256:7-22.

**Plaintiff's Response: Disputed,** controverted by evidence and inadmissible as hearsay.

**Defendants' Reply**: The employee investigations are included in Plaintiff's Exhibit 21. Specifically, employee 72063603 (BLM2193-2194) and 72607568 (BLM2213-2214). The factual statement is not refuted as Plaintiff's cites no evidence to the contrary. The records cited are business records and thus, an exception to the hearsay rule. See Becker Decl., ¶ 24, for business record exception foundation.

129.    The Asset Protection team does not necessarily look for people evading the payment of New York State and City sales tax, but it has come up several times in investigations. Every time an employee has admitted to tax evasion, they have been discharged from employment.

See Exhibit H for a summary chart of the Asset Protection investigations where an employee has admitted to evading sales tax. Cox confirms the termination of the employees in her declaration as cited. Becker Decl., ¶ 17; Ex. H; Cox Decl., ¶ 37, Ex. L.

**Plaintiff's Response:** Disputed. Tyler Rose admitted to shipping to the same state as Plaintiff and he was not terminated by Richard Law.  Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577; Further disputed to the extent the assertion implies employees that admitted tax evasion were discharged for that reason as defendants did not terminate any other employees for tax evasion. Law Dep. P. 126:4-134:14; Diaz Dep., p. 91:17-22; Exh. 10, bates BLM1576-1577; They were suspended and resigned. Further disputed as the evidence cited is controverted by evidence in the record. Employee Exh. 21, BLM 2224-2225, Employee number 72664210 falsified business records to circumvent taxes and made a profit off of it for customers. She was not terminated but only suspended at the conclusion of the investigation. Exh. 21, BLM 2255-2256. Employee number 72043055 stated that she was using her discount to buy Chanel at discounted prices for her friends at NYU and using their credit cards to pay her account. . Exh. 21, BLM 2259-2260. Employee number 72026718 after admitting to avoiding taxes there was further investigation done which revealed employee lied during investigation and was making a profit warranting termination. exh 21BLM 2229-2230. Employee number 72028976 terminated for return fraud unrelated to taxes. Exh 21, BLM 2224-2225. Employee number 72043089 did not mention taxes he was falsifying time sheets and using his discount for customers. exh 21 BLM 2187-2188. employee Number 72001188 was using relatives' addresses to save on taxes but the items were going home with him they were not actually shipped. Exh 21 BLM 2199-2200. On September 29, 2016, Employee number 72043192 was getting reimbursed from family and friends for using his discount to buy their purchases. Exh 21 BLM 2209-2210. Employee number

72071094 was investigated because rung up by employee under investigation and the employee ringing her up sent this employees purchase to address to avoid sales tax. Employee number 72071094 was not terminated only suspended and did not return to work which Employee relations then takes as resignation.  Ex 21, BLM 2235-2236; Castellani Dep. P. 105:8-106:15. Employee number 72063603, Angy Lee resigned after she was investigated and cooperating with the FBI for processing 26 fraudulent transactions for various suspects using fraudulent Bloomingdales credit cards to purchase $128,926.23 in Chanel handbags. Exh. 21 BLM 2194. Employee number 72063570 Idress Orya was involved in the same fraudulent scheme as angy lee processing fraudulent transactions. Nowhere does it mention terminated for tax evasion. Exh 21 bates BLM 2218-2219. Employee number 72607568 was suspended and not terminated but because she did not respond to HR within 48 hours she was terminated. Exh 21, BLM 2213-2214. Employee number 72051456 was making large cash payments from her business in NJ. Exh 21 bates BLM 2265-2266. Employee number 72029423 did not properly ring up a client who asked for item to be shipped. Unclear what date that employee was terminated. Exh. 21 bates BLM 2250-2253. Employee Number 72073466 was reselling merchandise, profiting off her discount, besides sending to NJ addresses to avoid taxes. Ex 21 BLM 2244-2249.

**Defendants' Reply**: Tyler Rose did not admit to tax evasion. He steadfastly maintained that the package he mailed was a gift for a friend. As for the other employees, at least one violation that they admitted was tax evasion, and all either resigned during the investigation (and thus were not eligible for rehire) or were terminated. Plaintiff's argument that Defendants' cannot prove that tax evasion was the only reason for the terminations misses the point. In some instances, there were several violations and the person was discharged or resigned before the company could terminate them. The salient piece of this fact is that there is no one who *admitted tax evasion* –

either as their only violation or as part of a group of violations who was not discharged. If the employee resigned during the investigation, they were deemed not eligible for rehire. Plaintiff's two-page argument does not refute that fact. Of the employees listed by Plaintiff, their termination information was attached to Courtney Cox's Declaration as Ex. L. Employee 72664210 was discharged, see document number BLM2258; 72043055 – BLM2262; 72026718 – BLM2233; 72028976 – BLM2227; 72048359 (Plaintiff lists the number as 72043089) – BLM2191; 72001188 – BLM2201; 72071094 – BLM2237 (Resign – No Rehire); 72063603 – BLM 2197 (Resigned – No Rehire – implicated Mikhaylova in diversion); 72063570 – BLM2222; 72607568 – BLM2216 (implicated Mikhaylova in diversion); 72051456 – BLM2269; 72029423 – BLM2253; 72073466 – BLM2249.

130.    Plaintiff had not previously spoken to Richard Law or Chris Castellani before the events surrounding her termination. Mikhaylova Dep., pp. 111:16-112:19; 241:4-17.

**Defendants' Reply**: This fact should be deemed admitted as Plaintiff has failed to challenge it.

## PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS

Defendants object to Plaintiff's Counter Statement of Material Facts. Many are irrelevant to the pending issues and others are duplicative of Defendants' Statement of Material Facts and/or facts added by Plaintiff in response to Defendants' Statement of Material Facts. The sheer number of additional facts is oppressive and unnecessary. However, Defendants' will respond fully as set forth below.

131.    Defendants principal place of business is 7 West 7TH Street, Cincinnati, Ohio 45202.

**Defendants' Response:** Disputed. Bloomingdale's, LLC and Macy's, Inc. both have their

principal places of business in New York, New York based on the ***Hertz*** test set forth by the United States Supreme Court,  *Hertz Corp. v. Friend*, 559 U.S. 77 (2010).

132.    Plaintiff was employed by Defendants from May 3, 2016 until June 16, 2017. Exh.13, paragraph 2 and 3; Mikh. Decl. paragraph 3-4; Exh 10, bates 754.

**Defendants' Response:** Duplicative but undisputed.

133.    Plaintiff was suspended without pay from June 6, 2017 until June 16, 2017.

**Defendants' Response:**  Undisputed.

134.    Cathy Younis testified the Chanel Handbag department was "owned" until July 2017 when they went "leased."

**Defendants' Response:** Plaintiff's fact should be deemed denied since no citation to the record has been provided. Defendants cannot respond to this alleged quote as there is no citation. Defendants do not dispute, however, that the Chanel Handbag department in Bloomingdale's 59th Street location became a leased department in July 2017.

135.    Plaintiff was told many times by management that the handbags purchased during sales were not to be included in the purchase limit. Exh. 12, bates Mikhaylova 211; Exh 1, Mikhay. Dep. P. 189:19-192:17**.**

**Defendants' Response:** Partially disputed. Agreed that Plaintiff so testified, but Exhibit 12 bates-numbered as Mikhaylova 211, does not prove the fact stated. Defendants cannot state how many times the alleged statement was made to Plaintiff, if ever, as the term "management" is not specified. Additionally, Plaintiff has submitted no evidence that any bag purchased by her while at Bloomingdale's was "on sale." Cathy Younis testified that the liquidation sales to which this refers were infrequent – approximately once a year. Younis Decl., ¶ 10; Younis Dep., pp 72:5-73:13.

136.        Plaintiff was and is not a diverter. Mikahy Dep. P. 65:1-22.;Becker dep. P.

139:15-22.

**Defendants' Response**: Disputed. Agreed that Plaintiff so testified, but Becker's cited

testimony does not  support this statement.  Additionally, Richard Law believe that Plaintiff was a

diverter. There is no other explanation for an employee who earns a little over $100,000 a year

spending $264,000 in an eight month period on handbags, shoes and other brand name products with

no visible means of paying that amount of money. Additionally, a significant amount of the

purchases were mailed to a UPS Store to varied names and to various mailboxes – some even listing

a business. Others who worked with Mihaylova who also mailed to the same address stated they

were working with a diverter and that Mikhaylova had gotten them involved. Moving Gerber Decl.,

Ex. K, Law Dep., pp. 88:3-17; 124:3-125:2; 171:13-23; 177:2-5; Becker Decl., Ex. F, G and H;

Mikhaylova Dep., pp. 207:22-208:11.

137.    Plaintiff told Diaz she had morning sickness. Exh 1, Mikhay Dep. P.  88:5-94:8.

**Defendants' response:** Disputed. Diaz stated that Mikhaylova never told him she suffered

from morning sickness. Diaz Dep., p. 69:3-13.

138.    Plaintiff had a pre-pay account. Per the employee handbook, "A prepay account

requires an associate to pay the net amount of the purchase (item price less discount, plus tax)

before it can be rung on the register") Exh. 10, BLM 1434—if 2016 handbook applied, Cox Decl.,

Exh D.

**Defendants' response:** Undisputed.

139.    Younis did not know that Plaintiff was terminated for shipping gifts out of state to

avoid taxes. Younis said that she was fired for policy type violations.  Younis Dep. P. 54:23-55:22.

**Defendants' response:** Undisputed that Younis testified that she did not know that

Mikhaylova was discharged for tax evasion at the time of termination. Also, undisputed that

Younis testified that normally she will "keep it under the more general guidance of policy and procedure." Disputed that in the cited section Younis stated that Mihaylova was discharged for policy violations.

140.    Plaintiff also testified that Younis sent her stuff to New Jersey to avoid sales tax. Exh 1 Mikhay Dep p. 76:5-16.

**Defendants' response:** Undisputed that Mikhaylova so testified. However, there is no evidence in the record of Younis mailing any purchases to New Jersey.

141.    During plaintiff's employment Defendants' policy was that employees could not ring up their own sale but another colleague could ring them up. Younis Depo, P. 37:24-38:15.

**Defendants' response:** Undisputed.

142.    During Plaintiff's employment, managers rang up employees. Younis depo p. 45:19-46:3.

**Defendants' response:** Partially disputed. In the testimony cited above, Younis agreed that managers were able to ring associate transactions. However, in the section cited in the previous fact (Number 141), Younis stated that she was not sure if managers could ring up employees before the department became leased. She stated colleagues did the ringing because they were receiving commission. Younis Dep., p. 38:6-15.

143.    Plaintiff did not violate Company policies by shipping her purchases to friends and family out of state. Younis Depo, 107:8-108:6.

**Defendants' response:** Disputed. Younis testified that if you are mailing gifts to family and friends, then there is no violation. However, Younis made clear that Mikhaylova's actions were a violation of policy. She went further and noted that if Mikhaylova was mailing packages out of state to avoid taxes, that would be a violation of policy and the Code of Conduct. Younis

Dep., pp. 107:8-108:24. Of note, the packages mailed by Mikhaylova out of state were all to a UPS Store not to the addresses of family and friends receiving a gift. Becker Decl,. Ex. G.

144.    Plaintiff paid New York taxes on most if not all of her purchases. Exh 5, Castellani Dep. p. 49:23-50:15;

**Defendants' Response:** Disputed. Plaintiff misstates Castellani's testimony. He stated unequivocally that Plaintiff did not pay sales tax on the bags mailed to New Hampshire and Mississippi. Castellani testified that Mikhaylova paid sales tax on "some purchases" and specified it was on those purchases not shipped to a state without sales tax. Castellani Dep., pp. 49:23-50:15.

145.    Around January 31, 2017, Defendants announced the business decision effective July 2017, to change the Chanel businesses in the ready to wear and handbags departments at the Bloomingdales 59th Street location from "owned" to "leased." Exhibit 10, bates BLM001552. The Chanel shoe department at the Bloomingdales 59th Street location was to remain an "owned" business. Exhibit 10, bates BLM001552.

**Defendants' response:** The citation is not accurate. There is no BLM1552 in Exhibit 10. However, in reviewing that document in Bloomingdale's production, undisputed.

146.    Angy Lee admitted to reselling for a profit but she was not terminated. Exhibit 10, bates BLM001555; Exh. 6, Becker Dep. Exh. P-2.

**Defendants' response:** Disputed. Lee was interviewed on September 26, 2017 and was suspended while the investigation progressed. She resigned on September 27, 2017 while on suspension. She is coded as a no rehire for resigning during an investigation. Plaintiff Ex. 10, BLM 1555; Cox Decl., Ex. L, BLM 2197.

147.    Defendants failed give plaintiff an accommodation Plaintiff. Exh 1, Mikhay Dep. P. 98:13-101:22-25.

**Defendants' response:** Disputed. Plaintiff's medical documentation states that Mikhaylova may need up to two hours to address her nausea and vomiting one time a week for six months. Ex. 10, BLM 768. This was modified on June 14, 2017 to be up to five times per week. Ex. 10, BLM 788. Her doctor did not request any accommodation other than time for Plaintiff to deal with her nausea as it occurred. Intermittent leave is the mechanism that allows an employee to take time when needed for a medical condition. It is undisputed Plaintiff completed the paperwork for an intermittent leave and it was granted. Plaintiff admitted in her deposition that her leave of absence was approved on June 9, 2017. Mikhaylova Dep., p. 169:10-12. See also Lippman Decl., ¶¶ 8-10, 14.

148.    Diaz could not recall who he spoke with at Human Resources about Plaintiff's pregnancy. Exh 4, Diaz dep P. 67:1-68:14.

**Defendants' response:** Undisputed and irrelevant.

149.    Plaintiff testified she told Castellani on June 6, 2017 that Diaz had approved her purchases. Exh 1, Mikhaylova Dep., 130:5-23.

**Defendants' response:** Disputed. Plaintiff testified in her deposition that she told Castellani that Diaz approved her purchases but that is not contained in her handwritten statement or the notes of the interview. Becker Decl., Exhibit F, BLM 1894-1900.

150.    Castellani testified that the discount abuse and potential diverter reselling aspect initiated the investigation against Plaintiff. Exh 5, Castellani Dep., 56:1-20.

**Defendants' response:** Undisputed that was his testimony.

151.    Plaintiff's Union Local 3 filed a grievance on her behalf around June 20, 2017. The grievance hearing was on July 10, 2017. Ex 10, Mikhyalova 182-191.

**Defendants' response:** Disputed and irrelevant. Exhibit 10 does not contain the cited

pages. However, in reviewing Plaintiff's production, it is undisputed that the union filed a grievance on Mikhaylova's part that was denied by the company.

<u>**Fraud**</u>

152.    Becker testified Plaintiff was not terminated nor found to have committed fraud. Becker Dep. P. 39:24-40:10.

**Defendants' response:** Disputed as that is not supported by the citation. Becker testified that Mikhaylova was invested along with the other Chanel employees in the fraud investigation that was turned over to the NYPD. He stated that he did not recall the results of that investigation. Mikhaylova had already been discharged by the time the investigation concluded.

153.    Becker testified that no Bloomingdales employees were terminated and/or prosecuted for fraud during the 2017 over $1 million investigation into fraud. Becker Dep. 57:4-59:2. Becker testified that outside individuals were prosecuted for that fraud scheme. Becker Dep. 58:16-59:2.

**Defendants' response:** Disputed. Becker said he would need to review the files to determine if any Bloomingdale's employee was prosecuted for fraud. He is not aware of any but noted that could be inaccurate. He noted he simply did not recall. Employees who were found to have committed policy violations or thought to be part of the fraud were investigated and the information was given to human resources. Becker was aware of arrests being made but those of whom he is aware were not Bloomingdale's employees. Becker Dep. pp. 57:4-59:2.

154.    Becker testified at his deposition that in preparation for his deposition he reviewed documents and information about Plaintiff's case with Defendants. Becker dep. P. 10:18-24.

**Defendants' response:** Disputed to the extent this suggests Becker reviewed all of the case records. He testified that he reviewed some of the documents in this case. He did not testify about

information.

155.     During the month of June 2017 the Chanel handbag department saw an increase in sales from $1,515,495.00 in 2016 to $2,859,648.00. Exh. 10, bates 1554-1555.

**Defendants' response:** Undisputed that this appears in the Asset Protection Executive Summary. Disputed as to what information was used to reach these numbers and the document is unsworn. Also, this fact is irrelevant to the issues in this case.

156.     After review of all sales in the Chanel handbag shop it was identified that approximately $1,100,000.00 of the sales increase on Bloomingdales Prop Credit Cards were made fraudulently. Exh. 10, bates 1554-1555.

**Defendants' response:** Undisputed.

157.     The five individuals responsible for $722,000.00 of the fraudulent $1,100,000.00 credit card purchases total between June 1, 2017 to June 29, 2017. Exh. 10, bates 1554-1555.

**Defendants' response:** Undisputed that the Asset Protection Executive Summary lists five employees whose had fraudulent sales in the June time frame totaling $722,000. The recap also notes several of these employees were involved in diversion and evaded taxes by shipping to states with zero tax.

158.     The five individuals responsible for the fraudulent credit card purchases are Noemi Coste, Angy Lee, Idress Orya, Yueman (Moon) Chen, and Eleanor Dahan. Exh. 10, bates 1554-1555.

**Defendants' response:** Undisputed that the employees who were responsible for the $722,000 in fraudulent purchases in June 2017 were those listed in this fact.

159.     Plaintiff admitted that she was aware of coworkers that were terminated for their involvement in a fraud scheme. Exh. 13, ¶45.

**Defendants' response:** Undisputed that was Mikhaylova's response to Request for Admission No. 45.

Asset Protection

160.     Younis testified that Asset Protection oversaw employees' purchase limits. Younis Depo, P. 20:18-24,23:17-24, 37:1-23.

**Defendants' response:**  Undisputed that was Younis' testimony.

161.     Younis testified it was "extremely difficult" "if not impossible" during Plaintiff's employment to catch an employee exceeding the purchase limits. Younis Dep. p. 25:16-22.

**Defendants' response:** Undisputed.

162.     Younis testified that although Asset Protection oversaw purchase limits, employees such as herself had a responsibility to say something if they saw something. Younis Dep. p. 25:5

**Defendants' response:** Incomplete citation. Based on the totality of page 25, undisputed.

163.     Defendants terminated Plaintiff because of a suspicion that plaintiff was reselling. Law Dep. P. 88:1-25, 124:16-125:2.

**Defendants' response:** Undisputed that was part of the reason for Mikhaylova's termination. Law made the decision to discharge Plaintiff. The primary reason for his decision was that Plaintiff exceeded the purchase limits for the merchandise and he believed, based on the amount of money she was spending, the number of purchases she was making, and the fact that she was sending them out of state to someone else that she was a diverter/selling the product for profit which was a violation of the discount policy. Plaintiff also admitted to purposefully evading taxes which was also a terminable offense. Law alone made the termination decision. Law Dep., pp. 46:20-48:17; 69:25-71:15; 80:17-23; 86:1-87:4; 88:1-17; 168:17-169:24; 171:13-23; 173:11-175:10; 177:2-17; 178:12-23.

164.    Plaintiff testified that she does not know if the people that started the investigation knew she was pregnant nor if they would have told her that but that she was visibly pregnant. Mikhaylova Dep. P. 136:18-138:14.

**Defendants' response:** Undisputed that Plaintiff so testified and thus, cannot attribute her pregnancy to the initiation of the investigation into her conduct. Disputed that Plaintiff was visibly pregnant. She was three months pregnant at the time of the investigation and her discharge, according to her doctor's note. Cox Decl., Ex. G. There is no admissible evidence in the record that Plaintiff was visibly pregnant during the investigation and the termination of her employment.

165.    Becker testified that firsthand observations by management is part of the investigation process for reselling. Becker Dep. 46:15-23.

**Defendants' response:** Undisputed that Becker stated that it is part of the investigation process to see if there were any firsthand observations by management. Becker noted that is among a series of things the Asset Protection team considers. Becker Dep., pp. 46:15-47:3.

166.    Castellani did not tell Plaintiff how her purchases and shipping addresses came to his attention.  Exh 1, Mikhay Dep p. 130:20-23.

**Defendants' response:** Undisputed Castellani did not tell Mikhaylova how the issues he was investigating came to his attention.

167.    Younis testified that the policies for going over purchase limits was a warning and could be grounds for immediate termination. Younis Depo, P. 23:17-24

**Defendants' response:** Undisputed.

168.    Determination whether there was a violation of the discount policy was done by asset protection and done on a case-by-case basis. Ex 14 paragraph 5

**Defendants' response:** There is no paragraph 5 in Ex. 14. Without seeing the context,

Defendants cannot respond. However, if this refers to Exhibit 15, paragraph 5, undisputed.

169.    At that time, Becker testified they were not using a system to track investigations. Exh. 6, Becker Dep. P.86:1-13.

**Defendants' response:** Undisputed that Becker stated there was not an overall tracking system. However, he testified each investigator would track their own caseload.

170.    Defendants do not have a list of employees that were investigated for the same reasons as Plaintiff. Exhibit 15 paragraph 5.

**Defendants' response:** Undisputed that Asset Protection does not maintain lists of investigations for any reason.

171.    Asset Protection can and has recommended human resources terminate an employee. Booker Dep. P. 33:16-34:18.

**Defendants' response:** Undisputed that Booker testified that has occurred in specific circumstances.. Becker testified that if human resources asks for his advice, he will provide it to help ensure consistency in the decision-making. Becker Dep., p. 51:16-52:3

172.    Becker testified Asset Protection's investigations involve internal theft, dishonesty, not necessarily policy type violations. Becker Dep. P. 47:24-48:7.

**Defendants' response:** Disputed. Becker testified that internal theft and dishonesty cases are the priority, not the only cases they handle.

173.    Becker testified Chanel has their own department and processes for tracking bags and resellers. Becker Dep. P. 48:13-23.

**Defendants' response:** Undisputed but citation is inaccurate – should be p. 48:8-9.

174.    Becker testified that Cathy Younis and Denis Diaz were part of the Chanel Leadership team during Plaintiff's employment. Becker Dep. P. 48:13-23.

**Defendants' response:** Undisputed.

175.     Cathy and Denis would have worked with Asset Protection to determine if Plaintiff and other employees were resellers. Becker Dep. P. 48:13-23.

**Defendants' response:** Disputed. Becker testified that his team would have worked with the Chanel leadership if necessary.

176.     [Plaintiff left this number blank]

## Diversion

177.     Becker testified Bloomingdales did not have a diverter policy and each vendor had their own policies. Becker Dep. 59:14-22.

**Defendants' response:** Disputed. Becker testified he did not know if there was a specific diverter policy for the company but that some vendors have their own diverter policy.

178.     Becker testified what diverting meant to him which is similar to reselling, diverting merchandise to a different, a third party. Similar to reselling, which is buy merchandise and resell to individuals, diverter would more buy it and then divert it more in bulk. Becker dep. P. 140:1-7. Diverter buys merchandise and diverts it to a location where you can't buy it. Becker dep. P. 149:1-22.

**Defendants' response:** Undisputed but the citation is wrong, and, for clarity of the record, should be "Becker Dep. 139:1-22."

179.     Becker testified that a person sending to a third party to avoid paying taxes is not diversion. Becker dep. P. 139:15-22.

**Defendants' response:** Disputed as Becker testified that evading taxes could be part of a diversion scheme. Becker Dep., pp. 139:15-140:2. In the Asset Protection Executive Summary in this case, tax evasion was called out as part of the diversion scheme. Exh. 10, bates 1554-1555.

180.    Younis testified that no one was terminated for product diversion. Younis Depo, p. 20:3-9.

**Defendants' response:** Disputed as citation is wrong and does not support the stated fact. Additionally, Younis testified that she can discharge for performance issues but not policy violations. Younis Dep., pp. 21:24-22:8. She also noted in her testimony that when there is a termination for a policy violation, she does not know the specifics or why the termination decision was made. Younis Dep., p. 21:1-10.

181.    Castellani testified that during Plaintiff's employment Diaz and Younis were concerned about external fraud occurring also known as diverters. Castellani Dep. P. 32:3-18.

**Defendants' response:** Disputed. Castellani said they were "concerned about external fraud occurring, a lot of what we called diverters." The statement is not clear but could be talking about two different things – external fraud and diverters or that part of external fraud involves diverters. It is not clear but Plaintiff's cited fact is not supported by the citation.

182.    Law testified that a diverter is someone purchases merchandise and provides it to another seller who is not necessarily authorized for that second seller to sell this particular type of merchandise. Law Dep. P. 124:10-15.

**Defendants' response:** Undisputed.

**<u>No Policy Regarding Taxes</u>**

183.    Plaintiff testified that the Company knew she was sending items to tax free states and some of the items were rang by the managers, including Denis Diaz, and that she was doing what everyone else was doing. Mikhaylova Dep. P. 129:3-21; 130:5-12, 131:10-20.

**Defendants' response:** Undisputed that Mikhaylova testified to this. It is disputed, however, that there is any admissible evidence in the record to prove that this occurred. Plaintiff's

testimony changed on this topic throughout questioning. However, when pointedly asked if Denis Diaz told her she could mail product out of state to avoid taxes, Mikhaylova stated: "Did he say, no. But he has rung me up and I gave him the address." Plaintiff Dep., p. 75:13-18. She continued to state that he knew she was buying the bag for herself and mailing out of state because he saw her "try on the bag." He rung up her sale and she gave him the address. When pushed on the question of whether Diaz ever stated it was okay to mail items out of state to avoid taxes, Plaintiff stated that she did not recall. Mikhaylova Dep., pp. 75:13-76:4. Plaintiff's conclusory statements that everyone was doing it or that managers knew what she is doing is not admissible evidence as there is no proof as to what any manger saw or knew. When asked if she ever spoke to Younis about mailing product out of state, Mikhaylova once again, did not recall. Mikhaylova Dep., p. 76:5-23. Of the 28 receipts involved in the investigation that led to her termination, none were rung by Diaz or Younis. All were rung by co-workers – not managers. Becker Decl., Exhibit G. See also Supp. Cox Decl., ¶¶ 4-6.

184.    Plaintiff testified that managers Denis and Viktoria approved sending merchandise to a state for herself that did not have taxes for the purpose of avoiding taxes. Exh. 1, Mikh. Dep., 74:7-22. When asked which manager approved Plaintiff mailing bags to New Hampshire to avoid sales tax Plaintiff testified Denis Diaz and testified that management was doing it too. Mikhaylova Dep., 71:8-15.

**Defendants' response:** Undisputed that Mikhaylova testified to this. Disputed, however, in that there is any admissible evidence in the record to prove that this occurred. Plaintiff's testimony changed on this topic throughout questioning. However, when pointedly asked if Denis Diaz told her she could mail product out of state to avoid taxes, Mikhaylova stated: "Did he say, no. But he has rung me up and I gave him the address." Mikhaylova Dep., p. 75:13-18. She continued to state that he knew she was buying the bag for herself and mailing out of state because he

saw her "try on the bag." He rung up her sale and she gave him the address. When pushed on the question of whether Diaz ever stated it was okay to mail items out of state to avoid taxes, Plaintiff then stated that she did not recall. Mikhaylova Dep., pp. 75:13-76:4. Plaintiff's conclusory statements that everyone was doing it or that managers knew what she is doing is not admissible evidence as there is no proof as to what any manger saw or knew. When asked if she ever spoke to Younis about mailing product out of state, Mikhaylova once again, did not recall. Mikhaylova Dep., p. 76:5-23. Of the 28 receipts involved in the investigation that led to her termination, none were rung by Diaz or Younis. All were rung by co-workers – not managers. Becker Decl., Exhibit G. See also Supp. Cox Decl.,, ¶¶ 4-6.

185.    Plaintiff testified that former manager, Viktoria Somek told plaintiff that everybody mails products out of state to avoid tax. Exh. 1, Mikh. Dep., 74:19-75:6.

**Defendants' response:** Undisputed that Mikhaylova testified to this. Disputed, however, in that there is any admissible evidence in the record to prove that this occurred.

186.    Chris Castellani did not tell plaintiff that it was against policy to send items for her personal use out of state for the purpose of avoiding taxes. Exh 1, Mikhaylova Dep. P. 129:22-130:4.

**Defendants' response:** Disputed. Plaintiff says she does not recall, but that does not mean that Castellani did not tell her. In addition, in her handwritten statement, Mikhaylova admits she now knows this is inappropriate ("I now understand that it is a problem to ship things out of state to avoid taxes.") She clearly learned that she was violating policy during her interview. It is unclear who told her that if Castellani did not. Becker Decl., Ex. F, BLM 1894.

187.    The Company allowed employees to send items to states to avoid paying taxes. exh 1, Mikhaylova Dep. P. 129:3-130:12, 131:10-20.

**Defendants' response:** Disputed. In the cited testimony Mikhaylova basically admits that

she feels the company let her do it because no one stopped her. She noted that Saks has a process that if you try to mail out of state to avoid taxes, Asset Protection is immediately notified. She then goes on to state that since Bloomingdale's did not automatically stop her, it was allowed. Her allegations that everyone was allowed to do it is not supported by the record. Anyone who admitted to tax evasion – as an only policy violation or in conjunction with other policy violations – has been discharged or prevented from being rehired if they resigned. The employees that Asset Protection were able to find from searching their database for tax evasion are set forth in a summary attached to Fred Becker's declaration. Becker Decl., Ex. H. The termination information for those same employees is attached to Courtney Cox's Declaration as Ex. L. Employee 72664210 was discharged, see document number BLM2258; 72043055 – BLM2262; 72026718 – BLM2233; 72028976 – BLM2227; 72048359 (Plaintiff lists the number as 72043089) – BLM2191; 72001188 – BLM2201; 72071094 – BLM2237 (Resign – No Rehire); 72063603 – BLM 2197 (Resigned – No Rehire – implicated Mikhaylova in diversion); 72063570 – BLM2222; 72607568 – BLM2216 (implicated Mikhaylova in diversion); 72051456 – BLM2269; 72029423 – BLM2253; 72073466 – BLM2249.

188.    No policy saying cannot ship gifts out of state. Castellani Dep p. 50:16-19.

**Defendants' response:** Undisputed that no policy prevents an employee from mailing a legitimate gift out of state.

189.    Since 2014 other employees in the Chanel handbag department have informed Defendants that it was common practice and known and approved by the brand manager for Chanel that customers and associates ship to states to avoid taxes. Exh. 21BLM 2229-2230.

**Defendants' response:** Undisputed that this was stated by an employee in 2014 according to the summary. However, as the document is not sworn, and is at least double hearsay, it is not

admissible for purposes of opposing a summary judgment motion.

190.    Castellani testified that he could not recall Plaintiff stating that other employees including managers were shipping out of state to avoid taxes. Ex.5, Castellani Dep. P. 66:24-67:14.

**Defendants' response:** Undisputed that Castellani said that in his deposition. Also undisputed that claim is not in her handwritten statement. Becker Decl., Ex. F.

191.    During Plaintiff's employment and while Chanel was still "owned" not leased, Defendants' employees were allowed to ship gifts to states that have zero tax if it was a gift being sent. Younis Depo, P. 33:2- 36:6-21, 37:1-18.

**Defendants' response:** Undisputed that Younis said that if it was truly a gift for someone else and not for the employee or part of a diversion scheme, it could be mailed to the state where the gift recipient lived.

192.    During Plaintiff's employment, Defendants did not have any specific policies about purchasing gifts but had very strong language about diversion that whoever is making a purchase and using your employee discount that it is for yourself. Younis Depo, P. 36:6-23, 37:1-18,

**Defendants' response:** Disputed as phrased. Younis testified that in 2017 if a gift was truly a gift for someone else and not for the employee or part of a diversion scheme, it could be mailed to state where the gift recipient lived. Younis' testimony is also that Chanel and Bloomingdale's both had strong language around diversion. Bloomingdale's had strong language about ensuring an employe was using their discount just for themselves.

193.    Defendants changed their policies after Plaintiff's employment and when Chanel went leased instead of owned. Younis Depo, P. 34:2-35:13.

**Defendants' response:** Dispute as stated. Younis testified that Chanel has taken its shipping in-house three or four years ago and now runs its own shipping and receiving department

out of the store. Additionally, customers and employees can only ship product to the address on their driver's license. There are some states where shipping is not permitted in the absence of a valid driver's license.

194.   After Plaintiff's termination, Defendants changed their shipping policies where employees cannot ship a purchase unless there is a valid driver's license that says the customer lives in that state. Younis Depo, P. 34:2-35:13.

**Defendants' response:** Disputed to the extent the implication is that Plaintiff's termination was related to the shipping change. Younis testified the changes were tied to Chanel bringing all shipping in-house. She testified that change occurred 3 to 4 years ago – a year or more after Plaintiff's discharge.

195.   After Plaintiff's termination, when Younis asked Law what Younis and Diaz should be doing on their end, Law told Younis "my suggestion would be to reinforce to all associates that they are to adhere to all store policies and procedures. If they have a question about a policy or procedure, they should consult with a manger before proceeding." Exh. 10, bates BLM1535.

**Defendants' response:** Undisputed that is what Law stated.

196.   Plaintiff testified she emailed Law on June 8, 2017 asking if her pregnancy was related to the investigation because she felt that ever since she announced her pregnancy and need for an accommodation, the problems happened because she did not have issues before. She had been buying since December but they started questioning in May or June for purchases that she made in February and she was doing what everyone else was doing. Mikhaylova Dep. P. 132:15-133:33.

**Defendants' response:** Undisputed Mikhaylova provided that self-serving answer. However, she ignores the fact that she had already been questioned in February for issues related

to her possible involvement in fraud and it cannot be disputed that she was not pregnant at that time. In addition, her answer ignores that the investigations that came after February were started outside the store location by people who did not know her and certainly did not know she was pregnant. Her answer ignores the fact that she admitted to mailing merchandise out of state in violation of the Code of Conduct. Finally, her answer ignores the fact that she spent over $264,000 in purchases in an eight-month period that included 46 Chanel bags and 29 pair of shoes – all in violation of company purchase limits policy and with no visible means of paying that much money for Chanel product. Moving Gerber Decl., Ex. K; Becker Decl., ¶¶ 7, 17-19, Exs. A, C-G; Castellani Dep., pp. 35:9-37:4; 77:17-78:4; 79:15-82:15, 84:6-23; 104:6-105:7, Ex. 4.

## **Accommodations for FMLA/Disability/Pregnancy**

197.    Defendants have not given pregnancy related accommodation other than a lactation room. Law Dep. P. 29:3-30:3.

**Defendants' Response**: Disputed and misstates Law's testimony. Law testified that accommodations are determined by a central part of the company – Centers of Expertise. They would review medical documentation. When approved, it would come to the store and Richard Law or others in human resources to determine how to implement in the store. He was asked about the accommodations he was involved with and then asked about pregnancy accommodations. He testified that the only pregnancy accommodation he could recall was a lactation room. He then stated he did not recall specific pregnancy accommodations. When asked how he determined what accommodations would be given, he stated he worked with the department to see what could be done to meet the restrictions. Law Dep., pp. 27:4-30:14. Younis also testified about accommodations for pregnant women. Younis Dep., pp. 97:5-100:1; 102:4-103:17.

198.    The only accommodations provided to employees for pregnancy related conditions

is FMLA leave. Law Dep. P. 155:10-18.

**Defendants' Response**: Disputed and misstates Law's testimony. Law testified that if a request for accommodation was approved by the corporate office, it would be honored in the store. When asked what pregnancy related accommodations were given in the store, Law stated that various accommodations were given. He specifically recalled weight limit restrictions as being the most common. He could not recall others off the top of his head. He stated that was a general medical accommodation. When ask to specify what he recalled as far as accommodations for pregnancy, all he could recall was intermittent leave. He did not say there were no others – he stated he could not recall them. Law Dep., pp. 154:7-155:18. Cathy Younis recalled that the company had very generous leave programs for pregnant mothers. She specifically mentioned that extra breaks or time off the floor were accommodations given for pregnancy. Younis Dep., 97:5-100:1; 102:4-103:17.

199.     Plaintiff testified she was not allowed to sit down or lean on the counter and Younis told her to stand up and not lean. Exh 1, Mikhay Dep. P. 99:7-17.

**Defendants' Response**: Undisputed that Mikhaylova made that statement in her deposition. Denied that Mikhaylova ever provided medical documentation that stated she should be allowed to lean on the counters or sit while on the selling floor. Ex. 10, BLM 768. Mikhaylova admits she was allowed her breaks in the breakroom. She was also allowed to be late without any write ups after her write up in April 2017. She felt being asked why she was late was inappropriate and they should have just assumed she was late because she was pregnant. Mikhaylova Dep., pp. 99:7-101:6; 102:2-23; Cox Decl., ¶ 34 Ex. K.

200.     Law denied ever receiving a complaint of pregnancy discrimination and/or retaliation. Law Dep. P. 22:25-23:4.

**Defendants' Response**: Undisputed.

201.    Younis testified that managers such as Diaz decided which accommodations to give for pregnancy related conditions including breaks, time off the floor, etc. Younis Dep. P. 98:22-99:11.

**Defendants' Response**: Undisputed Younis made that statement. Additionally, Law testified that once an accommodation was approved, he worked with the department manager to see what could be done to meet the restrictions. Law Dep., pp. 27:4-30:14.

202.    Alla Bershadskaya ("Bershadskaya") was employed by Defendants from 2005 until August 31, 2019 as a Sales Associate in the handbag department at Defendants' flagship store, 160 East 60th street New York, NY 10022. Exhibit 9, BLM 1196-1201.

**Defendants' Response**: Undisputed that those allegations are set forth in the complaint. Disputed that an unsworn the complaint is a sufficient mechanism to establish opposing facts for summary judgment. Thus, the facts are not established as true. Also, this complaint is irrelevant to the claims at issue in this matter.

203.    Between June 2019 and August 2019, Defendants had Bershadskaya file for FMLA intermittent leave of absence for future leave to assist her mother with her mother's medical treatment and condition.

**Defendants' Response**: Undisputed that those allegations are set forth in the complaint. Disputed that an unsworn the complaint is a sufficient mechanism to establish opposing facts for summary judgment. Thus, the facts are not established as true. Also, this complaint is irrelevant to the claims at issue in this matter.

204.    Defendants terminated Bershadskaya's employment on August 31, 2019 while her FMLA leave application was still pending. Exhibit 9, BLM 1196-1201

**Defendants' Response**: Undisputed that those allegations are set forth in the complaint. Disputed that an unsworn the complaint is a sufficient mechanism to establish opposing facts for summary judgment. Thus, the facts are not established as true. Also, this complaint is irrelevant to the claims at issue in this matter.

205.    On August 10, 2020 Bershadskaya filed a lawsuit against Defendants for discrimination, unlawful interference,  retaliation, and unlawful termination for seeking future intermittent FMLA leave of absence. Exhibit 9, BLM 1196-1201.

**Defendants' Response**: Disputed that those allegations are set forth in the complaint. The only claims alleged were for "Interference and/or Retaliation Under the Family and Medical Leave Act." Disputed that an unsworn the complaint is a sufficient mechanism to establish opposing facts for summary judgment. Thus, the facts are not established as true. Also, this complaint is irrelevant to the claims at issue in this matter.

206.    That lawsuit was settled around February 9, 2021 and the case was closed on February 10, 2021. SDNY, Docket Number 20-cv-06271.

**Defendants' Response**: Undisputed that the case was resolved and dismissed in February 2021. Disputed that this is a sufficient mechanism to establish opposing facts for summary judgment. Thus, the facts are not established as true. Also, this complaint is irrelevant to the claims at issue in this matter.

207.    Defendants hired Angela Kotsovolos ("Kotsovolos") on February 17, 2004 as the Manager in the Women's Alterations Department for Defendants 59th street flagship store at 1000 Third Ave. New York, NY 10002. Exh. 17, BLM 1383-1388.

**Defendants' Response**: Undisputed that those allegations are set forth in the referenced demand letter submitted by Kotsovolos' son. Disputed that an unsworn demand letter is a sufficient

mechanism to establish opposing facts for summary judgment. Thus, the facts are not established as true. Also, this letter is irrelevant to the claims at issue in this matter.

208.    Around March 2, 2020, Kotsovolos made a formal complaint of discrimination against co-worker Surazhsky to Human Resources for age and disability discrimination. Defendants failed to respond and/or address Kotsovolos' complaint. Exh. 17, BLM 1383-1388.

**Defendants' Response**: Undisputed that those allegations are set forth in the referenced demand letter submitted by Kotsovolos' son. Disputed that an unsworn demand letter is a sufficient mechanism to establish opposing facts for summary judgment. Thus, the facts are not established as true. Also, this letter is irrelevant to the claims at issue in this matter.

209.    Rather, three months after Kotsovolos made her complaint, Defendants terminated Kostovolos due to alleged workforce reduction. However, Defendants Surazhsky did not also fire Surazhsky but rather promoted Surazhsky (with 4 months of experience) to replace Kotsovolos (with 16 years of experience). Exh. 17, BLM 1387.

**Defendants' Response**: Undisputed that those allegations are set forth in the referenced demand letter submitted by Kotsovolos' son. Disputed that an unsworn demand letter is a sufficient mechanism to establish opposing facts for summary judgment. Thus, the facts are not established as true. Also, this letter is irrelevant to the claims at issue in this matter.

210.    Former employee Theodora Nikolakopoulos sued Defendants for disability discrimination, interference and retaliation with FMLA during her employment around April 2017. exhibit 18 to be attached BLM001148-001195.

**Defendants' Response**: Undisputed that those allegations are set forth in the referenced complaint other than the date of April 2017. Nikolakopoulos was discharged in January 2020 according to the allegations. Disputed that an unsworn complaint is a sufficient mechanism to

establish opposing facts for summary judgment. Thus, the facts are not established as true. Also, this complaint is irrelevant to the claims at issue in this matter.

211.    Around April 2017, Nikolakopoulos requested a reasonable accommodation and made a complaint of discrimination to Law. Exh. Law Dep., p. 146:14-150:12; exhibit 18 BLM001148-001195.

**Defendants' Response**: Undisputed that those allegations are set forth in the referenced complaint. Disputed that an unsworn complaint is a sufficient mechanism to establish opposing facts for summary judgment. Thus, the facts are not established as true. Moreover, as shown in the testimony in the cited deposition pages, Law had limited recall of this former employee. Also, this complaint is irrelevant to the claims at issue in this matter. Of note, this case was dismissed on summary judgment. Case No. 20 CV 1641, docket numbers 123 and 124.

212.    On October 4, 2020 former employee Heidi Dakter filed a complaint in the southern district of new York against Defendants for discrimination on the basis of her sex, and pregnancy and unlawful interference with her FMLA leave during her employment with Defendants at the 59th street location around December 2017. Exh. 26, BLM 1202-1211. That case settled after prediscovery. Exh. 26, BLM 1202-1211.

**Defendants' Response**: Undisputed that those allegations are set forth in the complaint. Disputed that an unsworn the complaint is a sufficient mechanism to establish opposing facts for summary judgment. Thus, the facts are not established as true. Also, this complaint is irrelevant to the claims at issue in this matter.

<u>**Sex/Gender Discrimination/ Hostile Work Environment**</u>

213.    Booker would unwelcomingly visit Plaintiff on a daily basis and touch her arm, hold her elbow and shoulders. Ex. 11, paragraph 6 and 10; Ex 1, Mikhay Dep. P. 49:8-56:23.

**Defendants' Response**: Disputed. In her deposition, Mikhaylova mentioned that Booker hugged her when they both worked the same shift but denied any other touching. Mikhaylova Dep., p. 55: 22-25. She admitted that this was only when they worked the same shifts. There were shifts he worked and she did not, and vice versa. It was not a daily event. Exhibit 11 is the Declaration of Martha Weh who was discharged for diversion. The complete declaration should be stricken in that Weh has never been identified as someone with knowledge of Plaintiff's sexual harassment allegations. Weh was not disclosed on Plaintiff's Initial Disclosures nor did Plaintiff name her as someone with knowledge of Booker's alleged conduct. Mikhaylova Dep., 52:3-54:1. In addition, in paragraph 6, Weh states Booker's conversations were unwelcome. There is no factual foundation for this statement, and it is speculative and conclusory. Her comments in paragraph 10 regarding Mikhaylova's discomfort are also conclusions without factual support.

214.     Booker made sexually inappropriate comments to Plaintiff many times and Plaintiff's coworkers and managers were witnesses to these comments. Ex. 11, paragraph 7,10; Ex 1, Mikhay Dep. P. 51:11-56:23. Booker asked Plaintiff out, what she was doing later, asked her to a restaurant. Ex 1, Mikhay Dep. P. 51:11-61:6, 139:40-140:6.

**Defendants' Response**: Disputed. Martha Weh's complete declaration should be stricken in that Weh has never been identified as someone with knowledge of Plaintiff's sexual harassment allegations. Weh was not disclosed on Plaintiff's Initial Disclosures nor did Plaintiff name her as someone with knowledge of Booker's alleged conduct. Mikhaylova Dep., 52:3-54:1. In addition, Weh's comments in paragraph 7 that Booker made sexually inappropriate comments is conclusory and lacks any factual specificity. Unsupported speculation that other employees or managers saw the alleged conduct. Undisputed that Mikhaylova testified that Booker asked her out, asked what she was doing later and asked her to a restaurant. Mikhaylova alleged in the cited sections of her

deposition that Booker made other sexual comments to her but she cannot recall what they were due to the passage of time. Mikhaylova Dep., p. 138:23-140:11.

215.    When speaking to Plaintiff he would come in very close proximity and stare her straight in the eyes as though he was undressing her, look at Plaintiff's butt and chest all the time, and tell other employees in asset protection to look at Plaintiff's body. Ex. 11, paragraph 8; Ex 1, Mikhay Dep. P. 51:11-56:23, 151:1-156:17.

**Defendants' Response**: Disputed. Martha Weh's complete declaration should be stricken in that Weh has never been identified as someone with knowledge of Plaintiff's sexual harassment allegations. Weh was not disclosed on Plaintiff's Initial Disclosures nor did Plaintiff name her as someone with knowledge of Booker's alleged conduct. Mikhaylova Dep., 52:3-54:1. In addition, Weh's comments in paragraph 8 that Booker would look into Mikhaylova's eyes as if undressing her is conclusory and speculation on Weh's part as to what Booker's stare meant. Undisputed Mikhaylova stated Booker would look her in the eyes and she also stated he looked at her butt and chest. Plaintiff also testified to her belief that Booker told other employees in Asset Protection to come and look at her butt. No one told her this but she testified that she could read his lips. This testimony is speculative and unsupported by nothing other than Plaintiff's belief that people coming into the department were looking at her butt and did that because of Booker.

216.    Booker ignored all of Plaintiff's rejections by coming closer, laugh, and take no for an answer. Ex. 11, paragraph 8; Ex 1, Mikhay Dep. P. 58:1-58:19.

**Defendants' Response**: Disputed. Martha Weh's complete declaration should be stricken in that Weh has never been identified as someone with knowledge of Plaintiff's sexual harassment allegations. Weh was not disclosed on Plaintiff's Initial Disclosures nor did Plaintiff name her as someone with knowledge of Booker's alleged conduct. Mikhaylova Dep., 52:3-54:1. In addition,

Weh's comments in paragraph 8 are conclusory and speculative. Undisputed that Mikhaylova testified Booker would laugh when she told Booker to leave her alone.

217.    Plaintiff did not report Booker's comments because management and associates were witnesses. Mikhaylova Dep. P. 56:11-57:14, 152:15-153:8,

**Defendants' Response**: Partially Disputed. Undisputed that Mikhaylova made this statement but when pressed to name the persons who allegedly witnessed the conduct, she admitted that she could not recall. There is no evidence of the persons who allegedly witnessed this conduct. 152:15-153:19.

218.    Plaintiff complained to Diaz several times that Booker made her feel uncomfortable. Ex 1, Mikhay Dep p. 56:16-59:13.

**Defendants' Response**: Partially disputed. Undisputed that Mikhaylova testified she told Diaz that Booker made her uncomfortable. Disputed as to the number of times Mikhaylova allegedly said this to Diaz. When pressed, she stated she could not recall how many times she told Diaz this or his responses. Mikhaylova Dep., p. 57:11-16. Diaz does not recall Booker and never saw any inappropriate conduct of the type alleged by Mikhaylova. Diaz Dep., pp. 61:24-62:24.

219.    Booker had his own office. Booker Dep. P. 28:11-21.

**Defendants' Response**: Disputed. In the cited testimony, Booker stated he had a desk in the Asset Protection Office. He did not state he had his own office. This fact is also irrelevant to the issues in the case.

220.    Booker testified to speaking to female employees in the Chanel handbag department at 59th street. Exh. 8, Booker Dep. P. 69:19-24.

**Defendants' Response**: Partially disputed on the basis that the statement is incomplete. Booker testified he spoke to both men and women at Chanel but he did not recall Mikhaylova

specifically.

221.    Booker testified that inappropriate comments which is subjective for the most part individuals and the conversation and those in earshot are off limits. Exh. 8, Booker Dep. P. 55:5-56:20.

**Defendants' Response**: As stated, this fact makes no sense. However, when reading the citation, when asked about whether any comments were off limits under Bloomingdale's policy, Booker stated inappropriate comments were off limits. He noted, however that whether something was inappropriate was for the most part subjective to those in the conversation and those who might overhear it (in earshot). It is undisputed that was his testimony as stated by Defendants. He stated later that comments that were overtly harassing – both sexual and nonsexual – were not appropriate. Booker Dep., p. 55:5-25. He continued to give an example that commenting on a customer's body would not be appropriate. Conversations about having an affair or cheating on your relationship were also not the type of conversation that should happen at work. Booker Dep., p. 56:1-57:2.

222.    Booker testified that depending on the situation he would report someone complimenting another female's body; and that if he hears two people having a conversation that is not outwardly inappropriate there's no reason to report them because of their relationship. Exh. 8, Booker Dep. P. 53:20-56:20.

**Defendants' Response**: Disputed as it misstates Booker's testimony. Booker was responding to a question about whether he would report any conversation that he overheard in which someone was complimenting a woman's body. He responded it would depend on the situation. His example was if he knew the two people were very good friends and they are comfortable with each other, he would likely not report them for having a personal conversation that both parties were

comfortable with based on their relationship.

223.    Booker testified that if you're in their space and they are joking and having a good time and no one steps away or appears they are uncomfortable then they are comfortable with the conversation. Exh. 8, Booker Dep. P. 53:20-56:20.

**Defendants' Response**: Disputed as it misstates Booker's testimony and is non-sensical as stated. Booker was responding to a question about whether he would report any conversation that he overheard in which someone was complimenting a woman's body. He responded it would depend on the situation. His example was if he knew the two people were very good friends and they are comfortable with each other, he would likely not report them for having a personal conversation that both parties were comfortable with based on their relationship. When asked how he would deduce if someone were comfortable with the conversation, Booker stated by way of example he would look to see if they were joking and having a good time, whether someone stepped away or appeared to him to be uncomfortable or looking for someone to assist them.

224.    Booker testified there are innocent touches versus inappropriate touches when asked if any physical touch is considered sexual harassment or discrimination according to Bloomingdales' policies. He testified it was a gray area. Exh. 8, Booker Dep. P. 56:20-57:13.

**Defendants' Response**: Undisputed that Booker made the statements referenced. He further clarified his comments by noting the situation would be based on the specific circumstances. He then identified what he considered an innocent touch: hello/good-bye hug, handshake or pat on the back. Booker Dep., p. 57:4-17.

225.    Defendants offered Booker a severance package to leave his position in early 2018.

**Defendants' Response**: Plaintiff has no citation to the record for this fact and it should be denied. However, it is undisputed that Booker left during a reorganization and was given a severance

package Booker Dep., p. 17:17-25.

### Plaintiff's Termination/Discrimination/Retaliation

226.    Plaintiff was the first and only employee defendants terminated for violating the handbag policy by exceeding the purchase limits. Law Dep. P. 151:15-152:8.

**Defendants' Response:** Disputed. In the cited testimony, Law stated that Mikhaylova was the first employee he had discharged for exceeding purchase limits, but it was clear he was not speaking for anyone else in the company. Other human resources managers in the building (there was a team of human resources executives in the 59th Street location – at least five others were named by Law) could have discharged someone for that policy violation. Law Dep., p. 16:16-25; 24:11-25:4. Additionally, he also referred to Martha Weh who was terminated for diversion as someone else who may have been discharged for violating purchase limits.

227.    Defendants reported to the Department of Labor the reason for Plaintiff's termination was that plaintiff was terminated because Plaintiff "evaded taxes on purchases she made by shipping the items out of state and exceeded purchase limits on merchandise by category. She admitted to avoiding NYS sales tax and acknowledged that she made an excessive amount of purchases. Explanation given was that she wanted to take advantage of the associate discount before department changes occurred." Exh. 22 , BLM 901-911.

**Defendants' Response:** Disputed as stated. A third-party entity hired by Defendants submitted the questionnaire. There is no information on the document about who provided the stated information. Undisputed that the quoted verbiage appears on BLM 901.

228.    However last charge was on April 21, 2017 and she paid taxes but she rang up Tyler Rose who sent to Yu Yu Lai and they said her last date of violation to DOL was 4/21/2017.Ex 10BLM 1572 and Plaintiff's statement from April 2017 shows plaintiff paid taxes on her handbags.

Exh 12, Mikhyalova 525.

**Defendants' Response:** Disputed because all statements are not supported by the citations to the evidence. Mikhaylova 525 is not in Exhibit 12. Undisputed that Mikhaylova rang up the purchase that Rose was investigated for sending to YuYu Lai as shown on the page in Exhibit 10. This occurred on April 21, 2017. There is no citation to the unemployment records but from the previous fact and citation, it undisputed that BLM 901 states the "final incident" occurred on April 21, 2017. There is no record evidence of who provided that information or to what it refers. When reviewing Mikhaylova 525 from the produced records, she did appear to pay sales tax on the purchases on that statement. Mikhaylova 525 also shows that she spent over $24,000 on Chanel handbags in that month alone.

229.    The only evidence defendants had to state Yu Yu Lai was a reseller was statements from Plaintiff's coworkers. These statements were received after Plaintiff's termination (June 16, 2017) and before Defendants' decision to the Union grievance committee not to reinstate plaintiff. (November 17, 2017). Castellani Dep. P.117:3-118:7.

**Defendants' Response:** Disputed as stated. Castellani also mentioned that his team also looked at YuYu Lai's website and articles about her selling merchandise. There is also no other reason so many employees would be sending her their purchases.

230.    Castellani testified that at the time he suspended Plaintiff he did not know if shipping out of state to avoid taxes was illegal. Castellani Dep. 62:13-63:24.

**Defendants' Response:** Disputed as stated. Castellani stated that he had not consulted an attorney to see if evading taxes was illegal but he believed that it was "legally not allowed."

231.    Abraham Gonzalez worked in Central Investigations and partnered with the Asset Protection team to investigate Plaintiff. Castellani dep. P. 80:12-23;109:21-110:3, Exh 10 BLM

1883-1905.

**Defendants' Response:** Disputed as stated. The documents demonstrate that an MCCS employee in Ohio reached out to Abe Gonzalez in Central Investigations because of irregularities in Plaintiff's account. Gonzalez then reached out to Castellani to ask that he investigate the issue to see if the Plaintiff was a diverter and/or otherwise violating the discount policy. The citation to Castellani's deposition at p. 109-110 is referring to the Tyler Rose investigation and not the investigation into Mikhaylova. It is undisputed the Central Investigations worked with the store Asset Protection team to protect the company from employees like Mikhaylova who were violating the discount policy and/or diverting.

232.    Performance and conduct includes lateness, sales, and productivity. Diaz Dep. 36:21-37:14.

**Defendants' Response:** Disputed as stated. The cited testimony addressed whether Diaz conducted annual performance reviews for those employees reporting to him. He testified he did those in conjunction with Younis or another manager. This fact is not relevant to the issues in this case.

233.    Diaz oversaw and managed the conduct and performance of Defendants' Chanel handbag department employees. Diaz Dep. 36:21-37:14.

**Defendants' Response:** Disputed as stated. The cited testimony addressed whether Diaz conducted annual performance reviews for those employees reporting to him. He testified he did those in conjunction with Younis or another manager. This fact is not relevant to the issues in this case.

234.    Diaz was responsible for checking the employees' sales everyday and who made the most in a month. Exh. Diaz Dep. P. 83:12-25.

**Defendants' Response:** Undisputed that Diaz checked the amount of sales for the employees reporting to him. Disputed that the cited section says this was done every day. The testimony is that he checked sales on a monthly basis.

235.    Productivity is measured by whatever the total sales were for the month divided by the number of associates and then take into account the number of hours worked and then it would look at where they would fall in their hourly sales. That would determine whether an associate was falling below the average or above. Diaz Dep. P. 105:11-106:3.

**Defendants' Response:** Undisputed that Diaz testified that this was his best recollection but he did not remember the precise formula. He also stated this was to determine whether employees were meeting the department productivity standard. This fact is not relevant to the issues in this case.

236.    Plaintiff's termination code – 529 Misconduct/Policy Violation – encompasses numerous issues including any policy violations or misconduct. Exhibit 14, Rog. No. 15. defs Resp to Plaintiffs Interrog Req. dated May 12, 2021.

**Defendants' Response**: Undisputed and irrelevant.

237.    Younis testified Plaintiff was not a top producer nor was there an investigation into her sales. Younis depo p. 48:1-9.

**Defendants' Response**: Disputed, as Plaintiff misstates Younis' testimony. Younis stated on the page before the cited section that Mikhaylova was a top producer. The cited section dealt with whether there was an investigation into Mikhaylova being a "top producer." Younis Dep., 47:19-48:9. That is not the same thing as an investigation into her sales.

238.    Becker testified Plaintiff was terminated because she rang transactions and did not charge state taxes. Becker Dep. P. 41:5-14.

**Defendants' Response:** Disputed, as Plaintiff misstates Beckers' testimony. Becker stated the investigation was around avoiding taxes but it was all presented to human resources who made the termination decision.

239.    Defendants did not find plaintiff to be reselling. Becker Dep. P. 47:12-15.

**Defendants' Response:** Disputed, as Plaintiff misstates Becker's testimony. He stated his understanding of the findings were "more on an avoidance of taxes." He did not say there was no finding of reselling. Law testified that he believed, based on the facts of the investigation, that Mikhaylova was not just a reseller but a diverter, and that played in a role in his decision to terminate her employment. There is no other explanation for an employee who earns a little over $100,000 a year spending $264,000 on handbags, shoes and other brand name products in an eight month period. Additionally, a significant amount of the purchases was mailed to a UPS Store to varied names and to various mailboxes – some even listing a business. Others who worked with Mikhaylova who also mailed to the same address stated they were working with a diverter and that Mikhaylova had gotten them involved. Moving Gerber Decl., Ex. K, Law Dep., pp. 88:3-17; 124:3-125:2; 171:13-23; 177:2-5; Becker Decl., Ex. F, G and H; Mikhaylova Dep., pp. 207:22-208:11.

240.    Plaintiff never received reimbursement for any of her purchases.**;** Mendoza Decl., Exhibit 12, MIKHAYLOVA_00154.

**Defendants' Response**: Undisputed that Mikhaylova claims she was not reimbursed but that is not supported by the evidence. Mikhaylova spent $264,000 on purchases in an eight-month period and there is no obvious source of the money.

241.    Plaintiff did not violate company policy by using her discount to purchase gifts for family and friends. Law Dep. P. 125:13-24.

**Defendants' Response:** Misstates Law's testimony. He was responding to a hypothetical

– not the facts in this case. He never testified that he felt Mikhaylova's actions in this case did not violate policy. The issue is that Mikhaylova was not purchasing gifts for family and friends. She admitted in her written statement that she was sending to YuYu Lai to avoid taxes. She further testified that Lai brought the merchandise back to her in New York. The packages were undisputedly not going to family and friends. They were going to YuYu Lai – a known diverter. While Mikhaylova alleged in her written statement that she was sending to various people so as not to burden any one person, the addresses were all to the same UPS Store. Mikhaylova Dep., pp. 65:25-67:12; 68:5-18; 198:7-199:20; Becker Decl., ¶ 20, Ex. F.

242.    Law testified that nothing was proven Plaintiff was a diverter. Law Dep. P. 125:3-8.

**Defendants' Response:** Undisputed that Law testified he could not prove that Mikhaylova was  diverter. However, Law believed based on the facts he had that Mikhaylova was a diverter and that played in a role in his decision to terminate her employment. There is no other explanation for an employee who earns a little over $100,000 a year spending $264,000 on handbags, shoes and other brand name products in eight months, on a prepay account, with no obvious means of paying that amount of money. Additionally, a significant amount of the purchases was mailed to a UPS Store to varied names and to various mailboxes – some even listing a business. Others who worked with Mikhaylova and mailed to the same address stated they were working with a diverter and that Mikhaylova had gotten them involved. Moving Gerber Decl., Ex. K, Law Dep., pp. 88:3-17; 124:3-125:2; 171:13-23; 177:2-5; Becker Decl., Ex. F, G and H; Mikhaylova Dep., pp. 207:22-208:11.

243.    Plaintiff paid New York taxes on most if not all of her purchases. Castellani Dep. p. 49:23-; Younis Decl. Exh. D.

**Defendants' Response:** Disputed and duplicative. Plaintiff misstates Castellani's

testimony. He stated unequivocally that Plaintiff did not pay sales tax on the bags mailed to New Hampshire and Mississippi. Castellani testified that Mikhaylova paid sales tax on "some purchases" and specified it was on those purchases not shipped to a state without sales tax. Castellani Dep., pp. 49:23-50:15.

244.    Plaintiff was terminated by asset protection for not following policy and procedure. Younis Dep. p. 48:12-18.

**Defendants' Response**: Disputed. In the cited section, Younis said "terminated from Asset Protection" which is unclear at best. Asset Protection did not discharge Plaintiff but investigated her conduct. Castellani Dep., pp. 60:12-25; 106-9-19. Law alone made the termination decision. Law Dep., pp. 37:12-38:7; 46:20-48:17; 80:17-81:6; 171:13-23. Additionally, Richard Law advised Younis and Diaz of Mikhaylova's termination. Younis then reached out to Richard Law after the termination to understand what issues she needed to address with her team in light of the termination. Law told her to reinforce all policies and procedures. Younis Dep., pp. 48:20-52:18. It is not disputed that Mikhaylova was discharged for violating several policies.

245.    Defendants replaced Plaintiff with a male employee named Zaid. Exh. Diaz Dep. P. 81:16-82:8.

**Defendants' Response**: Disputed, as this claimed fact misstates Diaz's testimony. Diaz stated he did not recall who replaced Plaintiff but he did not think it was Zaid Constantine because he started much later.

246.    Rose shipped to two of the same addresses as Plaintiff. Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577.

**Defendants' Response**: Disputed. The investigation into Rose's conduct revealed one transaction on April 21, 2017 that was mailed to the same address that Mikhaylova had mailed to:

373 S. Willow Street Unit 204 in Manchester, New Hampshire 03103. Plaintiff's Ex. 10, BLM 1576 (under section addressing violations).

247.    Rose was not terminated nor did he receive any disciplinary action against him. Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577.

**Defendants' Response**: Undisputed that Law did not believe he had sufficient facts to allow him to take action against Rose based on the Asset Protection investigation in 2017. Law Dep., pp. 128:8-142:12; 168:4-12, Ex. I.

248.    Law nor anyone in HR inquired into Rose's performance. Law Dep. P. 126:4-134:14; Exh. 10, bates BLM1576-1577. HR inquired into Plaintiff's personnel file and performance prior to making the decision to terminate Plaintiff's employment. Exh 10, bates BLM 1516-1518.

**Defendants' Response**: Undisputed that no one looked into Rose's performance. Disputed that anyone looked into Plaintiff's performance. The citation for that issue is a series of unsworn emails. While one email was someone asking Richard Law about Plaintiff's performance, he referred the inquirer elsewhere. There is no evidence Law reviewed Mikhaylova's performance before making his decision on her diversion and other policy violations. Law alone made the termination decision. Law Dep., pp. 37:12-38:7; 46:20-48:17; 80:17-81:6; 171:13-23. Moreover, this issue is not relevant. Performance has nothing to do with whether Mikhaylova violated company policies nor is there any difference between how Mikhaylova and Rose were treated on this issue.

249.    Rose refused to write and sign a statement even though was pressured into writing a statement several times by Asset Protection and risk facing termination. Exh. 10, bates BLM1576-1577.

**Defendants' Response**: Disputed as to the characterization that Rose was pressured by Asset Protection. The cited documents show that Rose was asked to write a statement and he declined. There is no support for the argument that Rose was pressured to write a statement.

### Miscellaneous

250.   Cox was not produced as the corporate representative to address the discount policies. Exh. Cox Dep. P. 34:8-35:9. Cox was produced to discuss discrimination, sexual harassment policies and training. Exh. Cox Dep. P. 34:8-35:9; Exh. 25 topics 1-4.

**Defendants' Response**: Disputed to the extent that there was not a request for a 30 (b)(6) witness on the topic of the discount policy and thus, no one was presented on that issue. There was a broad request for testimony about Defendants' credit cards and the division that handles the credit cards but that is not the same as the discount policy. When Defendants properly objected to these broad topics and stated a witness would be produced upon clarification, Plaintiff never responded further. Cox's Declaration laid the foundation for the business records attached to her declaration which includes the discount policy.

251.   Defendants state that their email retention policy is only 60 days, and emails for employees who terminate, unless subject to a litigation hold at the time the employment relationship ends, are not preserved beyond the last date of employment. Exh. 16, ¶4 Defs Resp. to Doc. Demands (1/21/2021).

**Defendants' Response**: Disputed to the extent this suggests some improper action by Defendants. This issue is also irrelevant to the motion pending before this Court. It is true that Defendants' email retention policy is sixty days, and emails for terminated employees, unless subject to a litigation hold at the time the employment relationship ends, are not preserved beyond the last date of employment. However, emails that were preserved in hard copy or that were

preserved in the mailbox of someone copied on an email, still existed at the time of litigation for some of those involved in facts of this matter. As required, Defendants made a diligent search for responsive emails. Relevant emails have been produced in this case. There is no evidence that any relevant emails were not properly preserved as of the first notice of this litigation nor is there any evidence that any relevant emails have not been produced.

252.     Absent a litigation hold at the time of Plaintiff's termination, Defendants' emails related to this action were deleted and/or do not exist. Exh. 16,  ¶4 All emails were deleted after 60 days unless saved on separate server. Exh. 10, BLM 16

**Defendants' Response**: Disputed to the extent this suggests some improper action by Defendants. This issue is also irrelevant to the motion pending before this court. It is true that Defendants' email retention policy is 60 days, and emails for terminated employees, unless subject to a litigation hold at the time the employment relationship ends, are not preserved beyond the last date of employment. However, emails that were preserved in hard copy or that were preserved in the mailbox of someone copied on an email, still existed at the time of litigation for some of those involved in facts of this matter. As required, Defendants made a diligent search for responsive emails. Relevant emails have been produced in this case. There is no evidence that any relevant emails were not properly preserved as of the first notice of this litigation nor is there any evidence that any relevant emails have not been produced.

253.     Since the events leading to the Plaintiff's termination occurred in mid-June 2017, unless the custodian's email was on a hold from a previous matter, no emails would have been saved from mid-June 2017. Exh. 16, ¶4

**Defendants' Response**: Disputed to the extent this suggests some improper action by Defendants. This issue is also irrelevant to the motion pending before this Court. It is true that

Defendants' email retention policy is 60 days, and emails for terminated employees, unless subject to a litigation hold at the time the employment relationship ends, are not preserved beyond the last date of employment. However, emails that were preserved in hard copy or that were preserved in the mailbox of someone copied on an email, still existed at the time of litigation for some of those involved in facts of this matter. As required, Defendants made a diligent search for responsive emails. Relevant emails have been produced in this case. There is no evidence that any relevant emails were not properly preserved as of the first notice of this litigation nor is there any evidence that any relevant emails have not been produced.

254.    Since Richard Law resigned effective December 17, 2017, and his account was not subject to a litigation hold at the time he left Bloomingdale's employ, his emails have not been preserved as they were gone before notice of Plaintiff's claims were served in April 2018. Exh. 16, ¶4.

**Defendants' Response**: Disputed to the extent this suggests some improper action by Defendants. This issue is also irrelevant to the motion pending before this Court. It is true that Defendants email retention policy is 60 days, and emails for terminated employees, unless subject to a litigation hold at the time the employment relationship ends, are not preserved beyond the last date of employment. However, emails that were preserved in hard copy or that were preserved in the mailbox of someone copied on an email, still existed at the time of litigation for some of those involved in facts of this matter. As required, Defendants made a diligent search for responsive emails. Relevant emails authored by Law have been produced. There is no evidence that any relevant emails were not properly preserved as of the first notice of this litigation nor is there any evidence that any relevant emails have not been produced.

Respectfully submitted,

By: _/s/ Steven Gerber_____

Steven Gerber
BARTON GILMAN LLP
165 Passaic Avenue, Suite 107
Fairfield, New Jersey 07004
Telephone: (973) 256-9000
Email:  sgerber@bglaw.com

By: _/s/ Betty Thorne Tierney_____

Betty Thorne Tierney (admitted *Pro Hac Vice*)
MACY'S, INC. LAW DEPARTMENT
11477 Olde Cabin Rd., Suite 400
Creve Coeur, Missouri 63141
Telephone: (314) 342-6728
Email: betty.tierney@macys.com

*Attorneys for Defendants, Bloomingdale's, LLC, Macy's, Inc. and Christopher Castellani*

Dated: October 3, 2023